```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,      Docket No. 16-20032-JAR

 4        Plaintiff,                Kansas City, Kansas
                                    Date:  09/07/2016
 5   v.

 6   LORENZO BLACK,
     KARL CARTER,
 7   ANTHON AIONO,
     ALICIA TACKETT,
 8   CATHERINE ROWLETTE,
     DAVID BISHOP,
 9
          Defendants.
10   ....................

11
                         TRANSCRIPT OF
12     HEARING ON ORAL MOTION TO APPOINT SPECIAL MASTER
              BEFORE THE HONORABLE JULIE A. ROBINSON
13               UNITED STATES DISTRICT JUDGE

14   APPEARANCES:
     For the Government:  Ms. Erin S. Tomasic
15                        Mr. D. Christopher Oakley
                          United States Attorney's Office
16                        500 State Avenue
                          Suite 360
17                        Kansas City, Kansas 66101

18                        Ms. Debra L. Barnett
                          United States Attorney's Office
19                        301 North Main Street
                          Suite 1200
20                        Wichita, Kansas 67202-4812

21                        Mr. Duston J. Slinkard
                          United States Attorney's Office
22                        444 Southeast Quincy
                          Suite 290
23                        Topeka, Kansas 66683-3592

24   For the Defendant Lorenzo Black:
                          (Appeared not)
25
     (Appearances continued on next page).
```

```
 1     APPEARANCES:

 2     (Continued)

 3

 4     For the Defendant Karl Carter:
                            Mr. David J. Guastello
 5                          The Guastello Law Firm, LLC
                            4010 Washington Street
 6                          Suite 501
                            Kansas City, Missouri 64111
 7
       For the Defendant Anthon Aiono:
 8                          Mr. Jason P. Hoffman
                            Hoffman & Hoffman
 9                          CoreFirst Bank & Trust Building
                            100 East Ninth Street
10                          Third Floor East
                            Topeka, Kansas 66612
11
       For the Defendant Alicia Tackett:
12                          Ms. Kathleen A. Ambrosio
                            Ambrosio & Ambrosio, Chartered
13                          800 Southwest Jackson
                            Suite 817
14                          Topeka, Kansas 66612

15     For the Defendant Catherine Rowlette:
                            Mr. Michael M. Jackson
16                          Attorney at Law
                            727 South Kansas Avenue
17                          Suite 2
                            Topeka, Kansas 66603
18
       For the Defendant David Bishop:
19                          Ms. Cynthia Dodge
                            Cynthia M. Dodge, LLC
20                          233 Southwest Greenwich Drive
                            Suite 10
21                          Lee's Summit, Missouri 64082

22     Court Reporter:      Kelli Stewart, RPR, CRR, RMR
                            Official Court Reporter
23                          259 U.S. Courthouse
                            500 State Avenue
24                          Kansas City, Kansas 66101

25
```

1                           I N D E X

2

     Government's Witnesses:                              Page
3
     SERGEANT WAYNE LEE BIGELOW
4      Direct Examination By Mr. Oakley                     67
       Cross Examination By Ms. Brannon                     80
5      Redirect Examination By Mr. Oakley                  100

6    LAURIE HARRISON
       Direct Examination By Mr. Oakley                    102
7      Cross Examination By Ms. Brannon                    108

8    DEPUTY U.S. MARSHAL MATTHEW CAHILL
       Direct Examination by Ms. Tomasic                   118
9      Cross Examination By Mr. Redmond                    123
       Redirect Examination By Ms. Tomasic                 135
10

11

12                        E X H I B I T S

     Government's
13     Exhibits            Offered          Received

14         1                 38                39
           2***              39                40
15         3                 40                41
           4                 40                41
16         5                 40                41
           6                 40                41
17         7                 41                41
           8                 58                59
18         9                 57                58
          10                 58                58
19    11 (Under seal)        42                42
          13 ***             --                65
20        14 ***             --                65
          15 ***             --                65
21        16 ***             --                65
          17 ***             --                65
22        18 ***             --                65
          19 ***             --                65
23        20 ***             --                65
      21 (Under seal)       135               136
24
     *** Subject to objection
25

1

2                           E X H I B I T S

3
     Defendant's
4    Exhibits              Offered              Received

5        450                 57                   59
         451                 57                   59
6        452                 57                   59
         453                 57                   60
7        454                 57                   60
         455                 57                   60
8        456                 57                   60
         457                 57                   60
9        458                 57                   60
         459                 57                   60
10       460                 57                   61
         461                 57                   61
11       462                 57                   61
         463                 57                   61
12       464                 61                   62
     (Under seal)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                 (1:38 p.m., proceedings commenced).

 2                 THE COURT:  All right.  You can be seated.

 3     All right.  We're here in United States versus Lorenzo

 4     Black, et al.  The case number is 16-20032.  Your

 5     appearances, please.

 6                 MR. SLINKARD:  Good afternoon, Your Honor.

 7     May it please the Court.  The government appears by

 8     Duston Slinkard, Debra Barnett, Christopher Oakley, and

 9     Erin Tomasic.

10                 THE COURT:  All right.  Defendants.

11                 MR. GUASTELLO:  May it please the Court.

12     David Guastello on behalf of Karl Carter, who has waived

13     his appearance for purposes of today.

14                 MS. DODGE:  Cynthia Dodge on behalf of David

15     Bishop, who appears in person.

16                 MR. JACKSON:  Your Honor, Catherine Rowlette

17     appears in person and by counsel, Mike Jackson, if it

18     please the Court.

19                 MS. AMBROSIO:  Your Honor, Ms. Tackett does

20     not appear, but appears by counsel, Kathleen Ambrosio.

21     She has filed a waiver of appearance, Your Honor.

22                 MR. HOFFMAN:  Mr. Aiono appears by and

23     through counsel, Jason Hoffman, Your Honor.

24                 THE COURT:  All right.

25                 MS. BRANNON:  Federal Public Defender

 1    appears through Branden Bell, Kirk Redmond, and Melody

 2    Brannon.

 3              THE COURT:  All right.  All right.

 4              MR. LAURANS:  Your Honor?

 5              THE COURT:  Yes.

 6              MR. LAURANS:  Interested party David Lougee

 7    appears by John Laurans.

 8              THE COURT:  All right.  As you know, we've

 9    had two hearings on these matters concerning the CCA

10    video and now audio-recordings and related issues to

11    that.  And I indicated that I intended to appoint a

12    special master in view of these many issues and

13    complicated issues and serious issues surrounding the

14    Sixth Amendment and other constitutional and perhaps

15    statutory concerns.  And so I had that under advisement.

16              But as part of the process of this and

17    during the two hearings, I've obviously received

18    evidence in the form of affidavits and other exhibits

19    that were admitted into evidence.  To date I did not

20    feel like I had a number of questions that needed to be

21    answered answered.  And a lot of these questions are

22    directed to the U.S. Attorney's Office because obviously

23    they're the prosecutors and were involved with the

24    investigation, conducted the investigation.

25              And so I decided that I needed a number of

1    questions answered, and so that's why I called the

2    hearing today.  I directed certain prosecutors to be

3    here, the ones that are involved and actually are

4    counsel of record in this investigation.  That would be

5    Ms. Tomasic, Mr. Oakley.  And also directed other

6    counsel of record, which is why Mr. Slinkard is here and

7    Ms. Barnett is here.  And I think I directed

8    specifically Kim Flannigan to be here because her name--

9    although she's not counsel of record, her name comes up

10    in a number of the factual assertions made by both the

11    government and the defense.  And I wanted people here

12    that could answer the questions.

13            At the prior hearings, for example, Ms.

14    Barnett was here and she's not-- she was not involved in

15    the matters underlying this case and could not answer a

16    number of the questions that I had.  Since then and in

17    going through the materials, I've developed a number of

18    other questions that I knew that Ms. Barnett at least

19    didn't have personal knowledge of.  And so that's why I

20    directed particular people to be here.

21            So since the filing of the last-- since the

22    time of the last hearing, the parties have filed briefs.

23    One of the concerns of the government at both of the

24    last hearings is that I called these hearings on short

25    notice.  You'll recall that I considered the August 9th

1    hearing an emergency hearing in view of the serious

2    allegations about recordings of attorney-client meetings

3    at CCA and I felt like something needed to be done

4    immediately.  And the government expressed concern about

5    not being able to respond to filings by the FPD and

6    others before that hearing and before the following

7    hearing.

8         Now, though, everyone has had plenty of

9    opportunity and everyone has taken the opportunity to

10   file a number of things.  So in addition to the record

11   that is already part of the record from the two prior

12   hearings, I since that time have received the-- a reply

13   to the government's recommendation related to the scope

14   of the special master, which was Document 120.  And the

15   government's response to motion to impound evidence,

16   which was Document 121.  I don't recall if those two

17   documents from the government were filed before the last

18   hearing, but obviously I have Document 120, 121 from the

19   government, their recommendation related to the scope of

20   special master and their response to the motion to

21   impound evidence.

22        And then Document 130, I now have the

23   defense reply to that.  That was filed on September 2nd.

24   And I also have a supplement to the reply, which the

25   defense filed on September 6th.  And then I have the

1  government's supplemental memorandum in support of

2  proposed order to appoint a special master and offer to

3  present evidence.  That was filed late last night about

4  10:55 p.m., Document 133, last night.  I have reviewed

5  that document extensively, even though it was filed last

6  night.

7            So those are the additional submissions.

8  The parties have included a number of factual

9  assertions.  They've briefed a number of the issues that

10  have been raised by one or the other or raised through

11  things I might've said or questions-- questioned at the

12  last hearing.  So those are the pleadings and those are

13  all incorporated into the record on these issues.

14            As I said, I do have a number of questions

15  and I want answers from people that have personal

16  knowledge of the matters that I'm inquiring about.

17            So the way I intend to proceed today is

18  starting with the questions, and they're somewhat

19  extensive, but it may go rather quickly, I don't know.

20  The government's latest submission filed last night

21  answers some of these questions, it doesn't answer all

22  of my questions.  And based on the government's brief, I

23  feel like there may be some questions that need some

24  clarification, so I intend to ask questions for that

25  reason.

1          The government's response filed last night

2    indicates an offer to present evidence.  So after I ask

3    the questions, the next thing I'd like to see happen is

4    the government present any additional evidence it has,

5    whether that's by witness or proffer or declaration or

6    affidavit, or whatever the case may be, that whatever

7    form it's in, I will receive that into evidence as part

8    of the record.

9          I don't know if the defense has any

10   additional evidence to offer in any of those formats,

11   but if you do, now would be the time.  My intent at the

12   end of today's hearing is to consider the record closed

13   and everything is under advisement at that point.  And I

14   do intend to appoint a special master or perhaps a

15   neutral expert to-- to assist the Court in a number of

16   things, which I'll address and go into that with you

17   later on and just to-- I know that there's a difference

18   in terms of the scope of what you think that person

19   should accomplish.  And I may have questions both of the

20   defense and the government about that.  And then there

21   are some other miscellaneous matters I'd like to bring

22   to the-- to the parties' attention as well.

23          All right.  So if we start with the

24   questions, and I don't know if there's a particular

25   person that needs to take the lead on this.  These are

1    all directed to the government.  Again, I may have

2    additional questions of the defense later, but I simply

3    would like whoever wants to answer these questions.

4              So is there a plan of action, Ms. Barnett,

5    in terms of who's going to answer questions at this

6    point?

7              MS. BARNETT:  Your Honor, I don't mean to be

8    vague, but I think it will just depend upon the Court's

9    question and who we feel has the-- the most in depth

10   information to provide a complete answer to the Court on

11   that issue.  So I guess we might ask the Court to maybe

12   just give us the question and then whoever can best

13   respond to it will do so, if that's okay.

14             THE COURT:  That's fine.  But let me ask you

15   something else because, as you know, there are a number

16   of allegations made in this case, allegations of

17   misconduct, allegations of Sixth Amendment violations,

18   not only by CCA, but there are allegations directed at

19   the U.S. Attorney's Office as well; Sixth Amendment,

20   6(e), ethical, whatever.  A number of categories.

21             Have you all followed the Department of

22   Justice procedure in terms of seeking counsel about how

23   to proceed?  So, for example, a number of the

24   allegations are probably directed at Ms. Tomasic,

25   perhaps at others.  Ms. Tomasic is still counsel of

 1    record.  And so I just wonder if you followed any

 2    procedures in terms of how to handle that at this point.

 3              MS. BARNETT:  Yes.  We've consulted

 4    internally with the appropriate personnel that we would

 5    need to consult in terms of basically Ms. Tomasic or Mr.

 6    Oakley answering the Court's questions about what

 7    occurred.

 8              THE COURT:  All right.  And so at this point

 9    your intention, your office's intention is that Ms.

10    Tomasic, Mr. Oakley, whoever is counsel of record, will

11    remain counsel of record throughout this case?

12              MS. BARNETT:  Yes.

13              THE COURT:  All right.  Understanding that,

14    at least with respect to these issues, they're perhaps -

15    and particularly Ms. Tomasic - key witnesses on-- or at

16    least providing facts that the Court deems necessary to

17    determine the scope of what the special master or expert

18    ought to do?

19              MS. BARNETT:  Yes.

20              THE COURT:  Okay.  All right.  Okay.  So my

21    first question is, at what point did the government come

22    to know that the video-recordings included

23    attorney-client communications?  At what point, point in

24    time did the government come to know that the

25    video-recordings included attorney-client

 1    communications, attorney-client visitations?

 2           MS. TOMASIC:  Your Honor, would you like me

 3    to approach the podium or just answer in place?

 4           THE COURT:  Well, yeah, that would probably

 5    be better.  We could hear you better.  I realize there's

 6    going to be a lot of movement back and forth.  You could

 7    stay at the podium and then if there's something Mr.

 8    Oakley or somebody else needs to come forward for, maybe

 9    that's the way to proceed, so... all right.

10           MS. TOMASIC:  Okay, Your Honor.  It's a

11    complicated question because no-- the government had a

12    good-faith basis to believe that the CCA

13    video-recordings contained attorney-client meetings at

14    the time the issue-- the subpoena was issued.  I did not

15    recognize that.  I did not think about it.  I did not

16    consider it until July-- either on the eve of the

17    hearing or in response to the Court's questioning at the

18    time of the hearing.  I don't remember the exact moment.

19           It could've been possibly one of two things

20    triggered my memory; the concerns about Richard

21    Dertinger obtaining information through his attorney at

22    any attorney-client room may have spurred, oh, I think

23    we probably have that, given what I know based on what

24    the cooperator says, and I got all surveillance footage,

25    or in response to the Court's questioning at the time of

1    the hearing when I answered that we had it, that spurred

2    me to think, yes, we do have it.  And in response to

3    that, I talked to the agent.

4              THE COURT:  Are you talking about the

5    July 21 hearing?

6              MS. TOMASIC:  Yes, Your Honor.

7              THE COURT:  So when you spoke of the

8    subpoena, the subpoena for video-recordings, that was

9    issued in April?

10             MS. TOMASIC:  Yes, Your Honor.

11             THE COURT:  And you had some indication then

12   that there might be?  Was that based on the informant's

13   information?

14             MS. TOMASIC:  Yes, Your Honor, only on the

15   informant's information.  And so to clarify; the

16   informant provided that information as-- as was set

17   forth in the briefing in discussing how to set up a

18   controlled buy.  His proffer was very lengthy, he

19   provided an overwhelming amount of evidence or, excuse

20   me, information.

21             So when the subpoena was issued, in an

22   attempt to get all of the surveillance footage that we

23   thought we need or could need in the future, it was

24   broadly drafted, but not intended in any way to get

25   attorney-client video-recordings.  And I should have

 1  recognized at that time that it may include

 2  attorney-client meetings, but I just didn't recognize it

 3  and didn't contemplate it until July-- either on the eve

 4  of the July 21st hearing or at the July 21st hearing.

 5          THE COURT:  So in other words, before the

 6  July-- shortly before the July 21st hearing or during

 7  the July 21st hearing when I posed a question about "are

 8  there recordings," we were talking about the scope of

 9  the recordings in the facility, and I said in I think

10  medical rooms and attorney-client rooms.  At that point

11  that triggered in you something that you thought there

12  might be a problem?

13          MS. TOMASIC:  Yes.

14          THE COURT:  Okay.  Your communications with

15  Ms. Rokusek, which I believe began on August 1,

16  concerning Mr. Dertinger and the proffer and all of

17  that.

18          MS. TOMASIC:  Uh-huh.

19          THE COURT:  When was the first communication

20  you had with Ms. Rokusek concerning the potential

21  conflict issue with her?

22          MS. TOMASIC:  Ms. Flannigan sent her an

23  e-mail the previous Friday and then again on Monday, but

24  she didn't get it.  I believe with certainty the meeting

25  was on August 2nd, 2016.

1          THE COURT:  All right.  And at the time of

2    that e-mail, were you aware that there were

3    attorney-client communications included in the

4    recordings?

5          MS. TOMASIC:  The e-mail wasn't issued by

6    me, it was by Ms. Flannigan.  And during the meeting,

7    again, I was relying solely on the cooperator's

8    information.  I didn't state that we had them during the

9    meeting, what I said is the agent is locating them,

10   locating attorney-client meetings.

11         THE COURT:  So you had some idea that there

12   were attorney-client meetings if you had an agent

13   looking to locate them.

14         MS. TOMASIC:  What I said to the agent

15   either on the eve of the July 21st hearing or after the

16   July 21st hearing is, "I need you to look at this video

17   of Mr. Dertinger leaving his meeting with Ms. Rokusek

18   and look for everyone's reaction when he gets back into

19   the pod."  Because our understanding, based on what the

20   cooperator said, was-- is that Mr. Dertinger passed this

21   information along to other inmates in his pod after his

22   meeting with Ms. Rokusek and that everyone freaked out,

23   that certain inmates were upset and dropped out of the

24   conspiracy, that there was a lot of scuttlebutt about

25   the fact that they were being investigated.

1           And we knew from having listened to-- the

2    agents knew from having listened to recorded inmate

3    calls that at some point prior to the search warrant,

4    inmates had found out that they were being investigated

5    and were taking measures to try and avoid law

6    enforcement's detection.  For example, they previously

7    were sending wire transfers between the individuals on

8    the outside to pay for the contraband that was passed

9    between inmates on the inside, and at a certain point a

10   leader/organizer in the organization instructed the

11   person on the outside handling that to no longer use

12   wire transfers, to just do in-person exchanges.  And I

13   think the inference was that things were hot right now

14   and that-- and the agents identified that as a concern,

15   that somehow the inmates had learned about the

16   investigation.

17           THE COURT:  All right.  So the July 21

18   hearing, you did know by then that there were

19   attorney-client recordings in the attorney-client rooms?

20           MS. TOMASIC:  When I made that

21   representation on July 21st at the hearing and on

22   August 2nd to Ms. Rokusek that we were locating them, I

23   was relying solely on the cooperator's information.  And

24   in my mind, I was not distinguishing between monitoring

25   versus recording.  The inmate indicated that he knew the

1    attorney rooms were being recorded, I-- presumably

2    because he saw a camera in there.  And it made sense to

3    me that if there's a camera in there, that they're

4    recording.  I didn't even contemplate that they could be

5    monitored but not recorded.  And I had no reason to

6    doubt his statement because there was really no reason

7    to lie.

8              Our concern way back in March, early March

9    when he provided that information was, if we were going

10   to do a controlled buy, he needed to be under

11   surveillance the entire time for his safety and also so

12   that we could verify who he bought the drugs from inside

13   CCA and that he didn't have an opportunity to get them

14   from someone else for chain of custody purposes for

15   making a case against his source of supply.

16             So my concern and the agents' concern in

17   speaking with this cooperator was:  Are you going to be

18   under surveillance the whole time, are you going to be

19   recorded the whole time, because we can't do this buy,

20   DOJ won't let us do this buy if you're not being

21   recorded the whole time.

22             THE COURT:  Well, did you contemplate he was

23   going to go into an attorney-client room during the--

24   the controlled buy?

25             MS. TOMASIC:  Yes, Your Honor.  The plan was

1    that he was going to obtain the drugs from his-- well,

2    the entire plan was that an agent was going to put buy

3    money on his source of supply's books, and then the

4    source of supply was going to release the drugs or

5    contraband, I believe it was K2 and I think

6    methamphetamine he was going to purchase.  And then to

7    get the drugs out of the facility, we were-- were going

8    to pre-arrange an attorney-client meeting and we were

9    going to have an undercover female agent act as the

10   attorney's paralegal and she was going to go with the

11   attorney into the attorney-client meeting and take

12   custody of the drugs so that the attorney wasn't in the

13   chain of custody.

14            THE COURT:  And you intended to have that

15   recorded?

16            MS. TOMASIC:  If, in fact-- yes, that's what

17   we intended to do, if he was going to be under

18   surveillance the whole time, yes.

19            THE COURT:  So at that point you did know

20   that he could be-- you could record what went on in the

21   attorney-client room?

22            MS. TOMASIC:  Based on what he believed,

23   yes, Your Honor.

24            THE COURT:  So you're telling me that you

25   set up a controlled buy with an understanding that you

16-20032-JAR    United States v. Lorenzo Black    09.07.16    20

1  could completely control it by recording a transaction

2  involving, you know, the so-called sort of undercover

3  agent that happened in the attorney-client room, you

4  intended to proceed in that way based solely on what he

5  told you?  You took no measures to determine if, in

6  fact, you could record in that room?

7            MS. TOMASIC:  That was the initial steps and

8  that was the discussion with him.  The controlled buy

9  was abandoned before it ever got off the ground because

10 we deemed it was too dangerous because there couldn't be

11 agents inside the facility to be near him if, in fact,

12 his life was put in danger.  And we didn't know who we

13 trusted inside CCA at that point to act on behalf of the

14 agents to intervene and-- and keep him safe during the

15 controlled buy.

