# UNITED STATES DISTRICT COURT
## District of Kansas

**UNITED STATES OF AMERICA,**

        Plaintiff,

        v.                                 Case No. 16-20032-JAR

**LORENZO BLACK,** *et al.*,

        Defendants.

---

**GOVERNMENT'S CONSOLIDATED RESPONSE TO THE FEDERAL PUBLIC DEFENDER'S FILINGS (Docs. 220, 229, and 230) CONCERNING THE SPECIAL MASTER'S REPORT REGARDING OTHER ISSUES RELATED TO RECORDINGS AT CCA-LEAVENWORTH (Doc. 214)**

---

The United States of America respectfully responds to the Federal Public Defender's Response to Special Master's Report Regarding Other Issues Related to Recordings at CCA-Leavenworth (Doc. 220), Objection to the Special Master's Report Regarding Other Issues Related to Recordings at CCA-Leavenworth (Doc. 229), and Proposed Findings of Fact and Supplemental Request to Expand the Special Master's Investigation (Doc. 230).

**I.**     **The Federal Public Defender's Response to Special Master's Report Regarding Other Issues Related to Recordings at CCA-Leavenworth (Doc. 220)**

In this first responsive document, the public defender raises no objections to the Special Master's Report Regarding Other Issues Related to Recordings at CCA-Leavenworth (Doc. 214) (hereinafter the "Special Master's Report" or "Report"). Instead, the public defender requests

additional information from the Special Master for the approximate 188 recorded telephone calls identified in his Report where the attorney's telephone number was marked "Private," and thereafter "Selected." The Report explained that "selected" meant the call was downloaded by CCA-Leavenworth for the purpose of either review, that is, being listened-to by a law enforcement officer and/or government attorney, or downloaded by a Securus employee in response to a subpoena by a government attorney or defense counsel.[1] Regarding the identity of the lawyers, inmate, inmate account number, call type, call status, date of call, duration of call, port location for call, and termination category of each of the 188 calls, the government has no objection to the request for additional information.[2]

## II. The Federal Public Defender's Objection to the Special Master's Report Regarding Other Issues Related to Recordings at CCA-Leavenworth (Doc. 229) and Proposed Findings of Fact and Supplemental Request to Expand the Special Master's Investigation (Doc. 230)

In the "Objection" pleading, the public defender "objects to the Special Master's conclusion that the defense bar's response to the government's actions is a product of 'a widespread undergrowth of mistrust between the Office of the United States Attorney for the District of Kansas and defense counsel.'"[3] The public defender goes on to "further object to the Special Master's tentative conclusion that: '(1) neither the OUSA nor any law enforcement [*sic*] actually viewed any of the video-recorded attorney-client meetings that were seized from CCA-Leavenworth in May of 2016; and (2) neither the OUSA nor any law enforcement officer have

---

[1] Doc. 214 at pp. 22-23; 21 n. 19.
[2] Doc. 220 at p. 2.
[3] Doc. 229 at p. 1 (quoting Doc. 214, at pp. 25-26).

ever before obtained (much less actually viewed) video-recordings of attorney-client meetings at CCA-Leavenworth.'"[4] The public defender also accuses the government of misconduct.[5]

In the "Proposed Findings," the public defender reiterates its objection to the Special Master's tentative conclusion that no member of the United States Attorney's Office ("USAO") or law enforcement officer reviewed any of the video of attorney-client meetings at C.C.A.-Leavenworth. The public defender asserts no other specific objection to the Special Master's Report, and proposes alternative findings to those of the Special Master. It also invites findings by the Court absent evidence to support such findings, as well as suggesting other areas of inquiry for the Special Master as an expansion of his duties. In connection with those suggestions, the public defender provides no authority for the expansion and fails to identify a mechanism to pay the related costs.

