**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA,         ) | |
| ) | Case No. 16-CR-20032-JAR |
| Plaintiff,         ) | |
| ) | |
| v.         ) | Brief of the Department of Justice |
| ) | Special Attorney Concerning the |
| LORENZO BLACK,         ) | Special Master's Report Dated |
| KARL CARTER,         ) | October 20, 2017 |
| ANTHON AIONO,         ) | |
| ALICIA TACKETT, and         ) | |
| CATHERINE ROWLETTE,         ) | |
| ) | |
| Defendants.         ) | |
| _____ ) | |

The United States of America, by and through its counsel of record with respect to Phase III of the Special Master's Investigation in the above-captioned case, Department of Justice Special Attorney Steven D. Clymer, hereby files its brief addressing issues concerning the Special Master's Report dated October 20, 2016 [Docket Entry #298] (hereinafter "the Report"). This brief is filed pursuant to this Court's Order dated October 25, 2017, permitting the parties to "submit briefs addressing any issues concerning the Special Master's Report by November 14, 2017." [#300].

**1.    The Report Erroneously Describes the Rationale for the Phase III Investigation, Masking that the Actual Objective of the Investigation Has Been Achieved.**

   **a.    The Objective of the Phase III Investigation was to Determine Whether There Were Violations of the Sixth Amendment and/or the Attorney/Client Privilege.**

At page 9, the Report states:

As the Special Master noted earlier, 'there is a widespread undergrowth of mistrust between the Office of the United States Attorney for the District of Kansas and defense counsel,' Report at 25-26 (docket no. 214). *The Court ordered the Phase III investigation in order to cure (or at least improve) this situation.*"

(Emphasis added.)

This passage mischaracterizes the rationale for the Phase III investigation that the district court ordered. The Phase III order describes a very different objective:

> This investigation is necessary to the Court's analysis of whether there were violations of the attorney-client privilege, prejudice to the affected clients, and Sixth Amendment violations. And, if the Court concludes there were any such violations or any such government misconduct, the Phase III investigation will inform the Court's decision about appropriate relief and remedies.

Docket Entry #253 at p. 9.

Elsewhere, the Phase III order states:

> Moreover, the Phase III investigation must focus on two key questions about the conduct of the USAO: (1) has the government listened to audio recordings of any attorney-client telephone calls of defendants charged in this case, defendants in other cases who have filed motions for relief, or CCA inmates who are subjects or targets of the ongoing investigation?; and (2) has the government viewed any video recordings of communications in the attorney-client conference rooms at CCA of any of the above described defendants or inmates? The Phase III investigation will allow the Court to fashion individual and/or global remedies to address any and all intrusions into privileged attorney-client communications, and any and all corresponding violations of the Sixth Amendment rights of defendants.

*Id*. at pp. 9-10 (footnote omitted).

The Phase III order also explains that:

> The Phase III investigation will further focus on whether the government's conduct in obtaining attorney-client calls was intentional and purposeful, or inadvertent and unintentional. Although any intrusion into attorney-client communications is of grave concern, the government's intent or lack of intent will inform the Court as to the type and extent of appropriate remedial action the Court will order. Thus, the Court directs the Special Master to investigate the intent of the USAO's attorneys and staff as well as the intent of investigative agents.
>
> The Court also directs the Special Master to investigate how the government used the information, if at all. Did the government use any such information in its investigative strategy, in its charging decisions, in its litigation posture on bond, or in defending motions filed by the defendant? Did the government obtain information, directly or indirectly, that it has or could use at trial, in plea negotiations, or in any other way?

*Id.* at p. 23 (footnote omitted).

These passages make clear that the Phase III investigation was intended to determine whether the government had violated the Sixth Amendment or the attorney-client privilege of any CCA inmates. Indeed, in the section of the Phase III order setting out the specifics of the Phase III investigation, there is no discussion of the Special Master conducting an investigation in order to "cure" or "improve" relations between the defense bar and federal prosecutors as the Report mistakenly asserts. *See id.* at pp. 45-47.

To be sure, the Phase III order does mention what it characterizes as a "culture of distrust" among certain members of the defense bar and certain federal prosecutors (which it describes as "probably a minority"), but it does not state or suggest that ameliorating this situation is what warrants Phase III of the Special Master's investigation. Indeed, the Order assumes that improved relations between the defense bar and the United States Attorney's Office would be, at best, an uncertain collateral benefit: "[t]he Court recognizes that no matter the outcome of this investigation, and no matter the outcome of this Court's de novo review of the Special Master's future reports and this Court's own findings and conclusions, the long-simmering culture of distrust may not cool upon the filing of this Court's final order." *Id.* at p. 44.

