IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 16-20032-02-JAR-TJJ |
| v. ) | |
| ) | |
| KARL CARTER ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT
FOR PROSECUTORIAL MISCONDUCT AND MEMORANDUM IN SUPPORT**

Defendant Karl Carter, by and through undersigned counsel, respectfully moves this Court to dismiss the Superseding Indictment in this matter due to the government's unlawful recording and monitoring of privileged phone calls and video recorded meetings between Mr. Carter and his attorneys. This motion is based upon the Fifth and Sixth Amendments of the United States Constitution, and is supported by the following Memorandum in Support:

**MEMORANDUM IN SUPPORT**

**I.    Relevant Facts**

   **A.    Defendant Carter's Charges and Conviction in the Western District of Missouri**

On June 26, 2014, defendant Carter was charged by complaint in the Western District of Missouri with being a felon in possession of a firearm.[1] Carter was originally represented by the Western District of Missouri Federal Defender's office. Carter was ordered detained during the pendency of his case and was held in custody at CCA-Leavenworth.[2] Carter later was charged by indictment in count one with possession with intent to distribute a controlled substance and in

---

[1] Western District of Missouri, case no. 14-cr-193-DGK; Docket Entry (D.E.) 1.
[2] Id., D.E. 9.

1

count two with being a felon in possession of a firearm.[3]  On September 5, 2014, the Federal Defender's Office was granted leave to withdraw from representing defendant Carter and Justin Johnston was appointed.[4]  On May 23, 2016, after previously entering a guilty plea to count one, defendant Carter was sentenced to a term of 230 months custody.[5]   According to discovery produced in *U.S. v. Black*, Mr. Johnston met with defendant Carter at CCA-Leavenworth on at least six different occasions while the case in the Western District of Missouri was pending.[6]

### B.   CCA-Leavenworth Contraband Investigation and Resulting Charges

On March 28, 2016 a District of Kansas grand jury subpoena was issued for production of all "inmate recorded calls" for twelve named inmates for the time period from July 1, 2014 "until notified recorded calls are no longer needed."[7]  Subsequent to the grand jury subpoena being issued and returned, the U.S. Marshals Service contacted CCA-Leavenworth and informally obtained recordings of inmate phone calls made while they were in custody.[8]

On April 8, 2016, Federal and Kansas law enforcement agencies conducted a search of CCA-Leavenworth.[9]  Also present on site with law enforcement agents were SAUSA Erin Tomasic and AUSA Chris Oakley.[10]  CCA-Leavenworth video surveillance captures both prosecutors, along with various law enforcement officers, inspecting CCA-Leavenworth during the April 8, 2016 search of the facility.  On April 9, 2016, defendant Carter and six co-defendants were charged by criminal complaint based on the alleged drug conspiracy at CCA-

---

[3] Id., D.E. 13.
[4] Id., D.E. 33.
[5] Id., D.E. 89.
[6] CCA DRIVE-274024, 274549, attached herein as Exhibit 1.
[7] D.E. 253 at 11.
[8] D.E. 253 at 11, D.E. 135 at 27.
[9] D.E. 1, at 5-26.
[10] Still photo from CCA surveillance footage, attached hereto as Exhibit 2.

Leavenworth.[11]  Then on April 12, 2016, four days after the federal prosecutors had toured the CCA-Leavenworth facilities, a grand jury subpoena was issued to CCA-Leavenworth for "all video footage" recordings from July 2014 to April 2016.[12]

### C. Misrepresentations by SAUSA Tomasic to the Court Regarding Listening to Attorney Client Calls

At a hearing on September 7, 2016, SAUSA Tomasic told this Court that she was aware of only one instance in the past when a government agent had inadvertently listened to a recording of an attorney-client phone call made from CCA-Leavenworth.  SAUSA Tomasic told this Court:

> the only instance I knew where an agent had encountered attorney-client video -- or excuse me attorney-client recordings, audio-recordings, inmate calls, he told me, I immediately contacted our professional responsibility point of contact.  He emailed PRAO.  PRAO gave an advisory opinion . . . I emailed the attorney, let him know we had encountered them, let him know the agent had inadvertently listened to between 10 and 15 seconds and that we did not intend to listen to them anymore.[13]

