```
 1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,

 4        Plaintiff,

 5   v.                          Docket No. 16-20032-02-JAR

 6                               Kansas City, Kansas
     KARL CARTER,                Date:  08/01/2018
 7
          Defendant.
 8   ....................

 9
                        TRANSCRIPT OF
10                      MOTIONS HEARING
           BEFORE THE HONORABLE JULIE A. ROBINSON
11              UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13
     For the Government:  Mr. Steven D. Clymer
14                        (Appeared telephonically)
                          Department of Justice - USAO
15                        Lrm Eckert, William
                          100 S. Clinston Street
16                        Suite 9000
                          Syracuse, New York 13261
17
                          Mr. Duston J. Slinkard
18                        Office of United States Attorney
                          444 Southeast Quincy
19                        Suite 290
                          Topeka, Kansas 66683-3592
20
                          Mr. Stephen R. McAllister
21                        Office of United States Attorney
                          500 State Avenue
22                        Suite 360
                          Kansas City, Kansas 66101
23

24

25
```

```
 1    APPEARANCES:

 2    (Continued)

 3    For the Defendant Karl Carter:
                      Mr. David J. Guastello
 4                    (Appeared telephonically)
                      The Guastello Law Firm, LLC
 5                    811 Grand Boulevard
                      Suite 101
 6                    Kansas City, Missouri 64106

 7    For the Movant Federal Public Defender:
                      Ms. Melody J. Brannon
 8                    Mr. Kirk C. Redmond
                      Mr. Branden Bell
 9                    Office of Federal Public Defender
                      117 Southwest Sixth Street
10                    Suite 200
                      Topeka, Kansas 66603
11
      For the Special Master David R. Cohen:
12                    Mr. David R. Cohen
                      (Appeared telephonically)
13                    David R. Cohen Co., LPA
                      24400 Chagrin Boulevard
14                    Suite 300
                      Cleveland, Ohio 44122
15
                      Ms. Alleen VanBebber
16                    VanBebber Law Firm, LLC
                      2029 West 95th Street
17                    Leawood, Kansas 66206

18

19

20

21

22
      _____
23
         Kelli Stewart, CSR-KS, CRR-MO, RPR, CRR, RMR
24                  Official Court Reporter
            259 U.S. Courthouse, 500 State Avenue
25                 Kansas City, Kansas 66101
```

1                          I N D E X

2

3                                              Page

4    Questions by The Court to Mr. Clymer         9

5    Statement by Mr. McAllister                 47

6    Statement by Ms. Brannon                    48

7    Comments/Rulings by The Court               62

8

9

10                        E X H I B I T S

11    Defendant's
      Exhibits              Offered        Received
12
        555                   23              23
13

14

15

16

17

18

19

20

21

22

23

24

25

1          (2:05 p.m., proceedings commenced).

2          THE COURT:  All right.  You can be seated.

3    All right.  We are on the record in United States versus

4    Lorenzo Black, Karl Carter, Anthon Aiono, and others.

5    The case number is 16-20032.  Let's start with

6    appearances for the government.

7          MR. CLYMER:  Good afternoon, Your Honor.

8    Steven Clymer for the United States.

9          MR. McALLISTER:  Also from the U.S.

10   Attorney's Office, Steve McAllister and Duston Slinkard

11   and Agent John Seubert here with us from Secret Service.

12         THE COURT:  Thank you.

13         MS. BRANNON:  Your Honor, on behalf of the

14   Federal Public Defender, Melody Brannon, Kirk Redmond

15   and Branden Bell appear.

16         THE COURT:  All right.  Thank you.  All

17   right.  So I-- oh, I'm sorry.  Mr. Cohen--

18         MS. VANBEBBER:  Alleen VanBebber for the

19   Special Master.

20         THE COURT:  I'm sorry, I talked over you.

21   Say it again.

22         MS. VANBEBBER:  Alleen VanBebber for the

23   Special Master.  I believe the Special Master is on the

24   phone.

25         THE COURT:  Mr. Cohen.

1    SPECIAL MASTER COHEN:  Yes.  Hi, Judge.  I'm

2    on the phone with Mr. Clymer.  There are also two other

3    attorneys who are on the phone.  And I should mention

4    that we basically are not hearing anything from any of

5    the attorneys in the courtroom.  I don't know if-- if

6    there are microphones that they can get closer to or

7    something like that.

8             THE COURT:  Okay.  I think I will ask them

9    to use the microphone at the lectern from here on out.

10   But Mr. McAllister, Mr. Slinkard have entered

11   appearances.  Ms. VanBebber has entered an appearance,

12   along with you.  Mr. Clymer, of course, is on the phone

13   entering an appearance.  And then Melody Brannon, Kirk

14   Redmond and Branden Bell from the Federal Public

15   Defender's Office have entered appearances as well.

16             SPECIAL MASTER COHEN:  David Guastello is on

17   the phone as well as Alyssa Brockert representing CCA,

18   who's just kind of appearing to monitor the events.

19             THE COURT:  All right.  So, Mr. Guastello,

20   state your appearance, you represent one of the

21   defendants.

22             MR. GUASTELLO:  Thank you, Judge.  David

23   Guastello by phone on behalf of Karl Carter, who has

24   filed a waiver of appearance.

25             THE COURT:  Thank you, Mr. Guastello.

 1          And then tell me again who's on the phone,

 2  not because they represent a party but just as an

 3  interested person, somebody from CoreCivic?

 4          MS. BROCKERT:  Yes, Your Honor.  Good

 5  afternoon.  Alyssa Brockert, counsel for CoreCivic,

 6  appearing as sort of a bystander in this case, but I

 7  have entered my appearance.

 8          THE COURT:  Okay.  Thank you.  And then I

 9  should also mention that, although not entering an

10  appearance of course, United States Marshal Ron Miller

11  and Deputy United States Marshal Craig Beam are present

12  in the courtroom as well.

13          And Jason Hoffman is present.  He hasn't

14  entered an appearance.  I don't know if you want to in

15  Mr. Aiono's case.

16          MR. HOFFMAN:  No, Your Honor.  Thank you.

17          THE COURT:  Okay.  Thank you.  All right.

18  So the original purpose of today's status conference, at

19  least what I anticipated would happen, was that Mr.

20  McAllister and his office, Ms. Brannon and her office,

21  who have been working diligently on what we're calling a

22  proposed standing order for prospective relief, were

23  going to simply report to me whether they had-- whether

24  they had agreed language.

25          They had already come to some agreement, but

1    I know that they had listened to some concerns of the

2    United States Marshals Service and taken that into

3    account, as the Court had as well.  And I thought what

4    we were going to do today was I was going to hear from

5    you all.

6            And then obviously this is the court's

7    order.  And a standing order would be an order from the

8    entire district, so I was going to consult with my

9    colleagues with the idea that we would get a standing

10   order to address prospectively how to hopefully ensure

11   that we never be in this situation again with

12   attorney-client video and audio-recordings coming into

13   the possession of the prosecutor and law enforcement.

14   So that's what I thought today's hearing was for.

15           Apparently the terrain has changed.  And Ms.

16   Brannon on behalf of the Federal Public Defender, she is

17   the Federal Public Defender, filed a motion to have an

18   evidentiary hearing, to resume the evidentiary hearing

19   that the Court continued a few months ago after the

20   parties indicated that they would like the opportunity

21   to engage in negotiation.  My understanding is they've

22   been engaging in extensive negotiations ever since.  In

23   fact, I've heard from them at least once regarding that.

24   I know Mr. Cohen has as well.

25           And just minutes-- a few minutes ago, maybe

1   around 1:30, Mr. Clymer filed a response to Ms.

2   Brannon's motion for evidentiary hearing.  I would

3   imagine that Ms. Brannon hasn't had time to see it or at

4   least really study it.  I don't know if Mr. McAllister

5   and his office have.  I certainly have had only a very

6   cursory review of it.

7          It was also my understanding, though,

8   because Rod Rosenstein, Deputy Attorney General Rod

9   Rosenstein, addressed a letter to Special Master David

10  Cohen dated July 27 and carbon-copied Melody Brannon,

11  John Jenab, Jason Hoffman and David Guastello - Jenab,

12  Hoffman and Guastello representing named defendants in

13  the *Black* case, Melody Brannon representing the Federal

14  Public Defender - wrote this letter, and I won't even

15  try to summarize or characterize it, I have a number of

16  questions about it.

17         But essentially I guess my thought in

18  reading this letter was that Department of Justice is

19  now inserting themselves into this case in some way that

20  they hadn't before.  And I think the gist of this letter

21  is that whatever settlement had been negotiated or was

22  in the process of being negotiated is no longer

23  operative.

24         I want to hear from Mr. Clymer about that.

25  I have some very specific questions for Mr. Clymer.  But

1    let's start with this, I just want to be clear, Ms.

2    Brannon has filed a motion for hearing.  As you know,

3    the hearing wasn't closed.  I continued the hearing,

4    stopped the hearing, whatever you want to call it,

5    because the parties wanted to negotiate and I thought

6    that was a good idea.

7            Now Ms. Brannon has simply asked to resume

8    the evidentiary hearing apparently in light of her

9    understanding that the settlement negotiations are over

10   or at least at an impasse or perhaps Department of

11   Justice is now running the show and not the U.S.

12   Attorney.

13           Mr. Clymer, I very quickly read your

14   response.  Is the bottom line you oppose an evidentiary

15   hearing?

16           MR. CLYMER:  Yes, Your Honor.  But I'd like

17   to-- to clarify something because I think based on the

18   motion the Federal Public Defender filed, the Court may

19   be under a misimpression about something.

20           The Court began by saying that it came to

21   this hearing with the expectation that it would be able

22   to move forward with respect to the agreement that had

23   been reached or at least reached with the U.S.

24   Attorney's Office and the Federal Public Defender with

25   some concern by the U.S. Marshals about prospective

1  relief.  There is nothing that the Department of

2  Justice, whether Main Justice in Washington or the U.S.

3  Attorney's Office in Kansas, has done to suggest that

4  that agreement between the parties should not move

5  forward as the Court had planned to do.

6              THE COURT:  Are you--

7              MR. CLYMER:  I'm sorry, Your Honor.

8              THE COURT:  I'm sorry.  It's so hard with

9  you being on the phone.  Are you talking about

10  specifically the proposed standing order that the

11  parties had presented to me for prospective relief?

12             MR. CLYMER:  Exactly, Your Honor.

13             THE COURT:  Okay.

14             MR. CLYMER:  Exactly.  I'm sorry I didn't

15  make that clear.

16             The-- the Deputy Attorney General's letter

17  does not suggest in any way, shape, or form that the

18  Department of Justice in its entirety is not committed

19  to the sort of prospective relief that the Court

20  described that would prevent this from ever happening

21  again.

