```
1               UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5    v.                          Docket No. 16-20032-JAR

6    KARL CARTER                 Kansas City, Kansas
                                 Date:  10/11/2018
7

         Defendant.              Day 8
8    . . . . . . . . . . . . . . . . . . .

9
                        REDACTED
10             PARTIAL TRANSCRIPT OF
                  MOTIONS HEARING
11    (TESTIMONY OF KENNETH MICHAEL "MIKE" WARNER,
          MELANIE MORGAN, AND TANYA TREADWAY)
12      BEFORE THE HONORABLE JULIE A. ROBINSON
              UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15   For the Government:  Mr. Steven D. Clymer
                          Department of Justice - USAO
16                        Lrm Eckert, William
                          100 S. Clinston Street
17                        Suite 9000
                          Syracuse, New York 13261
18
                          Mr. Duston J. Slinkard
19                        Office of United States Attorney
                          444 Southeast Quincy
20                        Suite 290
                          Topeka, Kansas 66683-3592
21
                          Mr. Stephen R. McAllister
22                        Office of United States Attorney
                          500 State Avenue
23                        Suite 360
                          Kansas City, Kansas 66101
24

25
```

```
 1    APPEARANCES:

 2    (Continued)

 3    For the Defendant Karl Carter:
                          Mr. David J. Guastello
 4                        The Guastello Law Firm, LLC
                          811 Grand Boulevard
 5                        Suite 101
                          Kansas City, Missouri 64106
 6
      For the Movant Federal Public Defender:
 7                        Ms. Melody J. Brannon
                          Mr. Kirk C. Redmond
 8                        Mr. Branden A. Bell
                          Office of Federal Public Defender
 9                        117 Southwest Sixth Street
                          Suite 200
10                        Topeka, Kansas 66603

11    For the Special Master David R. Cohen:
                          Mr. David R. Cohen
12                        David R. Cohen Co., LPA
                          24400 Chagrin Boulevard
13                        Suite 300
                          Cleveland, Ohio 44122
14
                          Ms. Alleen VanBebber
15                        VanBebber Law Firm, LLC
                          2029 West 95th Street
16                        Leawood, Kansas 66206

17

18

19

20

21

22
      _____
23
         Kelli Stewart, CSR-KS, CRR-MO, RPR, CRR, RMR
24                  Official Court Reporter
           259 U.S. Courthouse, 500 State Avenue
25                Kansas City, Kansas 66101
```

1                          I N D E X

2

3    Defendant's Witnesses:                              Page

4    KENNETH MICHAEL "MIKE" WARNER
        Direct Examination By Ms. Brannon              6
5        Cross Examination By Mr. Clymer               26

6    MELANIE MORGAN
        Direct Examination By Mr. Bell                41
7        Cross Examination By Mr. Clymer               67
        Redirect Examination By Mr. Bell              73
8
     TANYA TREADWAY
9        Direct Examination By Mr. Bell                80
        Cross Examination By Ms. VanBebber           120
10       Cross Examination By Mr. Clymer              122

11   MELANIE MORGAN (Recalled)
        Direct Examination By Mr. Bell               143
12

13                       E X H I B I T S

14      Government's
        Exhibits            Offered          Received
15
            43*                5                5
16
        Defendant's
17      Exhibits            Offered          Received

18          592               56               56
            592C              99               99
19          592D             102              102
            592G              51               51
20          592H              53               53
            692*             142              143
21          693*             142              143

22

23   * Denotes demonstrative exhibit.

24

25

16-20032-JAR  USA v. Karl Carter (Black) REDACTED 10.11.18    4

1              (Proceedings commenced at 8:36 a.m.)

2              THE COURT:  All right.  You can be seated.

3  All right.  You can call your next witness.

4              MR. CLYMER:  Your Honor, before we begin may

5  I address the Court briefly?

6              THE COURT:  Yes.

7              MR. CLYMER:  Your Honor, the other day I

8  used an exhibit with Mr. Federico that I described as

9  exhibit-- Government Exhibit 40.  Unfortunately, I was

10 confused.  Government Exhibit 40 already existed.  It

11 was a different exhibit.

12             So we have re-numbered the exhibit I used

13 with Mr. Federico to 43.  I've given a copy to your

14 clerk and clarified that with her.  I've also given

15 copies to the Special Master and to defense counsel.

16             THE COURT:  Okay.  Thank you.

17             MS. BRANNON:  I believe that that--

18             THE COURT:  So there was already a 40 that

19 was admitted is what you're saying?

20             MR. CLYMER:  Yes.

21             THE COURT:  Okay.  So all the references

22 during Mr. Federico's testimony to Exhibit 40, it really

23 should be Exhibit 43?

24             MS. BRANNON:  Actually, Your Honor, it's

25 also a demonstrative exhibit.

1           THE COURT:  Oh, okay.  So I need to admit

2    Exhibit 43.

3           MR. CLYMER:  As a demonstrative exhibit.

4           THE COURT:  As a demonstrative.  Okay.

5           MS. BRANNON:  Your Honor, our next witness

6    is Michael Warner.  Before we call him to the stand,

7    however, the United States Attorney and DOJ had sent I

8    believe it was an e-mail or a letter to Mr. Warner

9    regarding *Touhy*, and I believe that position may have

10   changed and would ask Mr. Clymer to put that on the

11   record.

12          MR. CLYMER:  I communicated to Ms. Brannon

13   last night, Your Honor, that Mr. Warner is authorized to

14   testify about the subject material that's been

15   identified in the *Touhy* notice we received from the

16   public defender regarding him except that he can't

17   reveal any privileged communications.  And if he has any

18   questions while he's testifying, I'd be happy to talk to

19   him.

20          THE COURT:  Okay, I understand.

21           KENNETH MICHAEL "MIKE" WARNER,

22   called as a witness on behalf of the Federal Public

23   Defender's Office, having first been duly sworn,

24   testified as follows:

25          THE COURT:  Just a minute.  I'm sorry.  I'm

1    trying to find something here.  Okay.  Go ahead.
2                    DIRECT EXAMINATION
3    BY MS. BRANNON:
4        Q.  Could you tell us your name, please.
5        A.  Kenneth Michael "Mike" Warner.
6        Q.  All right.  Mr. Warner, you can pull that
7    microphone a little closer if that's easier.
8        A.  Okay.
9        Q.  Mr. Warner, could you give us a brief overview of
10   your professional background?
11       A.  I am a-- a lawyer.  I have been a lawyer since
12   1984.  Pretty much exclusively I've worked in the area
13   of criminal law.  The majority of my professional career
14   I've been either a state or federal prosecutor.  Roughly
15   30 years have been equally divided between those two
16   types of prosecutorial positions.  I've also worked in--
17   in private practice in the criminal defense field.
18       Q.  When you were a-- where did you start as a
19   federal prosecutor?
20       A.  I began as a federal prosecutor in the Western
21   District of Missouri in 1999.
22       Q.  And what roles did you play in that office?
23       A.  I was a criminal prosecutor exclusively there for
24   11 years.  I was assigned to I think basically every
25   unit in the office with the exception of the terrorism

1    unit.  I handled primarily white collar crimes,

2    narcotics offenses, and a fair number of violent crimes,

3    including homicides and including I think-- I'm trying

4    to remember, three, maybe four death penalty cases.

5        Q.   Did you hold any management roles in that office?

6        A.   In the Western District of Missouri, no, I did

7    not.

8        Q.   And were you ever a federal prosecutor in the

9    District of Kansas?

10       A.   Yes.  I began in the District of Kansas in

11   December of 2010.  I was hired to be the first assistant

12   under then U.S. Attorney Barry Grissom.

13       Q.   Where was your office physically located when you

14   began in that?

15       A.   Initially my-- my primary office was in Topeka.

16   However, my role was one which required travel not only

17   to the Wichita office but also to this office here in

18   KCK.

19       Q.   Did you take cases in all three offices?

20       A.   Yes, I did.  I-- I actively prosecuted cases as

21   first assistant and-- and did so in all three offices,

22   yes.

23       Q.   Could you briefly summarize your managerial

24   responsibilities as first assistant?

25       A.   Well, there were a number.  And I might add that

1  along the way-- I was actually first assistant from

2  December of 2010 until October of 2013.  In that interim

3  period coinciding with being first assistant, I was

4  interim criminal chief and also criminal coordinator of

5  the Kansas City, Kansas, criminal division in 2013.

6          But my responsibilities were-- were many, at

7  least in written form, involving supervision of support

8  staff, both civil and criminal attorneys, advising the

9  U.S. Attorney, and attempting to comply with DOJ

10 directives and apply them to the everyday operations of

11 the office.

12   Q.  We've heard a lot about these different roles and

13 I want to see if I understand the hierarchy correctly.

14 You have line attorneys that may be prosecuting criminal

15 cases.  In each of the three cities there's a criminal

16 coordinator?

17   A.  Yes.

18   Q.  And then above that there's a criminal chief?

19   A.  Yeah.  In a decentralized district, the District

20 of Kansas, there were three offices.  Each office, if

21 you're talking solely about the criminal divisions, had

22 a criminal coordinator and then overriding all three

23 offices at that time was a criminal chief and then a

24 first assistant and then ultimately whoever the

25 political appointee was.

1    Q.   All right.  You began with your office in Topeka,

2   but at some point you became the criminal coordinator

3   among your other duties in Kansas City, Kansas.  Can you

4   explain why that transition took place?

5    A.   Throughout the time of 2011 and 2012 management,

6   which included Barry Grissom and to some extent Jared

7   Maag, were very much aware of complaints and problems

8   about heavy-handed, for lack of a better word, unfair

9   prosecutorial patterns, behaviors in the Kansas City,

10   Kansas, criminal division.

11    Q.   Can you give us a couple of examples?

12    A.   Well, I mean--

13    Q.   Not necessarily cases, but--

14    A.   To answer your question, and I certainly will,

15   then I was asked because of those problems in early-- in

16   fact, January 2013 to actually come here and to try to

17   assist better in interrupting or maybe modifying some of

18   the practices that had been the subject of complaints,

19   primarily from the defense bar but also other entities

20   in the criminal justice system.

21        And examples included just, you know, the whole

22   gamut from concerns about discovery, concerns about the

23   use of prosecutorial discretion, the use of discretion

24   in ways that were consistently severe, the lack of any--

25   any balance really in terms of distinguishing cases.  It

1  was basically a "one-size-fits-all, let's punish to the

2  max" philosophy that the office seemed to have.  And

3  that was coupled with just some nasty behavior by

4  prosecutors towards not only defense attorneys but also

5  management like myself.

6      Q.  Did you-- well, let me ask it this way:  There

7  were a couple of written policies that were developed in

8  your office regarding how to charge drug cases and how

9  to handle cooperators.  Were those written policies

10  implemented to sort of standardize how each of the three

11  offices operated?

12      A.  Yeah.  And one of the-- kind of going back to the

13  answer I previously gave, I mean, not to be flippant,

14  but one could take judicial notice of the fact that

15  criminal prosecutorial practices in the Kansas City,

16  Kansas, office for a long time were markedly distinct

17  from the way criminal cases were handled in Wichita and

18  Topeka.  I mean, judges even recognized that.  Judge

19  Lungstrum even stated that once on the record at a

20  sentencing in Topeka.

21      The areas that those differences primarily

22  exhibited themselves were in narcotics cases and the use

23  of enhancements and the use of prosecutorial discretion

24  in sentencings and in discovery and also in the

25  application and the measurement of so-called 5K or

1    cooperator consideration.

2         In the late spring-summer of 2013, myself and

3    Jared Maag and to some extent Grissom put together some

4    policies that attempted to standardize the conduct of

5    prosecutors with respect to not only 5K consideration

6    but also the prosecution of narcotics offenses.

7         And I might add this was not something we just

8    invented, it was in conformity with at that time the

9    Holder memo which had directed how prosecutors should

10   handle various types of cases in that area.

11   Q.   What was the Kansas City, Kansas, office's

12   reaction to these sort of directives?

13   A.   Well, extremely oppositional.  You know, it--

14   it's difficult to put into words unless you've

15   experienced it, and maybe Mr. Slinkard has, we're

16   talking about a group of folks that were extremely

17   fervent, like-minded, punishment-oriented, very insular,

18   did not like to be supervised and were extremely

19   oppositional to the administration that was then in

20   office, the Obama Administration, Eric Holder for sure,

21   any of the policies.

22        I mean, preceding opposition to the Holder memo

23   and the directives that we attempted to implement, there

24   had been in the Kansas City, Kansas, office in 2011 a

25   unified opposition to the amendment of the crack versus

1  cocaine powder weight disparity--

2      Q.  When you say--

3      A.  -- and a desire by that office not to follow

4  those directives.

5      Q.  All right.  When we're talking about the KCK

6  office, we're-- there are a lot of people in that

7  office.  When you talk about the group that is

8  resisting, can you put some names to that group?

9      A.  Well, the senior attorneys that I guess best

10  characterized the disposition of the Kansas City,

11  Kansas, criminal division were, of course, Terra

12  Morehead, Scott Rask, Sheri-- I knew her as McCracken,

13  Kim Martin, I guess she's called Flannigan now, Dave

14  Zabel.

15      There were so-called secondary attorneys that for

16  I suppose reasons of either peer pressure or survival

17  acquiesced or did not oppose the-- the fervent

18  opposition of the senior attorneys that I mentioned.

19  But those were the five to six attorneys that primarily

20  were resistant in-- to virtually everything.

21      Q.  So if we take as an example the policy that was

22  implemented about charging narcotics cases, when you say

23  they were resistant to that directive, you're the first

24  assistant in that office, you have a written directive,

25  you tell them about it and try to implement it.  What do

1  you mean by they were resistant to it?  Because you were

2  management.  Right?

3      A.   In theory, yeah.  Well, what I would receive on

4  almost a daily basis would be vitriolic e-mails, long,

5  you know, in the vernacular goofy e-mails from folks

6  like Scott Rask and Sheri McCracken objecting to

7  policies, particularly involving 851s or enhancements

8  for prior drug convictions, trying to cite some type of

9  authority to usurp the policy, suggesting that the

10  policy was misguided, that somehow management was wrong

11  and they shouldn't follow it.

12      Basically what-- what I was receiving was kind of

13  obfuscation and obstruction to a smooth transition to

14  following, frankly, the directives that DOJ had

15  promulgated.

16      Q.   Do you remember having to issue a directive

17  regarding filing 851s when someone asked for a detention

18  hearing?

19      A.   Oh, yeah.  Yeah.

20      Q.   Can you tell us about that?

21      A.   Yes.  I-- okay.  I'd been a prosecutor in the

22  Western District of Missouri for 11 years, I had never

23  heard of this, that-- you know, a defendant has a right

24  to a detention hearing, all right?  I mean, it's no big

25  deal.  I mean, being a federal prosecutor is ten times

1    easier than being a state prosecutor.  A detention

2    hearing is not a high-effort phenomena for an AUSA.  And

3    it's up to the judge to decide whether or not detention

4    is warranted or not according to some very specific

5    statutes.

6         Several AUSAs, most notably Terra Morehead, but

7    others considered a detention hearing to be a war to be

8    won.  And that if somehow somebody wasn't detained, that

9    was a defeat and evil prevailed.

10   Q.   Because if they were detained, then they would

11   most likely be housed at CCA; is that right?

12   A.   That's true, of course.

13   Q.   Part of that detention mindset, did it include

14   appealing detention-- or release orders?

15   A.   Yeah.  And-- and I-- I've kept statistics on my

16   career, and the number of times that I've appealed a

17   detention hearing is zero, me personally, but that

18   happened all the time here.

19   Q.   All right.

20   A.   And given the district courts at that time, you

21   know, oftentimes the magistrate's decision would be--

22   would be overruled.

23   Q.   And I think I interrupted you when you were

24   trying to describe the phenomena of threatening an 851

25   if someone asked for a detention hearing.

1   A.  Yeah.  I mean, the defense attorney would be told

2   if-- if you don't acquiesce to detention, we're going to

3   file an 851, which, of course, then puts the-- the

4   defendant in an obviously worse sentencing position.

5        And there was at that time-- I mean, probably not

6   now, at that time the Holder memo and other directives

7   had instructed that 851s be used more judiciously and

8   not just be used as a hammer as a matter of course just

9   to drive up a sentence or to use it as some sort of

10  negotiation leverage for personal prosecutorial agenda

11  purposes.  But that was done in this office, which I

12  personally found to be both amazing and disgusting.

13  Q.  Did you actually implement a policy that AUSAs

14  could not do that?

15  A.  Yes.

16  Q.  Okay.  Let's talk for a minute about discovery.

17  You talked about discovery practices.  If you had to

18  describe the discovery practices in the Kansas City,

19  Kansas, office while you were there as either generous

20  or parsimonious, how would you describe it?

21  A.  Well, the prosecutorial culture that I

22  experienced when I was here, and, of course, you know,

23  it's four years ago, I-- I suppose we wouldn't be here

24  if things had changed, but it was one of extreme

25  retentiveness with respect to the notion of open

1    discovery.

2        We're talking about a group of folks that were

3    very much concerned about preserving what in their mind

4    was kind of an absolute right to have prosecutorial

5    power.  And part of that power I think in their minds

6    were diminished if they turned over discovery, that

7    somehow they would lose a tactical advantage.

8        Q.  We've heard some testimony about a-- kind of a

9    principle of if you're not going to use it in your

10   prosecution, don't disclose it.

11       A.  No, that's, I mean--

12       Q.  Would that be consistent with how they worked?

13   If they weren't going to have to actually use it in

14   court, they just wouldn't actually disclose it to

15   defense counsel?

16           MR. CLYMER:  I'm going to object unless the

17   witness has firsthand knowledge about what somebody's

18   disclosure was in particular cases.

19           THE COURT:  All right.  I'll overrule.  If

20   the witness has knowledge in general or specifically, he

21   can answer.

22           THE WITNESS:  I-- yes, I-- I have heard-- I

23   heard that statement made on several occasions here in

24   Kansas City, Kansas.  And that was some-- I don't know

25   what basis either in law or policy that that came from.

1  But I suppose if I had been different, I'd still be

2  here.

3           But my practices had always been you provide

4  everything always regardless.  And the-- the reason you

5  do that is for purposes of efficiency so you can resolve

6  a case.  And why folks would hold stuff back like

7  proffer reports and-- and particularly evidence related

8  to narcotics weight in sentencing matters or even

9  non-essential things, really that-- why they would hold

10 it back or-- or want to do that, I never understood.

11 Q.  Were there issues about revealing *Brady* and

12 *Giglio*?

13 A.  I had complaints.  You got to understand in my

14 role for however long I was first assistant here, it

15 seemed like 20 years, but I think it was only

16 three-and-a-half, I was the constant recipient of

17 complaints from the defense bar about the Kansas City,

18 Kansas, office and the disclosure of all kinds of

19 things, not only discovery but also *Brady* and *Giglio*

20 issues and many-- several defense attorneys had actually

21 discovered some *Giglio* issues on their own and had to

22 bring those up.

23 Q.  The-- apart from just the question about whether

24 to disclose, were there also issues about timing of

25 disclosure and slow-walking discovery?

1    A.   Yeah.   I observed that pattern in the Kansas

2   City, Kansas, office, and it was also the subject of

3   communication quite frequently from defense attorneys

4   and-- and the FPD.   You know, I-- the argument was

5   always that that's hard-nosed prosecution, somehow

6   that-- that you have a tactical advantage if you hold

7   back your best stuff until the end and not give the

8   defense time to prepare.

9         For me and for others, it kind of reeked of

10   ambush prosecution.   And I know of a lot of defense

11   attorneys who oftentimes had to plead cases, excuse me,

12   for a variety of reasons, particularly in narcotics

13   cases, not being fully confident of the weight of

14   narcotics that might be attributed to their defendant

15   and then being surprised either just prior to sentencing

16   or by a PSI that suddenly is off the charts and contains

17   information that they didn't know about because

18   cooperation reports were not turned over.   Maybe they

19   were turned over to probation but-- but not to the

20   defense attorney, which was amazing.

