UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF KANSAS


UNITED STATES OF AMERICA,

     Plaintiff,

v.                                  Docket No. 16-20032-02-JAR

KARL CARTER                         Kansas City, Kansas
                                    Date:  10/02/2018

     Defendant.                     Day 3
.....................               Pages 398-699


                  TRANSCRIPT OF MOTIONS HEARING
             BEFORE THE HONORABLE JULIE A. ROBINSON
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:   Mr. Steven D. Clymer
                      Department of Justice - USAO
                      Lrm Eckert, William
                      100 S. Clinston Street
                      Suite 9000
                      Syracuse, New York 13261

                      Mr. Duston J. Slinkard
                      Office of United States Attorney
                      444 Southeast Quincy
                      Suite 290
                      Topeka, Kansas 66683-3592

                      Mr. Stephen R. McAllister
                      Office of United States Attorney
                      500 State Avenue
                      Suite 360
                      Kansas City, Kansas 66101

```
 1   APPEARANCES:

 2   (Continued)

 3   For the Defendant Karl Carter:
                          Mr. David J. Guastello
 4                        The Guastello Law Firm, LLC
                          811 Grand Boulevard
 5                        Suite 101
                          Kansas City, Missouri 64106
 6
     For the Movant Federal Public Defender:
 7                        Ms. Melody J. Brannon
                          Mr. Kirk C. Redmond
 8                        Mr. Branden A. Bell
                          Office of Federal Public Defender
 9                        117 Southwest Sixth Street
                          Suite 200
10                        Topeka, Kansas 66603

11   For the Special Master David R. Cohen:
                          Mr. David R. Cohen
12                        David R. Cohen Co., LPA
                          24400 Chagrin Boulevard
13                        Suite 300
                          Cleveland, Ohio 44122
14
                          Ms. Alleen VanBebber
15                        VanBebber Law Firm, LLC
                          2029 West 95th Street
16                        Leawood, Kansas 66206

17

18

19

20

21

22
     _____
23
          Kelli Stewart, CSR-KS, CRR-MO, RPR, CRR, RMR
24                   Official Court Reporter
          259 U.S. Courthouse, 500 State Avenue
25                  Kansas City, Kansas 66101
```

1                          I N D E X

2
   Special Master's Witnesses:                         Page
3
   ERIN TOMASIC
4    Direct Examination By Ms. VanBebber            452
     Cross Examination By Ms. Brannon               590
5    Cross Examination By Mr. Clymer                673

6

7                     E X H I B I T S

8    Special Master's
     Exhibits              Offered          Received
9
        1144                  497              497
10

11
     Federal Public Defender's
12   Exhibits               Offered          Received

13      582                   589              590
        583                   589              590
14      584                   589              590
        606                   589              590
15      617                   589              590
        639                   589              590
16      641                   589              590

17

18

19

20

21

22

23

24

25

```
 1                    (9:03 a.m., proceedings commenced).
 2              THE COURT:  All right.  You can be seated.
 3  All right.  United States versus Karl Carter, 16-20032--
 4  is this on?  Is this on?  Appearing for the United
 5  States?
 6              MR. CLYMER:  Good morning, Your Honor.
 7  Steven Clymer for the United States.  I'm assisted this
 8  morning by United States Attorney Stephen McAllister and
 9  First Assistant United States Attorney Duston Slinkard.
10              I also want to inform the Court that an
11  attorney from the chief counsel's office of the United
12  States Secret Service is here.  Her name of Courtney
13  Scadden.
14              THE COURT:  All right.  Thank you.
15              MR. CLYMER:  I'm sorry, Your Honor.  I
16  forgot to introduce-- Special Agent John Seubert is also
17  here from Secret Service.
18              THE COURT:  All right.  And for-- is Karl
19  Carter's lawyer--
20              MR. GUASTELLO:  Yes, Judge.  David Guastello
21  on behalf of Mr. Carter, who has waived his appearance
22  for purposes of this hearing.
23              THE COURT:  All right.  And for the Federal
24  Public Defender?
25              MS. BRANNON:  Your Honor, the Federal Public
```

1  Defender appears through Melody Brannon, Kirk Redmond,

2  and Branden Bell.

3          THE COURT:  And Special Master?

4          MS. VANBEBBER:  Special Master appears

5  personally and by counsel, Alleen VanBebber.

6          THE COURT:  All right.  All right.  We're

7  here for an evidentiary hearing.  There are a number of

8  motions that are pending.  There is Document 82, the

9  Federal Public Defender's motion under Rule 41 for

10 return of information that was filed August 5, 2016;

11 Document 85, the Federal Public Defender's amended

12 motion under Rule 41 that was filed August 7, 2016;

13 Document 301, which is the Federal Public Defender's

14 motion for order to show cause, which was filed

15 October 25, 2017; and Document 585, the Federal Public

16 Defender's supplemental motion for order to show cause

17 and seeking costs filed August 31, 2018.

18          I note that the government and the Federal

19 Public Defender have filed briefs on the issue of *Touhy*

20 invocation.  The government's filing was in a sealed

21 notice with attached exhibits that's Document 615.  The

22 Federal Public Defender's memorandum of law is

23 Document 622.

24          I won't be taking those up obviously during

25 the hearing, but we can address at the close of the

 1   hearing whether you'd like to just orally argue those--

 2   well, whether you would want to submit oral argument in

 3   addition to those filings.

 4           There are some other motions which are

 5   pending but not set for hearing today.  Defendant Karl

 6   Carter's motion to dismiss indictment, which was filed

 7   on December 18th, 2017.  That, of course, has been held

 8   in abeyance because of the other pending matters that

 9   are going to be heard today.  That's Document 333.

10           Document 572 is the Federal Public

11   Defender's motion for-- I'm not sure if it's 572 or 573,

12   but Federal Public Defender's motion-- well, there's

13   Federal Public Defender's motion for discovery regarding

14   requests by United States Attorneys for audio calls.

15           There's Document 573, that's the defender's

16   motion for discovery regarding detailed information on

17   eight computers under the control of the United States

18   Attorney employee Pauletta Boyd before cyclical refresh,

19   and computers ordered by the Special Master to be

20   forensically imaged, and certain hard drives associated

21   with those computers as well as data backups.

22           There's Document 589, the government's

23   motion for leave to file a surreply to the defender's

24   motions that are Documents 572 and 573.  And then

25   there's Document 605, which is the defender's motion for

1    discovery of impeachment information.

2              All right.  So Documents 333, which is the

3    motion to dismiss, I won't be deciding at this point.

4    Document 572 I do not think needs to be decided at this

5    point.  I think it's more relevant for 2255 litigation.

6              The other pending motions that I've spoken

7    of that aren't being heard today, there's the motion for

8    discovery regarding Boyd computers, that's Document 573.

9    I wonder if that's moot.  My understanding is that you

10   all had reached-- had been negotiating and reached an

11   agreement about that.

12             MR. CLYMER:  Your Honor, my understanding is

13   that an agreement has been reached as to both 572 and

14   573.  If I'm wrong about that-- I believe the Public

15   Defender has the motions open so they're not moot.  I

16   think they're just being held in abeyance pending the

17   government's compliance to the Public Defender's

18   satisfaction.  That's my understanding.

19             THE COURT:  All right.

20             MS. BRANNON:  That's correct, Your Honor.

21   We are trying to work through the issues and talk about

22   what evidence should be produced, so we would just ask

23   the Court to hold both of those motions.

24             THE COURT:  I'm having trouble hearing you.

25             MS. BRANNON:  I'm sorry.  We are working

1    through the issues with those and negotiating with the

2    government, so we'd ask the Court to just hold both of

3    those motions right now.

4            THE COURT:  All right.  Will do.  The

5    government in Document 589 filed a motion for leave to

6    file a surreply.  That motion failed to follow Local

7    Rule 15.1, which requires attaching the proposed

8    surreply, so I'm going to deny that for failure to

9    follow the local rule to the extent it is not moot.

10           The Public Defender's motion for discovery

11   of impeachment information, which is Document 605, I've

12   spent some considerable time with it.  And largely for

13   the reasons stated in the government's response, I'm

14   denying the motion.

15           First, the defender concedes in its motion

16   that this information is sought for impeachment

17   information of witnesses called by the defender and the

18   Special Master, and that it's not discoverable under

19   *Giglio* or Jencks Act because, of course, that applies to

20   witnesses called by the government.

21           As for information about investigations or

22   findings by the Kansas Disciplinary Administrator or by

23   state or federal courts, there's no showing that the

24   U.S. Attorney's Office has any greater access to such

25   non-public information than the Federal Public Defender.

1   To the extent there are public findings, certainly that

2   can be inquired into if it's proper impeachment.  But

3   beyond that, pending discovery-- or I should say pending

4   proceedings that are not in the public domain, there's

5   no showing that the U.S. Attorney's Office would have

6   greater access to that.

7            And then as for any OPR, that's internal

8   investigation material, the Court agrees that this is

9   covered by the Privacy Act.

10           All right.  So just to remind the parties

11  about the scope of the hearing.  Being mindful of the

12  Tenth Circuit's directive to limit the scope of the

13  Phase III investigation into, quote, matters related to

14  defendants before the Court in *United States v. Black*

15  and to other parties in *Black* who have filed Rule 41

16  motions in that proceeding.  And that, of course,

17  includes some other parties that are represented by the

18  FPD.

19           I am going to give the FPD some latitude to

20  establish threshold evidence that would pertain to the

21  statute of limitations issues that will arise from the

22  proceedings in the 2255 litigation for other defendants

23  outside of this case.  To the extent there is a dispute

24  about where the Court should draw this line, I will rule

25  on any such objections contemporaneously.

1          All right.  Exhibits-- of course, we began

2   this hearing in May, and I know that you all made a

3   record at the end of the May hearing about some

4   exhibits, and there's been some discussion leading up to

5   today's hearing.  Is everybody clear on the marking of

6   exhibits and what number ranges that you're to use for

7   purposes of this hearing going forward?

8          MR. CLYMER:  Your Honor, if I'm confused,

9   I'm so confused I don't even know it.  I believe I have

10  it clear.

11         THE COURT:  All right.

12         MS. BRANNON:  We believe we understand, Your

13  Honor.

14         MS. VANBEBBER:  Yes, Your Honor, I believe

15  so.

16         THE COURT:  Okay.  Now, I-- so on

17  August 17th, Special Master David Cohen issued a

18  subpoena *duces tecum* under the authority of Federal Rule

19  of Criminal Procedure 17 served on Mr. McAllister.  It

20  demanded production of 13 categories of information on

21  or before August 31 at 1:00 p.m.

22         On that date, August 31, the Court granted

23  the government's motion to allow it to produce on a

24  rolling basis any responsive documents.  The government

25  asked, I think, for a two-week deadline that would

1   extend beyond August 31 to allow for this rolling

2   production.  I actually entered an order that gave the

3   government three weeks, so up to and including

4   September 21, in order to allow the government time to

5   obtain Department of Justice approval under 28 Code of

6   Federal Regulations Section 16.27.

7            I stated in that order I would not grant any

8   further extensions.  Nonetheless, there has been

9   production of documents after that September 21

10  deadline.

11           Ms. VanBebber, can you make a record about

12  the production received when-- either before or after

13  the deadline and the volume of the discovery?

14           MS. VANBEBBER:  Yes, Your Honor.  I should

15  get up here and make sure I can be heard.  I would like

16  to make a-- a record on that.  And the first record--

17  piece of the record that I would like to make is to

18  identify what has been produced pursuant to the

19  subpoena.

20           Drive No. 1-- they're all on thumb drives.

21  Drive No. 1 came in about 4:00 on the 17th, and it is

22  104,051 kilobytes.

23           THE COURT:  Do you mean September 17th?

24           MS. VANBEBBER:  Excuse me.  September 17th,

25  yes, indeed.

1          Drive No. 2 came in the next day, the 18th,

2    and it is 94,581 kilobytes and-- or .09 gigabytes.

3    Drive No. 3 came in on the 25th after the deadline at

4    1:00 p.m.  It is 75,430 kilobytes or .07 gigabytes.

5          Drive No. 4 came in on the 28th, after the

6    deadline, at 4:00 p.m. on Friday, and it has

7    1,022,908,000 kilobytes or 1.02 gigabytes.

8          Drive No. 5 came in Sunday morning at my

9    request as opposed to Monday.  It has 2,113,473

10   kilobytes or 2.11 gigabytes.

11         When the deadline ended for the return-- or

12   the responses to the subpoena *duces tecum*, I made a

13   decision to go ahead-- rather than to come to the Court

14   and ask for sanctions or some other kind of relief, I

15   made a decision to allow these to roll in, and they're

16   still rolling in.  I would like to know today if we're

17   through or if there are some more that need to be

18   provided because they're responsive to the subpoena.

19         The concern I have is that many of these--

20   for example, the last one is a perfect example of

21   non-cooperation because that particular thumb drive

22   contains the laptop information of Erin Tomasic's lap--

23   files that were collected in an effort, or at least a

24   supposed effort, to produce to the Master back in

25   October and December of 2016.

1           They have been in the possession-- this

2    particular thumb drive, not the drive itself, but the

3    material that's on it has been in the possession of the

4    United States Attorney's Office since Mr.-- since Mr.

5    Cohen began Phase III and could've been turned over at

6    any time.  Instead, it was turned over Sunday morning.

7           So to the extent that I'm making this

8    record, it is merely to set the record straight as to

9    why they were being allowed to do rolling discovery long

10   after the Court's generous extension of time being

11   granted.

12          THE COURT:  Mr. Slinkard or whoever,

13   Mr. Clymer, do you anticipate providing any more

14   discovery that responds to the subpoena *duces tecum*, or

15   are you finished?

16          MR. CLYMER:  I do, Your Honor, but I don't

17   know how much it is.  And my strong suspicion, and I

18   think Mr. Slinkard and Mr. McAllister would agree with

19   me, I believe that the vast bulk of what there is to

20   provide has been provided already.

21          And if I may, Your Honor, I'd like to

22   supplement the record that Ms. VanBebber just made.

23          THE COURT:  Go ahead.

24          MR. CLYMER:  Mr. McAllister and I have both

25   been very open and transparent with Ms. VanBebber about

 1    what Mr. McAllister's instructions are from the

 2    Department regarding production.  Those instructions

 3    require that the massive quantities of data that

 4    Ms. VanBebber just described be reviewed.  And

 5    Mr. McAllister and Mr. Slinkard and I have spent nights

 6    and weekends looking through documents that have been

 7    identified by Mr. McAllister's office as responsive to

 8    get that material to Ms. VanBebber as soon as possible.

 9             There's no effort to slow-walk this or

10    delay.  We are working long hours to try to get this

11    reviewed because we have instructions from the

12    Department that certain sorts of internal communications

13    that have no bearing on misconduct or even any

14    allegation of misconduct, for example multiple drafts of

15    a document before it's filed and discussions about what

16    sorts of words should be used in it, should not be

17    produced as work product.  And so we are trying to weed

18    out the wheat from the chaff.

19             I think when the Court sees some of the

20    exhibits from this, the Court will realize that we have

21    made a good-faith effort to identify documents that are

22    relevant to the allegations of misconduct in this case

23    and produced them as fast as we possibly can.  And if

24    the Court has concerns about that, I'm sure Mr. Slinkard

25    or Mr. McAllister can give the Court, or I can give the

 1   Court gory detail about how many hours we've spent

 2   trying to do this.

 3            THE COURT:  Well, I have a couple of

 4   concerns.  First, we're in the hearing and you're

 5   telling me the discovery is not complete, and you can't

 6   tell me when.  And I'm just wondering as a practical

 7   matter what the Special Master is supposed to do in the

 8   middle of calling witnesses when more discovery is to be

 9   received and not knowing whether that pertains to a

10   witness already called or-- or what and when-- they're

11   supposed to have time to review it and decide whether to

12   use it or not.

13            MR. CLYMER:  I understand that, Your Honor,

14   and I don't disagree that that is a legitimate concern.

15   With respect to the U.S. Attorney witnesses, they will

16   be here and available throughout the hearing to be

17   recalled if that becomes necessary.

18            And as I said, Your Honor, based on having

19   reviewed as much as we have, I believe Mr. Slinkard,

20   Mr. McAllister and I all believe that the vast majority

21   of what's out there has been produced already.  It's not

22   as if there's some smoking gun that's going to come in

23   tomorrow.

24            Now, without having seen it, I can't

25   guarantee the Court that, and I don't mean to.  I guess

1  in short, Your Honor, we're doing the best we can with a

2  massive amount of data.

3         THE COURT:  All right.  My other concern is

4  something that Ms. VanBebber said, and that is, I

5  understand that-- that this is-- this is a lot of work

6  and you're getting departmental approval and you haven't

7  been able to accomplish it by the three-week deadline.

8         But I also think it's fair to say that this

9  is what you were supposed to have done in 2016 when the

10 Special Master was appointed and when the Special

11 Master-- the Court, through the Special Master, directed

12 you all to engage in this very sort of document

13 production and search and you supposedly were working

14 with the Special Master identifying search terms and, in

15 fact, it-- I believe the Special Master had identified

16 in his mind a final set of search terms so that this

17 very process could've been undertaken in 2016.

18        So I think-- I understand what you're going

19 through now, but I also think it's-- the record should

20 be clear that this is a process that really should've

21 started in 2016 and probably would've been completed in

22 2016.

23        MR. CLYMER:  That may be true, Your Honor.

24 The only response I have for that that occurs to me

25 right now is that the Department had not authorized the

1    disclosure at that time.  Mr. McAllister-- actually it

2    was Mr. McAllister's predecessor, Mr. Beall, had not

3    been authorized to disclose that information at that

4    time.

5              As the Court recalls, that was the point at

6    which I was appointed to assist in this litigation.  And

7    as I explained in a letter to Mr. Cohen back then, under

8    the *Touhy* regulations, the Department had made a

9    decision about what I was authorized to disclose.  I

10   disclosed some limited amount of information to

11   Mr. Cohen and not the rest, that-- following that,

12   Mr. Cohen issued two subpoenas *duces tecum*.  In both

13   cases the government moved to quash, and the Court never

14   enforced those subpoenas *duces tecum*, so we never had a

15   reason back then to collect any documentation for

16   production.

17             When the Court brought the issue of a

18   subpoena *duces tecum* up again at the August 1st status

19   conference, I promised the Court that the government

20   would take a close hard look at a subpoena *duces tecum*.

21   Ms. VanBebber narrowed the scope of the subpoena *duces*

22   *tecum*.  We went back and looked at it and once we got

23   the new subpoena *duces tecum*, from the time we got it,

24   we have moved with as much speed as we can to provide

25   it.

1              So I apologize to the Special Master that we

2    haven't completed it.  I apologize to the Court.  I

3    understand Ms. VanBebber's concerns.  We are really

4    doing the best we can.  That's all I can say, Your

5    Honor.

6              THE COURT:  All right.

7              MS. VANBEBBER:  Your Honor, if I may.

8              THE COURT:  Yes.

9              MS. VANBEBBER:  I would like-- given

10   Mr. Clymer's statement, I would like to know if there is

11   going to be a blanket approval of all of the material

12   that they provided to the extent that we seek to produce

13   something as an exhibit.

14             MR. CLYMER:  I'm not sure I understand the

15   question, Your Honor.

16             MS. VANBEBBER:  Will you stipulate to all of

17   your documents coming in as my exhibits?

18             MR. CLYMER:  Your Honor, is-- will the Court

19   let me answer that?

20             THE COURT:  Yes.

21             MR. CLYMER:  I need to see them to determine

22   their relevance, but I believe that all the ones that

23   Mr. Cohen had earlier marked we did stipulate to.

24             MS. VANBEBBER:  Not all of them.

25             MR. CLYMER:  My recollection is those are

1    already in evidence.  I haven't taken a look at the new

2    exhibits.  If there's materials that we produced, I may

3    have a relevance objection.  But my guess is there won't

4    be any authenticity objection, so I suspect there won't

5    be a problem.  But I'm happy to talk to Ms. VanBebber at

6    a break about that and work that out.

7              MS. VANBEBBER:  We are clear, are we not,

8    that somebody went through these so that the Attorney

9    General could allow them to be produced under *Touhy*.

10   Correct?

11             MR. CLYMER:  That is correct--

12             (Government counsel confer).

13             MR. CLYMER:  Yes and no.  The first four

14   rounds the answer is yes.  I'll just clarify this, and I

15   apologize for the complexity, Your Honor, but it's

16   unavoidable here.  The first four rounds of discovery we

17   gave, the first four productions, we did go through

18   those documents to ensure that they complied with

19   Mr. McAllister's instructions.  That is correct.

20             The fifth document, which Ms. VanBebber

21   mentioned, is a very large file that involves Erin

22   Tomasic's e-mail traffic.  At the very outset of

23   production, we flagged that document, Mr. McAllister

24   flagged that document for Ms. VanBebber and noted that

25   much of it is not responsive to the subpoena.

1              It's overbroad, and it was too large to

2    realistically go through.  And we hoped to weed out

3    whatever is in there in a different way to provide it,

4    but we were not going to produce that document on its

5    own because there was-- there was simply much in it that

6    was too-- that was not responsive or that did not fall

7    within Mr. McAllister's instructions.

8              THE COURT:  So I think it's fair to say if

9    it was too large for you to go through, it's probably

10   too large for the Special Master to go through, having

11   received it two days ago.

12             MR. CLYMER:  I think that's probably true,

13   Your Honor, and I don't mean to suggest otherwise.  But

14   this is what happened:  The process by which we hoped to

15   identify the responsive Tomasic materials has taken

16   longer than we anticipated.  And we didn't want to not

17   produce anything from Tomasic, given her important role

18   in this litigation.  And so Mr. McAllister made the

19   decision, in agreement with me and in agreement with Mr.

20   Slinkard, to produce that.

21             So there was no effort to try to winnow out

22   material from that based upon the instructions from the

23   Department of Justice.  Rather, we just produced the

24   whole thing.  So we weren't being under-inclusive, we

25   ran the risk of being over-inclusive.

1          THE COURT:  All right.  So what I'm hearing

2   is with respect to Thumb Drives 1 through 4, the

3   government has no foundation or authenticity objections

4   but preserves their right to raise relevancy objections.

5          MR. CLYMER:  And that's probably true with

6   respect to the things in Production 5 too, Your Honor.

7   I'd just like to talk to Ms. VanBebber about that.

8          MS. VANBEBBER:  Your Honor, there's really

9   only one other question I have then for Mr. Clymer, and

10  that is, given the way that the production has occurred,

11  we have what they say they're willing to give us.  We do

12  not know what they have chosen not to give us, and so I

13  would like to know is there going to be what we would

14  normally have in a case, which is something on the lines

15  of a privilege log?  Because *Touhy* does not create a

16  privilege, but something else might create a privilege.

17  And if not, how are we to know what's been withheld and

18  why it's been withheld?

19          MR. CLYMER:  In terms of what's been

20  withheld, Your Honor, it would take months to generate a

21  list because the amount of documentation is so large.

22  Any single e-mail can generate five or six or seven or

23  25 or 30 chains.  And there are multiple drafts of

24  multiple documents that we have not produced.  So I--

25  it's simply impractical to try to produce a log.

1          In terms of what's not been produced,

2    Mr. McAllister sent a letter to Ms. VanBebber that

3    described the parameters for production versus not

4    production.  Like many subpoenas, I believe the Special

5    Master is just going to have to rely on trust in the

6    U.S. Attorney's Office that it is complying with what it

7    said it's going to do.

8          MS. VANBEBBER:  I'm sorry, Your Honor, the

9    Special Master cannot do that under these circumstances.

10         THE COURT:  I understand.  Mr. Redmond.

11         MR. REDMOND:  Could I have just a moment,

12   Your Honor?  There's-- we're obviously downstream from

13   the Special Master in terms of receiving these

14   materials.  While very grateful for how carefully

15   they've made sure that everything that we received was

16   transferred to us, we-- but we-- the way this has

17   worked, we've got 2,650 pages of discovery yesterday.

18   We're through about 1,000 of it.  But we would like to

19   make a record and make a couple specific requests for

20   relief.

21         Everything the Court said about the series

22   of events is correct.  I would also point the Court to

23   Docket Entry 317, which was the December 4th of 2017

24   issuance of the subpoena *duces tecum* by the Special

25   Master.  What's happened since then has only narrowed

1    that request.

2            The government has been on notice, on direct

3    notice for at least ten months that these documents were

4    requested or were ordered to be provided by the Special

5    Master.  And the Court, as Ms. VanBebber pointed out,

6    was quite generous with extensions, giving the

7    government more time than they asked.

8            But by September 21st, we still didn't have

9    a page of documentation.  It was still going through the

10   process of the Special Master.  We got our first

11   productions on September 24th, which was supposed to be

12   a rolling production, but that's just not how it worked.

13           It was also complicated by the fact that a

14   number of those documents were provided in Outlook,

15   Microsoft Outlook.  And as luck would have it, our

16   office is currently going through the transition to

17   Outlook.  Half of us are on the system and half of us

18   are not, so we then had to take all of those documents

19   and reconvert them from .pst files.

20           The kilobytes that the Special Master

21   indicated, that's consistent with our analysis of those

22   drives as well.  And honestly, we're up through the

23   first two disclosures, even though we've only had those

24   for eight days.  We have pulled a bunch of exhibits from

25   those.  We think that we have those internalized.  The

1   third group of exhibits, not so much.  And then

2   yesterday we got 2,650 pages.  We're obviously not

3   through that.

4          I mean, we're not-- we're obviously-- we're

5   certainly not asking that the Court continue the

6   hearing.  I mean, we're prepared to go forward, but we

7   would have two requests of the Court.

8          One, consistent with the Special Master's

9   position, that the vast majority of documents that we

10  have received are-- have been provided from the

11  government, meaning there shouldn't be any objection to

12  it except for relevancy.  And that's exactly the same

13  way that the Court approached evidentiary questions at

14  the last hearing, which was to admit them subject to the

15  Court's own relevancy review, because there's not a jury

16  in the box and the Court knows what's relevant.

17         So we would ask for the same approach as the

18  Special Master insofar as the-- we would ask the Court

19  to admit the exhibits that we have provided that are

20  government documents that have been provided by the U.S.

21  Attorney's Office, subject to any relevance objection by

22  the government.

23         We would also ask that the Court create an

24  additional deadline.  Apparently there's more discovery

25  still coming.  We would ask for leave to submit

1   additional exhibits from 21 days of that final

2   production, and we would ask that the Court take the

3   same approach to that evidence as the evidence in this

4   hearing, meaning that if it's provided by the

5   government, it's coming in, subject to a relevancy

6   objection.

7           And third, we would ask the Court to leave

8   open the hearing.  We have no idea what's still coming.

9   That last disclosure of the government, the contents of

10  Ms. Tomasic's computer, we still have not been able to

11  open because we have to try to convert it from a .pst

12  view because we can't view it, and apparently it's

13  gigantic.  So, I mean, obviously there's ways that we

14  would key search it, but we have no-- we have no chance

15  of doing that during the course of the hearing.

16          So I guess the-- in sum, our three requests

17  are that our evidence be admitted, that deadlines be

18  extended for new exhibits, and that, if necessary, that

19  the hearing be left open.

20          THE COURT:  Ms. VanBebber.

21          MS. VANBEBBER:  We would join in that

22  motion.

23          THE COURT:  Mr. Clymer.

24          MR. CLYMER:  Your Honor, on the first two

25  requests, the government has no objection.  On the third

1    request, I'd ask that if the parties want to re-open the

2    hearing upon the receipt of new documents that they

3    simply make a motion to the Court.  And based on what

4    the Court hears during this hearing and based on the

5    nature of the exhibit, the Court rule on it at that

6    time, rather than make a ruling now.

7              I do want to say one other thing, Your

8    Honor.  As the Court is well aware, one of the grounds

9    for quashing of a subpoena under Rule 17 is that it's

10   cumbersome or overbroad.  Given the quantity of

11   documents involved in this situation, I think the

12   government could've moved to quash on that ground, as we

13   did on the-- using that ground on the first two motions

14   to quash.

15             We chose not to do that because we wanted to

16   provide as much as we possibly could to the Special

17   Master and the Public Defender.  And I guess no good

18   deed goes unpunished because we-- we are doing our best

19   to provide as much as we can as soon as we can.  It's

20   simply not practically possible to go through as many

21   documents as they just described to you any more quickly

22   than we're doing.

23             THE COURT:  I'm not sure I'd call it a good

24   deed that is punished, because the whole point of the

25   Special Master working with you all to develop search

 1   terms was so that it wouldn't have to be a massive--

 2   hopefully not this type-- or this volume of massive

 3   production.

 4             And, you know, I think I'm going to hear

 5   evidence about that, but I'm just recalling because I,

 6   you know, obviously worked closely with the Special

 7   Master that months of negotiation went on between he and

 8   Emily Metzger and perhaps others.  And then ultimately

 9   he figured out that-- well, the U.S. Attorney's Office

10   let him know they weren't going to go forward, they

11   weren't going to agree to search terms after they had

12   negotiated and spent months doing that.

13             Had that process gone its natural course, I

14   don't think we'd be here today with massive amounts of

15   discovery coming in in these volumes.  I mean, that was

16   the whole point of that.

17             What we're talking about is ESI and--

18   electronically-stored information, and this is the

19   process that happens in civil and criminal litigation

20   all the time.  It didn't happen in this case.

21             So I understand you've undertaken this, you

22   know, massive production in response to the subpoena

23   *duces tecum*, but I think the record should be clear

24   that, you know, this would not have happened had the

25   U.S. Attorney's Office done what they were supposed to

1    have done in 2016 in working with the Special Master.

2           All right.  A discovery deadline is the

3    other thing that Mr. Redmond asked for in terms of the

4    outstanding discovery.

5           Mr. Redmond, you didn't ask for a specific

6    deadline.  Did you have something in mind?  And I'll

7    hear from Mr. Clymer whether he thinks that's doable.

8           MR. REDMOND:  We're in a tough spot, Your

9    Honor, because this could be helpful information, and

10   that-- we say that if the government doesn't provide it

11   by ten days from now, then we've essentially cut off our

12   own nose.

13          What I would ask for is the Court to sort of

14   reverse engineer a deadline from the date of the last

15   disclosure.  So the government could notify the Court,

16   yes, now this is everything, and then we would have 21

17   days from that time to provide additional exhibits from

18   that material.

19          THE COURT:  All right.  Let's do this:  I'm

20   not going to set a deadline at this point.  I will

21   direct the government to continue to engage in the

22   rolling discovery.  This would happen, I presume, over

23   the next couple of weeks, even while we're in the

24   hearing.  I would expect that the Special Master and the

25   FPD probably won't be able to really utilize it to its

 1   full extent.

 2           By the time we get close to the close of

 3   next week, I'll hear from you all again as to where you

 4   think we're at.  At least perhaps by then they will have

 5   received, hopefully, the rest of the discovery and will

 6   at least know the size of the files.  And then we can

 7   take it from there in terms of any motion they want to

 8   raise in terms of a deadline and leaving the record open

 9   for any admission of additional exhibits and perhaps

10   more of an evidentiary hearing, I don't know.  But let's

11   take a good measure of it sometime next week.

12           Mr. Clymer, though, if you'll keep us

13   posted.  And say, for example, you finish the discovery

14   by the end of this week, maybe we could talk about it

15   then too.

16           MR. CLYMER:  Obviously, Your Honor, if I'm

17   in court during the day and preparing for court at

18   night, I'm going to have very little time to be looking

19   at discovery as well.  So I don't expect to be able to

20   make an enormous amount of progress over the next two

21   weeks given this hearing.

22           As I have for the last weekends, I'll

23   continue to work on weekends.  I also have informed the

24   Court that I will be out of the country after this

25   hearing for two weeks, and I will be unable to work on

1   it out of the country because I cannot take my computer

2   with me.

3            THE COURT:  All right.  That's fine.  And to

4   remind you all, so we will revisit it probably next

5   week.  We're not going to be in session on the 5th.

6   Monday-- we're not going to be in session Friday or

7   Monday.  Monday is a federal holiday.  If-- so I'm going

8   to really be a taskmaster and try to keep this thing

9   moving as quickly as possible.

10           But if we have to, I guess we'll-- we will

11  have to spill over into November because I'm committed

12  the next two weeks too after this two-week period.

13           All right.  One other matter I want to bring

14  up at this point.  There's this pending motion to quash

15  filed by a witness, former AUSA Tanya Treadway.  It's

16  Document 627.  Ms. Brannon, do you intend to file a

17  response to that?

18           MS. BRANNON:  We do not, Your Honor, but I

19  would defer the argument to Mr. Bell.

20           THE COURT:  As I understand it, have you

21  advised her that you want to take her testimony on

22  October 10, 11 or 12?

23           MR. BELL:  Yes, Your Honor.

24           THE COURT:  And you've picked those dates

25  based on her earlier submission of when she had doctors'

1    appointments?

2                 MR. BELL:  Yes, Your Honor.

3                 THE COURT:  So do any of these dates

4    conflict with her doctors' appointments?

5                 MR. BELL:  Not that she's told us.

6                 THE COURT:  All right.  So her motion

7    indicates she has a broken foot and she can't travel

8    without medical assistance.  I don't know if she's

9    talking about an ambulance or Air Evac, $700.  I don't

10   know.  Tell me where we're at on this.

11                MR. BELL:  Your Honor, we-- I've looked at

12   the motion to quash yesterday as well.  The last

13   communication I had with Ms. Treadway prior to that

14   motion was to ask her to contact the marshals if she

15   thought she was going to have difficulty getting here,

16   and then I didn't hear back from her until I saw the

17   motion to quash.  So the last communication that I had

18   with-- that our office had with Ms. Treadway is attached

19   in her motion.

20                So if it's going to-- if it's financially

21   burdensome and it's-- she's unable to pay the estimated

22   $700 to transport her, her motion states that the

23   marshals service will reimburse her for whatever that

24   cost is.  If she doesn't have that amount in pocket,

25   which she doesn't state in her motion, then obviously we

1   would figure out a way for her to be able to pay those

2   costs.

3           But with all due respect to her medical

4   condition, Ms. Treadway is like any other witness who

5   faces some financial difficulty in coming to the

6   courthouse, and the marshals service and the statutes

7   have a mechanism for dealing with that.

8           THE COURT:  So she's-- she lives in

9   Lawrence, is that correct?

10          MR. BELL:  Yes, Your Honor.

11          THE COURT:  So-- and it sounds like she

12  can't drive because of the broken foot which is in a

13  cast, so she needs somebody to drive her here.  I'm not

14  sure where $700-- she doesn't explain how she-- she said

15  she made some phone calls, I think, in her motion.  It's

16  an estimate, I'm not sure where that comes from.

17          But what you're saying is that there's a

18  mechanism to do this through the marshals service

19  because this is-- she's subpoenaed by the Federal Public

20  Defender.  I mean, have you had conversations about

21  sending somebody to pick her up, whether it's an Uber or

22  taxi, or is that not a plausible way to deal with this?

23          MR. BELL:  From Ms. Treadway's motion, it

24  appears-- and from her early communications, I assume

25  she would want any person who is transporting her to

1    sign a waiver of liability in case she is further

2    injured while coming to the courthouse.  I'm going to

3    guess that an Uber driver is not prepared to do that.

4              But from her motion, she recounts what she

5    talked to with the marshals service, and the marshals

6    service told her that if she has to pay for whatever

7    transport costs to get here, the marshals service can

8    reimburse her.

9              So from what I read, there is some way she's

10   investigated that can get her here, and that the

11   marshals service has told her that they will reimburse

12   her for this cost.  So I don't-- based on the face of

13   her motion, I don't see a reason to quash.

14             THE COURT:  All right.  The other thing is I

15   had my folks check and there is a wheelchair available,

16   so whenever-- I mean, I would-- she's your witness, so

17   I'd expect you all to make sure these accommodations are

18   taken care of.  But whenever she arrives at the

19   courthouse, we could have somebody-- or you could have

20   somebody take the wheelchair out to the parking lot and

21   get her in a wheelchair.  She wouldn't have to be on

22   crutches or anything like that to come into the

23   courtroom.

24             All right.  Well, I'm going to deny the

25   motion to quash.  I think that she has the-- has the

1    means to get here.  It may be more expensive than

2    getting in a cab because of her medical situation, but

3    based on-- and she attached I think it was a letter,

4    something that-- not from a doctor, but explaining

5    that-- you know, what toe was broken or what part of her

6    foot was broken, et cetera.  But I think that this--

7    this can be accommodated in the sense that there's a

8    mechanism to pay-- reimburse her way here from Lawrence.

9           And I just want you all to work closely with

10   her so she's not too inconvenienced.  Pick the date that

11   you really need her and coordinate that with her.  And

12   you and the Special Master I think have been talking all

13   along about-- although the Special Master's order of

14   proof is first and yours is second, you've agreed to

15   slot your, you know, witnesses in as you need to, so I

16   ask you to do that with respect to her as well.

17           All right.  I will deny the motion to quash.

18           All right.  I think we're ready to go unless

19   someone tells me otherwise.  Now, I think I communicated

20   to you that you can each have 20 minutes for an opening

21   statement if you wish.  So I don't know who wants to go

22   first.

23           And it's really hard to hear you all when

24   you're from-- at the table, so let's try to use the

25   lectern as much as possible.  Obviously once you start

1  examining witnesses, that will be the case, but I know

2  I'm having difficulty hearing you from the table.

3        MS. VANBEBBER:  Your Honor, I'm not going to

4  do the usual here's-what's-going-to-happen and give you

5  a preview of-- of everything that's going to go on.

6  There's nobody in this courtroom amongst all of these

7  attorneys that hasn't-- isn't well aware of what's going

8  on and what's going to happen.  But I will do a little

9  synopsis just so we keep all the times straight.

10       The Special Master was appointed October the

11  11th, 2016.  Phase I, Phase II went ahead.  There were

12  no problems.  Phase III was ordered to proceed on

13  May 17th, 2017.  A while back.  The Court specifically

14  ordered the United States Attorney to fully cooperate

15  with the Special Master as he conducted Phase III.

16       The Special Master learned on July 14th of

17  2017 that Mr. Clymer had been appointed by the Attorney

18  General to represent the United States with regard to

19  Phase III, and from then on cooperation ceased or

20  virtually ceased.

21       The Department's consistent reasoning for

22  why they won't comply with this Court's order for

23  cooperation has mainly consisted of just one argument,

24  that this Court exceeded its power when it ordered Phase

25  III to investigate allegations of misconduct by members

1   of the United States Attorney's Office in the Kansas

2   City, Kansas, facility in what has been called the *Black*

3   case and what we now call the *Carter* case.

4           The Court originally set this hearing to

5   begin on January the 18th, 2018.  On January the 16th,

6   DOJ asked the Tenth Circuit for an emergency stay to

7   prevent the hearing, and they also argued that the

8   Circuit ought to just stop Phase III from going forward,

9   using the same argument, that this Court exceeded its

10  powers in allowing Phase III to proceed.

11          And they got a little of what they asked

12  for.  The Tenth Circuit did grant the stay.  But on

13  February the 26th, the panel directed this Court to go

14  forward with the hearing, this hearing, but submit-- but

15  to limit its scope to matters related to the defendants

16  in the underlying case in *Black* and the other parties in

17  *Black*, such as the Federal Public Defender and

18  Mr. Guastello's client, Mr. Carter, who had filed 41(g)

19  motions.  And that's what's happened ever since then.

20          The Tenth Circuit rejected DOJ's request for

21  reconsideration on March 23rd, 2018, and this hearing

22  got reset for May 15th.  And we all showed up and the

23  hearing was convened, and the next day the hearing was

24  recessed because the parties indicated to the Court that

25  they wished to proceed to try and settle these matters.

1          That effort failed.  So we're back here

2    today to continue the January 2018 hearing one more time

3    and with the hope we will be able to finish it sometime.

4    Today what we've heard means-- it sounds like it's not

5    going to happen until maybe in November, but perhaps we

6    will finally get to the end of this process.

7          Questions today, questions for the next two

8    weeks are likely to arise about DOJ's housekeeping

9    regulations.  Now, as Mr. Clymer indicated, I narrowed

10   my requests, the Federal Public Defender narrowed their

11   requests.  And, consequently, instead of telling each

12   witness, as they did in May, that they don't have any

13   authority to answer any questions, there will be many

14   questions that the Department of Justice has said are

15   going to be legitimately asked and are not going to be

16   denied under guise of the *Touhy* regulations.

17         We recognize again, and we're sure the Court

18   does and everybody else does, that no DOJ employee or no

19   former DOJ employee can obey a demand for DOJ records or

20   for DOJ testimony about their work without authority

21   from the Attorney General, not even when the demand

22   comes in a subpoena, as they have-- as the demands have

23   come for every single witness in this case.

24         But the considerations for deciding to grant

25   or deny authority is not always so easy.  The authority

1    generally under Subsection (c), 1626(c) is supposed to

2    be granted unless the testimony is being asked for

3    reasons that violate the law or violate a known

4    privilege or fits under one of six subcategories under

5    Subsection (b).

6           The Supreme Court has been quite clear that

7    *Touhy*, the *Touhy* regulations-- and they call them that

8    because of the first case that the Supreme Court ruled

9    on that had to do with these regulations was named

10   *Touhy*, so we call them today *Touhy* regulations, even

11   those who are not put out by the Department of Justice

12   but by some other department such as the Secret Service,

13   Treasury.  But they're not statutory law, and they don't

14   create any substantive right or privilege.

15          Consequently, during this hearing I

16   anticipate that there may be occasions when a question

17   is a follow-up question or some question that Mr. Clymer

18   doesn't feel necessarily fit into the summaries that we

19   have to give them in order to get permission for these

20   people to answer questions.  And in that instance, Mr.

21   Clymer, of course, will be required to let the witness

22   know that the witness can't answer the question.

23          It remains the Special Master's position

24   that any lack of cooperation by the United States

25   Attorney's Office prior to July 2017 had nothing to do

 1  with *Touhy*.  Mr. Clymer hadn't been appointed.  Nobody

 2  was talking about *Touhy*.  If they didn't cooperate prior

 3  to Mr. Clymer raising *Touhy* as a bar to their

 4  cooperation, then their lack of cooperation was nothing

 5  more or less than deliberate and willful and does not in

 6  any way implicate *Touhy* as either a sword or a shield.

 7           Parties have exchanged witnesses and exhibit

 8  lists.  As the Court has verified, we're going to call

 9  them what technically I suppose would be out of order

10  and-- because we do want to accommodate out-of-town

11  witnesses and the work schedules of the U.S. Attorney's

12  Office.

13           MS. BRANNON:  Your Honor, just as a

14  preliminary matter since the Special Master pointed out

15  the delay of this hearing in order to try to reach

16  negotiations and settle cases, we would point out that

17  we have filed over 60 2255s in the last six weeks.  In

18  almost every case, those filings were accompanied by a

19  request to negotiate in the individual cases because

20  that's what we understood Mr. Rosenstein to direct.  In

21  no case have we received any response whatsoever from

22  the government.

23           In this particular hearing that we have now,

24  the Court will hear from four categories of witnesses

25  the Special Master described, U.S. Attorneys and

 1    employees.  We will present expert witnesses on

 2    attorney-client communication and evidence destruction

 3    that will also go to, as the Court pointed out, statute

 4    of limitations and how the slow-walking of this case by

 5    the government has affected timeliness of 2255s.

 6              The Court will hear, third, from some

 7    defense attorneys about their knowledge and experience,

 8    particularly with recorded attorney-client calls.

 9              Finally, the Court will hear phone data

10    analysis.  The counsel from Securus will be here to

11    testify.  We have also undertaken analysis of all of the

12    phone data that we have available to date, which is not

13    complete.

14              And I just want to touch on that.  Securus

15    has a really powerful technological program that

16    captures-- that can record or not record almost every

17    phone call that's made out of CCA by a client.  And the

18    other side of that is that CCA has provided a, I would

19    say, ineffectual and inconsistent means of privatizing

20    attorney-client calls.

21              And what's happened, Your Honor, is at that

22    intersection of Securus technology and CCA's protocol,

23    as we would have it, that has made attorney-client calls

24    vulnerable to recording when those calls should not have

25    been recorded.  And the evidence that we will present is

1    that the U.S. Attorney took advantage of that

2    vulnerability and obtained numerous attorney-client

3    phone calls.

4              It took the position that if an

5    attorney-client call was recorded, it was fair game

6    without notice or a hearing.  And from our analysis,

7    every time the government asked for recorded calls,

8    there was an almost one-in-three chance that they would

9    obtain attorney-client calls.  One-in-three chance.  So

10   for-- from what we've analyzed, there are hundreds of

11   attorney-client calls that should've been protected that

12   were obtained by the United States Attorney's Office or

13   its agents.

14             The reason that our analysis is not complete

15   is because so much of this information is in the sole

16   possession and control of the U.S. Attorney's Office.

17   And even yesterday in our quick perusal of what's been

18   provided, there is more information on calls that they

19   requested and obtained that I don't think we knew about.

20             So our analysis is ongoing, but it has been

21   slowed and impeded considerably by the government's

22   approach to discovery, particularly in the subpoena

23   *duces tecum*.

24             At the end of this we are going to ask the

25   Court to find that there was a pervasive and

1   long-standing practice that violated the Sixth Amendment

2   rights of detainees at CCA.  In this hearing we will not

3   attempt to quantify any violations at other facilities,

4   but we expect that that information will be forthcoming

5   in the 2255s that we present.

6           And finally, based on the evidence that the

7   Court hears, we would ask the Court to hold the

8   government in contempt based on the destruction of

9   evidence, based on their slow-walking of discovery, and

10  their failure to comply with the Court's orders in this

11  case.

12          MR. CLYMER:  May it please the Court.

13  Steven Clymer for the United States.  Your Honor, there

14  is reason for the Court to be troubled about events that

15  occurred in this case and related cases.  A federal

16  prosecutor walked into the Court's chambers without

17  permission.  That should never happen.  A federal

18  prosecutor listened to an attorney-client call

19  intentionally without using a taint team.  That should

20  never happen.

21          A federal prosecutor hired an interpreter to

22  listen to attorney-client calls.  That should never

23  happen.  A federal prosecutor stood before this Court

24  and was less than fully candid when asked questions

25  about that conduct.  That should never happen either.  I

1    will make no attempt to dispute, deny, or defend either

2    that conduct or the former federal prosecutor who

3    engaged in it during this hearing.

4          There also was good reason for the defense

5    bar in the District of Kansas to be concerned when its

6    members learned that the U.S. Attorney's Office was in

7    possession of video evidence showing defense lawyers

8    meeting with their clients at CCA-Leavenworth.  This is

9    especially true when it received inconsistent

10   information about the recording practices at

11   CCA-Leavenworth and when there was uncertainty about

12   whether the U.S. Attorney's Office or its agents were

13   watching that video.  That will not be disputed during

14   this hearing either.

15         The Court, I believe, is already familiar

16   with these parts of the story.  But there are other

17   parts of the story, Your Honor, with which the Court may

18   be less familiar.  And part of the story I hope to

19   present to the Court today and during this hearing is

20   that the United States Attorney, when it became aware of

21   the possible violation or intrusion into attorney-client

22   communications, acted quickly and properly to prevent

23   any problems from occurring.

24         Excuse me, Your Honor.

25         Your Honor, this is a timeline that I hope

1    to present to the Court during the proceedings today

2    that shows the events mainly in early August 2016.  And

3    what this timeline will show is that the United States

4    Attorney's Office first received word that there were

5    potential problems with the CCA videos and

6    attorney-client meetings in August of 2016.

7              That information made its way to Erin

8    Tomasic, who was the attorney that had subpoenaed that

9    evidence, in the late afternoon of August 4th.  She

10   received an e-mail chain from a colleague of hers

11   regarding concerns that Laura Shaneyfelt had raised, and

12   her criminal chief also circulated a message shortly

13   thereafter.

14             Immediately after that, an attorney with

15   whom she had worked and had discussed the CCA video

16   expressly asserted the attorney-client privilege as to

17   that video.  That was after hours in the early evening

18   of August 4th.  What happens within the next 24 hours,

19   Your Honor, is significant.

20             The first thing that Tomasic does, for all

21   that she did wrong in this case, is that she immediately

22   informed Rokusek that she would not view the video.  So

23   she assured the attorney who asserted the privilege that

24   the video would not be watched, and then she alerted her

25   criminal chief about the problem.  Her criminal chief

1   concurred in that decision and discussed using the taint

2   team.  Tomasic then told the attorney, Attorney Rokusek,

3   that the video was available for her to review.

4          Significantly then, Your Honor, within 24

5   hours of first receiving notice, Tomasic, not the

6   defense bar, Tomasic brought the problem to the

7   attention of this Court.  She sent an e-mail to the

8   Court's clerk and the defense attorneys in the case,

9   letting them know about the assertions that had been

10  made, letting them know about her uncertainty about what

11  was on the video, explaining her agreement not to view

12  any attorney video, and expressing a willingness to use

13  a taint team and to coordinate with defense counsel.

14  This was before the Public Defender or any other

15  litigant brought this matter to the Court's attention.

16         Shortly thereafter, the Federal Public

17  Defender filed Document No. 82, which was the initial

18  return of property motion.  Then Tomasic instructed the

19  only two parties who had access to the video evidence to

20  secure it, to mark it "attorney-client privileged" and

21  not to let anybody look at it.

22         Shortly thereafter, two days later on a

23  weekend, criminal chief of the U.S. Attorney's Office

24  told those two people also to secure any

25  audio-recordings that they had.  That also was before

1   any defense attorney brought concerns about

2   audio-recordings to this Court's attention.

3          In addition to that part of the story that

4   we would like to tell during this hearing, Your Honor,

5   we will present evidence and show a lack of evidence

6   with respect to four critical points, and I'd like to

7   turn to those points now.

8          The first point is we will show the Court

9   that there is no evidence in this case of a Sixth

10  Amendment violation of-- or a violation of the

11  attorney-client privilege with respect to any of the

12  soundless video of attorney-inmate meetings at

13  CCA-Leavenworth.

14         In fact, although the burden is not on the

15  government to prove the absence of a violation, the

16  evidence will show exactly that, that there was no

17  violation with respect to any litigant in this case with

18  regard to that video evidence.  And we will show that in

19  several different ways.

20         Second, Your Honor, the government will show

21  that there's no evidence in this case and no evidence

22  will be presented to the Court of a violation of either

23  the Sixth Amendment rights or the attorney-client

24  privilege of any litigant in this case.  There was a

25  violation, a potential violation with respect to some

 1   different case in this district, but not with respect to

 2   the litigants in this case regarding the

 3   audio-recordings of inmate phone calls.

 4            Third, the evidence will show there was no

 5   effort to obstruct or frustrate the Special Master's

 6   investigation.  There was simply compliance with

 7   Department of Justice regulations under federal law.

 8            And finally, the evidence will show there

 9   was no willful violation of a court order to preserve

10   computer evidence.

11            I want to talk about the specifics of a

12   couple of those things, Your Honor.  First of all, let's

13   talk about the CCA-Leavenworth video.  There's no

14   violation of the Sixth Amendment or the privilege here

15   because there is no evidence, Your Honor, that any

16   United States Attorney employee ever watched a video of

17   a meeting between any inmate and any attorney at any

18   time.  In fact, the evidence will show that no U.S.

19   Attorney employee ever watched such a meeting.

20            You don't have to take my word for it, Your

21   Honor, or the evidence.  The Special Master has already

22   reached exactly that conclusion.  This is from Docket

23   No. 214.  "The Special Master tentatively concludes that

24   neither the U.S. Attorney's Office nor any law

25   enforcement officer actually viewed any of the

1    video-recorded attorney-client meetings that were seized

2    from CCA-Leavenworth in May of 2016."  Now, that's a

3    tentative conclusion.  The Special Master has never

4    suggested that that conclusion was misguided or wrong.

5              The Public Defender almost implicitly agrees

6    with this conclusion because it has shifted its theory

7    to claim that the real violation here was the

8    intentional acquisition by the government of

9    attorney-client meetings from CCA, but that's disputed

10   by the Special Master as well.

11             He said in the same report, "It cannot be

12   said that the Office of the U.S. Attorney and law

13   enforcement officers have used an array of tactics to

14   intentionally obtain attorney-client communications."

15   As the evidence will show, it was not done

16   intentionally, it was done inadvertently.  And once the

17   U.S. Attorney found out about it, the U.S. Attorney

18   promptly and properly took steps to ensure that nobody

19   would watch that video.

20             This is from Special Master report 298 which

21   came out after Phase III.  "Indeed, the Phase III

22   investigation to date suggests there is only one

23   instance where the Office of the U.S. Attorney even made

24   a request for video-recordings."  That was the grand

25   jury subpoena in the CCA investigation, and the Special

1    Master continues, "and the Office of the U.S. Attorney

2    did not actually view any such meeting."  The evidence

3    will show that the Special Master got that exactly

4    right.

5              Even, however, Your Honor, had a U.S.

6    Attorney employee or an agent watched soundless video of

7    attorney-inmate meetings, there would not have been a

8    violation of either the privilege or Sixth Amendment.

9    And I say that for two reasons, and the evidence during

10   this hearing will bear this out.

11             First, Your Honor, the evidence is going to

12   show that the privilege protects only communications

13   that are made for the purpose of, and involving legal

14   strategy and legal advice.  Hand and facial gestures and

15   body language can communicate things.  There's no

16   question about that.  But they can't communicate

17   abstract concepts like legal advice and legal strategy.

18   Thus, a soundless video that doesn't have any

19   accompanying sound or words or any written words cannot

20   reveal privileged communication.

21             Now, the Court may disagree with me about

22   that.  And if the Court does, there's an additional

23   problem that is not going to be surmounted in this

24   hearing by the Public Defender or by any individual

25   litigant.

 1              Every single defendant who claims that his

 2    rights were violated has an obligation to show that's

 3    the case.  Sixth Amendment rights are personal.  It's

 4    not a group right, it's not some sort of rule that tells

 5    the U.S. Attorney's Office it can't engage in conduct

 6    against a class of people.  It applies to a particular

 7    defendant and a particular communication.

 8              To prevail, a claimant must show that a

 9    soundless video of his meeting or her meeting with his

10    own attorney revealed privileged information.  A sort of

11    generalized claim based on a law professor's opinion

12    does not establish a Sixth Amendment violation as to any

13    individual person.  Without that evidence, there is no

14    Sixth Amendment violation.  The Sixth Amendment talks

15    about the right of an accused.  An accused is an

16    individual.

17              Let's turn then to the telephone calls, Your

18    Honor.  And Ms. Brannon talked about the evidence that

19    they expect to present, and the Public Defender's Office

20    was good enough to preview for the U.S. Attorney's

21    Office a preview of some of that evidence, and I believe

22    that some of the evidence that they describe will be

23    presented during this hearing.

24              And the evidence may show the following:

25    That prosecutors and agents in this district frequently

1   obtained outgoing inmate telephone calls either by

2   subpoena or by informal requests of various sorts.  And

3   I think the Court will see evidence of that happening on

4   a regular basis.

5            Now, when they obtained those inmate calls,

6   it was not unusual for there to be inmate-to-attorney

7   calls commingled with those calls.  So the U.S.

8   Attorney's Office by asking for inmate calls, which

9   often was necessary in cases, necessarily got

10  attorney-client communications.

11           It's also true, and unfortunately true, and

12  we agree with the Public Defender that this should not

13  happen, sometimes calls that were privatized to legal

14  counsel were wrongly produced either to the U.S.

15  Attorney's Office or to law enforcement as well.

16           And now as we all know, unfortunately, even

17  more unfortunately, one former federal prosecutor

18  actually intentionally obtained and listened to calls an

19  inmate made to his attorney without using a taint team.

20  All that is true, Your Honor, but there's other things

21  that the evidence will show as well.

22           It will show that the U.S. Attorney's Office

23  prosecutors here have never intentionally obtained

24  inmate-to-attorney telephone calls, other than the

25  incident involving Tomasic.  It was rare for these

 1    prosecutors to encounter inmate-attorney telephone

 2    calls.  And you'll hear testimony from prosecutors about

 3    their experiences and how unusual this was.

 4              When they did, you'll hear that these

 5    prosecutors took affirmative steps, and this even

 6    includes Tomasic in other instances, to avoid learning

 7    the content of those calls.  And that in any event, as

 8    the Court knows, in many cases, in all the cases where

 9    there's no privatization, the inmates who made those

10    calls to counsel did so only after consenting to the

11    recording and knowing because they were warned that the

12    recording was going to occur, as their attorneys were

13    warned by the recordings themselves, which have the

14    recording to both the call recipient and the call maker.

15    That covers the inmate-attorney telephone calls.

16              In short, Your Honor, what occurred in

17    *Herrera-Zamora* is unconscionable, but it's also the

18    exception, it's not the rule.  And the evidence at the

19    hearing will demonstrate that to you.

20              In terms of cooperation with the Special

21    Master, there will be evidence that the U.S. Attorney's

22    Office did not endeavor to improperly impede or

23    frustrate the Special Master.  In fact, it will show

24    that the U.S. Attorney's Office bent over backwards to

25    cooperate with the investigation when doing so was

1    consistent with the regulations that bind Department of

2    Justice employees.

3              And finally, Your Honor, there is no willful

4    violation of this Court's preservation order.  The

5    evidence will show that a computer in the U.S.

6    Attorney's Office was refreshed as part of a

7    pre-scheduled nationwide computer upgrade.  The U.S.

8    Attorney's Office has voluntarily provided evidence to

9    that effect to the Federal Public Defender, and the

10   evidence will show this refresh occurred not after the

11   Court issued its preservation order but, unfortunately,

12   the day before the Court issued its preservation order.

13   So there was no willful violation of any court order

14   here.

15             Your Honor, I thank you for your attention.

16             THE COURT:  Thank you.  All right.  Let's

17   get started with the first witness.

18             MS. VANBEBBER:  Yes, Your Honor.  Your

19   Honor, my first witness will be to-- will be Erin

20   Tomasic, who is actually being recalled.  She testified

21   the first day of the May hearing.

22             THE COURT:  And just remind the parties that

23   we, since the first hearing, have been under a

24   sequestration order of witnesses.  That sequestration

25   order continues.  Mr. Clymer sought I think-- well, by

1  motion I think it was just clarification that that did

2  not preclude him from preparing witnesses, and obviously

3  it does not with respect to the U.S. Attorney's Office

4  employees.

5          MR. CLYMER:  Thank you, Your Honor.

6          MR. GARRETT:  Judge, good morning.

7          THE COURT:  Good morning.

8          MR. GARRETT:  I'm Nathan Garrett.  I'm here

9  with Ms. Fisher, Kathleen Fisher, from Graves Garrett,

10 and we represent Ms. Tomasic.

11         THE COURT:  All right.

12         MR. GARRETT:  So I do not ask for any part

13 of these proceedings but rather just to make sure you

14 understood who we were.

15         THE COURT:  Mr. Garrett and Ms?

16         MR. GARRETT:  Fisher.

17         THE COURT:  Fisher, all right.

18         MR. GARRETT:  And we'll just sit over here,

19 Your Honor, is that okay?  Or do you want us to sit in

20 the back?

21         THE COURT:  How about you sit in the jury

22 box.  You'll be close to your client.

23         MR. GARRETT:  Okay.  Will do.

24                 ERIN TOMASIC,

25 recalled as a witness on behalf of the Special Master,

1    having first been duly sworn, testified as follows:

2              MS. VANBEBBER:  Your Honor, before I begin

3    the questioning, I have prepared a demonstrative exhibit

4    which is merely dates and times when things happened.

5    And counsel have all reviewed it and have no problem

6    with it, and I invite them to go ahead and add to it if

7    things would be appropriate to be added.

8              THE COURT:  All right.

9                   DIRECT EXAMINATION

10   BY MS. VANBEBBER:

11     Q.   Ms. Tomasic, you've been sitting in this chair

12   before.  Correct?

13     A.   That is correct.

14     Q.   And sometimes you didn't know whether you were

15   supposed to answer questions or not because of the *Touhy*

16   regulations.  Right?

17     A.   That's correct.

18     Q.   Are you aware that today you are being permitted

19   to answer many questions?

20     A.   I am.

21     Q.   And that-- and that today, if Mr. Clymer thinks

22   there's a question that isn't within the parameters of

23   the advice given by the Attorney General, he will tell

24   the Court; is that right?  That's your understanding?

25     A.   That's my understanding from the attorneys, that

 1    the-- the burden is on the government representative to

 2    assert *Touhy*.

 3              MR. CLYMER:  Your Honor, I'm sorry to

 4    interrupt Ms. VanBebber, but that's both-- that's wrong.

 5    I-- it's not my role to tell the witness to answer or

 6    not answer an individual question.

 7              She's been given direction by the Department

 8    specifically about what her authorization is.  It's

 9    incumbent on her to comply.  I can answer questions if

10    she's uncertain about things, and I'm happy to do so.

11    But I'm not in a position to direct her to answer or not

12    answer, that-- that's not appropriate and it's not my

13    role here.

14              THE COURT:  I don't know how you invoke

15    *Touhy* without making a record as to a particular

16    question that you think falls within the ambit of *Touhy*

17    and that the witness should not answer.  The way it

18    works is you tell the witness not to answer on the

19    record and then she doesn't.

20              And if I ultimately think there's something

21    wrong with that, you know, I can hold perhaps you in

22    contempt or someone above you in contempt, whoever the

23    authority came from.  But a record has to be made if

24    you're going to invoke *Touhy*, otherwise you're not

25    invoking *Touhy*.

1          MR. CLYMER:  Your Honor, I-- I beg to

2    differ.  The Court-- the way it worked at the last

3    hearing is I believe the proper way for it to work,

4    which is the witness is instructed about what their

5    authorization is, and we have sent a letter-- or an

6    e-mail message to counsel for Ms. Tomasic explaining

7    what her authorization is.

8          She's allowed to answer questions without

9    any input from me with respect to anything she's

10   authorized to answer.  She's not authorized to answer

11   other things.  I-- I don't invoke anything.  It simply

12   tells the witness what her authorization-- disclosure

13   authorization is.

14          Now, if she's unclear about something, I can

15   answer questions she has about my interpretation of the

16   scope of her authority, but I-- I don't believe I have

17   authority to direct her not to answer questions.

18          THE COURT:  Last time you did.  Last time

19   you objected.  You invoked *Touhy* orally on the record.

20          MR. CLYMER:  I don't disagree, Your Honor.

21   That's correct.  The last time there were times where I

22   said I believed that's outside the scope of that

23   witness' authority.  I did not ever instruct a witness

24   to answer or not answer.  I don't have the authority to

25   do that, Your Honor.

1           THE COURT:  All right.  So what can-- I

2    guess just so-- edify me, edify Ms. Tomasic, how is this

3    going to proceed?  If Ms. VanBebber asks her a question

4    that in your view is not within her authority, you're

5    not going to say anything?

6           MR. CLYMER:  That's correct, Your Honor.

7           THE COURT:  All right.  Mr. Garrett.

8           MR. GARRETT:  Yes, Your Honor.  May I?

9           THE COURT:  Yes.

10          MR. GARRETT:  I just want to clear up our

11   own position on that.  Our instruction to Ms. Tomasic is

12   to answer questions truthfully, period, you know.  And I

13   understand *Touhy*, and I've walked that walk.  But here

14   we have an occasion where the Department is a party and

15   has a representative party here.  And they've given

16   Ms. Tomasic almost two-and-a-half pages of authorization

17   under *Touhy*, letters A through X.

18          To expect that Ms. Tomasic is going to sit

19   here with the burden of answering questions truthfully,

20   which she intends to meet, and thread the needle through

21   two-and-a-half pages of what you can and can't do is

22   just simply unreasonable, generally speaking, but

23   specifically when the Department's representative is

24   sitting right here at the table.  So I just wanted the

25   Court to understand my position on that and how that has

1    translated to my advice to Ms. Tomasic.

2            MR. CLYMER:  Your Honor, maybe I have a

3    solution, Your Honor.  I don't mind raising a concern,

4    but I just-- and I don't mean to be difficult.  I'm

5    actually trying to help.  I think counsel makes a good

6    point.  I think it would be very difficult for

7    Ms. Tomasic to remember all of this.  It's difficult for

8    me to remember all of it.

9            If I believe that Ms. Tomasic is asked a

10   question that's outside her authorization, I will make

11   that point.  But my position, just to be clear, is I'm

12   not directing Ms. Tomasic not to answer.  I don't have

13   the authority to direct her to do anything or not do

14   anything.  I can only give her guidance about what her

15   authorization is.  And so if I believe something is

16   outside her authorization, I will say so, and

17   Ms. Tomasic can make her own decision at that point.

18           THE COURT:  Well, maybe we're splitting

19   hairs here, but my understanding is the way this-- the

20   way this-- the Department of Justice or any executive

21   agency utilizes this regulation is to advise their

22   employees here's what you can answer, here's what you

23   cannot answer.  The authority comes from above.

24           The only remedy, if there is a remedy at

25   all, is for-- if there's going to be contempt, it's

1   going to go-- it's going to be directed against the

2   person that made that authorization and placed those

3   limitations on the witness.  So are you-- I guess what

4   I'm asking, your authority comes from above, I assume.

5             MR. CLYMER:  That is correct, Your Honor.

6             THE COURT:  Is it from the DAG or the ADAG?

7             MR. CLYMER:  It's the Office of the Deputy

8   Attorney General, Your Honor.

9             THE COURT:  So it's Mr. Rosenstein?

10            MR. CLYMER:  It's his office, yes.  I have

11  not communicated with him personally about this, but

12  that's the office I communicate with.

13            THE COURT:  So if I were going to find

14  someone in contempt, who's the decision-maker and who

15  would I find in contempt?

16            MR. CLYMER:  I don't know if I can tell you

17  that, Your Honor.  I don't know what happens inside that

18  office about making decisions.  I don't know who talks

19  to whom.

20            THE COURT:  Well, this is very-- this is a

21  very unusual way to proceed under *Touhy*.

22            Ms. VanBebber, do you have any thoughts on

23  this, because I'm entitled to know who the

24  decision-maker is.

25            MS. VANBEBBER:  Yes, I understand the

16-20032-JAR   USA v. Karl Carter (Black)   10.02.18          458

 1  hair-splitting, and I understand why Mr. Clymer feels
 2  that he can't say-- in other words, take the
 3  responsibility as we stand here to make a *Touhy* decision
 4  and communicate it to the witness.
 5          We are entitled to know, I believe, who
 6  makes the decision.  And it's not the office, it's a
 7  human being.  And if Mr. Clymer does not know as we
 8  stand here who is making-- who made the decisions and
 9  who's going to make the decisions if new ones need to be
10  made, then perhaps he can call and find out and let the
11  Court know later today.
12          MR. CLYMER:  Your Honor--
13          THE COURT:  I agree.  I want you to find out
14  at the next break.  I want to know who the
15  decision-maker is.  A person's name.
16          MR. CLYMER:  Person's name?
17          THE COURT:  Yeah.  Because I can't hold
18  the-- the Department of Justice in contempt.  I can only
19  hold whoever it was that made the decision.  And if it's
20  more than one person, so be it, but I still need a
21  record of their names.
22          All right.  I do think Mr. Garrett's
23  concerns are well-taken, and I think Mr. Clymer
24  recognizes that to stand mute, you know, is not at all
25  helpful.

1            Let's proceed.  I don't know what else to do

2   at this point.

3   BY MS. VANBEBBER:

4       Q.  All right.  Ms. Tomasic, can we agree then that I

5   will ask you questions and you will answer them

6   truthfully?

7       A.  Yes.

8       Q.  And can we agree that your counsel is present

9   here and that if you have a problem, if you're concerned

10  or don't understand my questions or anything else, that

11  you're free to get legal advice from the two counsel

12  that are in this room?

13      A.  Yes.

14      Q.  All right.  But if I ask you a question you just

15  don't know what I'm talking about, you can just ask me

16  to restate it and I'll be glad to.

17      A.  All right.  And just-- and just so I'm clear, I'm

18  going to answer unless counsel for the government

19  invokes *Touhy*.

20      Q.  Or your lawyers tell you not to.

21      A.  Okay.

22      Q.  And I'm going to do my best to stay within the

23  parameters.

24      A.  Okay.

25      Q.  When you testified here before, it was a little

1   bit piecemeal because you got stopped right in the

2   middle of things, didn't you?

3       A.  Yes.

4       Q.  So can we-- we're just going to start over today.

5       A.  Okay.

6       Q.  And that as you do not know, Mr. Clymer-- Mr.

7   Clymer had a timeline that-- that he was concerned

8   about, and this is the timeline that I have prepared.

9   And so to the extent that you need refreshing of your

10  recollection on what day something happened, would you

11  please refer to the-- to the demonstrative exhibit?

12      A.  Yes.

13      Q.  When did you begin working for the United States

14  Attorney's Office?

15      A.  And I also prepared a timeline with just my dates

16  of starting and stopping.  I began working in the U.S.

17  Attorney's Office in April of 2013.

18      Q.  Had you worked in this building before then?

19      A.  I had.

20      Q.  What were your-- who were your previous employers

21  in this building?

22      A.  I worked as a law clerk for two separate judges,

23  and then I also interned in the building for two

24  separate judges and also for the U.S. Attorney's Office.

25      Q.  Now, when did-- or did you first apply for the

 1  position here with the U.S. Attorney's Office to be a

 2  regular Assistant United States Attorney?

 3      A.   I do not believe so, but I don't know.  I just

 4  don't recall.

 5      Q.   So when you came on as an employee, as a

 6  full-time employee, what was your title?

 7      A.   I was a Special Assistant United States Attorney.

 8  It was a HIDTA SAUSA is what it's called, and it was an

 9  entry-level position, and I was assigned to handle drug

10  cases.

11      Q.   Now, when you say "drug cases," what do you mean?

12      A.   Under the HIDTA program, it's my understanding

13  that I could prosecute any case with a drug nexus.  So

14  drug trafficking typically would be the types of cases,

15  but also I could handle firearms cases if there was also

16  a drug nexus.

17      Q.   Okay.  Did you always work in the criminal

18  division of this office?

19      A.   I did.

20      Q.   And you always were at KCK?

21      A.   I did.

22      Q.   You didn't work at either of the other two

23  offices?

24      A.   I did not.

25      Q.   Who was the criminal supervisor of the KCK office

1   when you started?

2       A.  When I started there was a lot of turnover, but I

3   believe when I started my criminal supervisor was Mike

4   Warner.

5       Q.  And where was he located, here or someplace else?

6       A.  He was in the Kansas City office.

7       Q.  Do you recall who the criminal chief was at that

8   time?

9       A.  I think it was also Mike Warner, but I'm not

10  certain.

11      Q.  So when you started you were being supervised

12  directly here by at least two levels of supervision in

13  the criminal division; is that right?

14      A.  Theoretically, yes, but I believe it was the same

15  person.

16      Q.  Okay.  How long were you employed here before you

17  got formal training from DOJ at the Attorney General's

18  Advocacy Institute in South Carolina?

19      A.  I don't recall exactly the date, but it would've

20  been within the first six months.  And I was assigned a

21  mentor, Sheri Catania, and she suggested that I attend a

22  class on Title III wiretaps, so that was the first class

23  I took.

24      Q.  So you were assigned Ms. Catania, or had a

25  different name at that time but now Ms. Catania, as your

 1   mentor?

 2      A.   That's correct.

 3      Q.   What was she supposed to do, to your knowledge?

 4      A.   I-- I believe she was supposed to train me, to

 5   take me to hearings and let her-- me observe her and

 6   others.  And then eventually she came along and observed

 7   me at hearings.  And that happened a few times.

 8      Q.   Did something interfere with your internship with

 9   Ms. Catania?

10      A.   It did.

11      Q.   What was it?

12      A.   There was conflict in the office when I arrived

13   between several AUSAs and Mike Warner.  And Mike Warner

14   instructed me shorty after arriving that I was to not

15   have contact with Ms. Catania, Terra Morehead, Scott

16   Rask, or Kim Flannigan.

17      Q.   So if you couldn't have contact with your

18   assigned mentor, who helped you?

19      A.   Well, he asked me to come to him if I had

20   questions, and I did on occasion.  But then when other

21   AUSAs would see me in his office, they would corner me

22   and ask me why I was speaking to him and what I was

23   doing.  And they were suspicious that I was interacting

24   with him.  So I ended up just-- I got on USANET, which

25   is an internal program, and I tried to figure out how to

1  do it myself.

2      Q.  All right.  Did you feel like you did it pretty

3  successfully?

4      A.  I thought I did initially, yes.

5      Q.  Did you have some cases of your own?

6      A.  I had a number of cases, yes.

7      Q.  Did you have any cases that-- at first, did you

8  have any cases that weren't just yours alone?

9      A.  Initially I was assigned a handful of cases that

10  were just my own.

11      Q.  So you had to start finish-- start and finish

12  them all by yourself?

13      A.  Yes.

14      Q.  How did those cases come out?

15      A.  Guilty pleas and then sentencing.

16      Q.  So when you went to the Advocacy Institute, did

17  you learn what an AUSA was supposed to do if she learned

18  that a detention facility was recording attorney-client

19  communications?

20      A.  This is a little bit of a long answer, but

21  eventually I became a SAUSA in the Western District of

22  Missouri, and I began around August of 2016.  And the

23  reason for that was that I was a Social Security SAUSA

24  by this time and the Missouri SAUSA had been promoted to

25  an AUSA and Missouri needed me to just handle his cases

1    until they could find a replacement SAUSA.

2         When I started in Missouri, the criminal chief

3    over there, who was very helpful, instructed me that I

4    should-- all new hires in their office had to attend

5    four or five classes within the first year of their

6    employment, including grand jury, discovery, trial

7    advocacy and a couple other I can't recall off the top

8    of my head.  I had never received any training in grand

9    jury matters or discovery matters formally from the NAC.

10   But at his suggestion, I signed up for--

11       Q.  What's the NAC?

12       A.  The National Advocacy Center, which is in South

13   Carolina, and it's where AUSAs receive training.  So at

14   the Missouri criminal chief's direction, I attended a

15   discovery class in the spring, roughly March of 2017.

16   And at that class it was discussed at length that inmate

17   calls are property of the government because we contract

18   with the jails or we directly supervise them and,

19   therefore, they're Rule 16 statements of the defendant

20   and must be turned over.

21        And at least some members of the panel felt that

22   even if the government hadn't ordered them as part of

23   the case, they had an obligation to either alert the

24   defense attorney that jail calls existed and in some

25   cases had an obligation to obtain those jail calls for

1    the defense attorney.  But there were varying views, but

2    everyone on the panel in the course agreed that those

3    jail calls were Rule 16 statements of the defendant.

4        Q.  Did you learn what you're supposed to do if you

5    come into possession of a-- of privileged material of

6    any sort?

7        A.  I do not recall prior to the *Black* litigation any

8    extensive training on how to handle privileged

9    information or a filter team.  It may have been a small

10   portion of a different curriculum, but I don't recall

11   it.

12           I know after the *Black* litigation arose, Tom

13   Beall assigned everyone in the district to watch a

14   roughly one or two-hour video produced by the Department

15   of Justice Education Center on how to handle a filter

16   team, what a filter team is, and how you should handle

17   privileged communications.

18       Q.  So then did you ever in your conversations with

19   the other AUSAs - I'm going to say AUSA because you were

20   functioning as one - with the other AUSAs in that office

21   what you're supposed to do when you have-- when you run

22   across an attorney call to his client?

23       A.  This came up on more than one occasion.  And

24   every time it came up, I initiated the conversation, so

25   I'll just start at the beginning.  I cannot give you an

 1  exact date, but within the first two years of my

 2  employment I-- an agent with the ATF encountered an

 3  attorney call with the Wyandotte County jail, calls he

 4  was listening to, and he brought it to my attention.

 5       We were both very concerned.  And our concern and

 6  our question that we raised was whether he needed to be

 7  removed from the case because, although he didn't listen

 8  to much, he had heard some and didn't realize it was the

 9  attorney until some period into the call.

10       So as was common, if you had a legal issue that

11  you needed advice on, I brought the issue up at a lunch.

12  There were three AUSAs at the lunch table.  One of them

13  was Dave Smith.  I do not recall who the other two were.

14  And Dave Smith answered that he had encountered this

15  issue once, that it's not as bad as I thought because

16  the law said that those phone calls weren't privileged,

17  but that I needed to contact my supervisor, who was Mike

18  Warner, and let him handle it.  The other two AUSAs at

19  the table did not weigh in.

20       So I took that issue to Mike Warner, and I cannot

21  recall if we sought guidance from PRAO, but I believe we

22  did, but I'm not certain.

23  Q.  PRAO is?

24  A.  The Professional Responsibility and

25  Accountability Office, and they're the ethics arm of the

 1   Department of Justice.  And if you have a question about

 2   ethics, you e-mail them-- actually you're supposed to

 3   e-mail your professional responsibility officer, your

 4   PRO.  There's an acronym for everything.  You're

 5   supposed to e-mail your PRO, and then your PRO will

 6   e-mail PRAO, and then it filters back through that

 7   person.

 8      Q.  Who was the professional responsibility officer

 9   in the District of Kansas?

10      A.  Later on it was Lanny Welch.  I don't recall who

11   it was early on.  It may have been Lanny, but I'm not

12   certain.

13          But although I don't recall whether we actually

14   sent the information off to PRAO, I do recall Mike

15   Warner's advice, and his advice was to bring in the

16   defense attorney.  Although the case was still in the

17   investigative stage, we knew that this particular

18   individual had an attorney for other purposes.  And we

19   brought her in, and we told her what had happened and

20   sort of felt out what she wanted to happen.  She didn't

21   have any concerns because I believe the phone call was

22   just-- it was scheduling or something like that.  And we

23   moved forward.

24          So then the second time I recall encountering an

25   attorney-client call was in Gregory Rapp's case.  And in

1    that case I personally didn't encounter the call but an

2    agent, Jeff Stokes, encountered one or two or three

3    calls.  I can't recall.  It was more than one, but it

4    was either two or three, and he realized it was the

5    attorney.

6         Jeff reported to me that he-- when he realized it

7    was the attorney, he stopped listening.  Once he

8    realized there was more than one call, he brought it to

9    my attention and asked me what to do.  I e-mailed Lanny

10   Welch.  And again, I don't remember the specific content

11   of the e-mail, but I copied my supervisor, who was Kim

12   Flannigan by this time, and I explained what he had

13   heard.  I explained we didn't intend to use the calls,

14   but that this had happened.  And I think the question

15   was should Jeff be removed from the case since he had

16   heard it.

17        And the e-mail-- the advice came back from PRAO--

18   I don't remember exactly what the advice was.  But in

19   the interim I had also done some research and talked to

20   other AUSAs about whether these calls were privileged.

21   My own research and then my conversations with everyone

22   in the office, no one disagreed that the phone calls

23   aren't privileged.

24   Q.   That the phone calls are or are not privileged?

25   A.   Are not privileged.  Because they received the

 1  warnings, the warning preamble at the beginning of the

 2  call, the phone calls aren't privileged.

 3        So there was something said in some guidance

 4  about alerting the defense attorney, and so I followed

 5  up and e-mailed just Lanny and I said, we don't intend

 6  to use these phone calls.  Do we still need to alert the

 7  defense attorney?  And Lanny said he wasn't sure.  So he

 8  e-mailed Emily Metzger, who at that time was not in my

 9  chain of command, but she was the civil chief.  And

10  Emily Metzger weighed in and said she thought that we

11  did need to alert the defense attorney.

12        And so I e-mailed the defense attorney and let

13  him know what had happened, and I copied my supervisor,

14  Kim Flannigan, and she had been in communication with

15  most of this incident.

16        After that fact, I went to the lunch table, and

17  there was a large group.  I would say between five and

18  eight people.  I cannot recall who was at the table, but

19  I know who typically is there.  And I told them what

20  Emily Metzger's guidance had been, that I needed to

21  alert the defense attorney.  And the group discussion

22  was that-- and there was just some colorful language,

23  but that that was stupid.  If the defense attorney is

24  stupid enough to make a call on a recorded line, then

25  that's on them, and you have no obligation to alert

 1  them.

 2          And I left that discussion thinking that the

 3  phone calls were fair game.  Not that everyone was going

 4  around listening to them, but that they didn't have the

 5  protection that required special treatment.

 6          So at some point thereafter-- at that point my

 7  position was that the phone calls were fair game.  At

 8  some point thereafter I talked to Chris Oakley.  And I

 9  often did this with many different legal issues, I

10  fielded questions with several AUSAs because no one did

11  anything alike.  Everyone operated like a silo in the

12  office and did their own thing.

13          So I respected Chris.  I asked him what to do.

14  He said he personally had encountered an attorney call

15  one time, and he did not alert the defense attorney, he

16  did not think we had an obligation to.  But he

17  discontinued listening, and he had instructed his agents

18  to do so.  And I think that he did that-- I think we

19  discussed that it was a litigation risk and not worth

20  the hassle.

21          Then finally in the last instance in July or June

22  of 2016, I had an incident as part of a trial with Dave

23  Zabel in which we believed an attorney was-- through his

24  own words, was making contact with represented inmates

25  who were represented by other attorneys, and he was

1    trying to procure them to be witnesses on his client's

2    behalf.

3            And in that instance, I discussed it at length

4    with Dave.  Kim was aware of it, that we-- our plan was

5    to intentionally obtain attorney-client calls.  So I

6    e-mailed Lanny Welch.  I copied Kim Flannigan and Dave

7    Zabel, and I told them-- I requested-- I said, you know,

8    I'm comfortable that these phone calls aren't

9    privileged, but I would like to intentionally get them,

10   and that makes me a little uncomfortable.  Is that okay?

11           And the advice back from PRAO was that if-- if

12   Ms. Tomasic is-- and I'm paraphrasing because I don't

13   have the e-mail in front of me.  If Ms. Tomasic is

14   confident that the phone calls aren't privileged, then

15   it would not violate any rules for her to listen to them

16   herself, but the safer course of action would be to use

17   a filter team.  And then the guidance suggested reasons

18   for having done so.

19           None of the reasons seemed applicable.  One of

20   the suggestions was that maybe Mr. Moran was setting a

21   trap for us.  I didn't think that was the case.  And the

22   goal was to get information about Mr. Moran and other

23   clients, not to procure trial strategies between him and

24   his client.

25      Q.  When you say Mr. Moran, are you speaking of an

1   attorney?

2      A.   Yes, Carlos Moran, who represented Juan

3   Herrera-Zamora.

4      Q.   All right.  So to summarize this, would you say

5   that in general you got advice from all the other people

6   in the office and even people in other branches that you

7   shouldn't-- attorneys shouldn't generally be listening

8   to attorney-client calls unless there was some kind of

9   an exception?

10     A.   I-- I don't know that I ever got that advice.  I

11  never asked that question, though, except in the case of

12  Mr. Herrera-Zamora.

13         Initially my question-- I had no intention of

14  listening to it or I thought my case was going to fall

15  apart.  My question was:  Do we have to pull this agent

16  off the case, is he tainted?  And through conversations

17  with other AUSAs, I began to become less concerned about

18  the phone calls and to think that the phone calls were

19  more fair game and less of a reason to be concerned.

20     Q.   You've mentioned the word filter team.  Is that

21  sometimes also called a taint team?

22     A.   Yes, it is.

23     Q.   And is it your understanding that that's a

24  situation where someone who was not part of the trial

25  team and is, therefore, not going to be involved in the

1  case would do the initial listening to see if there was

2  a privilege involved?

3     A.   That is my understanding.  In April of 2016, we

4  were going to execute the search warrant at CCA.  And at

5  that time I had not thought of a filter team.  I-- I

6  probably knew what it was from law school, but it wasn't

7  anywhere in my consciousness.  I had done large cases

8  with other AUSAs in which we had executed document

9  search warrants.  I'd never seen or heard of a filter

10  team being used.

11     Henry Herron, who was an experienced agent on the

12  investigation, came to me and suggested that we needed a

13  filter team, and he said that's something that IRS does

14  typically.  And based on Henry's suggestion, I went to

15  my supervisor, Kim Flannigan, and told her that I

16  thought we needed a filter team for the search at CCA

17  because there might be inmate mail with their attorneys

18  that the agents might inadvertently have to go through

19  looking for drugs, and then also because I knew we were

20  going to seize the law library computers, which may have

21  drafts of letters that inmates were writing to their

22  attorneys.

23     Q.   Isn't it true that AUSAs and case agents-- let me

24  start over.  Leaving aside the question of

25  attorney-client, isn't it true that case agents and

1   AUSAs routinely obtained phone calls because they were

2   recorded by the CCA and also video of other areas, such

3   as the law library?

4       A.   The phone calls were very regularly obtained as

5   part of cases.  Tris Hunt suggested to me that if a case

6   was going to trial, I had almost an obligation to get

7   them because he-- he recounted some instances in which

8   he was able to avert a trial because he got the-- he

9   heard the guy confessing.  So I used that practice, I

10  got them in most cases.

11        The video, I don't know of any instances where

12  CCA video would've been obtained unless it was like a

13  case involving an assault in the prison or something--

14  where something happened inside the prison and the video

15  was pertinent to the case.

16      Q.   When-- in early 2015 did you begin working on--

17  with Kim Flannigan on a case entitled *United States*

18  *versus Rapp*?

19      A.   I would have to look at the start date.

20  Initially for-- I would say from-- if *Rapp* began-- I

21  believe it began in November of 2014, but I'm not

22  certain.  But I was alone on that case until - and this

23  is a rough approximation - until the summer of '15

24  because I was pregnant and I was going to have to take

25  maternity leave, and Kim got on the case because the

1    case had gotten big and because I was going to be on

2    maternity leave.  And it looked like it was going to be

3    a six-week trial, and up to that point I'd only had one

4    trial.

5         Q.  You had one trial--

6         A.  Yes.

7         Q.  -- before that?

8         A.  Yes.

9         Q.  And what trial was that, if you remember the

10   name?

11        A.  I don't remember his name.  It was a four or

12   five-day trial involving two controlled buys of crack

13   cocaine.

14        Q.  Were you lead counsel on that?

15        A.  I was.

16        Q.  And what does legal counsel mean, or lead

17   attorney?

18        A.  Lead attorney means that you're sort of driving

19   the ship.  And you prepare the exhibits, you prepare the

20   order in which you're going to present your proof.  You

21   make sure all the elements are met.  You prepare any

22   motions *in limine* or responses.  You organize witnesses,

23   you prep witnesses.  And then, you know, if you have a--

24   an assistant counsel, you'll divide that labor up.

25                THE COURT:  When you're at a stopping point,

1   we'll take a break.  It doesn't necessarily have to be

2   with this question.

3   BY MS. VANBEBBER:

4       Q.  Finished?

5       A.  I am finished, yes.

6             MS. VANBEBBER:  Okay.  Very well, Your

7   Honor.

8             THE COURT:  Do you want to break now?

9             MS. VANBEBBER:  Whenever.

10            THE COURT:  Oh, let's take a break for 15

11  minutes.

12            (Recess).

13            THE COURT:  All right.  You can be seated.

14  You can resume.

15  BY MS. VANBEBBER:

16      Q.  We were talking before the break about Mr. Herron

17  having filled you in on what a taint team does; is that

18  right?

19      A.  That's correct.

20      Q.  And about what year was that?

21      A.  That was the day of or the day before we executed

22  the search warrants at CCA.

23      Q.  Would that be in May?

24      A.  So April or May, 2016.

25      Q.  So you've been there since 2013?

1      A.   That's correct.

2      Q.   In your job at least.

3      A.   Yes.

4      Q.   And nobody had educated you on taint teams before

5   that?

6      A.   That's correct, at least the best of my

7   recollection.

8      Q.   Management never told you about that part?

9      A.   Not that I recall at all.

10      Q.   All right.  You said that you began working with

11   Kim or she put herself-- she's your supervisor.  Right?

12      A.   Yes.

13      Q.   So she put herself on your case in the *Rapp* case

14   as a second chair or lead counsel?

15      A.   Second chair.

16      Q.   All right.  So you were still in charge; is that

17   right?

18      A.   That's correct.

19      Q.   What they call the AIC, the attorney in charge of

20   that case?

21      A.   Yes.

22      Q.   Okay.  In the process of investigating Rapp, did

23   you learn that there was a separate drug and contraband

24   trafficking conspiracy taking place at CCA?

25      A.   Yes.

1      Q.   Did you open, you personally open a criminal

2   investigation into that conspiracy?

3      A.   I spoke with Kim about it, and we initially

4   discussed we didn't have time for it because I had

5   inherited all these other Social Security cases and

6   everyone was booked up.  But then Rapp and Dertinger

7   pled guilty, so the agents who-- had dedicated six weeks

8   to being there for the trial, and there was no longer a

9   trial.  And so the agents and Kim-- with Kim's input

10  agreed we could convert this to an investigation at CCA.

11      And so I don't know who officially opened the

12  matter, but I was put in charge of it.

13      Q.   Kim assigned you to it or did somebody else

14  assign you to be in charge of it?

15      A.   Kim did.

16      Q.   All right.  Was Chris Oakley another AUSA

17  assigned as your co-counsel?

18      A.   Initially he was not assigned to the case, but

19  Kim and I realized how big the case was.  Tris Hunt

20  actually asked if he could join the case because he

21  thought it seemed like an exciting case.  Kim and I

22  talked privately and we did not think that was a good

23  choice, and so Chris Oakley was assigned.  He was

24  assigned sometime before execution of the search warrant

25  at CCA, but I don't know--

1    Q.   All right.  So at this time you had-- you had

2    going-- you were first chair in *Rapp*?

3    A.   Yes.

4    Q.   And then you became first chair in what is now

5    called the *Black* investigation?

6    A.   Yes.

7    Q.   And that's the drug trafficking-- or contraband--

8    drug and contraband trafficking that has led to today's

9    hearings.  Right?

10   A.   Yes.

11   Q.   What else did you have going on?

12        You had other cases, your Social Security cases,

13   and you had to do that because by that time you were a

14   Social Security attorney, were you not?

15   A.   That's correct.  Beginning-- when I returned from

16   maternity leave in November of 2015, I was a Social

17   Security SAUSA.  And there was some concern that Social

18   Security had become frustrated with their previous hire

19   because he did absolutely no work for Social Security.

20        So Kim and I talked at length that my drug cases

21   in large part would need to be re-assigned to other

22   AUSAs so that I could make way for the between 30 and 50

23   stagnant Social Security cases.

24        So I had those cases, and then I was allowed to

25   stay on only for trial purposes as second chair in

1    *Herrera-Zamora.*  And so the government has erroneously

2    indicated in the *Touhy* notice that I was the lead

3    prosecutor in *Herrera-Zamora,* that is not true.

4          And then I was allowed to stay on *Rapp* because

5    the case was so far along.  And there were a smattering

6    of other cases where although they had been re-assigned,

7    the AUSA, behind Kim's back, would sort of come and tell

8    me to do work on the case.  So I continued to work on

9    some of my drug cases although I wasn't necessarily

10   assigned to them.

11      Q.  All right.  So as the *Black* case got fired up,

12   you were also working on *Rapp*, at least until everybody

13   started pleading, and then you had all the 30 to 50

14   Social Security cases to deal with?

15      A.  Yes.

16      Q.  And you were second-chairing *Herrera-Zamora*?

17      A.  That's correct.

18      Q.  And who was first chair?

19      A.  David Zabel.

20      Q.  All right.  Now, you said prior to this time you

21   had how many actual trials?

22      A.  My recollection is one.  I don't remember a

23   second one.

24      Q.  So you came straight out of-- a brand-new baby

25   lawyer into the U.S. Attorney's Office.  Right?

16-20032-JAR   USA v. Karl Carter (Black)   10.02.18            482

1      A.   Uh-huh.

2      Q.   And you now had in the beginning-- in the middle

3   of 2016 three major cases plus Social Security cases,

4   and *Black* being-- one of those three cases was *Black*,

5   which was considered a complex multi-defendant case.

6   Right?

7      A.   Yes.

8      Q.   Who-- I'll ask someone else that question.

9           Was there a grand jury subpoena in *Rapp* for phone

10  recordings?

11     A.   I don't recall.  Typically phone recordings

12  would've been obtained by a form that was given to me by

13  Sheri Catania, and she got it from the marshals service.

14  That's how I always got phone calls.  But then once CCA

15  realized we were investigating them, they were requiring

16  formal subpoenas because I-- I don't know why, you'd

17  have to ask them, but they were demanding subpoenas

18  rather than just the form.

19     Q.   At any rate, the CCA audio files that were

20  obtained for the *Rapp* case had to be given out to the

21  attorneys for the defendants.  Correct?

22     A.   In discovery?

23     Q.   (Nods head up and down).

24     A.   That happened, I would think, in most if not

25  every case.  I don't know.  Because in some instances,

 1   the agents ordered the phone calls and the phone calls

 2   would go directly to the agents.  In some cases, the

 3   prosecutor would order the phone calls and the

 4   prosecutor would receive them.  And I-- I did it

 5   different ways too.

 6        For example, sometimes I would ask my assistant

 7   to go ahead and download them onto our server because I

 8   didn't know when I would get them back from the agent or

 9   if they'd be in one piece.  And so there really was no

10   consistent way.

11        But my general practice would've been to send

12   them out in discovery, but I cannot say that that always

13   happened.

14   Q.   Was one of the *Rapp* defendants named Richard

15   Dertinger?

16   A.   Yes.

17   Q.   Who represented him in the *Rapp* case?

18   A.   Jackie Rokusek.

19   Q.   Is there another *Rapp* defendant named Ashley

20   Huff?

21   A.   Yes, there was.

22   Q.   Who represented her?

23   A.   William Session.

24   Q.   In March and April of 2016, did you and Kim have

25   assistance on the *Rapp* case from some cooperating

1    inmates at CA-- CA?

2       A.   People who were on their case already but were

3    also housed at CCA?

4       Q.   Inmates.   Inmates cooperating.

5       A.   I-- I believe so.   I believe at-- we had some

6    people who were on the *Rapp-Dertinger* case who were in

7    custody, but I don't know if they had been released by

8    that time.

9       Q.   Did some cooperators come to you or to Kim, to

10   your knowledge, and say that Mr. Dertinger was

11   spreading-- spreading information at CCA about the *Black*

12   investigation?

13      A.   Yes, but those folks were not actually-- they had

14   nothing to do with *Rapp* and *Dertinger* except that they

15   were also housed at CCA.   Those people were on the other

16   cases.

17      Q.   All right.   What did they say that they

18   understood the source of Mr. Dertinger's information to

19   be?

20      A.   His attorney.

21      Q.   And that would've been?

22      A.   Jackie Rokusek.

23      Q.   Do you recall that the *Black* indictment was filed

24   on May the 4th, 2016?

25      A.   I don't know the date for sure, but that sounds

 1  very close, yes.

 2      Q.  And on that same day, May the 4th, did you issue

 3  the subpoena for surveillance, all surveillance at CCA?

 4      A.  If that is the date on the subpoena, that sounds

 5  like when I did it.

 6      Q.  Did you exclude the attorney-client rooms from

 7  that subpoena?

 8      A.  No, I did not.

 9      Q.  Isn't it true that part of the reason you sent

10  out that subpoena was because the informants had told

11  you that they believed Rokusek was giving information to

12  Dertinger who was spreading it all over?

13      A.  When the subpoena was issued, that would not have

14  been part of my calculus for issuing it because there

15  wasn't much information about it, and I don't think we

16  were even discussing it at that point.  The purpose of

17  getting the video footage at that point was to support

18  the charges in the indictment, which was the drug

19  trafficking.

20      Q.  So you were particularly concerned with the law

21  library and the various pods and living spaces of the

22  inmates?

23      A.  Initially, yes.  But the decision-- I made the

24  decision to get all the video because it only is

25  retained for a short period of time.  The investigation

1    was, compared to other investigations, very limited.

2    And I knew it was going to grow with time, and I knew

3    we'd lose that evidence if we didn't get it all.

4        Q.  Did you know it then when you issued the subpoena

5    for the surveillance, did you know whether the

6    attorney-client visits in any of the eight

7    attorney-client rooms at CCA were being videotaped?

8        A.  I did not think about it.  I mean, I know your

9    question is did you know.  It did not register, it

10   didn't come to mind, it was not in any way part of my

11   calculus in how I wrote the subpoena.

12       Looking back, I did have information from one

13   cooperator as part of a very lengthy and extraordinarily

14   informative proffer in which he said that there were

15   cameras in the attorney-client rooms, but I simply

16   didn't think about that at the time.

17       Q.  I'm going to direct your attention to May 17th.

18   Is that the day that CCA responded to the *Black*

19   surveillance subpoena as far as you know?

20       A.  That sounds about right, yes.

21       Q.  So you issue it on the 4th, it comes back on the

22   17th.  And what form did it come back to you in?

23       A.  I-- I only know this because I've talked-- this

24   case has been going on for a long time ago and I've

25   talked to a lot of people about it.  I wouldn't have

1   known what it was at the time.  It's called a PELCO and

2   it has six different boxes that somehow fit into a

3   machine and-- and I don't know how-- beyond that, I

4   don't know.

5       Q.   So there were six boxes?

6       A.   That's-- I know that from the litigation.

7       Q.   And each box had a hard drive in it?

8       A.   Yes.

9       Q.   A DVR in it, a DVR in it?

10      A.   I didn't-- I don't know the innerworkings of how

11  it worked, but yes, I knew each-- six-- box had

12  different videos with different camera angles in it.

13      Q.   Did you see the boxes at the U.S. Attorney's

14  Office?

15      A.   Yes, I did.  I believe-- and I don't know who

16  went and got them, but someone involved in the case went

17  and got them.  And I believe they initially brought them

18  to me, to my office, and I don't know if I immediately

19  or within a short time frame thereafter said, take that

20  down to Pauletta, because Pauletta was handling all the

21  discovery in the *Black* case.

22      Q.   Is Pauletta Boyd a litigation specialist in your

23  office?

24      A.   She is.

25      Q.   She's not an attorney?

1    A.   She is not.

2    Q.   Okay.  Did you ever see any markings on the white

3  boxes that were given to you from that surveillance--

4  surveillance subpoena?

5         MR. CLYMER:  Judge, I'm going to object.  I

6  don't think there's testimony about any white boxes.  I

7  think the witness said they were boxes, she may have

8  said black, but I don't think there's anything about a

9  white box.

10         THE COURT:  Overruled, answer if you can.

11         THE WITNESS:  I don't recall what color the

12  boxes were.  I don't remember any markings.  And I

13  didn't inspect it, I-- it was an agent brought me

14  something and I knew it was the video.  I knew that that

15  was not going to be anything I needed to be doing, so I

16  sent it directly to Pauletta or-- or it stayed on my

17  desk for a period of time, I don't know.  But I know in

18  some short time frame it went to Pauletta.

19  BY MS. VANBEBBER:

20    Q.   After you knew Pauletta got it, was she telling

21  everyone she couldn't figure out what she was viewing

22  and needed an index?

23    A.   Yes.

24    Q.   And did CCA provide an index, to your knowledge?

25    A.   It did.  And I know in the July 21st hearing I

1  made a statement that I believe led others to believe

2  that Pauletta had created the index.  But I know from

3  speaking with Pauletta that she did not create the

4  index, that a former employee of CCA made the index and

5  provided it to her.  Matt Cahill sort of coordinated

6  that getting done.

7      Q.  Did-- do you recall which of the boxes were

8  identified at some point as the videos of the

9  attorney-client conference rooms?

10     A.  I know from the litigation that it was Box No. 6.

11     Q.  On July 21st, 2016, did you and Chris Oakley

12  attend a routine discovery conference in the *Black* case?

13     A.  Yes, we had a hearing on that date and it dealt

14  with discovery.  I don't think Chris and I-- I think we

15  didn't really know what to expect because we weren't

16  expecting a hearing and we had thought we were going to

17  have a meet and confer.  But then there was a hearing

18  and it dealt with discovery and concerns Judge Robinson

19  had about how we were handling discovery.

20     Q.  All right.  We know then that you issued the

21  subpoena for surveillance on the 4th, it was returned on

22  the 17th.  And if there's testimony that it got to the

23  U.S. Attorney somewhere around the 6th and then the

24  index came in on the 10th, does that ring a bell?

25     A.  The 10th of?  Of what month?

1    Q.   June.

2    A.   June, okay.

3    Q.   And then in July you had what you initially

4    assumed would just be a routine discovery conference

5    hearing.

6         Now, on May the 13th you had the-- do you see the

7    green dot?  You had had a subpoena go out that was for

8    audio-recordings at CCA in the *Black* case.  Right?

9    A.   Okay.

10   Q.   And before-- sometime before July 16th-- or,

11   excuse me, July the 21st, you had gotten returns on

12   those, you had gotten audio; is that right?

13   A.   I don't-- I haven't looked at-- I have not had

14   access to any of this information--

15   Q.   Uh-huh.

16   A.   -- in a long time, but that sounds right.

17   Q.   Okay.

18   A.   The exact date I couldn't recall.

19   Q.   So you told the Court that you were prepared to

20   do the normal distribution of the videos--

21   A.   Yes.

22   Q.   -- and of some pictures and some e-mails.  Do you

23   recall why you didn't tell her that you also had these--

24   all these audio-recordings?

25   A.   I don't recall that-- I don't know if I-- if it

 1   didn't come to mind.  I don't know the line of

 2   questioning, I haven't looked at that transcript in some

 3   time.  Pauletta Boyd might be better equipped to

 4   respond.

 5        At the time of the hearing-- beginning in

 6   mid-June until early July I had taken a break from the

 7   *Black* case and Chris Oakley was watching the *Black* case

 8   as far as discovery goes because I had to stop

 9   everything and deal with the *Herrera-Zamora* trial, and

10   then also the lead case agent had gone off to the

11   Republican National Convention as part of his duties

12   with Secret Service and some of the other agents had

13   vacation during that period.  So I hadn't dealt with the

14   discovery in a while and I don't know that I was as

15   familiar with the status of the discovery as I should

16   have been.

17        And then one other point about how the discovery

18   was processed in that case; KBI had undertaken a new

19   system that was supposed to be the new and amazing

20   system to deal with discovery to consolidate it, and I

21   think everyone at least on our end felt like it was not

22   what it had promised to be.

23        So every single bit of evidence, including those

24   jail calls, had to go to the KBI, had to filter through

25   some system where a cover sheet was attached and then

1   eventually filter their way back to our office and at

2   that point we could put it in discovery.  But I just

3   don't know if the calls were ready or not.

4       Q.  All right.  I'm going to show you what's been

5   marked as Special Master's Exhibit No. 1144 and ask you

6   if you've seen that before?

7       A.  I have.

8       Q.  Were you-- you told the-- you told the Court that

9   day that you did not believe there were recordings of

10  the attorney-client rooms; is that correct?

11      Let me back up.  This particular letter is

12  addressed to whom?

13      A.  That letter is from me to Chris Oakley, Bonnie

14  Wiest, David Guastello, Kathleen Ambrosio, Cindy Dodge,

15  Jason Hoffman, John Jenab and it says Jackson.  And

16  those were the counsel in the *Black* case, co-counsel--

17  or defense counsel.  And then Chris Oakley is my

18  co-counsel and Bonnie the courtroom deputy for Judge

19  Robinson.

20      Q.  All right.  So this letter went out to all the

21  defense counsel in *Black* and it also went to the Court?

22      A.  Uh-huh.

23      Q.  Is that right?

24      A.  Yes, it did.

25      Q.  And were you trying to clear up some issues that

1  you thought had arisen on July 21st?

2      A.    Well, I was trying to clear up some issues that I

3  thought-- let's see, what date did I send this?

4  August 5th.

5      Q.    Uh-huh.

6      A.    I-- I sent this e-mail because at that point the

7  warden for CCA had come back and said that there was no

8  video-recordings in the cells.

9      Q.    And how did you know that?

10     A.    I don't remember exactly how.  I think I got an

11  e-mail from someone in our office.

12     Q.    Deb Barnett tell you that?

13     A.    Deb Barnett, I don't think she would've directly

14  told me that because our contact was very limited, but I

15  think it might've been an e-mail sent out to everyone.

16  And I don't know if it was from her or maybe someone

17  else.

18     Q.    When-- you said by this time you-- you had

19  received everything on the 10th of June.  You had-- you

20  had a hearing on the 21st of July and you had in the

21  office's possession-- Pauletta had control of these

22  DVRs?

23     A.    Yes.

24     Q.    And you knew that at least one of them was of the

25  attorney-client rooms?

1    A.  I didn't know it.  I-- beginning in July I began

2  to think it, but we hadn't confirmed it.  And I-- I

3  honestly didn't go look at the index to study it to

4  confirm it.  I don't know why I didn't think of that,

5  but I didn't.

6    Q.  All right.  So after the hearing in July when--

7  it was obvious to you then that the Court had some

8  concerns.  Right?

9    A.  Yes.

10    Q.  Did it not occur to you to just either go out to

11  CCA or tell an agent to go out to CCA and check and see

12  if those-- if those attorney rooms were recorded?

13    A.  My perception, which was probably wrong, of Judge

14  Robinson's concerns is that we weren't getting enough

15  discovery out.  We weren't doing it quickly enough and

16  we weren't doing it efficiently enough.  And that I

17  think she felt like we were kind of bullying the defense

18  attorneys by not providing discovery in a reasonable

19  way.

20        So when we came back from that hearing, Chris

21  Oakley and I discussed in sort of a frenzied way what

22  can we get out fast, what's available, what do we need

23  to do to clean up and get stuff ready so they have what

24  they need?

25        I had talked with John Jenab during the hearing

1    about addressing privilege issues with Judge Robinson,

2    and he said, let's just wait until the meet and confer.

3    And so I knew when we got to the meet and confer we

4    would deal with that.  We would deal with the video, we

5    would deal with the law library computers and any other

6    sort of buckets of privileged information.

7          But my priority at that point was getting stuff

8    out to the defense attorneys that I could.

9    Q.   Let me direct your attention to Paragraph 2 there

10   where it says, "I don't believe it's recorded," and then

11   you explain that your supervisors asked some people

12   whether it was recorded; is that right?  So it wasn't

13   you, it was your supervisors who asked?

14   A.   Definitely.  I did not know what was happening at

15   this point.

16   Q.   So your supervisors had told you that they had

17   inquired and were told that there was no recording?

18   A.   That's correct.

19   Q.   And you just took their word for it; is that

20   right?

21   A.   I did.

22   Q.   You weren't curious enough to want to go out

23   there yourself and figure it out?

24   A.   Well, I would-- I kind of thought the warden

25   would have a definitive answer, I had no reason to doubt

 1   her.

 2       Q.   And did you know whether your supervisor had

 3   actually talked to the warden or was it third-hand

 4   hearsay?

 5       A.   I believe it was an e-mail from Deb Barnett, but

 6   I can't say with certainty.

 7       Q.   And Deb Barnett at that time was the criminal

 8   chief; is that right?

 9       A.   She was the criminal chief, yes, so she would've

10   been my second line above me supervisor.

11       Q.   Did you draft this letter all by yourself?

12       A.   I don't know.  Honestly.  I probably, given the

13   importance of it, would've run it by a couple of people,

14   but...

15       Q.   Who?

16       A.   Chris Oakley and Kim.  But I don't think she was

17   in town.  Maybe--

18       Q.   Well, you can see from the e-mail-- I've been

19   referring it to a letter, but it's a letter encased in

20   an e-mail, isn't it?

21       A.   Yes.

22       Q.   Look at the top.  And who forwarded it on after

23   they got it?

24       A.   I did.  And I sent it to Deb Barnett and Kim

25   Flannigan because I wanted them to know that I was

1    trying to correct this with chambers, whatever was going

2    on.

3        Q.   Did you get any positive feedback from this?

4        A.   I don't recall.

5        Q.   Okay.

6            MS. VANBEBBER:  I'd move for the admission

7    of 1144.

8            MR. CLYMER:  No objection.

9            THE COURT:  1144 admitted.

10   BY MS. VANBEBBER:

11       Q.   Now, after that hearing, after the July 21st

12   hearing, did you turn your attention back to-- you and

13   Kim turn your attentions back to the *Rapp* case?

14       A.   Yes.  There is a one-week period in July where I

15   missed the entire week of work because I had the flu.

16   So I think it was-- if the hearing with Judge Robinson

17   was on the 21st, if that was a Friday, then the

18   following week I missed the entire week.  I think I came

19   in for a few hours on Friday, but I was completely

20   bedridden the entire week.

21       Q.   So that puts us to the first week in August.

22   Correct?

23       A.   That does.

24       Q.   And during that first week in August - to be

25   precise, on August the 2nd - who called Rokusek?

1    A.   Either Kim or me or both.

2    Q.   You don't recall?

3    A.   I don't recall.

4    Q.   And who told her that she'd better come in and

5    meet with you?

6    A.   I-- I don't recall.  I haven't looked at those

7    e-mails.  I think they were e-mails.

8    Q.   And during that call-- this is a telephone call.

9    A.   Okay.

10   Q.   During the telephone call, did you or Kim

11   Flannigan explain to Jackie Rokusek that you had video

12   in the *Black* case showing her meeting with Dertinger?

13   A.   I don't believe so, not at all.

14   Q.   So you don't think it was you?

15   A.   No.

16   Q.   And did you or Flannigan tell her she had a

17   conflict and she needed to cease representation?

18   A.   Is this during a phone call?

19   Q.   That's why I'm asking you.

20   A.   No, I don't-- I don't remember any lengthy phone

21   calls with Jackie Rokusek.

22   Q.   Did you e-mail her and tell her that?

23   A.   No, I don't recall e-mailing.

24   Q.   Do you know how she got the idea that she was

25   supposed to come in because you had video?

1     A.   Either Kim or I asked her to come in for a

2   meeting.  And that was discussed at length with

3   multiple, multiple attorneys in the office.

4     Q.   Okay.  Like who?

5     A.   I know without a doubt that I ran this issue by

6   Tris Hunt, Dave Zabel, Chris Oakley, Kim Flannigan, and

7   Sheri Catania.  And I also think I ran it by Scott Rask.

8     Q.   By who?

9     A.   Scott Rask.  It was a group discussion because

10   I--

11     Q.   Who was that?

12     A.   Scott Rask, he was a line AUSA at the time but he

13   later became the supervisor.

14     Q.   Okay.

15     A.   And the purpose of the discussions was he-- at

16   this point we had three cooperators who had said that

17   Dertinger had gotten information from his attorney, and

18   so we felt like that was important.

19          So my question to everyone - and we met in--

20   sometimes alone and sometimes in different meetings, but

21   there were multiple discussions - was:  Is this a

22   conflict of interest?  How should it be handled?  Should

23   we meet with her?  Should I just file the motion?  How

24   should we communicate?

25          And I know because there's been a lot of banter

1    about it since then that Tris Hunt told me not to meet

2    with her, to just file the motion, because he has

3    reminded me jokingly repeatedly that had I followed his

4    advice we wouldn't be here.

5         Chris Oakley and Dave Zabel told me to meet with

6    her and to take Kim because she and Kim were friends and

7    let Kim do the talking, because what we did not want to

8    do was escalate it.  We realized that there was a

9    conflict between me and Jackie and that we needed to--

10   the very first thing I said in the meeting, I know

11   because we talked about it, I said, "Jackie, I don't

12   want to fight with you for the next 20 years."  And--

13   and I meant it.

14        Q.  So the entire four-day stretch when there were--

15   when Rokusek was concerned, you were communicating with

16   your supervisors and with your other associates at the

17   U.S. Attorney's Office to decide whether you should go

18   ahead to push Rokusek on this; is that right?

19        A.  Yes.

20        Q.  So you didn't make that decision on your own?

21        A.  Not at all.

22        Q.  And you and Kim didn't make it together by

23   yourselves?

24        A.  We talked to other people in the office, yes.

25        Q.  All right.  And you've named who those people

1   are?

2       A.   Yes.  Yes.

3       Q.   On August the 3rd, are you-- do you recall that

4   Rokusek did come to you, meet with you?

5       A.   Yes, she did.

6       Q.   And she specifically came to meet with you

7   because she sent an e-mail saying that the reason she

8   was coming to meet with you was she wanted to look at

9   the video, didn't she?

10      A.   I don't-- I might have my dates mixed up here.

11  So she and I-- met with me and Kim.

12      Q.   Uh-huh.  On the 3rd, August the 3rd.

13           MR. CLYMER:   Judge, I'm going to object to

14  that.  I think that that's wrong.

15           THE COURT:   You can cross examine.

16           MR. CLYMER:   Very well.

17           THE WITNESS:   And I don't have the dates

18  straight.  But there was-- there were two-- well, there

19  was one meeting with Jackie in which we discussed what

20  we believe was a potential conflict of interest.  And I

21  know from reading her testimony she believes that Ms.

22  Flannigan said that she intended to have an agent look

23  at video.  That meeting happened, not necessarily - at

24  least in my view - as Ms. Rokusek recalls it, but it

25  happened.

 1              And then by the end of the week, Ms. Rokusek

 2  contacted someone, me, Pauletta, or Kim Flannigan and

 3  asked to view the video.  Pauletta Boyd provided the

 4  video to Ms. Rokusek and Kim and I were not involved in

 5  that in any way.

 6  BY MS. VANBEBBER:

 7    Q.  All right.  So-- and I probably misled you there.

 8  There's an e-mail between you and Flannigan saying she

 9  wants to see the video, but she doesn't really see it

10  until August the 5th.  Right?

11    A.  That sounds correct, if it's toward the end of

12  the week.

13    Q.  Uh-huh.  On August the 5th, which is a Friday.

14    A.  Okay.  That sounds correct.

15    Q.  Now, when did you become aware or did you-- did

16  you ever become aware that Ms. Brannon with the Federal

17  Public Defender's Office e-mailed Debra Barnett and

18  said, we plan to file a 41(g) motion for return of

19  property and seek to intervene in the *Black* case?

20              MR. CLYMER:  Objection, assumes a fact not

21  in evidence.

22              THE COURT:  Overruled.  The question is:

23  Did you become aware or-- when did you become aware or

24  did you become aware.

25              THE WITNESS:  I was not aware of any

1    involvement by the Federal Public Defender at all until

2    I saw a document come through on ECF-- well, I take that

3    back.  There was one e-mail that I can recall showing

4    that the Federal Public Defender was involved in trying

5    to determine whether the-- CCA was recording video, but

6    I did not get that e-mail from Debra Barnett.

7              Scott Rask, who was not a supervisor at the

8    time, felt like something was going on, something big,

9    and so he reached out to someone in the marshals service

10   to ask if they knew what was going on.  And they

11   provided an e-mail that showed that Melody Brannon was

12   trying to determine if there were video-recordings and

13   that Debra Barnett was also involved in the process, but

14   Deb Barnett did not communicate that with me.

15   BY MS. VANBEBBER:

16       Q.  All right.  So you weren't involved in all of

17   that exchange?

18       A.  I was not involved, no.

19       Q.  Okay.  So you knew on August the 5th, Friday,

20   that Rokusek was coming to review the videos?

21       A.  Uh-huh.

22       Q.  And that Pauletta Boyd would help her with that?

23       A.  Uh-huh.

24       Q.  And that's also the day that you wrote the

25   letter, explanatory letter, to the judge and counsel.

1    Correct?

2        A.   Uh-huh.

3        Q.   So when you said that you weren't sure whether

4    they were being videotaped, you were aware that Ms.

5    Rokusek was, in fact, that very day looking at the

6    video.  Correct?

7        A.   I knew she was coming to look at video to see if

8    it existed.  And I was not trying to mislead Judge

9    Robinson.  My thought in drafting this was clearly I

10   made a misrepresentation to the Court and if it turns

11   out-- and I thought it-- I thought it was going to turn

12   out that I was wrong, that there was no video because

13   the warden said so, that I want to be the one to tell

14   Judge Robinson.  I don't want the defense bar to come

15   forward and say, look, Ms. Tomasic lied on the record

16   and there, in fact, is not video, and she indicated that

17   she thought there was.

18       Q.   So what did you think was in that video-- that

19   DVR box?

20       A.   While Ms. Rokusek was back there looking at it,

21   Pauletta Boyd-- at some point around that time Pauletta

22   Boyd brought the index to me, which she says she's

23   previously shown me, but it was just in passing, and we

24   saw that it said "attorney-client rooms."  And at that

25   point I thought, okay, we do have the video, but it was

1   after I had sent this e-mail.

2       Q.   And you didn't send a second e-mail to fix that

3   problem?

4       A.   I did not because-- it's hard to remember, but at

5   that point I think the motion came through, we were

6   trying to talk to Deb.  There was so much internal

7   conflict, and I felt like I didn't have a grasp of what

8   was happening.  It was-- this e-mail was never designed

9   to tell the judge anything misleading.  This e-mail was

10  designed to sort of correct at the moment based on what

11  I knew, what the warden said, that I had gotten it wrong

12  on July 21st.

13      Q.   Now, you-- you just mentioned the motion had been

14  filed, do you mean the Federal Public Defender's motion?

15      A.   I think so, or I knew it was coming.  I don't

16  know the exact timing.

17      Q.   But the reference you're making is to the Federal

18  Public Defender's motion?

19      A.   Yes.  And I don't remember-- I don't remember if

20  Jackie Rokusek filed one first or if they filed one

21  first, I don't remember the timing.

22      Q.   Okay.

23      A.   I just-- I just remember thinking that I was

24  fixing things by sending this e-mail and addressing them

25  before someone else accused me of having misrepresented.

1    And it turns out this e-mail was wrong.

2        Q.   Okay.  So when the judge got the motion from the

3    Federal Public Defender, she convened an emergency

4    hearing, didn't she--

5        A.   Yes.

6        Q.   -- on August the 9th?  August the 9th.  Did you

7    get to go to that hearing?

8        A.   No, I was directed not to go to the hearing.

9        Q.   Who directed you not to go to that hearing?

10       A.   In the morning prior to the hearing, I saw Duston

11   Slinkard and Tom Beall walk in and--

12       Q.   Walk in where?

13       A.   There's a door that faces my office, so they

14   walked in the U.S. Attorney's Office.  And my office is

15   very small.

16       Q.   Now, let me ask you, at that time what was

17   Beall's position in the office?

18       A.   He was the acting U.S. Attorney.

19       Q.   And the acting U.S. Attorney is the person who

20   acts as the U.S. Attorney until one has been appointed;

21   is that correct?

22       A.   That's correct.  He was the top person.

23       Q.   Right.  And what position did Duston Slinkard

24   have, if you know?

25       A.   He was the criminal coordinator for the Topeka

1  office and that's it.  So he was not in my chain of

2  command and-- and, honestly, we didn't understand why

3  he-- what was his involvement.  So Tom--

4      Q.  On that day when you saw them come in, did you

5  still assume you were going to be going to the trial?

6      A.  I did.

7      Q.  Excuse me, to the hearing.

8      A.  To the hearing, absolutely I did.  Turning back

9  to the-- the previous Friday.  After the motion was

10  filed, Chris Oakley and I called Ms. Barnett and she did

11  not seek any facts or offer any facts, she just said,

12  don't worry about it, I'm going to try to get Melody to

13  withdraw the motion.

14      Q.  That's Friday?

15      A.  That's Friday.  And then Saturday passed, Sunday

16  passed.  There was no information except I believe Ms.

17  Barnett contacted Agent Seubert asking about the jail

18  calls.  And I know Agent Seubert and I had an exchange,

19  well, why is she worried about jail calls?  This motion

20  seems to be about video.  And he didn't know, nor did I

21  know.

22          And then one more important point turning-- if

23  we're going in order.  Thursday, before the Friday,

24  before the motion is filed--

25      Q.  The 4th?

1      A.   The 4th, I can tell something is percolating

2   because Scott had given me that e-mail.  I don't know

3   what it is.  So I called Debra Barnett around

4   approximately 5:15.

5      Q.   Scott Rask you mean?

6      A.   Scott Rask got an e-mail from the marshals to try

7   and help me to understand what was happening.

8      Q.   Uh-huh.

9      A.   Because he didn't know either and he was

10  concerned too.  And we saw that Deb was involved-- Debra

11  Barnett was involved with something going on about the

12  video.  So Dave Zabel and I called her on Thursday at

13  around 5:15 and asked her questions, what's happening?

14  Can you tell us?  Can you fill us in?  And she said she

15  couldn't and-- talk right now because she had to go work

16  out at the YMCA.  And that's just sort of stuck in my

17  brain now knowing how important all this was, that she

18  didn't even have the time to talk to me because she

19  needed to go exercise.

20     Q.   Now, wait a minute.  At this time, at this point

21  the only two people who had ever-- three people who had

22  ever been involved in the *Black* case were you, Oakley--

23     A.   Uh-huh.

24     Q.   -- and Kim Flannigan--

25     A.   That's correct.

1    Q.    -- is that correct?  Were you aware of anybody

2    else in the entire District of Kansas who had any facts

3    about the *Black* investigation and the *Black* discovery

4    and anything that had gone on in the *Black* case except

5    you three?

6    A.    Debra Barnett would've had to approve my wiretap

7    affidavit, so she would've had facts from very early on

8    when we were submitting a wiretap.

9    Q.    You're talking about the investigation?

10   A.    The investigation.

11   Q.    Not about the--

12   A.    The case.

13   Q.    -- the subpoena for surveillance?

14   A.    Not at all.  And then she also would've had some

15   knowledge of discovery, because I met with her in May of

16   2016, and Kim did too, and told her we were overwhelmed

17   by the volume of discovery in the *Black* case and that we

18   needed help.  And she promised she would give help, but

19   then it never materialized.  And there should be a

20   number of e-mails showing that.

21   Q.    All right.  So you tried to call and talk to her

22   on the 5th, Friday the 5th?

23   A.    Yes.

24   Q.    And she didn't have time to talk to you; is that

25   right?

1    A.   Thursday she didn't have time to talk with me

2   because she was exercising.   Friday she did not have any

3   facts or seek any facts, she just told me not to worry

4   about it, that she was going to try and get them to

5   withdraw the motion and she felt she could.

6                THE COURT:   All right.   Just so-- for

7   clarity, are we talking about Friday, August 15th?   Or,

8   I'm sorry, August 5th?

9                THE WITNESS:   Yes.

10                THE COURT:   So Thursday is August 4th?

11                THE WITNESS:   Yes.

12                THE COURT:   Okay.

13   BY MS. VANBEBBER:

14    Q.   So August the 4th she's not got time for you.

15   August the 5th you and Oakley are both on the phone?

16    A.   Yes.

17    Q.   And you're trying to explain things to her?

18    A.   We're trying to get a sense of what is happening.

19   And also if she needs any facts, to provide them to her.

20    Q.   You offered her factual material?

21    A.   Yes.

22    Q.   What did she say?

23    A.   She said, don't worry about it, I'm going to try

24   to get them to withdraw the motion.

25    Q.   Is that the last contact you had with her until

1    the day of the hearing, which is the 9th?  Or did you

2    have other kinds of contact?

3         A.   There might've been an e-mail-- I think I was

4    copied on the e-mail about the phone calls over the

5    weekend.  And then turning back to Thursday the 4th, she

6    had initially e-mailed me and said she wanted to meet

7    with me on Friday, and I had said I was going to be out

8    on part of Friday.  And that is why I called her on

9    Thursday the 4th and she didn't have time.

10        Friday she made no effort to meet with me.  So

11   again Friday evening Chris Oakley and I called her

12   between 5 and 5:30.  Saturday there may have been an

13   e-mail about telephone calls, but not any effort to seek

14   information from me.  Sunday the same thing.

15        Monday morning, which is now the 7th, I e-mailed

16   her approximately 10:00 in the morning, 9:00 in the

17   morning and said, you know, I have all of these facts,

18   all this information, I'd like to help, can we prepare a

19   response to their motion?  She never responded until

20   about 4:10 p.m. and her response was, no, stand down for

21   now.

22        Q.   So this is Saturday-- Sunday the 7th or Monday

23   the 8th?

24        A.   Monday the 8th.

25        Q.   Monday the 8th, all right.  She tells you to

1    stand down?

2      A.   For now that's it.  And she had not spoken with

3    me or Kim about the facts.  Scott had been trying to

4    call her throughout the--

5      Q.   Scott Rask?

6      A.   Excuse me, yes, I'm sorry.  Scott Rask had been

7    trying to call her throughout the day and was unable to

8    get hold of her.  We saw that Duston Slinkard entered

9    his appearance in the case on Monday the 8th, and we

10   didn't understand his involvement because he was not a

11   supervisor at least in Kansas City and he had no facts

12   about the case.

13        And so late that evening on the 8th, which is a

14   Monday, Scott Rask finally got ahold of Deb Barnett and

15   I don't know the substance of that conversation, but I

16   know he explained that we were very upset that we didn't

17   know what was going on and that we had facts to offer

18   and arranged for her to at least meet with us in the

19   morning.

20     Q.   All right.  So morning came.  This is the 9th?

21     A.   The morning of the 9th Tom Beall and Duston

22   Slinkard walk in through a door into the U.S. Attorney's

23   Office which faces my office.  And I was standing there.

24   Duston Slinkard walked off.  Tom Beall came in my office

25   and he was red-faced and angry and pointing.

1        And he said, there's some things we have to talk
2    about.  You are not to go to that hearing.  And that is
3    a very close approximation but not a direct quote.  And
4    he left.  And at that point I became tearful because I
5    really didn't understand what was happening.

6        Shortly thereafter I was-- oh, during that
7    conversation he said he would meet with me shortly
8    thereafter, and I asked if Scott Rask could come to the
9    meeting because Kim, as my supervisor, is still out of
10   the office, and he said he would have to check with Deb.
11   And then I was called into the office and--

12   Q.   To the Office of the U.S. Attorney?

13   A.   Yes, but it was a table, like a conference room
14   connected to it.  And Scott Rask was there, Tom Beall,
15   Duston Slinkard, and Debra Barnett.  I don't think Emily
16   Metzger was there yet, I think that she was sitting in
17   the kitchen the whole day because they had called her to
18   come up there but did not explain to her why she was
19   there.

20        And the meeting was-- I guess they elected Duston
21   Slinkard to do the speaking because Deb didn't speak.
22   And Duston said, we are going to go forward with this
23   hearing.  We are-- they are very angry.  Melody is very
24   angry at you.  We're going to allow them to put on their
25   evidence and you are not to go to that hearing, Duston

1  said and then Tom Beall reiterated.  Debra Barnett said

2  almost nothing.

3      I was crying and-- by this point.  I wasn't

4  earlier.  And I said, I don't understand why you're

5  doing this.  I don't understand how you can go forward

6  with a hearing with no facts.  You're going to destroy

7  my reputation and Kim's.  You haven't talked to her

8  either.  This makes no sense to me.  And they let me say

9  that, but then they didn't respond to it.  And they

10  said, well, we're going to proceed the way we have

11  chosen, thank you.  And excused me.

12      And so I sat in a conference room with Chris

13  Oakley during the hearing.  And midway through, Leon

14  Patton comes down and told me that-- that Kim and I were

15  being accused of misconduct and that Deb was not even

16  really cross examining anyone, which how could she, she

17  didn't have the facts.

18      And I saw Tom Beall in the hall, he left the

19  hearing midway through, and I said to Tom, why won't you

20  talk to me, I have this information, I have things I can

21  give you.  And he shook his arms and said, just let it

22  happen, just let it happen.  And left the office.

23  Q.  Now, you said Leon Patton came and gave you the

24  information about what had happened.  Do you know, had

25  he been-- was he at the hearing?

1    A.   I think every single person on the criminal side

2    who was in the office went to the hearing.  So yes, he

3    was.

4    Q.   Except for you and Oakley?

5    A.   And Oakley, yes.

6    Q.   Now, did you-- did you believe that anybody

7    besides you would've had enough information at that

8    point to have done a good job on August the 9th?

9    A.   If Deb had started talking to me on Thursday the

10   4th and gotten the facts, I think she could've gotten up

11   to speed to handle it.

12   Q.   But she didn't have that information?

13   A.   She did not have that information.

14   Q.   Did you consult with Rask and agree that there

15   needed to be a response filed to the Federal Public

16   Defender's motion?

17   A.   Yes.

18   Q.   And that had not happened yet.  Right?

19   A.   No.  On Monday the 4th, Scott organized everyone

20   in the office on the criminal side, dropped what they

21   were doing.  Scott had an organizational meeting since

22   Kim was gone and divided up sections as how to respond

23   and we worked all day long on drafting a response, a

24   written response.  And we sent it to Deb through Scott,

25   he did it that evening.

1     Q.   Now, let me ask you, was another hearing already

2   scheduled for the 16th of August?

3     A.   I don't-- I don't know the timing.

4     Q.   That's what happened in any event, right, there

5   was another hearing?

6     A.   There was another hearing.

7     Q.   All right.  So after the-- after the appearances

8   on the 9th, this team began working on a response?

9     A.   On the 8th.

10    Q.   On-- on the--

11    A.   On the 8th.

12    Q.   August the 9th was the hearing.

13    A.   So August the 8th we had a written response based

14  on what we knew just from the motion because we didn't

15  know the meat of the allegations.

16    Q.   So you had not been able to talk to Deb that

17  whole weekend?

18    A.   No.

19    Q.   But Rask organized a crew to get a response in

20  for the August 9th hearing?

21    A.   Yes.

22    Q.   And when was he planning on having that

23  presented?

24    A.   He sent it to Duston Slinkard and Debra Barnett

25  and Tom Beall and had a conversation with them

1  approximately 6:00 p.m. on the 8th.  And they I think at

2  that point - now I know in hindsight - they had made an

3  agreement not to present any evidence.  So that is why

4  they decided not to use the response.

5      Q.  And who was involved in that response, to your

6  recollection?

7      A.  Carrie Capwell.  I want to say every single

8  person on the criminal side.  There may have been one or

9  two who were out-of-pocket or too busy, but I know

10  between six and ten people were dividing it up just to

11  do legal research on particular issues.

12      Q.  So you-- and when did you start that project?

13      A.  At-- when-- about an hour past-- after I had

14  e-mailed Deb and Scott had tried to get ahold of her and

15  couldn't.  So I'm approximating 11:00 a.m. on the 8th.

16      Q.  Okay.  All right.  Do you know what happened to

17  that-- to that motion?

18      A.  I don't know.

19      Q.  All right.  Did-- do you recall or did you find

20  out that at the August 9th hearing the Court had

21  required the U.S. Attorney's Office to submit all the

22  originals and copies of the videos to chambers?

23      A.  I don't know when I would have learned that, I

24  know we had to e-mail-- after the hearing there was a

25  team meeting, as everyone who had gone to the meeting

1    met and Kim appeared by speaker phone.  And everyone who

2    was at the hearing discussed what had happened at the

3    hearing and tried to recap it for Chris and I and Kim,

4    who were not present.

5         Q.   Okay.

6         A.   About that time, we got an e-mail from Debra

7    Barnett stating that the hearing was a success and she

8    had locked in witnesses into their accounts, which is

9    how these things are handled.  Chris Oakley sent a

10   response to many people saying, "And Waterloo was a

11   wash."  Because I think everyone at that meeting was

12   devastated by the way she handled the hearing because

13   she-- her silence spoke more than-- than any evidence we

14   could've put on.  She--

15        Q.   All right.  Do you recall then that there was

16   another hearing in August?

17        A.   There was another hearing.

18        Q.   Were you allowed to attend that hearing?

19        A.   I was not.  I don't know that Tom Beall

20   reiterated what he said, or Duston, but I know that

21   there were efforts to communicate with Debra Barnett and

22   she was not responsive.  And I know at this point she

23   had twice asked me for the *Black* case agents' contact

24   information.  I had twice provided it by e-mail, but she

25   had not contacted any of them.

1    Q.   Do you know if Oakley was allowed to attend that

2    meeting?

3    A.   I don't know if he was.  I believe he sat with me

4    during that hearing as well.  I know Debra Barnett

5    appeared in the courthouse and we were-- Kim and I and

6    Oakley were sort of waiting for her in the office all

7    morning so she could prep us, because we thought there

8    was a chance we would get to testify.

9         And we received an e-mail that the Court didn't

10   want any evidence and there would be no testimony.  She

11   did not stop at the U.S. Attorney's Office, she went

12   directly up to the courtroom.  And oddly enough, she

13   brought Annette Gurney with her to handle the hearing,

14   who is a forfeiture specialist from Wichita and who knew

15   nothing about the *Black* case.

16   Q.   Is-- Annette Gurney, who is another AUSA?

17   A.   She is.

18   Q.   But she does forfeiture work?

19   A.   Exclusively forfeiture work.  And I know that at

20   the hearing the Federal Public Defender raised the issue

21   of the phone calls.  And within five minutes before the

22   hearing approximately, Debra Barnett e-mailed Pauletta

23   Boyd and said, do you know anything about these phone

24   calls?

25        And I want to correct.  I know Chris Oakley I

1   think was at that second hearing because I think he was

2   directly behind Debra Barnett, and she didn't even

3   bother to turn around and ask him, the co-counsel on the

4   case, if he knew anything about the phone calls.

5       Q.   You got the phone calls by subpoena issued on May

6   the 13th.  Correct?

7       A.   That's correct.

8       Q.   So apparently she had not bothered to look at the

9   file sufficiently to learn that fact?

10      A.   She has said throughout this process that it was

11  not her obligation to learn the facts of the case.  She

12  said that to agents, she said that Agent Herron, she

13  said that to Agent Seubert, she said that to me.  She

14  said she was simply here to deal with the Special

15  Master.

16      Q.   All right.  So then you do know that the Court

17  entered an impoundment order for the phone recordings on

18  the 16th--

19      A.   I do.

20      Q.   -- right, at the hearing?  And the Court directed

21  the government to provide the Court a list of all

22  persons or entities who got the recordings that had

23  been-- that had been sent out by you or Oakley or Kim to

24  the defendants in the case--

25      A.   Uh-huh.

1    Q.  -- right, their counsel?  And the government got

2    24 hours to notify those people.  Right?

3    A.  I-- I believe so.  I haven't looked at this

4    portion.

5    Q.  And then they were supposed to-- and then they

6    had seven days to return the recordings and derivative

7    information back to the Court?

8    A.  That is correct.

9    Q.  To claw them back, right, to do a clawback?

10   A.  Yes.

11   Q.  After the Court issued the August 18th clawback

12   order, and that's what happened on August 18th, was

13   there a meeting in Topeka?

14   A.  Yes.

15   Q.  Okay.  Did you and Oakley both attend that

16   meeting?

17   A.  Yes.  The meeting included, as I recall, me,

18   Chris Oakley, Kim Flannigan, Scott Rask, Tom Beall,

19   Duston Slinkard, Debra Barnett and possibly Brent

20   Anderson and possibly Tanya Treadway, but I'm not sure.

21   Q.  Was there a group decision about interpreting the

22   clawback order?

23   A.  Yes.  In advance of the meeting, I went to Carrie

24   Capwell, who I had come to believe was very bright in

25   the short time she had worked there, and I had her

1   interpret for me-- because I felt like the clawback
2   order applied to all attorney-client calls, not just the
3   *Black* case.
4       She-- as I recall, although I don't have the
5   e-mail and haven't looked at it in some time, she agreed
6   with my assessment.  I raised that issue at the group
7   meeting.  I know others recall me raising that issue.
8   And as I recall, Emily Metzger and Debra Barnett felt
9   like the clawback order only applied to the *Black* case.
10      Q.   Did-- is it true that you suggested it would be
11  best to consult the Court about the breadth of her own
12  order?
13      A.   Yes.
14      Q.   How was that received?
15      A.   I don't recall specifically.  I recall that
16  management was openly hostile at this point.
17      Q.   Hostile to who?
18      A.   To me and Kim and to some extent Chris Oakley.
19  He was in trouble as well.
20      Q.   Did you have any impression from this
21  conversation in the group of the reasons that they
22  didn't want to include other cases where you knew
23  recordings had been distributed?
24      A.   No.
25      Q.   And nobody volunteered that information as to why

1   they thought that?

2       A.   No, they did not.

3       Q.   Did Oakley ask you to stand in for him and

4   deliver the government's documents pursuant to that

5   order?

6       A.   Yes, he did.

7       Q.   Why did you think you had a deadline of

8   August 25th?

9       A.   Chris Oakley gathered all the information and had

10  it in a box on a Wednesday, which I think is the 24th.

11  When he provided me with the box, he said the deadline

12  is tomorrow, I'm going on vacation Thursday and Friday,

13  I need you to turn this in.  And he gave me instructions

14  as to how to do it.

15      Q.   So you took Chris' word for what the deadline

16  was; is that right?

17      A.   Yes.  And he's--

18      Q.   You didn't do the counting on your fingers as to

19  what seven days-- seven business days were?  The order

20  came out on the 18th.  Correct?

21      A.   Correct.

22      Q.   August the 18th.  And it said the government has

23  got 24 hours to gather-- to notify everybody and tell

24  them they have to claw back.  Right?

25      A.   Yes.

1    Q.   And then they gave the people who had the

2   information seven business days.  So counting from the

3   18th, one, two, three, four, five, six, seven.  That

4   would be the 29th, not the 25th.  Correct?

5    A.   That's correct.

6    Q.   So Oakley got it wrong.  Right?

7    A.   He did.  And he's acknowledged it and he

8   apologized to me.

9    Q.   Okay.  In any event, on the 25th you thought you

10   had a deadline--

11    A.   Yes.

12    Q.   -- right, that day?  Now, you've been over the

13   issue, your visit to the Court's chambers again--

14    A.   Yes.

15    Q.   -- chambers before, but I'm going to bother you

16   with it again.

17    A.   Okay.

18    Q.   You said he had already boxed up the materials

19   that he had gleaned from the recipients of the

20   audiotapes.  Right?

21    A.   Yes.

22    Q.   Okay.  What time did you take that material from

23   the third floor U.S. Attorney's Office to the chambers

24   on the fifth floor?

25    A.   I would approximate between 2:00 and 3:00.

1      Q.   If we say 3:00, if the record reflects 3:00, does

2    that seem reasonable to you?

3      A.   It does.

4      Q.   All right.  Then you went back down to the U.S.

5    Attorney's Office on the third floor?

6      A.   Yes, I did.

7      Q.   And when you got there, what happened?  What made

8    you make a trip upstairs?

9      A.   I did other things for a short period of time and

10   then I thought, well, I better check the order and make

11   sure there's no additional obligation since Chris is

12   gone.  And as I read the order, I saw that it required

13   the government to also turn in any derivative evidence

14   of phone calls.

15     Q.   What's derivative evidence of phone calls?

16     A.   Any report or affidavit that mentioned the phone

17   calls or quoted the phone calls, would include

18   information about the phone calls.

19     Q.   All right.

20     A.   And so after I read this, Kim Flannigan, who was

21   my supervisor still at the time, was about two doors

22   down.  I went down to Kim's office and I explained the

23   issue to her.  We looked at the order together.  Kim was

24   not authorized at this point to make any decisions in

25   the *Black* case, nor was I.

1        But in-- really, Debra Barnett had set herself as

2   the only person who could make decisions in the case at

3   this point.  But I had e-mailed her an e-mail in all

4   caps the day prior stating that I had found additional

5   video and asked her what to do with it because it was

6   video from Matt Cahill that we had found in a box

7   somewhere.  She never responded.

8        There were other really important e-mails that we

9   had sent her to which she didn't respond.  And I believe

10  based on my memory now that Kim Flannigan was getting

11  really frustrated with Deb's unresponsiveness so she

12  called someone, a friend, in the Wichita branch that

13  morning and they asked where was Deb, she wasn't

14  responding.  And that person, I don't know who it was,

15  indicated that Deb was in Overland Park at the DEA

16  probably.  And so--

17  Q.   Did you-- did she have a cell phone?

18  A.   She did have a cell phone.

19  Q.   Do you have access to it?  Could you call her?

20  A.   I probably could've.  I think I had access to her

21  phone number and Kim probably did too, but-- I'm not

22  going to say what Kim's motivations were.  Deb had

23  become very difficult to deal with, very unpleasant to

24  deal with and Emily Metzger was much friendlier and also

25  was involved to some extent in the *Black* case.

1    Q.   So did you call Emily then?

2    A.   We called Emily instead.

3    Q.   All right.

4    A.   And so Emily discussed the issue at length with

5    Kim on the speaker phone while I was in the room and

6    we-- I joined in.  We discussed whether we felt like the

7    order was intending to get derivative evidence where

8    there was no attorney-client call or-- it looked

9    literally, if you read it, like it should include all

10   derivative evidence of phone calls.

11   Q.   What did you have in your possession at that time

12   that you thought might be problematic with regard to

13   turning the materials over to the Court?

14   A.   There was no reason not to do it, to err on the

15   side of--

16   Q.   What did you have?  What was in your hands?

17   A.   We had wiretap affidavits.  We had reports.  We

18   had other types of affidavits, lots of them, that all

19   mentioned the phone calls, all quoted the phone calls.

20   Q.   And you were-- you found those in the office when

21   you went back after the 3:00 visit or not?

22   A.   I didn't find them.  What I did when I read the

23   order myself, which I should've done before I went up

24   there the first time but didn't, I remember what Chris

25   Oakley had told me was in the box and what I saw in the

1  box.  And what he told me was in the box did not include

2  derivative evidence.

3       Q.   All right.  This is-- so there's a box he said--

4       A.   Uh-huh.

5       Q.   -- had derivative evidence in it?

6       A.   No.  He said this box contains audio-recordings

7  and the agents' notes, the handwritten notes where they

8  had gone through, but not reports or affidavits or

9  anything like that.

10      Q.   All right.  So that box was or was not taken up

11 at 3:00?

12      A.   That box was taken up at 3:00.

13      Q.   All right.  So now what are you concerned about?

14      A.   My concern is we haven't complied fully with the

15 Court's order.

16      Q.   Why?

17      A.   Because there are things mentioned in the Court's

18 order that were not taken up, there are items mentioned.

19      Q.   So-- and where were those located?

20      A.   They were located on our servers, on the agency

21 servers, in physical form printed out.

22      Q.   So what was the conclusion finally reached by Kim

23 Flannigan, Emily and you?

24      A.   We did not reach a conclusion.  Emily some time

25 into the phone call said she thought she heard Deb down

1    the hall, that she was back from Johnson County where

2    she had been doing a training.  And so she said, let me

3    talk to Deb for just a minute and then we'll call you

4    back.  But they didn't call back for some period of

5    time, a lengthy period of time.  I don't know exactly,

6    but, you know, I would estimate, although I could be

7    wrong, between 10 and 15 minutes additional time.

8            Finally, Deb and Emily call back to Kim's phone.

9    They're on speaker, I'm still in the room.  It's near

10   5:00 at this point, at least based by my estimation.

11   And they discuss at length what they're going to do

12   about it.  They're clearly reading from the order which

13   has the deadline.  They're clearly reading from what,

14   you know, they think their obligations are.  So they

15   decide--

16       Q.  What makes you say they're reading from the

17   order?

18       A.  Because I can hear them reading.

19       Q.  So the information we just discussed a few

20   minutes ago about it being not a deadline on the 25th--

21       A.  Uh-huh.

22       Q.  -- they had that same information in front of

23   them; is that correct?

24       A.  Yes.

25       Q.  And they could count to seven, I take it?

1        A.   Yes.

2        Q.   So what was their-- why did they bother?  Why did

3    they care whether you-- whether you took that

4    information back to the Court or not?

5        A.   I don't know.  I think they-- clearly they didn't

6    notice that part either.  It's just down the road they

7    blamed the lack of the wrong deadline on me.  So--

8        Q.   So what's their final decision?

9        A.   Their final decision is, yes, we do need to turn

10   the items in, to err on the side of caution so we don't

11   get-- because the FPD will make hay of it if we don't

12   comply with the deadline and the judge will be angry if

13   we don't.

14       Q.   You've described all of these things, some of

15   which are in electronic form, some of which are in paper

16   form; is that right?

17       A.   Yes.

18       Q.   So what action did you take?

19       A.   Emily Metzger suggested that I write a letter

20   explaining what I was doing and what I was turning in,

21   and she had a list of criteria to go in the letter, and

22   attach it to the outside of the envelope.

23       Q.   Okay.  What envelope?  You haven't explained.

24       A.   There's not an envelope yet.  Well, there's an

25   envelope that these items are going to go inside.  And I

1   am to go down the hall to Sandie Kistler, who's the

2   paralegal, and have her print out all this stuff that

3   could be arguably derivative evidence.  And then I was

4   also instructed by someone, I don't know who, to send an

5   e-mail to the agencies telling them if you have these

6   items on your server, don't touch it.  I think that's

7   what the e-mail said.

8       Q.   And you did that.  Correct?

9       A.   I did that.

10      Q.   Now, let me ask you whether two copies were made

11  or one copy was made of what you're now referring to as

12  derivative evidence?

13      A.   I don't know the answer to that.

14      Q.   You have possession of one copy eventually to put

15  in the envelope?

16      A.   Oh, Sandie is printing it out and I think she

17  just put it in an envelope for me.

18      Q.   All right.  So you received the envelope from

19  Sandie?

20      A.   Yes.  And while Sandie was printing that, I was

21  typing the letter and the e-mail.  I took it back down

22  to Kim to make sure that the letter was what Emily

23  wanted.

24      Q.   You don't know whether Sandie made any copies?

25      A.   I don't know, but I don't--

1    Q.  Have you ever seen any copies of what you took to

2    judge-- to judge's chambers at-- after 5:00?

3    A.  I don't know the answer to that, I don't recall.

4    Q.  You don't remember seeing any copies, or you do?

5    A.  I-- it makes sense to me that we would've still

6    had copies of it because we would've used it in our

7    litigation because it was evidence, but I don't-- I

8    really just don't remember.

9    Q.  All right.  So they were saying that you had to

10   get the package to chambers?

11   A.  Yes.

12   Q.  Did-- was it 5:00 by that time?

13   A.  That's my recollection, yes.

14   Q.  Maybe after 5:00?

15   A.  My recollection is it was after 5:00.  I recall

16   on the phone line Kim or I or someone on the phone, one

17   of the four of us saying, well, it's after 5:00.  Then

18   the question was, what do we do now?

19   Q.  Okay.  So it's your testimony that you had

20   possession of a package of what you believe to be

21   derivative information which had been printed off by

22   your support staff and was in an envelope?

23   A.  It was not done until after the phone call ended,

24   she was in the process of printing it off.  But yes.

25   Q.  Okay.  And that you also were instructed by Emily

1   to put a letter on top of the envelope for the judge to

2   understand how this happened?

3       A.   Yes.

4       Q.   Did you do that?

5       A.   I did that.

6       Q.   You typed the letter?  Who typed the letter?

7       A.   I typed the letter, I took it to Kim to proofread

8   it and make sure that I wrote in there what Emily

9   wanted.  And I think she caught a typo and then I went

10  back and fixed it and printed it.

11      Q.   You didn't e-mail it back to Deb and Emily?

12      A.   No.

13      Q.   Now, it's after 5:00, are the others still on the

14  phone with you?

15      A.   No.  I don't know if the phone call was over when

16  I left, but I think it was because we had agreed upon a

17  course of action.  I went down the hall to hurry along

18  Sandie.  Kim had said at the conclusion of the call that

19  she was going to call the marshals, Deb and Emily

20  affirmed okay.  So after I left--

21      Q.   Well, now let's back up a little.  When you're on

22  the phone call and you realized it was going to be after

23  hours, all of you realized that.  Correct?

24      A.   Uh-huh.

25      Q.   And then you had to figure out how to get

1    upstairs because you knew the door would be locked.

2    Right?

3        A.   Yes.

4        Q.   Now, you had some options.  Right?

5        A.   Yes.

6        Q.   You could've filed the motions under seal using

7    the clerk's electronic filing system.  Right?

8        A.   Yes.

9        Q.   You could've done that.  You could've filed a

10   motion just asking for a day extra time to file these

11   additional materials.  You didn't do that?

12       A.   Did not.

13       Q.   You could've called chambers just to see if

14   somebody accidentally was there.  And as a matter of

15   fact, somebody was there, weren't they?

16       A.   Yes, and I could've done that.

17       Q.   You could've done that.  Nobody-- you didn't do

18   that.  You could've e-mailed the judge explaining what

19   was happening and saying that you could have it upstairs

20   by 8:00 a.m. when the building opened the next day,

21   couldn't you?

22       A.   We could have, and I do believe we contemplated

23   doing that.

24       Q.   You did talk about that one?

25       A.   I do believe so.

1    Q.   You didn't talk about the other three I just

2    mentioned?

3    A.   No.

4    Q.   And finally, you could've enlisted the help of

5    the clerk at that point, couldn't you, the clerk's

6    office?  Would there have been anybody there?

7    A.   I don't know that they work after 5:00, but I-- I

8    just don't know.

9    Q.   But you didn't try?

10   A.   We did not try.

11   Q.   Whose idea was it to go up and get into the

12   locked chambers of a federal judge?

13   A.   I cannot be 100 percent certain, but I believe it

14   was Kim Flannigan's suggestion.

15   Q.   And Emily went along with it?

16   A.   Yes.

17   Q.   And Deb went along with it?

18   A.   Yes.

19   Q.   And did you have any authority to make a

20   different decision?

21   A.   No.

22   Q.   But you went along with it?

23   A.   I did.

24   Q.   So all of you agreed together we're going to go

25   up and get in the judge's locked chambers.  Correct?

1    A.   Well, not we, I was the one that they chose to do

2    it.

3    Q.   Okay.  You all agreed that that should be done.

4    Correct?

5    A.   Yes.

6    Q.   And the person who was going to get to do it was?

7    A.   Me.

8    Q.   Why not Flannigan?

9    A.   I don't know.  And I will say, as the

10   conversation was going along, I did not agree with

11   writing the letter because I knew how Judge Robinson

12   felt about ex-parte communications and I thought it was

13   a terrible idea, but I didn't speak up because I'm

14   dealing with upper-- upper-level management and the

15   relationship is extremely tense by this point.

16   Q.   All right.  Do you remember who directed-- did

17   anybody physically say, Erin, go take that stuff

18   upstairs?

19   A.   Yes, it was decided Erin is going to write the

20   letter.

21   Q.   Who?  Who decided?  Emily decided you were going

22   to write the letter you said?

23   A.   Emily suggested writing the letter, I don't know

24   who decided it would be me versus Kim doing it.

25   Q.   Okay.  So you couldn't get in there by yourself,

 1   could you?

 2        A.   No.

 3        Q.   You didn't have a key to the-- to the fifth

 4   floor?

 5        A.   No.

 6        Q.   And it-- all the floors are the same in that that

 7   is a-- that is a totally secured floor, correct, not

 8   just an office, the floor is secure, isn't it?

 9        A.   Except for the restrooms, yes.

10        Q.   For the outside-- outside the chambers areas?

11        A.   Yes.

12        Q.   And how do you get in during the day?

13        A.   You buzz a buzzer for the judge you would like to

14   see and that judge's chambers looks in a camera to see

15   if you-- they know you and you can come in and then they

16   click a button and the door opens.

17        Q.   So the door is electronically opened from a

18   distance.   Right?

19        A.   Yes.

20        Q.   Nobody comes to the door?

21        A.   That's correct.

22        Q.   The door just beeps and you can open it and you

23   can go inside?

24        A.   Yes.

25        Q.   And then you're in a hallway, aren't you?

 1      A.   Yes.

 2      Q.   And it's kind of an open hallway and you have to

 3    take a turn to the right to get into Judge Robinson's

 4    particular chambers.   Go down the hall and take a right;

 5    isn't that correct?

 6      A.   Yes, that's correct.

 7      Q.   So how did you get in?

 8      A.   Kim called a Deputy U.S. Marshal, Chris Johnson.

 9      Q.   Does Kim volunteer to do that or does somebody

10    tell her to do that?

11      A.   She volunteered to do that while on the phone

12    with all four of us and they affirmed it.   And "they"

13    meaning Emily Metzger and Debra Barnett.

14      Q.   What made them think that the marshal was going

15    to let the U.S. Attorney into the judge's chambers?

16      A.   I don't know.   I think that they knew a marshal

17    was necessary to get in, although I know they now deny

18    that.   There's no reason to call a marshal except to let

19    you in, because it's not like I needed a safety escort

20    to the fifth floor.   So--

21      Q.   Well, that-- did you have any other way to get in

22    if the marshal didn't let you in?

23      A.   No, I did not.

24      Q.   So some-- Kim calls somebody in the marshal's

25    office?

1    A.   Kim called Chris Johnson, who's a deputy.

2    Q.   Did Chris Johnson come down and meet you?

3    A.   He called-- she clearly relayed it was going to

4 be me who was doing it.  He called me.  And the marshals

5 have all of our direct lines and I think we have all of

6 their direct lines.

7         So he called me at my desk and said, are you

8 almost done?  I've got to leave by 5:30.  I was

9 scrambling to get it all done because I wanted to make

10 sure we had all the documents we needed and Sandie was

11 working hard to get it in there.  And I said, just a few

12 more minutes.  And he said, okay, I'll meet you out by

13 the elevators.

14        So I got it all done in two or three or four

15 additional minutes and then sort of trotted out to the

16 elevators to meet him.  We went up to the fifth floor.

17   Q.   Did you go up in the public elevator?

18   A.   Yes.  And then we got to the fifth floor and he

19 went around to the door that the public would use to go

20 in, not the private back door, and he buzzed me in.  We

21 walked down the hall and when we got to Judge Robinson's

22 chambers door, it was wide open and the lights were on.

23   Q.   And did you ask to see if anybody was in there?

24   A.   He rapped on the door frame as we walked through

25 and we both said hello, hello.  A law clerk came out

1   from the right, excuse me, from the right in the back.

2   And I evidently may-- and I don't deny it, made a joking

3   remark that I had to get a marshal to break me in.  And

4   I handed her information, I explained what I was doing.

5        And then I left and I went back down.  Chris went

6   on his way, Chris Johnson.  And I went down and Kim

7   Flannigan had Tris Hunt in her office at the time and I

8   told them both that we were in luck, a law clerk was

9   still there so we got it there in time.

10   Q.  What had you planned to do if there had not been

11   anybody there and the judge's door was locked?

12   A.  If-- it was not my suggestion that we slide it

13   under the door, and I don't know who suggested that.  I

14   thought I'll just set it outside the door, it has the

15   letter on it.  It's a secure place, it's not--

16   Q.  Ms. Tomasic, would there be any way you could

17   slide what you have described as an envelope with a

18   bunch of paper in it under that door?

19   A.  No.

20   Q.  So whose idea was it to say that you intended to

21   slide it under the door?

22   A.  I don't recall.

23   Q.  Was it yours?

24   A.  I don't believe so, but I don't recall.

25   Q.  So was it-- it was not-- it was or was not your

1   intention to slide it under the door?

2      A.  I didn't really think about that-- that part.  I

3   just thought if her door was shut, which I thought it

4   would be, I would just lay it against the door and that

5   would be that.  I wasn't-- if it was going to damage it

6   to go under the door, I wouldn't have done it.

7      Q.  When you got back downstairs, was-- is anybody

8   still there besides Kim and Tris?

9      A.  Yes.  But those-- I went to tell Kim because she

10  was involved and she was my supervisor and Tris just

11  happened to be in there.

12     Q.  Did you get back on the phone with the other two

13  and let them know what had happened?

14     A.  I didn't.  I didn't know if Kim Flannigan did.

15     Q.  All right.

16          THE COURT:  When you're at a stopping place,

17  again it doesn't have to be this precise question, we'll

18  take a lunch break.

19          MS. VANBEBBER:  Okay.  I am at a stopping

20  place, unless you have something you were planning to

21  say.

22          THE WITNESS:  (Shakes head from side to

23  side).

24          MS. VANBEBBER:  Yeah.  Thank you, Your

25  Honor.

```
 1              THE COURT:  All right.  Let's take a recess
 2   until 1:30.
 3              (Recess).
 4              THE COURT:  All right.  You can be seated.
 5   Go ahead.
 6   BY MS. VANBEBBER:
 7     Q.  We were speaking before the break on a matter of
 8   going up to the judge's chambers--
 9     A.  Yes.
10     Q.  -- and you got me confused.  That's me, not you.
11   You're not confused.  I'm not sure I heard you properly.
12   You said the marshal took you up in the public elevator;
13   is that right?
14     A.  Yes, yes.
15     Q.  And you worked in the building?
16     A.  Yes.
17     Q.  So you know that there's a buzzer only down at
18   the south end of the hallway--
19     A.  Yes.
20     Q.  -- where all the judges that are in that
21   particular area have buzzers.  Right?
22     A.  Uh-huh.
23     Q.  Did you think about, when you talked earlier
24   about the options that you had, about buzzing the other
25   chambers to see if anybody was there that could let you
```

1  in?

2      A.  I did not.

3      Q.  Okay.  And none of the others mentioned that one

4  either?  Before you called the marshal, why don't you

5  just go up and buzz and see if anybody is in?

6      A.  No.

7      Q.  Okay.  So when the marshal brought you up, did

8  the marshal have a key like this or did the marshal have

9  a key key?

10     A.  I honestly don't recall.

11     Q.  You worked in the building.  You had one of

12 those, didn't you?

13     A.  I did, but for my-- only for my office.

14     Q.  When you worked-- when you worked on the fifth

15 floor, you had--

16     A.  I had one that looked like yours--

17     Q.  Uh-huh.

18     A.  -- when I worked there.  And I have never seen a

19 regular key be used to open the door.

20     Q.  Okay.  So when you got out of the elevator, you

21 went to the double doors.  Did you go to the buzzer

22 area?

23     A.  I went to the buzzer area.  I think it's a single

24 door, and there's-- where you can choose your judge and

25 buzz if you wanted to.  That's the door I-- I recall we

1   used.  I could be wrong.

2       Q.  You didn't go through the other door where you

3   have to have a-- one of these to get in?

4       A.  I really don't recall.

5       Q.  Okay.  Then-- then the next day you're aware that

6   things pretty well got grim where the judge was

7   concerned.  Right?

8       A.  Was it a Thursday when we went up to the judge's

9   chambers?

10      Q.  The 25th of August--

11      A.  Yes.

12      Q.  -- was a Thursday.  That's right.

13      A.  Okay.  Yes, I became aware that Judge Robinson

14  was upset with my after-hours entry into her chambers,

15  after hours on Friday.

16      Q.  How did you find out?

17      A.  I received a phone call, and I'd have to look to

18  get the exact time, but in the evening, roughly at 6:30,

19  from Debra Barnett and Emily Metzger, who were in

20  Wichita together on the phone.

21      Q.  They both office there, correctly?

22      A.  They do both office there.  And, as I recall-- I

23  don't recall the entire conversation, but I recall

24  they-- I believe they initially texted me and said, call

25  me back, call us back at this number, on my personal

1    cell phone.  And I thought that was very strange.  So I

2    called them back, and it was one of their office lines,

3    but they were together.

4         And I asked what was the purpose of the call, and

5    they didn't explain but started asking me questions

6    about-- I do recall they asked how far into Judge

7    Robinson's chambers did you go, and specific details

8    about what had happened once I went up there.

9         And then I stopped them and I said, hold on, you

10   knew this was going to happen, you authorized this.  And

11   they said, well, we didn't know you were going to go

12   into the judge's chambers.  And I said, well, the door

13   was wide open and the lights were on, and we knocked on

14   the door and stepped inside to where Bonnie sits and--

15   but Emily said, oh, oh, okay.  Well, I didn't realize

16   the door was open, okay.  And they said, well, she's

17   upset, but we'll call and take care of it.

18        And at the time there was a tornado watch, and I

19   was home alone with my kids, so I explained, you know,

20   I'm on the phone, I need to get downstairs.  And they

21   said, just go on downstairs and don't worry about this,

22   we'll see you on Monday.

23   Q.   All right.  Now, did you hear anything over the

24   weekend?

25   A.   After I got off the phone with them, sometime

1    that evening I called Kim Flannigan, because she's my

2    direct line supervisor.  She did not know this was going

3    on.  She did not know it was an issue.  She was upset

4    because they had cut her out of the line of

5    communication, not only as a supervisor but also in

6    something she was directly involved in.

7         And then I don't know if she did or I did, but

8    someone contacted Chris Johnson and just let him know

9    that Judge Robinson was upset and that there might be

10   fallout for him too.

11   Q.   Okay.  So then Monday morning you go to work?

12   A.   I went to work and there was a meeting about the

13   *Black* case and what to do with-- something new had been

14   filed.  I don't recall where we were as far as the

15   litigation goes, but Tom Beall and Kim Flannigan, Chris

16   Oakley and I were in the Kansas City office in a small

17   conference room.  And then Duston Slinkard was appearing

18   by VTC and Debra Barnett was also appearing by VTC.  So

19   they weren't in the room, but they were on the screens.

20   And management is just discussing what we're going to do

21   to move forward with the case.  I don't recall the

22   content of that discussion.

23   Q.   Wait a second.  This-- this meeting was called

24   after you got to work on Monday?

25   A.   I don't know.  I don't know when it was

1    scheduled, but I know that I knew to be there and I knew

2    the purpose was to discuss something new that was

3    percolating in *Black*.

4       Q.   Someone told you, we need to have a meeting for

5    the *Black* case?

6       A.   Yes.

7       Q.   And you don't recall who it was?

8       A.   No.  And there probably was an e-mail though.

9       Q.   Okay.

10      A.   So we're in the meeting and we're discussing

11   legal issues and legal approaches, and then Tom Beall

12   says, I have to go talk to Judge Robinson about the

13   chambers incident.

14           And at that point he hadn't spoken to me.  And I

15   said, may I speak to you out in the hall?  And we went

16   out in the hall and I said, I want you to understand

17   from my point of view what happened before you go talk

18   to her.  And I start to explain, and he said, I've got

19   it, I've got it, and he walked away.

20           And then he went up and talked to Judge Robinson,

21   and the meeting went on without him.  And then he came

22   back down and he was very red-faced and very angry, and

23   he said, she's very upset.  And-- and he elaborated on,

24   you know, what had happened during his meeting with her.

25           And then some time passed, and then we turned

1  back to discussing--

2     Q.  You said he elaborated on the meeting he had with

3  her.  What did-- what did he say to you about it?

4     A.  He said that-- he said basically-- the idea was--

5  and not only he, but others weighed in, is that she had

6  become sort of irrational because how dare she think a

7  federal prosecutor and a U.S. Marshal would go up there

8  to do something nefarious and--

9     Q.  Did-- did he mention-- did anybody say, why would

10  she be upset that you went up for any reason?

11     A.  I think so, yes.  I think that they just felt

12  like she had become irrational.  And they said, we're

13  talking about a woman who comes home from her honeymoon

14  a day early over this.  He's deputized to protect her.

15  Basically, how dare she get upset.  And that they had

16  given her all the information and she was still angry.

17  And they felt like their explanation-- or Tom felt like

18  his explanation was plausible and should've calmed her

19  down, but it didn't.

20     Q.  Did he tell you what his explanation was?

21     A.  No.  He said he gave her the facts, though.  And

22  that became an issue in the months to come, because I

23  got angrier and angrier that he hadn't cleared it up,

24  and he repeated that, through Scott Rask, that he had

25  given her all the facts and she chose to ignore them.

1    Q.   Now, you had not given him any facts at that

2    point, right, that he could've given to the judge?

3    A.   No.

4    Q.   And do you know if anybody else of the four of

5    you who got together and came up with this scheme - Kim,

6    you, Emily, Barnett - did he say where he got the facts

7    from, any of the four of you?

8    A.   He did not elaborate.  I know Kim did not-- I

9    don't know.  I do not believe Kim was given an

10   opportunity to talk with him before he went up there

11   either, so he would've had to have gotten his facts from

12   Deb-- Deb Barnett and Emily Metzger.

13   Q.   All right.

14   A.   And I want to be clear on what I said.

15   Everything I just said about management and

16   interpretation of Judge Robinson's reaction may not have

17   happened in that meeting, because I may have confused it

18   with later meetings, but it did happen, and it's things

19   that I heard from management and other people who were

20   involved in the *Black* case.

21   Q.   Okay.  Do you recall whether you had any more

22   conversations about what happened on the 25th of August

23   with anybody besides Beall?  Did you speak to

24   Mr. Slinkard?

25   A.   No, I don't believe I did.

1    Q.   Did you--

2    A.   And I talked to Mr. Rask.

3    Q.   All right.  Scott Rask.  And who was the first

4    assistant in those days?

5    A.   I don't know if we had one for a period.  At a

6    certain point Emily Metzger became the first assistant.

7    Q.   And prior to the-- to Mr. Grissom leaving as U.S.

8    Attorney, had Beall been the first assistant?

9    A.   Yes, he did-- was.

10   Q.   Okay.  What was the-- let me ask you one

11   unrelated question here.  It seems like every time you

12   have-- you get called in to go to speak to the boss,

13   whichever boss is available, you want someone else with

14   you; is that fair to say?

15   A.   Yes.

16   Q.   Why?

17   A.   Because of the ongoing conflict in the office.  I

18   knew people were recording other people's phone calls.

19   I knew people were printing out e-mails every night and

20   taking them home in binders because they did not trust

21   the people they worked with.  I was instructed to do

22   that as well.

23        I was instructed never to be alone with

24   Ms. Barnett, which is why at the beginning, even before

25   the *Black* litigation blew up, I asked Dave Zabel to come

1   and sit in on the conversation.

2       After that conversation I reported to Scott Rask

3   what happened, and he told me to make contemporaneous

4   memos to myself as e-mails and document them because she

5   couldn't be trusted.

6   Q.  Who's "she"?

7   A.  Debra Barnett.  I know I have seen e-mails where

8   Scott Rask says Debra Barnett cannot be trusted that are

9   contemporaneous with the first and second hearings in

10  the *Black* litigation, but the office was strongly

11  divided.  And I saw someone somewhere in the press said

12  it was a "Lord of the Flies" mentality.  And while there

13  are certainly exceptions, there are very great people in

14  that office, there was a "Lord of the Flies" mindset and

15  people were at full-out war with one another.

16  Q.  And did management-- was management part of that

17  conflict?

18  A.  Yes, absolutely.

19  Q.  And did management foster or cease to not foster

20  that kind of conflict?

21  A.  Management fostered that conflict.  I know Mike

22  Warner, for example, sent some fairly mean-spirited

23  e-mails to Scott Rask and then-- it mentioned something

24  about a bagel and eating a bagel, and so lots of people

25  made jokes about that.

1          Someone suggested that people in the office had

2    mental disorders and left a copy of the DSM at the front

3    desk and sent an office-wide e-mail that everyone needed

4    to take a look at it.  Just mean-spirited, angry

5    conflict within the office that made it difficult for

6    someone to come in and figure out how to do the job

7    well.

8        Q.  Let me ask you about the three big cases.  We've

9    got - they're all intertwined here - *Black*, of course?

10       A.  Yes.

11       Q.  And we've got *Rapp* and *Herrera-Zamora* and some

12   others.  And to the extent that you got involved with

13   problems within all of the three cases, were they all

14   linked and related?

15       A.  I don't believe *Herrera-Zamora* was related

16   factually, but it was related temporally.

17       Q.  All right.  Now, you said that-- well, let me ask

18   you first about the Huff-- about Ms. Huff in the *Rapp*

19   case.

20       A.  Yes.

21       Q.  Ms. Huff was a defendant.  Correct?

22       A.  Yes, she was.

23       Q.  And she was represented by Mr. Session?

24       A.  Yes, she was.

25       Q.  And you overheard a conversation in which

1    Mr. Session was on the phone with Ms. Huff.  Correct?

2       A.  Well, it's-- not with Ms. Huff.  Ms. Huff was on

3    the phone with her mom's boyfriend or a friend.  And

4    then in the background Ms. Huff's mom is on the phone

5    with Mr. Session, I believe.

6       Q.  So you can hear them all?

7       A.  For a period of time you can hear Mr. Session but

8    not for the entire duration.

9       Q.  Why were you listening to that phone call?

10      A.  I was listening to a series of Ashley Huff's

11   phone calls to prepare for a hearing.  And I would say

12   and I think that the agents on the *Rapp* and *Dertinger*

13   case would say that it was unusual for me to listen to

14   inmate calls, but we were overwhelmed.  And there was a

15   time crunch and I needed some information.

16          Now, I could be wrong, but I believe we had just

17   discovered that Ms. Huff was making calls under another

18   inmate's PIN, and those were the calls I was listening

19   to.

20      Q.  PIN being the personal identification number?

21      A.  Yes.

22      Q.  What was the-- the upshot of your having listened

23   to that call with Mr. Session on the phone?

24      A.  What did I benefit from?

25      Q.  What was the upshot?  What happened as a result

1  of that?

2     A.  I know at some point-- and, again, I don't even

3  know what month I listened to it in, so it would be hard

4  to give an estimation.  At some point I brought it to

5  Kim's attention, Kim Flannigan's.  And then I also at

6  some point brought it to Chris Oakley's attention.

7        They all agreed it wasn't even arguably

8  privileged.  I think one of them said, if that call is

9  privileged, I need to retire.  And we didn't intend to

10  use that portion of the call for any purpose.  So we had

11  given it to Mr. Session in discovery, and we didn't do

12  anything further.

13        But as a caveat, in advance of that phone call, I

14  had had conversations with Mr. Session about the fact

15  that she kept repeating things he had said to her on her

16  inmate calls and he needed to talk to her about it,

17  because she had said something that I had found

18  troublesome.

19        And I talked to him about it, and I also talked

20  to Tom Bartee about it because he was Mr. Session's

21  mentor.  And we had sort of put him on notice she was

22  doing it, and she did it pretty regularly.  I mean, she

23  also said some very helpful things for our case on the

24  phone calls, but she also talked about what Mr. Sessions

25  had said to her.

1      Q.  Let me ask you about *Herrera-Zamora*.

2      A.  Uh-huh.

3      Q.  Is it true that you, during the trial of

4    Herrera-Zamora, went to a court interpreter,

5    court-contracted interpreter, and asked her to listen to

6    Herrera-Zamora's phone calls specifically to find a call

7    with his attorney?

8      A.  My directions to her, as I recall it now - and

9    again, I haven't thought about this in a long time -

10   were to listen to all of Mr. Herrera-Zamora's calls with

11   his attorney to find instances where he put someone else

12   on the line.  I know I said, I need you to find other

13   voices, because she was very familiar with

14   Mr. Herrera-Zamora's voice and other members of his

15   family's voice.  I said, you're looking for someone

16   else.

17     Q.  And these are conversations in Spanish?

18     A.  They were.  I-- I don't know if he spoke some

19   English, but-- I don't recall if he spoke some English,

20   but yes, they were in Spanish.

21     Q.  And didn't you tell her that you wanted to use it

22   for impeachment purposes?

23     A.  I think-- she probably understood it that way.

24   What Dave Zabel and I had discussed in advance was that

25   we were going to use Mr. Moran contacting these other

1  represented witnesses against Mr. Moran, not to-- Mr.

2  Herrera-Zamora wasn't going to testify, at least we had

3  no reason to believe he would.  So it would've been a--

4  against Mr. Moran for having contacted represented

5  witnesses without going through their attorneys.

6        I know Dave Zabel contacted both of these

7  inmates' attorneys.  They said they had had no contact

8  from Mr. Moran.  Mr. Moran indicated to us he had spoken

9  to these inmates.  Dave and I discussed what we needed

10  to do to address this problem.  And I think I suggested,

11  well, we could get jail calls to see if he didn't block

12  his number and to see if he's discussing these--

13  reaching out to other inmates and trying to convince

14  them to testify in-- on behalf of his client but not

15  necessarily in their own benefit.

16        David had a specific interest in this because one

17  of the two witnesses was Vicencio Olea-Monarez, and that

18  is someone Dave had just done a six-week trial with, and

19  he wasn't happy that Carlos Moran was contacting this

20  guy when he was about to have a sentencing hearing on

21  him.

22   Q.   And do you know for a fact that David Zabel knew

23  exactly what was going on with the situation and you

24  kept him apprised of what was happening?

25   A.   I know without a doubt that I discussed with Dave

1    Zabel that I was going to have-- do you want me to say

2    her name, the interpreter's-- that I was going to have

3    her listen to the calls before I did it.  He agreed with

4    it.  Then we were having her listen to calls in the

5    office, but we didn't know where to set her up.

6          I discussed with him that we were doing that, and

7    then she said she needed to leave because she didn't

8    have her foot pedals.  But I believe she was coming up

9    in the line of witnesses, so I went to him again and

10   said, she needs to leave because she doesn't have her

11   foot pedals to listen to these calls.  He said, okay, if

12   she leaves, do you think we're going to get to her?  And

13   he said it was fine.

14         I have no doubt whatsoever that he knew she was

15   listening to these calls.

16   Q.   Did you listen to any phone calls in the company

17   of Mr. Zabel in a different situation?

18   A.   Yes.  Based on my recollection, I did.  I know

19   that he says he doesn't recall that.  But yes, I recall

20   Mr. Zabel listening to two of Mr. Moran's phone calls on

21   his computer in my presence, and they were phone calls

22   between Mr. Moran and the other two inmates.

23         And to clarify, the first batch of

24   Mr. Herrera-Zamora's calls that we got were just

25   Mr. Herrera-Zamora and Carlos Moran.  The second batch

1    that we got contained two calls from two different

2    inmates, and that's the disk that I recall Dave Zabel

3    listening to those two calls in my presence on his

4    computer.

5        Q.  All right.  Let's move along to the Special

6    Master situation.  During-- you're familiar with the

7    fact that the-- the Phase III investigation began after

8    the-- shortly after the Special Master gave his report--

9    or gave his reports on Phase I and Phase II.  Correct?

10       A.  Do you know what month it was in?  I don't--

11       Q.  Well, just in general, was it-- Phase III wasn't

12   approved until after Phase I and Phase II got finished.

13   Right?

14       A.  That's correct.

15       Q.  All right.  So then on October the 11th, 2016,

16   this is the appointment of the Special Master.

17       A.  Okay.

18       Q.  And there was a request for production from the

19   Special Master of many, many, many documents only two

20   weeks later on the 25th.

21           Do you recall anything coming to you from the

22   management saying what, if anything, you're supposed to

23   do about responding to those-- to the request for

24   production?

25       A.  I don't recall in the early phases what I was

1    instructed to do.  If I was instructed, it would be in

2    my e-mails, which I haven't seen in some time.  I do

3    know that I didn't believe we had any real guidance on

4    it until December of 2016 when we had a meeting with

5    Emily Metzger.

6        Q.  All right.  So you have no recollection of-- of

7    management telling you to do anything prior to the

8    December 19th letter?

9        A.  I don't.  And I do remember there was some

10   concern amongst some of the people-- line AUSAs in

11   Kansas City because Ms. Barnett's instructions were

12   limited to preserving phone calls that she identified

13   from the *Black* case, and we had put-- Kim Flannigan and

14   I had put her on notice, I think three possibly four

15   times, that there were attorney calls in other cases and

16   we were asking her to address it.

17           And I know that Kim Flannigan had a meeting with

18   Tom Beall and Debra Barnett, and Kim Flannigan raised

19   this issue again and Debra Barnett denied knowing

20   anything about it in front of Tom Beall.

21           So Kim Flannigan went back and found all three

22   e-mails where she had previously notified Debra Barnett,

23   highlighted them, scanned them, attached them and sent

24   them back to Debra Barnett and said, here, Erin and I

25   have been telling you this three times.  And Debra

1   Barnett never responded to that e-mail.

2       Q.  Do you recall a meeting being held here where all

3   the assistants were told either-- were told they should

4   probably show up, where Emily Metzger and Debra Barnett

5   came to give you information or instructions about the

6   Special Master's Phase III investigation?

7       A.  I do recall that.  I remember that being in

8   December of 2016 I think.

9       Q.  What did they tell you?

10      A.  I think that they said that they were working on

11  search terms with the Special Master and David Steeby

12  and they weren't able to come to a consensus, but they

13  would give us some guidance.  And then I think we at

14  some point received an e-mail that we were supposed to

15  forward to every agent or agency we've ever worked with,

16  telling them to preserve things.

17      Q.  Were you ever told to turn-- well, the

18  December 19th letter itself is a protection letter,

19  document protection letter, isn't it, to preserve and

20  maintain, make sure you don't throw away anything that

21  might be useful?

22      A.  That's what I recall, yes.

23      Q.  And were you required to turn anything in to

24  Ms. Metzger in that December 19th letter?

25      A.  I do not recall.  I know at some point I began

1    gathering things, but it-- again, it's been a long time.

2         Q.   Did you produce the material to Ms. Metzger as

3    she had requested?

4         A.   Yes, I did.

5         Q.   You were aware, weren't you, that the Court

6    appointed the Special Master?  And when the Court

7    ordered him to start Phase III, every employee of the

8    U.S. Attorney's Office was told you will provide full

9    cooperation with the Master; is that correct?

10        A.   That's correct.

11        Q.   What did-- what comments did you hear management

12   make about that order?

13        A.   Comments I heard from Scott Rask--

14             MR. CLYMER:  Your Honor, I believe this goes

15   beyond the authorization that the witness has.  It's an

16   internal comment in response to a litigation hold, so

17   it's attorney-client protected, deliberative process

18   protected and work product.

19             THE COURT:  You're not raising this under

20   *Touhy*, in other words?

21             MR. CLYMER:  Yes, I am.  I believe it's

22   beyond this witness' authorization.  I'll check her

23   lengthy list of authorizations, but I do not believe

24   this is on it.

25             THE COURT:  And--

 1          MS. VANBEBBER:  Do you want to consult with

 2   your lawyer?

 3          THE COURT:  I'm going to want to hear from

 4   you who the decision-maker--

 5          MR. CLYMER:  I have that information for

 6   you, Your Honor.

 7          THE COURT:  All right.  Go ahead and tell

 8   me.

 9          MR. CLYMER:  Bradley Weinsheimer,

10   W-E-I-N-S--

11          THE COURT:  Wait a minute.  W-E-I...

12          MR. CLYMER:  N-S-H-E-I-M-E-R.  He's an

13   Associate Deputy Attorney General.

14          THE COURT:  Okay.

15          MR. CLYMER:  If I may have one minute, Your

16   Honor, I just want to check her authorization, if I

17   could.

18          MS. VANBEBBER:  Your Honor, may the witness

19   be permitted to consult with her attorney?

20          THE COURT:  Do you want to consult with your

21   attorney?

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  Go ahead.

24          (The witness and her counsel confer).

25          MR. CLYMER:  Your Honor, may I have the

 1  question read back?

 2           THE COURT:  Yes.

 3           (The question was read back).

 4           MR. CLYMER:  Could I speak to Ms. VanBebber

 5  for a second, Your Honor?

 6           THE COURT:  Yes.

 7           (Counsel confer).

 8           MR. CLYMER:  I think we've resolved it, Your

 9  Honor.  Thank you.

10           MS. VANBEBBER:  May I rephrase the question,

11  Your Honor?

12           THE COURT:  Yes.

13  BY MS. VANBEBBER:

14   Q.  What were you instructed or directed by the U.S.

15  Attorney Office management to do or not do regarding

16  your cooperation with the Special Master in Phase III?

17   A.  I don't know specifically in Phase III, but I was

18  in my office on one day, and I have an e-mail

19  documenting it, when Scott Rask came to my office or

20  either called me to come to his office.  And he told me

21  that Deb Barnett had just called him, and I was

22  instructed per Deb to have no contact with the Court,

23  court personnel, or the Special Master regarding the

24  *Black* case.

25           And this was very upsetting to me, so I

1   immediately went down and relayed that information to
2   Chris Oakley and Kim Flannigan.  I asked Kim Flannigan
3   if I should document what had happened by sending an
4   e-mail back to Scott Rask, like just so that it was in
5   writing, but she said that would anger Scott, don't do
6   it, just let it go.
7          And then a short time later, I would say two or
8   three months later, the issue came up again in the
9   presence of Kim Flannigan.  And I said, you know, I
10  really want to talk to the Special Master, but you told
11  me I couldn't.  And I was speaking to Scott Rask.  And
12  he said, I don't remember ever saying that.  And I just
13  looked at Kim just-- it was like a breaking point,
14  because if even Scott was not being truthful, then there
15  was just no hope left.
16         So I went back with Kim, and she helped me to
17  craft an e-mail to Emily Metzger, because we felt like
18  Emily Metzger would be the one who was left, and saying,
19  you know, I'd like to speak to the Special Master.  He's
20  indicated through Pauletta Boyd that he wants to speak
21  with me, but Deb told me on such and such date through
22  Scott not to have contact with the Court, court
23  personnel, or the Special Master.
24         And Emily responded and was truthful, and she
25  agreed Deb had done that.  And she said the reason Deb

1  had done that was to allow time to pass because everyone

2  was very angry at me, and I think she specifically named

3  like the judge and the Special Master presumably.  But--

4  and I have given that e-mail, I think.

5      Q.   To your recollection, were you first told not to

6  talk to the Special Master in October of 2016?

7      A.   That does sound accurate.

8      Q.   Okay.  And at that point then did you comply?

9      A.   I did with one exception.  I knew he wanted to

10  speak with me through other people, so I called him on

11  his phone that I found on the Internet.  And I said, I

12  would like to speak with you-- I identified myself, and

13  I said, I would like to speak with you and I know you

14  want to talk with me, but I can't do it until I get

15  permission, and I'm working on it.  And that was it.

16      Q.   Did you feel that you had, because of the court

17  order, implicit permission to speak with the Special

18  Master whenever necessary?

19      A.   I did not because I had direction from my

20  management not to do so.  And I know other people in the

21  office felt that way too.  Many people wanted to speak

22  with him, but-- Kim Flannigan, for example, also asked

23  to speak with him, and Emily Metzger told her she had

24  e-mailed the Special Master and that Kim wanted to speak

25  with him, but that the Special Master never responded.

1        And so I know others wanted to speak with him as

2   well, but we felt like we couldn't without permission

3   from management.

4       Q.  Now, look ahead to February the 6th, 2017.  Was

5   that when Pauletta Boyd told you that the Special Master

6   would like to speak with you?

7       A.  If that is the date that she was allowed to

8   interview--

9       Q.  Uh-huh.

10      A.  -- with him, she told me either that day or the

11  next day.

12      Q.  Did you then contact Emily?

13      A.  Yes.  And I don't know the exact date, but it

14  would've been shortly after Pauletta had met with the

15  Special Master.

16      Q.  Shortly after, right?

17      A.  Yes.

18      Q.  Then did she tell you-- did Metzger tell you that

19  she would speak to Beall and she'd get back to you?

20      A.  Yes.

21      Q.  Did you wait for two weeks?

22      A.  I did.

23      Q.  Did you hear anything within those two weeks?

24      A.  No, I did not.

25      Q.  When she did get back to you, can you estimate

1   how long it did take her?

2       A.   I don't recall.  I know when they did not get

3   back with me after that request, I talked with several

4   people in the office.  I felt like I had no recourse.  I

5   was completely boxed in, not allowed to speak directly

6   with Debra Barnett or Tom Beall since September 10th

7   roughly.  And I wasn't sure if my efforts-- I kept

8   asking to speak with them through Scott Rask, as he told

9   me to, but I wasn't sure he was passing along the

10  message.

11       So other people in the office said, you need to

12  file a grievance, any sort you can, to get their

13  attention because this office has just gone off the deep

14  end.

15      Q.   When-- when she did get back to you, did Metzger

16  tell you that they wouldn't have expected you to reach

17  out to the Special Master?

18      A.   Yes, I recall that language.

19      Q.   Did she say why not, if full cooperation was

20  expected and you had something to tell him?

21      A.   She did not.  I think-- I know that they had

22  concerns about the Special Master, and I know they

23  wanted to limit the office's contact with him.

24      Q.   What do you mean by saying "they had concerns"?

25      A.   I heard--

1             MR. CLYMER:  Your Honor, I believe this is

2    beyond the witness' authorization.  She does not have

3    authorization to talk about general office scuttlebutt

4    or privileged communications regarding views about the

5    Special Master.

6             MS. VANBEBBER:  If it's a privileged

7    communication between this attorney and a different

8    attorney, does this attorney not have the ability to

9    waive that privilege?

10            I believe you do.  Would you want to waive

11   your privilege, after talking to someone else in the

12   office?

13            THE WITNESS:  I don't mind to waive the

14   privilege about any communications in the office, I

15   think it would be helpful to get the truth out here.

16   But I also don't want to get in trouble with the

17   government down the road.

18   BY MS. VANBEBBER:

19    Q.  Are you telling me that you could certainly

20   answer that question if you were not being gagged by the

21   Department of Justice?

22    A.  Yes, I could.

23            MR. CLYMER:  May I hear the question read

24   back, Your Honor?

25            THE COURT:  Yes.

```
 1                (The question was read back).

 2                MR. CLYMER:  Your Honor, it might be helpful

 3    if the question was focused a little because it's so

 4    broad.  I'm not sure I know what it's eliciting.  If I

 5    had--

 6                THE COURT:  All right.  So is your question

 7    directed to communications that Ms. Tomasic was directly

 8    involved in?

 9                MS. VANBEBBER:  Yes.

10                THE COURT:  All right.  With that caveat, do

11    you understand?

12                MR. CLYMER:  Yeah, and I-- I suppose I'd

13    like to know-- when you use communications she's

14    directly involved in, is it someone giving her

15    instructions or guidance?  There's-- that's clearly

16    within her authorization.  But it's not clear to me from

17    the question that that's what it's seeking.

18                THE COURT:  Why don't you reframe the

19    question, Ms. VanBebber.

20    BY MS. VANBEBBER:

21       Q.  Do you recall-- well, you-- you indicated that

22    you had-- you knew there were concerns.  Correct?

23       A.  That's correct.

24       Q.  That management had concerns about the Special

25    Master?
```

1        A.   That's correct.

2        Q.   What concerns were stated to you about

3    management's-- about management with regard to the

4    Special Master?

5        A.   If it's limited to management, my contact with

6    management was generally limited to Scott Rask.  And he

7    felt that the Special Master was, in his words,

8    untrustworthy.

9            Before I went to meet with the Special Master,

10   Mr. Rask came to me and we had-- since the day I started

11   had a-- a very cool and unfriendly relationship for the

12   most part, and he said I was finally showing some

13   maturity because I was putting the interest of the

14   office in front of my own, and he wanted me to think

15   about that when I met with the Special Master.

16           He also relayed that exact same language to Kim

17   Flannigan, and she relayed-- about me, that I was

18   finally showing some maturity by putting the interest of

19   the office in front of my own.  And he wanted her-- I

20   don't know that he asked her to tell me, but she did

21   tell me.

22       Q.   What did you take from that in terms of what he

23   thought putting the best interest of the office ahead of

24   your own meant?

25       A.   Not to air our laundry outside of the office.

1   And I know that was specifically discussed.  Scott

2   specifically discussed not airing our laundry with me

3   and Kim Flannigan.

4        Q.  In what context?

5        A.  About there an upcoming hearing in *Rapp*, and

6   Kim and I were so excited because we finally got a

7   chance to put on an explanation as to why the government

8   had sat silent during the entire *Black* litigation.  We

9   felt like we understood Ms. Barnett's motives for having

10  done so.  He didn't want it to come out because he

11  didn't think it was in the best interest of the office.

12       Q.  So you finally got permission to speak with the

13  Special Master or not?

14       A.  I did.

15       Q.  And was that relayed to you by Ms. Metzger?

16       A.  I believe so.

17       Q.  Did she ever tell you the reason why you were

18  forbidden to speak to the Special Master in the first

19  place?

20       A.  She said-- and I don't have the exact language in

21  front of me, but she said Ms. Barnett gave me that

22  instruction because she wanted to allow time to pass

23  because-- I believe she said because the Court was very

24  angry at me and she wanted to allow tensions to subside.

25       Q.  Did she explain-- this is Metzger relaying

1    Ms. Barnett's attitude toward the matter?

2       A.  Yes, because I was instructed not to have any

3    direct contact with Ms. Barnett or Mr. Beall from

4    September 10th until a Department-of-Justice-ordered

5    mediation in May.  September 10th, 2016 until

6    approximately ten days or so before I left the office, I

7    don't have the exact date, but late April 2017 or early

8    May 2017.

9       Q.  When you left the U.S. Attorney's Office, you

10   went where?

11      A.  I was still a Social Security employee.  I went

12   to the Western District of Missouri where I was

13   cross-designated filling in, long enough to tidy up my

14   cases, which was just a few weeks.  And then I resigned

15   from there, but-- and then I went to the Social Security

16   Administration, and I was sort of in limbo but-- until

17   June or July 2017.  But I had purchased a house in

18   Kentucky in late May, I believe, and I let them know at

19   Social Security that I was resigning from there as well

20   and walking away from what was at this point an

21   enormously stressful situation.

22      Q.  In the *Black* case, did you ever listen to any

23   attorney calls-- excuse me, attorney-client calls?

24      A.  Unless you count Ashley Huff as part of the *Black*

25   case, no.

1    Q.   Did you review VCR No. 6?

2    A.   No, I didn't ever directly handle any of the

3  videos.

4    Q.   Do you know of any other Assistant United States

5  Attorney-- or any other person in the office, other than

6  Pauletta Boyd who had control of-- of the VCRs, who

7  listened-- or, excuse me, who watched any of the video

8  that had been turned over by CCA?

9    A.   So initially as part of the investigation, CCA

10  was turning over just specific disks.  So just so I'm

11  clear--

12    Q.   Uh-huh.

13    A.   -- Matt Cahill had some of those disks, but they

14  did not include any attorney-client--

15    Q.   Right.

16    A.   It was just the parking lot, I believe, and maybe

17  a pod.  Once we got the entire system, the only folks

18  who I know who looked at any video are Jeff Stokes, an

19  agent with the KBI, and then I believe Pauletta Boyd

20  looked at it just long enough to try and figure out how

21  it worked.

22    Q.   Do you have any personal knowledge of any other

23  instances where an AUSA or case agent listened to

24  recorded attorney-client calls?

25    A.   I know, for example, that Chris Oakley

1   encountered a call, an attorney-client call, in an

2   individual case when he was listening to them, but that

3   he explained-- as he explained it to me, he discontinued

4   listening to the call and he notified the agents.  He

5   showed me the e-mail.  He notified the agents that there

6   were attorney calls and not to listen to them.

7        I know Tris Hunt encountered an attorney-client

8   call during the course of the *Black* litigation, and so

9   he already had the benefit of how to deal with it

10   correctly, and he did.  I know Dave Smith encountered

11   attorney-client calls because he relayed that to me.

12        As far as agents go, Jeff Stokes relayed it to me

13   when he did.  Pat Greeno relayed it to me when he did,

14   and that's the *Jerome Birdsong* case I previously spoke

15   about.

16        There was at least one Deputy U.S. Marshal who

17   encountered an attorney call during the course of the

18   *Black* investigation.  And once this litigation arose, he

19   was fairly new, and he relayed it to me that he had not

20   done so earlier.  That's it as far as I know.

21   Q.   And the name of that agent?

22   A.   Zac, Zac Howard.

23   Q.   Ms. Tomasic, if we look at the early part of

24   2016, you are-- you're in pretty good shape at the U.S.

25   Attorney's Office, right?  In spite of the dissent

1   within the office, you've got big cases, you're being

2   trusted to try them on your own or with a second--

3   second chair.  You were being treated-- how would you

4   describe the way you were being treated?

5       A.  Well, beginning the previous fall, Kim, who was

6   very wonderful in understanding that it's difficult for

7   a working mom to do this job, suggested that I apply to

8   be a Social Security SAUSA.  And she felt like it was a

9   good fit for me because it didn't require late night

10  search warrants and things like that.  So she also said

11  she would take care of the pushback that would come from

12  re-assigning my cases, which--

13      Q.  Why would there be a pushback?

14      A.  Because no one wanted more cases.  Everyone had

15  too many cases and everyone was overworked and--

16      Q.  Did they often ask you to jump in and do their

17  work or not?

18      A.  Some people asked me to jump in and do their work

19  a lot.  Some people never did.  And so I had my Social

20  Security cases and, yes, I think that-- you know, I felt

21  like I was at a point where I could finally slow down

22  and catch up and-- and understand what I was doing.

23          Scott acknowledged when he took over that I

24  hadn't been trained properly, those were his words, and,

25  you know, sort of taking the opportunity in 2016 to do

1   so.

2       Q.   He was taking over from Mike Warner?

3       A.   He was taking over from Kim Flannigan.  But my

4   training should've occurred in the first year, and it--

5   and it really didn't.

6       Q.   So as time went on, we get to August 2016 and the

7   *Rapp* matter brings up the Rokusek situation?

8       A.   Yes.

9       Q.   From that time forward-- and that's a point at

10  which the FPD filed its motion and everything went crazy

11  in *Black*--

12      A.   Yes.

13      Q.   -- is that true?

14           Were you treated differently after that-- after

15  the 5th of August or the 9th of August when you were not

16  allowed to go to court?

17      A.   Yes, I was.  I was having trouble getting-- once

18  Scott took over, I was having trouble getting like plea

19  agreements.  I would draft plea agreements that were

20  very simple and the parties had already agreed to the

21  terms, and he would sit on them and not approve them.

22           I had a hearing coming up in *Rapp-Dertinger*, and

23  he wanted to see my pleadings beforehand, which was

24  fine.  But I gave it to him on a Friday, and Monday I

25  recall he came into my office at 3:30 or 4:00, and it

1    was due by 5:00 for some reason, I don't recall why, or

2    at least we had to leave by 5:00.  But for some reason

3    it was very near the deadline, and he said, I haven't

4    had a chance to look at it.  Let's start going through

5    it together.

6           And Kim was in there too.  He was standing over

7    me and making changes.  We were down to less than five

8    minutes before we had to file it, and he just started

9    doing it.

10    Q.  Did you have similar disrespect from the rest of

11    the management?

12    A.  I don't know what was happening with Tom Beall

13    and Deb Barnett because they weren't speaking to me and

14    I didn't see them.

15    Q.  All right.  What happened on September 10th with

16    regard to your communications with upper management?

17    A.  I e-mailed-- I called a friend of mine who's an

18    employment lawyer, and she said you-- I said, what do I

19    need to do here to get this corrected, because Tom Beall

20    is making it look like I'm breaking into a federal

21    judge's chambers to steal evidence.  And she was my

22    friend, she said, you need to e-mail him and you need to

23    ask him to fix it, and that way if he doesn't fix it,

24    it's on him.

25           So I e-mailed him and asked him to fix it.  And

1   he was very angry.  He said any suggestion that I

2   wasn't-- that I had a lack of clarity or plausibility in

3   speaking to Judge Robinson is flatly inaccurate and

4   offensive, or something like that.

5        And from that point on, I don't know what the

6   conversation was, but there was some conversation

7   between Scott Rask and upper management when-- where

8   they said, don't let her communicate directly with us.

9   Q.   All right.  Are you telling me that from

10  September 10th or somewhere in the middle of September,

11  for a certain amount of months, you were told that you

12  could not speak to a member of upper management?

13  A.   To Tom Beall and Debra Barnett, yes.

14  Q.   That's the top two, isn't it?

15  A.   Yes.  Well, Emily Metzger at some point became

16  first assistant.

17  Q.   I'm sorry.  Go ahead.

18  A.   At some point she did.  And she actually at

19  Scott's request came and talked to us a couple of times,

20  but it was just so Kim and I could talk, and then she

21  would say, I'm sorry, I don't have the answer, Deb is

22  handling that.  And Kim and I were so frustrated because

23  we said, at what point is someone who's willing to do

24  something and take ownership and handle this litigation

25  correctly going to get involved?

1     Q.   All right.  So was your inability to speak to

2   Barnett and Beall limited to the *Black* case, or were you

3   not supposed to speak to them at all?

4     A.   At all.

5     Q.   So if you wanted to deliver any messages to-- or

6   just communicate at all with the acting U.S. Attorney

7   and the criminal chief--

8     A.   Yes.

9     Q.   -- you, as an AUSA in the criminal division, had

10  to go through Scott Rask to telegraph whatever it was

11  you wanted to say to them?

12    A.   As a SAUSA, yes.  I was still a SAUSA.

13    Q.   And how long did that last?

14    A.   It lasted until May when several AUSAs had

15  lodged-- I had lodged any complaint I could find to get

16  someone-- and other people did it too.  People were

17  trying to reach out to EOUSA, to OPR, to any agency or

18  body in-- in the DOJ that we could find to have someone

19  come in and take this-- take hold of what was unraveling

20  in the office.

21          So I lodged an initial OPR complaint against Tom

22  Beall and Emily Metzger, I believe, and Debra Barnett,

23  for not creating the record when I went up to chambers.

24  And then I lodged a second one and, for my part, it was

25  that-- just that-- their lack of competence for trying

1   to even get the facts before they walked into the first

2   two hearings.

3         And then, you know, my record that I made on

4   September 7th, looking back at it, is not clear because

5   management wouldn't even meet with me until an hour

6   approximately, maybe an hour-and-a-half before the

7   hearing.  And my question that I had asked several days

8   earlier is, who's going to handle this hearing?  Can we

9   put on evidence?  Judge Robinson needs evidence.  And no

10  one ever responded to that e-mail.

11        So an hour-and-a-half before the hearing,

12  Mr. Slinkard finally is telling us who's going to handle

13  the hearing, and it's going to be me evidently, and what

14  we can put on as far as evidence.

15  Q.   And you're speaking about the hearing that

16  occurred on September the 7th?

17  A.   Yes, I am.

18  Q.   And so you were not-- you were ordered by the

19  Court--

20  A.   Yes.

21  Q.   -- to show up at the hearing, and so was Chris

22  Oakley and so was Kim Flannigan.  Correct?

23  A.   Yes.

24  Q.   Did you hear anybody in management express anger,

25  disgust, any other kind of disrespectful comments about

1    the judge for doing that?

2        A.   For ordering us to appear?

3        Q.   Yeah, for ordering you to appear.

4        A.   Not for ordering us to appear, no.

5        Q.   Did-- well, for what else?

6            MR. CLYMER:   Judge, I'm going to object.

7    That assumes a fact not evidence.

8            THE COURT:   Overruled.

9    BY MS. VANBEBBER:

10       Q.   You said "not for that."  What do you mean "not

11   for that"?

12       A.   The-- the consensus among many people - again,

13   there are some exceptions - is that Judge Robinson had

14   an axe to grind for some reason.  Someone said she had

15   had some bad experience with law enforcement in her

16   family life and it made her hate law enforcement.

17   Someone said that she had joined-- had joined the Black

18   Lives Matter movement and was jumping on the bandwagon

19   with that.

20       Q.   So is it fair to say that there were an awful lot

21   of criticisms of Judge Robinson around the office at

22   that time?

23       A.   Yes.

24       Q.   Did management do anything at all to tamp that

25   down?

1    A.  I would characterize it differently.  We had

2  absentee management.  Tom Beall wasn't around, Debra

3  Barnett wasn't around.  They weren't responding to

4  e-mails from what I could tell.  And Scott Rask was-- he

5  was in a very difficult position.

6        But I-- yes, he definitely agreed in the

7  sentiments that-- I mean, he told me personally that

8  this is a woman who comes home from her honeymoon a day

9  early, that's what we're dealing with, Erin.  So if you

10  think she's going to be rational, you're wrong.

11    Q.  All right.  Now, if--

12    A.  And I will-- I will acknowledge that I wasn't

13  very happy either with Judge Robinson at that time

14  because I felt like Tom Beall had given her all the

15  information and she had ignored it.

16        But Leon Patton, who knew Judge Robinson from

17  years earlier, talked to me over the months and talked

18  to me and talked to me and he said she wouldn't do that,

19  she wouldn't make a decision like she did unless he

20  withheld that.

21    Q.  Did that lead you to believe that management had

22  given an improper explanation to the judge?

23    A.  Yes.  And for a series of reasons I began to

24  think management was lying to me about a number of

25  things.

1    Q.   Did you completely lose the ability to trust

2   management?

3    A.   Yes.  And I-- and I completely lost the ability

4   to function.  I did.  By the time I left that office,

5   I-- and I know I try not to cry today, but by the time I

6   left that office, I was a complete mess.  Not because I

7   feel sorry for myself for anything I've done, I take

8   ownership for it, but because I think that I just

9   cracked mentally.

10    Q.   So between September and May, you had still had

11   the rules in effect you can't talk to Debra and you

12   can't talk to Beall; is that right?

13    A.   Yes, until the mediation.

14    Q.   All right.  And then did you have any more

15   contact with the *Black* case between September and now,

16   except for being a witness?

17    A.   Between September 7th--

18    Q.   From the time that they cabined you in away from

19   management and the time-- and today, have you had any

20   more contact with the *Black* case?

21    A.   Well, while I was still working there, there were

22   additional pleadings sometime in the spring, and I know

23   Scott, Kim and I worked at length to provide facts to

24   Deb again for that pleading.  Scott-- I was actually

25   going to Florida for the week, and so I was gone.  But

1   we had a lengthy pleading that finally was giving her

2   some of the facts to help her in her decision, cited a

3   lot of case law.

4          As I recall, Scott stayed and worked over the

5   weekend, and then Kim sent me a copy while I was at

6   Disney World.  And Deb had deleted every bit of it, and

7   it was a pleading-- a response that had no facts.  Scott

8   was furious because he had spent all this time working

9   on it.  And no one could understand why she didn't want

10  to give Judge Robinson any facts, none.

11  Q.   Were you ever asked to sign a pleading that you

12  really had no input into?

13  A.   Not-- not that I recall, no input.  I signed the

14  pleading that was drastically changed after I had it,

15  and I was told-- it was before the September 7th

16  hearing.  I began working on that pleading several days

17  prior, so September 7th-- September 4th I think was a

18  Saturday.  I had hired a babysitter for my children that

19  day because my husband works all weekend.

20         I e-mailed every member of management and-- and

21  anyone involved in the *Black* case, and I said, the FPD

22  just filed a 53-page reply, I'm here alone, this is too

23  much.  You know, I think I said, I know I'm a lowly

24  SAUSA, but can we get some help here because I can't do

25  this and I need help, and we don't know what we're going

1   to do with the hearing and I'd like some answers,

2   because there had been several other e-mails asking what

3   we can do.

4        Emily Metzger responded as to one minor point,

5   but she didn't have authority to respond to the rest I

6   assume.  No one ever responded to that e-mail.  So

7   Sunday went by, Monday went by.  And I don't know if

8   September 7th-- what day of the week is that?

9        Q.   September the 7th was a Wednesday.

10       A.   Okay.  I believe Monday was a federal holiday.

11  Chris Oakley and I were working that day as well.

12       Tuesday, still no response from any member of

13  management.  Tuesday, in the afternoon, Debra Barnett

14  calls for the first time.  And Scott Rask, Chris Oakley,

15  Kim Flannigan and I are in the office on speaker phone

16  with her, and she says - and it was well afternoon -

17  okay, we're ready to start editing the pleading.  And

18  the hearing is the next day at noon.  And she said she's

19  driving from Wichita to Kansas City, and we'll just

20  e-mail back and forth and edit the pleading.

21       So I-- Scott said he would handle it on the

22  Kansas City end.  So Scott sat at his desk.  He told me

23  to go sit at mine.  Kim Flannigan and Chris Oakley are

24  still there.  And that Debra Barnett and Emily Metzger

25  are there and make edits and send it to Scott, and then

1    he'll absorb those edits.  I think they're hand-writing

2    them for some reason.  I don't recall.

3          But anyway, it was a convoluted process involving

4    Scott, Emily Metzger and Debra Barnett.  They finish

5    editing that pleading at roughly 10:30 or 11:00 at

6    night.  And by that time I know Kim Flannigan left in

7    disgust because she says they wait until the last minute

8    and they throw in garbage.  She knew it was going to

9    upset the judge because she wouldn't have time to read

10   it.  Chris Oakley I think left, but I'm not certain.  I

11   was still there.

12         Occasionally Scott would call me down to ask me a

13   question, if he needed a question answered, but I did

14   not have very much involvement.  And then I filed the

15   pleading at Scott's direction when he e-mailed it to me,

16   and I had been sitting in my office for hours.  And

17   that's the pleading that was filed on September 6th.

18   Q.  Do you know if that pleading-- at that point was

19   that pleading truthful?

20   A.  I can't say.  I haven't looked at it.  I don't

21   know that I ever looked at it in its entirety after it

22   was filed, and I certainly haven't looked at it since I

23   left the office, so...

24         MS. VANBEBBER:  No more questions.

25         THE COURT:  All right.  Why don't we take a

 1  break for 15 minutes.

 2              (Recess).

 3              THE COURT:  All right.  You can be seated.

 4              MS. VANBEBBER:  With the Court's permission,

 5  I have a couple more questions before I finish.

 6              THE COURT:  Go ahead.

 7  BY MS. VANBEBBER:

 8     Q.  I hate to bring you back to the-- to August 25th,

 9  but I need to for just a couple more questions.

10         You took the discovery of the audio materials up

11  to the judge's chambers at 3:00 or 3:30.  Right?

12     A.  That's correct, or approximately, yes.

13     Q.  About 3:00 I think the record reflects.  Does

14  that sound right to you?

15     A.  That does.

16     Q.  And at 5:30 you went back up?

17     A.  That's correct.

18     Q.  So there was a two-and-a-half hour gap there.

19  Given that you had-- you had wheeled them up in a great

20  big cart-- cart, right, at 3:00?

21     A.  I did.  I think so, yes.

22     Q.  And at that time you didn't have anybody else

23  with you, it was just you?

24     A.  Yes.

25     Q.  You gave them to the clerk and the clerk put them

1    in the judge's office.  Right?  Into a room next to

2    the-- next to the secretary's desk?

3        A.  I don't recall.

4        Q.  You took them inside the chambers anyway and gave

5    them to him?

6        A.  I think so, yes.  I know I went into the chambers

7    the first time.

8        Q.  Uh-huh.  Then when you went-- but when you went

9    the second time, you had to have assistance to get in.

10   Given that chronology and the seriousness of what was

11   being impounded, don't you think it was reasonable for

12   the judge to believe you might've been up there to do

13   something nefarious?

14       A.  I think if she didn't have all the information,

15   then I understand why she would be very concerned,

16   especially with the delay, because it doesn't make any

17   sense.

18       And also with understanding the dysfunction of

19   getting approval for something, you know, I was assigned

20   to the case and she doesn't understand-- Judge Robinson

21   doesn't understand how the office was working at the

22   time, I can see where she would think, well, why

23   wouldn't Ms. Tomasic just bring it right back up when

24   she figured out it wasn't included in the first batch

25   and call?

1    Q.   You could see how that would give a person pause?

2    A.   I can absolutely see that, yes.

3    Q.   And you can see that she might even have thought

4    that you were up there to take something?

5    A.   While it's a little bit heart-breaking, yes, I

6    can see that.

7    Q.   Looking at it from the other side?

8    A.   Yes.

9              MS. VANBEBBER:  No other questions.

10             THE COURT:  Ms. Brannon.

11             MS. BRANNON:  Your Honor, I've spoken with

12   the government, and we would go ahead and move to admit

13   our exhibits.  582, 583, 584, 606, 617.

14             THE COURT:  Wait a minute.  Slow down.

15             MS. BRANNON:  I'm sorry.

16             THE COURT:  583, 584, 606, 617.

17             MS. BRANNON:  617, 639 and 641.

18             THE COURT:  640--

19             MS. BRANNON:  41.

20             THE COURT:  Any objection?

21             MR. CLYMER:  Your Honor, I think there may

22   have been a miscommunication there.  Was it 582 and 584

23   or 583 and 584?

24             MS. BRANNON:  582.

25             MR. CLYMER:  I think you said 583.  I think

1  it's 582 and 584.  There's-- there's agreement with Ms.

2  Brannon.  I just think there might've been a

3  miscommunication.

4            THE COURT:  I think she said 582, '83 and

5  '84.

6            MS. BRANNON:  Yes.

7            MR. CLYMER:  Oh, I'm sorry.

8            THE COURT:  But my exhibit list does not

9  have a-- an identification of what 584 is.

10           MS. BRANNON:  584 we just marked today.  I

11  provided copies to the government, to special counsel--

12  or to the Special Master and to the Court.  It just was

13  not on our original master list.

14           THE COURT:  All right.  If there's no

15  objection, then I'll admit 582, 583, 584, 606, 617, 639,

16  and 641.

17           MS. BRANNON:  Thank you, Your Honor.

18                  CROSS EXAMINATION

19  BY MS. BRANNON:

20     Q.  Good afternoon, Ms. Tomasic.

21     A.  Good afternoon.

22     Q.  Before you testified today, did you review

23  anything in preparation?

24     A.  I reviewed my most recent OPR timeline and-- that

25  had most of the facts of the case in it, and I think

1  that's it.  I didn't review any transcripts.

2      Q.  All right.

3      A.  And I didn't review any pleadings.

4      Q.  Did you review any e-mails?

5      A.  Maybe one or two.

6      Q.  Okay.  During the course of this investigation,

7  did you provide a-- a set of e-mails to the Special

8  Master?

9      A.  I did.

10     Q.  Did you keep a set for yourself?

11     A.  I did.

12     Q.  Did you review those e-mails in preparation?

13     A.  I did not.

14     Q.  Okay.

15     A.  I-- I've been subpoenaed so many times, this time

16  I just figured let's see what stuck in there because...

17     Q.  Understood.  Did you review any exhibits that

18  have been admitted?

19     A.  I did.  You gave some exhibits to my lawyers.  I

20  just looked at those.

21     Q.  Right.

22     A.  And I reviewed some exhibits yesterday I think.

23  Yes.

24     Q.  Do you know what exhibits those were?

25     A.  They were exhibits that were admitted through me

1  last time I think.

2      Q.  Since you testified last time, you understand

3  that you've been under sequestration; is that right?

4      A.  That's correct.

5      Q.  Have you had communication with anyone from the

6  U.S. Attorney's Office since that time?

7      A.  I believe Rich Hathaway called me just to be

8  nice, though.  We weren't-- I think I did tell him what

9  happened from my end with the going up to the chambers

10  issue, but he didn't relay any information to me.

11      And I think that's it as far as-- now, I've

12  talked to other people before the hearing, but after the

13  hearing I just made a decision not to.

14      Q.  When you've been reviewing or looking at I think

15  dates while you've been on the stand, are you looking at

16  that timeline with the OPR that you talked about?

17      A.  I looked at that last night a couple times, and

18  then I just put a few dates that I wrote down like when

19  I-- because I get the years mixed up, when I started,

20  when I went on maternity leave, when I came back, what

21  my new position was, when the *Black* indictment was, when

22  I was removed from *Black*, and when I was fired, and what

23  it-- what month it is now.

24      Q.  All right.  Is that all the data that you have

25  with you on the stand?

 1      A.   That is.

 2      Q.   And what was your last day in the office?  Was it

 3   May 10th?

 4      A.   I don't know the exact day, but that-- I think

 5   that was the day I met with Scott, so maybe it was a few

 6   days after that, but I don't know.  Somewhere between

 7   May 10th and May 15th I would think.

 8      Q.   In the last hearing the Special Master talked

 9   about a 28-page OPR complaint I believe.  Do you

10   remember that?

11      A.   I do.

12      Q.   Is that the same thing that you reviewed?

13      A.   No.  The one that he-- the Special Master

14   admitted was my first one, which only dealt with going

15   up to chambers.  My second one has not been admitted as

16   far as I know, and that was much more lengthy and it

17   included an accusation by-- some accusations by Sheri

18   Catania and then also some accusations by Kim Flannigan.

19      Q.   So was it like a joint complaint?

20      A.   It was.

21      Q.   All right.  Do you have that with you today?

22      A.   I do.

23           MS. BRANNON:  Your Honor, because she

24   reviewed it in preparation for her testimony, we'd ask

25   for an opportunity to review that document.

 1            MR. CLYMER:  Your Honor, the government

 2    objects to that.

 3            THE COURT:  I think it's covered by the

 4    Privacy Act, so I'll sustain the objection.

 5    BY MS. BRANNON:

 6      Q.  Had you provided that OPR complaint to anyone

 7    else, like the Special Master?

 8      A.  Yes.

 9      Q.  Not just the first one, but the second one you're

10    talking about?

11      A.  Yes.

12      Q.  Anyone else?

13      A.  Not that-- not that I know of, no.

14      Q.  All right.  A couple of times you mentioned

15    things that you-- that have happened I believe after you

16    left the U.S. Attorney's Office.  And one example is

17    that you know that Dave Zabel denies knowing about the

18    Juan Herrera-Zamora recordings.  How did you find that

19    information out?

20      A.  Well, after I talked with Scott Rask-- and I'd

21    have to know the exact date that I talked to him, there

22    were about three or four more days while I continued to

23    work in the office, and Dave and I collectively were

24    going back through everything trying to figure out

25    exactly what happened so Scott would have all the facts.

1  And we tried to speak with Scott on the day I was fired,

2  both of us together, and he refused.

3       And I know from that that-- and from my

4  conversation with Dave beforehand, before I met with

5  Scott, that he denies remembering-- knowing that I

6  listened to calls.

7       Now, I also talked to Dave in the summer of 2017

8  and we discussed that issue again.  I called him right

9  after I wrote my letter to Judge Robinson, so we've

10 talked a few times after I left.

11    Q.  Let's talk for a minute about when you first came

12 to the U.S. Attorney's Office in 2013.  What had you

13 done before that as a lawyer?

14    A.  I was a law clerk for collectively about a

15 year-and-a-half, give or take a few months.  And that's

16 it.

17    Q.  All right.  So you went straight from being a law

18 clerk to the U.S. Attorney's Office?

19    A.  I did.

20    Q.  As a SAUSA?

21    A.  Yes.

22    Q.  All right.  When you interned in the U.S.

23 Attorney's Office, who was your supervisor?

24    A.  Leon Patton.

25    Q.  Was that just like a summer internship?

1    A.  I think it was a year-- it was a year-long

2  academic internship from August until May.

3    Q.  Let's talk about just the process of requesting

4  phone calls from CCA.  All right?

5    A.  Okay.

6    Q.  Who was it that taught you how to do that?

7    A.  Sheri Catania.  She-- looking back through what

8  you gave me, I realize I initially was asking for them I

9  think with a subpoena, and I don't know who taught me

10  how to do that.  But then Sheri Catania provided me with

11  a form, and she said she'd received it from the

12  marshals, and I started using the form.

13    Q.  Okay.  And for the record, I asked you to look at

14  Exhibit 606 over the lunch hour, which was a series of

15  requests for phone calls to CCA; is that right?

16    A.  That's right.

17    Q.  Okay.  There were times that you used the USMS

18  form that you talked about.  There were times that you

19  also used a grand jury subpoena?

20    A.  Yes.

21    Q.  There were times that you used a regular

22  subpoena, like a trial or a hearing subpoena?

23    A.  I didn't look carefully at the difference.  At

24  the beginning I probably just didn't know what I was

25  doing and I was asking legal assistants to help me, and

1   that would explain what-- how the earlier-on phone calls

2   were done by subpoena.

3        And then as a general trend, I would say I

4   started using the marshal's form.  And then at the end

5   of my time at the U.S. Attorney's Office, CCA started

6   demanding subpoenas in lieu of the form, so I switched

7   back to subpoenas.

8        Q.   There were times also that you just contacted CCA

9   directly by phone to request calls; is that right?

10       A.   Probably, yes.  And there would be times that

11   agents-- I can think of many instances in which agents

12   just reached out to the marshals or CCA directly and--

13   to get their own phone calls.

14       Q.   Just a phone call, "Could you download these

15   calls and get them to me," something like that?

16       A.   I wasn't privy to the conversations.  I just know

17   some of the more experienced agents who had been doing

18   it a lot longer than me said, don't worry about it, I'll

19   get them, and I said okay.

20       Q.   And in that case you would not have a paper trail

21   of how you obtained those calls.  Right?

22       A.   That's correct.

23       Q.   And if you had picked up the phone and called CCA

24   directly and asked for them to give you calls, you would

25   not necessarily have a paper trail of those requests?

1       A.   That's correct.

2       Q.   When you did use a subpoena or a USMS form, did

3    you keep those in your file?

4       A.   I can't say that I did 100 percent of the time.

5    I mean, you have a lot of them, and that seems like I

6    must have.  I didn't think I-- it was something that had

7    to be in the file.  I probably just did it out of habit.

8       Q.   There wasn't an office protocol about you have to

9    do it a certain way?

10      A.   There was not an office protocol on anything

11   about how to handle jail calls.

12      Q.   All right.  There were times that you also had to

13   sign, for example, a receipt of calls.  Do you remember

14   seeing something like that?

15      A.   I did, and that started later.  And the reason

16   for it was explained to me.  I think it had something to

17   do with Branden Bell, but I'm not sure what the history

18   was there.

19      Q.   All right.  If I'm going back to look at a file

20   of yours to find a record of requested phone calls, what

21   would I be looking for, other than the forms that you've

22   looked at?

23      A.   E-mails.

24      Q.   Okay.

25      A.   And that would be it, I would think.  I mean, you

1    might also-- if you looked in the discovery folder, you

2    would see jail calls.

3        Q.   You testified that you had some training about

4    whether jail calls had to be produced in Rule 16

5    discovery.  Right?

6        A.   Yes.

7        Q.   Was that fairly early on after you arrived at the

8    office?

9        A.   That was March 2017, two months before I was

10   fired.  And I went to that training at the request of

11   the Western District of Missouri.  It was basic

12   discovery training.

13       Q.   The first time you had had anything like that?

14       A.   Yes.  And I never had grand jury training.  I was

15   supposed to go to that in June of 2017, again at Western

16   District of Missouri's request, but I didn't go.

17       Q.   Before that training, did you usually produce

18   phone calls in discovery?

19       A.   I would think so, yes.  I-- it would depend--

20   like if I ordered them, oftentimes I would.  And then if

21   the agent got them, he would produce it to me as part of

22   his packet.  But there are-- I can't say with certainty

23   there aren't instances where the phone calls weren't

24   thought fruitful or weren't thought relevant or for

25   whatever reason weren't turned over.

1    Q.   You didn't have a standard protocol that you had

2  about if I got phone calls, every time I would turn them

3  over in discovery?

4    A.   That is true.

5    Q.   And once you had that training, did you change

6  your practice?

7    A.   I only had about six weeks left.  I had-- I

8  advocated for that practice--

9    Q.   Uh-huh.

10   A.   -- with others in the office, but there was

11 pushback.

12   Q.   And so what did you do?

13   A.   Well, I don't know that I got any more jail calls

14 after that point, but there were some jail calls that

15 had not been sent out.  And as a result of me bringing

16 it to my supervisor's attention and also Dave Zabel's

17 attention, we had a heated argument about it.  I

18 explained what I had learned.  They both disagreed.  And

19 ultimately, as a result, the phone calls went out in

20 *Herrera-Zamora*.

21   Q.   You said Dave Zabel and who?

22   A.   Scott Rask.

23   Q.   So from those conversations, did you understand

24 that they did not have the practice of sending phone

25 calls out in discovery?

1     A.   I wouldn't make that reach.   What I-- I sent Dave

2    Zabel an e-mail stating I just learned at the NAC that--

3    that inmate calls are Rule 16 statements of the

4    defendant.   Have you turned over the jail calls in

5    *Herrera-Zamora*?   He did not respond to that e-mail.

6          So the next day I went to him, and Tris Hunt was

7    also in the office.   So it was me, Tris Hunt and Dave

8    Zabel.   I asked him if he agreed with that, I thought

9    that was the practice.   And, in fact, some people on the

10   panel had-- at the NAC had also said, even if you as a

11   prosecutor hadn't ordered the jail calls, it's the

12   obligation of the government to provide them because

13   you're contracting with the prison, so it's technically

14   a government actor.   So you either have to write a

15   letter to the defense attorney and say, hey, these calls

16   are available, or you might have to get them.

17         So we went through all this.   Dave was adamant

18   that they were not Rule 16 statements of the defendant

19   and we had no obligation to turn them over.

20    Q.   Was that even after Mr. Moran had filed a motion

21   for a new trial?

22    A.   It's around the same time.   So it's March.   And I

23   don't know, again, I don't have the benefit of having

24   access to this information, but it's within two weeks of

25   each other.

 1    Q.  So the issue of the phone calls in *Herrera-Zamora*

 2  was on the table, so to speak, when Dave Zabel was

 3  resisting turning those phone calls over to Mr. Moran?

 4    A.  I believe so.  If not, it would've been on the

 5  table within the next few days.

 6    Q.  All right.

 7    A.  And--

 8    Q.  Uh-huh.

 9    A.  -- and then, as a result of that, Scott asked who

10  taught the course.  I told him who had taught the

11  course.  Scott did not have a good impression of him.

12  And then he said, well, given everything that's going

13  on, you need to e-mail-- talking to Dave, you need to

14  e-mail the SLC, the senior litigation counsel, who was

15  Tanya Treadway, and get her guidance on whether these

16  phone calls need to be turned over.

17        So as a result, Dave sent a lengthy e-mail

18  advocating why the phone calls do not need to be turned

19  over.  And then we had a private conversation.  He was

20  very angry at me for having brought it up in front of

21  Scott, and he said, now that it's in writing, it's going

22  to have to be done because there's no way now that we

23  put it in an e-mail Tanya is going to say no, because

24  there was a big difference in the office and everyone

25  knew it.

1          Not everyone.  I will never put everyone in the

2     same basket because there are different people in the

3     office.  But some people in the office had the position

4     that if you didn't want anybody to know about it, don't

5     put it in writing.  And like, for example, Deb sending

6     Scott to tell me not to cooperate, that's because they

7     didn't want an e-mail to exist.

8          Q.  So the resistance to turning the phone calls over

9     in *Herrera-Zamora*, was that because it contained

10    attorney-client calls?

11         A.  I can't speak for his motivation.  I think

12    probably yes, because there was so much going on.  And--

13    and me personally, I wasn't looking forward to that

14    battle in *Herrera-Zamora*, but, you know, it was what it

15    was.

16         Q.  Okay.  Well, we'll talk about *Herrera-Zamora* more

17    in just a minute.  Let's-- let's talk a little bit more

18    about the phone calls.  Just as a matter of routine, you

19    said you didn't usually listen to them yourself?

20         A.  I did not.

21         Q.  You had agents listen to them?

22         A.  Yes.

23         Q.  And when the agents listened to them, would they

24    write a report for you?

25         A.  It depended on the agency.  Some did and some

 1    didn't.

 2        Q.   Would they send an e-mail to you?

 3        A.   Summarizing the phone calls?

 4        Q.   Uh-huh.

 5        A.   Again, I wouldn't give a blanket rule.  I think

 6    that did happen on occasion.  But I know, for example,

 7    KBI wrote reports.  Most agencies I think wrote reports.

 8        Q.   Were there times that phone calls were obtained,

 9    reviewed by an agent, and they didn't write a report,

10    maybe just told you what they heard?

11        A.   I believe that happened, yes.

12        Q.   Okay.  Did it happen often?

13        A.   I think-- I don't-- I don't know.  I wouldn't

14    know if I would characterize it as often.

15        Q.   You knew when you requested phone calls from CCA

16    that there was a chance you would get recorded

17    attorney-client calls; is that right?

18        A.   After what happened in *Birdsong* and Rapp's case,

19    yes, I did know that.

20        Q.   Let's talk about Jerome Birdsong for just a

21    minute.  And just to back up, during the *Black*

22    litigation, you talked about getting phone calls in the

23    *Rapp* case.  And as I understand it, you told the Court

24    that that was the first time that it ever happened to

25    you.

1      A.   That would be incorrect, because I also had

2   gotten them in Jerome Birdsong's case.

3      Q.   Okay.

4      A.   And I don't know, I don't think that I was

5   intentionally being misleading.  It just was a different

6   jail a long time ago.

7      Q.   Sure.  I just wanted to find out when you

8   presented the *Rapp* case, was there something that

9   brought *Birdsong* to mind?

10     A.   Since that time?

11     Q.   Yes.

12     A.   I have scoured my mind for information trying to

13   get organized.  So, yes, I've put a lot of effort into

14   it.

15     Q.   All right.

16          MS. BRANNON:  If we could look at 582,

17   please, Branden.

18   BY MS. BRANNON:

19     Q.   When you were scouring your mind and looking for

20   things, did you find any correspondence like this which

21   you see on the screen?

22     A.   I haven't seen that.  Oh, September 25th, 2018?

23          MS. BRANNON:  Let me put this on the record

24   if I can.  A number of documents were provided to us,

25   Your Honor, that were in Word format from the

1    government.  When it is in Word format and we open it,

2    it changes the date.  And so there are some documents

3    that have the wrong date.

4                And this one, if we could scroll to the

5    second page, we actually have the document properties.

6    I think, if we could blow that up just a little bit.

7    BY MS. BRANNON:

8        Q.  E. Tomasic, that would've been you.  Right?

9        A.  Yes.

10       Q.  Authored?

11       A.  Yes.

12       Q.  And the date is there?

13       A.  Yes.

14       Q.  Last 10-1-2013?

15       A.  Yes.

16       Q.  Did you come across that document at all when you

17   were looking through anything?

18       A.  Not that I recall.

19       Q.  Do you recognize that document?

20       A.  Could you go back?  I know I wrote it because I

21   saw my name at the bottom, but...

22       Q.  Sure.

23       A.  Yes, I wrote that.

24       Q.  And can you tell us why you wrote it?

25       A.  I believe my supervisor at the time told me to.

1    Q.   And was that Mike Warner?

2    A.   Yes, it was.

3    Q.   Was this in October of 2013?

4    A.   I have no independent recollection of it, but

5    based on what you just showed me, yes, I believe it was.

6    Q.   And again for the record, this is an incomplete

7    letter.  But the purpose of this letter was what, if you

8    remember?

9    A.   To notify her that Agent Greeno had listened to a

10   portion of an audio-recording.  And it actually wasn't a

11   jail call now that I think about it, it was where you

12   can walk up and have face-to-face meetings.  And the

13   attorney went to the friends and family line instead of

14   the separate attorney line, and so it was recorded.  But

15   had she walked to a separate booth that was marked for

16   attorneys only, then it would not have been recorded.

17   Q.   And that attorney is Rebecca Hamilton?

18   A.   Yes.

19   Q.   And so when Pat Greeno came across this call, he

20   notified you?

21   A.   Yes.

22   Q.   And who's Pat Greeno?

23   A.   He is now retired.  He is a detective with the

24   KCK PD, and he also was a task force officer with ATF.

25   Q.   You say in this letter to Ms. Hamilton that your

1   office takes this matter very seriously.

2      A.   Yes.

3      Q.   And you're talking about the recording of an

4   attorney-client call that you came into possession of;

5   is that right?

6      A.   Yes.

7      Q.   In this particular case, do you remember if there

8   was a preamble on that call?

9      A.   I have no memory.

10      Q.   There's nothing in the letter-- this part of the

11   letter that references anything about that?

12      A.   No.

13      Q.   Was there a struggle in this case, if you

14   remember, over whether Ms. Hamilton had waived

15   attorney-client privilege by going to the wrong phone?

16      A.   No.   There was no interest whatsoever in

17   listening to the call, using the call for any purpose.

18   This was my first encounter with it, and this is the

19   instance where I sought guidance from Dave Smith and

20   then he told me to go to Mike Warner.

21      Q.   And what did Mike Warner tell you to do?

22      A.   I don't recall in detail, but I know the end

23   result was-- I didn't even recall writing the letter

24   honestly, but I knew we met with her face-to-face.  Mike

25   Warner and I did.

1    Q.   For the purpose of telling her that you had

2    obtained these calls?

3    A.   I think, and also explaining what was going on.

4    She was concerned because her client-- this occurred

5    during the investigative stage, and her client didn't

6    even know that there was an investigation going on.  So

7    she wanted a little more information about that, but

8    also just to follow up on the phone calls.

9    Q.   Sure.  And if we could look at 583, please.

10   Maybe blow it up just a little bit.  There we go.  I'll

11   give you a second to read through that.

12        So in this particular instance you contacted

13   PRAO?

14   A.   It looks like I did.  Is that part removed, it

15   looks like?

16   Q.   Right.  All I have is this part of the e-mail.

17   A.   Okay.  Okay.  I see I'm discussing a taint

18   attorney.  I guess I knew what it was back in 2013.

19   Q.   Well, maybe because Mike Warner talked to you

20   about it?

21   A.   I think so.  I think I talked with him and I

22   talked with Dave Smith, yeah.

23   Q.   So in this particular case when you came across

24   an attorney-client call, you notified the attorney, you

25   talked about giving it to a filter team or a taint team

1   to review, and you had no intention of actually

2   listening to it or using that; is that right?

3        A.   That's correct.  Well, I don't know what

4   recording we would've been listening to because we

5   didn't intend to use that call.  So if I'm referring to

6   other calls, then I suppose we would like to continue

7   listening to other calls, but I know we didn't intend to

8   use the attorney-client call for any purpose.

9        Q.   And so at least for Mr. Warner, who was your

10  supervisor at the time, this is how you learned to

11  handle that particular situation?

12       A.   That is true.

13       Q.   And did you have any other training on how to

14  handle a situation like this?

15       A.   Not that I recall.

16       Q.   You came into possession later on of other

17  attorney-client calls.  I think you mentioned Greg

18  Rapp's case.

19       A.   Yes.

20       Q.   And in that case had you been given different

21  advice from anyone in the attorney [sic] about how to

22  handle those calls?

23       A.   Not prior to the advice.  But after the advice,

24  yes.

25       Q.   And by "after the advice," what do you mean?

 1      A.   I went and discussed the advice I had received

 2  with several people at the lunch table, and that's when

 3  I got different advice.

 4      Q.   And when you're talking about advice, in Mr.

 5  Rapp's case you also contacted PRAO; is that right?

 6      A.   Yes, I did every-- every time.

 7      Q.   Okay.  You did that through Lanny Welch?

 8      A.   Yes.

 9      Q.   Let me ask you, why did you do it every time?

10      A.   PRAO's guidance is:  Don't ever assume two cases

11  are the same, send in every time.  And you want that

12  letter for your file, so...

13      Q.   So every time you came across any attorney-client

14  call, you contacted PRAO?

15      A.   Every time you have anything that is questionable

16  come up, e-mail PRAO, and that's what the guidance was.

17  And even if it's the same issue, e-mail PRAO.

18      Q.   You thought something had changed from the advice

19  that you had gotten the first time and the second?

20      A.   I didn't.

21      Q.   Okay.

22      A.   You just have to have that letter particular to

23  that case for that file.  That's what I was told, and I

24  don't even remember by who.

25      Q.   So if you had come across just an attorney-client

1  call, you don't intend to use it, you might produce it

2  in Rule 16 discovery, you still-- your understanding is

3  you still have to contact PRAO?

4      A.  No one said to me if you get an attorney-client

5  call you have to contact PRAO, except perhaps Mike

6  Warner did early on.

7      Q.  Uh-huh.

8      A.  You have to contact PRAO as a prosecutor in our

9  office if something questionable-- that you deem

10  questionable comes up.  And just because you've had the

11  same issue come up before, when you get to the next case

12  you still have to e-mail PRAO specific to that case.

13      Q.  Let's look at Exhibit 641.  And I think scroll

14  down since this is an e-mail chain.  Do you recognize

15  this?

16      A.  Yes.

17      Q.  Okay.  So this is a situation where Jeff Stokes

18  came across two or three attorney-client calls.  Right?

19      A.  Yes.

20      Q.  Brought them to your attention?

21      A.  Yes.

22      Q.  And you contacted Lanny?

23      A.  Yes.

24      Q.  And why did you contact Lanny?

25      A.  For the same reason I just explained, that I felt

1  like the phone calls were a gray area, were a

2  potentially sticky issue, so I...

3    Q.  I'm sorry.  Did he have a special role in your

4  office that you contacted him?

5    A.  He's called the PRO, the professional

6  responsibility officer.  So in every district there's a

7  civil PRO and a criminal PRO.  And I couldn't contact

8  PRAO directly, I have to e-mail my criminal PRO and then

9  he has to forward it with whatever-- if he might want to

10  add some information to PRAO, just so they're not

11  inundated I think with e-mails, and also for sort of--

12  so there's someone in each district who knows what's

13  going on.

14    Q.  When you first contacted Mr. Welch, did you

15  remember his reaction being that he did not think those

16  calls were privileged, despite the preamble?

17    A.  I don't-- I don't recall what his reaction was.

18  And I don't even know that I called him, perhaps I did.

19  I think it would've probably been by e-mail, but

20  sometimes maybe a phone call too.

21    Q.  So if you look at the screen right now, does that

22  look like the e-mail you would've sent him in this

23  particular case?

24    A.  Yes.

25    Q.  And your primary concern was whether Agent Stokes

1    would be disqualified from the case?

2        A.   Right.

3        Q.   And was it secondary whether you should have

4    these calls at all?

5        A.   I don't think that I got that far.  I don't think

6    that I contemplated whether I should have them at all.

7    I think the issue was because he had listened-- in my

8    mind, because he had listened, should he be removed from

9    the case?  And that's just how I framed it in my mind.

10       Q.   At that point is it fair to say from your

11   experience in that office, in talking to other people in

12   the office, you believed that if you received an

13   attorney-client call, a recorded attorney-client call,

14   and it had that preamble on it, then the privilege was

15   waived?

16       A.   Yes.

17       Q.   Period?

18       A.   Period.  And I know that I relied on other people

19   saying it, but I know I also did my own research and I

20   felt comfortable that they were right.

21       Q.   Okay.  Tell me about that research.

22       A.   I don't remember exactly what cases I looked up,

23   but I know-- I think I saw a *U.S. v. Eye*, which was one

24   of the Western District cases, and I think maybe-- I

25   don't want to elaborate beyond that because I don't

1   remember what cases I knew at that point, but I knew I

2   had done some research.  But I also knew I had talked to

3   other people about whether the privilege was waived, and

4   no one even remotely suggested that it wasn't.

5       Q.   So that was the viewpoint of your office, that if

6   you get a recorded attorney call and it has a preamble,

7   privilege is waived?

8       A.   Yes.

9       Q.   And that is fair game, that call?

10      A.   I don't know that I would take that last step.  I

11  don't think that I-- at the time this is going on with--

12  with Greg Rapp's calls, I hadn't made that next leap

13  because I hadn't had a conversation like that yet, to my

14  memory.

15      Q.   All right.  When you say that this was the office

16  view and you've talked to other people in the office,

17  tell us who.

18      A.   I've tried to remember who I talked to and who I

19  didn't.  All of these conversations, except for the one

20  with Chris Oakley that I can recall, took place in the

21  lunchroom.  And I can tell you who usually eats lunch

22  there, but I can't tell you who was there on that

23  particular date, except I do recall Dave Smith giving me

24  advice because whoever the other two people were in the

25  room when Dave Smith gave me the advice, they just

1   looked at me, and they packed up their stuff and walked

2   away and didn't answer.

3        And it was sort of awkward.  Like Dave was, like,

4   well, I guess I'll help her because-- you know.

5   Q.   Was that before *Birdsong* or was it before *Rapp*?

6   A.   That was *Birdsong*.

7   Q.   So before *Birdsong* you're talking to people and

8   trying to get advice on what to do?

9   A.   Yes, 2000--

10  Q.   Dave Smith told you that he had had similar

11  experiences?

12  A.   Yes.

13  Q.   And this is how he handled it, he believed that

14  the privilege was waived because of the preamble?

15  A.   Yes.

16  Q.   Okay.  Do you remember anybody else who told you

17  that that was the correct conclusion?

18  A.   That the privilege was waived?

19  Q.   Yes.

20  A.   I think-- as far as that being the law-- and I

21  can't tell you if I remember this conversation before or

22  after the *Black* litigation, but every single person on

23  the criminal side who I would've talked to, who would've

24  been Tris, possibly Leon, Dave Zabel for sure because I

25  know that the privilege issue came up in *Herrera-Zamora*.

1    Trent I wouldn't have talked to.  Kim, Sheri.  Chris

2    Oakley I know I talked to about a privilege issue.  And

3    Scott.

4        Q.   Terra Morehead?

5        A.   And Terra Morehead, yes.

6        Q.   Okay.  Anybody else you can remember?

7        A.   I don't think I would've talked to Jabari about

8    it or Carrie Capwell about it, but I may have talked to

9    Carrie about it after the *Black* litigation arose and we

10   were working on a pleading, but I do remember...

11       Q.   All right.  Let's scroll up because I think we

12   actually have part of the e-mail from PRAO on this

13   exhibit.  Go up a little bit further.  Or is that the

14   top of that one?  All right.  So I think if we go up

15   just a little bit further.  Do you remember getting the

16   actual PRAO e-mail?

17       A.   I do.

18       Q.   Okay.  And is that usually how you'd get a

19   response from PRAO is by e-mail?

20       A.   Yes.

21       Q.   All right.  So in that case-- that's an e-mail to

22   you from Lanny copying Kim Martin, who is Kim Flannigan.

23   Right?

24       A.   Uh-huh.

25       Q.   Suggesting that the inmate may have waived the

1  privilege.  Right?

2      A.  Uh-huh.

3      Q.  "Likely not privileged."  "If the inmate is

4  notified there is-- that it is a recorded line, they are

5  likely not privileged."  Correct?

6      A.  Yes.

7      Q.  Did this comport with the research that you

8  remember doing?

9      A.  I don't remember *Bump*, but I do remember *Hatcher*.

10     Q.  In fact, there's no Tenth Circuit law on this

11 particular point that either Lanny or PRAO gave you that

12 day.  Correct?

13     A.  Is this it, as far as what Lanny gave me right

14 here?

15     Q.  Give us a minute while we look for it.  In the

16 course of this talking about whether a privilege was

17 waived based on the preamble, what was the preamble at

18 CCA?

19     A.  I don't know if I can remember it now, I used to

20 know it.  I remember it says, "You may start your

21 conversation now," but I don't remember the beginning.

22 It says, "This call is subject to recording and

23 monitoring."  And then it says, "You may start your

24 conversation now," but there's something about Securus

25 at the beginning.  It's the same tone over and over and

 1  over again.

 2      Q.  In your research did it matter what the preamble

 3  actually said?

 4      A.  Yes.  If it says "may," then that is not-- that

 5  weighs against waiver.

 6      Q.  Right.  Uh-huh.

 7      A.  But if it says, "This call is subject to

 8  recording and monitoring," then it is stronger.  I

 9  didn't find any cases where it says, "This call is

10  subject to recording and monitoring" where the Court did

11  not find privilege was waived in my own research.  I

12  remember that.

13          MS. BRANNON:  May I approach the witness,

14  Your Honor?

15          THE COURT:  Yes.

16  BY MS. BRANNON:

17      Q.  I'm going to give you this to ask if it refreshes

18  your recollection on what the preamble was on the calls

19  from CCA.  The right-hand column.

20      A.  If this is what it says, then I don't have any

21  doubt that this is what it sounds like.  But I don't

22  remember that line.

23      Q.  All right.  So that doesn't refresh your

24  recollection about whether the preamble says, "This call

25  may be recorded"?

1    A.   I remember during the *Black* litigation seeing the

2    preamble that was documented somewhere and thinking,

3    okay, we're on solid footing because it didn't say

4    "may," but...

5    Q.   But that would make a difference in your

6    research?

7    A.   There was one case that suggested that if it says

8    "may," that it does weigh against finding the phone

9    call-- the privilege was waived.

10   Q.   Because it's not directly telling the person

11   making the call that this called is recorded?

12   A.   I don't remember, but that makes sense to me that

13   that is what the gist of the case law is.

14   Q.   And it says only that it's subject to monitoring;

15   is that correct?

16   A.   Yes.

17   Q.   Okay.  You actually listened to the preamble in

18   *Juan Herrera-Zamora*; is that right?

19   A.   I don't know-- I don't know how many phone calls

20   there were in *Juan Herrera-Zamora*, but I do recall

21   listening to the preamble in some, yes.

22   Q.   But you don't remember what that preamble

23   actually said?

24   A.   No.

25   Q.   Okay.  Let's talk about a few other things that

1   might matter in a determination of whether the privilege

2   is waived.  Did you know how the privatization process

3   worked at CCA?

4       A.  I did not know that it was unit specific as I

5   have learned.  I guess I thought that if an attorney

6   sent a letter in or sent notice somehow-- I didn't even

7   know it had to be a letter, saying that they were an

8   attorney and their number was privatized.  I didn't know

9   if it was particular to each client or if it was

10  forever, but I knew that's how the process worked.

11      Q.  You understood the process to work-- if I'm an

12  attorney and I want to privatize my number, what was

13  your understanding at the time, before August of 2016,

14  how that worked?

15      A.  That you just had to contact CCA and your number

16  would get privatized.

17      Q.  And how did you know that?

18      A.  I don't know if I knew it-- from someone at CCA I

19  think.  I'm not sure though.

20      Q.  Did you call CCA and say, tell me what your

21  privatization process is?

22      A.  I think so.

23      Q.  When was that?

24      A.  I think it was when I was trying to get-- and I

25  don't know for certain that I did it, first of all, but

1    I think I did it when I was trying to get the phone

2    calls for *Herrera-Zamora*.

3        Q.   And when-- because you wanted to find out if

4    Carlos Moran had privatized his number?

5        A.   Uh-huh.

6        Q.   And did you find out whether he had privatized

7    his number?

8        A.   When we ordered the calls and we got them, we

9    knew he must not have.

10       Q.   That's the first time?

11       A.   Yes.

12       Q.   Okay.  When you called CCA or who-- whoever gave

13   you this information about how to privatize a number,

14   they didn't explain that there were different ways to

15   privatize?

16       A.   No.

17       Q.   And do you know whether an attorney would know

18   that there are different levels or site levels of

19   privatization?

20       A.   Not unless they asked someone at CCA.

21       Q.   Did you do any research into what CCA published,

22   for example, about how to privatize calls?

23       A.   Like their inmate handbook and things like that?

24       Q.   Let's start with the inmate handbook.  Did you

25   ever read the inmate handbook?

1    A.   I didn't know any of that before this litigation

2  arose.

3    Q.   All right.  So as part of your research in

4  determining that a call-- a recorded call to an attorney

5  that has a preamble privilege is waived, did you do any

6  investigation into what the inmates are told?

7    A.   I did not do any investigation as far as CCA

8  goes.  I only got on Westlaw and looked at cases and

9  talked to the people I worked with.

10   Q.   Do you know whether that-- the attorney who is

11 receiving the call hears the preamble?

12   A.   Yes, I think so.

13   Q.   How do you know that?

14   A.   Because it plays-- it's part of-- it rings.

15   Q.   Uh-huh.

16   A.   And then it plays.  So once it's connected.

17   Q.   Once it's connected.  If the attorney, for

18 example, isn't answering the phone, it's the front desk

19 that's answering the phone, in a particular case do you

20 know if the attorney who's receiving that call hears the

21 preamble?

22   A.   I do not know.

23   Q.   Would that matter in your research?

24   A.   I-- I won't make a legal conclusion.  It seems

25 important though.

1    Q.   And do you know whether the inmate who's making

2   the call hears the preamble?

3    A.   I would assume so, because he's holding the phone

4   up, dials the number, waits for it to connect, then the

5   preamble plays, then he starts talking.

6    Q.   Do you know that that's the case and that's how

7   it works?

8    A.   Well, you hear the ringing and then you hear it

9   connect and then you hear the preamble.  So I assumed

10  that's how it works, but I don't know for a fact.

11   Q.   All right.  Did you ever hear the preamble in

12  Spanish?

13   A.   Yes, if it's a Spanish call-- well, and I even

14  heard it on English calls in some instances because if

15  someone is using-- I guess, I'm assuming, when you

16  assign-- fill out your account, you pick whether you

17  want Spanish or English.  Because sometimes English

18  speakers would use Spanish-speaking inmates' PINs, and

19  then the preamble would be in Spanish and then the

20  speaking would be in English.

21   Q.   Do you think the preamble changed at CCA over the

22  years that you were listening to calls?

23   A.   I have no idea.

24   Q.   In any particular case where you were trying to--

25  where you were obtaining recorded calls, did you ever

1  look to see if the inmate had signed an acknowledgement
2  that calls were recorded?
3      A.  I did not.
4      Q.  Did you ever contact an attorney to ask them if
5  they had privatized a number, other than in *Greg Rapp*?
6      A.  I did not.
7      Q.  Did you ever call CCA and ask them if a number
8  had been privatized before obtaining recorded calls?
9      A.  I may have done that in Mr. Moran's case, but
10 that would-- in Herrera-Zamora's case, but that's the
11 only one I know.
12     Q.  Did you ever cause a number to be privatized?
13     A.  No, I did not.  Not that I know of.
14     Q.  Okay.  Would you ever cause a number to be
15 deprivatized?
16     A.  No.
17     Q.  Did you ever check to see in a particular case if
18 the inmate had asked for his calls not to be recorded?
19     A.  I did not.
20     Q.  Did you ever check into the efficacy of the
21 privatization at CCA?
22     A.  I did not.
23     Q.  Did you ever check to see if there was a lag time
24 between requesting a number to be privatized and the
25 actual privatization?

 1    A.  I did not.

 2    Q.  Do you know how the privatization protocol

 3  actually worked in terms of when CCA got the request to

 4  privatize the number, what did they do?

 5    A.  I did not.

 6    Q.  Before August of 2016, did you know what signs

 7  were posted in the pods next to the phones?

 8    A.  I did not.  Well, I probably didn't pay attention

 9  to it, but I did go into a pod back in April.

10    Q.  April of 2016?

11    A.  2016.

12    Q.  You were at CCA when the search warrant was

13  executed?

14    A.  Chris Oakley and I were.

15    Q.  So you went into the pods?

16    A.  Just one.

17    Q.  Okay.  And you weren't paying attention to the

18  signs?

19    A.  I don't think I was, no.

20    Q.  Did you also go into the attorney-client rooms?

21    A.  As it turns out, I was in an interview in one,

22  but it wasn't designated as an attorney-client room.

23    Q.  Did you notice that there was a camera in there

24  at that time?

25    A.  I don't recall noticing that at all.  We brought

1   our own camera.  And I think I went in there-- by the

2   time I went in there, it was 2:00 or 3:00 in the

3   morning.

4      Q.  When you received sets of recorded calls from

5   CCA, you received usually a CD; is that right?

6      A.  A disk, yes.

7      Q.  And also a paper log of the calls?

8      A.  That's correct.

9      Q.  Before listening to any calls or asking anyone to

10  listen to calls, did you look at that log to see if any

11  numbers called were, in fact, an attorney?

12     A.  I did not.

13     Q.  In talking with anyone in your office about this

14  - we'll call it a presumption of waiver - do you know if

15  anybody in your office had ever done any of these

16  things?

17     A.  I do not.

18     Q.  Do you remember after this particular litigation

19  started an e-mail from Kim Flannigan saying, we need to

20  investigate this and find out how it works?

21     A.  I don't recall an e-mail, but I know Chris Oakley

22  and I undertook to figure it out.

23     Q.  After we started filing these motions, the

24  41(g)s?

25     A.  That's correct.  And I want to correct one point.

1      Q.   Sure.

2      A.   I don't know when I read the case, I'd have to

3   see what the case was and probably look at my Westlaw

4   history to see when the case was that I looked up where

5   "may" makes a difference, "may record" versus "record,"

6   because I know I did a fairly comparatively perfunctory

7   search back when the Greg Rapp calls came in, and I

8   actually wrote a portion of the response that's in the

9   *Black* case that includes a lot more case law about the

10  phone calls.

11       And so it may be that I came across that case at

12  a later time once this litigation had arisen, so I don't

13  know when I came across that call.

14     Q.   Okay.  Did you ever talk to any attorneys about

15  what their conversations were with their clients

16  regarding private phone calls?

17     A.   Did I talk with attorneys about them talking to

18  their clients?

19     Q.   Well, let me rephrase, I'm sorry.  Did you ever

20  talk to attorneys about whether they expected the calls

21  to be private?

22     A.   Only-- only Greg Rapp's attorney through e-mail.

23     Q.   In the cases where you produced-- or produced

24  recorded calls in discovery, do you remember any

25  attorney ever contacting you about that?

1    A.   Because there was an attorney call in the

2  discovery?

3    Q.   Uh-huh.

4    A.   I-- not prior to the *Black* litigation, no.

5    Q.   Let's look for a minute at Exhibit 606, which are

6  the papers that you reviewed over the lunch hour.  Would

7  you like that set back?

8    A.   What now?

9    Q.   Okay.  Can you-- do you want to look at that on

10  the screen or would you like a hard copy?

11    A.   I don't know how to get rid of this mark, but...

12    Q.   I don't either.  There we go.  So the front page

13  of 606, this is the United States Marshals Service form

14  that you talked about; is that right?

15    A.   Yes.

16    Q.   And is that your handwriting?

17    A.   It is.

18    Q.   Did you usually fill these out yourself?

19    A.   Not always.  My legal assistant filled them out a

20  lot and I had a couple of different legal assistants.

21    Q.   And it is asking for recorded phone calls of this

22  particular person, Joe Freeman.  Right?

23    A.   Yes.

24    Q.   For the purpose of trial prep?

25    A.   Yes.

1     Q.   Is there any place on there that you made an

2   exception for attorney-client calls?

3     A.   Well, it said this at the bottom.  It says,

4   "Note:  Attorney-client conversations will not be

5   included in these recordings."

6     Q.   Anywhere on that form do you identify who the

7   defense attorney is?

8     A.   No, I do not.

9     Q.   Anywhere on that form do you identify what the

10  defense attorney's phone number is?

11    A.   I do not.

12    Q.   For attorney-client conversations not to be

13  included-- well, let me ask you this:  Did you expect

14  the U.S. Marshal to do the research and find out what

15  the attorney-client-- or what the attorney's phone

16  numbers were?

17    A.   I did not.  I think I thought the blocking system

18  would work because no one-- of all the conversations

19  that I have told you, I'm the only one who ever brought

20  this up.  So I thought, well, maybe I just had a couple

21  attorneys who didn't know what they were doing and

22  that's the two calls that got through.  No one ever

23  brought this up as a problem that needed to be addressed

24  or--

25    Q.   But looking at the language on that, how would

1    you expect that to be carried out?

2        A.  The number would be blocked and then we wouldn't

3    have gotten the calls.  That's what I assumed at the

4    time.

5        Q.  You knew if the number was blocked there would be

6    no recordings.  Correct?

7        A.  I don't know if I thought there would be a blank

8    line or-- or what.  I-- I really didn't think about it

9    to be honest, I just thought that they wouldn't be

10   included.

11       Q.  So you didn't know-- you didn't really know what

12   privatization meant, whether it meant that the call

13   would not be recorded or just not be available?

14       A.  I did not understand the mechanics of that, no.

15       Q.  Did you expect CCA to identify who the defense

16   attorney was?

17       A.  Again, I just-- I didn't think about it.  I--

18       Q.  Okay.  You knew that you could ask for calls to a

19   particular number.  Right?

20       A.  Yes.  I don't know if I knew it back then, but at

21   some point I learned what-- it's called a reverse, yes.

22       Q.  You could do a reverse.  You could ask for just

23   calls to a certain number like you did with Mr. Moran.

24   Right?

25       A.  Yes.

1    Q.   You also understood you could exclude phone
2    numbers in your request?
3    A.   I don't know that I ever did that.
4    Q.   You didn't ever do that.  Did you know that you
5    could?
6    A.   I don't think I knew that I could, but it makes
7    sense that I could.
8    Q.   Right.  Did you ever ask anybody?
9    A.   No, I did not.
10   Q.   All right.  So on the documents that you looked
11   at at 606, there was never any time that you excluded an
12   attorney's phone number?
13   A.   That's correct.
14   Q.   All right.  Let's look through some of these
15   particular requests.  On Page 2 of 606, you requested
16   calls from a number of people, including Terry Tillman?
17   A.   Uh-huh.
18   Q.   Do you remember receiving attorney-client calls
19   for Terry Tillman?
20   A.   I do not.
21   Q.   How about Page 10, do you remember requesting
22   calls for Anthony Irvin?
23   A.   Yes.
24   Q.   And you did that by subpoena?
25   A.   Yes, and I don't know why I did that.

1    Q.   All right.  Did those calls come directly to you

2    if you did them by subpoena?

3    A.   They all would've gone to Brett Hoffer I think at

4    the time, and then Brett Hoffer would have either-- like

5    if he knew Pat Greeno, then he would've called Pat and

6    said, they're here, or he would've dropped them off.

7    And I usually put them up on a thumb board and I would

8    e-mail Pat and say your calls are here.

9         And early on I know I sent-- generally speaking,

10   I don't want to speak in absolutes, but generally I sent

11   my calls directly to the agent to go through.  And then

12   when he was done, I would take them back.  But as time

13   went on, I realized it was easier to download them all

14   to the hard drive so that we didn't have that lag time

15   of getting out discovery waiting for them to come back.

16   So I did that some as well.

17   Q.   You had the expectation that if your agents heard

18   an attorney-client call, they would tell you?

19   A.   Pat did and he was the very first one who did.

20   Q.   You worked with Pat Greeno a lot?

21   A.   Early I did, yes.

22   Q.   Okay.

23   A.   And then he retired.  But yes, I worked with him

24   a lot.  And that's the only time he ever told me that he

25   got one, and he took it seriously enough I believed

 1   there wouldn't be any others.

 2       Q.   Because he notified you about Jerome Birdsong?

 3       A.   Right.

 4       Q.   And in this particular subpoena, all recordings

 5   of telephone calls to and from Anthony Irvin at CCA; is

 6   that right?

 7       A.   Yes.

 8       Q.   And that's generally what you asked for when you

 9   were trying to get calls?

10       A.   Yes.

11       Q.   Did you understand that attorneys cannot call in

12   to CCA to a client?

13       A.   I did at some point because there was so much

14   complaining by the inmates that their attorneys were

15   hard to get in touch with because they wouldn't come see

16   them and they wouldn't call them and, you know, there

17   was a lot of complaining just generally about attorneys

18   not having contact with their clients.

19       Q.   And you knew that how?  From listening to calls?

20       A.   Well, it might've been or it might've been, you

21   know, in proffers.  Sometimes you just sort of talk

22   beforehand or after.

23       Q.   Okay.  On Page 11, do you remember Melvin

24   Shields?

25       A.   I do.

1    Q.  And you requested his calls?

2    A.  It looks like I did, yes.

3    Q.  Okay.  Do you remember getting attorney-client

4  calls in his case?

5    A.  No, I do not.

6    Q.  What about William Mitchell?  I think that's on

7  Page 15.  Do you remember William Mitchell's case?

8    A.  I do, that's my first trial.

9    Q.  All right.  And do you remember who the attorney

10  was on that?

11    A.  He had several I think.  John Duma was his

12  attorney and then he had John Jenab.

13    Q.  And in some of these cases you would request

14  their phone calls multiple times; is that right?

15    A.  I don't-- the same calls or different months?

16    Q.  Different months.

17    A.  Okay.  Like-- so like I requested a batch and

18  then he stayed in confinement and I requested another

19  batch?

20    Q.  Right.

21    A.  Yes.

22    Q.  Sometimes those dates would overlap?  You might

23  ask--

24    A.  That probably was in error.

25    Q.  Okay.  But there would be cases like Greg Rapp's

1  where you would ask for calls at least eight times.

2     A.   Okay.

3     Q.   Because it was a long case.  Right?

4     A.   They were in custody for a long time, yes.

5     Q.   And that was not uncommon for you to do that?

6     A.   If they were-- if it looked like trial and they

7  were in custody for a long time, no, not uncommon.

8     Q.   So looking at this particular document up at the

9  top regarding William Mitchell, can you tell us what

10  this is?

11     A.   It looks like maybe the form-- Bonnie started--

12  Bonnie Kaiser was my assistant for a while and she

13  started attaching the form to the e-mail.

14     Q.   So you would fill it out by hand and give it to

15  her?

16     A.   Or she would, yes, one of the two.

17     Q.   Okay.  Do you remember Damon Griffin?

18     A.   Yes.

19     Q.   And he's on Page 21.  That was a big case?

20     A.   It was.

21     Q.   You requested calls for Damon Griffin and you

22  have a note there, what does that note say?

23     A.   The one at the top?

24     Q.   Sure.  Let's start at the top, please.

25     A.   "Please expedite.  Re: destruction of evidence in

 1   pending case."

 2       Q.   So you needed things to move fast in that

 3   particular case.  Right?

 4       A.   Yes.

 5       Q.   And you were asking for a very short period of

 6   calls?

 7       A.   Yes.

 8       Q.   And what is your other note next to Damon's name?

 9       A.   "Star.  And all outgoing calls to 785-248-4092."

10       Q.   So were you asking for all of Mr. Griffin's calls

11   to that number or any calls to that number?

12       A.   It looks like any.

13       Q.   Do you remember getting attorney-client calls in

14   Damon Griffin's case?

15       A.   I do not.

16       Q.   What about Steven Dillow?  He's on Page 28.

17       A.   Steven Dillow was Dave Zabel's case and I filled

18   this out for him.

19       Q.   Why?

20       A.   He didn't have the form and he didn't know about

21   the form, I don't know why.  And I helped him out a lot

22   so I filled out the form for him.  I don't know if I

23   ever entered my appearance in that case, I know I never

24   worked on it.

25       Q.   So you made-- for that reason you may not know

1  that attorney-client calls were returned?

2     A.  I wouldn't have had any-- if those phone calls

3  came to me, I immediately took them down to Dave Zabel's

4  office.

5     Q.  What about Julie Clifton on Page 32, do you

6  remember her?

7     A.  Yes.

8     Q.  Do you remember getting attorney-client calls in

9  her case?

10    A.  No, I do not.

11    Q.  Was that your case?

12    A.  Julie Clifton and Damon Griffin were mine and

13 Sheri Catania's case together.

14    Q.  So any calls that you would've gotten in this

15 case that would've been in your file would've been

16 available to Ms. Catania as well?

17    A.  It was a shared drive.  And, I don't know,

18 sometimes if I worked with another AUSA, sometimes we

19 would put the discovery in their folder and some in

20 mine, but it was all together in one.  And we-- every

21 AUSA has access to every AUSA's discovery.

22    Q.  Since you brought that up, do you remember a time

23 right after this litigation started that that was locked

24 down?

25    A.  All the discovery?

1   Q.   The discovery at least in *Black* was locked down.

2   Were you aware of that?

3   A.   I don't remember it.

4   Q.   Okay.  Micky Rantz is the investigator on this

5   particular page for Julie Clifton.  Do you remember him

6   ever telling you that he reviewed attorney-client calls?

7   A.   I do not.

8   Q.   Arrick Williams on Page 36, do you remember that

9   case?

10  A.   I don't even know-- let me see.

11  Q.   It's A-R-R-I-C-K.

12  A.   Arrick Warren?

13  Q.   Arrick Warren, I'm sorry.

14  A.   I do remember that case.

15  Q.   Do you remember asking for phone calls in that

16  case?

17  A.   I do.

18  Q.   That's your handwriting?

19  A.   Yes.

20  Q.   Do you remember getting attorney-client calls in

21  that case?

22  A.   I do not.

23  Q.   All right.  Vicencio Olea-Martinez [sic] on the

24  next page.  You brought his name up earlier, why was

25  that?

1    A.   I was second chair on that case during the

2    investigative phase.  It was the-- I was learning how to

3    do wiretaps with Dave Zabel.  At some point I was off

4    the case because I know I was off it after charging at

5    some point.  I know that-- I recall his phone calls were

6    given to Sara Gardner to translate.

7    Q.   And do you remember there being attorney-client

8    calls in that batch?

9    A.   I do not.

10   Q.   There were times that you asked for phone calls

11   for someone who is not the defendant charged in your

12   particular case; is that right?

13   A.   I think if we learned that they were using

14   another inmate's line or PIN, yes.

15   Q.   Or if maybe they're-- you think they're a witness

16   in a case or they have information.  Do you remember

17   ever asking for recorded phone calls for someone who you

18   were not personally prosecuting?

19   A.   I think usually-- I do remember that happening on

20   many-- not many, but several occasions.  And I think in

21   every instance it's because my defendant was using

22   someone else's PIN, but I'm not saying that's not

23   possible that it was for another reason.

24   Q.   So in a particular case, let's just use Vicencio

25   as an example, if you asked for the phone calls of

1  another person, would that request be stored in

2  Vicencio's file?

3     A.   I don't know the answer to that, it should be

4  probably.

5     Q.   Okay.

6     A.   A lot of this comes down to what your legal

7  assistant chooses to do with it.  I mean, Bonnie was a

8  very-- Bonnie Kaiser was a very good legal assistant and

9  she would handle getting these requests to the marshals

10 and she filed it.  There are other legal assistants who

11 I had at other times who probably wouldn't have had the

12 initiative to do that.

13    Q.   There really isn't a protocol in your office

14 about how to handle these things; is that right?

15    A.   No.

16    Q.   Charles Steele on Page 58.  I'm going to skip

17 down to the last couple.  Do you remember that case?

18    A.   So Charles Steele would've been as part of the

19 *Black* case.  He was part of the investigation, although

20 not necessarily part of the charging plan.

21    Q.   Do you remember obtaining a call between Charles

22 Steele and Tim Burdick in my office?

23    A.   No.

24    Q.   Shawn Shutts-- Shutts.

25    A.   Shutts.

1    Q.  Do you recognize that name?

2    A.  I do remember him.

3    Q.  On Page 69.  You requested calls for him as well.

4  Do you remember obtaining attorney-client calls in his

5  case?

6    A.  I do not.  It is possible one of the calls that

7  you're referencing-- I know Zac Howard came forward and

8  said that he inadvertently encountered at least one

9  attorney call as part of the *Black* investigation.  So

10  these may be those calls.  I don't recall what inmate he

11  told me it was.

12    Q.  All right.  So Zac Howard, is he in the marshal's

13  office?

14    A.  Yes, he is.

15    Q.  Ran across an attorney-client call in *Black*, told

16  you about it.  Did he write a report?

17    A.  He told me about it after this litigation arose

18  and--

19    Q.  Okay.

20    A.  -- I don't know that he wrote a report about it.

21  I think I disclosed it at some point.

22    Q.  So he didn't tell you at the time he ran across

23  it--

24    A.  He did not.

25    Q.  -- it was after this came to light?

 1      A.   Yes.

 2      Q.   And you don't remember him actually writing a

 3   report about it at the time that it happened?

 4      A.   I just don't recall because there were so many

 5   people listening to phone calls.  I don't recall.

 6      Q.   Let's switch and talk about Juan Herrera-Zamora

 7   for a minute.  This is a case that you were a second

 8   chair to Dave Zabel?

 9      A.   That is my view.  I know the government put in

10   their *Touhy* notices that I was the lead prosecutor.

11             MR. CLYMER:  Your Honor, that's not our

12   *Touhy* notice, that's the defense-written *Touhy* notice.

13             THE COURT:  So noted.

14             THE WITNESS:  Yes, I was--

15   BY MS. BRANNON:

16      Q.   Let's correct the record.  You were second chair?

17      A.   Yes.

18      Q.   It was Dave's case?

19      A.   It was.  The entire history of the case is it was

20   initially my case.

21      Q.   Uh-huh.

22      A.   Then in November of 2015 I returned as a Social

23   Security SAUSA.  Kim re-assigned the case to Dave Zabel

24   but allowed me to stay on it only for trial purposes.

25   And I was to sit second chair at trial and learn how to

1   do a trial because I had never sat second chair at

2   trial, so...

3       Q.   This was the case that you intentionally

4   requested phone calls, all phone calls to the attorney

5   in the case, the defense attorney in the case?

6       A.   That is correct.

7       Q.   You were looking for conversations between that

8   attorney and people other than Mr. Herrera-Zamora?

9       A.   Yes.

10      Q.   But you requested all of the calls between Mr.

11  Herrera-Zamora and his attorney?

12      A.   Yes.  I requested all phone calls to the

13  attorney's number--

14      Q.   All right.

15      A.   -- which would've included phone calls between

16  Mr. Herrera-Zamora and his attorney, Carlos Moran.

17      Q.   That was not the only time that you had

18  intentionally asked for calls to an attorney?

19      A.   I-- I believe it is.

20      Q.   All right.  Can we look at Exhibit 512, please?

21  That was a big deal for you, to ask for calls to an

22  attorney's number?

23      A.   I thought so, yes.  I mean, I sought guidance

24  about it.

25      Q.   Let's look at 512.  Do you remember this

1    particular case?

2        A.  Yes.

3        Q.  And what case was that?  It was the *Rapp* case?

4        A.  That's Ashley Huff.

5        Q.  All right.  And do you see there that you're

6    asking for calls to mom's lawyer friend?

7        A.  But he wasn't a lawyer, he just was-- I mean, he

8    may have been a lawyer, but I really don't think he was.

9    He was just sort of a worldly guy who had lots of

10   opinions.

11       Q.  You have down there "mom's lawyer friend"?

12       A.  That's what we called him.

13       Q.  Okay.  Did you know that he was a lawyer?

14       A.  No.

15       Q.  Did you know that he wasn't a lawyer?

16       A.  No, but I had no reason to believe he really was

17   a lawyer.  And, in fact, based on the conversations, I

18   would be willing to bet that he was not.  If it wasn't

19   her boyfriend, you know, we just-- that's what we called

20   him.

21       Q.  All right.  You actually listened to calls

22   between Carlos Moran and Juan Herrera-Zamora?

23       A.  I did.

24       Q.  And you knew that was wrong?

25       A.  At the time I did it I did not believe it was

1  wrong.  After the *Black* litigation arose, I began to

2  think it was very wrong and I became very uncomfortable

3  with it.

4     Q.  What was in the *Black* litigation that made you

5  change your mind about whether this was right or wrong?

6     A.  I don't think it's what was going on in the

7  courtroom, I think it was what was going on in the

8  office.  I've described it as the ground shifted

9  underneath my feet and--

10    Q.  Were the people in the office that you went to

11 for advice, like whether privilege was waived, before

12 the *Black* case-- you testified about you went to Dave

13 Smith or whoever and asked them.  After the *Black*

14 litigation, did you doubt the advice that they gave you?

15    A.  What I saw, for example, is before it came out

16 that Tanya Treadway had been listening to attorney

17 calls, she met with me and everyone in the *Black* case

18 because she was our filter attorney.

19    Q.  Uh-huh.

20    A.  And she was very stern to me and Chris Oakley

21 that we hadn't fought to exclude attorney numbers when

22 we were making our jail requests, because that was

23 sloppy and this wouldn't have happened.

24    Q.  Did she tell you at the time that she had

25 listened to attorney-client calls?

1    A.  No.  In fact, I would-- I left thinking that I

2  was just the worst attorney in America because I hadn't

3  thought to exclude attorney numbers, so...

4    Q.  So is it your understanding that Tanya Treadway

5  when she requests calls that she excludes attorney

6  numbers?

7    A.  She indicated that she did that.  That was her

8  practice.

9    Q.  Was there anybody else in the office that

10  indicated that they did that as well?

11    A.  I don't recall anyone saying that specifically.

12  I recall Tris suggesting that this never would've

13  happened to him because he's much more cautious than me.

14    Q.  What do you mean he's much more cautious than

15  you?

16    A.  That was his words, not mine.

17    Q.  Okay.  Do you know what he meant?

18    A.  I think that he just has a self-assuredness that

19  at that moment he thought it wouldn't have happened to

20  him, but I disagree.

21    Q.  You didn't publicize the fact that you listened

22  to attorney-client calls between Mr. Moran and Mr.

23  Herrera-Zamora?

24    A.  I did not.

25    Q.  When you were confronted by Tanya Treadway, she

1  didn't tell you that she had done the same thing?

2      A.   That's correct.  Now, I did confide in others

3  that I had done it but not publicize it.

4      Q.   I understand.  Did you come to believe at that

5  point that doing something like that was, you know, if

6  not wrong, kind of taboo?

7      A.   I over time came-- again, the earth shifted

8  beneath my feet, but I began to think that it was bad

9  form, that I had made a miscalculation.  And based on

10 what I saw happening around me, that no one else was

11 going to own up to it and here I was being--

12     Q.   Nobody else volunteered and said, I've done the

13 same thing?

14     A.   No.  Except for Chris Oakley, he did.  But he

15 said he stopped listening and-- and he-- he did not

16 notify the defense attorney and he did not feel I had an

17 obligation to do it, but...

18     Q.   In terms of people who intentionally obtained

19 recorded attorney-client calls, did anybody else raise

20 their hand and say, I've done that?

21     A.   No.

22     Q.   And knowing what you know now, would you expect

23 anybody to raise their hand and volunteer if they had

24 done that?

25     A.   I knew generally just because of the-- of the

1    conflicts in the office that if someone messed up or if

2    someone did something in a gray area, they weren't going

3    to tell anyone outside their circle.  I had observed it

4    personally and I had been instructed not to tell other

5    people about things like that.

6       Q.   Who instructed you?

7       A.   In one instance when I was being trained, Tris

8    Hunt instructed me not to tell others in the office

9    about a judgment he had made.

10      Q.   Do you recall what that judgment was?  Or did it

11   have something to do with attorney-client calls?

12      A.   It did not have anything to do with

13   attorney-client calls, it did have something to do with

14   discovery and unilaterally deciding that because some

15   item of discovery wasn't used, that we had no duty to

16   disclose it.

17           And that's what he told me as a training exercise

18   in no uncertain terms.  If you're not using it, if you

19   didn't use it and if you did something debatable, you

20   can decide not to disclose it because you didn't use it.

21           And I heard that from Dave Zabel on multiple

22   occasions before and after I left the office about the

23   Herrera-Zamora calls.  We didn't use them, so there's no

24   reason for you to disclose that you listened to them.

25      Q.   Anyone else?

1    A.   No.

2    Q.   Was it sort of the culture in the office to be

3    sort of secretive about things like that?

4    A.   Someone recently used the term "silos," like they

5    were operating as silos.  And I-- I think that's true.

6    I didn't know what most people in the office were doing,

7    I only know what Tris and Dave were doing because they

8    ended up sort of taking me in and helping me to learn.

9    Q.   To the extent that you may have been portrayed as

10   sort of this young rogue attorney going off and doing

11   things wrong on her own, is that accurate?

12   A.   I believe it's completely inaccurate.

13   Q.   Why?

14   A.   Because I sought guidance more than anyone and--

15   and I was made fun of by making decisions by committee.

16   I wanted to know how to do it.  There was no playbook.

17   You know, the U.S. Attorney's Office issued a press

18   release after I was fired that said that they had a

19   policy in place not to listen to attorney calls, but I

20   did it.  Well, they did have a policy in place after I

21   got fired, but...

22   Q.   Did you know of any policy like that before you

23   got fired?

24   A.   Not only did I not know of it, I am certain it

25   didn't exist because I brought it up on multiple

1   occasions and I'm the only one bringing it up.  No one

2   else ever in a group setting said, hey, you know, this

3   keeps happening, maybe we should do something about it.

4       Q.   So the group setting was to say that if it's

5   recorded and has a preamble, privilege is waived.

6   Right?

7       A.   Yes.  And I believe it was said after I got the--

8   after I got the Rapp calls and I-- or had the issue with

9   the Rapp calls and I got guidance back from PRAO.  And

10  then Emily Metzger had followed up and suggested that

11  even if we weren't going to use those calls, we needed

12  to notify the defense attorney.  So I did.

13       And then I brought that up to a group setting

14  with a lot of people, and the consensus with a lengthy

15  conversation was:  If they're that stupid, then it's on

16  them.

17       Q.   Meaning defense attorneys?

18       A.   Yes.

19       Q.   And who was in that conversation, if you

20  remember?

21       A.   Again, it was a large group.  I don't know.  And

22  I don't know-- I have a slight inclination as to who

23  said it, but I don't want to say because I don't know

24  for certain.

25       Q.   Were there any dissenters in that group?

1        A.   There were not.

2        Q.   Do you remember Sheri Catania being there?

3        A.   Again--

4        Q.   If you don't remember, that's fine.

5        A.   I don't remember.  I just know I walked into the

6   lunchroom, there was a large group.  I brought up the

7   advice that Emily Metzger had given me.  The discussion

8   was:  She doesn't know what she's talking about because

9   she's on the civil side.  They're not a real litigators.

10  Chris Allman has never been to trial.  If the defense

11  attorneys are that stupid, then it's on them and you

12  have no obligation to notify the defense attorney.

13       Now, no one took the next step and said, we

14  listened to these calls.  They didn't.

15       Q.   But as far as the determination of the privilege

16  and whether or not to notify defense counsel, that

17  office was unified that privilege is waived and you

18  don't have to notify?

19       A.   At least the people in the lunchroom that day

20  were.

21       Q.   Do you remember-- if you can't remember who was

22  there, can you remember who was not there?

23       A.   Chris Oakley was not there--

24       Q.   Okay.

25       A.   -- because I went down and talked to him because

1    I'm getting such varied advice.  And, you know, what--

2    how do you reconcile it?  And so that's when I talked to

3    him.  I don't know that I talked to him-- I think it was

4    right after it, but I don't know.  And although I don't

5    know it for sure, just because I know his character, I

6    don't think Leon would've taken that position.

7        Q.  Was Leon in criminal at that time?

8        A.  I don't know.  He was moved to civil for a period

9    of time and moved back to criminal, but I have no doubt

10   that he would've exercised great integrity.

11       Q.  Let's talk for a minute about the videos, all

12   right?  You've described what you understood from the

13   cooperator.  You testified that you believed that the

14   videos were kept only for a short period and that's why

15   you had to move to get them.  Right?

16       A.  I think they started rolling back over the tape.

17       Q.  Right.  You sent out a grand jury subpoena for 22

18   months of all video.  Right?

19       A.  Uh-huh.  And someone-- someone at CCA, and I

20   don't know who, had told me that different systems had

21   different durations.

22       Q.  Right.

23       A.  So I just erred on the side of caution to get as

24   much as I could.

25       Q.  You went through with the Special Master sort of

1  what you knew when and sort of what was at the forefront
2  of your mind.  Back in March of 2016, you had
3  information from a cooperator that there were video
4  cameras recording meetings in the attorney-client rooms.
5  Correct?
6      A.  Yes.  Well, he didn't say recording, he just said
7  there are cameras in there.  But I probably made the
8  inferential leap that they recorded, but I can't say
9  with certainty that I did.
10     Q.  He also told you that he believed they could
11  audio-record in those rooms.  Right?
12     A.  If-- what he said, I believe, is that if they
13  pushed a button, they could listen in, but he didn't
14  think that it recorded, the audio.
15     Q.  Up until you got the e-mail from Deb Barnett
16  saying that they did not record, did you have any reason
17  to doubt that there were recordings in those rooms?
18     A.  I did not.
19     Q.  Okay.  At the time-- and you talked to Jackie
20  Rokusek before you got that e-mail from Deb Barnett.
21  Right?
22     A.  That's correct.
23     Q.  And so when you were talking to Deb-- or to
24  Jackie Rokusek, you believed that those rooms were
25  recorded?

1    A.  I believed that there was a possibility.  I

2    didn't-- hadn't confirmed it, but I certainly believed

3    there was a possibility.

4    Q.  Let me get this straight.  Is it your testimony

5    that you did not mention attorney-client rooms being

6    videotaped in your conversation with Jackie Rokusek that

7    morning in August?

8    A.  My recollection of her testimony is that Kim

9    Flannigan said that there were-- that we were going to

10   have an agent look at video-recordings of

11   attorney-client rooms.  That I didn't say it, but that

12   Kim Flannigan said it.

13   Q.  Were you in the room?

14   A.  I was.  My recollection is that Kim Flannigan

15   mentioned the video but did not in any way say

16   attorney-client room.  I don't know why she would've

17   specified that.

18   Q.  All right.  So let's think about the-- the

19   progress of what happened.  Jackie Rokusek meets with

20   you, you think nobody mentioned attorney-client

21   videotapes; is that right?

22   A.  Yes.

23   Q.  Next day I'm sending around e-mails saying, are

24   those rooms video-recorded.  Right?

25   A.  Yes.

1    Q.   And there's an investigation.  The warden is

2    contacted, the U.S. Marshal is contacted.  Are these

3    rooms videotaped?  Right?

4    A.   Uh-huh.

5    Q.   And you knew that Jackie had come to me after

6    your meeting to talk about whether those rooms were

7    videotaped.  Right?

8    A.   Uh-huh.

9    Q.   Is that right?

10   A.   Well, I didn't know she talked to you, but I knew

11   she talked to somebody.

12   Q.   Okay.  At the FPD?

13   A.   I don't know if we knew that at that point, but I

14   just don't know.

15   Q.   All right.  So things were happening very fast

16   during that time frame.  Right?

17   A.   Yes.

18   Q.   You knew that I was looking into whether these

19   calls were recorded.  Right?

20   A.   Uh-huh.

21   Q.   And if we could look at 444, please.

22        You knew that we were about to file motions in a

23   number of cases based on this idea that attorney-client

24   rooms were video-recorded.  Right?

25   A.   Uh-huh.

 1     Q.   And it caused you to send an e-mail to Judge

 2   Robinson--

 3     A.   Uh-huh.

 4     Q.   -- is that right?  But you still think the idea

 5   of attorney-client videotapes was not discussed with

 6   Jackie Rokusek?

 7     A.   I don't think that we used the word or Kim used

 8   the word "attorney-client."  I think she used the word

 9   "videos" and Jackie made the inference "attorney-client"

10   because of the context of the conversation.

11     Q.   All right.

12     A.   And I think Jackie-- I don't think Jackie is

13   lying, I think that she thinks she heard it or at least

14   that's how it impacted her.

15          What I was focused on this entire time actually

16   had nothing to do with the meeting with Jackie Rokusek.

17   I was concerned that I had made a major

18   misrepresentation to Judge Robinson on July 21st in

19   saying that-- I thought I had represented to her that

20   there was video but no audio and it was turning out

21   there was nothing.

22     Q.   Why do you think it was reasonable for Jackie to

23   infer that you were talking about videotapes of

24   attorney-client rooms?

25     A.   Because we had talked about that the inmates were

1  accusing her of having met with her client and then her
2  client coming back to take information to the others to
3  let them know they were under investigation.
4      Q.  How do you get from that information to an
5  inference that there were videotape recordings of those
6  rooms?
7      A.  I don't know that I would make that same
8  inference, but I understand why she would and I
9  understand why it would be important to her that we
10 weren't going to look at that kind of video.
11     Q.  Is it your testimony that neither you nor Ms.
12 Flannigan told her that you were having Agent Stokes
13 look for attorney-client meetings?
14     A.  At this point I don't remember exactly what was
15 said.  I just from the beginning strongly remember that
16 I don't-- I don't recall Kim saying we're going to look
17 at attorney-client videos of you meeting with your
18 client and we're going to use that against you.  I don't
19 remember it happening.
20         I know the video was discussed.  And the rest of
21 it is we had this long meeting-- this discussion took
22 place as we're walking out of the room.  We're standing
23 and walking.  So it just wasn't-- she didn't seem-- she
24 didn't seem upset.
25     Q.  Well, let's get back to this.  When you were

1   actually talking to her about what she's being accused

2   of, which is passing information to a client, which

3   would've had to happen in an attorney-client room.

4   Right?

5       A.  Or telling.  The accounts were different.  Some

6   of the-- I'd have to go back and look at the accounts.

7   Some of the accounts were that she said we're under

8   investigation.  I don't know if anyone said she handed

9   him a paper to see if-- that showed a list of people

10  that were under investigation.  I know that's been

11  raised, I don't know if that was by Jackie or if it's

12  actually in a proffer.

13      Q.  At the time you're having that part of the

14  conversation, is it when you were actually walking out

15  of the office or is that when you're sitting down and

16  explaining to her why you think there's a conflict?

17      A.  We sat down and sort of smoothed it over the best

18  we could because we knew it was touchy.  And then we

19  showed her the proffers, we showed her the case law that

20  we thought was on point.  I don't know if we showed her

21  anything else.

22          And then we talked about why we thought there was

23  a conflict, and that-- we said the purpose of the

24  meeting was not to bully her or to drag her to the U.S.

25  Attorney's Office, it was to try and handle it without

1   having a conflict.

2       Q.   And because you're a lawyer, you understand the

3   difference between an answer of "I don't remember" and

4   "no, it didn't happen."   Right?

5       A.   Yes.

6       Q.   And you're saying any statement about Agent

7   Stokes looking at video for Jackie's meeting with her

8   client, you don't remember that being made?

9       A.   Not with the use of attorney-client room video.

10  I do not remember that being made.

11      Q.   Was there a statement made that Agent Stokes is

12  looking for video of Ms. Rokusek meeting with her client

13  without a reference to attorney-client room?

14      A.   There was definitely a statement about Agent

15  Stokes looking for video.   Beyond that, I don't recall

16  the exact language used except that I even from the

17  beginning did not think that Kim said "attorney-client

18  video" or "attorney-client rooms," anything

19  "attorney-client."

20      Q.   If we could look at 441 for a minute.   You

21  received a-- an e-mail from Jackie Rokusek right after

22  this meeting?

23      A.   Yes.

24      Q.   Do you remember that?

25      A.   Yes, I do.

1      Q.   And I don't-- I'm a little curious to see if it

2   was you or Kim saying, "The agent is looking through the

3   video for your visits."  Do you remember that?

4      A.   That I said that?  "For the time/date of your

5   visits but has not paired those dates up to the video

6   yet."

7      Q.   So you understood that Jackie was asking to come

8   in and look at video of her attorney-client meetings?

9      A.   What we had discussed-- I knew what I was doing.

10  What I had told Agent Stokes was, if you can look at

11  video around the time of her visits and let's try and

12  narrow this down.  But if we're going to look at

13  attorney-client video, if, in fact, it does exist, we're

14  going to have to send it off to a filter team.  And we

15  discussed who the filter team would be.

16     Q.   Getting back to my question.  You understood from

17  this e-mail that Jackie was asking to look at the

18  videotape of her meeting with her client and that it had

19  just not been located yet?

20     A.   I don't know if I processed it that we were going

21  to actually be looking at attorney-client room or around

22  the time of her visits.  I certainly read the e-mail

23  quickly and didn't mean for it to implicate that we were

24  going to look at attorney-client meeting room.

25     Q.   At that time you still say that you didn't know

1   whether there was attorney-client videotape at all?

2       A.  We had not confirmed it.

3       Q.  When you say "we," who are you talking about?

4       A.  Me, Kim, and the agents involved.

5       Q.  Agent Stokes?

6       A.  Agent Stokes and others, yes.

7       Q.  If we can look at 644, please.  Who are the other

8   agents that you're referring to?

9       A.  Well, John Seubert, Henry Herron and Matt Cahill

10  at the time.

11      Q.  All right.  Have you seen this e-mail before?

12      A.  I don't know that I have.

13              THE COURT:  What exhibit number is this, by

14  the way?

15              MS. BRANNON:  I believe it is 644.

16  BY MS. BRANNON:

17      Q.  You're not listed on it.  Did you ever get-- but

18  you don't remember maybe it being forwarded to you or a

19  blind copy to you?

20      A.  It could have been, but I don't recall.

21      Q.  And you understand that's Agent Stokes asking if

22  the attorney visitation video is in yet?

23      A.  Oh, wow.  No, I have not seen that.

24      Q.  And you see the date on it?

25      A.  I do.

1    Q.   And if we scroll up just to look at Pauletta's

2    response, that's the index that has been talked about

3    quite a bit.  Right?

4    A.   Yes.

5    Q.   Were you forwarded that e-mail from Pauletta to

6    Jeff Stokes?

7    A.   It's possible, but I don't recall it.

8    Q.   You knew that Jeff Stokes had actually looked at

9    an array of attorney-client rooms?

10   A.   I don't know if that-- I thought that perhaps

11   there were some attorney-client rooms in what he looked

12   at, but they were empty.  But, again, I didn't know that

13   until the litigation arose.

14   Q.   So he was not talking to you at this point in

15   July, before the July 21st hearing, about whether he was

16   looking for video of attorney-client rooms?  You didn't

17   know about this?

18   A.   The only conversation Jeff Stokes and I had about

19   this video is the one I just recounted for you.  While

20   I'm in trial on *Herrera-Zamora*, he sees me in the hall

21   and I tell him, if you encounter attorney-client video,

22   it has to go to the filter team.

23   Q.   And this-- July 12th is while you were actually

24   in *Herrera-Zamora*?

25   A.   I don't know, I don't remember the dates of the

1    trial.  But I know that I did not have that much contact

2    with Jeff Stokes in the month of July because he went on

3    vacation.  And then I believe the following week I was

4    out all week sick.  So the first week was

5    *Herrera-Zamora*.  I think he was on vacation the second

6    week, but I'm not sure.  And then the third week I was

7    out sick.

8        Q.   Let's look at Exhibit 612, please.  You are on

9    this particular e-mail where Jeff Stokes is talking

10   about looking at attorney-client rooms?

11       A.   I was, yes.

12       Q.   This was after the litigation started

13   August 20th; is that right?

14       A.   Yes.

15       Q.   Do you remember notifying anyone outside of your

16   office that he had actually viewed attorney-client

17   rooms?

18       A.   Like the defense bar?

19       Q.   Yes.  Or the Court.

20       A.   By this point Deb Barnett was in charge of the

21   *Black* litigation and I was not involved.

22       Q.   All right.  So if we look at 618, if you remember

23   ever seeing this e-mail.  Do you know why Kim Flannigan

24   would continue to insist that Jeff never encountered any

25   attorney room video?

1      A.  I do not know that.

2      Q.  And you see that those two e-mails are

3  inconsistent?

4      A.  I do.

5      Q.  You testified that there were times that people

6  in your office instructed you to print out e-mails and

7  record calls and things like that; is that right?

8      A.  That's right.

9      Q.  Before you left the office, you printed out a

10  number of e-mails?

11      A.  Uh-huh.

12      Q.  Took them with you?

13      A.  Uh-huh.  Well, I didn't actually take them with

14  me.  They were later brought to me.

15      Q.  By who?

16      A.  By Dave Zabel and Kim Flannigan.

17      Q.  Who was it that told you you needed to print out

18  e-mails to keep them?

19      A.  I believe that was the practice of most people

20  who were in conflict with others in the office.

21          I know Sheri Catania did it as a practice.  Kim

22  Flannigan.  I believe Scott did it as a practice.  I

23  would be surprised if everyone didn't.  I don't know

24  about recording calls.  I never personally did that.

25      Q.  Who was it that told you you needed to record

 1   calls?

 2        A.   I believe Sheri Catania said she would not talk

 3   to Scott Rask without the phone call being recorded.

 4        Q.   Anyone else?

 5        A.   I-- I know others didn't record but had

 6   witnesses, so like Tris had witnesses when he made

 7   certain phone calls.  A lot of people would have a

 8   witness.  I know as part of a major conflict in the

 9   office, someone had a witness so that it was two against

10   one.

11        Q.   When all of this broke, was there - I don't know

12   if this is the right term - an internal investigation in

13   your office where you were interviewed and others were

14   interviewed by management about what had happened?

15        A.   Not that I know of.  It certainly wasn't

16   characterized that way to me.  I was briefly interviewed

17   by Emily Metzger and Debra Barnett, I assume to get the

18   facts for the litigation sometime before the second

19   hearing, like a day before perhaps or the week-- if the

20   hearing was on a Monday, on a Friday.

21        Q.   Did you tell either of them that you had

22   instructed Jeff Stokes to locate an attorney-client

23   meeting between Ms. Rokusek and Mr. Dertinger?

24        A.   I don't know that I would've said "the meeting."

25   I know we were operating-- as far as our review of the

1   video, we were starting at her meeting times.  He was

2   going to do the review outside the attorney-client

3   meeting rooms.  And any review conducted inside the

4   attorney-client rooms was going to be shipped off to the

5   filter team.

6       Q.  Did he try to dissuade you of that and say it was

7   too much of a burden for some other agent to look for

8   attorney interaction?

9       A.  What he tried to dissuade me from, and I actually

10  acquiesced, was I didn't want him-- initially my

11  instruction is don't touch the video at all, let's send

12  it all off to a filter team.  And he said it's however

13  many terabytes of video, it's very difficult to operate

14  or at least seems to be.  Let me get in there, figure

15  out how it works, isolate where the attorney rooms are.

16  And then we'll ship that off if, in fact, it exists.

17      Q.  But it wasn't isolating attorney rooms, it was

18  locating the attorney-client meeting between Ms. Rokusek

19  and Mr. Dertinger.  Correct?  That was his instruction?

20      A.  Not to actually view the attorney-client meeting,

21  no.

22      Q.  To view when they were meeting but not go into

23  the room and view the actual meeting?

24      A.  He was going to look at the log and see when the

25  meetings were going to take place.  He, because he's on

1  the prosecution team, couldn't look at attorney-client

2  meeting video.  So he was going to look at Dertinger

3  leaving the meeting, going back to the pod and

4  presumably meeting with his co-conspirators who we could

5  identify, we knew who they were, and seeing that they

6  happened to meet up with these same people.

7        I can't say that we would-- that the prosecution

8  team wouldn't have eventually employed a filter team to

9  look at attorney-client video, but it wasn't a priority

10  at that point.

11    Q.  It's your testimony that he was not told to find

12  a meeting between Ms. Rokusek and Mr. Dertinger?

13    A.  If he was told to find the meeting, it was for

14  the purpose of looking at video outside the room and

15  then to find the meeting to ship it off to the filter

16  team.

17    Q.  Was he told that purpose?

18    A.  We discussed that it would have to be sent off to

19  the filter team.  I know we did.

20    Q.  Did you tell Mr. Beall that the agent would

21  continue to look and ascertain whether there were

22  recordings of attorney-client visitation?

23    A.  At what point?  Before the litigation arose?

24    Q.  Yes.  Well, told him-- told Stokes that before

25  the litigation arose, that he was to continue to look at

1    the videotapes to determine whether there were attorney

2    client meetings?

3        A.   In what time frame?  Like after Jackie-- the

4    meeting with Jackie?

5        Q.   Uh-huh.

6        A.   I think I told Jackie we're going to continue to

7    use the video until she asked that it would be

8    sequestered.  And at that point we said, okay, we'll

9    lock it up.

10       Q.   And that would include ascertaining whether there

11   were recordings of attorney-client visitation?

12       A.   I don't deny it.  I don't independently recall

13   it.

14       Q.   All right.  Let's talk for just a minute about

15   what you knew when, in that time period of August 4th

16   through the 8th.  Is it fair to say communication in

17   your office was not particularly good?

18       A.   That's fair to say.

19       Q.   That you were not being told what the status of

20   the information was?

21       A.   That's correct.

22       Q.   And if we could look again at 444.

23            Before you sent the e-mail to Judge Robinson,

24   were you ever told that the Western District of Missouri

25   U.S. Marshals had confirmed that there were recordings

1  of attorney-client rooms?

2      A.  I do not know.  It's possible.

3      Q.  Uh-huh.

4      A.  But I don't know.

5      Q.  That would've been helpful for you to know?

6      A.  It would've been helpful, but it would've been

7  strange if the marshals in the Western District of

8  Missouri knew more about CCA than the warden.

9      Q.  Yeah, it would be.  If we could look at the date

10 of this e-mail.  Do you know Scott Seeling or Shane Van

11 Meter over in the Western District?

12     A.  I do not.

13     Q.  So on August 4th of 2016, the day before-- that

14 was the Thursday, Western District of Missouri was

15 saying that there were actually video-recordings of the

16 attorney-client rooms.  You were not made aware of that

17 by management?

18     A.  I do not-- I just don't recall.  I think if I

19 was, I would've taken the warden as sort of the final

20 word on what's going on in her facility.

21     Q.  Let's talk for a minute about after this

22 litigation started.  You said that management didn't

23 tell you much until you met with Emily Metzger in

24 December of 2016; is that fair?

25     A.  Just as far as the litigation hold.

1      Q.   Right.  You know what a litigation hold is?

2      A.   I had never experienced one before.

3      Q.   Okay.  The first one you were given in this case

4   was in December of 2016?

5      A.   That's my memory, but--

6      Q.   Okay.

7      A.   -- I don't know if there was an earlier e-mail.

8      Q.   Had you been told to preserve information related

9   to any of this litigation before December of 2016?

10      A.   I don't recall that.  I know as part of

11   Ms. Catania's complaint against Ms. Barnett, she felt

12   like Ms. Barnett misrepresented to the Court at one of

13   the *Black* hearings that-- Ms. Barnett represented that

14   there was some sort of hold on items in the office, and

15   that was not true.

16      Q.   Okay.

17      A.   And so Ms. Catania outlined that complaint and--

18      Q.   During that time it was business as usual; you

19   were still closing files, sending them off, that sort of

20   thing?

21      A.   No.

22      Q.   No?

23      A.   No.  I was just slowly having a breakdown of

24   sorts and-- and nothing was really happening, no.  I

25   mean, we were all-- we were all having an internal

 1  fight.  The agents were frustrated.  Their bosses were

 2  frustrated.

 3      Q.  Were you told not to close files or to preserve

 4  the evidence in the files, if you remember?

 5      A.  Not that I know of, no.

 6      Q.  Okay.

 7      A.  But if someone else-- I am at a disadvantage to

 8  everyone in the office because I'm sure they've sat

 9  there with the prosecutor and all their e-mails and all

10  their files for the weeks leading up to this, and I

11  haven't seen this stuff in at least a year, most of it

12  not in two years.  So a lot of these questions will have

13  to go with someone who was prepped.

14          MS. BRANNON:  Your Honor, could I have just

15  a moment?

16          THE COURT:  Yes.

17          (Counsel confers).

18          MS. BRANNON:  Thank you.

19          THE COURT:  All right.  It is 4:40.  As you

20  know, Ms. Tomasic has traveled a great distance to be

21  here.  Is there a possibility we can finish with her

22  this evening so she can go back home?

23          MR. CLYMER:  Your Honor, I would really like

24  to have Ms. Tomasic finished up, but I don't think it's

25  possible.  I'm happy to start if the Court would like,

 1  but there's no way I can finish, after she's been

 2  examined all day long, to try and do it in 20 minutes.

 3  I just can't do that.

 4          THE COURT:  All right.  Give me an idea how

 5  long you think you'll be with her.

 6          MR. CLYMER:  My guess is, Judge, between an

 7  hour-and-a-half and two hours, but that's a rough

 8  estimate.

 9          THE COURT:  All right.  Do you anticipate

10  re-directing?

11          MS. VANBEBBER:  Not unless something comes

12  up in Mr. Clymer's direct-- or cross exam.

13          THE COURT:  All right.  Do you need a break?

14  I think we should go ahead and get started.  Do you need

15  a break at this point?  We've been going since 2:30 or

16  so.

17          THE WITNESS:  I do not.

18          THE COURT:  All right.  Let's proceed.

19                  CROSS EXAMINATION

20  BY MR. CLYMER:

21   Q.  Ms. Tomasic, when you first came to the U.S.

22  Attorney's Office, you specialized in drug cases?

23   A.  That's correct.

24   Q.  Did you do OCDETF cases?

25   A.  I did.

 1     Q.   And would it be safe to say that you, for a young

 2   attorney, were very successful in doing drug

 3   prosecutions?

 4     A.   I don't know by what measure you would say that.

 5   I tried really hard.

 6     Q.   Do you remember the term CPOT?

 7     A.   Yes.

 8     Q.   Do you recall what it stands for?  I know you

 9   talked of other acronyms.  I'll test you on this one.

10     A.   I don't remember.

11     Q.   Do you remember the terms "consolidated priority

12   target"?

13     A.   No, but I know what it is.

14     Q.   What is it?

15     A.   It's someone with a certain level of ties to the

16   cartel.

17     Q.   And is it correct to say in the world of drug--

18   federal drug prosecutors, those are the sorts of targets

19   that are particularly important to get because those are

20   the people that are profiting enormously from the drug

21   trade?

22     A.   I think so, yes.

23     Q.   Did you make some cases involving CPOTs as a

24   young attorney?

25     A.   I think so.  I don't remember how many.

1    Q.   Would it be safe to say that when you were

2    assigned to the CCA-Leavenworth investigation, this was

3    outside your area of specialty?

4    A.   It was, except we legitimatized it because there

5    was a Social Security nexus.

6    Q.   But it made it more challenging for you to handle

7    the case, didn't it?

8    A.   To handle the case?

9    Q.   It was new territory for you.  You were doing

10   things that you hadn't done before; is that accurate to

11   say?

12   A.   Well, initially it was a drug case, which

13   wouldn't have been new territory, but it turned into

14   white collar, which was new territory.

15   Q.   Was that part of the reason why Chris Oakley was

16   assigned at some point to help out?

17   A.   I think so, yes.

18   Q.   I'm going to ask you about that case, and I'm

19   really going to focus on three areas and try to limit

20   myself to three areas.

21       I want to ask you some questions about the

22   soundless video that you've testified about.  I'm going

23   to ask you about the audio-recordings of inmate

24   telephone calls, and I'm going to ask you about

25   cooperation with the Special Master.  And we won't

1    finish today, but I'll try to limit myself to just those

2    three areas.

3         Can you start by giving us a little background

4    into what the nature of the CCA-Leavenworth

5    investigation was about?

6    A.   So the investigation, as we learned it, was that

7    inmates at CCA were engaged in what we believed to be a

8    large-scale drug trafficking organization.  And what the

9    inmates would do is Inmate A, let's just say he's a

10   supplier, he would have other inmates put money through

11   their friends and family onto his inmate account.

12        And then once he received payment, someone on the

13   outside on his behalf would meet up with a guard, and

14   then the guard would receive payment for his services as

15   well.  And the guard or guards, as we believed, smuggled

16   drugs and contraband into the facility, and then it was

17   distributed throughout the facility.

18   Q.   So there were inmates involved.  Correct?

19   A.   Inmates, yes.

20   Q.   Guards were involved.  Correct?

21   A.   Yes.

22   Q.   And outsiders were involved?

23   A.   Yes.

24   Q.   Was there bribery going on as well?

25   A.   Yes.

1    Q.   Was there money laundering going on as well?

2    A.   Yes.

3    Q.   So it was a fairly serious investigation?

4    A.   That's-- yes, I believe so.

5    Q.   And this ultimately resulted in the indictment of

6    six individuals that became *U.S. versus Black,* that's

7    now *U.S. versus Carter;* is that right?

8    A.   Yes.  I didn't know it had been re-styled, but

9    yes.

10   Q.   And did you have hopes at the time you first

11   sought indictment that there would be follow-up

12   indictments of other individuals?

13   A.   Yes.

14   Q.   During the course of your investigation, did you

15   hope to get cooperators to learn more and more about

16   what was going on in the prison?

17   A.   Did I want cooperators?

18   Q.   Did you hope to develop, as you did the

19   investigation and it got larger, to develop cooperators?

20   A.   I think-- honestly, I think we had a little

21   hesitation with the later cooperators because we were

22   afraid they were just jumping on the bandwagon.  So we

23   wanted to get cooperators in early so that we could lock

24   them in before everyone knew what was happening, and

25   then to be-- we ended up being pretty selective about

1   cooperators down the road, especially ones who had

2   problems like-- that we believed were problematic.

3       Q.   I take it getting cooperators of a pool of people

4   who are prison inmates is a challenging thing to do.  Is

5   that safe to say?

6       A.   It seemed to be.  I had never tried it before.  I

7   mean, every case they're in prison a lot of times, but

8   because they were all living together and breathing

9   together and the substance that they were cooperating

10  about involved each other, it did seem like a pressure

11  cooker.

12      Q.   Did that play any role in your decision to want

13  to get as much video from the facility as possible?

14      A.   Yes.  The reason I wanted to get as much video as

15  possible is that we were-- compared to other cases where

16  you can do a really long-term investigation, as I was

17  accustomed to in drug cases, this investigation was cut

18  off because the marshals service and I think-- I think

19  someone in Main Justice were not comfortable with us

20  allowing to contribute-- continue to investigate,

21  knowing that drugs were going into the facility.

22          So we were sort of given a mandate when we sought

23  the Title III.  Yes, you can have this, but we're not

24  going to keep letting you go up on phones, knowing that

25  drugs are going in the facility.  So that cut it off

1  early.

2     Q.  And then once it got cut off, the video would get

3  erased periodically and you wanted to capture it; is

4  that right?

5     A.  That's right.

6     Q.  And that's why you had a broad grand jury

7  subpoena?

8     A.  That is why.

9     Q.  I'm going to show you-- because there's some

10  confusion, I'm going to show you some documents about

11  dates.  I'm going to approach you with what's been

12  marked as 438.

13          MR. CLYMER:  This is in evidence, Your

14  Honor, but it's sealed, so I'm not going to put it up.

15          THE COURT:  All right.

16  BY MR. CLYMER:

17     Q.  Take a look at Exhibit 438, Ms. Tomasic, and tell

18  me if that is the grand jury subpoena that you had

19  served on CCA-Leavenworth in order to obtain the video

20  evidence?

21     A.  Yes, it is.

22     Q.  Now, counsel for the Special Master said that

23  that subpoena went out on May 4th; is that correct?

24     A.  It does look like it-- no, it's dated April 12th

25  and it has to be delivered by May 4th.

1      Q.   So the subpoena service date or the date it was

2  generated by your office on behalf of the grand jury was

3  April 12th, 2016?

4      A.   That's correct.

5      Q.   At the time you drafted-- did you draft the

6  subpoena?

7      A.   I believe so.  I believe-- I know it was my

8  decision to seek everything versus just particular

9  areas, because I felt like that was too limited.  I

10 don't know if I'm the person who typed it up.

11     Q.   Was it your purpose at the time you drafted that

12 subpoena to try to get attorney-client privileged

13 information?

14     A.   No, it was not.

15     Q.   Was it your purpose at the time you get the

16 subpoena to get video of the inside of the

17 attorney-client meeting rooms so you could watch those

18 to invade people's privileges?

19     A.   No, it was not.

20     Q.   Was it in your mind at the time you drafted that

21 subpoena that four months down the road you'd be talking

22 to Jackie Rokusek about a conflict of interest?

23     A.   No, it was not.

24     Q.   Ms. Tomasic, in April of 2016 was there a law

25 enforcement search conducted at CCA-Leavenworth?

1      A.   Yes, there was.

2      Q.   Were you involved in that search?

3      A.   I was there and Chris Oakley was there.  We

4  didn't actually physically help search, but we were

5  there.

6      Q.   And you were the people that helped arrange the

7  search by getting search warrants; is that right?

8      A.   That's right.  And then I had been encouraged to

9  go I think by Kim, because when there are complicated

10 searches like that, that legal issues arise.  And they

11 actually did.  The warden-- I forgot, there was some

12 issue with the warden.  We needed to be there to provide

13 legal advice.

14     Q.   And did you realize at the time you were going to

15 execute-- or the agents were going to execute the search

16 warrant at the facility that you were going to search,

17 among other places, the law library?

18     A.   I did.

19     Q.   Did you realize that there might be

20 attorney-client privileged materials in the law library?

21     A.   I did, with the help of Henry Herron.

22     Q.   And did you discuss that with Agent Herron before

23 the search?

24     A.   I did.  He brought it to my attention, and I then

25 took it to Kim Flannigan, who took it to Tanya Treadway.

1   Q.   And did you set up a filter or a taint team in

2   order to screen any potentially attorney-client

3   privileged materials that were seized during the

4   execution of that search warrant at the law library?

5   A.   Agent Herron did, and Tanya Treadway was the

6   filter attorney.

7   Q.   And that was part of your operational plan in the

8   execution of those search warrants; is that right?

9   A.   Yes, it was.

10   Q.   Because you realized you might come across

11   attorney-client privileged material?

12   A.   That's correct.

13   Q.   If it had occurred to you at the time of that

14   search that you might get video of attorney-client

15   meeting rooms, would you have done the same thing with

16   that?

17   A.   Yes, I would.

18   Q.   Was it in your mind at the time this all happened

19   that you might get videoed attorney-client meeting

20   rooms?

21   A.   It was not.

22   Q.   How busy were you at the time this was all

23   occurring?

24   A.   I was very busy.  I-- we were doing this big

25   takedown.  We had all the warrants, all the first

1   appearances, detention hearings, and starting to get--

2   work on getting discovery ready.

3       And then I know, as everybody knows because it's

4   been in the pleadings, while we're searching CCA, my

5   parents came to town to help with my infant daughter and

6   she started vomiting.  We took her to the doctor three

7   times-- or two times I think in the next week, and they

8   kept sending her back.

9       And so by Thursday, which is the day I signed the

10  subpoena I think, she was admitted to Children's Mercy

11  for dehydration and also for antibiotic resistance.  And

12  she was in like quarantine with a spacesuit from

13  Thursday until Monday, and I had to be there the whole

14  time because she had IVs and stuff, just was having

15  trouble.

16      I did come to work for a couple hours on Sunday,

17  and my husband came and held her.  But, you know, it was

18  a rough week.  And I know it's-- it's-- I just know that

19  it's easy as a lawyer to forget about what everybody

20  else has going on, but I had life.  Life got in the way,

21  and I made a mistake that will-- it changed my life

22  forever.

23  Q.  Had you realized that you might get video of the

24  attorney-client meeting rooms when that subpoena was

25  served, would you have set up a taint team at that time?

1     A.  Yes.  I would've just added it-- so the computers

2   were locked away somewhere that Henry was involved in

3   with the filter team.  I just would've put the video

4   with it.  I-- instead of trying to send it out in

5   discovery, which is what I did.

6     Q.  Did you have any burning desire to watch hours

7   and hours of soundless video of attorneys and their

8   clients sitting in meeting rooms?

9     A.  I did not.

10    Q.  Ms. Tomasic, I'm going to show you what's been

11  marked as Exhibit 8.  And you-- you have testified about

12  a lot of events that occurred long ago.  And what I'm

13  going to do when I show you documents, I'm going to give

14  you a chance to read it first so-- to refresh your

15  memory about it.  And when you're done reading it, let

16  me know because then I'll have some questions.

17        Exhibit 8 is a long document.  I'm not going to

18  question you about the whole thing.  I'm going to

19  question you about the first two e-mails that are on

20  Pages 1 and 2, and that's it.  So if you could, read it

21  to yourself and let me know when you're done.

22  Exhibit 8.

23        By the way, if you need a break, Ms. Tomasic, let

24  me know, okay?

25    A.  I'm all right.  Thank you.  All right.

1    Q.   Okay.  Would it be correct to say that Exhibit 8

2    is-- at least the first two pages are a series of

3    e-mails that you sent out to defense attorneys in the

4    *Black* case?

5    A.   That's correct.

6    Q.   And would it be accurate to say that this e-mail,

7    the first e-mail dated April 26th, 2016, went out before

8    you had received the video evidence from

9    CCA-Leavenworth?

10    A.   I don't know exactly what date we got it, but I

11    sent this on April 27th and the compliance date was

12    May 4th of 2016.

13    Q.   So do you think it's possible you hadn't even

14    gotten the video?

15    A.   Yes, I do think it's possible.  And I know that

16    as far as the size of the video, there was a lot of back

17    and forth because we didn't know the size of the video,

18    and we were trying to tell the defense attorneys how big

19    it was going to be and what they needed to provide so we

20    could get it to them.

21    Q.   If you look at the second e-mail, the one at the

22    bottom which would've been the first one that went out,

23    that's dated April 26th; is that correct?

24    A.   Yes.

25    Q.   And on Bullet Point No. 1 in that you refer to

1   the discoveries, including the surveillance footage

2   alone at CCA, will require a four-terabyte external

3   drive?

4       A.  Yes.

5       Q.  Did you make any effort to hide from the defense

6   attorneys in the case the fact that you subpoenaed all

7   this video evidence which ultimately proved to include

8   attorney-inmate meeting rooms?

9       A.  I did not.

10      Q.  Did you think you had done anything wrong by

11  issuing that grand jury subpoena?

12      A.  I did not.

13      Q.  Did you try to conceal it from anybody?

14      A.  I did not.

15      Q.  Okay.  I'm going to ask you to go down to Bullet

16  Point 4 on that-- that earlier e-mail from April 26th.

17      A.  Yes.

18      Q.  Was Bullet Point 4 talking to the defense

19  attorneys or communicating about your willingness to use

20  a taint team with respect to the material from the law

21  library?

22      A.  Yes.

23      Q.  At this time, before you had even received the

24  material or the video, would you have done that as well

25  if it had occurred to you that the video would include

 1  attorney-client meeting rooms?

 2     A.  Yes.

 3     Q.  I'll ask you to look at the second e-mail, the

 4  later e-mail at the top of the first page of Exhibit 8

 5  that's dated April 27--

 6     A.  Yes.

 7     Q.  -- 2016.

 8     A.  Yes.

 9     Q.  And did you learn that actually the surveillance

10  footage was going to be much larger than you originally

11  thought?

12     A.  Yes.

13     Q.  And it was going to be 18 terabytes.  Correct?

14     A.  That's correct.

15     Q.  Is that what it proved to be ultimately?

16     A.  I honestly don't recall.

17     Q.  Did CCA-Leavenworth comply with the subpoena

18  that's been marked as 438 for the video evidence?

19     A.  They did.

20     Q.  To the best of your recollection, can you

21  describe for us what happened?  Do you recall who

22  brought-- who brought the evidence to your-- to your

23  office?

24     A.  I don't recall who brought it.  I do recall that

25  CCA couldn't make a copy of it, so we had to buy-- I

1    think we had to buy them the exact same machine that

2    they had and switch it out with them so that they had an

3    empty version and then we had the full version of the

4    PELCO.

5       Q.   I'm guessing you're not a computer wizard; is

6    that accurate?

7       A.   I mean, no, but I-- I can do--

8       Q.   I'm not going to test you.

9       A.   Okay.

10      Q.   Would it be correct to say that the six devices

11   were external hard drives that stored data, digital

12   data?

13      A.   Yes.

14      Q.   Okay.  Do you recall whether a copy was made of

15   them and the original kept somewhere other than the U.S.

16   Attorney's Office?

17      A.   Yes.  A copy was made and kept at the Secret

18   Service because-- at Pauletta Boyd's request because she

19   didn't want to have the only copy because she was afraid

20   she might damage it accidentally and then they

21   wouldn't-- we would lose evidence.

22      Q.   And ultimately did you come to learn that

23   Pauletta Boyd had a copy of that video-- of that video

24   evidence?

25      A.   Yes.

 1      Q.   And that was six hard drives.  Do you recall
 2  that?
 3      A.   Yes.  And, again, I didn't know it was six.  Now
 4  we've talked about it since the litigation arose, now I
 5  know it's six.  I don't think at the time I knew.
 6      Q.   Did you-- did you recall learning at some point
 7  that Pauletta now had the copy in her possession?
 8      A.   Yes.
 9      Q.   Did you contact all your colleagues and say,
10  let's all sit down and watch attorney-client videos
11  together?
12      A.   No.
13      Q.   Did you make it known that you had videos of
14  attorney-client meetings that you all could take
15  advantage of in your cases?
16      A.   No.
17      Q.   Did it occur to you at that point that there was
18  attorney-client video on those hard drives?
19      A.   Not in May and June, no, it did not.
20      Q.   Oh, by the way-- I'll ask it later.  I'm going to
21  show you now what's been marked as Exhibit 439.  I'm
22  going to ask you if you recognize Exhibit 439.
23              MR. CLYMER:  This is in evidence as well,
24  Your Honor.
25  BY MR. CLYMER:

```
1    Q.  Do you recognize Exhibit 439?

2              THE COURT:  I'm sorry.  Is Exhibit 8 already

3    admitted?

4              MR. CLYMER:  Yeah, that has been.  I'm

5    sorry, Your Honor, I forgot to tell you.  Yes, it has

6    been.  It was admitted at the hearing on September 7th,

7    2016.

8              THE COURT:  All right.  Thank you.

9    BY MR. CLYMER:

10   Q.  Do you recognize Exhibit 439, Ms. Tomasic?

11   A.  Yes.  It's the index.

12   Q.  And when you say it's the index, can you tell us

13   a little bit about what the index is?

14   A.  It's the index that CCA produced that shows which

15   camera angles are on which of the hard drives.

16   Q.  I'm going to put that up on this.  Thank you.

17            Ms. Tomasic, was there a fairly strong demand

18   from the defense attorneys in the case that you obtain a

19   document like Exhibit 439 to assist them?

20   A.  Yes.

21   Q.  Can you explain that to the Court, please?

22   A.  I believe-- I don't remember the exact timing,

23   but in July the attorneys on the case and who were

24   receiving the discovery were frustrated because of the

25   volume of evidence.  And John Jenab, who I considered a
```

1   friend of mine, said that this was unusually raw the way

2   I was providing the discovery.

3        And so I began working with Pauletta to try and

4   remedy that so that they didn't-- the defense attorneys

5   didn't have to wade through all of this stuff

6   unnecessarily.  And I asked her to get an index or

7   whatever she needed to help them to navigate it.

8        And so she got in contact with Matt Cahill.  He

9   got in contact with someone at CCA, and they-- CCA

10   generated this index and provided it to Pauletta.

11   Q.   Do you remember that when CCA provided the index,

12   it was in Excel spreadsheet form?

13   A.   I don't recall that.

14   Q.   Now, if you look at Exhibit 439-- and actually,

15   strike that.

16        Ms. Tomasic, when you got Exhibit 439, did you

17   send it out in discovery?

18   A.   I think I told Pauletta to hold off and put it

19   with the video so that it wouldn't get lost in the wades

20   of all the other stuff and it would just be attached to

21   the video.  I don't know that for certain, but that's my

22   recollection.

23   Q.   Do you recall this ever going out to the defense

24   bar?

25   A.   I think after the hearing on July 21st when we

1  started just shoving out whatever we could, I do think

2  it went out in that batch, but I don't know for sure.

3      Q.  Did you make any effort to conceal this document

4  from anybody?

5      A.  Not-- no.

6      Q.  Since you raised that hearing on July 21st, let

7  me talk about that.  I want to show you what's been

8  marked as Exhibit 447.

9           MR. CLYMER:  And, Your Honor, this I believe

10  is in evidence as well from the last proceeding.

11  BY MR. CLYMER:

12     Q.  And I'm not going to ask you to read the whole

13  thing, but I will get a page number for you and have you

14  take a look at this.  Was there a status conference that

15  day?

16     A.  Yes, there was.

17     Q.  And that was at-- that was the-- this is the

18  transcript for it?  37 [sic] is the transcript of that

19  status conference?

20     A.  Yes.

21     Q.  And was there discussion at that status

22  conference about trying to figure out where in this

23  large volume of video evidence certain events or certain

24  pods or certain inmates could be found?

25     A.  I haven't looked at this in a long time, and that

 1    does not strike a cord.

 2        Q.   Okay.  I'm going to ask you to look at Page 11 of

 3    Exhibit 437 [sic].  About halfway down the page there's

 4    a question from the Court that begins with the word

 5    "okay."  Do you see that?

 6        A.   Yes.

 7        Q.   Can you start reading there and then read through

 8    the next page where the Court again says "okay."  On to

 9    Page 12 where the Court says--

10        A.   Out loud?

11        Q.   Pardon me?

12        A.   Out loud?

13        Q.   No, to yourself.  Just read it to yourself.  I

14    don't want to ask you a question until I give you a

15    chance to refresh your memory.

16        A.   (Witness reads).  Yes.

17        Q.   Does that refresh your memory about some of the

18    events that occurred at that hearing?

19        A.   It does.

20        Q.   Okay.  And at that hearing did the judge ask you

21    a question about whether there's any tracking done of an

22    inmate who leaves the pod to go to visit, say, with an

23    attorney?

24        A.   Tracking?

25        Q.   Or maybe I-- I didn't have you read enough.  On

1    Page 11, start up near the top where you're talking

2    about the Offender Management System.

3        A.   Okay.  Oh, and how to follow an inmate and know

4    where to look, yes.

5        Q.   Let me ask my question again and I'll ask a

6    better question now.  Were you trying to-- did the judge

7    ask you a question about the tracking of an inmate

8    leaving the pod and going places, including to see an

9    attorney?

10       A.   Yes.

11       Q.   And did you answer that question?

12       A.   Yes.

13       Q.   And then did the judge ask a follow-up question

14   about whether there's cameras in the visiting and the

15   attorney-client rooms?

16       A.   Yes.

17       Q.   And what did you tell the Court about whether

18   there's cameras there?

19       A.   I said yes-- do you want me to read?

20       Q.   Sure.

21       A.   "Yes."  She said, "And are there cameras

22   identified with particular-- the visitor room and the

23   attorney-client room as well, or no?"  And I answered,

24   "Yes, except that there is no-- there is-- there are no

25   audio in attorney-client unless someone at CCA, an

1  employee, took it upon themselves to turn on the audio."

2     Q.  You can stop there.  What you just told us is

3  consistent with what you described to Ms. Brannon as

4  coming from your cooperator; is that right?

5     A.  That's right.

6     Q.  So the information you gave to Judge Robinson at

7  the status conference on July 21st, 2016, was based on

8  that cooperator information; is that right?

9     A.  That's right.

10    Q.  Was that the best of your knowledge at the time?

11    A.  It was.

12    Q.  How many attorneys were at that status

13  conference, if you recall?  You can look at the front of

14  the transcript if it helps you.

15    A.  I know that the six defendants' attorneys were

16  there, and I know that some members of the FPD were

17  there as well.

18    Q.  Did it occur to you when you gave that answer to

19  Judge Robinson that capturing that video evidence which

20  you were talking about at this hearing could potentially

21  intrude on attorney-client meetings?

22    A.  I think that I realized it ahead of the hearing

23  and I-- or around the time of the hearing.  I don't

24  know, sometime in July I realized it and I intended to

25  discuss it at the meet and confer, along with all the

1  other privilege issues that we were discussing and that

2  I also talked to John Jenab about during the hearing.

3      Q.  Did you raise that at the hearing?

4      A.  I did not.  And I asked John Jenab should we

5  raise this at this hearing, and he said, no, we'll

6  just-- should we raise the privilege issues at the

7  hearing, and I'm paraphrasing, but that was the

8  question.  And he said, no, let's just discuss it at the

9  next meet and confer.

10     Q.  And when you had this conversation with Mr.

11 Jenab, where was that conversation?

12     A.  In the courtroom.

13     Q.  Was that immediately before the hearing took

14 place?

15     A.  I honestly think it was in the middle of the

16 hearing.  When somebody else was talking, I sort of

17 grabbed him and leaned over, like, should we also put

18 this out there.  We were whispering.

19     Q.  At that time had you watched any of the video

20 from CCA-Leavenworth?

21     A.  No.

22     Q.  To your knowledge, at that time was anybody

23 watching any of the video from CCA-Leavenworth?

24     A.  I don't know at what point Jeff Stokes started

25 looking at the video, but it would've been in July.

1    Q.   When Jeff Stokes started looking at the video,

2  did he have instructions not to watch anything inside

3  the attorney-client meeting rooms?

4    A.   Yes, he did.

5    Q.   Did any attorney at the July 21st, 2016 hearing

6  raise to you a concern about the privilege after you

7  made that statement?

8    A.   No.

9    Q.   Did anybody say to you, I'm asserting the

10 privilege on behalf of my client, I want you to secure

11 that video, after that July 21st hearing?

12   A.   No.

13   Q.   Did Mr. Jenab assert the privilege as to that--

14 the video at that time?

15   A.   No.

16   Q.   If somebody had asserted the privilege at that

17 time, what would you have done?

18   A.   I suppose I would've locked it up where

19 everything else was locked up, with Agent Herron.

20           MR. CLYMER:  Your Honor, how long does the

21 Court intend to go?

22           THE COURT:  I don't know.  Are you ready to

23 take a break?

24           MR. CLYMER:  Probably.

25           THE COURT:  All right.  Let's reconvene--

 1   can you all start at 8:30?

 2           MR. CLYMER:  I will start whenever you tell

 3   me to be here, Judge.

 4           THE COURT:  All right.  We're already

 5   behind, so let's start at 8:30 tomorrow morning.  And,

 6   Ms. Tomasic, hopefully we can get you out of here by

 7   midday--

 8           THE WITNESS:  Thank you.

 9           THE COURT:  -- or even earlier.

10           THE WITNESS:  Thank you.

11           THE COURT:  All right.  Any matters we need

12   to take up outside the hearing of the witness--

13           MR. CLYMER:  Not from me, Your Honor.

14           THE COURT:  -- before we close for the

15   evening?  Anybody?

16           MR. CLYMER:  I would-- Your Honor, I think

17   we can do this after court recesses, I'd like to get a

18   sense of who the other witnesses are tomorrow because

19   there's some changes for today.  So I can just talk to

20   counsel about that afterwards.

21           THE COURT:  All right.  Anyone else have

22   anything to bring up to me before we recess?

23           MS. BRANNON:  No, Your Honor.

24           THE COURT:  Okay.  We'll recess until 8:30.

25           (5:05 p.m., proceedings recessed).

1                    C E R T I F I C A T E

2

3

4

5      I, Kelli Stewart, a Certified Shorthand Reporter and

6   the regularly appointed, qualified and acting official

7   reporter of the United States District Court for the

8   District of Kansas, do hereby certify that as such

9   official reporter, I was present at and reported in

10   machine shorthand the above and foregoing proceedings.

11      I further certify that the foregoing transcript,

12   consisting of 301 pages, is a full, true, and correct

13   reproduction of my shorthand notes as reflected by this

14   transcript.

15      SIGNED October 29, 2018.

16

17

18

19              /s/ Kelli Stewart

20              Kelli Stewart, CSR, RPR, CCR, RMR

21

22

23

24

25