```
1                   UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5    v.                              Docket No. 16-20032-02-JAR

6    KARL CARTER,                    Kansas City, Kansas
                                     Date:  10/03/2018
7

8         Defendant.                 Day 4
     ....................            Pages 700-1056

9
                    TRANSCRIPT OF MOTIONS HEARING
10           BEFORE THE HONORABLE JULIE A. ROBINSON
                 UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Government:   Mr. Steven D. Clymer
                           Department of Justice - USAO
14                         Lrm Eckert, William
                           100 S. Clinston Street
15                         Suite 9000
                           Syracuse, New York 13261
16
                           Mr. Duston J. Slinkard
17                         Office of United States Attorney
                           444 Southeast Quincy
18                         Suite 290
                           Topeka, Kansas 66683-3592
19
                           Mr. Stephen R. McAllister
20                         Office of United States Attorney
                           500 State Avenue
21                         Suite 360
                           Kansas City, Kansas 66101
22

23

24

25
```

```
 1    APPEARANCES:

 2    (Continued)

 3    For the Defendant Karl Carter:
                           Mr. David J. Guastello
 4                         The Guastello Law Firm, LLC
                           811 Grand Boulevard
 5                         Suite 101
                           Kansas City, Missouri 64106
 6
      For the Movant Federal Public Defender:
 7                         Ms. Melody J. Brannon
                           Mr. Kirk C. Redmond
 8                         Mr. Branden A. Bell
                           Office of Federal Public Defender
 9                         117 Southwest Sixth Street
                           Suite 200
10                         Topeka, Kansas 66603

11    For the Special Master David R. Cohen:
                           Mr. David R. Cohen
12                         David R. Cohen Co., LPA
                           24400 Chagrin Boulevard
13                         Suite 300
                           Cleveland, Ohio 44122
14
                           Ms. Alleen VanBebber
15                         VanBebber Law Firm, LLC
                           2029 West 95th Street
16                         Leawood, Kansas 66206

17

18

19

20

21

22
      _____
23
          Kelli Stewart, CSR-KS, CRR-MO, RPR, CRR, RMR
24               Official Court Reporter
          259 U.S. Courthouse, 500 State Avenue
25               Kansas City, Kansas 66101
```

1                      I N D E X

2
   Special Master's Witnesses:                        Page

3
   ERIN TOMASIC
4     Cross Examination By Mr. Clymer (Cont'd)          704
      Redirect Examination By Ms. VanBebber             785
5     Recross Examination By Ms. Brannon                795

6  PAULETTA BOYD
      Direct Examination By Ms. VanBebber               976
7     Cross Examination By Mr. Bell                    1018
      Cross Examination By Mr. Clymer                  1040
8     Redirect Examination by Ms. VanBebber            1046

9
   Federal Public Defender's Witnesses:                Page
10
   AGENT JOHN SEUBERT
11    Direct Examination By Mr. Bell                    815
      Cross Examination By Ms. VanBebber                852
12
   JABARI WAMBLE
13    Direct Examination By Ms. Brannon                 875
      Cross Examination By Ms. VanBebber                898
14    Cross Examination By Mr. Clymer                   913
      Redirect Examination By Ms. Brannon               919
15
   THOMAS CHRISTIAN COX
16    Direct Examination By Ms. Brannon                 928
      Cross Examination By Mr. Clymer                   938
17    Redirect Examination By Ms. Brannon               942

18 CAPTAIN JARED SCHECHTER
      Direct Examination By Ms. Brannon                 944
19    Cross Examination By Special Master Cohen         953
      Cross Examination By Mr. Clymer                   955
20    Redirect Examination By Ms. Brannon               958
      Recross Examination By Mr. Clymer                 958
21    Recross Examination By Special Master Cohen       959

22 CAPTAIN TOBY STEWART
      Direct Examination By Ms. Brannon                 960
23    Cross Examination By Special Master Cohen         969
      Cross Examination By Mr. Clymer                   970
24    Redirect Examination By Ms. Brannon               974

25

```
1                        E X H I B I T S

2        Special Master's
3        Exhibits              Offered            Received

4           1133                851                851
            1134                851                851
5           1135                851                851
            1136                851                851
6           1137                851                851
            1138                851                851
7           1139                851                851
            1140                851                851
8           1141                851                851
            1142                851                851
9           1143                851                851
            1144                851                851
10          1145                851                851
         Calendar*             744                744
11

12       Federal Public Defender's
         Exhibits              Offered            Received
13
            570                 874                874
14          571                 874                874
           593**                951                952
15         594**                951                952
            595                 951                952
16         596**               1054               1054
            597                1054               1054
17          598                1054               1054
            599                1054               1054
18          607                 874                874
            616                 836                837
19          637                 874                874
            644                1019               1019
20

21       Government's
         Exhibits              Offered            Received
22
            32*                 743                744
23          42                  915                915

24
       * Denotes demonstrative exhibit
25     ** Denotes admitted under seal
```

```
1                  (8:33 a.m., proceedings commenced).
2                  THE COURT:  All right.  You can be seated.
3    Mr. Clymer.
4                  MR. CLYMER:  Thank you, Your Honor.
5                        ERIN TOMASIC,
6    called as a witness on behalf of the Special Master,
7    having first been duly sworn, testified as follows:
8                     CROSS EXAMINATION
9    BY MR. CLYMER:
10   (Continued)
11      Q.  Ms. Tomasic, I want to jump back a little bit in
12   time because there's an exhibit I wanted to show you
13   that I missed yesterday.  I'm going to approach you with
14   what's been marked as Government Exhibit 23.
15                  MR. CLYMER:  And, Your Honor, there's a
16   stipulation as to the admissibility of this document.
17   BY MR. CLYMER:
18      Q.  If you'd just read this to yourself and let me
19   know when you've had a chance to do so.  Thank you.
20      A.  Yes, I've read it.
21      Q.  Thank you.  What I'd like to ask you about is to
22   try to pin down the date on which the-- the DVDs arrived
23   in your office.
24                  Would it be correct to say that Exhibit 23 is a
25   discovery letter you sent out as part of the
```

1    CCA-Leavenworth investigation and prosecution?

2        A.   It is.

3        Q.   And what's the date of that e-mail?

4        A.   I sent it on June 29th, 2016.

5        Q.   And to whom did you send it?

6        A.   To Michael Jackson, John Jenab, Kathleen

7    Ambrosio, Jason Hoffman, David Guastello, Cynthia Dodge,

8    and then I copied Chris Oakley and Pauletta Boyd.

9        Q.   And was the list of defense attorneys you named,

10   were those the attorneys who were representing the

11   defendants in *United States versus Black*?

12       A.   It is.

13       Q.   And from the text of that letter, does it appear

14   to you that at the time you sent that letter the hard

15   drives had already arrived in your office?

16       A.   Yes.

17       Q.   And what makes you say that?

18       A.   Item 3 in my list says-- suggests that I am still

19   waiting for defense counsel to give me drives.  And at

20   this point I know that I need six different drives, each

21   three terabytes in size, so-- and it says that the

22   footage is divided by camera angle, so it's clear that

23   we-- the office, Pauletta namely, knows how the video is

24   organized.

25       Q.   Thank you.  I'm going to also ask you to look at

1   another exhibit, and I'm not going to put it up on the

2   screen, it's not in evidence.  I want you to keep it

3   with you because I want to have you help me with it.

4   It's Exhibit No. 32.  So if you can just familiarize

5   yourself briefly with Exhibit 32.  Let me know when

6   you've done so.

7        A.  Is this something that someone else prepared,

8   because I'm not familiar with it.

9        Q.  You've never seen that before; is that correct?

10       A.  That's correct.

11       Q.  Okay.  But have you had a chance to just take a

12   look at it and figure out how it works?

13       A.  Yes.

14       Q.  Okay.  I'm just going to ask you, you testified

15   yesterday about going to a hearing on July 21st, and I

16   showed you a transcript from that.  Do you recall that

17   testimony?

18       A.  Yes.

19       Q.  Does it appear that the first entry in Exhibit 32

20   accurately describes what you testified about yesterday

21   regarding that hearing?

22       A.  Yes.

23       Q.  Thank you.  You can put 32 aside for a minute.

24   We'll come back to it periodically.

25            Now, we've established that as of late June, the

1  video had clearly arrived in your office.  Do you recall

2  there came a time on August 5th when the video evidence

3  was taken away from Pauletta Boyd and put into the U.S.

4  Attorney's Office vault?

5      A.  I do.

6      Q.  Okay.  I want to ask you some general questions

7  about the time period between the time the video arrived

8  in your office and the time period it went to the vault

9  on August 5th, 2016, and then I'll get into some more

10 specifics.  So first I want to ask you some general

11 questions.

12      During that time period when that video was in

13 the U.S. Attorney's Office, did you ever watch any of

14 that video?

15      A.  I did not.

16      Q.  Did you ever watch any video from CCA of any

17 attorney meeting with any inmate at CCA?

18      A.  I did not.

19      Q.  To your knowledge, did any U.S. Attorney employee

20 watch any video of any attorney meeting with any inmate

21 at CCA?

22      A.  To my knowledge, no one did.

23      Q.  And this-- this evidence that apparently depicts

24 this was subpoenaed as part of your case; is that right?

25      A.  That's correct.

1     Q.   To your knowledge, who had possession of the hard

2  drives during the time they were in the U.S. Attorney's

3  Office?

4     A.   As I recall, the hard drives were initially

5  brought to my office and they stayed there for a very

6  short period of time.  I don't know if it was-- if I

7  immediately told the agent to take it on to Pauletta or

8  if a short period of time passed.  But then the agent

9  took the box to Pauletta Boyd, and that's where it

10  remained, in her office.

11     Q.   Did you ever have access on your computer, or any

12  other computer that you could get to, the special

13  software needed to view the video from CCA-Leavenworth?

14     A.   Not to my knowledge, but I never looked to see if

15  I had special software on there.  I never tried to do

16  it, so--

17     Q.   Do you have any idea how that software works?

18     A.   No.

19     Q.   Did you ever use that software?

20     A.   No.

21     Q.   Did you ever install it on a computer?

22     A.   No.

23     Q.   Did you learn that Agent Stokes had possession of

24  the software-- I'm sorry, the-- the hard drives at some

25  point?

1    A.   Yes.

2    Q.   Do you recall how that came about?

3    A.   I recall that Jackie Rokusek was contacting the

4  office.  I don't recall if it was me or Kim Flannigan or

5  Pauletta, but she wanted to view the video, and we

6  learned that Jeff Stokes had custody of the video.  I

7  may have known it earlier, but I don't recall.  But Jeff

8  was gone on vacation so someone had to go to get the

9  video from Jeff's house to bring it back to the office

10  for Jackie Rokusek to view.

11    Q.   During the time Jeff Stokes had possession of the

12  video, did you ever use his computer to view any of the

13  video?

14    A.   No.

15    Q.   Do you know where Jeff Stokes lived at the time?

16    A.   I think he had shown me one time when we were

17  preparing for the *Rapp* case from the main highway, "I

18  live in this neighborhood," but I don't-- I had never

19  been to his home.

20         We were going to the Johnson County jail to do

21  something, to mark evidence to prepare for the *Rapp*

22  trial.  And Jeff had Kim Flannigan and me with him, and

23  we were driving to lunch and he showed us what

24  neighborhood he lived in by pointing from the highway.

25  But it was a neighborhood with lots and lots of houses.

1      Q.   So you never went to Jeff Stokes' house to watch

2   the video?

3      A.   Never.

4      Q.   Did there come a time back in 2016 when you and

5   Kim Flannigan became concerned that a CCA inmate named

6   Richard Dertinger was spreading information in the

7   detention center about your investigation and about

8   people who were cooperating with you?

9      A.   Yes.

10     Q.   How did you come to learn that that was

11  happening?

12     A.   It was through inmate proffers.  And, again, I

13  haven't had the benefit of looking at this information

14  for some time, but my recollection without having looked

15  at it is-- recently, is that in early July, in a short

16  period of time, two additional proffers came forward,

17  indicated Richard Dertinger had this information.  And

18  the agents brought it to our attention.  And we were in

19  a group setting and someone-- and I believe it was Glen

20  Virden with the KBI, but I don't recall, reminded

21  everyone that the first inmate who did the proffer back

22  in March or April had also made this claim.

23          And so we went back and pulled that proffer

24  report and found that information.  I don't know if it

25  actually made it into the report or if it was in the

 1  agent notes, but somehow we determined that-- well, an

 2  inmate had made that claim earlier.  So now we were up

 3  to three inmates.

 4     Q.   And these-- the second and third inmate who

 5  provided this corroborating information, that

 6  information came to you after you had drafted the grand

 7  jury subpoena.  Correct?

 8     A.   Yes.  It came to me, as I recall, in early July

 9  2016.

10     Q.   And that was, in fact, as we've established,

11  after the video was already in your possession?

12     A.   That's correct.

13     Q.   Did the information that you suspected or learned

14  that Dertinger was spreading around, was it consistent

15  with information that had been provided to Jackie

16  Rokusek when she was representing a different client?

17     A.   Yes, it was.

18     Q.   Based on your concerns about that, did you and/or

19  Kim Flannigan task Agent Stokes to try to find some

20  events in the CCA video that you had obtained?

21     A.   Yes.

22     Q.   Can you please describe that for us?

23     A.   I don't recall it being a lengthy conversation,

24  but we asked Jeff to start to take a look at the video.

25  And I don't recall if Kim Flannigan was present or not,

1    I just recall walking down the hall.

2          And my understanding of the instructions I gave

3    to him, as I recall, was that he was going to look at

4    video outside of the attorney-client room.  He was going

5    to match it up to the meetings when we had the time and

6    date of meetings that Ms. Rokusek came to the facility,

7    and he was going to look at Dertinger leaving those

8    meetings and going back to his pod to see who he met

9    with, whether he had anything in his hand possibly, what

10   the general demeanor was of the group.

11         And our thought was if there were 40 or so

12   inmates in a pod, and if Dertinger comes back in the pod

13   and the six people who we know are drug traffickers or

14   believe are drug traffickers come to meet in a separate

15   corner, then that would help to substantiate the claim.

16   Q.   So the events you were concerned about were

17   events after a Rokusek-Dertinger meeting.  Correct?

18   A.   That's correct.

19   Q.   Not events during a Rokusek-Dertinger meeting.

20   A.   No.  And I-- I cannot say that eventually we

21   would not have taken those steps to look at the meeting,

22   but we would have used a filter team to do so.

23   Q.   And you recall you telling Stokes to take these

24   steps to look at-- for events after a Rokusek-Dertinger

25   meeting?

1      A.   I recall telling Jeff Stokes that.  And I don't

2   recall my exact instructions because there's been so

3   much talk since then, so like I know there's talk about

4   something being in-- in Dertinger's hand.  And I think

5   when we went back and looked at the proffers, I don't

6   think that was in any of the proffers, but I know that

7   that's come out.  So I don't recall if that was part of

8   my instructions or not, but I do recall that being an

9   issue either at the time or subsequently as a part of

10  this litigation.

11     Q.   And are you certain that you told Stokes that if

12  you were to watch any video of the meeting, that had to

13  go through a filter team first?

14     A.   I'm positive because we discussed who the filter

15  team would be, and I suggested Micky Rantz.  And Henry

16  Herron later pointed out to me that that was wrong

17  because Micky had helped with the searches at CCA and,

18  you know, I just wasn't thinking because I was doing a

19  different case at the time and I had taken a break from

20  *Black*, but...

21     Q.   Did the fact that Dertinger was spreading this

22  information in the facility cause problems for your

23  investigation?

24     A.   It did.  We believed it did because we-- at least

25  one person dropped out of the conspiracy of his own-- he

1  stated, I dropped out of the conspiracy because I was

2  scared, I got spooked by what Dertinger said.

3       We also believed that because Dertinger knew the

4  investigation was happening that the-- the drug

5  trafficking organization modified the way that they were

6  working.  They became more secretive.  I don't recall

7  the ins-and-outs, again, because it's been a long time,

8  but we believed that it had an effect on the way the

9  organization was working.

10  Q.  Did Dertinger spreading information jeopardize

11  anybody's safety?

12  A.  Yes, it did.  It-- should I say the name of the

13  person?

14  Q.  No, do not say the name of the person.  Just

15  describe it generally.

16  A.  Okay.  So the information that Dertinger claimed

17  to have was that he had access to a proffer report.  He

18  knew the person who had proffered and that this person

19  was talking on Dertinger and then I think two or three

20  other inmates, and Dertinger knew those people by name.

21       And when we went back and looked at the proffer

22  report, that report was given to Ms. Rokusek as part of

23  a different case, different representation.  And, in

24  fact, it did mention this person proffering on Dertinger

25  and I believe a couple of other inmates for drug

1   trafficking inside CCA.

2       Q.   In addition to the concerns you've just described

3   to us about Dertinger releasing this information, did it

4   also raise the possibility of a conflict of interest

5   between attorney Rokusek and client Dertinger?

6       A.   That's what I brought-- I brought that issue to

7   others in the office, and the agreement-- no one felt

8   like it did not cause a conflict.  Everyone agreed it

9   caused a conflict.

10      Q.   And did you-- did you and Kim Flannigan

11  eventually have a meeting with Jackie Rokusek about this

12  concern about a conflict?

13           MS. BRANNON:  Judge, I'm going to object.

14  This is supposed to be cross examination, and basically

15  we're rehashing everything she already testified to.

16  It's basically been asked and answered in some form or

17  another.  This is going to take a long time if we're

18  just going to re-do her direct from yesterday.

19           MR. CLYMER:  I'm not re-doing her direct,

20  Your Honor.  There's information I'd like to bring out

21  that's not been brought out in this case, Your Honor.

22           THE COURT:  All right.  All right.  That's

23  fine.  I do think there's been a lot of rehash.  There's

24  not been a lot-- there's been some, but I mean--

25           MR. CLYMER:  I'll keep it to a minimum, Your

 1    Honor.

 2              THE COURT:  All right.

 3    BY MR. CLYMER:

 4        Q.  I'm going to direct your attention-- actually,

 5    the first thing I want to do is pin down the date of

 6    that meeting, okay?  So I'm going to show you what's

 7    been marked as 441, which is in evidence.  I'm going to

 8    ask you to read it to yourself and let me know when

 9    you're done.

10        A.  Yes, I've seen this before.

11        Q.  Okay.  And I'll ask you, this is an e-mail chain.

12    Correct?

13        A.  It is.

14        Q.  If you'd look at the third e-mail in it, the one

15    that would've come first.

16        A.  Yes.

17        Q.  The first sentence is in an e-mail from Jackie

18    Rokusek to you and AUSA Flannigan; is that right?

19        A.  Yes.

20        Q.  And what's the date of this e-mail?

21        A.  August 3rd, 2016.

22        Q.  And does it refer to the meeting you had?

23        A.  It does.

24        Q.  What day does it say the meeting occurred on?

25        A.  Yesterday, which would've been August 2nd, 2016.

 1    Q.   Would you look at Exhibit 32, the other exhibit

 2    I've given to you.  Does that document correctly reflect

 3    the fact of the date of the meeting in the second entry?

 4    A.   It does, except there's a typographical error in

 5    the year.  It says 216 instead of 2016.

 6    Q.   We'll fix that.  Thank you.

 7         Now, if you'd go back to Exhibit 441, and I want

 8    to ask you some questions about what you were questioned

 9    on yesterday regarding who thought what had occurred at

10    that meeting.

11    A.   Okay.

12    Q.   If you look at Jackie Rokusek's e-mail to you and

13    Kim, does it appear that Jackie interpreted whatever was

14    said to her at that meeting to mean that Stokes had

15    watched a video of her meeting with her client at CCA?

16    A.   Well, it says "you," so--

17    Q.   That meant you and Kim.  Correct?

18    A.   It did.

19    Q.   You mentioned that you were reviewing what?

20    A.   "Video of my visits with Mr. Dertinger at CCA."

21    Q.   And she was sending that e-mail to people who she

22    had just met with the day before.  Right?

23    A.   That's correct.

24    Q.   Does that appear then that Ms. Rokusek believed

25    that whatever was said to her, she interpreted it to

1   mean that you had told her you were-- someone was

2   watching meetings of her and her client.  Right?

3              MS. BRANNON:  Objection to testifying about

4   what Ms. Rokusek's impressions were.  She's testified

5   before this Court.

6              THE COURT:  All right.  I'll sustain.

7   BY MR. CLYMER:

8       Q.  Is-- the next e-mail up is your response to that;

9   is that right?

10      A.  Yes.

11      Q.  Do you respond in a different way about what had

12  occurred at the meeting the day before?

13      A.  Yes.  I-- I-- from her e-mail, it appears as

14  though she thinks Kim and I were already reviewing video

15  of her visits.  And I respond, "The agent looking

16  through the video for your visits said he has located

17  the date/time of your visits but has not paired those

18  dates up to the video yet."

19      Q.  So did it appear from your response that you

20  thought it had been communicated that you were trying to

21  find when she had met with Dertinger; is that right?

22      A.  That makes sense to me.  I don't know.  I just--

23  I don't know what was going through my head at that

24  time.  I know that I wasn't-- I didn't interpret her

25  e-mail to say that we were looking at attorney-client

1  meetings.

2      Q.  Did you mean to communicate by your e-mail to her

3  that you had looked at attorney-client meetings?

4      A.  No.

5      Q.  Had you looked at attorney-client meetings?

6      A.  No.

7      Q.  To your knowledge, had the agent looked at

8  attorney-client meetings?

9      A.  No.

10     Q.  I'll ask you to look now at Ms. Flannigan's

11 e-mail.  Does Ms. Flannigan say anything about actually

12 having watched a video and the agent watched a video?

13     A.  No.

14     Q.  What does she say?

15     A.  "Hey, Jackie, given the fact that you have a

16 deadline in Pet, it might be best, if you have time, for

17 you to come over and try to find the video.  Just a

18 thought."

19     Q.  Does that suggest that nobody had found a video

20 for a meeting with her client yet?

21     A.  Yes.

22     Q.  Looking at this e-mail now over two years later,

23 does it appear to you that this may have just been a

24 simple miscommunication where she interpreted

25 Ms. Flannigan to say one thing, where you and

1    Ms. Flannigan interpreted Ms. Flannigan to say something

2    different?

3        A.   I believe so.

4        Q.   That doesn't mean anyone is lying about this,

5    does it?

6        A.   I don't think anyone is.

7        Q.   If you'll look at Exhibit 30-- never mind.  I'm

8    going to show you what's been marked as Exhibit 24--

9    actually one more question about Exhibit 41 first, 441.

10           Did Ms. Rokusek in that e-mail on August 3rd

11   raise any concerns about a violation of the

12   attorney-client privilege?

13       A.   No, she did not.

14       Q.   There's no assertion of privilege in that e-mail?

15       A.   No, there is not.

16       Q.   I'm now going to direct your attention to

17   Exhibit 24.  Tell me when you've had a chance to look at

18   that, Ms. Tomasic.

19       A.   I have.  Yes, I've read it.

20       Q.   Okay.  Do you recognize that to be another e-mail

21   chain between you and Ms. Flannigan and Ms. Rokusek

22   about this meeting that you had on August 2nd?

23       A.   It is.

24       Q.   And what's the date on the bottom e-mail in this

25   chain?

 1        A.    Thursday, August 4th, 2016.

 2        Q.    So now we're on to August 4th.  Right?  The

 3   meeting was August 2nd?

 4        A.    Yes.

 5        Q.    The first e-mail we just looked at, 441, was

 6   August 3rd.  Now we're on to August 4th.

 7        A.    Yes.

 8        Q.    And what does Ms. Rokusek ask you to do with

 9   respect to her first e-mail message?

10        A.    She wants to come over to look at the videos, and

11   she will be at the courthouse that day at 9:30.

12        Q.    And the-- did the rest of the e-mail traffic

13   suggest there's a problem with her watching the video

14   that day?

15        A.    Yes.

16        Q.    What was the problem with her watching the video

17   that day?

18        A.    I couldn't find Pauletta Boyd, and I remember I

19   went to her office more than once.  And I asked I think

20   Maria Gallup or someone in the office who is close to

21   her where she was, and they didn't know.

22        Q.    Why was Pauletta Boyd necessary for Ms. Rokusek

23   to watch the video?

24        A.    Because she knew-- she had the video, and she

25   knew how to get it to play.

1    Q.   And there's a reference in one of those e-mail
2  messages to the PELCO player.  Can you tell us what that
3  is?
4    A.   That's the system that has the six drives that
5  was given to us by CCA that is used to play the video.
6    Q.   In this e-mail traffic on August 4th, does
7  Ms. Rokusek raise any concerns about a violation of the
8  attorney-client privilege?
9    A.   No, she does not.
10   Q.   Up to this point, from the time you first raised
11 this issue at the July 21st hearing until August 4th
12 when you had this e-mail exchange with Ms. Rokusek, to
13 your knowledge, had anybody raised to you any
14 attorney-client privilege concerns?
15   A.   No.
16   Q.   I'm now going to direct your attention to
17 Exhibit 25 and ask you to read this and let me know when
18 you're done.
19   A.   I have read it.
20   Q.   Okay.  Do you recall the e-mail traffic that's
21 reflected in Exhibit 25?
22   A.   I do.
23        MR. CLYMER:  And, Your Honor, these exhibits
24 I'm dealing with have all been moved into evidence, Your
25 Honor.  There's been a stipulation.

1  BY MR. CLYMER:

2      Q.  Would it be correct to say that Exhibit 25 is

3  another e-mail chain?

4      A.  It is.

5      Q.  And is the first e-mail, the one at the bottom of

6  the two-page document, an e-mail from Laura Shaneyfelt

7  to herself with a cc to Melanie Morgan?

8      A.  It is.

9      Q.  Can you describe just briefly what that e-mail

10  message talks about?

11      A.  It looks like an e-mail for-- it says, "For

12  counsel with clients in CCA."

13          MS. BRANNON:  Judge, I'm going to object.

14  No. 1, this has already been admitted into evidence.  It

15  speaks for itself, we don't need her to review it.  And,

16  again, this is supposed to be cross examination.

17          THE COURT:  This Exhibit 25 is in evidence?

18          MS. BRANNON:  It was admitted as a defense

19  exhibit before.  I think this may be the third time it's

20  in evidence.

21          MR. CLYMER:  I don't believe the rest of the

22  chain is in evidence, Your Honor, and that's what's

23  important here.  It's what Ms.-- it shows what Ms.

24  Tomasic knew and when she knew it.

25          THE COURT:  All right.  If your questions go

1    to what she knew about this.  I do think it speaks for

2    itself.

3                    MR. CLYMER:  I'll curtail it.

4    BY MR. CLYMER:

5        Q.   Is it correct that the Shaneyfelt e-mail traffic

6    is raising concerns about CCA video and the

7    attorney-client privilege?

8        A.   Yes.

9        Q.   Okay.  Now, is there then a second e-mail message

10   there from an attorney named Steve Schweiker to an AUSA

11   named Sheri Catania?

12       A.   Yes.

13       Q.   And does that e-mail then get forwarded to you,

14   the whole chain get forwarded to you at some point?

15       A.   Yes.

16       Q.   And it's forwarded to you by Sheri Catania?

17       A.   Yes.

18       Q.   What date and time?

19       A.   August 4th, 2016, at 4:41 p.m.

20       Q.   And are you on that distribution list?

21       A.   Yes.

22       Q.   So that-- you got that e-mail delivered to your

23   inbox at 4:41 on August 4th?

24       A.   Yes.

25       Q.   To the best of your recollection, is this the

1    first time you got any notice that there was a concern

2    about the CCA video and attorney-client privilege?

3       A.  I don't remember if this e-mail was first or the

4    one that Scott Rask got for me was first, but it was one

5    of those two.  And that's when I realized there was an

6    issue, yes.

7       Q.  If you look back at Exhibit 32, is there a line

8    that reflects the e-mail traffic I just asked you

9    questions about?

10      A.  Yes.

11      Q.  Does it accurately reflect the time and date of

12   that e-mail message?

13      A.  It does.

14      Q.  I'm now going to show you what's been marked as

15   Exhibit 26.

16           MR. CLYMER:  This is in evidence as well,

17   Your Honor.

18   BY MR. CLYMER:

19      Q.  I'd ask you to take a look at this and let me

20   know when you're done.

21      A.  Yes, I've read it.

22      Q.  Is this an e-mail message that was sent to all

23   the attorneys in the criminal division of the U.S.

24   Attorney's Office from Deb Barnett?

25      A.  It is.

1     Q.   At what date and what time?

2     A.   August 4th, 2016, at 6:15 p.m.

3     Q.   And does this e-mail reflect Deb Barnett's

4   inquiry - through another law enforcement official - of

5   the CCA warden to get an explanation of what was going

6   on in the video-- in the attorney-client meeting rooms?

7     A.   It does.

8     Q.   And did Deb Barnett then circulate this to people

9   in your office?

10    A.   She did.

11    Q.   And did that include you?

12    A.   It would have, I believe, yes.

13    Q.   Do you recall getting this e-mail?

14    A.   I do.

15    Q.   And this is at 6:15 on August 4th?

16    A.   Yes.

17    Q.   I'm now going to direct your attention to Exhibit

18  No. 27.  Excuse me, wrong exhibit.  No, that's right.

19  Exhibit No. 27.  I'll ask you to take a look at Exhibit

20  No. 27.

21            MR. CLYMER:  This is in evidence as well,

22  Your Honor.

23  BY MR. CLYMER:

24    Q.   Let me know when you've had a chance to look at

25  that.

1        A.   Yes, I've read it.

2        Q.   Okay.  Before we talk about 27, Ms. Tomasic, I

3   just realized I have a corrected version of 32, the one

4   that had the typo on it.

5        A.   Okay.

6        Q.   So let me switch it out with you.  This is a

7   smaller copy.  I'll make a better copy later.  That's

8   just a smaller copy.

9             So let's go back to Exhibit 27, Ms. Tomasic, and

10   I'll ask you to look just at the last e-mail in the

11   chain, which is the one at the bottom of the second to

12   last page leading on to the last page.  Is this an

13   e-mail from Jackie Rokusek to you on August 4th, 6:52

14   p.m., to you and Kim Flannigan?

15        A.   Yes.

16        Q.   And in this e-mail does Jackie Rokusek assert the

17   attorney-client privilege with respect to the CCA video?

18        A.   Yes.

19        Q.   To the best of your knowledge, is this the first

20   time an attorney explicitly asserted to you the

21   privilege with respect to any of the video on the CCA

22   videotape?

23        A.   Yes.

24        Q.   To the best of your knowledge, up to that point

25   in time had anybody watched any of the attorney-client

1    meeting video from those CCA videos?

2        A.   No.

3        Q.   Had you asked anybody to do so?

4        A.   No.

5        Q.   Had anybody told you they had done so?

6        A.   No.

7            MS. BRANNON:   Judge, asked and answered.

8    And again, we've re-tread this ground, I think this is

9    the third time.

10            THE COURT:   Mr. Clymer.

11            MR. CLYMER:   Your Honor, I don't believe-- I

12   don't believe there's been any discussion about when

13   this attorney learned what she did and what she did,

14   Your Honor.   That's all I'm going through, and I'm very

15   close to the end of this.

16   BY MR. CLYMER:

17       Q.   You mentioned before a message from Mr. Rask.

18   I'm going to direct your attention to Exhibit 41.   If

19   you keep 27 with you, we'll need that again.   But take a

20   look at 41.   Take a look at it, let me know when you've

21   had a chance to read it.

22       A.   Yes, I'm familiar with this one.

23       Q.   Okay.   I'm going to ask you to-- well, let me ask

24   you generally so we can speed this along.   Would it be

25   correct to say that this is the e-mail from Scott Rask

1    you referred to before?

2        A.  It is.

3        Q.  And does this e-mail chain forward to you

4    additional information about the concerns about the CCA

5    video?

6        A.  Yes.

7        Q.  Does this include an e-mail from Ms. Brannon

8    expressing her concerns?

9        A.  It does.

10       Q.  Is there anywhere in Ms. Brannon's e-mail where

11   she says anything about filing a motion with the Court?

12       A.  I do not see any.

13       Q.  Okay.  I'm going to ask you then to look at the

14   last e-mail, the one that got this to you from Mr. Rask.

15   What date and time was that?

16       A.  Friday, August 4th, 2016, at 8:13 p.m.

17       Q.  I'll ask you to look again at the corrected

18   version of Exhibit 32 I gave you.

19              MR. CLYMER:  And, Your Honor, I have a

20   corrected version for the Court, too, if the Court would

21   like one, because that-- this document is not on the

22   first version, it's only on the corrected version.  May

23   I approach, Your Honor?

24              THE COURT:  This is Exhibit 41?

25              MR. CLYMER:  She's looking at Exhibit 41,

1    but it-- there's a reference to it on Exhibit 32.

2              THE COURT:  So what's corrected?

3              MR. CLYMER:  32 was missing this document

4    before.  It didn't reflect Exhibit 41 before.  Now it

5    does.  May I hand it to the Court, Your Honor?

6              THE COURT:  32 is an attachment to the

7    e-mail that's Exhibit 41?

8              MR. CLYMER:  No, Your Honor.  It's a table

9    that lists the date and time of certain events that are

10   relevant in this case.

11             THE COURT:  Okay.

12             MR. CLYMER:  I showed it to the Court during

13   opening statement yesterday.

14             THE COURT:  It's not-- so it's a

15   demonstrative exhibit.

16             MR. CLYMER:  I'm going to move it in, Judge,

17   but I want to establish its accuracy before I do so.

18             THE COURT:  All right.  Go ahead.

19             MR. CLYMER:  May the Court like a copy?

20             THE COURT:  Yes, that's fine.

21             MR. CLYMER:  Thank you, Your Honor.  I'll

22   have a better copy later today, Your Honor.

23   BY MR. CLYMER:

24      Q.  Ms. Tomasic, I now want you to go back to

25   Exhibit 32, the corrected one.  And I'll ask you to look

1    at the entries on August 4th for the afternoon.  Do

2    these entries accurately reflect the date and the time

3    of the events we talked about in Exhibits 27 and 41?

4         A.   August 4th?

5         Q.   Yes, at 8:52 and 8:13 p.m.

6         A.   6:52 p.m.--

7         Q.   Yes.

8         A.   -- and 8:13 p.m.?

9         Q.   And you've still got 27 and 41 in front of you.

10        A.   Oh, okay.  Yes.

11        Q.   So it would be correct to say you had notices of

12   a concern about CCA video at 4:41, 6:15 [sic] and

13   6:52 p.m. on the evening of August 4th.  Correct?

14        A.   Yes.

15        Q.   You testified yesterday when you were questioned

16   by the Special Master that you had a telephone

17   conversation that evening with Deb Barnett, the criminal

18   chief.

19        A.   Yes.

20        Q.   Do you remember that testimony?

21        A.   I do.

22        Q.   Do you remember where in the sequence of events

23   that conversation with Deb Barnett occurred?

24        A.   I do not.  I know it was after hours.

25        Q.   Do you recall telling us yesterday that she had

1   to go to the YMCA at a certain time?

2       A.  I may have gotten the time wrong, but I know she

3   said it.

4       Q.  But you don't recall when that was?

5       A.  I know it was the evening of August 4th.

6       Q.  Do you recall in that conversation there was a

7   discussion between you and Ms. Barnett about whether the

8   warden's version of events, no recording in the

9   attorney-client rooms, versus your version, possibility

10  of recording in the attorney-client rooms, was a topic

11  of conversation?

12      A.  I don't recall that part.

13      Q.  You don't recall-- do you remember anything else

14  about the content of the call?

15      A.  I just remember she asked me how I-- I came to

16  believe that there was video-recording, and I said a

17  cooperator told me.  And she said, no one at CCA told

18  you?  And I said, I don't think so, but I'll have to

19  think about it.  I remember that.  And that's the main

20  thing I remember.

21          I think I made a contemporaneous memo, but I'm

22  not sure.  And if I did, it would've been left in my

23  office and you all have it.

24      Q.  I want you to go back to Exhibit 27.  If you go

25  back, we looked at the first e-mail message and the last

1    one at the bottom from Ms. Rokusek to you and

2    Ms. Flannigan.  Do you recall that?

3        A.   Tell me again, please.

4        Q.   If you look at the last two pages of Exhibit 27,

5    we've already talked about Jackie Rokusek asserting the

6    privilege?

7        A.   Yes.

8        Q.   Did you respond to her?

9        A.   I did.

10        Q.   What did you say to her?

11        A.   "Jackie, I received this e-mail.  Kim is out

12    today.  I understand your position and do not intend to

13    view the video until this matter is resolved.  I will

14    instruct the case agent and any other pertinent parties

15    regarding your position."

16        Q.   And was that sent the morning after you got the

17    evening e-mail message from Ms. Rokusek?

18        A.   Yes.

19        Q.   Did you ultimately comply with what you told

20    Ms. Rokusek you were going to do?

21        A.   Yes.

22        Q.   Did you not watch the video?

23        A.   No one watched the video or-- from that point on.

24        Q.   And did you secure the video?

25        A.   Mr. Rask did.

1    Q.   I'll now ask you to direct your attention to the

2   next e-mail-- by the way, that e-mail message is at

3   9:19.  When was the next e-mail message in this chain

4   from you to Ms. Rokusek?

5    A.   9:34 a.m.

6    Q.   And what did you tell her in that e-mail message?

7    A.   "Jackie, to clarify my e-mail below, we intend to

8   continue our view of CCA surveillance footage, but the

9   agents, staff, and I will refrain from viewing any video

10   depicting attorney-client exchanges if any such videos

11   exist."

12    Q.   Did you then contact Criminal Chief Barnett?

13    A.   It looks like two minutes later I sent the

14   e-mail-- forwarded the e-mail to Ms. Barnett.

15    Q.   And did you say anything when you forwarded the

16   e-mail?

17    A.   "Deb, at this point Jackie has asked that we do

18   not"--

19          MS. BRANNON:  Judge, again, the document

20   speaks for itself.  If we're going to read e-mails,

21   we're going to be here all day.

22          MR. CLYMER:  I won't ask her to read the

23   e-mail.

24   BY MR. CLYMER:

25    Q.   Do you recall communicating information to Deb

1   Barnett?

2     A.   I forwarded the e-mail chain to Ms. Barnett and I

3   let her know what I had-- I summarized what I said

4   below.

5     Q.   And did Ms. Barnett respond to you?

6     A.   Yes.

7     Q.   And what time was that response?

8     A.   9:42 a.m. on August 5th.

9     Q.   Did Ms. Barnett agree or disagree with your

10  decision?

11    A.   She agreed.

12    Q.   Did she raise the possibility of using the taint

13  team?

14    A.   Yes, she did.

15    Q.   Did you then forward information to Ms. Barnett

16  in response?

17    A.   Yes.  I forwarded the contact information,

18  e-mails and phone numbers for all the agents.

19    Q.   And was that to make sure nobody watched the

20  video?

21    A.   No, that was at her request, I believe, because--

22  yes, she asked me, "Would you please tell me who the

23  agents are on your case and their agency?"  She didn't

24  say why she needed that information.

25    Q.   And you forwarded it.  Correct?

1      A.  I did, but she never contacted them.

2      Q.  If you'll look at Exhibit 32, the corrected one I

3  gave you, are the events that we just described in those

4  exhibits properly characterized at the bottom of Page 1

5  of Exhibit 32?

6      A.  And I want to clarify my statement.  I said she

7  never contacted them.  She didn't contact them for

8  several weeks is my recollection.

9      Q.  Gotcha.  Thank you.

10     A.  That's correct, yes.

11     Q.  Okay.  Now, after you had assured Ms. Rokusek

12  you'd do what she asked and contacted your criminal

13  chief, did you then contact the Court?

14     A.  Yes, I did.

15     Q.  I'll direct your attention to Exhibit 444.  If

16  you can take a look at that.  You were asked a lot of

17  questions about this yesterday, I just want to clean up

18  a few things about it.  Let me know when you've had a

19  chance to read it.  I'm sorry, I'm showing you the wrong

20  exhibit.  I meant to show you 445.  Now 445, here.  Let

21  me show you 445.

22             MR. CLYMER:  This is in evidence.

23     A.  Yes, I'm familiar with this e-mail.

24  BY MR. CLYMER:

25     Q.  And would it be correct to say that Exhibit 445

1   is an e-mail message that you sent to the Court and to

2   the parties in *United States vs. Black*?

3       A.   Yes.

4       Q.   And on the second page of that-- strike that.

5   Was that sent August 5th, the same day this other

6   communication was going on with Ms. Rokusek, this one at

7   2:57 p.m.?

8       A.   Yes.

9       Q.   Direct your attention to Paragraph No. 2 on the

10  second page.  In Paragraph No. 2 did you try to describe

11  to the Court what had happened and the issues that had

12  been raised with respect to the CCA video?

13      A.   Yes.

14      Q.   Does the first paragraph summarize what you said

15  at the July 21st, 2016 hearing?

16      A.   Yes.

17      Q.   Does it do so accurately and completely?

18      A.   I don't know because I don't have the transcript.

19      Q.   Okay.  From your recollection of what you had

20  said and from reading the transcript yesterday, does it

21  appear that the first paragraph is accurate?

22      A.   Yes.

23      Q.   Did you try your best to be accurate in this

24  e-mail message to the Court?

25      A.   I did.

 1     Q.   And did you have somebody review it with you
 2  before you sent it out?
 3     A.   I believe so.
 4     Q.   Okay.  I'll ask you to look at the second
 5  paragraph now.  Does the second paragraph accurately
 6  describe the information you had received in the chain
 7  of e-mail messages you and I just talked about?
 8     A.   Yes.
 9     Q.   Does the third paragraph in numbered Section 2 of
10  that report then describe the defense attorneys'
11  concerns about the case, and then does the e-mail go on
12  to describe what you're going to do in response to those
13  concerns?
14     A.   Yes.
15     Q.   Did you attempt to be accurate and truthful in
16  that part of the e-mail message too?
17     A.   Yes, I did.
18     Q.   Did you express uncertainty in the e-mail message
19  about whether you even had attorney-client meeting
20  video?
21     A.   Yes.
22     Q.   Were you still uncertain at that time?
23     A.   Yes.
24     Q.   Did you do anything to try to deceive or mislead
25  the Court or the parties about what you had learned and

1   what you knew?

2       A.   No.

3       Q.   Were you trying to be as complete and truthful as

4   you could?

5       A.   Yes.

6       Q.   Now I'm going to show you what's been marked as

7   Exhibit 29.  Do you recognize what Exhibit 29 is?

8       A.   Yes.

9       Q.   And is Exhibit 29 a standard e-mail notice form

10  from the CM/ECF filing system?

11      A.   It is.

12      Q.   Does it show the time of the filing by the

13  Federal Public Defender of a Rule 41(g) motion on

14  August 5th, 2016?

15      A.   It does.

16      Q.   And what time was that?

17      A.   August 5th, 2016, at 5:06 p.m.

18      Q.   Was this filed after you had notified the Court

19  about the defense attorney concerns and what you knew

20  about the CCA video?

21      A.   Yes.

22      Q.   Who notified the Court first about the problems?

23      A.   I did.

24      Q.   I'll ask you to take a look now again at

25  Exhibit 32.  Do the entries about your e-mail to the

1   Court and about this filing appear accurate on the

2   second page of Exhibit 32?

3       A.  Yes, those-- the August 5th at 2:57 and

4   August 5th at 5:06 are correct.

5       Q.  Ms. Tomasic, I want to go back a minute.  I'll

6   show you Exhibit 444.  And let me take-- I can take this

7   from you and this from you.  I don't think you'll need

8   these two again.

9           Take a look at Exhibit 444 and familiarize

10  yourself with that and let me know when you have,

11  please.

12      A.  Yes.

13      Q.  Do you recall Ms. Brannon showing you Exhibit 444

14  yesterday?

15      A.  Yes.

16      Q.  And do you recall her asking you if you had seen

17  that during this time when notices were coming in about

18  the problem?

19      A.  I know I have seen this at some point.  I don't

20  know if I received it contemporaneous-- I don't know if

21  I received it on August 4, 2016.

22      Q.  You might've seen it later?

23      A.  Yes.

24      Q.  Okay.  Would it be correct to say that there's no

25  indication in the document itself that it was sent to

1  you originally, cc'd to you, or forwarded to you at any

2  time?

3      A.  Not-- no, there is not.

4      Q.  I'm now going to direct your attention to

5  Exhibit 28.

6          MR. CLYMER:  This is in evidence as well,

7  Your Honor.

8  BY MR. CLYMER:

9      Q.  Can you tell the Court, please-- actually, take a

10  look at that and let me know when you're done with it.

11  Are you done?

12      A.  Yes.

13      Q.  Would it be safe to say that August 5th, 2016,

14  you also notified Ms. Rokusek that the video was

15  available for her to watch whenever she wanted to?

16      A.  Yes.

17      Q.  And that's in Exhibit 28?

18      A.  Yes.

19      Q.  Finally in this series, Ms. Tomasic, I'm going to

20  show you what's been marked as Exhibit 30 and ask you to

21  take a look at Exhibit 30 and let me know when you've

22  had a chance to review it.

23      A.  Yes.

24      Q.  Would it be correct to say that the last e-mail,

25  the one at the end of Exhibit 30, which was the e-mail

1  sent out first, was from you to Ms. Boyd and Agent

2  Seubert and Ms. Flannigan and Ms. Barnett?

3      A.   Yes.

4      Q.   In this e-mail did you make efforts to secure the

5  CCA video?

6      A.   Yes.

7      Q.   Is that what you had told Ms. Rokusek you would

8  do?

9      A.   Yes.

10     Q.   Why did you send the e-mail to Ms. Boyd and

11 Special Agent Seubert?

12     A.   Because Pauletta had the one copy, and then-- of

13 the CCA surveillance footage, and then the second copy

14 was at Secret Service, but I didn't know the agent who

15 had it.  And John Seubert was my case agent, so I sent

16 it to John Seubert because he works for Secret Service.

17     Q.   And you assumed the two of them would have

18 control over the only two copies you knew about?

19     A.   Yes.

20     Q.   In this e-mail message did you ask them to mark

21 the boxes as "attorney-client privilege"?

22     A.   Yes.

23     Q.   To your knowledge, was this the incident that

24 caused them to be marked "attorney-client privilege"?

25     A.   To my knowledge, yes.

 1    Q.   Did Agent Seubert get back to you in an e-mail

 2  the same day?

 3    A.   He did.

 4    Q.   And what did he tell you?

 5    A.   That he has secured the item in his evidence

 6  vault and he sealed it, and he will make sure it's

 7  marked as I instructed on Monday.

 8    Q.   Two days later did Ms. Barnett also instruct them

 9  to seal any-- or secure any audio-recordings, telephone

10  audio-recordings from CCA?

11    A.   Yes.

12    Q.   And that's also reflected on Exhibit 30?

13    A.   Yes.

14    Q.   And does Agent Seubert acknowledge that message

15  as well?

16    A.   Yes.

17    Q.   Now, look back at 32.  Are these events also

18  reflected accurately on Exhibit 32?

19    A.   Yes.

20         MR. CLYMER:  Your Honor, I move Exhibit 32

21  into evidence.

22         MS. BRANNON:  Well, Judge, we would object.

23  We think there are inaccuracies on there.  It's a

24  summary, but it's actually not evidence.  It-- at most

25  it's a demonstrative exhibit.

1          We can go through and throughout this

2    hearing and point out the inaccuracies, but I think the

3    very first entry says that there were cameras in the

4    attorney-client meeting rooms at CCA with no audio.

5    That's not actually what's on the transcript.  She

6    talked there might be the capability of audio-recording.

7    So we can go through and nitpick this, but basically

8    it's not an accurate representation of the evidence, so

9    we would object.

10          THE COURT:  Exhibit 32 will be admitted as a

11   demonstrative exhibit only.  I'm going to admit the

12   Special Master counsel's timeline that is

13   A-Year-At-A-Glance, May 2016 through April 2017, as a

14   demonstrative exhibit as well.

15          I am very familiar with these e-mails.

16   They've been in evidence for a while, since the May

17   hearing.  Special Master collected them quite a while

18   back, some of them at least.  You know, I don't really

19   need anyone to go through them line-by-line or to

20   re-interpret them.  I mean, ultimately it's going to be

21   my fact-finding that-- you know, what interpretation or

22   how I perceive the communications to have been.

23          I'm not suggesting that you can't ask

24   questions about them, but I'm just cautioning that-- and

25   it's the reason why this isn't really evidence, that

 1    there's much more going on in these e-mails, and there's

 2    other-- you know, other evidence about other things

 3    going on at the same time as these e-mails, that it

 4    would be really hard for anybody in this case, I think,

 5    to in a chart give me something that-- that would be a

 6    true and complete representation of the evidence as to

 7    everything that's going on.

 8              So I will consider this as a demonstrative

 9    exhibit.  Timelines are very helpful.  But, again, I

10    agree that they don't really have evidentiary weight in

11    the sense that they can't possibly and they don't

12    summarize the full content and context of the

13    communications.

14              MR. CLYMER:  I'll take those comments to

15    heart, Your Honor, and move on.

16    BY MR. CLYMER:

17    Q.   I want to ask you some questions about the

18    *Birdsong* case.  Can you tell us the nature of that

19    investigation?

20    A.   I believe it was a methamphetamine distribution

21    and firearm case.

22    Q.   And if I recall correctly from your testimony

23    yesterday, an attorney-client privilege issue arose

24    before there were any charges; is that right?

25    A.   That's my memory, yes.

1     Q.  To the best of your memory, what were the events

2  that occurred that caused the capture of an

3  attorney-client communication?

4     A.  As described to me by Pat Greeno, Jerome Birdsong

5  was in the Wyandotte County jail on unrelated charges to

6  our federal investigation and his attorney went to visit

7  him.  And I have never been there and I don't know how

8  it's organized, but there are evidently windows that you

9  can pick up a phone on one side and the inmate is on the

10 inside and he picks up the phone on the other side.  And

11 one is designated as an attorney-- or one or more, I

12 don't know, but specific to attorneys.  Only attorneys

13 can sit there.

14        And then the other section is the friends and

15 family section.  And the attorney section is not

16 recorded, and the friends and family section is

17 recorded.  And Jerome Birdsong's attorney inadvertently

18 sat down at the friends and family phone.

19    Q.  Do you recall whether the information you learned

20 included that there were warnings about recording on the

21 friends and family side?

22    A.  I don't even remember that being an issue.  But

23 I-- it's been so long.  I think it was, as I recall from

24 yesterday, 2013.  I just don't remember.

25    Q.  Do you recall how you came to learn that there

 1  had been a capture of an attorney-client communication?

 2      A.  Pat Greeno either called me or e-mailed me and

 3  said that he had been listening to Jerome Birdsong's

 4  jail visits at Wyandotte County jail and he was

 5  listening to a call and he didn't realize it until some

 6  time in, a short time in, and he realized it was an

 7  attorney.

 8      Q.  And once you got that information, what did you

 9  do?

10      A.  I raised the issue at the lunch table.  And then

11  based on what Dave Smith told me, I went to my then

12  supervisor, Mike Warner.

13      Q.  And did Mr. Warner put you in touch with the

14  Professional Responsibility Advisory Office?

15      A.  I don't recall that for certain.  I-- I know that

16  Mr. Warner walked me through it.  I think I had been

17  there a few months at the time, and he walked me through

18  the process.

19      Q.  And did the process include PRAO?

20      A.  I don't-- I don't recall.

21      Q.  Ultimately, how did you resolve that issue?

22      A.  We brought in--

23          MS. BRANNON:  Judge, I'm sorry.  We went

24  through this yesterday.  Again, this is cross

25  examination.  If we're just rehashing the same ground,

1   we might as well go ahead and move the rest of our

2   witnesses off of today.

3           MR. CLYMER:  Your Honor, I believe I'm

4   entitled to explain.  I don't believe that this was

5   fully explored.  I am trying to understand the incident.

6   There's very little paperwork on this incident.  I'm

7   just trying to understand the incident.

8           THE COURT:  I don't think the way to do that

9   is to rehash the direct examination.

10          MR. CLYMER:  I don't believe I am.

11          THE COURT:  I think you need to target-- you

12  are.  You know, I'm not taking notes because I've heard

13  this before.  When I-- when you point to something

14  different or perhaps clarifying, then I do.  That's what

15  I would expect would happen during cross examination.

16  BY MR. CLYMER:

17      Q.   Based on the information you received, did you

18  notify defense counsel about the call?

19      A.   Yes, in a face-to-face meeting.

20      Q.   And did you ensure that nobody listened to that

21  call as part of your investigation?

22      A.   Mr. Greeno did.  I mean, he-- we didn't-- I don't

23  think we locked them up, the phone calls, and I think he

24  continued to listen to other calls, but...

25      Q.   Do you recall getting a second notice from an

1    attorney in a-- I'm sorry, from an agent in a case about

2    an attorney-client communication as part of the *Rapp*

3    case?

4        A.  Yes.

5        Q.  I'm going to show you what's been marked as

6    Exhibit 33.  Take a look at Exhibit 33.  It's an e-mail

7    chain.  If you'd read it and let me know when you've had

8    a chance to take a look at it.

9        A.  Yes.

10       Q.  Do you remember this e-mail chain?

11       A.  I do.

12       Q.  Did Agent Stokes at some point notify you that he

13   had come across one or more attorney-client

14   communications as part of phone records obtained in the

15   *Rapp* investigation?

16       A.  Yes.

17       Q.  How did he notify you?

18       A.  It looks like-- I don't independently recall, but

19   it looks like he called me first because in the first

20   e-mail, the last page of this exhibit, he references a

21   prior conversation.

22       Q.  Did he follow up that conversation with an e-mail

23   message?

24       A.  Yes.

25       Q.  And that was on January 20th, 2016?

1       A.   Yes.

2       Q.   Once you got this information from Agent Stokes,

3  what did you do?

4       A.   I forwarded the information to Lanny Welch and my

5  supervisor, Kim Flannigan.

6       Q.   And that e-mail is in Exhibit 33 as well?

7       A.   Yes.

8       Q.   And why did you contact Lanny Welch?

9       A.   My question, again, was my question as in

10 *Birdsong,* does my agent need to be removed from the

11 case?

12      Q.   Well, why-- why was Lanny the person you

13 contacted?

14      A.   Because he was the professional responsibility

15 officer.

16      Q.   And you saw this as a professional responsibility

17 question?

18      A.   Because-- yes, because it had been on a previous

19 occasion.

20      Q.   And you testified yesterday your understanding

21 was you should raise it every time it comes up.

22 Correct?

23      A.   That's what I thought, yes.

24      Q.   Was that your practice?

25      A.   I didn't have much interaction with PRAO, but I

1    did-- if I felt like something came up, yes.

2       Q.   So would it be safe to say that anytime-- at

3    least from your memory, anytime you were confronted with

4    an attorney-client communication issue, you reached out

5    to PRAO in one form or another?

6       A.   To the best of my recollection, I only had the

7    three times, and every time I contacted PRAO.   That's

8    the best of my recollection.

9       Q.   And the three times would've been *Birdsong*?

10      A.   Yes.

11      Q.   *Rapp*?

12      A.   Yes.

13      Q.   And *Herrera-Zamora*?

14      A.   Yeah.

15      Q.   Those are the only three times?

16      A.   That I recall, yes.

17      Q.   Do you remember confronting attorney-client

18   communication issues in any other cases?

19      A.   I don't recall it, no.

20      Q.   To the best of your knowledge, would you say it

21   didn't happen in any other cases?

22      A.   Well, I guess I need to clarify that.   After this

23   litigation arose in the *Black* case, for example, one of

24   the Deputy U.S. Marshals I testified to yesterday came

25   forward and said that had been an issue.   And then there

 1   was a motion filed in the *Black* case, I believe about

 2   Petsamai Phommaseng.  And I had handled that case with

 3   Sheri Catania.  And I contacted the agent, because he

 4   had been the one listening to the calls, and asked him

 5   if he had encountered attorney calls, and he said he

 6   didn't.

 7        So I guess that I-- that's all I-- the only three

 8   instances I was aware of prior to the *Black* litigation

 9   are those three.

10   Q.   And so you don't-- nobody notified you about an

11   instance of an attorney-client communication in any

12   other case you handled?

13   A.   Not in my cases, no.

14   Q.   Thank you.  In Exhibit 32, does it reflect an

15   ongoing conversation between you and Lanny Welch about

16   what to do in this case and what your options are?

17   A.   Yes.

18   Q.   Is there discussion here about the case law

19   regarding attorney-client privilege when an inmate

20   receives warnings about monitoring and recording?

21   A.   Yes.

22   Q.   Was that the-- the information you were talking

23   about yesterday?

24   A.   Yes.

25   Q.   So you actually had this discussion by e-mail

1   with Mr. Welch?

2       A.  Yes.

3       Q.  Ultimately, in this case what did you decide to

4   do?

5       A.  At Emily Metzger's suggestion, I e-mailed the

6   defense attorney and copied my supervisor, Kim

7   Flannigan, and let him know what had happened, that

8   Agent Stokes had listened to the calls, just portions,

9   small portions of them, and that we did not intend to

10  listen anymore.

11      Q.  I'm going to show you what's been marked as 34A.

12  Is 34A the e-mail message you sent to the attorney

13  notifying him of that?

14      A.  Yes.

15      Q.  To the best of your knowledge, did anybody listen

16  to any of these attorney-client communications in *Rapp*,

17  other than the short amount that Stokes listened to that

18  caused him to first contact you?

19      A.  To my knowledge, no one did.

20      Q.  Ms. Tomasic, aside from the cases you just talked

21  about, I want to ask you more generally about your

22  experience with attorney-client-- I'm sorry, excuse me,

23  inmate telephone calls.

24          Was it a regular practice for you to subpoena or

25  informally request inmate-- outgoing inmate phone calls

1   from CCA-Leavenworth?

2       A.   Yes, it was.

3       Q.   And for what purpose?

4       A.   Well, as I testified to yesterday, as part of my

5   training, Tris Hunt indicated that in drug and gun cases

6   it was a good idea to get jail calls in every case that

7   it appeared the case was going to trial.  And he

8   recounted a story where he had actually-- it was a

9   difficult FIP case and he was able to get a conviction

10  on the eve of trial because the guy actually admitted on

11  the jail call that it was his gun.

12          And then I knew other experienced attorneys in

13  the office regularly got inmate calls to help with their

14  cases.  And then-- or as you can see from my phone

15  requests, early on-- and that case agent I worked with

16  the most was Pat Greeno, and he was very experienced.

17  And Pat really liked to get jail calls because it-- he

18  thought it was a useful tool.  So following his

19  approach, I just continued on to do that.

20      Q.   Was it your general practice to listen to the

21  calls yourself when you got them or to have the agent

22  listen to the calls and screen them for you?

23      A.   In the vast-- just from a time point of view, in

24  the vast majority of cases the agent listened first.  In

25  rare instances I listened if the agent was too busy or

1    if we were under a time crunch.

2         Q.   When you listened, did you ever personally come--

3    other than *Herrera-Zamora*, did you ever come across an

4    attorney-client communication on the calls?

5         A.   In Ashley Huff's case, the four-way call that

6    involved an attorney, that's the only other instance.

7         Q.   But in that instance there were two other people

8    clearly in the room at the time of the communication.

9    Correct?

10        A.   Yes.  And the attorney wasn't actually talking to

11   Ms. Huff.

12        Q.   He was talking to somebody else?

13        A.   Yes.

14        Q.   So you heard the attorney's voice talking to a

15   person.  Correct?

16        A.   That's correct.

17        Q.   Other than that and the *Herrera-Zamora* case, did

18   you personally ever inadvertently or intentionally

19   encounter any attorney-client communications?

20        A.   No.

21        Q.   Other than the cases you've told us about,

22   *Birdsong* and *Rapp*, did you ever have an-- and the other

23   ones you talked about after the *Black* litigation, did an

24   agent ever tell you he had encountered--

25        A.   No.

1    Q.   Did you ever intentionally subpoena

2  attorney-client communications, other than in the

3  *Herrera-Zamora* case?

4    A.   No.

5    Q.   I'm going to read you the names of some cases

6  you've handled, I believe.  Can you confirm that you've

7  handled cases against these people?  Julie Clifton?

8    A.   With Sheri Catania, yes, I did.

9    Q.   Steven Dillow?

10   A.   I never was actually on that case.  For a period

11  of time Dave Zabel had me enter an appearance in all his

12  cases just because I was doing a lot of ghost writing or

13  research, but I never handled any aspect of that case

14  that I can recall.

15   Q.   Damon Griffin?

16   A.   I prosecuted that case, along with Sheri Catania.

17   Q.   Anthony Irvin or Irvin Anthony?  I'm not clear

18  which it is.

19   A.   Anthony Irvin, yes.

20   Q.   William Mitchell?

21   A.   Yes, I prosecuted that.

22   Q.   Vicencio Olea-Monarez?

23   A.   I am not sure if I was on that case after

24  prosecution.  I was on the investigation, the

25  pre-indictment investigation for sure when we were

1    getting wiretaps.

2        Q.   Antonio Robertson?

3        A.   I don't think I ever had that case.

4        Q.   Melvin Shields?

5        A.   Yes, I had that case.

6        Q.   Terry Tillman?

7        A.   Yes, I did have that case.

8        Q.   Arrick Warren?

9        A.   Yes.

10        Q.   Charles Steele?

11        A.   No, that was not my case.  Well, I take that

12    back.  He was someone who was not a target but-- in the

13    *Black* investigation, but whose phone calls were

14    important.

15        Q.   Shawn Shutts?

16        A.   He was part of the Griffin conglomerate of cases

17    I prosecuted with Sheri Catania.

18        Q.   David Lougee?

19        A.   No, I never had that case.

20        Q.   Ms. Tomasic--

21        A.   I take-- let me clarify that.  He may have been a

22    target or someone involved in the *Black* case.

23        Q.   Did you ever personally encounter attorney-client

24    communications on inmate phone calls in any of those

25    cases?

1    A.  No.

2    Q.  Did an agent notify you about an attorney-client

3  communication in any of those cases?

4    A.  No.

5    Q.  If you had encountered, either through an agent

6  or personally, an attorney-client communication in any

7  one of those cases, based on your experience in *Birdsong*

8  and *Rapp* and understanding PRAO, what would you have

9  done?

10   A.  I suppose it depends on the timeline because

11  after-- after *Rapp* and I got the advice from Emily

12  Metzger, as I testified, I went and had a large group

13  discussion about Ms. Metzger's advice.  And if-- if I

14  had encountered those calls after that group discussion

15  and also after talking with Chris Oakley separately, I

16  would not have notified the defense attorney most

17  likely, because I thought that that was the right course

18  of action.

19       If-- if it was early on in my career, I probably

20  would have followed the pattern that I followed

21  initially, which is to contact PRAO and then to notify

22  the defense attorney.

23   Q.  Aside from the discovery issue, notifying the

24  defense attorney, was there ever a question in your mind

25  that at the time you realized an attorney was involved,

1   nobody listened anymore?

2       A.   Obviously there was at a certain point because I

3   listened in *Herrera-Zamora*.  So up to that point there

4   had been no reason to listen.  And, therefore, at-- in a

5   discussion with Chris Oakley, the idea was, well, why

6   listen because you-- there's no purpose to do it and it

7   causes problems potentially down the road.

8       Q.   So your understanding, which perhaps you didn't

9   follow in *Herrera-Zamora*, was don't listen to the call

10  anymore?

11      A.   I did not go against my understanding in

12  *Herrera-Zamora*.

13      Q.   Fair enough.  Let's take that out.  Was it your

14  understanding as a general matter that in an

15  attorney-client communication that could potentially be

16  privileged, you stop listening?

17      A.   There was nothing in my mind based on my

18  conversations and my own research that these phone calls

19  could potentially be privileged.  It just wasn't there.

20      Q.   Good point.  But I'm not asking that question.

21      A.   So, therefore, there was no reason to not listen

22  to them except that there was no reason to listen to

23  them from an evidentiary point of view and it

24  potentially caused problems.  So while we did not have

25  to treat them as privileged, we weren't going to listen

1  to them and-- because there was no purpose to do it.

2      Q.  So-- so aside from whether you notified defense

3  counsel, was it your practice or understanding, for

4  either practical reasons or other reasons, that it was

5  better not to listen?

6      A.  Yes, I would say so.

7      Q.  I'm going to-- since you got on the issue of the

8  warnings, I'm going to show you what's been marked as

9  Exhibit 37, which is a Special Master report.

10          MR. CLYMER:  This is in evidence, Your

11  Honor.

12  BY MR. CLYMER:

13      Q.  I'm going to ask you to read to yourself Pages 19

14  and 20, as well as Footnotes 15 and 16 on those pages.

15      A.  Yes, I've read it.

16      Q.  Okay.  Ms. Brannon asked you yesterday about

17  whether the recordings at CCA-Leavenworth said the call

18  may be recorded versus the call is recorded.  Do you

19  remember those questions?

20      A.  Yes, I do.

21      Q.  Based on reading this, does that refresh your

22  memory about whether the CCA recordings said "may" or

23  "is" recorded?

24      A.  I-- I have read this, and this was the same as my

25  recollection.  When I read the case that Ms. Brannon was

1    referring to, I went and pulled a call, a non-attorney

2    call and listened to the preamble.  And I think I

3    actually quoted it in the brief that was filed in this

4    case around August or September of 2016.

5         So my understanding up until yesterday was that

6    the preamble was, "These calls are subject to recording

7    and monitoring."

8    Q.   And that's consistent with the Special Master's

9    report; is that right?

10   A.   It is.

11   Q.   Was it also your understanding, Ms. Tomasic, that

12   if there was a privatized attorney phone number, that

13   you would never receive the calls made to that number?

14   A.   That was my understanding.

15   Q.   Did you have an obligation in your mind to go

16   check to make sure people at Securus and CCA-Leavenworth

17   did their jobs to properly privatize numbers?

18   A.   I didn't contemplate it.  I didn't contemplate

19   doing that.

20   Q.   You talked about discussion in the lunchroom and

21   in some e-mail traffic about the Rule 16 discovery

22   issue.  Do you remember that testimony?

23   A.   Yes.

24   Q.   Do you understand that there's a difference

25   between whether you turn recordings involving attorney

1    communications over to the attorney, or any recordings

2    over to the attorney, and whether somebody stops

3    listening when they realize it's an attorney

4    communication?

5        A.   I do understand the difference.  Let me correct

6    your question though.

7        Q.   Sure.

8        A.   The Rule 16 discussion was-- and I understood it

9    was separate, was with Dave Zabel and Scott Rask related

10   specifically to *Herrera-Zamora* in Dave Zabel's office.

11       Q.   Got it.

12       A.   The lunchroom discussion was whether we, the

13   office-- a prosecutor had an obligation to notify a

14   defense attorney, whether the phone calls are privileged

15   and whether attorney-client phone calls on recorded

16   lines basically should be treated specially.

17       Q.   But there was no discussion about listening to

18   those calls, was there?

19       A.   No.

20       Q.   I want to switch topics to the issue of

21   cooperation with the Special Master.  You testified

22   about an incident in October of 2016 where you were told

23   not to talk to the Special Master at that time.  Do you

24   remember that testimony?

25       A.   Yes.  And I don't recall the specific date, but

 1    that sounds about right, yes.

 2        Q.  Let me show you some e-mail traffic to help

 3    refresh your memory today and ask you some questions

 4    about it.  I'm going to show you a document which I

 5    think has been alternatively marked as Special Master's

 6    1008 and 1032.  I'll give you 1032.

 7        A.  Yes, I'm familiar with these e-mails.

 8        Q.  Okay.  And does this e-mail traffic reflect

 9    communications by e-mail between you and Ms. Metzger

10    regarding your interest in talking to the Special Master

11    and in February responding to a request from the Special

12    Master?

13        A.  Yes.

14        Q.  Okay.  I want to start with the first time.  Do

15    you recall how long it was before the October 31st, 2016

16    conversation that you expressed an interest in talking

17    to the Special Master?

18        A.  I cannot give specific dates, but I know from

19    August-- well, from the appointment of the Special

20    Master on, Kim Flannigan and I repeatedly discussed with

21    Scott, so it would have been after he was supervisor,

22    that we wanted to talk to the Special Master.

23            Prior to that, Kim and I repeatedly discussed

24    with anyone who would listen that we wanted to put on

25    evidence for Judge Robinson.  So it was an ongoing,

1    worn-out discussion.

2      Q.  And I don't want to go over the testimony we had

3    yesterday, but would it be safe to say that you and

4    Ms. Flannigan thought you had a story to tell and nobody

5    was listening to you?

6      A.  Yes.  And we felt like the agents did too, and no

7    one was listening to them.

8      Q.  I'm going to show you what's been marked as

9    Exhibit 36, which is the appointment order for the

10   Special Master, because you said you raised this issue

11   about talking to him after he was appointed.  And I'll

12   have you look at the top CM/ECF line to see when he was

13   appointed as Special Master.

14     A.  It looks like-- if he was appointed in this

15   document, it looks like October 11th, 2016.

16     Q.  So the expressions to members of your office

17   about wanting to meet with the Special Master occurred

18   sometime after that date, October 11, 2016, and before

19   the conversation with Mr. Rask on October 31st.  Right?

20     A.  Yes.

21     Q.  And at the time you were first told by Mr. Rask,

22   did you know why the office had told you it didn't want

23   you meeting with the Special Master?

24     A.  I did not.

25     Q.  Did you learn later from that e-mail traffic with

1   Ms. Metzger?

2      A.   I found her explanation implausible, so I don't

3   know the real reason why I wasn't allowed to.

4      Q.   But she gave you a reason?

5      A.   It's a non-reason, but yes.

6      Q.   At this period from the time the Special Master

7   was first appointed to the time you were told not to

8   meet with him at that time, did he ask to meet with you,

9   if you recall?

10     A.   I don't recall.

11     Q.   Let me try and see if I can help you with that.

12  I'm going to ask you to look again at Exhibit 36, and

13  specifically I want you to look at pages--

14     A.   I don't think I have 36.

15     Q.   I'm going to give it to you right now.

16     A.   Okay.

17     Q.   Start on Page 4, that lists the Special Master's

18  additional duties.  Just read his duties to yourself per

19  that appointment order.  The initial duties.

20     A.   Yes.

21     Q.   Would it be safe to say, Ms. Tomasic, that in

22  this case the Special Master has proceeded in his

23  investigation in three phases; Phase I, Phase II and

24  Phase III?  If you recall.

25     A.   I don't know.  I-- without reading it more

1  carefully, I would need to know-- it says, "Additional

2  investigative duties" on Page 7 of the appointment

3  order, and it's not clear whether--

4     Q.   Read the first paragraph of that page, and I

5  think that will help you out.

6     A.   Okay.  "The Court considers"...

7     Q.   Take your time.

8     A.   Okay.  So it looks as though the Court had not

9  yet determined whether the Special Master should

10  undertake these additional duties, which would be

11  subjects that involved me.

12     Q.   So would it be safe to say, Ms. Tomasic-- and

13  maybe you didn't realize it at the time, but would it be

14  safe to say that as of August 31st of 2016, at the time

15  AUSA Rask talked to you and apparently communicated the

16  message from Deb Barnett, that the Special Master didn't

17  have authority under the Court's appointment order to be

18  interviewing Assistant U.S. Attorneys?

19              THE COURT:  Mr. Clymer, you can have this

20  witness testify to this, but I know what authority I

21  gave under these appointment orders and the focus of

22  phases.  Phase I was feasibility.  Phase II was to try

23  to discover how the recording system worked and how

24  recordings of attorney-client conversations even

25  happened.  And I-- Phase III, of course, was to turn to

1    the U.S. Attorney's Office conduct specifically.

2              But at all times, the Special Master had

3    authority to talk to anyone he wanted to that he thought

4    would get to this.  And talking to the Assistant U.S.

5    Attorneys happened during Phase II of the investigation.

6              MR. CLYMER:  And I didn't mean to suggest

7    otherwise, Your Honor.  What I was getting at is the

8    witness said she did not recall whether the Special

9    Master had requested to talk to her in October or not,

10   and I was trying to see if this would help refresh her

11   memory.  I understand the Court understands its own

12   orders, I didn't mean to suggest otherwise.

13             THE COURT:  All right.

14             MR. CLYMER:  My purpose in doing this was to

15   try to see if I can get her to remember whether it was a

16   specific request then as opposed to later.  That's what

17   I was trying to do.

18             MS. VANBEBBER:  Objection, Your Honor.

19             THE COURT:  A specific request by the

20   Special Master?

21             MR. CLYMER:  Exactly.

22             THE COURT:  Okay.  Because the testimony had

23   to do with whether she was making a request to talk to

24   the Master.

25             MR. CLYMER:  I understand that, Your Honor.

1    Maybe I didn't make that clear.

2                MS. VANBEBBER:  Objection, Your Honor.  At

3    least we need to make clear that he's mischaracterized

4    what she testified to yesterday.  And so if he could

5    just ask her specifically what happened, perhaps we

6    could get past this.

7                THE COURT:  Well, I think that's what I was

8    probably saying.

9    BY MR. CLYMER:

10       Q.  As you sit here right now, Ms. Tomasic, having

11   looked at the appointment order, do you remember whether

12   the Special Master had asked to talk to you in October

13   or whether it was you reaching out to talk to him?

14       A.  I know early on-- and, again, I can't give a

15   specific date, but sometime in the fall I received word

16   through a third party that the Special Master wanted to

17   talk with me.

18       Q.  Do you know when that was?

19       A.  I do not know if it was in October or possibly

20   November, but it seems like it was fairly early on.

21       Q.  And later in February there was a-- or an express

22   request from the Special Master to speak with you; is

23   that right?

24       A.  Through Pauletta Boyd, yes.  And I-- it's my

25   understanding that he had repeatedly been asking

1   Ms. Barnett, and she was sort of putting him off, but

2   that's--

3      Q.   But you weren't privy to any of those

4   conversations?

5      A.   No.

6      Q.   When the request came through Pauletta Boyd in

7   February, the office took some time, but it told you you

8   could speak to the Special Master; is that right?

9      A.   Well, actually it took a great deal of time.  And

10  because they hadn't responded, I talked to others about

11  what complaints I could file to force their hand.

12          And so I filed an EEO complaint.  And the remedy

13  that I sought was to allow me to speak with the Special

14  Master.  And I-- I know that's an unusual course of

15  action, but that was the only thing I could do.

16          So I think perhaps recognizing that the EEO

17  complaint was out there, based on their conduct and the

18  remedy I wanted was to speak to the Special Master, that

19  I think that pushed them along, but only they know.

20     Q.   But ultimately you were given permission to speak

21  to the Special Master when he made the request in

22  February?

23     A.   Ultimately I was.

24     Q.   And when you spoke to the Special Master, was

25  there someone with you or was it just you and the

1    Special Master?

2         A.   It was just me and the Special Master.

3         Q.   Where did that meeting take place?

4         A.   On the-- I think on the sixth floor, somewhere in

5    the courthouse.

6         Q.   Do you know if the meeting was recorded?

7         A.   I don't know.

8         Q.   Did you produce any documents at the meeting?

9         A.   I showed him documents that-- and I had talked to

10   Scott Rask and Emily Metzger beforehand about giving him

11   documents, and they said I could not without permission.

12   So I took several documents with me and showed them to

13   him, but I told him I could not give them to him without

14   permission.

15        And then when I left the meeting, I asked for

16   permission to give him the documents that he wanted, and

17   I asked in writing, I think, to Emily Metzger and others

18   in management and no one ever responded.

19        Q.   Was that the only time you met with the Special

20   Master while you were employed by the United States

21   Attorney's Office?

22        A.   There may have been phone contact, but I don't--

23   I don't know the exact date.

24        Q.   After your employment with the U.S. Attorney's

25   Office was terminated, did you meet with the Special

1   Master then?

2       A.  Yes, I did.

3       Q.  And how many times?

4       A.  Well, I met with him in the summer of-- I don't

5   have my paper today-- the summer of 2017.  I stopped

6   working there in May of 2017.  Correct?

7       Q.  Uh-huh.

8       A.  So the summer of 2017 I met with him.  And then

9   there were several instances in which there was going to

10  be a hearing and I was subpoenaed, and I would come out

11  here, and then last minute the hearing would be

12  cancelled for some reason.  So I met with him on those

13  occasions just to get ready to testify.

14      Q.  At any of the meetings with the Special Master

15  after you no longer worked for the U.S. Attorney's

16  Office, did you provide documents to the Special Master?

17      A.  May I have a moment, Your Honor?

18              THE COURT:  Yes.

19              (Witness confers with counsel).

20              THE COURT:  Why don't we take a morning

21  break.  It's about that time anyway.

22              Mr. Clymer, how much longer do you

23  anticipate being with this witness?

24              MR. CLYMER:  Maybe 10, 15 minutes at the

25  most, Your Honor.

1          THE COURT:  All right.  Let's be in recess

2    for 15 minutes.

3          (Recess).

4          THE COURT:  All right.  You can be seated.

5          MR. CLYMER:  Thank you, Your Honor.

6    BY MR. CLYMER:

7    Q.  Ms. Tomasic, I think I was asking you whether you

8    produced documents to the Special Master after you were

9    terminated by the U.S. Attorney's Office.

10   A.  Yes, I did produce documents to the Special

11   Master after I was terminated.  At the time I produced

12   them, I was familiar with the Court's order and believed

13   I was complying with the Court's order.  And also, I had

14   no reason to believe that the U.S. Attorney's Office was

15   not cooperating because they were still publicly stating

16   that they were cooperating.

17   Q.  Did you check with the U.S. Attorney's Office

18   before you produced those documents to the Special

19   Master?

20   A.  I contacted Kim Flannigan.  And Scott Rask had

21   been using her and Leon Patton as a go-between with me

22   over various issues, like turning in my phone and things

23   like that I believe.  And I-- she knew I had the e-mails

24   and she knew I wanted to keep them, and I asked her to

25   bring that to Scott's attention.

1          And she did she told me, and there may be an

2     e-mail to reflect that as well, because there was a

3     process I knew I could engage in.  I knew this from the

4     Western District of Missouri because I did it, where I

5     could keep items when I left.

6          And when I went through that process with the

7     Western District of Missouri, I asked my supervisor,

8     Kate Mahoney specifically, does this apply to documents

9     from the District of Kansas because I do have some?  And

10    she said, no, this only covers Western District of

11    Missouri documents.

12         So Kim I think twice went to Scott to try and get

13    them to engage with me in the process.  And Scott's

14    response through Kim was approximately, I'm not the one

15    who's handling that.  And so Kim and I talked

16    sporadically during that time period and we discussed

17    it, and we just commented how management wasn't

18    following through with this or other things.  So I held

19    on to them for a period of time, and I-- when I met with

20    the Special Master in the summer, I turned them over to

21    him.

22    Q.   So would it be safe to say that you never got

23    authorization to turn them over?

24    A.   That is correct.

25    Q.   Did you take those documents physically with you

1  when you left the U.S. Attorney's Office?

2      A.  I did not.  Well, some I may have, but not that I

3  recall.  At least not very many.

4        I was in communication with the Special Master

5  after I stopped working at the office, and he indicated

6  that he wanted me to cooperate.  And so based on our

7  conversations, I asked Kim Flannigan and I believe Dave

8  Zabel to bring me the binders that I had in my office

9  that-- where I had been filing information related to

10  the *Black* case.

11      Q.  So you actually had already started to collect

12  paper copies of various documents, including e-mail

13  traffic, in binders?

14      A.  Everyone-- as I previously testified, many, many

15  people in the office, because there's so much mistrust

16  in the office, do that as a routine practice.  And I was

17  instructed to do that as well.

18      Q.  So you had binders in your office of e-mail

19  traffic?

20      A.  Yes.

21      Q.  How many binders?

22      A.  I don't recall specifically.  I would estimate

23  somewhere between five and seven.

24      Q.  And did you leave those binders in there?  Were

25  they physically in your office when you were terminated?

 1      A.  Yes.

 2      Q.  And how did they get into your possession after

 3  you left the office?

 4      A.  Kim Flannigan and Dave Zabel brought them to me

 5  to my home.

 6      Q.  Did they come together or did they come

 7  separately?

 8      A.  I think together.

 9      Q.  And did they bring all the binders?

10      A.  They didn't bring every binder in my office, but

11  they brought all the binders that were on a certain

12  shelf.  So I-- I didn't get everything I needed, if

13  that's what you're asking.

14      Q.  I'm just curious what you got.  You think about

15  seven binders worth of documents?

16      A.  I estimate between five and seven.  I-- I don't

17  know the exact number.

18      Q.  And do you recall when it was that they brought

19  those binders to you?

20      A.  I estimate within a week of me leaving the

21  office.

22      Q.  And how did they know which binders to bring?

23      A.  Well, Kim, and Dave too, probably knew because

24  the office spent countless hours in meetings in anger

25  over what was happening in the office, and those binders

 1   were referenced regularly and e-mails were shared

 2   between folks.

 3        So if I didn't have a particular e-mail, other

 4   folks would share it with me so that if I needed it down

 5   the road.  Dave was not as involved in that process, but

 6   he was aware of it.  And-- and Scott knew about the

 7   binders too because when we would go to meetings, I'd

 8   pull out my binder and flip to a certain-- it was-- I

 9   did it by date.  Flip to a certain date, and on this

10   date Deb, you know, said blah, blah, blah, because it

11   was difficult to pin them down factually.  They would

12   contradict themselves.  So we had to have the e-mails

13   just to get anything done.

14   Q.  Did you make a specific request to either Kim

15   Flannigan or someone else to have her bring you the

16   binders?  In other words, after you left, did you call

17   her up and say, hey, bring me some binders from my

18   office?

19   A.  I asked her to bring me several things, I believe

20   the binders were among them, yes.

21   Q.  Was that a phone call, was it a face-to-face

22   conversation, was it in an e-mail message?

23   A.  I don't recall.

24   Q.  And it was shortly thereafter that she and you

25   believe perhaps Dave Zabel as well brought some binders?

1        A.   I know Dave Zabel, because they sat on my back

2    glider and talked to me for a long time.

3        Q.   And when you produced documents to the Special

4    Master, did you produce everything, copies of everything

5    that had been taken from your office by-- by Ms.

6    Flannigan and/or Mr. Zabel when they came over?

7        A.   I produced anything that was remotely relevant.

8    There was some stuff in some of the binders that was--

9    had to do with Social Security SAUSA training, and I

10   pulled that out.  But everything else, yes.

11       Q.   And when was that meeting with the Special

12   Master, to the best of your recollection?

13       A.   It was in the summer.  I know my Kentucky

14   attorney, Mr. Deatherage, was trying to set it up, and

15   it took a little longer to get it to happen than we

16   thought.  I'll also just add that--

17       Q.   Well, actually don't add, just answer the

18   question.

19       A.   Okay.

20       Q.   I want to talk about one other topic and then I'm

21   done.  I want to explore what happened in the

22   *Herrera-Zamora* case.

23       A.   Okay.

24       Q.   What was Mr. Herrera-Zamora charged with?

25       A.   He was charged with-- it was a controlled

1   delivery of a large quantity of methamphetamine and then

2   he also had a firearm.  So I think there was a 924(c)

3   count and then there were drug counts.  And maybe a

4   possession count too, but I'm not sure.

5       Q.   And were you and Mr. Zabel both assigned to that

6   case from the outset?

7       A.   I don't know if we were both from the outset.  I

8   think initially it was my case, and then at some point

9   he was assigned to it.  And then when I became a Social

10  Security SAUSA, it became his case and I was only

11  allowed to stay on for trial.

12      Q.   And as I understand it, in that case there was an

13  effort to listen to Mr. Moran's-- calls to Mr. Moran

14  from people other than Herrera-Zamora.  Correct?

15      A.   That was the-- or conversations, yes.  That was

16  the goal.

17      Q.   And in addition to that, there was also an effort

18  by you at one point to listen to conversations between

19  Moran and Herrera-Zamora.  Correct?

20      A.   With the goal of finding the conversations

21  between Mr. Moran and the secondary-- other folks, yes.

22      Q.   And there also was the use of an interpreter to

23  listen to conversations.  Correct?

24      A.   Yes.

25      Q.   Okay.  And I just-- I want to make sure I

1    understand how that all worked out, so I want to ask you

2    some questions about that.

3        A.   Okay.  And, again, I will give you to the best of

4    my recollection, but I haven't seen most of that stuff

5    since 2016.

6        Q.   Okay.  Fair enough.  What triggered your belief

7    that it was appropriate-- or appropriate is not the

8    right word.  What triggered your decision to start to

9    listen to calls to Mr. Moran to identify these other

10   people?

11           MS. BRANNON:  I'm going to object.  This

12   ground has been plowed several times.  She testified

13   about it yesterday.  This is not an opportunity for

14   Mr. Clymer to educate himself about the record.  If he

15   wants to ask questions about something on cross, we

16   don't object, but we've been through this.

17           THE COURT:  Well, I think this particular

18   question has been asked and answered several times.

19           MR. CLYMER:  Yesterday, Your Honor, when

20   there was testimony from Ms. Tomasic on this, there was

21   no clear delineation about when different things

22   occurred.  When, for example, the interpreter occurred.

23   And I have some other questions about the use of the

24   interpreter that were not asked.

25           THE COURT:  Well, your question was what

1    triggered her to-- to look for these conversations, and

2    she had already just answered it was-- she wanted to

3    listen to conversations between Moran and Herrera, and

4    she wanted to find Moran conversations with other

5    inmates was I think the answer to that particular

6    question.

7    BY MR. CLYMER:

8        Q.   When you ordered the phone records, did you use

9    what you called a reverse yesterday?

10       A.   Yes.

11       Q.   Did you make any effort, using that reverse, to

12   exclude Herrera-Zamora's PIN number from the reverse?

13       A.   The-- when I sent it out, no.  And that-- the

14   reason for that was I didn't know if Herrera-Zamora

15   handed the phone to the other friends midway through the

16   call.  He had done that in a previous instance, a phone

17   call we were going to use.

18           He had been on a phone call, handed the phone to

19   his co-defendant, and tried to force his co-defendant to

20   say that he was going to take blame for the drugs

21   basically.  And the co-defendant wouldn't do it and ran

22   away I guess, it sounded like on the phone.

23           And then Herrera-Zamora is cussing on the phone,

24   saying, you know, this guy won't take it, we're going to

25   have to go talk.  And we were going to use that as a

1    threat enhancement.

2           So there was precedent for that.  That was in one

3    of the phone calls that Sara Gardner had previously

4    translated for us.

5    Q.   And was there also incidents that you knew at the

6    facility where inmates had let other inmates use their

7    PIN numbers?

8    A.   Yes.

9    Q.   Did you listen to calls yourselves before getting

10   the interpreter, or did you have the interpreter listen

11   to the calls first?

12   A.   I listened first to portions and then stopped

13   and-- and I don't-- I don't remember the exact order for

14   the remainder of-- well, I can piece it together I

15   suppose.

16          I discussed with Dave Zabel that the filter team

17   still wasn't in place.  And the reason I listened

18   initially is because the filter team wasn't in place,

19   and they were struggling to find someone.  And there

20   should be e-mail traffic to support that.

21   Q.   Do you recall that the person that was supposed

22   to be the agent to screen the calls had a conflict and

23   couldn't do it?

24   A.   That didn't happen until much later.  Initially

25   the trouble was DEA couldn't find anybody to do it, so

 1  there was some lag time.

 2         So I went to Dave, discussed that this was still

 3  an issue, and I asked-- we talked, if Sara Gardner could

 4  listen to the calls, and he said that was fine.  And she

 5  was already coming to the courthouse because she was a

 6  witness who was going to translate, I-- some additional

 7  calls that we were using at trial, I don't know which

 8  ones.

 9         And Dave and I had a second discussion at least

10  about Sara Gardner listening to the calls because she

11  was going to have to do it at our office.

12         And then I had to go back to Dave a third time,

13  and he's doing other things, and ask him if she could

14  leave the courthouse.  And I think he was at this point

15  sitting at counsel table, but I'm not sure, because she

16  had to leave the courthouse because she couldn't do it--

17  the job sufficiently on our computers because she needed

18  either her foot pedals or some equipment that allowed

19  her to go back and forth, back and forth.  And Dave said

20  that was fine.

21         So then she went off and continued listening.

22  And at some point down the road, Dave and I discussed,

23  and it was his suggestion that he didn't think she would

24  be the right witness.  Not that we hadn't done

25  anything-- not that we had done anything wrong, but that

1   she wouldn't be the right witness to introduce the Moran

2   calls because it may cause a fight with Moran, so we'll

3   use the DEA task force officer, who by this point had

4   materialized.  Then she started listening to the calls,

5   although I'm not exact on the timing.  She may have been

6   listening to them at the same time Sara Gardner was.

7        And then at that point the task force officer

8   came to me and then I took her to Tris and said that she

9   had a conflict because she'd either recognized a voice

10  or something.

11       And I also recall that there were two batches.

12  Like the first batch actually wasn't a reverse, and so

13  it didn't include-- if you look at the index, it didn't

14  include the two other inmates, but the second batch that

15  we got actually was a reverse.

16       So the first batch had Mr. Moran's calls, but it

17  also had girlfriend and wife and other stuff.  And then

18  the second batch came with the same time frame, and that

19  included, I think, based on my memory, the two other

20  inmates' calls.

21  Q.  Did you task the interpreter to listen to calls

22  between Herrera-Zamora and his attorney?

23  A.  To listen to all the calls on the disk, to find

24  the two other inmates' calls, which would've included

25  calls between Mr. Herrera-Zamora and his attorney.

1    Q.   So you tasked her to listen to attorney-client

2    calls.  Correct?

3    A.   Yes, after discussing it with Dave Zabel and he

4    agreed with that course of action.

5    Q.   Did you, when you spoke to Scott Rask and

6    reported what you personally had done in terms of

7    listening to calls, tell Scott Rask about the

8    interpreter?

9    A.   I never mentioned the interpreter.  My

10   conversation with Scott Rask was a five to ten-minute

11   conversation.  I attempted to talk with him - and Dave

12   did too - before I was fired, after we had done this big

13   fact-gathering mission, and he refused to speak with us.

14   Q.   And in May of 2017, after you were terminated you

15   sat down and wrote a letter to Judge Robinson.  Correct?

16   A.   I did.

17   Q.   And in that letter you tried to describe to the

18   judge where you thought you had made missteps.  Correct?

19   A.   Yes.

20   Q.   Did you say anything to Judge Robinson about

21   tasking an interpreter to listen to attorney-client

22   telephone calls?

23   A.   That is not in the letter.  I did report it to

24   the Special Master.

25           MR. CLYMER:  Nothing further, Your Honor.

REDIRECT EXAMINATION

BY MS. VANBEBBER:

Q. Let me follow up with the last-- the last part of the questioning. You talked about filter teams early on in your cross examination.

A. Yes.

Q. And then you talked about *Herrera-Zamora* here. And you said that you were involved in the *Rapp* case as well as the *Black* case; is that right?

A. Yes.

Q. Those three. And we've heard about *Herrera-Zamora*.

A. Yes.

Q. Was there a filter team in place in *Rapp*?

A. No.

Q. Even though in *Rapp* you did listen to attorney phone calls, there were attorney phone calls, you would've had an opportunity to put a filter team in place before you listened, and you chose not to for reasons you've already discussed. Right?

A. Yes. That-- yes.

Q. Was there a filter team in place in *Black*?

A. Yes.

Q. And so you knew at the time that *Black*-- that *Black*-- after Black was indicted, you knew that there

 1    were recordings of audio/video-- audio-- excuse me, not

 2    audio/visual, attorney-client videos in that case.  Did

 3    you call the taint team in to check that out, tell them

 4    to go look, look at Disk-- look at DVR No. 6?

 5         A.  I suggested it.  And then in discussion with Jeff

 6    Stokes, we agreed he could isolate that video and then

 7    we would send that video off to the--

 8         Q.  He was not on the taint team, was he?

 9         A.  He was not.

10         Q.  He was the case agent, wasn't he?

11         A.  One-- well, I don't know if he was.  He was one

12    of many-- one of four or five of the main agents, yes.

13         Q.  So you picked him rather than sending-- whatever

14    was going to be on that No. 6 DVR, you picked Stokes

15    rather than the taint team to look?

16         A.  Yes, I agree, I did that.

17         Q.  Now, that's contrary to your testimony that said

18    that-- when you were given a hypothetical by Mr. Clymer,

19    well, what would you have done if the same situation had

20    arisen, and you said you would go to the taint team

21    first.  Right?

22         A.  I struggled with that answer because I-- I think

23    his question was a little more complicated than that.

24    It was if it all-- I took it as if everything was going

25    right and you had realized it, would you have handled it

1    correctly.

2        Q.   Okay.

3        A.   And--

4        Q.   So you realize today that that would've been the

5    proper way to go about it?

6        A.   I realized that about a year-and-a-half ago, yes.

7        Q.   Okay.  All right.  Then let's look at early on

8    when you did the right thing.  You've been asked a

9    number of different ways, a different scenario of the

10   idea that you didn't have to turn over to an attorney

11   the fact that someone had listened to his calls.  Right?

12   You've been asked that several times, haven't you?

13       A.   Yes.

14       Q.   All right.  Early on you-- is it your testimony

15   that you pretty much knew what the right thing to do

16   was, and that you did the right thing?  You called

17   Lanny, you got ahold of the PRAO, and they told you--

18   they gave you good advice and you acted on it.  Right?

19   But then you went to the lunchroom later; is that

20   correct?

21       A.   That's correct.

22       Q.   And before you went to the lunchroom, you had

23   talked-- you had actually called Emily on an issue.  And

24   Emily had given you the right advice, you better--

25   you've got to tell the lawyer.  Right?

 1      A.   Yes.

 2      Q.   And is it still your testimony that when you went

 3   into that lunchroom there were a bunch of people there?

 4   And Chris was there, Chris Oakley?

 5      A.   He was not there.

 6      Q.   Chris was not there?

 7      A.   I do not believe he was there.

 8      Q.   Can you remember who was today?

 9      A.   I really don't.  And it's because it was lunch

10   every single day.  And to isolate who was there on one

11   day is-- I think it's impossible.

12      Q.   Okay.  But it was how many-- approximately how

13   many people?

14      A.   I would say five to eight.

15      Q.   All right.  So then did you tell them, hey, I've

16   talked to Emily and Emily says I've got to do XYZ?

17      A.   Yes.

18      Q.   And is it correct that they told you that, first

19   of all, Emily was a civil lawyer?

20      A.   Yes.

21      Q.   And that civil lawyers don't really try cases?

22      A.   Yes.

23      Q.   And that she doesn't know what she's talking

24   about?

25      A.   Yes.

1    Q.   Was that enough to change your mind and pay

2    attention to what they told you?

3    A.   Yes.

4    Q.   And why would that be?

5    A.   Well, I worked with them every day.  I didn't

6    really know Emily.

7    Q.   Uh-huh.

8    A.   And, you know, in the office, for the most part,

9    everyone had been practicing law 20 years, 15 years, 30

10   years, and I was two or three years.  So I went to them

11   and--

12   Q.   And they gave you advice and you took it?

13   A.   Yes.  And-- and oftentimes it was good advice.

14   Q.   So is it fair to say that you were led to

15   believe-- well, then did you talk to Chris Oakley?

16   A.   I did.  I don't know the exact timeline, but I

17   know after that meeting I did.  And I think it was

18   fairly shortly thereafter.

19   Q.   And did he also reiterate the advice you had been

20   given in the lunchroom, which was that a prosecutor

21   doesn't have to notify a lawyer that his calls have been

22   listened to?

23   A.   He told me we-- what he had done specifically.  I

24   believe my question to him was, you know, that are these

25   calls fair game.  And while there was not a discussion,

1  "yes, I listened to phone calls," I left with the

2  sentiment that the phone calls-- the attorney-client

3  calls were fair game.

4     Q.  Didn't he-- didn't you testify yesterday that

5  he-- he told you that it wouldn't be a good idea because

6  it could cause litigation issues?

7     A.  Yes.

8     Q.  And that there would be trouble-- could be

9  trouble down the line?

10    A.  Yes.

11    Q.  Trouble-- did you-- what trouble did you take

12  that to mean?

13    A.  I didn't think it-- I didn't understand the

14  magnitude of the trouble.  I just thought a litigation

15  burden.

16    Q.  So if the lawyer didn't know somebody had

17  listened to his phone calls, it would be easy to

18  prosecute.  Right?

19    A.  Yes.

20    Q.  In other-- other visits around the lunchroom, was

21  it also a common belief in the KCK office that a

22  prosecutor doesn't have to notify a lawyer that his

23  calls have been recorded or disclose any other discovery

24  if you decide that you're not going to use it in the

25  case?

1      A.   I cannot say it was common.  I can say the two

2   folks who trained me the most, that was their explicit

3   instruction, that I should evaluate myself whether we

4   had used a certain piece of evidence.  And if we had not

5   used it, there was no duty to disclose it.

6      Q.   Okay.

7      A.   That is the advice that Dave Zabel gave me the

8   day I met with him.  And then Scott Rask-- he said it no

9   less than three times because I said I was going to go

10  talk to Scott.  And he said, you have no duty to

11  disclose it with Scott.  We didn't use it, I know we

12  didn't use it.

13         And then we continued on.  And I said, I think

14  I'm going to do it, I think I'm going to talk to Scott.

15  And he said, if it would make you feel better, do it,

16  but you have to be clear I didn't know about it and--

17  but you really don't have to tell him, we didn't use it.

18     Q.   Uh-huh.

19     A.   Then when I wrote my letter to Judge Robinson, I

20  called him immediately thereafter and read it to him.

21  And he was furious, and he said he believed he had

22  convinced Scott that we had no duty to disclose this at

23  all because-- that I had listened, because we didn't use

24  it.

25     Q.   All right.  And did that extend-- that's the

1   attorney call situation.  And did that extend to other

2   discovery?

3       A.   At least in one instance, yes, it did.  And even

4   when defense attorneys specifically asked for how we

5   obtained-- it was how we identified a new target

6   telephone in a wiretap case, and some concerning conduct

7   had taken place that may have led to us identifying that

8   target telephone.

9           And Tris brought the agent in in my presence and

10  said, how did you identify this target telephone?  The

11  agent went back and said-- and I don't know if I'm

12  allowed to go into the detail, but DEA had bribed

13  someone at a-- at a telephone company to steal company

14  records to identify the new target telephone.

15          But Tris didn't want to disclose that, so he had

16  the agent go back and check if they actually used it,

17  and the agent came back and said that they had not used

18  it, that they had identified the new telephone through

19  common call analysis.

20          And so Tris had that agent I believe write a memo

21  saying, you know, although someone in our group bribed

22  someone to get this information, we did not use it in

23  identifying the target telephone and, in fact, we

24  obtained the new target telephone through common call

25  analysis.

 1          And I'm sitting there, and this is explicit

 2     training that I got within the first year of my

 3     employment, and I thought that was accurate.  And I was

 4     not sent to a discovery course until three years later.

 5               MS. BRANNON:  Your Honor, for the record,

 6     could the record reflect that when you said common call

 7     analysis, you used air quotes?

 8               THE WITNESS:  Yes.

 9               MS. BRANNON:  Is that correct?

10               THE WITNESS:  That's correct.

11               MS. BRANNON:  Okay.

12     BY MS. VANBEBBER:

13     Q.  Did anybody at-- around the lunchroom or anybody

14     else ever tell you anything different at that office?

15     A.  I-- people didn't talk about the innerworkings of

16     their case unless it was something of interest.  So I

17     got most of my guidance from Tris and Dave.  I did cases

18     with Sheri as well.  I did not see her employ that

19     analysis.  I did the *Greg Rapp* case with Kim and, you

20     know, I don't-- nothing like that ever came up in *Rapp*,

21     so there was no reason to make that evaluation.

22     Q.  And Mr. Clymer asked you about your directions to

23     Agent Stokes.

24     A.  Uh-huh.

25     Q.  Is it fair to say that today you do not exactly

1   recall what you-- what you told Stokes to do or how to

2   do it?

3       A.  I don't recall my exact language, but I am very

4   confident that I told him not to look at attorney-client

5   video and that we would have to use a filter team to do

6   that if he ran across it, and that maybe Micky could be

7   the filter agent.  That's-- I am fairly confident about

8   that.

9       Q.  Do you recall testifying in May of this year?

10      A.  Yes.

11      Q.  And you recall that Special Master directed--

12  gave you a direct examination; is that right?

13      A.  Yes.

14      Q.  And do you recall anything from any of that

15  testimony that showed that you told the agent to just

16  look at the hallway?

17      A.  I don't remember that.

18      Q.  So if the record does not reflect that you told

19  him anything like that, is this something you're

20  remembering between now and May, or not?

21      A.  Honestly, I don't even remember being asked

22  anything like that in May.

23      Q.  Okay.  Would you agree that you told him what you

24  were looking for was information-- something to prove

25  that Rokusek behaved improperly with her agent-- or,

 1    excuse me, with her client and, therefore, was

 2    conflicted?

 3       A.   I don't recall that as part of that conversation.

 4    He was involved-- Jeff Stokes was involved in the

 5    conversation bringing the proffers to mine and Chris

 6    Oakley's attention and also Kim Flannigan's attention.

 7    So he would've understood what the individuals were

 8    alleging, and he would've understood--

 9       Q.   That's what you wanted him to look for, wasn't

10    it?

11       A.   He would've understood the nature of the

12    investigation and what evidence he needed to get, yes.

13       Q.   Now, is it fair to say that the best way to know

14    what happened between Rokusek and Dertinger would be to

15    watch them?

16       A.   It would be the best evidence.

17       Q.   And that means Drive 6, doesn't it?

18       A.   It does, yes.

19            MS. VANBEBBER:  I don't think I have any

20    other questions.

21                      RECROSS EXAMINATION

22    BY MS. BRANNON:

23       Q.   You wrote a lot of e-mails, didn't you?

24       A.   I evidently did.

25       Q.   And you also talked about writing memos so that

1    you could document things that you believed needed to be

2    documented?

3        A.   I didn't do that that much.  But beginning with

4    my first meeting with Debra Barnett in 2016, Scott Rask

5    told me to do it, and I started doing it some.  I also

6    had a calendar where I documented-- it was a personal

7    calendar, and I documented in handwriting what happened

8    at meetings, and it was not returned to me from my

9    office, so I assume the government has that as well.

10       Q.   You never saw that calendar after you left?

11       A.   No.  And I looked through the boxes for it, it

12   was not there.

13       Q.   We're talking about an old school printed

14   calendar?

15       A.   It was from Target.  It was pink.

16       Q.   All right.  Not an electronic calendar?

17       A.   No.

18       Q.   All right.  So you had this calendar.  You write

19   a lot of e-mails.  You also worked in an office where

20   the culture that you were taught is basically that -

21   let's see how you testified - if you don't want people

22   to know something, don't write it down?

23       A.   Absolutely, yes.

24       Q.   When it comes to this conversation about your

25   direction to Agent Stokes about what to look for and not

1    to look for, you don't have anything written down?

2        A.   I don't know that-- that to be true, but if

3    you've gone through my e-mails-- I mean, we have

4    pleadings I suppose, it should be in the pleadings.

5        Q.   Before August-- August of 2016, before all of

6    this became in controversy, you don't have anything in

7    writing memorializing what you told Agent Stokes to do

8    or not do regarding the attorney-client videotapes.

9        A.   That was not being sneaky.  The--

10       Q.   No, my question is:  Did you have anything in

11   writing?  Because we're looking for some kind of

12   documentation in writing.

13       A.   No, it was one conversation walking down a hall

14   when he had been told not to bother me because I was

15   working on *Herrera-Zamora*.

16       Q.   And you didn't follow up with anything to him

17   saying, let me be clear about what you can look for and

18   not look for?

19       A.   No, I did not.

20       Q.   Because you understood the material at issue here

21   had to do with attorney-client meetings.  Right?  You

22   knew that was important?

23       A.   Yes.

24       Q.   And you-- as you said to Ms. Hamilton, your

25   office took this seriously?

 1    A.   Well, that was three years prior when I was

 2   fresh.

 3    Q.   Okay.  At that time did you take it seriously

 4   that you had access to attorney-client communications?

 5    A.   Honestly, I did not take it as serious-- even

 6   remotely as seriously as I should have.

 7    Q.   Fair enough.

 8    A.   Because I didn't lock it up and I didn't insist

 9   on a filter team.  No, I didn't.

10    Q.   And so to your memory, your recollection, in this

11   office where if you don't want somebody to know it, you

12   don't write it down, you don't have anything written

13   about what you told Agent Stokes to do and not do?

14    A.   Not at that time, no.

15    Q.   And when you called Ms. Rokusek in, you really

16   did believe that she had handed information to her

17   client, Mr. Dertinger.  Right?

18    A.   I don't remember the timing of that.  I know that

19   that has been floated around, and I don't-- I don't

20   know.

21    Q.   Well, you later refused to give her discovery in

22   cases because you were concerned about what she would do

23   with it; is that right?

24    A.   Well, you said "handed."  We were concerned that

25   she had conveyed information in some way; verbally, by

1   handing something, by showing him the proffer but then

2   taking it back with her.  We didn't know how it had

3   happened.

4       Q.  So if she had shown him the proffer and taken it

5   back with her, that would've been on the video.  Right?

6       A.  Presumably.

7       Q.  And if she had given him the proffer to take

8   back, that would've been on the video.  Right?

9       A.  Yes.

10      Q.  And you were concerned about how she conveyed

11  that information to Mr. Dertinger?

12      A.  We were concerned if she had conveyed it and I

13  suppose how she had conveyed it as well, yes.

14      Q.  And you were concerned enough that in other--

15  later on, you were refusing to provide her discovery in

16  cases, hard copies or electronic, because you didn't

17  trust what she was going to do with it?

18      A.  I sought guidance about what I should do with her

19  and discovery, yes, and-- and that was the guidance I

20  was given.  That was not a decision by me.

21      Q.  Kim Flannigan was in on that decision.  Correct?

22      A.  If she-- it would depend on who was supervisor at

23  the time.  If it was when she was still supervisor, she

24  would've been in on it.  If it was when Scott was

25  supervisor, he would've been in on it.  Deb Barnett may

1  have been in on it.

2          MS. BRANNON:  May I approach the witness,

3  please?

4          THE COURT:  Yes.

5  BY MS. BRANNON:

6     Q.  I'd ask you to look at Exhibit 516 which has been

7  admitted.  Below that is an e-mail from you to

8  Ms. Rokusek's office, copied to Ms. Flannigan, refusing

9  to give discovery in the *Black* case?

10    A.  What's the date?  Yes, Kim was still supervisor.

11    Q.  All right.  Let's talk for a moment about what

12 you knew when, because the prosecutor was talking to you

13 about that quite a bit.  I'm going to ask-- Exhibit 453,

14 ask you to look at that and see if you ever-- have ever

15 seen this e-mail before.

16    A.  Is it--

17    Q.  We're getting to it.  453.  All right.

18          THE COURT:  453?

19          MS. BRANNON:  453.

20          THE COURT:  Okay.

21          THE WITNESS:  I did not see this e-mail

22 until you all attached it to a pleading months later.

23 BY MS. BRANNON:

24    Q.  Okay.  So that is August 3rd, later in the

25 evening, to Deb and Duston.  Were you provided that

 1   e-mail the next day, August 4th?

 2      A.   No.   No one in the office was provided the

 3   e-mail.

 4      Q.   All right.   The last part of that, where we're at

 5   least trying to express some caution and we want

 6   information--

 7      A.   Uh-huh.

 8      Q.   -- were you ever advised of that, whether by

 9   e-mail or any other way, that the FPD was trying to

10   approach this cautiously?

11      A.   No.   And I know that Tris Hunt was very angry at

12   you and Kirk because he-- as he said, you had

13   bushwhacked him, which is evidently a South African term

14   for blind-sided him, by coming in and handling the

15   detention hearing as you had.   And he took that

16   information to management and they didn't say, oh, we

17   have this e-mail, sorry we didn't pass it down.   They

18   just sort of agreed that you all had bushwhacked him,

19   so...

20      Q.   All right.   So let's talk about the detention

21   hearing.   It was on Friday, August 5th.   Right?

22      A.   I wasn't there, but that sounds-- I know it was

23   roughly after this e-mail.

24      Q.   And did you talk to Tris that afternoon after the

25   hearing?

1    A.  Yes.

2    Q.  And so at that hearing he learned-- well, from

3  what you understand, he learned about this, but he also

4  learned that we had information from Western District

5  that the attorney-client meetings were actually

6  videotaped.  Right?

7    A.  I don't remember him discussing the substance of

8  the hearing.  He discussed having some heated

9  conversation with you and Kirk out in the hall.  That's

10  what I heard about.

11    Q.  So he didn't tell you that the substance of the

12  hearing, he learned that there actually were

13  attorney-client video-recordings?

14    A.  I'm not going to say he didn't, but he-- the

15  focus of the conversation, as I recall it now, was the

16  heated conversation you all had out in the hall and that

17  you had surprised him.

18    Q.  Because that was before you sent the e-mail to

19  Judge Robinson about not knowing whether there were

20  attorney-client recordings.  Correct?

21    A.  The hearing?

22    Q.  Uh-huh.

23    A.  I don't know.

24    Q.  Okay.

25    A.  And I don't even know if my conversation with

1    Tris was immediately after the hearing.  It would've I

2    think been the same day.  I can't tell you the timeline

3    of when I talked with him.

4        Q.   And at that hearing Mr. Hunt actually got a copy

5    of the e-mail from Western District of Missouri.  Were

6    you aware of that?

7        A.   Not that I recall.

8        Q.   Okay.  Just to follow up on a couple of questions

9    from the Special Master about who trained you regarding

10   discovery.  You said two people trained you, that was

11   Dave Zabel and Scott Rask?

12       A.   No.

13       Q.   Okay.

14       A.   Sheri Catania was my assigned mentor.  But as I

15   testified to earlier, I was told shortly thereafter I

16   was not allowed to talk to her and three-- I think three

17   other people.  So I sort of set my own course for a

18   period of time.

19            And then I would say approximately six to nine

20   months in to being in the office, Tris and Dave-- Tris

21   asked Mike Warner if he could put me on a big case and

22   Mike approved it.  And so at that point Tris started

23   training me.  And then shortly thereafter, Dave started

24   training me.  And they-- I called them this, they called

25   themselves this, and other people in the office, they

1    were my de facto mentors because my real mentor and I

2    were not allowed to work together.

3        Q.   Was that even after Mr. Warner left?

4        A.   After Mr. Warner left I-- and Kim Flannigan took

5    over, I was allowed to work with Sheri again.  But while

6    Mr. Warner was still there, Sheri sent an e-mail to Mr.

7    Warner saying that I was ready to fly solo just because

8    she said she wasn't going to deal with mentoring someone

9    she couldn't talk to.  She told me that much later.

10           So I was out of the training period earlier than

11   a typical training period.  And then my training from

12   that point on was just to AUSAs who put me on their

13   cases and let me watch how they did things.  And Sheri

14   also put me on cases, the *Griffin* case for example.

15       Q.   The prosecutor asked you quite a bit about Juan

16   Herrera-Zamora.  Over the break I asked through your

17   attorneys for you to look at a particular memo; is that

18   right?

19       A.   Yes.

20       Q.   And do you have that memo in front of you?

21       A.   I do.

22       Q.   And what is the exhibit number on that, please?

23       A.   584.

24       Q.   And did you have a chance to review that?

25       A.   I did.  There's a lot here and I did the best I

1    could, but I have never seen this before.

2       Q.   All right.  Let's look at that for a moment if--

3    for the record, just what is that?

4       A.   That is a memorandum that Scott Rask wrote to his

5    own file made on May 17th, 2017, regarding a meeting

6    that he and I had on May 10th, 2017.

7       Q.   So is he reporting what your particular

8    conversation was about Juan Herrera-Zamora?

9       A.   That's what he appears to be doing.

10      Q.   Do you claim it to be accurate?

11      A.   I do not.  Portions of it are and portions of it

12   are not.

13      Q.   If you can, let's talk about what you believe is

14   inaccurate in it.

15      A.   Okay.  The most striking part about-- as a whole

16   is that he has essentially removed Dave Zabel from the

17   equation.  Everything I reported to him about Dave Zabel

18   almost without exception is removed or twisted.

19      Q.   And that would be the part that Dave Zabel knew

20   what you were doing with the attorney-client calls?

21      A.   And that he had also listened to calls himself,

22   yes, because I reported that to Scott that day, I am

23   certain.

24      Q.   All right.

25      A.   The second paragraph he states that I began the

1   conversation by stating whether I was uncertain to

2   disclose it because my husband had told me not to.

3       Q.   Uh-huh.

4       A.   That is inaccurate.  I had just left Dave Zabel's

5   office moments earlier when Dave had-- Dave had told me

6   not to disclose it.  So when I met with Scott, I said,

7   Dave told me I don't have an obligation to tell you.

8       Q.   Okay.  And what else?

9       A.   The part that says that I take anti-anxiety

10  medication to sleep and there are other negative impacts

11  on my life due to this issue, I probably was discussing

12  anti-anxiety medicine and negative impacts on my life,

13  but I was discussing the *Black* issue as a whole and the

14  way the office is run as a whole.

15      Q.   Okay.

16      A.   I-- the second paragraph, that I knew it was

17  wrong is twisted.  I said I believe now it was wrong but

18  that I felt like the-- the advice given by PRAO said

19  that if I was confident that it wasn't privileged, then

20  I could move forward and do it myself.  I took that as

21  an okay to do it.

22      Q.   What else?

23      A.   I mean, there are lots of little things but I

24  guess I'll focus on the big one.  So it says in the

25  third paragraph, "Because the prosecution team learned

1   that least one attorney for an inmate was not contacted

2   by Herrera-Zamora," well, it wasn't the prosecution

3   team.   Dave Zabel was the one who took the lead on this

4   issue of going after Carlos Moran.   Dave Zabel contacted

5   the two defense attorneys himself, Dave Zabel instructed

6   me-- I suggested to get the phone calls, but he

7   instructed me to do it.

8       Moving to Page 2.   The very first line, "A filter

9   team was established with a DEA Spanish-speaking agent,"

10  but that was established sometime later.

11  Q.   Okay.   Is there any reference in here to the

12  interpreter who actually did the interpreting on the

13  attorney-client calls?

14  A.   It is not mentioned in here.   And I want to

15  correct something because I know-- this is-- it is

16  related to that.   When those phone calls from

17  Herrera-Zamora appeared on my desk at some point, I

18  didn't say, oh, these are attorney-client calls.   It was

19  just odd that they appeared on my desk while I had been

20  working in the Western District of Missouri in my inbox

21  because I hadn't ordered any calls.   And it was odd that

22  it was the same case in which I had intentionally

23  ordered attorney calls.

24      So I immediately took them to Tris Hunt.   Tris

25  and Scott and Dave and I discussed this in groups and I

1    told Tris, you can find out, I-- I'm not going to get

2    involved because this involves me.  If you want to find

3    out who put these calls on my desk, here's who you

4    should go to.  Sara Gardner, she listened to attorney

5    calls in this case.  Scott Rask knew it.  Tris Hunt knew

6    it because as part of that discussion I told them.  And

7    then Dave Zabel knew it from day one, but...

8        Q.  This is a different incident than when you found

9    a file in your inbox and didn't know what it was?

10       A.  No, it's the same incident.

11       Q.  That wasn't an empty file, it was actually the

12   calls?

13       A.  It was jail calls, yeah.

14       Q.  Okay.

15       A.  And I took them to Tris Hunt.

16       Q.  Okay.

17       A.  But I don't know if they were attorney calls or

18   not.  But in taking them to Tris Hunt, whenever I did,

19   and that date is documented, I told Tris Hunt and Scott

20   Rask that Sara Gardner had listened to attorney calls as

21   part of this case and that they should interview her to

22   see if she had put them in my inbox.  Someone was

23   returning them, either the taint attorney or Sara

24   Gardner, because they'd both done it.

25       Q.  This was before or after August of 2016?

1        A.   After.

2        Q.   Okay.  All right.  And, again, is there anything

3   else major in Mr. Rask's report that you believe is

4   inaccurate?

5        A.   I didn't say that I impetuously inserted the disk

6   of calls because I had to know.  I said I felt like I

7   was on solid legal footing to do it and I did it because

8   the filter team wasn't coming through.  And we had been

9   working on it and I felt like with the guidance with

10  PRAO that I could do it.

11           I didn't say I listened to portions of the entire

12  disk and eventually ceased all listening.  I know that

13  they-- that Scott wrote that in his correction to the

14  record.  That surprised me because I didn't think that I

15  had listened to the entire disk.  But if that's what his

16  investigation has shown, then it's accurate I'm sure.

17           And I didn't say I knew it was wrong to do so.  I

18  was remorseful for having withheld that information from

19  Scott and from defense counsel, but I at the time didn't

20  think it was bad.  I came to-- I came to think it was

21  bad.

22           And then I know that he makes a big to-do that I

23  couldn't understand the dialect.  That conversation came

24  about because I said the phone calls are in Spanish.

25  And Scott said, oh, oh, okay.  Like no big deal.  And I

1  said, no, I do speak Spanish.  I don't think I could've

2  understood it all because they're from northern Mexico

3  and my experience is in southern Mexico.  But that was

4  an aside, it wasn't like the main thrust.

5      Q.  Okay.

6      A.  Then the paragraph, "On an unknown date, Erin

7  told Dave that she had listened to the telephone calls

8  between Herrera-Zamora and Carlos Moran.  However when

9  Erin brought the issue to Dave's attention later, he

10 expressed no recollection of such a conversation with

11 her."  That is misleading.

12      The first time Dave Zabel indicated he did not

13 remember it was ten minutes before my conversation with

14 Scott Rask.  So I know I had at least two conversations

15 in the fall with Dave Zabel talking to him about me

16 listening to phone calls and him listening to the phone

17 calls.  And during my second conversation with him in

18 the fall of 2016, he expressed that he did not remember

19 that he personally listened to phone calls in my

20 presence.

21      Then when I had a conversation with him in May of

22 2017, he again said he did not remember himself

23 listening to phone calls.  And that if I did go to

24 Scott, I would have to be clear that he did not remember

25 the previous conversations with me.

1    Q.  So the upshot of this memo, tell me if you agree

2    with this, is that it is written so as to make you look

3    like you're confessing to doing something wrong, that

4    nobody else was involved in it, and that Zabel had no

5    knowledge of it.  Is that about right?

6    A.  That is right.  I-- the most-- the thing that

7    stuck in my brain forever from that conversation is that

8    I said, well, Dave says he doesn't remember it.  And

9    Scott said, well, I have no doubt about that.

10         He hadn't talked to Dave.  You know, and I know

11   that they have an extraordinarily close relationship.

12   But he had decided at that moment that Dave had done

13   nothing wrong and was going to take every effort to

14   defend him.

15         The final paragraph is also incorrect on Page 2.

16   It said that I had no pressure within the office to

17   listen to calls between Herrera-Zamora and counsel and

18   that I was unaware that any other attorney in the office

19   would listen to those calls.

20         I saw something similar to that in Scott's motion

21   to correct the record.  That is flatly false and

22   manufactured.  What Scott said is, did anyone else

23   pressure you to listen to calls?  And I said, I'm not

24   here to talk about anyone else.  I'm here to talk about

25   me.  That's it.  And I have no doubt about that.

1    Q.  At that time were you aware that Tanya Treadway

2  had intentionally listened to attorney-client calls?

3    A.  Yes.

4    Q.  So it would've been untrue in that sense?

5    A.  It would've been untrue.  And I also-- I didn't--

6  I wasn't there to try and turn in other people to Scott.

7  I didn't feel like he was the right person to do it

8  because I didn't trust him.  But it's just not true,

9  what he wrote is not true.  And if-- unless his memory

10  is very faulty, there's no way he thinks it's true.

11          MS. BRANNON:  Could I have just one moment,

12  Your Honor?

13          THE COURT:  Yes.

14          MS. BRANNON:  Nothing further.  Thank you.

15          THE WITNESS:  May I add one more correction?

16          MS. BRANNON:  Certainly.

17          THE WITNESS:  I know, because Dave Zabel

18  told me, that the day I got fired he and Scott argued

19  for - according to Dave - hours because he was telling

20  Scott that I hadn't-- he was defending his position that

21  he told Scott I had no obligation to tell him.  And they

22  argued about it.

23          So Scott is also aware that Dave said I had

24  no obligation to tell.  And the reason was we didn't use

25  it.  And that is some legal framework that he uses as

1    far as whether things need to be disclosed.

2    BY MS. BRANNON:

3       Q.   Did you write corrections on this particular copy

4    that you have?

5       A.   I did, but I don't know that they make much

6    sense.

7       Q.   All right.  All right.  Thank you.

8       A.   Okay.

9              THE COURT:  Anything more?

10             MR. CLYMER:  Nothing further, Your Honor.

11             THE COURT:  All right.  May Ms. Tomasic be

12   excused?

13             MS. VANBEBBER:  Yes, Your Honor.

14             MS. BRANNON:  Judge, we'd certainly excuse

15   her to go home.  But because we have so much material

16   that includes her e-mails that we have not reviewed, and

17   I expect some hasn't even been produced, we're still

18   looking for those, we'd ask to at least keep her under

19   sequestration and subpoena.

20             I really hope we wouldn't have to call her

21   back.  And if there's an agreement to admit those, it

22   would be unlikely.  But for those reasons we would ask

23   not to excuse her.

24             THE COURT:  All right.  Ms. Tomasic, so

25   we're going to excuse you subject to recall.  It's my

1  hope that you won't need to be recalled.  This is, what,

2  the third or fourth time now that you've been called to

3  Kansas and-- but the government is still in the process

4  of producing documents is what Ms. Brannon is referring

5  to.  We'll make every effort not to recall you, but you

6  still remain under the sequestration order that all

7  witnesses are under just in case there should be a need.

8          The schedule is, we're going to go through

9  this week and next week.  And after that, I mean,

10 hopefully we'll be completed and really completed.  If

11 not, we'd have to go into November probably.  It

12 wouldn't be later in October.  Just for your knowledge.

13 But for now we excuse you.

14          THE WITNESS:  Thank you.

15          THE COURT:  All right.  Are you ready to

16 call your next witness?

17          MS. VANBEBBER:  Your Honor, I believe--

18          THE COURT:  Oh.

19          MS. VANBEBBER:  -- that Ms. Brannon will be

20 calling the next witness.

21          THE COURT:  Okay.

22          MR. BELL:  Your Honor, we'll call Agent John

23 Seubert.

24          AGENT JOHN SEUBERT,

25 called as a witness on behalf of the Federal Public

 1    Defender's Office, having first been duly sworn,

 2    testified as follows:

 3                        DIRECT EXAMINATION

 4    BY MR. BELL:

 5        Q.   Good morning, Agent Seubert.

 6        A.   Good morning, sir.

 7        Q.   You were one of the case agents or maybe the case

 8    agent on the *Black* investigation?

 9        A.   There were-- there were multiple case agents from

10    multiple agencies.

11        Q.   You were one of them?

12        A.   Yes, sir.

13        Q.   You were involved in the decision to issue the

14    subpoena to CCA for its surveillance video?

15        A.   I drafted a potential subpoena for that

16    information that designated specific locations at the

17    facility and forwarded it to Ms. Tomasic.

18        Q.   So you had drafted a subpoena that only asked for

19    video from certain areas of CCA?

20        A.   Yes, sir, that is correct.

21        Q.   And you said you forwarded that to Ms. Tomasic?

22        A.   As I did with all the-- the subpoenas.  I just

23    would draft them.

24        Q.   And that was, I suppose, as a suggestion of what

25    the form of the subpoena or the request of the subpoena

1   should be?

2       A.  Yeah.  Yes, sir.  Yes, sir.

3       Q.  Do you recall when you sent Ms. Tomasic that

4   draft subpoena with the limited request?  I'm going to

5   need the specific date and time.  I'm joking obviously.

6       A.  Yeah, and I apologize.  I do-- I would like to

7   note that I have some dates noted here because from the

8   testimony in June, I felt obligated to be a little bit

9   more specific, you know, for the Court and for the

10  parties.

11      Q.  Sure.  If it will refresh your recollection,

12  that's fine.

13      A.  I want to say it was towards the end of March--

14      Q.  All right.

15      A.  -- was when the draft went over.  Some-- sometime

16  toward the end of March of-- of 2016.

17      Q.  Okay.  And ultimately, we know that that was not

18  the form that was-- was not the subpoena that was

19  actually given to CCA?

20      A.  Yes, sir, that is correct.

21      Q.  So once you forwarded that, a more limited draft

22  to Ms. Tomasic, did you get a response from her?

23      A.  Yeah.  There was-- there was an exchange.  I

24  can't say if it was prior to or after I sent over the

25  draft, definitively I can't say.  But I think through

1    the course of additional proffers and witness

2    interviews, some other locations within the facility

3    came-- came to light.

4          Not-- not the-- the meeting locations for the

5    attorney, but I think it was, you know, maybe the-- the

6    kitchen area.  And then there was some discussion about

7    hair-up-hair-down.  It was all focused on employees of

8    the facility, the locations we were discussing.

9    Q.   So you forward this draft with certain areas to

10   be subpoenaed-- or certain areas of video to be

11   subpoenaed sometime around the end of March.  And then

12   after you forward that proposal, there's some sort of

13   discussion about there might be other areas that we

14   would want video from that are not included?

15   A.   Again, it was-- I can't specifically say that it

16   was after I sent the subpoena, it may have been prior

17   to.  It's all around the same time.  And then that was

18   an e-mail exchange between myself and Ms. Tomasic.

19   Q.   So there was an e-mail exchange between you and

20   Ms. Tomasic about what areas within CCA to ask for video

21   of?

22   A.   Yeah.  And, again, I think-- I want to say it was

23   the kitchen maybe.  I think it said maybe employee

24   entrance and I think it said employee locker room,

25   because we didn't know if there was, you know, a place

1   where they come and change into their uniforms like, you

2   know, a patrol officer or something.  And her response

3   back was, yeah, I think that's a good idea.  Maybe

4   hair-up-hair-down, or something along those lines, which

5   is a specific reference to a CO.  Corrections officer,

6   sorry.

7       Q.  All right.  So you forward this request for

8   limited video, she makes some suggestions of other

9   places to add to ask for the video?

10      A.  Yes, sir, that's correct.

11      Q.  And then what happens next?

12      A.  In what I looked at, I was notified.  I can't

13  specifically say whether that was via e-mail or a phone

14  call, but basically it was-- said, hey, the subpoena is

15  ready.

16          I went and picked it up, scanned it.  I did not

17  look at it.  Which, you know, once an AUSA-- you know, I

18  may have some back and forth.  But, you know, I didn't

19  look at it, I scanned it and I-- on the 14th of April

20  of 2016, I forwarded that e-mail to Diana Shew; I think

21  Linda Thomas, I think that's the name of the warden; and

22  at that time Deb Kinney, who was like, I don't know, for

23  lack of a better term, Internal Affairs investigator for

24  the facility, because those were the three people that

25  had been designated by CCA-- if I say CCA, I mean

1   CoreCivic but CCA-- CCA at that time.  Those were the

2   three people that I had been instructed by CCA as to

3   correspondence regarding any subpoena requests.

4       Q.  So between the time that Ms. Tomasic e-mailed you

5   with some suggestions to add on of places to request

6   video for and the time you went and actually picked up

7   the subpoena, were there any other discussions amongst

8   the agents or the agents and Ms. Tomasic about asking

9   for all of the video?

10      A.  To the best of my memory, no, sir.

11      Q.  So when you showed up to pick up the subpoena or

12  maybe the first time you looked at it, was that the

13  first time you knew that the request was going to be for

14  all of the video at CCA?

15      A.  Sir, I did not know at that time.

16      Q.  When did you first discover that the subpoena

17  asked for all of the video at CCA?

18      A.  It was somewhere roughly in the time when this

19  all trans-- the litigation started and the filings.  I

20  don't-- someone said and I-- for the life of me, I can't

21  remember, that there were issues with the video and that

22  the government had requested video.

23          And when I say "someone," it was-- it was either

24  an agent or someone with the U.S. Attorney's Office.  I

25  had had no, you know, dialogue with anyone else.  And so

 1   I went to look for the subpoena.  And I'm-- I'm kind of

 2   an obsessive compulsive guy, so I have everything in

 3   date order - well, did in the subpoenas - and couldn't

 4   recall specifically when that subpoena had been issued.

 5       So I went back to my e-mails and the draft and

 6   found the date.  And then when I pulled the subpoena

 7   from the-- the actual subpoena that was maintained by

 8   the U.S. Attorney's Office, that's when I saw it was not

 9   specific locations but, in fact, all-- and I don't

10   remember the exact language, all video surveillance and

11   photography, or something like that.

12       Q.  So if I understand your testimony correctly, and

13   I want you to be sure about this, there was never a

14   discussion about asking for all of the video at CCA

15   before the subpoena was issued?

16       A.  To the best of my recollection, no, sir.  If you

17   have-- if you have something, I would be happy to look

18   at it to refresh my memory.  But as I sit here, no, sir,

19   I do not recall anything like that.

20       Q.  You were present in the courtroom for Ms.

21   Tomasic's testimony?

22       A.  Yes, sir, I was.

23       Q.  You heard Ms. Brannon ask Ms. Tomasic if she

24   understood as a lawyer the difference between "I don't

25   recall" and "no, it didn't happen."  Do you remember

1  that?

2      A.  Yes, sir.

3      Q.  You're a trained law enforcement agent, I

4  understand you probably know the difference between

5  those answers as well?

6      A.  Yes, sir, I do.

7      Q.  When you said you don't recall, does that mean

8  it's possible, but you just don't remember it happening?

9      A.  No, that means I just don't-- I have absolutely

10 no memory of it.

11     Q.  All right.  I think you said earlier that when

12 you were coming up with the list of places that you

13 wanted video from, those were places that you had

14 evidence where trafficking had been occurring?

15     A.  I wouldn't say evidence.  I would-- it was-- it

16 was based on the proffers and the cooperating witnesses

17 that we were speaking with.

18     Q.  All right.  So you had been given specific

19 information where exchanges of contraband had been

20 occurring?

21     A.  Yes, sir, that is correct.

22     Q.  And you wanted video from those specific

23 locations?

24     A.  Yes, sir, that is correct.

25     Q.  And I think you said earlier that you didn't have

1   any information that any contraband had been going

2   through the attorney-client meeting rooms; is that

3   right?

4       A.   This came up in-- in May in the *Dertinger*

5   hearing.  I can't-- the kindest way to put it would be

6   that the-- the compliance by CCA was sporadic.  But at

7   one point in one of the subpoenas, and it may have been

8   put up yesterday, we were requesting-- and now I don't

9   remember what it's called, incident report, I think it's

10  an IR.  One of the things that we had requested were

11  IRs, and there was a specific reason we were requesting

12  those.

13      And there was-- there was a report, if memory

14  serves, I believe there was a weapon - I don't remember

15  what type of weapon, I want to say a shank, but for some

16  reason a bullet sticks out in my head, I don't know -

17  that was recovered as contraband that was recovered.  It

18  was in the client-- attorney-client meeting rooms I

19  believe.  But that was not what was significant, it was

20  the party that reported recovering it that was.

21      Now, when I-- when we received that, I-- I

22  would-- I cannot comfortably say when we got those--

23  those incident reports, prior to or after the subpoena.

24      Q.   Well, you wanted video of the places where

25  contraband was being exchanged?

1     A.   Yes.

2     Q.   And one of the places that you learned where

3  contraband was being exchanged or at least going through

4  was the attorney-client rooms?

5     A.   No, not-- I don't believe at the time the

6  subpoena was issued, no, sir, I don't believe we knew

7  that.  I think this was an after-the-fact.  And I-- I

8  specifically recall I did not in my initial subpoena nor

9  in my correspondence ever discuss anything about an

10  attorney-client meeting room.

11     Q.   You mentioned your testimony in May during the

12  *Dertinger* hearing.  Have you reviewed a transcript of

13  that hearing or that testimony?

14     A.   Yeah, I did a couple weeks ago, yes, sir.

15     Q.   Isn't it true that during that hearing you

16  testified under oath that you did have information that

17  contraband was going through attorney-client rooms?

18     A.   That is what I was just speaking to now.

19     Q.   All right.  But it's your recollection now that

20  you don't know if you got that information before or

21  after you issued the subpoena for the video?

22     A.   No, that's not my recollection now.  I never

23  discussed it in the hearing originally.  I just said,

24  hey, we had this.

25     Q.   So as you sit here today, do you recall whether

1    you received the information about contraband in the

2    attorney-client rooms before or after you issued the--

3        A.  I-- I don't know.

4        Q.  What would refresh your recollection about the

5    timing of that information and when you learned it?

6        A.  If-- if there was-- if compliance on the subpoena

7    was noted, if that date were available to me, that would

8    be a definitive answer.

9        Q.  And so you-- the incident reports itself are how

10   you first learned about these items of contraband?

11       A.  Yes, sir, it was-- it was in--

12       Q.  How did you first get the incident reports before

13   subpoenaing them?

14       A.  We didn't.

15       Q.  So how did you know to subpoena the incident

16   reports if you didn't know about the contraband in the

17   room?

18       A.  The-- the implication from some of the

19   cooperating witnesses was that there were several

20   instances that they were alleging had been reported as

21   it related to the drug trafficking to one of the

22   targets, a-- an employee of CCA.

23            And what we were told was that they had reported

24   this information of the trafficking, nothing to do

25   with-- with attorney-client rooms or anything like that,

1   and that the supervisory individual had claimed to have

2   filed an incident report and subsequently claimed to

3   have sent that incident report via electronic mail on.

4       So based on that statement, we decided the-- we

5   collectively, the-- the investigative agents, that one

6   of the things we needed to request to see if we could

7   corroborate the information we were being given was any

8   and all incident reports from the facility.

9   Q.  So you get this information, so you subpoena all

10  the incident reports from the facility authored by the

11  target or just all of the incident reports?

12  A.  All of them.

13  Q.  You subpoena all of the incident reports.  And

14  when reviewing those incident reports, that's when you

15  learned about contraband in the attorney-client meeting

16  rooms?

17  A.  Yes.  Yes, sir.

18  Q.  And so if we had the-- the date and the subpoena

19  or the subpoena return, that would help us narrow down

20  the time frame of when you learned about that?

21  A.  Possibly.  Because if I recall that subpoena,

22  like I said, it was coming in piecemeal, very sporadic.

23  I don't even know if a return has been done.  But if it

24  noted when this-- you know, these set of items-- and

25  there was employee files, phone-- it was-- I think it

1  was the one that Ms. Brannon put up yesterday.  It was

2  an attachment, it was two pages I think.  And maybe it

3  was-- maybe it was the Special Master.  But there was

4  employee handbook, inmate handbook.

5      Q.   Those were other things that were asked for?

6      A.   Yeah, it was a two-page thing.  It was a very

7  large laundry list.

8      Q.   Would you agree with me that that subpoena was

9  issued before the subpoena for the video?

10     A.   I can neither agree nor disagree, sir, because I

11  don't remember.

12     Q.   Okay.  Would the dates of the subpoenas

13  themselves be the best evidence of that?

14     A.   I think so.  I-- I believe that-- that-- the

15  large subpoena, frankly, we didn't know how to ask for

16  some of the things we were asking for.  So when it got

17  to counsel down at the CCA, there was discussions

18  between Ms. Tomasic and Ms. Shew as to clarify this is

19  what we're looking for.

20     Q.   I'm sorry, and I don't mean to interrupt, Agent

21  Seubert.  But the question was:  Would the dates on the

22  subpoenas be the best evidence of which one was issued

23  first?

24     A.   Yes, sir, I understood the question.  And where I

25  was trying to get to was, I think a second subpoena with

1    the corrections was issued.

2        Q.   All right.

3        A.   So whatever the last subpoena would be that would

4    be similar, that would be the subpoena that would have

5    the date.

6        Q.   At some point you did become aware that the

7    videos produced by CCA contained recordings of the

8    attorney-client rooms?

9        A.   Not until-- I don't know that we were ever made

10   aware.  I know there was dialogue, and that would've

11   been August of '17.

12       Q.   When was the first time you became aware that

13   there may be videos from the attorney-client rooms--

14       A.   Oh, may be?  There was a proffer.

15       Q.   Hang on, let me finish my question.

16       A.   Yes, sir.

17       Q.   When is the first time you became aware that the

18   DVRs that had been obtained from CCA may contain

19   recordings from the attorney-client rooms?

20       A.   Oh, that would've been the-- when all this

21   litigation started.  I don't-- to the best of my

22   recollection.

23       Q.   Are you sure that it wasn't-- well, do you

24   remember testifying in the *Dertinger* hearing?

25       A.   Uh-huh.

 1    Q.  And you said you reviewed a copy of that

 2   transcript?

 3    A.  Yes, sir.

 4    Q.  Let me show you what's been previously admitted

 5   as Exhibit 478.

 6              MR. CLYMER:  Mr. Bell, could you speak up a

 7   little bit?  I have trouble hearing you.

 8   BY MR. BELL:

 9    Q.  Let me show you what's been previously admitted

10   as Exhibit 478, Page 85, 4 through 14.  Do you recall

11   being asked, "When did you first become aware that the

12   videos may contain recordings from attorney-client

13   rooms"?

14    A.  Yes, sir.  This is-- this is towards the-- the--

15   it was that e-mail.

16    Q.  All right.  So it wasn't when the litigation

17   erupted, it was when-- roughly around the time Ms.

18   Tomasic sent you an e-mail saying to put the videos in

19   the vault?

20    A.  Yeah.  Yeah, I should restate what I said.  I--

21   it came up I'm assuming from some dialogue that was

22   occurring with the Federal Public Defender and the U.S.

23   Attorney's Office.  My-- that's my presumption of why I

24   got this e-mail.  I don't know why, other than she said,

25   hey, mark-- mark-- seal them up and-- and mark them that

1   they may contain attorney material.

2        Q.   So that's the first time you even entertain the

3   possibility that there might be attorney-client room

4   videos on these DVRs?

5        A.   Yes, sir.

6        Q.   Let me show you what's been previously admitted

7   as Exhibit 1004.  Jeff Stokes was an agent on the CCA

8   investigation as well.  Correct?

9        A.   Yes, sir.

10       Q.   And this e-mail sent on July 12th, he asks Ms.

11  Boyd whether the video from the attorney visitation

12  rooms has arrived at the U.S. Attorney's Office?

13       A.   Well, the segment-- from what I can see of the

14  blowup, yes, sir, that's correct.

15       Q.   Was Agent Stokes also involved in deciding what

16  the terms of the subpoena would be, requesting video?

17       A.   Not to my recollection, no, sir.

18       Q.   So there was a discussion about what video to

19  obtain from CCA.  He was not as far as you know part of

20  that discussion?

21       A.   Yes, sir, that's correct.

22       Q.   But apparently at some point on July 12th, he

23  learns that not only is the-- the video supposed to come

24  in, but that the video is supposed to include video from

25  the attorney visitation rooms?

1    A.  Sir, you're-- I can't answer for what Mr. Stokes

2    knew.

3    Q.  To your knowledge, who, excluding you and Ms.

4    Tomasic, was involved in the discussion about how much

5    video to request from CCA in the subpoena?

6    A.  As far as I know, it was myself and Ms. Tomasic.

7    Q.  So assuming that that-- that's accurate, that

8    those are the two people that know, one of the two of

9    you would had to have communicated to Agent Stokes that

10   there would be video coming in and that it would include

11   the attorney visitation rooms.  Right?

12   A.  I-- again, I did not have that conversation with

13   Mr. Stokes.

14   Q.  And that's my point.  And you know it's not you?

15   A.  Yes, sir.

16   Q.  All right.  Did you ever subsequently learn that

17   anyone else had known about the video subpoena before it

18   was issued or had been involved in the discussions about

19   how much video to ask for?

20   A.  Can you-- could you--

21   Q.  No problem.

22   A.  -- repeat the question?

23   Q.  As you sit here today, is there anyone else that

24   you knew of that was involved in the decision about how

25   much video to ask for?

1      A.   No, sir.  Not to my knowledge.

2      Q.   So I'd like to talk about the recorded phone

3   calls for a moment.

4      A.   Yes, sir.

5      Q.   As part of the *Black* investigation, you obtained

6   a number of recorded telephone calls from the facility?

7      A.   The-- the investigators did, yes, sir.

8      Q.   On August 7th you received an e-mail from Debra

9   Barnett?

10     A.   Is this the one discussing-- was this-- I know--

11  I know it's an exhibit I think, isn't it?

12     Q.   Let me show you what's been marked and admitted

13  as Exhibit 1119.  It's a little-- start at the top here.

14  It's an e-mail from-- would you agree that's an e-mail

15  from Ms. Barnett to a number of people, including you,

16  telling you to secure and mark any audio of calls from

17  CCA and mark them as containing potentially

18  attorney-client materials?

19     A.   Yes, sir.

20     Q.   And your response is, among other things, are you

21  asking, "Does this include calls made from inmates using

22  a PIN and are told are subject to recording and review?"

23     A.   Yes, sir.

24     Q.   Now, when you asked that question, are you

25  attempting to educate Ms. Barnett because you don't

1  think that they're privileged because of these reasons?

2     A.  I would not-- I would not presume to educate the

3  criminal chief.  This was me attempting to elicit some

4  sort of what is going on, because we had no idea what

5  was going on.

6     Q.  All right.

7     A.  We-- investigators had no idea what was going on.

8     Q.  So this description you've got here, "calls that

9  they make from their pods using a PIN and are told

10  they're subject to recording and review," as far as you

11  know, that covers all the calls made at CCA that you

12  have recordings of?

13     A.  I didn't personally have recordings of the-- that

14  were in possession as-- as part of the investigation,

15  yes, sir.

16     Q.  All right.  But this description as far as you

17  know describes all the calls from CCA that you got?

18     A.  Yes, sir.  Yes, sir.

19     Q.  And so when you're telling her this, you're

20  essentially telling her, does this include all of the

21  calls we have from CCA, even though that's exactly what

22  you've just told us it did?

23     A.  Yeah.

24     Q.  And the reason you're asking is because you're

25  listing these characteristics of the calls ostensibly

1  because you think she doesn't know them or do you think

2  they-- that would mean that they are-- don't contain

3  attorney-client privileged material?

4      A.  First, I did not listen, first of all, to any of

5  the calls in the *Black* investigation.  The calls I

6  listened to are the calls that were vetted by the

7  Special Master.  My-- my understanding would be that

8  there would be no attorney phone calls on there.  I-- I

9  would have no reason to think that there were attorney

10 phone calls on there.

11     Q.  But if there were, at least reading your e-mail

12 here, you don't think they're privileged.  Right?

13     A.  No, I don't say that anywhere, that I don't think

14 they're privileged.

15     Q.  All right.  And Ms. Barnett responds, yes, it

16 does include those calls if it's possible there are

17 calls to the inmates' attorneys within those recordings?

18     A.  And that's where we got-- and finally I had an

19 answer as to what-- what was going on here.

20     Q.  Right.  But you were just asking for a clarifying

21 question, you didn't have any opinion about whether the

22 calls were privileged or not?

23     A.  I-- I wouldn't have an opinion on privilege

24 because, like I said, I wouldn't-- wouldn't expect-- if

25 I can expound a little bit, it might be beneficial to

 1   you.

 2       Q.  Go for it.

 3       A.  We work financial crime, white-collar cases.  In

 4   my career, I have never asked or obtained phone calls.

 5   As you're well aware, sir, I mean, most white-collar

 6   criminals aren't remanded, you know, for pretrial,

 7   they're out on their own.  So that's just not a

 8   practice.

 9           And the first time I had encountered requests--

10   well, had been involved where phone calls had been

11   requested was *Greg Rapp*.  My understanding would be that

12   there-- there wouldn't be any attorney calls on there.

13       Q.  You later continued this e-mail chain by dropping

14   off Ms. Barnett and just e-mailing directly with Ms.

15   Flannigan?

16       A.  Yeah.

17       Q.  You e-mail Ms. Flannigan that you're still in

18   disbelief from her reply in the affirmative.  By "her"

19   you mean Ms. Barnett's?

20       A.  I'm in-- yes.

21       Q.  All right.

22       A.  I-- yes.

23       Q.  And you're in disbelief because you don't think

24   that those calls are privileged, even after-- because of

25   the information that you gave to her?

1     A.  No, sir, I don't say that in there.

2     Q.  You figured that she would say in response, oh,

3  it's a jailhouse conversation, then no.  Right?

4     A.  Yes.  That's what it says.

5     Q.  So you expected her to say, oh, no, you don't

6  need to mark those as privileged, as may contain

7  privilege, and stop reviewing?

8     A.  I would agree with that, yes, sir.

9     Q.  Ms. Flannigan apparently agreed with you, she

10  responds saying that she's trying to suspend disbelief

11  and that she was certain that Ms. Barnett had

12  misunderstood?

13     A.  That's what she types, yes, sir.

14     Q.  On August 16th Ms. Tomasic repeated in the e-mail

15  to you Ms. Barnett's directive to stop listening to CCA

16  calls.  Do you recall that?

17     A.  To me specifically?  Or to the entire group of

18  investigative agents?

19     Q.  Well, let me show you what's been marked for

20  identification as Exhibit 616.

21     A.  Yes, sir.

22     Q.  Do you recognize Exhibit 616 as being an e-mail

23  to several people, including you, from Ms. Tomasic on

24  August 16th?

25     A.  Oh, I'm sorry.  It's to-- to myself and-- well--

1      Q.   And some others.

2      A.   Yeah, the other agents working the investigation

3  with the CCA.  Mr. Oakley, Ms. Flannigan and Ms.

4  Barnett.

5      Q.   All right.  So August 16th Ms. Tomasic repeats

6  the instruction from Ms. Barnett to you and Henry Herron

7  to stop listening to all recorded CCA calls at this

8  time?

9      A.   To myself, Henry Herron, Jeff Stokes, Glen Virden

10  and Zac Howard, who were all the investigators on this

11  case.

12      Q.   On a number of-- a number of people?

13      A.   Yes, sir.

14      Q.   To your knowledge, was that directive or

15  instruction ever countermanded or said you can ignore

16  that after it was given to you on August 16th?

17      A.   No.  Not that I'm aware of, no, sir.

18      Q.   Let me show you what's--

19           MR. BELL:  Your Honor, at this point I'd

20  move to admit Exhibit 616.

21           THE COURT:  Any objection?

22           MR. CLYMER:  Could I see a copy, Your Honor?

23  I can't find my copy.  I just need to take a look at it

24  quickly.  Thank you.

25           (Counsel confer).

 1          MR. CLYMER:  I'm just trying to read it.

 2   Give me a second.  No objection.  No, Your Honor.

 3          THE COURT:  616 admitted.  How much longer

 4   are you with this witness?  I'm wondering when would be

 5   a good time to take a lunch break.

 6          MR. BELL:  I'm almost done, Your Honor.

 7          THE COURT:  All right.  Let's finish up with

 8   you and then we'll take a break unless there are no

 9   questions or very few.  We'll figure that-- go ahead.

10   BY MR. BELL:

11     Q.  So August 16th, 2016, instruction goes out, don't

12   listen to any CCA calls.  And to your recollection, no

13   one ever makes an exception to that direction; is that

14   right?

15     A.  Yes.  Yes, sir, that's correct.

16     Q.  Let me show you what's been previously admitted

17   as Exhibit 1116.  1116 appear to be an e-mail dated

18   September 6th?

19     A.  Yes, sir.

20     Q.  It's-- this is after the instruction not to

21   listen to any recorded CCA calls; is that right?

22     A.  It's a transcript.  I can't--

23     Q.  I'm just asking you about the date of the e-mail.

24   This is after the instruction not to listen to any more

25   recorded CCA calls; is that right?

 1      A.  Yes, sir.

 2      Q.  All right.  And this is an e-mail from Henry

 3  Herron to Ms. Tomasic, Mr. Oakley and yourself?

 4      A.  Yes, sir.

 5      Q.  And this e-mail says it contains an attachment of

 6  Ashley Huff transcripts of pertinent statements of call;

 7  is that right?

 8      A.  Yes, sir.

 9      Q.  And in here Mr. Herron writes that it's taken

10  from CCA recorded calls?

11      A.  Yes, sir.

12      Q.  When you received this e-mail with this

13  attachment, did you think to yourself, whoa, whoa, whoa,

14  what's anyone doing listening to a recorded call, we're

15  not supposed to be doing that?

16      A.  No, sir.

17      Q.  So let's look at the attachment.  This is also

18  part of Exhibit 1116.  Top right paragraph it says the

19  summary is prepared by Agent Herron, prepared on

20  September 6th, 2016.  So that's the same day as the

21  e-mail.  Right?

22      A.  Could you-- could you-- okay, and then-- yes,

23  sir, it is.

24      Q.  It says here that there's a discussion

25  generally-- do you have any recollection of reading this

1  by the way?

2      A.  No, I-- I know what the purpose of it was.  I

3  think it was in conjunction with maybe Mrs. Huff's

4  sentencing or something like that.  I-- I don't-- I

5  believe, but--

6      Q.  All right.

7      A.  I don't recall reading it.

8      Q.  So take a moment.  If you need a moment to read

9  it to answer my next question, feel free.  This call is

10  marked "pertinent."  Right?

11     A.  Okay.  So what is-- what was your question?

12     Q.  This call is marked "pertinent," described as

13  pertinent?

14     A.  Yes, sir.  Yes, sir.  I'm sorry, I couldn't find

15  it.

16     Q.  Would you agree with me that nowhere in this call

17  does Ms. Huff describe any criminal activity that she

18  had been engaged in in the past?

19     A.  Oh, yeah.  Yes, sir.

20     Q.  Would you agree with me that in this call there's

21  no discussion of any intent to carry on a-- carry on a

22  crime in the future?

23     A.  Yes, sir.

24     Q.  There's no mention of any ongoing criminal

25  activity that she's involved in?

1    A.  Yes, sir.

2    Q.  In fact, all this call talks about is her plea

3  negotiation strategy and how satisfied she is with her

4  lawyer?

5    A.  I don't know if I feel comfortable saying that

6  she's satisfied, because I don't know what she-- I would

7  say that the language isn't-- good meeting, I would say

8  that that was probably-- and she still wants to move

9  forward, so I guess that's a good meeting or a-- she's

10  happy.

11    Q.  So this call doesn't have anything to do with a

12  criminal investigation, this just has to do with her

13  representation and how she plans to proceed in her

14  criminal case?

15    A.  Yes, sir.

16    Q.  Is that fair?

17    A.  Yes, sir.  I think that's fair.

18    Q.  Would you agree with Agent Herron's assessment

19  that this call is pertinent to your investigation?

20    A.  I would agree with him that in the sense that--

21  as far as this was not-- at this point that criminal

22  investigation was resolved and I think the-- the

23  discussions were-- and this is very-- I know there was

24  some dialogue between the U.S. Attorney's Office, it may

25  have been Ms. Tomasic, and Mr. Sessions out of concern

 1   that they were going to move forward.  And I think

 2   that's what this was discussing.  The-- the concern over

 3   the plea agreement or something to that effect.

 4       Q.  Sure.  So this just gives you an insight into

 5   litigation strategy.  Right?

 6       A.  With a-- with a non-attorney, yes, sir.

 7       Q.  Well, I'm glad you mentioned that.  Is there

 8   anything from this transcript or what you saw that leads

 9   you to the conclusion that this person is not an

10   attorney?

11       A.  It would lead me to the conclusion that it's not

12   Mr. Sessions.

13       Q.  Well, Mr. Sessions is a attorney, he's not all

14   attorneys.  Is there anything about this transcript that

15   would lead you to believe that the person is not a

16   lawyer?

17       A.  I-- I don't think I can answer that question

18   without listening to the phone call in its entirety.  I

19   would need more information.

20       Q.  Sure.  But based on what you see, there's nothing

21   that-- a piece of evidence that would certainly

22   disqualify the person from being a lawyer?

23       A.  Based on what Mr. Herron typed up, no-- wait.

24   What was the last part?

25       Q.  There's nothing in there that would disqualify

1    the person on the other side of the phone line from--

2        A.   Based on what Mr. Herron typed up, no, sir,

3    there's not.

4        Q.   You said you hadn't dealt with jail calls before

5    this case; is that right?

6        A.   Yeah.  The first-- the first instance that I

7    can-- would've been part of what would've been the *Rapp*

8    one, yes, sir.

9        Q.   You heard Ms. Tomasic testify that Ms. Barnett

10   had told several people, including yourself, that she

11   was only involved to deal with the Special Master.  Do

12   you remember Ms. Tomasic saying that?

13       A.   Yes, sir, I do.

14       Q.   Did you hear Ms. Barnett say that?

15       A.   I-- I have no recollection of that whatsoever,

16   sir.

17       Q.   Did you hear Ms. Tomasic state that Ms. Barnett

18   told several people, including you, that she had no

19   obligation to learn the facts of what occurred in the

20   case?

21       A.   I did hear that statement, yes, sir.

22       Q.   Is that true?

23       A.   I don't feel comfortable with the way that

24   question is being asked.  I have no recollection of that

25   and I would be very surprised that Ms. Barnett would say

1    something like that to-- to a line agent.  But me

2    personally, I don't recall that, no, sir.

3        Q.   So if I understand what you're saying is-- when

4    you said you find it very surprising, you would think

5    that would be something you would remember if it

6    happened?

7        A.   Absolutely, sir, I would.

8        Q.   Did you know that Ms. Barnett tried to interview

9    Agent Stokes about the facts of the case on August 17th,

10   2016?

11       A.   No, sir, I did not.

12       Q.   Did you know that Agent Stokes refused to meet

13   with Ms. Barnett?

14       A.   No, sir, I did not.

15            MR. BELL:  I don't have any further

16   questions.  Thank you, Agent Seubert.

17            THE WITNESS:  Yes, sir.  Thank you.

18            THE COURT:  How long do you think you'll be

19   with your questions?

20            MS. VANBEBBER:  Not a whole lot of time

21   probably-- well, I would say half hour or less.

22            THE COURT:  Oh, okay.  I was just wondering

23   whether to break for lunch.  Do you have any idea how

24   long you'll be, Mr. Clymer?

25            MR. CLYMER:  15 minutes maybe, Your Honor,

 1  although I-- without knowing what the Special Master's
 2  questions are going to be, it's hard to predict.
 3            THE COURT:  Okay.  Why don't we take a break
 4  at this point.  It's five after 12:00.  Let's reconvene
 5  at five after 1:00.
 6            MR. CLYMER:  Your Honor, there are one,
 7  maybe two things I'd like to discuss with the Court
 8  before we resume testimony.  Should I wait until after
 9  the lunch break?
10            THE COURT:  We'll go ahead and excuse--
11  excuse Special Agent Seubert.  Go ahead.
12            MR. CLYMER:  Your Honor--
13            THE COURT:  Were you saying outside the
14  hearing of the witness?
15            MR. CLYMER:  No.
16            THE COURT:  Okay.
17            MR. CLYMER:  Before we bring in-- no, it
18  doesn't matter, Judge.
19            THE COURT:  Okay.  Go ahead.
20            MR. CLYMER:  Your Honor, I think there's
21  been an oversight that I'm going to ask the Court to
22  correct.  And the remedy I'm going to ask for is to ask
23  the Public Defender to turn a document over to the
24  government or to the Special Master.  And I-- I'll have
25  to explain why I say this.

1           At the last hearing in May, Mr. Cohen

2   started to question a witness about an OPR report.  And

3   I objected and Mr. Cohen graciously withdrew his

4   question and decided not to use the report at all.  That

5   report was going to be marked Tomasic No. 6 in his

6   exhibits, Special Master Tomasic 6.  He withdrew it, and

7   I've actually got the form where he wrote out-- where he

8   says Tomasic 6 withdrawn.

9           Before the hearing today, counsel for the

10  Special Master went through Mr. Cohen's exhibits and

11  re-numbered them all in the 1000s, so they got new

12  numbers.  And, you know, she made up binders which are

13  greatly appreciated.  And she inadvertently included in

14  those binders a number of exhibits that Mr.-- maybe she

15  did it intentionally, I don't know, that Mr. Cohen had

16  withdrawn, including that particular one.

17          The Court has already ruled that the defense

18  was not entitled to that OPR report in discovery.  I

19  think it was given to the defense accidentally by the

20  Special Master in an effort to be gracious and give us

21  all copies of exhibits, but I found it in my exhibit

22  book.

23          If that exhibit is in the Public Defender's

24  exhibit books as well, I'd ask that it be returned to

25  the Special Master, because the Public Defender is not

1    supposed to have that document.

2          MS. BRANNON:  So you want us to locate it

3    but not look at it?

4          MR. CLYMER:  Yeah, exactly.

5          MS. BRANNON:  Okay.

6          THE COURT:  I know that it was not the

7    Special Master counsel's intention to disclose the OPR

8    documents that were received to the defense.  Correct?

9          MS. VANBEBBER:  Correct.

10          SPECIAL MASTER COHEN:  That's correct.  It

11    was an oversight if that happened.

12          MR. CLYMER:  I'm sure it was an oversight.

13          THE COURT:  Okay.  So I will order the FPD

14    to return that to-- that copy to the government.  The

15    government has it, correct, or not?

16          MR. CLYMER:  And the Special Master has a

17    copy so we can go either-- I don't mind--

18          THE COURT:  Actually I think your copy as

19    well as the FPD's copy needs to go to the Special

20    Master, because--

21          MR. CLYMER:  That's fine.

22          THE COURT:  -- you didn't-- I don't know

23    that you possessed it.

24          MR. CLYMER:  I-- I certainly didn't have a

25    right to get it from the Special Master, you're right

 1    about that, so I don't mind doing that.

 2            THE COURT:  Okay.  So both of those need to

 3    go back or any other additional copies that have been

 4    made need to go back to the Special Master.  There are

 5    Privacy Act considerations.  And actually, I don't even

 6    know if it should be in the custody of the U.S.

 7    Attorney's Office rather than the custody of the

 8    individual.

 9            MR. CLYMER:  It's No. 1018 in the new books,

10    Your Honor.  I'm taking mine out right now.  I haven't

11    read it.  I'm taking mine out and I'm giving it to the

12    Special Master.

13            MS. BRANNON:  Well, if I could inquire.  If

14    the prosecutor has actually read this exhibit and wasn't

15    entitled to have it and has knowledge from that

16    exhibit--

17            MR. CLYMER:  I only saw the cover of this

18    exhibit, Your Honor.  I noticed it today.  I was looking

19    through the book to get ready to examine Ms. Tomasic and

20    I noticed it, and that's all I did.  I told Mr. Slinkard

21    about it and I went and found the earlier version where

22    it was withdrawn.  I'm just going to give it back to the

23    Special Master now.

24            THE COURT:  All right.  It sounds like they

25    haven't read it.  Have you read it?

1          MS. BRANNON:  I don't think we have it, but

2     we will double-check.

3          THE COURT:  What's the exhibit number?

4          MR. BELL:  We don't have 1018.

5          THE COURT:  1018.

6          MS. BRANNON:  I think my point is if the

7     prosecution was not entitled to have it-- whether they

8     were or not, however they got it, but if anybody at the

9     prosecution table preparing or participating in this

10    hearing read that and that information is being used to

11    strategize or ask questions, I think we're entitled to

12    it as well.

13         We understand if the Court puts some sort of

14    seal on it and limits how we use it.  But, you know, Ms.

15    Tomasic-- if this is the same one she said that she

16    reviewed in preparation for her testimony, if the

17    Special Master has it, you know, we'd like to at least

18    ask the Court to reconsider the ruling on whether we

19    could have that information.

20         THE COURT:  It's not admissible.  Do you

21    have Exhibit 1018, Special Master Exhibit 1018?

22         MR. REDMOND:  We have a folder marked that,

23    we have not looked inside that folder.

24         THE COURT:  All right.  So turn that over to

25    Mr. Cohen.  You turn over all of your copies to Mr.

1   Cohen.

2            MR. CLYMER:  I just gave it to him.

3            THE COURT:  All right.  That solves that.

4   It stays in the custody of the Special Master.  And when

5   this-- when this proceeding is over and all appellate

6   proceedings are over, that's something that will be

7   destroyed.  It will stay in the possession of the

8   Special Master.

9            All right.  So we'll see you back in 55

10  minutes, five after 1:00.

11           (Recess).

12           THE COURT:  All right. You can be seated.

13           MR. CLYMER:  May I address the Court?

14           THE COURT:  I'm sorry?

15           MR. CLYMER:  I should let you sit down

16  first, Judge.

17           THE COURT:  That's all right.

18           MR. CLYMER:  May I address the Court?

19           THE COURT:  Yes.

20           MR. CLYMER:  It occurred to me as soon as we

21  got done with the last session, I said something to you

22  that could've been misleading and I want to clarify it.

23           THE COURT:  Okay.

24           MR. CLYMER:  I told you truthfully that I

25  did not look at the exhibit that the Special Master had

1    put in the exhibit books.  I do have access to and long

2    ago did look at one of the OPR reports.

3            So I don't want the Court to think that I

4    was saying I've never seen and I don't have access to

5    the OPR reports.  I do as a Department of Justice

6    official.  But I did not look at the exhibit, so I don't

7    know which OPR report-- I'm sorry, which OPR complaint

8    that is.  And I didn't have anything to do with that

9    particular exhibit.  But my guess is I have access to

10   that-- that OPR complaint somewhere in my file.

11           THE COURT:  Do you know if the OPR report

12   you looked at is one and the same as the exhibit?

13   Aren't there multiple--

14           MR. CLYMER:  I misspoke.  It's not a report,

15   it's a complaint.  I meant complaint.  I have no idea

16   because I didn't look at the one in the exhibit.

17           As soon as I saw the name on it, I know that

18   that is an OPR employee, I didn't look any further.  So

19   I do not know if I've ever looked at or read that

20   particular document in any shape-- way, shape, or form.

21           THE COURT:  All right.  I understand.

22           MR. CLYMER:  Okay.  I just wanted to let you

23   know, Judge.

24           MS. VANBEBBER:  Before we begin with this

25   witness, Your Honor, may we introduce for purpose of

1   admission our-- the last batch of exhibits that came in

2   since we last amended our list?  And it would be 1033

3   through 1145-- or excuse me.  It would be 1133 through

4   1145.

5               THE COURT:  1133 through 1145 you're

6   offering for admission?

7               MS. VANBEBBER:  Up to 1145, yes, ma'am.

8   Those have been already agreed to subject to--

9               THE COURT:  Subject to relevance.

10              MS. VANBEBBER:  -- relevance--

11              THE COURT:  All right.

12              MS. VANBEBBER:  -- objections, uh-huh.

13              THE COURT:  I'll admit these.  Mr. Clymer,

14   do you want me to admit them subject to relevance?

15              MR. CLYMER:  Your Honor, I-- I'd like to

16   just take a look at them.  The concern I have is I know

17   Mr. Cohen had withdrawn a bunch of exhibits last time.

18   And because he withdrew them, I never looked at them.

19   So I don't know if this is--

20              MS. VANBEBBER:  These are the brand-new

21   exhibits that I gave you yesterday.

22              MR. CLYMER:  Oh, I'm sorry.  I didn't

23   realize that.  No objection, Your Honor.

24              MS. VANBEBBER:  We're up to 1132 in the

25   booklet, and so these ones will be back up to 1145.

16-20032-JAR  USA v. Karl Carter (Black) 10.03.18          852

 1              MR. CLYMER:  Thank you.  No objection,

 2   Judge.

 3              THE COURT:  Okay.  So 1133 through 1145

 4   admitted.

 5                    CROSS EXAMINATION

 6   BY MS. VANBEBBER:

 7     Q.  Mr. Seubert, the first thing I'm going to do here

 8   is ask you to take a look at three exhibits which are

 9   1133, 1134 and 1135, and just ask if you recognize them.

10     A.  Yes, ma'am.

11     Q.  Okay.  If you want to just keep-- well, here, I

12   guess I need to keep them.

13     A.  No problem.

14              MS. VANBEBBER:  I will represent to the

15   Court and counsel that these exhibits, '33, '34, and

16   '35-- 1033, 1044, and 1045-- wrong.  11.

17              THE COURT:  1133?

18              MS. VANBEBBER:  1133, '34, and '35.

19              THE COURT:  That's what you're showing the

20   witness?

21              MS. VANBEBBER:  I'll represent to you that

22   these exhibits were provided to us by the Secret

23   Service-- or were provided actually to-- I believe to

24   the Federal Public Defender pursuant to subpoena.

25   BY MS. VANBEBBER:

1      Q.   I show you what's been marked as Exhibit 1133.

2      A.   Yes, ma'am.

3      Q.   All right.  Does that document have requirements

4   the Secret Service expects U.S. agents to follow?

5      A.   Yes, ma'am.

6      Q.   Do those requirements include-- and you can look

7   at the underlying piece.  Do these requirements include

8   that attorney-client conversations in interview rooms

9   should not be monitored?

10     A.   Yes, ma'am.

11     Q.   Do they also require signs warning that the room

12   is being recorded if it is being recorded?

13     A.   I would like to put this in context, and I might

14   need to double-check with the Office of Chief Counsel

15   before--

16     Q.   Well, does it say that or does it not say that?

17     A.   It's my belief-- yes, it does say that, but it

18   pertains to Secret Service interviews.

19     Q.   I understand.  That's the only question I'm

20   asking you is, does it say that?

21     A.   Okay.  Yes, ma'am, it does.

22     Q.   Do these requirements also demand that if

23   unmonitored rooms are not available, then the attorney

24   and the client both have to be informed that they're

25   subject to surveillance while they're in that room?

1      A.   Where-- where?

2      Q.   That's on 30-- 1133, I believe.

3      A.   I don't see it there.

4           MS. VANBEBBER:  May I approach?

5           THE COURT:  Yes.

6      A.   Oh, yes.  Yes, ma'am.  I'm sorry.

7  BY MS. VANBEBBER:

8      Q.   Now, let me ask you to look at 1134.

9      A.   Yes, ma'am.

10     Q.   Does it say on that requirement that you are to

11  consider it an absolute rule to never knowingly listen

12  to or record a conversation between a target and his or

13  her attorney without a court order?

14     A.   Yes.  Yes, ma'am.

15     Q.   And also please look at 1135.  Does it note that

16  inmate-attorney telephone monitoring requires a court

17  order, absent a clear showing that there's no privilege

18  involved?

19     A.   Yes, ma'am.

20     Q.   And does it also specifically exclude

21  attorney-client calls from the ability of prison

22  officials to unilaterally decide to monitor inmate

23  calls?

24     A.   Federal Bureau of Prison officials, yes, ma'am.

25     Q.   Yes.  Now, these three documents come out of your

1   own Secret Service manuals.  Correct?

2       A.  Yes, ma'am.

3       Q.  And do you get training on them?

4       A.  23 years ago, yes, ma'am.

5       Q.  You get training once and then you get a manual.

6   Right?

7       A.  Yes, ma'am.  Well, I don't get a manual.  There's

8   a manual in the office.

9       Q.  There's a manual.

10      A.  Yes.

11      Q.  All right.  Now, do you have any reason-- all

12  these years you've been working with United States

13  Attorney's Offices.  Correct?  How many years?

14      A.  Less my time on the President's detail, 18.

15      Q.  Okay.  And during that 18 years, have you ever

16  had anybody tell you that the U.S. Attorney's manual is

17  any-- gives any less requirements for its people than

18  you get as an-- as a USSS agent?

19      A.  No, ma'am.

20      Q.  Okay.  So when you do your work for the United

21  States Attorney's Offices, you're doing it with-- in the

22  backdrop of your own requirements with your own agency.

23  Correct?

24      A.  Yes, absolutely, ma'am.

25      Q.  And what would happen if somebody at the U.S.

1   Attorney's Office asked you to violate your own

2   requirements?

3       A.   I would never do that, ma'am.

4       Q.   What would you do?

5       A.   I would politely decline to do any such thing.

6       Q.   Would you report anything to anybody?

7       A.   I would probably take it to my supervisor, my--

8   my immediate supervisor in my field office, yes, ma'am.

9       Q.   But in these 18 years, you've never had an

10  opportunity to have to do that?

11      A.   No one has ever asked me to do something that was

12  against my values, no, ma'am.

13      Q.   All right.  You were asked some questions earlier

14  today about the grand jury subpoena for recorded phone

15  conversations and-- and for the grand jury subpoena for

16  surveillance at CCA.  Correct?

17      A.   Yes, ma'am.

18      Q.   And let me show you Defendant's-- these are

19  defendant's exhibits, if I may.

20          I'm showing you what has been marked as - is this

21  thing on?  Yeah - as Exhibit 471 and ask if you've seen

22  that before.  I think we're not supposed to--

23              MS. VANBEBBER:  Is it correct these are

24  still under seal or not?

25              MR. CLYMER:  Yes.  Thank you.

1  BY MS. VANBEBBER:

2      Q.  Have you seen that before?

3      A.  This would be-- this is one of the subpoenas,

4  yes, ma'am.

5      Q.  And is that a typical subpoena for phone records?

6      A.  I-- I can't say that it's typical, having no

7  prior experience.  This is just what I-- I submitted as

8  a draft to the AUSA.

9      Q.  Had you ever drafted one of those before?

10     A.  No, ma'am.  No.

11     Q.  All right.  This is the one you drafted, and it

12  shows that it's giving a requirement for subpoenas to 17

13  different inmates.  Right?

14     A.  Yes, ma'am.

15     Q.  You want all the records for each one of these

16  people.  Correct?

17     A.  Yes, ma'am.

18     Q.  Phone records from CCA?

19     A.  Yes, ma'am.

20     Q.  Is this-- you testified earlier today about

21  having done some-- a subpoena for telephonic records

22  from people in the *Rapp* case.  Correct?

23     A.  I don't believe I testified to that.

24     Q.  Did you?

25     A.  I-- I don't recall ever doing a subpoena for

1   that.

2      Q.   You didn't prepare the grand jury subpoena in

3   *Rapp* for phone records?

4      A.   I prepared grand jury subpoenas.  To the best of

5   my recollection, I don't remember doing a subpoena in

6   *Rapp*.

7      Q.   All right.  But you did do the subpoena in this

8   one, did you not?

9      A.   Yes, ma'am.

10     Q.   And what's the return date on that, the response

11  date supposed to be?

12     A.   4-13 of 2016 at 9:00.

13     Q.   All right.  So do you recall whether you took the

14  responses on that subpoena?

15     A.   Again, I-- this came in so piecemeal, I-- I

16  couldn't--

17     Q.   Yeah, that's fine if you don't recall.

18     A.   I would be doing a disservice to anyone-- to

19  everyone to be-- to venture a guess.

20     Q.   All right.  Now, in contrast, let's take a look

21  at the second document.

22     A.   Yes, ma'am.

23     Q.   Do you recognize it, Document 438?

24     A.   Yes, ma'am.

25     Q.   And is that the subpoena that went out to CCA?

1    A.   Yes, ma'am, it is.

2    Q.   For the electronic surveillance?

3    A.   Yes, ma'am, it is.

4    Q.   And can you tell me the return date on it?

5    A.   Return date would've been May 4th of 2016.

6            MS. VANBEBBER:  Your Honor, to correct the

7    record, I believe Mr. Clymer corrected me yesterday that

8    it was not issued then.  It was-- that was the date for

9    the response.

10   BY MS. VANBEBBER:

11   Q.   Now, did you actually get the response on

12   May 4th?

13   A.   Oh, no, I-- if you'd like, I-- I have a timeline.

14   Q.   I'm going to ask you about it.

15   A.   Okay.  Okay.  Yes, ma'am.

16   Q.   But the answer is no.  Right?

17   A.   No.  No, we did not.

18   Q.   Okay.  Now, can you tell me when you did go out

19   to CCA and pick up what they had for you in the way of

20   surveillance hard drives?

21   A.   First of all, ma'am, I did not go out.  Senior

22   Special Agent Andrew Matushek, who is electronic crime

23   special agent program certified, which is the computer

24   forensics side of the Secret Service, Mr. Matushek

25   responded on May 17th of 2016 and took custody of the--

1    the five--

2                 (Phones buzzing).

3                 THE COURT:  That's the Presidential alert

4    that's supposed to be coming through all our phones at

5    1:18, I believe.  I'm sorry.  All our phones are

6    buzzing.

7                 MS. VANBEBBER:  This is a test.  This is

8    only a test?

9                 THE COURT:  This is a national test, yeah, I

10   think.

11                THE WITNESS:  So he responded.  And there

12   were five and I-- I heard this yesterday, and I would

13   like to make sure that everyone is understanding.  It--

14   it's hard-- as I recall, they're actually hard drives,

15   not the DVR unit.  There was one of those six that was

16   the actual entire unit because the-- the folks at CCA,

17   specifically I'm assuming Mr. Lajiness, didn't know how

18   to remove that drive.  So Mr. Matushek responded out

19   there and took custody of those, and we left

20   replacements for them so they could go about their

21   business.

22   BY MS. VANBEBBER:

23      Q.  And he took the whole shooting match, he took the

24   five hard drives, didn't he, plus the one unit that was

25   still connected to its hard drive?

1    A.  Yes, ma'am.

2    Q.  And what did he do with them?

3    A.  He brought them back, and then I-- he was

4  instructed by me that we needed to make a copy because

5  we had-- we were already behind on the compliance date,

6  and we were-- as the investigating agents, we were well

7  aware that discovery was-- was an utmost priority.

8    Q.  Right.

9    A.  So he made those copies from the originals.  The

10  originals were placed in the evidence inventory on a

11  Secret Service Form 1544 is what we call it.  That's an

12  evidence form.

13        So the originals were placed in the vault after

14  he completed the copies.  And those copies were

15  completed on May 23rd of 2016.

16    Q.  All right.  Now, let me stop you there.  So

17  you've got the originals?

18    A.  Yes, ma'am.

19    Q.  Well, you've got five originals and one copy

20  which is extraneous to what we're talking about here

21  today.

22    A.  A big box, yes.

23    Q.  All right.  And you took custody of them and you

24  put them in the vault, your vault.  Correct?

25    A.  Mr. Matushek did.

1    Q.  Mr. Matushek did?

2    A.  Yes.

3    Q.  All right.  What-- what color were the boxes?

4    Were they black?

5    A.  They're-- there were-- what we received, if I'm

6    remembering correctly, there's two sets.  I believe what

7    we received from CCA were skinnier boxes, and I want to

8    say green and white for some reason.  And they were

9    marked or notated DVR 1, 2, 3, 4, 5.  And-- and at that

10   point I-- I should have clarified earlier, Mr. Matushek

11   had figured out-- Agent Matushek had figured out how to

12   remove that last--

13   Q.  Hard drive?

14   A.  -- drive, and I'm-- I'm not saying it's Drive 6.

15   It was one of the six.  And all the boxes were labeled.

16   Q.  So they were all labeled with the identifiers

17   that came from CCA, 1, 2, 3, 4, 5 and then 6?

18   A.  Yeah, what DVRs were what, yes, ma'am.

19   Q.  Okay.  So at that point you-- you've got the best

20   evidence, you've got the originals?

21   A.  Yes, ma'am.

22   Q.  Then when did you take them to the U.S.

23   Attorney's Office the first time?

24   A.  That-- I don't recall that.  And there's

25   nothing--

1    Q.  Do you recall-- do you recall that you took the
2    originals over first-- first and tried to give them to
3    Pauletta Boyd and she wouldn't take them?
4    A.  No, ma'am, I do not recall that.
5    Q.  You don't remember that?
6    A.  No, ma'am.
7    Q.  If she remembers it that way, do you disagree
8    with her?
9    A.  I would have a very difficult time believing
10   after 23 years I would take original evidence over to
11   the United States Attorney's Office, knowing what the
12   purpose was for.
13   Q.  All right.  Well, in any event-- well, did you
14   make copies at your office--
15   A.  Yes, we did.
16   Q.  -- finally and take the six copies over to the
17   U.S. Attorney's Office and give them to Pauletta Boyd?
18   A.  That was on 6-2.  I originally took them to
19   Ms. Tomasic and then subsequently took them down to-- to
20   Pauletta.
21   Q.  And that was on the 2nd of June?
22   A.  Yes, ma'am.
23   Q.  When we-- we looked before at the subpoenas.  Do
24   you agree that it is routine to get phone recordings
25   from institutions in order to investigate federal

1   offenses?

2      A.  For me personally, no, ma'am.  But as a common

3   practice, I am-- yeah, I am aware of that practice, yes,

4   ma'am.

5      Q.  And are you aware that it's also common practice

6   to get video surveillance from an institution?

7      A.  Incident-based, yes, ma'am, I'm aware of that.

8      Q.  So that's not something unusual and different

9   that was done in this case, is it?

10      A.  (Shakes head from side to side).

11      Q.  Can you tell me whether on the grand jury

12   subpoena for the recorded phone conversations that's in

13   front of you as Exhibit 471--

14      A.  I don't--

15      Q.  Did I take it back?  I did.  Sorry.

16          Look at 471 and tell me, does it exclude anything

17   from what's to be collected pursuant to that subpoena?

18      A.  No, ma'am, it does not.

19      Q.  And it does not exclude attorney-client

20   conference rooms, does it?

21      A.  It does not say that, no, ma'am.

22      Q.  Out of the-- I'm sorry, out of the surveillance?

23      A.  No, ma'am, it does not say that.

24      Q.  And the phone call one just says give me the

25   phone calls for each of these people.  Right?

1      A.  Yes, ma'am.

2      Q.  And the surveillance one says just give me all

3  the surveillance, no exemptions?

4      A.  Yes, ma'am.

5      Q.  To your knowledge, does the U.S. Marshals Service

6  have supervision of the federal contract with CCA?

7      A.  Yes, ma'am.

8      Q.  So it's common for them to get records of federal

9  detainees that are being housed there by asking for

10  them?

11     A.  I-- I'm not-- I have no personal experience with

12  that, so I don't-- I can't answer that one.

13     Q.  All right.  Have you-- do you know that Treasury

14  agents will often skip the subpoena part and ask the

15  marshal to go and get something for them?

16     A.  With all due respect, ma'am, we're Department of

17  Homeland Security.  We left Treasury in 2001.

18     Q.  All right.

19     A.  In my-- in my office, no, I'm not-- I can't speak

20  for the agency as a whole.  I know that there were

21  instances that I referenced in-- in Mr. Cohen's RFI that

22  I believe those were state investigations and they

23  were-- the agents obtained them through the county

24  facilities.

25     Q.  All right.  Are you aware of any court orders

1  that were shown to you permitting CCA to record

2  attorney-client telephone calls that were subpoenaed in

3  this case?

4      A.  Court orders permitting?

5      Q.  Yes, any court orders?

6      A.  No, ma'am.

7      Q.  No court orders?

8      A.  No.

9      Q.  When you take-- when you took the copies of the

10 hard drives to the U.S. Attorney's Office, is that the

11 only copy that you all made?

12     A.  Yes, ma'am.

13     Q.  So you have the originals in your vault.  Ms.

14 Boyd has custody of the-- or U.S. Attorney's Office has

15 custody of the copies that were made, one each for each

16 hard drive.  Correct?

17     A.  In June of 2016, yes, ma'am.

18     Q.  All right.  Did you have an index for the hard--

19 for the originals?

20     A.  No, ma'am.

21     Q.  Did you get an index at some point?

22     A.  No, ma'am.

23     Q.  You did not.  Did you have occasion to ask for

24 any information about which hard drive is in which box?

25     A.  No, ma'am.

1      Q.   You never did.  Did you ever discuss with any

2  AUSA the need for a taint team to review any of the hard

3  drives before the case attorneys or the case agents

4  looked at them?

5      A.   Agent Henry Herron of the IRS, Internal Revenue

6  Service criminal investigations, brought that topic up.

7  But I did not have any conversation about that, no,

8  ma'am.

9      Q.   Did you hear Agent Herron have conversations

10  about that?

11     A.   Yes, ma'am.

12     Q.   And what did the conversations that you heard

13  consist of?

14     A.   There was the one-- there were two taint teams,

15  if I recall correctly.  The first taint team was for the

16  actual search at the facility, the CCA facility.  And

17  then I know Henry had been tasked or was coordinating a

18  second taint team to review whatever may have came up.

19  And that's the extent of-- of my knowledge on that.

20     Q.   All right.  You testified a little earlier about

21  being asked to mark the boxes.  Did you mark the

22  originals?

23     A.   That was the only thing I was in possession of,

24  so yes, ma'am, I personally marked the originals.

25     Q.   And did you-- how did you mark 5 and 6?

1      A.   I just marked the outside of the box-- I marked

2    all six of the boxes and said--

3      Q.   What would-- what did you say in your markings on

4    5 and 6?

5      A.   "May contain attorney-client material."

6      Q.   How did you know that?

7      A.   Based on the e-mail that I received from

8    Ms. Tomasic to--

9      Q.   Okay.  So that's the result of Erin's-- Erin

10   Tomasic's e-mail to you alerting you that they were

11   going to need some of those boxes.  Correct?

12     A.   I don't think at that time we had been told that

13   anything was going to be needed--

14     Q.   All right.

15     A.   -- or it was to be returned.  We were just told--

16     Q.   When did you-- when did you give 5 and 6 to

17   Ms. Tomasic to be given to the Court?

18     A.   I did not give those to Ms. Tomasic.

19     Q.   All right.  Who did you give them to?

20     A.   I believe Mr. Slinkard, as I recall it, because I

21   was not at the hearing.  I think it was-- it was during

22   a break, perhaps lunch, and Mr. Slinkard advised that

23   DVRs 5 and 6 were-- that the Court had requested DVR 5

24   and 6 to be returned.  So I contacted the office and had

25   another agent go in with, you know, our whole process.

1    Q.   So another agent took them.  Do you know who the

2  agent gave them to?

3    A.   I--

4    Q.   Was it Ms. Barnett perhaps?

5    A.   No, no.  An agent brought them to me--

6    Q.   Oh, brought them to you.

7    A.   -- from the office because I was over here, and

8  I-- I believe I gave them to Mr. Slinkard.

9    Q.   All right.

10   A.   It was either Mr. Slinkard or Mr. Rask.

11   Q.   At any rate, it was at the request of the U.S.

12 Attorney's Office?

13   A.   Yes, ma'am.

14   Q.   Did you get an e-mail later that day from AUSA

15 Rask thanking you for the delivery and telling you that

16 they were expecting that the Court would take custody of

17 No. 6?

18   A.   Sounds like something I-- I mean, if you have an

19 e-mail, I'd love to look at it.  But that sounds like

20 something Mr. Rask would do.  I don't recall that

21 e-mail, but...

22   Q.   And you learned the next day or-- that, in fact,

23 those two hard drives had been given to the Court.

24 Correct?

25   A.   I-- I thought they were given actually on the 9th

1   to the Court.  If I recall correctly, that was the whole

2   purpose of getting over there pronto.

3       Q.   Do you know what happened to the other four?

4       A.   Then the next day I was told-- I believe that--

5   I'm probably using the wrong legal term here, but I

6   think there was a clawback order at that point, and it

7   was expanded to include the-- the other four.  And I

8   don't--

9       Q.   All right.  And who delivered those?

10      A.   I delivered them.  I don't remember if I was at

11  the office, I just remember turning them over to the--

12  actually to the Court in that case.

13      Q.   All right.  On June the 11th, 2017, did you

14  receive, along with two other agency representatives,

15  Special Master's Exhibit 1137, which I'll show you?

16      A.   Is this the letter notifying--

17      Q.   Uh-huh.

18      A.   I received-- based on my e-mails, Mr. Cohen-- I

19  received this on 6-12 from Mr. Cohen.

20      Q.   All right.

21      A.   And I subsequently immediately turned around and

22  forwarded that to the Office for Chief Counsel because

23  this is, frankly, nothing I ever experienced before.

24      Q.   It was asking you for materials for the purposes

25  of the-- of his investigation, correct, Special Master's

1    investigation?

2        A.   Can I have a minute to read this in its entirety,

3    ma'am?

4        Q.   Uh-huh.

5        A.   He's indicating that he's been working with the

6    United States Attorney's Office on search terms that--

7    and he is--

8        Q.   That's all right.  You don't need to read it.  We

9    all have access to it.

10       A.   Well, I-- he's not telling me that he needs

11   information from me.  He's just saying, here's your

12   search terms and I'm going to be sending you an RFI in

13   the near future for you to complete.

14       Q.   All right.  Did you understand that they were the

15   same set of search terms that he was trying to get the

16   U.S. Attorney's Office to agree to use for their

17   records?

18       A.   Based on this letter, yes, ma'am.

19       Q.   And did you send the search terms along to the

20   counsel's office for their review?

21       A.   I tried to figure that out last night.  I-- I

22   don't know.  Because I think what happened was-- and I

23   think chief counsel's office may have that day contacted

24   Mr. Cohen.  I don't see anything where I forwarded it--

25   forwarded the search terms, but I know there was

1   dialogue shortly thereafter between Mr. Cohen and our

2   Office of Chief Counsel about it.

3       Q.  Who's Todd Wallace, if you know?

4           MS. VANBEBBER:  Counsel, I'm referring to

5   Special Master's Exhibit 1138.

6       A.  I think-- I don't know if he's-- I think he's

7   called an attorney advisor.  He's with the Office of

8   Chief Counsel for the Secret Service.

9   BY MS. VANBEBBER:

10      Q.  All right.  I'm going to show you 1138.  In

11  reading that e-mail, do you understand that Mr. Wallace

12  intends to use the search terms that he's been sent?

13      A.  In reading this e-mail, it appears to me that

14  he's already deployed the search terms and captured

15  20,000 items.

16      Q.  All right.  So he has 20,000 items on hand.  Do

17  you know whether those items were ever sent to the

18  Special Master?

19      A.  I know that compliance was completed in December

20  of '17 or early January of '18.  That's all I know.

21      Q.  So you don't know whether there was ever a

22  response made of those 20,000 items?

23      A.  I-- no, ma'am, I do not.

24      Q.  Do you remember that the Special Master reported

25  receiving a 24-page letter from Mr. Clymer on behalf of

1    the Attorney General on September the 12th, 2017?

2        A.   No, ma'am, I don't remember that.

3        Q.   Did you-- were you told that the letter said that

4    DOJ would not produce most of what was sought in the

5    Special Master's request for information?

6        A.   I remember something along those lines, yes,

7    ma'am.

8        Q.   And are you aware that the Secret Service

9    referred to the U.S. DOJ's letter and said that it was

10   re-thinking whether it would produce anything?

11       A.   I was not part of that conversation.

12       Q.   All right.  Were you ever given any instructions

13   from those who were part of that conversation as to what

14   should be done about any documents that you had?

15       A.   I was-- I received the RFI and was instructed to

16   complete it, which I did.

17       Q.   All right.  You did-- you did complete the RFI?

18       A.   I received it on August 14th of 2017 and I

19   completed it and forwarded it back to Office of Chief

20   Counsel on August 17th of 2017.

21       Q.   So you didn't give anything to Mr. Clymer

22   yourself; you just sent things back to the Office of

23   General Counsel?

24       A.   I don't have permission to give anything.

25       Q.   Okay.  Well, is your answer yes, you sent it to

1   general counsel?

2       A.  Yes, ma'am.

3       Q.  And do you know whatever happened to it after

4   that?

5       A.  No, ma'am, I do not.

6               MS. VANBEBBER:  Okay.  No other questions,

7   Your Honor.

8               THE COURT:  Ms. Brannon.  Oh, I'm sorry.

9   You've already-- Mr. Bell has already inquired.

10  Mr. Clymer.

11              MR. CLYMER:  No questions, Your Honor.

12              THE COURT:  No questions?  All right.  May

13  Agent Seubert step down?  No other questions?  All

14  right.  You can step down.

15              All right.  Next witness.  I'm not sure

16  who's calling the next witness.

17              MS. BRANNON:  Mr. Wamble.

18              Your Honor, while Mr. Wamble is coming in,

19  we have an agreement with the prosecutor and I assume

20  the Special Master to go ahead and admit 637, 607, 570

21  and 571.

22              THE COURT:  All right.  Exhibits 637, 607,

23  570 and 571 admitted by stipulation.

24              MS. BRANNON:  Thank you.

25                        JABARI WAMBLE,

1   called as a witness on behalf of the Federal Public

2   Defender's Office, having first been duly sworn,

3   testified as follows:

4                    DIRECT EXAMINATION

5   BY MS. BRANNON:

6       Q.   Would you state your name for the record, please?

7       A.   Jabari Wamble.

8       Q.   Mr. Wamble, what do you do for a living?

9       A.   I am a prosecutor.

10      Q.   And how long have you been a prosecutor?

11      A.   Almost eight years.

12      Q.   And how long have you been a prosecutor in the

13  District of Kansas?

14      A.   I'm sorry.  I've been a prosecutor since 2006.

15  I've been in this office almost eight years.

16      Q.   And by "this office," the Kansas federal-- or the

17  Kansas U.S. Attorney's Office?

18      A.   That is correct.

19      Q.   And you've always been in the criminal division

20  in that office?

21      A.   Yes.

22      Q.   All right.  As part of your job as a criminal

23  prosecutor, are there times that you collect recorded

24  calls from CCA?

25      A.   Yes.

1      Q.   And do you do that routinely?

2      A.   I wouldn't say routinely, but there's periods of

3   time that I have.

4      Q.   When you do that, do you review the calls

5   yourself?

6      A.   Yes.

7      Q.   Do you ever have an agent review the calls for

8   you?

9      A.   Yes.

10     Q.   When an agent reviews calls for you, do they

11  write reports?

12     A.   I don't believe so.

13     Q.   If an agent is reviewing calls for you, how would

14  you get the information that would be relevant to your

15  prosecution from the agent?

16     A.   I would probably sit down and talk with the

17  agent.

18     Q.   Talk to them.  Okay.

19          Now, are there times when you collect calls,

20  recorded calls, and then they are redistributed to other

21  agencies or other offices for any reason?

22     A.   No.

23     Q.   How about probation?

24     A.   No.

25     Q.   Okay.  When you request calls from CCA, how do

1    you usually do that?

2        A.   Either through my legal assistant or I have

3    contact directly with the marshals service.

4        Q.   All right.   I'm going to ask to pull up

5    Exhibit 637.

6            MS. BRANNON:   And if I may approach the

7    witness.

8            THE COURT:   Yes.

9    BY MS. BRANNON:

10       Q.   I'm going to go ahead and hand you a hard copy,

11   but if you could look at the last entry on that e-mail

12   chain.   And what-- what's the date on that last entry?

13       A.   Thursday, May 16th, 2013.

14       Q.   And are you on that e-mail chain?

15       A.   Yes.

16       Q.   And that e-mail is asking that a form be filled

17   out from the United States Marshals Service in order to

18   request records; is that right?

19       A.   Yes.

20       Q.   And are you familiar with that form?

21       A.   Yes.

22       Q.   Okay.   Let's look at Exhibit 607.   Is this an

23   e-mail from you?

24       A.   Yes.

25       Q.   Okay.   There are times when you would request--

1   even after that e-mail in 637, there are times that you

2   would request recorded calls from CCA by directly

3   contacting them; is that right?

4       A.   Or the marshals service, yes.

5       Q.   In this particular case, it is an e-mail from you

6   to Matthew Collins.  Do you know who Matthew Collins is?

7       A.   No, I don't.

8       Q.   Okay.  Is Matthew Collins anybody you know to be

9   in the United States Marshals Service?

10      A.   I don't know that.

11      Q.   And you don't know whether Matthew Collins is

12  from CCA?

13      A.   He could be.  I-- I don't know that.

14      Q.   You remember times, however, that you called or

15  e-mailed directly to CCA to request phone calls?

16      A.   Either contacted CCA or through the marshals,

17  yes.

18      Q.   But setting aside the marshals, do you remember

19  times that you e-mailed directly to CCA to ask for

20  recorded phone calls?

21      A.   I don't have a specific memory of that, but it's

22  likely that I did.

23      Q.   And in doing something like that, you wouldn't

24  necessarily use the United States Marshals' form?

25      A.   That is correct.

1    Q.   So the record of that request would be your

2    e-mail?

3    A.   Correct.

4    Q.   Do you remember ever just picking up the phone

5    and calling and asking for calls?

6    A.   I don't have a specific memory of that, but that

7    could be the case.

8    Q.   And in that case there wouldn't be any paper

9    trail of that request?

10   A.   Not unless there was a follow-up e-mail, no.

11   Q.   Okay.  Let's look at a couple of the exhibits or

12   the pages within 607.  You requested on Page 1 calls for

13   Robert Robinson and Dale Williamson.  Do you remember

14   obtaining attorney-client calls in Robert Robinson's

15   case?

16   A.   No, I did not.

17   Q.   You did not?

18   A.   I don't remember.  I think the question was do

19   you remember obtaining any attorney-client calls, and I

20   do not remember obtaining any--

21   Q.   You do not remember?

22   A.   -- calls.

23   Q.   All right.  If we look over at Page 3, there were

24   times that you asked for recorded calls in a particular

25   case multiple times?

1      A.   That is correct.

2      Q.   And you did that, in fact, in Brenda Wood's case;

3  is that correct?

4      A.   That is correct.

5      Q.   Okay.  You asked for attorney-client calls in

6  Mendy Forbes' case?

7      A.   I don't believe I specifically did, but I was a

8  prosecutor on that case, and I do know that calls were

9  requested.

10     Q.   Was Chris Oakley on that case with you?

11     A.   That is correct.

12     Q.   And do you remember obtaining attorney-client

13  calls in Mendy Forbes' case?

14     A.   No.

15     Q.   Do you remember reviewing calls in Mendy Forbes'

16  case, you personally reviewing those calls?

17     A.   I don't remember personally reviewing those

18  calls.

19     Q.   Uh-huh.  When you requested calls, there were

20  times that you actually got the link from Securus and

21  you could listen into the calls directly; is that right?

22     A.   Correct.

23     Q.   Is that usually how you obtained them?

24     A.   No.

25     Q.   How did you usually obtain them?

 1      A.   I usually received a disk with the calls.

 2      Q.   And how did you receive that disk?  Did somebody

 3  bring them to you?

 4      A.   Yes.

 5      Q.   Okay.  Somebody from the marshal's office?

 6      A.   Yes.

 7      Q.   The majority of the requests you made for calls,

 8  did that actually go through the marshal's office?

 9      A.   Yes.

10      Q.   Okay.  And when it went through the marshal's

11  office like that, did you get them by CD or by the link

12  from Securus?

13      A.   Generally CD.

14      Q.   Okay.  Do you remember any other case where you

15  actually did get attorney-client calls, other than

16  Brenda Wood's?

17      A.   No.

18      Q.   Okay.  Let's talk about Brenda Wood's for just a

19  minute.  You were the prosecutor in that case?

20      A.   Yes.

21      Q.   It was a bank fraud case?

22      A.   Amongst other charges, but yes.

23      Q.   Right.  A lot of charges, a long-- that case

24  lasted a long time; is that fair to say?

25      A.   Yes.

1    Q.   She was indicted in 2014?

2    A.   Yes.

3    Q.   And in that case you asked for calls multiple

4  times?

5    A.   That is correct.

6    Q.   The first time you asked for calls in that case,

7  you did come across attorney-client calls; is that

8  right?

9    A.   That is correct.

10   Q.   In the second-- well, each of the subsequent

11 times that you asked for calls in Brenda Wood's case,

12 did you do anything to exclude attorney calls?

13   A.   Yes.

14   Q.   What did you do?

15   A.   I asked my assistant to contact the marshals

16 service and have her previous attorney's number removed

17 and a clean set of calls delivered.

18   Q.   That was the first time.  Right?

19   A.   Yes.

20   Q.   And did you verify with CCA that that happened?

21   A.   I don't have a specific memory of verifying that,

22 no.

23   Q.   If we could look at 607, Page 12.  Were you the

24 one that filled out the request forms from the United

25 States Marshal's Office?

1    A.  I think sometimes I did and sometimes my legal

2  assistant did, but I-- I do have a memory of filling out

3  this form.

4    Q.  Okay.  And this would be-- this would not be the

5  first time you asked for Ms. Wood's calls; is that

6  right?  It's later on in the case.

7    A.  I'm sorry?

8    Q.  This would not be the first request you made for

9  Ms. Wood's calls that you're looking at, this page?

10    A.  No, that would not be the first time.

11    Q.  There's nothing on this particular form that you

12  excluded attorney-client calls to, for example, Mr. Cox?

13        Well, let me ask it another way.  Is Mr. Cox's

14  name on here?

15    A.  No, it's not.

16    Q.  I became her attorney later on; is that right?

17    A.  I believe that's correct.

18    Q.  My name is not on here?

19    A.  No, it's not.

20    Q.  There are no-- nothing on this form to identify

21  who the defense attorney is or what their numbers are?

22    A.  No, there's not.

23    Q.  And there's nothing on this form saying, do not

24  include these numbers in your return?

25    A.  No, there's nothing on that form.

1    Q.   When you got these CDs or these links to Securus,

2    you also got a log of the calls--

3    A.   Correct.

4    Q.   -- right?  And by comparing that log to the-- to

5    the actual recordings, you could determine what number

6    was called, who she was talking to?

7    A.   Yes.

8    Q.   So you could look at that log and identify what

9    number was called on a particular day and for how long?

10   A.   Yes.

11   Q.   When you got Ms. Wood's calls, did you ever look

12   at that log first and identify-- look to see whether she

13   called any-- her attorney-- excuse me, her attorney on

14   any of those occasions?

15   A.   No, I don't think so.

16   Q.   Did you ever do that in any case?

17   A.   No, I don't have a specific memory of doing that.

18   Q.   In any case, you could have just taken that log

19   and compared it to the defense attorney's name before

20   listening to calls?

21   A.   Yes, that could be done.

22   Q.   But that never happened?

23   A.   I don't have a specific memory of that happening.

24   Q.   And you don't remember any time that you actually

25   requested calls and specifically excluded

1  attorney-client numbers?

2     A.   Just the one instance that involved Mr. Cox's

3  number.

4     Q.   When I-- when the FPD became Ms. Wood's attorney,

5  did you ever do anything to exclude our calls from your

6  call request?

7     A.   No.

8     Q.   Did you understand that the FPD's calls would not

9  be recorded?

10    A.   That was my understanding.

11    Q.   And how did you know that?

12    A.   Well, the form says attorney-client conversations

13  will not be included in the recordings, so I took that

14  to mean if you request the calls, the attorney calls

15  wouldn't be included.

16    Q.   Well, how did you think that worked?  I mean, if

17  on the form there's not a defense attorney's name or

18  number, how were the attorney-client calls not to be

19  included in your request?

20    A.   I don't know.

21    Q.   Okay.  Did you expect the U.S. Marshals to look

22  up the numbers before they submitted the request?

23    A.   I didn't have an expectation that they would do

24  that, no.

25    Q.   Did you ever contact CCA-- other than Mr. Cox,

1    that incident, did you ever contact them to check to see

2    whether a defense attorney's number was privatized?

3        A.   No.

4        Q.   Did you ever ask a defense attorney whether they

5    privatized their calls?

6        A.   I had a discussion with Mr. Cox about privatizing

7    his number, and I think that's about it.

8        Q.   Okay.  No other occasions?

9        A.   I've never received phone calls that included

10   attorney-client communications, so that would be the

11   only time.

12       Q.   Do you know how the privatization protocol worked

13   at CCA?

14       A.   Not exactly.

15       Q.   When you came across the call in Ms. Wood's

16   case-- well, let me back up.

17            When you obtained that first set of calls in

18   Ms. Wood's case, you reviewed those personally?

19       A.   Yes.

20       Q.   And the timeline was she had a detention hearing

21   that was coming up fairly quickly?

22       A.   That's correct.

23       Q.   And you wanted to listen to those calls for that

24   reason, to prepare for that hearing?

25       A.   Yes.

1      Q.   When you listened to the call, do you remember

2  what the preamble was or whether there was a preamble on

3  the call?

4      A.   No.

5      Q.   Did that matter to you?

6      A.   Yes.

7      Q.   But you just don't remember whether--

8      A.   I don't remember what the specific preamble

9  would've been, but I know that in listening to calls,

10 it's basically on every call that you receive.

11     Q.   So you're listening to these calls, you hear what

12 you believe to be an attorney-client conversation; is

13 that right?

14     A.   I hear what I believe to be Mr. Cox's voice.

15     Q.   All right.  You had talked to him in the past?

16     A.   That's correct.

17     Q.   Had you talked to him on the phone?

18     A.   Yes.

19     Q.   And you knew his phone number?

20     A.   I knew his phone number?  Like by memory?

21     Q.   Well, no, but you knew how to reach him.  You

22 knew what his phone number was.

23     A.   I knew how to look his phone number up and call

24 him, yes.

25     Q.   Right.  So you could've looked at the log that

1  you got and compared it to the phone number you knew Mr.

2  Cox's to be to identify-- (reporter interruption).

3       I'm sorry.  You could've looked at the log that

4  you received and compared it to Mr. Cox's number to

5  identify whether there were any attorney-client calls on

6  that log?

7     A.  Yes.

8     Q.  Okay.  When you heard Mr. Cox's voice, did you

9  listen any further?

10    A.  No.

11    Q.  How many times did that happen?

12    A.  When I heard his voice, I stopped listening and

13 asked my assistant to get calls that did not include his

14 number.

15    Q.  So you put that batch away and you got a fresh

16 batch?

17    A.  That's correct.

18    Q.  Okay.  When you got that fresh batch, how was it

19 that you knew that there would be no attorney-client

20 calls in it?

21    A.  I guess I couldn't say for a certainty that I--

22 there wouldn't be, but I specifically requested that his

23 number be removed.

24    Q.  When you did this, when you heard that call and

25 you specifically asked for that number to be removed,

 1  did you send an e-mail, a letter, anything documenting

 2  this?

 3      A.  No.  I had a conversation with my assistant, and

 4  then she immediately e-mailed the marshals service with

 5  this request.

 6      Q.  Okay.  So there would be an e-mail from her to

 7  the marshals service asking for-- was it asking for--

 8  well, I'm sorry.  Do you know what the e-mail said?

 9              MR. CLYMER:  Your Honor, may I?  I'm sorry

10  to interrupt, counsel.

11  BY MS. BRANNON:

12      Q.  Do you know what the e-mail said?

13      A.  Yes.

14      Q.  Okay.  And were you on that e-mail?

15      A.  No.

16      Q.  Do you know whether CCA sent you a fresh batch of

17  calls without those calls or whether they actually

18  privatized Mr. Cox's number?

19      A.  I believe they did both.

20      Q.  All right.  And how were you made aware of that,

21  that they did both?

22      A.  Because I didn't receive any of his calls

23  anymore.

24      Q.  But if they just-- well, if they sent you a fresh

25  batch without his calls, that doesn't necessarily mean

1   they privatized his number; is that right?

2       A.   That's correct.

3       Q.   So did you receive confirmation from CCA or the

4   marshals that they had actually privatized Mr. Cox's

5   number on your behalf?

6       A.   No, I did not.

7       Q.   All right.  When this litigation began in October

8   of-- of 2016, I filed a motion in Brenda Wood's case,

9   what we've been calling a 41(g) motion.  Do you remember

10  that?

11      A.   Yes.

12      Q.   Were you given any directives by your office that

13  if you received one of those motions and had

14  attorney-client calls, that you were to notify counsel

15  and the Court?

16      A.   I don't have a specific memory of that.

17      Q.   After I filed that motion, did you ever notify me

18  that you had copies of attorney-client calls in your

19  file?

20      A.   I don't believe so.

21      Q.   Even while that motion was pending?

22      A.   That is correct.

23      Q.   Did you ever notify the Court that you had

24  attorney-client calls in that case while that motion was

25  pending?

1    A.   I don't believe so.

2    Q.   I filed an amended motion in January of 2018 for

3    the same-- for attorney-client communication.  Do you

4    remember that?

5    A.   I believe so.

6    Q.   And as a result of that, the Court ordered you to

7    produce any attorney-client calls that you had?

8    A.   That is correct.

9    Q.   Up until that point in time, had you ever

10   notified anyone, other than what you talk about, Mr.

11   Cox, that you had attorney-client calls in your file?

12   A.   Yes.

13   Q.   Who?

14   A.   My supervisor, Scott Rask.

15   Q.   Okay.

16   A.   And I believe I responded to a litigation hold

17   that would've gone to Emily Metzger.

18   Q.   So let's talk about Mr. Rask first.  When was it

19   that you notified Mr. Rask that you had attorney-client

20   calls in your file in Ms. Wood's case?

21   A.   I don't know when I would've had that discussion.

22   Q.   Would it have been in 2016?

23   A.   I don't know.

24   Q.   What about Ms. Metzger and the litigation hold?

25   A.   Whenever she sent out an e-mail requesting that

1  information, I responded with-- that there were

2  attorney-client calls associated with the *Brenda Wood*

3  case.

4      Q.   Did you do that by e-mail?

5      A.   Yes.

6      Q.   And did you actually provide the calls to

7  Ms. Metzger?

8      A.   No.

9      Q.   The actual recorded calls remained in your file?

10     A.   That's correct.

11     Q.   From 2014 until 2018 when you actually produced

12  them, they remained in your file?

13     A.   What do you mean "in my file"?

14     Q.   You had possession of them.

15     A.   Yes.

16     Q.   You had access to them.

17     A.   Yes.

18     Q.   During that time you could've listened to them?

19     A.   Sure.

20     Q.   They were on a shared discovery drive in your

21  office?

22     A.   I'm not entirely sure if those calls were on a

23  shared drive, but they were on my hard drive.

24     Q.   All right.  So between 2014 when you obtained

25  them and 2018 when you produced them, for those four

1    years you maintained copies of those recordings?

2        A.   That is correct.

3        Q.   And in 2018, pursuant to an order of the Court--

4    if we could look at Exhibit 571.  Do you recognize this

5    letter?

6        A.   Yes.

7        Q.   And you sent this to me; is that correct?

8        A.   That's correct.

9        Q.   And with this you delivered the actual recordings

10   of the phone calls?

11       A.   That is correct.

12       Q.   In the numbered Paragraph 1, you talk about your

13   interaction with Mr. Cox.  Let's talk about that for

14   just a minute.

15            When you discovered the attorney-client calls

16   that you had in your possession, what did you do in

17   regard to notifying Mr. Cox?

18       A.   In a phone conversation-- I didn't specifically

19   call him to talk about the phone calls, but in a phone

20   conversation I mentioned that he should probably

21   privatize his number.

22       Q.   Did you tell him why?

23       A.   I believe so.

24       Q.   Are you sure?  Do you know?  You say you believe

25   so.

1      A.   I'm not entirely sure how I phrased it, but it

2  was, you should probably privatize your number, you know

3  that we've requested calls involving Brenda Wood.

4      Q.   Do you remember telling-- do you remember whether

5  you told him that you actually had recorded

6  attorney-client calls in your possession?

7      A.   I don't think I phrased it like that.  I think it

8  was more of, I heard your voice on the phone, you should

9  probably privatize your number.

10     Q.   Did you give those-- well, obviously you didn't

11 give those calls to Mr. Cox?

12     A.   I did not.

13     Q.   You did not produce them in discovery?

14     A.   To?

15     Q.   Mr. Cox or to me.

16     A.   No, I did not.

17     Q.   When you asked for the fresh batch of calls

18 without the attorney-client calls, you still kept the

19 original batch that included the attorney-client calls.

20 Correct?

21     A.   That is correct.

22     Q.   Did you ever look to see how many attorney-client

23 calls were in that first batch?

24     A.   No.  I heard his voice, I stopped listening, and

25 that was the end of my interaction with those calls.

1      Q.   Did you ever send him an e-mail or a letter or

2   anything like that to confirm what you had told him

3   about having attorney-client communications?

4      A.   I don't believe so.

5      Q.   Were you ever directed-- well, let me ask you

6   this:  When you notified Mr. Rask that you had these

7   attorney-client calls in a case where a 41(g) motion had

8   been filed, did he tell you not to disclose that to

9   counsel or the Court?

10      A.   No.

11      Q.   Did he tell you whether to respond to the 41(g)

12   motion?

13      A.   I don't believe he ever said not to respond or to

14   respond.

15      Q.   So you just told him that you had these, and did

16   he tell you anything at all in response to you?

17      A.   I don't think the conversation was in response to

18   the 41(g) motion.  I think it was more of a conversation

19   of:  There's going to be a request from Emily Metzger to

20   hold documents, evidence, whatever, for the litigation.

21   And so that would've been the conversation.  I don't

22   remember a specific conversation about your specific

23   41(g) motion.

24      Q.   From anyone in management, including Ms. Metzger,

25   were you told that if you did have attorney-client

1   communications like this, that you were to notify

2   counsel or the Court?

3       A.   I don't remember that specific direction, no.

4       Q.   Were you told not to?

5       A.   No.

6       Q.   Were there any other cases that you identified in

7   response to the litigation hold as having

8   attorney-client communication?

9       A.   No.

10      Q.   Did you respond in the Mendy Forbes case, or was

11  that Mr. Oakley's responsibility?

12      A.   It would have been my responsibility if I was

13  co-counsel on the case, but I-- I don't know whether he

14  responded or not.

15      Q.   In the subsequent batches of phone calls, do you

16  remember getting phone calls to my office either in

17  Kansas City or in Topeka?

18      A.   No.

19      Q.   Did you review all of those calls yourself?

20      A.   I listened to the calls, yes.  I did not ask any

21  agent to listen to the calls, if you're referring to the

22  Brenda Wood matter.

23      Q.   Yes.

24      A.   No, I did the review myself.

25      Q.   Do you remember when the first time was that you

1  were asked by anyone to preserve any evidence or

2  information regarding recorded attorney-client calls?

3      A.   No, I don't remember the first time we were asked

4  that.

5      Q.   Were you asked more than one time?

6      A.   Yes.

7      Q.   Do you remember when the subsequent times were?

8      A.   No, I just remember there being requests to not

9  destroy anything, delete anything, just to keep

10  everything that you have that could be responsive and

11  there will be further direction once we had more

12  information.

13      Q.   Let's visit just for a minute about file

14  retention in a normal case when something like this

15  isn't going on.  When you're done with a case and you

16  have phone calls in it, what do you do with it?

17      A.   So if they're on disk, they go in the file, and

18  then I guess they would go then to storage.

19      Q.   Do you know what is kept and what is not kept?

20      A.   Generally, yes.

21      Q.   I'm sorry?

22      A.   Yes.

23      Q.   So what is kept and what is not kept?

24      A.   I would say the majority of the file is kept.

25  The things maybe that are not kept would be, you know,

 1  scratch notes from the prosecutor or just miscellaneous
 2  items, but I'd say the majority of the file is kept.
 3     Q.  So your understanding is if you've got recorded
 4  calls or the log sheets, that when a file is closed,
 5  that those would remain in the file and remain
 6  preserved?
 7     A.  I guess it would depend on each individual
 8  prosecutor, what they would want to save and not save.
 9     Q.  Oh, okay.  So that would be your decision what to
10  keep and what not to keep?
11     A.  Generally, yes.
12            MS. BRANNON:  All right.  May I have just a
13  moment, Your Honor?
14            THE COURT:  Yes.
15            MS. BRANNON:  Thank you, Mr. Wamble.
16                  CROSS EXAMINATION
17  BY MS. VANBEBBER:
18     Q.  I want to ask you a few questions on two
19  different topics, one being what counsel just asked you
20  questions on and one being how you cooperated or did not
21  cooperate with the investigation that's currently
22  proceeding in the *Black* case.
23            I'm going to draw your attention to just before
24  December 19th when you got the litigation hold letter
25  from Emily.

1    A.   Okay.

2    Q.   So never mind that.  I just want to talk to you

3  right now about what happened before that.  So before

4  that you had periodically gotten logs of recorded inmate

5  calls.  Correct?

6    A.   Correct.

7    Q.   And was one of those inmates Brenda Wood?

8    A.   Yes.

9    Q.   And so the log comes in-- let me make sure I

10  understand this.  The log comes in, it's got the

11  identifier for the inmate, and then it's got a list of

12  the calls that he made; is that right?

13    A.   Yes, that's if you receive a disk.  I think the

14  first time I received a link, that you have to download

15  within 48 hours, and I'm not entirely sure that comes

16  with like a spreadsheet.

17    Q.   All right.  At any rate, when you look at your

18  spreadsheets and you're getting your case ready, you

19  know which inmate it was and you know what numbers they

20  called?

21    A.   That's correct.

22    Q.   And from your experience in dealing with Mr. Cox,

23  you knew what his number was?

24    A.   Again, I didn't have it memorized, but I--

25    Q.   You could look it up?

 1     A.   I know how to get ahold of him.

 2     Q.   So was there any reason in your mind why when you

 3 got the logs with all the telephone numbers that you

 4 shouldn't go through there and filter out

 5 attorney-client calls?

 6     A.   So are you asking me did I take the spreadsheet,

 7 find his number--

 8     Q.   Uh-huh.

 9     A.   -- and filter those calls out?

10     Q.   Right.

11     A.   No.

12     Q.   You didn't think you had a responsibility to do

13 that?

14     A.   It's not that I didn't think I had a

15 responsibility.  It was my understanding that attorney

16 phone numbers were not included.

17     Q.   And you didn't do a double-check just to make

18 sure?

19     A.   I did not.

20     Q.   You didn't think that was very important then to

21 know, that maybe somebody made a mistake at the prison

22 and got Cox's telephone number included in there, his

23 calls were there?

24     A.   If I thought that there was a chance of that,

25 yes, I think that's important.

1    Q.   But it didn't occur to you to do that in this
2  case?
3    A.   Before that instance, I had never received
4  attorney calls and had no reason to think that I would.
5    Q.   How do you know you hadn't if you weren't in the
6  habit of looking?
7    A.   Because I don't have any-- any memory of hearing
8  other attorneys' recorded calls.
9    Q.   In the *Wood* case, was it your testimony here that
10 you did not notify Mr. Cox, except by telephone call,
11 telling him he ought to privatize?
12   A.   That's correct.
13   Q.   After that call did you find any more of his
14 calls?
15   A.   I did not, no.
16   Q.   Did you look?  You did not look, is that what
17 you're telling me?
18   A.   I didn't look because I didn't find any more
19 calls.
20   Q.   No more calls at all?
21   A.   No, no more of his recorded phone calls.
22   Q.   You got-- you got more logs after that call.
23 Correct?
24   A.   That is correct.
25   Q.   How do you know his number wasn't on there if you

1  didn't look for it?

2     A.  I'm just telling you I do not remember receiving

3  any more calls that I would've heard.

4     Q.  Did you-- and you said you did listen to the

5  calls that you had in the *Wood* case that were

6  attorney-client?

7     A.  No, I said I heard Mr. Cox's voice, I

8  discontinued listening and ordered calls without his

9  number.

10     Q.  What about the Federal Public Defender, did you

11  have any calls there from the Federal Public Defender--

12  that identified the Federal Public Defender's number?

13     A.  I did not hear any calls from the Federal Public

14  Defender.

15     Q.  When you went to work-- you say you've been at

16  this office for about a year; is that correct?

17     A.  Almost eight years.

18     Q.  Oh, excuse me.  Almost eight years.  So you

19  didn't work like in the Topeka office or Wichita office,

20  you were always in Kansas City, Kansas?

21     A.  Always in Kansas City.

22     Q.  Okay.  While you were here, did you have any

23  training on what you're supposed to do if you obtained

24  recordings of attorney calls?

25     A.  I don't remember any specific retraining-- or

1   training for that topic, no.

2       Q.  Did you have discussions with other assistants

3   about it?

4       A.  Other Assistant United States Attorneys?

5       Q.  Yes.

6       A.  Not about procuring the calls, but certainly

7   conversations about receiving calls.

8       Q.  Okay.  What conversations-- what do those consist

9   of?

10      A.  Things that we may have heard on the calls.  But

11  not a conversation about this is how I go about

12  obtaining jail calls.

13      Q.  You didn't have anybody say what you should do

14  once you got one of these calls?

15      A.  No.

16      Q.  Nobody told you that.  Did you ever ask?

17      A.  I don't remember asking anyone, no.

18      Q.  Do you have any-- do you eat in the lunchroom?

19      A.  Sometimes, yes.

20      Q.  Did you have any lunchroom conversations about

21  whether or not at CCA there was-- there was any

22  attorney-client privilege for the telephone calls to

23  their attorneys?

24      A.  No, that was not a lunch topic that I'm familiar

25  with.

1     Q.   The topic just did not come up when you were--

2     A.   That just--

3     Q.   The topic just did not come up when you were

4   there?

5     A.   About recorded attorney calls?

6     Q.   Right, yeah, about the attorney-client privilege

7   and whether it was waved at CCA.

8     A.   I don't remember a conversation like that.

9     Q.   Is it your understanding in general that

10  conversations of any kind between an attorney and his

11  client are privileged?

12    A.   Are you asking me is that my belief?

13    Q.   Is that your knowledge from your training?  Is

14  that what you believe or not?

15    A.   I don't remember any specific training that

16  talked about attorney-client phone calls and CCA and

17  inmates.

18    Q.   How about in general?  What from your training do

19  you know about a privilege for attorney-client calls in

20  general?

21    A.   You know, I think generally one could make the

22  argument that they are privileged and one could make the

23  argument that they are not.  I personally don't want

24  attorney calls because I don't want to be accused of

25  doing anything improper.

1    Q.   Uh-huh.  So from your education and your

2    training, you don't know for sure the answer to that

3    question, what the law is?

4    A.   I believe in a specific circumstance like this,

5    the preamble, the warnings would indicate that this is

6    not a privileged, private conversation.  But my own

7    personal standard is I don't want those calls.

8    Q.   What makes you think it's privileged?  Is that

9    what the other attorneys in the office tell you?  When I

10   say "it," I mean attorney-client calls from CCA.

11   A.   Well, certainly most folks, most lawyers

12   understand that defendants have a right to talk to their

13   attorney privately and that's a privileged conversation.

14   Those conversations between the client and an attorney

15   fall under a specific privilege.

16        If you add a phone in there, I think that there's

17   an argument that there would be a privilege or not be a

18   privilege.  And so I think it's an individual

19   determination as to whether you would want those calls

20   or not.

21   Q.   In any event, when you-- well, when did you let--

22   when did you let Scott Rask know that you had

23   attorney-client calls in your files?

24   A.   Probably around the first request for the

25   litigation hold.

1    Q.  Okay.  So sometime around December of 2016?

2    A.  Potentially, yes.

3    Q.  If that-- if the record reflects that that was

4    the date, does that sound right to you?

5    A.  Right.

6    Q.  All right.  So you told your supervisor about the

7    calls--

8    A.  Yes.

9    Q.  -- that you had in your files?

10   A.  Yes.

11   Q.  And your-- is it your testimony that he didn't

12   say one way or the other what you should do with them in

13   regard to the litigation hold?

14   A.  I don't remember a specific directive, no.

15   Q.  Did he ever say whether or not you had a

16   responsibility to notify the attorney, whatever attorney

17   was involved in any of those calls?

18   A.  I do not remember a specific directive, no.

19   Q.  Did you ask him?

20   A.  What I should do with the calls?

21   Q.  Whether you should tell the attorney, hey, I have

22   a call between you and your client.

23   A.  I don't remember asking it in that way.  I think

24   the conversation was, I see the directive went out to

25   hold information with respect to the litigation hold.

1   And I think of all of the cases that I have, Brenda Wood

2   would be included in that.

3       Q.   Because you have an attorney-client call in that?

4       A.   Yes.

5       Q.   Did you ask him whether you would have to turn

6   those calls, any calls that you had that were

7   attorney-client calls, over to the defense in discovery?

8       A.   I did not ask him that.

9       Q.   Did that-- did that occur to you that that might

10  be a problem?

11      A.   Well, I-- no, because he was no longer the

12  attorney on the case.

13      Q.   He was your supervisor, though, wasn't he?

14      A.   I think maybe we're talking about two separate

15  things.

16      Q.   All right.  When you talked to Scott Rask and

17  told him that you had attorney-client material in your

18  files, he was your supervisor; is that right?  Or was he

19  just an attorney on the case?

20      A.   Scott Rask was never on the case.

21      Q.   Okay.  So why would you have told him anything?

22      A.   Because he's my supervisor.  And if a directive

23  came that said, hey, if you have information that's

24  responsive to the litigation hold, I would've had a

25  conversation with whatever supervisor I had at the time.

1    Q.  So you think he was your supervisor at that time?

2    A.  I believe so.

3    Q.  All right.  So let me ask you again then.  You

4    told your supervisor you have these calls in Brenda

5    Wood's case, and he didn't say anything to you about

6    whether you had a responsibility to turn those over in

7    discovery?

8    A.  No.

9    Q.  And you didn't ask him?

10   A.  No.

11   Q.  Because you didn't see a problem with having

12   calls-- attorney-client calls that you had not yet

13   turned over in discovery?

14   A.  The calls that we're talking about involved the

15   attorney, Christian Cox.  He was no longer on the case

16   at some point in time.  So no, I didn't think to turn

17   over discovery to an attorney who was no longer

18   representing the defendant.

19   Q.  Tell me again, which calls?  I misunderstood

20   what-- I think the name that you gave me.  You didn't

21   say Brenda Wood, you said whose calls?

22   A.  Christian Cox was the attorney for Brenda Wood.

23   Q.  Oh, okay.  Christian Cox's calls, all right.

24       Did anybody ever tell you what you had a

25   responsibility to turn over if you had an order to turn

 1  over 41(g) material?

 2      A.  No.

 3      Q.  Okay.  Let's switch over now to the Special

 4  Master's investigation.  You've just talked about the

 5  litigation hold letter.  And are you aware that that was

 6  part and parcel of what was going on in the *Black* case

 7  with Mr. Cohen's investigation?

 8      A.  Yes.

 9      Q.  Did you believe that the Court's order that all

10  employees of the United States Attorney's Office would

11  fully cooperate with the-- with the Special Master

12  applied to you?

13      A.  Yes.

14      Q.  Did you-- what did you personally do about that

15  obligation to the Court?

16      A.  What specific obligation?

17      Q.  The one I just asked you about, the

18  responsibility to fully cooperate with the Special

19  Master.

20      A.  Yes, I believe it applied to me.

21      Q.  All right.  Now, what did you do to cooperate

22  with the Special Master personally?

23      A.  Whatever directive I received from management,

24  I-- I read whatever was sent to me.  And if I had

25  something that was responsive, I alerted them to that

1  fact.

2      Q.  What besides the litigation letter was-- was sent

3  to you?  Any directive from management.

4      A.  Management, to preserve all evidence.

5      Q.  And that's it?

6      A.  I'm sure that there were more, but that's the one

7  that is coming to my mind.  Preserve what you have.  And

8  at some point, if we need it, give it to us.

9      Q.  Do you remember an occasion when Emily Metzger

10 and Debra Barnett came to Kansas City, Kansas, to have a

11 meeting with all the attorneys and discuss the Special

12 Master's investigation?

13     A.  Yes.

14     Q.  Did you go to that meeting?

15     A.  Yes.

16     Q.  And what did they tell you?

17             MR. CLYMER:  Your Honor, I think there may

18 be an authorization issue here.  May I speak to

19 Ms. VanBebber?

20             THE COURT:  Yes.

21             (Counsel confer).

22 BY MS. VANBEBBER:

23     Q.  You were at the-- I'm going to start over and ask

24 the question again.  You were at the meeting where two

25 members of management were giving you instruction on

 1   what to do about the Special Master's investigation; is

 2   that right?

 3       A.   That's correct.

 4       Q.   And that would be Emily, who at that time was the

 5   first assistant or the civil chief, one of the two, and

 6   Debra Barnett, who was the criminal chief; isn't that

 7   right?

 8       A.   That's correct.

 9       Q.   And so-- so what instructions did management give

10   you with regard to cooperating with the Special Master

11   as ordered by the Court?

12       A.   My recollection was, save everything.

13       Q.   Yes.  And?

14       A.   That's the--

15       Q.   Did they tell you whether you were permitted to

16   volunteer information to the Special Master?

17       A.   I don't remember that instruction.

18       Q.   You don't remember being told that all-- all

19   interactions with the Special Master needed to go

20   through management?

21       A.   I don't remember that specific instruction.

22       Q.   Did the Special Master ever speak with you?

23       A.   No.

24       Q.   Did you ever volunteer any information to the

25   Special Master?

1    A.  No.

2    Q.  Did you ever talk to him at all?

3    A.  I don't believe so.

4    Q.  Did any member of the staff or the attorneys in

5  this office - just limit it to Kansas City, Kansas -

6  advise you that you better just not be talking to the

7  Special Master?

8    A.  No.

9    Q.  Did any of them volunteer that they had been

10  talking with the Special Master?

11    A.  Who specifically?

12    Q.  The attorneys or the staff at the KCK office.

13    A.  Like any attorney?

14    Q.  Anybody.

15    A.  I was aware that some attorneys had talked to the

16  Special Master, yes.

17    Q.  How did you become aware of that?

18    A.  In conversation, I believe.

19    Q.  Did any of them-- which ones?  Who?

20    A.  The only specific memory that I would have, I was

21  aware that Erin Tomasic had talked to the Special

22  Master.

23    Q.  And did you hear that from her or did you hear it

24  by hearsay?

25    A.  I think I heard that from her.

 1    Q.   Did she suggest that you might want to talk to

 2   the Special Master as well?

 3    A.   No.

 4            MS. VANBEBBER:  Okay.  No other questions.

 5                   CROSS EXAMINATION

 6   BY MR. CLYMER:

 7    Q.   Mr. Wamble, when you got the Brenda Wood calls,

 8   did you get them by way of the link or a CD too?

 9    A.   Both.

10    Q.   When you first got them, how did you get them the

11   first time?

12    A.   A link.

13    Q.   A link.  Do you recall how long it was from the

14   time you received that link to the time you started

15   looking at the call-- listening to the calls?

16    A.   Immediately, I believe.

17    Q.   And when you started to listen to the calls, how

18   long was it until you heard a voice that you recognized

19   to be Ms. Wood's attorney?

20    A.   I'd say less than a few minutes.

21    Q.   Once you recognized the voice, what did you do?

22    A.   I immediately went outside of my office, talked

23   to my assistant, who is out-- right outside of my

24   office, and said, we need new calls, these calls have

25   Christian Cox's number in-- included.

1    Q.   Did you then not listen to any more calls
2  associated with that link?
3    A.   That's correct.
4    Q.   Let me show you what's been marked as Exhibit 42.
5  Can you tell us, please, what Exhibit 42 is?
6    A.   This is an e-mail from my assistant to an
7  employee of the marshals service asking specifically to
8  take out Christian Cox's number, which is listed, and
9  then run the calls again without that number.
10   Q.   And is that-- is it your understanding that that
11 e-mail was sent in response to what you told your
12 assistant that day?
13   A.   That's correct.
14   Q.   And how long was it, can you estimate, from the
15 time you told your assistant to do that to the time your
16 assistant did that?
17   A.   Pretty short in time.  I remember getting the
18 calls, listening to them, and then asking Maria to get a
19 new set of calls.
20   Q.   Within maybe 10, 15 minutes?
21   A.   That's correct.
22   Q.   Did you later get a new set of calls?
23   A.   Yes.
24        MR. CLYMER:  Your Honor, I move 42 into
25 evidence at this time.

 1              MS. BRANNON:  No objection.

 2              THE COURT:  42 admitted.

 3              MS. BRANNON:  We'd ask that at the end of

 4    the day the prosecutor give us a set of marked exhibits

 5    that he's used today.

 6              THE COURT:  Okay.  You haven't seen this

 7    exhibit or-- except I think you handed to her the--

 8              MR. CLYMER:  I gave them a copy.  I will do

 9    that, Your Honor.

10              THE COURT:  All right.

11              MR. CLYMER:  I'll actually give one to the

12    Special Master too.

13    BY MR. CLYMER:

14       Q.  When you got the new set of calls, did you listen

15    to the new calls?

16       A.  Yes.

17       Q.  Were there any attorney-client calls in that

18    batch?

19       A.  No.

20       Q.  Other than this one instance you've described to

21    us, have you ever encountered an attorney-client call

22    during your eight years as a federal prosecutor?

23       A.  I have not.

24       Q.  Have you ever sent out a subpoena or another

25    request trying to intentionally get attorney-client

 1  calls?

 2      A.  I have not.

 3      Q.  Have you ever come across an attorney-client call

 4  and kept listening to it once you realized it was an

 5  attorney-client call?

 6      A.  I have not.

 7      Q.  After you got notice from recognizing the

 8  attorney's voice that you had encountered in an

 9  attorney-client call in the *Brenda Wood* case, did you

10  notify the attorney?

11      A.  Yes.

12      Q.  And was that Mr. Cox?

13      A.  That is correct.

14      Q.  Do you recall how long it was from the time you

15  heard Mr. Cox's voice to the time you gave him notice of

16  the fact you had received a call?

17      A.  I do not remember.

18      Q.  Was it more than a week or less than a week, if

19  you recall?

20      A.  It would've been whatever time I talked to him

21  next, and I don't know when that was.  But it wasn't a

22  specific phone call to say, hey, privatize your number,

23  it was involved in the conversation about the case.  I

24  said, you know, you should probably privatize your

25  number.  I heard your voice on some phone calls.

1       Q.   And at the time you had that conversation, was

2    Mr. Cox still representing Ms. Wood?

3       A.   Yes.

4       Q.   Did Mr. Cox say to you in that phone call, please

5    send me copies of the attorney-client calls you got?

6       A.   No, he did not.

7       Q.   If he had asked you to do that, would you have

8    done so?

9       A.   Probably.

10      Q.   I'm going to show you what's been marked as

11   Defense Exhibit 672.  And the print here is kind of

12   small, but I was wondering if you would read it.

13              MR. CLYMER:  This I believe is in evidence,

14   Your Honor.

15              THE WITNESS:  Yes, I can read the print.

16   BY MR. CLYMER:

17      Q.   And do you see that is a privatization order at

18   Securus?

19      A.   Yes.

20      Q.   And is that for the same phone number that your

21   legal assistant notified them about based upon your

22   request?

23      A.   Yes.

24      Q.   And can you tell from that Form 672 at what time

25   was that phone number privatized?

 1      A.  8:22 a.m. on December 22nd of 2014.

 2      Q.  And can you tell us what time the e-mail from

 3  your legal assistant went out at your request?

 4      A.  8:06 a.m., December 22nd.

 5      Q.  The same day?

 6      A.  Yes.

 7      Q.  So based upon what you told your legal assistant,

 8  Mr. Cox's phone number was privatized within minutes.

 9  Correct?

10      A.  Correct.

11      Q.  When you got the next batch, were there any calls

12  involving Mr. Cox in that batch?

13      A.  No.

14      Q.  Did you at any time try to impair or frustrate or

15  fail to comply with the Special Master's investigation?

16      A.  No.

17      Q.  Did anyone ever suggest to you that you should

18  not be fully compliant with the Special Master's

19  investigation?

20      A.  No.

21          MR. CLYMER:  May I have a moment, Your

22  Honor?

23          THE COURT:  Yes.

24  BY MR. CLYMER:

25      Q.  Have you ever used information from an

1  attorney-client communication in an investigation or

2  prosecution?

3      A.  No.

4      Q.  Were you aware in the summer of 2016 that Special

5  Assistant U.S. Attorney Erin Tomasic had subpoenaed

6  video evidence from CCA-Leavenworth?

7              MS. BRANNON:  Outside the scope.

8              THE COURT:  I think it is outside the scope.

9  I'll allow you some limited inquiry.

10             THE WITNESS:  No.

11 BY MR. CLYMER:

12     Q.  Did you at some time when litigation started

13 learn that Erin Tomasic had subpoenaed video evidence?

14     A.  Yes.

15     Q.  Did you ever watch any of the video evidence

16 subpoenaed from CCA-Leavenworth?

17             MS. BRANNON:  Again, outside the scope.

18 We'd object.

19             THE COURT:  Overruled.

20             THE WITNESS:  No.

21             MR. CLYMER:  Nothing further, Your Honor.

22             THE COURT:  Ms. Brannon.

23                     REDIRECT EXAMINATION

24 BY MS. BRANNON:

25     Q.  When you had this phone conversation with

1    Mr. Cox, you did not tell him that you had already taken

2    steps to privatize his number?

3        A.   I don't think so.

4        Q.   You just told him that he needed to still go

5    ahead and privatize his number?

6        A.   Well, I wanted him to be aware and look into it.

7    I-- I had no belief or experience to know how long that

8    process would take.

9        Q.   Uh-huh.  So it could've taken like six months to

10   do it and you-- you didn't know how long it would take?

11       A.   I didn't think that it would take six months, no,

12   but I didn't have a specific-- I didn't have specific

13   knowledge as to how really that process would work, but

14   I wanted him to be aware of it.

15       Q.   You didn't tell him that you had done anything to

16   privatize his number for him?

17       A.   No, I don't believe so.

18       Q.   In fact, that Exhibit 42 that you were shown

19   didn't say anything about privatizing Mr. Cox's number,

20   it just said give us a fresh batch of calls that doesn't

21   have attorney-client calls.  Right?

22       A.   Yes.

23       Q.   So, to your knowledge, your office didn't

24   actually do anything to privatize Mr. Cox's number?

25       A.   No, I think we-- if you read the e-mail, it says

1  take this number out.

2      Q.  Okay.  Fair enough.  Was there ever any other

3  time that you took steps to privatize an attorney's

4  number for them?

5      A.  No, because this is the first time I had ever

6  encountered any phone calls from an attorney.

7      Q.  Was there ever any time when you took steps to

8  deprivatize an attorney's number?

9      A.  Took affirmative steps to get an attorney's phone

10  calls?

11      Q.  To deprivatize the number so an attorney's number

12  would be--

13      A.  No, no.  No.

14      Q.  So when you had this conversation with Mr. Cox

15  and you tell him, I heard your voice talking to your

16  client, what was his response?

17      A.  I don't think he had a response.  It was, okay.

18      Q.  So he didn't say-- he didn't ask you questions

19  like, you have actual recordings between me and my

20  client, Ms. Wood?

21      A.  No.

22      Q.  But that was implicit from what you said?

23      A.  Yes.

24      Q.  And he didn't say, please give those back to me?

25      A.  It was a non-event.  It was--

1    Q.  It was a non-event to you.  But to Mr. Cox-- just

2  to get this conversation that you were reporting down,

3  he did not say to you, would you give me-- these

4  recordings to me?

5    A.  No.  I told him that he should probably privatize

6  his number, I heard his voice.  And then we moved on to

7  the next topic.

8    Q.  He didn't say, please don't listen to them?

9    A.  No.

10    Q.  He didn't say, what did you hear?

11    A.  No.

12    Q.  You would agree there were over a dozen

13  substantive calls between Mr. Cox and Ms. Wood that you

14  received?

15    A.  I don't know that.

16    Q.  Well, you can look on the CDRs and see that they

17  were rather lengthy calls, or did you ever do that?

18    A.  No.

19    Q.  So there was no response from Mr. Cox to you when

20  you told him that you had these calls between him and

21  his client?

22    A.  Other than, thanks for telling me, that was his

23  response.

24    Q.  And he was fine with you keeping those?

25    A.  I don't know what he was fine with.

1    Q.  He never said, are you going to give those to me

2    in discovery?

3    A.  No, he did not.

4    Q.  Now, let's talk about that for a minute.  You

5    didn't give those to him in discovery, but you never

6    gave them to me or Mr. Bartee in discovery either, did

7    you?

8    A.  I did not.

9    Q.  This was a pretty involved case.  There was a lot

10   of rounds of discovery.  Correct?

11   A.  That's correct.

12   Q.  And you knew that we were looking for

13   attorney-client communications in a lot of cases.

14   Right?

15   A.  At what point?

16   Q.  Let's talk about it in August of 2016 when we

17   filed a motion for return of attorney-client

18   communications in Ms. Wood's case.  At that point you

19   did not tell me, I have recordings of attorney-client

20   calls in my possession?

21   A.  No, I did not.

22   Q.  You did not tell me that you had asked for those

23   calls?

24   A.  I never asked for attorney-client calls.

25   Q.  You never told me anything about it?

1    A.   That's not true.  When you asked--

2    Q.   Well, in 2016 you never told me--

3         MR. CLYMER:  Your Honor, I object.  I'd ask

4    that the witness be allowed to answer the question.

5         THE COURT:  All right.  That's fair.

6    BY MS. BRANNON:

7    Q.   In 2016 did you ever tell me anything about these

8    attorney-client calls that you had?

9    A.   No.

10   Q.   It was not until I filed a second amended motion

11   in 2018 that you told the Court that you had these

12   calls?

13   A.   That's correct.

14   Q.   Do you subscribe to the idea that if you're not

15   going to use something in a case that you don't have to

16   turn it over in discovery?

17   A.   No.

18   Q.   Did you make a specific decision in this case not

19   to turn the recordings over in discovery to either

20   Mr. Cox or myself?

21   A.   Did I make the specific decision to not turn--

22   Q.   Right.

23   A.   Yes.

24   Q.   And why did you not turn them over in discovery

25   to us?

1    A.  Well, I didn't turn them over to you because you

2    weren't the attorney that was recorded.

3    Q.  I wasn't the attorney on the calls, but I had

4    filed a motion for return of attorney-client

5    communications in the case.  Correct?

6    A.  That's correct.

7    Q.  And you didn't respond to that by telling me or

8    giving me the calls in that case?

9    A.  No.

10   Q.  So your discovery obligations are tied to who's

11   representing somebody at a particular time?

12   A.  No.

13   Q.  But that's why you didn't turn them over to me in

14   discovery, because they weren't my calls, I wasn't

15   representing Ms. Wood at that time?

16   A.  That's correct.

17   Q.  And you made a conscious decision not to turn

18   those over to me in discovery?

19   A.  That is correct.

20   Q.  And you made a-- I'm sorry.  What was your

21   answer?

22   A.  I said "correct."

23   Q.  And you made a conscious decision not to tell me

24   about those calls after I filed the 41(g) motion in

25   2016?

1    A.   I don't think I-- it was a conscious decision to

2    not turn over something.  It was-- you filed a motion.

3    We were still involved in litigation, and it wasn't a

4    decision that, no, I'm never going to turn these calls

5    over.

6    Q.   But you didn't tell me about them in 2016?

7    A.   I did not.

8    Q.   You didn't file a response to that motion, in

9    fact?

10    A.   No, I did not.

11    Q.   This matter came up in a number of status

12    conferences and things before this Court about my search

13    for attorney-client communications in that case.  Do you

14    remember that?

15    A.   Yes.

16    Q.   And before I filed the amended motion in those

17    status conferences, you never raised your hand to me or

18    the Court and said, I have these attorney-client calls

19    in my possession?

20    A.   What I remember at the time is that those motions

21    were being filed in pretty much every case.  And we were

22    waiting for a directive to figure out what to do and how

23    to respond to those motions.

24    Q.   And when we had a status conference before this

25    Court and talked about whether there were

1  attorney-client communications in that particular case,

2  because you didn't have a directive from management, you

3  didn't tell me or the Court that you had those calls?

4      A.  At that time, like I said, those motions were

5  being filed in every case and we were--

6      Q.  I'm talking this case.  It was filed in this

7  case.  Right?

8      A.  That's correct.

9      Q.  And when I filed them in this case, you knew that

10 you had attorney-client calls in your possession?

11     A.  That is correct.

12     Q.  And you knew that you had not disclosed those to

13 me?

14     A.  That is correct.

15     Q.  And we had status conferences before this Court

16 talking about this particular issue, right, that I had

17 this motion pending?

18     A.  I believe it did come up in status conferences,

19 yes.

20     Q.  And at no time did you ever raise your hand and

21 say, I have these calls, I'd like to produce them, I'd

22 like to put the Court on notice, I'd like to put counsel

23 on notice?

24     A.  No.

25          MS. BRANNON:  Nothing further.

16-20032-JAR  USA v. Karl Carter (Black) 10.03.18          928

```
 1              THE COURT:  Anything more?
 2              MR. CLYMER:  No, Your Honor.
 3              THE COURT:  All right.  May Mr. Wamble be
 4    excused?
 5              MR. CLYMER:  Fine with the government, Your
 6    Honor.
 7              MS. BRANNON:  Yes.
 8              THE COURT:  All right.  You're excused.  All
 9    right.  You can call your next witness.
10              MS. BRANNON:  Your Honor, we would call
11    Captain Schechter from Sedgwick County.
12              I apologize, Your Honor.  I jumped ahead.
13    Trying to make us move too fast.  We call Christian Cox
14    to the stand, please.  Sorry about that.
15                     THOMAS CHRISTIAN COX,
16    called as a witness on behalf of the Federal Public
17    Defender's Office, having first been duly sworn,
18    testified as follows:
19                      DIRECT EXAMINATION
20    BY MS. BRANNON:
21       Q.  Could you state your name for the record, please?
22       A.  Thomas Christian Cox.
23       Q.  And, Mr. Cox, what do you do for a living?
24       A.  I'm a lawyer.
25       Q.  And do you practice criminal defense?
```

1    A.  I do.

2    Q.  Practice in Missouri and Kansas?

3    A.  I do.

4    Q.  All right.  Have you had clients charged in

5    federal court in either Kansas or Missouri who were

6    housed at CCA or CoreCivic?

7    A.  I have.  Many.

8    Q.  Many?

9    A.  Yes.

10    Q.  All right.  For how many years have you been

11    practicing?

12    A.  Well, I've been practicing law for 25 years, and

13    I've probably been doing a fair amount of federal

14    defense for the last six or seven years.  My father

15    before me was doing a lot of federal defense, and so I

16    worked on some of those cases with him as well.

17              THE COURT:  Can you speak into the-- pull

18    the microphone closer.  You can pull it closer too,

19    there you go.

20              THE WITNESS:  I apologize, Your Honor.

21    BY MS. BRANNON:

22    Q.  You had clients at CCA.  Did you visit your

23    clients in person at CCA?

24    A.  I did, often, yes.

25    Q.  All right.  And what was the purpose of your

1    visits at CCA?

2       A.   To discuss case matters with regard to that

3    individual client.

4       Q.   And when you went there and talked to clients

5    about these matters, did you believe that those

6    conversations in person were confidential?

7       A.   Absolutely.

8       Q.   And why did you believe that?

9       A.   Well, because I wouldn't expect that my

10   attorney-client conversations were being recorded and

11   listening, so...

12      Q.   All right.

13      A.   Is that your--

14      Q.   Yes.  Yes.

15      A.   Okay.

16      Q.   In the entire time that you've visited clients at

17   CCA, do you remember a time where you ever went to see

18   them to talk about something that was not case-related

19   or part of your representation of them?

20      A.   Never.

21      Q.   So a suggestion that maybe you would go-- or that

22   any attorney would go visit a client just to talk about

23   a football game or something like that, that was not

24   your practice?

25      A.   Well, I can't speak for others, but for me, no,

1   it was not a personal-- personal conversations.  It was

2   100 percent about the case.

3       Q.   You also accepted calls from your clients at CCA

4   to your phone number?

5       A.   I have, yes.

6       Q.   And can you tell us what that phone number is?

7       A.   (816) 335-1000 is the cell number.  I have two

8   office numbers, but many clients would call me on my

9   cell phone.

10      Q.   Is that what you told clients to do?

11      A.   Yes.

12      Q.   Okay.  Did you have conversations with clients

13  about whether your communications with them over the

14  phone were confidential?

15      A.   I just-- no, I just assumed that they were.

16      Q.   And why did you assume that?

17      A.   Because I just cannot imagine that my calls with

18  my clients were being recorded.

19      Q.   At the time that you had clients at CCA, did you

20  ever see anything-- did CCA ever make you aware that

21  there was a process by which you had to privatize your

22  number or have your number not recorded?

23      A.   Never.

24      Q.   Okay.  And how many years have you had clients at

25  CCA?

1        A.   Six or seven probably.

2        Q.   When your clients called that 1000 number, that

3   was directly to your cell phone, it was not through a

4   receptionist or front desk?

5        A.   Correct.

6        Q.   Do you remember ever hearing a preamble on those

7   calls?

8        A.   I do not.

9        Q.   You represented Brenda Wood at one time?

10       A.   I did.

11       Q.   And can you tell me when you began representing

12   her?

13       A.   I believe it was in 2014.

14       Q.   At some point was Brenda taken-- or Ms. Wood

15   taken into custody and placed at CCA?

16       A.   Yes, she was.

17       Q.   And do you remember when that was approximately?

18       A.   It's been four years.  I'm not-- I-- I can't say

19   exactly when, but it was after I had begun my

20   representation of her on-- on previous charges, and then

21   she was eventually charged with additional felonies.

22   I'm not sure exactly when that was, but it was sometime

23   within a couple of months of my initial entry of

24   appearance into the matter.

25       Q.   Did Ms. Wood ever make calls to your 1000 number

1  from CCA?

2     A.  Yes.

3     Q.  Did she make a lot of them?

4     A.  She did.

5     Q.  Were some of those substantive calls?

6     A.  They were all substantive calls.

7     Q.  Okay.  Would there have been times where maybe

8  she called you and missed you or you didn't answer,

9  something like that?

10     A.  Oh, yeah.  I mean, she was calling me several

11  times a day and so I always didn't pick up.

12     Q.  Right.

13     A.  She may leave a message.  Oftentimes she

14  wouldn't.

15     Q.  Do you remember at one point where you were

16  scheduled to have a detention hearing in her case?

17     A.  I do.

18     Q.  Were there a couple of detention hearings or just

19  one?

20     A.  You know, I remember being in court with her a

21  lot.  After the additional charges were filed after the

22  original indictment, those calls sparked, and I believe

23  that we had at least one or two hearings about that,

24  about those-- about those additional charges.

25     Q.  Your conversations on the phone with Ms. Wood,

 1   were those legal in nature?

 2        A.   Yes.

 3        Q.   And did you expect that those would be

 4   confidential?

 5        A.   Absolutely.

 6        Q.   Did you ever advise Ms. Wood that they were not

 7   protected?

 8        A.   I don't recall that.

 9        Q.   Would you have had any reason to tell her that

10   they were not protected?

11        A.   Absolutely not.

12        Q.   Who was the prosecutor on Ms. Wood's case?

13        A.   It was Jabari Wamble.

14        Q.   Mr. Wamble ever call you as part of the case just

15   to talk about the case?

16        A.   Oh, we talked on the phone several times.

17        Q.   All right.

18        A.   Many times.

19        Q.   At some point did you learn that your phone calls

20   with Ms. Wood had been recorded?

21        A.   At some point, yes, I-- I did learn that.

22        Q.   How did you learn that?

23        A.   I believe that you told me.

24        Q.   And do you remember when that was?

25        A.   Within the last year.

1    Q.   Were you aware that Mr. Wamble was requesting

2    recorded calls of Ms. Wood from CCA?

3    A.   I had no idea.

4    Q.   Were you aware that he obtained your recorded

5    calls with Ms. Wood?

6    A.   That is what I have been advised by your office.

7    Q.   Did Mr. Wamble ever tell you that?

8    A.   I have no recollection of him calling me and

9    telling me that.  Otherwise, I would've been really

10   upset and would've made every precaution to make sure

11   that my future phone calls were not recorded.

12   Q.   Back in 2014, early 2015, did you ever do

13   anything to cause your number to be privatized?

14   A.   I did not.

15   Q.   Because you didn't know that you needed to?

16   A.   I had no idea--

17   Q.   If you had been--

18   A.   -- until 2018.

19   Q.   Had you been told by Mr. Wamble or anyone else in

20   2014 that your calls were being recorded, would you have

21   taken any steps to make sure they were not?

22   A.   Well, absolutely.

23   Q.   And if Mr. Wamble called and said, I heard your

24   voice and have listened to calls between you and

25   Ms. Wood, what would your response have been?

1    A.   Well, I mean, my-- look, I like Jabari.

2    Q.   Sure.

3    A.   And I thought that we were friendly.  If he

4  would've called me and told me that he was listening to

5  my conversations with my client, I would have been very

6  direct with him.

7    Q.   Would you have asked for the calls back?

8    A.   I would've asked to-- to hear which calls he

9  recorded-- or he listened to, and then I would've made

10  sure that any future calls for any client, not just

11  Ms. Wood, were no longer recorded.  I guess there's some

12  affirmative action that needs to be taken of which I had

13  no idea.

14    Q.   You never received any calls in discovery?

15    A.   No.  Between my client and I?

16    Q.   Uh-huh.

17    A.   No.

18    Q.   All right.

19    A.   Not that I'm aware of, no.

20    Q.   And when you discovered that your-- your calls

21  were recorded and that they were in the possession of

22  the U.S. Attorney, did you go back to look through your

23  file to see if you had any communication or record of

24  being notified of that from Mr. Wamble?

25    A.   Yes, I did.  And I went through my e-mail and I--

1    I went through my file, and I didn't have any-- any

2    document indicating that, nor did I have an e-mail from

3    Jabari on it.  But again, I had been out of the case

4    since 2015, and so, you know, that's three years ago,

5    and I certainly have not received anything within the

6    last three years on-- on the *Brenda Wood* case, since

7    your office had taken over representation.

8        Q.   When we took over representation, you gave us

9    everything you had in the file?

10       A.   Yes.

11       Q.   All right.  And-- and you said something about

12   having an amicable relationship with Mr. Wamble.  Did

13   you want to be here today?

14       A.   Absolutely not.  I mean, I'm not interested in

15   ruining anybody's career.

16       Q.   You don't have anything against Mr. Wamble?

17       A.   No, no.  I mean, you know, we talk.  I thought we

18   were friends.  And, you know, I hope that I-- no, I

19   don't want to be here.

20       Q.   If we could look at Exhibit 570.  When I

21   contacted you about these calls, did you give me an

22   affidavit?

23       A.   I did.

24       Q.   All right.  And the purpose of that affidavit at

25   that time was to be used in Ms. Wood's case; is that

 1   correct?

 2        A.   That's correct.

 3        Q.   Have you had a chance to look at this recently?

 4        A.   I have.

 5        Q.   Is there anything about it that you want to add

 6   to or you think needs to be modified?

 7        A.   No, I think it's succinct, and I think it's

 8   accurate.

 9        Q.   In there it says you were shocked to find that

10   your calls were not-- that your calls had been recorded

11   essentially.

12        A.   Correct.

13        Q.   Were you also shocked to learn that those

14   recordings were in the U.S. Attorney's possession?

15        A.   Yeah, that-- that is quite-- quite a shock.

16   Correct.

17             MS. BRANNON:  All right.  Thank you,

18   Mr. Cox.

19             MS. VANBEBBER:  I have no questions.

20                  CROSS EXAMINATION

21   BY MR. CLYMER:

22        Q.   Mr. Cox, do clients ever call your office number?

23        A.   Sure, yes.

24        Q.   And so you have a different office number than

25   your cell number?

1      A.   Correct.

2      Q.   What's your office number?

3      A.   (816) 842-7400.

4      Q.   I'm not calling because I want to be a client, I

5  don't want to get your expectations up.

6      A.   I apologize, what?

7      Q.   I'm not trying to become a client, so I'm not--

8      A.   I understand that.

9      Q.   After this experience, do you continue to

10  represent clients who are incarcerated at CCA?

11      A.   Yes.  Yes, yes.  I have had clients at CCA

12  since-- since Ms. Wood I believe.  Correct.

13      Q.   So you still do?

14      A.   I don't think I have anybody over there right

15  now.

16      Q.   But you have had clients since Ms. Wood?

17      A.   Yes.

18      Q.   And since--

19      A.   I-- I believe so.  I believe so.  Again, you're

20  asking me to-- to recall something from five-- two to

21  three years ago.  I-- I have had a regular steady stream

22  of federal clients, some of whom were at CCA, yes.

23      Q.   So I imagine you got this (816) 842-7400 number

24  privatized.  Right?

25      A.   I-- no, I haven't done anything to do that.  I

1  figured that the system glitch had been recalled or

2  fixed.

3      Q.   So when you said repeatedly on direct examination

4  if you knew, you would've made sure your calls weren't

5  recorded, in fact, when you knew, you did nothing to

6  make sure your calls weren't recorded?

7      A.   Well, I mean, I-- I don't understand the

8  question.

9      Q.   Okay.  Knowing that your calls were not

10  privatized and that you could privatize your calls, you

11  did nothing to privatize your office line, did you?

12      A.   That's correct.  I-- I believe that that was

13  taken care of for me.  I-- I believe that in December of

14  that year my phone number was-- was taken off of the

15  recorded list, or something like that.

16      Q.   Did you ever check to make sure your cell phone

17  and your personal-- your office line were taken off?

18      A.   I assumed that-- that all of my phone numbers

19  were taken off the AUSA's recording list.

20      Q.   Now, you say in this affidavit--

21      A.   And I'm still yet to receive any information as

22  to how I go about getting all of my phone numbers taken

23  off the no-recording list.

24      Q.   You know where CCA-Leavenworth is.  Right?

25      A.   That's correct.

1    Q.   You've been over there.  Correct?

2    A.   I have.

3    Q.   Have you asked anybody there, how do I get my

4    number privatized?

5    A.   I haven't-- I'm not even sure I've been over

6    there since I found out about-- about this, so...

7    Q.   You've got a cell phone.  Correct?

8    A.   That's correct.

9    Q.   You've got an office phone.  Correct?

10   A.   That's right.

11   Q.   Did you ever pick up either one of those phones

12   and call CCA-Leavenworth and say, I'd like to get my

13   line privatized?

14   A.   No, huh-uh, I didn't.

15   Q.   Do you have an e-mail program?

16   A.   I do.

17   Q.   Did you ever send an e-mail to CCA-Leavenworth

18   asking for your number to be privatized?

19   A.   No, because I-- it's my understanding from the

20   PD's office that all of my information was taken out of

21   that recording system.

22   Q.   I noticed in this affidavit, Exhibit-- I think

23   it's 572, you say you don't remember any preamble

24   advising that the call may have been recorded?

25   A.   Correct.

1    Q.   Over the years, how many phone calls did you

2   receive on your cell phone from clients at CCA?

3    A.   I have no idea.

4    Q.   More than 100?

5    A.   Probably not.

6    Q.   Less than 100?

7    A.   Probably.

8    Q.   And is it your testimony that in all the calls

9   you received representing people for six to seven years

10  in federal court, you never noticed that there was a

11  preamble in every call a client made to you at CCA?

12   A.   That's correct.

13        MR. CLYMER:  I don't have anything further,

14  Your Honor.

15            REDIRECT EXAMINATION

16  BY MS. BRANNON:

17   Q.   Mr. Cox, the first time that you found out that

18  your recorded calls were in the possession of the United

19  States Attorney, I told you that your 1000 number had

20  been privatized for you?

21   A.   That's correct.

22   Q.   And that's the number that we discussed that you

23  usually give to clients to call you?

24   A.   Right.  That's correct.

25   Q.   All right.

1      A.   It's rare that-- that I speak with my clients on

2   the 842-7400 number because that's for secretarial,

3   incoming new clients, et cetera.  I normally deal with

4   my clients on the 335-1000 number.

5      Q.   When you have a-- you have a number of clients

6   from Western District of Missouri that were housed in

7   CCA, is that right, or some?

8      A.   Again, you know, without hearing names and-- and

9   all that, it's-- it's difficult to remember exactly who

10  was where, because now they're placing them in Bates

11  County and in different counties all over.  So I've seen

12  many clients in some of these county jails as opposed to

13  CCA because they're drug conspiracies and they separate

14  the defendants.

15     Q.   All right.  Are you on the CJA panel in Kansas?

16     A.   I applied for it, but no, I'm not on the panel.

17     Q.   All right.  Do you remember getting anything from

18  CCA or seeing anything at CCA telling you how to

19  privatize your number?

20     A.   Never.

21               MS. BRANNON:  Okay.  Thank you.

22               THE COURT:  Any other questions of Mr. Cox?

23               MR. CLYMER:  No, Your Honor.

24               THE COURT:  May he be excused?

25               MS. BRANNON:  He may.  Now we would call

 1   Captain Schechter.

 2            THE WITNESS:  Thank you, Your Honor.

 3            THE COURT:  All right.  I think we'll take a

 4   break for 15 minutes.

 5            (Recess).

 6            THE COURT:  All right.  You can be seated.

 7                CAPTAIN JARED SCHECHTER,

 8   called as a witness on behalf of the Federal Public

 9   Defender's Office, having first been duly sworn,

10   testified as follows:

11                DIRECT EXAMINATION

12   BY MS. BRANNON:

13       Q.   Would you state your name for the record, please?

14       A.   Jared Schechter.

15       Q.   All right.  You might pull the microphone just a

16   little closer.  And what do you do, Mr.-- is it Captain

17   Schechter?

18       A.   Captain Schechter.  I'm a captain with the

19   Sedgwick County Sheriff's Office in Wichita, Kansas.

20       Q.   And how long have you been at that job?

21       A.   A little over 19 years.

22       Q.   Federal detainees from the District of Kansas,

23   some of them are housed in Sedgwick County; is that

24   right?

25       A.   Yes.

1    Q.   All right.  When someone is housed at Sedgwick
2  County, there's a phone service provided to them?
3    A.   Yes.
4    Q.   And who provides the phone service, what company?
5    A.   Securus.
6    Q.   All right.  And are you familiar with how Securus
7  works?
8    A.   Yes.
9    Q.   Is there-- so is your system set up so that all
10  calls are recorded unless there's been a privatization
11  or no-record request?
12    A.   Yes.
13    Q.   All right.  Let's look at Defendant's
14  Exhibit 595, please.  Do you recognize this?
15    A.   Yes.
16    Q.   And what is it?
17    A.   It's a sign we have posted in our elevator as
18  access to the professional visitation area of our jail.
19    Q.   And what does this describe?
20    A.   It describes to attorneys how to notify us if
21  they need a number-- that our calls are recorded, and if
22  they need a number set as privileged or confidential,
23  and who to contact, and how that's done.  And if they
24  hear a recording saying the call is being recorded, it
25  is being recorded.

1       Q.   To go see someone in person at Sedgwick County,

2  an attorney has to ride that elevator.  Right?

3       A.   Yes.

4       Q.   And it's posted in a couple of places in that

5  elevator?

6       A.   Yes.

7       Q.   Is it posted anywhere else in the jail?

8       A.   It's posted above all inmate phone calls-- all

9  inmate phones, that calls are being recorded.

10      Q.   Is it posted at the front desk?

11      A.   The sign?

12      Q.   Uh-huh.

13      A.   I cannot be 100 percent on that right now.

14      Q.   All right.  Can you think of other ways that

15  Sedgwick County tries to inform attorneys about how to

16  privatize calls?

17      A.   We have quarterly meetings of attorneys, or the

18  undersheriff does.  And in that meeting in the past,

19  it's been discussed about our phone services.  And when

20  we change phone services, about how the phone services

21  work.

22      Q.   You were familiar about the process of actually

23  privatizing an attorney's number; is that right?

24      A.   Yes.

25      Q.   And can you just briefly describe that?

1    A.   Basically we put the number and the information

2   into our system, and there's a box that I and my staff

3   put information in, and they then check that box to make

4   the call confidential.  It still tracks the call was

5   made, but it's not recorded at that point.

6    Q.   All right.  There's a record of the call being

7   made, but the call itself is not recorded?

8    A.   Yes, ma'am.

9    Q.   All right.  Who is it that can go in and actually

10  privatize a number?

11   A.   People who are set as an administrator in our

12  system.

13   Q.   Who is it that can actually go to Securus to

14  obtain recorded phone calls through Sedgwick County?

15   A.   So through our Sedgwick County database--

16   Q.   Uh-huh.

17   A.   -- any law enforcement personnel has access to

18  our system or to listen to phone calls and those things.

19   Q.   And if we could look at Exhibit 4-- 594, please.

20  So in order to-- to access calls, do you have to have a

21  user account?

22   A.   Yes.

23   Q.   And can you tell us what a user account is?

24   A.   It's basically an account that allows them access

25  into the Securus system.  That basically puts in their

1  name, information, who they are, what kind of access

2  level we're granting them within the system.

3      Q.   Is this sort of like a log-in name, password

4  situation?

5      A.   Yes, ma'am.

6      Q.   Okay.  And is it Sedgwick County or Securus who

7  decides who can have a user access account?

8      A.   Sedgwick County does.

9      Q.   Is there a limit on who-- how many user access

10 accounts there can be?

11     A.   Not that I'm aware of.

12     Q.   And is it Sedgwick County who decides who can

13 have a user access account?

14     A.   Yes.

15     Q.   Does Securus have anything to do with that?

16     A.   For enrolling users, no.

17     Q.   Or saying who can be a user or not.

18     A.   No.

19     Q.   Okay.  You've provided a couple of spreadsheets

20 to us.  This is one of them.  Can you just briefly

21 explain what this represents?

22     A.   This represents the first page of our active

23 users in the system right now.  People who are active in

24 the system, who can monitor and listen to recorded phone

25 calls and receive notifications.

1    Q.   And so if we look at the user name, what comes

2    after the "@" sign?  What is that number?

3    A.   That's our facility ID with Securus.

4    Q.   So when you look at that or Securus looks at

5    that, they know that that ID belongs to Sedgwick County?

6    A.   Correct.

7    Q.   And the first part of the user name would be

8    whoever the user account is given to?

9    A.   Yeah.

10   Q.   And that would be the last name and first name

11   that follows.  The template, what is that?

12   A.   The template, basically that identifies their

13   access level.  It's what they call the column, template.

14   That's what their access level is within the system.

15   Q.   And the e-mail address, what does that have to do

16   with this?

17   A.   That's how they get notifications if they're

18   requesting to be notified about a call or information

19   like that.  It's also how-- our way of also verifying

20   who they are.

21   Q.   As I look through the e-mails, they appear to be

22   mostly governmental entities; is that right?

23   A.   Correct.

24   Q.   And that's a requirement before you get a user

25   access account through Sedgwick County.  Do you have to

1    be law enforcement?

2        A.   Law enforcement.

3        Q.   All right.  And the last log-in date just is

4    exactly what it says.  Right?

5        A.   Correct.

6        Q.   If I were to go pull records to see who had

7    accessed a particular inmate's records, would those

8    records go back to the user account or just to Sedgwick

9    County, if you know?

10       A.   I'm trying to understand your question correctly.

11   If you're wanting to know who accessed an inmate's phone

12   call--

13       Q.   Right.

14       A.   -- it would be-- our record would be that.  We

15   would be able to pull a report like this which would

16   show who accessed the phone call and what they did with

17   the phone call.

18       Q.   It wouldn't just show that it went through the

19   Sedgwick County platform, so to speak, but it would show

20   who it was, which user access account actually accessed

21   that?

22       A.   Correct.

23       Q.   All right.  Do you have any restrictions on

24   whether these user access names and accounts are shared

25   outside of the person they're assigned to?

1    A.   The person they're assigned to is expected to be

2    the only user of that account.

3    Q.   All right.  So if we see calls accessed by that

4    user, it's a fair assumption that that user accessed the

5    calls?

6    A.   Correct.

7    Q.   All right.  Defendant's Exhibit 593, you also

8    brought a list of inactive users; is that right?

9    A.   Correct.

10   Q.   So these are just people that at one time had an

11   account and no longer do?

12   A.   Correct.

13   Q.   And if there is no last log-in date, does that

14   mean that they never accessed calls?

15   A.   I believe so.

16   Q.   All right.  And although this just shows the

17   log-in date, is it possible to run a report to show

18   every time that that user account has accessed calls?

19   A.   It should be.

20          MS. BRANNON:  All right.  Your Honor, we'd

21   go ahead and move to admit Exhibits 593, '94, and '95.

22          MR. CLYMER:  I believe Ms. Brannon wanted

23   '93 and '94 sealed; is that correct?

24          MS. BRANNON:  Yes, Your Honor.  We would ask

25   them to be sealed.  Securus' counsel will testify next

1   week.  We're taking witnesses a little bit out of order,
2   but they had some proprietary concerns.
3              THE COURT:  Okay.  So 593 and 594 should be
4   admitted under seal.  595 just admitted without being
5   sealed; is that correct?
6              MR. CLYMER:  No objection, Your Honor.
7              MS. BRANNON:  Yes.
8              THE COURT:  Okay.  593, 594 admitted under
9   seal.  595 also admitted but not under seal.
10  BY MS. BRANNON:
11     Q.  When you get a subpoena or a request for recorded
12  calls at your facility, who fulfills that request?
13     A.  We have two intelligence corporals, and that's
14  part of their job duties, is they fill that request,
15  they turn it over to me to be reviewed, and then I
16  actually sign an affidavit that goes along with those
17  requests.
18     Q.  And would those corporals be the actual ones who
19  accessed the calls?
20     A.  Correct.
21     Q.  And so it would be their user name that shows
22  that they accessed the calls?
23     A.  Correct.
24     Q.  Do you have a system for keeping track of why
25  they accessed the calls?  In other words, is it tethered

1  somehow to the subpoena or written request?

2      A.  We make an extra copy for our record to document

3  why we did it.

4      Q.  All right.  Very good.

5              MS. BRANNON:  If I could have just one

6  moment, Your Honor.

7  BY MS. BRANNON:

8      Q.  These documents that you brought, Captain, are

9  they actually documents that were produced by Securus?

10     A.  These documents that I brought were produced by

11 us.

12     Q.  By what?

13     A.  They were produced by us with our log-in into the

14 system.  We produced them.

15     Q.  So you produced them but through the Securus

16 platform?

17     A.  Correct, through their platform.

18     Q.  All right.

19              MS. BRANNON:  All right.  Thank you very

20 much.

21              THE COURT:  Any questions?

22                  CROSS EXAMINATION

23 BY SPECIAL MASTER COHEN:

24     Q.  Good afternoon.

25     A.  Good afternoon.

1      Q.   Have we met?

2      A.   Maybe.  I-- I don't know.

3      Q.   I'm trying to remember myself.  I visited

4  Sedgwick and I was given a tour about a month ago.

5      A.   Yes.  It flashes all back now.

6      Q.   We were wearing different-- we weren't quite so

7  dressed up then.

8      A.   Correct.

9      Q.   You're familiar with-- is this report that we're

10 looking at produced using a-- kind of a Securus website

11 log-in?

12     A.   Correct.

13     Q.   And do you have access to that Securus site

14 yourself?

15     A.   Yes.

16     Q.   Have-- have you ever run a report on the number

17 of attorney telephone numbers that have been privatized?

18     A.   On the number of calls we privatized, no, I've

19 not run a report for that.

20     Q.   Do you have any idea how many attorney telephone

21 numbers are privatized for the Sedgwick County Jail

22 site?

23     A.   I wouldn't be able to give you an answer to that

24 today.

25     Q.   Who is it that receives the attorney telephone

1   numbers for privatization?

2       A.   It would either be-- it would be Lieutenant

3   Taylor right now who filled former Lieutenant Mylan's

4   (phonetic) position.

5       Q.   I'm sorry.  Did you say you do sometimes?

6       A.   I do it sometimes too.  If he's off on vacation

7   or sick, then I fill in and do that.

8       Q.   Could you take an educated guess as to how many

9   attorney telephone numbers are in the system that are

10  privatized?

11      A.   I wouldn't be able to take a guess right now.

12      Q.   Has it always been the case that there has been

13  some sort of public notification to attorneys that they

14  can privatize their numbers?

15      A.   Again, the colonel has bar meetings with them

16  about every quarter, and she's talked to them several

17  times about this, to let them know to make us aware.

18          SPECIAL MASTER COHEN:  Okay.  That's all I

19  have.  Thank you very much.

20          THE WITNESS:  Yep.

21                  CROSS EXAMINATION

22  BY MR. CLYMER:

23      Q.   Is it Captain?

24      A.   Yeah.

25      Q.   Captain, suppose I was a qualifying law

1    enforcement officer somewhere in the area, what would I

2    do in order to become a user?

3        A.   You'd either send an e-mail or you would make a

4    phone call to our intelligence section and request

5    access.

6        Q.   And are there any qualification requirements,

7    other than being law enforcement?

8        A.   In our agency, no.

9        Q.   Okay.  So if I were a law enforcement officer and

10   I made a request and you verified that I was a law

11   enforcement officer, I now become a user.  Right?

12       A.   Correct.

13       Q.   And what-- what privileges or rights do I have as

14   a user?  What can I do?

15       A.   You'd have investigator access.  You would be

16   able to listen to phone calls, look through the history

17   of phone calls.  You could receive an alert if a certain

18   number was called.  You'd be able to listen to that call

19   live with what was going on if you're trying to capture

20   some information.

21       Q.   So I can actually get real-time phone-- phone

22   intercepts if I'm-- just by being a user?

23       A.   Correct.

24       Q.   If an attorney does not privatize his or her

25   phone number, is there a warning that goes on the call?

1       A.   It states that the call is being recorded.

2       Q.   And is it the policy of the Sedgwick County

3  Detention Facility and Securus in that situation, where

4  those calls are fair game for any user in your system?

5       A.   If it's a recorded call, anyone can listen to it.

6       Q.   So if an attorney doesn't know to privatize his

7  or her calls or is not diligent and doesn't privatize

8  his or her calls, that attorney's communications with

9  clients can be listened to in real-time by any law

10 enforcement officer who's a user of this system; is that

11 right?

12      A.   It could be.

13      Q.   Do law enforcement officers in the state of

14 Kansas have an obligation to notify attorneys if they

15 overhear their attorney-client calls under those

16 circumstances?

17      A.   I don't know if all law enforcement in Kansas

18 have that order.  I can't answer for that.

19      Q.   So a law enforcement officer could for years and

20 years and years intercept in real-time or after-the-fact

21 calls of an attorney who fails to privatize his number

22 in your system; is that right?

23      A.   Correct.

24      Q.   And no prosecutor who has professional

25 responsibility obligations has to get involved in that

 1  process at all; is that right?

 2      A.  No prosecutor has to be involved, no.

 3          MR. CLYMER:  I don't have anything further,

 4  Your Honor.

 5                 REDIRECT EXAMINATION

 6  BY MS. BRANNON:

 7      Q.  For any of the scenarios that the prosecutor

 8  posed to you, such as the real-time access, under this

 9  system you would be able to-- you would have a record of

10  which user account accessed those calls.  Correct?

11      A.  Correct.

12          MS. BRANNON:  Nothing further.

13          THE COURT:  Anything more from--

14          MR. CLYMER:  Yes, just a couple questions.

15                 RECROSS EXAMINATION

16  BY MR. CLYMER:

17      Q.  And that officer who did that wouldn't have done

18  anything wrong, would he?

19      A.  Knowingly listening to an attorney-client call?

20  I--

21      Q.  An unprivatized attorney-client call.

22      A.  Personally, I would say yes, that's-- that's

23  wrong.

24      Q.  But there's no-- it's not against the law, is it?

25      A.  I can't speak to that.  I don't know.

1      Q.   Okay.  Then there's-- as you told us, there's no

2   professional responsibility obligation, is there?

3      A.   For the whole state, I don't know what the whole

4   state's stance would be on that.

5      Q.   Is there anything in the user contract that

6   prevents a law enforcement official from doing that?

7      A.   Prevents them from listening?

8              MS. BRANNON:  This is outside the scope of

9   redirect.

10             THE COURT:  I agree.

11             MR. CLYMER:  Nothing further, Your Honor.

12             THE COURT:  All right.  May Captain

13   Schechter be-- oh, I'm sorry.

14                    RECROSS EXAMINATION

15   BY SPECIAL MASTER COHEN:

16     Q.   Very quickly.  Have you ever gotten any

17   complaints from any attorneys who said that they asked

18   for their number to be privatized and then it wasn't?

19     A.   No, sir.

20     Q.   Are you aware that Securus-- sometimes the system

21   doesn't work the way it's supposed to and that numbers

22   that were privatized, calls are recorded anyway?

23     A.   I'm not aware of that, but technology, it could

24   happen.

25             SPECIAL MASTER COHEN:  Thank you.

1              THE COURT:  All right.  Anything more?

2              MS. BRANNON:  No, Your Honor.

3              THE COURT:  May Captain Schechter be

4      excused?

5              MS. BRANNON:  Yes.

6              THE COURT:  You're excused.  Thank you.

7              THE WITNESS:  Thank you.

8              THE COURT:  Yes.

9              MS. BRANNON:  Call Captain Stewart.

10                   CAPTAIN TOBY STEWART,

11     called as a witness on behalf of the Federal Public

12     Defender's Office, having first been duly sworn,

13     testified as follows:

14                   DIRECT EXAMINATION

15     BY MS. BRANNON:

16     Q.   Could you state your name for the record?

17     A.   Toby Stewart.

18     Q.   And it's Captain Stewart?

19     A.   Captain Stewart.

20     Q.   And what do you do for a living?

21     A.   I'm the operations captain at the Butler County

22     Detention Facility.

23     Q.   How long have you been in that role?

24     A.   A few months.

25     Q.   Not so long?

1     A.  Yes.

2     Q.  All right.  I want to talk to you just a little

bit about the phone system at Butler County.  Butler

County houses Kansas federal detainees?

5     A.  That is correct.

6     Q.  You house other people as well.  Right?

7     A.  Correct.

8     Q.  While someone is in custody at Butler County, you

provide a phone system for them?

10    A.  That is correct.

11    Q.  What company provides your phone service?

12    A.  Securus.

13    Q.  And during your short months at Butler County,

have you become a little bit familiar with how Securus

works?

16    A.  Minimally, yes.

17    Q.  And as a part, well, of coming here today, did

you bring some documents with you that I requested?

19    A.  I did.

20    Q.  All right.  We've already covered in this

courtroom about how calls are privatized and so forth,

so I want to talk to you about user access accounts.

And if we could look at Defendant's Exhibit 596.

24        While we're bringing that up, let me ask you

this:  Do you have a system for privatizing calls at

1   Butler County?

2       A.   Securus has a system, correct.

3       Q.   Okay.  And do you know how that works?

4       A.   Yes.

5       Q.   And how is that?

6       A.   Okay.  So the attorney can provide us with a

7   phone number that can be set basically as private.  So

8   once it's received, hopefully either by phone or-- or by

9   fax, e-mail, however we receive the correspondence, we

10  usually try to get those numbers set as private within

11  the system and then give some sort of response back out

12  to the attorney letting them know that we have, in fact,

13  privatized the number.

14      Q.   By that point-- when you say "privatize," that

15  means that calls to that number will no longer be

16  recorded?

17      A.   Correct.

18      Q.   All right.

19      A.   In the system itself it will show that the phone

20  call existed, but you are unable to play the recording

21  or download the recording.

22      Q.   How is it that you let attorneys know about this

23  privatization process?

24      A.   I cannot tell you as of this time--

25      Q.   Because you haven't been there that long?

1    A.  -- because I haven't been there that long, that's

2    correct, ma'am.

3    Q.  Fair enough.  All right.  Let's talk about these

4    documents that you brought with you.  You're looking at

5    596.

6    A.  Okay.

7    Q.  I've given you a hard copy, but it's also on the

8    screen in front of you.  This is a list of user access

9    accounts; is that your understanding?

10    A.  Correct.

11    Q.  All right.  How are the user access accounts set

12    up?

13    A.  Anybody who has administrative privileges--

14    Q.  Uh-huh.

15    A.  -- can go in and actually create an account.

16    Q.  All right.  Who has administrative privileges?

17    A.  I do, as of just recently.  As of just recently,

18    all three of my lieutenants have administrative

19    privileges, as well as our facility detective and

20    another captain.

21    Q.  All right.

22    A.  The other captain at the facility.

23    Q.  So any of these people can actually set up a user

24    account for someone else to access calls--

25    A.  Correct.

1    Q.   -- at Securus?

2         All right.  What is the criteria for someone

3    getting a user account?

4    A.   We do not have anything in place at this time

5    that I know of since I just took over the position.  We

6    actually have a future meeting set up to discuss this.

7    The former captain used to take care of the user

8    administrative side and there wasn't too many people out

9    there now that still-- that knew how to do that.

10   Q.   All right.  If we look at this particular chart

11   that you've brought, I want to ask about a couple of the

12   columns.  The first one is "template."  Can you explain

13   to me what that column represents?

14   A.   Template?

15   Q.   Uh-huh.

16   A.   Basically that is what-- as a user or

17   administrator, when you set up an account, you would

18   assign the user that you're setting up the account for a

19   template.  The template basically is what provides them

20   the permissions as well as any restrictions or

21   limitations that the user will have.

22   Q.   So when, for example, the template is booking,

23   what does that give them access to?

24   A.   I'd have to refer to my notes because I do not

25   know.

1     Q.   Okay.  All right.  Does the template represent
2  different levels of access for that person?
3     A.   Correct.  Correct.
4     Q.   So someone who has full access to any calls, do
5  you know what that template would be?
6     A.   That would be mine.  I'd have to refer to it, but
7  I believe it's "administrator-everything."
8     Q.   Okay.  And so it's possible for you to set the
9  level of access a user account has?
10     A.   Correct.
11     Q.   Do you know if you keep a record about how
12  someone became a user?
13     A.   I am not aware of any that the facility keeps.
14  The system itself keeps a record of what the-- each user
15  does.
16     Q.   When we go over to "Job Title," that's just
17  describing who the user is.  Correct?
18     A.   Correct.  And that's-- all these were formerly
19  created by the former administrator.
20     Q.   And is there some verification of who the user is
21  in relation to their job title?
22     A.   Can you restate that?
23     Q.   When someone applies and says, I work for Shawnee
24  County sheriff, is there some verification process to
25  make sure that they actually do?

1    A.   There's always a verification process.  I do not

2  know what the verification process was, and we're still

3  discussing what future verification processes will be.

4    Q.   If someone has never-- if we look at the last

5  column, "Last Log-in Date," if it's blank-- I'm sorry,

6  if it's blank, does that mean they have never logged in?

7    A.   No.  That just means that their account is

8  inactive at this time.

9    Q.   In the column that's marked "Active," it means

10  that they can log on and get access?

11    A.   Correct.

12    Q.   If the last log-in date is blank, it just means

13  they're not using it; is that right?

14    A.   Correct.

15    Q.   Okay.

16    A.   That's my understanding.

17    Q.   Let's look at a couple of the other documents you

18  brought with you.  I apologize.  On that particular

19  document, 596, in the "Active," it includes active and

20  inactive users.  Correct?

21    A.   Correct.

22    Q.   They're not split.  All right.  Thank you.  So

23  Exhibit 597, can you tell us what this document is?

24    A.   Let me see.  Sorry.  That is the user templates.

25  So I provided-- so before, we were looking at documents,

1    and it told you what template was being used.

2        Q.   Right.

3        A.   This would be the permissions and/or restrictions

4    for the template itself.

5        Q.   So if we look, for example, at the second page on

6    "Monitor-Scan Patrol," that has a checkmark that they

7    can view certain things but they can't change anything

8    in the system; is that accurate?

9        A.   Correct.

10       Q.   So it's sort of you may have a role and then

11   certain rights are assigned to that role?

12       A.   Correct.

13       Q.   Okay.  And that's what 597 represents?

14       A.   Correct.

15       Q.   Is there anything else on 597 that you'd like to

16   point out that--

17       A.   No.

18       Q.   Okay.  And it is Butler County that actually sets

19   the description level?

20       A.   Correct.

21       Q.   Let's look at 598.  And can you tell us what this

22   document is?

23       A.   I would say it's the exact same document that we

24   just looked at, just a different template.

25       Q.   Okay.  So I can take these two documents and

1   compare and see that there are differences in the roles

2   and rights assigned?

3       A.   Correct.

4       Q.   Okay.  And finally, looking at Exhibit 599.  And

5   please explain this document.

6       A.   This is how the system tracks what the user does.

7   So this was an example provided of how the system does

8   that.  So for each user, no matter what they do on the

9   system, whether they listen to a recording, whether they

10  do a search, whether-- whatever they do on the system,

11  the system tracks it.

12      Q.   Because you have a user account name assigned to

13  a particular investigator or law enforcement officer,

14  you can track what that particular user did within the

15  Securus system?

16      A.   We can.

17      Q.   If they requested recorded calls from a certain

18  time span, that would show up on a report like this?

19      A.   It should.

20      Q.   If they called in just to listen to calls without

21  downloading, would that show up as well?

22      A.   It should.  I'm unclear, though, as-- I haven't

23  seen too many of these reports.

24      Q.   Uh-huh.

25      A.   So I'm assuming it does.

16-20032-JAR   USA v. Karl Carter (Black) 10.03.18          969

 1      Q.   A report like this would reflect any activity of
 2   that user when they logged into the Securus system?
 3      A.   It should.
 4      Q.   All right.  When someone's account has been made
 5   inactive, can they still sign in?
 6      A.   No.
 7      Q.   That is an action taken by you to deactivate an
 8   account?
 9      A.   Correct, an administrator, yes.
10      Q.   Do you have any restrictions set on whether
11   someone with a user account can give that information to
12   someone else to use?
13      A.   I'm not aware of any right now.
14           MS. BRANNON:  All right.  Thank you very
15   much.
16           THE WITNESS:  Yeah.
17                    CROSS EXAMINATION
18   BY SPECIAL MASTER COHEN:
19      Q.   Good afternoon.
20      A.   Good afternoon.
21      Q.   Have we met before?
22      A.   No.
23      Q.   Did we meet at the jail maybe middle, end of July
24   when I took a tour with Marshal Miller?
25      A.   Perhaps, yes.

1   Q.  We were a little bit less formal than we are

2   today?

3   A.  Correct.

4   Q.  It was a fairly brief meeting.

5   A.  Yes, sir.

6   Q.  Are you aware that phone numbers can be

7   privatized so that inmates at your jail, if they call

8   that number, it isn't recorded?

9   A.  Restate that, please, sir.

10  Q.  Are you aware that the Securus system that you

11  have has a privatization function?

12  A.  Correct.

13  Q.  So that-- and that function works this way:  A

14  telephone number is marked as private, and that way if

15  an inmate calls that number it isn't recorded?

16  A.  Correct.

17  Q.  Okay.  Do you have any idea how many telephone

18  numbers are privatized in the Sedgwick County system?

19  A.  I have no idea.

20  Q.  Have you ever privatized a number yourself?

21  A.  No, I have not.

22              SPECIAL MASTER COHEN:  Okay.  Thank you very

23  much.

24              THE WITNESS:  Okay.  Thanks.

25                   CROSS EXAMINATION

```
1   BY MR. CLYMER:

2       Q.  Good afternoon.

3       A.  Afternoon.

4       Q.  I'm interested in these templates, 597 and 598.

5   Do you have copies in front of you?

6       A.  They're on the ground.

7       Q.  Here you go.

8       A.  Okay.

9       Q.  597 says "Investigator CID Level."  I'm from out

10  of state, you'll have to forgive me.  What's an

11  Investigator CID Level I?

12      A.  I cannot tell you.

13      Q.  And the second template, 598, is an investigative

14  template for all investigators.  Do you see that?  Do

15  you know the difference between the two?

16      A.  I do not.

17      Q.  Okay.  If you look at the second page of 597 on

18  the permissions, the second one down, it says,

19  "monitor/listen to live calls and recordings," and it's

20  checked in both of the boxes.  Do you see that?

21      A.  Okay.

22      Q.  Can you tell us what that means?

23      A.  Can you-- which ones again?

24      Q.  Sure.

25      A.  I'm sorry.  I was still trying to find it.
```

1    Q.   That's all right.  There's six lines right in the

2    middle of the page.

3    A.   Okay.

4    Q.   Each one begins with the word "monitor."  The

5    second one down says, "Monitor/listen to live calls and

6    recordings," and there's two checked boxes.  Do you see

7    that?

8    A.   Yes.

9    Q.   Can you tell us what that means?

10    A.   I really can't.  This is new to me as well.

11    Q.   One other question.  Actually, a couple other

12    questions maybe.  Five-- 589.  I'm sorry, 599.  No, 589,

13    the last one, the one that reports the-- the activity

14    log.  Do you know what this is used for?

15    A.   I'm sorry?  I--

16    Q.   It's this one.  My eyes are going bad.

17    A.   Okay.  So explain that again.

18    Q.   Yeah.  Do you know what that report form is used

19    for?

20    A.   The report form itself?

21    Q.   In other words, when would you pull up that and

22    look at information on it, under what circumstances?

23    A.   I've only pulled this up for the subpoena.  That

24    was it.

25    Q.   You've never had occasion to do it any other

1   time?

2      A.   I have never had an occasion to do it any other

3   time.

4      Q.   On the-- on the outgoing calls by inmates in

5   Butler County, is there a warning that tells them that

6   the call is being recorded and monitored?

7      A.   That is correct.

8      Q.   And is that on every call unless it's privatized?

9      A.   Every call.

10     Q.   Okay.  And so if an attorney doesn't privatize

11  his number with Securus or Securus goofs up for any

12  reason and fails to properly privatize, that attorney's

13  calls will get recorded in the system.  Correct?

14     A.   Correct.

15     Q.   And users will have free access to those calls.

16  Right?

17     A.   Correct.

18     Q.   But the attorney will hear that recording when

19  his client calls him?

20     A.   That is correct.

21     Q.   Thank you.

22         MR. CLYMER:  Nothing further, Your Honor.

23         THE WITNESS:  You're welcome.

24         MR. CLYMER:  I'll take that one back.

25  That's this one.

1           MS. BRANNON:  Your Honor, I-- I have a

2    couple of questions that I just missed the first time

3    around because we just got those documents, if I could

4    ask those.  They're outside the scope, but they will be

5    rather quick.

6                    REDIRECT EXAMINATION

7    BY MS. BRANNON:

8        Q.  If we could look at Exhibit 596 on the third

9    page.  I'm going to direct your attention on the screen,

10   because we're going to blow this up.  And I want to look

11   at the e-mails that indicate who the user account is

12   assigned to.  And if we look at that e-mail column, the

13   first one, does that indicate that that user is with the

14   KBI?

15       A.  Looking at the e-mail it looks like it's, yes,

16   KBI.

17       Q.  If we go down a couple, we've got Steve Rowe with

18   the U.S. DOJ?

19       A.  Uh-huh.

20       Q.  But that person is not active.  Correct?

21       A.  Correct.

22       Q.  If we go down a little bit further, we get to

23   Justin Sprague with the ATF?

24       A.  Okay.

25       Q.  Those are the sorts of entities that have user

1  accounts through Butler County; is that right?

2      A.  That's correct.

3      Q.  Law enforcement?

4      A.  Correct.

5      Q.  And sometimes federal law enforcement?

6      A.  Correct.

7      Q.  And so when they would log on to get phone calls,

8  those records and that access of those phone calls would

9  trace back to this e-mail?

10     A.  I believe so.  I couldn't answer that, but yes.

11     Q.  Or to this user account that's assigned?

12     A.  To this user account with this e-mail, yes.

13     Q.  All right.  Thank you.

14             MS. BRANNON:  Nothing further, Your Honor.

15             THE COURT:  Anything more?

16             SPECIAL MASTER COHEN:  No.  Thank you,

17  Judge.

18             MR. CLYMER:  No, Your Honor.

19             THE COURT:  All right.  May Captain Stewart

20  be excused?

21             MS. BRANNON:  Yes.

22             THE COURT:  All right.  You're excused.

23  Thank you.

24             MS. BRANNON:  We appreciate the Special

25  Master letting us call some witnesses out of order, and

1   we'd turn it back over to the Special Master.

2                THE COURT:  All right.  Call your next

3   witness.

4                MS. VANBEBBER:  I would call Pauletta Boyd.

5                    PAULETTA BOYD,

6   called as a witness on behalf of the Special Master,

7   having first been duly sworn, testified as follows:

8                    DIRECT EXAMINATION

9   BY MS. VANBEBBER:

10     Q.   Ms. Boyd, how long have you worked for the U.S.

11  Attorney's Office?

12     A.   Well, I was in Western District for a while, and

13  then I came over here.  So it's been-- I've been with

14  the government 35 years almost.

15     Q.   And what's your current position?

16     A.   Litigation support specialist.

17     Q.   What does that mean?

18     A.   I help prepare evidence for trial electronically

19  and help them display their evidence at trial.

20     Q.   So that would include pictures and phone calls,

21  records of phone calls, video, whatever-- whatever is

22  available, whatever the attorney needs?

23     A.   Yes.

24     Q.   All right.  I want to draw your attention first

25  to-- well, you know we're here for the *Black* case.

1    A.  Yes.

2    Q.  And I'll be asking you questions about first the

3  *Black* case, the basics, and then I'll be asking you

4  questions about the Special Master's investigation.

5    A.  Okay.

6    Q.  You are the person who made an index for the

7  phone calls that were collected from CCA, the

8  recordings, to send out in discovery; is that right?

9    A.  I don't understand what you mean by an index.

10   Q.  Pardon me?

11   A.  I don't understand what you mean by an index.

12   Q.  Well, when you send out-- you sent out the

13 discovery--

14   A.  Yes.

15   Q.  -- for the phone calls-- for recorded phone calls

16 to the defense counsel.  Is there no index that goes

17 with them, or is it just the bare discovery?

18   A.  We send what we call a Bates log that talks about

19 the beginning Bates number and the ending Bates number

20 for specific items.

21   Q.  Do the mic.

22   A.  We do what we call a Bates chart, and it will

23 list any documents that have Bates numbers on them that

24 relate to any items, but I didn't really create an

25 index.

1    Q.   But you did send out the recordings to counsel?

2    A.   Yes.

3    Q.   You testified that you e-mailed-- do you remember

4    when you testified in the *Dertinger* case--

5    A.   Sort of.

6    Q.   -- that you-- you told the Court then that you

7    e-mailed Erin Tomasic when you got the phone index.  Is

8    that what you're talking about?

9    A.   No.  I was talking about the index from the

10   videos that came from CCA.

11   Q.   Did she ever ask to view the videos?

12   A.   No.

13   Q.   All right.  Now, let's see if we can get at least

14   a chronology because we've had a lot of different

15   testimony.  And you are the keeper of the records, so

16   we'll ask you.

17       Do you recall getting the original hard drives

18   from the CCA video surveillance on June the 2nd of 2016?

19   A.   I don't remember the date specifically because

20   I'm not a date person, but I do know it was in June.

21   Q.   If the record reflects-- or if Agent Seubert

22   remembers June 2nd, is that appropriate?

23   A.   That would be right.

24   Q.   All right.  What did he bring you?  Did he bring

25   you copies or did he bring you the original the first

1    time around?

2        A.   The originals.

3        Q.   He brought you the originals and did you-- what

4    did you do with them?

5        A.   I told him I didn't want the originals.  I don't

6    work off of originals, and I asked him to make copies.

7        Q.   All right.  And did someone do that?

8        A.   Yes.

9        Q.   And then did Agent Matushek bring them back,

10   bring the copies back to you?

11       A.   I don't specifically remember how I got them

12   back, I just know that I did.

13       Q.   When you got them back, were they in boxes?  The

14   hard drives, were they in boxes?

15       A.   Yes.

16       Q.   What color were the boxes?

17       A.   Gray and black.  They were the boxes that they

18   were actually purchased in.

19       Q.   All right.  And then what did you do with them?

20       A.   Initially I tried to see what was on them.

21       Q.   And you didn't accomplish that, did you?

22       A.   No.

23       Q.   No.  So you discovered you had to have more

24   equipment in order to read them or look at them.  Right?

25       A.   Correct.

1      Q.   So did you get a-- a-- just an ordinary external

2  docking station for them?

3      A.   Yes.

4      Q.   And then did you-- were you able to-- you still

5  had more to have to go to play them, didn't you?

6      A.   Yes.

7      Q.   So what did you get?

8      A.   I contacted Agent Seubert again, told him that

9  there was no software included with the drives and that

10  I would need something, you know, in order to do that.

11  And he got me in contact with Agent Matushek.

12      Q.   And so did Agent Matushek then provide you with

13  a-- with the software that you're just talking about?

14  It's called a PELCO player?

15      A.   Yes.

16      Q.   And once you had-- got the PELCO player, were you

17  able then to view-- or anybody could view them if-- they

18  would have to stick the hard drive into the external

19  docking station.  Right?

20      A.   Right.

21      Q.   And then you would have to have the disk for the

22  player inside there as well, put the disk into whatever

23  computer you were going to put them on.  Right?

24      A.   Correct.

25      Q.   And then you could view them.  Right?

1    A.   Yeah, but it was more difficult than that.  The

2   viewer was very complicated.

3    Q.   Okay.  Explain it to me.

4    A.   Well, the player was very complicated.  And so I

5   loaded the player and I put the first DVR in, and I

6   tried to bring up a video and I still couldn't do it.

7   So I contacted Agent Matushek again.  And over the phone

8   we talked about-- he had looked up instructions online.

9   We walked through it, and I was finally able to look at

10  the first DVR.

11   Q.   So you-- at this point you were the only person

12  who had control of anything that had to do with those

13  video files.  Correct?

14   A.   Yes.

15   Q.   Did you make-- how many disks-- at that point you

16  had the player disk that-- that they had provided to

17  you, right, that Treasury had provided to you.  And then

18  you had the option, if you wanted to, to make more disks

19  from that.  Correct?

20   A.   Correct.

21   Q.   And at that point, did you?

22   A.   No.

23   Q.   So you're the only one, you've got the only disk

24  and you've got the-- the only copies of the--

25   A.   At that time.

1    Q.   -- of the hard drives at that time.

2    A.   Yes.

3    Q.   All right.  So then when did you make a disk for

4    KBI Agent Stokes?

5    A.   Early part of July, I think.  Like I said, I'm

6    not a really good date person, but I think it was the

7    early part of July.

8    Q.   If Agent Stokes' testimony verifies that, that's

9    the way you remember it?

10   A.   Yes.

11   Q.   Do you know-- did he-- what did he tell you he

12   was going to use-- what computer was he going to use for

13   playing disk-- the player disk?

14   A.   His own.

15   Q.   His own personal or his own KBI?

16   A.   I would assume it was KBI.  I don't know that for

17   a fact.

18   Q.   Where did he tell you he was going to keep it?

19   A.   The computer?

20   Q.   The disk.

21   A.   I don't think he-- I don't remember him telling

22   me where he was going to keep them.

23   Q.   All right.  So you made him a disk.  And then did

24   you give him a cheat sheet for how he could figure out

25   how to use it?

16-20032-JAR   USA v. Karl Carter (Black) 10.03.18          983

1      A.   I did.

2      Q.   And to your knowledge, did he manage to do that?

3      A.   I don't know.  I never found out if he was

4  successful or not.

5      Q.   Did you ever talk to him again about how he used

6  that CD--

7      A.   No.

8      Q.   -- or that disk?

9      A.   Not that I remember, no.

10      Q.   Did you give him-- did you send him home with the

11  hard drives?

12      A.   No.  They were still in my office after we

13  discussed, you know, how to load the player and the

14  cheat sheet.  They remained in my office.

15      Q.   So he would not need the hard drives anymore?

16      A.   He didn't take them at that time.

17      Q.   How would he play them without having the

18  external docking station to put the hard drives in?

19      A.   Well, he wouldn't.  But I'm just saying at that

20  point, after I told him how to do it, he didn't take

21  them at that point.  I know that later he did take them.

22      Q.   So you know that at some point he had possession

23  of the copies, the hard drive copies, the U.S.

24  Attorney's copy, and he had the ability to go ahead and

25  play them because he had the disk as well; is that

1   right?

2       A.   I think, if I remember right, and I'm not

3   100 percent sure, but I was gone when he had them, so I

4   didn't know that they were even gone.  So I didn't know

5   anyone had reviewed them.

6       Q.   So he never told you whether he made another copy

7   of the player?

8       A.   No.

9       Q.   Whether he had some other agents make copies of

10  that from his?

11      A.   No.

12      Q.   He never told you what-- whether he ever played

13  them?

14      A.   Not that I remember, no.

15      Q.   And did he ever tell you whether anybody asked

16  him to give them-- to give them copies of what he had?

17      A.   We never had a discussion, that I remember, about

18  that.

19      Q.   So as long as he had the hard drives and the

20  player, he or anybody he gave permission to could've

21  watched everything in that set-- copy set that the U.S.

22  Attorney's Office had; is that right?

23      A.   I think with the instructions, they might've been

24  able to do that, yes.

25      Q.   Now, can you explain to me what is an AVPC

1   computer?

2      A.   It's a special computer that the Department of

3   Justice issued to each district that's mainly used to--

4   if you have video clips you need to make or audio clips

5   you need to make, that's what it's for.  100 percent

6   that's what they gave it to us for.

7      Q.   And that was 100 percent for you to use.

8   Correct?

9      A.   Yes.

10     Q.   Because that's what you needed in your job?

11     A.   Yes.

12     Q.   Did you also have a laptop in your possession

13  that was used for courtroom work?

14     A.   Yes.

15     Q.   What-- what did you-- what was the casual phrase

16  that you used for that, what would you call it?

17     A.   I just call it my courtroom laptop.

18     Q.   The courtroom laptop.  All right.  Then if an

19  attorney wanted use of the courtroom laptop, could they

20  check it out from you, or did you have to go with it?

21     A.   I never checked out my courtroom laptop.

22     Q.   So you had total possession of that, total

23  possession of the AVPC.  Did you put a number of things

24  on the AVPC?

25     A.   I very rarely stored anything on it.  I did

1  whatever I needed to do and then took it off and put it

2  on my courtroom laptop or whatever so that I could get

3  ready.

4     Q.  But you needed to work on the AVPC preliminarily

5  at least?

6     A.  Sure.

7     Q.  Now, once you got hold of the-- all the mechanics

8  and everything you needed for the visual stuff that CCA

9  had given you, the six-- the six hard drives, did you

10 store that material on your AVPC?

11    A.  No, I stored the player software on the computer.

12    Q.  So is that where the-- the original disk that you

13 got, the player disk, is that where that was housed--

14    A.  Yes.

15    Q.  -- at the-- and who could access it on the AVPC?

16    A.  Just me directly.

17    Q.  And how come just you?

18    A.  I had it-- I had it loaded under my log-on so

19 anyone else that logged on would not have access to it.

20    Q.  Are your log-ons carefully secured?

21    A.  Yes.

22    Q.  Can you give your-- can you give your log-on

23 information to anybody else in the office?

24    A.  No.

25    Q.  So who has access to your log-on information

1   besides you?

2       A.   Myself.  That's it.

3       Q.   The administrators cannot-- if you have an

4   automobile accident, are they stuck and nobody can get

5   into your computer?

6       A.   I would assume there's a back door, but I don't

7   know that for a fact.

8       Q.   When you say a back door, are you using that

9   colloquially?

10      A.   Yes.

11      Q.   A way to hack into it?

12      A.   I wouldn't call it hack, but...

13      Q.   That's the same thing, isn't it?

14      A.   True.

15      Q.   So, to your knowledge, not one person in the

16  world has access to your log-in information but you?

17      A.   I don't know.

18      Q.   Okay.  So for all you know, there could be a

19  number of people who have access to those-- to

20  everybody's log-ins.  Right?

21      A.   I don't know that I can answer that.

22      Q.   Okay.  As far as you know, you know it and you

23  didn't give it to anybody else; is that right?

24      A.   Correct.

25      Q.   So to get onto your AVPC player to play the

1    disk-- to play the disk that plays the hard drives, they

2    would have to log in as you, right, or you would have to

3    do it?

4        A.  Yes.

5        Q.  You could get onto it and then let somebody else

6    look at it, couldn't you?

7        A.  Yes.

8        Q.  Did that ever happen?

9        A.  No.

10       Q.  Did anybody ever ask you for access to your AVPC

11   computer just for any reason at all?

12       A.  No.

13       Q.  No reason.  Now, with the courtroom-- where did

14   you store the courtroom laptop?  Where did you keep it?

15       A.  In my office.

16       Q.  In your office.  And where did you-- where was

17   your AVPC located?

18       A.  In my office.

19       Q.  All of it was in your office.  What about the

20   hard drives?

21       A.  In my office.

22       Q.  Isn't it true that you had the-- I think you

23   testified before that you kept the hard drives and the

24   CD in-- on a table inside your door?

25       A.  Yes.

1     Q.  Now, who had the keys to your office?

2     A.  It's not locked.

3     Q.  Oh, okay.  So that isn't-- you didn't have one of

4  the lockable offices?

5     A.  I do have one, but I don't lock it at night.  I

6  just close the door when I leave.

7     Q.  All right.  Now, what if somebody wanted to just

8  someday when you were gone go in your office and take,

9  let's say, Hard Drive 6 and take your disk, couldn't

10  they just go load it on their laptop?

11     A.  Sure.

12     Q.  Okay.  And do you know whether anybody ever did

13  that?

14     A.  Not to my knowledge.

15     Q.  Do you think it's likely they would've told you

16  if they had?

17     A.  I think they would've had to ask for my help to

18  learn how to use it.  I don't know of anyone in my

19  office that could've taken that on themselves.

20     Q.  Well, Agent Stokes had the cheat sheet, didn't

21  he?

22     A.  Right.  But in my office you have to have

23  administrative privileges to load any software.

24     Q.  And who has those administrative privileges?

25     A.  Myself and our IT person.

1    Q.   When you say you have to have privileges, does

2  that mean that you have to have a paper that says this

3  person is privileged or is there an actual mechanism by

4  which you're able to prove that you have administrator

5  privileges?

6    A.   Our log-on allows it.

7    Q.   Your log-on allows it?

8    A.   Yes.

9    Q.   So what if somebody did it without administrative

10  privileges?  Is there a mechanism within the system to

11  not let that happen?

12    A.   Not that I'm aware of.

13    Q.   So if they just took it upon themselves to

14  proclaim that they had privileges to load an executable

15  file, they could've done it?

16    A.   I don't understand the question.

17    Q.   In order to-- you said that you have to have

18  executive privileges to be allowed to load an executable

19  file, right, such as the player?

20    A.   Right.

21    Q.   What if somebody just decided to take it upon

22  themselves to say they had executive-- administrative

23  privileges and went on with their own log-on; would that

24  work?

25    A.   It wouldn't work.  It wouldn't work.

1      Q.   There is a fail-safe so that that can't happen?

2      A.   Yes.

3      Q.   All right.  Now, one second here.  On August the

4    5th-- were you familiar with Attorney Jackie Rokusek?

5      A.   Yes.

6      Q.   Okay.  So on August the 5th, did she come with

7    her agent and help you-- and ask you to help them set up

8    viewing of one of the disks or more--

9      A.   Yes.

10     Q.   -- that were provided by CCA?

11     A.   Yes.

12     Q.   Okay.  When you-- when they got there, what

13   happened?

14     A.   We went into an attorney room that's outside of

15   our office area.

16     Q.   Is that an attorney room that's used to have--

17   let defense counsel look at stuff?

18     A.   Sure.

19     Q.   All right.

20     A.   And there's a stand-alone computer in there

21   that's not connected to a network, so that-- I had

22   loaded the player on there earlier that day because I

23   was told they were coming.

24          So when they got there, I took them in.  I showed

25   them how all of it worked, how to get the docking

1  station set up and how the DVRs worked and how the

2  player worked, and then I left them my extension number

3  in case they had problems, and I left the room.

4      Q.  Just for clarity, I've said DVRs sometimes and

5  I've said hard drives sometimes.  Are we meaning the

6  same thing when we say that?

7      A.  I'm assuming that, yes.

8      Q.  Okay.  So you didn't see them actually work

9  with-- with the DVRs?

10     A.  No.

11     Q.  Did you come and retrieve your stuff while they

12  were still there?

13     A.  No.

14     Q.  Did you-- when did you come and retrieve it?

15     A.  I believe she called me or-- I can't remember how

16  that was, but I knew that they were done, and I went out

17  and retrieved it.  They were already gone from the room.

18     Q.  Well, then how did you dismantle?  What did you

19  do to dismantle it?  You weren't going to leave that CD

20  and everything sitting there in that room, were you?

21     A.  No.  I mean, they were already back in the box,

22  if I remember right.  They had already returned it to

23  the boxes.  The player was still attached to the

24  computer, I do remember taking that off-- or the docking

25  station.  But other than that, everything else was back

1  the way I had-- you know, when I first brought it in.

2      Q.  Did you retrieve the disks?

3      A.  Yes.  Well, that's what I mean.  There was no

4  disk in the player.

5      Q.  Oh, I'm sorry.

6      A.  The docking station, everything was back in their

7  original boxes when I went back in.

8      Q.  So what if someone had come-- well, they wouldn't

9  have the hard drive, would they, if someone decided they

10 wanted to come in and look and see what she had seen,

11 they wouldn't have the hard drive, so they would have to

12 ask you for that, wouldn't they?

13     A.  Right.

14     Q.  Nobody did?

15     A.  No.

16     Q.  Except for the viewing by Ms. Rokusek and her

17 investigator, her agent, did anybody else, to your

18 knowledge, outside the U.S. Attorney's Office come and

19 have a viewing?

20     A.  Outside, no.

21     Q.  What about inside?

22     A.  No.

23     Q.  Nobody?

24     A.  Not that I recall.  I mean, I-- I did the first

25 day to try to figure it out.

1    Q.  And what did you-- which disk did you put in?  I

2    mean, which hard drive did you put in?

3    A.  I put in DVR 1.

4    Q.  Okay.  And so you didn't see anything but the

5    parking lot?

6    A.  No.

7    Q.  Did you ever put in Drive 5 or Drive 6?

8    A.  No.

9    Q.  Now, I want to take you to a little bit later and

10   ask you about the office computer refresh.  To your

11   understanding, were all three locations of the U.S.

12   Attorney's Office - Wichita, Topeka, Kansas City - to

13   have a cyclical replacement just on a routine basis that

14   DOJ wanted you to do during the month of August 2016?

15   A.  Again, dates are bad for me, but I do know that

16   we had to have that done, yes.

17   Q.  And did they send you instructions about what was

18   going to happen, tell you what was going to happen

19   before they did it?

20   A.  They did for our desktop computers, the computers

21   that we used every day.

22   Q.  Uh-huh.  You had control of five laptop

23   computers, right, and some of them you could check out

24   and some of them you didn't check out.  Right?

25   A.  Somewhere around there, yeah.

16-20032-JAR  USA v. Karl Carter (Black) 10.03.18                995

1    Q.   And then you had three PCs that you had control
2  of, did you not?
3    A.   Yes.
4    Q.   And that included the AVPC?
5    A.   Yes.
6    Q.   And two others?
7    A.   My own personal computer that-- not personal but
8  my work computer.
9    Q.   That you worked from?
10   A.   And then what we call the law PC.
11   Q.   The what?
12   A.   Law PC.
13   Q.   The law PC.  What is the law PC?
14   A.   It's used for processing discovery, large
15  discovery projects.
16   Q.   And was the AVPC the newest one in the bunch?
17   A.   I believe the law PC came after the AVPC.
18   Q.   Were you told that the law PC would remain in
19  place and wouldn't be-- wouldn't be disturbed because it
20  was the newest one?
21   A.   Yes.  And it had special software that was
22  outside of our normal.
23   Q.   So there were various ways of things that they
24  were going to do this refresh, right, they were going
25  to-- weren't they going to take the insides out of all

1   the attorneys' laptops, for example, and give them--

2   take the shells off and take-- replace the insides?

3       A.   I don't know the whole--

4       Q.   You don't remember that one?  All right.

5       A.   I don't know the process.  I had a brand-new

6   computer when I got back to my office the day that mine

7   got done.

8       Q.   So to your knowledge, the-- the refresh, the

9   whole system-- system-wide refresh was supposed to be

10  finished with Kansas City, you were the last in line.

11  Right?

12      A.   I don't remember that.

13      Q.   Do you remember that it was supposed to take

14  place on August 31st and September the 1st?

15      A.   I do not remember the dates.

16      Q.   Okay.  Let's look at-- let's look at the

17  calendar.  Do you recall that when the-- the office-wide

18  refresh happened, you were-- you were at work?

19      A.   I believe so because I-- I kind of remember it.

20      Q.   And then did you take annual leave, go on leave

21  for a few days?

22      A.   I usually do, vacation.

23      Q.   All right.  So when you left for your annual

24  leave the week of the 4th, you came back.  And came back

25  what day?  Did you come back on the 8th, come back on a

1   Thursday?

2       A.  I don't remember that specifically.

3       Q.  Well, in any event, when you got back what had

4   happened to the AVPC?

5       A.  I don't--

6       Q.  The one that had your projects on it and had the

7   PELCO player on it and all the-- all the--

8       A.  Well, I know that it got refreshed with the new

9   image at some point.  And that may have been when it

10  was, I don't know.

11      Q.  Weren't you a little upset when you got back and

12  all of your materials were missing?

13      A.  I think the-- when I was more upset was when the

14  hard drives were removed for this case because that I

15  had no warning over.  Both of them were removed, the

16  AVPC and the law PC.

17      Q.  Both of?

18      A.  The hard drives were removed from both the AVPC

19  and the law PC.

20      Q.  Were there-- were there--

21      A.  There were projects on both.  Not really the AVPC

22  because I don't save anything there, but the law PC had

23  some projects on there that I would've really liked to

24  have had access to.

25      Q.  And the-- the hard drives by that time had been

1   impounded.  Right?

2       A.  Right.

3       Q.  Hard drives for the-- from CCA had been

4   impounded?

5       A.  Yes.

6       Q.  August the 5th.  And-- and then again later for

7   the-- for the originals coming in from Agent Seubert.

8   So the only copy, so to speak, left in the U.S.

9   Attorney's Office would've been the one on the AVPC.

10  The disk was still in there, wasn't it, when the--

11      A.  The copy of the PELCO player?

12      Q.  Uh-huh.

13      A.  I think it might've been wiped by then.  I don't

14  remember when the actual date was that it was wiped.

15      Q.  But it was wiped?

16      A.  It was-- a new image was put on.

17      Q.  And that entire-- that computer happened to be

18  the one that had-- had it loaded that-- that you had

19  loaded the disk on--

20      A.  Yes.

21      Q.  -- correct?

22          So even if you went down to the vault and got the

23  judge to let you bring back the hard drive, let's say

24  Hard Drive 6 because that's the one we're concerned

25  with, then you could not have played it unless you had

16-20032-JAR  USA v. Karl Carter (Black) 10.03.18          999

1  another disk to put in a computer.  Right?

2     A.  Correct.

3     Q.  And the ones that were-- what about the one on

4  the court laptop, is that one gone?

5     A.  I-- I believe that was removed by us.  The only

6  time it was put on the court laptop was for the hearing

7  before the judge that Jackie Rokusek had a closed

8  courtroom demonstration or-- I don't know.  I was just

9  asked to bring it up, set it up.

10    Q.  The hearing of August 9th?

11    A.  Probably, yes.

12    Q.  So when you got it onto the court laptop, did it

13  stay on the court laptop?

14    A.  No.

15    Q.  What did you do with it?

16    A.  I removed the player.  And then that's all I had

17  to do on the courtroom laptop.

18    Q.  So that wouldn't have helped?

19    A.  No.

20    Q.  To have it would not help.  The AVPC is wiped.

21    A.  (Nods head up and down).

22    Q.  The law PC is wiped or refreshed at least?

23    A.  The law PC, the hard drive was removed from.

24    Q.  Do you know where the hard drive is that's still

25  kept at the U.S. Attorney's Office?

1    A.  I think it's still locked up with all the other

2  hard drives from our computers from the refresh.

3    Q.  But the AVPC, there's a hard drive in there, but

4  it doesn't have your stuff on it, does it?

5    A.  No, there's no hard drive in the AVPC anymore.

6  It's been removed, and I've been without it.

7    Q.  So it's just sitting there with nothing?

8    A.  Yes.  Yes.

9    Q.  So the law PC is wiped, the hard drive is

10  completely gone from the AVPC.  And which of those two

11  had the information from CCA on it?

12    A.  The AVPC.

13    Q.  And you do not personally know where that hard

14  drive is, do you?

15    A.  No.

16    Q.  Because there's been two different stories told.

17  One is that the law PC got wiped, and the other is that

18  the AVPC got wiped.  But as far as you know, the law PC,

19  in fact, is wiped; is that correct?

20    A.  The law PC, the hard drive is gone.  It was-- the

21  hard drive was removed as part of this-- this case.  And

22  I haven't ever gotten that back.

23      The AVPC was the one-- my understanding was that

24  the new image was put on it, what you're calling wiped.

25  The new image was put on there.  And then after the new

 1   image was put on there, the drive was removed completely

 2   and has been gone since then.

 3       Q.   So essentially there's a shell there and

 4   nothing-- and there's nothing on it?

 5       A.   Correct.

 6       Q.   How is it that you didn't know those two PCs were

 7   going to be dismantled in that way?

 8       A.   I don't know.

 9       Q.   Where did your information come from about what

10   was going to happen and when it was going to happen?

11       A.   I had no information.  I came in one day and

12   there was a sticky note on it that said the drive was

13   removed.

14       Q.   And where were the projects that you were working

15   on?  Where did they go?

16       A.   On the drive.

17       Q.   Pardon me?

18       A.   They were on the drive.

19       Q.   So they're gone?

20       A.   I assume they're still on the drive.

21       Q.   If the drive still exists, they're still on it?

22       A.   Yes.

23       Q.   But if the drive-- and that-- and those were on

24   the law PC?

25       A.   Yes.

 1      Q.   Okay.  So that was where all your projects were?

 2      A.   Yes.

 3      Q.   But the AVPC, the drive is missing.  Whatever

 4   else was on it, including the PELCO player, is also

 5   gone.  Correct?

 6      A.   Yes.

 7      Q.   Now, did you have-- what about the five laptops

 8   that you had?

 9      A.   Those-- those were not touched in any way.  Those

10   were not replaced.

11      Q.   They were not-- as far as you know, they were not

12   refreshed in any way?

13      A.   No.

14      Q.   You've still got them in your office?

15      A.   Yes.

16      Q.   Do they still work?

17      A.   Yes.

18      Q.   All of them still work.

19           All right.  Now, I'm going to move over to the

20   Special Master's investigation.  When did you first find

21   out about the Special Master's investigation Phase III

22   starting?

23      A.   I don't remember.

24      Q.   Do you think you found out shortly after it did

25   start, October-- in October of '11-- October 11th to be

1  precise in 2016?

2      A.  I-- I would imagine that's about when I found

3  out, yeah.

4      Q.  What-- how did you find out what the Court's

5  order said about you personally-- not you personally,

6  but all employees of the U.S. Attorney's Office?

7      A.  I don't remember seeing anything from the Court.

8      Q.  Nobody told you about the court order that said

9  you were all to fully-- each employee was to fully

10 cooperate?

11     A.  Well, we-- yeah, that was a given, yes.

12     Q.  Why was it a given?

13     A.  Well, we would always comply with the Court.

14     Q.  You always comply with a court order.  That's

15 what you do personally?

16     A.  Yes.

17     Q.  All right.  So since you were told you were

18 supposed to comply with the court order, since you knew

19 you had a court order for compliance, did you comply?

20     A.  As far as I'm aware I did, yes.

21     Q.  Did you have any instructions from management

22 about how you are to-- to comply or not comply?

23     A.  The only thing I remember specifically about that

24 was being told that I was going to be interviewed by

25 Mr. Cohen.

1    Q.   Who told you?

2    A.   Emily Metzger.

3    Q.   And what did she tell you besides the fact that

4  you were going to get interviewed?

5    A.   Just that if I felt more comfortable having

6  someone with me, I could.  But if I was fine with just

7  going on my own, that the office was fine with that and

8  that I should cooperate any way that I could.

9    Q.   Do you know why you specifically were told you

10  were going to be interviewed?

11    A.   I would-- I assumed things, but I wasn't told

12  specifically why.

13    Q.   What did you assume?

14    A.   Because of the computers and the DVRs.

15    Q.   Did-- where did you meet with him?

16    A.   Here in the courthouse.

17    Q.   All right.  And were you able to answer all of

18  his questions?

19    A.   I think so.

20    Q.   Did you have questions for him?

21    A.   I don't remember that, no.

22    Q.   Did you have-- tell him that-- did he tell you

23  that you-- he would like to interview Erin Tomasic?

24    A.   I believe he did, yes.

25    Q.   And did you tell Erin that?

1    A.   I don't think I did tell Erin that, no.

2    Q.   Who did you tell?

3    A.   I may have told Scott Rask.  I'm not sure.

4    Q.   Pardon me?

5    A.   I may have told Scott Rask.

6    Q.   Scott Rask.  You didn't tell Emily?

7    A.   Not that I remember, no.

8    Q.   All right.  Do you recall getting a letter from

9  Emily in December of 2016 saying that you are to

10 preserve materials?

11   A.   Yes.

12   Q.   Did you do your best to do that?

13   A.   Yes.

14   Q.   Did you have any hand in the destruction or

15 dismantling of any computer in your office?

16   A.   No.

17   Q.   Did anybody tell you they were going to dismantle

18 or in any way change out the computers, your computers?

19   A.   No.

20   Q.   Was-- did they make a record of it?

21   A.   Of?

22   Q.   Of what happened to your computers.

23   A.   I don't know.

24   Q.   You had eight computers under your control.

25 Right?  That's sophisticated equipment, isn't it?

1    A.  Yes.

2    Q.  And you would've been expected to be very careful

3    about not letting anything happen to them.  Right?

4    A.  Sure.

5    Q.  And had you been in the office when your three

6    PCs were taken, did-- would you want to know about that

7    before they took them?

8    A.  I don't know that I feel comfortable answering

9    that because I don't-- I don't know that I would've had

10   a choice.

11   Q.  Well, would you have preferred that they tell you

12   what they were going to do and then let you document so

13   that no one would suggest you had done anything to the

14   computers?

15   A.  I think more than anything I would've liked the

16   chance to maybe back up some things, but--

17   Q.  But you weren't given that chance?

18   A.  No.

19   Q.  You didn't know that was going to happen when you

20   went on vacation or leave-- when you went on leave, and

21   it was just that way when you came back?

22   A.  As far as I remember, that's true, yes.

23   Q.  Did you discuss that at all with the Special

24   Master?

25   A.  I don't remember that specifically.

1    Q.  So you told Scott Rask that the Special Master

2    would like to speak with Erin Tomasic.  Right?

3    A.  I don't-- I'm not 100 percent sure about that.

4    Q.  Well, who-- if it was not Scott Rask, who did you

5    tell?

6    A.  If I didn't tell Scott, I didn't tell anyone.

7    Q.  All right.  So it must've been Scott Rask?

8    A.  If I did tell someone.  I just can't remember

9    that specifically.  I do remember Mr. Cohen asking me

10   about speaking to Erin.

11   Q.  Uh-huh.  Why did you-- why didn't you just go

12   tell Erin, hey, the Special Master wants to speak with

13   you?

14   A.  I didn't feel like that I could do that.  I felt

15   like our communication was not something I was supposed

16   to discuss.

17   Q.  Did you think management would be upset if you

18   did that?

19   A.  I don't think that was the reason I didn't tell

20   anyone.

21   Q.  Well, do you think they would've been?  If you

22   had gone-- if you had gone and spoken to Erin about the

23   Special Master wanting to talk with her?

24   A.  I don't know that they would've been upset.  I

25   don't know.

1     Q.   In any event, you know now that she did speak

2  with the Special Master, don't you?

3     A.   I do now since you said that, yes.

4     Q.   All right.  Nobody asked you anything about it

5  prior to my asking you about it today?

6     A.   No.

7     Q.   All right.  Did you ever advise any of the other

8  personnel in the office that perhaps it would be better

9  if they didn't speak with the Special Master?

10     A.   No.

11     Q.   Did you ever advise anybody in the office that

12  you should be talking to the Special Master?

13     A.   They should be?

14     Q.   That they should be.

15     A.   No.

16     Q.   Did you-- did you share with anyone your

17  conversation with him, other than perhaps speaking with

18  Scott Rask about wanting to see Erin?

19     A.   Not that I recall, no.

20     Q.   Did you provide the Special Master with any

21  documents or any e-mails or any recorded conversation or

22  any other objects when you-- when you spoke with him?

23     A.   No, I didn't take anything with me that day.

24     Q.   Did you make notes?

25     A.   No.

1    Q.   Did he?

2    A.   I kind of remember that, yes.

3    Q.   Since you knew you were under orders to fully

4    cooperate, did-- did you ever ask management how you

5    should go about doing that?

6    A.   No.

7    Q.   Until-- the only-- the only impetus was when

8    Emily told you the Special Master wanted to speak with

9    you?

10   A.   Yes.

11   Q.   Do you recall a meeting that occurred in this

12   office where people were encouraged to attend and listen

13   to Emily Metzger and Deb Barnett discuss this matter,

14   the *Black* case--

15   A.   No.

16   Q.   -- and the extent of the cooperation with the

17   U.S. Attorney's Office?

18   A.   I don't remember that.

19   Q.   Excuse me.  The extent of the U.S. Attorney's

20   Office's cooperation with the Special Master.

21   A.   I don't remember that specifically, no.

22   Q.   You don't remember that there was such a meeting

23   or you don't remember that you went?

24   A.   No.

25   Q.   You didn't know about it?

1    A.   I don't remember it.  That's all I can say right

2    now.

3    Q.   Okay.  You said you had executive-- or

4    administrative privileges to load executable files.

5    Correct?

6    A.   Yes.

7    Q.   Who else had those kinds of--

8    A.   Just David Steeby I think.  I don't know.

9    Q.   David Steeby, who-- would he have been your

10   supervisor?

11   A.   No.

12   Q.   Who's your supervisor?

13   A.   At the time I'm trying to remember-- right now

14   it's Duston Slinkard.  I'm trying to remember at the

15   time who it was.

16   Q.   Were there two other IT people besides David

17   Steeby?

18   A.   There's one other.

19   Q.   Who is that?

20   A.   Tessa Hooker in Wichita.

21   Q.   All right.  I would like for you to explain, if

22   you can, Exhibit 1130.  It's up-- can you see here?

23   A.   It's really big.  I can't see the whole page.

24   Q.   Just a second.

25            THE COURT:  Just--

1           MS. VANBEBBER:  There we go.  Oh, yeah, now

2    I remember.  I'm not used to this.

3    BY MS. VANBEBBER:

4        Q.  Okay.  Now, this is an e-mail, as you see, from

5    Chris Oakley to several of you, management people and

6    you.  You got a carbon copy.  Right?

7        A.  I don't recall it.  Can I read it?

8        Q.  Yes.  Please read it to yourself.

9        A.  Okay.

10       Q.  The first line, it says, "In trying to find the

11   discovery letters to determine who needs to receive

12   notice of the order," the Court's order.  Do you think

13   that that-- when you received this, did you understand

14   that they were talking about the phone calls from CCA?

15       A.  That's what the subject line is, so yes.

16       Q.  All right.  But these are recorded telephone

17   calls.  Correct?

18       A.  Right.

19       Q.  And then you said you accessed the discovery

20   drive, or as Chris-- excuse me, Chris Oakley says he

21   accessed the discovery drive.  What's the discovery

22   drive?

23       A.  It's-- right now it's on a Cloud.  We actually

24   store all of the discovery in a case in one location so

25   that we can process and disseminate it.

16-20032-JAR   USA v. Karl Carter (Black) 10.03.18          1012

1      Q.   Who has access to get to visualize those things,

2   to look at those things?

3      A.   The attorneys, the support staff.

4      Q.   Okay.  So it's-- it's a file that everybody can

5   get into at any time.  Right?

6      A.   Sure, unless it's a case that requires, you know,

7   specific people to only look at it, and then there's

8   what they call a lockdown.

9      Q.   So if, for example, we wanted to see all the

10  recorded phone calls in the *Rapp* case, let's say, would

11  the attorneys simply be able to get onto the computer

12  and find that material and look at it?

13     A.   Yes.

14     Q.   All right.  You said-- or, excuse me, Chris says

15  that all that material appears to be on the drive.  And

16  you-- you-- he asked you, and you said it was

17  apparently.  Does that sound right?

18     A.   Yes.

19     Q.   It says, "Pauletta said she could have Steeby

20  lock them down so no one could access them."  How would

21  that happen?

22     A.   He would block privilege from anyone.

23     Q.   From all people?

24     A.   Yes.

25     Q.   Or some people?

 1       A.   Yes.

 2       Q.   Isn't it also true that they could be wiped out--

 3   could be wiped off?

 4       A.   Sure.

 5       Q.   And somebody would have-- anybody would have the

 6   ability to do that, or there would just-- would there be

 7   someone in charge who would have the ability to do that?

 8       A.   I've never had that happen, so I don't know how--

 9   what it would--

10       Q.   Would that be accomplished through Mr. Steeby?

11       A.   I'm sure I could've done the same thing.

12       Q.   Or you could've done it?

13       A.   The lockdown would've had to have been done by

14   him.

15       Q.   But if you wanted to erase something, you

16   could've-- you could've done it or-- or would the

17   attorney have to do it?

18       A.   Either the attorney or I could've done it.

19       Q.   Do you know what happened as a result of this

20   e-mail, what they decided?

21       A.   I do not.

22       Q.   Okay.  And what we're talking about here is

23   recorded calls in the possession of the U.S. Attorney,

24   not somebody else's calls.  Are these just-- just the

25   ones that the U.S. Attorney had ordered in discovery?

1      A.  For this case?

2      Q.  For this case, uh-huh.

3      A.  Yes.

4      Q.  What about recorded calls that one of the

5   assistants might have or AUSAs might have decided to put

6   on their own laptops?

7      A.  I don't understand the question.

8      Q.  If an AUSA recorded a call, could that be placed

9   on the Cloud with the other materials, or did it have to

10  just be discovery?

11     A.  I still don't understand.  Could it have been put

12  where?

13     Q.  If an AUSA recorded a call, their own call with

14  somebody, could that be-- could they establish on their

15  laptop a way to record that call and keep it?

16     A.  I don't know.

17          MS. VANBEBBER:  Okay.  That's all I have for

18  you.

19          SPECIAL MASTER COHEN:  Just a minute.

20          MS. VANBEBBER:  Wait just one second.

21  BY MS. VANBEBBER:

22     Q.  Take you back to the beginning when you first

23  started dealing with Agent Stokes on this case.  Do you

24  recall that he sent you an e-mail that asked you, "Did

25  we get in video from the attorney visitation rooms, the

1  law library and the pods at CCA?"  I'll show you the

2  memo.

3      A.  I must've gotten that.  I just don't remember it

4  specifically, no.

5      Q.  You don't-- you don't doubt that you got it?

6  It's in evidence.

7      A.  No, I don't.

8      Q.  The fact that he's saying, did we get-- "Did we

9  get video in from the attorney visitation rooms," did

10 that cause you any problems or any concerns?

11     A.  No, because that's not my call as-- in the

12 position that I'm in.  I just-- I answer him, I'm sure,

13 that I received the DVRs.

14     Q.  Uh-huh.  That didn't personally disturb you in

15 any way that that was happening at CCA?

16     A.  I didn't-- it didn't even dawn on me what that

17 meant.

18     Q.  Okay.  And let's-- I'm still a little unclear on

19 the AVPC and the other.  Was the AVPC the only computer

20 that your office used to view-- would've used to view

21 the CCA video-- videos?

22     A.  That, and the stand-alone computer that Jackie

23 Rokusek used.

24     Q.  Was there any reason that you didn't remove--

25 erase that material from that stand-alone, or did-- did

1   you think other attorneys were going to be looking at

2   it?

3      A.   I just left it on there in case I was asked to

4   review anymore or whatever.  I always leave the software

5   behind.  I never know when I'm going to need it again.

6      Q.   All right.  Now, was-- is it true that the AVPC

7   was the only computer that was wiped clean and the hard

8   drive not given to the Court?

9      A.   I believe it was wiped clean-- re-imaged, which

10  would've-- including wiping off the old image.  But it

11  is a part of the hard drives that are in the Court's

12  possession.

13     Q.   As far as you know, the hard drive-- wait a

14  minute.  That is in the Court's possession?

15     A.   Well, whoever has all of our drives locked up,

16  that's-- it's with those.

17     Q.   So if it-- if those drives are locked up in the

18  U.S. Attorney's Office, that would-- that would be

19  compatible with what your testimony is?

20     A.   Right.  And I don't know.  Like I said, I wasn't

21  here when that happened, I just know that they were

22  gone.

23     Q.   And Mr. Steeby would be the one who would know

24  that, wouldn't he--

25     A.   Right.

 1     Q.  -- wouldn't he?  So the only hard drive you've

 2   got left there is the law-- the law--

 3     A.  I don't have my original.  My law PC, that drive

 4   is still gone.  I have a replacement for it so that I

 5   could use the software, but it's-- doesn't have my data

 6   on it.

 7     Q.  But the AVPC is just empty?

 8     A.  Yes.

 9     Q.  And then you have your own regular computer for

10   you to use for your regular personal work?

11     A.  Yes.

12     Q.  And does that have a new hard drive?  Is that

13   what happened?  Is that how come you can use it?

14     A.  My computer?

15     Q.  Uh-huh.

16     A.  This was-- the computer I have now is the one

17   that I got after the refresh.

18     Q.  Okay.  It's a brand-new one?

19     A.  Yes.

20     Q.  Okay.  The old one is-- the old one is wherever

21   it is, and you got a brand-new one?

22     A.  Right.  The hard drives are still--

23     Q.  The chassis is new and the-- also the hard drive?

24     A.  Right.

25     Q.  Okay.

```
 1              THE COURT:  Ms. Brannon, do you have-- or

 2   Mr. Bell, do you have any questions?

 3              MR. BELL:  We do, Your Honor.  Given the

 4   hour, I don't think I'll be able to finish before 5:00.

 5              THE COURT:  How long do you think you'll be?

 6              MR. BELL:  30 or 45 minutes.

 7              THE COURT:  Okay.  How long do you think

 8   you'll be?

 9              MR. CLYMER:  Very brief.

10              THE COURT:  Do you want to keep going?  We

11   could go 'til 5:30.

12              MR. BELL:  That's fine, Your Honor.

13              THE COURT:  Okay.

14                        CROSS EXAMINATION

15   BY MR. BELL:

16      Q.  Good afternoon, Ms. Boyd.

17      A.  Hi.

18      Q.  Ms. VanBebber asked you some questions about the

19   e-mail you received from Jeff Stokes from the KBI asking

20   about the attorney-client video.

21              THE COURT:  I'm having a hard time hearing

22   you.

23              MR. BELL:  I'm sorry.  I don't know if this

24   is-- there we go.

25   BY MR. BELL:
```

1    Q.  I'll try again.  Ms. VanBebber asked you some

2  questions about the e-mail you received from Jeff Stokes

3  about the KBI-- from the KBI?

4    A.  Yes.

5    Q.  And you said you didn't remember receiving it,

6  but obviously you had; is that right?

7    A.  Yes.

8    Q.  And you think you actually may have responded to

9  that e-mail as well?

10    A.  I don't remember specifically.

11    Q.  So I'd like to show you what's been marked as

12  Exhibit 644.  Do you recognize 644 - I have a hard copy

13  here for you - as the second part of that e-mail chain

14  where you do, in fact, respond to Agent Stokes?

15    A.  Yes.

16        MR. BELL:  Your Honor, at this time I'd move

17  to admit Exhibit 644.

18        MR. CLYMER:  Could I see a copy, Mr. Bell?

19  Thank you.

20        (Counsel confer).

21        MR. CLYMER:  Here you go.  Thank you.

22        THE COURT:  Exhibit 644 admitted.

23        MR. CLYMER:  No objection to admission.

24        THE COURT:  I'm sorry?

25        MR. CLYMER:  No objection, Your Honor.

1          THE COURT:  644 admitted.

2   BY MR. BELL:

3      Q.  All right.  And so in response to Mr. Stokes'

4   question, or Agent Stokes' question, you send him the

5   index.  Is that what 644 says?

6      A.  Yes.

7      Q.  All right.  And it says right there as an

8   attachment that there's cameraroster.pdf, so that

9   would've been the index of camera views for the-- for

10  the video from CCA?

11     A.  Yes.

12     Q.  Now, at this point obviously Agent Stokes is

13  asking whether we have-- they have the video yet, so

14  this would've been before he actually got the video from

15  your office, the DVR disks?

16     A.  Correct.

17     Q.  Did I hear you-- well, let me ask you this:  Did

18  you ever make any copy of any of the content on any of

19  those six DVRs for Agent Stokes?

20     A.  No.

21     Q.  Did you ever make a copy of any of the content on

22  any of those DVR disks for anyone?

23     A.  No.  Well, after they were returned to me, the

24  ones that were approved by-- after the hearing, the five

25  DVRs, those were copied and sent out in discovery.

1    Q.  So you mentioned a time when you facilitated

2    Jackie Rokusek and Mike Bussell to review the video

3    when-- on what you call the stand-alone computer?

4    A.  Yes.

5    Q.  And that was done on some afternoon, I think you

6    don't remember the dates.

7    A.  I don't remember exactly.

8    Q.  Was there a time while they were-- the pair of

9    them were reviewing that video, did Erin Tomasic ask you

10   for a copy of this index?

11   A.  While they were reviewing it?

12   Q.  Yes.

13   A.  Not to my knowledge.  I don't remember that.

14   Q.  Do you have any recollection of her sending you

15   an e-mail on that day asking you for a copy of the

16   index?

17   A.  It's possible she did, but I don't remember that.

18   Q.  Do you have any recollection of her coming to

19   your office and saying, do you have a copy of that

20   index?

21   A.  I do not recall that, no.

22   Q.  Were you aware or did you become aware that Ms.

23   Rokusek and Mr. Bussell had come to the office the day

24   before in an attempt to view the video?

25   A.  I was aware of that.

1    Q.   All right.  And they were-- they had been told,

2    you know, Pauletta is not here so you can't view the

3    video?

4    A.   That's my understanding, that's just someone else

5    telling me that.

6    Q.   Now, if I understand your testimony about your

7    office, it's that you leave your office unlocked.

8    Right?

9    A.   Yes.

10    Q.   So when Ms. Rokusek and Mr. Bussell came the day

11    before, there was nothing to stop anyone from taking the

12    DVRs and the docking station and taking them to the

13    stand-alone computer to allow them to review the video?

14    A.   Other than they didn't know how to use it.

15    Q.   So-- and we'll get to that in a second.  But

16    otherwise, there was no physical impediment stopping

17    anybody from doing that?

18    A.   No.

19    Q.   So your-- and your testimony is your office can

20    be locked, but you just as a practice never lock it?

21    A.   Correct.

22    Q.   Were you ever made aware of a time when the

23    Special Master and a few other people had come to the

24    U.S. Attorney's Office and wanted to look at the-- the

25    videos in question and you were out?

1        A.   Not aware of that, no.

2        Q.   Are you aware that the Special Master and other

3   people were told by people in your office that you were

4   gone that day and your office was locked so there is no

5   way for them to view what they needed to view?

6        A.   There was a time when we did lock our doors all

7   the time.

8        Q.   Okay.  So that's--

9        A.   It could've been during that time.

10       Q.   Okay.  So that's new.

11       A.   I have a key.

12       Q.   So generally you didn't look your door, but there

13  was a time when you did lock your door?

14       A.   Yes.

15       Q.   All right.  When was that time?

16       A.   I do not remember.  I just know that for a while

17  every night everyone locked their doors.  And I don't

18  even remember why, we just did.

19       Q.   So you had this normal practice over 30-something

20  years of never locking your door.  At some point you

21  started locking your office door, but you don't remember

22  when and you don't remember why?

23       A.   It had to do with an evaluation we were going to

24  have and we were asked to lock our doors.  That's all I

25  remember.

1      Q.   Who asked you to lock your doors?

2      A.   I don't remember.

3      Q.   Do you remember what year this occurred in?

4      A.   I do not.

5      Q.   Was it before the *Black* case or after the *Black*

6    case?

7      A.   I do not remember.

8      Q.   Who told you to start locking your doors?

9      A.   I do not remember.

10     Q.   Did someone tell you to start locking your doors

11   in person or was there some sort of e-mail?

12     A.   No e-mail.  I don't remember specifically.

13     Q.   So at some point, if I understand you correctly,

14   you're not sure when, but you were told to start locking

15   your doors.  But you don't know by who and you don't

16   remember how?

17     A.   Correct.

18     Q.   And do you continue to lock your office door to

19   this day?

20     A.   I do not.

21     Q.   All right.  So at some point did someone tell you

22   it's okay to stop locking your office door?

23     A.   I don't even remember why.  I just stopped

24   locking my door.

25     Q.   And how recently was that?

1    A.   A while.  I can't remember when I stopped.

2    Q.   At some point you made or you burned a copy of

3  the software necessary to view the CCA video for Jeff

4  Stokes?

5    A.   Yes.

6    Q.   And you did that before he actually took the

7  boxes that had the video-- the DVRs that had the videos?

8    A.   Yes.

9    Q.   How long was it between the time you gave him the

10  software and the time he took the-- the videos?

11    A.   I don't recall because I was gone when he took

12  them, so I don't remember what the time was between.

13    Q.   Okay.  So that must've been during one of the

14  times when you weren't locking your office?

15    A.   True.

16    Q.   So he gives you the player, doesn't-- but doesn't

17  ask for the DVRs, doesn't ask for the surveillance

18  video?

19    A.   When I gave him the player, he did not take the

20  DVRs at that time.

21    Q.   Okay.  Did-- once you gave him the player, to

22  your knowledge, did the player serve any other function

23  other than to play the videos that you had?

24    A.   No.

25    Q.   All right.  Did you anticipate then, since he'd

1   asked for the player and you had given him the player

2   and instructions on how to play the videos, that at some

3   point he was going to view these videos?

4       A.   Sure.

5       Q.   And at some point you show up to your office one

6   day and the box with the DVRs in it is gone?

7       A.   I don't specifically remember, but obviously it

8   was.

9       Q.   All right.  And does that prompt you to start

10  asking around and say, hey, where did the box of videos

11  go?

12      A.   I don't remember doing that, no.

13      Q.   Did you even notice-- do you recall noticing that

14  the videos were gone?

15      A.   I have a lot of stuff in my office for a lot of

16  different cases, and I don't remember specifically

17  missing that.

18      Q.   Before Agent Stokes came to get those videos,

19  they were in your office, available for anybody who

20  might need them?

21      A.   Sure.

22      Q.   And the only thing that-- the three things that

23  were necessary to play those videos were the DVRs, a

24  docking station and the software?

25      A.   Correct.

 1    Q.  So the DVRs are in your office that's-- that's

 2   unlocked when you're not there?

 3    A.  Yes.

 4    Q.  The docking station is also in the box with the

 5   DVRs, office not locked when you're not there?

 6    A.  It was in the box sometimes and it was on a

 7   cabinet other times.  I remember it not being always

 8   with the DVRs.

 9    Q.  All right.  So were there times when the docking

10   station wasn't where you left it in the box?

11    A.  No.

12    Q.  So the docking station, regardless of whether

13   it's in the box or on a counter, it's in your office?

14    A.  Yes.

15    Q.  And the third thing that's necessary is the

16   software player.  Right?

17    A.  Yes.

18    Q.  And I think your testimony was you contacted

19   somebody at the Secret Service and they found the

20   software player on-- online somewhere?

21    A.  I don't-- I think that's what he told me.

22    Q.  All right.  So the software player that can be--

23   presumptively, if that's accurate that it can be found

24   online, you said that no one in the office can install

25   new software on their office computers unless they have

1  administrative privileges?

2      A.  Yes.

3      Q.  Okay.  But that same restriction, to your

4  knowledge, wouldn't apply to anyone's personal computer.

5  Right?

6      A.  I don't know how their personal computers are set

7  up.

8      Q.  Right.  So, for instance, if somebody had a

9  personal computer, let's say a laptop in the office, and

10  they had installed the PELCO player software on that

11  laptop, they could walk into your office, plug in the

12  docking station and plug in a DVR?

13      A.  I don't know.  It depends on their laptop, I

14  don't know.

15      Q.  Was there any specific thing that you noticed

16  about the PELCO player software that would lead you to

17  believe that it wouldn't play on-- or wouldn't be

18  compatible with certain laptops?

19      A.  I didn't try it on any other kind of computer

20  with any other-- like Mac or Windows versions.

21      Q.  Okay.  So when you returned to the office on

22  August 5th, this is the day Mr. Bussell and Ms. Rokusek

23  are going to review the video, obviously the box with

24  the DVRs is back in your office?

25      A.  Yes.

1       Q.   Had you noticed by that point-- at some point
2   that the box had been gone?
3       A.   No, I don't remember that.
4       Q.   So it wasn't noteworthy to you, because you
5   hadn't noticed the box had been gone in the first place.
6   So the box, at least as you recall, was where it was
7   supposed to be, right there?
8       A.   Yes.
9       Q.   So, again, this must've been during a time when
10  you left your office unlocked because someone obviously
11  came in and put the box of the videos back in your
12  office?
13      A.   Sure.
14      Q.   Now, you returned to your office on Monday,
15  August 8th, so this is the Monday after the Friday that
16  they view the videos.  When you enter your office you
17  discover that the box with the videos is gone?
18      A.   Correct.
19      Q.   All right.  This is still during the time you
20  leave your office unlocked?
21      A.   Yes.
22      Q.   So someone had come into your office
23  presumptively and taken the box of videos out of your
24  office?
25      A.   Yes.

1      Q.   And then you later received an e-mail that the

2   box with the DVRs had been placed in the United States

3   Attorney's Office vault?

4      A.   I-- I do know that, but I don't know how I found

5   out.

6      Q.   Now, the vault is a secure area?

7      A.   Yes.

8      Q.   You've had to put things in the vault before

9   presumably?

10     A.   No.

11     Q.   You've never put-- you've never put anything in

12  the vault?

13     A.   No.

14     Q.   Have you ever retrieved anything from the vault?

15     A.   No.

16     Q.   Who has access to the vault?

17     A.   I can't answer that, I don't know.

18     Q.   You don't know the code?

19     A.   I'm sorry?

20     Q.   You don't know-- you don't have access to it and

21  you don't even know who has access to it?

22     A.   No, I don't have access to it and I'm not sure

23  who does.

24     Q.   So if you wanted to put something in the vault,

25  you'd have to find somebody who knew the code, who knew

1   how to get in?

2       A.  Correct.

3       Q.  All right.  I'd like to talk a little bit about

4   the AVPC, and Ms. VanBebber covered a lot about that.

5   So this is a desktop computer.  Right?

6       A.  Yes.

7       Q.  It's a special computer made to help with audio

8   and video?

9       A.  Yes.

10      Q.  And it's got special software on it?

11      A.  Yes.

12      Q.  And among the types of special software on this

13  computer is video enhancement software?

14      A.  Not to a full extent of video enhancement, no.

15  It's made for clipping videos and audios.

16      Q.  Well, you can use that software to-- the software

17  on the AVPC to enhance video?

18      A.  I have never used it to enhance video.  I don't

19  know if that's possible or not.

20      Q.  Do you remember testifying in the *Dertinger* case?

21      A.  Yes.

22      Q.  I'm going to show you what's already been

23  admitted as Exhibit 502.  And this is Page 232.  Do you

24  recall testifying in that case that it has special-- the

25  AVPC has special software that you can use to enhance

1   video?

2       A.   I said that yes, but I've never used it for that.

3       Q.   The PELCO player used to view the video, that you

4   used to view the video, you downloaded it onto the AVPC?

5       A.   Yes.

6       Q.   The stand-alone computer?

7       A.   Yes.

8       Q.   You gave a disk of it to Agent Stokes?

9       A.   Yes.

10      Q.   Did you install or copy any other versions of

11  that program?

12      A.   The only other copy of the PELCO player was on

13  the laptop we used at the hearing for the closed court

14  session.

15      Q.   So you had-- there were four times on four

16  different instances, mediums, that you had this-- this

17  software on there.  It was on the AVPC, stand-alone

18  computer, the disk you burned for Agent Stokes, and then

19  on the courtroom laptop that you used for the Court to

20  view the video?

21      A.   Right.  I did not load it for Jeff Stokes.

22      Q.   All right.  You put it on a disk and gave it to

23  him to load himself?

24      A.   Yes.

25      Q.   You said that the PELCO player would only show up

1    on the AVPC when you logged in because it would show you

2    your desktop?

3        A.   Yes.

4        Q.   And if somebody else logged in to the AVPC with

5    their user name and password, the PELCO software

6    wouldn't show up?

7        A.   Correct.

8        Q.   Isn't it true that because the desktops-- when

9    you log in, it just shows you the icons that you have on

10   your desktop.  Right?

11       A.   Yes.

12       Q.   But that doesn't show you the full list of

13   programs that are on the computer?

14       A.   Correct.

15       Q.   So you might have solitaire or chess or other

16   programs as icons on your desktop when you log in, for

17   example.  Right?

18       A.   I suppose.

19       Q.   And I might have, you know, a poker game and a--

20   some other game on there as my desktop that show up as

21   icons when I log in?

22       A.   Right.

23       Q.   But those are just what we see when we log into

24   the desktop.  Those computers, regardless of who's

25   logged in, still contain that-- all those programs?

1    A.   That's correct.

2    Q.   And so if I were to, again, log in to my account

3    which doesn't have the-- the solitaire on the desktop,

4    but if I search for solitaire, it's still going to show

5    up?

6    A.   It could, yes.

7    Q.   So, for instance, if someone logged into the AVPC

8    with their own log-in credentials, not you, they might

9    not see the PELCO software as an icon on the desktop,

10   but if they do a search it's going to show up?

11   A.   If they knew how and if they knew what it was

12   called, yes.

13   Q.   Agent Stokes knew what it was called because you

14   burned a copy of it for him.  Right?

15   A.   But Agent Stokes doesn't have a log-on for our

16   computers.  He couldn't log on as himself on my AVPC.

17   Q.   I understand, but that wasn't my question.

18   A.   Okay.

19   Q.   My question was:  Agent Stokes knew the name of

20   the software?

21   A.   He may have, I don't know.  I don't know what he

22   knew.

23   Q.   All right.  I'd like to turn your attention to

24   the computer refresh.  There were some computers that

25   were slated to get totally replaced and there were some,

1    the newer ones, that were just supposed to get what you

2    called the new image put on them?

3        A.  Yes.

4        Q.  Which means their hardware shouldn't have been

5    messed with or hard drives shouldn't have been messed

6    with, but their software should've been changed?

7        A.  Well, the hard drive, in order to do a re-image,

8    gets completely wiped and the new image is put on that

9    drive.

10       Q.  Are you sure about that?

11       A.  I'm not sure because I'm not the IT person, but

12   that's what I was-- that's what I assumed when they said

13   they were refreshing them.

14       Q.  So did someone tell you that in order to do the

15   re-imaging, that they were going to have to wipe the

16   hard drives?

17       A.  I was told to remove anything off of the drives

18   that I was concerned about because I would need them-- I

19   would need to reload them after the refresh was done.

20       Q.  And so that led you to believe that they were all

21   going to be erased?

22       A.  Correct.

23       Q.  Did someone tell you that they had to be erased

24   as part of the program?

25       A.  They just warned me that if I wanted things off

1    of there, I should back them up.

2        Q.   Okay.  So when-- earlier when you said they had

3    to be erased as part of the re-imaging, you don't know

4    that they had to be erased, you just knew that they were

5    planning to be erased as part of the image--

6        A.   That's what I assumed, yes.

7        Q.   -- the refresh?  Okay.  So you knew, at least at

8    some point prior to it happening, that the AVPC was

9    going to get re-imaged, which meant its hard drive was

10   going to get wiped?

11       A.   Yes.

12       Q.   At that same time you also knew there was some

13   controversy about the CCA surveillance videos?

14       A.   I don't remember if that was at the same time or

15   not.

16       Q.   All right.  Did anyone ever tell you that our

17   office had asked the U.S. Attorney's Office to preserve

18   all of their electronically-stored information?

19       A.   At some point, yes, but I don't know if that was

20   at the same-- at that time or not.

21       Q.   All right.  So before the refresh, before the

22   AVPC gets wiped, do you recall anyone in your office

23   telling you that we had asked for all of the

24   electronically-stored information in your office to-- to

25   be preserved?

 1      A.   I don't remember when-- what the time frame was,

 2   no.

 3      Q.   So the refresh ended up occurring on

 4   September 6th, 2016, in Kansas City?

 5      A.   Again, I don't remember the specific date.

 6      Q.   All right.  So you came into work that day and

 7   you were surprised?

 8      A.   Not after the refresh, no.

 9      Q.   All right.  Well, weren't you surprised because

10   the drives were gone from the AVPC?

11      A.   That was after all of the drives were asked to be

12   locked up in our vault.

13      Q.   So you remember testifying in the *Dertinger*

14   hearing?

15      A.   I do.

16      Q.   So let me show you what's previously been

17   admitted as Exhibit 502.  This is Page 275.  You were

18   asked the question, "So you were surprised when you came

19   into the office after September 6th and learned that the

20   image had been refreshed on that particular computer?"

21   And you said that you were surprised when you came in

22   and the drives were gone.

23      A.   And that's why I think I was confused, because

24   the drives were not gone after the refresh, the drive

25   was still there after the refresh.

1      The drive was gone after they-- we were asked to

2  preserve all the drives in the office that had anything

3  to do with the case.  So I think at that hearing I was

4  confused about what it was talking about, because

5  there's two different instances in that answer.

6      Q.  But they're just--

7      A.  The drives are not physically gone until after

8  the Court asked us to preserve all drives that pertain

9  to the case.

10      Q.  So when were the drives-- you said there are two

11  instances.  When are the hard drives removed from the

12  AVPC?

13      A.  After the refresh.  I don't know what date, I

14  just know that I came into work, there are sticky notes

15  on both computers saying that the hard drives had been

16  removed.  That was the first that I was aware that that

17  was happening and that they were gone.

18      Q.  So there's a refresh, and that's on

19  September 6th?

20      A.  Okay.

21      Q.  And the AVPC is wiped at that point.

22      A.  And the new image was put on.

23      Q.  Sometime after September 6th and after it's

24  wiped, you come in to work and the hard drives are

25  removed?

1      A.   Correct.

2      Q.   How long had it been since the AVPC had been

3  wiped until the hard drives were removed?

4      A.   I do not know specifically.

5      Q.   Let me show you page-- or what's previously been

6  marked as 502.  It's Page 276 and part of 277.  The

7  question you were asked was:  The drives you're talking

8  about that weren't in your office, what drives you're

9  referring to.  It says:  The actual hard drives from

10  both computers, the law PC and the AVPC.  Is that right?

11      A.   Right.

12      Q.   And I believe your testimony about the previous

13  one I showed you was-- Page 275 of Exhibit 502, is that

14  you were confused about the question?

15      A.   Well, I-- I think that the refresh and then when

16  the drives were actually gone, if you read both-- the

17  refresh, the drive was not removed.  When it was

18  refreshed, the drive was still in there.  My projects

19  were backed up, I was able if I needed to to restore

20  them.

21           But when the drives were removed, that happened

22  after the refresh, I was not given any-- any warning

23  then.  So no backups were done on either of those

24  computers.

25      Q.   Would you agree with me that the question that

1    you were asked in Exhibit 502 is about the refresh?

2       A.   I-- I see that, but I-- I think I was confused.

3       Q.   All right.

4       A.   Because there's-- it's obviously two separate

5    instances, because no drives were removed during the

6    refresh.  The drives were removed after the refresh.

7       Q.   Would you agree with me that that's-- from

8    looking at the text of this transcript, that's not what

9    you said when you were asked about it?

10      A.   I agree.  I think I was confused because there's

11   two separate instances.

12      Q.   Thank you.

13           MR. BELL:  Thank you, Ms. Boyd.  I have no

14   further questions, Your Honor.

15           THE COURT:  Okay.  Mr. Clymer.

16                  CROSS EXAMINATION

17   BY MR. CLYMER:

18      Q.   I just want to clarify some terminology because a

19   lot of different computer-related terms have been used

20   sometimes interchangeably or in different contexts.

21           The-- the digital video data that you got was on

22   six drives that you've called DVRs but some people call

23   external hard drives; is that right?

24      A.   Sure.

25      Q.   Has that data ever been wiped, erased,

1    reformatted, wiped out in any way, to your knowledge?

2       A.   No.

3       Q.   That's been preserved.  Correct?

4       A.   Yes.

5       Q.   So any of the original data about what was

6    actually happening that was captured on cameras at

7    CCA-Leavenworth still exists.  Correct?

8       A.   Yes.

9       Q.   And that's in the Court's possession now.

10   Correct?

11      A.   Yes.

12      Q.   You had a copy on six hard drives, Secret Service

13   had the original.  Right?

14      A.   Right.

15      Q.   In order to watch that video data, one needed a

16   PELCO player.  Correct?

17      A.   Correct.

18      Q.   Do you remember it-- what the-- the name of the

19   player was?  Was it a DX-8100 or something like that?

20      A.   Something very long and crazy.

21      Q.   In order to put that player onto a computer, you

22   needed an executable file.  Correct?

23      A.   Yes.

24      Q.   That file essentially builds the player on a

25   computer.  Correct?

1   A.   Right.

2   Q.   You had that executable file, the-- the software

3   necessary to build a player on a disk you got from the

4   Secret Service.   Correct?

5   A.   Yes.

6   Q.   Using that disk, one can build one or 500 of

7   those players, depending on how many times you install

8   it.   Correct?

9   A.   Sure.

10   Q.   You made a copy of that executable file for Jeff

11   Stokes to take.   Correct?

12   A.   Yes.

13   Q.   Do you have any reason to believe that Jeff

14   Stokes gave that to other people to-- to install

15   multiple players?

16   A.   No.

17   Q.   You believe he was going to install it once on

18   his computer.   Correct?

19   A.   Yes.

20   Q.   You also could've taken that disk and made

21   multiple copies elsewhere, other than the instances

22   you've described.   Correct?

23   A.   Sure.

24   Q.   But you only used it to install it on your own--

25   the AVPC, the stand-alone for Jackie Rokusek, and a

 1  laptop for the Court.  Correct?

 2      A.  Yes.

 3      Q.  Other than that, did you install it anywhere

 4  else?

 5      A.  No.

 6      Q.  Do you have any reason to believe that an

 7  Assistant U.S. Attorney or a law enforcement person

 8  snuck into your office when it was unlocked, stole that

 9  disk, and installed it on their home computer?

10      A.  No.

11      Q.  As part of a regularly-scheduled Department of

12  Justice function, that AVPC was refreshed.  Correct?

13      A.  Yes.

14      Q.  People have used the term "wiped."  What does

15  "wiped" mean with respect to a computer?

16      A.  Well, to me it means that all the data was hard--

17  hard removed, so it didn't exist anymore.

18      Q.  Are you an expert in computer forensics?

19      A.  No.

20      Q.  Are you an IT person?

21      A.  No.

22      Q.  Do you know the difference between a quick

23  reformat and a full reformat?

24      A.  I think I do, but I don't know that for a fact.

25      Q.  Do you know what kind of reformat was done as

1   part of the upgrade on that computer?

2       A.  No idea.

3       Q.  Do you know what happened to the data on the AVPC

4   when the upgrade occurred?

5       A.  No.

6       Q.  After the upgrade occurred September 6th, could

7   you go back to your office and continue to use that

8   computer?

9       A.  Yes.

10      Q.  Because the hard drives were still in it.

11  Correct?

12      A.  Yes.

13      Q.  Does that computer have two hard drives or one?

14  Or did it have two or one, do you know?

15      A.  No, the law PC has two.

16      Q.  Did the AVPC only have one, to your knowledge?

17      A.  Yes.

18      Q.  But after the refresh, those computers still

19  functioned.  Correct?

20      A.  Yes.

21      Q.  And you had notice of the refresh coming.

22  Correct?

23      A.  Sure.

24      Q.  And that notice gave you a chance to back up your

25  projects.  Correct?

1       A.   Right.

2       Q.   And so that didn't trouble you when that

3   happened, did it?

4       A.   No.

5       Q.   Was there a separate event where you came in and

6   suddenly the hard drives in your computers were no

7   longer there?

8       A.   Yes.

9       Q.   And that was some time after the computer

10  refresh?

11      A.   Yes.

12      Q.   When that happened and you have no hard drive,

13  the computer will no longer do anything.  Correct?

14      A.   Correct.

15      Q.   Is that what made a problem for you?

16      A.   Yes.

17      Q.   Were you trying to mislead anybody at the

18  *Dertinger* hearing when you were answering those

19  questions?

20      A.   No.  And this is the first I've read it close

21  enough to see that that's what happened.

22      Q.   While the DVRs or external hard drives, whatever

23  you want to call them, that had the video evidence from

24  CCA were in your possession, to your knowledge, did

25  anybody other than you, Jackie Rokusek, and her

1  investigator look at that video?

2      A.   No, other than whoever was in the courtroom the

3  day that it was used in the-- in that hearing.

4      Q.   Did Erin Tomasic ever ask you to look at the

5  video?

6      A.   No.

7      Q.   Did any other AUSA ever ask you to look at the

8  video?

9      A.   No.

10     Q.   What's the average level of computer

11 sophistication of the attorneys in your office?  And

12 feel free to be honest about that, because other people

13 have been honest about their views of their colleagues

14 in this courtroom.

15             MR. BELL:  Objection, vague.  I don't know

16 what "the general level of computer sophistication"

17 means or how anyone could answer that question.

18             THE COURT:  I'll overrule, if you can

19 answer.

20             THE WITNESS:  I just know that I helped them

21 with a lot of things that are a lot less complicated

22 than that.

23             MR. CLYMER:  I don't have anything else,

24 Your Honor.

25                    REDIRECT EXAMINATION

1   BY MS. VANBEBBER:

2      Q.  Well, that leads me to what you already know,

3   which is, I'm right in there with the group who's less

4   sophisticated than you are.  Would you say that's a true

5   statement?  From what you've heard so far.  Right?

6          Well, I'm going to ask you to educate me one more

7   time.  You know that it was about-- well, let me just

8   phrase all this because you don't remember the dates, so

9   counsel will tell me if I've said it wrong.  It was on

10  August the 9th when there was a hearing and the judge

11  ordered the hard drives compounded.  Right?  Impounded.

12  Right?  To your knowledge?

13              MR. SLINKARD:  Your Honor--

14              MS. VANBEBBER:  Counsel can--

15              MR. SLINKARD:  I believe it was

16  September 7th that the Court discussed the hard drives,

17  at the third hearing.

18              MS. VANBEBBER:  No.  Well, at any rate, they

19  were impounded and--

20              THE COURT:  I don't recall--

21              MS. VANBEBBER:  -- just the hard drives, not

22  the--

23              THE COURT:  There was an in camera hearing

24  in my office.  Ms. Boyd came in with the laptop loaded

25  with the PELCO, and it was Jackie Rokusek and her

 1   investigator.

 2            MR. SLINKARD:  That was August 9th.

 3            THE COURT:  Yeah.

 4            MR. SLINKARD:  But the ordering-- I'm sorry,

 5   if the hard drives impounded means the refreshed hard

 6   drives, that was September 7th.  So maybe I

 7   misunderstood the question.

 8            THE COURT:  The day of the September

 9   hearing.  Well, I don't know if that's right or not.

10            MS. VANBEBBER:  Well, at any rate, we will

11   find the date.  I believe it is August the 9th because

12   the second set was brought up.  I think Mr. Seubert

13   testified, yeah.

14            MR. SLINKARD:  That's correct, the DVRs with

15   the video on them.

16            MS. VANBEBBER:  Yeah, that's what I'm

17   talking about.  All right.  So the DVRs with the video--

18            THE COURT:  Wait a minute.  Mr. Cohen, do

19   you want to weigh in on this?

20            SPECIAL MASTER COHEN:  Well, I just want to,

21   for the record, make clear that on September 7th on

22   Page 56 of the transcript is the colloquy between the

23   Court and Mr. Slinkard regarding the order for the U.S.

24   Attorney's Office to preserve the hard drives in that

25   office.

 1           THE COURT:  Because that's the date that Mr.
 2   Slinkard brought to my attention that there was a--
 3           MR. SLINKARD:  I apologize for any
 4   confusion.  The way she-- the way she referenced, I
 5   thought she was looking for help on the dates.  And she
 6   referred to them as hard drives when Ms. Boyd had been
 7   referring to them as DVRs.
 8           I would agree that on the 9th at the hearing
 9   the Court ordered into custody all six of the DVR drives
10   and all copies of those, pending the examination.
11           THE COURT:  Okay.  With that clarity,
12   there's no dispute it was August 9th that I ordered
13   that.  Proceed with-- re-frame your question.
14           MS. VANBEBBER:  And Ms. Barnett had already
15   anticipated that that might happen and brought 5 and 6
16   to the Court and they were taken at that time and then
17   they were brought in, as Mr. Seubert testified earlier,
18   the next day.
19   BY MS. VANBEBBER:
20   Q.  So if the-- if the DVRs were impounded on August
21   the 9th, then anybody who was going to look at the DVRs
22   had to have done it before then.  Correct?  Because
23   after then, all three pieces it took to look weren't
24   available, they weren't in your office anymore, were
25   they?

1     A.   Correct.

2     Q.   All right.  So we're looking-- the time frame

3  we're looking at is between sometime in June and August

4  the 9th?

5     A.   Sure.

6     Q.   Okay.  Now, with that in context, sometime in

7  July you've testified that you gave Stokes both the

8  software and a cheat sheet for how to put it together,

9  put all three pieces together.  Right?

10    A.   Sure.

11    Q.   And then you don't know whether he ever came

12 and-- and borrowed the DVRs from you?

13    A.   I have no specific recollection of him ever

14 taking them.

15    Q.   It was when-- when you were gone.  If he did it,

16 it was when you were gone.  So if he ever did load

17 anything and look at anything, it had to be when you

18 were gone.  Right?

19    A.   Correct.

20    Q.   Because you didn't-- you didn't check them out to

21 him.

22         Then let's go to the-- the refreshment.  If the

23 record reflects, and I believe it does, that the refresh

24 that you've-- what you've referred to as the refresh

25 itself took place on August the 31st, which was a

1  Wednesday, and September the 1st, which was a Thursday,

2  and as you-- as you said, when the refresh occurred,

3  your computers still worked, your PCs still worked, both

4  the court one and the AVPC?

5      A.  Correct.

6      Q.  All right.  And then you went on break and I-- I

7  believe-- I think Mr.-- I think we misspoke as to what

8  days you were gone.  But on the-- you came back on the

9  8th?

10     A.  I don't remember that specifically, but...

11     Q.  But if you testified to that before and the

12 record reflects that, you don't have any reason to--

13     A.  I just don't remember it specifically.

14     Q.  When you came-- when you left, your AVPC was

15 working and your law PC was working.  Right?

16     A.  Yes.

17     Q.  I will leave out the third one that's your

18 personal computer.  Just those two that we're concerned

19 with.

20         So we know from the record that the second

21 episode of taking care of the computers happened on

22 September the 6th?

23     A.  When the drives were removed?

24     Q.  When the drives were removed.  You were gone, you

25 didn't know it was going to happen.  Right?

 1      A.   Right.

 2      Q.   But it did happen, and that was the second

 3   incident.   The refresh had already occurred.   These two

 4   were there when you left still working.   You come back

 5   on the 8th, because we know the drives were removed on

 6   the 6th, you came back on the 8th and--

 7      A.   Right.

 8      Q.   -- there was no insides--

 9      A.   Correct.

10      Q.   -- to your computers.   Correct?

11      A.   Correct.

12      Q.   Now, since that time, and I'm not sure I

13   understood your testimony on this, you said that the law

14   PC which was empty has now got a new hard drive in it?

15      A.   Yes.

16      Q.   And you can use it?

17      A.   Yes.

18      Q.   And you are using it?

19      A.   Yes.

20      Q.   And you've got a brand-new personal computer?

21      A.   I got that in-- during the refresh.

22      Q.   So that was just by the refresh, so you've got

23   those two working.   And the AVPC is still empty sitting

24   there on your desk, the chassis, but there's no hard

25   drive in it?

1        A.   Right.

2        Q.   Is that right?

3        A.   Right.

4        Q.   And as far as you know, it may be locked up

5   somewhere in the vault, but you haven't seen it.  Right?

6        A.   No, I haven't.

7        Q.   You haven't had-- your hands have not touched

8   that hard drive--

9        A.   No.

10       Q.   -- since you left for your leave during the first

11   week of September?

12       A.   No.

13       Q.   Okay.  Is it your opinion-- I don't want to say

14   it's your opinion.  Do you think the first-- the only

15   person who can really elucidate what happened would be

16   Mr. Steeby?

17       A.   As far as the refresh and removal?

18       Q.   The refresh and also removing the hard drives.

19       A.   Yes.

20       Q.   There isn't anybody else that you know in the

21   U.S. Attorney's Office who would have that kind of

22   ability to go about taking care of those jobs?

23       A.   No.

24       Q.   Okay.  Thank you.

25            THE COURT:  Anything more, Mr. Bell?

```
 1                MR. BELL:  No, Your Honor.

 2                THE COURT:  Mr. Clymer?

 3                MR. CLYMER:  No, Your Honor.

 4                THE COURT:  May Ms. Boyd be excused?

 5                MS. BRANNON:  Yes.

 6                THE COURT:  You're excused.  Thank you.  All

 7     right.  So we will recess and we will reconvene at 8:30

 8     tomorrow morning.  Is there something we need to bring

 9     up?

10                MS. BRANNON:  Yes.  I forgot to move into

11     admission four exhibits.

12                THE COURT:  Go ahead.

13                MS. BRANNON:  I believe Bonnie has the

14     numbers.  596 through 599 we move into admission.

15                THE COURT:  596 through 599.  Any objection?

16                MR. CLYMER:  What were those ones?

17                (Counsel confer).

18                MR. CLYMER:  No objections.

19                THE COURT:  All right.  596-599 admitted.

20     Those are the Sedgwick County and Butler County

21     spreadsheet reports?

22                MS. BRANNON:  Those are just Butler County,

23     which are-- I believe earlier we moved for admission of

24     Sedgwick County and 593-- or 596 I believe is the

25     spreadsheet, which needs to be under seal.
```

1          THE COURT:  596 is under seal and then 597,

2    '98, '99 are admitted but not under seal.  Correct?

3          MS. BRANNON:  Thank you.

4          THE COURT:  All right.  Any other cleanup or

5    any other matters to talk about tonight before we close

6    out?  All right.  We will see you back at--

7          MR. SLINKARD:  Thank you, Judge, no.

8          THE COURT:  -- 8:30 tomorrow morning.

9          (5:27 p.m., proceedings recessed).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E
 2
 3
 4
 5      I, Kelli Stewart, a Certified Shorthand Reporter and
 6   the regularly appointed, qualified and acting official
 7   reporter of the United States District Court for the
 8   District of Kansas, do hereby certify that as such
 9   official reporter, I was present at and reported in
10   machine shorthand the above and foregoing proceedings.
11      I further certify that the foregoing transcript,
12   consisting of 356 pages, is a full, true, and correct
13   reproduction of my shorthand notes as reflected by this
14   transcript.
15      SIGNED October 29, 2018.
16
17
18
19            /s/ Kelli Stewart
20            Kelli Stewart, CSR, RPR, CCR, RMR
21
22
23
24
25
```