16            So we discussed the controlled buy during

17 the initial meeting with this inmate.  We sought

18 approval at a certain point from DOJ for the controlled

19 buy and then immediately DOJ said no, it's too

20 dangerous.

21            THE COURT:  All right.  So by August 5, what

22 was your knowledge with respect to the video-recording

23 of attorney-client rooms?

24            MS. TOMASIC:  Is August 5 a Friday?

25            THE COURT:  Let's see.

1          MS. TOMASIC:  I believe it is.

2          THE COURT:  Well, I don't have that with me.

3          MR. SLINKARD:  Yes.

4          THE COURT:  It is?  It's a Friday.  All

5     right.  August 5.

6          MS. TOMASIC:  By August 5th, Ms. Rokusek in

7     the afternoon came in to view the video.  And she met

8     with Pauletta Boyd and was viewing the video, and I

9     don't know exactly what time she came in.  When she

10    left, I assume she reported it to the FPD that the

11    video, in fact, existed.  And then they told my

12    supervisor and my supervisor told me.  That's how I

13    learned that the video existed.

14          Between Wednesday and Friday, my concern was

15    that I had made a misrepresentation to the Court during

16    the July 21st hearing because I had made a clear

17    representation that we had it based solely on a

18    cooperator statement.  And in discussions with people

19    much more experienced than me, I came to the conclusion

20    that that was foolish.

21          THE COURT:  You made a-- I'm not

22    understanding.  On the-- at the July 21 hearing, you

23    made a clear representation of what?

24          MS. TOMASIC:  That the government-- that the

25    CCA video-recordings included attorney-client

1    video-recordings based on what the cooperator had told

2    me.  Not that I had seen it myself, not that I viewed

3    the index.  I didn't view the index until most likely

4    late afternoon on Friday, August 5th, but certainly not

5    before I met with Ms. Rokusek and certainly not before

6    the July 21st hearing.

7              THE COURT:  That July 21st transcript, that

8    hearing is in evidence.  I think it was in evidence at

9    the August 9th emergency hearing.  Have you reviewed

10   that transcript?

11             MS. TOMASIC:  Yes, Your Honor.

12             THE COURT:  All right.  The index of the

13   video-recordings, who made the index?

14             MS. TOMASIC:  CCA made the index.  I only

15   knew and learned at the August 9th hearing, which I was

16   instructed not to come to, so I had to wait until the

17   transcript came out to see what happened at the

18   August 9th hearing.  In that I read the transcript and

19   saw that it was an issue who created the index.  And I

20   spoke with Ms. Boyd and said, "Who created the index?"

21   And Ms. Boyd said, "I did not create the index.  They're

22   acting like I created the index.  CCA created the

23   index."

24             Since that time, I've spoken with Ms. Boyd

25   about that index in much more detail and she explained

1    this, that-- I asked her to get an index because the

2    defense attorneys wanted an index and I also thought an

3    index would be needed to view the video.  She met with

4    Matt Cahill, who's a retired Deputy U.S. Marshal, and he

5    put her in contact with Ken Lajiness at CCA.  Ken

6    Lajiness was actually at the courthouse in the marshals

7    service office the next day training a new employee, who

8    was a contract employee for CCA.  Marshal Cahill got Ms.

9    Boyd, took her down there to meet with Mr. Lajiness.

10   She said she needed it and he said, "I'll get it to you

11   the next day," and then he e-mailed that to her.  I have

12   the e-mail and we have it ready to admit into evidence

13   showing that CCA provided the index.

14         I never asked to see the index until after I

15   learned through my supervisor, Deb Barnett, that the FPD

16   was concerned that I had misrepresented to the Court on

17   July 21st that the government had attorney-client

18   footage and also misrepresented, according to the FPD,

19   to Ms. Rokusek that we had attorney-client footage.  So

20   I asked to see the index, and the index showed that

21   there were attorney-client rooms.

22         THE COURT:  So the first time you saw the

23   index was when?

24         MS. TOMASIC:  I don't know the exact date.

25   It was either Thursday, August 4th, or Friday,

```
 1   August 5th.  I believe it was in the late afternoon on

 2   Friday, August 5th.

 3            THE COURT:  I thought the index came to you

 4   sometime in June.

 5            MS. TOMASIC:  It came directly to Ms. Boyd

 6   and I never saw it.

 7            THE COURT:  But you were in the process of

 8   disseminating information, but you didn't bother to look

 9   at the index?

10            MS. TOMASIC:  The surveillance footage-- as

11   the Court knows based on the July 21st hearing, the

12   volume of discovery in this case is overwhelming.  And

13   so the surveillance footage was on the back burner in my

14   mind because we didn't have the drives yet.  And I knew

15   once we got the drives, it was going to take 20 days to

16   copy them.  So my goal was to get out what we had and

17   what was ready and what we could provide to them first.

18   And then once we got the drives, to move forward with

19   addressing that.

20            THE COURT:  All right.  In your latest

21   submission filed yesterday, it seems that you-- the

22   government agrees that the audio-recordings should be

23   subject to review by the special master or expert; is

24   this correct?

25            MS. TOMASIC:  That's correct.
```

1          THE COURT:  Okay.  To your knowledge, in all

2    instances where inmate attorney calls have been

3    recorded, have these inmates been notified of the

4    recordings?

5          MS. TOMASIC:  Prior to the August 9th

6    hearing, the only instance I knew where an agent had

7    encountered attorney-client video-- or excuse me,

8    attorney-client recordings, audio-recordings, inmate

9    calls, he told me, I immediately contacted our

10   professional responsibility point of contract.  He

11   e-mailed PRAO.  PRAO gave an advisory opinion.

12          And then in further discussion with our

13   professional responsibility point of contact, I e-mailed

14   the attorney, let him know we had encountered them, let

15   him know that an agent had inadvertently listened to

16   between 10 and 15 seconds and that we did not intend to

17   listen to them anymore.  And I have in evidence-- the

18   government can admit that e-mail to the defense attorney

19   that was sent as part of this investigation.

20          THE COURT:  All right.  I would suggest at

21   the close of all of these questions-- I assume you have

22   these marked.  And what I'll have you do is just

23   describe them by exhibit number and I'll admit all of

24   that for the record.

25          Have the inmates been given an opportunity

1    to assert their privilege?

2              MS. TOMASIC:  Could you clarify that point?

3              THE COURT:  Well, if they're not notified

4    that the recordings exist, when have they had an

5    opportunity to assert their privilege with respect to

6    those recordings?

7              MS. TOMASIC:  The only inmate-attorney call

8    that I was aware was encountered, I notified the

9    attorney immediately.  After this issue has arisen, I've

10   spoken with all the agents who listened to calls in this

11   case, and they did state that they had encountered some

12   additional attorney calls, did not listen to them,

13   minimized immediately.  But neither Chris Oakley nor I

14   were ever told about those particular calls, because an

15   agent other than Jeff Stokes is the one who encountered

16   the calls and they used a different procedure.

17             THE COURT:  So how is it that you came--

18   you, the U.S. Attorney's Office or your investigative

19   agents, how did you come in the possession of the

20   audio-recordings from CCA to begin with?

21             MS. TOMASIC:  There was a subpoena issued in

22   April that the government also has and can admit.  But

23   it is a grand jury subpoena, so we would request to

24   admit it under seal.

25             THE COURT:  This is for the audio, not the

1  video.

2          MS. TOMASIC:  Yes, Your Honor.

3          THE COURT:  So you used a grand jury

4  subpoena for the audio-recordings, just like you did for

5  the video-recordings?

6          MS. TOMASIC:  Initially.  And a number of

7  inmates were identified, along with a number of phone

8  numbers in that subpoena.  At a later date, Marshal

9  Cahill contacted CCA after the agents recognized that

10  the conspiracy was much longer in duration than we

11  initially anticipated.  Initially we thought the

12  conspiracy was from October, 2015 moving forward.

13          At a certain point in the investigation,

14  Marshal Cahill and the other agents involved recognized

15  that the conspiracy spanned several years.  And so he

16  contacted CCA and-- an employee of CCA and requested

17  those phone calls pursuant to the marshal's contract,

18  without a subpoena, and got-- a number of those calls

19  were the exact same calls that were initially produced,

20  but he got a larger time span.

21          THE COURT:  All right.  So the-- but the

22  subpoena-- and I think the subpoena should be put into

23  evidence, just like the other one was for the video, but

24  it starts sometime in 2015 and goes forward through the

25  date of the subpoena for the audio-recordings?

1          MS. TOMASIC:  That's my recollection, Your

2    Honor, yes.

3          THE COURT:  But then the marshals service

4    supplemented that request in some sort of oral way or is

5    there some written memorandum or something, what they

6    requested beyond the-- the parameters of the subpoena?

7          MS. TOMASIC:  It would've been either

8    through an e-mail or a phone call.

9          THE COURT:  But you don't have an e-mail or

10   any other written records at this point?

11         MS. TOMASIC:  No.  And I am not certain,

12   because Marshal Cahill has retired, whether he can

13   access his old e-mails, but I can check with him.

14         THE COURT:  And so is the subpoena directed

15   to CCA or is it directed to Securus?

16         MS. TOMASIC:  To CCA.

17         THE COURT:  Okay.  So how is it that the

18   audio-recordings include, for example, attorney-client

19   calls between Jackie Rokusek and her client, Virok Webb,

20   that date back to 2011?

21         MS. TOMASIC:  The request made by Marshal

22   Cahill was for all inmates during the entire duration of

23   their time at CCA.  So if-- if 2011 is when the phone

24   call with Ms. Rokusek and Virok Webb was intercepted, it

25   appears as though he had been at CCA for some time,

1    which is highly unusual to be at CCA that length of--

2    period of time.  I would have to check into that.

3              THE COURT:  Well, I'm not understanding you.

4    So Virok Webb I can tell you, because I sentenced him,

5    and I believe it was in 2011, he wasn't at CCA in 2015

6    or 2014 or 2016.  So I'm not understanding how his calls

7    get caught up in this subpoena.

8              MS. TOMASIC:  Okay.  I'm not aware of the

9    time that he was at CCA.  What Marshal Cahill did is he

10   provided a list of targets and also not necessarily

11   targets--

12             (Government counsel confer).

13             MS. TOMASIC:  Oh, okay.  Thank you.  This is

14   a Topeka case, and Mr. Slinkard just helped me to

15   understand the connection.

16             And then also, Your Honor, I do have a

17   question.  I know Virok Webb's name is already on the

18   record.  The government's-- upon our review of the 6(e)

19   parameters, I don't necessarily want to outline the

20   particular 40 inmates whose calls were obtained pursuant

21   to the grand jury subpoena and then also through Marshal

22   Cahill, because many of them are unindicted

23   co-conspirators and we would be putting it in the public

24   forum - and I know the press is perhaps here, too - that

25   they are potentially targets of an ongoing

1    investigation.

2            THE COURT:  All right.  But what you're

3    telling me is that Virok Webb was-- that the subpoena of

4    those calls related to the overall investigation?

5            MS. TOMASIC:  Yes, Your Honor.  There is a

6    person who was previously identified for the

7    leader/organizer of this present conspiracy, had an

8    overlapping role as a leader/organizer of the

9    conspiracy, who was at CCA for an extended period of

10   time.  And so without knowing more and speaking to the

11   agents, Virok Webb was either a co-conspirator to this

12   person, given the time frame and the connection I just

13   became aware of, or this leader/organizer was using

14   Virok Webb's PIN to place outgoing calls in an attempt

15   to avoid law enforcement detection.  And that is

16   something that we encountered repeatedly in the course

17   of this investigation.

18           THE COURT:  All right.  And the

19   audio-recordings, when did you first learn that there--

20   included attorney-client calls?

21           MS. TOMASIC:  I'd have to look at the

22   e-mail.  But in January or February, I believe, Agent

23   Stokes contacted me and said, "I encountered an

24   attorney-client call.  I inadvertently listened to

25   between 10 and 15 seconds, because he did not identify

1    himself as an attorney immediately."  And at that point

2    I contacted PRAO, and then e-mailed the attorney and

3    notified him.

4              THE COURT:  All right.

5              MS. TOMASIC:  And that is--

6              THE COURT:  Did anyone have any

7    conversations at CCA-- with CCA at that point about the

8    fact that an attorney-client call had been identified as

9    being recorded?

10             MS. TOMASIC:  No, Your Honor.  I was aware

11   of the procedures that CCA could block, and so I just--

12   block attorney calls.  And I didn't know who initiated

13   the block, an inmate or an attorney, but I just believed

14   that the attorney had failed to do so and he would do so

15   at that point.

16             In fact, I'd have to grab his e-mail, but I

17   believe he indicated he was going to contact CCA and

18   follow up.  And in the e-mail he also indicated that he

19   typically places-- it might help if I get the e-mail

20   because my memory is not clear, but he did mention

21   something about CCA's procedures and that he didn't

22   intend for the call to be recorded.

23             THE COURT:  Okay.  If you-- if one of your

24   colleagues can find that, that's fine.

25             MS. TOMASIC:  In response to my e-mail, the

1   attorney e-mailed, "Thank you for alerting me to this

2   fact.  I typically use the jail lines for scheduling

3   only, but I do appreciate you discontinuing the calls

4   when Stokes realized that they were attorney-client.

5   Sometimes these calls are initiated by my letter to CCA.

6   And when done so, CCA should route the call through a

7   privileged line, such as a case worker's.  I will

8   contact CCA to ensure that they do not error in any such

9   instance."  And that e-mail exchange took place on

10  January 22nd, 2016.

11          THE COURT:  All right.  In this case, in the

12  Lorenzo Black case, when did you or have you started-- I

13  think you have.  When did you disseminate the

14  audio-recordings?

15          MS. TOMASIC:  It was in-- it was Round 2a,

16  and it was in late July, 2016.

17          THE COURT:  And to whom did you disseminate

18  them?

19          MS. TOMASIC:  To counsel of record at that

20  point I believe.

21          THE COURT:  And so I take it from what I've

22  heard thus far, there was no attempt to separate these

23  recordings in a way that one counsel would not discover

24  the attorney-client conversation of another counsel?

25          MS. TOMASIC:  Other than the phone calls

1  that relate to this e-mail to this particular attorney,

2  I was unaware that there were any other attorney-client

3  calls.  And AUSA Oakley was unaware that there were any

4  other attorney-client calls among any of these 40

5  inmates.  It was only brought to our attention at the

6  August-- the second hearing, which I think was August

7  16th.

8          THE COURT:  All right.  So tell me what

9  measures have been taken to date to gather, to secure,

10 to impound, and surrender the audio-recordings, as well

11 as the video-recordings to the Court.

12         MS. TOMASIC:  When the Court-- I was not

13 involved in anything to do with handling the

14 video-recordings once the Court became involved.  I

15 believe Ms. Barnett and Mr. Slinkard handled that, so I

16 can't speak to that.

17         With respect to the audio-recordings, Mr.

18 Oakley and I-- he initiated an e-mail to all agents.  I

19 had verbal communications with all agents and said,

20 you're the case agents for these particular agencies

21 involved - there are four agencies involved - find out

22 exactly who had access to the calls, get all the calls

23 back, and we have to do so by... and I provided the date

24 by which we had to comply.

25         And based on that, the-- the agents, the

1    case agents took it upon themselves to work in their own

2    agency to get all of those calls back and all of the

3    notes back from the agencies.

4            THE COURT:  All right.  So when you provided

5    these materials pursuant to the impound order to me on

6    August 25th, you submitted a cover letter that explained

7    the efforts and-- but also mentioned that these things,

8    these recordings, still resided on the server in the

9    U.S. Attorney's Office and also some servers of

10   investigative agencies?

11           MS. TOMASIC:  Not the calls, Your Honor.

12   And if the letter says so, it's an error.  The

13   derivative reports.  So all of the calls were deleted

14   off the agency servers and all the calls were deleted

15   off of the U.S. Attorney's Office server.  And what we

16   did is we copied the calls onto a thumb drive, provided

17   that to the Court, and then deleted it off the U.S.

18   Attorney's Office server.

19           What is still on the agency server and on

20   our server are-- is the derivative information in the

21   form of reports, which would not contain any information

22   about attorney-client calls.  It's just reports.  For

23   example, Marshal Cahill recapped the pertinent phone

24   calls that he encountered, pertinent to the

25   investigation.  So there's no attorney-client

 1  information, it's just he generated a report talking

 2  about on Phone Call 35 this is what's pertinent to the

 3  investigation.

 4          And then also, there would be derivative

 5  information in various affidavits that have been

 6  submitted to the Court, for example, search warrant

 7  affidavits.  But again, there would be no

 8  attorney-client information on those.

 9          THE COURT:  So they're not-- they're

10  derivative of calls, but not derivative of

11  attorney-client calls.

12          MS. TOMASIC:  That's correct.  There is no

13  derivative information of attorney-client calls, period.

14  It's just that the order was broadly drafted and we

15  wanted to be sure that we complied.  The only -

16  quote/unquote - potentially derivative information would

17  be, for example, in Marshal Cahill's notes, he had a

18  call-- he had one line that said, "Attorney call.

19  Didn't listen."

20          THE COURT:  All right.  What matters are

21  currently in the hands of the Taint Team?

22          MS. TOMASIC:  Ms. Treadway, who is the Taint

23  attorney, would be in a better position to answer that

24  than me.  My quick answer would be nothing, because the

25  law library computers have been imaged, but the Taint

1  Team was not going to be given that information until

2  the parties in this case came to an agreement about the

3  search terms that would be used to ferret out potential

4  attorney-client communications.  And that has not

5  happened and so they're just sitting there until the

6  parties come to an agreement.

7          So we-- our goal-- and Ms. Treadway, who's

8  much more experienced in Taint Teams, advised me how to

9  handle this procedure in proposing it at the meet and

10 confer.  She suggested, and I did so, let the defense

11 attorneys weigh in first and provide the search terms,

12 and then we will execute those search terms on the

13 computer images.  And whatever information they draw up

14 based on those search terms will be provided over to the

15 defense attorneys first.  And then they will identify

16 what they believe is privileged and what they do not

17 believe is privileged.

18         What they identify as privileged would then

19 go to the Taint Team.  And then if the Taint Team agreed

20 it was privileged, we're done, the prosecution team

21 never gets to see it.  If the Taint Team disagrees, then

22 Ms. Treadway would bring that matter to the Court.

23         THE COURT:  And other than Ms. Treadway, are

24 there any other employees of the U.S. Attorney's Office

25 that are on the Taint Team?

1              MS. TOMASIC:  No, Your Honor.

2              THE COURT:  Who are the other people on the

3    Taint Team?

4              MS. TOMASIC:  IRS agents.

5              THE COURT:  That are not involved in this

6    investigation?

7              MS. TOMASIC:  Yes, Your Honor.  And I would

8    elaborate, too, that IRS agents not involved in the

9    investigation were at each search location which-- on

10   April 8th, 2016, which was the day of the takedown,

11   including CCA and various residences in Missouri.  And

12   they were onsite Taint Team agents who, if an agent

13   encountered something he believed to be attorney-client

14   or she believed to be attorney-client, the Taint agent

15   would come in and looked at it substantively and decided

16   if it was privileged.  And if it was, the agent who's

17   conducting the search wouldn't look at it further.

18             Specific to CCA, our concern was that, based

19   on jail calls, we-- the agents believed that inmates

20   were-- had instructed an individual on the outside at

21   least in one instance to go to Kinko's and print up fake

22   legal letterheads and then to spray that paper with

23   synthetic cannabis chemicals and then to send it in as

24   legal mail.  And then the paper would be cut up and

25   smoked like a synthetic marijuana joint.

16-20032-JAR   United States v. Lorenzo Black   09.07.16   38

1           And so at least in CCA, the Taint Team's

2    purpose was to look at the legal mail and see if it

3    perhaps was fake legal mail that was really a drug or

4    sprayed with chemicals that were K2 cigarettes.

5           THE COURT:  And so the Taint Team does have

6    that in their possession at this point, or no?

7           MS. TOMASIC:  Nothing was seized.  Nothing

8    privileged was seized at CCA.  The Taint Team looked at

9    everything, didn't locate anything, and it was not

10   seized.

11          THE COURT:  All right.  The government's

12   response indicates or asserts that inmates knew that

13   their conversations were being audio-recorded.  Is there

14   support in the record that each inmate actually received

15   and reviewed the inmate handbook which provided notice

16   of recording?

17          MS. TOMASIC:  The government has a witness

18   prepared to testify, Laurie Harrison I believe is her

19   name, and she is an intake officer and she would testify

20   that the inmate handbook is provided to each inmate at

21   intake.  The government also has-- and I don't know if

22   the Court has a copy of the government's proposed

23   exhibits, but there is a-- a form which the government -

24   it's Government's Exhibit No. 1 - would move to admit at

25   this time.

1          MS. BRANNON:  No objection.  I think we've

2    already admitted it as a defense exhibit.

3          THE COURT:  It was attached to your brief as

4    well?

5          MS. TOMASIC:  Yes, Your Honor.

6          THE COURT:  Yeah, but you can certainly--

7    all right.  Exhibit 1 is admitted.

8          Are you intending to call her as a witness

9    or proffer her, or what are you doing?

10          MS. TOMASIC:  We could call her as a-- we

11    would be intending to call her as a witness, Your Honor,

12    yes.

13          THE COURT:  Okay.  All right.  So they

14    received this at the time of the intake.

15          MS. TOMASIC:  Yes.

16          THE COURT:  And does this-- is there

17    something else they receive that describes for them the

18    procedure to make sure their outgoing or incoming

19    attorney calls are not recorded?

20          MS. TOMASIC:  That is in the inmate

21    handbook, which is Government's Exhibit No. 2.  And,

22    Your Honor, the government moves to admit Exhibit No. 2

23    at this time.