    A.    <u>Standard of Review</u>

The Court's Appointment Order provides the procedure and standard for the review of the orders, findings, reports, rulings, and recommendations by the Special Master. "Pursuant to Rule 53(f)(2), any party may file an objection to an order, finding, report, ruling, or recommendation by the Special Master within 14 calendar days of the date it was filed; failure to meet this deadline results in permanent waiver of any objection to the Special Master's orders, findings, reports,

---

[4] Doc. 229 at p. 4 n. 11 (quoting Doc. 214, at pp. 26-27). With respect to this objection, the public defender goes on to state: "The evidence demonstrates that, at minimum, the second tentative conclusion is incorrect." (Doc. 229, at p. 4 n. 11) The United States is puzzled by this portion of the objection, as the public defender does not identify the specific evidence supporting the position, and no evidence was admitted in support of any prior filings, or during any prior hearings, in this matter suggesting any video-recordings of attorney-client meetings had ever been obtained from CCA-Leavenworth prior to those obtained in connection with the investigation related to the instant case.
[5] *Id*. at pp. 2, 5, and 6.

rulings, and recommendations."[6]  "[T]he Court shall decide *de novo* all objections to conclusions of law made or recommended by the Special Master; and the Court shall set aside a ruling by the Special Master on a procedural matter only for abuse of discretion."[7]  "To the extent the Special master enters an order, finding, report, ruling, or recommendation regarding an issue of fact, the Court shall review such issue *de novo*, if any party timely objects . . . ."[8]  The Court shall retain sole authority to issue final rulings on matters formally submitted for adjudication, unless otherwise agreed by the parties, and subject to waiver of objection to written orders or recommendations as noted above."[9]

    B.    Discussion

From the government's perspective, this litigation started out with a request for information.[10]  However, the public defender discounts that their request, which in no way referenced the investigation in the instant case, was met with immediate action by the government, who reached out to the U.S. Marshals Service, and through them to the warden at CCA-Leavenworth.  The government immediately reported the information it received.  That the warden at the facility ultimately turned out to be unaware of its own policy and practice was certainly regrettable, but does not change the fact that the government reacted quickly and reasonably on the public defender's concern.  Additionally, that sequence of events and information does not lead to a reasonable inference that CCA, the Marshals Service, or the USAO communicated intentional false information to the public defender.

---

[6] Doc. 146 at p. 10.
[7] *Id.* at p. 11.
[8] *Id.*
[9] *Id.*
[10] Doc. 229 at p. 7 (citing Defense Ex. 453).

As a result of learning from other sources that the information from the warden was not accurate, the public defender let the government know, for the first time, that their concern arose in the context of the *Black* case, and proceeded to file its original emergency motion.[11]  During ongoing discussions contemporaneous with the filing of the public defender's original motion, the government agreed to suspend any disclosure in discovery of the video recordings at issue and to segregate and secure them pending a hearing with the Court.

The United States Attorney agreed to meet with the public defender and because of that meeting agreed to provide the video recordings to the Court.  The parties agreed to request the use of a Special Master for the purposes of guarding against any disclosure of possibly privileged information and to allow for a determination of whether in fact there was any privileged information among the video recordings.[12]  However, the United States Attorney was unwilling to agree, sight unseen, without any knowledge of the extent, nature, and characteristics of the video recordings, that their mere existence constituted a violation of the Sixth Amendment of the Constitution.[13]  This latter position by the government is contrary to the public defender's early position and seems to be a significant point of contention for the public defender.

At the resulting original hearing on the public defender's motions for return of evidence, the government stood by its agreement to produce the video recordings to the Court for safekeeping, and to move for appointment of a Special Master to analyze them to determine whether they did actually constitute any privileged materials.[14]  Notably, despite evidence that

---

[11] Doc. 82.
[12] Doc. 163, pp 4-6.
[13] *See* Doc. 82 at p. 1-2.
[14] Doc. 101.

the recording of attorney client meetings only resided on Digital Video Recorder Drive ("DVR") 6 and possibly DVR 5, the government did not object to the public defender's request that both sets of all six of the DVRs be taken into the custody of the Court – despite doing so resulted in the loss of material to an ongoing investigation for a period of months.[15]