   **b.**  **The Efforts by the District Court and the Special Master Have Shown that Concerns About Violations of the Sixth Amendment and Attorney-Client Privilege Are Unfounded.**

Given the actual objective of the Phase III investigation – to determine if there is proof of improper intrusions into the attorney-client relationship − it is noteworthy that the Report does not identify any evidence supporting defense claims of government violations of the Sixth Amendment and attorney-client privilege. The Report essentially acknowledges that the Special Master's investigation has uncovered no such proof.

First, the Report notes that "the Special Master's *initial* investigation suggested that '[defense bar] suspicions of regular incursion into attorney-client communications . . . are groundless.'" Report at p. 8 (emphasis in original). The Report does not describe the later discovery of any evidence casting doubt on this initial conclusion.

Second, the Report explains that "the Phase III investigation to date suggests there is only one instance where the OUSA even made a request for video-recordings of meetings at CCA between inmates and their attorneys, and the OUSA did not actually view any such meeting." *Id*. at 9.[1]

Third, the Report does not take issue with the following assertions in the September 12, 2017 letter from Department of Justice ["DOJ"] Special Attorney Clymer to the Special Master

---

[1] The Federal Public Defender objects to this statement in the Special Master's Report. [#304]. Although the Federal Public Defender concedes that the Special Master's role includes "evaluating credibility," *id*. at p. 3, it nonetheless challenges the Special Master's credibility determination. *Id*. at pp. 3-6. The Federal Public Defender's objection appears to be based on its own interpretation of an interaction in August 2016 involving defense counsel Jackie Rokusek, who formerly represented a defendant in different case named Richard Dertinger; former Special Assistant United States Attorney Erin Tomasic; and Assistant United States Attorney Kim Flannigan. As the Court is aware, there is a dispute whether this interaction proves that a government employee watched a soundless video of Rokusek meeting with Dertinger in an interview room at CCA Leavenworth. *Id*. at pp. 2-3.

The Federal Public Defender's challenge to the Special Master's Report does not mention, however, that (a) the Federal Public Defender does not represent Dertinger and did not do so at that time of the disputed interaction; (b) Dertinger is not a defendant in this case and never has been; (c) Dertinger had an opportunity to litigate any claims concerning violations of his Sixth Amendment rights in his own case and, in fact, did so, ultimately pleading guilty instead of pressing those claims; and (d) even had a government employee watched the soundless video (which is both unproven and disputed), this would not have violated either the attorney-client privilege or the Sixth Amendment right to counsel. Indeed, after viewing the video, this Court, in its Phase III order, refrained from finding that it depicted attorney-client privileged information. In short, even if the Federal Public Defender's credibility assessment trumps the one made by the Special Master, there still remains no evidence of any government violations of the attorney-client privilege or the Sixth Amendment related to the CCA Leavenworth investigation and certainly none involving any defendant in this case.

(which appear in a section of the letter entitled "The Record is Devoid of Evidence of Sixth Amendment Violations"):

- "[T]here is no evidence of any Sixth Amendment right-to-counsel violations arising from the investigation at the CCA-Leavenworth detention facility ['CCA'] that resulted in the charges in *United States v. Black*." *Id*. at p. 10
- "[T]here is no evidence that any defendant indicted in the *Black* case suffered a violation of his or her Sixth Amendment right to counsel or infringement of his or her attorney-client privilege." *Id*.

Indeed, in seven singled-spaced pages, the September 12, 2017 letter sets out a host of additional detailed factual assertions all supporting the conclusion that there is no evidence here of any constitutional violations or any infringement of the attorney-client privilege.[2] *Id*. at pp. 10-17. These detailed factual assertions are buttressed by citations to the record. The letter invites the Special Master to notify DOJ Special Attorney Clymer "[i]f you believe that any of [these] assertions are inaccurate or incomplete, or there is material information that I have not but should consider . . . ." *Id*. at 11. The Special Master has not disputed any of these factual assertions, either in the Report or otherwise. He has not notified DOJ Special Attorney Clymer of any inaccuracies or omissions regarding the factual assertions in the letter.