Contrary to this representation to this Court, however, it has come to light that SAUSA Tomasic, during the July 2016 trial in another prosecution, in fact listened to recorded calls from CCA-Leavenworth between the defendant and his attorney.[14]  Apparently SAUSA Tomasic, despite her awareness of a filter team procedure put in place to filter potentially privileged calls, decided to listen to calls herself, in advance of filter review, to learn whether defense counsel had contact with inmates at CCA who would be potential defense witnesses.[15]  Further, SAUSA

---

[11] D.E. 1.

[12] Black, Grand Jury Subpoena, attached hereto as Exhibit 3.

[13] D.E. 135 at 25; D.E. 253 at 13.

[14] *United States v. Herrera-Zamora*, D.E. 176 at 3-4.

[15] Id.

Tomasic became aware that she was listening to conversations between the defendant and his attorney.[16]

### D. Government Obtained and Distributed Calls Between Defendant Carter and his Attorneys

On December 16, 2016 the Special Master reported that he reviewed 48,333 telephone audio files for calls made to known attorney numbers.[17] The Special Master found 204 calls made to known attorney numbers, including a total of three to undersigned counsel and five calls to attorney Justin Johnston.[18] Of the calls obtained by the government involving undersigned counsel, two were calls made by defendant Carter consisting of discussions of facts and legal advice regarding this underlying litigation. The third call was from another client undersigned counsel represented in an unrelated matter in the Western District of Missouri in which the client was using the phone card of another inmate. In addition, the Special Master identified five calls from defendant Carter to attorney Justin Johnston in which discussions were had regarding sentencing issues, the content of a sealed motion, legal strategy, and facts of the underlying case pending in the Western District of Missouri. All of the intercepted attorney client calls between defendant Carter and his attorneys were obtained by the government and initially distributed to the parties in the Black case.

### E. The Government Obtained the Video Recordings of Attorney Client Meetings of Carter and his Attorney and Subsequent Spoliation of Evidence

Included in the discovery produced in *U.S. v. Black* are the CCA-Leavenworth visitation logs. According to those logs, Mr. Johnston met with defendant Carter on at least six occasions between September 10, 2014 and October 5, 2015.[19] These dates are within the time frame of

---

[16] Id. at 4.
[17] D.E. 183 at 3.
[18] D.E. 183 at 5.
[19] Exhibit 1.

4

the grand jury subpoena for all video footage from CCA-Leavenworth. This Court has already made a finding of fact that there is evidence suggesting that the government procured, viewed and used video recordings of an attorney-client meeting of at least one CCA inmate, Richard Dertinger.[20] On September 7, 2016, this Court orally ordered the government to produce all hard drives, for personal and laptop computers assigned to attorneys and staff in the Kansas City, Kansas division of the USAO.[21] After his appointment, the Special Master directed the USAO to produce all of the hard drives and necessary hardware for his inspection and analysis. The USAO responded that it was able to produce all of the hardware except for one computer, that is, the very computer used by Pauletta Boyd to play the video recordings in the Dertinger case. This critical evidence has been destroyed despite this Court's order.

### F. Non-Cooperation by the Government with Phase III

On May 17, 2017 this Court authorized Phase III for the purpose of answering two key questions about the conduct of the USAO: (1) has the government listened to audio recordings of any attorney-client telephone calls of defendants charged in this case; (2) has the government viewed any video recordings of communications in the attorney-client conference rooms at CCA of any of the above described defendants or inmates?"[22] The purpose of the Phase III investigation is to allow the Court to fashion individual and/or global remedies to address any and all intrusions into privileged attorney-client communications, and any and all corresponding violations of the Sixth Amendment rights of defendants.[23]

---

[20] D.E. 253 at 24.
[21] See, D.E. 253 at 40.
[22] D.E. 253 at p. 9.
[23] Id.