22             THE COURT:  All right.

23             MR. CLYMER:  I know that the marshals

24  service has concerns.  We-- we are willing, if the

25  Federal Public Defender is willing, to sit down and have

1  discussions to try to resolve the U.S. Marshal's

2  concerns and reach agreement as to that component of the

3  proposed standing order as well.

4           THE COURT:  Okay.  You're getting ahead of

5  me.  But the bottom line is, you are opposing an

6  evidentiary hearing going forward; is that fair to say?

7           MR. CLYMER:  That's correct, Judge.  Or in

8  the alternative, I would say that if we're going to have

9  an evidentiary hearing, I think it would be useful to

10  have some discussions to better focus the evidentiary

11  hearing to make it go more smoothly and more quickly.

12           THE COURT:  All right.  But you do oppose

13  the evidentiary hearing, that's your primary--

14           MR. CLYMER:  Yes.  That's correct, Your

15  Honor.

16           THE COURT:  All right.  That answers that

17  question.

18           The second question, and you've touched on

19  this a little bit, and that is:  Who has authority to do

20  what now?  I sentenced Mr. Aiono today, I sentenced Mr.

21  Black I think on Monday.  You know, reading Mr.

22  Rosenstein's letter, I have no clue what Department of

23  Justice has now taken authority over.

24           So you're here telling me, oh, you know,

25  we're fine with the prospective relief order.  Does that

1  mean that the U.S. Attorney no longer has authority to

2  negotiate that or-- not that I'm going to allow any

3  further negotiation, but are you saying that you've

4  taken over that piece of this litigation now?

5            Because I will tell you, Mr. Clymer, when

6  you entered this case, I got a letter and the letter

7  said the extent of Department of Justice's authority was

8  to handle the Special Master Phase III litigation,

9  meaning that you-- Department of Justice opposed the

10 Phase III order.  Once you entered, they opposed the

11 Phase III order, they opposed the evidentiary hearing,

12 they filed a petition for writ of mandamus to stop the

13 hearing.  The Tenth Circuit did not stop the hearing,

14 they sent it back.  We proceeded to the hearing.

15           You on behalf of the Department of Justice

16 then engaged in a strategy of invoking in my view

17 blanket *Touhy* objections.  And for the most part, the

18 witnesses answered almost nothing at the hearing.  All

19 under the control and auspices I suppose of Department

20 of Justice, represented by you.  But my understanding at

21 that point was that was the long and short of what the

22 Department of Justice had taken responsibility for.

23           Then the hearing was shut down because Mr.

24 McAllister, the presidentially-appointed United States

25 Attorney, and Melody Brannon, the Federal Public

1    Defender, said they were going to engage in

2    negotiations.  You were at the hearing, you never said,

3    oh, wait a minute, they're not-- there's no authority

4    for the U.S. Attorney to engage in negotiations, and

5    they began to engage in negotiations.

6              And until this letter came from the Deputy

7    Attorney General, at least I had no clue the Department

8    of Justice took the position that Mr. McAllister didn't

9    have settlement authority or negotiation authority or

10    whatever.

11              So what I would like to know is what are you

12    now - you, the Department of Justice - now telling me

13    that-- that you're in charge of and that the U.S.

14    Attorney's Office has no authority over?  Prospective

15    relief--

16              MR. CLYMER:  Well, Your Honor--

17              THE COURT:  No, no, no, let me finish.

18              MR. CLYMER:  I'm sorry.

19              THE COURT:  Prospective relief, the matters

20    concerning the evidentiary hearing and all that happens

21    with respect to that, the pending Rule 41 motions, the

22    pending 2255 motions and the anticipated flood of 2255

23    motions that are yet to be filed.  So those are five

24    things I've named.  Which of those five, if any, is

25    Department of Justice taking authority over?

1          MR. CLYMER:  Your Honor, I-- I-- I have to

2    take issue with the characterization.  Just like Mr.

3    McAllister, I work for the Department of Justice, and so

4    the Department of Justice as a whole has authority for

5    all this litigation.

6          The Department of Justice, as the Court is

7    aware, has individual U.S. Attorneys handle matters

8    within their districts where they have primary authority

9    unless for some reason the-- their supervisors or

10   their-- the people above them in the chain of command at

11   Main Justice become interested for one reason or

12   another.

13         THE COURT:  Okay, Mr. Clymer, I-- Mr.

14   Clymer, I don't need a lesson about this, all right?  I

15   used to be--

16         MR. CLYMER:  Well, I--

17         THE COURT:  No, no.  Let me finish.  Let me

18   finish.  I don't want an expository about this.  What I

19   want to know is-- because based on Mr. Rosenstein's

20   letter, I have a lot of questions and I think the

21   parties in this case do as well, at least the-- the

22   defense side of the parties do as to what pieces of all

23   of this-- because this is a complicated kind of

24   interwoven matter.  What are-- what is Department of

25   Justice taking authority for, because Mr. McAllister is

1  engaged in negotiations, he is the U.S. Attorney for the

2  District of Kansas.

3          Reading-- and again, I'm going to ask you

4  questions about Rosenstein's letter.  But as I read

5  Rosenstein's letter, it appears to me what the

6  Department of Justice is saying is somebody at the

7  Department of Justice, I guess under the leadership of

8  Mr. Rosenstein and as delegated to you, is taking over

9  something and Mr. McAllister is no longer able and has--

10 no longer has the authority to negotiate with Ms.

11 Brannon; is that correct?

12         MR. CLYMER:  I believe the Department of

13 Justice has told me, Your Honor, that I should be the

14 one taking the leading role in negotiations from here on

15 out.

16         THE COURT:  Okay.  Let's drill down a little

17 bit because I need to know, and I think to be fair to

18 all parties involved in this case they need to know,

19 what does that mean?

20         So there are all kinds of components of this

21 litigation.  Of course, there's the *United States versus*

22 *Black* criminal case.  My understanding is the Department

23 of Justice did not take over authority in that criminal

24 case.  We're down to one defendant.  I sentenced two of

25 those defendants this week, in fact one today, and we're

1   down to one defendant, Karl Carter.

2           Mr. Clymer, are you taking the lead on the

3   *United States versus Black, et al.,* criminal case?

4           MR. CLYMER:  My appointment authority does

5   not cover that prosecution, Your Honor.

6           THE COURT:  Do you-- is your appointment

7   authority in writing so that you could share it with the

8   Court and parties so we're clear on what it is that

9   you're doing and what remains with Mr. McAllister?

10           MR. CLYMER:  It is in writing, Your Honor.

11   I would need authorization from the Department to show

12   it to the Court and the parties.  If the Court would

13   like, I will request that authority.

14           THE COURT:  Okay.  Well, then absent that in

15   the time being, so you're saying that the U.S. Attorney

16   still has responsibility or you do for the *U.S. versus*

17   *Black* case, the--

18           MR. CLYMER:  The United States Attorney's

19   Office had retained responsibility for taking actions

20   related to the prosecution of the underlying *Black* case,

21   Your Honor.

22           But, Your Honor, I want to make clear

23   because I--

24           THE COURT:  Okay.  No, no.  No, no, no, no.

25           MR. CLYMER:  Judge--

1            THE COURT:  Mr. Clymer, please, just answer

2    my questions.  You're going to have plenty of

3    opportunity to supplement with what you need to.  But

4    the way I best process information is by asking

5    questions and just answer my question.

6            All right.  So the *U.S. versus Black*

7    criminal case, U.S. Attorney's Office.  Now, there's

8    Rule 41 motions that spawn from the recordings that were

9    obtained and some of those remain pending.  Most of them

10   are moot because those folks have been sentenced and are

11   out of the court system.  How about those pending

12   Rule 41 motions, who has responsibility for those?

13            MR. CLYMER:  To the extent that they're

14   wrapped up in this Phase III investigation, Your Honor,

15   it's my understanding that I do.

16            THE COURT:  Okay.  And I'm not sure I

17   understand if-- "wrapped up in the Phase III

18   investigation," what you mean by that.  Do you want to

19   explain that further?

20            MR. CLYMER:  Yeah, I-- that might be the

21   best I can do, Judge.  I-- I don't fully understand this

22   litigation.  To the extent I understand the litigation,

23   the Rule 41 motions are somehow connected to the Phase

24   III investigation.  My appointment authority is to have

25   responsibility over the Phase III investigation, or the

1    Department's role in that investigation.

2            THE COURT:  Well, that's the appointment

3    authority you already had before.  Correct?

4            MR. CLYMER:  That's correct, Your Honor.

5    That was my original appointment authority.

6            THE COURT:  All right.  So then how about

7    the current-- the 2255 motions that are currently

8    pending?

9            MR. CLYMER:  I-- I do not know the answer to

10   that question, Your Honor, but I can find out if the

11   Court would like.

12           THE COURT:  Who-- who do you get your

13   authority from?

14           MR. CLYMER:  I was appointed by the Attorney

15   General under a statute, but I answer to the Office of

16   the Deputy Attorney General.

17           THE COURT:  And that's Mr. Rosenstein?

18           MR. CLYMER:  And his office, correct.

19           THE COURT:  Okay.  How about the future

20   2255s, some of which may be filed by people that were in

21   this case as defendants, some of which may be filed by

22   people that have Rule 41 motions, some of which may be

23   filed by people whose recordings were obtained by the

24   government in the course of the CoreCivic contraband

25   investigation, and some of which may be filed by people

1   whose recordings were not obtained by the government in

2   the context of this investigation but perhaps obtained

3   in some other way?  So there's a whole-- there's a whole

4   universe of those different categories.  Who has

5   responsibility for those?

6          MR. CLYMER:  I have not been told that I

7   have any responsibility over any of the 2255s, Your

8   Honor.  But if the Court would like, I will check and

9   provide the Court an answer for that.

10         THE COURT:  So does that mean that Mr.

11  McAllister still has the authority to negotiate with

12  respect to pending and future 2255s unless Department of

13  Justice has taken over that authority?

14         MR. CLYMER:  I'll answer your question, Your

15  Honor, but I have to give a little explanation

16  unfortunately.  Everything that Mr. McAllister does as a

17  United States Attorney, Your Honor, is subject to

18  guidance and direction and consultation and oversight by

19  the Department of Justice.  So he may have principal

20  authority if the Department so determines, but that

21  doesn't mean he can do anything he wants on the case.

22  There's always going to be oversight by the Department

23  of Justice.

24         THE COURT:  Well, there's-- there's lines of

25  settlement authority on both the civil and the criminal

1    side.  And the Department of Justice does not typically,

2    unless they take over the case itself or the litigation

3    itself, it doesn't insert itself into settlement

4    negotiations unless those settlement negotiations are

5    beyond the-- I don't know, under the regulations of the

6    U.S. Attorney manual, whatever it may be, beyond the

7    limits of what the U.S. Attorney can do.  Would you

8    agree?