21    Q.   There was a reference to specific cases.   Did you

22   become involved in the *Dahda* case?

23    A.   The *Dahda* case, yes.

24    Q.   And why did you become involved in that case?

25         MR. CLYMER:   Your Honor, I'm going to object

1  about testimony about specific cases.  We can't retry

2  cases, individual cases.  I think the witness has given

3  a-- a fairly thorough description of his concerns about

4  the exercise of prosecutorial discretion in the office.

5  I'm not sure we have to have a case-by-case analysis.

6            THE COURT:  What's this related to?

7            MS. BRANNON:  It's relating to his having to

8  come into a case to correct some prosecutorial what I

9  would call misconduct regarding disclosure and the

10  timing of sentencing, but--

11            THE COURT:  All right.  I'll allow this

12  example.  I agree with the government that it's not

13  appropriate to go through a lot of examples of this, but

14  I'll allow this.

15            MS. BRANNON:  This is the only case that we

16  intend to refer to, Your Honor.

17            THE COURT:  All right.  Go ahead.

18  BY MS. BRANNON:

19     Q.  Why was it, related to the things that we've

20  already talked about, that you became involved in the

21  prosecution of the *Dahda* case?

22     A.  I, in a nutshell, took away the prosecution of

23  that case from Terra Morehead.  It was a multi-defendant

24  narcotics case.  The primary illegal narcotics involved

25  was marijuana.  It was by any objective standard an

1    over-prosecution.  There were almost unanimous

2    complaints communicated by the defense bar about how

3    that case was being handled in terms of resolution by

4    Ms. Morehead.

5         In terms of trying to describe what was going on,

6    I guess in that case and to some extent in this office

7    generally, I-- I guess I had never seen the-- the tools

8    of federal prosecutorial discretion utilized in such

9    onerous and, quite frankly, heavy-handed ways.

10    Q.  Did that include issues about disclosure of

11    evidence, either Rule 16 or *Brady* or *Giglio* and the

12    timing of it, if you remember?

13    A.  Primarily that case involved issues about

14    discovery, cooperator information, plea agreements, the

15    timing of plea agreements, and the kind of offering in

16    what might've been characterized as a bait-and-switch 5K

17    situation.

18         The communication I received was essentially

19    defense attorneys were being told, "You know your guy is

20    guilty.  He's guilty as hell.  He either pleads by this

21    date and I might consider a 5K or we go to trial.  I

22    don't care.  Take it or leave it."

23         And with respect to Ms. Morehead, the-- and,

24    frankly, a lot of the other prosecutors that I

25    mentioned, they treated defense attorneys like dogs.

1    They were the enemy.  They were rude.  They were abrupt

2    and short and did not display what you might call just

3    the basic practices of professional courtesy.

4        Q.  So even going back to 2010 when you got there?

5        A.  Yeah, absolutely.

6        Q.  One name that hasn't came up in your testimony is

7    Erin Tomasic.  Was Ms. Tomasic in the KCK office at any

8    point that you were in the KCK office?

9        A.  Yeah.  She started as a SAUSA in 2013, and that's

10   when I was there and I-- I had a lot of contact with

11   her.

12       Q.  And, Mr. Warner, the subject of this litigation

13   arose after you left the office, but have you kept--

14   sort of kept track of what's going on in the *Black* case?

15       A.  Yeah, I mean--

16       Q.  And have you talked to the Special Master?

17       A.  Yes.  I mean, I've been-- I've been a prosecutor

18   in the Kansas City area or was a prosecutor in the

19   Kansas City area from 1991 on.  I mean, most of the

20   defense bar and prosecutors I know throughout the state,

21   state and federal, and I still have I guess you might

22   call channels of communication.  I know how to use PACER

23   sort of.

24       Q.  All right.

25       A.  I have kept up, not fervently so.  And to be

1  quite honest, I'm glad I'm gone.  But, yes, I'm aware of

2  what's been going on.

3      Q.  In your cases that you were prosecuting, was it

4  your practice to always go and get the recorded calls of

5  a defendant from CCA?

6      A.  No.

7      Q.  All right.  While you were in the office, did the

8  issue of getting recorded calls or of obtaining perhaps

9  even inadvertently attorney-client calls, did that ever

10 come up, to your knowledge?

11     A.  No.  It was not-- you know, I was a federal

12 prosecutor for 15 years.  It was not standard practice

13 to request reflexively all of the attorney-- or excuse

14 me, all of the recorded phone conversations of

15 in-custody defendants.  Were those sometimes examined,

16 particularly in a case that might be going to trial to

17 see if the defendant might've made some incriminating

18 statements either to, you know, a friend or a relative,

19 yes.  But, you know, did I or any agent ever, you know,

20 try to harvest attorney-- or CCA calls or any type of

21 in-custody calls for attorney information?  No.

22     Q.  When I first contacted you about this hearing, I

23 asked you about a defendant named Jerome Birdsong.

24     A.  Yes.

25     Q.  Do you remember anything about the-- Jerome

1    Birdsong and attorney-client communications?

2        A.   Yeah, there-- there was an agent assigned, I

3    believe an ATF agent, and he had primarily worked in the

4    Kansas City, Missouri, area which, at least as law

5    enforcement quality goes, was higher than I experienced

6    at least in this county.  And in the course of

7    retrieving CCA calls for Ms. Tomasic, he had

8    inadvertently accessed what appeared to him to be an

9    attorney-client conversation.

10         He immediately brought that to the attention of

11   Erin and I believe myself, and then we all sat down and

12   discussed what to do, which is essentially, you know,

13   inform the defense attorney, "Look, this happened.  We

14   didn't hear anything."  You know, turn over the calls.

15   Document it in the file.  If necessary, if you're going

16   to be looking at these calls for purposes of case

17   preparation, get a taint team going.  I think I even

18   offered to be the-- the taint person on that.  And

19   that's what-- that's what you did.

20       Q.   All right.

21             MS. BRANNON:  Could I have just a moment,

22   Your Honor?

23             THE COURT:  Yes.

24   BY MS. BRANNON:

25       Q.   So, Mr. Warner, looking back at the culture of

1    that office and your contact with Ms. Tomasic in

2    particular and knowing what the allegations are in this

3    litigation, if-- would it be more consistent with your

4    experience and knowledge that Ms. Tomasic was some rogue

5    young prosecutor acting out on her own and maybe doing

6    things wrong or that she was the product of the culture

7    in the Kansas City, Kansas, office as you've described

8    it?

9              MR. CLYMER:  Objection.  Calls for

10   speculation.

11             THE COURT:  Overruled, if you can answer it

12   based on your experience and knowledge of everyone

13   involved.

14             THE WITNESS:  Yeah, I had a-- you know, I

15   guess in terms of foundation, I had a great deal of

16   contact with Ms. Tomasic in 2013 and then experienced

17   the full flavor of the Kansas City, Kansas,

18   prosecutorial division for almost four years.

19             Erin Tomasic started out very conscientious.

20   When she started in 2013, she was brand-new, she wanted

21   to do a good job.  She was stressed.  She had just I

22   think given birth to a second child and so she had

23   pressures of working and family life and we talked about

24   that, and several times she was worried about being able

25   to balance everything.

1          At the same time you've got to understand

2    there was enormous pressure in that office to conform to

3    a particular way of dealing with criminal cases.  And,

4    you know, Barry Grissom who, I guess in most polite

5    terms, lacked the character to interrupt prosecutorial

6    heavy-handedness, at least had the insight to say to me,

7    and I would quote, "Don't let Erin become one of the

8    mean girls," which meant some of the harsher

9    prosecutorial approaches that were taken by totemic

10   Terra and the rest.

11          Unfortunately, we lost her.  And over the

12   time I was there, she began to work more and more with

13   Kim Flannigan and Sheri whatever her name is now, and

14   she changed.

15          And you've got to also understand, even

16   though I was technically first assistant and criminal

17   coordinator of that office, I had no power whatsoever.

18   I had no support.  It was essentially an

19   inmates-run-the-jail-type office.  And that's why I

20   quit.  And there was no support from the U.S. Attorney,

21   basically wanted to stick his head in the sand and go

22   out and get his picture taken and maybe run for office

23   someday, I don't know.

24          MS. BRANNON:  Thank you, Mr. Warner.

25          MS. VANBEBBER:  I have no questions.

1                        CROSS EXAMINATION

2    BY MR. CLYMER:

3        Q.   Mr. Warner, have you ever heard the expression

4    "just because you can do it, doesn't mean you should do

5    it"?

6        A.   Usually in some sort of context.

7        Q.   Well, with respect to prosecutors, would you say

8    that your testimony reflects an understanding on your

9    part based on your experience in the Western District of

10   Missouri that just because something may be legally

11   permissible, doesn't mean it's the right thing for a

12   prosecutor to do?

13       A.   Well, you know, I-- I think to answer that

14   question and-- it's a little vague, but it sounds corny

15   to say, but the whole notion of being a prosecutor is to

16   ensure that justice be done.

17       Q.   And the hard part about being a prosecutor is

18   figuring out what that means.  Right?

19       A.   No, not generally.  It's usually pretty

20   clear-cut.

21       Q.   So you think that you have sufficient wisdom to

22   decide in every case what the appropriate sentence is?

23       A.   What the appropriate sentence is?

24       Q.   Yeah.

25       A.   I think I-- I have the ability to make a

 1    recommendation.

 2       Q.   Do you think reasonable minds can differ about

 3    what a just sentence is in a particular case?

 4       A.   Well, I think that happens all the time and

 5    that's why there are opposing sides and an adversarial

 6    system.

 7       Q.   Do you think two prosecutors could have different

 8    views about an appropriate sentence in a case?

 9       A.   I'm sure that happens, yes.

10       Q.   Okay.   Now, with respect-- you talked about 851s,

11    let's talk about that.   You understand, right, that

12    Congress, an elected body in this country, passed

13    legislation that remains in place that provides for the

14    filing of 851 informations to enhance sentences in drug

15    cases.   Correct?

16       A.   It-- the definition and the usage of 851s has

17    been subject to political re-definition over the years.

18    But essentially, yes, Congress makes laws.

19       Q.   And Congress passed 18-- 21 U.S.C. 841, correct,

20    the drug statute?

21       A.   I-- I would agree with that.

22       Q.   And would you also agree Congress passed

23    21 U.S.C. 851?

24       A.   I'm sorry?

25       Q.   Congress also passed 21 U.S.C. 851?

1      A.   Yes.

2      Q.   And to your knowledge, has either one of those

3   statutes been repealed?

4      A.   Repealed?

5      Q.   Yes.

6      A.   No.

7      Q.   Okay.  So you'd agree with me then that it's

8   legal for prosecutors, when there's sufficient evidence,

9   to file 851 enhancements.  Correct?

10     A.   I-- I don't disagree with the-- the context of

11  that question--

12     Q.   But your--

13     A.   -- no.

14     Q.   -- point--

15     A.   Do you want me to finish or--

16     Q.   I'm sorry, I thought you were finished, sir.

17     A.   Okay.  851s have been re-defined.  They've been

18  re-defined in the current administration.  They were

19  re-defined in their usage in terms of directives from

20  your agency, have changed.  21 U.S.C. 851 hasn't been

21  the same forever and you know that, and there have been

22  directives--

23     Q.   That's what I was going to ask you about, sir.

24     A.   -- that have modified how they are to be used and

25  when it's appropriate to use them.

1    Q.   If you answer my question directly, I promise you
2  we'll get there, okay?  I promise you I'll let you get
3  there.
4    A.   Thank you.
5    Q.   Okay.  So you'd agree with me, though, that as a
6  simple matter of law, whether it's legal or illegal, if
7  a prosecutor has sufficient evidence, there's nothing
8  illegal or unethical about a prosecutor simply filing an
9  851?
10   A.   I would disagree.  It is unethical to-- in my
11  opinion, to use that sort of discretion in a
12  heavy-handed, onerous, inappropriate manner.
13   Q.   And let's get to that.  So you understand, I take
14  it, that the sentences when you file an 851 can be very
15  draconian.  Correct?
16   A.   Yes.
17   Q.   And you think in certain circumstances that,
18  based on the nature of the case and the offender that's
19  in front of the Court, it may lead to an unjust result
20  if you file an 851?
21   A.   In some cases, yes.
22   Q.   And there are people in some administrations that
23  agree with that position.  Correct?
24   A.   I'm sure there are.
25   Q.   Well, in the-- when-- when the Obama

1  Administration was in power, Attorney General Eric

2  Holder issued a directive that gave prosecutors in the

3  field more latitude not to file 851s in cases where they

4  didn't think it was appropriate.  Correct?

5      A.  I'm not sure that was the exact language of the

6  Holder memo.  I mean, we can quibble about that.  There

7  was specific guidance on when they were appropriate.

8      Q.  And the idea was-- is to make sure you didn't

9  overuse them.  Correct?

10     A.  Use them in manner-- in a manner that was-- I

11  guess your word is applicable, draconian.

12     Q.  To not use them in that manner.  Correct?

13     A.  I'm sorry?

14     Q.  To not use them in that manner, correct, that was

15  the guidance?

16     A.  That was the-- the apparent intent of the

17  guidance, yeah.

18     Q.  And the Holder memo came out while you were in

19  charge of the Kansas City, Kansas, office?

20     A.  Yes.

21     Q.  And so I take it there was some blow-back from

22  people in the office because they thought there should

23  be a more aggressive rather than a less aggressive use

24  of 851s?

25     A.  Yeah, they-- it was sort of like management or

1  DOJ directives be damned, so to speak, we want to do

2  things the way we want to do things.

3    Q.   And you found that troubling because you think

4  sometimes filing those 851s leads to unjust sentences?

5    A.   It wasn't just 851s.  It was the entire way that

6  cases were pursued and the accompanying philosophy or

7  culture that went with it.

8    Q.   Did that include the filing of 851s, sir?

9    A.   That was a-- a part.  And I don't want to say

10  small part, but that was a part.

11    Q.   Okay.  And would it be correct to say that both

12  the administration before the Obama Administration and

13  the administration after the Obama Administration took a

14  different view about the filing of 851s than the Obama

15  Administration did?

16    A.   You know, the-- other than the Immigration Act of

17  1924, I think the-- the memorandum that most excites

18  heavy-handed prosecutors was the Ashcroft letter.  And

19  that was, of course, something that was always heralded

20  as the greatest document ever for certain-- a certain

21  mentality of prosecutors.

22         They-- they do differ, but I think in terms of--

23  if we're going to focus in on 851s, for whatever reason,

24  in my experience the Holder memo was the most specific

25  with respect to identifying exactly that type of

1    enhancement and, at least given that administration,

2    when it was appropriate or not to pursue one.

3        Q.    The Holder administration memo or the memo that

4    came out that was called the Holder memo essentially

5    said reserve this very powerful tool for the most

6    dangerous people who do the worst things.  Correct?

7        A.    That's essentially my recollection of it, yeah.

8        Q.    And so, in your view, that was a tool that gave

9    you the ability to more properly use prosecutorial

10   discretion than you had before that memo came out.

11   Correct?

12       A.    It wasn't just me.  It was applicable to every

13   federal prosecutor nationwide.

14       Q.    Well, I didn't mean to suggest it was only

15   applicable to you.  So my question is different though.

16   Did you understand that or did you look at that memo as

17   giving you an argument to say this is how we should use

18   our discretion more wisely and circumspectly when filing

19   851 informations?

20       A.    Do you mean me as a prosecutor or me as a

21   management official?

22       Q.    Was it-- in terms of the guidance that was given

23   to federal prosecutors, was it a tool that gave federal

24   prosecutors more discretion about filing 851s?  That's

25   all I'm asking.

1    A.  No.  I think my interpretation was that it

2  suggested caution and reservation and more deliberation

3  and less reflexiveness in terms of pursuing those, not

4  enhanced discretion, not at all.  I think, if anything,

5  it was an attempt to slow down the knee-jerk use of

6  851s, particularly in some of the practices that I

7  observed and have been discussed here in this office.

8    Q.  Mr. Warner, did you ever put a policy in place

9  that required approval by the criminal chief or the

10  first assistant or the United States Attorney for filing

11  an 851 enhancement?

12    A.  Yeah, that's what we just discussed on direct

13  examination.

14    Q.  You put that policy in place?

15    A.  I'm sorry?

16    Q.  You put a policy in place that did that?

17    A.  Well, we sent out directives in the spring or

18  summer of 2013.  They were in existence and in force for

19  probably, oh, three weeks.

20    Q.  Why didn't you enforce it?

21    A.  I'm making-- I'm being facetious there.  I

22  resigned in October of 2013 as first assistant and left

23  this office mainly for a lot of the reasons that we've

24  already discussed.

25        But the directives that we sent out internally

1    that we provided also to the defense bar, including the

2    FPD, in fact all of the judges, maybe you have copies of

3    them from your folks downstairs, I don't know, but they

4    did describe and prescribe the policy to be followed for

5    filing 851s.

6         And as maybe you're aware, you know, plea

7    agreements have to be approved by criminal-- by criminal

8    coordinators, which I was at the time.  There also

9    conferences called pre-indictment conferences which

10   sometimes discussed cases and prospective sentencings.

11   And so those were opportunities for the usage of 851s to

12   be discussed.

13        And the decision to file an 851 or not, subject

14   to so-called management approval, were based on the

15   Holder memo and the directives that-- that we had put

16   together.

17   Q.   Did people file 851s while you were in office

18   here without your approval?

19   A.   Yes.

20   Q.   Did you do anything to sanction them for

21   insubordination?

22   A.   Well, I-- I don't mean to laugh, but sanction

23   them for insubordination.  You have no idea how

24   ineffectual the ability to prosecute or -- prosecute --

25   to sanction or confront these folks were.

1    Q.   You were a supervisor in a U.S. Attorney's

2    Office, correct, sir?

3    A.   Yeah, that's correct.

4    Q.   You filled out performance work plans for your

5    employees.  Correct?

6    A.   Oh, yes.

7    Q.   You had the ability to put on those performance

8    work plans that people didn't satisfy the requirements

9    for professionalism and ethics.  Correct?

10   A.   Yeah.

11   Q.   Did you do it?

12   A.   Oh, I did.

13   Q.   Did you put anybody in a performance work plan

14   when they were insubordinate, sir?

15   A.   I'm sorry?

16   Q.   Did you put anybody on a performance work plan

17   through the Department of Justice when they were

18   insubordinate?

19   A.   Well, sir, I don't want to-- I-- I don't want to

20   be facetious or rude in response to your question, but

21   it totally belies the reality of what it was like

22   working as a supervisor in this type of context.  And

23   let me finish.

24        I was powerless as first assistant and criminal

25   coordinator in this office.  I had zero support from the

1    U.S. Attorney.  I had zero support from the criminal

2    chief.  I was on my own in terms of trying to confront

3    and interrupt this type of behavior.  I was met daily

4    with explicit and implicit disrespect.  It was open.

5    There was nothing I could do about it.

6         I would go to the U.S. Attorney, yes, sir, and

7    complain and say we should sanction these people; we

8    need to do something.  I did that on a, excuse me,

9    damned daily basis.  I documented it.  I did it

10   verbally.  Okay?  Nothing happened.  It was frustrating.

11   Q.  Mr. Warner--

12   A.  Let me finish.  It was frustrating and that's why

13   I quit.  Okay?

14   Q.  My question to you is, Mr. Warner, is--

15   A.  These folks were the type that when you attempted

16   to discipline them or confront them or to even suggest

17   in an e-mail, look, you might do this a little bit

18   differently, they would go off the rails and either

19   respond back vitriolically with e-mails, there would be

20   threats of EEO complaints, either sexual discrimination

21   or hostile work environment, every sort of goofy

22   oppositional "You can't control me.  I don't care if

23   your management behavior-- if you're management, my

24   behavior is not going to change" went on.

25        I mean, in terms of just saying an

1  inmates-run-the-jail operation, that's exactly what it

2  was.  And I don't think we'd be in this mess here today,

3  sir, if that wasn't the case.