24          THE COURT:  All right.  Why don't we just

25    walk through all your exhibits and I'll admit them at

1    this point.  So Exhibit 2 is the CCA inmate handbook,

2    that will be admitted.

3         MS. TOMASIC:  And then 3 is a photograph of

4    a sign at CCA above a Securus phone.  And 4 and 5 are

5    photographs of signs on a CCA phone.  And 6 is a

6    photograph of a Securus sign.  And the government moves

7    to admit Exhibits 3 through 6 at this time.

8         MS. BRANNON:  Judge, we don't have any

9    objection to those as long as they're admitted to the

10   Court in a way that the properties of the photographs

11   are available.  The properties will show that all of

12   these photographs were taken August 18th, which was

13   after the Court's order to change the recording

14   practices at CCA.  And so we believe the signage changed

15   after that.  So as long as the Court has that available,

16   that the photographs post-dated the Court's order.

17        THE COURT:  Is there any dispute that these

18   photographs were taken on August 18th or after the Court

19   had issued an order?

20        MS. TOMASIC:  No, Your Honor.

21        THE COURT:  Any dispute that CCA changed its

22   signage after the Court's order?

23        MS. TOMASIC:  With some clarification.  My

24   understanding is, and we would have to have the-- the

25   witness testify to this, is that certain signs were

1   pulled down and replacement signs were put up that

2   where-- the wording was perhaps slightly different in

3   some pods, but not the signage that is on the phone.

4           THE COURT:  All right.  I'll admit

5   Exhibits 3 through 6 with that understanding, that it

6   goes to the weight but not the admissibility, and hear

7   further from the witness as to when these signs were

8   placed and how they differed, if at all, from what was

9   there before.

10           All right.  So Exhibit 7.

11           MS. TOMASIC:  Is the screenshot of a Securus

12   computer showing the blocked calling restriction.  And

13   that's the manner in which a phone call can be blocked

14   through Securus.

15           THE COURT:  All right.  Exhibit 7 admitted.

16           MS. TOMASIC:  And then Exhibit No. 8 are

17   copies of e-mails from SAUSA Erin Tomasic to counsel

18   regarding CCA video-recordings.

19           THE COURT:  All right.

20           MS. BRANNON:  We have not seen those, Your

21   Honor.

22           MS. TOMASIC:  Okay.  Your Honor, may I have

23   a moment?

24           THE COURT:  Yes.

25           MS. TOMASIC:  Your Honor, those aren't

1  relevant to this issue, so the government does not move

2  to admit those at this time.

3            THE COURT:  Exhibit 8?  All right.

4            MS. TOMASIC:  And then there is an

5  additional exhibit, Your Honor, that the government

6  would move to admit under seal, and that is the signed

7  forms that are the exact form in Government's Exhibit

8  No. 1 for all 40 inmates whose phone calls were

9  obtained.

10            THE COURT:  Is that Exhibit 11?

11            MS. TOMASIC:  Yes, Your Honor.

12            THE COURT:  All right.  I'll admit those

13  under seal--

14            MS. BRANNON:  Judge, could we have copies of

15  those?

16            THE COURT:  -- Exhibit 11.  But I think the

17  parties should have copies of them.

18            MS. TOMASIC:  Your Honor, may we approach on

19  that issue?

20            THE COURT:  Okay.

21            (Proceedings had at the bench, outside the

22  hearing of open court).

23  ████████████████████████████████████

24  ████████████████████████████████████████

25  ████████████████████████████████████████







 1 ████████████████████████████████████████

 2 █████████████████████████████████████████

 3 ███████████████████████████████████████████

 4 ██████████████

 5            ███████████████████████████████

 6           █████████████████████████████████

 7 █████████████████████████████████████████

 8 █████████████████████████████████████████

 9 ████████████████████████████████████████████

10 ██████████████████████████████

11           ████████████████████████████████████

12 ████████████████████████████████████████████

13 ██████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████

17           ██████████████████████████████████

18 █████████████████████████████████████

19           ████████████████████████████

20            (Proceedings continued in open court).

21            THE COURT:  All right.  Let me continue with

22 the questions.  You're going to have these witnesses

23 testify about how CCA records, the warnings, the

24 signage, the inmate handbook, so that I won't ask-- I

25 had a whole series of questions about that.  And

 1   obviously I have a number of affidavits from practicing

 2   lawyers that address a number of these questions in

 3   their view, so I won't ask those.  I have questions

 4   about the CCA recording system itself and how those are

 5   secured or saved.  I'll ask the witness that.

 6            But I'll ask you this:  Were there any

 7   incoming phone calls from attorneys to inmates at CCA

 8   that were recorded?

 9            MS. TOMASIC:  That is not a possibility on

10   the recorded line.  So there's two methods by which an

11   attorney can contact their client.  First, an inmate can

12   place an outgoing call in his pod.  And that's the

13   phones with the signs that say that, "This phone is

14   subject to recording and monitoring."  And those are the

15   phones where the preamble plays before the call is

16   initiated to both parties, "This phone call is subject

17   to recording and monitoring."  An inmate can place an

18   outgoing call only using a phone card to his or her

19   attorney on that line, and that is the phone line that

20   the attorney has the capability of blocking by sending a

21   fax to CCA recommending that his or her phone number be

22   blocked as an attorney.

23            There is a second method, and that is the

24   method that's set forth in Government's Exhibit No. 1--

25   excuse me, it's not set forth in Government's Exhibit

 1    No. 1.  The second method is that an inmate can tell his

 2    or her counselor that he wants to place a call to his

 3    attorney or the attorney can contact CCA, and usually

 4    they'll know their inmate's counselor and contact them

 5    directly or there's a receptionist that they can contact

 6    by phone or e-mail.  And when that is done, the inmate

 7    is called out to the counselor's office.  And that is a

 8    line that is not recorded and the inmate can talk to his

 9    or her attorney in the counselor's office on an

10    unrecorded line.

11          THE COURT:  So how is it that there are

12    attorney-client calls that are in the recordings then?

13          MS. TOMASIC:  Only if an attorney didn't

14    block-- send a fax to CCA and block his or her number.

15    If there are phone calls in the counselor's office,

16    those would never be provided to the government.  In

17    fact, I didn't even know that that was a possibility

18    until this litigation arose.  The only phone calls the

19    government gets are the phone calls initiated by an

20    inmate in his pod on the Securus phones with the

21    inmate's phone card.  Otherwise, the-- those phone calls

22    in the counselor's office are not part of the litigation

23    here and I can't contemplate a circumstance under which

24    the government would even seek to obtain those calls.

25          THE COURT:  All right.  So outgoing calls

 1    from CCA out are either not recorded because they're

 2    placed in the counselor's office, or they're placed in a

 3    pod, they can be recorded unless the number has been

 4    blocked?

 5              MS. TOMASIC:  That's correct, Your Honor.

 6              THE COURT:  Incoming calls can be recorded

 7    unless the number has been blocked?

 8              MS. TOMASIC:  No, Your Honor.  There are no

 9    incoming calls to the pod.  And the only incoming calls

10    would be to a counselor's office, and those lines are

11    not subject to recording.

12              THE COURT:  Okay.  So the only possibility

13    of recordings are outgoing calls from a pod that-- with

14    non-blocked attorney numbers?

15              MS. TOMASIC:  That's correct, Your Honor.

16              THE COURT:  Okay.  Your response indicates

17    that a government agent inadvertently listened to a

18    phone call, an attorney-client call, in January, 2016.

19    I may have asked you this already, but did you notify

20    counsel-- and that you did notify counsel for that

21    defendant of the recording.  At that time did you notify

22    any other defense counsel that their calls with clients

23    at CCA were being recorded or perhaps were being

24    recorded?

25              MS. TOMASIC:  No, Your Honor.  Because

 1  this-- based on my understanding, this was an

 2  exceptional circumstance where an attorney did not block

 3  his or her number.

 4          THE COURT:  Are you aware of any other

 5  instance in which an attorney or agent listed-- listened

 6  to recorded attorney-client phone calls?

 7          MS. TOMASIC:  Since the first hearing, I

 8  have questioned the agents and I am aware of additional

 9  circumstances where, for example, Marshal Cahill

10  encountered one attorney call.  And he estimates that he

11  listened to between 500 and 1,000 calls as part of this

12  investigation.  He encountered one call, it was an

13  outgoing call from a female inmate.  And when the phone

14  picked up, it said, "law office," that's it.  It was a

15  receptionist he assumes, and then he hung up-- he

16  discontinued listening to that call.

17          THE COURT:  Okay.

18          MS. TOMASIC:  There may be additional

19  instances where other agents encountered calls.  Again,

20  I would have only learned of those after this first

21  hearing.  For example, I believe Deputy U.S. Marshal Zac

22  Howard encountered some attorney calls.  But again, he

23  said the phone was answered "law office," and he

24  discontinued listening.  So there was no substance that

25  was encountered.

1              THE COURT:  Okay.  In the past, has the U.S.

2    Attorney's Office used attorney-client recordings in any

3    other cases, to your knowledge?

4              MS. TOMASIC:  Used them?

5              THE COURT:  In any way.

6              MS. TOMASIC:  I can think of-- well, first

7    of all, I'm not in a position to know for everyone else,

8    so I don't want to speak to that.  I can think of one

9    instance in which I, along with another AUSA, subpoenaed

10   calls to a particular attorney's-- not subpoenaed,

11   either requested or subpoenaed calls to an attorney's

12   cell phone number.  Those were provided to a Taint Team,

13   because we had reason to believe, based on the

14   attorney's representations, that he was communicating

15   with other inmates who were represented by counsel

16   without contacting their attorney first.

17              And the Taint Team went through those calls

18   to find the calls with the other inmates.  And that

19   information was provided to a Taint attorney not

20   associated with the investigation, and that that

21   investigation is-- not that that investigation-- that

22   matter is pending at this time in another court.

23              THE COURT:  All right.

24              MS. TOMASIC:  And the purpose of those phone

25   calls with the other inmates was to procure them as

1    witnesses and wasn't necessarily beneficial to their

2    interest.  And the attorney knew that those other

3    inmates were represented by counsel, and he was

4    intentionally not going through their attorneys.

5              THE COURT:  All right.  Let's see, I think

6    we've talked-- I asked you about the computers in the

7    law library, a Taint Team involved, but none of that has

8    been viewed by the Taint Team yet.  It's been imaged,

9    but nobody has gone through any of that yet--

10              MS. TOMASIC:  That's correct.

11              THE COURT:  -- because you're working on

12    search terms.

13              All right.  August 25, you provided an

14    ex-parte letter to the Court that summarized the storage

15    of certain discovery in the case.  It spoke to the

16    servers that I asked you about a little earlier.

17    Defense counsel have not been given a copy of this

18    letter, and I wanted to ask you, was there any reason

19    why it should remain ex-parte?  I thought it would be

20    helpful for them to know what steps you've taken.

21              MS. TOMASIC:  Your Honor, the decision to

22    write a letter under those circumstances was made in

23    concert with supervisors, so I would ask if they have

24    any reason.

25              MS. BARNETT:  No, I don't believe we have

 1    any reason, Your Honor, not to give it to defense

 2    counsel.

 3              THE COURT:  Okay.  We're going to-- and I'm

 4    going to need to schedule with you all shortly another

 5    discovery conference.  I'm going to schedule probably an

 6    ex-parte one with the defense because we need to sit

 7    down with the case budgeting attorney and Mr. Naseem and

 8    talk about some of those things, but we also need to

 9    have one with everyone.  So I just thought that would be

10    helpful for them to know what you've done in terms of

11    compliance with the impoundment order.

12              One thing that was raised in the defendant's

13    submissions that I want to ask you about is, they were

14    concerned about your office doing a cyclical replacement

15    of equipment and concern probably about spoliation of

16    evidence or files or deletion or modification or

17    something in the conversion of files.  What can you tell

18    me about that?

19              MS. TOMASIC:  That's not going to be me,

20    Your Honor.

21              THE COURT:  Okay.

22              MR. SLINKARD:  Your Honor, I asked that

23    question, in light of the defense's filing, of our

24    computer information manager, for want of a recollection

25    of his specific title.  This was a cyclical refresh of

1    new PC units in all of the three branch offices of the

2    U.S. Attorney's Office.  And he informs me that the hard

3    drives from the old laptops and desktops have been

4    removed from the machines, are labeled and are in

5    storage in each district office.

6            Before sending them off for ultimate data--

7    to the data destruction center in Columbia, South

8    Carolina, as part of the decommissioning process, he

9    intended to hold on to them for at least another month

10   to accommodate user requests to restore any files that

11   had not properly been backed up during the conversion to

12   the new machines.

13           THE COURT:  I think those need to be held on

14   to until further order of the Court so the--

15           MR. SLINKARD:  Well, that's what I was going

16   to ask your opinion on that.

17           THE COURT:  Okay.

18           MR. SLINKARD:  "All old laptop hard drives

19   are protected with Check Point Full Drive Encryption, so

20   any drive encryption with the Full Drive Encryption can

21   only be read when re-connected with its original laptop

22   chassis.  And those original laptop chassis, after the

23   hard drives are removed, are due to be turned in."

24           So I'm assuming based on-- on your order,

25   that you would want the laptops that are necessary to--

1    to access those individual hard drives to be-- an

2    ability to access those laptop hard drives be also

3    retained until further order of the Court?

4              THE COURT:  Yeah.  And I don't-- I don't

5    know if this really will be something that someone needs

6    to look at or not, but in-- it would be much safer to

7    have everything preserved until further order.

8              MR. SLINKARD:  That is the information that

9    he provided today immediately prior to the hearing.

10             THE COURT:  Okay.

11             MR. SLINKARD:  So we will communicate with

12   him that we need to retain the hard drives from the

13   Kansas City office, unless the Court orders more

14   broadly, retain the hard drives from the Kansas City

15   office, as well as the ability to access the laptop hard

16   drives from the Kansas City office, if that's

17   acceptable.

18             THE COURT:  Yeah, that's fine.  Just the

19   Kansas City division will be fine.  And that's something

20   I'll ask whoever is appointed to look into fairly

21   quickly so we can determine whether you really need to

22   hold on to those things any longer or not.

23             MR. SLINKARD:  Thank you, Your Honor.

24             THE COURT:  Okay.  I have the government's

25   exhibit list.  I don't know that I have a copy of the

1    exhibits.  Do we have the originals or-- that have been

2    admitted?  I also have an exhibit list from the

3    defendants, it's cumulative I think from the other

4    things that were admitted before, but now there's some

5    additional proposed defense exhibits.

6                (The Court and courtroom deputy confer).

7                THE COURT:  Mr. Jenab, we should've made a

8    record of this, couldn't be here.  He's on vacation.  He

9    had asked to participate by phone, we forgot to call

10   him.  And we've since talked to him and he's okay, he'll

11   just get a transcript of today's hearing.

12               Okay.  So I just want to make sure those

13   exhibits are in the record from the government.

14   Likewise, I think we need to-- I need to admit-- it

15   looks like it's Exhibits 440 through 463 on behalf of

16   the defense for today's hearing.

17               MS. BRANNON:  Yes, Your Honor.

18               THE COURT:  Okay.

19               MS. TOMASIC:  And, Your Honor, the

20   government also moves to admit Exhibit No. 9, which is

21   the e-mail from Kennith Lajiness, who's an employee of

22   CCA, to Pauletta Boyd, providing her with the camera

23   roster on June 10th, 2016.

24               MS. BRANNON:  Could we see it, please?  We

25   don't have any objection to... No. 8?  Or was it 9?

 1           THE COURT:  It's Exhibit 9; is that correct?

 2    All right.  Exhibit 9 will be admitted.  And there's

 3    another Exhibit 10, did you intend to admit that as

 4    well?

 5           MS. TOMASIC:  Exhibit No. 10, Your Honor,

 6    yes, is the e-mail from SAUSA Tomasic, me, to an

 7    attorney explaining that his phone calls were

 8    inadvertently listened to and then his response.  And

 9    that's Government's Exhibit No. 10, the government moves

10    to admit at this time.

11           THE COURT:  All right.  Exhibit 10 will be

12    admitted as well.  And--

13           MS. TOMASIC:  And then--

14           THE COURT:  Oh, I'm sorry, go ahead.

15           MS. TOMASIC:  I'm sorry, Your Honor.

16    Finally, Government's Exhibit No. 8 is a series of

17    e-mails sent by SAUSA Tomasic to defense counsel of

18    record in this case and also in related cases regarding

19    the attempted distribution of CCA surveillance footage

20    beginning on April 27th.  And that's Government's

21    Exhibit 8.

22           MS. BRANNON:  Could we have just a moment,

23    Your Honor?

24           THE COURT:  Yes.

25           MS. TOMASIC:  And, Your Honor, may I

1    approach?  Does the Court already have a copy of all of

2    the exhibits?

3              THE COURT:  I don't, no.  All right.  I

4    think that completes my questions at this time.

5              MS. BRANNON:  We don't have any objection to

6    No. 8.

7              THE COURT:  I'm sorry?

8              MS. BRANNON:  We don't have any objection to

9    No. 8.

10             THE COURT:  Oh, all right.  Exhibit 8

11   admitted as well.

12             MS. BRANNON:  Judge--

13             THE COURT:  Ms. Brannon, let's run through

14   your exhibits and get those admitted for the record as

15   well.

16             MS. BRANNON:  Your Honor, we have noted the

17   proposed defense exhibits.  I checked with Ms. Barnett,

18   they don't have any objection to any of these being

19   admitted.

20             THE COURT:  All right.  So Exhibit 450,

21   transcript of a hearing, United States versus Huff, on

22   May 16, 2016 admitted.  Exhibit 451, affidavit of Gary

23   Hart, admitted.  Exhibit 452 is an August 22, 2016

24   e-mail from Ms. Tomasic to me, and that's admitted as

25   Exhibit 452.  Exhibit 453, an e-mail from Ms. Brannon to

 1    Ms. Barnett dated August 3, admitted.  Exhibit 454, a

 2    transcript of a hearing in United States versus Wright

 3    on August 5, that's admitted.

 4            Exhibit 455 is an e-mail from Assistant U.S.

 5    Attorney Oakley regarding some phone calls.  That's

 6    dated August 18th.  That's admitted.  Exhibit 456 is

 7    another transcript of a hearing in United States versus

 8    Huff.  This one on August 22.  That's admitted.

 9    Exhibit 457 is a transcript in U.S. versus Benimon dated

10    August 22.  That's admitted.  Exhibit 458 is an August 5

11    e-mail from Deputy U.S. Marshal Craig Beam, that's

12    admitted.

13            Exhibit 459 are a number of affidavits from

14    attorneys on the CJA panel; Christopher Joseph, Kathleen

15    Ambrosio, Roberto Calbi, Cynthia Dodge, John Jenab, Deb

16    Vermillion, Michael Jackson, Jackie Rokusek, Tom Haney,

17    Robin Fowler.  And is it Thomas Telthorst.

18            MS. BRANNON:  No, Your Honor.  And I'm

19    looking.  We have them listed in a footnote within the--

20    it is Tom Johnson.

21            THE COURT:  Thomas Johnson.

22            MS. BRANNON:  And there's also Melanie

23    Morgan, those just got cut off on the list.

24            THE COURT:  All right.  So Exhibit 459

25    admitted.  460 is an e-mail from CCA local counsel

1    regarding CCA inmate intake form.  It's dated August 24.

2    That's admitted.  Exhibit 461 are docket sheet excerpts

3    from U.S. versus Dertinger.  That's admitted.  462 is a

4    transcript in a hearing in this case on August 9th.  And

5    finally-- and it's admitted.  And finally, Exhibit 463

6    is a transcript of the August 16th hearing in this case,

7    it's admitted.  Is that everything?

8              MS. BRANNON:  It is, Your Honor.

9              THE COURT:  Okay.

10             MS. BRANNON:  There is one other matter we

11   need to take up as long as we're dealing with documents.

12   In Mr. Hart's affidavit, he describes obtaining phone

13   calls from Securus that included phone calls between my

14   office and a former client, but it also includes phone

15   calls between my office, which we believe to have been

16   blocked, and other clients, as well as Tricia Bath and

17   some clients.  What we've done is we've sealed these and

18   we would tender these to the Court because it does

19   include privileged information.

20             THE COURT:  All right.  This is Exhibit 464.

21   It's sealed for the Court's eyes.  And it's recordings?

22             MS. BRANNON:  It's what Mr. Hart subpoenaed

23   from Securus that is described in his affidavit.  I will

24   tell the Court the only phone call we listened to was

25   one between Mr. Burdick in our office and a client of

 1  his that are unrelated to this case.  And so we would

 2  submit-- this is the only copy that we have.  Mr. Hart

 3  has copies as well.

 4            THE COURT:  All right.  You can give that to

 5  Ms. Wiest.  That's Exhibit 464, and that's admitted as

 6  well under seal.

 7            And again, just to be clear, on Exhibit No.

 8  11, it is admitted under seal except for those

 9  acknowledgment forms for the named defendants in this

10  case.

11            MS. TOMASIC:  And, Your Honor, there are a

12  few more government exhibits.

13            THE COURT:  Okay.

14            MS. BRANNON:  Judge, we'd ask for a recess

15  so that we can review these.  They don't have copies for

16  us and we haven't seen them.

17            THE COURT:  All right.  Let's be in recess

18  for 15 minutes.

19            (Recess).

20            THE COURT:  All right.  You can be seated.

21  So there was an additional exhibit.  Have you had a look

22  at it, Ms. Brannon?

23            MS. BRANNON:  Yes, Your Honor, we have.  We

24  understand that the government has the original-- or has

25  copies of recordings of these phone calls.  We would

1    like to have copies of that.  I understand they're

2    making copies for us, and we'd like to listen to them

3    before they're submitted to the Court.