　　　The foregoing history stands strongly for the proposition that from the time it learned of the existence of the video recordings, the government responded promptly and reasonably. The government agreed to a procedure to safe guard the questioned information to the full extent necessary to allay the public defender's worst concerns of what it might contain or what the impact of its disclosure might be. Further, despite reservations about the propriety of the type of motion filed by the public defender - the public defender's standing to bring any motion in the matter (not representing a defendant in the case and in fact representing some of the cooperating inmates) - the government deferred litigation of all such issues to ensure that, first and foremost, the questioned material was safeguarded in a manner approved by counsel.[16] In other words, despite an available litigation strategy focused on procedure, the government chose to forgo that option and address the substantive issue, which deserved appropriate attention and resolution. The government has sought to keep the focus on the substantive issues meriting attention. The public defender, on the other hand, appears to be more interested in questioning the credibility of officers of the court instead of addressing the substantive issues.[17]

---

[15] Doc. 104, Transcript of 8/9/2016 hearing, at pp. 102-115.
[16] *Id.* at p. 102; *see also generally* Doc. 110.
[17] *See* doc. 230 at p. 9, n. 18.

As the litigation developed, the government opposed aspects of the role of the Special Master, most based on concern about the propriety, need, and costs of certain aspects.[18] However, the government has endeavored to cooperate fully with the Special Master, and has not opposed any of the orders, directions, and requests made by the Special Master.[19]  As such, the government submits that the only real basis for the public defender's repeated assertion that the government has not taken the matter seriously is that their standard for taking it seriously is for the government to adopt their position that a Sixth Amendment violation occurred, and was complete, based simply upon the existence of the attorney-client meeting videos.  This is simply not the law.

Now in its objection, the public defender extends this reasoning to the Special Master, effectively complaining that he is unwilling to equate a potential intrusion, part of his assigned task, with completed widespread and systematic misconduct.[20]  In taking this tack and renewing these allegations in the face of the Special Master's analysis, the public defender is assigning "guilt" by association and advocating a rush to judgment, both of which she routinely rejects as appropriate in her work on behalf of clients.  Moreover, the public defender ignores the fact that everything upon which she bases her conclusion of misconduct was available to, and presumably

---

[18] *See e.g.* Doc. 163.
[19] Indeed, the government does not know the reason behind the Special Master's statement in his Report that "[t]he OUSA has also produced some of the requested information" (Doc. 114, at p. 2).  The government is not aware of any request that it has resisted, or any outstanding request that is unfulfilled.  However, it is certainly true that the government is also an employer, subject to its duties to its client, and simply does not always maintain information of the type and in the form the Special Master may have presumed that it does, and the government assumes that some or all of the foregoing may account for the Special Master's statement.  In any event, should the Special Master view any request as outstanding, the government would welcome an opportunity to comply.
[20] Doc. 229 at p. 2.

considered by, the Special Master, who then supplemented by his own investigation during his independent review.

With respect to assigning guilt by association, the public defender's continuous attempts to aggregate the conduct of CCA-Leavenworth, Securus, and the USAO,[21] despite the fact that they are legally separate entities, with the former two not even being parties to the litigation.[22] There has been no evidence that the recording of video from attorney-client meeting rooms was anything but a unilateral policy of CCA-Leavenworth, and not directed, sought, counselled, or even known about, by the government. It is undisputed that CCA-Leavenworth provided the video recordings in response to a subpoena, and not as a result of any involvement by CCA-Leavenworth as a participant in any joint investigative activity with the government or in any way a member of any prosecution team.[23] The lack of joint investigative activity is illustrated through the video surveillance subpoena, which sought approximately 22 months of footage. However, because of the manner in which the video surveillance system operated, less than three months of video footage was even available.

---

[21] Doc. 230 at p. 6.

[22] *See, e.g., United States v. Logue*, 412 U.S. 521(1973). In *Logue*, the Supreme Court determined the law that imposed the duty of providing safekeeping and care on the Government, and authorized the Government to contract with state and local authorities to provide that care also "clearly contemplated that the day-to-day operations of the contractor's facilities were to be in the hands of the contractor, with the Government's role limited to the payment of sufficiently high rates to induce the contractor to do a good job." *Logue*, 412 U.S. at 529. Because the acts of negligence were allegedly committed by employees of a contractor with the United States, whose physical performance is not subject to governmental supervision, the independent contractor exception bars plaintiff's FTCA claim against the United States. While *Logue*, addressed the contractor relationship in the context of civil liability, the principle is applicable here with respect to the limited role of the government regarding the day-to-day operations of entities such as CCA-Leavenworth and Securus.