Obviously, a non-acrimonious relationship between the defense bar and the United States Attorney's Office is a worthy objective. But, this was not the rationale for the Phase III order and the Report is mistaken for suggesting otherwise. Significantly, although the Report is less than fully explicit, the Special Master's investigation to date, along with related evidence from court proceedings and filings described in the September 12, 2017 letter, make clear that the real impetus

---

[2] The September 12, 2017 letter to the Special Master was filed with the Report as Exhibit I.

for the Special Master's investigation − concerns raised about Sixth Amendment and attorney-client privilege violations − have proven unfounded. In short, the Special Master's investigation, coupled with the district court's efforts, has successfully accomplished its real objective. The Special Master competently investigated whether there have been systematic government violations of the Sixth Amendment and/or the attorney-client privilege at CCA and conclusively has shown that there is no evidence of such violations.

**2.     The Report Erroneously Attributes the Response of the DOJ Special Attorney to the United States Attorney's Office for the District of Kansas.**

The Report correctly states that the September 12, 2017 letter from DOJ Attorney Clymer "respectfully decline[d] to provide most of the information and documents" that the Special Master had requested from United States Attorney Thomas Beall. But, the Report mistakenly attributes this response to the "OUSA," the term the Special Master uses to refer to the United States Attorney's Office for the District of Kansas. For example, at page 8, the Report refers to "[t]he OUSA's recent choice not to produce information responsive to the Special Master's requests" and "the OUSA's choice." At page 9, the Report describes the DOJ Special Attorney's response to the Special Master as the OUSA's "latest position" and refers to what the Report characterizes as "non-cooperation by the OUSA." At page 10, the Report states "that the OUSA has chosen to bring this caveat [in the district court's Phase III order] into play."

These attributions to the United States Attorney's Office are mistaken. As a letter to Chief Judge Robinson dated July 14, 2017, from Jay Macklin, General Counsel for the Executive Office for United States Attorneys, makes clear, the author of the September 12, 2017 letter to the Special Master, Assistant United States Attorney Clymer, was appointed as a DOJ Special Attorney "under 28 U.S.C. § 515 to take overall responsibility for, and control of, the Department's participation in Phase III of the Investigation" and was given "full authority for making any necessary decisions

on responses to requests from you or the Special Master related to Phase III of the Investigation."[3] The September 12, 2017 letter is DOJ Special Attorney Clymer's response to the Special Master; it is not the response of the United States Attorney's Office for the District of Kansas. DOJ Special Attorney Clymer does not report to and is not supervised by the United States Attorney for the District of Kansas.

### 3. The Report Neglects to Describe the Basis for the Government's Response to the Special Master.

The Report acknowledges, without further explanation, that "[f]rom the Special Master's perspective . . . the [government] may have valid bases upon which to refuse production of information . . . ." Report at p. 8. But, the Report neglects to mention that the government's response to the Special Master's demands for document production and other information is dictated by federal law. As the September 12, 2017 letter to the Special Master explains, federal regulations known as the "*Touhy* regulations" (set out at 28 C.F.R. § 16.21, *et. seq.*) govern a federal prosecutor's response to demands – including those from a federal court – for internal DOJ documentation and information. *See* September 12, 2017 letter (Exhibit E) at pp. 2-5. These regulations *require* consideration of certain substantive provisions of federal law setting out rules of criminal procedure, various privileges, and grand jury secrecy obligations, as well as the Privacy Act (5 U.S.C. § 552a) and the need to safeguard law enforcement sensitive information. *See* September 12, 2017 letter at pp. 5-10. As the letter to the Special Master explains in significant detail, under the circumstances present here − where there is no evidence of any violation of the constitutional rights of any defendant in the *Black* case, or of any other person as a result of the investigation that resulted in the indictment in the *Black* case − federal law prohibits most of the

---

[3] The July 14, 2017 letter to Chief Judge Robinson was filed with the Report as Exhibit E.

disclosures that the Special Master demanded. *Id*. at pp. 17-22. The letter also explains that the government is willing to make disclosures to the Special Master that are permissible under federal law. *Id*.

### 4. The Government Recommends That the Court Not Impose the Sanction That the Report Proposes.

The Report proposes that the Court order the government to bear the cost of the Phase III investigation. For several reasons, the government recommends that the Court not adopt this suggestion.