The Special Master in his report dated October 20, 2017, indicated that the OUSA has been non-cooperative with Phase III of the investigation.[24] The Special Master expects that most of the information necessary to answer the questioned posed by the Court in the Phase III Order is in the possession of the OUSA.[25] According to the September 12, 2017 letter from Special Attorney to the United States Attorney General Steven Clymer to Federal Special Master Cohen, the OUSA/DOJ is unwilling to cooperate with the Phase III Order of this Court.[26] Mr. Clymer in support for his refusal to cooperate with the Special Master's request for production relies in part on the assertion that:

> Indeed, it is my understanding that only one of the six indicted defendants in *Black*, Karl Carter, was housed at CCA during the investigation, and there is no evidence known to me suggesting that the government viewed or used any video of Carter meeting with an attorney or listened to or used any audio file of a telephone call involving Carter and his lawyer. (Indeed, I know of no evidence showing that such video or audio files were obtained by the government.) [27]

In addition to not providing materials requested by the Special Master, the USAO/DOJ has provided no explanation to date for the "wipping" Ms. Boyd's hard drive. This Court authorized the Special Master to impose or recommend contempt sanctions for failure to cooperate, under Fed. R. Civ. P. 37 or 45.[28] The Federal Defender's Office has filed a motion for a Show Cause Hearing that is currently scheduled for January 18, 2018 based on the OUSA/DOJ refusal to cooperate with the Special Master's investigation.[29]

## II.     Legal Analysis/Argument

---

[24] D.E. 289, at 1-10.
[25] D.E. 298, at p. 4.
[26] D.E. 298-5.
[27] Clymer Letter, D.E. 298-9 p. 10-11.
[28] D.E. 146 at 13.
[29] D.E. 301

This Court should dismiss the superseding indictment in this matter, with prejudice, based on the prosecutorial misconduct in obtaining, reviewing and disseminating the attorney-client telephone communications between defendant Carter and his attorneys as well as the unlawful video recording of attorney-client meetings between Carter and his attorneys. The interception and dissemination of Carter's calls with counsel constitutes a violation of his right to due process under the Fifth Amendment to the United States Constitution and his right to counsel under the Sixth Amendment to the United States Constitution. Likewise the government's intentional obtaining and possessing of the video recordings of attorney/client meetings between Carter and his attorneys constitutes a violation of defendant Carter's Fifth and Sixth Amendment rights.

In the alternative, the Court should dismiss the superseding indictment in this matter pursuant to its inherent equitable powers to impose sanctions in light of the flagrant attorney-client privilege violations committed by the government, its lack of willingness to follow this Court's order to cooperate with the requests of the Special Master, and its destruction of evidence in direct violation of this Court's order for preservation of evidence.

### A.    The Government's Collection, Possession and Distribution of Attorney-Client Phone Calls Constitutes Prosecutorial Interference with the Right to Counsel and Violates Defendant Carter's Due Process and the Sixth Amendment Rights.

A defendant's unfettered and private ability to consult with counsel is essential to secure the fundamental right to due process and the protections of the Sixth Amendment.[30] The attorney-client privilege "is key to the constitutional guarantees of the right to effective

---

[30] *Strickland v. Washington*, 466 U.S. 668, 684-85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

7

assistance of counsel and a fair trial."[31] The government interference with that right violates both constitutional guarantees, and constitutes structural error.

> [A] prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant, and because a fair adversary proceeding is a fundamental right secured by the Sixth and Fourteenth Amendments, we believe that absent a countervailing state interest, such an intrusion must constitute a per se violation of the Sixth Amendment. In other words, we hold that when the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed. In adopting this rule, we conclude that no other standard can adequately deter this sort of misconduct. We also note that prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost.[32]