9              MR. CLYMER:  I really-- Your Honor, to be

10   honest with you, I really don't know.  I've never been

11   in a situation like this.  I'm simply following the

12   guidance I get from the Department, Your Honor.  I can't

13   tell you where the lines of authority are and when

14   they're triggered.  That-- that's not something I have

15   any experience in.  That's not something I have any

16   particular expertise in.

17             THE COURT:  Well, the thing that's troubling

18   is-- so, you know, we've got this litigation here.  And

19   it was well on its way to resolution or at least to

20   partial resolution by settlement, and then Mr.

21   Rosenstein's letter comes down and-- and, you know,

22   you're now in this hearing telling me that-- essentially

23   what the Department of Justice will or won't agree to.

24             So there has been some-- there has been some

25   action I guess on behalf of the Department of Justice to

1    say we have authority to-- to make decisions, and I'm

2    just trying to get a clear understanding of what the

3    limits are.

4            I mean, is Mr. McAllister involved in this

5    at all?  Is this all Department of Justice?  And if not,

6    where are the lines to be drawn?  Because, frankly, I

7    think the parties need to know if the parties are

8    engaged in settlement negotiations.  I think the Court

9    needs to know how to draw the lines or where the lines

10   are drawn.  Would you agree?

11           MR. CLYMER:  Your Honor, the best I can say

12   to you is Mr. McAllister and his office has not been

13   recused from this case, so they remain involved in it,

14   and I continue to have conversations with Mr. McAllister

15   and the members of his staff who are not sequestered as

16   a result of the hearing.  But I have been tasked by the

17   Department of Justice to take the lead role in future

18   negotiations regarding the article-- or sorry, the Phase

19   III investigation.

20           And I-- I understand Your Honor may be

21   frustrated by the change in direction.  I was not

22   involved in the negotiations and I did not make the

23   decision for the Deputy Attorney General's Office, Your

24   Honor.  I am simply reporting to the Court what I've

25   been tasked to do as an employee of the Department of

1    Justice.

2              THE COURT:  So would I have to talk to Mr.

3    Rosenstein to get some clarity about these questions?

4              MR. CLYMER:  Well, I could-- if the Court

5    would like, I will-- if the Court has a set of questions

6    where it wants clarity, I am more than happy to take

7    those questions back to the Office of the Deputy

8    Attorney General and do my best to answer them.

9              THE COURT:  Okay.

10             MR. CLYMER:  I believe, though, Judge-- to

11   get to the point you're getting at, I believe that I am

12   tasked now, not Mr. McAllister or his office, to take

13   the lead role in any future negotiations regarding

14   resolving this issue of the Phase III investigation.

15             I-- I called Mr. Cohen up this weekend after

16   this letter came out and I expressed to him that if

17   there's any willingness on the other side, I am ready,

18   willing, and able to continue negotiations.  I

19   understand the other side may be frustrated by Mr.

20   Rosenstein's letter as well.  I-- there's nothing I can

21   do to change the terrain we're in.  I simply remain

22   willing to try to resolve this matter and-- and that's

23   the best I can tell you, Your Honor.

24             THE COURT:  Well, I mean, I can't speak for

25   the parties, but what's frustrating to me about Mr.

1   Rosenstein's letter is it raises more questions than

2   answers, and I have a number of questions, because it

3   will affect the course of this litigation going forward.

4           So let's turn to some of my-- well, all of

5   my questions.  So the-- the first thing, and maybe--

6   maybe you've already answered this, Mr. Rosenstein-- and

7   we're going to mark this.

8           Actually, Ms. Brannon, you want to mark this

9   as an exhibit--

10          MS. BRANNON:  That is correct.

11          THE COURT:  -- the Rosenstein letter?  Okay.

12  Let's admit it as Exhibit 555, Defendant's Exhibit 555

13  is admitted.  And, Mr. Clymer, hopefully you have the

14  letter in front of you.

15          MR. CLYMER:  I do, Your Honor.

16          THE COURT:  Okay.  Because I want-- I want--

17  let's just go through it chronologically because I have

18  a number of questions.  I think some of them I've asked

19  generically but some of them may get to more specific

20  questions.

21          Okay.  So to start, of course, in that first

22  paragraph it says that the purpose I guess of the letter

23  is to inform-- and it's addressed to Mr. Cohen, to

24  inform him in his capacity as Special Master about the

25  DOJ's position, and it says this, "in the *United*

1   *States/Black* litigation and the Special Master

2   investigation."

3               So it sounds like his letter is directed to

4   what the DOJ's position is in the criminal case and the

5   Special Master investigation.  Would you agree?

6               MR. CLYMER:  Not necessarily, Your Honor.  I

7   don't know that the-- that the Deputy Attorney General

8   was trying to specifically talk about those two

9   components the way the Court thinks about them.  I-- I

10  simply don't know the answer.

11              THE COURT:  Well, Mr. Clymer, I-- you know,

12  I-- I doubt Mr. Rosenstein wants to come out here and

13  have another hearing and I ask him these-- this is under

14  his signature and you're the one that was delegated the

15  primary lead role as you put it, so I expect you to

16  answer my questions about this letter.  If you can't do

17  it, then maybe we need to get Mr. Rosenstein on the

18  line.

19              MR. CLYMER:  Your Honor, I will do my best

20  to answer.  But as an officer of the court, I'm not

21  going to give the Court an answer that I don't know to

22  be fully accurate.  If the Court would like, I can check

23  with the Office of the Deputy Attorney General and find

24  out if Mr. Rosenstein meant to differentiate between the

25  underlying criminal case and the Phase III investigation

 1   in that first sentence.  But I-- I cannot honestly

 2   answer that question for the Court.

 3             THE COURT:  Okay.  So noted.  You know,

 4   we'll go through these questions and then we'll have to

 5   figure out where to go.  If there's anything that I

 6   think I really need answered that you can't answer,

 7   we'll have to talk about how to-- how to get that

 8   information.

 9             Okay.  So then it says-- well, the second--

10   the second paragraph mentions that the pending criminal

11   case, the *Black* case, is now largely resolved and talks

12   about the status of the remaining defendants and that

13   the remaining defendant Carter there's a motion to

14   dismiss pending.

15             I-- I wonder, I mean, what's the import of

16   that?  I mean, is Department of Justice's position that

17   once this case is over, the Special Master's

18   investigation is over?

19             MR. CLYMER:  Your Honor, it's-- it's the

20   Department's position that the Court's jurisdiction here

21   is based on the case in controversy before it, which is

22   the-- which is the-- the *Black* case.  And that if all

23   the defendants' cases are dismissed, that there's no

24   longer a case or controversy before the Court.

25             THE COURT:  Well, there's a lot of 2255s and

1    there's Rule 41s filed in other cases.  You're not

2    questioning the Court has jurisdiction over those?

3                MR. CLYMER:  I'm not questioning the Court's

4    jurisdiction over any other case that's filed.  I'm--

5    I'm just talking about the *Black* case, Your Honor.

6                THE COURT:  Okay.  All right.  So then the

7    next paragraph says, "The United States does not oppose

8    the return of any recordings of attorney-client

9    communications to aggrieved persons under Rule 41(g)."

10               So are you saying that you don't oppose the

11   return of attorney-client communications to anyone whose

12   attorney-client communications have been recorded, or

13   are you limiting that to only those that have filed

14   Rule 41 motions?

15               MR. CLYMER:  I-- I don't know what Mr.

16   Rosenstein meant, Your Honor, but we have no opposition

17   to return of anyone who's had them recorded that were

18   subpoenaed as part of the *Black* litigation, because I

19   believe that's what the Rule 41(g) motions refer to.

20               THE COURT:  Okay.  And just to be clear, a

21   lot of those weren't subpoenaed, but they were obtained.

22   "Obtained" is a better word.

23               MR. CLYMER:  Okay.  Yeah, I'm sorry, I

24   misspoke, Your Honor.

25               THE COURT:  Okay.  And then you mentioned

1    there, "the only other persons with standing to litigate

2    pursuant to the Tenth Circuit's mandamus ruling in this

3    matter," which is kind of a commentary I guess.

4          You do understand that the Tenth Circuit

5    ruled that the Court could proceed with the Phase III

6    investigation of the named defendants in *Black* and those

7    that had 41 motions because their recordings were seized

8    as part of the *Black* investigation?  You do-- you do

9    understand that part of the ruling.  Correct?

10          MR. CLYMER:  That's correct, Your Honor.

11          THE COURT:  Okay.  And then the next

12    paragraph says-- it mentions that there has already been

13    a standing order drafted, a proposed one, that's the

14    prospective one we've been referring to.  "Best

15    practices in the handling of attorney-client recordings

16    in the future," it says that it's under review.

17          I don't think there's anything more to ask

18    you about that.  You do understand that while the Court

19    is willing to entertain suggestions from the government,

20    from the FPD, from defense counsel, from the marshals

21    service, this will be the court, the District of Kansas'

22    standing order, and nobody is going to dictate what's in

23    the order.  It's the court's order.  You understand

24    that.  Correct?

25          MR. CLYMER:  Yes.  Yes, Your Honor.  And

1   we-- as I've said, we've offered to-- to work with any

2   of the parties involved into trying to reach a

3   satisfactory conclusion, but I do understand it's a

4   court order.

5           THE COURT:  Okay.  Well, as far as I know,

6   Mr. McAllister and Ms. Brannon had already accomplished

7   that, but I can ask them about that a little later.

8           Okay.  And then the next paragraph says, "It

9   is important to the Department of Justice that we

10  identify any defendant who has harmed by an unwarranted

11  invasion of attorney-client privilege, and that we

12  ensure an appropriate remedy."  And I have a number of

13  questions about that.

14          So when you talk about the importance of

15  identifying any defendant who was harmed, how does that

16  square with the fact that you are opposed to an

17  evidentiary hearing?

18          MR. CLYMER:  Because, Your Honor, the

19  evidentiary hearing:  A, is not necessary in order to

20  make that identification; B, I don't think it's the best

21  method; and C, the list of testimony sought that I

22  received with respect to the question of U.S. Attorney

23  employees doesn't get to that issue.  It-- it focuses

24  largely on tangential or collateral issues about the

25  internal operations and the decision-making.

1        The Court may recall at the evidentiary

2   hearing when a question was posed to AUSA Scott Rask, do

3   you know of anyone in the office who has listened to

4   recordings, which would go directly to the issue of

5   whether there's a Sixth Amendment violation, that

6   question hadn't been propounded in any of the summaries,

7   and so the Department under the *Touhy* regulations had

8   the authority to say that he was un-- not authorized to

9   answer.  I instructed Mr. Rask to answer that line of

10  inquiry and he did.

11       If the questioning goes to whether there's

12  been Sixth Amendment violations, Your Honor, we are

13  willing to cooperate with the Court and the Special

14  Master to try to determine if there have been

15  violations.

16            THE COURT:  Well--

17            MR. CLYMER:  What we're not willing to do is

18  open our files when there is a lack of evidence of any

19  constitutional violation.