4      Q.  Are you finished now, Mr. Warner?

5          MS. BRANNON:  Judge, I'm going to object to

6  the treatment of the witness like this.  He asked--

7          MR. CLYMER:  I don't want to interrupt him

8  again.  I'm asking him if he's finished.

9          COURT REPORTER:  One at a time, please.  I'm

10  sorry, I didn't hear.

11          MR. CLYMER:  I don't mean to interrupt him.

12          THE COURT:  Did that complete your answer,

13  Mr. Warner?

14          THE WITNESS:  Yeah, I'm finished.

15  BY MR. CLYMER:

16      Q.  Mr. Warner, if I were to pull the performance

17  work plans you signed when you were a supervisor in a

18  United States Attorney's Office for the Department of

19  Justice, would the comments you wrote for the Assistant

20  U.S. Attorneys you've named reflect the things you've

21  said here in court today?

22      A.  I-- I don't recall everything that-- that I wrote

23  and I don't know how to answer your question.  I will

24  tell you if you were to verify my communications with

25  the criminal chief, with the then U.S. Attorney, even

1    members of the judiciary, law enforcement and the

2    defense bar, everything that I have testified here about

3    was communicated to them.

4          To be quite honest, a lot of times the

5    performance evaluations were just mailed in because

6    these people were so oppositional and-- and so, for lack

7    of a better word, nuts; that if you criticized them in

8    some sort of performance evaluation, matters would've

9    gotten even worse.

10   Q.   So it's your testimony, sir, that you chose not

11   to use the tools the Department of Justice has given you

12   to address conduct that's less than professional by

13   prosecutors who you were responsible for supervising?

14   A.   That's incorrect.  I attempted in every way I

15   could given the position I had, which was not absolute,

16   sir, to do everything possible to interrupt and change

17   this culture, and I failed.

18   Q.   Let's talk about it.  Can you tell the Court,

19   please, what a performance work plan is?

20   A.   Yeah.  A performance work plan is sometimes

21   called a PIP.  In my experience, it's only been applied

22   to clerical personnel.  It's rarely, if ever, applied to

23   attorneys.  I've never seen it apply to an attorney in

24   the 15 years I was a federal prosecutor.  It's usually a

25   pre-condition to firing somebody and it's a CYA practice

 1  that's done by management.  The decision is already made

 2  to fire the person.

 3     Q.  A performance work plan is a document that's

 4  completed by a supervisor every year and you rate your

 5  employees in certain categories; is that correct?

 6     A.  That's correct.

 7          MS. BRANNON:  Your Honor, if I may.  Since

 8  we're getting into trying to perhaps impeach Mr. Warner

 9  based on what was written in these plans or reviews,

10  we'd ask for those to be disclosed to the defense so we

11  can--

12          MR. CLYMER:  I don't have them, Judge.  I've

13  never seen them.  I'm just asking questions about what

14  he did when he filled them out.

15          THE COURT:  You've never seen them?

16          MR. CLYMER:  No, I have not.

17          THE COURT:  But you're suggesting that he

18  didn't write certain things in them?

19          MR. CLYMER:  No, I asked him, I wanted to

20  know, and he's told us that he-- he couldn't do it

21  because of the circumstances.

22          THE COURT:  All right.  Well, I'm not going

23  to consider this impeachment.  You don't know what's in

24  them.  He doesn't have them in front of him.  I'm not

25  going to rule that they should be disclosed, but I'm not

1    going to give any credit to your suggesting that he

2    didn't do what he needed to do.

3                MR. CLYMER:  I asked the question, Your

4    Honor, he's told me what he's done or hasn't done.

5    BY MR. CLYMER:

6        Q.   When did Erin Tomasic come into the office?

7        A.   I'm sorry?

8        Q.   When did Erin Tomasic come in the office?

9        A.   I believe early 2013.

10       Q.   What did you do to make sure she was properly

11   supervised in the environment that you've described?

12       A.   Well, I met with her.  We discussed cases.  We

13   discussed approaches with respect to discovery, case

14   handling, communication with defense attorneys.

15   Everything I could to assist.

16       Q.   Do you know she's testified in this courtroom

17   that no one sent her to the NAC until she had been

18   fairly senior in the office?

19       A.   Well, I-- I'm-- I've been to the NAC and I'm sure

20   that's helpful, but, you know, I mean, I don't know what

21   your point is with that.

22       Q.   I'm just asking you a question, sir.  Did you

23   make any effort when she started to have her go down to

24   the basic training at the National Advocacy Center that

25   the Department of Justice runs in Columbia, South

 1   Carolina?

 2       A.   Did I personally?  No, I did not.

 3       Q.   You were her supervisor.  Right?

 4       A.   Yes, I was one of them.

 5               MR. CLYMER:  Nothing further, Your Honor.

 6               MS. BRANNON:  We have nothing further.

 7               THE COURT:  All right.  May Mr. Warner be

 8   excused?

 9               MS. BRANNON:  He may, Your Honor.

10               MS. VANBEBBER:  Yes, Your Honor.

11               THE COURT:  All right.  You're excused.

12               THE WITNESS:  Thank you.

13               THE COURT:  Next witness.

14               MR. BELL:  Your Honor, we call Melanie

15   Morgan.

16                    MELANIE MORGAN,

17   called as a witness on behalf of the Federal Public

18   Defender's Office, having first been duly sworn,

19   testified as follows:

20                    DIRECT EXAMINATION

21   BY MR. BELL:

22       Q.   Good morning.  Would you please state your name,

23   spelling the last for the record.

24       A.   Melanie Morgan, M-O-R-G-A-N.

25       Q.   Ms. Morgan, what do you do for a living?

1     A.   I'm a lawyer.

2     Q.   Is there a particular field that you practice in?

3     A.   I primarily practice in federal criminal defense

4  in the Western District of Missouri and the District of

5  Kansas.

6     Q.   How long have you been practicing federal

7  criminal defense in the District of Kansas and the

8  Western District of Missouri?

9     A.   Pretty much the entirety of my career, 25 years.

10     Q.   Do you hold a specific position as it relates to

11  the CJA panel for the District of Kansas?

12     A.   I do.   I am what's known as the CJA panel

13  representative.   It's a position that is appointed for a

14  term of three years by the chief judge.   I first became

15  involved with that sometime in 2014 when Judge Marten

16  appointed me for an interim basis and then have been

17  re-appointed by Judge Robinson and am in my second term

18  of that.

19     Q.   Do you recall a time when you were asked to

20  accompany the Special Master on a trip to the United

21  States Attorney's Office here in the Kansas City branch?

22     A.   I do.

23     Q.   Do you recall what the purpose of that visit to

24  the United States Attorney's Office was?

25     A.   Yes.   We had just had a hearing with respect to

1    the *Black* litigation, one of the first hearings I

2    believe, and there was to be I think evidence that was

3    picked up or drives or something that was to be picked

4    up.  And so I went down to facilitate that with him

5    since he was new to the building, had not been here

6    before and just wanted to assist just because I know the

7    people in the U.S. Attorney's Office and I thought I

8    could be helpful.

9       Q.  So you come down from the courtroom, go in-- down

10   to the third floor to the lobby of the United States

11   Attorney's Office.  What happens?

12      A.  So we were down there for a substantial period of

13   time.  I think they knew we were coming; it had been

14   discussed.  I felt like we were stonewalled.  And then

15   finally, I mean, 20, 30 minutes later Kim Martin came

16   out and basically-- I didn't stay much past that, but

17   either what we were looking for we weren't getting, but

18   at least some inspection of the system was going to take

19   place at that point in time.  And that was not part of

20   my task, so I didn't stay past that.

21      Q.  Do you recall a statement that the materials that

22   the Special Master wanted to look for-- or wanted to

23   look at were in Pauletta Boyd's office?

24      A.  Yes.

25      Q.  And that Pauletta Boyd wasn't there that day?

1      A.   That's correct.

2      Q.   And that her office was locked?

3      A.   And there was no access to that.  There was

4    something that he could take a look at, but what he was

5    wanting to take a look at was not available because it

6    was with Pauletta's stuff.

7      Q.   And those communications that-- or those

8    statements that what he wanted to look at was in

9    Pauletta Boyd's locked office that no one could get

10   into, who made those statements?

11     A.   Kim--

12     Q.   Ms. Martin?

13     A.   -- Martin, yes.

14     Q.   I'd like to talk to you a little bit about the

15   phone calls or the privatization procedure for inmates

16   at CCA.  When did you first become aware that there was

17   a way to make sure that CCA did not record your phone

18   calls with your clients?

19     A.   I can't remember specifically the year, but I'm

20   going to say 2008, '9, '10, something around in that

21   time period.  And the procedure, as I understood it, was

22   that we would send a letter, that letter would have the

23   phone numbers associated with my office or my cell

24   phone, and those would be submitted by letter and then

25   all of the calls would be not recorded.

1    Q.   You become aware at some point about the preamble

2    that plays on some of the calls that are made from

3    inmates at CCA?

4    A.   Yes.

5    Q.   And are you aware that the preamble states that

6    the call is subject to recording and monitoring?

7    A.   Yes.

8    Q.   Now, you had learned about the privatization

9    procedure, you had privatized your number.  If you heard

10   that preamble, the call being subject to recording and

11   monitoring, in your mind would that mean that this call

12   is absolutely being recorded or monitored or would you

13   mean-- would you take it to mean that, well, I've

14   satisfied this procedure so some calls might be subject

15   to recording, but not mine?

16   A.   I think that as I hear that preamble, that it

17   means that it is possible that certain calls could, but

18   "subject to" means not every call.  And I certainly

19   believed that my calls would not be recorded because I

20   had taken those steps.

21   Q.   Now, I assume you take a number of calls from

22   clients that are housed at CCA.  When you take those

23   calls, do you ever hear the preamble?

24   A.   I do not hear the preamble anymore because I

25   don't-- I'm not the first person to receive the call in

 1    my office.

 2         Q.   So your call [sic] is like a lot of law offices,

 3    there's a receptionist or someone who answers the main

 4    line?

 5         A.   Yes.

 6         Q.   And the way you understand the way the call is

 7    set up, it would be whoever picks up that number or

 8    whoever picks up that call first is going to hear the

 9    preamble, whatever it says?

10         A.   Yes.

11         Q.   Do you typically have people with legal training

12    answering your main line at the reception desk?

13         A.   I mean, no.  I mean, they don't have that level

14    of education.  I mean, they have just whatever training

15    they've received in our office.

16         Q.   Did you ever represent a woman named Michelle

17    Reulet?

18         A.   I did.

19         Q.   Who was the prosecutor on that case?

20         A.   Tanya Treadway.

21         Q.   Were you Ms. Reulet's first lawyer in the

22    criminal case?

23         A.   I was not.  She was previously represented by

24    somebody by the name of Andino Reynal.

25         Q.   When you came into the case, did Mr. Reynal file

1    a motion to withdraw?

2        A.   He did.

3        Q.   Was that motion immediately granted?

4        A.   No.

5        Q.   Was it later granted a number of months later

6    after Mr. Reynal satisfied a number of conditions the

7    Court had imposed?

8        A.   Yes, it was-- I became involved in the case

9    either in-- in February, I can't remember when my actual

10   appointment was, either February or March of 2016.  And

11   I think it was sometime in August of 2016 that the judge

12   actually granted Mr. Reynal's motion to withdraw.

13       Q.   Was Ms. Reulet-- at the time you were appointed

14   to represent her, was she in custody?

15       A.   Not initially.  But at some point she ended up in

16   custody because she violated her conditions of pretrial

17   release and was taken into custody at that time.

18       Q.   And what was the precipitating event that caused

19   her release to get revoked?

20       A.   She was charged with a DUI down in Texas where

21   she lived.

22       Q.   So after her release is revoked from a charge of

23   DUI, did you learn that she had a lawyer that was

24   representing her on that state DUI charge?

25       A.   Yes.  She actually had a number of lawyers.  When

1   she was taken into custody, she then had custody issues

2   with her child because her ex-husband was also in

3   custody on the same case.  So there was a family law

4   attorney that was involved.

5        She had the DUI lawyer that was involved.  And

6   Mr. Reynal continued to be involved because he was

7   assisting me in getting up to speed on the case but also

8   facilitating her representation in Texas on the DUI.

9   Q.   Did Mr. Reynal-- his-- the Court didn't grant his

10  motion to withdraw until sometime after Ms. Reulet was

11  taken into custody; is that right?

12  A.   That's correct.  I want to say she was-- she came

13  up, we had the preliminary hearing on the revocation.  I

14  want to say she was taken into custody in-- maybe the

15  third week of May of 2016 and then she-- he was

16  ultimately permitted to withdraw sometime in August of

17  2016.

18  Q.   So you mentioned that she had a number of lawyers

19  when she went into custody or as a result of going into

20  custody.  And did all those representations with

21  Mr. Reynal, her DUI attorney, and her custody-- her

22  family law attorney, did all of those issues have some

23  overlap with the criminal case you were defending her

24  on?

25  A.   Yes, I would say that they did.

1    Q.   Was the custody attorney's name Richard Grimes?

2    A.   Yes.

3    Q.   Was the DUI attorney's name Mark Metzger?

4    A.   Yes.

5    Q.   Was Mr. Reynal also representing Ms. Reulet in a

6    federal civil forfeiture action in Texas?

7    A.   Yes.

8    Q.   Were the allegations that were-- that underlied

9    that federal civil forfeiture action the same

10   allegations or similar allegations to those in the

11   criminal case?

12   A.   Yes.

13   Q.   And did Mr. Reynal, even after he had moved to

14   withdraw and had been permitted to withdraw in the

15   criminal case with Ms. Treadway, did he continue to

16   remain Ms. Reulet's counsel on the forfeiture matter?

17   A.   He did.

18   Q.   Did there come a time after Ms. Reulet had been

19   taken into custody that you learned that the government

20   had been listening to her calls with Mr. Reynal?

21   A.   Yes.

22   Q.   How did you find that out?

23   A.   I-- there were two attorneys for the government

24   that were involved with the Reulet case.  Tanya Treadway

25   was one of them, Tony Mattivi was another.  Tony at some

1   point withdrew from that representation, but at least at

2   some point he was involved in the case.  Mr. Mattivi and

3   I had multiple cases together.  And in an effort to try

4   and see if we could make some headway on those cases, we

5   had gotten together to discuss the status.

6       Q.  And during that conversation, what happened that

7   alerted you that they had been listening to calls

8   between Ms. Reulet and Mr. Reynal?

9       A.  I-- I didn't know at that time specifically that

10  it was with Mr. Reynal, I knew that it was with attorney

11  calls based on what he had said to me.  And I don't

12  remember the specific words, but we had quite a

13  discussion at that meeting about the fact that

14  attorney-client calls had been listened to because the

15  only way he could know that information was because of

16  attorney-client calls.

17      I asked him specifically if he had listened to

18  those calls.  He-- he declined to answer that at that

19  point in time.  And that then led me to Ms. Treadway,

20  having a conversation with her.

21      Q.  And when you had a conversation with

22  Ms. Treadway, what did she tell you?

23      A.  She-- she did not immediately tell me.  And I

24  think this was done by e-mail exchange and-- and letters

25  back and forth, but I requested all of those phone

 1  calls, all of the phone calls that they had obtained so

 2  that I could figure out whose calls had been listened to

 3  and who actually had listened to the calls.

 4      Q.  When you discovered that the government had been

 5  listening to telephone calls between Ms. Reulet and her

 6  attorneys, did you file a pleading or a motion asking

 7  for those calls to be returned?

 8      A.  I did.

 9      Q.  Did the government file a response to that

10  motion?

11      A.  They did.

12      Q.  So you've got the exhibits in front of you and

13  I'd like to turn your attention to Exhibit 592G,

14  Page 32.  I'm sorry, Page 31.

15      A.  31?

16      Q.  Yes.

17      A.  Okay.  Yes.

18      Q.  Does this appear to be-- does Exhibit 592G appear

19  to be the pleading that the government filed in response

20  to your motion?

21      A.  Yes, it does.

22          MR. BELL:  Your Honor, I'd move to admit

23  Exhibit 592G.

24          MR. CLYMER:  No objection.

25          THE COURT:  592G admitted.

1    BY MR. BELL:

2        Q.   So we're looking at the 31st page of 592G.  It's

3    also labeled Document 823 in the litigation.  Is this an

4    appendix that the government prepared listing calls that

5    it had obtained to the lawyers that we talked about?

6        A.   Yes.

7        Q.   And it includes the names Mark Metzger, Richard

8    Grimes and Andino Reynal?

9        A.   That's correct.

10       Q.   It also includes on which disk and which call

11   number the calls to those people from Ms. Reulet were

12   made?

13       A.   Yes.

14       Q.   Did the Court ever conduct a hearing on your

15   motion?

16       A.   Yes.  We had a hearing in late December on my

17   motion.

18       Q.   At that hearing did you ask permission to call

19   Ms. Treadway as a witness so that you could determine

20   exactly how much and which calls she had listened to?

21       A.   Yes.

22       Q.   Did Ms. Treadway tell the Court and ultimately

23   convince the Court that that was unnecessary, that her

24   word as an officer of the court should be good enough?

25       A.   So what happened in that hearing, the judge had

1  indicated to me that it was going to take some

2  convincing for me to be able to put Ms. Treadway on the

3  witness stand, but he was going to give me the

4  opportunity to do that convincing and certainly had

5  taken the position that Ms. Treadway could make

6  statements as an officer of the court and that would

7  suffice.

8       There were two witnesses that we had that day.

9  One of the additional witnesses failed to show up in

10 court, and so the hearing was supposed to be continued.

11 And how we left it-- I think it was continued to, like,

12 January 4th or 10th, I don't remember which.  And how we

13 left it is that I could renew my request to have

14 Ms. Treadway testify as a witness.  The case was

15 resolved before we had that further proceeding.

16   Q.  So I'd like you to turn to Exhibit 592H.  Does

17 592H appear to be a transcript of the hearing you just

18 referenced?

19   A.  Yes, it does.

20       MR. BELL:  Your Honor, I'd move to admit

21 Exhibit 592H.

22       MS. VANBEBBER:  No objection.

23       THE COURT:  592H, any objection?

24       MR. CLYMER:  No, Your Honor.

25       THE COURT:  592H admitted.

1    BY MR. BELL:

2       Q.   Ms. Morgan, I'd like you to turn to the 15th page

3    of that exhibit.  And while you're doing that, do you

4    recall that there was a time when Judge Crabtree put a

5    direct question to Ms. Treadway and asked her to answer

6    it as an officer of the court?

7       A.   He did.

8       Q.   And was that question specifically about whether

9    Ms. Treadway had listened to calls between Ms. Reulet,

10   your client, and Mr. Grimes, her custody attorney?

11      A.   Yes.

12      Q.   And did Ms. Treadway say as an officer of the

13   court that she had only listened to enough of the calls

14   to identify them-- the call as being between Ms. Reulet

15   and Mr. Grimes and identified the parties that were

16   present?

17      A.   Yes.  The Court specifically asked her, "You're

18   telling me as an officer of this court that you have not

19   listened to the calls between Ms. Reulet and Mr.

20   Grimes?"  And she responded, "Except to identify them

21   and identify who was present."  And then he asked the

22   same thing about her attorney, Mr. Metzger, and the

23   response was the same.

24      Q.   So the-- Mr. Metzger represented Ms. Reulet on

25   the DUI issue which was what caused her bond to be

1   revoked?

2        A.   Right.

3        Q.   Did that bond revocation hearing-- or proceeding

4   stop at the moment the magistrate ordered her detained?

5        A.   No.

6        Q.   How long did that go on?

7        A.   Actually, it went on for quite some time because

8   not only did we litigate the issue in front of Judge

9   Crabtree and have an evidentiary hearing in front of him

10  I believe, but we also took this up to the Tenth Circuit

11  and sought relief from the Tenth Circuit.  So I think it

12  went on until August at least.