4            If the recordings are accurate and reflect

5    what's on these transcripts, we think the Court could

6    just accept the recordings themselves.  We have a number

7    of issues with the transcripts themself because they

8    have extraneous information on them.  They were

9    apparently prepared yesterday.  But to the extent that

10   it has information beyond what is the actual transcript,

11   we would object.

12           THE COURT:  Okay.  I'm not understanding.

13   I'm trying to look back to see where we left-- I'm not

14   sure I even understand what this exhibit is.

15           MS. BRANNON:  Sure, I'll back up.  I believe

16   Government Exhibits 13, 15, 17, and 19 are documents

17   that were prepared by the U.S. Attorney's Office, I

18   believe by Agent Herron yesterday.  They purport to be

19   transcripts of a call between Ashley Huff and other

20   people using someone else's PIN.  We just received

21   these, we have not heard the actual recordings.  We'd

22   like to hear the recordings before they're submitted to

23   the Court.

24           THE COURT:  Okay.  I see.  So this-- all

25   right.  So just so I'm clear, when we broke, I thought

1   there was an additional exhibit the government-- you

2   hadn't seen it.  I didn't know what it was.  That's why

3   I'm confused.

4           MS. BRANNON:  I'm sorry, Judge.

5           THE COURT:  So, Ms. Tomasic, these are

6   Exhibits 13, 15, 17, and 19, that's what you've marked

7   them as?

8           MS. TOMASIC:  That's what the transcripts

9   are, and then there's calls associated with them, which

10  would be 14, 16, 18, and 20.  And we had provided only

11  the portion of the call on the disk that goes with this

12  particular transcript, but Ms. Brannon would like to

13  review the entire call.  So we're in the process of

14  providing that to her.  I don't know that, given our

15  time constraints, we could address that at this time.

16          I would just proffer at this point and allow

17  the Court to proceed accordingly, however you choose

18  after I proffer, that the government believes that these

19  phone calls are relevant because in defendant's-- or the

20  FPD's, excuse me, reply, which is Document 130 at

21  Page 4, they include in their factual basis a transcript

22  and-- excerpts from that from something that happened on

23  May 16, 2016, in United States v. Ashley Huff, a case

24  pending before Judge Murguia.  And they note that

25  counsel for the government reported that Ms. Huff has

1  met with her attorney regarding his ineffective

2  assistance of counsel--

3          THE COURT:  Okay.  I'm well aware of this

4  issue and I understand the dispute.

5          MS. TOMASIC:  Okay.

6          THE COURT:  So I think it is probably

7  relevant.  But I'll admit these subject to your review.

8  And if you want to file an objection, I won't look at

9  them obviously until you have an opportunity to hear the

10 recording, compare them in the transcripts, and raise

11 any objection you want to do.

12          MS. BRANNON:  I would tell the Court if they

13 are what they're purported to be, we don't have any

14 objection.

15          THE COURT:  Okay.  So Exhibits 13 through

16 20, tapes and transcripts, are admitted, subject to

17 objection by the defense once they have an opportunity

18 to review.

19          MS. BRANNON:  Judge, I-- if I may, we don't

20 have objection to the recordings themselves.  We do have

21 an objection to, for example, Exhibit 19 because it has

22 basically narrative on there that is not transcript,

23 adding information that we think is not part of the

24 phone calls themselves.

25          THE COURT:  All right.  The real evidence,

 1   of course, are the recordings of the calls.  The

 2   transcript is just an aid.  I will disregard.  I'll

 3   instruct the expert or master to disregard any narrative

 4   and to only use the transcripts as an aid, if at all.

 5   The real evidence being the calls.

 6             MS. BRANNON:  So if a redacted version of

 7   this could be provided, I think we'd be satisfied.

 8             THE COURT:  All right.  Is that acceptable?

 9             MS. TOMASIC:  Yes, Your Honor.  We will work

10   it out with Ms. Brannon during the next break.

11             THE COURT:  Okay.  If you all can maybe

12   accomplish this within the next couple of weeks, that

13   would be helpful.

14             Okay.  All right.  So other than your

15   witnesses who you're going to call, no other evidence

16   from the government.  Correct?

17             MS. TOMASIC:  That is correct, Your Honor.

18             THE COURT:  Okay.  And other than these

19   exhibits, any other evidence from you?

20             MS. BRANNON:  Not unless something comes up

21   with these witnesses, Your Honor.

22             THE COURT:  Okay.  Understood.  All right.

23   Call your first witness.

24             MR. OAKLEY:  Your Honor, the United States--

25             THE COURT:  And how long do you anticipate

1  with these witnesses?

2          MR. OAKLEY:  I'm very bad at these guesses,

3  Your Honor, but I would say 20 minutes apiece.  And

4  there are two witnesses.

5          THE COURT:  Okay.  Go ahead.

6          MR. OAKLEY:  United States calls Wayne

7  Bigelow.

8              SERGEANT WAYNE LEE BIGELOW,

9  called as a witness on behalf of the Government, having

10 first been duly sworn, testified as follows:

11                DIRECT EXAMINATION

12 BY MR. OAKLEY:

13   Q.  Sir, would you please tell the Court your name?

14   A.  My name is Wayne Lee Bigelow.

15   Q.  And could you please spell your name for the

16 court reporter?

17   A.  It's Wayne, W-A-Y-N-E.  Middle initial L.  Last

18 name, B-I-G-E-L-O-W.

19   Q.  And how are you currently employed?

20   A.  I'm the Security Threat Group Coordinator for

21 Leavenworth Detention Center, Correction Corporation of

22 America.

23   Q.  Now, how long have you worked for-- now, that

24 company, is it commonly referred to as CCA?

25   A.  Yes, sir.

1    Q.   How long have you worked for CCA?

2    A.   14 years.

3    Q.   How long-- you said that you're currently the

4  Security Threat Group Coordinator.  How long have you

5  been in that position?

6    A.   Nine months.

7    Q.   And what are your duties as the Security Threat

8  Group Coordinator as it relates to CCA's phone recording

9  system?

10    A.   I maintain contact with the-- it's a Securus

11  platform.  Securus is a company.  I maintain a

12  relationship with the individuals there.  Any required

13  maintenance.  If I have a request for phone recordings

14  or a list of phone calls made, things like that, why, I

15  handle those requests.

16    Q.   Okay.  Are you familiar with CCA's policies

17  regarding how an attorney can make a request that their

18  phone number be blocked from the Securus system?

19    A.   I am.

20    Q.   Now, are you the person that handles those

21  requests?

22    A.   I have been, yes.

23    Q.   And how long have you been doing that?

24    A.   For nine months.

25    Q.   Okay.  You said that-- that CCA contracts with

1    Securus.  Securus is the company that-- that has the

2    phone recording system; is that accurate?

3        A.   That's correct.

4        Q.   So when an attorney makes such a request to you,

5    how is that request made?

6        A.   Generally they'll either send me a fax or I will

7    get a letter with their letterhead identifying the-- the

8    firm or the attorneys involved.  They'll give me a list

9    of phone numbers.  At that time I will go in and each--

10   each number is done individually.  I will place them on

11   private-- there's a-- there's a place on the format that

12   shows a private attorney privilege on it.  I also

13   identify that number.  At the bottom of the-- of the

14   screen will show an area for the law firm, and I put

15   that information on as well.  And then I return a cover

16   letter with the information stating that-- that the

17   numbers that they have sent and requested to be

18   restricted have been done.

19              MR. OAKLEY:  Your Honor, may I approach?

20              THE COURT:  Yes.

21       Q.   (BY MS. BARNETT)  Sergeant Bigelow, I've handed

22   you what's been marked as Government's Exhibit 7.  Are

23   you familiar with that document?

24       A.   Yes, sir.

25       Q.   Is that a-- a copy of the computer screenshot for

1    the Securus system that you utilize?

2       A.   It is.

3            MS. BARNETT:  And, Your Honor, I believe

4    this has already been admitted.  But if not, I'd offer

5    it as an exhibit.

6            THE COURT:  I think that's Exhibit 7, it's

7    been admitted.

8            MR. OAKLEY:  Thank you.

9       Q.   (BY MR. OAKLEY)  So, Sergeant Bigelow, I'm

10   showing you the photocopy of this screenshot.  Could you

11   explain for the Court exactly what it is that we're

12   looking at?

13      A.   This is the-- this is the actual screenshot that

14   I use.  At the top it will say-- it says "dialed

15   number."  The-- the box that has the 1 is obviously for

16   the beginning of the number.  The second oblong box

17   there is for the 10-digit number with the three-digit

18   area code and the phone number itself.

19           And then I go down to where it says, "Private use

20   for attorney-client privilege," and check that box.  And

21   then all the way down to where it says "Description,"

22   and that's where I type in the-- the law firm or the

23   individual attorney, whichever the case may be, and put

24   that in there.  And then to actually complete the

25   process, there at the bottom it says-- it shows

1    "Create," and I-- I click that and it actually puts it

2    in the database.  So it-- it disables that particular

3    phone number from being monitored or recorded.

4        Q.  Okay.  Now, when you entered that information, is

5    it specific to a particular inmate or is that attorney's

6    phone number that you enter then blocked as to every

7    inmate that is at CCA?

8        A.  No one in the monitored system is able to call

9    that number.  And we-- we are not able to-- it

10   completely disables us and prevents us from recording or

11   monitoring that number, it matters not who calls.

12       Q.  Okay.  When you say the recorded system, are you

13   referring to the phones that are located in the inmates'

14   pods--

15       A.  That's correct.

16       Q.  -- in the living facility--

17       A.  That's correct, yes.

18       Q.  -- at CCA?

19       A.  Uh-huh.

20       Q.  And so you don't have to do that-- an attorney

21   doesn't have to do that for every client?

22       A.  No.

23       Q.  Just once is effective?

24       A.  That's correct.

25       Q.  Now, do you know how long it's effective for?

1      A.  Until it's removed.

2      Q.  Do you know how to remove that-- that block?

3      A.  I-- actually I've never done it at this point.

4    I've never had a request from anybody to remove a

5    restriction on a phone number.  So I'm-- that's another

6    process.  And I couldn't honestly tell you how to do it

7    because I haven't done it yet.

8      Q.  Okay.  And you've been in this position for-- for

9    nine months you said?

10     A.  That's correct, yes, sir.

11     Q.  Okay.  And so when you talk about the process and

12   never having done it, you're referring to the last nine

13   months?

14     A.  That's correct.

15     Q.  Okay.  Other than an attorney making a request in

16   writing to the Security Threat Group Coordinator, is

17   there any other way that an attorney or an inmate can

18   request an unrecorded phone call at CCA?

19     A.  The-- the procedure we presently have in effect

20   at this point is the attorney will usually call and give

21   us a 24-hour notice requesting an unmonitored phone call

22   or a conference with an inmate.  Our unit team generally

23   will conduct that process.  Anybody can, but unit team

24   members usually take care of it, either the case manager

25   or counselor.  The attorney will either send an e-mail

1  or make a phone call to the receptionist and schedule

2  that.  A copy of that goes to that individual unit team,

3  depending on where the housing location of that

4  particular inmate is, and they will call-- return a

5  phone call back to the attorney confirming that we have

6  received it and making sure that we're-- we're on

7  agreement as to the schedule of the time.

8          I have several in-- in the past that have fallen

9  during count procedure and I've had to reschedule them a

10  few minutes earlier or a few minutes later.  So we get

11  together on that.  And then at the date and the time

12  that the actual phone conference is conducted, then we

13  bring the inmate into the office and use the telephone

14  there to make the call.

15  Q.  And the telephone in the office is not a line

16  that is recorded by the Securus system?

17  A.  That's correct.

18  Q.  Now, do you know how inmates are informed of

19  these procedures?

20  A.  The inmate handbook has the information printed

21  in it to-- to notify them as to the fact that the-- the

22  phones in the pods are all monitored and recorded.

23  They're capable to be monitored, they're not always

24  monitored, but they are recorded.  We have signage in

25  the-- the housing units that state it.  The signage is

1    in the vicinity of the-- of the telephone so that it's--

2    it's there so that they can-- and it's in English, as

3    well as Spanish, both.

4        Q.  Okay.  I'm going to hand you some photographs

5    that have been admitted.  These are Government's

6    Exhibits 3, 4, 5, and 6.  Are you familiar with those

7    photographs?

8        A.  Yes, sir.

9        Q.  Do those photographs fairly and accurately depict

10   the signage that is-- is present at CCA?

11       A.  Yes, sir, they do.

12       Q.  Now, that's-- that does not represent the

13   entire-- all of the phones at CCA; is that correct?

14       A.  No, sir.

15       Q.  But that's an example of-- of some of the signage

16   that is visible?

17       A.  Yes, sir.

18       Q.  Now, do you know if at some point during the last

19   month or so if some additional signs were put up at--

20   some new signs were put up at CCA?

21       A.  Yeah, there were some-- some new ones added and

22   there was-- there was some of the older signs that had

23   been replaced.

24       Q.  Okay.  Do you--

25       A.  And these-- this is an example of the-- one of

1    the older ones.  I don't see one of the new ones here,

2    but this is one of the older signs right here.

3        Q.  And for the record, you're referring to

4    Government's Exhibit 3?

5        A.  Yes.

6        Q.  Okay.  And so that's-- that's one of the older

7    signs that was--

8        A.  That's correct, uh-huh.

9        Q.  -- not recently replaced?

10       A.  That's correct, yes.

11       Q.  Okay.  Do some of the phones themselves as

12   depicted in the other photographs have signs on them

13   indicating that the-- the calls made from that

14   particular phone are recorded?

15       A.  They do not, to my knowledge.

16       Q.  Directing your attention to Government's

17   Exhibit 5.  Would you-- does that appear to be one of

18   the Securus phones?

19       A.  Yeah, that's the same-- correct, that's right, it

20   does say there.

21       Q.  Okay.  And for the record, you're showing me

22   Government's Exhibit 6?

23       A.  Yes.

24       Q.  Is Government's Exhibit 6 a close-up photograph

25   of a sign that appears on-- on a phone similar to the

1    one that's depicted in Government's Exhibit 5?

2        A.    It is, yes, sir, uh-huh.

3        Q.    Okay.

4        A.    It gives dialing instructions and then, "Calls

5    are subject to monitoring and recording."

6        Q.    Okay.  Now, when an inmate makes a phone call

7    from one of the-- the phones that are subject to

8    recording, the inmate making the phone call, are they

9    advised in any way that the call is recorded during the

10   phone call?

11       A.    There is a recorded message that they get upon

12   initiating the phone call.  It will also-- it will tell

13   them that the-- the phone call may be monitored and will

14   be recorded.  And it gives-- also it gives the

15   individual receiving the phone call the opportunity to

16   block the call if they don't want to accept it.

17       Q.    Okay.

18       A.    They can actually on their end press 6 and the--

19   their number is no longer allowed to be called.

20       Q.    But my question was whether or not the inmate

21   making the call is advised, and you said yes.

22       A.    It is on both ends.

23       Q.    Okay.  In addition to having the opportunity to--

24   to hit 6 to reject the call or to be blocked, is the

25   person that receives the phone call placed from the

1    Securus phones advised that the call may be recorded, if

2    it's a phone call that is being recorded?

3        A.   Yes, sir.

4        Q.   And how are they advised?

5        A.   It's on-- it's on the recording.  Both-- both

6    parties involved-- pardon me.  Both parties involved in

7    the conversation are-- hear the same recording.

8        Q.   Okay.  Now, you said that the information that

9    you enter into the computer system is Securus'

10   information; is that correct?

11       A.   Yes, sir.

12       Q.   Now, does CCA handle the blocking or is that a

13   Securus issue?  Well, you physically enter it to block

14   it.  Correct?

15       A.   I physically do it, but it goes into their

16   database.  I-- I know in the past, prior to my assuming

17   this position, that we could just contact the-- the

18   people at Securus and they would go ahead and block the

19   numbers.  So that's-- they can do it on their end as

20   well.

21       Q.   Okay.  So either the Security Threat Group

22   Coordinator, your position--

23       A.   Right.

24       Q.   -- can do it or someone else can contact--

25       A.   Correct.

1     Q.  -- Securus directly?

2     A.  Correct.

3     Q.  Do you know--

4          THE COURT:  Let me get clarity on that.  I

5     don't understand.  So you said in the past Securus has

6     sometimes entered the data themselves.  How does that

7     happen and how long ago?

8          THE WITNESS:  When I say the past, I'm

9     referring to my-- my position.  I was not-- when I

10    readily took this position, I was not completely

11    familiar with the system at that time.  So if I had--

12    and I had a couple of requests at that time that-- and I

13    didn't know exactly how to go about the procedure, the

14    actual procedure of physically doing it, so I contacted

15    the people at Securus and they-- they blocked it on

16    their end as opposed to me being able to do it on our

17    end.

18          THE COURT:  So that was early in your

19    nine-month tenure?

20          THE WITNESS:  That's correct.

21          THE COURT:  Because you didn't understand

22    how to do it, you contacted them.  You're not testifying

23    that an attorney or somebody else has--

24          THE WITNESS:  No.

25          THE COURT:  -- from time to time contacted

1    them?

2              THE WITNESS:  No.

3              THE COURT:  All right.  I understand.

4    Q.  (BY MR. OAKLEY)  Now, the recording that both the

5    sending-- the person making the phone call and the

6    person receiving the phone call, the recording that they

7    hear, does it say that the phone call is subject to

8    recording or does it-- does it say it could be subject

9    to recording?

10   A.  It goes into a-- as the way I understand the

11   process, it goes into a database.  And for me to

12   reproduce it, I have to put the requested information

13   that-- the particular dates.  And I can-- I can go

14   specific numbers or whatever, but I have to put it into

15   a database and make a request of Securus to get that

16   information so that I can reproduce it if I have to.

17   Q.  Okay.  But my question relates to the actual

18   recording that is heard by the inmate and whoever the

19   inmate is calling.

20        Does the recorded message, is it a general

21   statement of it could be recorded or does it

22   affirmatively state that this call is being recorded?

23   A.  It will state that this-- that this is-- it is

24   subject to recording or monitoring.

25   Q.  Okay.  Do you know if when an inmate makes a call

1    to a blocked number, whether or not either the inmate or

2    the person receiving that phone call gets that

3    recording?

4        A.  I do not.

5        Q.  Have you ever listened to a phone call to a

6    blocked number?

7        A.  I can't.  I don't have the ability.

8        Q.  Okay.  And so, therefore, you wouldn't know in

9    that circumstance whether or not that message is played?

10       A.  The only-- the only indication that I have is if

11   I had-- I pulled up a list of-- of completed calls from

12   an inmate to somebody outside the facility.  It will

13   display on the right side-- or the left side of the

14   page, it will have little speaker icons.  If those icons

15   are not there, if they're not displayed, then I can tell

16   by looking at that particular number that it's-- it's

17   been blocked.

18       Q.  And you have no ability to listen to that?

19       A.  And I-- I have no ability to listen to them or

20   record them.

21            MR. OAKLEY:  Your Honor, may I have one

22   moment?  No further questions, Your Honor.

23                   CROSS EXAMINATION

24   BY MS. BRANNON:

25       Q.  Good afternoon.  I want to talk about terminology

1    to begin with.  You've used the term "private" and the

2    term "blocked."  What's the difference between those two

3    terms?

4        A.  I honestly don't know.  I assume they mean the

5    same thing.  In the-- on the sheet that we've got here

6    as evidence here, I used the-- the "private" because it

7    says, "Use for attorney-client privilege."  I don't know

8    that there's any real difference between something-- a

9    phone call being blocked or being privatized, to be

10   honest with you.

11       Q.  So when an attorney would contact you and say, "I

12   don't want my phone calls to be recorded," you would be

13   the one to mark "private"?

14       A.  That's correct.

15       Q.  And if the term "blocked" is being used here

16   today, do you mean that it was private as opposed to

17   blocked?

18       A.  Yes, ma'am.

19       Q.  Because you don't know what blocked means?

20       A.  That's correct.

21       Q.  Okay.  When you-- well, let me ask about this

22   first.  You described a situation where an attorney

23   could call in and ask for a confidential phone call with

24   a client; is that right?

25       A.  Yes, ma'am, uh-huh.

1    Q.   And can the client also ask for a confidential

2  phone call?

3    A.   No.

4    Q.   Okay.  So the only means that an-- that an inmate

5  has to initiate a phone call is by calling from the day

6  room or the pod?

7    A.   That's correct.

8    Q.   So if an inmate said, "I want to make sure that I

9  have a confidential phone call with my attorney," that

10  has to be initiated by the attorney?

11    A.   I would say that if there was a special

12  circumstance or something, that we-- we'd give that some

13  consideration as far as allowing that to happen.

14    Q.   That would be an exception, though?

15    A.   We-- we could make an exception in a situation

16  like that, depending on what the circumstance is,

17  absolutely.

18    Q.   Right.  But your policy and practice is not to,

19  for example, have in the inmate handbook that they could

20  ask for this and initiate it on their own?

21    A.   That's correct.

22    Q.   When an attorney does initiate this confidential

23  phone call that you described in the counselor's office,

24  who else is present?

25    A.   Usually a-- a member of the unit team.

1     Q.  All right.  So on the inmate's end of the phone

2  call, there is someone standing there listening to it.

3  Correct?

4     A.  They're capable of it, yes.

5     Q.  Well, you don't--

6     A.  We do it for security reasons.  We don't leave

7  the inmate unattended in the-- in an office situation.

8     Q.  Right.  So any time that is initiated by an

9  attorney, there is a member of CCA listening to that end

10  of the phone call?

11     A.  Yes, ma'am.

12     Q.  All right.  You talked about what your

13  responsibility is as opposed to Securus.  When an

14  attorney-- if an attorney were to contact you and say,

15  "I don't want my phone calls recorded," you check the

16  "private" box, it is your responsibility and CCA's

17  responsibility to make sure they're not recorded.  Do I

18  understand that right?