[23] Defense Ex. 453.

Individuals retain their attorney-client privilege when incarcerated or detained.[24] While the attorney-client privilege may be the oldest of the privileges for confidential communications known to the common law,[25] the attorney-client privilege is a rule of evidence.[26] Therefore, the attorney-client privilege is not a constitutional right.[27] The purpose behind the attorney-client privilege is to preserve confidential **communications** between an attorney and client.[28]

At the present time, the parties know nothing more about whether the video recordings of attorney-client meetings reveal any actual communication than they did at the time of the first hearing on August 9, 2016. At that time, evidence presented revealed that portions of the disputed video had been previously viewed by Jacquelyn Rokusek and her investigator, and subsequent to that hearing was viewed by them further and by the Court.[29] It has now also been viewed by the Special Master and those working with him; however, no concrete details of what it depicts, whether it is sufficiently clear, light, and focused to allow, for example, the determination of identity of documents exchanges, the evaluation of facial expressions, and other nonverbal communications has ever been revealed. Certainly, the public defender presented the opinion of experts at the August 9 hearing on the proposition that if the video did permit the detailed analysis of nonverbal communication that it would, in their opinion, reveal the substance of the communication between an attorney and client sufficient to invoke the protection of privilege. However, none of those experts ever viewed the video in question, and the degree to which the

---

[24] *See, e.g., United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011).
[25] *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).
[26] *United States v. Rogers*, 751 F.2d 1074, 1077 (10th Cir. 1985) ("The attorney-client privilege is an evidentiary rule designed to prevent the forced disclosure in a judicial proceeding of certain confidential communications between a client and a lawyer.").
[27] *Howell v. Trammell*, 728 F.3d 1202, 1222 (10th Cir. 2013).
[28] *In re Grand Jury Subpoenas (United States v. Anderson)*, 906 F.2d 1485, 1492 (10th Cir. 1990) (emphasis added).
[29] Doc. 104, Transcript of 8/9/2016 hearing, at p. 116.

video recordings at issue implicate the aspects that caused them concern are still unknown. As such, the necessary element of privileged communication upon which the public defender's claim of misconduct stands, remains missing. Merely desiring or anticipating that the meetings be "confidential" does not necessarily make them so for privilege purposes.

Assuming arguendo that the video recordings of the meetings do reveal communications subject to the attorney-client privilege, intrusions into the attorney-client relationship are not per se constitutional violations. Instead, establishing a Sixth Amendment violation requires some showing of prejudice in terms of injury to the defendant or benefit to the prosecution.[30] In *Weatherford v. Bursey*, the Supreme Court held that a government informant's attendance at several attorney-client strategy sessions did not violate the defendant's Sixth Amendment rights because there was "no tainted evidence [at trial], no communication of defense strategy to the prosecution, and no purposeful intrusion" by the informant into the attorney-client relationship.[31]

Moreover, even when there is an intrusion of the attorney-client relationship, a Sixth Amendment violation only occurs if a defendant can show a realistic possibility that she was prejudiced by the intrusion.[32] Four factors are relevant in determining whether the defendant suffered prejudice from an intrusion: (1) whether the government purposely intruded into the attorney-client relationship; (2) whether any evidence offered at trial was obtained directly or indirectly from the intrusion; (3) whether the prosecutor obtained any details of the defendant's

---

[30] *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977).
[31] *Id.*
[32] *See id.*

trial preparation or defense strategy; and (4) whether overheard conversations had been used in any other way to the substantial detriment of the defendant.[33]

Here the public defender offers no evidence as to the second and third factors, i.e., that any evidentiary use has been made of improper material at a hearing or trial, or that any details of a defendant's strategy has been learned by the government. Rather, she founds the entirety of her claim that there was a knowing intrusion, under the first factor, on statements made by a prosecutor at a July 21, 2016 status conference in reliance on the beliefs of a cooperating inmate and on a singular and contested interpretation of a conversation between two prosecutors and a defense counsel on August 2, 2016, in a case different from this one. The public defender then further relies on the one interpretation of this same conversation to support, under the fourth factor, that there was use of privileged information to the substantial detriment of a defendant.