First, there has been no waiver of sovereign immunity here. As a result, such an order would be improper. Absent a waiver of sovereign immunity, the federal judiciary cannot shift litigation costs to the executive branch, even when there is proof of "unpardonable" government misconduct, which is not the case here. *United States v. Horn*, 29 F.3d 754, 767 (1st Cir. 1994) ("We hold, therefore, that fee-shifting against the government can be accomplished only in conjunction with the passage of a statute (or a sufficiently explicit rule having the force of a statute) that authorizes such an award. In the absence of such an enactment, the secondary principle of sovereign immunity saves the federal government harmless from all court-imposed monetary assessments, regardless of their timing and purpose."); *see also United States v. Droganes*, 728 F.3d 580, 590 (6th Cir. 2013) ("most circuits faced with similar arguments [that district courts have inherent authority to impose monetary sanctions against the government] have suggested that the government's sovereign immunity wins when it comes head-to-head with a lower court's inherent authority").

Second, there is no evidence of government misconduct or bad faith. As explained above, there is no proof of any constitutional violations and the government's response to the Special

Master's Phase III demands is dictated by federal law. Thus, there is no basis for a sanction against the government.

Third, as the September 27, 2017 letter to the Special Master explains and supports with decisions from the Supreme Court and federal appellate courts, *id.* at pp. 22-24, "[a] district court lacks constitutional and supervisory authority to investigate the operations and decisions of an executive-branch agency like a United States Attorney's Office." Thus, the DOJ Special Attorney's "response to [the Special Master's] requests . . . is not only required by the *Touhy* regulations and the substantive law that they command [be considered], it is consistent with constitutional limits on a district court's authority to demand information from a co-equal branch of government." *Id.* at p. 24. Under these circumstances, a sanction against the government would raise separation of powers concerns.

**5.     Conclusion**

When members of the defense bar originally made allegations of widespread and ongoing Sixth Amendment and attorney-client privilege violations, there was understandable reason for this Court to be concerned. It was uncertain whether a local detention facility was capturing privileged communications between inmates and attorneys; whether audio and/or video recordings of such communications were being produced to federal prosecutors; and whether prosecutors had directed such capture, sought such recordings, and/or were making use of such evidence. But, since then, as a result of proceedings in the *Black* case, the Court-ordered Special Master investigation, a hearing in the *Dertinger* case, and documents filed with the Court, it has become apparent that the original concerns of the defense bar, although undoubtedly genuine, are unfounded. There is no evidence that the capture of audio and video at the detention facility was done for reasons other than legitimate security considerations; that federal prosecutors sought,

received, or used privileged communications; or that there were violations of the Sixth Amendment or the attorney-client privilege.

Under Article III, federal courts resolve claims that the government has infringed on a criminal defendant's Sixth Amendment rights − whether by violating the attorney-client privilege, improperly interfering with his payment of attorney fees, or seeking to gain strategic advantage by forcing disqualification of chosen counsel – through adversarial litigation in the "case" or "controversy" before the district court in which the claimant is named as a defendant. In that context, the claimant is entitled to legal representation, to discovery, to challenge and test the government's proof, and to present evidence on his own behalf. [4]

And significantly, with respect to the case and controversy before this Court in *United States v. Black, et al*., "the record remains devoid of evidence that any defendant . . . suffered a violation of his or her Sixth Amendment right to counsel"; indeed, "of the *Black* defendants, only Karl Carter was an inmate at CCA during the investigation and he has not alleged, much less established, any violation of his attorney-client privilege or Sixth Amendment rights." September 12, 2017 letter at p. 17. As a result, whatever justification there may have been for the appointment of a special master in the first instance no longer exists. If any present or former CCA inmate believes that his rights were violated, he can press his claims in the case in which he is charged as

---

[4] Those defendants who have alleged specific violations of their Sixth Amendment rights in connection with conduct that the Special Master has investigated − Richard Dertinger and Juan Herrera-Zamora − have raised their claims in the cases in which they are charged as defendants, *United States v. Dertinger*, 2:14-CR-20067, and *United States v. Zamora*, 2:14-CR-20049.

a defendant.  The proper course is to terminate the Phase III investigation and avoid unnecessary expenditure of judicial resources.

                                       Respectfully submitted,

                                       Steven D. Clymer
                                       Special Attorney
                                       United States Department of Justice
                                       900 Federal Building
                                       100 South Clinton Street
                                       Syracuse, NY 13261
                                       (315) 448-0684 (voice)
                                       (315) 448-0658 (facsimile)

**Certificate of Service**

I hereby certify that on the 6th day of November, 2017, the foregoing was electronically filed with the clerk of the court for the District of Kansas using the CM/ECF system, which will send a notice of electronic filing to all counsel.

*S/Deanna Lieberman*
Deanna Lieberman
Paralegal Specialist
United States Attorney's Office
Northern District of New York