Communications between counsel and the defendant Carter, whether in-person at CCA, or by telephone via Securus are within the scope of the attorney-client privilege, the oldest of the privileges for confidential communications known to the common law.[33] The privacy of these communications is "crucial to the relationship."[34] Defendant Carter's Sixth Amendment right to counsel was violated here by the interception of at least seven total confidential telephone calls between Carter and his criminal defense attorneys, and the disclosure of the content of those phone calls to the prosecution team and other parties to this litigation. Two calls between Carter and undersigned counsel were recorded by Securus, obtained by the government and distributed in discovery. Additionally, there were five calls between Carter and attorney Johnston that were recorded by Securus, obtained by the government and distributed in discovery. The calls

---

[31] *See United States v. Neill*, 952 F. Supp. 834, 839 (D.D.C. 1997) (citing *Coplon v. United States*, 191 F.2d 749, 757 (D.C. Cir. 1951)).

[32] *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995).

[33] *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); see also In Re Grand Jury Subpoenas, 454 F. 3d 511, 519 (6th Cir. 2006) (attorney-client privilege "dates back to the Tudor dynasty at least").

[34] *Al Odah v. United States*, 346 F.Supp.2d 1, 10 (D.D.C. 2004).

between defendant Carter and his attorneys involved discussion regarding the underlying facts of the cases of representation, sentencing issues, the content of a sealed motion and other matters.

The government was aware that recordings of calls between inmates and their lawyers had been obtained during the course of discovery production. SAUSA Tomasic acknowledged in an August 24, 2016 court filing that as early as January 2016 the government had listened to portions of recorded calls between an inmate at CCA-Leavenworth and his attorney.[35] SAUSA Tomasic's knowledge of the recorded attorney client calls was confirmed by her belated admission that during the July 2016 trial of defendant Herrera-Zamora she in fact listened to recorded calls from CCA-Leavenworth between the defendant and his attorney.

Here the government obtaining and distributing attorney client calls is an intentional intrusion into the attorney client relationship such that a prejudicial effect on the reliability of the trial process must be presumed.[36]

### B. The Government's Intentional Collection and Possession of Video of Attorney-Client Meetings and the Spoliation of Evidence Violates Defendant Carter's Fifth and Sixth Amendment Rights.

Video recording client meetings is prosecutorial interference with the right to counsel. The Kansas Supreme Court addressed a milder form of surveillance by jail personnel in *Case v. Andrews*,[37] which held that,

> The Lyon County jail policy of visually monitoring all consultations between attorneys and clients is an unreasonable interference with the right to confidential attorney-client communications. The confidentiality of communications between an attorney and his client who is charged with a crime should be carefully protected by the courts.[38]

---

[35] D.E. 121 at 3-4.
[36] *See Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995).
[37] 226 Kan. 786 (Kan. 1979).
[38] Id. at 70.

Here, a number of the attorney-client meeting room were not just visually monitored, but rather were recorded. Some of those recordings have been provided to the United States Attorney's Office. This Court has already made the finding that the video recording of the attorney-client meeting rooms at CCA-Leavenworth were of such quality that one could easily observe non-verbal communications.[39] Here, the government had a good faith basis to believe that its grand jury subpoena requesting all video surveillance from CCA-Leavenworth would include attorney client meeting rooms. Both of the federal prosecutors originally assigned to *U.S. v. Black* had participated in an extensive tour the facility days prior to the issuance of the subpoena and had a reasonable basis to know that the grand jury subpoena request for "all video" included video recordings of attorney client meeting rooms.

Further, the government's destruction of the one computer used by the USAO to play CCA-Leavenworth videos will likely prevent the Special Master and this Court from learning the extent of government's intrusion into defendant Carter's constitutional rights. The Kansas Supreme Court has held that the destruction of evidence may rise to the level of a constitutional due process violation if the defendant can show that the evidence in question was destroyed in bad faith.[40] The *LaMae* court held: "[t]he presence or absence of bad faith by the State for purposes of the Due Process Clause necessarily turns on the State's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. The determination of whether the State acted in bad faith is one of fact." Here the USAO, in violation of this Court's preservation and protective order, "wiped clean" the computer used by USAO employee Pauletta Boyd, which was the one computer dedicated to playing CCA-Leavenworth videos, which prevented the Special Master from learning who viewed which recordings on that computer and

---

[39] D.E. 253 at 24.
[40] *See LaMae*, 268 Kan. 544, 998 P.2d 106, Syl. ¶ 2

10

when.[41] The USAO has provided no explanation to date for this destruction of highly relevant evidence regarding defendant Carter's and other defendant's potential Sixth Amendment violation claims.