20            THE COURT:  The whole point and scope of the

21  Phase III investigation by the Special Master was to

22  determine if there had been misconduct by prosecutors in

23  the U.S. Attorney's Office.  Misconduct being defined

24  having improperly obtained, improperly listened and/or

25  improperly used what they learned from attorney-client

1    recordings.

2         So you're telling me that you view that as a

3    proper line of inquiry at the evidentiary hearing?

4         MR. CLYMER:  Your Honor, I believe it's a

5    proper line of inquiry at the evidentiary hearing or in

6    some other format to determine if a federal prosecutor

7    watched one of those videos or listened to a recording

8    known to the attorney to be an attorney-client

9    conversation.  We have not objected to that questioning

10    at the hearing.

11         THE COURT:  Well, that's not my

12    recollection.  But what other mechanism would we use

13    other than an evidentiary hearing, Mr. Clymer?

14         MR. CLYMER:  Your Honor, I-- I would be

15    willing to sit down with the Special Master and see if

16    there's other ways we can investigate that.  But I-- I

17    think if the Court will look at the transcript, we did

18    not object to questioning on that topic.

19         THE COURT:  Well, I know you don't know

20    this-- this case because you weren't involved, but you

21    do probably understand that the Special Master tried to

22    get to that information in a variety of ways in the

23    course of his investigation, and it culminated in an

24    evidentiary hearing because - and, of course, this

25    predates Mr. McAllister being U.S. Attorney - because

1    the U.S. Attorney's Office would not cooperate. They

2    wouldn't talk, they wouldn't share information, they

3    wouldn't share records, any of that. You understand

4    that. Correct?

5              MR. CLYMER: I-- I don't think I can agree

6    with that characterization, Your Honor. And if the

7    Court would like, I will elaborate.

8              THE COURT: That's all right. Let's

9    proceed.

10             What is this business about you will ensure

11   an appropriate remedy? That gives me pause. I think

12   the Court is the one that ensures an appropriate remedy

13   if there's been a Sixth Amendment violation. So what

14   does-- what do you mean about that?

15             MR. CLYMER: Your Honor, again, I-- I didn't

16   write this letter. I-- the Deputy Attorney General may

17   have been referring to the situations involving Mr.

18   Dertinger and Mr. Herrera-Zamora where there were--

19   there was some evidence that the-- of-- of government

20   access to attorney-client recordings or communications,

21   and the government resolved the cases with those

22   defendants apparently to the satisfaction of both the

23   defendants, their counsel and the government. But I-- I

24   don't know for certain, that's-- that's my supposition.

25             THE COURT: All right. Then Mr.

1   Rosenstein's letter goes on to state that if-- "If any

2   defendant has a valid claim, we will seek either to

3   negotiate a resolution with counsel representing the

4   defendant's interests, or address it in litigation

5   involving the aggrieved defendant."

6           So that gives me pause too, because

7   essentially I think what you're saying, what he's saying

8   is we'll negotiate or we'll litigate if a defendant has

9   a valid claim.  I mean, are you suggesting that the

10  Department of Justice is going to determine the validity

11  of a claim before you feel responsible for participating

12  in litigation or-- or in negotiation?

13          MR. CLYMER:  I-- I don't believe that's the

14  import of that statement, Your Honor.

15          THE COURT:  Well, what do you mean by "valid

16  claim"?

17          MR. CLYMER:  Well, Your Honor, I believe

18  that the point is, is that if there's some evidentiary

19  support for a claim of a Sixth Amendment violation, the

20  Department of Justice will take appropriate action,

21  either through litigation or through resolution.

22          THE COURT:  All right.

23          MR. CLYMER:  And I believe we have done so,

24  Your Honor.

25          THE COURT:  Well, I-- and I return to the

1    question I asked you before.  You say if there's some

2    evidentiary support.  Mr. Rosenstein kind of uses

3    language that's similar to that.  But the point is, yet

4    at the same time you're telling me today that you oppose

5    an evidentiary hearing so that the Court can determine

6    whether there's evidentiary support or not.  Correct?

7              MR. CLYMER:  Your Honor, I-- I think there

8    are a number of reasons why we oppose an evidentiary

9    hearing, but I'll-- I'll point out to the Court that,

10   you know, in part we're guided by the fact that there's

11   no basis for the disclosures that the parties are

12   seeking from the government at this hearing,

13   particularly when there's no factual predication for the

14   claims of violations.

15             THE COURT:  All right.  I'd suggest that you

16   read all of Mr. Cohen's reports and you read my initial

17   order appointing the Special Master, which was based on

18   a very incomplete record and some of which I have since

19   mentioned in subsequent orders that I've learned more

20   about and-- you know, but much of which my subsequent

21   order sort of affirmed I still didn't know or I didn't

22   know.

23             I'd suggest you read the Phase III order,

24   because I-- I think you'd have to perhaps re-think your

25   position-- or your statement that there's no-- there's

1    no predicate or no basis for any of this investigation.

2            All right.  So then Mr. Rosenstein goes on

3    to talk about the fact that there are internal

4    investigations, that the Department of Justice has

5    referred "the allegations," it says "the allegations" to

6    the Office of Inspector General and the Office of

7    Professional Responsibility to conduct any appropriate

8    investigation.

9            When were those referrals made, Mr. Clymer?

10            MR. CLYMER:  I do not know, Your Honor.

11            THE COURT:  Well, this matter has been going

12    on for over two years.  The reason I ask is this

13    paragraph seems to suggest that we can handle this

14    internally.  We, the Department of Justice, can handle

15    this internally.  We'll take appropriate disciplinary

16    and corrective action it says if-- if they uncover

17    misconduct or lapses.  And then it offers to share any

18    findings, conclusions, and recommendations with the

19    Court under seal, as well as acknowledging that

20    Department of Justice would have to share with-- with

21    affected defendants potentially exculpatory evidence.

22            I just wonder if this is sort of something

23    that matters.  I mean, unless these findings are coming

24    out or unless there's exculpatory evidence that's being

25    developed, how-- how does that help anyone?  In other

 1    words, unless they've been conducting this investigation

 2    for some time, why-- why does any of that matter?

 3              We've got a criminal case with speedy trial

 4    implications and then we've got 2255s that have statutes

 5    of-- or limitations attached to them.  So what are we to

 6    make of that?  Where are the-- what's the status of the

 7    investigations, if you know?

 8              MR. CLYMER:  Your Honor, I don't know and I

 9    don't think I would have the ability to be privy to

10    that, although I can try to find out if the Court would

11    like.

12              My general understanding, Judge, and I--

13    this is not based on these particular cases.  As a

14    general matter, I think the fact that there is this

15    pending litigation that we're all involved in probably

16    is delaying the internal investigations.  I think as a

17    general matter they tend to wait for the outcome of

18    litigation before they complete their investigations.

19              Now, I'm not suggesting to the Court that

20    the Court should think that it should-- has to make one

21    option over another.  I don't think Mr. Rosenstein was

22    suggesting that either.  I think the point is just to

23    assure the Court that the Department takes this

24    seriously.

25              And I can say to the Court I've been in the

1    Department a long, long time and for a matter to get to

2    the level-- to get the attention of the Deputy Attorney

3    General I think should give the Court a high degree of

4    assurance that this is being taken very seriously.  This

5    is not typical.

6            THE COURT:  Well-- well, if the practice is

7    ordinarily not to really conduct an internal

8    investigation until the external matter is concluded,

9    this is an empty promise.  We're not even close to it

10   being concluded when you've spent the last however long

11   you've been around here fighting the Court's ability to

12   conduct an evidentiary hearing so that perhaps we can

13   conclude this.  So I'm going to consider that an empty

14   promise, but-- unless you tell me otherwise.

15           All right.  It says when-- the next

16   paragraph, and this is the next to the last paragraph.

17   "When there is particularized evidence that may

18   establish a violation of a defendant's rights," it

19   mentions Dertinger and Herrera-Zamora, "the Court [sic]

20   resolves those cases in a fair manner."  And then it

21   says, but "the Department of Justice cannot approve

22   blanket sentencing reductions absent evidence of

23   particularized harm."

24           I may be beating a dead horse, but, Mr.

25   Clymer, how would we have evidence of particularized

1    harm when the investigation has been thwarted and the

2    evidentiary hearing has been delayed and in some sense

3    thwarted as well?

4              MR. CLYMER:  Your Honor, again, as I said,

5    we have not opposed focused questions that go to whether

6    there was Sixth Amendment violations with respect to

7    individual defendants by individual Assistant U.S.

8    Attorneys.  And so the Department remains willing to

9    work with the Special Master and the Court to get at

10    that evidence.

11              What we're not willing to do is open our

12    files to discovery that has no legal basis, particularly

13    to parties that really aren't in the criminal case and

14    doesn't represent defendants who have a viable claim

15    that they had any Sixth Amendment rights violated.

16              THE COURT:  Well, if you're referring to the

17    Federal Public Defender, they have clients that have had

18    recordings that are in the possession of the U.S.

19    Attorney's Office and the law enforcement agencies, if

20    that's who you're referring to, or are you referring to

21    someone else?

22              MR. CLYMER:  No, I understand-- I understand

23    what you said, Your Honor.

24              THE COURT:  Okay.  And then the last

25    paragraph of Mr. Rosenstein's letter talks about

1   shifting responsibility for this matter, whatever "this

2   matter" means, to an attorney who did not participate in

3   the conduct at issue.  Is that you, Mr. Clymer?

4           MR. CLYMER:  Yeah, I believe it is, Your

5   Honor.

6           THE COURT:  Okay.  And then it-- "will

7   continue to cooperate," which, frankly, there hasn't

8   been any cooperation until Mr. McAllister arrived.  And

9   then it goes on to say, "The Department is open to

10  working with you," meaning Mr. Cohen, "as a mediator to

11  further identify, refine, and possibly resolve issues."

12          Returning to an earlier question I asked

13  you.  We had a whole, you know, back and forth

14  conversation about the fact that Mr. Cohen is-- is

15  appointed in the *Black* case.  So when Mr. Rosenstein is

16  offering to continue to work with Mr. Cohen as a

17  mediator, is that beyond the life of the *Black* case?

18          MR. CLYMER:  Your Honor, I believe it's in

19  connection with the Phase III investigation.

20          THE COURT:  Which is in the *Black* case.  So

21  is he willing to-- to work with Mr. Cohen as the

22  mediator beyond the Phase III investigation of the

23  Special Master in the *Black* case?

24          MR. CLYMER:  I can check, Your Honor.  My

25  understanding was Mr. Cohen's appointment order was

1    limited to the *Black* case.  But I-- if it's been

2    extended, I just didn't know that.  But I-- I assume

3    that probably is why that that sentence is drafted the

4    way it is, is under the assumption that Mr. Cohen's

5    appointment is limited to the *Black* case.