13       Q.   And during those proceedings at the district

14  court and the appellate court, did the government still

15  oppose Ms. Reulet's release and seek to convince the

16  Court that based on the DUI she should remain in

17  custody?

18       A.   Absolutely.

19       Q.   Did there come a time when-- during this hearing

20  that Ms. Treadway made a representation to the Court

21  about the content of the calls between Ms. Reulet and

22  Mr. Reynal?

23       A.   Yes.

24       Q.   So if you would turn to the next page of the

25  exhibit, Page 16.  If you look down to the line number

1    that starts at 20.  Did Ms. Treadway tell Judge Crabtree

2    that the calls between herself-- that the calls between

3    Ms. Reulet and Mr. Reynal did not concern and were not

4    about the current criminal prosecution?

5        A.  Yes.

6        Q.  Ms. Morgan, I'm going to show you what's been

7    marked as Exhibit 592.  Have you ever seen Exhibit 592

8    before?

9        A.  No.

10       Q.  Take a few moments and look through it.  On the

11   first page at the top right corner does it state in

12   someone's handwriting "Disk No. 1, 5-25-16 through

13   6-4-16"?

14       A.  Yes, it does.

15       Q.  Based on what you recall about Ms. Reulet's phone

16   calls, does that-- is that consistent with the first

17   disk of phone calls that was produced to the government?

18       A.  It is.  It appears to be a log of the phone calls

19   and who are part of the-- who are participants in the

20   phone call and what phone numbers those phone numbers

21   are to.

22            MR. BELL:  Your Honor, I'd move to admit

23   Exhibit 592.

24            MR. CLYMER:  No objection.

25            THE COURT:  592 admitted.

1   BY MR. BELL:

2      Q.  So I'd like you to turn to the tenth page of this

3   exhibit.  On the tenth page of this exhibit is there a

4   call listed Call No. 17 or references Call No. 17?

5      A.  On the tenth page of the exhibit it goes--

6   there's a 16 and there's a 20.

7      Q.  I apologize.  These are a little out of order.

8   I'm sorry, turn to Page 11.

9      A.  Yes.  Yes, there is a phone Call No. 17.

10     Q.  Does Call No. 17-- that matches what the

11  government indicates is a call between Ms. Reulet and

12  Richard Grimes from Disk 2?

13     A.  It does.

14     Q.  And it's-- whoever wrote this labels that the

15  party on the call is Deb/Richard Grimes?

16     A.  Yes.

17     Q.  And does it appear that whoever is taking these

18  notes is actually taking notes describing the content of

19  the call?

20     A.  Yes.  There's absolutely documentation of what

21  the call is about, about her son's custody, about what

22  they need to do about the son, conversations with Andino

23  Reynal and her-- somebody's feedback about Michael,

24  which was the ex-spouse.  So it's detailed.

25     Q.  Turn to the next page, Page 12.  Is there a call

1    there labeled Call No. 18?

2        A.   Yes.

3        Q.   And is Call No. 18 identified by Ms. Treadway as

4    one of the calls from Ms. Reulet to Mr. Grimes?

5              MR. CLYMER:  I don't think you've

6    established yet it's Ms. Treadway.  I object to the

7    reference to Ms. Treadway.

8              THE COURT:  All right.  I'll disregard that

9    part of the question.

10             THE WITNESS:  Whoever-- whoever has made

11   this log, it appears to have the date of the phone call,

12   it has the number that's being called.  It looks like it

13   has the participants of the call, and then it has

14   detailed information about that particular phone call.

15   BY MR. BELL:

16       Q.   Are there initials next to some of the

17   statements, the initials MR?

18       A.   Yes.

19       Q.   Would that match Michelle Reulet?

20       A.   Yes.

21       Q.   And are there-- is there writing next to some of

22   the statements by someone named Grimes?

23       A.   I'm sorry, what was your question?

24       Q.   Is there-- has someone written the word "Grimes"

25   next to some of the statements?

1    A.  Yes, on the next page there is.  It looks like

2    that would reference who was saying what in the

3    conversation.

4    Q.  And at the end of the call does whoever is taking

5    these notes write down the phone numbers for Mr. Grimes

6    for both his cell and his office number?

7    A.  Yes.

8    Q.  If you could turn to Page 13.  Does Page 13

9    reference a Call No. 20?

10    A.  It does.

11    Q.  Is Call No. 20 identified as one of the calls by

12    the government between Ms. Reulet and Mr. Grimes?

13    A.  Yes, I believe it is.

14    Q.  Does it appear here that content of the call is

15    written down by whoever is taking notes?

16    A.  It does.  It has an initial which would seem to

17    be what the Attorney Grimes is saying.  It would have

18    initials for MR, Michelle Reulet, that says what

19    Michelle is responding.  And another initial with what

20    the Attorney Grimes is discussing with his client.

21    Q.  Turn to Page 16.  Does Page 16 include a Call

22    No. 33?

23    A.  Yes, it does.

24    Q.  Is Call No. 33 identified by the government as a

25    call between Mr. Grimes and Ms. Reulet?

1     A.   It was one of those calls, yes.

2     Q.   And does it appear that whoever took these notes,

3  that they've put a "G" next to both statements?

4     A.   Yes.

5     Q.   And that the call-- they've written down that the

6  call is to-- or they've written down the word "Grimes"?

7     A.   Yes.   And I would just note that it looks like

8  that they're discussing another legal issue that

9  Michelle had.  Her mother had passed away, and so there

10  was questions about what would happen with her mother's

11  estate.  And multiple times Ms. Treadway tried to

12  disqualify me from the representation because she

13  believed that information-- she believed that she was

14  inheriting some resources that would disqualify her from

15  being able to have court-appointed counsel.

16     Q.   Turn to Page 17.  Is there a Call No. 37?

17     A.   Yes, there is.

18     Q.   Do you see Call No. 37 reflected by the

19  government as a call between Ms. Reulet and Mr. Grimes?

20     A.   Yes, it is.

21     Q.   Does, again, whoever took these notes indicates

22  that-- write down statements by Ms. Reulet and

23  Mr. Grimes?

24     A.   Yes.

25     Q.   Turn to Page 18.  Is there a Call No. 43

1   reflected on Page 18?

2       A.   There is.  That also appears to be a call with

3   Michelle Reulet and Attorney Grimes, and there's

4   notations that specify who the speaker is and what's

5   being said.  And the speakers are Grimes and Michelle

6   Reulet.

7       Q.   Is there a discussion from Ms. Reulet concerning

8   her criminal case?

9       A.   Yes, there is.

10      Q.   If you'd look at the next call, is there a Call

11  No. 44?

12      A.   Got it.

13      Q.   Is this the-- again, 44 is one identified by the

14  government as a call between Ms. Reulet and Mr. Grimes?

15      A.   Yes.

16      Q.   Do the notes reflect statements made by

17  Mr. Grimes?

18      A.   Mr. Grimes, Michelle Reulet, more statements by

19  Mr. Grimes.  Substantive detail about what their

20  conversation is about.

21      Q.   Turn to Page 46.  At the top of Page 46 is there

22  written "Disk 5"?

23      A.   Yes.

24      Q.   And have you turn to Page 48.  Does Page 48

25  contain a call designated as No. 13?

1     A.   Yes.

2     Q.   And is Call No. 13 on Disk 5 designated by the

3  government as a call between Ms. Reulet and Mr. Grimes?

4     A.   Yes, it is.

5     Q.   Call No. 13, again, contains statements made by

6  Ms. Reulet?

7     A.   Statements made by Ms. Reulet and Attorney

8  Grimes.  Substantive discussion about matters that he

9  was assisting her with but also references to matters

10  that I was assisting her with.

11     Q.   So now let's talk about the calls with

12  Mr. Metzger, the DUI attorney.  Could you turn to

13  Page 2, please.  Do you see a call designated as Call

14  No. 5?

15     A.   Yes.

16     Q.   And on Call No. 5 does it-- is the party

17  identified or at least someone has written down "Mark

18  Metzger"?

19     A.   Yes.

20     Q.   And does the-- do the notes contain statements by

21  Ms. Reulet?

22     A.   They have notes, yes.

23     Q.   And statements made by Mr. Metzger?

24     A.   Yes.

25     Q.   Have you turn to Page 54.  Does Page 54 state

 1   that it has summaries from Disk No. 6?

 2      A.   Yes.

 3      Q.   Does it identify Call No. 6?

 4      A.   Yes.

 5      Q.   Is Call No. 6 from Disk 6 designated as a phone

 6   call by the government between Ms. Reulet and

 7   Mr. Metzger?

 8      A.   Yes, it does.

 9      Q.   Do the notes associated with Call No. 6 identify

10   Mr. Metzger as the DUI attorney?

11      A.   Yes, it does.

12      Q.   And do they contain statements made by both

13   Ms. Reulet and inferentially by Mr. Metzger?

14      A.   Yes.  It doesn't specify who the speaker is of

15   each of those statements, but reading the substance

16   suggests to me that it's both Michelle and Mr. Metzger's

17   statements.

18      Q.   The degree of content described in these calls,

19   is that consistent with what Ms. Treadway represented to

20   you and the Court about how she had listened to the

21   calls between Mr. Metzger, Mr. Grimes and Ms. Reulet?

22      A.   Absolutely not.

23      Q.   Were you ever told that someone had taken down

24   this amount of content or listened to this amount of the

25   calls between Ms. Reulet and her attorneys?

1     A.  No.  The understanding that we had, which she

2  said repeatedly "as an officer of the court"-- I think

3  "officer of the court" was a term that was used multiple

4  times in that hearing, was that all she had done was

5  listen to identify who the speaker was in that

6  conversation.

7     Q.  Do you remember during that hearing that one of

8  the questions you had is you wanted to know who had

9  listened to all of these calls?

10    A.  Yes.

11    Q.  Did Ms. Treadway respond to that inquiry by the

12  Court?

13    A.  She had indicated she had listened to the calls.

14    Q.  Did she say-- did she tell the Court she was the

15  only one who had listened to the calls?

16    A.  I don't believe she did.

17    Q.  Now, as we talked about, she also made some

18  statements about the content of Ms. Reulet's calls with

19  Mr. Reynal.  Correct?

20    A.  Yes.

21    Q.  So if you would turn to Page 8 of Exhibit 592.

22    A.  Got it.

23    Q.  Does this request-- reflect Call No. 44?

24    A.  Yes, it does.

25    Q.  And is Call No. 44 from Disk 1 designated by the

1   government as a call between Ms. Reulet and Mr. Reynal?

2       A.  Yes, it does.

3       Q.  Does the content of the call as it's written down

4   in these notes concern the criminal case Ms. Treadway is

5   prosecuting against Ms. Reulet?

6       A.  Yes, it does.

7       Q.  The date of this call as it's labeled here is

8   June 3rd, 2016?

9       A.  Yes.

10      Q.  At this time had Mr. Reynal had permission to

11  withdraw from representation of Ms. Reulet?

12      A.  No, he had not.

13      Q.  At this time did Mr. Reynal continue to represent

14  Ms. Reulet on the civil forfeiture action?

15      A.  Yes.

16      Q.  Turn to Page 39.  On Page 39 does it reflect

17  call-- a Call No. 11?

18      A.  Yes.

19      Q.  From Disk 4?

20      A.  Sorry?

21      Q.  From Disk 4?

22      A.  From Disk 4, yes.

23      Q.  And that's one of the calls designated by the

24  government as between Ms. Reulet and Mr. Reynal?

25      A.  Yes.

1    Q.   Do the notes that correspond to Call No. 11 first

2    identify the person on the other end of the line as

3    Andino?

4        A.   It does.  The AR signifies Andino Reynal.

5        Q.   And is the word "Andino," is that Mr. Reynal's

6    first name?

7        A.   Yes, it is.

8        Q.   Does it include comments or statements by

9    Mr. Reynal and Ms. Reulet?

10       A.   Yes, it does.

11       Q.   From your review of these comments, are all the

12   notes concerning the current criminal case that

13   Ms. Treadway is prosecuting against Ms. Reulet?

14       A.   Yes, it is.

15       Q.   At this time on June 21st, 2016, had Mr. Reynal

16   been permitted to withdraw from defending Ms. Reulet?

17       A.   He had not.

18       Q.   Turn to Page 54.  Does Page 54 reference Call

19   No. 73?

20       A.   Yes, it is.

21       Q.   Is Call No. 73 from Disk 6 referenced as-- by the

22   government as a call between Ms. Reulet and Mr. Reynal?

23       A.   Yes, it is.

24       Q.   Do the notes contained in these statements

25   concern the criminal case that Ms. Treadway is currently

1  prosecuting against Ms. Reulet?

2      A.   Yes, it does.

3      Q.   The date associated or written is July 18th,

4  2016?

5      A.   Yes.

6      Q.   Had Mr. Reynal been permitted to withdraw from

7  Ms. Reulet's criminal case at that point?

8      A.   No.

9      Q.   At some point during the hearing with

10  Judge Crabtree did Ms. Treadway say that it was a sorry

11  state of affairs when her word as an officer of the

12  court was no longer her bond?

13      A.   Yes, she did.

14      Q.   Do you agree with that statement?

15      A.   I absolutely do.

16          MR. BELL:  No further questions.

17          MS. VANBEBBER:  I have no questions, Your

18  Honor.

19                CROSS EXAMINATION

20  BY MR. CLYMER:

21      Q.   Ms. Morgan, do you recall signing and providing

22  to the Pubic Defender's Office a declaration back in

23  September of 2016 for purposes of this litigation?

24      A.   Yes.

25      Q.   I'm going to show you-- it's the first two pages

1    that have been marked as 459.  Take a look at them and

2    let me know when you're done reading them.

3         Are you done?  Do you recall as you sit here

4    today how you learned about the privatization process?

5    A.   Specifically how I recall, I mean, 10, 12, some

6    years ago we received some communication that we needed

7    to send these letters to CCA to make sure our calls were

8    not recorded.  How that communication came to me, I have

9    no independent recall.

10   Q.   Gotcha.  In your answer to me just now you said

11   "we received notification."  When you say "we," who did

12   you mean by "we?"

13   A.   I am sort of assuming here that somebody didn't

14   specifically say, Melanie Morgan, you know, we want you

15   to do this.  I'm assuming it came from the Pubic

16   Defender's Office, whoever was coordinating CJA matters,

17   and sent it to the CJA lawyers.

18   Q.   So you think someone in the criminal justice

19   system, likely the Public Defender, may have realized

20   that this would be something CJA panelists would want to

21   know and sent out a blast to everybody?

22   A.   I suspect that that is the case, but I don't have

23   an independent recall of that.

24   Q.   Gotcha.  And as far as you recall, this was back

25   in-- around 2008 roughly?

1     A.  It certainly-- the reason I'm picking that is

2   because I moved into my building in Olathe in

3   approximately 2008 and I moved to my building that I own

4   now in 2012, and I remember sending that letter while I

5   was in that building.  So sometime between 2008 and 2012

6   the letter was sent.

7     Q.  When you say "the letter," now you're talking

8   about the letter you sent to have your number

9   privatized.  Correct?

10     A.  Yes.

11     Q.  Do you recall before you did that ever hearing

12   the part of the warning-- or the warning on it, the

13   recording that says this call is subject to recording

14   and monitoring?

15     A.  I do not recall that.

16     Q.  Did you at any time before privatization ever

17   have a telephone call where you answered the phone and

18   it was an inmate calling you from CCA, if you recall?

19     A.  I've always had support staff, so I don't know

20   that I've ever picked up that call.  I'm sure I have

21   because of times when the office-- but I couldn't tell

22   you sitting here today if I recall that.

23     Q.  Have you ever heard the-- the preamble now that

24   your phone has been privatized or your numbers are

25   privatized?

1     A.   No.

2     Q.   So you-- you have no idea what that preamble

3   says?

4     A.   I mean, I have a secretary and a receptionist, so

5   the phone doesn't ring in my office.  It rings at our

6   main desk.  So I don't-- like, I don't hear that.

7     Q.   You mentioned I think on direct examination that

8   you also gave CCA-Leavenworth your cell phone number.

9   Did I mishear you or did you say that?

10     A.   No, you didn't mishear me.  Yeah.

11     Q.   Do clients ever call you on your cell phone

12   number?

13     A.   No.

14     Q.   Okay.  So the only number that a client would

15   call you on is the one someone other than you is going

16   to pick it up?

17     A.   I'm not going to say-- so let me correct that.

18     Q.   Okay.

19     A.   They could potentially call me on my cell.  But

20   if it is a number that I do not recognize or if it says

21   like no caller ID, I do not pick that up.

22     Q.   Do you recall ever speaking to a client on your

23   cell phone-- strike that.  A client who is in CCA on

24   your cell phone?

25     A.   I don't think so.

1    Q.   Okay.  So you don't remember ever hearing that
2  preamble on your cell phone?
3    A.   No.
4    Q.   Are you aware that in the preamble, even without
5  the warning I've mentioned, there's a prompt to press
6  certain buttons on whether you want to accept the call,
7  reject the call, that sort of thing?
8    A.   Yes, I'm aware there's a prompt.
9    Q.   Do you recall ever having heard that?
10   A.   Do I recall the prompt?
11   Q.   Yes.
12   A.   Well, I-- I obviously know that there's a prompt,
13  right, I've told my staff to accept the phone call.
14   Q.   That's what I wanted to know.
15   A.   So my staff knows to accept the phone call.
16   Q.   So you've had a conversation with the people who
17  answer the phone about what they're supposed to do when
18  one of these calls from CCA comes in?
19   A.   Yes, right.
20   Q.   Has anyone in your staff ever given you
21  information back about what was on the recording--
22   A.   No.
23   Q.   -- however they do it?
24   A.   No.
25   Q.   And I take it it's the case that whenever one of

1    these calls comes into your office, no matter who

2    answers it, the person on the other end of the line is

3    the client who's an inmate at CCA.  Correct?

4        A.  Yes.

5        Q.  And he or she is hearing that recording on that

6    end.  Correct?

7        A.  I don't have any idea what they hear.

8        Q.  Okay.  I want to ask you a couple of questions

9    about the trip you took to the U.S. Attorney's Office

10   with the Special Master.

11       A.  Uh-huh.

12       Q.  Do you recall that the Special Master was

13   introduced to the parties at a discovery conference late

14   October 2016?

15       A.  I don't remember the time frame of when-- I-- I

16   recall that he had been here a number of different

17   occasions.  And I-- it feels like it was in one of those

18   earlier occasions that-- that he was here.  So I don't

19   know if October is right.  I don't know if it was a

20   discovery conference.  I just know that I escorted him

21   downstairs to the U.S. Attorney's Office.

22       Q.  From the conference whenever it was held straight

23   to the U.S. Attorney's Office?

24       A.  I think so.

25       Q.  Do you know from your own personal knowledge

 1  whether the U.S. Attorney's Office had advance notice

 2  that the Special Master was coming that day to look at

 3  things?

 4      A.  Yeah, I mean, I think everybody knew he was going

 5  to be here that day.

 6      Q.  That-- that's not what I asked, whether the U.S.

 7  Attorney's Office knew that the Special Master was going

 8  to be here.  Do you know from your own personal

 9  knowledge whether the Special Master or anyone else

10  notified the U.S. Attorney that he had come to the

11  office looking to see certain things?

12      A.  I don't-- I don't know what they knew or didn't

13  know.

14              MR. CLYMER:  Thank you.  Nothing further,

15  Your Honor.

16              THE COURT:  All right.  Anything more?

17              MR. BELL:  (Shakes head from side to side).

18              THE COURT:  All right.

19              MR. BELL:  Actually one item.

20                  REDIRECT EXAMINATION

21  BY MR. BELL:

22      Q.  Ms. Morgan, if you could turn your attention to

23  Page 15 of Exhibit 592H.

24      A.  Yeah.

25      Q.  Do you recall that during that hearing that

1    Ms. Treadway essentially makes a comment to

2    Judge Crabtree that if you listen to these calls that I

3    submitted under seal, you know they're not privileged.