19     A.  Yes, ma'am.

20     Q.  All right.  Have you ever had the U.S. Attorney's

21  Office or any law enforcement agency contact you and ask

22  you to record phone calls that have been marked

23  "private"?

24     A.  No.

25     Q.  Would they-- would you be the person that they

1    went to?

2        A.    Yes.

3        Q.    If they did that, would there be some kind of

4    documentation that that had been done?

5        A.    I don't have the ability to do that on my end.  I

6    don't know whether it would be something that would-- we

7    could circumvent going through Securus or not, but I--

8    personally I don't-- we don't have the ability to do it.

9        Q.    So you don't have-- I'm sorry.

10       A.    Once they're put in there-- and like I say, I've

11   never unblocked one--

12       Q.    Right.

13       A.    -- I'm-- I'd be-- I'm sure I'd be remiss to say

14   that's not possible, because I'm sure it is.  But I

15   would not have the slightest idea on how to do that,

16   so...

17       Q.    Your understanding of the system is if the U.S.

18   Attorney's Office or law enforcement agency wanted to do

19   that, they would need to go through Securus to do this?

20       A.    Correct.

21       Q.    All right.  And if they did that, you wouldn't

22   necessarily know about it?

23       A.    No.

24       Q.    All right.  Do you know how long recordings of

25   phone calls are kept?

1    A.  I don't.

2    Q.  All right.  Do you--

3    A.  They are kept for a considerable amount of time

4  I'm sure.

5    Q.  Is any part of your job related to maintaining

6  the phone calls or how long they're kept or anything

7  like that?

8    A.  No, ma'am.

9    Q.  As I understand it, what you're here testifying

10  to today has to do with what phone calls are recorded

11  and not and checking that box--

12    A.  Right.

13    Q.  -- is that right?

14    A.  Right.

15    Q.  And you don't know whether this recording that

16  you talked about plays if a phone call has been marked

17  "private."  Did I understand that right?

18    A.  I don't.

19    Q.  Okay.  Tell me again what your title is.

20    A.  My title?

21    Q.  Uh-huh.

22    A.  I'm the sergeant in rank and I'm-- I'm the

23  Security Threat Group Coordinator.  What I-- basically

24  my-- my main responsibilities is I monitor the gang

25  activity in the facility.

1    Q.   Right.  Have you ever had reason as part of your

2   job to monitor phone calls?

3    A.   If-- if we have an investigation, ongoing

4   investigation--

5    Q.   Uh-huh.

6    A.   -- on an internal issue, and then the

7   investigator can ask me and has asked me to monitor

8   phone calls.

9    Q.   Has a U.S. Attorney or federal law enforcement

10  agent ever asked you to monitor phone calls?

11   A.   No, ma'am.

12   Q.   All right.  When the U.S. Attorney or federal

13  agent ask for copies of phone calls, does that go

14  through you?

15   A.   Yes, ma'am.

16   Q.   And tell me about that process.

17   A.   What they'll do is they will send me a subpoena--

18   Q.   Uh-huh.

19   A.   -- with the inmate's name, federal ID number,

20  the-- it may be a specific phone number, it may be just

21  a series of dates.

22   Q.   Uh-huh.

23   A.   And they'll-- they'll ask for a particular date

24  beginning until this particular date.  And then I can

25  pull those up in the system and download them into a

1    database.  And I have to request permission from Securus

2    to get those.  Once I get those back, then I can-- I can

3    burn them onto a DVD and then I-- I transport those to

4    the-- whoever.

5        Q.  So it would not be a situation where you would

6    give them some sort of access code to go to Securus

7    directly and listen to those?

8        A.  Yes.

9        Q.  And you would maintain a copy of any record of

10    requests for phone calls, copy of the subpoena, for

11    example?

12        A.  The subpoena I would keep, yes.

13        Q.  And as I understand from your description, you

14    can be very selective and particular about what phone

15    calls, what phone numbers, what inmates; is that right?

16        A.  That's correct.

17        Q.  Okay.  If you know, when an attorney faxes or

18    e-mails Connie at the front desk and says, "I'd like to

19    set up a phone call or have my client call me," is that

20    call secure or is it recorded, do you know?

21        A.  No, it's secure.

22        Q.  So if an attorney is the one initiating this by

23    saying, "I would like my client to call," and makes that

24    request by fax or e-mail, that is not recorded?

25        A.  That's correct.

1    Q.  And how is that-- how does that happen?  How do

2    you not record that?

3    A.  Well, those-- the internal phone system that

4    the-- the employees and staff use is not on the Securus

5    platform.

6    Q.  All right.  So this situation, as you envision

7    it, would be sometime when they would take the client--

8    the inmate to a counselor's office to make the call?

9    A.  Right.

10    Q.  It's also the case that we can fax and e-mail and

11    have our client call from the pod.  Correct?

12    A.  Yes, ma'am.

13    Q.  And if an attorney initiates that phone call and

14    has the client call in from the pod, that is recorded?

15    A.  It's possible, yes.

16    Q.  It's recorded unless you've marked it "private"?

17    A.  Well, they-- it's been my experience generally

18    that they don't-- if they-- they want an unmonitored

19    call, that they-- they don't call and say, "Have inmate

20    so and so give me a call from the housing unit."  They

21    will-- they will schedule a conference like we talked

22    about earlier.

23    Q.  If it were the case that an attorney faxed or

24    e-mailed in and said, "Please have my client call me,"

25    that doesn't necessarily go through you?

1    A.  No.

2    Q.  Okay.

3    A.  I do get copies of them.  They do-- the

4    receptionist do-- does, and I maintain a file, but--

5    Q.  All right.

6    A.  -- but they're-- I really don't play any role in

7    it any longer.  I was a counselor prior to this

8    position, so they-- they asked them to give me the

9    copies, so I get a copy of them.

10   Q.  So every fax and every e-mail from an attorney

11   asking the client to call would be maintained at CCA?

12   A.  Yes, ma'am.

13   Q.  All right.  Let's talk about terminology again,

14   the difference between recording and monitoring.  You

15   know the difference between that and how your system

16   works?

17   A.  I do.

18   Q.  And, for example, so when CCA uses just the term

19   "monitoring," that's very specific.  Correct?

20   A.  Yes, ma'am.

21   Q.  And when it uses just the term "monitoring," that

22   does not mean automatically also recording?

23   A.  I believe the way the system works, that those--

24   those phone calls are maintained when they're made on a

25   database if they haven't been blocked.  Because I can go

1  into the system and pull up a phone call that's a month

2  old--

3      Q.  Uh-huh.

4      A.  -- and listen to it.  So it has to be recorded.

5            MS. BRANNON:  May I approach the witness,

6  Your Honor?

7            THE COURT:  Yes.

8      Q.  (BY MS. BRANNON)  If you could look at that.

9  That is one of the exhibits.  It's the copy from the

10  handbook, the CCA handbook.

11      A.  Uh-huh.

12      Q.  If you look at the top at "Access to Telephone,"

13  it says, "Day room telephones are subject to

14  monitoring."  Is that right?

15      A.  Yes, ma'am.

16      Q.  And in that particular paragraph, it doesn't say

17  anything about recording.  Correct?

18      A.  It doesn't.  That's correct.

19      Q.  And there's nothing in this-- well, let me back

20  up.  As part of your job, are you responsible for ever

21  notifying any attorneys of the procedure to block calls?

22      A.  No.

23      Q.  You get the letters perhaps from some of us; is

24  that right?

25      A.  Yes.

1    Q.  You've gotten a few letters like that in the last

2  month?

3    A.  I have a couple.

4    Q.  All right.

5    A.  I've gotten very adept.

6    Q.  You got one from my office, too, didn't you?

7    A.  I'm sure I did.

8    Q.  About 70 numbers.  And so when you got those

9  numbers you went through and marked "private"?

10    A.  I did.

11        MS. BRANNON:  May I approach again, Your

12  Honor?

13        THE COURT:  Yes.

14    Q.  (BY MS. BRANNON)  I'm going to show you what is

15  marked as Affiant Exhibit F.  It's actually an addendum

16  to Gary Hart's affidavit that's been marked and admitted

17  into evidence.  Have you look at that.  Who's Connie

18  Parish?

19    A.  Connie Parish is the warden's secretary.

20    Q.  All right.

21        MR. OAKLEY:  Your Honor--

22    Q.  (BY MS. BRANNON)  Down at the bottom--

23        MR. OAKLEY:  I'm sorry, may I see a copy of

24  this?

25        MS. BRANNON:  You have a copy.  It's

1    attached to Gary Hart's affidavit, Exhibit F.  Would you

2    like me to--

3              MR. OAKLEY:  Can I see it just real quick?

4              MS. BRANNON:  Can I borrow that back?

5              THE WITNESS:  Absolutely.

6              MR. OAKLEY:  Thank you.  Okay.  Thank you.

7        Q.  (BY MS. BRANNON)  All right.  This is a little

8    bit hard to read, but down at the bottom of the page,

9    it's a little bit different than what we have from the

10   government here today.  But does that indicate that that

11   phone number has been marked "private"?

12       A.  If this check mark here is under "private," I'm

13   having difficulty-- a time reading it.

14       Q.  I'm sorry about that.

15       A.  I'm in my third trifocal here and I'm still not

16   getting it.  But that is correct.  If that's-- if that's

17   what that-- that says "private," I believe that's what

18   it is.

19       Q.  All right.  And so if that's checked "private,"

20   that means to you that those phone calls to that number

21   would not be recorded?

22       A.  That's correct.

23       Q.  And that means to you-- well, checking that box

24   "private" was either done by you or someone at CCA in

25   your capacity?

16-20032-JAR    United States v. Lorenzo Black    09.07.16    93

```
 1       A.  That's correct.
 2       Q.  Because it's CCA's responsibility to do that in
 3  response to a letter?
 4       A.  Right.
 5       Q.  All right.
 6       A.  And I see this was Matthew Collins on here, so he
 7  was-- he was my predecessor.  Not this time, but the
 8  time before, so...
 9       Q.  Is Mr. Collins still with CCA?
10       A.  He is not.  He's with the Bureau of Prisons at
11  the FCI Leavenworth.
12       Q.  Do you have anything to do with the
13  video-conferencing system?
14       A.  No.
15       Q.  All right.  Let's talk a little bit about the
16  signage that you testified about.  Did you take
17  photographs of those?
18       A.  I did not.
19       Q.  Do you know who did?
20       A.  I did not-- I don't know.
21       Q.  Do you know how specifically those signs changed
22  in August?
23       A.  I-- as I understand by reading them, they-- the
24  only difference I could tell was that the-- the
25  background was red on the older ones and it was white on
```

1  the newer ones, and they were a little larger placard.

2  But I think they said the same thing.

3    Q.  Do you know if they kept the signs that were

4  taken down?

5    A.  I don't believe they removed-- I'm not sure that

6  they removed any.  I think the new ones were just made

7  to-- because they needed to add some signage in

8  different places and that they-- they just put

9  additional signage up.  I don't know that they actually

10  removed any.  But I wasn't-- I wasn't involved in that

11  process so I could be speaking out of turn.

12    Q.  Well, that's what I was about to ask you.  Who

13  was responsible for the signage?

14    A.  Our maintenance department did that.  They were

15  instructed, I assume, by the assistant warden or the

16  chief of security to do that.

17    Q.  Do you spend time now in your current job in the

18  pods?

19    A.  I do.  It's not nearly as-- as frequent because

20  I-- usually I'm-- when I conduct my interviews, I'll

21  just go in and pull them out and we go to an office

22  where I conduct interviews.  I don't do them in the

23  units.

24    Q.  Let's talk about interviews for just a second.

25  Since all of this has been going on, say within the last

1    month or so, has there been any sort of internal

2    investigation at CCA about video-recordings or phone

3    recordings that you've conducted?

4        A.   No.

5            MR. OAKLEY:  Your Honor, I'm going to object

6    to relevance to this particular hearing.

7            THE COURT:  Overruled.

8        Q.   (BY MS. BRANNON)  Have you participated in any

9    sort of investigation into either the video-recordings

10   or the phone recordings at CCA?

11       A.   No, ma'am.

12       Q.   Do you know if there was an investigation at CCA?

13       A.   Not to my knowledge.

14       Q.   All right.  Have you given any statements to

15   anyone about your job and your participation in phone

16   recordings at CCA?

17       A.   Statements?

18       Q.   Uh-huh.

19       A.   I'm not sure I understand.

20       Q.   Well, first of all, have you given any written

21   statements to anyone about this?

22       A.   No, ma'am.

23       Q.   All right.  Have you been interviewed about this?

24       A.   Yes.

25       Q.   By who?

1    A.   The-- our attorney, the attorneys that were--

2    this gentleman right here and-- and Ms. Tomasic.

3    Q.   The attorneys for CCA?

4    A.   Yes.

5    Q.   What about the U.S. Attorney's Office?

6    A.   Yes.

7         MS. BRANNON:   Judge, we would make a request

8    for any Jencks Act material that might apply to this

9    witness.

10         THE COURT:   Did you make statements or

11    interview notes?

12         MR. OAKLEY:   We have interview notes of the

13    attorney, but not anything that was prepared by this

14    witness, Your Honor.   We did, in anticipation of this

15    hearing, meet with this witness at CCA, along with CCA

16    counsel.   But to my knowledge, they did not--

17         THE COURT:   But you have statements he made?

18    You do have--

19         MR. OAKLEY:   Nothing that he made.

20         THE COURT:   All right.

21         MS. BRANNON:   I think my question is whether

22    they have notes coming from an interview of him, whether

23    he actually wrote them or not.

24         THE COURT:   Did you--

25         MR. OAKLEY:   We have our notes, but they are

 1    not Jencks material.  No one asked this witness to

 2    review the notes to affirm any of the information in the

 3    notes.  That our notes would be, of course, work

 4    product.

 5              THE COURT:  All right.  I understand.

 6    Q.  (BY MS. BRANNON)  Were you asked to review

 7    anything before you testified today?

 8    A.  No.

 9    Q.  The photographs, anything like that?

10    A.  No.

11    Q.  All right.  Getting back to the signage for just

12    a minute.  You don't have any role or participation in

13    what the signs actually read?

14    A.  I do not.

15    Q.  Okay.  And do you know who's responsible for

16    that?

17    A.  I do not.

18              MS. BRANNON:  Could I have just a moment,

19    Your Honor?

20              THE COURT:  Yes.

21    Q.  (BY MS. BRANNON)  All right.  So, for example,

22    when you got our letter from our office asking that

23    these certain numbers be private and not recorded, and

24    you put those into the system, was there anything in the

25    system that would alert you that those had previously

1    been marked as "private"?

2        A.   Yes, they-- it would-- once I put it in

3    initially, it will-- it will usually flash a second

4    screen back for me to be able to check it.  If that

5    number is already in there, then it will give me a

6    bigger screen and it will show me that that number has

7    already been put in.

8        Q.   And that sort of information, is that stored on

9    the computer so that if you did it again, that would be

10   available?

11       A.   It should be, yes.

12       Q.   Okay.  Is there any reason that-- anything at CCA

13   that would go through and take that information out say

14   on a cyclical basis?

15       A.   Not to my knowledge, ma'am, no.

16       Q.   When you are trying to enter a number that has

17   been marked-- that you want to mark as "private," is

18   there any sort of error message that ever comes up?

19       A.   No.

20       Q.   Would you ever get any sort of message, other

21   than to let you mark it as "private" and some indication

22   that it had been marked previously?

23       A.   That would be it.

24            MS. BRANNON:  May I approach one more time,

25   Your Honor?

1              THE COURT:  Yes.

2      Q.  (BY MS. BRANNON)  I'm going to hand you what's

3   been marked Exhibit 451.  Just for abbreviation, sir,

4   this is an affidavit from Gary Hart, which basically

5   says that he had contacted CCA, asked to have his number

6   blocked, he was given that sheet from Connie that

7   verified that his number had been blocked.

8          Can you explain how his phone calls would still

9   be recorded, despite the fact that they had been

10  blocked, marked as "private"?

11     A.  I cannot.

12     Q.  If for some reason the U.S. Attorney or a federal

13  agent had contacted Securus to change that so that those

14  phone calls could be recorded, would you know that?

15     A.  No.

16     Q.  If that had happened, would that screen where it

17  had been marked "private" change?

18     A.  After I-- after I initially put the number in,

19  then it would-- like I say, it would come back and show

20  me that it had already been put in there.  But that

21  would be the only way I know.  I'd have to initially go

22  in there to check.

23     Q.  If Securus did anything on their end to change

24  what was being blocked or private, would you know that?

25     A.  I would assume that they would notify me that

1    that-- something like that had happened, but I--

2        Q.  Has that ever happened?

3        A.  No, not to my knowledge.  Not since I-- not

4    during my position.

5        Q.  So if the attorney has asked for the number to be

6    not recorded, you've gone in and marked "private," and

7    those phone calls are still recorded, you don't have any

8    idea how that happened?

9        A.  No, ma'am.

10       Q.  All right.

11            MS. BRANNON:  I think that's all.  Thank you

12   very much.

13                    REDIRECT EXAMINATION

14   BY MR. OAKLEY:

15       Q.  You have not-- do you have any reason to believe

16   that the U.S. Attorney's Office contacted Securus and

17   asked them to record phone calls that were blocked?

18       A.  No one-- no reason to, no.

19       Q.  I do want to talk to you about one thing.  On

20   cross examination, counsel asked if-- if you reviewed

21   any photographs during the pretrial interview on Friday.

22   Now, we did show you what we anticipated to be exhibits

23   in this case.  Correct?

24       A.  These.

25       Q.  The photographs that are in front of you.

1    A.   Okay, yeah.  I do recall that, yes.

2    Q.   Okay.  But other than-- you didn't provide us

3  with any notes or anything of that?

4    A.   No.

5    Q.   Correct?

6    A.   No.

7    Q.   Okay.

8         MR. OAKLEY:  No further questions, Your

9  Honor.

10        THE COURT:  All right.  He can be excused?

11        MS. BRANNON:  Yes.

12        THE COURT:  All right.  Thank you.

13        THE WITNESS:  Thank you.

14        THE COURT:  You can call your next witness.

15        MS. TOMASIC:  Before we call our next

16  witness, I just want to alert the Court that on Friday

17  morning a subpoena was served on Securus at their

18  corporate headquarters in Dallas, Texas.  I left a

19  voicemail with in-house counsel.  She called me back.

20  And then I-- I was not in the office, so I returned her

21  call and left a voicemail letting her know that she had

22  been subpoenaed, please contact me if she had any

23  questions about the subpoena, but that the hearing was

24  today.

25             No one showed up from Securus, and I believe

 1   we should take that matter up perhaps at the end of the

 2   hearing.  But the government did put forth an effort to

 3   get someone from Securus here to answer those questions.

 4              THE COURT:  All right.  You can come

 5   forward.  Yes.

 6              MR. OAKLEY:  I'm sorry.  The United States

 7   would next call Laurie Harrison.

 8                    LAURIE HARRISON,

 9   called as a witness on behalf of the Government, having

10   first been duly sworn, testified as follows:

11                  DIRECT EXAMINATION

12   BY MR. OAKLEY:

13   Q.  Ma'am, would you please tell the Court your full

14   name and spell it for the court reporter?

15   A.  My name is Laurie Harrison.  And I'm an R&D

16   intake officer at CCA.  My name is spelled L-A-U-R-I-E.

17   And my last name is Harrison, H-A-R-R-I-S-O-N.

18   Q.  And how long have you been employed at CCA?

19   A.  I've been there nine years.  And I've worked in

20   the R&D department and transportation department for

21   eight of those years.

22   Q.  What do you currently do?

23   A.  I'm in receiving and discharge, which is R&D.  I

24   intake the inmates that are brought in from like the

25   federal courthouses.  We do in-process county inmates,

1    state inmates into our facility.

2        Q.   Okay.

3        A.   I'm also one that will release the inmates from

4    our custody per the marshal's request.

5        Q.   Okay.  I want to talk to you about your job

6    duties as it relates to receiving inmates.

7        A.   Okay.

8        Q.   Are you familiar with what is told to inmates who

9    first arrive at CCA concerning the monitoring of their

10   phone calls by CCA?

11       A.   Yes, sir, I am.

12       Q.   And what-- how is it that you're aware of that?

13   Do you participate in that process?

14       A.   Yes, sir, I do.

15       Q.   And explain for the Court how that happens.

16       A.   When we in-process the inmate, we are-- we're

17   given a information sheet by the marshals service or

18   whoever they're being in-processed from, whatever

19   division, marshals or whatever.  That information sheet

20   tells us everything that we need to know about the

21   person that's being in-processed.  We put all that

22   information into our system.

23            And then once we've talked to them and discussed

24   that, we have what's called a intake booking packet for

25   the inmates.  It goes over what they'll be issued when

1   they're there, how our phone call system works, how our

2   mail system works.  And they pretty much are-- have it

3   all explained to them.  And they sign all these

4   individual pages stating, yes, I received these garments

5   or, yes, I received this, I understand this is how the

6   phone calls work, I understand this is how the mail goes

7   in and out of your system.  So, I mean-- and we explain

8   everything step-by-step.

9        Q.  Okay.

10                MR. OAKLEY:  May I approach, Your Honor?

11                THE COURT:  Yes.

12        Q.  (BY MR. OAKLEY)  I'm going to hand you what's

13   been admitted as Government's Exhibit No. 1.

14        A.  Okay.

15        Q.  Are you familiar with that form?

16        A.  Yes, sir, I am.  This is our telephone monitoring

17   paper that is in the booking packet that one of the

18   inmates will sign when they are brought into the

19   facility.