On April 12, 2016, the government served a subpoena on CCA's record custodian seeking "all video footage or still images currently retained by Corrections Corporation of America, (CCA) depicting any internal or external surveillance video or still image taken between July 2014 and April 12, 2016 at the CCA facility in Leavenworth, Kansas."[34] The broadly drafted subpoena sought to further the investigation of the widespread conspiracy to distribute drugs and contraband within the facility. The investigation revealed inmates distributed drugs and contraband to other inmates in the law libraries, medical facility, twelve-step program, church, and various pods where inmates resided. Although the government acquired video recordings throughout the CCA

---

[33] *See id.* at 552-57.
[34] Exhibit 438.

facility, which included video recordings without audio of attorney-client meeting rooms, the government never intended to request or receive CCA recorded attorney-client meetings.

The public defender inaccurately states that prosecutors "knowingly" obtained attorney-client video recordings. While a cooperating inmate stated during an interview in early March 2016 that cameras were located in the attorney-client meeting rooms, that single fact from a lengthy interview was not recalled when drafting the subpoena nearly one month later.[35] Although the government contemplated a controlled purchase utilizing this cooperating inmate, the agents never developed an operation plan and abandoned the idea without confirming whether CCA had any recording capability within attorney-client meeting rooms.

On June 27, 2016, another cooperating inmate told investigators that inmate Richard Dertinger warned other members of the drug trafficking conspiracy inside CCA that law enforcement agents were investigating them. Sometime after this interview, probably in early-to-mid July, the prosecutor remembered information from the previous cooperating inmate about cameras being located in the attorney-client meeting rooms. During the September 7 hearing, the prosecutor provided more insights and explanation for the comments about potential video recordings made at the July 21 hearing.[36] The public defender discounts the prosecutor's explanation without discussion.[37] The prosecutor explained, "[b]ut I want the Court to know that I did not intend to get that footage," and to dispel any concern that the government purposely sought the meeting room video in this matter.[38] It is not plausible to conclude a prosecutor should

---

[35] For context about recalling this incidental fact from the cooperating witness, the primary prosecutor had a very ill young daughter who was hospitalized for several days just after the subpoena was issued.
[36] Doc. 135, Transcript of 9/7/2016 hearing, at p. 137.
[37] Doc. 230 at p. 9.
[38] Doc. 135, Transcript of 9/7/2016 hearing, at p. 137.

know of video recordings at a facility when the warden was uncertain. The government took steps to during the search warrant served at CCA as part of this investigation to review materials that could be potential attorney-client materials to prevent a "taint" of the lead investigators. Similarly, when agents came across recorded calls that involved attorneys with inmates, they reported those to the prosecutors who contacted the attorneys involved. These are not the actions of a prosecutor seeking to "intrude purposely an attorney-client relationship" or to "use any communications to the detriment of a defendant." Rather, a straw man has been constructed through the argument and innuendo offered.

With respect to the communication between a defense counsel representing an inmate in *U.S. v. Rapp, et al.*, and two prosecutors, defense counsel provided the Court with her recollection of that communication, as well as what she took that conversation to mean. However, the prosecutors provided their account of the communication, and while all three substantially agree on the overall substance of the communication, they differ strongly regarding defense counsel's recollection and interpretation of a statement made near the end of the conversation about agents reviewing video. Defense counsel recalls that statement to have been made by AUSA Kim Flannigan and reports it as follows, "[a]t the—near the conclusion of this conversation, I was informed by Ms. Flannigan that they had a case agent on the case who was reviewing attorney client meetings from CCA to determine whether or not this document had been provided to Richard Dertinger, which I told them it had not."[39] Defense counsel went on to state she understood this, and other parts of the conversation to mean, "[t]hat the case agent was reviewing videos to