In light of the government intentionally obtaining video of attorney client meetings, possession of video of attorney/client meetings between defendant Carter and his attorney coupled with the government's destruction of evidence, this Court should dismiss the superseding indictment with prejudice.

### C. The Court Should Dismiss the Superseding Indictment Pursuant to its Inherent Equitable Powers to Impose the Sanction of Dismissal with Prejudice Because of the Government's Abusive Litigation Practices

A district court has inherent equitable powers to impose the sanction of dismissal with prejudice because of abusive litigation practices during discovery.[42] The Tenth Circuit has suggested that while there is no rigid test for determining when dismissal is appropriate, a district court should evaluate five factors before imposing a dismissal sanction:

> (1) the degree of the actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for non-compliance; and (5) the efficacy of lesser sanctions.[43]

Due to the government's spoliation of evidence and unwillingness to cooperate with the Special Master's requests, Defendant Carter has been prejudiced in his ability to assert and defend his Constitutional rights. The government's disregard of this Court's order has forced the defense to resort to examining the records of other District of Kansas prosecutions where evidence of Sixth Amendment violations committed by the government has occurred. The government has interfered with the judicial process at every phase of this litigation. Initially, the

---

[41] D.E. 256 at 40.
[42] *Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1179 (10th Cir. 2009)
[43] Id., (*See Ehrenhaus v. Reynolds*, 965 F.2d 916, 920-21 (10th Cir. 1992).

government provided inconsistent, inaccurate, or misleading statements about their knowledge of the existence of video recordings of attorney client meetings and whether these videos have been used by the government. After this Court orally ordered the government to produce all hard drives, for personal and laptop computers assigned to attorneys and staff throughout the District of Kansas, the government wiped clean the hard drive of the one computer in its office that had been used to view attorney client meetings at CCA-Leavenworth. Currently, the government has refused to provide most of the information and documents requested by the Special Master.

This Court has at its disposal all remedies including those pursuant to Fed. R. Civ. P. 37. Among the remedies listed in Rule 37 is the dismissal of the action for failure to preserve electronically stored information.[44] The government had been adequately warned by the court that dismissal is a possible sanction. That being said, the Tenth Circuit has held that an explicit warning that dismissal would be a likely sanction is not a prerequisite to dismissal.[45] Finally, dismissal is the only sanction that will adequately protect defendant Carter's Sixth Amendment rights. Even if the government eventually changes its litigation posture and cooperates with this Court's orders and the Special Master, the information on Ms. Boyd's hard drive is forever lost making any remedy other than dismissal insufficient to fully protect defendant Carter's Constitutional rights.

### III. Conclusion

The government's intentional interference with defendant Carter's right to counsel is a direct violation of his Sixth Amendment right. This interference coupled with the government's lack of transparency, misleading statements, spoliation of evidence and non-cooperation with the

---

[44] Fed. R. Civ. P. Rule 37(e).
[45] *Garcia*, 569 F.3d at 1180.

requests of the Special Master establishes both actual and presumed prejudice and warrant dismissal with prejudice.

Defendant Carter further requests that this Court allow defendant to submit supplemental briefing on this issue, if needed, and defer ruling until after the Court has had the benefit of additional briefing from other parties to this litigation and hears evidence at the January 18, 2018 hearing.

Respectfully submitted,

*/s/ David J. Guastello*
David J. Guastello, KS #22525
811 Grand Boulevard., Suite 101
Kansas City, MO 64106
(816) 753-7171
david@guastellolaw.com

Certificate of Service

I hereby certify that on December 18, 2017, I electronically filed the foregoing motion using the Court's CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ David J. Guastello*
David J. Guastello