6            If the Court-- if the Court is looking for

7    some way to have a-- a negotiated or mediated resolution

8    to similarly-situated defendants across 2255 cases, I

9    can explain that to the Office of the Deputy Attorney

10   General and-- and get a sense of what can or can't be

11   done there.  I-- I don't-- I have not had discussions

12   with anyone about doing that.

13           THE COURT:  I think that's an important

14   inquiry for you to make because, as I said, there are

15   pending-- I think there's still pending Rule 41s, I know

16   there's pending 2255s.  And I know based on the status

17   of the investigation Mr. Cohen has done that we can

18   expect at least 100 I think - Mr. Cohen, you can correct

19   me - my recollection was at least 100 2255s that spawned

20   from this particular CoreCivic investigation.

21           And that's not to mention-- we may get 2255s

22   on other District of Kansas defendants because there's--

23   I mean, there's other people that have these claims or

24   say they have these claims and some of them are showing

25   up in class action litigations, civil litigation in both

1   Kansas and Missouri.  So we anticipate a flood of 2255s,

2   and I think it's important for us all to know what the

3   Department's position is.

4           Are they amenable to appointment of a

5   mediator which the Court has-- not a mediator, but

6   appointment of Mr. Cohen in other cases?  Are they

7   amenable to some sort of global mediation with him being

8   appointed a mediator in the context of all of these

9   2255s, current and future?  I'd really like to hear more

10  about that, if you will.

11          MR. CLYMER:  I-- I can find out, Your Honor.

12  And I-- obviously I'd be more than willing to sit down

13  and talk to Mr. Cohen and Ms. Brannon or a member of her

14  office to try to find-- to see if-- where there's

15  agreement.  And if there's any disagreement, to identify

16  or focus where the disagreement is on that.  And I will

17  certainly talk to the Office of the Deputy Attorney

18  General about it as well.

19          THE COURT:  All right.  Finally--

20          MR. CLYMER:  When the Court is done, Your

21  Honor, I want to go back and correct something I've told

22  you earlier because as we've been speaking, I think I

23  may have made a mistake in an answer I gave you earlier.

24          THE COURT:  Okay.  That's fair, I'm almost

25  done.  But one other thing, and then I'll have you do

1    that and then I'll call on the parties.  You know, I've

2    kind of consumed all the air in the room thus far,

3    but...

4              So you've-- I'm going to give the parties an

5    opportunity to peruse your response to Ms. Brannon's

6    motion for the hearing, to file a reply if they want.

7    But, you know, you can probably tell from the content of

8    my questions I can't imagine we're not going to have an

9    evidentiary hearing going forward.

10             You mentioned a little earlier something

11   along the lines of you thought that-- something along

12   the lines that made me think that what you were

13   suggesting if we went forward with the hearing is some

14   sort of conversation between you and the other side

15   about what questions the Department wouldn't object to

16   or what questions the Department wouldn't invoke *Touhy*

17   to.  Were you suggesting that?

18             MR. CLYMER:  Your Honor, I have for quite

19   some time been eager to sit down with either Mr. Cohen

20   and the parties or Mr. Cohen, the parties, and the Court

21   to have a discussion about trying to identify what the

22   relevant issues are and try to work a way to streamline

23   it.

24             If the Court is inclined to have a hearing,

25   I'm happy to-- you know, I'd ask that maybe we have a

1  chambers conference or status conference or some

2  face-to-face meeting where we sit down and iron it out.

3  I think it will go much more smoothly and much more

4  easily if we could have-- if before we start taking

5  evidence we could just have a conversation about the

6  best way to accomplish.

7           I have to be honest with you, Judge, and

8  I've been doing this a long time, I think if you-- if

9  you talk to other judges who I've appeared in front of,

10  they'll tell you that I understand my obligations as an

11  officer of the court.  But I do not understand what

12  relief is at issue here, I don't understand what the

13  issues here-- are here.  I've never been involved in

14  litigation like this, Judge.  And I'm just trying to do

15  my best to safeguard the Department's prerogatives and

16  be responsive to the Court.

17           It would give me much-- it would be

18  important to me or helpful to me to find out exactly

19  what the nature of these proceedings are supposed to be

20  because, quite frankly, I just don't understand them.

21           THE COURT:  I'm surprised you don't

22  understand it, because if you read the longitudinal

23  record, if you read the orders, if you read Mr. Cohen's

24  reports and if you conferred with the people that have

25  been involved in the U.S. Attorney's Office, you would

1    have a very good understanding because they understand

2    it.  And I also say--

3              MR. CLYMER:  I'm sorry, Your Honor, I--

4              THE COURT:  I also have to take issue with

5    one other thing you said, Mr. Clymer.  You have not--

6    you have not tried to negotiate under *Touhy*.  I was

7    stunned when you entered your appearance in this case

8    and immediately laid down the gauntlet and appeared at

9    the evidentiary hearing and instructed your folks to

10   essentially invoke *Touhy* with respect to every question

11   or almost every question.

12             There was no pre-hearing negotiation.  You

13   did not approach anyone.  You didn't offer to negotiate,

14   you wouldn't talk to anyone.  So maybe you're confusing

15   this with another matter in which you were involved.  I

16   know you're probably involved in other *Touhy* litigation.

17             It's not-- it's not uncommon, it's not usual

18   either, but normally my understanding is what happens is

19   the parties do try to sit down and figure out what are

20   the universe of questions that are appropriate that all

21   can agree are appropriate so we don't have what happened

22   at that last hearing, but you did not do that.

23             So to say that you've always wanted to do

24   that, I think you're misrepresenting what happened.

25   Maybe you're willing to do it now, but you certainly

1    indicated nothing that would lead anyone to believe you

2    were willing to negotiate before that evidentiary

3    hearing we had a few months ago.

4            So now you wanted to clarify something you

5    said earlier. So I'm done with my questions for now, so

6    go ahead and do that.

7            MR. CLYMER: Your Honor, you-- the Court had

8    asked me about the government's position with respect to

9    returning the recordings involving attorney-client

10   meetings. And I think my answer-- I answered more

11   broadly with respect to all recordings. The-- the

12   government-- absent some specific evidence that I'm not

13   aware of, that there is evidence of a crime on some

14   recording involving an attorney, the government is

15   willing to have returned to the inmates or their counsel

16   any recording that was made and that used to be in the

17   government's possession regarding any attorney-inmate

18   communications.

19           And, in fact, as the Court is aware, the

20   Court has impounded all that material, we don't have it,

21   and the Court certainly is free to return that at any

22   time. We are not opposing or contesting the return of

23   any inmate-attorney communications that I know of.

24           THE COURT: Okay. So just so I'm clear, I--

25   you're right, I've impounded. So any attorney-client

1    recordings that I've impounded, video and/or audio, you

2    do not oppose return?

3                MR. CLYMER:  Absolutely, Your Honor.

4                THE COURT:  Okay.  One other-- oh, one other

5    thing I wanted to talk to you about.  And again-- and

6    I-- I don't know that you addressed this, you probably

7    didn't, in the motion for evidentiary hearing, but you

8    will recall-- and I'm not ruling on that motion today,

9    by the way.

10               But you will recall before the evidentiary

11   hearing before-- or at least at some stage of the

12   proceeding, Mr. Cohen had issued subpoenas *duces tecum*

13   and you filed motions to quash.  And that is something

14   else I want to address before we go forward with an

15   evidentiary hearing.

16               Last time the Court didn't rule on those

17   motions to quash, we just went forward without the

18   records.  If we're going to have an evidentiary hearing,

19   it needs to be a full hearing, and that would include

20   appropriate subpoenas.  I'm not saying that everything

21   that was subpoenaed is appropriate.  Some of it may very

22   well need to be quashed.

23               But do you take a position-- I know you may

24   not agree as to the scope of what would properly be

25   subpoenaed in records, but do you take a general

1    position as to your willingness to - you said you're

2    willing to negotiate under *Touhy* - your willingness to

3    provide records that you can agree don't fall within the

4    parameters of *Touhy* or don't for some other reason fall

5    within the parameters of something that should be

6    quashed?

7         MR. CLYMER:  I will-- Your Honor, if I have

8    no basis to quash or if they were discoverable,

9    obviously we would turn them over.  I-- beyond that, I

10   would have to have a-- a discussion both with whoever

11   was seeking the records and the-- the Office of the

12   Deputy Attorney General before turning them over.  I

13   don't have authority to make that sort of agreement.

14        THE COURT:  Okay.  I understand.  All right.

15   Was there something else-- oh, you did, you did want to

16   clarify about the Rule 40-- or the recordings, the

17   return of the recordings.

18        MR. CLYMER:  Right.

19        THE COURT:  Okay.  So let me turn to the

20   other parties that are here.

21        First of all, Mr. Guastello, you're on the

22   phone for Mr. Carter.  Is there anything that you would

23   like to say at this point?

24        MR. GUASTELLO:  No.  No, Your Honor.

25        THE COURT:  Okay.  Mr. McAllister, Mr.

1    Slinkard, is there anything that you have?

2              MR. McALLISTER:  Would you like me to

3    approach here?

4              THE COURT:  Sure.  Yeah, it would be helpful

5    to be able to hear on the phone.

6              MR. McALLISTER:  Yeah, with respect to the

7    question Your Honor asked about 2255s, and Mr. Clymer

8    can correct me if I'm wrong, my understanding is that

9    those would still probably come individually to our

10   office.  So the U.S. Attorney's Office would handle

11   those, but our direction would be we have to adhere to

12   the standards set forth in Deputy Attorney General

13   Rosenstein's letter in terms of responding to those.

14             So in other words, I don't understand that

15   we could negotiate over those unless there was proof of

16   an actual constitutional violation and prejudice.  So

17   short of that, we would have to take the position that

18   that's what's required.

19             THE COURT:  Okay.  I understand.  Well, my

20   understanding is that what you and Ms. Brannon were

21   negotiating, I don't want to get into the substance of

22   that, but what we were focusing on at least were people

23   whose recordings were clearly in the possession of the

24   U.S. Attorney's Office before I impounded them because

25   they were obtained one way or the other as part of the

1    *Black* investigation; is that fair?

2              MR. McALLISTER:  That is correct, Your

3    Honor.

4              THE COURT:  Okay.  All right.  Ms. Brannon.

5              MS. BRANNON:  There are quite a few issues

6    here, Judge, but I'd like to start with the motion to

7    reconvene that we filed.

8              When we recessed that hearing, we had a very

9    specific agreement and that was to negotiate, but if the

10   negotiations fell through that we could reconvene the

11   hearing as it stood at that point.  And that was the

12   agreement, and Mr. Clymer was in the room when we made

13   that agreement.

14             Negotiations on the retrospective relief

15   have fallen through, so we ask to reconvene the hearing.

16   And based on the quick perusal I had of his response,

17   DOJ is essentially reneging on that agreement that we

18   had because that was the agreement, we get to walk back

19   in and pick it up where we were.