4    And if you've done that, you've actually listened to

5    more of the calls than we've listened to?

6        A.   Yes.

7        Q.   And that the Court asks what she means by the

8    word "we?"

9        A.   And she says "that would be me."

10       Q.   Does she identify anybody else in the office who

11   had listened to the calls?

12       A.   No, she does not.

13              MR. BELL:  Thank you.  No further questions.

14              MS. VANBEBBER:  I have no questions, Your

15   Honor.

16              THE COURT:  All right.  May Ms. Morgan be

17   excused?

18              MR. CLYMER:  Yes, Your Honor.

19              THE COURT:  You're excused.

20              THE WITNESS:  Thank you.

21              THE COURT:  All right.  We'll take a recess

22   for 15 minutes.  What's the next witness?

23              MR. BELL:  Tanya Treadway.

24              THE COURT:  All right.  We'll be in recess

25   for 15 minutes.

1        MR. CLYMER:  Your Honor, we'd like to speak

2  to the Court at sidebar before Ms. Treadway is called

3  into the court.

4        THE COURT:  Okay, come on up.

5        (Proceedings had at the bench, outside the

6  hearing of open court). █







1  ███████████

2             ████████████████████

3             ███████████████████

4             (Proceedings continued in open court).

5             (Recess).

6             THE COURT:  All right.  Counsel come to the

7  bench, please.

8             (Proceedings had at the bench, outside the

9  hearing of open court).██

10            ███████████████████

11 ████████████████████████████

12 ████████████████████████████

13 █████████████████████████████

14 ████████████████████████████

15 ██████████

16            ████████████████████

17 █████████████████████████

18 ███████████████████████████

19 ████████████████████████████

20 ██████████████████████████

21 ████████████████████████████

22 ████████████

23            ██████████████████

24            ████████████████

25            (Proceedings continued in open court).

1           THE COURT:  All right.  You can call your

2    next witness.

3           MR. BELL:  Call Tanya Treadway.

4                   TANYA TREADWAY,

5    called as a witness on behalf of the Federal Public

6    Defender's Office, having first been duly sworn,

7    testified as follows:

8                 DIRECT EXAMINATION

9    BY MR. BELL:

10       Q.   Good morning.  Would you please state your name,

11   spelling the last for the record.

12       A.   Tanya Treadway.  T-R-E-A-D-W-A-Y.

13       Q.   Ma'am, did you once hold a position within the

14   United States Attorney's Office for the District of

15   Kansas?

16       A.   I was an Assistant United States Attorney.

17       Q.   How long did you hold that position?

18       A.   From July 1st of 1990 until September 30th of

19   2017.

20       Q.   During the course of your employment with the

21   United States Attorney's Office, did you only perform

22   criminal cases or did you perform civil cases as well?

23       A.   I did both.

24       Q.   During your employment with that organization,

25   I-- I assume you became very familiar with the

1  constitutional amendments that deal with defendants?

2      A.  Yes.

3      Q.  Including the Fifth Amendment right to not

4  incriminate oneself?

5      A.  Yes.

6      Q.  And warnings that have to be given to people

7  under the decision in *Miranda* about their choice or

8  their freedom not to make any statements that would

9  incriminate themselves?

10     A.  Yes.

11     Q.  Did you hold a position in the office dealing

12  with filter teams?

13     A.  There was no real position to deal with that, no.

14     Q.  Were you asked to serve as the--

15              THE COURT:  I'm having trouble hearing both

16  of you.

17              MR. BELL:  I'm sorry.

18  BY MR. BELL:

19     Q.  Were you ever asked to serve as a filter attorney

20  on criminal cases?

21     A.  Yes.

22     Q.  Is that something you would do regularly or just

23  when asked?

24     A.  When asked.

25     Q.  What role would you perform when you were acting

1   as a filter attorney?

2       A.  I guess I need to ask a question here.  This is--

3               MR. CLYMER:  You're authorized to answer.

4               THE WITNESS:  I am authorized?

5               MR. CLYMER:  Yes.

6               THE WITNESS:  All right.  Thank you.

7               MR. CLYMER:  And feel free to ask if you're

8   not sure.

9               THE WITNESS:  Thank you.  I'm sorry, would

10  you repeat the question?

11  BY MR. BELL:

12      Q.  What was your obligations as a filter attorney?

13      A.  Oh, that depended on the case.

14      Q.  What is the role in general of a filter attorney?

15      A.  Well, again, it depended on the case and at what

16  point it was.  For instance, if defense counsel had

17  already been engaged and retained, the role was very

18  different than if there had not been defense counsel

19  retained.

20          It was pretty-- a pretty rare situation that I

21  was a filter attorney for cases in which defense counsel

22  had not already been retained.  And so when I ran a

23  filter team, I usually talked to the defense counsel,

24  asked them to collaborate.

25          We would get the information to them that we

1    believed might have attorney-client privileged

2    information in it.  We would let them review it and then

3    assert privilege, and they would send us back privilege

4    logs.  I would then review what they claimed to be

5    privileged.  If I agreed, it ended the issue.  If I

6    disagreed, we would collaborate again and see if we

7    could negotiate a resolution.  If we couldn't, then we

8    would go to the Court.  And I don't remember a time that

9    we had to go to the Court to resolve an issue of

10   privilege.

11        Q.   So was your role to make sure that potentially

12   privileged material or even actually privileged material

13   didn't wind up in the hands of the prosecution team or

14   the-- a prosecutor assigned to the actual case?

15        A.   Correct.

16        Q.   Were you ever asked to perform continuing legal

17   education or CLEs within the office?

18        A.   Yes.

19        Q.   And did some of those CLEs touch on the roles of

20   privileged material and filter teams?

21        A.   I don't remember.

22        Q.   Would you agree with me that there is a

23   difference between a violation of the attorney-client

24   privilege and a violation of someone's Sixth Amendment

25   right to counsel?

1     A.   Well, I think sometimes it can be coterminous.

2   But, yes, they are different concepts under the law.

3     Q.   So just because an attorney acquires

4   communications between an attorney-- or I should say a

5   prosecutor acquires information between an attorney and

6   that attorney's client, that won't always mean that

7   there's been a Sixth Amendment violation?

8     A.   Well, I-- I don't know.  That's kind of a

9   hypothetical, so I don't know that I can answer that

10   question.

11     Q.   All right.  Do you remember a hearing in front of

12   Judge Crabtree on December 28th, 2016?

13     A.   No.

14     Q.   Do you remember prosecuting a defendant named

15   Michelle Reulet?

16     A.   Yes.

17     Q.   Do you remember that at some point that case

18   involved claims of your office or the prosecution team

19   listening to recorded telephone calls between Ms. Reulet

20   and certain attorneys?

21     A.   I remember there were allegations of that, yes.

22     Q.   So I want to show you what has been marked and

23   admitted as Exhibit 592H, and it's in your-- your

24   exhibit book as well.  If you could turn to Page 102.

25          Do you recall Judge Crabtree asking you if your

1   position at that hearing was that the presence of a

2   recording device on a call is in effect like having

3   another person in there and that destroys the

4   attorney-client privilege?

5      A.  I don't see that on Page 102.  I mean-- sorry,

6   let me read it.

7            THE COURT:  Can you point it to her in her--

8   she can't see the screen, I don't believe.

9   BY MR. BELL:

10     Q.  It starts at Line 12.

11           THE COURT:  Page 102, not Page 1 and 2.

12   Right?

13           MR. BELL:  Page 102.

14           THE COURT:  I heard 1 and 2.  Page 102.

15           THE WITNESS:  Judge Crabtree asks me a

16   question and I answer, "No, Judge, because that's how

17   the law characterizes it."

18   BY MR. BELL:

19     Q.  And then Judge Crabtree asks you-- do you

20   remember him asking you a question about why you would

21   exclude any calls at all?  Do you remember that during

22   this hearing you had told Judge Crabtree that in your

23   requests for Ms. Reulet's phone calls that you had

24   specifically excluded her defense attorney, Melanie

25   Morgan's, phone numbers from that request?

1    A.  Yes, that's what I said.  I said, "We asked for

2   them to be excluded because she is a criminal defense

3   counsel in the case.  And as a result, what that

4   implicates is not privileged, Judge, it implicates the

5   Sixth Amendment right to counsel and we don't intrude on

6   that."

7    Q.  All right.  So even though the position was that

8   Ms. Morgan's phone calls-- the privilege had been waived

9   because of a recording device, that wasn't really the

10  issue.  The issue is whether listening to those

11  communications would be a Sixth Amendment violation; is

12  that right?

13   A.  Well, that's the position I took, yes.  And, of

14  course, we didn't receive any calls between Ms. Reulet

15  and Ms. Morgan.

16   Q.  Right.  So even if, as you were arguing, the

17  privilege had been waived in any of those calls, that

18  wouldn't answer the question about whether there had

19  been an intrusion into the Sixth Amendment right to

20  counsel.  Do I understand that's the position?

21   A.  Well, I said what I said.  I don't know if I can

22  improve upon it.

23   Q.  If you could turn to in your notebook what's

24  already been admitted as Exhibit 495.  Do you recall

25  receiving an e-mail from David Zabel asking for your

1    advice about whether he had to turn over certain phone

2    calls to Mr. Moran, who was the defense attorney for the

3    defendant?

4        A.   I don't remember it.  I recognize that that's

5    what this is, but I don't remember it.

6        Q.   Had Mr. Zabel-- do you recall him sending you a

7    lengthy e-mail arguing why he did not think he needed to

8    disclose those phone calls?

9        A.   I don't remember.  And I'm not trying to be

10   evasive, I have a traumatic brain injury and my memory

11   is not what it used to be.  I was in a very bad car

12   accident and so I'm suffering from memory deficits.

13       Q.   So let me show you what's been previously

14   admitted as Exhibit 494.  Let me get you a copy of that

15   real quick.

16       A.   I don't have that.

17       Q.   So looking at what's been admitted as

18   Exhibit 494, do you now recall receiving an e-mail from

19   Mr. Zabel regarding disclosing phone calls to Mr. Moran?

20       A.   I don't remember it, but this appears to be a

21   couple of e-mails from Mr. Zabel to me and it is a very

22   lengthy e-mail.  Do you want me to read it?

23       Q.   No.

24       A.   But do I remember this?  No, I don't remember it.

25       Q.   Do you recall-- or I guess if you'd just glance

1   at it, does Mr. Zabel in e-mail four-- or in Exhibit 494

2   appear to take the position that the calls do not need

3   to be disclosed?

4        And if it's helpful, there's a-- on the second

5   page there's a one-sentence line about the bottom.

6   A.   I believe he says, "My position is that these

7   calls do not need to be turned over for the following

8   reasons," and then he lists two lengthy reasons.

9   Q.   And then when you respond in Exhibit 495, you

10  tell Mr. Zabel that you think that he should turn over

11  those calls?

12  A.   That if it were me, I would've turned over the

13  second batch of calls.

14  Q.   And the reasons are-- and I'm paraphrasing from

15  the exhibit, but you don't review every scrap of

16  information you get and you don't know what's in it, so

17  you don't know whether it is *Brady, Giglio,* or

18  disclosure under Rule 16.  Is that a fair summary?

19  A.   I think-- I think my real point is my review of

20  evidence is not what makes things subject to disclosure.

21  They are either disclosable or not.  It doesn't matter

22  whether I've reviewed them or not.

23  Q.   You charged a woman named Michelle Reulet on

24  January 15th, 2014.  Does that date sound accurate?

25  A.   Relativity.  I'm not sure.  I think it was

1   sometime in 2014 because I think that's the case number,

2   14 something.

3       Q.   Do you recall Ms. Reulet was originally

4   represented by an attorney named Andino Reynal?

5       A.   Yes.

6       Q.   Do you remember at a certain point Mr. Reynal

7   filed a motion to withdraw?

8       A.   He filed a motion to withdraw with the consent of

9   his client, yes.

10      Q.   And that-- that motion wasn't immediately

11  granted?

12      A.   Well, in essence, it was because Melanie Morgan

13  was appointed immediately and Mr. Reynal did not have

14  anything to do with the defense of that case going

15  forward.

16           We had Rule 4.2 problems with him because he had

17  hired a criminal defense attorney and so we didn't

18  communicate with him.  We communicated with his defense

19  counsel, Kurt Kerns.  And so Ms. Morgan was Ms. Reulet's

20  counsel.

21      Q.   Do you remember that Mr. Reynal filed a motion to

22  withdraw?

23      A.   I believe I just answered yes.

24      Q.   Do you recall what the Court's ruling on that

25  motion-- the first ruling on that motion was?

1    A.   I think he retained jurisdiction regarding the

2    sanctions issue.

3    Q.   Wasn't the title of the order that this motion

4    was denied without prejudice?

5    A.   I don't know.

6    Q.   Did there later come a time when the Court did

7    grant Mr. Reynal's motion to withdraw?

8    A.   Again, I don't-- I don't remember the chronology.

9    All I remember is Mr. Reynal was not representing

10   Ms. Reulet and Ms. Morgan was.

11   Q.   At a certain point you moved to revoke

12   Ms. Reulet's bond?

13   A.   Excuse me?  I didn't hear that.

14   Q.   At a certain point you moved to revoke

15   Ms. Reulet's bond?

16   A.   Yes.  She received a driving while intoxicated

17   complaint I guess, was filed in Houston and we moved to

18   revoke her bond, yes.

19   Q.   Her attorney for that charge was a person named

20   Mark Metzger?

21   A.   No, it was Ms. Morgan.

22   Q.   For the DUI charge, I'm sorry if I was unclear.

23   A.   Oh, I have no idea.  I don't remember.

24   Q.   At the time Ms. Reulet's bond was revoked, she

25   was the sole provider at the time for a small child?

1    A.  I don't know.

2    Q.  And there were custody proceedings initiated

3 since she-- because she was detained was no longer able

4 to care for the child.  Do you recall that?

5    A.  I-- I do seem to remember that both Mike, the

6 father, and Michelle, the mother, were incarcerated.

7 And so I don't know if it was a custody issue as much as

8 it was where does the child go.

9    Q.  And Ms. Reulet's attorney on that matter was a

10 man named Richard Grimes?

11    A.  I don't remember.

12    Q.  When Ms. Reulet's bond was revoked by Judge

13 Sebelius, Ms. Reulet appealed that decision to the

14 district court?

15    A.  Yes.

16    Q.  And when the district court denied the appeal,

17 Ms. Reulet appealed the decision to the Tenth Circuit

18 Court of Appeals?

19    A.  I believe so, yes.

20    Q.  And the issue of Ms. Reulet's bond went on for

21 several months?

22    A.  If the record would reflect that, I-- I don't

23 remember.

24    Q.  And, again, that revocation proceeding was

25 premised, among other things, upon the-- as you said,

1    the DUI charge in Texas?

2        A.  Yes.

3        Q.  When Ms. Reulet went into custody at CCA, you

4    requested recordings of her telephone calls?

5        A.  Some calls, yes.

6        Q.  When you sent the e-mail to the DEA agents

7    requesting the calls, you specifically put in your

8    e-mail exclude Melanie Morgan's office number and cell

9    number and you supplied those telephone numbers?

10       A.  I think I did that.  I'm-- you know, if you show

11   me the e-mail, I'm sure that I did that, but I don't

12   recall.

13       Q.  And why would you have done that?  Why would you

14   have taken an extra step to make sure that her calls

15   wouldn't be included in any calls you would receive?

16       A.  Well, I believe we already answered that question

17   with regards to the Sixth Amendment issue.

18       Q.  It could be seen as an intentional intrusion if

19   you didn't take steps to make sure you didn't get those

20   calls?

21       A.  Well, that's the way I looked at it.  And I

22   always did that.  I mean, it was pretty rare that my

23   defendants were incarcerated, but when they were, that's

24   how I handled it.

25       Q.  Do you remember having a meeting with Erin

1  Tomasic and Chris Oakley sometime in September of 2016?

2      A.  I don't remember the date, but I do remember

3  meeting with Chris and Erin, yes.

4      Q.  And we've heard testimony about that meeting

5  before.  Is it fair that during that meeting the topic

6  of excluding attorney telephone numbers in phone

7  requests came up?

8      A.  You know, if I'm remembering the meeting that

9  you're talking about, they had requested that I come in

10  and develop a filter plan.  That filter plan was never

11  put into effect because the Special Master was

12  appointed, so there was no need for a filter team.

13      I-- I can't remember the variety of things that

14  were spoken about that day, but it was about what

15  possible types of information were out there and in what

16  form that needed to be filtered.  And I'm sure that

17  phone calls at CCA was one of those many issues.

18      Q.  Do you remember giving them that advice, that if

19  you're going to request calls you should make sure to

20  exclude the defense attorney's telephone number from the

21  request?

22      A.  I don't remember details like that, I'm sorry.

23      Q.  If someone had asked you is this how I should do

24  it, is that what you would've told them, that you should

25  make sure to exclude the attorney's telephone number

1    when you make the request?

2        A.   If somebody had asked me, yes, that's what I

3    would tell them.  I'm-- I'm beginning to think that

4    that-- that meeting was a planning meeting for the

5    filter and it was after information had already been

6    received by subpoena or the search.  So it wasn't a

7    proactive planning meeting, it was an after-the-fact,

8    after the evidence had been received.  I don't know if

9    that makes a difference, but...

10       Q.   It does, thank you.  When you obtained

11   Ms. Reulet's phone calls from CCA, you received her

12   conversations with both Mr. Grimes, the custody

13   attorney, and Mr. Metzger, the DUI attorney?

14       A.   I don't remember any conversations being received

15   from-- from them.  I-- I do remember that Ms. Reulet

16   used friends and family to call her attorneys and then

17   report back to her.  That's-- that's what I remember

18   because I thought that was very odd.  And her friend

19   Debra did that a lot.

20       Q.   So as we sit here, you don't recall receiving any

21   recorded conversations between Ms. Reulet and Mr.

22   Metzger or Mr. Grimes?

23       A.   No, I'm not saying I didn't, I just don't recall

24   them.  And I don't recall them being calls without

25   another person involved because Ms.-- I can't remember

1    Debra's last name, but Debra, the friend, actually was
2    communicating with the custody attorney.  And that's Mr.
3    Grimes you said?  And she would be present in his office
4    when she would call Michelle.
5        Q.   And what about Mr. Metzger?
6        A.   See, I don't remember him at all.
7        Q.   Okay.  So this topic of calls that you had
8    listened to from Mr. Grimes and Mr. Metzger, do you
9    recall that coming up during the December 28th, 2016,
10   hearing with Judge Crabtree?
11       A.   You know, we litigated this rather robustly, and
12   so I would defer to the pleadings that I wrote at the
13   time when my memory was clear and I had everything in
14   front of me and the recordings were all out there.  We
15   gave all the recordings to the Court.  And so I would
16   just defer to whatever I said in those pleadings.
17       Q.   If you could turn to Exhibit 592G and look at
18   Page 31.
19       A.   I'm sorry, thirty?
20       Q.   31.
21       A.   Okay, I'm there.
22       Q.   All right.  Do you recognize Exhibit 592G and
23   this specifically, Page 31, being part of the pleadings
24   that you filed in response to the allegation of coming
25   into attorney-client privileged materials in

1    Ms. Reulet's case?

2       A.   Yes.   That's the-- that's the appendix we offered

3    the Court in response to the allegations.   Of course,

4    Mr. Metzger and Mr. Grimes being-- or Mr. Grimes being a

5    civil attorney, the Sixth Amendment doesn't apply to

6    him.   But I also believe that, again, this appendix

7    would also show when the friends and family are speaking

8    to attorneys and then reporting back.

9       Q.   And so the first three numbered paragraphs,

10   you've identified the calls to Mark Metzger, Richard

11   Grimes, and Andino Reynal that are on the disks that you

12   had obtained from CCA?

13      A.   That's what that appendix does, yes.

14      Q.   Do you recall at a certain point during the

15   December 28th hearing with Judge Crabtree that he asked

16   you as an officer of the court if you had listened to

17   calls between Ms. Reulet and Mr. Grimes?