20        Q.  And that's a-- a form that hasn't been signed by

21   anyone.  That's an example of the form that you go over

22   with inmates; is that correct?

23        A.  Yes, sir, that's right.

24        Q.  Now, you said that every inmate during the

25   receiving process-- that you go over that form with

1   them.  Now--

2       A.  Yes, sir, we do.

3       Q.  -- do you do that both verbally and in writing?

4       A.  Yes, sir.

5       Q.  Explain for us how you go over the form verbally

6   with the inmate.

7       A.  If you were to come in, I would say, "This here

8   will explain to you that all phone calls are being

9   monitored through our system."  And then the person that

10  we explain to will sign the top line.  And then the

11  officer that explained it will sign the bottom line and

12  then also print their name on there.  So if their

13  signature is sloppy and unreadable, it also has their

14  printed name.

15      Q.  Okay.  And so you go over that both verbally and

16  provide the written form to the inmate?

17      A.  Yes, sir.  They have the option to read that.

18  And we pretty much just tell them that what I have said

19  is what's on that form, but you have the option to read

20  it.

21      Q.  Okay.  Then you said that you have the inmate

22  sign.  Do you ever have a situation where an inmate

23  refuses to sign the form acknowledging that--

24      A.  Yes, sir.

25      Q.  -- they understand?

1    A.  Yes, we do.

2    Q.  What do you do in that circumstance?

3    A.  Where they sign their name, we would put "refused

4  to sign" or "inmate refused to sign."  And then we still

5  sign our name and we still print our name.

6    Q.  And why is it that you sign the form if the

7  inmate refuses?

8    A.  So that-- so if my boss or anyone has an issue

9  with, you know, did this-- why is this not signed, they

10  have who to go to and ask, "Okay, are you sure the

11  inmate refused?"  And, you know, if any questions arise,

12  then he's able to go to that person and say, "Is this

13  what went on?  What was the issue of them not signing

14  any of the lines?"

15    Q.  Now, is their refusal to sign taken as a refusal

16  that their phone calls will not be recorded?

17    A.  No.  We still will record phone calls.

18    Q.  And is the inmate aware of that fact--

19    A.  Yes.

20    Q.  -- even though they refuse to sign the form--

21    A.  Uh-huh, yes.

22    Q.  -- acknowledging that they understand?

23    A.  Yes, they are.

24    Q.  And so when refusal happens, do you do anything

25  that would-- would lead the inmate to believe that their

1    phone calls are now not recorded?

2        A.  Huh-uh.  No.

3        Q.  As part of the intake process--

4        A.  Uh-huh.

5        Q.  -- when an inmate arrives at CCA, are the-- are

6    they ever provided a handbook?

7        A.  Yes, they are.  They'll see a unit team within

8    the first couple days of their being at CCA, and they'll

9    be issued a handbook at that time.  Usually the unit

10   team person will ask them, you know, if you have any

11   questions about the handbook or the way things are done,

12   they will let them know.

13       Q.  And so they're not given a handbook during the

14   intake process that you go through, the signed form?

15       A.  No.

16       Q.  But they're given one shortly after arriving at

17   CCA?

18       A.  Yes.  Yes.

19       Q.  I'm going to show you what's been admitted as

20   Government's Exhibit 2.  Is that a copy of the handbook

21   that's given to the inmates?

22       A.  Yes, sir, it is.

23       Q.  And if I could direct your attention to Page 10

24   of that handbook.  Is that the page that discusses CCA's

25   policy concerning recording of phone calls?

 1      A.  Yes, it is, sir.

 2              MR. OAKLEY:  Your Honor, I have no further

 3  questions.

 4                  CROSS EXAMINATION

 5  BY MS. BRANNON:

 6      Q.  I'm sorry, just one second.

 7      A.  No, you're fine.

 8      Q.  All right.  I'll go ahead, and let me ask you

 9  this; before you testified today, did you review

10  anything?

11      A.  Huh-uh, no, ma'am.

12      Q.  And who have you met with about this?

13      A.  Just the woman behind you in the gold, the

14  gentleman that was questioning me, and there was one

15  other person.

16      Q.  All right.  And was that last Friday?

17      A.  That was Friday, yes.

18      Q.  Is that the only time you've been interviewed

19  about this?

20      A.  Yes.

21      Q.  Has anybody at CCA interviewed you about any of

22  this?

23      A.  No.

24      Q.  If I understand, the review of the inmate

25  handbook you don't have anything to do with?

1    A.  I know some of the stuff that's in here--

2    Q.  Uh-huh.

3    A.  -- but I don't know into detail.

4    Q.  Okay.  So, for example, Government Exhibit No. 2,

5  do you have that in front of you, the cover of it?  The

6  date on that is what?

7    A.  Let's see.  It's February 3rd, 2016.

8    Q.  Do you have any idea what previous versions

9  would've been like or how they would have been different

10  than this?

11    A.  No, I don't.

12    Q.  When an inmate is at intake, how long does that

13  usually take, what's the average?

14    A.  They are usually with me for about 45 minutes.

15  And then we put them in what's called a holding cell

16  until medical is ready to see them.  And it's usually

17  probably I want to say two hours at the most.  It just

18  depends on how many inmates we have come in at a time.

19    Q.  Sure.  Sure.  How many pieces of paper do they

20  have to sign?

21    A.  There are eight "X"s in a booking packet that

22  they have to sign.  And the booking packet can total

23  anywhere from 12 to 14 pages.

24    Q.  Uh-huh.  And Government Exhibit No. 1, this form,

25  is that part of the booking packet?

1       A.  Yes, ma'am.

2       Q.  If we could look at this just for a minute and

3  kind of walk through it.

4       A.  Uh-huh.

5       Q.  Do you know how long this particular version has

6  been in effect?

7       A.  They just updated our operating system for this.

8  But as long as I've been in receiving and discharge,

9  there has always been the phone call paper and the mail

10 paper in the packet.

11      Q.  Pretty much in this same form?

12      A.  Uh-huh.

13      Q.  All right.  I want to ask you some questions

14 here.  If you don't know the answer, don't worry about

15 it.

16      A.  That's fine.

17      Q.  But let's go through it line-by-line.

18 Community-- or "Corrections Corporation of America

19 reserves the authority to monitor."

20      A.  Uh-huh.

21      Q.  Do you know what "reserves the authority" means?

22      A.  Not really, but--

23      Q.  Do you explain that to the inmates?

24      A.  I do the best I can.

25      Q.  Okay.  Do you read through this line-by-line?  I

1    may have missed that in your direct.

2        A.  I don't.  I give them a short form and then I--

3    but I also allow them the opportunity to read it.

4        Q.  Sure.  So monitoring, this includes recording of

5    conversations on any telephone located within the

6    institution?

7        A.  Yes, ma'am.

8        Q.  That means the phones in the pods, as well as

9    counselor's office?

10       A.  I do not know that the counselor's phones are

11   monitored.  I know that the housing units have-- their

12   phone calls are monitored.

13       Q.  So when it says "any telephone," do you know what

14   else that would include?

15       A.  As far as I know, it would be any phone in the

16   facility.

17       Q.  All right.  And the monitoring, if they're

18   reading this, is to be done to preserve the security and

19   orderly management of the institution?

20       A.  Yes.

21       Q.  Do you know what that encompasses?

22       A.  Yes.  We have some that-- some people that have

23   tried to have outside communications to like harm

24   district judges and such.

25       Q.  Is there any form-- anything you go with--

1    through with them that explains to them that recorded

2    phone calls would be made available to the United States

3    Attorney's Office?

4        A.   No.

5        Q.   Is there anything you go through with them that

6    explains that these recorded phone calls, or even

7    monitored phone calls, might be made available to

8    federal law enforcement agents?

9        A.   No.

10       Q.   So what you review with them is that it could be

11   recorded for basically security and the administration?

12       A.   Yes.

13       Q.   All right.  And it says, "An inmate use of

14   institutional phones constitutes a consent to this

15   monitoring."

16       A.   Uh-huh.

17       Q.   And by "monitoring" there, it doesn't also say

18   recording there, but is it explained that way or do you

19   make a distinction between monitoring and recording at

20   that point?

21       A.   No, we don't.

22       Q.   All right.  Do you have anything to do with the

23   process about contacting a unit team to request an

24   unmonitored call?

25       A.   No, I don't.

1    Q.  When you start the intake, you said that there's
2    a form that tells you everything you need to know.  Does
3    it identify who their attorney is?

4    A.  No, it doesn't.

5    Q.  All right.

6    A.  It gives me like their charges.

7    Q.  Uh-huh.

8    A.  Their height, their weight, eye color, hair
9    color, maybe previous charges, previous incarceration,
10   other jails or facilities they may have been at, that
11   type of stuff.

12   Q.  And so on this paper as well, it says, "A
13   properly placed phone call to an attorney is not
14   monitored."  Right?

15   A.  Uh-huh.

16   Q.  And again, monitored on this piece of paper
17   includes recording.  Right?

18   A.  (Nods head up and down).

19   Q.  At the intake, you don't have anything to do with
20   explaining how they get a properly-- how they properly
21   place a phone call to an attorney?

22   A.  No, we don't.

23   Q.  All right.  If an inmate-- well, whether or not
24   an inmate signed one of these forms, it would go into
25   their file; is that right?

1    A.  Yes, ma'am.  Uh-huh.

2    Q.  Is there any other part of the intake procedure

3    that you've described that talks about attorney-client

4    visitation?

5    A.  No, ma'am.

6    Q.  Do you talk about video-conferencing, anything

7    like that?

8    A.  No.

9         MS. BRANNON:  Could I have just one moment,

10   Your Honor?

11        THE COURT:  Yes.

12   Q.  (BY MS. BRANNON)  Have you ever had an occasion

13   for someone to refuse to sign it because they said they

14   didn't understand the form?

15   A.  No.

16   Q.  What happens when someone comes in who, for

17   example, is illiterate, do you know that necessarily?

18   A.  Yeah, we explain it to them.

19   Q.  Okay.

20   A.  We ask-- you know, a lot of them will tell you

21   that, "I can't read this."  So we will read it for them.

22   Q.  Okay.  In that case, you read it to them or do

23   you just explain it pretty much in a short form?

24   A.  No, I-- I personally read it to them.

25   Q.  Okay.  What do you do if they don't speak

1    English?

2        A.  We have a officer that works in receiving and

3    discharge that does speak Spanish.

4        Q.  Do you have these forms in Spanish?

5        A.  Yes, we do.

6        Q.  Okay.  Are there any other forms or other

7    information you review with them that has to do with the

8    telephones themselves?

9        A.  No, ma'am.

10        Q.  Do you issue a PIN number?

11        A.  Yes.  It's usually a computer-generated number

12    and it's attached to their ID.  Like let's say their

13    number is 1234567, and then the last four numbers after

14    those will be computer-generated.  That will be their

15    PIN number.

16        Q.  Do those PIN numbers have anything to do with

17    anything other than phone calls?

18        A.  No.

19        Q.  Okay.  Thank you.

20        A.  Uh-huh.

21            THE COURT:  Anything more?

22            MR. OAKLEY:  No, Your Honor.

23            THE COURT:  All right.  You can be excused.

24    Thank you.  All right.  So that completes your evidence?

25            MS. TOMASIC:  No, Your Honor.  The

1    government has an additional witness, Matt Cahill, to

2    testify.  I know it's nearing the time, would it be

3    possible to take a three- to five-minute break?

4              THE COURT:  How long will you be with him?

5    We have some other matters to take up besides his

6    testimony.

7              MS. TOMASIC:  15 minutes at the most.  And

8    then there may be a proffer of additional evidence that

9    would be brief, too.

10             THE COURT:  And what is Mr. Cahill's

11   testimony about?

12             MS. TOMASIC:  About how the calls were

13   obtained.  And he has actually viewed surveillance

14   footage, not as part of the 18 terabytes that was

15   provided, but he has viewed footage as part of this

16   investigation.  And he has also listened to calls as

17   part of this particular investigation.  And he is

18   familiar with the manner in which the video works;

19   whether you can zoom in, whether there's audio, and the

20   quality.

21             THE COURT:  All right.  We'll take a

22   five-minute break.  But before we do that, I'm reminding

23   you that the grand jury subpoena on the

24   audio-recordings, I need you to submit that into

25   evidence.  And you've told me that Securus has not

 1    complied with the subpoena, so I would just suggest if

 2    you want me to do something about that, you can file a

 3    motion for an order to show cause with any relief you'd

 4    like in that regard.  So we don't need to take that up

 5    anymore today.

 6              So I'll hear from Special Agent Cahill, any

 7    further proffer you have.  And then I want to discuss

 8    with you all the scope of the special master.  Obviously

 9    that's going to be the key part of my ruling, but I-- I

10    want to make a record about-- and I do know that you

11    have differing views about the scope of the special

12    master, but I want to talk to you specifically about

13    payment and-- of the special master services.  And then

14    I have one other matter to take up with you regarding

15    all of this.  So hopefully we'll finish at 5:00.  So

16    let's take a break for five minutes.

17              (Recess).

18              THE COURT:  All right.  You can call Mr.

19    Cahill.

20              MS. TOMASIC:  Yes.  The government next

21    calls retired Deputy U.S. Marshal Matt Cahill to

22    testify.

23              DEPUTY U.S. MARSHAL MATTHEW CAHILL,

24    called as a witness on behalf of the Government, having

25    first been duly sworn, testified as follows:

1          THE COURT:  Proceed.

2                    DIRECT EXAMINATION

3    BY MS. TOMASIC:

4      Q.  Mr. Cahill, could you please state your name for

5    the record?

6      A.  It's Matthew Cahill.

7      Q.  And you are now retired?

8      A.  Yes, ma'am.

9      Q.  And where did you work before you retired?

10     A.  Here in the District of Kansas marshals office.

11     Q.  How long did you work in the marshals office?

12     A.  31-and-a-half years.

13     Q.  As part of your employment as a deputy marshal,

14   were you ever involved in any investigations at CCA?

15     A.  Yes.

16     Q.  And recently were you involved in the

17   investigation at CCA?

18     A.  Yes.

19     Q.  And could you please explain your role?

20     A.  Back in December of 2015, my chief deputy, Craig

21   Beam, informed me that some agents had believed that

22   there was some contraband being smuggled into

23   Corrections Corporation of America and possibly staff

24   involvement.  And he asked me to go down and meet with

25   the U.S. Attorney's Office and the agents.

1    Q.  As part of your involvement, were you a case

2    agent acting on behalf of the U.S. Marshals Service?

3    A.  Yes.

4    Q.  And what type of investigative techniques did you

5    aid as part of the investigation?

6    A.  We requested documents on inmates' profiles and

7    also staff.  When we learned that some staff may be

8    involved, tried to identify which staff may or may not

9    be involved, get their personnel records, where they

10   worked, telephone calls, things like that.

11   Q.  Did you ever obtain video-recordings from CCA

12   that depicted either the interior or the exterior of

13   CCA?

14   A.  I did.

15   Q.  What particularly do those areas depict?

16   A.  The only video-recordings I ever received myself

17   and-- and viewed was the law library video.  There was

18   video of the outside parking lot, one video that I

19   reviewed there for a particular reason, and also I was--

20   I saw one video of the visitation room with only one

21   staff member that was present in that visitation room.

22   Q.  Did you ever obtain any video-recordings of the

23   interview rooms, also known as the attorney-client

24   meeting rooms?

25   A.  Never did.

1    Q.   The footage you obtained, how did you get it?

2    A.   I would request it through the investigator at

3    CCA.  And she would either take care of it herself by

4    sending the information to me or she would have a couple

5    of her staff members that worked there with her in the

6    investigation section send it to me.

7    Q.   And you said that you reviewed some of these

8    video-recordings.  Correct?

9    A.   I did.

10    Q.   Could you just briefly describe the quality of

11    the video-recordings?

12    A.   The quality of the video was very poor.  It's

13    very grainy.  I had trouble identifying some inmates

14    that-- I may have even had a photo of the inmate I was

15    looking for in the law library, but the video was very

16    grainy.  The video that I-- that I watched the parking

17    lot of CCA was so poor that I couldn't make out-- I had

18    to ask for extra video for it.  But-- and it does--

19    while I was watching that video, whoever was running the

20    camera at the time would sometimes zoom in to certain

21    parts of the parking lot and would take me off of the

22    vehicle that I was probably looking at.

23    Q.   Uh-huh.

24    A.   But the video was so poor, I couldn't see when

25    people came by cars, if they could put anything on a

 1  vehicle or not.

 2      Q.  Did you as the viewer have the capability of

 3  zooming in on anything?

 4      A.  I did not.

 5      Q.  Was there any audio in any of the recordings you

 6  obtained in your entire career from CCA?

 7      A.  There was not.

 8      Q.  Now, turning to inmate phone calls, did you

 9  obtain inmate phone calls as part of this investigation?

10      A.  I did.

11      Q.  Did you review a number of inmate phone calls?

12      A.  I would say somewhere between-- I listened to

13  somewhere between 500 to 1,200 phone calls.

14      Q.  And that is specifically as part of this

15  investigation?

16      A.  Yes.

17      Q.  Did you encounter any phone calls from an inmate

18  outbound to an attorney as part of this investigation?

19      A.  Towards-- I retired at the end of June.  I would

20  say sometime in maybe late May or early June I listened

21  to one phone call where it was a female inmate that was

22  brought up in this investigation, had made a phone call.

23  And when the-- and I was going down from phone call to

24  phone call, one after another, and some calls are 15

25  minutes long and some are ten seconds long.  As soon as

1  the Securus radio went off-- or the by line or whatever

2  they say on there, the inmate asked-- the person that

3  picked up said "law offices," and then I-- I went to the

4  next call.

5      Q.  Did you make any notes suggesting that you had

6  encountered an attorney call in your notes?

7      A.  I made a note that it was an attorney call.  That

8  was it.  Attorney call.  And then it was-- then I

9  stopped.

10      Q.  And you stopped listening immediately?

11      A.  Yes.

12      Q.  Did you encounter any other attorney calls during

13  the course of your review of all those inmate calls?

14      A.  I did not.

15      Q.  What was the purpose of obtaining and reviewing

16  the inmate calls as part of this investigation?

17      A.  To try to identify who was involved, either on

18  the inside or the outside, in bringing in contraband

19  into the facility.  And-- and part of the job of the

20  marshals service is for the security of the facility,

21  the staff in the facility, the other inmates in the

22  facility, and-- and for law enforcement and for deputy

23  marshals that are handling prisoners in the facility.

24      Q.  Were you able to glean any useful information

25  from the inmate calls that aided the investigation?

16-20032-JAR    United States v. Lorenzo Black    09.07.16    123

1    A.  Yes.

2    Q.  What was the purpose of obtaining the video

3  footage generally?

4    A.  Generally is to find out if-- if an inmate was--

5  try to identify who was involved, where the-- where the

6  contraband was being stored, where it was being

7  distributed within the facility and who was bringing it

8  in.

9    Q.  Did you ever obtain any video footage to aid in

10  corroborating a cooperator's statement?

11    A.  Yes.  Yes.

12          MS. TOMASIC:  Just one moment, Your Honor.

13  No further questions.

14          MR. REDMOND:  Thank you, Your Honor.

15                CROSS EXAMINATION

16  BY MR. REDMOND:

17    Q.  Mr. Cahill--

18    A.  Yes, sir.

19    Q.  -- we've heard testimony today that there was a

20  proffer session conducted in mid-March with a

21  cooperating witness.  Were you present at that proffer

22  session?

23    A.  I would have to-- I was present at several

24  proffer sessions, but not all of them.  So I would-- I

25  would have to know--

1      Q.  I don't know a name.

2      A.  Well, I-- I wouldn't know unless I--

3      Q.  It's been described as a very lengthy proffer

4  with somebody who seems to be a fairly central

5  government witness.  Does that help you at all?

6      A.  There was several lengthy proffers.  I usually

7  try to get out of those somehow.

8      Q.  Okay.

9      A.  But-- and you say this was when?

10     Q.  Mid-March.

11     A.  Yeah, I was probably involved-- I was probably

12 there, yes.

13     Q.  Okay.  And were you there when the cooperating

14 witness talked about how the attorney-client visitation

15 rooms at CCA were video-recorded?

16     A.  You know, I've might've been.  During these

17 proffers, I-- I didn't do a whole lot of proffers in my

18 31 years, mainly I relied on the other agents to do

19 that.  And they were-- all these proffers were

20 generally-- notes were taken by them or recordings were

21 done in some of the proffers, too.

22     Q.  Okay.

23     A.  So I may have heard-- but when-- sometimes we go

24 in and out of the-- to go obtain other things or go get

25 a drink of water or go to the bathroom or something like

1    that.  I may have been present when that happened.

2       Q.  Do you have any independent recollection of that?

3       A.  I've been to so many of them, that was not

4    something that-- that could happen.  I can't say for

5    sure that I was-- that I was there or that I recall that

6    being said.

7       Q.  You did not prepare a report of that proffer?

8       A.  I probably did not.

9       Q.  Okay.  Okay.  I want to just back up just to get

10   as much detail as I can about exactly the process that

11   the marshals office goes through when it's obtaining

12   phone calls from CCA.

13      A.  Okay.

14      Q.  Who is it that you call, do you remember a name?

15      A.  The investigator?  At CCA?

16      Q.  Yeah, if you want somebody's phone call, if you

17   call CCA, who are you asking for?

18      A.  Generally the investigator, Deborah Kinney.

19      Q.  Okay.  And the-- you testified that she had a

20   couple of folks that worked with her that could help you

21   out sometimes?