---

[39] Doc. 104, Transcript of 8/9/2016 hearing, at p. 35.

determine whether or not I had provided the document and that all he had seen so far was me walking down the hall."[40]

SAUSA Erin Tomasic recalls that she talked to defense counsel about how the government intended to follow-up on the claims made by cooperating inmates.[41] During the course of the *Black* investigation, several cooperating inmates informed agents that another inmate had tipped them off to the CCA drug and contraband trafficking investigation.[42] According to the cooperators, this inmate claimed his attorney provided him with the name of an inmate who was cooperating and with the names of individuals who were targets of the investigation. Before filing a motion to determine conflict regarding this issue, the two prosecutors sought to discuss the issue with the particular defense counsel. On August 2, 2016, defense counsel read the interview reports that included the allegations of the inmate telling other inmates about the drug and contraband trafficking investigation.

Government counsel explained to defense counsel that they were not accusing defense counsel of any wrongdoing, but that agents were continuing the investigation to ascertain any corroboration of the cooperating inmates' statements. Specifically, the agents used CCA's visitation logs to identify dates when defense counsel visited this particular inmate and then locate video footage of the inmate following the visit(s). The agents intended to review the actions of the inmate and the other inmates within that pod to determine if the conspirators met or altered

---

[40] *Id.*
[41] Doc. 133 at pp. 18-19.
[42] That inmate is not charged in this case, but did join as an interested party. He pleaded guilty before August 2016, in an unrelated case to charges stemming from marijuana trafficking and money laundering and is awaiting sentencing. That inmate recently filed a motion in his own case advancing claims of Sixth Amendment violations based on the conduct alleged by the public defender. Because that inmate's concerns are being addressed in his own case, the government will not provide additional facts or background on those issues here.

their behavior.  (At no time did the prosecutors state they intended to view any attorney-client meeting; however, the prosecutors failed to explain specifically the video to be viewed was within a particular pod or other locations apart from attorney-client meeting rooms.)  One prosecutor told defense counsel that, thus far, the agent reviewing the video had only identified video of the inmate walking down the hallway and not yet any interactions with other inmates.  Neither prosecutor stated they intended to have an agent view video of attorney-client meetings.  Neither prosecutor stated they intended to have an agent determine if defense counsel handed a document to the inmate.

The public defender chooses to adopt only the recollection and interpretation of defense counsel, and discounts the prosecutor's words as defying credibility.[43]  However, the objective circumstances of the encounter do not support the derisive dismissal of the prosecutor's information by the public defender.  In context, SAUSA Tomasic was the lead attorney assigned to the instant case, handling the cooperator statements, as well as all other discovery, and communicating with the case agents.  Additionally, SAUSA Tomasic was the lead attorney in *U.S. v. Rapp, et al*., so fully versed on its facts and aware of the overlap between the two cases from the drug and contraband trafficking investigation.  As such, it makes sense that she would have been the one to address these specific aspects during the meeting.  However, both prosecutors were handling *U.S. v. Rapp, et al*., so appropriate for both of them participating in addressing the very serious circumstance where a defense counsel had been the subject of allegations that true or false, would potentially jeopardize an ongoing case.  At the time of that

---

[43] Doc. 230 at p. 11.

15

meeting, AUSA Flannigan was unaware of the possibility that attorney-client meetings may have been on the video recordings, so she could not have made the statement reported by the defense counsel.

Further, to the extent the public defender seeks to use this incident as evidence of the use of protected information to the substantial detriment of a defendant, it is inapposite because no such detriment occurred. No attorney-client meeting video between defense counsel and her inmate client was ever viewed, let alone used by the government.