20             We're going to ask the Court both to

21   reconvene the hearing but also to give a specific

22   performance.  Specific performance of that agreement,

23   which is on the record, is to reconvene the hearing and

24   let us pick up where we left off without setting the

25   defense behind.

1          We are kind of behind because we lost time,

2     two-and-a-half months, negotiating these things.  I want

3     to put on the record that during that time we met often

4     with Mr. McAllister and Mr. Slinkard and today have full

5     confidence that they dealt with us in good faith.  We

6     believe we made a lot of progress.

7          Since Mr. Clymer has chosen to put some of

8     the agreements on the record, I think it's fair to put

9     the rest of the agreements on the record, which were

10    that if the United States Attorney was in possession of

11    video-recordings, regardless of what was done with them,

12    that there would be a benchmark of a reduction of 35 to

13    40 percent based on certain cases.  There was a

14    reservation that certain cases would be handled

15    individually, but that was the heart of our agreement.

16    And--

17          THE COURT:  Could I-- could I stop you for a

18    minute on the video-recordings?

19          MS. BRANNON:  Sure.

20          THE COURT:  Because there is a difference,

21    some difference in the video-recordings versus the

22    audio-recordings.

23          MS. BRANNON:  Right.

24          THE COURT:  And when you talk about

25    particularized evidence or individualized harm with

1    respect to the video-recordings, there was the computer

2    that was used to access-- there was only one computer

3    that was used to access video-recordings and view them.

4           And at the first or second hearing in this

5    case, and only because Mr. Slinkard stood up and advised

6    the Court that the-- no one else did, even though Ms.

7    Barnett was representing the government.  Mr. Slinkard

8    stood up and said, you need to know that we're going

9    through a cyclical replacement, you may want to order us

10   to preserve, which I did because of Mr. Slinkard's

11   candor and-- and what he told the Court.

12          Nonetheless, the U.S. Attorney's Office

13   wiped that computer clean and that evidence is now gone

14   and that metadata is gone.

15          So with respect to the video-recordings--

16   and I say some of this for Mr. Clymer's benefit because

17   maybe he's not aware of this.  But with respect to the

18   video-recordings, there really is no mechanism at least

19   from the computer of determining when they were looked

20   at, what was looked at, who accessed them, et cetera;

21   would that be correct?

22          MS. BRANNON:  That is correct, and that's

23   why the negotiation just moved to what they were in

24   possession of and deeming that if they were in

25   possession of those videotapes, which we were able to

1   identify our clients from the visitation logs at CCA

2   that Mr. Cohen provided to us, we basically negotiated

3   away this idea that whether they looked at them or not

4   was not an issue.

5           The agreement was if the government was in

6   possession of those videotapes, that those clients would

7   be eligible for relief.  The same would be true of the

8   phone recordings, that there was going to be a

9   comparable reduction if they were in possession of phone

10  recordings.  So what was negotiated away was this idea

11  of review and reliance essentially based on their

12  possession.

13          And I'd like to back up, I don't want to

14  take anything from Mr. Slinkard, but on August 31st our

15  office became aware through other sources that they were

16  undergoing a cyclical replacement of computers.  We sent

17  an e-mail to Ms. Barnett on that day asking them to

18  preserve that evidence and preserve those, and that's

19  how the issue arose.

20          So the U.S. Attorney's Office was on notice

21  August 31st that those computers, those hard drives were

22  critical to this case.  And it's my understanding that

23  it was only after that that that computer was destroyed.

24          That's the sort of evidence, Your Honor,

25  that we believe would come out at the continued hearing

1    that we focused on.  That's the reason Ms. Barnett and

2    Ms. Metzger and Ms. Boyd were all subpoenaed, because we

3    believe they have information relevant to that.  It goes

4    not only to the destruction of that but to their

5    knowledge and responsibility to have preserved that

6    going back as early as August 31st, which is when we

7    sent the e-mail about the cyclical replacement.

8              The agreement we had with Mr. McAllister -

9    although it was not finalized, there were some

10    outstanding issues - would've been for comparable relief

11    for those phone clients.  We identified 102 cases that

12    were involved with the videos, but we had not been able

13    and have not yet identified all of the clients who were

14    affected by the phone recordings.

15              And, of course, we're not talking just about

16    what was obtained in *Black*, although there were a number

17    of phone recordings they had in *Black,* and Mr. Cohen has

18    helped us with identifying those.  But as the Court

19    knows, as we've-- as we have dug deeper into this, there

20    are numerous cases where the U.S. Attorney's Office

21    obtained phone recordings and that those included

22    attorney-client calls.  So we're in the process of

23    identifying those.

24              So when the Court talks about coming 2255s,

25    it is not just those 100 videos, it's going to be all of

1   the phone recordings as well.  Since we last met we've

2   been able, I believe, to confirm that CCA was recording

3   FPD calls for a two-year period when they should not

4   have been, when we understood that they were not.  So

5   it's our concern that every time the U.S. Attorney's

6   Office got phone calls, recorded phone calls in our

7   cases, that our phone calls would've been included in

8   that.

9          Those have not been identified for us yet.

10  We intend to file a motion asking the U.S. Attorney's

11  Office to identify every case where they requested phone

12  calls and whether attorney-client phone calls were

13  included in that.  We'll be able to somewhat cross-check

14  that with the information we have, but that's one of the

15  things that's coming.

16          In the past couple of weeks, it seems that

17  the U.S. Attorney's Office, perhaps at the direction of

18  the DOJ, have been scrambling to resolve the remaining

19  cases-- remaining defendants in the *Black* case.  That

20  will not end the Court's inquiry.  We have a motion to

21  show cause why they should not be held in contempt.  The

22  government cannot evade a contempt finding by this Court

23  simply by trying to make the case disappear, and that

24  appears very much to be what they're-- they're trying to

25  do.

1          As far as discussion about further

2    negotiations, we consider the attempt to block the

3    hearing an act of bad faith on the part of Department of

4    Justice.  We consider their reversing our negotiations

5    on the retrospective relief to be in bad faith, because

6    we understood and asked point blank whether the U.S.

7    Attorney's Office had authority to make these

8    negotiations and were assured that they did.  So by

9    going in and-- and taking that away, we believe that

10   that was an act of bad faith by the Department of

11   Justice.

12          THE COURT:  Well, even today Mr. Clymer

13   can't tell me definitively whether the U.S. Attorney's

14   Office has authority to negotiate 2255s, and Mr.

15   McAllister says they do.  I know-- and those-- 2255s are

16   separate cases.  Mr. McAllister says they do.  Mr.

17   Clymer, I asked him and he says he doesn't know.

18          MS. BRANNON:  Which is part of the confusion

19   that we have now.  But the deal that we had negotiated

20   was for all of these 2255s that there would be a

21   benchmark that we could use in fashioning a remedy for

22   relief and that we could come to an agreement on the

23   factual findings and conclusions of law necessary for

24   courts to grant 2255 relief and-- because we had-- we

25   had negotiated those sort of as a whole to have some

1    consistency and to streamline these, and that is what

2    has been undone and reversed by the Department of

3    Justice.  And by going and reversing that when we

4    understood that the U.S. Attorney had authority to make

5    that sort of global agreement, we consider that in bad

6    faith.

7                The other thing is that since Mr. Clymer and

8    the Department of Justice have been involved in this,

9    which I think was last July, this case has been on the

10   slow track.  I think that's for several reasons, but

11   there's clearly been a tactic of delay throughout this.

12   Those are reasons that we are not confident in

13   negotiating directly with the Department of Justice.  We

14   will not negotiate these cases with the Department of

15   Justice.  If Mr. McAllister and his office has the

16   authority to negotiate individual cases, that's

17   wonderful.  We hope to continue those discussions.

18                But we have no intention whatsoever, unless

19   the Court orders otherwise, of engaging in direct

20   negotiations with the Department of Justice because it's

21   simply a waste of time.  We have found that we cannot

22   rely on what they tell us.  And that when we do engage

23   in these negotiations, it just delays this case further.

24   As the Court noted, we're, you know, upon two years of

25   litigation in this and haven't resolved it and are just

1    now in the midst of the evidentiary hearing.

2          The concern about the letter from Mr.

3    Rosenstein is not only that it seems that he was not

4    fully advised of the facts of this case - because he

5    refers to the absence of evidence of a Sixth Amendment

6    violation, that is not the record in this case.  That's

7    not the evidence in this case, and it does not reflect

8    the Court's orders or the Special Master's findings so

9    far - it's also that he appears misadvised of the Tenth

10   Circuit law regarding what has to be proved regarding a

11   Sixth Amendment violation.

12         Certainly review and reliance are factors

13   but they're factors of-- that go to remedy, not to the

14   Sixth Amendment violation.  But intentionally obtaining

15   attorney-client communications, which they did with the

16   videotapes and which we believe the record shows they

17   did with videotape-- or with phone calls, that is a

18   Sixth Amendment violation.

19         United States Marshal is an agent of the

20   U.S. Attorneys.  CCA is an agent of the marshals.  The

21   Court has sufficient record right now to find a Sixth

22   Amendment violation based on the U.S. Attorney's

23   misconduct in this case.  So what we're really talking

24   about-- and we are asking the Court to make that

25   finding.  What we're really talking about is determining

1    the appropriate remedy.

2            The negotiations we reached were for a

3    reduction in sentence.  We intend in these 2255s to ask

4    to vacate convictions, not just to reduce sentences but

5    to overturn convictions.  We-- the 2255s will also be

6    accompanied by motions to expand the record so that each

7    2255 will be able to-- to encompass the record in the

8    *Black* case as well as *Herrera-Zamora* and the others that

9    have relevant evidence as well as discovery motions.

10           If for some reason, you know, we don't

11   continue with taking evidence in this case, which we

12   firmly believe the Court should enforce our agreement,

13   we're going to do so in the 2255s.  And it makes sense

14   and we ask the Court to appoint Mr. Cohen to be a

15   Special Master on those 2255s so that we are not again

16   thwarted in our discovery and our ability to obtain

17   information regarding the internal use by the U.S.

18   Attorney's Office of attorney-client communications.

19           The other request we have, Your Honor, is

20   that we compiled a significant amount of information

21   during negotiations and provided that to the U.S.

22   Attorney's Office.  They have returned that information

23   to us.  We understand it was also provided to the

24   Department of Justice.

25           Because it was produced during the course of

1   negotiations, we'd ask the Court to order the Department

2   of Justice to return all that information to us and to

3   destroy any copies they have.  They should not be able

4   to benefit from our work in negotiations going forward

5   if they're going to continue to litigate this.

6               THE COURT:  And you're telling me you're not

7   willing to negotiate further with the Department of

8   Justice?

9               MS. BRANNON:  Correct.

10              THE COURT:  All right.  Is that in Mr.

11  Clymer's possession?  Who has these records?

12              MR. SLINKARD:  Your Honor, during the course

13  of the negotiations, we were provided several things,

14  but the-- I think the matter most pertinently at issue

15  was a spreadsheet prepared by the Federal Public

16  Defender that was an evolving work-in-process

17  identifying certain defendants that they believe fell in

18  the category of those who might've had video-recordings

19  of meetings.