18      A.   He may have, I don't remember.

19      Q.   If you could turn to Exhibit 592H, Page 15.

20      A.   15?

21      Q.   15.   Look down at-- it starts at Line 17.   Does

22   that refresh your memory about what Judge Crabtree asked

23   you during that hearing?

24      A.   He's asking me if I've listened to the calls

25   between Ms. Reulet and Mr. Grimes, and I said, "Except

1  to identify them and identify who was present and that

2  was it.  Same thing with Mr. Metzger."

3      Q.  So he's asking you, are you telling me that you

4  have not listened to these calls?  And you say, except

5  to the extent that I identified the calls themselves and

6  I identified who the people on the calls were?

7      A.  Correct.

8      Q.  And so-- and you treated the calls with Mr.

9  Metzger the same way?

10     A.  Correct.

11     Q.  So I take it from your recitation here that as

12  soon as you identified who was on the call, the calls

13  from Mr. Metzger and Mr. Grimes, that you stopped

14  listening?

15     A.  Because they were not important, not because they

16  were attorneys.

17     Q.  Do you recall telling the Court that you had

18  treated the calls with Mr. Reynal differently than you

19  had treated the ones with Mr. Grimes and Mr. Metzger?

20     A.  Yes.

21     Q.  You told the Court that you had listened to the

22  content of the calls with Mr. Reynal?

23     A.  Yes.

24     Q.  Do you recall telling the Court that you couldn't

25  remember what Ms. Reulet's calls with Mr. Reynal were

1  about?

2      A.  Right.  I-- I don't remember what they were

3  about.

4      Q.  And do you recall telling the Court that you were

5  certain what those calls were not about?

6      A.  If you'll point me to the passage, I'll agree

7  with it.

8      Q.  Turn to Page 16 of Exhibit 592H starting on

9  Line 16.

10     A.  I said, again, repeating my prior testimony that

11  the information Ms. Ham imparted to Ms. Reulet from Mr.

12  Reynal was-- were actually the more important calls.  I

13  don't-- and I didn't remember then and I certainly don't

14  remember now any substance of the Reynal calls with

15  Ms. Reulet.

16     Q.  But you told the Court that you-- you might not

17  remember what they were about, but you-- they certainly

18  weren't about this case?

19     A.  That's-- that was my memory at the time.

20     Q.  And when you say "this case," you're talking

21  about the-- the criminal case that you're there in front

22  of Judge Crabtree about?

23     A.  Correct.

24     Q.  If you could turn to Exhibit 592C.  Do you

25  recognize Exhibit 592C as a call detail report you

1    received as part of the phone calls from Ms. Reulet?

2        A.   Yes, that appears to be a call log.

3        Q.   And while looking through Exhibit 592C, do you

4    see that there are some handwritten notations on that

5    call log?

6        A.   Yes.  It says "duplicates."

7        Q.   Are those-- is that your handwriting?

8        A.   It is.

9             MR. BELL:  Your Honor, I'd move to admit

10   Exhibit 592C.

11            MR. CLYMER:  No objection.

12            THE COURT:  592C admitted.

13   BY MR. BELL:

14       Q.   So on the first page of Exhibit 592C up at the

15   top you've written "Disk 6"?

16       A.   Yes.

17       Q.   And if we go down to the third page of the

18   exhibit, we see that you've written "duplicates" and

19   you've put numbers next to what I assume to be each

20   telephone call?

21       A.   Yes.  I numbered them to make sure that the

22   numbers on the call log matched the actual calls

23   received.

24       Q.   And then on some of these-- for all the ones that

25   we see on Page 3 here, you've put an "X" next to the

1    number.  What does the "X" signify?

2        A.  I have no idea.

3        Q.  And if we turn to the next page on the batch of

4    calls that you haven't marked as duplicates you've

5    marked-- you've put a checkmark next to some of those

6    instead of an "X."  Do you recall what the checkmark was

7    meant to signify?

8        A.  I don't.

9        Q.  Is it possible, Ms. Treadway, that the "X" was

10   meant to signify that you had not listened to that

11   telephone call?

12       A.  I don't think so.  I don't know what it meant,

13   because I would've listened to the first four because--

14   they were duplicates.  I don't know.  I have no memory,

15   I'm sorry.

16       Q.  So even if there was an "X" next to the call

17   number, do you think you still would've listened to it?

18       A.  I don't know.

19       Q.  You had a-- a co-counsel on this case for at

20   least the majority of it?

21       A.  I think through all of it, yes.

22       Q.  The one at the beginning and at the time when

23   these phone calls were received was Anthony Mattivi?

24       A.  Yes.

25       Q.  Did Mr. Mattivi review any of the telephone calls

1   obtained from CCA belonging to Ms. Reulet?

2       A.   Boy, I don't remember.

3       Q.   That you know of, did he do that?

4       A.   I don't remember.

5       Q.   Was there anyone else that you know of in the

6   United States Attorney's Office who reviewed the

7   telephone calls of Ms. Reulet?

8       A.   Well, preparing for trial, the paralegal and the

9   secretary may have to make sure that the disks that we

10  were submitting as evidence had properly copied.  There

11  were some that the paralegals synced with transcripts I

12  believe, but that was in preparation for trial.

13      Q.   So as I recall from the pleading, you told the

14  Court that there were ten phone calls that the

15  government had between Ms. Reulet and Mr. Grimes?

16      A.   I don't know.  Where is that again?

17      Q.   It's on Exhibit 592G, Page 31.

18      A.   I count nine.

19      Q.   All right.  And you've identified one of the

20  calls as being on Disk 2, Call No. 17?

21      A.   Yes.

22      Q.   If you could turn to Exhibit 592D as in dog.

23      A.   I'm there.

24      Q.   Thank you.  You've written "Disk No. 2" at the

25  top right of this page?

1    A.  Yes.

2    Q.  If you'd turn to the--

3         MR. BELL:  Well, first I'd move to admit

4  Exhibit 592D as in dog.

5         THE COURT:  Oh, 592D?

6         MR. BELL:  Yes, Your Honor.

7         THE COURT:  Any objection?

8         MR. CLYMER:  No, Your Honor.

9         THE COURT:  592D admitted.

10  BY MR. BELL:

11    Q.  If you'd turn to Page 3 of that exhibit.

12    A.  Okay.

13    Q.  So we're at Disk 2.  Is there a call on Disk 2

14  that you have numbered No. 17?

15    A.  Yes.

16    Q.  And is there a checkmark next to that number?

17    A.  Yes.

18    Q.  Does that signify that you listened to that call?

19    A.  I don't remember.  I could've been check-marking

20  it to make sure it was coordinated with-- these call

21  logs sometimes did not match up to the log that you

22  would pull up on the computer.

23    Q.  Uh-huh.

24    A.  So that might-- I-- I really don't know what the

25  checkmark is about.  That's a guess.  Some don't have

1    checkmarks or "X"s.  Don't know what that means either.

2        Q.  So let's go back to page-- or Exhibit, I'm sorry,

3    592H where you tell the Court that the calls between

4    Ms. Reulet and Mr. Metzger and Mr. Grimes you only

5    listened to enough to identify who was there and then

6    you stopped listening once you realized who it was.

7        A.  No, not because we realized who it was but

8    because it was unimportant.

9        Q.  I'm going to show you what's been previously

10   marked and admitted as Exhibit 592.  Do you recognize

11   your handwriting?

12       A.  Yes.

13            MR. BELL:  Your Honor, I'd move to admit

14   Exhibit 592-- or, I'm sorry, it's already admitted.

15   BY MR. BELL:

16       Q.  Look at Page 10 of Exhibit 592.

17       A.  Ten?

18       Q.  Yes, Your Honor-- yes, ma'am.

19       A.  Okay.  I see it.  592-010.  All right.  I'm

20   there.

21       Q.  Do you see noted that this refers to-- you've

22   written "second disk"?

23       A.  Yes.

24       Q.  If you'd turn to the next page.  Is there a call

25   on the next page, Page 11, that you've written the

1  number 17 next to?

2     A.  Yes.

3     Q.  And the excerpt from your pleading to the

4  government [sic] identifies Disk 2, Call 17 as one of

5  the calls between Ms. Grimes-- or Mr. Grimes and

6  Ms. Reulet?

7     A.  And Debra.  Debra was there.

8     Q.  So you say Debra is there.  And is that reflected

9  in the notes that you've made there on--

10    A.  Yes.

11    Q.  -- the exhibit?

12    A.  Yes.

13    Q.  And so the top right of the excerpt we see you've

14  written at least who you understand to be the parties to

15  the call--

16    A.  Yes.

17    Q.  -- other than Ms. Reulet?

18    A.  Yes.

19    Q.  And here you've noted Deb/Richard Grimes?

20    A.  Yes.

21    Q.  And you wrote down the statements that were made

22  by Mr. Grimes during this call?

23    A.  I don't know whose statements-- the first are

24  about-- discussion about ████'s custody.  It could've

25  been Deb, it could've been Michelle, I don't know.  I

1  don't-- I don't know who said the second statement.

2  Evidently Mr. Grimes had spoken with Mr. Reynal.  And I

3  don't know who said "I could care less about" and "don't

4  like Michael," sounds like Michelle.

5      Q.  So would you agree that you knew at the time when

6  you were writing this down who's making these

7  statements, you just don't recall today?

8      A.  I do not recall.

9      Q.  Turn to Page 12.  Page 12 shows a call from Disk

10  2 that you've labeled as Call No. 18?

11      A.  Yes, with Debra-- with Debra and Mr. Grimes.

12      Q.  And that's one of the calls you identified in

13  your pleading that was between Ms. Reulet and Richard

14  Grimes?

15      A.  Yes.

16      Q.  And, again, you've noted the parties on the call

17  to be Deb/Grimes.  Correct?

18      A.  Yes.

19      Q.  And you've written on the left column here the

20  letters MR.  Is that meant to signify Michelle Reulet as

21  the speaker?

22      A.  I think so, yes, because she's saying "I'm making

23  six figures," and I remember her saying that several

24  times.

25      Q.  And you've also written the word "Grimes."  Is

1  that to note Mr. Grimes as the speaker of those

2  statements?

3      A.   Again, I know he was present.  I don't know what

4  he said and what he didn't say.  It was hard to get a

5  word in edge-wise when Deb was there, she spoke most of

6  the time.

7      Q.   So from your handwritten notes from your review

8  of Call No. 18, did you attribute any statements being

9  made by Deb?

10      A.   I would say most of them were, although I did not

11  attribute them, just from the context.

12      Q.   Did you ever--

13      A.   It's either-- it's either Michelle or Deb I

14  think.

15      Q.   Would you agree with me that just looking at

16  these notes, there's no indication that anyone else is

17  the speaker other than Michelle Reulet and Mr. Grimes?

18      A.   Well, I don't see any indication about Mr.

19  Grimes.  Again, my memory was that Deb did most of the

20  talking.

21      Q.   Turn to the next page.

22      A.   Uh-huh.

23      Q.   Do you now see statements made by-- that you

24  attribute to Mr. Grimes as part of Call 18?

25      A.   Yeah, two-- two statements about money.

1    Q.  If you'd turn to Page 16.

2    A.  Pardon me?  16?

3    Q.  16, yes.  I'm sorry, Page 10, my apologies.

4  Please turn to Page 10.

5    A.  Page 10?

6    Q.  Yes.  Does Page 10 reflect Call No. 20 on Disk 2?

7    A.  Yes.

8    Q.  Again, you've noted the parties in the top right

9  portion of the call summary?

10   A.  Yes, Mr. Grimes.

11   Q.  The party you identified as Mr. Grimes?

12   A.  Right.

13   Q.  You write down statements made and you put the

14  letter "G" next to them.  Is that meant to signify Mr.

15  Grimes?

16   A.  I don't see a "G" anywhere.

17   Q.  In the left indent on Call 20.

18   A.  Left indent.  I'm sorry, I don't see that.

19   Q.  Does it show the calls made on June 6th?

20   A.  Yes.

21   Q.  Turn to Page 16.

22   A.  I'm there.

23   Q.  Does Page 16 have calls that you've designated 32

24  and 33?

25   A.  Yes.

1    Q.   And you've identified to the Court that Disk 2,

2    Call No. 33, is a call between Ms. Reulet and Mr.

3    Grimes?

4    A.   Yes.

5    Q.   You've noted that the only other party to the

6    call is Mr. Grimes?

7    A.   Yes.

8    Q.   And you've written down statements made by Mr.

9    Grimes?

10   A.   Yes, two statements.

11   Q.   Turn to Page 17.  On Page 17 there's a call that

12   you have identified as Call No. 37?

13   A.   Yes.

14   Q.   It's from Disk 2?

15   A.   I don't know which disk we're on.

16   Q.   Call No. 37 from Disk 2 is one of the calls you

17   identified to the Court as being between Ms. Reulet and

18   Mr. Grimes?

19   A.   Yes.

20   Q.   In your notes you identify the only other person

21   to the call as being Mr. Grimes?

22   A.   And Ms. Reulet.

23   Q.   And you write down statements made by Mr. Grimes?

24   A.   One statement, yes.

25   Q.   And a statement made by Ms. Reulet?

1    A.   Yes.  And, again, I don't know how much of the

2    call I listened to.

3    Q.   Turn to Page 18.

4    A.   There.

5    Q.   Does Page 18 contain a call that you have

6    identified as Call No. 43?

7    A.   Yes.

8    Q.   You identified Call No. 43 to be a call to--

9    between Ms. Reulet and Mr. Grimes?

10   A.   Yes.

11   Q.   You have identified in the top right portion of

12   your note that the only other party to the call is Mr.

13   Grimes?

14   A.   Yes.

15   Q.   You've written down statements made by Mr.

16   Grimes?

17   A.   Two.

18   Q.   You've written down a statement made by

19   Ms. Reulet?

20   A.   One.

21   Q.   If you'd look at the next call, Call No. 44, on

22   the same page.

23   A.   Yes.

24   Q.   And Call 44 is a call you identified to the Court

25   that was between Ms. Reulet and Mr. Grimes?

1    A.   Yes.

2    Q.   You note in the top right corner of the note that

3  the only other party to the call is Mr. Grimes?

4    A.   Yes.

5    Q.   You write down statements made by Mr. Grimes?

6    A.   Yes.

7    Q.   You write down a statement made by Ms. Reulet?

8    A.   Yes.

9    Q.   That statement relays information she received

10  from a person named Melanie?

11    A.   Yes.

12    Q.   Did you understand that to be Melanie Morgan?

13    A.   Yes.

14    Q.   Melanie Morgan at this time was Ms. Reulet's

15  criminal defense attorney?

16    A.   Yes.

17    Q.   At this time you didn't know whether Ms. Morgan

18  and Mr. Grimes had a joint defense agreement or not?

19    A.   Why would a civil attorney have a joint defense

20  agreement with a criminal attorney?  I don't believe

21  that's proper.

22    Q.   Did you ever ask?

23    A.   No, because it wasn't required for me to ask.

24  Mr. Grimes was a civil attorney, not subject to the

25  Sixth Amendment and not subject to attorney-client

 1    privilege.

 2        Q.   Turn to Page 46.

 3        A.   46?

 4        Q.   Yes, ma'am.

 5        A.   Okay, I'm there.

 6        Q.   There you have titled-- you begin your notes

 7    regarding Disk 5?

 8        A.   Yes.

 9        Q.   Turn to Page 48.

10        A.   Okay.

11        Q.   Do you see a call that you have designated as

12    No. 13?

13        A.   Yes.

14        Q.   Disk 5, Call 13, is a call you've identified to

15    the Court as a call between Mr. Grimes and Ms. Reulet?

16        A.   Yes.

17        Q.   You note that the only other party to the call is

18    Mr. Grimes?

19        A.   Yes.

20        Q.   You note that he is Ms. Reulet's custody

21    attorney?

22        A.   Yes.

23        Q.   You note that Grimes is updating Ms. Reulet on

24    the temporary custody issue?

25        A.   Yes.

1    Q.   And you write down that-- statements made by

2    Ms. Reulet?

3    A.   Yes.

4    Q.   You write down statements made by Mr. Grimes?

5    A.   Yes.

6    Q.   You write down the statement that Mr. Grimes is

7    in communication with Melanie, who you understand to be

8    Melanie Morgan about--

9    A.   Well, he was sending documents to Melanie Morgan

10   for Michelle Reulet to sign.  That's what it says.

11   "He'll e-mail to Melanie so MR can sign."  So I don't--

12   I don't know what communications he had with her.

13   Q.   Turn to the first page of the exhibit.

14   A.   The first page?

15   Q.   Yes, ma'am.  You said a couple of times that

16   because Mr. Grimes was a custody attorney that-- and

17   being civil, listening to his calls would not implicate

18   the Sixth Amendment because the Sixth Amendment wouldn't

19   apply in a civil case?

20   A.   I believe that's the position we took in the

21   pleadings, yes.

22   Q.   Mr. Metzger you knew to be representing

23   Ms. Reulet on the criminal DUI matter in Texas?

24   A.   I'm sorry?

25   Q.   You knew that Mark Metzger was representing

 1    Ms. Reulet on the criminal DUI matter in Texas?

 2       A.  You know, I probably did, but I don't remember

 3    what I knew at the time, but I'll accept that.

 4       Q.  So the first page you've noted that this

 5    summarizes your calls from Disk 1?

 6       A.  Yes.

 7       Q.  Turn to the second page.  You've noted the calls

 8    between Ms. Reulet and Mark Metzger, the DUI attorney,

 9    one of them is on Disk 1, Call No. 5?

10       A.  Yes.

11       Q.  Do you see Call No. 5 there on the second page?

12       A.  Yes.

13       Q.  And you've identified the party to the call as

14    Mark Metzger?

15       A.  Yes.

16       Q.  And you note that Ms. Reulet states, "This is

17    attorney-client privilege"?

18       A.  Yes.

19       Q.  You also write down other statements Ms. Reulet

20    makes?

21       A.  Yes.

22       Q.  And you write down a statement that Mr. Metzger

23    makes?

24       A.  I wasn't sure who made it.  It didn't sound like

25    him.  I have a question mark.

1    Q.   And you noted that he said that Mr. Metzger-- or

2    you noted that the speaker says that they've spoken with

3    Melanie.  You understand that to be Melanie Morgan?

4    A.   Yes.

5    Q.   And that she has high hopes for an appeal?

6    A.   Yes.

7    Q.   At this time was Ms. Reulet appealing Judge

8    Sebelius' decision to revoke her release?

9    A.   I don't know what the time frame was.  It

10   could've been the Tenth Circuit appeal, I don't know.

11   Q.   Turn to Page 54.

12   A.   Page what?

13   Q.   54.

14   A.   Okay, I'm there.

15   Q.   You've written there that this starts your

16   summaries from Disk 6?

17   A.   Yes.

18   Q.   Also on Page 54 there's a call that you

19   identified as Call No. 6?

20   A.   Yes.

21   Q.   You've identified Call No. 6 on Disk 6 to the

22   Court as a call between Ms. Reulet and Mr. Metzger?

23   A.   And I identify him here as her former boyfriend.

24   Q.   Well, that's not all you identify him as, is it?

25   A.   DUI attorney and former boyfriend.  I didn't-- I

1    had not remembered that.

2        Q.   You write down statements made, but you don't

3    write down who makes them.

4        A.   I would say the first statement is by Mr. Metzger

5    or Ms. Reulet, I don't know.  "Nothing new in the case,

6    waiting for court date."  And then Ms. Reulet says

7    something about Mike Elliott paying Mr. Metzger, so it

8    looks like these are possibly Michelle's statements.

9        Q.   You also told the Court during the December 28th

10   hearing that you were certain the calls between

11   Ms. Reulet and Mr. Reynal were not about the case you

12   were prosecuting?