22      A.  Yes.  And I believe Sergeant Bigelow, who

23   testified.  However, I-- I dealt with generally Ken

24   Lajiness, who was-- worked for Deborah Kinney, and I

25   think Sergeant Bigelow worked there, too.  But I had

1    only a couple of occasions that I-- that I requested

2    stuff from Sergeant-- I probably requested it through

3    Deb Kinney and maybe Sergeant Lajiness, or Ken Lajiness

4    was not available and may have given it to Sergeant

5    Bigelow.

6        Q.  Okay.  So when it comes to you, how does it come?

7    Is it on a disk?

8        A.  It generally comes on a disk, yes.

9        Q.  Okay.  And is it-- is it always like that?

10       A.  Yes.

11       Q.  Do you have-- I mean, we've heard some testimony

12   that when Securus records a phone call and CCA wants to

13   give somebody access to that phone call, they're sent a

14   link and then you can open that link and the phone calls

15   are available.  You don't do it that way?

16       A.  I've never done it that way.

17       Q.  Okay.  So you just--

18       A.  That I recall.  I don't think that I've ever done

19   it that way.

20       Q.  Okay.  So you call CCA, you request particular

21   phone calls on a person or a number; is that right?

22       A.  Yes, sir.

23       Q.  And then a disk is sent to you.  Do you know by

24   who?

25       A.  I'm assuming it's the one who prepared it.  And

1    some-- because of the nature of some of the calls, I

2    think they try to not-- if it's-- particularly in this

3    investigation, if it's-- because there's CCA staff

4    possibly involved, that generally comes right from the

5    people who prepared it.  And they will put a name on it,

6    either my name or put Patricia Cook's name, who's our

7    COTR up there, or Brett Hoffer, who is assigned to

8    basically oversee the-- a lot of the things that happen

9    with CCA.

10    Q.  Okay.  And so how long between the time that you

11    make the request and then you receive the disk, how

12    long?

13    A.  Generally, if-- depending on the-- the time that

14    we request it and/or the volume of the request,

15    generally it's pretty-- pretty quick.  It's usually by

16    the next day.

17    Q.  Okay.  And there's no subpoena involved?

18    A.  There's generally just a-- a letter from the--

19    CCA sending this to us and we sign off on it.  So

20    whoever receives it downstairs signs off that they

21    received it.

22    Q.  Downstairs where?

23    A.  In the marshals office, yeah.

24    Q.  Okay.

25    A.  Because it comes through their-- it comes from

1    transportation.  They put it with the transportation

2    officers when they're bringing it down.

3        Q.  Okay.  And so when that disk shows up, is there

4    any paperwork memorializing the transfer of the disk

5    from CCA to the marshals office?

6        A.  Generally I'm not down there, so...

7        Q.  Is there any that you're aware of?

8        A.  I believe there is, but I'm-- I'm not the one

9    that sees that.  I'm not the one that signs for it.

10       Q.  Okay.  And so who are you picking up from in the

11   marshals office?

12       A.  Generally somebody down-- whoever receives it is

13   working the-- the cell block or working down in the

14   marshals office, they generally send it upstairs and

15   either put it in my box or my desk.  Or what used to be

16   my desk.

17       Q.  Okay.  Let's talk about video.  Sort of the same

18   questions.  If you want video from CCA, are you calling

19   Investigator Kinney?

20       A.  I'm requesting either-- either by phone or by

21   e-mail, generally, yeah, that's the way it goes.

22       Q.  Okay.  And we heard some testimony I think at the

23   hearing on the 9th from a CCA employee that because the

24   marshals sort of, you know, fund CCA, they consider

25   their property your property.  Is that sort of both

1  ways?

2      A.   Yeah, I don't-- I don't know anything about that,

3  but--

4      Q.   What you know is you can call--

5      A.   All I know is the CCA is a-- a contract facility

6  that the marshals service uses.

7      Q.   Sure.

8      A.   And I don't know that-- we don't have any say so

9  over their staff or anything like that.  I mean, we

10 don't-- if that's what you're asking.

11     Q.   No.  My-- my point is narrower.  If you call them

12 and say, "I want these phone calls"--

13     A.   Yes.

14     Q.   -- they will send you those phone calls?

15     A.   Yes, sir.

16     Q.   If you call them and say, "I want these videos,"

17 they will send you those videos?

18     A.   Generally.  Depending on what it is.

19     Q.   Has there ever been a time where they said no?

20     A.   None that I can think of, but--

21     Q.   Okay.

22     A.   -- generally we don't-- videos are something we--

23 that are usually requested when we get something from

24 CCA a lot of times where they tell us, hey, we had a

25 stabbing incident in, you know, Pod-- F Pod, or

1    something like that, and we also had an-- an officer

2    that was injured during that and we found contraband

3    in-- in C Pod or something like that.  And they-- and if

4    we have video of it, then they'll-- we'll request the

5    video of that and they'll send a copy of that to us.

6       Q.  And it follows the same sort of route, transport

7    brings it?

8       A.  Yes.

9       Q.  Okay.  Okay.  We heard some testimony earlier,

10   some I guess answers to the Court's questions earlier

11   today that involved an investigation of an attorney who

12   was contacting clients at CCA who he did not represent,

13   I'm assuming it's a he, did not represent.  Were you

14   involved in that investigation?

15      A.  I was not.

16      Q.  Okay.  Were you aware of its--

17      A.  Not until I heard about it today.

18      Q.  Okay.  You testified briefly about the process of

19   sort of minimizing a phone call.  You have a-- you're

20   listening to the recorded phone calls, you hear an

21   attorney-- or you identify an attorney because someone

22   says "law office."  Right?

23      A.  Yes.

24      Q.  And was there never a conversation that you got

25   15, 20, 30 seconds into-- into before you realized it

1   was a lawyer?

2       A.  Myself, no.  That was-- that was the only-- and I

3   would say probably in my 31 years, that may have been

4   the only call that I've ever listened to that was an

5   attorney's office.

6       Q.  And--

7       A.  And I didn't listen to it.  The lady who answered

8   the phone said "law offices," and I couldn't even tell

9   you what law office it was or whatever.  I stopped the--

10  that call and went to the next call.

11      Q.  Okay.  But there was never a time, you testified,

12  where you realized later on in the phone call that it

13  was a phone call between an attorney and a client?

14      A.  Never.  Myself, never.

15      Q.  Okay.  You testified, if I'm correct, that you

16  were completely unaware that there was any

17  video-recording capability of any attorney-client room

18  at CCA; is that right?

19      A.  I didn't testify to that.  But I didn't-- I've

20  never viewed any attorney-client-- I never viewed any

21  visitation room video at all, other than after the

22  search warrant was conducted at CCA, we got-- I was

23  contacted by the investigator at CCA to say that, hey,

24  one of our staff members claims that they found

25  contraband in the visitation room.

1        Now, whether that was the attorney-client

2    visitation room or whatever, and I said, "Please send me

3    the report.  What was the contraband that was seized?"

4    And I asked them for the video that they had.

5        And quite honestly, the video was a-- you were

6    looking through the windows.  You could only see waist

7    high.  And you could see the staff member walk along the

8    windows, pick up something on the ground, you couldn't

9    see what it was, and walk back out.  So I couldn't see--

10   and there was no other-- no other inmates, there was no

11   attorneys, there was no staff, other than this one staff

12   member.  That's the only time I ever reviewed a

13   visitation room video.

14   Q.  But you don't know that that was an

15   attorney-client visitation room?

16   A.  I don't know that.

17   Q.  Okay.  Are we talking about a-- sort of a big

18   rectangular room with a bunch of different windows?

19   A.  All I could see, it looked like there was chairs

20   on this.  There was a-- there was a wall that was

21   probably waist high--

22   Q.  Uh-huh.

23   A.  -- walking along.  And I could see the windows on

24   the other-- windows and the staff member was on the

25   other side of that wall, and the windows, walking past,

1    picking up something, and walking back out.

2       Q.  Okay.  And so this sounds like a room that could

3    accommodate a fair amount of people?

4       A.  All I could-- all I could tell from the-- because

5    the video basically showed a staff member walking past

6    maybe three or four windows, with a separation in

7    between them.

8       Q.  Okay.

9       A.  So I don't know, I've never been in the

10   visitation room that I can recall.  So I don't know if

11   that's an attorney-client visitation or if it's a

12   family-client visitation.

13      Q.  Okay.  There has been some testimony about the

14   capability of the cameras in the attorney-client rooms

15   that could tilt and pan and zoom.  Was that capability

16   present on the videos that you received?

17      A.  No.

18      Q.  And the--

19      A.  Now, whether it was capable-- whether they were

20   capable of doing it-- any of the videos that I received,

21   we did not have any capability to zoom in or zoom out or

22   anything on-- on our end.

23      Q.  That's precisely what I was asking.  Thank you.

24      A.  Yes.

25      Q.  And the-- you also testified the video quality

1  was terrible?

2      A.  Yes.

3      Q.  Or poor?

4      A.  Yeah, very poor.

5      Q.  And the-- we're talking about two cameras, the

6  visitation room and the outside of CCA?

7      A.  Yes.  And also the law library.

8      Q.  How big is the law library?

9      A.  How big is the law library?

10     Q.  Yeah, big as a courtroom or--

11     A.  I would say the law library-- no, it's not as big

12  as this courtroom, not even a close.  Probably a quarter

13  of the size of this courtroom.

14     Q.  Okay.  And it was just one camera surveying?

15     A.  One camera in the far corner up in the-- there

16  (indicating).  So when the inmates would come underneath

17  the camera, you could barely see what they were doing.

18     Q.  Okay.  So--

19     A.  Yeah.  So it was one camera and it-- it did not

20  zoom.

21     Q.  Okay.

22         MR. REDMOND:  Could I have just a second,

23  Your Honor?

24         THE COURT:  Yes.

25         MR. REDMOND:  Thank you, sir.  Those are all

1    my questions, Your Honor.

2                    THE COURT:  Thank you.  Anything more?

3                    MS. TOMASIC:  Just one question, Your Honor.

4                        REDIRECT EXAMINATION

5    BY MS. TOMASIC:

6      Q.  Mr. Cahill, is it your understanding that the

7    U.S. Marshals Service is tasked with maintaining the

8    safety and security of the facilities with which it

9    contracts?

10     A.  Yes.

11                   MS. TOMASIC:  Okay.  Thank you.  No further

12   questions.

13                   THE COURT:  All right.  Mr. Cahill, you can

14   go back to retirement for now.

15                   THE WITNESS:  Thank you, ma'am.

16                   THE COURT:  All right.  Ms. Tomasic, you

17   said you had some proffers?

18                   MS. TOMASIC:  Yes, Your Honor.  At this time

19   in-- before we move on to the proffers, the government

20   moves to admit Exhibit No. 21, which is the subpoena we

21   discussed.

22                   THE COURT:  Okay.  And again, that one--

23                   MS. TOMASIC:  Move to admit it under seal.

24                   THE COURT:  Exhibit 21.  I'm sorry?

25                   MS. BRANNON:  May we have a copy?

1          THE COURT:  Yes, I think they should have a

2    copy.

3          MS. TOMASIC:  Okay.

4          THE COURT:  But we'll otherwise admit it

5    under seal.  Exhibit 21 is the subpoena for the

6    audio-recordings in this case, at least the initial

7    subpoena.  Correct?

8          MS. TOMASIC:  And, Your Honor, I do not

9    oppose the Court's recommendation that they get a copy,

10   except that I would note that it contains the same list

11   of names we previously discussed at sidebar with respect

12   to Government's Exhibit No. 11.

13         THE COURT:  Let me see it.

14         MS. TOMASIC:  A shorter list, but still a

15   number of them.

16         THE COURT:  I'll admit this under seal.

17   I'll allow the defendants to see a redacted version of

18   the attachment that redacts out those names that aren't

19   already defendants of record.

20         All right.  So Exhibit 21 will be admitted

21   under those circumstances, so you'll need to give them a

22   copy, but redacted of the names that you're concerned

23   about.  Okay.  What else?

24         MS. TOMASIC:  Okay.  Your Honor, I would

25   like to proffer a little bit of information just to

1    supplement the Court's questions.  I have not been in

2    either of the first two hearings, but I've read the

3    transcripts and I'm aware of the concerns with what I

4    knew and also my intent.

5             And what I knew and my intent are completely

6    different.  I was aware, based on what a cooperator said

7    in probably a three- to five-minute conversation out of

8    two hours or more, that CCA was likely recording

9    attorney-client meeting rooms.  And I learned that

10   information in early March.

11            Between that time and the time the subpoena

12   issued, I handled a wiretap, I handled half a dozen

13   search warrants.  I recognized that dozens and dozens of

14   targets were being identified.  And I was overwhelmed by

15   the quantity of information before me.  At this point I

16   was working the case alone, Mr. Oakley wasn't on the

17   case yet.  And as the Court knows, I'm a fairly new

18   attorney.

19            I did not intend to get the attorney-client

20   video-recordings.  I was not circumspect and I made a

21   very serious mistake that has taken a great deal of time

22   and resources from a number of people, including the

23   Court.  But I want the Court to know that I did not

24   intend to get that footage.

25            When I got the video-recordings, we were

1    amassing an enormous volume of discovery.  We were

2    amassing an enormous volume of information.  At this

3    point Mr. Oakley was on the case.  Ms. Boyd was handling

4    discovery.  And we were scrambling to keep up.  And this

5    case is fundamentally different from any other case I've

6    ever worked because, based on representations from the

7    marshals and from DOJ, we had to take this case down as

8    soon as we knew that contraband was coming into that

9    facility.  We couldn't work a two-year drug case.  We

10    couldn't get our ducks in a row.  We couldn't make

11    everything pretty and packaged correctly.

12               THE COURT:  And this is something I've

13    wondered about, because I understand that you had to

14    stop-- stop it.  But why you decided to file this case

15    before you had-- you've got these huge volumes of

16    discovery.  I'm sure you probably didn't even realize at

17    the outset how big they are.  What was the rush to file

18    this case?

19               Frankly, I've seen this happen again and

20    again with your office.  You rush to file these cases,

21    the discovery is not even close to being amassed.  And

22    now you're scrambling with the investigative agencies to

23    get that done, even while the speedy trial clock is

24    running.  Sometimes I know it may be a bank robbery,

25    you've got to arrest them, you've got to get them off

 1    the street, you've got to get them in custody, you've

 2    got to have the speedy trial clock run.  But I've seen

 3    it happen in prospective cases, drug cases.  It seems

 4    like there's a rush to file it, but you don't have your

 5    act together.  And so now the speedy trial clock is

 6    running and we're all scrambling and trying to, you

 7    know, hopefully get the case discovered.

 8            I have not understood-- I understand why you

 9    want to do the search warrant, I understand why you

10    wanted to bring the whole thing down.  But why would

11    you-- this is a rhetorical question.  Why would you

12    indict these people that are already in custody?  That--

13    at least most of them.  That, I don't get.  Because now

14    here we have, you know, at one point you said 43 or is

15    it 23 million e-mails?  We've got to deal with that

16    issue, we've got to deal with the-- the computers in the

17    law library.  We've got to deal with this horrendous

18    situation.

19            And in my perception, in part, something

20    that's happened here is you received a volume of

21    evidence and your response is to turn over the volume of

22    evidence to the defense with perhaps actually-- without

23    actually going through it, which creates all kinds of

24    problems and all kinds of issues when it turns out that

25    there's attorney-client communications in that evidence.

1              So it's a rhetorical question.  I'm not

2    picking on you specifically, but I'm telling you that

3    I-- I've had this same question about this case and a

4    number of other cases that I've seen that creates a lot

5    of work for you, for the defense, for the Court, for

6    everybody involved.  And the very worst is it creates a

7    situation where defendants are in custody with the

8    speedy trial clock running.  And we're six months into

9    the case, a year into the case, 18 months into the case,

10   and the government still hasn't got their discovery out

11   to the defendants.

12             So I just say all that in the hearing of

13   your boss, the U.S. Attorney, and everybody else that's

14   in there, you all need to get your act together.

15   Because this creates all kinds of issues beyond this

16   case when you-- you have a five-year statute of

17   limitations on most of these cases, so-- these people

18   are in custody.  Take the case down, but why file it

19   when you're going to have 23 million e-mails while Mr.

20   Black and others are in custody and-- and all of these

21   other issues that are arising?  That, I don't get.

22             MS. TOMASIC:  Your Honor, that too was a

23   very big mistake.  And my assessment in charging

24   initially was to get the six core people that I could

25   get and dismantle it and stop it, which was Mr. Aiono,

 1   who the government believed was bringing the contraband

 2   in, Mr. Rowlette who was in custody, Karl Carter who was

 3   in custody.  Those two we considered leaders/organizers

 4   of the organization.  And then everyone else of the six

 5   total who were charged were out of custody.  And only

 6   Mr. Carter and Mr. Black have remained in custody.

 7           But that was also a mistake.  We should've

 8   waited, we should've gotten our ducks in a row.  My

 9   mindset at the time was I'm going to charge as few

10   people as I can.  And the discovery seemed at that point

11   manageable, but we were working furiously.  And-- and

12   again, it was kind of messy, I acknowledge that.  And

13   then charge more people much further down the road,

14   either in a separate case or by superseding.

15           What I came to recognize is it was really

16   hard to parse out the discovery for these six

17   individuals with everyone else, because it was a very

18   large conspiracy.  And that's when the discovery kept

19   mounting and mounting and mounting.

20           What I want to stress, though, as far as my

21   intent and my knowledge is beginning-- and that's--

22   Government's Exhibit No. 8 are a series of e-mails I

23   sent, and the Court is completely accurate, we were

24   sending stuff out, we were definitely trying to send out

25   the video-recordings without ever having looked at them

1  en masse.  I hadn't looked at the index.  I've been

2  trying to send that out since April 26th.

3           I've sent over a dozen e-mails to defense

4  counsel trying to push it out, trying to push it out,

5  which would've been a mistake had it been sent out

6  because they would've had access to each other's

7  attorney-client meeting rooms.  But I represent that to

8  the Court to make clear I didn't have this and was

9  trying to hide it and the agents-- have the agents

10  review it and look at attorney-client meeting rooms and

11  use it.  I didn't know what was on there.

12           Had I pushed it out on April 26th, as I had

13  intended to, they would've had it, they would've known

14  probably before me that we had it.  And my point in

15  saying all of this is that it was a mistake and not

16  intentional.  And I think I-- I know I've learned a

17  great deal from this.  And I think everyone else in our

18  office has.  So if anything good can come from all of

19  this, that's the good.

20           THE COURT:  All right.  Thank you.

21           MR. REDMOND:  Your Honor, Ms. Tomasic can

22  proffer anything that she wants.  I'm not here to argue

23  about her or any of the content of that statement.  The

24  problem is that that's all legally irrelevant.  We would

25  note an objection to any consideration of government

1    assertions as evidence in a privilege hearing.  The

2    Tenth Circuit has spoken directly on this issue.  We

3    have briefed this exhaustively.  The government hasn't

4    breathed a word in return of any authority that the

5    Court could rely on to say that you can resolve

6    privilege issues simply by believing what the government

7    says when they don't take the stand.

8                THE COURT:  All right.  Thank you, Mr.

9    Redmond.

10               Well, I'm not going to resolve the privilege

11   issues now.  That's-- the first step is to appoint a

12   master or an expert to help me do that and to help me

13   resolve some other matters.  So before I talk about

14   that, just to make sure, has all the evidence been

15   submitted that's going to be submitted?

16               MS. BARNETT:  Yes, Your Honor.  Thank you.

17               THE COURT:  Okay.

18               MS. BRANNON:  Actually, Judge, we have a

19   problem with one of the exhibits.  Government Exhibit

20   No. 2, we were provided two pages of this booklet.  We

21   thought that that's what the government had given the

22   Court.  Instead, they gave the Court the entire booklet.

23   We haven't had it.  We haven't had a chance to read it.

24   I would suggest, kind of like the audio-recordings, if

25   the Court-- I believe the government has the original.

 1    If after today we would have an opportunity just to

 2    review the booklet and the audio-recordings.  And we can

 3    just let the Court know if we have an objection or if

 4    there's a problem with them.

 5             THE COURT:  Well, first of all, at least-- I

 6    don't know where the original is, but in my-- in my

 7    notebook, all I have is Page 1, 10, and 11.

 8             MS. BRANNON:  They have the booklet marked

 9    as the original.

10             THE COURT:  As the original, all right.  So

11    that's-- that's more than what I have in my notebook.

12    So do we have that entire handbook?

13             MS. BARNETT:  Yes, Your Honor.  Exhibit 2 is

14    right here.  And we actually took it.  I've spoken to

15    Ms. Brannon during the break.  We took it down to our

16    office, and I apologize, we took it apart without asking

17    the Court's permission, and we actually made a copy of

18    it for her that we provided to her.  But here is the

19    original that we were offering as an exhibit.

20             THE COURT:  All right.  So the entire inmate

21    handbook will be admitted, subject to objection by the

22    defendants once they have the opportunity to review it,

23    since they haven't had that opportunity.

24             All right.  So I'm-- all of this, the whole

25    point of this hearing today was so that I would have a

1    number of questions answered, you all have submitted

2    additional evidence that would inform my ruling on the

3    appointment of a special master.  You-- both government

4    and defendant before had indicated that you-- and your

5    pleadings have indicated that you agree that the Court

6    should appoint a special master, although-- and I won't

7    go into the particulars, it's all spelled out in your

8    papers.  But what the defendant wants versus what the

9    government wants is very different.

10            Here's what my intent is, and I've alluded

11    to this before.  To have the special master start by

12    acting as if that person is a Taint Team and going

13    through all of the audio-recordings and video-recordings

14    law library imaging, all of that, to go through that

15    with the goal of culling out attorney-client contacts

16    versus non-attorney-client contacts.  And then perhaps

17    going a step further and looking at the attorney-client

18    contacts and if, for some reason, that person in their

19    expertise thinks it's not a privileged communication,

20    identifying that group and then making some sort of

21    recommendation to me.