Ultimately, in the context of the public defender's objection to the report of the Special Master it is important to note that all of the foregoing, whether and however resolved, weighed, or credited by him, was nevertheless known to him in reaching his conclusions in his Report. While the Special Master does not speak to the resolution of each point, he certainly had it before him to consider, and he certainly had the opportunity to test it through further investigation. Indeed, the Court imposed upon the parties a full duty to cooperate with him, empowered him to sanction noncompliance, and decreed that he had the authority to carry out his duties.[44] The Special Master has investigated the matters assigned to him for approximately six months and in that time has taken whatever steps he deemed necessary to carry out his charge. He detailed some of these steps throughout this most recent, as well as his previous reports, and certainly we know that he has interviewed USAO staff and law enforcement officers of his choosing. As such, he has had for his consideration all of the information previously known to the parties and great deal of

---

[44] Doc. 146 at pp. 13; 4.

additional information not known to the parties that he has independently developed through his own activities.

The Special Master has now detailed his most recent work in his Report of March 16, 2017. In doing so, he acknowledges the very real concerns raised by the public defender at the outset of this litigation, making clear his appreciation for the significance of his labors:

> The August, 2016 disclosure that the OUSA had seized video-recordings of attorney-inmate meetings raised suspicions of regular incursion into attorney-client communications. But the Special Master is confident most of these suspicions are groundless. Specifically: (1) no individuals used the CCA-Leavenworth video system to monitor attorney-inmate meetings; (2) no individuals used the CCA-Leavenworth intercom system to monitor or record attorney-inmate meetings; (3) calls between inmates and their attorneys using CCA-Leavenworth telephones (as opposed to Securus telephones) are not recorded; (4) to the extent calls between inmates and their attorneys using CCA-Leavenworth telephones (as opposed to Securus telephones) are monitored by a Unit Team Manager, this monitoring is not hidden – it is obvious to the inmate; and (5) calls between inmates and their attorneys using the Polycom video-telephones are not monitored or recorded.
>
> Moreover, the Special Master tentatively concludes that: (1) neither the OUSA nor any law enforcement officer actually viewed any of the video-recorded attorney-client meetings that were seized from CCA-Leavenworth in May of 2016; and (2) neither the OUSA nor any law enforcement officer have ever before obtained (much less actually viewed) video-recordings of attorney-client meetings at CCA-Leavenworth.[45]

In offering these conclusions, the Special Master described his appointment as occurring "after a spark lit a flame," and offered his hope "that this Report helps to tamp down the flames" by allaying the defense bar's concerns about the security of their clients' information.[46] Whether that ultimately happens remains to be seen, and it is certainly the government's hope that it will. However, the tenor of the public defender's objection suggests that any relief at having the defense

---

[45] Doc. 214 at p. 25.
[46] Doc. 214 at pp. 25-26.

bar's worst fears dispelled is, for now, overshadowed by disappointment that some of those fears were not validated to the government's detriment. The government respectfully submits that, ironically, this represents the same hardening of feeling and mistrust that the public defender decries in the Special Master's Report, and lends strong support to his conclusion. Certainly, it is not the government's intention to either lay or deny blame for the climate of mistrust the Special Master has described because to do either would simply perpetuate it. Rather, the government submits that there can be no credible denial that the mistrust does in fact exist to the detriment of professional relations and, ultimately, the best interests of justice, and that it is in all parties' interests to work diligently to overcome it. The government stands ready to work with the Federal Public Defender and defense counsel to resolve these issues.

WHEREFORE, the government respectfully requests that the Court affirm the Special Master's Report Regarding Other Issues Related to Recordings at CCA-Leavenworth (Doc. 214). Additionally, should the Court or Special Master desire proposed findings the government remains ready to provide such information and support for them.

    Respectfully submitted,

    THOMAS E. BEALL
    United States Attorney

    s/Debra L. Barnett
    DEBRA L. BARNETT
    Assistant United States Attorney
    United States Attorney's Office
    301 N. Main, Suite 1200
    Wichita, Kansas 67202
    316-269-6481
    316-269-6484 (fax)
    K.S.Ct.No. 12729
    debra.barnett@usdoj.gov

**CERTIFICATE OF SERVICE**

      I hereby certify that on April 17, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

                                              s/Debra L. Barnett
                                              DEBRA L. BARNETT
                                              Assistant United States Attorney