20              The most recent hard copy version of that

21  that was received from them was given to the Department

22  of Justice, to the Office of the DAG, when they were

23  considering and doing their-- their

24  information-gathering related to the decision that

25  ultimately resulted in the DAG's letter.  So that's

1    what's being referred to is-- is specifically a

2    spreadsheet and with judgments for the individual

3    defendants referenced in that spreadsheet linked to it.

4        THE COURT:  Okay.  Mr. Clymer, do you have

5    any objection to returning this-- this spreadsheet and

6    any other related information you received as part of

7    the settlement negotiations?

8        MR. CLYMER:  Without knowing what sort of

9    motions are going to be filed alleging matters regarding

10   these negotiations, Your Honor, I don't think it would

11   be fair to make the government return information that

12   was involved in those negotiations.  So yes, I do oppose

13   it.

14       THE COURT:  So you're referencing whether--

15   if they're going to-- well, I guess I'm not

16   understanding.  Are there going to be any additional

17   motions filed related to the settlement negotiations?  I

18   don't know why there would be.  There is the pending

19   order to show cause.  I assume part of the argument will

20   now become what's happened in the course of the

21   settlement negotiations or not.

22       MS. BRANNON:  It could be, Your Honor, but I

23   don't see that the actual factual information we gave

24   them identifying particular cases and the facts that go

25   with that would bear on that at all.

1        MR. SLINKARD:  Your Honor, I will say when

2   they made their initial request for return of this and I

3   indicated to them what-- I returned the hard copies,

4   indicated to them that the information had been circled,

5   made clear in that communication that we recognize that

6   these are the substance of settlement negotiations and,

7   thus, subject to F.R.E. 408, that no one could use them

8   either affirmatively or even for cross examination sorts

9   of purposes because they're protected.

10       SPECIAL MASTER COHEN:  Judge, we're unable

11  to hear Mr. Slinkard and I think it's he who is

12  talking--

13       THE COURT:  Okay.

14       MR. SLINKARD:  I mean, we did acknowledge

15  that these are 408-protected materials, so I-- I don't

16  know that that goes to the substance completely of the

17  question being asked.  But so the Court is clear,

18  there's no issue of a belief that those would be used to

19  litigate the substance as factual evidence.

20       THE COURT:  By anyone.

21       Okay.  Ms. Brannon, prepare an order for me

22  and I'll sign an order that orders Mr. Clymer and the

23  Department of Justice to return those materials.

24       MS. BRANNON:  Thank you, Your Honor.  And

25  that just gives us another example of why we will not be

1    negotiating with Mr. Clymer.  When we provide

2    information during negotiation, we expect it to be used

3    for that purpose and for no other purpose.

4              If I could have just one moment to consult.

5              MR. CLYMER:  Your Honor, so the Court is

6    aware, I don't believe I've ever been given copies of

7    these spreadsheets.  Mr. Slinkard did send me one

8    spreadsheet, but I think it was something else, and so

9    I've-- I've never been involved in those negotiations

10   and I do not have a copy, to my knowledge, of that

11   spreadsheet.

12             THE COURT:  All right.  Well, the-- the

13   order will be directed to the Department of Justice.

14   And since you're the lead attorney in the Special Master

15   litigation, it will be your responsibility to get

16   those-- whatever the documents are from whoever has them

17   and to return them.

18             MS. BRANNON:  Your Honor, just lastly, we do

19   not intend to reply to the response that was filed

20   today.  We consider the matter submitted with the Court.

21             THE COURT:  Okay.

22             MS. BRANNON:  We feel-- we take the same

23   position regarding the prospective relief.  We did sit

24   down with the marshal to discuss some issues, but

25   there's really no reason to-- to continue that.  We

1    consider that matter submitted with the Court as well.

2         THE COURT:  All right.  With respect to the

3    standing order and prospective relief, I have given

4    thought to the U.S. Marshals' concerns.  Mr. Cohen also

5    provided me with a marked-up copy of the standing order,

6    some things that he wanted me to take a closer look at.

7         I understand that the United States

8    Marshal's contractual relationship with the facilities,

9    including CoreCivic, I understand their concerns about

10   an order that directs them to make people do something

11   when they don't have control over them except through

12   the-- you know, the contract and the remedies that the

13   contract provides.  So I will work on that language.

14        I-- I understand that it's too much to

15   expect the United States Marshal to-- to, you know, make

16   somebody do somebody-- something, or perhaps "ensure"

17   isn't even the right word.  But I think the order needs

18   to be modified to reflect that the United States

19   Marshals should provide a copy of the standing order to

20   these facilities.

21        They're all, you know, state actors or

22   private actors and they're not, you know, under the

23   Court's jurisdiction necessarily, you know, at least

24   right now with respect to this.  But I think they need

25   to be made aware of what the standing orders say.

 1          And to the extent, for example, I-- I think

 2   it's important that they have a protocol and that the

 3   defense lawyers know what the protocol is, or at least

 4   the FPD does, and then they can make sure the defense

 5   bar knows what the protocol is, the U.S. Attorney's

 6   Office knows what the protocol is.

 7          And then if there comes a time that a

 8   facility changes their protocol in any way, obviously

 9   everybody that it affects, which would again be defense

10   counsel and the prosecutor, need to be aware of that.

11   So we'll make those changes.

12          I'm not going to hold the United States

13   Marshal to an impossible standard of making some county

14   jail do X, Y, and Z, but they should be, you know,

15   provided with a standing order and made to understand

16   that this is an order of the federal court for these

17   federal detainees and, you know, that the marshal's

18   expectation is that they will abide by the order.

19          And then further that, you know, there will

20   be some direction in there about they need to have

21   protocols, not that the protocols are dictated to them,

22   but they need to have protocols that provide for

23   privatization of attorney numbers or private attorney

24   phone calls without recording.  I mean, we'll leave it

25   pretty generic.

1           And, as I understand it, Mr. Cohen and I

2      think Ms. Brannon, and I don't know who else, did an

3      inspection of some of these facilities and they do have

4      mechanisms in place to do this.  They understand that

5      they're supposed to do this.  We just want to make sure

6      that the order reflects that they-- you know, that they

7      have protocols.  If they change the protocols, they'll

8      let the appropriate people know.

9           And there's also language in there and it

10     gave the marshals some concern about-- something to the

11     effect that the burden will not fall exclusively on the

12     detainee to find these things out and to follow the

13     protocol.  And that's because in this case CoreCivic's

14     position was, well, we put it in the inmate handbook.

15     They didn't tell the attorneys this.  And so I think

16     that's why a lot of these recordings happened.  That's

17     why a lot of the numbers weren't privatized, because the

18     attorneys were not aware at all.

19           CoreCivic did not do anything to make them

20     aware of it and thought that the-- the detainee is

21     supposed to be able to make this work.  And yet the

22     detainee can't privatize the number, they have to tell

23     their attorney to go through it.  So, I mean, that

24     doesn't work obviously.

25           So I think the standing order is going to

1    require that it not fall just on the detainee; that, you

2    know, the attorneys be placed on notice so that they can

3    actually, you know, do whatever they need to do to make

4    sure the facility is privatizing.

5         And really, this is between I think the

6    defense attorney and the facility to make this work.

7    But the attorneys have to know, they have to be aware of

8    how to do it, and they have to have-- be able to

9    communicate with the facility to make it happen.

10        So those are the things that I anticipate

11   will be changing in the standing order before I submit

12   it to my colleagues so that they can-- they can review

13   and hopefully approve it.  And then we can get it filed

14   and it will affect all of the-- all of the judges, the

15   entire court in this district.

16        Okay.  So the motion for hearing, if that's

17   what it's called, is under advisement.  There will be no

18   further reply to that, and I'll be issuing an order on

19   it fairly soon.  I will tell you right now I'm going to

20   issue an order that grants the motion for evidentiary

21   hearing for a variety of reasons.

22        We might need to have a status conference,

23   because I do want to talk about the subpoena *duces*

24   *tecum*, I do want-- because I'm going to ask Mr. Cohen to

25   reissue those.  And I'm going to work with him to make

1 sure that, at least on behalf of the Master, that those

2 are tailored as tightly as I think they should be.

3           And in view of the Department of Justice's

4 language in this letter about particularized harm and

5 all of these sorts of things, it could very well be

6 that-- and I can't speak for the parties, but I can

7 speak for Mr. Cohen perhaps, it could very well be that

8 he will want to expand the number of witnesses and

9 subpoena people that he wasn't going to otherwise

10 subpoena, but that's something that, you know, he can

11 work on.

12           Mr. Cohen, are you still on the phone?  I

13 know you had another matter.

14           SPECIAL MASTER COHEN:  I am, Judge.  And

15 when there's an opportunity, there is something that I

16 would like to say.

17           THE COURT:  Go ahead.

18           SPECIAL MASTER COHEN:  Thank you very much,

19 Judge.

20           You know, I have a-- I think what is a

21 fairly unique role in this case, which is both to

22 investigate and also to mediate.  And that's principally

23 what I do is mediate.  And so I-- I appreciated Mr.

24 Clymer's suggestion that if there was any way that

25 mediation could continue, despite the way that

1   negotiation had occurred, that he was willing to give

2   that a shot.  And I-- and I understand perfectly,

3   unfortunately, the Federal Public Defender's position

4   that it's not willing to do that.

5           But I-- I think that the reason that the

6   mediation began in the first place, that is to say I

7   think that the reason that Mr.-- Attorney Clymer--

8   excuse me, Attorney McAllister suggested that there be a

9   break in the hearing and that the parties be given an

10  opportunity to mediate a resolution of the *Black* case

11  and all that it implicates was because I suggested to

12  him, Mr. McAllister, that that might be a good idea.

13          And the reason that I suggested that to him

14  was because it was my sense that that was the best way

15  for both the United States Attorney's Office and the

16  Federal Public Defender and its clients to get what they

17  wanted and what-- what they needed.

18          Specifically, I think that the hearing

19  suggested that the two witnesses whom I questioned may

20  have committed perjury, to be frank.  And it seemed to

21  me that it made sense for the parties to stop, stop the

22  hearing and discuss maybe a better way to go forward.

23          I believe that the only reason that we are

24  here in this circumstance today where there has been a

25  two-month negotiation which at the very end of it is--

1   frankly, the rug has been pulled out is because there is

2   a-- an incomplete understanding on the part of the

3   Department of Justice.

4           And so it would be my request that Mr.

5   Clymer allow me to speak with Attorney Rosenstein, or

6   whoever it is in his office, so that I can give my

7   perspective on what is happening and where we are and

8   how we go ahead and the best way forward, because I

9   think this isn't it.