13       A.   That was my memory at the time, yes.

14       Q.   Turn to Page 8.

15       A.   Eight?

16       Q.   Yes.

17       A.   I'm there.

18       Q.   This Page 8 contains a call you have labeled as

19   No. 44?

20       A.   Yes.

21       Q.   From Disk 1?

22       A.   Yes.

23       Q.   And you identify to the Court that Call No. 8--

24   or, I'm sorry, Call No. 44 from Disk 1 was a call

25   between Mr. Reynal and Ms. Reulet?

1    A.   Yes.

2    Q.   You've noticed-- you've written there the other

3    party to the call Andino, is that Mr. Reynal's first

4    name?

5    A.   Yes.

6    Q.   You've noted that Ms. Reulet asks if Melanie has

7    a legal ground for appeal?

8    A.   Yes.

9    Q.   To your knowledge, was the only appeal that was

10   going on at that time that she would be discussing was

11   the appeal of the bond revocation in your case?

12   A.   Yes, I think so.

13   Q.   And you write down what Mr. Reynal tells her?

14   A.   Yes, let's-- "lots to keep you from drinking."  I

15   don't know if that's about the appeal.

16   Q.   Please turn to Page 39.

17   A.   I'm sorry?

18   Q.   Page 39.

19   A.   Okay, I'm there.

20   Q.   Do you see a call that you've designated as Call

21   No. 11?

22   A.   Yes.

23   Q.   And Disk 4, Call 11, is one of the calls you

24   identified to the Court as being between Ms. Reulet and

25   Mr. Reynal?

1    A.   Yes.

2    Q.   Call No. 11, again, you've identified the only

3    other party on the call is Andino, which is Mr. Reynal?

4    A.   Yes.

5    Q.   You write down Mr. Reynal's comment that he saw

6    the judge's order?

7    A.   Yes, and I don't know what order that is.

8    Q.   You write down Mr. Reynal's comments that he

9    needs-- she needs to take the case in front of 12 jurors

10   to win at trial?

11   A.   Yes.

12   Q.   Mr. Reynal mentions you by name?

13   A.   Yes.

14   Q.   Mr. Reynal tells her it just takes one person on

15   a jury?

16   A.   Yes.

17   Q.   Mentions you again by name by saying what you had

18   offered as part of a plea?

19   A.   When we were discussing pleas with him, yes.

20   Q.   And he offers his advice about whether she should

21   take that plea or not?

22   A.   "You can do better even if convicted."

23   Q.   Is that a yes to my question?  He offers her

24   advice about whether she should accept the offer?

25   A.   I don't know if that's advice or not, but...

1    Q.   Does he tell her, "You have a shot at trial"?

2    A.   A shot at trial?  I don't see that.  I see, "You

3    need to get this before 12 jurors to win.  And if not,

4    the judge will decide the appropriate punishment."

5    Q.   Keep reading.

6    A.   "Tanya is spinning her web of bullshit.  Just

7    takes one person on a jury.  Concerned about being

8    dishonest with police officer.  Will come out at trial

9    if you testify.  Be ready to explain."

10   Q.   Ms. Treadway, you don't need to read out loud.

11   If you could just identify the portion of your notes

12   that state, "You have a shot at trial."

13   A.   Oh, here it is.  I see it.

14   Q.   Thank you.

15   A.   "You have a shot at trial."

16   Q.   Please turn to Page 54.

17   A.   I'm there.

18   Q.   On Page 54 you've identified a call as being Call

19   No. 73?

20   A.   73?  I don't see 73, I'm sorry.

21   Q.   Are you looking at Page 54 of the exhibit?

22   A.   Yes.  Disk 6?

23   Q.   All right.  Now, look at Page-- I apologize.

24   Look at Page 55.

25   A.   Okay.  All right.

1    Q.   Do you now see Call No. 73?

2    A.   No.  I see Calls 10 and 11.

3    Q.   I'll tell you what, look through your notes about

4    your review of Disk 6 and you let me know--

5    A.   Oh, here it is.  I apologize.  It's way at the

6    bottom.  I see it.  I see it now, yes.

7    Q.   Disk 6, Call No. 73, is a call you've identified

8    to the Court as being between Ms. Reulet and Mr. Reynal?

9    A.   Yes.

10   Q.   In your notes of Call No. 73, you note that the

11   only other party to the call is Andino, which we know

12   belongs-- is Mr. Reynal's name.

13   A.   Yes.

14   Q.   And you write down comments made by Mr. Reynal?

15   A.   Some of them are, yes, some of them are

16   Ms. Reulet's.

17   Q.   And then you write down a particular comment by

18   Mr. Reynal that you put a box around and put a star next

19   to.  Do you see that?

20   A.   Yeah.  "Afterwards file a Hyde claim."

21   Q.   What's a Hyde claim?

22   A.   A Hyde claim is a claim that a defendant who's

23   acquitted can file to recover costs from the government

24   in certain very narrow circumstances.

25   Q.   Such as prosecutorial misconduct?

1   A.  I'm not sure that that's the only one, but it may

2   be one of them.

3   Q.  Do you recall telling Judge Crabtree during that

4   hearing on December 28th that it was a sorry state of

5   affairs when your word wasn't your bond in front of the

6   court?

7   A.  I don't remember that.

8   Q.  Do you agree?

9   A.  I'm sorry?

10   Q.  Do you agree with that statement?

11   A.  Say it again.

12   Q.  It's a sorry state of affairs when the Court

13   can't rely on your word as your bond?

14   A.  Yes, I agree with that.

15   Q.  So do I.

16           MR. BELL:  I have no further questions.

17                 CROSS EXAMINATION

18   BY MS. VANBEBBER:

19   Q.  I have just a couple of questions for you.  You

20   said you left the U.S. Attorney's Office in September of

21   2017?

22   A.  Yes.

23   Q.  So you were there during the time that the

24   Special Master was appointed?

25   A.  Yes.

1    Q.   And do you recall that in December of 2016, Emily

2    Metzger sent out what is known as a litigation hold

3    letter?

4    A.   Yes.

5    Q.   Do you remember getting that?

6    A.   Yes.

7    Q.   And do you recall that you were required to

8    maintain a whole laundry list of documents and things?

9    A.   Yes.

10   Q.   And did you do that?

11   A.   Yes.

12   Q.   Did you ever turn them in to Ms. Metzger or just

13   maintain them?

14   A.   I believe we did both, depending on what they

15   were.  But I remember sending information to Emily.

16   Q.   Did you--

17   A.   Because some of it-- some of it was-- some of it

18   was electronic and I know it was being gathered by the

19   IT people.  So I don't know what happened to that.  But

20   I didn't do anything to delete it, so I maintained it.

21   Q.   Did you ever-- ever have occasion to speak with

22   the Special Master?

23   A.   No.

24   Q.   Or meet with him?

25   A.   No.

 1   Q.   Did anybody ever tell you not to meet with him or

 2   speak with him?

 3   A.   No.

 4   Q.   Okay.

 5           MS. VANBEBBER:   No other questions.

 6                   CROSS EXAMINATION

 7   BY MR. CLYMER:

 8   Q.   Ms. Treadway, I don't remember the page of 592H,

 9   but 592H was the transcript.  And if I recall correctly,

10   there was a passage in there where you told the judge in

11   that proceeding that you only listened to the calls

12   involving attorneys for voice recognition.  Do you

13   remember that passage in 592H?

14   A.   I don't know if it was voice recognition, but to

15   recognize who was there.

16   Q.   The passages from the notes in Exhibit 592 that

17   Mr. Bell just went through with you seem to suggest that

18   you not only were going through those calls for content,

19   but you were recording the content in some considerable

20   detail.  Would you agree with me on that?

21   A.   Well, some of the calls, yes.  Some of the calls,

22   no.  Some of the calls I would just listen to a few

23   minutes.  Sometimes they were ten minutes long and I'd

24   maybe listened to two minutes of it and said not

25   important, move on.  And I would record what I listened

1   to.

2       Q.   So how do you reconcile what you told the judge

3   about what you were trying to do with the extensive

4   nature of some of these notes?

5       A.   Well, I think that the way I am thinking through

6   the issue at the time is, is there an attorney-client

7   privilege that has been violated?  Answer no.  Is there

8   a Sixth Amendment privilege that has been violated?  No.

9            And when I was recounting to the Court what I had

10  listened to, especially with Mr. Grimes, the custody

11  attorney, and now this Mr. Metzger person, those calls

12  were unimportant.  I don't-- I didn't remember and I

13  certainly-- when I looked at my notes, they didn't

14  reflect anything of importance.  So I just--

15      Q.   And that's not my question.

16      A.   I'm sorry.

17      Q.   That's all right.  I understand that there was a

18  dispute in this proceeding about the privilege and the

19  Sixth Amendment, whether one or the other applied or

20  whether both applied or whether neither applied.  I'm

21  not asking you about that.

22      A.   Uh-huh.

23      Q.   I'm asking you about the statement you made to

24  the judge that you had only listened to the voice-- the

25  calls to identify voices.  And I'm asking you how you

1    reconcile that with the detailed note-taking you made on

2    592 of calls that you knew to involve the lawyers.

3        A.   Well, I'm not sure that we're talking about the

4    same lawyers.  Are you talking about Mr. Metzger and Mr.

5    Grimes or Mr. Reynal?  Because we had told the judge we

6    had listened to the Reynal calls.

7        Q.   In that hearing?

8        A.   Yes.

9             MR. CLYMER:  May I have a moment, Your

10   Honor?

11            THE COURT:  Yes.

12            (Confer).

13            MR. CLYMER:  Just give me the page number if

14   you could.  What page number is that on the document?

15            MR. BELL:  Just a moment, I can tell you.

16            MR. CLYMER:  I'm sorry.

17            MR. BELL:  That's all right.  Page 15,

18   Line 17 through 25.

19            MR. CLYMER:  You said Page 15 of 592?

20            MR. BELL:  592H.

21            MR. CLYMER:  592H, Page 15.

22            THE WITNESS:  Yeah, it--

23   BY MR. CLYMER:

24       Q.   So can you read that passage to us?

25       A.   Where are we starting at, 15?

1     Q.   Yes.

2     A.   Which passage?

3     Q.   "Would be me."

4     A.   "Would be me.  The 14 calls involved, the

5   majority of them I believe are with the custody

6   attorney, Mr. Grimes.  Could care less what that

7   conversation was about, those conversations were about.

8   I don't know whether they were confidential

9   communications or not, but I doubt very seriously that

10  they were."

11        And the Court says, "But your position-- you're

12  telling me as an officer of this court that you have not

13  listened to the calls between Ms. Reulet and Mr. Grimes

14  except to identify them and identify who was present?"

15  "That was it.  Same thing with Mr. Metzger."

16    Q.   And that's exactly the passage I was talking

17  about in 592H.  And I-- and I'm not sure I understood

18  your answer so I'll ask it again.

19        How do you reconcile what you told the judge

20  there on Page 15 of 592H with the passages that Mr. Bell

21  identified for you where you seem to have listened to

22  substantial parts of calls involving Ms. Reulet and an

23  attorney and took notes of the content of what they were

24  saying to each other?

25    A.   Well, by December of 2016 I had forgotten that

 1   because they were so unimportant.  That's the only way I

 2   can reconcile it.

 3              MR. CLYMER:  Nothing further, Your Honor.

 4              THE COURT:  Anything else?

 5              MR. BELL:  We have no further use of the

 6   witness, Your Honor.

 7              THE COURT:  All right.  May Ms. Treadway be

 8   excused?

 9              MR. BELL:  Yes, Your Honor.

10              MR. CLYMER:  No objection.

11              THE COURT:  All right.  She's excused.  All

12   right.  It's 12:00, we'll reconvene at 1:00.

13              (Recess).

14              THE COURT:  All right.  You can be seated.

15              MS. VANBEBBER:  Your Honor, if I may, I've

16   got a couple of housekeeping things that I would like to

17   get on the record before we start.

18              THE COURT:  Okay.

19              MS. VANBEBBER:  The government delivered to

20   us this afternoon Carter documents-- Document 7, that's

21   a-- another thumb drive, No. 7.  And for the record,

22   what is on there is 57,663 kilobytes or a little more

23   than-- well, .057663 gigabytes.

24              The other thing that I would like to do, if

25   I may, is enter into the record a stipulation.  And it

1   is that Thumb Drive No. 5, which-- which is the

2   repository of Erin Tomasic, is the version that was

3   printed by Mr. Steeby back in June of 2017 and it has

4   not been altered since then.

5            THE COURT:  All right.  So noted.  All

6   right.  You can call your next witness.

7            MS. BRANNON:  Actually, Your Honor, if I

8   could ask to put something on the record and maybe ask

9   for some information.  We just wanted to be clear.  The

10   notes that we-- that were introduced in-- with

11   Ms. Treadway, I don't remember the document number.

12            THE COURT:  592.

13            MS. BRANNON:  592.  It's our understanding

14   that we obtained those notes through the subpoena *duces*

15   *tecum* production to the Special Master from the U.S.

16   Attorney's Office.  My understanding is that those

17   documents were gathered after Ms. Treadway left the

18   office.

19            For the AUSAs who are still in the office,

20   it's my understanding that the production in response to

21   the subpoena *duces tecum* was entrusted to each of the

22   individual AUSAs, such as Ms. Morehead or Ms. Catania,

23   to make the production.  And we don't know whether it

24   was reviewed or checked against anything at that point.

25   But that's my understanding.  If that is in error, I

1  would like the government to correct that because we are

2  very concerned and want to know where these documents

3  come from and who has reviewed them.

4          MR. SLINKARD:  Your Honor, what I can tell

5  the Court is in response to the subpoena *duces tecum*,

6  U.S. Attorney McAllister and I initially sat down with

7  the subpoena and attempted to identify individuals we

8  thought were likely to have information related to the

9  demands for production sought by the subpoena.

10         The subpoena was sent to those individuals

11 with direction that they not respond-- or not "reply to

12 all" because of the nature of the sequester of witnesses

13 in this case, and many of them were also subpoenaed

14 witnesses.  They were told to review the entire subpoena

15 in full, not-- not just limit themselves to the areas

16 where we had identified them as people we thought might

17 have something.

18         They were to indicate back whether-- if they

19 disagreed that they had something, if they knew of

20 someone else who they believed likely to have something.

21 And then there was a procedure whereby they were to

22 submit the documents to an individual in our office,

23 who's had no involvement with this litigation, to

24 collect them in a particular spot on the computer system

25 where they could then be reviewed by USA Clymer-- or

1   excuse me, USA McAllister and Special Attorney Clymer

2   and, when necessary, myself.

3          So I think it is appropriate to say that we

4   directed-- and I should say we expanded that group as we

5   either developed names from people saying that they

6   thought there was someone else.  We developed names as a

7   result of documents that came in for review or we

8   definitely expanded it to everyone once testimonial

9   subpoenas were issued in the case to anyone who had a

10  testimonial subpoena.

11         While we had an individual requirement for

12  folks to identify and collect documents, they were told

13  that they were not to be the ones reviewing them for

14  whether they should or should not be produced, that that

15  would be done by USA McAllister and Special Attorney

16  Clymer.

17         And I should say that the procedure in place

18  also allowed us to go to the Office of the Deputy

19  Attorney General if there had been a disagreement as to

20  what should or should not be produced.  As a practical

21  matter, the initial review was done by U.S. Attorney

22  Clymer and Special Attorney-- or Special Attorney Clymer

23  and U.S. Attorney McAllister.

24         So individuals were told to identify and

25  collect and submit for review.  Of course, many

1  documents would be produced by many different people in

2  a duplicative fashion because if it, for example, was an

3  e-mail that was addressed to many people, that sort of

4  thing.

5            For former employees, which would've

6  included Erin Tomasic and Tanya Treadway due to her

7  retirement, and I suppose to a degree Mike Warner,

8  although his time period was far before most of the time

9  periods in these requests, former employees, we had the

10  ability to designate someone to do inquiry of their

11  e-mail, and that is what we did for former employees.

12            I can tell the Court I don't think it would

13  be appropriate, unless-- unless I'm told otherwise from

14  behind me, to suggest exactly how every document came to

15  be reviewed for production.  But the notes that

16  Ms. Brannon referred to, one of the Special Master

17  requests directed any documents that were produced with

18  respect to the litigation hold as opposed to-- a "hold"

19  being to hold the items if someone actually produced to

20  the hold coordinator any documents.  And I believe those

21  documents were responded-- were responsive to that

22  subpoena request as being documents that had been

23  produced to the litigation hold coordinator by an

24  individual attorney.

25            THE COURT:  All right.  So you're saying

1   that particular request by Special Master was for

2   documents that had been preserved under the litigation

3   hold or preserved and produced?

4            MR. SLINKARD:  I apologize, I don't have the

5   subpoena in front of me.  But either Request No. 1 or

6   Request No. 2, both of them dealt with Emily Metzger's

7   litigation hold letter.  And one or both of them

8   directed responses that were made to the litigation hold

9   as being responsive to the request.

10           And for the most part, the hold, as there's

11  been testimony in court, was a directive that went out

12  to people that said identify what you might have and

13  preserve it.  It did not request that it be produced to

14  Ms. Metzger.

15           But at the point of her retirement, Ms.

16  Treadway, who had been holding documents pursuant to

17  that litigation hold instruction, literally handed to me

18  in the Topeka office a redwell of documents and I handed

19  them to Ms. Metzger at the first opportunity because

20  they were labeled to be responsive to the litigation

21  hold that Emily had put in place.

22           I believe, although I don't know with

23  certainty, that the materials Ms. Brannon referred to

24  came from that trove of documents that Ms. Treadway had

25  been holding pursuant to the litigation hold that were

1    conveyed to Ms. Metzger to continue to hold when

2    Ms. Treadway separated from employment.

3                  THE COURT:  All right.  Thank you.

4                  MS. BRANNON:  So, Your Honor, I think what I

5    would ask before we recess tomorrow, if we could just

6    have an accounting from the government about where they

7    are in the production, what the status of the privilege

8    log is.  We have a number of documents that the

9    providence is not clear.  It's just kind of a

10   free-standing sheet of information.  We don't know where

11   it came from.  So just before we recess this hearing if

12   they could let us know where we are and what to expect,

13   I think that would be helpful.

14                  THE COURT:  All right.  I think that's

15   well-taken.

16                  MR. CLYMER:  Your Honor, just to avoid any

17   confusion, there is no privilege log, as I told the

18   Court when we first discussed this.  We didn't make a

19   privilege log.  We don't believe there's any obligation

20   to make a privilege log under these circumstances.

21                  So we have no problem in communicating with

22   counsel and with the Court about our progress and our

23   expectations.  I-- my guess is we're either done or very

24   close to being done and we'll-- we'll obviously keep the

25   parties informed.  But I don't want the Court or the

 1    parties to expect a privilege log.

 2              MS. VANBEBBER:  May I speak to that?

 3              THE COURT:  Yes.

 4              MS. VANBEBBER:  As a matter of practicality,

 5    I'm interested in what you've given us and glad to have

 6    it, but I'm just as interested in what you didn't give

 7    us.

 8              And I don't think this is any different than

 9    any other litigation where you would have to-- whether

10    you call it a privilege log or find some other way to

11    identify what's been withheld.  Because at the point of

12    which we believe it should not have been withheld,

13    that's for the judge to determine, just as it would be

14    in any other typical litigation.

15              So, I mean, I don't know whether you want to

16    call it a privilege log or you want to call it something

17    else, but we need to know what was withheld and on what

18    basis.

19              MR. CLYMER:  Your Honor, when Mr. McAllister

20    made his first production of the materials to the

21    Special Master, there was an accompanying cover letter

22    and that cover letter described the dividing line that

23    the Department of Justice settled on for purposes of

24    disclosure and non-disclosure.  So we have notified the

25    Special Master in response to that subpoena exactly

 1   where we drew the line.

 2              I think that if-- I would like to think that

 3   the parties in this case would realize based on the

 4   nature and the amount of documentation we've given that

 5   there is a very good-faith basis effort here to provide

 6   anything that would be relevant to the allegations in

 7   this case, but perhaps not.