22            To start with that I think misses the point

23    of why I think a master or an expert needs to be

24    appointed in this case.  It could be ultimately that

25    that's where this person needs to go and that's what the

1    government apparently wants, but I think what the master

2    needs to start with is a determination of whether there

3    were Sixth Amendment violations, the extent of the Sixth

4    Amendment violations, CCA's involvement in the

5    violations, the U.S. Attorney's Office in the

6    violations, whether there have been any other

7    problematic violations in terms of Rule 6(e) or other

8    ethical considerations.  All of which then informs me as

9    to what's the appropriate remedy.

10                If the expert says no Sixth Amendment

11    violations, you know, we don't need to get to remedies.

12    But I think we can probably agree at this point that

13    there have been significant Sixth Amendment violations,

14    although, you know, there may be some dispute-- there

15    apparently is some dispute about the audio-recordings

16    and maybe perhaps about the video-recordings, I don't

17    know.

18                But in any event, what I want this person to

19    start with is a determination based on this record, and

20    any other further investigation the person in their

21    expertise thinks should happen, to determine the-- the

22    nature of the violations, the scope of the violations,

23    the extent of the violations of Sixth Amendment and

24    other rights of the defendant.  And then to go the next

25    step and help me decide what the appropriate remedies

1    would be.

2              As I sit here, there's a lot of remedies

3    that come to mind, but I guess the three categories of

4    remedies that immediately come to mind are-- would the

5    appropriate remedy be just to sanction?  CCA is not a

6    party to this case.  But to the extent the government

7    did something wrong, to sanction them, if that's what

8    the finding was.  That might be one remedy if it were

9    appropriate.

10              Another remedy might be exclusion of this

11   evidence or exclusion of part of the evidence.  That

12   might be a remedy.  Another remedy might be much more

13   grave, and that might be a dismissal of the case

14   outright.  That would be probably the worst remedy one

15   might consider.  But that would be the second stage of

16   the determination based on the findings as to what the

17   nature, extent, and scope of the violations are and who

18   the violations were by.

19              If I then determine that exclusion of none

20   of the evidence were appropriate, then it seems like the

21   next step would be some sort of process by which this

22   neutral person would determine what's admissible and

23   what is privileged.  And we would go through that.  And

24   that, of course, is the most labor-intensive process of

25   all, given the-- you know, the volume of the recordings

1    at issue.  So that's what my intent is.

2              The Court has no money to do this.  I've

3    done a lot of checking.  There-- there really is not a

4    fund for this.  Given that the reason we're here is

5    because of violations perhaps by-- by CCA, which

6    contracts with the Department of Justice through the

7    U.S. Marshals Service, and given that at least there are

8    allegations that the U.S. Attorney's Office improperly,

9    whether it's intentionally or inadvertently, disclosed

10   privileged communications, it seems to me that the

11   Department of Justice should pay for this.

12             So I know the justice-- I know the U.S.

13   Attorney's Office can-- you know, agrees that there

14   should be a master appointed, but I need to make a

15   record as to whether the U.S. Attorney's Office consents

16   to the process I've just outlined.  Because if that's

17   the case, then I will be entering an order and that

18   order will say that the Department of Justice will pay

19   for this process in the stages that I've described.

20             So I'll hear from you, Ms. Barnett, on that.

21             MS. BARNETT:  No, Your Honor, we do not

22   consent to that.

23             THE COURT:  What do you consent to?

24             MS. BARNETT:  We consent to having a special

25   master look at the recordings that have been provided to

1  the Court and excise out the material that shows

2  contacts with counsel, either through the phones or

3  through the attorney-client interview rooms at CCA.

4  Excising that material out.  And then the rest of the

5  material that would arguably be permissible evidence for

6  us to use and provide in discovery, then to be given

7  back to the government and to defense counsel in the

8  case so that the case could go forward.

9          THE COURT:  So essentially you want to tie

10  the Court's hands and preclude me from fashioning any

11  remedy, other than to give you what you would be

12  entitled to or would want anyway, which would be to have

13  non-privileged communications and to have somebody go

14  through that and do all of that work for you?

15          MS. BARNETT:  Your Honor, frankly, if the

16  issue is cost, I would certainly be willing to try to

17  sit down with the defense and try to work out another

18  solution.  Maybe--

19          THE COURT:  The defense can't pay for it.

20  They don't have a fund.  The Court doesn't have a fund.

21  The Department of Justice has the fund.  This isn't a

22  civil matter where the parties split costs.  I've done--

23  I mean, I've looked into that.  There's no funding

24  mechanism, other than through Department of Justice, if

25  I'm going to appoint a special master.  And Rule 53 says

1    that that has to be done with the consent of the

2    parties.  So you're telling me you're not going to

3    consent?

4              MS. BARNETT:  No.

5              THE COURT:  All right.  Well, that's fine.

6    I do have another avenue in mind and I'll just-- I'll

7    just go the other avenue.  Because I am going to appoint

8    someone, a master, expert, or otherwise, and I am going

9    to order Justice Department to pay for it, because

10   there's no other funding mechanism available.  And we're

11   here because of Justice Department, not because of the

12   defense, not because of the Court, so...

13             All right.  I-- I needed to make a record of

14   that because my order will indicate that it's not with

15   the consent of the government.  I don't know if it's

16   with the consent of the defense, I need to get a record

17   from you on that as well, Ms. Brannon.

18             MS. BRANNON:  We consent.

19             THE COURT:  You've asked for more, I'm not

20   necessarily-- you've asked, for example, for someone to

21   investigate the policies and practices of the U.S.

22   Attorney's Office.  That is not the language that I'm

23   going to use in this order.  It's going to be what I've

24   just described.

25             MS. BRANNON:  Judge, if I may inquire.

1    Earlier in some proceeding the Court mentioned that the

2    order would allow the special master to investigate

3    whatever was necessary and appropriate.  In other words,

4    whatever this investigation might lead to, would allow

5    the special master to approach the Court as far as that

6    investigation might be necessary.

7              THE COURT:  Yeah, I intend to have that

8    language.  But again, as I've described, I'm not going

9    to-- I'm not thinking that the master or the expert is

10   going to start by acting as a Taint Team.  They're going

11   to start with are there violations, what the extent of

12   the violations are.  They can-- I mean, whatever they

13   determine, they're-- I think they should be allowed the

14   liberty to pursue and investigate to answer that

15   question, so that I can then determine whether there are

16   any remedies appropriate.  I may determine that all that

17   needs to be done is what the government wants, but I'm

18   not going to start with that.

19             I'm hearing from the government they don't--

20   they don't consent to this, so I'll have to consider

21   another mechanism to have this done and paid for out of

22   the taxpayer's dollar, out of the Department of Justice

23   bucket, because there's no other bucket available, to my

24   knowledge.  Okay.  I appreciate that.

25             All right.  So I will be entering an order.

1    I have in mind someone that I will likely appoint, but

2    I'm doing some interviewing and so that's not--

3    obviously that's within my discretion, but you'll have

4    notice of that.

5            All right.  One final matter I'm going to

6    bring to you all's attention that is somewhat related to

7    this that occurred within the context of this case.  And

8    it's a fairly lengthy record I'm going to make and I

9    feel the need to make this record.  I've consulted with

10   judicial colleagues who-- in my view, I think I need to

11   make this record, they do too.  And then at the end I'll

12   tell you what-- what this information-- you know, what

13   the consequences will be, which essentially at this

14   point won't be much.

15           All right.  So, as you know, I entered an

16   order to impound evidence.  On August 24th, in the

17   afternoon, Ms. Tomasic sent an e-mail to my chambers

18   requesting to deliver CCA recordings to my chambers.

19   That was Wednesday, August 24th.  And my chambers, my

20   law clerks, responded they would be available most of

21   the rest-- most of the following day to receive the

22   items and asked that she give them a call or e-mail when

23   she was ready to deliver the materials, they would look

24   out for you-- for her.  And Ms. Tomasic confirmed that

25   she would call the next day, August 25th, before coming

1    up.

2              And just to give you-- most of you know

3    this, most of you that practice in this court from time

4    to time have come back into chambers and have let us

5    know you were coming.  There's a buzzer.  The way the

6    chambers are configured on all floors, including the

7    fourth floor where the district judges are housed, are

8    we're in a secure area.  There's an outer door that no

9    one can gain access to unless they have a key.  And the

10   people that have keys are chambers' staff, some clerk's

11   office staff, and the United States Marshals because

12   they are charged with security.  And, you know, they

13   have master keys throughout the whole building,

14   including the U.S. Attorney's office, FPD's office, et

15   cetera, because they are in charge of maintaining the

16   security of the building.

17             So anyone else that wants to gain access

18   even to the general chambers area has to, you know, do

19   that by a buzzer and announce their presence - and there

20   are buzzers for each judge's chambers - and to announce

21   their presence.  And then that particular chambers will

22   buzz them in, kind of like an apartment building.  Then

23   once you get into that space, each chambers, of course,

24   has their own door.  And at least here in Kansas City,

25   most of us leave our doors open to the hall during the

1  workday, because our chambers staff are going and coming

2  and sometimes chambers are going from one chambers to

3  another.  But after hours we close those doors and we

4  lock those doors.

5          So on Thursday, August 25th, at about 3:00,

6  Ms. Tomasic had called chambers and said she-- asked if

7  she could deliver the items, and they conferred and said

8  yes.  They buzzed her in.  She delivered the items.  One

9  of my law clerks buzzed her into the chambers space on

10 the fifth floor I should've said, not fourth floor.  And

11 she brought a-- a very sizable amount of materials,

12 because there were-- the CCA system, I had ordered that

13 they turn over all recordings.  And as part of that,

14 they had to turn over these DVR drives.  And they were

15 very bulky and it took a big cart.  Ms. Tomasic brought

16 all of that up.  My law clerk, Mr. Treaster, was there

17 and put them in my inner-office within my chambers

18 office, and Mr. Treaster told Ms. Tomasic, "We'll put

19 them there for now."  So anyway, that happened

20 August 25th at 3:00.

21          And then that was it, I mean, for that

22 point.  Ms. Tomasic did not indicate-- and this was

23 about 3:00 again on Thursday.  She didn't indicate that

24 there would be more or that she had additional things to

25 deliver.  She didn't-- there was no conversation about

1   whether anyone would be there later on that afternoon.

2   So that was it.

3           So the next thing that happens, same day at

4   5:30 p.m., another one of my law clerks is working in

5   chambers.  It's after hours, it's 5:30 of course.  And

6   she-- my law clerk hears a female voice calling right

7   outside the chambers door within the outer office where

8   Bonnie Wiest is saying, "Hello?  Is anyone here?"  And

9   then that person says, "Oh, someone is here."

10          And so Ms. Schlacter comes out and finds Ms.

11  Tomasic with a deputy marshal, Christopher Johnson, with

12  her.  And they're there at the entrance of my chambers

13  door, which startled Ms. Schlacter, because no one had

14  buzzed her in, no one had indicated that Ms. Tomasic or

15  the marshal was coming in.  There hadn't been any

16  additional e-mails or calls or any indication that Ms.

17  Tomasic was needing to come up to deliver more things

18  that day.  So it startled her, but, you know, they had--

19  they exchanged pleasantries.

20          Ms. Tomasic delivered to Ms. Schlacter a

21  manila envelope that was about an inch thick and then

22  also a white business envelope that included a cover

23  letter.  And that's the letter that I-- I had asked

24  earlier about whether there was any reason to keep that

25  ex-parte, and-- and Ms. Barnett said no.  And it was

1    basically just a cover letter from Ms. Tomasic saying

2    here are the things that we've given you all, and also

3    that there are still matters on servers and how we've

4    told people to lock those down and don't look at them.

5    So that's what happened at about 5:30, no later than

6    5:35 on August 25th.  Ms. Tomasic with Chris Johnson,

7    the deputy marshal, gave that to Ms. Schlacter.

8              I should also say that Ms. Schlacter stated

9    that, you know, when she heard the voice and she went

10   out in the office and she was surprised to see Ms.

11   Tomasic, that Ms. Tomasic also expressed surprise and,

12   in fact, said, "Oh, I didn't think anyone would be here,

13   so I had a marshal break me in."  Those were her exact

14   words.

15             So anyway, this caused my law clerk some

16   consternation.  As an aside, I will just tell you, I

17   mean, this, of course, could've been totally innocent on

18   Ms. Tomasic's part, but the way our chambers are

19   configured, they're secured.  And I, frankly, really

20   thought about whether I should even bring this up,

21   because I'm not-- I don't have enough information to say

22   that there was anything wrong going on or anything like

23   that.  But it caused me great discomfort, it caused my

24   law clerks great discomfort.

25             If Melody Brannon and her staff had done

1  this and had a U.S. Marshal bring them in to deliver a

2  package after hours unannounced without my knowledge,

3  without my consent, I'd be sitting here right now

4  telling the U.S. Attorney's Office and all of you.  And

5  I guarantee you, the prosecutors wouldn't like that.

6  They'd be concerned, just like I'm sure you're

7  concerned.  So that's why I'm bringing it to your

8  attention.

9          I don't want to make more of it than should

10 be made, but I felt like it's not something I'm going to

11 hold on to in terms of information because it did cause

12 us great concern.  The impounded materials presumably

13 were in my office.  That's evidence.  I don't normally

14 have that kind of stuff in my office.  I mean, that

15 resides with the U.S. Attorney's Office or the

16 investigative agencies.  I'm not particularly

17 comfortable with the fact that I have ordered all of

18 this impounded and it's now under my custody and

19 control.

20          Ms. Tomasic and no one else knew this, but

21 fortunately, my law clerks have been trained well and

22 when Ms. Tomasic brought all that stuff up at 3:00, they

23 immediately secured it in a locked vault in the clerk's

24 office, where it has remained since, where it will

25 continue to remain.  And when I appoint this master or

1    expert, we're going to ensure that as that person

2    reviews these things or whoever reviews them, we're

3    going to make sure that they're secure.  You have my

4    assurance about that.

5            But anyway, it gave us all consternation

6    that someone, a litigant in a case, a lawyer in a case,

7    and frankly that a Deputy U.S. Marshal, who has access

8    to our chambers but only for security purposes, would

9    come in after hours.  Like you prosecutors, like you

10   defense counsel, like you working people in this

11   courtroom, if you come into my office, my private

12   secured chamber space without my knowledge or consent,

13   I'm not hiding anything except I have work product, I

14   have work in progress, I don't want any of you to see

15   it.  I don't want anyone to see it.  Just like you don't

16   want the other side or even me to see your work in

17   progress and your work product and other things.

18           I had in camera submissions in this case

19   that-- for example, Ms. Rokusek I think at that point

20   had given me something.  The government today has given

21   me a number of in camera things.  I mean, these are the

22   things that when we lock our door at night, we have to

23   have some assurance that nobody is going to come in

24   there and-- and be in that space.  Even if they're not

25   going to view it, we-- we just don't want anybody in our

 1   space.  So it did cause consternation.

 2          I keep in camera things locked up.  The

 3   things submitted to me today by the government are going

 4   to be locked up.  In fact, everything in this case is

 5   going to be kept in that vault, I assure you.  But

 6   anyway, it caused us some consternation, so much so that

 7   my law clerks-- I was out of town on vacation.  My law

 8   clerks were concerned, they called our Clerk of Court,

 9   our Clerk of Court had communication with United States

10   Marshal Ron Miller that night and United States Attorney

11   Tom Beall.  And they discussed the incident.

12          At that point what Mr. O'Brien, my Clerk of

13   Court, was told through an e-mail from Ms. Barnett--

14   well, no, Ms. Barnett called Mr. O'Brien, and Ms.

15   Barnett reportedly told Mr. O'Brien that she and Ms.

16   Metzger were involved in how things proceeded, it wasn't

17   just a unilateral decision from Ms. Tomasic as to how to

18   deliver this package, and-- and apologized.

19          Later the next day, Ms. Barnett sent an

20   e-mail apologizing for the intrusion into your office

21   last night and requesting that I meet with her boss,

22   U.S. Attorney Mr. Tom Beall, which I did.  I came back

23   from vacation early.  The following Monday, on

24   August 29th, I met with U.S. Attorney Tom Beall.  I met

25   with U.S. Marshal Ron Miller.  They had already talked

1    amongst themselves, but Mr. Beall-- and I should say

2    that both Mr. Beall and Mr. Miller apologized profusely

3    and assured me that it would not happen again.  No one

4    on either one of their staffs would enter my chambers or

5    any other chambers unannounced, without knowledge,

6    without consent, because obviously that's not the proper

7    protocol or procedure.  And they both assured me, and

8    I-- I trust their assurances that it won't happen again.

9           Mr. Beall in that conversation with me

10   explained that the reason this happened was that Ms.

11   Tomasic felt that she needed to comply with the Court's

12   order to impound, and that she thought the deadline for

13   full compliance was that day, August 25th.  Actually,

14   the deadline wasn't that day.  I had given the

15   government seven business days, that might've been the

16   seventh calendar day.  But in any event, she thought she

17   needed to comply.  That she had had a conference with

18   Kim Flannigan and Debra Barnett and Emily Metzger about

19   how to comply and how to submit these additional

20   materials.

21           And that in the course of that conversation,

22   someone, who they didn't identify, someone decided that

23   they should get a U.S. Marshal to let her into the

24   Court's secured space so that she could deliver the

25   package under the door.  And that she didn't have an

1    intent to actually enter my chambers office, that her

2    intent was to slip the package under the door back in

3    the secured space, given access with-- by the U.S.

4    Marshal.

5              So that's what Mr. Beall and I discussed.

6    And I-- again, I just bring this to your attention.  I

7    don't think I have to harp on this.  You all know-- I'm

8    sure you can understand why this made me uncomfortable.

9    Why it would make any of you uncomfortable if it

10   happened to you from someone else.

11             I-- I'm uncomfortable with the explanation

12   as well.  I'm not saying it's not true, but it just

13   gives me great discomfort that Ms. Tomasic appeared in

14   my office at 5:30 or 5:35 on that Thursday.  She made no

15   attempt whatsoever to contact us like she had at 3:00 to

16   say, "Hey, I've got more things, let me bring it up to

17   you."  We would've, you know, accomplished that.  There

18   was somebody there.  She had no reason not to think

19   somebody was there.  But more importantly, she didn't

20   check to see if anyone was there.

21             Yet from the explanation given and what I

22   can reconstruct, before 5:30 when she shows up with the

23   marshal, she had time to send an e-mail at 5:09 to-- and

24   it's attached to the ex-parte letter that was given to

25   me, an e-mail to investigative agents telling them, you

1  know, don't look at certain things because of the

2  judge's order.  She did that at 5:09.  She had time to

3  get other attorneys on the phone and have a phone

4  conference where they apparently-- somebody decided the

5  way to handle this was not to call my chambers or

6  e-mail, but to find a marshal to-- to let them in.  And

7  she had to get the marshal to bring her upstairs.

8           So, I mean, it just-- it boggles my mind

9  that all of this happened, but no one says, "Hey, why

10  don't we check with Judge Robinson and follow the

11  protocol and-- and see if we can bring it up."  Because

12  if the idea was to meet some deadline, it doesn't make

13  sense to me that this is the way you do it.

14           First of all, my door to my office doesn't

15  have a time stamp on the bottom.  So if you slip

16  something under the door, you're not going to be able to

17  prove you gave it to me on August 25th versus the next

18  morning, I mean, if nobody is there.  So that doesn't

19  make sense.  The package itself is thick enough that I

20  would have been surprised that somebody would've assumed

21  it would slip under an office door.  It was probably

22  about an inch thick and then there was an envelope

23  attached on top of it.

24           It just doesn't make sense to me.  I find it

25  puzzling.  It does not at all factor into the scope of

1    what I'm going to have the master do.  I'm not telling

2    you that for that reason.  But I will say the master or

3    the expert is going to be considering violations and is

4    going to be following the trail as it may be.  And who

5    knows, I mean, I don't know if that person will find

6    something that will shed light on this or not.  Or maybe

7    that person will find something that-- you know, this

8    was just a bad error of judgment, that's all it was, and

9    it was totally innocent.  That's fine too.

10              I just wanted to make this record because it

11   troubled me.  At the same time I wanted to assure all of

12   you that I'm doing everything I can to keep these

13   materials secure, to keep the in camera submissions from

14   the government secure, to keep the in camera submissions

15   from the defense secure.  They're in a vault.  I can't

16   even open the vault, only someone in the clerk's office.

17   I won't reveal who that person is.  So we're doing

18   everything we can, and we will continue to.

19              And that's all I wanted to do, was make a

20   record of that, bring it to your attention, tell you

21   that I-- I can-- have not and will not draw any

22   conclusions about what that was all about.  Hopefully it

23   was just totally a bad error in judgment and an innocent

24   bad error in judgment, but I wanted to make that record

25   before we closed the record today.

1          All right.  This matter is considered

2    submitted, it's under advisement.  And I'll be issuing a

3    written decision appointing-- it will likely be a

4    neutral expert rather than a master, given the

5    government's lack of consent to anything other than what

6    they want.

7          All right.  So we'll be in recess.

8          (5:17 p.m., proceedings recessed).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3

4        I, Kelli Stewart, a Certified Shorthand Reporter and

5    the regularly appointed, qualified and acting official

6    reporter of the United States District Court for the

7    District of Kansas, do hereby certify that as such

8    official reporter, I was present at and reported in

9    machine shorthand the above and foregoing proceedings.

10       I further certify that the foregoing transcript,

11   consisting of 164 pages, is a full, true, and correct

12   reproduction of my shorthand notes as reflected by this

13   transcript.

14       SIGNED September 9, 2016.

15

16

17

18           /s/ Kelli Stewart
          _____

19           Kelli Stewart, CSR, RPR, CCR, RMR

20

21

22

23

24

25