10          THE COURT:  All right.  I think that's fair.

11  I would suggest that you and Mr. Clymer have that

12  conversation and hopefully Mr. Clymer and the Department

13  of Justice would be amenable to that kind of

14  conversation in your capacity as a mediator, Mr. Cohen.

15          You know, I think-- I don't want to speak

16  for Mr. McAllister, but I-- I think he recognized - if

17  not before, during the hearing - that, you know, this is

18  the type of case that if-- if at all possible should be

19  mediated and resolved.

20          I think, despite how difficult this has all

21  been and, you know, I think to say that some-- you know,

22  people in the defense bar have been outraged.  Their

23  clients have been outraged.  There's been a lot of

24  public interest in this and I think a lot of people in

25  the public are if not outraged, they're quizzical as to

1    how this could be.

2            I think the U.S. Attorney's Office's

3    reputation has been damaged, and I think the best thing

4    that could happen is that there's-- that there not be

5    litigation, frankly, and that this just goes forward and

6    we fashion prospective relief.  The parties agree, if

7    they can, to retrospective relief with judicial

8    involvement to the extent there needs to be.  And that

9    hopefully, you know, the District of Kansas and the

10   defense bar and the prosecution-- prosecutor's office

11   and everyone involved can heal from this and go forward.

12           I think the U.S. Attorney's Office is under

13   very good and strong leadership.  I think the Federal

14   Public Defender's Office is under very good and strong

15   leadership.  I believe that Mr. McAllister and Ms.

16   Brannon operate in good faith, want to fix this problem,

17   want to move forward.

18           Understand that the nature of the beast, if

19   you will, is that their offices will continue to have to

20   work together to advocate for their respective

21   positions, and that the system is going to work a whole

22   lot better if this doesn't continue to get mired down in

23   litigation and strategy and posturing and, you know,

24   protecting some institutional-- so-called institutional

25   interest that does nothing to fix the problem in the

1   District of Kansas.

2         So my concern is that Department of Justice

3   understand that, and that they understand at the end of

4   the day the District of Kansas is still going to be

5   here.  The U.S. Attorney's Office is still going to be

6   investigating and prosecuting defendants.  The FPD and

7   the defense bar are still going to be defending them.

8   Juries are still going to be trying-- or presiding over

9   trials, I'm going to still be presiding over cases.

10         And I think all of us in Kansas want this

11   fixed so that we can go forward and everyone can do what

12   they have done very well for many, many years.  A lot of

13   people here with, you know, a lot of experience and--

14   and whose hearts are in the right place.  And that

15   doesn't mean there weren't mistakes made, that doesn't

16   mean that there weren't-- there wasn't misconduct.

17         You know, I'm not saying whether there was

18   or wasn't, but certainly the findings that I've made so

19   far and Mr. Cohen's investigation so far is pretty good

20   evidence that there was-- there was some Sixth Amendment

21   violations here.  But it's an incomplete record, and we

22   need to have a complete record if I'm going to make

23   findings and conclusions ultimately as to whether there

24   was a misconduct and-- and, if so, to what extent and

25   what that all means.

1         But I encourage you, Mr. Clymer, to talk to

2    Mr. Cohen.  I encourage you to get involved Mr.

3    Rosenstein, or whoever in his office you need to,

4    because my concern-- and I agree with Mr. Cohen, reading

5    this letter, it's pretty apparent to me that whoever

6    wrote this for Mr. Rosenstein's signature either really

7    doesn't understand this case or didn't want to tell Mr.

8    Rosenstein the full picture, one or the other.

9         I want to believe that if the Department of

10    Justice really understood the whole picture, they would

11    be wanting to negotiate this if they could and come to

12    some reasonable resolution for all concerned, which is

13    what Mr. McAllister was trying to accomplish.

14         All right.  So I'm going to rule on the

15    motion for hearing.  I may set a status conference

16    before any hearing.  I encourage you all to negotiate.

17         If Ms. Brannon doesn't want to negotiate

18    with Mr. Clymer, so be it, I understand that.  But I

19    encourage Ms. Brannon to re-think that, particularly if

20    Mr. Clymer talks to his people and they indicate a real

21    willingness to negotiate, which I haven't-- I don't know

22    that I believe the-- that they-- there's really a

23    genuine desire based on the language that is in Mr.

24    Rosenstein's letter, which suggests that they think

25    there has to be all these showings made before they even

1    have to-- to participate in an evidentiary hearing.  So

2    I don't know.

3              All right.  Is there anything else anyone

4    wants to bring up before we close out this hearing for

5    now?  Mr. McAllister?

6              MR. McALLISTER:  Could I?

7              THE COURT:  Sure.

8              MR. McALLISTER:  Just a couple of practical

9    questions.  I understand you are granting the motion to

10   continue the hearing.

11             THE COURT:  I'm going to do that in writing

12   since I have the two-- I-- I've told you what I'm going

13   to do, but I'm going to issue a written order.

14             MR. McALLISTER:  Right.  So my only

15   questions were, particularly with lots of vacations

16   scheduled and so forth, do you have any idea when you

17   anticipate setting a potential hearing and also how long

18   might you want the hearing to be?

19             I know FPD has suggested a couple of days.

20   But just for planning for everyone, the sooner we had

21   some sense, it would help make sure we've got everyone

22   that you need and that sort of thing.

23             THE COURT:  Well, that's why I was thinking

24   maybe we'd have a status conference first so we could

25   have that very discussion.  And I don't think two days

1   is long enough.  I mean, we were, what, a day-- a little

2   over a day into the hearing and-- and it was supposed to

3   be a two-day hearing and I kept thinking this is going

4   to be four or five days.

5            And, I don't know, I mean, it could be that

6   Mr. Cohen will want to subpoena even more witnesses.

7   I'm pretty sure that I'm-- we're going to have to deal

8   with the subpoena *duces tecum*s.  So I would anticipate

9   it will be much longer than two days, but we'll have

10  that conversation.

11           Obviously if Mr. Clymer is the lead attorney

12  on this, he needs to be here for the status conference,

13  not by phone.  He needs to be here for the hearing.  He

14  needs to be here.

15           You're the lead counsel, Mr. Clymer, I

16  expect you to be here.  You know, I'm not going to let

17  you call it in anymore, because as the lead person you

18  need to be here.

19           In this district, you know, in all

20  districts, you know, we have Department of Justice

21  attorneys, really great Department of Justice attorneys,

22  tax evasion, et cetera, and they actually are the lead

23  attorneys on cases from time to time.  And they're here,

24  and so I expect that from you as well.  That's just

25  generally the way it goes when you're the No. 1 attorney

1    on the list, so...

2              But I think probably the best bet, Mr.

3    McAllister, is to have a status conference and then

4    we'll figure it out from there.

5              MR. McALLISTER:  Okay.  Thank you.

6              THE COURT:  Okay.  All right.

7              MR. CLYMER:  Your Honor, I have other

8    professional and sundry obligations, so as much advance

9    notice as I can get about the date of the status

10   conference would be appreciated.

11             THE COURT:  Sure.  All right.  Anyone else?

12             Mr. Cohen, I-- you know, I did a lot of

13   talking, you didn't weigh in much and I didn't really

14   mean to foreclose you.  Was there anything else that you

15   wanted to talk about today?

16             SPECIAL MASTER COHEN:  No, Judge.  I said

17   what I needed to say and I appreciate the opportunity to

18   do so.

19             I would just I guess remind you I think it

20   would be a good idea for me and for the Court if Mr.

21   Clymer would provide - Mr. Clymer, I think you said that

22   there was and you're willing to produce - some written

23   delegation of authority to you so that we could have an

24   understanding of exactly what it is.

25             THE COURT:  Yeah.

1          MR. CLYMER:  I will check to see if I can

2    release the delegation of authority letter.

3          THE COURT:  I mean, I assume--

4          SPECIAL MASTER COHEN:  That's all.

5          THE COURT:  Have you already given that to

6    Mr. McAllister at least?

7          MR. CLYMER:  I don't know if Mr. McAllister

8    or-- Mr. McAllister wasn't the United States Attorney at

9    the time I was appointed, Your Honor, so I don't know

10   if-- if his predecessor received a copy or not.  I never

11   gave Mr. McAllister a copy.  He never asked me for one.

12         THE COURT:  Okay.  Well, I know you're

13   talking about the initial appointment document, but

14   we're talking about whatever the new appointment

15   document is because it's changed.  Correct?

16         MR. CLYMER:  That was by way of an e-mail

17   message, Your Honor.

18         THE COURT:  The-- the new document or the

19   new authority?

20         MR. CLYMER:  I-- I-- I don't think it's

21   authority, Your Honor, it's simply the e-mail that asks

22   that I take the lead role in the negotiations going

23   forward.

24         THE COURT:  Okay.  So you've provided that

25   e-mail to Mr. McAllister?

1          MR. CLYMER:  I think Mr. McAllister has seen
2    a copy of it.
3          THE COURT:  Okay.  Well, you know, you'll
4    recall kind of from the beginning of this hearing-- to
5    say that you have the lead role in the negotiations, I
6    mean, there's still some question marks.  And so I'd--
7    I'd suggest you talk to Mr. Rosenstein or whoever it is
8    that your contact is and come up with something in
9    writing so that we can all be clear.
10          I mean, if Ms. Brannon, for example, were to
11    change her mind and be willing to negotiate, I think she
12    should expect to see something in writing so she's clear
13    on what the authorization is, because Mr. McAllister had
14    an authorization to negotiate until you all said he
15    didn't.  And apparently that happened pretty far in the
16    game.
17          MR. CLYMER:  Your Honor, I'm sorry.  I'm
18    sorry, Your Honor, I have to balk at the "you all."
19    Judge, I work for the Department of Justice the way Mr.
20    McAllister does.  I follow directions I receive.  Mr.
21    McAllister can confirm for you it wasn't my decision to
22    decide I was going to be the one that was going to do
23    the negotiations, it was the Department of Justice.
24          THE COURT:  Okay.  I said "you all," but I
25    meant the Department of Justice.  That's how we talk

1   here in Kansas, at least I do.  I wasn't saying you

2   specifically, Mr. Clymer.

3            MR. CLYMER:  I'm sorry.  Thank you, Your

4   Honor.

5            THE COURT:  Okay.  Anything else?

6            MS. BRANNON:  No, Your Honor.  Thank you.

7            THE COURT:  Okay.  All right.  We'll be in

8   recess.

9            (3:33 p.m., proceedings recessed).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

   I, Kelli Stewart, a Certified Shorthand Reporter and the regularly appointed, qualified and acting official reporter of the United States District Court for the District of Kansas, do hereby certify that as such official reporter, I was present at and reported in machine shorthand the above and foregoing proceedings.

   I further certify that the foregoing transcript, consisting of 77 pages, is a full, true, and correct reproduction of my shorthand notes as reflected by this transcript.

   SIGNED August 2, 2018.


/s/ Kelli Stewart
_____

Kelli Stewart, CSR, RPR, CCR, RMR