 8              MS. BRANNON:  We would just note that it is

 9   I believe the Special Master's second anniversary in

10   this case.  This has been going on a while.

11              THE COURT:  Well, I know, for example,

12   shortly before you were-- before you entered an

13   appearance in this case, Mr. Clymer, before you were

14   appointed, if that's the right word, to represent the

15   government with respect to the Special Master's Phase

16   III investigation, there was this e-mail traffic and I--

17   I know that, I think it's admitted into evidence.

18              Up until that point, the Special Master and

19   Ms. Metzger and perhaps others were engaged in

20   back-and-forth on search terms and had agreed that those

21   would be run against Ms. Tomasic's repository.  And

22   the-- the search terms needed to be tweaked so that the

23   production wouldn't be so big.  In the Special Master's

24   view, that had been done.

25              And then for the first time in the Special

1    Master's view, Ms. Metzger or whoever it was he talked

2    to at that point, Ms. Barnett or Ms. Metzger, said,

3    well, we still can't produce because there are items

4    that are subject to national security, privilege, and

5    privacy I think were the three words that were used.

6    And then there really was no more interaction after

7    that.

8            You got involved in the case and shut down

9    the search process and shut down production at least at

10   that point.  So I'm concerned that you have-- the

11   government has taken the view that there are documents

12   that are privileged in some way.  And I know you don't

13   call *Touhy* privilege, but that might be a basis under

14   which you withhold.  For example, in *Touhy*, one of the

15   *Touhy* provisions has to do with national security.

16           MR. CLYMER:  Right.

17           THE COURT:  And I think the proper thing to

18   do is to-- in some sort of log-- and, I mean, we're all

19   very familiar with these kind of logs.  They're used in

20   civil litigation all the time, identify we didn't

21   provide these particular documents because they're not

22   discoverable under these categories.

23           You could present that to the Court.  You

24   should present that to the Court in camera so that I can

25   just be satisfied that you went through that

1  deliberative process and have a basis to withhold what

2  you withheld.  Otherwise, I'm in the dark, the parties

3  are in the dark.  I can't make a judicial determination

4  as to whether there's any other discovery that should be

5  properly disclosed.  And that's why we need a log.

6          MR. CLYMER:  Your Honor, as we went through

7  the process, I think Mr. McAllister and Mr. Slinkard

8  could back me up with this, the amount of documentation

9  we had to go through, it would be extremely difficult,

10 time-consuming and cumbersome to try to go back now and

11 create a log of what was withheld.  And I-- I think

12 under these circumstances it's not clear that the

13 government has a lawful-- legal obligation to do so.  So

14 this is something I would have to consult with the

15 Office of the Deputy Attorney General about.

16          But I-- I can't image we would be able to

17 get a log to the Court, even if it was approved, if we

18 were authorized to disclose that information, I can't

19 see us having such a document ready anytime in the near

20 future.

21          THE COURT:  Well, that makes it sound like

22 what you've withheld is voluminous as opposed to what

23 you produced.

24          MR. CLYMER:  Part of the problem, Your

25 Honor, is this:  Much of what was withheld were drafts

1    of pleadings that were filed in court.  So Assistant

2    U.S. Attorney No. 1 drafts a pleading and circulates it

3    to four other people.  So now we have five-- four or

4    five messages with this draft pleading.  From there,

5    other people made comments and it gets changed.  So that

6    one pleading may generate 15 to 20 e-mails, or even more

7    sometimes.  And that all is attorney work product and we

8    don't believe we have an obligation to disclose that.

9          The dividing line that Mr. McAllister

10   identified was that we would produce-- and I can't quote

11   it verbatim, but I'm paraphrasing here, my recollection

12   is what the letter says is we would produce any records

13   that we had that were related to the conduct relevant to

14   the allegations of misconduct made in this case.

15         So if it had to do with the chambers entry,

16   we produced it.  If it had to do with the conduct

17   involving alleged Sixth Amendment violations or

18   violations of the attorney-client privilege, we produced

19   it.  If it had to do with conduct involving failure to

20   cooperate with the Special Master, we produced it.  If

21   it had to do with, you know, a violation of a court

22   order, if it involved that conduct, we produced it.

23         What we didn't produce were internal

24   communications that were not-- that did not describe the

25   conduct that's at issue in this hearing.

 1            THE COURT:  Well, I'm not suggesting you

 2    should produce a relevance or irrelevance log.  I'm

 3    suggesting that you should produce a log with respect to

 4    those materials that you withheld that might be

 5    relevant, but that you didn't withhold them on the basis

 6    that they're irrelevant.  You withheld them on the basis

 7    of a privilege, national security, I mean, the things

 8    that you were concerned about in Emily Metzger's e-mail,

 9    and as to why she was not-- or somebody was telling her

10    she was not to produce that which had been identified by

11    the search.

12            MR. CLYMER:  Your Honor, the-- two things

13    about that.  First of all, given the broad scope of the

14    subpoena *duces tecum*, the e-mail chains I described a

15    minute ago, we would've had to produce all those e-mail

16    chains which are all work product and-- because I think

17    that those fall within-- if the pleadings are-- fall

18    into one of the 13 categories in that subpoena *duces*

19    *tecum*, that would be literally responsive to the

20    subpoena *duces tecum*, but it's work product.

21            So what we would have to do now is go back

22    and document each one of those many, many, many e-mail

23    messages and say this was withheld because of work

24    product.  It's going to take us an enormous amount of

25    time and effort to do that.

 1                    THE COURT:  So are you talking about-- what

 2       you're referring to as work product are draft e-mails--

 3                    MR. CLYMER:  No.

 4                    THE COURT:  -- among AUSAs that had

 5       something to do with pleadings they were working on in

 6       the *Black* litigation?

 7                    MR. CLYMER:  Somebody drafts a pleading in

 8       Microsoft Word and they send it to somebody else.  That

 9       person uses the "track change" feature in Microsoft Word

10       and makes edits to the document that's going to be

11       filed.

12                    THE COURT:  And-- and what request of the

13       Special Master would that fall under?  Because I--

14                    MR. CLYMER:  I'd have to go back and look at

15       the-- the categories are drafted in such a way that when

16       people produced the responsive documents, they produced

17       those as responsive to categories in the subpoena *duces*

18       *tecum*.

19                    THE COURT:  Okay.  I tell you what we're

20       going to do:  It's been apparent to me for some time

21       that we're going to have to have a hearing on this, and

22       we're not going to be able to do it this week, but a

23       hearing on the production.

24                    I mean, there was still another thumb drive,

25       as Ms. VanBebber made a record, produced today.  There

1    was a massive thumb drive, Thumb Drive No. 6 that was

2    produced on Sunday to the FPD and Monday of this week to

3    the Special Master, who agreed to take it on Monday

4    morning rather than Sunday, which, you know, is of

5    concern.

6              I had set a deadline for all production and

7    I gave the government I think a week longer than they

8    asked for.  You advised me that you could not make that

9    because of the volume of the outstanding discovery and

10   that you would have to do it on a rolling basis, and the

11   rolling basis continues apparently even as of today.

12             The parties are indicating they haven't

13   heard from you whether it's-- whether it's complete

14   today or whether there will be more to come.  We're

15   going to need to have a hearing on this.

16             So for example-- and I will tell you that

17   I've asked the Special Master to make a record of when

18   they received this-- this additional discovery after the

19   deadline, what the volume of it was.  And from the

20   review that they've been able to do, which I have to

21   tell you is pretty limited because they've been here in

22   court on this hearing, what-- what the subject matter

23   was or who it pertained to, they have not had the

24   opportunity to go through all of this.  I imagine the

25   FPD hasn't either.

1          You, yourself, told me that Thumb Drive 5

2    was so voluminous that you didn't go through and try to

3    cull it at all, it was just too big.  And that's the

4    biggest production so far.  That came in over the

5    weekend I believe before we started this hearing last

6    Tuesday.  So I think we're going to need to have a

7    hearing about this and what I-- you know, I'm going to

8    have to decide what to do about this.

9          I think the parties have probably been-- I

10   mean, they've been impeded in their ability to ask

11   witnesses questions about e-mails or whatever it is that

12   either they haven't received yet or they've received and

13   they can't get to because of the volume of the-- and the

14   untimeliness of the discovery.

15         So we'll have-- we'll have a hearing about

16   that.  I don't know when.  After this hearing closes

17   tomorrow, we'll-- or sometime thereafter we'll-- we'll

18   figure out when people are available sometime next month

19   and we'll have to figure out what to do about that.  And

20   you're going to have to be prepared to tell me how much

21   more discovery there's going to be and how long it's

22   going to take.

23         And I think it's only fair to leave the

24   record open.  I-- you know, I don't know.  I mean, I

25   don't intend to have another trial once all the

1    discovery is closed.  We all knew that this was-- this

2    hearing was going to happen.  It's been delayed several

3    times, really since, what, January of 20-- I can't even

4    keep my years straight.  Since January of 2018.  That

5    was the first time I tried to have this hearing.  Tried

6    again in May.  And now here we are.

7              So, you know, I say all that to say we're

8    going to have to have a hearing on this and I'm going to

9    have to figure out what the proper remedy will be.

10             All right.  Anything else?  All right.

11   Let's call the next witness.

12             MR. BELL:  Your Honor, before we do, I'd

13   move to admit-- they are essentially the-- the

14   presentations we used during the examinations of

15   Ms. Morgan and Ms. Treadway as demonstrative exhibits.

16   They're 692 and 693.

17             THE COURT:  What are they now?

18             MR. BELL:  They're the-- essentially

19   demonstratives of the-- demonstrative exhibits I used

20   during the examinations of Ms. Morgan and Ms. Treadway.

21             THE COURT:  And you're offering them as--

22   Demonstrative 692 is Ms. Morehead?

23             MR. BELL:  No, Ms. Morgan-- I'm sorry.  Ms.

24   Morgan and Ms. Treadway.

25             THE COURT:  Oh, Ms. Morgan.  And 693 is

1    Ms. Treadway--

2                    MR. BELL:  I used both of them.

3                    THE COURT:  -- and they're excerpts of

4    testimony and documents.  All right.  I'll admit those

5    as demonstrative.

6                    MR. BELL:  Your Honor, at this time we would

7    recall Melanie Morgan.

8                    THE COURT:  I'm sorry?

9                    MR. BELL:  We'd recall Melanie Morgan.

10                         MELANIE MORGAN,

11   recalled as a witness on behalf of the Federal Public

12   Defender's Office, having been previously duly sworn,

13   testified as follows:

14                    REDIRECT EXAMINATION

15   BY MR. BELL:

16      Q.  Ms. Morgan, were you present for Ms. Treadway's

17   testimony?

18      A.  I was.

19      Q.  The calls between your client, Ms. Reulet, and

20   Mr. Grimes and Mr. Metzger, did the information

21   contained in those calls bear on the criminal

22   prosecution that you were representing Ms. Reulet in?

23      A.  They did.

24      Q.  How so?

25      A.  There was a lot of overlap between what was

1    happening outside of the courtroom with the criminal

2    prosecution.  There was the custody issue, of course.

3    There was the issue related to her mother's estate and

4    there was the issue related to the DUI.

5         And the reason that those came into play is

6    because-- is for two reasons.  The first reason that it

7    came into play is because we were litigating Michelle's

8    release.  She was initially taken into custody in May.

9    We appeared sometime mid to late June in front of

10   Judge Crabtree and had another evidentiary hearing.  And

11   then, of course, we appealed that up to the Tenth

12   Circuit sometime in July.

13        And at each of those opportunities-- or each of

14   those hearings, things about her DUI, things about her

15   custody situation with her child were coming into play

16   at those particular hearings.  So they were-- they were

17   very relevant.

18   Q.   So let me show you part of the excerpts of the

19   calls.  The first call from Mr. Metzger, it's dated

20   May 26th of 2016.

21   A.   Yes.

22   Q.   Did Michelle-- was her-- or Ms. Reulet, was her

23   bond revoked on May 24th, 2016?

24   A.   Right about that time.

25   Q.   So was this call made between the time her

1   release had been originally revoked by the magistrate

2   and the time that Judge Crabtree reviewed that order?

3       A.   Yes.

4       Q.   And, in fact, was the hearing in front of

5   Judge Crabtree on June 15th?

6       A.   I believe that's the date.

7       Q.   Did Ms. Treadway in opposing Ms. Reulet's request

8   for release use or reference facts about the DUI

9   infraction during the hearing?

10      A.   Yes.

11      Q.   There's another call to Mr. Metzger dated on

12  July 6th, 2016?

13      A.   Yes.

14      Q.   During that time was Ms. Reulet's appeal to the

15  Tenth Circuit of her release order-- or detention order

16  still pending?

17      A.   Yes.

18      Q.   And did the brief to the Tenth Circuit that was

19  filed on behalf of the government contain facts

20  regarding the DUI charge?

21      A.   It did.

22      Q.   We heard some testimony about Ms. Reulet having

23  to get a custody attorney or a family law attorney

24  because at the time she was the sole caretaker for her

25  small child.  Was the father of that child a

1  co-defendant in this case?

2      A.  He was not only a co-defendant, he was called by

3  the government to testify against her in terms of

4  discussing her drinking habits and other-- other

5  matters.

6      Q.  During her bond revocation?

7      A.  Yes.

8      Q.  Had the co-defendant already been-- had his

9  release revoked before Ms. Reulet's release had been

10 revoked?

11     A.  He had.

12     Q.  The calls between Ms. Reulet and Mr. Grimes,

13 could a reasonable person listen to those and conclude

14 that Ms. Reulet was very concerned about her child being

15 given to the father or co-defendant?

16          MR. CLYMER:  Objection, speculation.  They

17 say what they say.

18          THE COURT:  Overruled.  You can answer it if

19 you can.

20          THE WITNESS:  Yes.

21 BY MR. BELL:

22     Q.  Would a reasonable person reviewing those calls

23 come to the conclusion that the basis of Ms. Reulet's

24 concern was a fear of abuse by the co-defendant?

25     A.  Yes.

1    Q.   Could a reasonable person after listening to

2    those calls conclude that Ms. Reulet was motivated to

3    make sure that she would get out of custody before the

4    co-defendant in order to prevent the child being put in

5    the custody of the co-defendant?

6    A.   Yes.  I think there's a phone call where she

7    says, "I need you to tell me this is all worth it."

8    Q.   At a certain point after these phone calls were

9    made, did Ms. Treadway come to you and essentially pitch

10   a plea offer?

11   A.   Yes.  Midway between-- we did not conclude the

12   hearing on the listening of the phone calls.  There were

13   two outstanding issues.  One is a witness failed to

14   appear, and that was Sergeant Bigelow from CCA, and the

15   second issue was Ms. Treadway's own testimony.

16       And between that hearing that concluded December

17   20th-ish or right around the end of December and when

18   the judge had set it for either the 4th or the 10th of

19   January, I don't remember, there was a proposal made for

20   a resolution.

21   Q.   And was there a particular feature or highlight

22   of the proposal for resolution that Ms. Treadway

23   communicated to you?

24   A.   Yes.  This was a-- a five-year deal, (c)(1)(C)

25   plea.  Michelle had already been in custody for a

1  significant period of time.  And based on anticipated

2  credits that she would receive, that she would get out

3  of custody before her husband-- ex-husband.

4      Q.   And as it was communicated to you by

5  Ms. Treadway, that was one of the attractive features of

6  the deal she was offering?

7      A.   Yes.

8      Q.   Did Ms. Reulet ultimately accept that deal?

9      A.   She did.

10      Q.   What happened after that?

11      A.   After Michelle was convicted and she was

12  sentenced, Mr. Myers was sentenced to a request by the

13  government for time served.

14      Q.   Before that request had been made at Mr. Myers'

15  sentencing, had he had a different deal with the

16  government?

17      A.   He did have a cooperation deal, but my estimation

18  of where that cooperation would've taken him, especially

19  since he didn't testify in any court trial other than

20  the proceeding in the revocation proceedings, was that

21  he would've not been out before Ms. Reulet.

22      Q.   So did the feature that Ms. Treadway articulated

23  to you for your client that came along with that deal,

24  did that come to fruition?

25      A.   No.

 1      Q.   Do you recall Ms. Treadway testifying that
 2   Mr. Reynal was no longer acting as Ms. Reulet's counsel
 3   during these times because Judge Crabtree had permitted
 4   him to withdraw?
 5      A.   Yes, I do.
 6      Q.   Do you remember the hearing on December 28th,
 7   2016, where that topic came up?
 8      A.   Yes.
 9      Q.   Do you remember Ms. Treadway making that same
10   argument to Judge Crabtree, that Mr. Reynal was no
11   longer Ms. Reulet's attorney because he had been
12   permitted by the Court to withdraw?
13      A.   I do remember that.
14      Q.   Do you recall what Judge Crabtree told
15   Ms. Treadway in response?
16      A.   I don't remember the specific language, but he
17   essentially told her she was wrong.
18      Q.   So let me show you what's been admitted as
19   Exhibit 592H, to the 107th page.
20           During that hearing does Judge Crabtree
21   explicitly tell Ms. Treadway that she has misread his
22   order and, in fact, Mr. Reynal had not withdrawn at the
23   time Ms. Treadway thought?
24      A.   Absolutely.  The judge says, "I'm telling you
25   that you're mistaken about that position and that you, I

1   believe, misread that order."  And then he re-emphasizes

2   it and says he did not withdraw.

3       Q.   In the calls that we reviewed between Ms. Reulet

4   and Mr. Reynal, and we can go look at them, was the

5   first one that you recall, did it occur on June 5th,

6   2016?

7       A.   Approximately.

8       Q.   The last one on July 18th, 2016?

9       A.   Yes.

10      Q.   Did the Court ultimately allow Mr. Reynal to

11  withdraw on August 30th, 2016?

12      A.   Yes, he did.

13      Q.   When you were having this hearing with

14  Judge Crabtree, was there a specific request that you

15  had made of the Court regarding Ms. Treadway's further

16  participation in the case?

17      A.   Yes.  In my responsive pleading I asked that she

18  be recused from any further litigation in this matter,

19  that another U.S. Attorney be assigned to the case.  I

20  believe that by her listening to those telephone calls

21  between my client and the other attorneys, that she had

22  then gained an unfair tactical advantage in the

23  litigation and that she should be precluded.

24          And that is the reason why it was-- her

25  statements to the Court were so critical, because the

1    judge was being asked-- or the judge was asking whether

2    or not she had actually listened to them.  And if she

3    hadn't listened to them, then my argument was not nearly

4    as compelling.  But if she had listened to them, then

5    she was actually gaining an unfair tactical advantage.

6       Q.   Did you hear when Mr. Clymer questioned

7    Ms. Treadway how she reconciled the statements she made

8    to the Court versus the depth of information in her

9    notes?

10      A.   I believe she said she didn't think it was

11   important.

12      Q.   To your recollection, did Ms. Treadway ever

13   correct the record with Judge Crabtree about what she

14   had listened to?

15      A.   No, she's never done that.

16            MR. BELL:  Okay.  I don't have any further

17   questions.  Thank you, Ms. Morgan.

18            MS. VANBEBBER:  No questions.

19            MR. CLYMER:  No questions, Your Honor.

20            THE COURT:  All right.  May Ms. Morgan be

21   excused?

22            MR. BELL:  Yes, Your Honor.

23            (1:35 p.m., testimony concluded).

24

25

1                    C E R T I F I C A T E

2

3

4

5      I, Kelli Stewart, a Certified Shorthand Reporter and

6   the regularly appointed, qualified and acting official

7   reporter of the United States District Court for the

8   District of Kansas, do hereby certify that as such

9   official reporter, I was present at and reported in

10   machine shorthand the above and foregoing proceedings.

11      I further certify that the foregoing transcript,

12   consisting of 151 pages, is a full, true, and correct

13   reproduction of my shorthand notes as reflected by this

14   transcript.

15         SIGNED October 15, 2018.

16

17

18

19              /s/ Kelli Stewart

20              Kelli Stewart, CSR, RPR, CCR, RMR

21

22

23

24

25