```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF KANSAS
 2

 3  UNITED STATES OF AMERICA,

 4       Plaintiff,

 5  v.                          Docket No. 16-20032-02-JAR

 6  KARL CARTER,                Kansas City, Kansas
                                Date:  10/04/2018
 7

        Defendant.             Day 5
 8  ....................       Pages 1057-1358

 9
                              REDACTED
10          TRANSCRIPT OF MOTIONS HEARING
          BEFORE THE HONORABLE JULIE A. ROBINSON
11            UNITED STATES DISTRICT JUDGE

12
    APPEARANCES:
13
    For the Government:  Mr. Steven D. Clymer
14                       Department of Justice - USAO
                         Lrm Eckert, William
15                       100 S. Clinston Street
                         Suite 9000
16                       Syracuse, New York 13261

17                       Mr. Duston J. Slinkard
                         Office of United States Attorney
18                       444 Southeast Quincy
                         Suite 290
19                       Topeka, Kansas 66683-3592

20                       Mr. Stephen R. McAllister
                         Office of United States Attorney
21                       500 State Avenue
                         Suite 360
22                       Kansas City, Kansas 66101

23

24

25
```

```
 1    APPEARANCES:

 2    (Continued)

 3    For the Defendant Karl Carter:
                          Mr. David J. Guastello
 4                        The Guastello Law Firm, LLC
                          811 Grand Boulevard
 5                        Suite 101
                          Kansas City, Missouri 64106
 6
      For the Movant Federal Public Defender:
 7                        Ms. Melody J. Brannon
                          Mr. Kirk C. Redmond
 8                        Mr. Branden A. Bell
                          Office of Federal Public Defender
 9                        117 Southwest Sixth Street
                          Suite 200
10                        Topeka, Kansas 66603

11    For the Special Master David R. Cohen:
                          Mr. David R. Cohen
12                        David R. Cohen Co., LPA
                          24400 Chagrin Boulevard
13                        Suite 300
                          Cleveland, Ohio 44122
14
                          Ms. Alleen VanBebber
15                        VanBebber Law Firm, LLC
                          2029 West 95th Street
16                        Leawood, Kansas 66206

17

18

19

20

21

22
      _____
23
            Kelli Stewart, CSR-KS, CRR-MO, RPR, CRR, RMR
24                    Official Court Reporter
              259 U.S. Courthouse, 500 State Avenue
25                    Kansas City, Kansas 66101
```

1                        I N D E X

2
     Special Master's Witnesses:                        Page
3
     DAVID STEEBY
4      Direct Examination By Ms. VanBebber            1081
       Cross Examination By Mr. Redmond               1106
5      Cross Examination By Mr. Clymer                1120
       Examination By the Court                       1131
6      Redirect Examination By Ms. VanBebber          1136
       Recross Examination By Mr. Redmond             1140
7      Recross Examination By Mr. Clymer              1142
       Redirect Examination By Ms. VanBebber          1143
8
     DAVID ZABEL
9      Direct Examination By Ms. VanBebber            1144
       Cross Examination By Mr. Redmond               1169
10     Cross Examination By Mr. Clymer                1198
       Recross Examination By Mr. Redmond             1206
11
     LANNY WELCH
12     Direct Examination By Ms. VanBebber            1227
       Cross Examination by Ms. Brannon               1239
13     Cross Examination By Mr. Clymer                1246
       Recross Examination By Ms. Brannon             1261
14
     EMILY METZGER
15     Direct Examination By Ms. VanBebber            1263
       Cross Examination By Ms. Brannon               1300
16     Redirect Examination By Ms. VanBebber          1341
       Recross Examination By Ms. Brannon             1353
17     Recross Examination By Mr. Clymer              1355

18   Federal Public Defender's Witnesses:             Page

19   ERIN TOMASIC
       Direct Examination by Ms. Brannon              1063
20     Cross Examination By Ms. VanBebber             1079

21   CARLOS MORAN
       Direct Examination By Mr. Redmond              1207
22     Examination By the Court                       1219
       Cross Examination By Mr. Clymer                1220
23

24

25

16-20032  USA v. Karl Carter (Black) REDACTED 10.04.18          1060

```
1                      E X H I B I T S
2

3       Federal Public Defender's
         Exhibits            Offered            Received
4
              556             1106               1106
5             580A            1169               1169
              589             1106               1106
6             614             1106               1106
              615             1106               1106
7             642             1299               1300
              651             1299               1300
8             666             1169               1169

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   (8:34 a.m., proceedings commenced).

 2              THE COURT:  All right.  You can be seated.

 3   All right.  Ms. Tomasic is being recalled?

 4              MS. BRANNON:  Yes, Your Honor.  We had one

 5   matter to bring up with the Court before we start.

 6              THE COURT:  Okay.  Go ahead.

 7              MR. BELL:  Your Honor, in our efforts to

 8   secure Ms. Treadway's attendance, the marshals service

 9   has said that they are able to reimburse Ms. Treadway's

10   expenses for coming to the courthouse, but because they

11   exceed what they would normally reimburse for, that they

12   would need a court order to pay for that amount.

13              I know the government doesn't have any

14   objection.  I just plan to submit a proposed order

15   authorizing the marshals to reimburse up to $700 for the

16   transport, since that's what Ms. Treadway estimated

17   would be the cost.

18              THE COURT:  I really want more information

19   before I'm going to sign a court order for $700

20   reimbursement for a 40-mile drive from Lawrence to

21   Kansas City, Kansas.  I mean, I don't think there was a

22   doctor's note attached to this.  And while I trust that

23   Ms. Treadway broke her foot or a toe-- I think a

24   metatarsal is a toe.  I only know that because I broke

25   my fourth metatarsal at some point.
```

1    But I think I'm going to need to hear-- or

2  have more information as to why she can't just ride in a

3  normal common carrier or in a private vehicle, why she

4  needs a medical attendant.

5    MR. BELL:  I can provide that.  Ms. Treadway

6  did provide a doctor's note to the marshals service, and

7  we were copied on that transmission.

8    THE COURT:  Okay.

9    MR. BELL:  Apparently the concern is that in

10 addition to the broken toe, Ms. Treadway suffers from a

11 condition that makes her have balance issues, so she's a

12 fall risk.  And the expenses are for a wheelchair

13 transport from her house to here and an attendant at $60

14 an hour to help her out of her house, be with her here

15 while she's at the courthouse, and then travel with her

16 and help her back into her home.

17    THE COURT:  All right.  Well, if you're

18 satisfied based on what you know that there's this

19 medical necessity, there is a doctor's note, I just

20 haven't seen it, you can submit a proposed order to me

21 and I'll sign it.

22    MR. BELL:  Thank you, Your Honor.

23    THE COURT:  Okay.  All right.  I'm sorry,

24 yes, swear Ms. Tomasic in.

25    ERIN TOMASIC,

1  recalled as a witness on behalf of the Federal Public

2  Defender's Office, having first been duly sworn,

3  testified as follows:

4                    DIRECT EXAMINATION

5  BY MS. BRANNON:

6      Q.   Good morning, Ms. Tomasic.

7      A.   Good morning.

8      Q.   Thank you for coming back.  In looking through

9  the transcript yesterday and thinking about some of your

10  testimony, there were a couple of areas I wanted to

11  clear up because I think if we don't clear it up now, we

12  may have some confusion later.

13          It has to do with your testimony about the

14  practice of-- or the principle of if you're not going to

15  use something in your prosecution, you don't have to

16  disclose it.

17      A.   Uh-huh.

18      Q.   And I want to ask a couple of questions about

19  that.  When you were talking about disclosing it, you

20  were talking about disclosing it to defense counsel in

21  that case.  Correct?

22      A.   That's correct.

23      Q.   And not necessarily about just disclosing it to

24  other attorneys in the office or law enforcement?

25      A.   Yes.

 1    Q.  And when you're talking about not disclosing

 2    evidence that you're not going to use, that would

 3    include Rule 16 evidence?

 4    A.  When I was presented with this analysis on a few

 5    occasions--

 6    Q.  Uh-huh.

 7    A.  -- I hadn't yet gone to the course at the NAC.  I

 8    didn't go to the discovery course in the NAC until March

 9    of 2017.

10         So I was aware of Rule 16.  I was aware of *Brady*

11    and *Giglio*, but I wasn't asking questions of the AUSA,

12    Tris Hunt or Dave Zabel, about how it all intersected,

13    their analysis where if you weren't going to use it--

14    and I remember Dave repeatedly saying, and if there's no

15    harm, like if it-- if it didn't lead to some sort of

16    evidence that we would use against the defendant, then--

17    then you didn't have to disclose it.

18         But I also heard on other instances those same

19    two individuals say that if it's *Brady*, you do have to

20    disclose it.  And if it's *Giglio*, you do have to

21    disclose it.  But then I heard other instances of

22    another prosecutor not turning over *Giglio* and pleading

23    cases out in advance of the *Giglio* deadline.

24    Q.  Okay.  Let's walk through just a little bit of

25    that.  Once you went through the training and had that

1   knowledge, when you look back on what they were telling

2   you early on, do you understand that-- that they were

3   going to withhold Rule 16 evidence if they were not

4   going to use it?  And if you can't put that together,

5   that's fine.

6       A.  I can't put that together.  And, honestly, my

7   mind has shut down to law.  I haven't-- I haven't

8   practiced law, I haven't thought about it.  I, you know,

9   had ruminating thoughts about the facts that we've

10  talked about the last few days for about a year.

11      But as far as legal analysis-- I mean, what was

12  at issue in the *Lopez* case where I first saw Mr. Hunt

13  employ this analysis would have been some sort of

14  documentation showing that someone at the DEA was paying

15  someone at a telephone company for company records and

16  then whatever those records were that were provided.  So

17  that was not disclosed.

18      Q.  All right.  So let's unpack that a little bit.

19  You talked about that, I think you called it a bribe

20  yesterday?

21      A.  Yes.

22      Q.  So a DEA agent bribed someone to get phone

23  numbers that were then used or proposed to be used in a

24  wiretap application; is that right?

25      A.  I don't-- so as it was presented to me-- and Tris

1  had the agent go find out.  The case agent was the one

2  reporting this back and forth to us, and he's not the

3  one who had done it with the-- with the phone company.

4      Q.  Okay.

5      A.  So he reported back that although one of the

6  agents in his group had secured this information - and

7  they were struggling to find the new target telephone in

8  a roving wiretap - that that information that came back

9  was not used to find the new phone.  Rather,

10 simultaneously a different agent found that exact same

11 new phone that was provided from the phone company

12 through common call analysis.

13     Q.  So the fact that there was the DEA bribery to get

14 this phone number in the first place was not disclosed

15 to counsel?

16     A.  No.  And the reason we were looking into it is

17 counsel-- and I don't recall which attorney it was, but

18 it was Mr. Lopez' attorney I think, and I don't know who

19 it was, called Tris to ask, I can't figure out how you

20 all got this phone.

21     Q.  And so the other part of that would be, besides

22 not disclosing that, the agent that did the bribery

23 would be subject to *Giglio*.  Right?

24     A.  If it was-- if it was against DEA protocol or

25 illegal, if it was-- yes.  I mean arguably.

1    Q.   Do you think bribery, bribing to get information

2    might be problematic?

3    A.   I think it would be, but I know DEA paid a lot of

4    people to do a lot of things.

5    Q.   But the fact that that bribery was not disclosed

6    to the defense attorney so the defense attorney could

7    investigate the propriety of that or impeach witnesses

8    with that, that was not disclosed.  So that sort of

9    impeaching evidence was not disclosed by Mr. Hunt?

10   A.   No.

11   Q.   Was there any further investigation into that

12   bribery done to find out how-- the extent of it?

13   A.   No.

14   Q.   Okay.

15   A.   What I recall - and, again, it's been a long

16   time - is that Mr. Hunt had the case agent write

17   something stating that he didn't-- he did not rely on

18   the phone company records in identifying the new target

19   telephone, and Mr. Hunt put it in the file.

20        And he was not being sneaky.  He was explaining

21   to me as a teaching moment.  And, Erin, this is why we

22   don't have to disclose it.  And the case agent was there

23   too, and he was explaining it to the case agent.

24   Q.   That memo that Mr. Hunt had written explaining

25   what had happened, that was not disclosed to counsel?

1   A.   No.

2   Q.   That was kept in the file?

3   A.   Yes.

4   Q.   Was that memo accurate or was that memo written

5   in such a way to cover up the bribery?

6   A.   I don't recall if I saw the memo, and I may have,

7   I don't recall what it said.

8   Q.   Did you understand that the point of the memo was

9   to cover up the bribery or to document what had happened

10  for Tris' purposes?

11  A.   To document for Tris' purposes to justify not

12  turning it over, that it-- that the phone records

13  weren't used to identify the new target telephone.

14  Q.   Did you see this sort of practice or principle in

15  play in other cases?

16  A.   I remember engaging in that analysis in other

17  cases when asking do I need to turn this over, but I

18  don't remember what cases.  I remember going to Dave and

19  saying, does this need to be turned over?  And I

20  remember him saying, what's the harm here?  Identify the

21  harm.

22  Q.   The harm in turning it over or the harm in

23  keeping it?

24  A.   The harm to the defendant.

25  Q.   The harm to the defendant in not disclosing it?

1    A.  I understood it like did it produce evidence that

2  was used against the defendant?  And if it didn't, then

3  there's no harm to the defendant, so we don't have to

4  turn it over.

5    Q.  And when either Mr. Hunt or Mr. Zabel are talking

6  to you about this, there was no discussion at that time

7  about whether it was Rule 16 or exculpatory or what

8  category it fell in, it was just that they were not

9  going to use it?

10   A.  I will not say-- I don't know that that's the

11 case.  I know that we did discuss at times Rule 16.  We

12 discussed Rule 16 a lot in discovery and *Brady* and

13 *Giglio*.  And I'm not going to say that they weren't also

14 using that analysis.  I just don't remember.

15   Q.  All right.  Would it be fair to say that the

16 baseline was:  If you're not going to use it, don't

17 disclose it, and then think about harm or the

18 consequences of not disclosing it?

19   A.  The harm to the defendant.

20   Q.  Right.  But the baseline would be:  If you're not

21 going to use it, don't disclose it.  And if that's the

22 baseline, then you'd think about what's the harm to the

23 defendant or what are other obligations?

24   A.  I don't know if I would agree with that either.

25 These conversations didn't happen that often because

1  there-- it didn't come up often that-- terribly often

2  that there was something that we didn't want to

3  disclose.  So it didn't come up frequently.

4       The reason the Tris Hunt incident was sort of

5  stuck in my mind was shortly after I got fired-- and

6  after I got fired, I was angry.  And I was talking to

7  Kim Flannigan after I had been fired.  And I said, you

8  know, this is no-- what I did in *Herrera-Zamora* is no

9  different than what Tris did in *Lopez*.

10      He told me that this is the analysis to use.  I

11  used that analysis.  I think he told me not to tell Kim

12  Flannigan at the time.  He told me not to tell the

13  ladies in the office what was happening with the

14  bribery.  And he said the reason was that they hated--

15  well, two of the three hated the DEA and that they were

16  jealous that he had gotten some big award for that case,

17  and he just didn't want them putting down the DEA.

18      He didn't act like it was bad behavior, but that

19  they would use this as another jab against the DEA, and

20  he didn't want them to know.

21      Q.  Who are the ladies in the office?

22      A.  It would be Kim Flannigan and Sheri Catania and

23  Terra Morehead.  And at the time and for over a

24  several-year period, Kim Flannigan and Sheri Catania had

25  a conflict with the DEA.  Terra Morehead did not.

1        But Kim took that to-- and I said, you know, ask

2   Scott, ask him how this is any different.  So she took

3   that to Scott and-- and Tris presumably, although I

4   don't know, and came back to me and she said, Scott said

5   it's completely different because Tris cut a deal to

6   avoid having to disclose it, and you didn't cut a deal

7   with Mr. Herrera-Zamora.

8        And I said, that's not true because the deal that

9   was cut in *Lopez* was cut much later for an entirely

10  different reason.  It had nothing to do with the

11  bribery.  It had something to do with something entirely

12  different that occurred months later.

13  Q.  Was this Lopez-Arenas, or do you remember?

14  A.  His first name was Elias.  I don't know what his

15  second last name was.

16  Q.  Were there any other instances-- well, you talked

17  about *Giglio*, and I think you mentioned another incident

18  that involved *Giglio* or a controversy over disclosing

19  *Giglio*.  Do you remember what that was?

20       MR. CLYMER:  Your Honor, at this point I

21  object.  This has gone far beyond the Sixth Amendment

22  claims in this case.

23       MS. BRANNON:  I think it's going to go to

24  the credibility of the witnesses that are going to

25  testify before this Court.

1          THE COURT:  All right.  Overruled.

2          THE WITNESS:  I was aware when I was working

3    there, and I can't give you a timeline, that there was

4    this huge conflict for which much-- many people in the

5    Kansas City office and in other branches were engaged

6    over a DEA agent who, as I was told, had been found by

7    the Inspector General to be untruthful because he had

8    lied in dealings with Tris Hunt - excuse me, not Tris

9    Hunt - Dave Zabel, Trent Krug and Sheri Catania.

10         And I knew that-- and I didn't know this

11   personally, but I-- there were lots of e-mails and lots

12   of fights over this, that Debra Barnett continued to use

13   this agent as a case agent, as an affiant on wiretaps,

14   as a grand jury witness.  And that was a problem from

15   Ms. Flannigan's eyes.  And there were lots of fights

16   with the DEA about this.  I know that--

17   BY MS. BRANNON:

18     Q.   Before you-- so is your testimony that Ms.

19   Barnett was using this agent without disclosing that

20   *Giglio*?

21     A.   Yes.

22     Q.   Okay.

23     A.   And so the agent was still on one of Sheri

24   Catania's cases, and she submitted a *Giglio* request to

25   the DEA and somehow the DEA supervisor found out.  And

1  someone in management - I don't recall who, upper

2  management - called Sheri Catania.  Actually, I do

3  recall who, it was Tom Beall.  And said, you're not

4  allowed to disclose that to the defense attorney and--

5     Q.  And you were on this e-mail traffic?

6     A.  No.  Sheri is telling me all this and telling

7  Kim, and they're furious.  And she says, I'm not doing

8  that, that's my law license.  And he says, fine, I'll

9  re-assign the case.  So he re-assigned the case to

10 someone else.  And then I was present--

11    Q.  Let me stop you.  Do you remember what case that

12 was?

13    A.  I know you were the attorney.

14    Q.  Okay.

15    A.  And it's a case-- I can't remember the name, but

16 it's kind of a famous case because there was an appeal

17 where Kansas--

18    Q.  Damian Brooks.

19    A.  Yes.  Yes.

20         THE COURT:  I'm sorry.  What's the name?

21         MS. BRANNON:  Damian Brooks.

22         THE WITNESS:  Yes.  And so Ms. Barnett, she

23 had a close relationship with this agent and continued

24 to use him.  And I was present--

25 BY MS. BRANNON:

1    Q.  Who was the agent?

2    A.  Chris Klein (phonetic).

3    Q.  Okay.  I'm sorry.

4    A.  And the idea-- the basis for the Inspector

5    General-- and I haven't seen the Inspector General's

6    report, but I was told that it suggested or it said,

7    found, that he was dishonest in dealing with Dave Zabel,

8    who had Trent Krug present as a witness for a

9    conversation, and that he was separately dishonest with

10   Sheri Catania and something about mishandling of CIs and

11   CIs going to Mexico, but I don't know the details.

12        But I know in the last year of my employment, Ms.

13   Barnett made a phone call to the Western District of

14   Missouri and was advocating for them to continue and use

15   Chris Klein as an agent.  And she says, he's not really

16   *Giglio*'d, it's just a personality conflict with Ms.

17   Catania.

18        And then Gene Porter called Ms. Catania-- and I

19   believe I was present for that phone call in the office,

20   but I-- if not, I came in right after.  And Sheri--

21   either I heard it or Sheri relayed to me that Deb was

22   telling them it was just a personality conflict.  And

23   she said, no, Gene, it is not a personality conflict.

24   It's not just me, it's three AUSAs, and there's been an

25   Inspector General finding.  Just get the report

1    yourself, don't take my word for it.

2        And so they got the report themselves in the

3    Western District of Missouri, I know, and they-- ASAC of

4    DEA, Troy Derby, had also been advocating for the use of

5    Chris Klein in the Western District.  And based on their

6    own looking at the report, they made a determination not

7    to deal with-- not just Chris Klein, but they made a

8    larger assessment because they felt like there had been

9    misrepresentations made about Chris Klein.  So that was

10   my understanding.  You know--

11       Q.  So--

12       A.  -- do you have to turn over *Giglio*, period,

13   because it's also *Brady* or do you have to turn over

14   *Giglio* or can you plead your case out before 14 days

15   before trial?

16       Q.  Or this idea that you can sort of paper around or

17   find another way around so that you don't have to

18   disclose, like Mr. Hunt did with the memo--

19       A.  Right.

20       Q.  -- and the other way they discovered the number.

21   Were there other instances of that, or was that a

22   practice in the office that you saw?

23           THE COURT:  Let me just interject a question

24   here just for-- so was this sort of what underlay the

25   great resistance to the new Kansas City, Kansas,

 1   pretrial order that I, along with a group of lawyers,

 2   including lawyers from your office, were trying to

 3   accomplish that would require early disclosure of *Brady*

 4   and *Giglio*?

 5              Was that why there was resistance to that,

 6   because of the practice of either not disclosing that or

 7   at least delaying disclosure so that a plea agreement

 8   could be negotiated before the defense knew about any

 9   such information?

10              THE WITNESS:  I don't know-- I don't know

11   the answer to that.  I-- I don't know.  I think-- I know

12   there was resistance to the new pretrial order, but I

13   don't remember the basis for it.  I think having to turn

14   over every-- maybe it was-- and I'm-- again, I'm not

15   clear on this.  But I think the resistance was that

16   everything had to be ready early and that they felt like

17   that was difficult to do, but I don't know.  I really

18   don't know.

19              THE COURT:  All right.  Well, Ms. Barnett

20   was involved in that, so I'll ask her or have-- somebody

21   else can ask her.

22   BY MS. BRANNON:

23      Q.  Do you remember the-- the time that there was

24   actually a-- a committee in place to talk about

25   discovery issues that Judge Robinson was the head of?

1      A.  I do remember hearing about it.

2      Q.  Okay.  Was there anything you were aware of in

3  your office that-- let me back up and just ask it like

4  this.  There are prosecutors that say, hey, there's an

5  open file, come and get it.  I want to just disclose

6  everything.  That was not the practice and philosophy of

7  the Kansas City, Kansas office; is that correct?

8      A.  That is correct.

9      Q.  And that also applied to early disclosure of

10  things like *Giglio* and *Brady*.  Right?

11      A.  Yes.

12      Q.  It's kind of like, don't hand it out until you

13  have to.  Right?

14      A.  Yes.

15      Q.  And even when you maybe have to, if you can find

16  a way around giving it out, you should?

17      A.  I won't make blanket statements like that,

18  because, again, there's a lot of different actors and

19  there was not a consistent discovery approach in the

20  office.

21      Q.  Right.

22      A.  There wasn't.

23      Q.  And so there wasn't a consistent discovery

24  approach for you to go to for guidance.  Right?

25      A.  No.

1    Q.   And there were prosecutors that would fall on one

2    side one time and the other side another time?

3    A.   What I took from-- in hindsight looking back, is

4    that the same person you could go to and one time if

5    they're giving you advice would go one way, but then

6    you'd see them do something different personally.

7         And that didn't happen all the time, but I saw

8    that happen looking back.

9    Q.   With any particular prosecutors that you can

10   remember?

11   A.   I mean, I think it's just the same stuff I've

12   just covered, you know.

13        MS. BRANNON:   Okay.  All right.  If I could

14   have just one moment, Your Honor.

15        THE COURT:  Yes.

16   BY MS. BRANNON:

17   Q.   In the case with Mr. Hunt on the bribery, you

18   mentioned two different DEA agents, one that was

19   actually engaged in the bribery and the other one who

20   was talking to Mr. Hunt; is that right?

21   A.   Uh-huh.

22   Q.   Who was the one who was talking to Mr. Hunt?

23   A.   The case agent, Brandon Burkhardt.

24   Q.   And who was the agent who was involved in the

25   bribery?

16-20032  USA v. Karl Carter (Black) REDACTED 10.04.18          1079

1    A.  I don't-- I cannot say with certainty, but I

2  think it was-- I don't-- I'm-- I'm not sure, but I think

3  it was Eric Smith.

4          MS. BRANNON:  All right.  Thank you very

5  much.

6          MS. VANBEBBER:  I just have one or two

7  questions.

8                CROSS EXAMINATION

9  BY MS. VANBEBBER:

10    Q.  Very early in the *Black* case, did you send a memo

11  out to your agents telling them-- telling them that it

12  was all right to read or listen to attorney-client

13  conference information?

14    A.  I did send an e-mail saying that based on my

15  research, it was okay to listen to attorney calls.  And

16  it is my memory that I followed up, after talking with

17  Mr. Oakley, and clarified that they didn't need to do it

18  just because there was no purpose in it and just to let

19  me know if they encountered any attorney calls.

20          When I was-- I found that e-mail when I was going

21  through my e-mails after I met with the Special Master

22  the first time.  I brought it to Chris Oakley's

23  attention, and I asked-- I told him what my memory was,

24  and I asked him if I should talk to the other agents to

25  confirm that I had gone back and followed up.  And he

1  said not to do it at that point because it would look

2  like I was trying to get our stories straight so just

3  hang back.

4         So when I was fired in May of 2017 and I was-- it

5  was either at the time I was writing my letter to Judge

6  Robinson or just after, I called Matt Cahill, who was

7  retired, and I told him I had been fired and that I had

8  written this letter of correction.  And I made it very

9  clear I don't mind correcting one other thing, I just

10  want to know if you remember me giving any follow-up

11  instructions regarding the phone calls.  And Matt Cahill

12  recalled me coming back and correcting and telling the

13  agents don't listen and just let me know if you

14  encounter a phone call.

15        And based on my own memory and Matt's memory, I

16  felt comfortable not writing another letter.  Well,

17  actually, I decided not to write any more letters to

18  Judge Robinson because she had indicated I would have to

19  be a party to the litigation if I did that, and I didn't

20  have the money for an attorney to do that.

21        So I brought the e-mail to Mr. Cohen's attention

22  and I explained that I had also talked to Matt Cahill.

23  And then this morning, I brought it up to you all again

24  because I didn't want anybody to find the e-mail and me

25  get called back again to the courtroom.  So that's--

16-20032   USA v. Karl Carter (Black) REDACTED 10.04.18      1081

1    that's--

2                    MS. VANBEBBER:  All right.  Thank you.

3                    THE COURT:  Mr. Clymer?

4                    MR. CLYMER:  No questions, Your Honor.

5                    THE COURT:  All right.  Anything to follow

6    up on that?  All right.  Hopefully this is it, Ms.

7    Tomasic.

8                    THE WITNESS:  Okay.  Thank you.

9                    THE COURT:  All right.  You're excused.

10                   THE WITNESS:  All right.  And I did want to

11   say if we do reconvene in the last week of November, I

12   do have a trip planned, so I'm hoping that we can work

13   around that if I do have to come back again.

14                   THE COURT:  All right.  We'll work around

15   it.

16                   THE WITNESS:  Thank you.

17                   THE COURT:  Okay.  Next witness.

18                   MS. VANBEBBER:  David Steeby.

19                        DAVID STEEBY,

20   called as a witness on behalf of the Special Master,

21   having first been duly sworn, testified as follows:

22                   DIRECT EXAMINATION

23   BY MS. VANBEBBER:

24     Q.  Mr. Steeby, how long have you worked for the

25   United States Attorney's Office?

 1      A.   I'm in my 17th year with the United States

 2   Attorney's Office.

 3      Q.   And what's your position?

 4      A.   I'm the district systems manager for the District

 5   of Kansas.

 6      Q.   Is that often just formal-- informally called the

 7   IT guy?

 8      A.   More often than not, yes.

 9      Q.   Are there any other IT people in your--

10   underneath your supervision?

11      A.   I supervise one IT specialist.

12      Q.   And that person's name?

13      A.   Tessa Hooker.

14      Q.   When did you first learn about the concerns that

15   this Court had in the *Black* case regarding video?

16           May I ask what you're referring to?  It's fine,

17   but may I ask what you're referring to?

18      A.   This is the disclosure authorization that was

19   provided to me by Steven Clymer.

20      Q.   Oh, okay.  All right.

21      A.   The first time I heard about concerns of the hard

22   drives of our computers was September 7th, 2016.

23      Q.   September 7th, 2016?

24      A.   Yes.

25      Q.   And how did you learn about that?

1    A.   Duston Slinkard had approached me in a hallway

2    conversation asking what our plans were with the hard

3    drives that had recently been removed from most of the

4    computers in our Kansas City branch office.

5    Q.   Now, you say he approached you in the hallway on

6    the 7th?

7    A.   To the best of my recollection, yes, the morning

8    of the 7th.

9    Q.   Would it help-- would it refresh your

10   recollection to know that the hearing-- one of the

11   hearings that revolved around these videotapes was on

12   September 7th in Kansas City?  Were you in Kansas City

13   on that day?

14   A.   Yes.  That makes perfect sense.  I was in Kansas

15   City that day as well as Mr. Slinkard.

16   Q.   Did you come to court?

17   A.   I did not.

18   Q.   Did you speak with Mr. Slinkard on the telephone

19   during the hearing?

20   A.   Not on the phone, no.

21   Q.   Pardon me?

22   A.   No, not on the telephone.

23   Q.   Did you e-mail?

24   A.   If I recall, Mr. Slinkard e-mailed me during the

25   hearing during that day.

1    Q.  Did you e-mail him back?

2    A.  Yes, I-- I e-mailed him back.

3    Q.  All right.  Did he e-mail you a second time?

4    A.  I don't recall.

5    Q.  I would like to go through a little timeline with

6    you to make sure we have our times straight because

7    there have been varying degrees of knowledge or memory

8    about that.  If I could approach the chart.  Do you see

9    this calendar up here?  Do you see this?  Do you want me

10   to move it?

11   A.  Yes, I can see it.  I think I can make it out

12   from here.

13   Q.  You can make it out?  All right.  So I'm going to

14   direct your attention to August of 2016.  Did you-- were

15   you involved or did you control the refresh of the

16   computers in the U.S. Attorney's Office during that

17   week?

18   A.  Yes.

19   Q.  All right.  That's the week of the 31st, and then

20   going over into September the 1st, right?  Those two

21   days?

22   A.  For our Kansas City office, that's correct.

23   Q.  Did you do the same for the other two offices?

24   A.  Yes.

25   Q.  Do you remember when the dates were for Wichita?

1    A.   I believe we started Wichita on the 22nd of
2  August.
3    Q.   Uh-huh.
4    A.   We had installers there for three days.  If I
5  remember right, there was a travel day in between, and
6  then the installers traveled to Topeka with me to do the
7  same thing in our Topeka branch, and then we finished up
8  in Kansas City.
9    Q.   So you were at the Kansas City office on the 31st
10 and the 1st, correct, superintending this change?
11   A.   Yes.
12   Q.   And you had workers you said with you?
13   A.   They were--
14   Q.   Installers?
15   A.   -- contractors hired by HP.
16   Q.   And what were they supposed to do?
17   A.   They were responsible for removing the old
18 computers from the user's desk, putting the new
19 computers in place, and starting the imaging process, as
20 well as removing the hard drives from the old computers
21 and labeling them.
22   Q.   Labeling the hard drives?
23   A.   Yes.
24   Q.   Did that include all the laptop computers for
25 everybody in the office?

1      A.   All laptops, yes.

2      Q.   Do you recall how many PCs Pauletta Boyd had

3   charge of?

4      A.   Eight.

5      Q.   Eight PCs or just eight computers?

6      A.   Eight total between work stations and laptops.

7      Q.   All right.  She had-- if the evidence so far says

8   that she had five laptops and three PCs, does that sound

9   right to you?

10      A.   That adds up to eight.

11      Q.   Yes, it does.

12      A.   Yes.

13      Q.   So during this refresh-- were you finished when

14   you got to the end of September the 1st, or was there

15   more left to do?

16      A.   September the 1st was the Hewlett Packard

17   technician's last day on our site.

18      Q.   Okay.

19      A.   I still had some follow-up to do to finish out

20   this project.

21      Q.   Okay.  What was that follow-up?

22      A.   Any computer that was eligible for an upgrade to

23   Windows 10 from Windows 7 I had to complete within 15

24   business days of the last day that HP was onsite.

25      Q.   And did you do that?

1    A.   Yes.

2    Q.   And did you accomplish that on the 6th of

3  September?

4    A.   The 6th is when I did one of the computers in

5  Kansas City that fell under that category.

6    Q.   And which computer was that?

7    A.   That was a HP 8300 tower in Pauletta's office.

8    Q.   Is that what has been referred to around the

9  office as the AVPC?

10    A.   Yes, that's one of three in our district.

11    Q.   Okay.  And what-- what did you do with that

12  equipment?

13    A.   I followed the instructions in the implementation

14  plan that I was given for the project, and that included

15  performing a BIOS update.

16    Q.   A what?

17    A.   A BIOS update.

18    Q.   B-I-O-S?

19    A.   Yes.  B-I-O-S.  That is software that runs on the

20  motherboard of the computer.  And that allowed us to run

21  the re-image task sequence for that computer to upgrade

22  from Windows 7 to Windows 10.

23    Q.   In layman's terms, does that mean what was on the

24  hard drive of that computer on September 5th went away

25  on September 6th?

16-20032  USA v. Karl Carter (Black) REDACTED 10.04.18      1088

1    A.  In layman's terms, yes.  It's more complicated

2    than that as far as I understand it, however.

3    Q.  All right.  And then it was reprogrammed with

4    Windows 10?

5    A.  Yes.

6    Q.  Now, can you tell me where all these computers

7    are today, if you know?

8    A.  The AVPCs?

9    Q.  All the laptops and all the PCs.

10   A.  Yes.  The-- all the laptops and work stations

11   that were replaced are in storage in the different

12   district offices.

13   Q.  In all three offices?

14   A.  Yes.

15   Q.  Are the-- are the chassis separate from the hard

16   drives?

17   A.  Yes.

18   Q.  And are they packaged up separately?

19   A.  Yes, the hard drives are all in our Kansas City

20   evidence vault.

21   Q.  And what about the chassis?

22   A.  For the Kansas City computers, they're here in

23   storage in Kansas City.

24   Q.  In storage someplace?

25   A.  Yes.

 1       Q.   Do you know where?

 2       A.   Yes.

 3       Q.   Where?

 4       A.   May I speak to Mr. Clymer?

 5            MS. VANBEBBER:  Certainly.

 6            MR. CLYMER:  Could you repeat the question

 7    again?

 8            MS. VANBEBBER:  I asked him where the

 9    chassis for the laptops are now located.

10            MR. CLYMER:  Okay.  May I approach, Your

11    Honor?

12            THE COURT:  Yes.

13            (Confer).

14            THE WITNESS:  All right.  I've been

15    authorized by Mr. Clymer to tell you that the chassis

16    for the laptops and the work stations are on the first

17    floor.  We have a storage room on the first floor of

18    this building.

19    BY MS. VANBEBBER:

20       Q.   In the U.S. Attorney's storage room?

21       A.   Yes.  Yes.  It's outside of our main office

22    space, but...

23       Q.   So the hard drives are in the vault, your vault,

24    and the chassis are in a storage room--

25       A.   Yes.

1    Q.   -- that's controlled by the U.S. Attorney?

2    A.   Correct.

3    Q.   Are they numbered up so they match up with each

4    other from when you took the hard drive out of the

5    chassis?

6    A.   Yes.  Each chassis has a DOJ asset tag, and each

7    hard drive is labeled with that DOJ asset tag.

8    Q.   There's been-- I can tell you that there is in

9    evidence in this case a-- a description of the

10   encryption process for the laptops that Mr. Steeby-- or,

11   I'm sorry, Mr. Slinkard provided to us.  Is there any

12   reason that you couldn't match up laptop chassis A with

13   laptop hard drive A?

14   A.   No reason that I'm aware of.

15   Q.   You could?

16   A.   I could.

17   Q.   Okay.  It's true that you would have to do that

18   matchup in order to read whatever was on the laptop

19   because of the encryption.  Correct?

20   A.   That would be the first step, yes.

21   Q.   Okay.  Was there any work left to do after you

22   took care of the AVPC on the 6th?

23   A.   There were two other AVPCs and one other PC

24   assigned to a Deputy U.S. Marshal in Wichita that also

25   required the same type of in-place upgrade.  Whether

1    those were done on the 6th or after, I don't recall at

2    this point, but it's possible that I had to do some more

3    work, yes.

4       Q.   This particular AVPC from Pauletta Boyd's desk is

5    the only one in Kansas City?

6       A.   Yes.  The only AVPC in Kansas City.

7       Q.   What happened to the law computer?

8       A.   The law computers were not eligible for upgrade

9    at all.  They were left running as is, and we were able

10   to get a waiver to keep them on Windows 7.

11      Q.   Were you aware during this time frame that the

12   videotape from CCA was loaded on the-- the software was

13   located-- was located on Pauletta's AVPC?

14      A.   No.

15           MR. CLYMER:  Your Honor, I'm going to object

16   and just ask that counsel rephrase the question because

17   the CCA video is not loaded on that computer.

18           MS. VANBEBBER:  I said-- I did restyle the

19   question, but I'll do it again.

20   BY MS. VANBEBBER:

21      Q.   The software taken from-- taken from-- for the

22   CCA audio drives or DVRs was in-- was loaded on

23   Pauletta's PC, wasn't it?

24      A.   No.

25      Q.   All right.  Where was it?  Where was-- where was

16-20032  USA v. Karl Carter (Black) REDACTED 10.04.18      1092

1   the PELCO player CD drive loaded onto-- or not drive,

2   CD, software loaded onto?

3       A.  I don't have that information.

4       Q.  Okay.  Were you aware-- were you aware on October

5   the 11th that the Special Master had been directed to

6   start Phase III of his investigation?

7       A.  I don't know if it was exactly on October 11th,

8   but I did hear about that.

9       Q.  How did you hear about it?

10      A.  I think I remember it was a-- a court order that

11  was shared with the staff, or at least certain members

12  of the staff.

13      Q.  Do you know who shared it with you?

14      A.  I can't say for sure.  It would've been a member

15  of our executive management.

16      Q.  And who was that at the time?

17      A.  That would've been acting U.S. Attorney Tom

18  Beall, first assistant Emily Metzger.

19      Q.  Okay.

20      A.  It could've been shared by Scott Rask, who was

21  criminal coordinator in Kansas City.

22      Q.  All right.  Did you understand from what they

23  told you that each employee of the U.S. Attorney's

24  Office was to completely-- fully cooperate with the

25  Special Master and his investigation?

1    A.   That was my understanding.

2    Q.   And you understood that that applied to you as an

3    employee.   Correct?

4    A.   Yes.

5    Q.   Can you tell me-- Mr. Steeby, I-- I understand, I

6    want to congratulate you with-- to the extent that you

7    did help the Special Master, or try.

8         So let me ask you first, the-- do you recall that

9    the Special Master had issued on-- a few days later,

10   October the 25th to be exact, a demand for production of

11   documents from the office?

12   A.   I can't say for sure whether I knew that the

13   demand was for production at that time.   I just don't

14   know.

15   Q.   But you knew that you were supposed to be working

16   with him to get e-mails from your office.   Correct?

17   A.   I understood the scope of my work with the

18   Special Master was to develop a set of search terms that

19   would be run against our Proofpoint e-mail archive

20   system.

21   Q.   He gave you a set of search terms he would like

22   you to use early on, didn't he?

23   A.   (Nods head up and down).

24   Q.   Do you remember when?

25   A.   It would've been probably December of 2016,

 1   possibly early 2017.  I remember those first search

 2   terms were formatted to be compatible with a Lexus

 3   search.

 4       Q.  All right.  So essentially between November,

 5   let's say, of 2016 and going forward, you were working--

 6   doing your best to try to come up with a set of search

 7   terms that would work practically to get the information

 8   off of your electronic systems.  Correct?

 9       A.  Off of our Proofpoint e-mail archive system,

10   correct.

11       Q.  Uh-huh.  That's where you were going to look was

12   the Proofpoint archive?

13       A.  The search terms we were working on were built

14   specifically to work for that system.

15       Q.  Okay.  Do you recall having meetings with Mr.--

16   with Mr.-- my brain just went dead, with Mr. Cohen?

17       A.  Yes.

18       Q.  And did you have anybody else with you when you

19   met with him personally, or did you two just get

20   together and try to work on this?

21       A.  I remember that I never met with Mr. Cohen

22   personally alone.  There were--

23       Q.  Did you meet with him personally?

24       A.  Yes.

25       Q.  Who was with you?

1    A.   In the first meeting, Emily Metzger.

2    Q.   Uh-huh.

3    A.   And possibly Ken Smiley.

4    Q.   Is it correct that you were working with Emily

5    Metzger on this project, that she was the management

6    person that worked with you?

7    A.   Yes.

8    Q.   And who-- do you know who-- do you know who Ken

9    Smiley is?

10    A.   I-- I know that he works for American Discovery

11    and may have been hired to work with the Special Master

12    on this project.

13    Q.   Would you say he's also an IT guy?

14    A.   Yes.

15    Q.   All right.  So the four of you had a meeting.

16    And then did you have any more meetings with the Special

17    Master?

18    A.   There was one more meeting in person.

19    Q.   Okay.  And who was at that meeting?

20    A.   Tom Beall.

21    Q.   The acting U.S. Attorney?

22    A.   Yes.  Emily Metzger.

23    Q.   Yes.

24    A.   Scott Rask.

25    Q.   The criminal coordinator in Kansas City?

1      A.   Correct.  And I believe Deb Barnett by phone.

2      Q.   And at the time she was the civil chief-- or,

3  excuse me, the criminal chief?

4      A.   Criminal chief, yes.

5      Q.   For the whole district?

6      A.   Yes.

7      Q.   All right.  What was the discussion about the

8  first time you had the meeting?

9      A.   About our ability to search different

10  repositories.

11      Q.   And what is-- what in U.S. Attorney terms is

12  the-- is the repository?

13      A.   Anywhere information about this matter may have

14  been stored.

15      Q.   Any-- anyplace you mean, or anybody's materials,

16  or-- explain that a little further.

17      A.   Yes, it was-- I remember that we were talking

18  about strategies and how best to-- to have our employees

19  search their data for what the Special Master was

20  interested in.  Another topic was covered in the meeting

21  and that was whether or not we had access logs for

22  employee Internet history.

23      Q.   So a repository let's say for you-- do you have a

24  repository?

25      A.   I do.

1    Q.   All right.  What's in it?

2    A.   It would be all of my e-mails going back a

3  certain period of time to my e-mail account, anything

4  that I've sent or received.

5    Q.   Anything else?  Your Internet history?

6    A.   I wouldn't call that a repository.

7    Q.   Okay.  So when we talk about repository in the

8  various materials that we have or have been given, we

9  would be talking primarily about e-mails?

10   A.   That was my understanding, yes.

11   Q.   All right.  That's where you were going to look?

12   A.   To start.  Correct.

13   Q.   All right.  The second meeting, what was it

14  about?

15   A.   I remember talking some more about how the search

16  might be run, whether centrally or by each employee on

17  their own repository.

18   Q.   Did management have suggestions for you or-- or

19  did they-- were they just listening?

20   A.   I remember being the person in that meeting who

21  was mostly listening.  As a support role, I believe, is

22  why I was asked to go to that meeting.

23   Q.   To your knowledge, did Mr. Beall or Ms. Barnett

24  have any particular IT qualifications to be making the

25  decisions about what would constitute good search terms?

1    A.  I would say they were able to speak best to what

2    was allowable in our office as far as policy-wise for

3    searches.

4    Q.  Wait a minute.  What did you-- I misunderstood

5    what you said I think.  Did you say allowable?

6    A.  Yes.

7    Q.  Okay.  What do you mean by "allowable"?

8    A.  The topic of the discussion, as I recall, was

9    whether the search would be conducted centrally or by

10   each employee.  And there was some policy discussion

11   about what we're allowed to do as far as employee data.

12   Q.  As far as searching somebody's e-mails?

13   A.  Yes.

14   Q.  And identifying them by name?

15   A.  Yes.

16   Q.  Okay.  Did you decide to do some test runs on

17   some search terms?

18   A.  Yes.

19   Q.  Did you ever run one on just the search terms

20   that the Special Master had given you, or had they

21   already been tweaked by the time that you ran the first

22   test?

23   A.  They had been tweaked before I ever ran a test.

24   Q.  Okay.  Whose repository did you work on first?

25   A.  I believe that would've been my own.

1    Q.   All right.  Using the search terms you had in

2  hand at that time, which would've been what--

3  approximately what date area, what month?

4    A.   I'd say probably early 2017.

5    Q.   Okay.  Was it a fruitful test?

6    A.   I remember that there-- I thought the results

7  were overly broad at that time.

8    Q.   So you went back to the drawing board?

9    A.   I'd say we worked to enhance the search phrase.

10  I wouldn't say we scrapped everything and went back to

11  the drawing board.

12    Q.   Is it safe to say that you and Ms. Metzger and

13  the Special Master worked with this clear up into the

14  spring trying to come up with a set of search terms that

15  would work?

16    A.   Yes.

17    Q.   I'm going to ask you to look at a document and

18  see if you recall it.  Well, let me ask you about one

19  preliminary document first.  Am I on?  I just turned it

20  off.  There.

21        Look at the top right under the subject line

22  where it says, "Good morning, Emily."  Have you seen

23  this e-mail before?  It appears to be from you.

24            THE COURT:  Is this-- there's an exhibit

25  number?

 1              MS. VANBEBBER:  Oh, I'm sorry, that's

 2    Exhibit 155.

 3              THE COURT:  One?

 4              MS. VANBEBBER:  155.

 5              THE COURT:  155?

 6              MS. VANBEBBER:  1155.

 7              THE COURT:  1155.

 8              THE WITNESS:  Sorry.  Yes, I recognize this

 9    e-mail.

10    BY MS. VANBEBBER:

11       Q.  Given that you had been working well with the

12    Master and with Ms. Metzger up to now, why did you think

13    that you ought to-- why were you hesitant to respond to

14    Mr. Cohen directly?

15       A.  I never understood that it was my authority to

16    meet with Mr. Cohen without at least a member of the

17    senior management knowing about it.  I wanted to make

18    sure that Emily was aware of a possible meeting coming

19    up and that I didn't respond without her blessing.

20       Q.  Was that an assumption that you drew, or had you

21    actually been told that?

22       A.  That was my understanding.  I believe that's

23    something that I asked about early on myself.

24       Q.  So you weren't to deal with the Special Master

25    directly without management knowing?

 1      A.   Yes.

 2      Q.   All right.  Along towards May, it looked like you

 3   were getting close, didn't it, to coming up with a good

 4   set of search terms?

 5      A.   We were making some good progress.

 6      Q.   I now want to show you what's been marked 1156.

 7           MR. CLYMER:  I'm sorry, counsel, what was

 8   that number?

 9           MS. VANBEBBER:  1156.

10           MR. CLYMER:  Thank you.  Do you have an

11   extra copy, counsel?  I didn't get that this morning.

12           MS. VANBEBBER:  Oh, I'm sorry, you're right.

13   I'll take care of that.  I'll do that with Ms. Metzger.

14   BY MS. VANBEBBER:

15      Q.   In light of-- in May didn't the Special Master

16   kind of try to light a fire under everybody and say

17   let's get on with this?

18      A.   I wouldn't use those words myself, but I would

19   say that it looked like we were getting close to-- to

20   the final product.

21      Q.   So did you decide to do a trial-- well, you had

22   done the first trial on yours.  And then did you do a

23   secondary trial with two other individuals'

24   repositories, Mr. Rask and another person?

25      A.   Mr. Rask would've searched his own repository,

1  and I had access to Erin Tomasic's repository to run

2  tests on.

3    Q.  All right.  That was in-- in the month of May

4  after she had left, is that why you had access to it?

5    A.  Yes.

6    Q.  So before, each person would've had to search

7  their own repository.  Correct?  Is that the policy of

8  the office?

9    A.  For departed employees and litigation matters, we

10 can give-- be given access to search their repositories.

11   Q.  All right.  If you're doing a generalized

12 repository of a current employee, would they have to

13 be-- would they be the ones who had to do it?

14   A.  Yes.

15   Q.  Okay.  So Mr. Rask had searched his repository by

16 himself.  Correct?

17   A.  Yes.

18   Q.  And you still weren't satisfied with how good a

19 set you had of search terms.  Right?

20   A.  I probably always thought there was room for

21 improvement.

22   Q.  So then towards the end of May you had access,

23 full access, to Ms. Tomasic's laptop computer and all of

24 her e-mails; is that right?

25   A.  Not her laptop computer.  It was her e-mail

1    repository that I had access to.

2        Q.  She was gone and so she didn't have her laptop

3    anymore.  You had hopes that that would work well enough

4    to be able to have a final set of search terms, didn't

5    you?

6        A.  Yes.

7        Q.  Did it?

8        A.  I-- I don't think that was my decision to decide

9    whether that was adequate or not.  I was passing

10   information back to the Special Master and to our

11   management.

12       Q.  All right.  Then in June didn't-- didn't the

13   Special Master say-- send you an e-mail that said, I

14   want to add names and let's run this search on the

15   repository and produce the results to Ken Smiley as soon

16   as possible?

17       A.  Yes.

18       Q.  Did that ever get done?

19       A.  No.  The search was run.  But the second half of

20   that, producing the results to Ken Smiley, I don't know

21   if that happened or not.

22       Q.  That was not your decision to make?

23       A.  No.

24       Q.  Was there anybody you worked on this project with

25   who was in the management chain or the management team

1  except Emily Metzger?

2      A.   Yes.

3      Q.   Who?

4      A.   Scott Rask.

5      Q.   What about Debra Barnett?

6      A.   Well, I don't recall ever having too much

7  communication with Deb about the search terms.

8      Q.   Do you know who made the decision to never send

9  the results to Ken Smiley?

10     A.   No.

11     Q.   Did anybody ever formally tell you to cease your

12  work on that project?

13     A.   Not that I recall.

14     Q.   I want to go back just a second and pick up on

15  some questions I asked you earlier.  We talked about you

16  having had e-mail conversations with Mr. Slinkard on

17  September the 7th.  Do you remember what he asked you in

18  those e-mails?

19     A.   He was concerned about what was going to happen

20  to the hard drives that had been removed from most of

21  the computers.

22     Q.   Uh-huh.

23     A.   And if I remember correctly, my response was what

24  we had planned and some of my concerns about accessing

25  the data if-- if we were to be asked to do that in the

1    future.

2      Q.  Did you tell him that the AVPC had been upgraded

3    in place on the 6th of September?

4      A.  Not on the 7th, no, that didn't come up.

5      Q.  Why not?

6      A.  Because the questions that were asked of me were

7    about the other computers that the HP technicians had

8    removed the drives from.

9      Q.  Then when you-- when did you let him know that

10   the AVPC had been upgraded on the 6th of September?

11     A.  I believe that was October, sometime in October

12   of 2016.

13     Q.  When did you physically take the hard drive of

14   the AVPC to the-- to the vault?

15     A.  To the best of my recollection, December of 2016.

16     Q.  Where was it between the 7th-- the 6th of

17   September and December?

18     A.  To be clear, there were two hard drives in that

19   machine.

20     Q.  Uh-huh.

21     A.  Both were taken to the vault.  And both hard

22   drives between that time frame were installed in the

23   AVPC machine.

24     Q.  With the Windows 10 on it?

25     A.  Yes.

1    Q.   In other words, upgraded?

2    A.   Correct.

3    Q.   Do you know of any way to get back the data that

4    was on that AVPC on September the 5th, 2016?

5    A.   I'm not a forensic expert; however, I would be

6    interested in-- in looking at the unallocated space on

7    that hard drive if I were asked to try to get the data

8    back.

9                MS. VANBEBBER:  Thank you.

10               MR. REDMOND:  Your Honor, before I begin, I

11   would move to admit Exhibits 556, 589, 614, and 615.

12               MR. CLYMER:  No objection, Your Honor.

13               MS. VANBEBBER:  No objection.

14               THE COURT:  Exhibits 556, 589, 614, 615

15   admitted.

16               MR. REDMOND:  Thank you, Your Honor.

17                       CROSS EXAMINATION

18   BY MR. REDMOND:

19   Q.   Mr. Steeby, I have a couple of questions of my

20   own, but I wanted to follow up to make sure I was clear

21   on your testimony.

22               THE COURT:  I'm sorry, just a minute.  Was

23   there something you needed?

24               MR. BELL:  Bonnie, could you switch over?

25               COURTROOM DEPUTY:  Sure.  I'm sorry.

1            MR. REDMOND:  May I approach, Your Honor?

2            THE COURT:  Yes.

3   BY MR. REDMOND:

4       Q.  Mr. Steeby, I'm showing you what's been marked as

5   Exhibit 556.  This-- do you recognize that?  It's a

6   letter drafted by Duston Slinkard to David Cohen, the

7   Special Master.

8       A.  Yes, I recognize this.

9       Q.  I'm certain you were consulted in the creation of

10  this letter?

11      A.  Yes.

12      Q.  Okay.  During your testimony you were asked about

13  some e-mails that you've sent back and forth with Mr.

14  Slinkard.  Are the e-mails you're talking about the

15  e-mails set out on Pages 6 through 8 of that letter?

16      A.  Yes.

17      Q.  And here we're talking about e-mails that went

18  back and forth between you and Mr. Slinkard after the

19  hearing on September 7th; is that right?

20      A.  I'm sorry.  What's the question again?

21      Q.  We're talking about the e-mails that went back

22  and forth between you and Mr. Slinkard after the hearing

23  on September 7th of 2016?

24      A.  One may have been during the hearing.  I'm not

25  sure if all were after.

1     Q.  I appreciate the clarification.  You also

2  testified that Mr. Rask was involved in the project to

3  identify search terms, if I understood your testimony

4  correctly.  What role did he play in that process?

5     A.  Mr. Rask was running search terms we developed

6  against his own Proofpoint e-mail repository to try to

7  give us a better idea of the scope of results from

8  someone's repository who was more closely involved with

9  the matter than my own.

10     Q.  And the case he chose to do that in was a capital

11  case; is that right?  Does the name Marcas McGowan--

12  does that make you remember anything?

13     A.  No, that doesn't ring a bell to me.  I'm sorry.

14     Q.  So this project was you, Mr. Rask, and Ms.

15  Metzger; is that right?  Am I missing anybody?

16     A.  Those are the two I remember working most closely

17  with.

18     Q.  Okay.  And where is your home base?  Are you in

19  Kansas City?

20     A.  Yes.

21     Q.  Okay.  And Mr. Rask is in Kansas City?

22     A.  Correct.

23     Q.  Ms. Metzger is in Wichita?

24     A.  Yes.

25     Q.  So in-person meetings are mostly with Mr. Rask;

1    is that fair to say?

2        A.  Yes.

3        Q.  Would you say that you were coordinating the

4    project with him in Kansas City and then sort of

5    reporting to Ms. Metzger?

6        A.  No.  No, I wouldn't say that.

7        Q.  How would you describe the dynamic?

8        A.  I would say that Emily, as our first assistant,

9    was who I was reporting to and Mr. Rask was helping out

10   with searches on his own mailbox and giving us

11   information about the number of results.

12       Q.  Okay.  So the-- Ms. VanBebber asked you about

13   sort of how this ended up petering out.  Once you get

14   your-- your, I guess, quasi-final set of results, you

15   said you weren't really happy with things or you

16   could've improved it anyway.  Once you get the final set

17   of results, who do they go to?  Mr. Rask or Ms. Metzger

18   or both?

19       A.  I remember having the final set of results on

20   Tomasic's mailbox packaged up and delivered to Emily

21   Metzger.

22       Q.  Okay.  And approximately when was that?

23       A.  It would've been in the spring of 2017.

24       Q.  Okay.  You also responded to one of Ms.

25   VanBebber's questions saying that you didn't recall if

1    you were formally told to cease work on this project.

2    Am I getting that correct?

3        A.   Right.

4        Q.   Were you informally told to cease work on the

5    project?

6        A.   I really didn't hear much about it after I

7    delivered the results to Emily Metzger.

8        Q.   Okay.  You saw that as the conclusion of your

9    role in this process?

10       A.   I wasn't asked to do anything else after that.

11       Q.   Fair enough.  During this process of developing

12   search terms, is most of the communication by e-mail or

13   in person?

14       A.   Most of my communication with the Special Master

15   was through e-mail.

16       Q.   I asked a bad question.  What I was referring to

17   was the process of developing search terms inside the

18   U.S. Attorney's Office with Mr. Rask and Ms. Metzger.

19   When you're talking to them about this project, are you

20   doing it by e-mail or in person?

21       A.   It would've been both.

22       Q.   How much of the time is it over e-mail?

23       A.   My personal preference would've been e-mail, so I

24   can't say for sure.

25       Q.   Okay.

 1    A.   But that's what I would've probably preferred at

 2   the time.

 3    Q.   Fair enough.  Okay.  So I want to back up before

 4   the September 7th hearing, and I'm going to refer to

 5   Exhibit 589.

 6         And so we're clear, you're in charge of

 7   essentially IT for the District of Kansas U.S.

 8   Attorney's Office?

 9    A.   Yes.

10    Q.   Okay.  And so you're ultimately responsible for

11   managing the information that's on their computer

12   systems?

13    A.   I-- the information is so broad, I don't think

14   anyone would-- would say that I'm responsible for

15   managing all that information, no.

16    Q.   Should you-- should somebody have a question

17   about the computer system in the U.S. Attorney's Office,

18   the guy they're coming to is you; is that fair?

19    A.   Yes.  There's also the other IT specialist I

20   mentioned earlier.

21    Q.   Okay.  So I am showing you what has been marked

22   and admitted as Exhibit 589.  You're probably not going

23   to recognize this e-mail chain because I don't think you

24   were on it, but do you recognize the people who were?

25   Emily Metzger, Duston Slinkard, Debra Barnett and Tom

1    Beall.

2        A.  Yes.

3        Q.  Okay.  Would you start from the bottom, please.

4    I'm representing Melody Brannon, my boss, who's sitting

5    right over there, that's who wrote this e-mail.  And

6    this is on what date and what time?

7        A.  August 30th, 2016, 5:58 p.m.

8        Q.  Okay.  And what Ms. Brannon is saying in this

9    e-mail is that they want to make sure that no computer

10   data is lost during the cyclical refresh.  Right?

11       A.  Yes.

12       Q.  Okay.  And so if you will scroll up one in the

13   e-mail chain on Page 1.  There's another e-mail that's

14   authored, the one at the bottom of the page, by Emily

15   Metzger.  At this point Emily Metzger is the first

16   assistant in the U.S. Attorney's Office.  Right?

17       A.  Correct.

18       Q.  Okay.  So-- and at that point she opines that she

19   doesn't think any data will be lost, but David Steeby

20   can likely verify that nothing will be lost; is that

21   right?

22       A.  That's correct.

23       Q.  And they are aware at this point that the-- Ms.

24   Brannon's concern is about metadata on the videos?

25           MR. CLYMER:  Your Honor, I believe that

1   mischaracterizes the e-mail.  I'd ask that counsel just

2   ask basically what's actually said.

3              MR. REDMOND:  I don't think it

4   mischaracterizes the e-mails, Your Honor.

5              THE COURT:  Well, I think it speaks for

6   itself.  She says-- Emily says, "Does she," meaning Ms.

7   Brannon, "think we have some type of metadata on the

8   videos?"

9   BY MR. REDMOND:

10      Q.  When is this-- and this e-mail is dated

11   August 31st, 2016, at 12:17 p.m.; is that right?

12      A.  Yes.  From Emily?

13      Q.  Correct.

14      A.  Correct.

15      Q.  That is a week before you did your work on the

16   AVPC?

17      A.  Yes.

18      Q.  This is the kind of e-mail that would've been

19   pretty handy for you to have; is that fair to say?

20      A.  Yes.

21      Q.  Okay.  Might've saved you from the witness chair?

22      A.  I'm sorry?

23      Q.  Might've saved you from the witness chair?

24      A.  I'm not sure about that.

25      Q.  Okay.  So the-- during this time frame, late

1    August, early September, you had heard about the *Black*

2    litigation.  Right?  About the CCA videotapes and then

3    the phone calls, all the hearings, everybody was kind of

4    in an uproar.  I mean, you knew this was going on.

5    Right?

6        A.  I really can't say I knew much about it.  I'm out

7    of the loop on a lot of the litigative matters in the

8    office unless somebody, you know, explains to me exactly

9    what's going on.  I was aware that we had a large amount

10   of data from the CCA coming into our systems.

11       Q.  Okay.  So you knew that you were getting data

12   from CCA and-- is that right?

13       A.  Correct.

14       Q.  And you knew that our office had filed something

15   related to that data; is that right?

16       A.  No.

17       Q.  Well, did you-- you seem to say you knew that

18   there was ongoing litigation; is that true?

19       A.  I knew we had a case dealing with some videos

20   that we were getting from CCA.

21       Q.  Okay.  That's what I was asking.

22       A.  Okay.

23       Q.  So then on September 6th, I want you to explain

24   precisely what you did to the AVPC and what time-- well,

25   let's start with what you did, just in the most

1  technical terms, whatever it is that you need to express

2  yourself.

3      A.   Okay.  Well, I would've gone into Pauletta's

4  office, would've scheduled with her before time to have

5  access to that machine.  Made sure that we didn't need

6  to back anything up off of it.  Explained to her what it

7  was that this re-image was going to do.

8          Once I had access to the computer, I applied a

9  BIOS update from the old system.  This is a software

10 that resides on the motherboard of the computer.

11         After the BIOS update, I would've rebooted the

12 computer and told it to boot from the network.  When it

13 booted from the network, it would've picked up the new

14 operating system files, installed the files.  This

15 process would've taken probably over two, three hours,

16 the entire task sequence, for the system to load

17 everything it needed to do to upgrade from Windows 7 to

18 Windows 10.

19     Q.   And you're starting this at about 3:00 in the

20 afternoon?

21     A.   You know, I think I would've started it earlier

22 in the day.

23     Q.   Okay.  Do you know what time the procedure ended?

24     A.   It would've been before the end of my workday.

25     Q.   Okay.  And what time does your workday end?

1    A.  4:00 p.m.

2    Q.  Okay.  So had somebody gone to that computer the

3 next day after the hearing and booted it up, could they

4 have found any data that had existed-- or could they

5 have found anything that was on that computer before you

6 performed the procedure?

7    A.  Anyone in our office?  No.

8    Q.  Anyone-- okay.  Why not?

9    A.  All the-- part of the re-image task sequence was

10 for all the hard drive space to be formatted and

11 prepared for the new installation of Windows 10.

12    Q.  Okay.  Besides what you've already mentioned, is

13 there any other software you employed to perform this

14 procedure?

15    A.  No.  Just the BIOS update and the network boot

16 for the re-image.

17    Q.  Okay.  Now, you said you've been here 17 years.

18 Right?

19    A.  I've been with the U.S. Attorneys for 17 years.

20    Q.  Fair.  This is likely not your first cyclical

21 refresh?

22    A.  No.

23    Q.  How many have you been through before?

24    A.  I would say probably at least four or five.

25    Q.  Okay.  So what was the rush here to do the AVPC?

1    A.   This project was one of our biggest projects.

2  These refreshes only come around every three or four

3  years or so.  And for me, this was one of the last tasks

4  I had to do before jumping into the next project.  I had

5  a final overall certification that I needed to send to

6  our executive office that everything had been done.

7    Q.   When is that due?

8    A.   I believe that was 30 days after the last day

9  onsite of HP.

10   Q.   What was the last day onsite of HP?

11   A.   September 1st.

12   Q.   Okay.  So you had until approximately October 1st

13 to get your certification in?

14   A.   Yes.

15   Q.   Okay.  And there's-- I mean, we lost some

16 critical data here.  Right?  I mean, there was a lot of

17 data on that machine that we can no longer recover; is

18 that fair?

19   A.   I'm not sure what can be recovered or not

20 recovered off of that machine as it stands now.

21   Q.   Well, I misunderstood your earlier testimony

22 then, because you said that if you would've gone down to

23 the computer on September 7th after the hearing, you

24 wouldn't have been able to find anything that had

25 occurred on that computer prior to your procedure.  Did

1    I misunderstand that?

2        A.   You had asked if someone would've gone there,

3    yes.  I assumed that that means someone from our office,

4    one of our users.  If a forensic expert would've gone

5    there, the case may have been different.

6        Q.   Do you know that?

7        A.   No.

8        Q.   Do you know if that's been done?

9        A.   No.

10               THE COURT:  All right.  Is your answer it

11   hasn't been done, or you don't know whether it's been

12   done?

13               THE WITNESS:  I don't know if that's been

14   done.

15               MR. REDMOND:  Okay.  Could I have a moment,

16   Your Honor?

17               THE COURT:  Yes.

18   BY MR. REDMOND:

19       Q.   I'm showing you what's been marked as

20   Defendant's-- or admitted as Defendant's 616.  As long

21   as we're doing this, here's 614 as well.  Can you just

22   say what these documents are?

23       A.   This is the PC Refresh 2016 Implementation Plan

24   and Appendix A07 of the implementation plan titled

25   "In-place Upgrade Existing System BIOS and Image."

1    Q.  Okay.  And this is your sort of instruction

2  manual for the cyclical refresh?

3    A.  Yes.

4    Q.  Okay.  So where in the re-image task sequence in

5  615, which is the appendix, does it instruct you to

6  actually format the hard drive?

7    A.  That's not something that I do, it's something

8  that the task sequence does after the network boot.

9    Q.  Is that something that you knew was going to

10  occur before you did it?

11    A.  Yes.

12          MR. REDMOND:  Okay.  We would also request

13  any of the actual e-mails that were in those strings

14  that Mr. Slinkard's letter relies on.

15          THE COURT:  So the letter references e-mail

16  strings, but they're not attached or included in the

17  letter?

18          MR. REDMOND:  Correct.

19          THE COURT:  Which exhibit are you talking

20  about again, five--

21          MR. REDMOND:  589, Your Honor.

22          THE COURT:  589.

23          MR. CLYMER:  The letter is 556.

24          MR. REDMOND:  556, my apologies.

25          THE COURT:  556.  Was that something that

1   was requested before the hearing?

2           MR. REDMOND:  No, not by us.  We did not.

3           THE COURT:  Mr. Slinkard.

4           MR. SLINKARD:  For the most part, at the

5   time the letter was written, e-mails were excerpted, cut

6   and pasted into the text of the letter so it would read

7   like a narrative.  I have no problem trying to identify

8   all the ones that are referenced, either narratively or

9   by cut and paste, and getting the actual e-mails to

10  them.  That hadn't been requested before, but it

11  shouldn't be a problem.

12          THE COURT:  All right.  All right.  So if

13  you can do that-- and I know you probably can't do it

14  immediately.  Does that mean you want Mr. Steeby subject

15  to recall or you just want those part of the record?

16          MR. REDMOND:  Probably, but I don't see much

17  of a likelihood that we will, but we would like to see

18  the full form of the e-mails first before we excuse him.

19          THE COURT:  Okay.  All right.

20          MR. REDMOND:  Thank you, Your Honor.

21          THE COURT:  Mr. Clymer.

22                  CROSS EXAMINATION

23  BY MR. CLYMER:

24  Q.  Mr. Steeby, I want to start by going back to your

25  testimony about the upgrade of the AVPC and then move to

1    a couple other matters.

2         When a computer is reformatted, are there

3    different types of reformats?

4         A.   Yes.

5         Q.   Can you explain that, please?

6         A.   The type of format that's most common and what I

7    believe occurred in the task sequence for the AVPC is

8    called-- or I would call it a quick format.  That's

9    where the-- all the data on the drive is marked as

10   unallocated so that the system then can override it with

11   whatever it needs to.

12        Q.   So the system needs space in order to put new

13   data, like the new operating system on.  Correct?

14        A.   Yes.

15        Q.   And there's already data on the hard drive.

16   Correct?

17        A.   At least some, some space on the hard drive, yes.

18        Q.   And what it does is it cleans out that space to

19   make room for the new data.  Correct?

20        A.   I wouldn't say it cleans it.  I would say it

21   marks it as available.

22        Q.   Okay.  I want to talk about that.  You used the

23   term "unallocated space."  What does that mean?

24        A.   If-- if the file exists on a hard drive and the

25   operating system allows the user to access the file,

1    that would be an example of allocated space.  So that--

2    there's-- there's physical space on that hard drive that

3    is allocated for storing that file.

4       Q.  And it's-- is it also then referred to as within

5    a file structure?  Have you heard that terminology?

6       A.  Yes.

7       Q.  So a user can find it by looking through the

8    files and folders and determine where that data is.

9    Correct?

10      A.  Correct.

11      Q.  And then you-- so that there's something called

12   unallocated space.  Is that also data-- a place where

13   data can reside on a computer hard drive?

14      A.  It can.

15      Q.  Can you explain what that means?

16      A.  That's data that as far as the operating system

17   is concerned-- or sorry.  Those are areas of the hard

18   drive that as far as the operating system is concerned

19   are available for new files to be created or stored.

20          What was the second part of the question?  I'm

21   sorry.

22      Q.  Well, can you-- and can data be stored there as

23   well?

24      A.  Yes.

25      Q.  And is that outside the file structure?

1    A.   Yes.

2    Q.   So a user who starts the computer and looks

3  through Windows Explorer, or whatever the directory

4  system is, may not be able to see that data, but it may

5  still be on the hard drive.  Correct?

6    A.   That's right.  That's right.

7    Q.   Can a computer forensic specialist identify and

8  locate data that's in unallocated space?

9    A.   They should be able to.  I'm sure that happens

10  all the time.

11    Q.   And that's a typical computer forensic tool to

12  look at unallocated space for files that have been

13  deleted.  Correct?

14    A.   Correct.

15    Q.   So when a user deletes a file, it doesn't get

16  wiped or go away forever, it just gets moved from

17  allocated space to unallocated space.  Correct?

18    A.   Right.

19    Q.   And the sort of format that you believe may have

20  occurred on the AVPC on September 6th may have taken

21  data from that hard drive that was there before the

22  reformat and simply moved it from allocated to

23  unallocated space.  Correct?

24    A.   Correct.

25    Q.   And until a computer forensic specialist looked

1  at that, you wouldn't know that.  Right?

2     A.  Not any user that would've walked up to that

3  machine and tried to use it, no.

4     Q.  Are you familiar at all with the PELCO software

5  that had been installed onto the AVPC computer's hard

6  drive to read video from CCA-Leavenworth?

7     A.  I'm familiar with it in name only.  I can't

8  remember ever using it myself or seeing it used.

9     Q.  Do you know anything at all about its

10  capabilities?

11     A.  My understanding is that it's a proprietary

12  viewer for certain types of surveillance video.

13     Q.  So you don't know whether it has any logging

14  functions on it, do you?

15     A.  No.

16     Q.  And you don't know what may be or may not be

17  logged by it; is that correct?

18     A.  No.

19     Q.  And do you know at all how it interacts with a

20  Windows 7 operating system?

21     A.  No.

22     Q.  So would it be safe to say that before-- strike

23  that.

24         Would it be safe to say that you have no idea

25  whether before that reformat occurred there was any

1    logging information on the hard drive of the AVPC.

2    Correct?

3        A.   That would be safe to say.

4        Q.   So a person-- even if it had never been

5    reformatted as part of the upgrade, it may be that a

6    person looking at that hard drive would-- could not be

7    able-- from your knowledge, could not be able to tell

8    whether that PELCO software had ever been used on that

9    system; is that right?

10       A.   It's possible.

11       Q.   If, however, there was some logging evidence,

12   either in the Windows 7 logging system or in the PELCO

13   software logging system, if there is one, and that

14   computer was formatted, might that data have been moved

15   to unallocated space?

16       A.   Yes.

17       Q.   And until a computer forensics expert looks at

18   that, we simply can't tell; is that correct?

19       A.   Correct.

20       Q.   I'll ask you to look at what's been marked as

21   Exhibit 556.  I think it's Mr. Slinkard's letter.  Do

22   you have that in front of you?

23       A.   Yes.

24       Q.   I'm going to ask you to look at Page 14 of 556,

25   specifically the paragraph that begins with the letter

1   C.

2         Does that paragraph inform the reader of just

3   what you said, namely that data was not permanently

4   deleted on that computer, but rather it was moved to

5   unallocated space?

6       A.   That's correct.

7       Q.   Now, when the new operating system gets put on,

8   it needs space.  Correct?

9       A.   That's right.

10      Q.   And that new data may override or overwrite some

11  of the old data that's in allocated-- unallocated space.

12  Right?

13      A.   Right.

14      Q.   Until you look, you don't know if that happened?

15      A.   That's right.

16      Q.   What date was that letter?

17      A.   November 5th, 2016.

18      Q.   And that was sent to the Special Master?

19      A.   Yes.

20      Q.   Now, when was the hard drive taken out of that

21  computer and secured, to your knowledge?

22      A.   The AVPC?

23      Q.   The hard drives, yeah, out of the AV-- the hard

24  drives, plural.

25      A.   Taken out of the computer?

1    Q.   Yeah.  Was it ever taken out of the computer?

2    A.   Yes.  On December-- sometime in early December I

3  believe.

4    Q.   Of 2016?

5    A.   Yeah, 2016.

6    Q.   So early December.  So there was a period of time

7  when the computer was still running after November 5th,

8  2016; is that right?

9    A.   That's right.

10    Q.   So if a computer forensic expert were to look at

11  that-- those hard drives today, the-- the AVPC hard

12  drives, and could not find any logging data, that does

13  not mean that your activity on September-- does not

14  necessarily mean that your-- your activity on

15  September 6th caused that data to be lost; is that

16  right?

17    A.   Correct.

18    Q.   It could've never been there in the first place.

19  Correct?

20    A.   That's right.

21    Q.   And it also could've been lost by being

22  overwritten by new data sometime between the time the

23  Special Master was notified about this and the time that

24  hard drive was taken out.  Correct?

25    A.   I would say that that time frame would be a

1    little wider.  It would be from the September 6th

2    re-image to the time that the hard drive was taken out.

3        Q.  Correct.  And within that time is the time after

4    November 5th, 2016; is that right?

5        A.  Yes.

6            MR. CLYMER:  Could I have 589 up on the

7    screen, please.

8            MR. BELL:  By us?

9            MR. CLYMER:  Yeah.

10   BY MR. CLYMER:

11       Q.  Thank you.  If you could go to the second page to

12   start.  Direct your attention to 589, Mr. Steeby.  Is

13   that still in front of you?

14       A.  Yes.

15       Q.  Okay.  Ms. Brannon sends out this e-mail to Ms.

16   Barnett with a copy to Mr. Redmond on August 30, 2016;

17   is that right?

18       A.  That's right.

19       Q.  Okay.  If you'd turn to the--

20           MR. CLYMER:  Could you turn to the first

21   page, please.  Thank you.

22   BY MR. CLYMER:

23       Q.  Ms. Barnett's response to that e-mail is to do

24   what?

25       A.  It looks like she's unsure of what to do.

1    Q.  She just responds-- or doesn't respond, but she

2    sends an e-mail to people internally at the U.S.

3    Attorney's Office with three question marks.  Right?

4    A.  That's right.

5    Q.  And then Ms. Metzger, who's one of the recipients

6    of the question mark e-mail, responds.  And I want to

7    take a look at her response.

8              MR. CLYMER:  If you could get the Metzger

9    response, I'd appreciate it.  Thank you.

10   BY MR. CLYMER:

11   Q.  Now, according to Metzger's response, does it

12   appear that she thinks that what Ms. Brannon is

13   requesting may have already been done?

14   A.  Yes.  It seems she's satisfied that it's been

15   taken care of.

16   Q.  And she just thinks that it might be a good idea

17   to have either you or Pauletta Boyd verify that nothing

18   will be lost.  Right?

19   A.  Correct.

20   Q.  But helpfully, Mr. Bell is highlighting for me

21   the part that I wanted to get to next.  But she says

22   probably the better thing to do is to confirm with

23   Pauletta and David that nothing has been lost.  Right?

24   A.  She does say that.

25   Q.  Doesn't seem to be an effort to want to destroy

1    or conceal anything, does there?

2        A.   No.

3        Q.   Okay.  And then if you look up to the e-mail

4    above that, Mr. Slinkard seems to agree because he says,

5    "Check with David to make sure."  Correct?

6        A.   Correct.

7        Q.   And Metzger agrees and wonders whether Melody is

8    just being overly cautious, but nobody disputes that

9    that would be a good thing to do.  Right?

10       A.   Right.

11       Q.   And it looks like this slipped through the

12   cracks.  Right?

13       A.   I think so.

14       Q.   You never got this e-mail forwarded to you?

15       A.   No.

16       Q.   Nobody ever requested that you preserve that data

17   near the end of August or early September?

18       A.   No.

19       Q.   Okay.  And as a result, on September 6th you

20   did-- consistent with your job duties, is you upgraded

21   the software in that computer?

22       A.   Correct.

23       Q.   But as you sit here right now, you have no idea

24   if that resulted in the destruction of any data relevant

25   to this case; is that right?

1     A.   That's right.

2          MR. CLYMER:  Nothing further, Your Honor.

3          THE COURT:  I have a few questions, Mr.

4     Steeby.

5                    EXAMINATION

6     BY THE COURT:

7     Q.   So the upgrade of the AVPC-- and I think this

8     applies to the law PC as well, was an upgrade from

9     Windows 7 to Windows 10?

10    A.   The law PC was not upgraded.

11    Q.   Okay.  AVPC from Windows 7 to Windows 10?

12    A.   Yes.

13    Q.   Larger operating system with more functionality,

14    Windows 10 versus Windows 7, or no?

15    A.   As I understand it, our Windows 10 image was a

16    leaner image than we've had in the past.

17    Q.   All right.  So the data that was lost or at

18    least-- the data that was, I guess, written as

19    unallocated, meaning available for overwrite of either

20    the operating system or any new data that might've been

21    put in once the new operating system was in place, that

22    space might've been larger, the same, or smaller than it

23    was under the Windows 7 operating system?

24    A.   The amount of unallocated space that that task

25    sequence made available for Windows 10 would've been

1   just the capacity of the drives.  So it would've

2   unallocated the entire capacity of both drives for the

3   upgrade to Windows 10.

4       Q.  All right.  So you said you're not a forensic

5   expert, and this would be the job of forensic experts to

6   determine whether any of the data that had preexisted,

7   that was in existence before the upgrade, whether any of

8   that data could be retrieved after the upgrade.

9   Correct?  A forensic expert would have to make that

10  determination?

11      A.  I believe they would be able to be best-suited to

12  make that determination, yes.

13      Q.  All right.  And in terms of if there was any old

14  data that wasn't completely overridden and was somewhere

15  in the unallocated space, that data likely existed in

16  fragments.  In other words, you don't necessarily find

17  full files that are-- that are-- that are not

18  overwritten.  The way the system operates in

19  transferring data is in fragments.  It's no longer in a

20  file structure when it's in unallocated space; is that

21  correct?

22      A.  That can sometimes be the case, unless the

23  computer is defragmented on a recurring basis.

24      Q.  Were these?

25      A.  I believe that there was a defragment scheduled

1    task about weekly on our old Windows 7 computers.  I

2    seem to remember that being the case.

3        Q.  All right.  So when would these computers have

4    been defragmented in the context of September 6th,

5    September 7th, in the context of-- of the upgrade?

6        A.  If my recollection--

7        Q.  Yes.

8        A.  If my recollection is correct about that task

9    being on a weekly basis, the maximum amount of time

10   since the last defragmentation would've been seven days.

11       Q.  All right.  But this was-- this was-- this was

12   new data in the sense of new data now being moved from

13   allocated to unallocated.  Can you say that as it was

14   moved or shortly after it was moved or in some way it

15   operated in a way that as it was moved from allocated to

16   unallocated, the defragmentation process would've kept

17   that data intact, rather than fragmenting it into

18   unallocated space?

19       A.  Is this prior to the upgrade?

20       Q.  I'm saying during the upgrade.  What you're

21   telling me is you don't know when the fragmentation

22   happened prior to September 6th.  It could've been

23   anytime from September 6th through, what, August 31st,

24   seven-day window?

25       A.  (Nods head up and down).

1       Q.   Okay.   So let's just assume that it happened

2   somewhere-- somewhere in that seven-day window.   Unless

3   it happened on September 6th, when the allocated data

4   was moved into unallocated space, it would've been moved

5   on a fragmented basis, unless there was some sort of

6   contemporaneous defragmentation going on during that

7   upgrade?

8       A.   That's incorrect.

9       Q.   All right.   Explain.

10       A.   It would've been in the same order it was before.

11   I'll explain.   When data is moved in-- we're using the

12   phrase "moved into unallocated space."   I don't believe

13   the data is actually being moved.   I would explain it

14   more like the table of contents being ripped out of a

15   book.   Everything after the table of contents is still

16   there in the same order, the table of contents is just

17   gone.   And then the author, or anyone who wants, can

18   just start writing over the pages at that point.

19       Q.   And in that writing-over process, though, part of

20   the problem is the system doesn't look at this-- it's

21   not looking at data in files anymore.   So it is grabbing

22   space because it's all been allocated-- or unallocated

23   and made available, it's grabbing space in some sort of

24   systematic way, but not on the basis of:  Here's a file,

25   we're not going to overwrite that because we don't need

1  that file space, we need the next file space.  So we

2  keep this file intact.

3       In other words, this-- this designation of

4  something being unallocated is not programmed in a way

5  that preserves files intactly or documents intactly

6  necessarily.  It might, but it may not.  And likely, it

7  doesn't because it's not-- that's not the purpose of it.

8  That's not the goal of it.  Would that be fair to say?

9    A.   Again, anything that was marked unallocated would

10 still be there in the same order that it was before.

11 Whether it was overwritten by the new data from the

12 operating system install, I'm not sure.

13   Q.   All right.  It's still in the same order, but

14 that doesn't mean it's overwritten in any particular

15 order?

16   A.   Most of the time, in my experience, what I've

17 seen when an operating system is laid down on a drive

18 that's completely unallocated is that it chooses to do

19 so at the very beginning of the drive instead of putting

20 it in different fragments all over the place.  It's kind

21 of like a clean slate, how you would start at the

22 beginning of a notebook if you-- if you were writing.

23 Exactly where that data went down on the hard drive, I

24 can't be sure.

25   Q.   All right.  Well, maybe it's a better question

1  for the experts.  The reason I ask this is because I've

2  been through this before.  I've had this happen.  And,

3  frankly, it is fragments.  You might be able to retrieve

4  a paragraph at best.  You might be able to retrieve a

5  word.  Sometimes you can only even retrieve partial

6  words.  You certainly couldn't retrieve it in an intact

7  way and reconstruct a document unless, I suppose - which

8  wasn't the case - unless there was a lot of unallocated

9  space that wasn't overwritten.

10         I'll ask the experts.  But my point is, although

11  it may-- all of this data may be moved, you say in some

12  sort of order, it's not in a file structure.  And you're

13  not sure as it's overwritten whether it's overwritten in

14  a fashion that is designed to preserve things intactly;

15  is that correct?  Am I fair in saying that?

16     A.  I'd say if it was overwritten, the operating

17  system is not going to pay any attention to files in the

18  unallocated space and lay down the new data in a way

19  that doesn't fragment the unallocated space.

20         THE COURT:  Okay.  That's exactly what my

21  understanding was.  Okay.  I think we understand each

22  other.  Thank you.

23         Ms. VanBebber.

24                 REDIRECT EXAMINATION

25  BY MS. VANBEBBER:

1    Q.   Just so we can keep our timeline straight, I

2    think we left out one piece of the timeline so far.

3    This is August the 30th; is that right?  Is that what

4    you were told earlier, that the date on this was August

5    the 30th or the 31st?

6    A.   This looks like the-- August 31st.

7    Q.   All right.  The highlighted piece says, "Pauletta

8    and David Steeby can likely verify that nothing will be

9    lost."  This is Emily Metzger's understanding; is that

10   right?

11   A.   Yes.

12   Q.   As a matter of fact, you wouldn't be able to

13   verify that nothing will be lost with regard to the AVPC

14   since it was being upgraded.  Correct?

15   A.   On August 31st?

16   Q.   Excuse me.  Yes.  September the 6th.  I'm sorry.

17   A.   Okay.

18   Q.   You couldn't-- you could not verify after

19   August 31st through the upgrade that there wasn't

20   anything lost, could you?

21   A.   If-- if I was aware of this on August 31st?

22   Q.   You could have then, couldn't you?  You could

23   have done it, couldn't you?

24   A.   Are you asking about August 31st or September--

25   Q.   All right.  Let me ask about August 31st first.

1    And on August 31st, had you gotten this e-mail, had

2    anybody informed you that care, special care had to be

3    taken that that AVPC didn't lose any data--

4       A.  No.

5       Q.  You couldn't have done anything then?  If you had

6    gotten the letter and knew about this, could you-- could

7    you have stopped the upgrade, I guess is what I'm

8    asking.

9       A.  Yes.  That would've been within my authority.

10      Q.  Okay.  But nobody told you, did they?

11      A.  No.

12      Q.  They didn't tell you on September the 6th either,

13   did they?

14      A.  No.

15      Q.  Even though they knew there was a hearing on

16   September the 7th, that-- strike that.  You wouldn't

17   know that.

18      A.  I don't know what the--

19      Q.  At any rate, they never told you before-- before

20   the job was finished, did they?

21      A.  Correct.

22      Q.  Now, you had indicated that the work was done on

23   the 6th but that the computer itself, the AVPC, wasn't

24   moved to the lockup until sometime in December?

25      A.  I believe my testimony was that it was the hard

1    drives moved to the vault, not the computer itself.

2      Q.  Okay.  The hard drives are moved to the vault in

3    December?

4      A.  Yes.

5      Q.  Okay.  I want to show you what's been marked

6    Exhibit 1147, which is a-- an e-mail chain.  Okay.  Down

7    on the bottom, the very bottom one, this is an e-mail

8    from Debra Barnett.  Right?

9      A.  Correct.

10     Q.  Okay.  And it says, "Lock down that PC."

11   Correct?

12     A.  That's right.

13     Q.  Now, this is November that she's giving you this

14   information.  Correct?

15     A.  Correct.

16     Q.  So she'd been using it since September the 7th or

17   the 8th, right up through November the 7th, hadn't she?

18     A.  I'm not sure what she was doing with that

19   computer during that time.

20     Q.  But she had it on her desk and it was available

21   for her to use.  Correct?

22     A.  Right.

23     Q.  So you get this e-mail from Ms. Barnett - why

24   can't I get it to-- there we go - and you respond to her

25   by saying that, on November the 7th, "Pauletta is

1    powering down the AVPC"?

2        A.  Correct.

3        Q.  And then at the top, again, "All powered down and

4    cord removed."  Correct?

5        A.  Can you move that down so I can see who that's

6    from?

7        Q.  I'm sorry.  That's from Pauletta.

8        A.  That's correct.

9        Q.  So anything could've been overwritten between

10   September the 6th and November the 7th.  Correct?

11       A.  Correct.

12                    RECROSS EXAMINATION

13   BY MR. REDMOND:

14       Q.  Mr. Steeby, Mr. Clymer asked you a couple

15   questions about Exhibit 589, that e-mail chain.  Was

16   today the first time you've ever seen that e-mail?

17       A.  I-- I think I've seen this first message from

18   Melody somewhere before, but I don't recall seeing any

19   of the replies to this.

20       Q.  Did you see it-- did you see that first message

21   before September 6th?

22       A.  No.

23       Q.  Okay.  You testified about the PELCO player.

24   Assuming that the hard drive had not been altered in the

25   manner that it was, you could have checked to see when

1    that software was opened.  Correct?

2        A.  I would've had to research how to do that.  But,

3    yes, I would've given it my best.

4        Q.  And you could've checked to see when that PELCO

5    player was closed.  Right?

6        A.  I'm not sure if that type of information is

7    available in the logs.

8        Q.  Well, most software you can see when it's opened

9    and closed; is that fair?

10       A.  I wouldn't say that that's something that I do

11   very often and am familiar with finding out.  Again, I

12   would've had to do some research myself before embarking

13   on that type of task.

14       Q.  Okay.  You talked to Mr. Clymer about the

15   continued use of the AVPC would overwrite data in the

16   unallocated space.  Why didn't you, at the conclusion of

17   your conversation with Mr. Slinkard on the 7th, simply

18   go unplug that machine so the data would not continue to

19   be overwritten?

20       A.  That machine was not the focus of our discussion

21   on the 7th.  The focus of our discussion on the 7th was

22   the hard drives that had been removed from computers

23   replaced during the cyclical PC refresh project.

24       Q.  Okay.  That computer was squarely an issue in the

25   hearing.  At what point did you have a discussion about

1   the-- taking that machine offline to prevent further

2   data overwriting?  Was it that e-mail in November?

3       A.   When you-- which e-mail in November?  Is that

4   something I have up here?

5       Q.   No.   The one we saw on the screen asking that

6   the-- the AVPC be unplugged and powered down.  Was that

7   the first time that occurred between September 7th and

8   that date in November, I think it was the 12th?

9       A.   No.

10      Q.   So had you taken any efforts before that day in

11  November to prevent data from being overwritten on that

12  computer?

13      A.   No.

14      Q.   Had anybody told you to do so?

15      A.   No.

16              MR. REDMOND:  All right.  Thank you.

17                  RECROSS EXAMINATION

18  BY MR. CLYMER:

19      Q.   Based on your understanding of the way computers

20  work, is there a chance that relevant logging data still

21  resides on one of those computer hard drives taken from

22  the AVPC?

23      A.   There's a chance, yes.

24      Q.   And we won't know unless somebody checks, will

25  we?

1   A.   No.

2              MR. CLYMER:   No further questions.

3              THE COURT:   No one has ever asked you to

4   check, have they?

5              THE WITNESS:   No.

6              THE COURT:   All right.

7              MS. VANBEBBER:   I do have one question, Your

8   Honor, if I may as a result of the recross.

9              THE COURT:   I'm sorry.   Go ahead.

10                    REDIRECT EXAMINATION

11  BY MS. VANBEBBER:

12   Q.   Mr. Steeby, you said that that could be done.

13  How much would it cost?

14   A.   That what could be done?

15   Q.   The-- the request that Mr. Clymer had of you as

16  to, well, could you go in there and find out everything

17  you need to know.   How much-- pardon-- oh, basically do

18  a forensic analysis, how much would it cost?

19   A.   I don't have that information.   I'm not sure how

20  much that would cost.

21              THE COURT:   Anyone else?

22              All right.   May Mr. Steeby be excused

23  perhaps, subject to recall?

24              MR. REDMOND:   Yes, Your Honor.

25              THE COURT:   All right.   Mr. Steeby, you're

1  excused.  You may be recalled.  Someone will let you

2  know.  For the time being, you're excused.

3              THE WITNESS:  Thank you, Your Honor.

4              THE COURT:  All right.  Let's take a-- a

5  15-minute recess.

6              (Recess).

7              THE COURT:  All right.  You can be seated.

8  Call your next witness.

9              MS. VANBEBBER:  Your Honor, I call David

10  Zabel.

11              MR. McALLISTER:  Your Honor, I think-- we

12  thought someone had told him, and apparently not.  So I

13  will summon him up here.

14              THE COURT:  Okay.

15              MR. McALLISTER:  James will go grab him.

16                   DAVID ZABEL,

17  called as a witness on behalf of the Special Master,

18  having first been duly sworn, testified as follows:

19                   DIRECT EXAMINATION

20  BY MS. VANBEBBER:

21    Q.   Mr. Zabel, how long have you been working for the

22  U.S. Attorney's Office?

23    A.   Since 2005.  I was hired as a Special Assistant

24  United States Attorney.  And then in 2008, I became an

25  Assistant United States Attorney.

1   Q.   So after three years as a special, you became a

2   regular assistant-- excuse me, Assistant United States

3   Attorney?

4   A.   Yes, ma'am.

5   Q.   Have you always worked in the criminal division

6   here?

7   A.   Yes.

8   Q.   I'm going to ask you about some cases, and then

9   I'm going to ask you about activities in your office.

10   Were-- were you at the September 7th hearing in the

11   *Black* case?

12   A.   September 7th, 2017-- '16?

13   Q.   '16.

14   A.   I believe I was.

15   Q.   All right.  I'm sorry.  Strike that.  I asked you

16   about the wrong hearing because I wanted to do them

17   chronologically.  So let's start-- were you at the

18   August 9th hearing?

19   A.   I-- I don't know.  I mean, if--

20   Q.   This would've been the first hearing that Ms.

21   Barnett made her appearance in.  Were you at that

22   hearing?

23   A.   I don't know.

24   Q.   Didn't you attend the first half?  Didn't you--

25   you did not attend that hearing?

1    A.  I-- it seems to me I-- I tried to attend those

2    hearings, the early hearings.  But one of the early

3    hearings, I either attended part of or none of because I

4    had some conflict.

5    Q.  All right.  Let me draw your attention to what

6    happened before that hearing then.  Were you aware that

7    Ms. Tomasic had apparently run into some trouble with

8    the *Black* case?

9    A.  I knew that there were some allegations.

10   Q.  And you knew there was going to be a hearing on

11   the 9th, August the 9th?

12   A.  I don't remember the dates now, but yes, I was

13   aware of the dates of the *Black* hearings back during

14   that period of time.

15   Q.  And a few days before that-- so August the 9th is

16   on a Wednesday.  Right?  If you look at the calendar--

17   I'm sorry, I should've drawn your attention to that

18   first.  Do you want me to get it closer to you?  Would

19   that help?

20   A.  It would.  My eyesight is not as good as it once

21   was.

22   Q.  Okay.  Does that help?

23   A.  Yes.  But it looks like August 9th, 2016, was a

24   Tuesday.

25   Q.  It's a Tuesday.  Tuesday.  All right.  So

1    somewhere between the weekend prior to the hearing, you

2    heard about what the troubles were, did you not?

3        A.   Yes.  I-- I don't know what number of hearing

4    that was, but prior to the first *Black* hearing regarding

5    assertions of phone calls at CCA, I was aware at least

6    generally what the assertions were.

7        Q.   Were you an attorney on the *Black* case?

8        A.   No.

9        Q.   At that time was it not just Chris Oakley and

10   Erin Tomasic that were the only attorneys up to, say,

11   August the 6th?

12       A.   That's-- that was my understanding.

13       Q.   All right.  And are you aware-- or if the record

14   reflects it, do you disagree that Ms. Barnett a few days

15   before the hearing, before the weekend actually, entered

16   her appearance as counsel in that case?

17       A.   I don't know when she did, but I know she did

18   prior to the first hearing regarding the allegations.

19       Q.   Did several of you get together and decide that

20   you would try to assist by helping Ms. Barnett with a

21   brief or-- or at least a memo of what-- what had

22   occurred?  Did you feel like you ought to file something

23   in that case?

24       A.   I do remember there being a collective effort to

25   do legal research.

1      Q.   And was Scott Rask sort of spearheading that--

2    that effort?

3      A.   I-- that-- that sounds right.  I don't

4    specifically recall if-- who was, quote, spearheading

5    it, but that may be.  I don't have a specific

6    recollection.

7      Q.   You participated in the team effort, didn't you?

8      A.   Yes.  I do recall doing some legal research.  I

9    don't-- it wasn't very extensive.

10     Q.   Do you recall that Ms. Barnett never used that

11   research?

12     A.   I know that nothing was filed at that time.  You

13   know, did she use it in some other way to educate

14   herself?  I don't know.

15     Q.   All right.  Now let's go to the September 7th.

16   And you went to what you called the first half of that

17   hearing, didn't you?

18     A.   I-- I know that I was at part of at least-- I

19   know I was at part of the September 7th hearing at a

20   minimum.  I don't remember which hearings I was there

21   for the full hearing or part of the hearing.

22     Q.   All right.  I'm going to show you what's been

23   marked as Special Master's Exhibit 1150.  All right.

24   Does that refresh that you were at the first half of the

25   hearing?

1    A.   Yes.

2    Q.   And does this letter reflect that this was the

3  day--

4    A.   Well--

5    Q.   Excuse me.

6    A.   I'm sorry.  It states-- and I wrote this and

7  then-- to Tom Beall and Tris was cc'd on it.  It says,

8  "Tris was at the first half," parenthetical--

9    Q.   I'm sorry, Tris was.  And you were at the second

10  half.  Right?

11    A.   Yes.

12    Q.   And you say you heard Judge Robinson's comments

13  at that hearing about the incident where Erin Tomasic

14  went into her chambers after hours?

15    A.   Yes.

16    Q.   Look at the first sentence on the second

17  paragraph.

18    A.   Okay.

19    Q.   You then apparently felt very strongly that

20  somebody ought to file something about the event, from

21  your point of view?

22    A.   Well, I'm-- I'm just listening to the way you're

23  wording the question and trying to answer it.  I felt

24  like something should be filed clarifying the actual

25  chain of events.  It had nothing to do with my point of

 1   view.

 2       Q.   It wasn't your point of view of the chain of

 3   events?

 4       A.   Right.   I'm not sure what you were modifying with

 5   your question.   But I felt like, given what I had been

 6   told about the chain of events and who had approved what

 7   and what I heard in court, my concern was Judge Robinson

 8   didn't understand what had actually occurred.   That was

 9   just what I was surmising from what I knew and what I

10   had seen in court.

11       Q.   So you and Tris went to-- went to your boss.

12   Right?

13       A.   Well, I sent that e-mail to Tom Beall, who was

14   the acting U.S. Attorney.

15       Q.   And your-- and your top line supervisor.  Right?

16       A.   Right.

17       Q.   So did you go talk to your boss or not?

18       A.   He responded and assured us that-- I don't

19   remember the exact statements, but that he thought Judge

20   Robinson did have all the facts.   And then we may-- I

21   think I responded and said thank you.   I don't think

22   there was a phone call, but I mean, it's possible there

23   was, because he-- he would've been in the Topeka office,

24   we're in Kansas City.   But I don't-- I think it was just

25   the e-mail exchange.

1    Q.   Well, why were you so concerned that some-- some

2  information be given to Judge Robinson if she already

3  had all the facts?

4    A.   When my e-mail was sent, it was based on my

5  understanding of what had occurred, who had approved

6  what, and then seeing Judge Robinson's comments.  And my

7  concern was that she didn't have all the facts of what

8  had occurred.

9         Once Mr. Beall responded to me, then I didn't-- I

10  didn't respond further.  I mean, when he said he

11  believed Judge Robinson did have the facts-- and I don't

12  remember if he said he had talked to her or what he said

13  in the e-mail, then that-- my concerns were dealt with.

14    Q.   Didn't you gather from sitting through the

15  hearing that Judge Robinson had the impression that Erin

16  Tomasic had just gone off on her own and broken into her

17  chambers?

18    A.   Yeah, that-- that was-- that's fair, that that--

19  it seemed like that she thought Ms. Tomasic had done

20  this at least in part on her own.

21    Q.   You didn't hear anything from the bench that day

22  that made you think she-- that the judge understood

23  other people were involved, did you?

24    A.   I did not.

25    Q.   And you-- you knew for a fact that other people

1  were involved, didn't you?

2      A.  Well, I-- I knew what people had told me, and I--

3  I had no reason not to believe those statements at the

4  time.

5      Q.  So when the acting U.S. Attorney said, hey, we've

6  got all the facts, you didn't-- you took him at his

7  word, didn't you?

8      A.  Yes.

9      Q.  Okay.  You were involved in the *Herrera-Zamora*

10  case, were you not?

11      A.  I was.

12      Q.  You were the lead attorney?

13      A.  No.

14      Q.  Who was the lead attorney?

15      A.  We don't often put those-- well, we don't always

16  put that title.  Ms. Tomasic was because she filed the

17  case.  She-- I was-- the case was filed originally in

18  March of 2014.  I entered my appearance at the request

19  of my supervisor to assist Ms. Tomasic in-- I think it

20  was January 5th of 2017.

21      Q.  The case was tried in July of 2017; is that

22  correct?

23      A.  July of 2016.

24      Q.  '16?

25      A.  I don't know if I misstated.  I entered my

1   appearance in January of 2015.

2       Q.   The case was tried-- wasn't it tried in 2017, not

3   2016?

4       A.   No.  It was tried in-- in 2016.  Because then in

5   February of 2017, that's when defense counsel contacted

6   me about this assertion about listening to calls or

7   watching video.

8       Q.   So in 2017, on June the 19th, did you sign what

9   has been now marked as Defendant's Exhibit No. 497,

10  Notice of Record Correction?

11      A.   Yes.  What's before me, yes.

12      Q.   All right.  And what was the purpose of that

13  filing?

14      A.   The purpose was to inform the Court that-- that

15  Ms. Tomasic had, I mean, in her words at least reviewed

16  or scanned or-- some calls between Mr. Moran and Mr.

17  Herrera-Zamora.

18      Q.   So you started out by letting-- letting the Court

19  know that you were wrong when you said initially that

20  Ms. Tomasic did not listen to these calls?

21      A.   Correct.  And I-- I mean, I'm just listening to

22  your words.  I spoke for myself when I spoke to defense

23  counsel and then-- on February 15th and told them I

24  didn't think-- have any reason to think Ms. Tomasic had

25  listened to any calls, but she was gone that week.

1      And then before she returned to the office, the

2  motions by the defense had been filed.

3      Q.   So your motion to correct the record mentions

4  several-- mentions quite a few things that you said Ms.

5  Tomasic told you that were, in fact, wrong and that you

6  were going to try to correct the record.   Right?

7      A.   Correct.

8      Q.   And you also said that the information-- look at

9  Page 5, please, the very last page where I've

10  underlined.   And read that sentence to yourself, please.

11      A.   I've read it.

12      Q.   Does that essentially say that she did these

13  things, you're now correcting the record, and you didn't

14  have anything to do with those things; is that right?

15      A.   Correct.

16      Q.   In fact-- in fact, you and Ms. Tomasic sat in

17  your office and listened to calls-- to the same calls

18  you're talking about having had her do by herself?

19      A.   That is not correct.

20      Q.   You never sat in your office and listened to--

21  and listened to calls with Ms. Tomasic in the

22  *Herrera-Zamora* case?

23      A.   I did not.

24      Q.   And you also say in your pleading that you-- she

25  told you or you found out that she had engaged the

1    services of a contract interpreter on the day-- one of

2    the days of trial.  Right?

3        A.   That's in the pleading?

4        Q.   In the motion, Notice of Record Correction.

5        A.   If you can show me, it might refresh my

6    recollection.

7        Q.   Okay.  Okay.  I direct your attention to the same

8    document at the bottom of Page 3, No. 8.

9        A.   I can see 7.  I can't see 8.

10       Q.   I'm sorry.  And then turn the page.  You were

11   well aware on that trial day that she was listening to

12   records-- excuse me, to recordings of Juan

13   Herrera-Zamora.

14       A.   I was aware on which day?

15       Q.   The date we just looked at, the trial date.

16       A.   July 11th, 2016?

17       Q.   Yes.

18       A.   I was not.

19       Q.   You were in the courtroom trying the case.

20   Right?

21       A.   Trial began on July 11th, 2016.

22       Q.   She was in the courtroom trying the case as well.

23   Right?

24       A.   Yes.

25       Q.   And you were-- you became aware, according to

1   this, that she-- she listened to recordings.  And were

2   you also aware that she got the services of a contract

3   interpreter to go through Mr. Herrera-Zamora's phone

4   calls and find him talking to Carlos Moran, his

5   attorney?

6           MR. CLYMER:  Your Honor, I'm going to object

7   because counsel said "you're aware because of this" and

8   the "this" is the record correction that says nothing of

9   the kind.

10          THE COURT:  All right.  Reframe the

11  question.  I think it's compound.  It's asking about his

12  awareness with respect to two different things.  I think

13  you need to be clear on when the awareness-- what you're

14  asking about in terms of his awareness and when.

15  BY MS. VANBEBBER:

16     Q.  On the date of the trial that we just discussed,

17  you both were in the courtroom.  Correct?

18     A.  Yes.  We would've picked a jury that day at a

19  minimum.

20     Q.  All right.  You did-- were you aware that Ms.

21  Tomasic had called in the-- called in an interpreter to

22  look through-- to listen to Juan Herrera-Zamora's phone

23  recordings and find him talking to Carlos Moran?

24     A.  On July 11th?

25     Q.  Yes.

1    A.   No.

2    Q.   You didn't know Sara Gardner was in the building?

3    A.   On July 11th?  I-- no.

4    Q.   During the trial.

5    A.   Well--

6    Q.   What about-- what about July the 8th?

7    A.   July the 8th was the *limine* hearing, and I think

8    we had requested Ms. Gardner to be available because we

9    were addressing-- I had filed a motion *in limine*, and I

10   think we had asked her to be available.

11   Q.   She was there, wasn't she?

12   A.   Where?

13   Q.   In the-- in the courthouse that day.

14   A.   I don't specifically recall, but she may have

15   been.

16                THE COURT:  Are we talking about July 8th?

17                MS. VANBEBBER:  According to this e-mail.

18   BY MS. VANBEBBER:

19   Q.   I'm showing you what's been marked Special

20   Master's Exhibit 1149.  That is an e-mail, is it not,

21   from Sara Gardner?

22   A.   Appears to be a--

23   Q.   A string.

24   A.   -- string of e-mails, yes.

25   Q.   And the one at the-- the very last one, you-- you

1    saw, did you not, that day?

2        A.  I don't know if I saw it or not.

3        Q.  It's directed to you.  Did you read it, do you

4    think?

5        A.  Which one are you referring to?

6        Q.  The very top, right there.  You and Sara have

7    been having a conversation here back and forth, have you

8    not?  From David Zabel.  Is that you?

9        A.  Yes.

10       Q.  So you knew Sara Gardner was coming in on the

11   8th, and you knew what she was there for, didn't you?

12              MR. CLYMER:  Your Honor, this is the e-mail

13   that's from July 2nd.

14              MS. VANBEBBER:  That's right.  It's telling

15   her to come in on the 8th.

16   BY MS. VANBEBBER:

17       Q.  And she did come in on the 8th, didn't she?

18       A.  I don't know if she--

19       Q.  For a motion *in limine*.

20       A.  I don't know if she came in on the 8th.  And I--

21   I don't know if Erin was asking her to come in for the

22   motion *in limine* or prep as a witness, because she had

23   interpreted calls between the defendant and his

24   girlfriend.

25       Q.  So why would she be in the building at Erin's

1    request and copying you and you copying her back and

2    chatting about it?

3        A.    Look at my e-mails.  My-- my e-mails are not

4    substantive in nature.  You-- I don't recall if Erin was

5    asking her to be there for the *limine* hearing or to prep

6    for trial.

7                MR. CLYMER:  Your Honor, may we see the

8    Court at sidebar, please?

9                THE COURT:  Yes, over here.

10               (Proceedings had at the bench, outside the

11   hearing of open court).█

12   ████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

16-20032  USA v. Karl Carter (Black) REDACTED 10.04.18        1160



 1  ████████████████████████████████████████████

 2  ██████████████████████████████████████████████████

 3  ████████████████████

 4          ███████████████████████████████

 5  ██████████

 6          ████████████████████████████████████████████████

 7  ███████████████████████████████████████████

 8  ███████████████████████████████████████████

 9  ███████████████████████████████████████████

10  ██████████████████████████████████████████████████

11  █████████████████████████████████████████████

12  ██████████████████████████████████████████████

13  ██████████████████████████████████████████████

14  ████████

15          ██████████████████████████████

16              (Proceedings continued in open court.)

17  BY MS. VANBEBBER:

18      Q.   I'm going to show you a copy of the document that

19  we've been looking at on the ELMO.  Would you take time

20  to read it?

21              THE COURT:  And that's Exhibit 1149,

22  correct, 1149?

23              MS. VANBEBBER:  Yes.  Yes, ma'am.

24              THE WITNESS:  Okay.

25  BY MS. VANBEBBER:

1      Q.   So let's go at the beginning and go through to
2   the end.  On July the 1st you wrote to Sara Gardner that
3   you're planning on proceeding to trial on July 11th and
4   she would probably testify on July 13th or 14th and
5   you're wanting her to come and prep with you preparatory
6   to that on the 7th; is that right?
7      A.   Correct.
8      Q.   She responds and tells you she's going to be on
9   vacation until Thursday night so she wants to do it
10  Friday?
11     A.   Correct.
12     Q.   Then the next thing that happens is Erin Tomasic
13  writes begging-- "I'm going to beg you to testify on
14  Friday, July the 8th at 9:00," and then discusses what
15  it is that she's doing.  He's claiming certain things.
16  "I'm reviewing the-- the CCA calls I plan to use to show
17  they're all together.  I'll scan and send them to you."
18     A.   Correct.
19     Q.   All right.  Then she says, "Ugh.  Only because
20  it's you, Erin."  Right?
21     A.   Correct.
22     Q.   And then Zabel says, "Umm -- & me."  Right?
23     A.   Correct.
24     Q.   Sara Gardner responds jovially to you on Saturday
25  July the 2nd, "If you don't know me by now, you'll never

1    know me at all Dave Zabel."

2        A.   Correct.

3        Q.   And then you respond back, "Kind of a cryptic

4    response, I'm going to interpret that..."  and so on?

5        A.   Correct.

6        Q.   All right.  So you apparently had planned for her

7    to come in for a prep session and then come in to

8    testify on the 8th?

9        A.   Correct.

10       Q.   And you knew that she had came to the building,

11   right, she never did testify, did she?

12       A.   No.

13       Q.   But you have told the Court in your motion-- or

14   Notice of Record Correction, Document 497, that you

15   didn't know anything about any of this; is that right?

16            MR. CLYMER:  I'd ask that if the witness is

17   being questioned about a document, he be given a copy of

18   the document to read.

19            THE COURT:  What's the exhibit number?

20            MS. VANBEBBER:  The exhibit number is 497.

21   BY MS. VANBEBBER:

22       Q.   Are you familiar with a Notice of Correction that

23   you signed?

24       A.   I am.

25       Q.   Let me show you a copy of it in case you need a

1   refreshment of your recollection.

2      A.  Okay.  Do you want me to go ahead and answer your

3   question?

4      Q.  Yes.

5      A.  The e-mails, I don't remember what exhibit it is,

6   and the Notice of Record Correction are not dealing with

7   the same subjects.

8      Q.  That's your testimony?

9      A.  Yes.  The notice of e-mail is about her coming in

10  to prep for trial because she interpreted calls between

11  the defendant and his girlfriend and another individual

12  who may have been his wife.

13     Q.  Uh-huh.

14     A.  The *limine* hearing purpose was to put her on if

15  we needed to address a claim by the defendant of marital

16  privilege.

17         The Notice of Record Correction deals with me

18  learning on May 10th, 2017, from Ms. Tomasic that she

19  had briefly reviewed or done some kind of spot-check of

20  calls that she believed were between Mr. Moran and Mr.

21  Herrera-Zamora.  So the e-mail and the Notice of Record

22  Correction do not deal with the same subject.

23     Q.  Very well.  Then I will simply ask you:  Were you

24  aware that Sara Gardner was in the building on the 8th

25  of July 2016 for whatever purpose?

1    A.  I do not have a recollection if she came over or

2    not.  I do see that the e-mail asked her to.

3    Q.  And it's your testimony that you didn't know that

4    Erin Tomasic was asking Ms. Gardner while she was in the

5    building to listen-- or to-- excuse me, to read,

6    interpret Herrera-Zamora's conversations with his

7    attorney?

8    A.  I did not know that.

9    Q.  She didn't tell you that that's what she was

10   doing that day?

11   A.  No.

12   Q.  All right.  Now, let me ask you when you found

13   out that the Special Master was going to do Phase III of

14   his investigation?

15   A.  When did I find out?

16   Q.  When did you find that out?

17   A.  I don't remember the date.

18   Q.  Was it shortly after, to your knowledge, that he

19   was told to start it?

20   A.  I assume so.

21   Q.  Did you ever look-- take a look at the court

22   order that ordered for that investigation to proceed?

23   A.  I believe I did.

24   Q.  Did you understand it to say that every member of

25   the United States Attorney's Office had to fully

1   cooperate with the Special Master?

2       A.   Yes.

3       Q.   Did you feel that that applied to you personally?

4       A.   Yes.

5       Q.   We've talked about two other instances where you

6   felt someone was not being treated fairly and you

7   expected-- you wanted the U.S. Attorney to know about

8   that?

9       A.   I'm not sure what you're referring to.  Two

10  instances?

11      Q.   The two instances when you felt that the record

12  should be corrected with regard to Ms. Tomasic's

13  entrance in the chambers after hours and the initial

14  August time when you tried to put together a team

15  approach to make sure that Debra Barnett had facts that

16  she could work with at trial-- at the hearing.

17      A.   As I've testified to, I was involved in those two

18  things, but I would not say that I felt like I was

19  having to-- I don't remember how you put it, defend

20  somebody or go to bat for somebody.

21           I mean, the team approach to doing research is

22  something our office does all the time when we're up

23  against a deadline.  That didn't have anything to do

24  with defending a certain person or anything like that.

25      Q.   And your letter to Mr. Beall was in support of

1   Ms. Tomasic, wasn't it?

2      A.  Well, we all have a duty of candor to the

3   tribunal.  And based on my understanding of what had

4   occurred and what I saw in court, I was concerned that

5   Judge Robinson may not have all the facts.  I was merely

6   expressing that.  When Mr. Beall said he believed she

7   did, I believed him.

8      Q.  Were you ever given any instructions by

9   management that you should not speak personally with the

10  Special Master?

11     A.  No.

12     Q.  Were you given any instructions that you should

13  speak with the Special Master?

14     A.  That I should?

15     Q.  Yes, that you should.

16     A.  Yes, if requested.

17     Q.  If requested by whom?

18     A.  I assume the Special Master.

19     Q.  How did you get that information?  Was there an

20  e-mail or some kind of notice?

21     A.  I don't recall if there were e-mails or-- there

22  may have been, I just don't specifically recall.

23     Q.  Did you believe that you should not speak with

24  the Special Master unless you had been given authority

25  to do so by management?

1    A.   No.   I know we were instructed to comply with the

2    Phase III order, I know that.

3    Q.   Do you recall having a meeting in Kansas City

4    where Emily Metzger and Debra Barnett came to speak with

5    the attorneys as a group?

6    A.   I do recall that.

7    Q.   And do you recall that the reason for that visit

8    was to discuss the *Black* case and what the Special

9    Master was doing with his investigation?

10   A.   Yes.

11   Q.   And what did they tell you?  What was the content

12   of those instructions?

13   A.   I'm not sure that I remember specifics.  I

14   think-- I know Ms. Metzger was in charge of the

15   litigation hold.  There may have been discussion about

16   that.

17   Q.   Nobody told you at that meeting that you should

18   not be talking to the Special Master without authority

19   from management?

20   A.   I-- I don't think so.

21   Q.   Okay.

22   A.   I mean, we may have been told that if-- I'm not

23   going to speculate.  I don't recall anyone saying that.

24   Q.   Did you volunteer any help to the Special Master?

25   A.   Did I volunteer help?  No, I wasn't involved in

1    the *Black* case.

2              MS. VANBEBBER:  All right.  No other

3    questions.

4              MR. REDMOND:  Your Honor, before I begin, I

5    will rely on a couple of exhibits.  Exhibit 491 is

6    already admitted.  We would move to admit Exhibits 580A

7    and 666.

8              THE COURT:  588?

9              MR. REDMOND:  I'm sorry, 580A.

10             THE COURT:  580A?

11             MR. REDMOND:  Yes.

12             THE COURT:  And what?

13             MR. REDMOND:  And 666.

14             THE COURT:  Any objection?

15             MR. CLYMER:  Not from the government, Your

16   Honor.

17             THE COURT:  580 subpart A and 666 both

18   admitted.

19             MR. REDMOND:  May I approach, Your Honor?

20             THE COURT:  Yes, go ahead.

21                        CROSS EXAMINATION

22   BY MR. REDMOND:

23     Q.   Mr. Zabel, after Ms. Tomasic was terminated, did

24   you remain in contact with her?

25     A.   I-- I did have some contact with her.

1    Q.   The reason I ask is my questions will-- or this

2    set of questions will regard-- relate to some binders

3    that she had in her office.  There's been some testimony

4    that there were binders in her office with the-- that

5    contained e-mails that had been printed off.  Were you

6    aware that such binders were in her office?

7    A.   No.

8    Q.   And that those e-mails concerned *Black*, did she

9    ever talk to you about that?

10   A.   About the binders?

11   Q.   Yes.

12   A.   No.  I took her some of her personal property,

13   but I don't recall taking her binders.

14   Q.   You-- so the binders that I'm talking about were

15   still in her office after she was terminated.  Did you

16   ever come to understand that Ms. Tomasic wanted those

17   binders?

18   A.   No, I don't-- no.

19   Q.   Did you take those binders to her?

20   A.   I don't believe I did.  I recall going to her

21   house on one occasion taking some heavier items, and I

22   believe Kim Flannigan took her some items that day as

23   well because Kim was at the house when I got there.

24   Q.   So was Kim with you when you went to her house?

25   A.   She wasn't with-- we didn't go together.

1    Q.  Okay.  That's what I was asking.  I want to back

2  up to Exhibit 491.

3              MR. REDMOND:  I apologize, Your Honor.

4  BY MR. REDMOND:

5    Q.  I'm going to ask you about some advice you

6  solicited through Lanny Welch and then more indirectly

7  through PRAO.  Do you remember this?

8              THE WITNESS:  Your Honor, may I ask Mr.

9  Clymer if I'm authorized to answer questions about

10  professional-- the office of-- PRAO?

11              MR. CLYMER:  You are, including the advice

12  that's in this e-mail message.  So, yes, you're--

13  there's another page to it, you're fully authorized to

14  answer questions.

15              THE WITNESS:  Okay.

16  BY MR. REDMOND:

17    Q.  Okay.  I'm just asking you right now, do you

18  remember having an e-mail conversation with Lanny Welch?

19    A.  I did.  I was copied on the e-mail that Ms.

20  Tomasic sent Mr. Welch.

21    Q.  Correct.  But you read the content of those

22  e-mails?

23    A.  I believe I did--

24    Q.  Okay.

25    A.  -- at the time.  I have read it, but I believe I

1    did at the time.

2        Q.   What was the discussion that led up to e-mailing

3    Mr. Welch?

4        A.   So it was precipitated by the events of the

5    motion-- the *limine* hearing on July 8th, 2016, where Mr.

6    Moran, Mr. Herrera-Zamora's attorney, had revealed that

7    he had been talking to inmates at CCA who were

8    represented.

9        I had talked to one of those attorneys, tried to

10   contact all of them, and ascertained that Mr. Moran did

11   not have permission to talk to his client.  We had a

12   hearing regarding what the purpose of their testimony

13   could be, because I surmised that it would have to be

14   hearsay.

15       After the hearing, we were still unclear what the

16   purpose would be.  So we-- Ms. Tomasic and I discussed

17   whether it would be proper to try to obtain calls

18   between Mr. Moran and individuals at CCA who he did not

19   represent.

20       Q.   I couldn't hear that last sentence, I'm sorry.

21       A.   We-- we talked about whether it would be proper

22   to obtain calls between Mr. Moran and inmates,

23   detainees, at CCA who he did not represent, specifically

24   individuals listed on his witness list that had been

25   discussed at the *limine* hearing.

1      Q.   Okay.  So what you're asking to do is subpoena

2  phone calls between Mr. Moran and third parties?

3      A.   Right.  When you say third parties-- and I don't

4  know if-- if the plan was to subpoena or just request

5  through the marshals because--

6      Q.   Fair enough.

7      A.   -- I didn't take on that part of it.  After it

8  was-- we got the answer from Mr. Welch and PRAO, Ms.

9  Tomasic took care of that.

10     Q.   And the ultimate response was that if Ms.

11 Tomasic's research confirmed that they could-- that

12 these phone calls were a proper use of a request for

13 phone calls-- I mean, if her research was right that

14 this wasn't a Sixth Amendment violation, then to go

15 ahead.

16     A.   Yes.  To go ahead, but out of an abundance of

17 caution use a filter team.

18     Q.   But to be clear, PRAO didn't say, we think this

19 is a tremendous plan and have independently assessed the

20 substantive law here.  They said, if your own research

21 is good and you use a filter team, then we give you

22 permission; is that a fair statement?

23     A.   Yeah, I don't know that PRAO would say they give

24 permission or not.  They give advice.  But yes.  But

25 understand the context of it is getting calls between

1    Mr. Moran and people who are not his clients.  We wanted

2    to do the filter team in case we got calls between Mr.

3    Moran and Mr. Herrera-Zamora.  That-- that's why we

4    needed-- we wanted a filter team.

5        Q.  Is the-- what I'm showing you in front of you is

6    Exhibit 491.  Is that a fair statement of-- or does that

7    contain PRAO's advice to you?

8        A.  Yes.

9        Q.  Okay.  So I've given you a copy of Exhibit 580A.

10   580A is a memorandum drafted by Scott Rask after an

11   interview with you; is that right?

12       A.  I've never seen it before.

13       Q.  Okay.  I'm not going to talk very much about it.

14   I would direct your attention to Page 3.

15       A.  Okay.

16       Q.  And the-- would you just take a moment to read

17   the last full paragraph?

18       A.  The last full paragraph?

19       Q.  Yes, sir.

20       A.  Okay.

21       Q.  Now, are you finished with that paragraph?  And I

22   just need the part on Page 3.

23       A.  Yes.

24       Q.  Okay.  Now, these are words related to you, I

25   want to make sure that they actually capture what you

1    told Mr. Rask before he prepared this report.

2         In the middle of the paragraph it says, "Because

3    Dave considered those calls not protected by

4    attorney-client privilege due to the audio banner before

5    each call, he opined to Erin that she had not done

6    anything legally or ethically wrong."  Does that

7    accurately report what you told Mr. Rask?

8    A.   My-- my-- I mean, I don't have a specific

9    recollection of what I told Mr. Rask.  But what Ms.

10   Tomasic and I had discussed after she revealed to me

11   what she did, it wasn't-- my opinion wasn't about

12   whether it was attorney-client privilege or not because

13   of the audio banner, it was her statements to me that

14   she had heard no content.  That the allegation had been

15   previously that we had used these.

16        So, yes, I think it's accurate except I don't

17   think my emphasis was that it wasn't privileged because

18   of the audio banner as much as my understanding of what

19   she did at the time, what she had told me on May 10th.

20   Q.   But May 10th she has made a disclosure and she is

21   fired on May 10th as well.  Correct?

22   A.   I don't think she's let go on May 10th.

23   Q.   But it's shortly thereafter?

24   A.   Yes.

25   Q.   And this is the conversation that she had with

1   you that you're recounting directly before she went to

2   speak with Mr. Rask and was shortly thereafter

3   terminated; is that right?

4       A.   Right.  I'm just saying the way Mr. Rask has

5   described it there, I would I guess at least have added

6   to that, which, I mean, I see that you have things

7   prepared by me as well, so...

8       Q.   Let's turn to that.  Exhibit 666, I'd like to

9   draw your attention to Page 6, please.

10      A.   Okay.

11              THE COURT:  Is this a memo authored by Mr.

12  Zabel?

13              MR. REDMOND:  This is a memo authored by Mr.

14  Zabel, yes.

15  BY MR. REDMOND:

16      Q.   The first full paragraph in the middle of the

17  page, this is your report, right, that you drafted

18  yourself?

19      A.   Correct.

20      Q.   And your opinion as you express it in that

21  paragraph is what as relates to whether the calls are

22  privileged or not?

23      A.   Are you talking about the paragraph that starts

24  "during the meeting"?

25      Q.   Yes, sir.

16-20032  USA v. Karl Carter (Black) REDACTED 10.04.18          1177

1      A.   Can I review it?

2      Q.   Sure.

3      A.   Yes.

4      Q.   So that accurately-- does that paragraph

5  adequately relate your belief as to the privileged

6  nature of these calls?

7      A.   Yes.

8      Q.   Okay.  And your opinion is that the law is clear

9  that CCA's pre-call preamble warning the call was being

10  recorded made the call non-privileged?

11      A.   Correct.

12      Q.   And so you had a meeting with Erin Tomasic on

13  May-- May 10th I believe and she told you she had

14  listened to these calls.  Right?

15      A.   Correct.

16      Q.   And it was your opinion after listening to Ms.

17  Tomasic that no legal or ethical violations had

18  occurred?

19      A.   Based on specifically what she told me she did on

20  May 10th-- or what she was telling me on May 10th, yes.

21      Q.   Which is that because she's listening to calls,

22  that the-- are not privileged because, in your opinion,

23  there's a pre-call preamble which eliminates the

24  privilege?

25      A.   No.

1      Q.  But that's what you said in your memorandum?

2      A.  That is a point I made in my memorandum.  The

3  first discussion Ms. Tomasic and I had when she revealed

4  this to me was what were our legal obligations.  Was the

5  defendant's Sixth Amendment rights violated and/or had

6  we made material misrepresentations or any

7  misrepresentations to the Court or counsel.

8      Q.  All I care about right now is whether these calls

9  are privileged.  If the calls are not privileged because

10  of the preamble, why do you care what she listened to?

11      A.  Because she didn't follow the procedure

12  recommended by PRAO that had been recommended-- that had

13  been-- we had been given authorization to do this by

14  management under the-- with the understanding that we

15  would follow the advice of PRAO, which was to use a

16  filter team.

17          So I thought it was a problem.  But based on her

18  saying she didn't listen to any content or understand

19  any content, that was the legal analysis part of it.

20  That's a different issue than whether she had done

21  something she shouldn't have.

22      Q.  Okay.  But you-- you don't even see this as a

23  reason for her to report the conduct to her supervisor.

24  Right?

25      A.  I told her I didn't think-- based on what she was

1   telling me, that she heard no content, she didn't

2   understand any content, and that we-- we took some time

3   to determine whether I had - believing that she had

4   never listened to calls - misrepresented anything to the

5   Court or to counsel.

6        It was my conclusion that she probably didn't

7   have a legal or ethical obligation, but she asked me

8   what would I do and I said I would tell Scott Rask.  And

9   I said, I think it's bothering you, you should probably

10  tell Scott Rask.

11  Q.   And your advice to her, though, was she didn't

12  have to, that if it was an emotional problem for her,

13  she could, but there was no legal or ethical violation?

14  A.   That was my conclusion immediately, during, and

15  after our conversation based specifically on what she

16  was telling me, which was she did not ascertain any

17  content.  And she was adamant about that.

18  Q.   Okay.  But the question is:  When she describes

19  this, you're-- the first thing that you put in your

20  memorandum when you're discussing her assessment is that

21  these calls are not privileged.  I want to ask you about

22  the prevalence of that attitude in your office.

23       Is it a common belief in the Kansas City U.S.

24  Attorney's Office that a preamble on a phone call means

25  the privilege is waived?

1    A.  I-- I can't speak for the entire office, but-- I

2  mean, I cannot speak for the entire office.

3    Q.  Okay.  But you assert in your memorandum and to

4  PRAO that the law is clear on this topic; is that right?

5    A.  I didn't assert anything to PRAO.

6    Q.  That's fair.  In an e-mail chain on which you're

7  included, the-- it is represented to PRAO that the law

8  is clear on this topic; is that right?

9    A.  I-- I believe that that was in Erin's e-mail.

10    Q.  I couldn't hear you.

11    A.  I believe that's-- I believe that Erin put that

12  in her e-mail.

13    Q.  And then you put the same thing in your-- or that

14  you had the same discussion with Mr. Rask when you

15  interviewed with him after-- or shortly before the time

16  that Ms. Tomasic was terminated; is that right?

17    A.  Yes.

18    Q.  You said the same thing.  And then you said the

19  same thing again in a memorandum that you drafted to

20  Scott Rask, "The law is clear that CCA's pre-call

21  preamble warning that the call was recorded made the

22  call non-privileged."  That's your belief, isn't it?

23    A.  Based on my understanding of the law, yes.

24    Q.  Okay.  So let's talk about that.  I mean, any

25  legal decision, just applies facts to law.  So I have a

1   series of questions about what you knew about the facts

2   of CCA's phone system.

3          For example, did you know that CCA didn't

4   publicize their privatization system in any way?

5      A.  Did I know that?

6      Q.  Correct.

7      A.  No.

8      Q.  Did you know that there were no signs in the

9   lobby or at the front desk about how to privatize a

10  phone call at CCA?

11     A.  Mr. Redmond, just so I'm clear what I'm

12  answering.  You're asking me what I knew at what point

13  in time?

14     Q.  I'm asking you if you knew these things when you

15  opined in May of 2017 that the law was clear that these

16  phone calls were not privileged?

17     A.  Okay.  I did not, no.

18     Q.  And I do want to-- I understand it's kind of hard

19  to segregate temporally.  If you're able to, I

20  appreciate it.  If not, your current statement of belief

21  is-- or your current statement of knowledge is fine.  Do

22  you understand what I'm saying?

23     A.  Yeah.  I'm just going to assume you're asking me

24  what I knew when I wrote this.

25     Q.  Yes.

1      A.   Okay.

2      Q.   Did you know that a prominent-- a number of

3   prominent CJA panel counsel have submitted sworn

4   affidavits saying that they assumed their phone calls

5   were privileged and not recorded?

6      A.   I'm sorry.  Ask me the question again.

7      Q.   Did you know that in the *Black* case, there's

8   about 20 defense attorneys have submitted affidavits

9   saying, I always thought my phone calls were privileged

10  and not recorded and the government couldn't get them.

11  Were you aware of that?

12     A.   No.  I'm aware that there were one or two

13  affidavits.  But beyond that, no.

14     Q.   Did you know that there's no privatization form

15  available on CCA's website?

16     A.   No.

17     Q.   Did you know, and I'm referring here to

18  Exhibit 435, that CCA publicly promised detainees

19  confidential contact with their attorneys?

20     A.   No.  My understanding was they're told that their

21  calls are recorded unless they follow a certain

22  procedure having the attorney ask CCA to block their

23  call, their number.

24     Q.   My question is whether you knew that CCA publicly

25  promised detainees that confidential-- excuse me, CCA

1    publicly promised detainees confidential contact with

2    their attorneys?  Did you know that?

3        A.   No.

4        Q.   Did you know that-- well, you probably do, the

5    detention statute, 18 U.S.C. 3142(i)(3) directs that any

6    detained person be afforded reasonable opportunity for

7    private consultation with counsel.  It's in every

8    detention order.  Did you know about that?

9        A.  Yes.

10        Q.   Okay.  So did you know the exact wording of the

11   CCA preamble?

12        A.  I did not know the exact wording.  I knew there

13   was a--

14        Q.   Did you know the exact wording?  I'm sorry.

15        A.   I mean, I've heard it on recordings before.  But,

16   I mean, I couldn't have cited it to you verbatim, but I

17   know I've heard it and it warns I think both sides of

18   the call, that the call is being recorded.

19        Q.   But you don't know and you don't remember-- you

20   don't know if it's both sides?

21        A.   I don't know that for a fact.

22        Q.   Right.  And you don't remember exactly what the

23   language was?

24        A.   It says this call is being recorded.

25        Q.   Are you sure about that?  Because I think that's

 1   wrong.

 2       A.   It's my belief that--

 3            MR. CLYMER:  I'm going to object to

 4   counsel's making an assertion, Your Honor.  We've

 5   already had a question to another witness about the

 6   preamble that was erroneous.

 7            THE COURT:  Reframe the question.

 8            MS. BRANNON:  Objection to that.

 9            MR. REDMOND:  Well, Your Honor, I'm

10   referring to-- the Special Master has already drafted a

11   report which contains the precise preamble.  I'm simply

12   testing Mr. Zabel's knowledge of that.

13            THE COURT:  All right.  Proceed.

14   BY MR. REDMOND:

15       Q.   Okay.  Do you have any knowledge of what the

16   Spanish CCA preamble says?

17       A.   No.

18       Q.   Do you have any knowledge of the idiomatic

19   translation of the Spanish CCA preamble?

20       A.   The what?

21       Q.   The idiomatic translation.

22       A.   Tell me what that means.

23       Q.   Translating one language to another, sometimes

24   the literal usage of the words doesn't make much sense

25   and you sort of-- which is the process of translation.

1    Does that make sense?

2        A.   Yes.

3        Q.   Okay.

4        A.   I do not know.

5        Q.   Okay.  And did you know that, despite the

6    preamble, some attorneys were advising their clients

7    that their calls were confidential nonetheless?

8        A.   I did not know that.

9        Q.   Let's look at this from the other end, what

10   inmates knew.  In the summer of 2016, do you know what

11   the inmate handbook advised detainees at CCA about how

12   to procure confidential phone calls?

13       A.   I believe I've seen it at some point, but I don't

14   think I had when I wrote this.

15       Q.   Okay.  Did you know that the handbook was often

16   called in for revisions by CCA?

17       A.   No.

18       Q.   And did you know that the-- as a result, the

19   handbook was often unavailable completely to detainees?

20       A.   No.

21       Q.   Did you know that detainees who filled out their

22   forms to privatize calls at CCA complained to staff that

23   their calls were still being recorded, despite the fact

24   they filled out the form CCA gave them?

25       A.   I did not know that.

1    Q.  Did you know that although CCA relies on the

2   inmate handbook to advise the detainee which calls can

3   be recorded-- actually, strike that question.

4        Okay.  Now, make the assumption that everybody

5   did everything right.  The detainee put in their

6   paperwork, the lawyer put in their paperwork.  Did you

7   know that lawyers and detainees who completed the

8   privatization process still in some instances had their

9   calls recorded?

10   A.  I knew during *Black* litigation that that

11   assertion had been made.  I didn't have any personal

12   knowledge of that.

13   Q.  Okay.  But you didn't know that at the time that

14   you were drafting this memoranda?

15   A.  Well, the memorandum would've been drafted in--

16   Q.  Oh, no, you would've, yeah, that's right.

17   A.  And, you know, my memorandum, Defendant's

18   Exhibit 666, and I'm sure this has been pointed out, the

19   date of it is not-- was not drafted on September 23rd,

20   2018.  I've noticed when you use this form, it puts in

21   the date that you're actually seeing the form.  So I

22   don't-- I don't really know the date I prepared it, but

23   I'd surmise that it was in late May or early June.

24   Q.  So you may have known when you drafted that that

25   people were being recorded, even though they thought

1    they had been privatized?

2        A.  I may have known that some attorneys had asserted

3    that, yes.

4        Q.  Okay.  Did you know that the Federal Public

5    Defender phone calls were recorded and disclosed to the

6    government, despite the fact that we privatized I think

7    five times?

8        A.  I know that that assertion has been made.  I

9    don't know what I knew about FPD's assertions

10   specifically when I drafted the memo.

11       Q.  Okay.  Did you know that even after privatization

12   requests were entered, it often took months for those

13   requests to become effective?

14       A.  I did not know that.

15       Q.  Did you know that Securus would send back

16   spreadsheets full of mis-entered privatization requests

17   back to CCA to be corrected?

18       A.  I did not know that.

19       Q.  Did you know that attorneys who sent in

20   privatization requests and were sent confirmations from

21   CCA that their phones had been privatized still had

22   their phone calls recorded?

23       A.  No, I did not know that.

24       Q.  So we've-- that's maybe 20-odd questions.

25       A.  Can I-- I knew that-- that last question, that--

1    that their calls-- I knew there was an assertion by some

2    defense counsel, at least by the writing of this

3    memorandum, that some of their calls had been recorded,

4    despite them following the procedure.  I-- I think I

5    knew at least one defense attorney was making that

6    assertion, and I think it was Gary Hart.  But I don't

7    know beyond that.

8        Q.  So if facts are important in making a unilateral

9    determination of waiver, I've asked you about 20-odd

10   questions and you didn't know the answer to all but a

11   handful; is that right?

12       A.  Correct.

13       Q.  Let's talk about the law.  Have you ever

14   participated in a case in federal district court, in

15   Kansas, where a judge held that the preamble-- CCA's

16   preamble or any facility's preamble voided the

17   attorney-client privilege or waived it?

18       A.  I've never litigated the issue or are aware of it

19   being litigated.

20       Q.  Have any of your colleagues?

21       A.  Litigated the issue?

22       Q.  Yes.  That you're aware of.

23       A.  Not that I'm aware of.

24       Q.  Are you aware of any Tenth Circuit authority for

25   the proposition that having a preamble waived the

1    attorney-client privilege in a phone call?

2      A.  I'm not going to be able to cite for you a case,

3    but I think when the research was being done on this

4    that there is case law about that, but I-- that's my

5    belief.

6      Q.  And you're talking about the footnote that Ms.

7    Tomasic put in-- it's docket filing 121.  You don't have

8    it in front of you, we're just-- it's not an exhibit,

9    it's part of the Court's files in the case.

10        Are you talking about what Erin Tomasic wrote

11   about the preamble waiving phone call-- waiving the

12   privilege in a government filing in this case?

13     A.  I'm not specifically referring to her footnote or

14   any specific case.

15     Q.  Okay.  Did you do any legal research?

16     A.  I believe I participated in legal research.

17     Q.  I'm talking about on this question.

18     A.  I don't-- I don't recall if it was specifically

19   on this question or not.  I-- I've read some things, but

20   I don't know if I specifically researched it.

21     Q.  So you're then aware of no binding authority in

22   this district holding that the law is clear that CCA's

23   pre-call preamble warning the law was being recorded--

24   the call was being recorded made the call

25   non-privileged?  You're not aware of one case?

1    A.  Specifically Tenth Circuit, no.

2    Q.  Or anything in Kansas?

3    A.  I don't know if there is or there isn't.

4    Q.  Okay.  To be fair, I don't know if it's fair,

5  Erin Tomasic says you listened to phone calls with her

6  in the case three times, attorney-client phone calls,

7  not phone calls between Mr. Moran and a third party but

8  between Mr. Moran and Mr. Herrera-Zamora.  You deny

9  that?

10   A.  Can you break it down, because I wasn't--

11   Q.  Okay.  We're talking about this set of phone

12  calls, calls between Moran and Herrera-Zamora.

13   A.  Correct.

14   Q.  She says you listened to those calls with her

15  three times prior to trial.

16   A.  I never listened to any calls between Mr. Moran

17  and Mr. Herrera-Zamora with Ms. Tomasic, myself, or

18  anyone.

19   Q.  The discovery drive in your office, that's where

20  the discovery and the phone calls would be placed; is

21  that right?

22   A.  I don't know.  I mean, it would be now.  I assume

23  that's where it was then.

24   Q.  I'm trying to figure out a way to get down to--

25  I'm trying to get to a way to figure this out.  Is there

1  metadata on your computer that would show whether you

2  accessed a file or not?

3      A.   I don't understand metadata, but I can assure you

4  I never accessed an audio call between Mr.

5  Herrera-Zamora and Mr. Moran.

6      Q.   What I'm asking is, is there a way to figure that

7  out?

8      A.   I don't know.

9      Q.   Okay.  Are those calls, the Herrera-Zamora phone

10  calls, still on your discovery drive?

11     A.   I don't know if they ever were.  I don't know.

12     Q.   Okay.  So the-- because it's clear, none of those

13  phone calls were ever disclosed to defense counsel,

14  right, at least during the district court proceedings?

15     A.   They were disclosed to defense counsel after I

16  asked Mr. Moran if he wanted them.  And I didn't know

17  what was on them, I just knew it was the second batch of

18  calls.  And that would've been in March-- it would've

19  been March 7th of 2017.

20     Q.   Okay.  I want to talk about the way that the U.S.

21  Attorneys stacks their trial cases.  Erin Tomasic was

22  much your junior in terms of trial experience?

23     A.   Yes.

24     Q.   You've been here you said 15 years?

25     A.   I started with the U.S. Attorney's Office in

1    February of 2005.

2        Q.   Okay.  So 13 years.  She had been here

3    approximately two-and-a-half, two?

4        A.   I don't know.  I mean, it wasn't a long time,

5    yeah.

6        Q.   She is participating in this case so you can help

7    show her how a federal criminal case is prosecuted?

8        A.   She was assigned the case by her supervisor.  I

9    was asked to get involved and enter my appearance, what,

10   about seven or eight months later to assist her because

11   it appeared it might be a case that would go to trial.

12   And I don't think-- I don't-- I don't think she had done

13   a trial yet.

14       Q.   Right.  You're there to supervise her?

15       A.   I'm not there to supervise her.  I mean, this is

16   my understanding, I was there to advise her.

17       Q.   Right.  Not in a management sense, but she

18   doesn't really know what to do and you've been through

19   it, so you're going to show her what to do?

20       A.   I was there to-- I mean, my-- what actually

21   happened was I was there to answer her questions.  When

22   it appeared we were going to trial, I did-- we got ready

23   twice.  The first time I was going to try the case by

24   myself because she had another conflict.  And then when

25   that conflict went away, Mr. Moran entered his

1  appearance I believe in there, and then it went to trial

2  the second time, and we were co-counsel.

3      Q.  Right.  But we do this in our office.  You have a

4  younger attorney, you pair them with a more experienced

5  attorney to show the younger attorney what to do.  I

6  mean, that's what was going on here.  Right?

7      A.  I'm not-- I'm not trying to argue with you, Mr.

8  Redmond, but I wasn't necessarily involved in the

9  day-to-day things she did on the case.  I mean, she

10  hadn't tried a case yet, but she had a heavy caseload

11  and she had handled a lot.

12      I was there prior to getting ready for trial to

13  answer any questions.  Good idea-- is this a good idea,

14  a bad idea, strategy, but I didn't direct her.  I mean,

15  we did discuss things.  But then once the matter started

16  to get-- once we were proceeding to trial, then it's a

17  full team effort.

18      Q.  Right.  Okay.  But, I mean, tell you-- say you

19  have a meeting and she says, I've decided to use a lot

20  of profanity in my opening.  You're going to say no and

21  she's going to abide by that.  Right?

22      A.  Look, I wasn't her supervisor, I would've told

23  her that's a bad idea.

24      Q.  Okay.  I mean, second chair cases require a lot

25  of cooperation, you're spending a lot of time together,

1  you've both got to learn the same stuff; is that fair?

2      A.  Yes.

3      Q.  Especially around a trial?

4      A.  Yes.

5      Q.  You're essentially living with each other the

6  entire time?

7      A.  I mean, it's intensive.

8      Q.  Right.  During the time when Ms. Tomasic says

9  you're in trial and Sara Gardner is downstairs

10  translating attorney-client phone calls, where are you?

11      A.  Your question assumes facts I have no knowledge

12  of.  So I-- during trial I'm either in trial or I'm in

13  my office doing-- getting ready for the next day.  But

14  your question-- I have no knowledge of-- of-- I have no

15  knowledge that Ms. Tomasic and Ms. Gardner, who was the

16  interpreter, were going through attorney-client calls

17  during trial.

18      Q.  Okay.  So the-- what times during the trial was

19  Ms. Tomasic absent from the courtroom when you were

20  there by yourself?

21      A.  None to my-- none.

22      Q.  During breaks did you eat lunch together?

23      A.  I don't usually eat lunch or if I do it's

24  something really fast during trial, so I doubt it.

25      Q.  I'm trying to figure out times where you would be

1   apart.

2       A.  I-- I don't have a specific recollection of-- of

3   that trial, the lunch breaks, when we were working on

4   things together, when we weren't.  I think it's fair to

5   say there would've been lunch breaks and other times

6   when we were working together and then times when we

7   were prepping on what we needed to do individually.  I

8   don't recall seeing Ms. Gardner, though, during that

9   week in our office.

10      Q.  An e-mail was circulated in your office during

11  the *Black* litigation notifying the office of a

12  litigation hold?

13      A.  Yes.

14      Q.  Do you remember that?

15      A.  Uh-huh.

16      Q.  And you eventually responded that you had

17  material responsive to that hold?

18      A.  I don't specifically recall if I did, but I--

19  that sounds right.

20      Q.  Okay.  Do you consider the Herrera-Zamora phone

21  calls what's responsive to that litigation hold?

22      A.  Yes.

23      Q.  Okay.

24      A.  But I-- but I don't think that-- if I said I had

25  material, I doubt I was referring to Herrera-Zamora

 1   because I never-- I never had those phone calls.

 2       Q.  One quick question about that.  Did they come in

 3   on a disk?

 4       A.  I don't know.  I never saw them.

 5       Q.  You never even sighted the disks?

 6       A.  No, sir.

 7       Q.  Okay.

 8            MR. REDMOND:  Could I have just a moment,

 9   Your Honor?  Thank you.

10            (Counsel confer).

11            MR. REDMOND:  Thank you very much, Your

12   Honor.

13   BY MR. REDMOND:

14       Q.  So once in May of 2017 you find out from Ms.

15   Tomasic at least a version of what happened.  How long

16   did it take you to notify the Court?

17       A.  I think the Court was first notified in the

18   Notice of Record Correction, which was June-- June.

19       Q.  It's a couple of months or close to it?

20       A.  It was in June.

21       Q.  Like 40 days?

22       A.  I don't--

23       Q.  What happened?  Why?  What was the delay?

24       A.  I mean, management was deciding whether or not we

25   needed to file anything and, if so, what.  That-- you

1  know, I-- that wasn't necessarily my decision one way or

2  the other.  I-- Mr. Rask, AUSA Rask, wrote it.  I

3  obviously checked it for accuracy and we both signed it,

4  because I was counsel of record.

5      Q.  Do you know whether attorneys who would privatize

6  their numbers still heard the preamble?

7      A.  Ask me again.

8      Q.  Do you know whether attorneys who had privatized

9  their phone numbers still heard the preamble?

10     A.  I don't know.

11     Q.  Okay.  One more small series of questions.  You

12  talked about knowing of some case law that Ms. Tomasic

13  or just generally-- general awareness of some case law

14  that supported the idea that the preamble waives the

15  attorney-client privilege.

16         All of those cases were court cases decided by

17  judges; is that right?  I mean, it's an opinion written

18  by a judge in every single one of those cases.  Right?

19     A.  Correct.

20     Q.  So what happened was the parties came to court,

21  presented the facts, and the Court ruled on whether

22  there was privilege or not?

23     A.  I-- that's how case law works, I assume so.

24     Q.  Right.  But that's not how it worked when you

25  have the opinion that the-- that preamble by itself

1    waives the privilege and you don't need to go get

2    permission from a judge to do anything, you can make the

3    unilateral secret decision to listen to a phone call if

4    you want because that's the law?

5         A.   That's not my opinion.

6         Q.   Well, that--

7         A.   My-- my opinion is that should not generally be

8    done, not a good idea.  In *Herrera-Zamora*, the reason we

9    had the filter team was to not get those calls.  But

10   e-mails with PRAO indicated that that was being done out

11   of an abundance of caution.

12        But I just don't want you to get confused about

13   what my opinion of the law was at the time and what I

14   was advising.  I thought from the beginning we should

15   get a filter team and use a filter team.

16        Q.   Was your opinion on the law at the time wrong?

17        A.   I don't know.

18             MR. REDMOND:  That's all I have, Your Honor.

19   Thank you.

20                    CROSS EXAMINATION

21   BY MR. CLYMER:

22        Q.   Mr. Zabel, if you recall now, what was the basis

23   for your understanding of the law that a party who makes

24   a phone call, knowing it's going to be recorded, waives

25   the attorney-client privilege?

1      A.   What was my understanding--

2      Q.   Back then.

3      A.   -- back then?

4      Q.   Yeah.

5      A.   My understanding with--

6      Q.   And I'm not asking what was your understanding,

7  I'm asking you for the basis of your understanding.

8  What made you think that if a party makes a phone call,

9  knowing it's going to be recorded, they waive the

10 privilege?

11     A.   Right.  I mean, my legal education, I probably

12 had seen some case law.  During the *Black* litigation

13 things had been filed, including by you, that I had

14 read.  Just things I had read and my education.

15 Generally if there's a privilege and you bring somebody

16 else into that, it's waived.

17     Q.   When you-- strike that.

18          Do you know that there's a difference between

19 relying on law to make decisions during an investigation

20 versus asserting legal positions during advocacy in

21 court?

22     A.   Yes.

23     Q.   Okay.  I want to talk about those two situations.

24 Now, you know from looking at pleadings in this case

25 that it's the Department of Justice's position in this

1  litigation before Judge Robinson that a person who makes

2  a phone call, knowing that it's going to be recorded,

3  waives the privilege.  Correct?

4      A.  Correct.

5      Q.  If that's correct, if either Judge Robinson

6  agrees or the Tenth Circuit agrees, if that is correct,

7  then you and Erin Tomasic and I and Mr. McAllister and

8  Mr. Slinkard could listen to any attorney-client phone

9  call that has that preamble without violating the

10 privilege; isn't that right?

11     A.  We could.

12     Q.  So based on your belief at the time of the

13 *Herrera-Zamora* case about whether knowingly making a

14 call with the awareness it's going to be recorded waives

15 the privilege, you could have listened to

16 Herrera-Zamora/Moran calls without using a taint team,

17 correct, legally?

18     A.  Yes, that was our belief.

19     Q.  Okay.  And so it's a complete waste of time for

20 you to use a taint team, isn't it?

21     A.  No.

22     Q.  Why not?

23     A.  Because just because we legally could do that, we

24 didn't-- we don't want communications-- prosecutors--

25 well, I'll speak for myself.  As a prosecutor, I do not

1  want communications between an attorney and the client

2  unless I'm investigating him for some kind of crime

3  together, some conspiracy, and then I think you would

4  have to get some approval.

5       The taint team was used to ensure that the

6  prosecution team - myself, Ms. Tomasic and the agents -

7  did not have access to any calls between Mr. Moran and

8  his client.  We were requesting calls between Mr. Moran

9  and specifically I think two CCA-- two or three CCA

10  detainees who he admitted-- Mr. Moran admitted he had

11  talked to without consulting with their attorneys.

12  Q.  Now, Mr. Zabel, is the view you just expressed

13  that, whether the law permits it or not, the proper

14  thing to do is use a filter or a taint team with

15  attorney-client communications, is that the prevalent

16  view in the U.S. Attorney's Office in the District of

17  Kansas?

18  A.  Yes.

19  Q.  Was it the prevalent view at the time of the

20  *Black* litigation?

21  A.  Yes.

22  Q.  Was it the prevalent view throughout the time you

23  were in the U.S. Attorney's Office?

24  A.  Yes.

25  Q.  Is that why what Erin Tomasic did in

1     *Herrera-Zamora* was so appalling to people?

2        A.   I-- I can't speak if it was appalling to people.

3        Q.   Was it appalling to you?

4        A.   Yes.

5        Q.   And why was it appalling to you?

6        A.   Because we had set up this procedure to ensure

7     that we wouldn't get the calls, to ensure that we

8     couldn't be accused of trying to listen to

9     attorney-client communication, whether we legally could

10    or not, to try to figure out defense strategy and those

11    kinds of things.  And I thought that had been done until

12    May 10th, 2017.  And, yes, it made no sense to me why

13    she did-- she did that.

14       Q.   Did you-- did the U.S. Attorney's Office run this

15    issue through the professional responsibility officer in

16    your office?

17       A.   Prior-- yes.

18       Q.   And who was-- who is that?

19       A.   Lanny Welch.

20       Q.   And there's e-mail traffic showing that this

21    issue of trying to get calls to these two other

22    witnesses in the case went through Lanny Welch.

23    Correct?

24       A.   Yes.

25       Q.   Did Mr. Welch then get in touch with the

1    Professional Responsibility Advisory Office?

2        A.   Yes.

3        Q.   And that's back at Main Justice?

4        A.   I believe so.

5        Q.   And these are professionals who opine on

6    professional responsibility issues.  Correct?

7        A.   Correct.

8        Q.   That's just what your office should've done.

9    Right?

10       A.   Yes.

11       Q.   And after doing that, did your office establish a

12   taint team?

13       A.   Yes.

14       Q.   Was there an Assistant U.S. Attorney uninvolved

15   in the investigation who was the taint attorney on that

16   case?

17       A.   Yes.

18       Q.   Who was that?

19       A.   Tris Hunt.

20       Q.   And was there a-- a agent assigned to be the

21   taint attorney?

22       A.   Yes.

23       Q.   Ultimately, was that taint attorney conflicted

24   out for a reason?

25       A.   Not the taint attorney, the taint agent.

1    Q.   I'm sorry, the taint agent, excuse me.

2    A.   Yes.

3    Q.   After the taint agent was conflicted out, to your

4    knowledge, was there going to be any review of the

5    attorney-client communications?

6    A.   None.  We specifically discussed it and I told

7    Erin we don't need it, we're in trial, we're not doing

8    any more.

9    Q.   Until Erin Tomasic had that conversation with you

10   on May 10th, 2017, did you know that the procedures that

11   your office had set up were not followed in that case?

12   A.   No.

13   Q.   Do you speak Spanish?

14   A.   No.

15   Q.   Ultimately, after you learned-- strike that.

16       You said earlier that you produced the

17   attorney-client calls to Mr. Moran; is that right?

18   A.   Correct.

19   Q.   Did a court order you to do that?

20   A.   No.

21   Q.   Did you make that decision on your own?

22   A.   Yes.

23   Q.   When you produced them, did you actually produce

24   them to Mr. Moran?

25   A.   Are we talking about what I've referred to as the

1   second batch of calls?

2       Q.   The calls that captured the attorney-client

3   communications.

4       A.   Okay.

5       Q.   Did you personally produce those to Mr. Moran?

6       A.   No.

7       Q.   Who produced them to Mr. Moran?

8       A.   Well, my understanding was that Mr. Hunt would.

9   He was the taint attorney.

10      Q.   Why-- if it was your case, why was Mr. Hunt

11  producing them, rather than you?

12      A.   It's not prudent for me to be handling those

13  calls at all.

14      Q.   Did you ever handle any disk or any other digital

15  media, storage media that held those calls?

16      A.   No.

17      Q.   Did you ever listen to those calls?

18      A.   No.

19      Q.   You were asked about delay in filing the record

20  correction.  Do you remember those questions?

21      A.   Yes.

22      Q.   Do you know if your upper management ran the

23  issue of this record correction by Main Justice?

24      A.   I don't know.

25      Q.   Have you ever dealt with Main Justice on issues?

1    A.  Have I?

2    Q.  Yes.

3    A.  I've dealt with PRAO.

4    Q.  Any other components of Main Justice?

5    A.  I mean, is Main Justice-- like I've dealt with

6  other components like civil rights division.  I don't

7  know if that's considered Main Justice.

8    Q.  Are the folks back in Washington sometimes slow

9  in getting back to the people in the field?

10    A.  Sure.

11         MR. CLYMER:  No further questions, Your

12  Honor.

13         THE COURT:  Anything more?

14         MS. VANBEBBER:  I don't have anything.

15         THE COURT:  Mr. Redmond?

16         MR. REDMOND:  One final thing.

17              RECROSS EXAMINATION

18  BY MR. REDMOND:

19    Q.  You testified that what Ms. Tomasic did was

20  appalling?

21    A.  Well, that was-- I mean, I would-- I think that's

22  fair, yeah.  My understanding of what she--

23    Q.  I just asked if you testified to that.

24    A.  Okay.

25    Q.  But what you wrote at the time was that no legal

 1   or ethical violation occurred.

 2       A.  Based on what she was telling me on May 10th.  I

 3   have a different understanding of that now.

 4                 MR. REDMOND:  That's all I have, Your Honor.

 5                 THE COURT:  All right.  May Mr. Zabel be

 6   excused?

 7                 MR. CLYMER:  No objection, Your Honor.

 8                 MS. VANBEBBER:  No objection.

 9                 THE COURT:  All right.  You're excused.

10   You're excused.  It's 12:20, let's reconvene at 1:20.

11                 (Recess).

12                 THE COURT:  All right.  You can be seated.

13   Call your next witness.

14                 MR. REDMOND:  We'd call Carlos Moran, Your

15   Honor.

16                       CARLOS MORAN,

17   called as a witness on behalf of the Federal Public

18   Defender's Office, having first been duly sworn,

19   testified as follows:

20                    DIRECT EXAMINATION

21   BY MR. REDMOND:

22       Q.  Mr. Moran, what do you do for a living?

23       A.  I'm an attorney.

24       Q.  Where do you live?

25       A.  I live in Mayfield, Kentucky.

1    Q.  What did you-- could you outline briefly your
2    professional experience for us, the jobs you've had over
3    the years?
4    A.  I've been practicing for 14 years and five
5    months, and I'm licensed in Kentucky.  I practice in the
6    areas of criminal law and immigration primarily.
7    Q.  What did you do before you were an attorney?
8    A.  I worked for the Department of Justice.
9    Q.  What did you do?
10   A.  I worked for the Federal Bureau of Investigation
11   as a linguist and I-- I worked for the BOP.
12   Q.  Okay.  So when-- the Department of Justice, the
13   BOP and your work in linguistics, could you put that in
14   order in terms of the jobs that you had, like, since
15   college?
16   A.  Well, I got out of the Army on a Friday and went
17   to college on a Monday.  I was drafted.  That was in--
18   during the Vietnam War.  And I went to junior college in
19   California.
20            THE COURT:  Could you pull the microphone
21   down?  I'm having difficulty hearing you.
22            THE WITNESS:  Yes, ma'am.
23            THE COURT:  Thank you.
24            THE WITNESS:  College was free for
25   California residents, and I worked in the fields and

1  went to college.  And when I completed my two years, I

2  transferred to the University of Nebraska.

3            THE COURT:  Pull-- actually the pull the

4  microphone piece itself.  There we go.

5            THE WITNESS:  Let's see.  Would that work?

6  BY MR. REDMOND:

7     Q.  Let's fast-forward to your job at the Department

8  of Justice as a linguist.  How long were you a linguist

9  for the Department of Justice?

10    A.  That was my first real job.

11    Q.  Okay.

12    A.  I was a farm worker before that.

13    Q.  Okay.  And what did you-- as a linguist, what

14  languages did you translate?

15    A.  I translated Spanish into English or English into

16  Spanish.

17    Q.  And then the-- your job with the Bureau of

18  Prisons, what did you do for them?

19    A.  I was a-- I started as a correctional officer,

20  went to case manager.

21    Q.  Okay.  So during your time in the Department of

22  Justice, did you become familiar with how the Department

23  of Justice treated the confidentiality of

24  attorney-client calls?

25    A.  Yes, sir.

1    Q.   And how-- what did you learn?

2    A.   In the Bureau of Prisons, correctional officers

3  that worked towers, they monitored conversations of

4  inmates from cell blocks.  And there was a memo that if

5  an attorney was engaged in a conversation with an

6  inmate, you'd-- you had like a dial and you moved to

7  another phone.

8    Q.   So even the Bureau of Prisons, they took measures

9  to safeguard the confidentiality?

10    A.   That is correct.

11    Q.   Okay.  What about your time in the Department of

12  Justice, what did you learn about--

13    A.   It was different because you deal with-- it was a

14  foreign counterintelligence area.

15    Q.   Okay.  So the-- you appeared in district court in

16  the District of Kansas in *United States vs. Juan*

17  *Herrera-Zamora*?

18    A.   Yes, sir.

19    Q.   And you were his legal counsel?

20    A.   That is correct.

21    Q.   Okay.  And based on your experience in the

22  Department of Justice and the Bureau of Prisons, when

23  you called Mr. Herrera-Zamora or when he called you, did

24  you expect those conversations to be confidential?

25    A.   Absolutely.

1    Q.   Okay.  Was there a time that you came to find out

2    they were not?

3    A.   Yes.

4    Q.   Tell us about that.

5    A.   Well, as we were getting closer to trial, I

6    suspected that my conversations were being listened to

7    by opposing counsel.

8    Q.   Why do you say that?

9    A.   I mean, there was a specific-- it was a video, it

10   was a-- a CD and there was an individual directing two--

11   we call them mules.

12   Q.   Drug mules you mean?

13   A.   Yeah, delivering drugs to the Kansas City area.

14   And the U.S. Attorney's Office believed that the-- the

15   person directing the mules to a Super 8 Hotel was Mr.--

16   (reporter interruption).

17          THE COURT:  Can you move his microphone so

18   it's right in front of his mouth, please.

19          MR. REDMOND:  Sure.

20          THE COURT:  You don't have to move the base;

21   you can move the top of it, I believe.  There you go.

22          MR. REDMOND:  Is that better?

23          THE WITNESS:  Sorry, Your Honor.

24          THE COURT:  That's all right.

25          THE WITNESS:  The U.S. Attorney's Office

1  believed that Mr. Herrera-Zamora was directing the mules

2  to a Super 8 Hotel or something like that, and I

3  apologize if I'm not very specific, it's been a while

4  back.

5          And one individual at the very end is-- that

6  appears to be, like, in charge, you know, tells the-- I

7  think one of them was-- there were two-- and I call them

8  mules, and I apologize for the term.  I believe one was

9  Juan Gonzalez and the other one Martinez and I believe

10 that-- is it working?

11          THE COURT:  Yes.  When you speak into it.

12          MR. REDMOND:  Yes.

13          THE WITNESS:  Okay.  And that the individual

14 that the-- finally told the two mules to stop at the

15 Super 8 Hotel was believed to be Juan Herrera-Zamora.

16 But when I listened to it, I didn't think it was.  And I

17 had Mr. Herrera-Zamora listen to the conversation, he

18 was at the-- I think they call it ACA or--

19 BY MR. REDMOND:

20    Q.  That would be CCA?

21    A.  CCA.  And I played the-- that part and he said,

22 no, that was Ricardo.  I don't know if he actually said

23 Ricardo, but I knew that it was Ricardo Felix Gomez

24 actually the one directing them.

25          And when we submitted-- when we were submitting

1  exhibits, that was one of the initial exhibits that I

2  wanted to use at trial, and Ms. Tomasic and Mr. Zabel

3  objected to that.  And, of course, we were in court and

4  I told them that the only reason that they were

5  objecting to it is because they knew that it wasn't

6  Herrera.  So I was-- that was one of them.

7      Q.   Before-- before you move on, can I see if I can

8  sort of recap so I understand?

9      A.   Yes, sir.

10     Q.   So you're listening to recorded telephone calls

11 between drug co-conspirators is the government's

12 allegation, and there are--

13              MR. CLYMER:  I'm going to object to counsel

14 testifying for the witness.  I think Mr. Moran explained

15 what happened already.

16              THE COURT:  No, I'm going to allow you to go

17 back over this.  It's very confusing.

18              MR. REDMOND:  Thank you, Your Honor.

19              MR. CLYMER:  Your Honor, then I ask that it

20 not be done with leading questions.

21              THE COURT:  Object contemporaneously.  I

22 think it's appropriate to set a foundation for what

23 you're trying to ask him and ask him if-- if your

24 understanding of what he said is correct.  That's not

25 really leading.

1    BY MR. REDMOND:

2        Q.   So there's intercepted telephone calls directing

3    a drug shipment; is that right?

4        A.   That is correct.

5        Q.   And the government believes that the person

6    directing the drug shipment is your client?

7        A.   That is correct.

8        Q.   You did not believe it was your client?

9        A.   Correct.

10        Q.   And so you subpoenaed or you-- you gave notice of

11    your intent to introduce this evidence?

12        A.   That is correct.

13        Q.   And you believe that the government intercepted

14    your phone calls with Mr. Herrera-Zamora discussing that

15    conversation with your client?

16        A.   That is correct.

17        Q.   Okay.  Now, you had something else that I

18    interrupted you on.

19        A.   I use my cell phone-- my car is almost like my

20    office because I travel a lot.  In Mayfield the courts

21    are very separated.  Some of them are 25 miles or 20,

22    other ones 200 miles, so my clients have my cell phone.

23            I had received a phone call from somebody at the

24    ACA.  It was an individual and he wanted to talk to me.

25    He said that he has already been sentenced and that he

1    wanted to report some malfeasance in the U.S. Attorney's

2    Office, you know, how he was set up and all that.  And--

3    and he had already been sentenced.  And there was

4    another one.

5         And I brought that to the attention of the court

6    because I didn't know-- I thought that there were some

7    ethical issues, you know, maybe talking to somebody who

8    has already been sentenced, maybe there's an appeal, I

9    don't know.

10   Q.   Can you-- what did you say to the Court?

11   A.   That the thing were-- I was-- that I had received

12   phone calls from two individuals--

13   Q.   Okay.

14   A.   -- at ACA.  And, anyway, so I never used those

15   individuals.  I never talked to them.  I-- I thought I

16   may.  I thought-- I was working and checking around, so

17   I never used them.

18        But later on Mr. Zabel and Ms. Tomasic, they-- I

19   think that they said something to the effect that the--

20   the reason they were listening to it, to make sure that

21   I was not tampering witnesses or something to that

22   effect.  And that was the other area.

23   Q.   Okay.  So the trial concludes and

24   Mr. Herrera-Zamora is convicted?

25   A.   That is correct.

1    Q.  And after trial, did you file any motions?

2    A.  I file-- I file a motion to set the conviction

3  aside based on my belief that the-- during the trial my

4  conversations with my client were being monitored by the

5  U.S. Attorney's Office.

6    Q.  So you-- you filed a motion alleging a Sixth

7  Amendment violation?

8    A.  Yes.

9    Q.  Okay.  So do you have any conversations with the

10  government about that motion before it is decided?

11    A.  I did.

12    Q.  Tell us about that.

13    A.  Before I filed the motion, I called Mr. Zabel and

14  I told him that I-- I said something in those lines.  I

15  said, David, if you tell me that you didn't do this, if

16  you assure me that this never happened, I'll drop the

17  subject immediately.  And I believe that my

18  conversation-- that you were listening to my

19  conversations in trial.  And he said, I didn't, but let

20  me check with Erin.

21      I said, well, let me-- let-- just get back with

22  me very quickly.  I waited a day, another day.  I think

23  the third day I filed the motion because I didn't hear

24  from him.

25      And then I received a phone call from Mr. Zabel

1    and it was actually a conference call.  My co-counsel

2    was on the other line and I believe Mr. Zabel and Ms.

3    Tomasic were in the speaker phone.  And basically

4    Ms. Tomasic was telling me that I had no basis for

5    filing the motion.  And I told her that I did and I-- I

6    told her what I just said just a little while ago.  And

7    I told her that I also read an article that-- that

8    apparently they were doing that.  And she-- you know,

9    and she was very indignant and persuaded me that they

10   didn't do it.  And based on that, I filed a motion to

11   withdraw.

12       Q.   And when you say "didn't do it," you mean didn't

13   listen to your phone calls?

14       A.   That is correct.

15       Q.   Okay.  So you filed a motion.  Did the motion get

16   heard then by the district court?

17       A.   I'm sorry?

18       Q.   Did-- was the motion heard by the district court?

19       A.   They were-- on that day I told my co-counsel-- we

20   had another pretrial conference and-- and I told him

21   just to tell the judge that we were withdrawing the

22   motion based on the conversations that we had with the

23   Assistant U.S. Attorneys.

24       Q.   And so you withdrew that motion based on the

25   representation of Mr. Zabel and Ms. Tomasic?

1    A.   That is correct.  I believed that they were

2    acting in good faith and telling me that they didn't do

3    it and I really-- quite frankly, I felt pretty ashamed

4    that I did that.  And they persuaded me that they didn't

5    do it.

6    Q.   What sentence did Mr. Herrera-Zamora receive

7    after you withdrew your motion?

8    A.   I believe it was 38 years.

9    Q.   Okay.  Do you know what's happened to him since?

10   A.   Yes.  Eventually when the appeal-- an appeal was

11   filed with the Tenth Circuit and there were some

12   negotiations with the U.S. Attorney, with the-- the

13   Public Defender's Office, Federal Public Defenders.  And

14   he pled to a lesser charge and time served and he was

15   deported to Mexico after that.

16            MR. REDMOND:  Could I have just a moment,

17   Your Honor?

18            THE COURT:  Yes.

19   BY MR. REDMOND:

20   Q.   When did you find out that your phone calls had

21   been recorded?

22   A.   When I learned that the-- a notice was filed with

23   the Court correcting the statements, that, in essence,

24   Ms. Tomasic admitted that she had been listening to my

25   conversations.

16-20032  USA v. Karl Carter (Black) REDACTED 10.04.18          1219

1      Q.  How did you react?

2      A.  I-- I was pretty offended because I really

3   believed that-- when they assured me that they wouldn't.

4   And, you know, to accuse another member of the bar is

5   not an easy thing, or is not a very pleasant thing to

6   do.  And then when I-- when I learned that, in fact,

7   they did, I don't know, it's even worse.

8                MR. REDMOND:  That's all the questions I

9   have.  Thank you, Mr. Moran.

10               THE WITNESS:  Thank you.

11                       EXAMINATION

12  BY THE COURT:

13     Q.  I just want to make sure I understand something,

14  I'm still a little bit confused.  So there was an

15  exhibit that you offered at trial that the government

16  objected to.  And that exhibit was a recording of a

17  conversation with two mules and a third person that was

18  directing them to go to the Super 8; is that correct?

19     A.  That is correct.  And that was the same exhibit

20  that the government show as their exhibits against my

21  client.

22     Q.  All right.  So the government had marked that as

23  an exhibit as well?

24     A.  That's right.

25     Q.  Then you-- at trial did you actually offer that

1    exhibit?

2       A.   Yes, ma'am.

3       Q.   And the government objected to that exhibit?

4       A.   That is--

5       Q.   And was there a reason that the-- did they give a

6    reason on the record why they objected to the exhibit?

7       A.   Yes, Your Honor.

8       Q.   What was the reason?

9       A.   Irrelevant.

10      Q.   And why do you think-- the fact that the

11   prosecutors objected to that exhibit, why do you think

12   that is evidence that they listened to your conversation

13   with Mr. Herrera about whether he was the one on that

14   recording?

15      A.   Because then they realized that the person on the

16   recorded conversation was not Juan Herrera, but it was,

17   in fact, a person by-- named Ricardo Felix Gomez.  So

18   that would've been exculpatory.

19              THE COURT:  Okay.  Thank you.  You're

20   finished, Mr. Redmond?

21              MR. REDMOND:  Yes.  Thank you.

22              THE COURT:  Do you have any questions?

23              MS. VANBEBBER:  No, Your Honor.

24              THE COURT:  Mr. Clymer?

25                   CROSS EXAMINATION

1  BY MR. CLYMER:

2      Q.  Mr. Moran, I want to go back to the conference

3  call you had after you filed the motion.

4      A.  Yes, sir.

5      Q.  On your side of the conference call, who was

6  involved?

7      A.  Vince-- I'm sorry.

8      Q.  Rivera?

9      A.  Yes, sir.

10     Q.  Vince Rivera, was he your local counsel here?

11     A.  Yes, sir.

12     Q.  And you were on that side of the line?

13     A.  I was in Kentucky and he was here in Kansas.

14     Q.  And you were both on the conference call?

15     A.  Yes, sir.

16     Q.  And who was on the conference call on the

17  government's side?

18     A.  I know that it was Mr. Zabel and Ms. Tomasic.

19     Q.  And the reason for that call was because, when

20  you first spoke to Mr. Zabel, he said, I didn't listen

21  to the calls, but I want to check to make sure my

22  co-counsel says the same thing?

23     A.  That is correct, sir.

24     Q.  And so the conference call was to get Erin

25  Tomasic on the line and have her tell you whether she

1    had done what you suspected she might have done?

2        A.   Yes, sir.

3        Q.   And she lied to you.  Right?

4        A.   Well, she-- she didn't tell me the truth.

5        Q.   She didn't tell you the truth.  In fact, you know

6    now from the record correction that Erin Tomasic did

7    listen to recorded calls between you and

8    Mr. Herrera-Zamora.  Correct?

9        A.   Yes, sir.

10       Q.   And you knew from the time you worked at the

11   Bureau of Prisons and the Department of Justice, that

12   was something you were not supposed to do.  Correct?

13       A.   That is correct.

14       Q.   And so presumably she knew that as well.

15   Correct?

16       A.   That is correct.

17       Q.   And not only did she lie to you, but she got

18   indignant on the phone about it.  Right?

19       A.   That's what bothered me the most.

20       Q.   And she-- by getting indignant, she wanted to

21   suggest to you that you had done something wrong by

22   suspecting her of doing something wrong?

23       A.   That is correct.

24       Q.   And that's what troubled you?

25       A.   Yes, sir.

1    Q.   And based on the lie that Erin Tomasic told you,

2    you then withdrew your motion?

3    A.   That is correct.

4    Q.   Because you believed her?

5    A.   I did.

6    Q.   After the government acknowledged that Erin

7    Tomasic had not been truthful in that case about what

8    she had done, and in other cases that she had not been

9    truthful, the government agreed to let your client

10   withdraw his appeal.  Correct?  I'm sorry, withdraw his

11   conviction.

12   A.   That is my understanding.  And please note that I

13   was not the attorney at that time yet.

14   Q.   Fair enough.  But your understanding is the

15   government agreed that he could have his conviction

16   overturned?

17   A.   Yes, sir.

18   Q.   And then the government worked out an agreement

19   where he was sentenced to time served and he went back

20   to Mexico?

21   A.   That is correct.  That is my understanding, sir.

22   Q.   There's been some testimony, Mr. Moran, about the

23   dialect your client spoke.  Do you know whether he's

24   from northern Mexico or southern Mexico?

25   A.   There is no such thing as dialect in the Spanish

1    language, none whatsoever.  I can assure you that.

2        Q.  So if somebody came into this courtroom under

3    oath and said, I couldn't understand what he was saying

4    because I speak one dialect and he-- in one part of

5    Mexico and he's from another part, that wouldn't be

6    true?

7        A.  That is absolutely incorrect.  There is such

8    thing as colloquialisms that some things are confused,

9    but it is the same language, it is the same grammar.

10   And if you listen to a radio station, say, from

11   Guatemala or Argentina, you may not be from those

12   countries but you understand perfectly well.  Just like

13   you listen to a radio from United Kingdom or Australia,

14   you may have a little bit difficulty, but it's the same

15   language, absolutely the same.

16       Q.  And you know this more than a regular Spanish

17   speaker because you used to be a linguist for the

18   Department of Justice.  Correct?

19       A.  Well, I speak the language for more than 60

20   years, I write it, I do poetry, I have four manuscripts,

21   and I love the language.

22       Q.  And would it be accurate to say that in your

23   criminal defense and immigration law practice, you use

24   your Spanish-speaking skills as well?

25       A.  As an immigration lawyer, I speak with folks on a

1   daily basis from Central-- or Mexico, Central America,

2   South America.

3       Q.   Would it be correct, Mr. Moran, to say that every

4   time you appeared in court in the District of Kansas

5   with Mr. Herrera-Zamora and Mr. Zabel present, that

6   Mr. Herrera-Zamora had an interpreter to assist him?

7       A.   Yeah, I think so.  I believe so.

8       Q.   I'll show you, sir, maybe to refresh your memory,

9   the court clerk's minute sheet from a docket call that

10  occurred on September 29, 2015.  I'll ask you if this

11  refreshes your memory about that particular court

12  appearance.  Take a look at that to yourself and let me

13  know what you've had a chance to look at it, sir.

14      A.   Yes, sir, I read it.

15      Q.   And that-- that minute sheet reflects, does it

16  not, that you were present in court on that day with

17  Mr. Herrera-Zamora, as was Mr. Zabel, and an interpreter

18  was present there to assist Mr. Herrera-Zamora.

19  Correct?

20      A.   Yes, sir, it reflects that.

21      Q.   I'll now show you another one, sir.  See if that

22  refreshes your recollection of the motion hearing, it's

23  from the motion hearing.

24      A.   Yes, sir, I read it.

25      Q.   And does it appear that you, Mr. Zabel, and

1    Mr. Herrera-Zamora were all present in court on that day

2    as well?

3        A.  Let's see, you said Mr. Zabel, Moran, and-- yes,

4    sir.

5        Q.  May I see that for a second, sir?  Let me check

6    one thing.

7        A.  Yes, sir.

8        Q.  The date on that was February 2nd, 2016, the date

9    of that hearing?

10       A.  Yes, sir.

11       Q.  And the interpreter is there to assist

12   Mr. Herrera-Zamora on that day as well.  Correct?

13       A.  Yes, sir.

14       Q.  And, finally, I'll show you the docket sheet from

15   the jury trial.  This was on the-- July 11th through

16   July 18th, 2016.  Does it reflect that you, Mr. Zabel,

17   and Mr. Herrera-Zamora were all there during the jury

18   trial?

19       A.  Yes, sir.

20       Q.  And Mr. Herrera-Zamora needed the assistance of

21   an interpreter for the jury trial as well.  Correct?

22       A.  Yes, sir.

23       Q.  Thank you.

24            MR. CLYMER:  I have no further questions,

25   Your Honor.

```
 1              MR. REDMOND:  Nothing based on that, Your
 2   Honor.
 3              MS. VANBEBBER:  No, Your Honor.
 4              THE COURT:  All right.  May Mr. Moran be
 5   excused?
 6              THE WITNESS:  Thank you, Your Honor.
 7              THE COURT:  You're excused.
 8              THE WITNESS:  Thank you.
 9              THE COURT:  All right.  Call your next
10   witness.
11              MS. VANBEBBER:  Next witness would be Lanny
12   Welch.
13              THE COURT:  Lanny Welch?
14              MS. VANBEBBER:  Yes, ma'am.
15                       LANNY WELCH,
16   called as a witness on behalf of the Special Master,
17   having first been duly sworn, testified as follows:
18                   DIRECT EXAMINATION
19   BY MS. VANBEBBER:
20      Q.  Mr. Welch, I'm going to ask you only a few
21   questions.  Thank you for driving all the way up here
22   from Wichita.  That is where you're located, isn't it?
23      A.  It is.
24      Q.  How long have you worked for the U.S. Attorney's
25   Office?
```

1    A.   Twenty-nine years.

2    Q.   And have you always been in the Wichita office?

3    A.   I have.

4    Q.   Have-- how long have you been what they call the

5    PRO, the professional responsibility office-- officer

6    for the District of Kansas?

7    A.   I'm no longer the PRO, but I served as the

8    criminal PRO from 1998 until 2017 I think.

9    Q.   You're aware that we're here today on the case of

10   *United States vs. Black*-- or now *Carter*?

11   A.   Yes.

12   Q.   And I'm going to ask you questions basically that

13   have to do with being a PRO.  Do you recall back as far

14   as 1916 [sic] when Erin Tomasic was working for the

15   United States Attorney in this district?

16   A.   Yes.

17   Q.   And did you have-- did you have occasion to have

18   calls from her in your role as a PRO?

19   A.   Yes.

20   Q.   Do you recall that she called you once about

21   witness-- witnesses that had been listened to in the

22   *Herrera-Zamora* case?

23   A.   I recall being contacted-- my hesitation is we

24   never discussed defendants' names.  There was a fact

25   pattern she described to me and I tried to assist her

1    with that.

2      Q.  Did you-- tell me what the usual practice is with

3    regard to your position in Main Justice when an attorney

4    has a-- has difficulty with wanting to know the answer

5    to a legal question or how she should handle a problem

6    that involves professional responsibility.

7      A.  Could you repeat the question?  I'm sorry.

8      Q.  Can you tell me what the practice is in this

9    office in the District of Kansas when an attorney has a

10   question that involves an issue of professional

11   responsibility, how do they go about getting-- getting

12   some help from what we call the PRAO, the P-R-A-O?

13     A.  Okay.  When I was the PRO, typically an attorney

14   would either call me or e-mail me with a question or

15   concern.  Almost-- most of the time, I should say, I

16   would contact the Professional Responsibility Advisory

17   Office, or PRAO, to get their assistance because they're

18   the experts and get them involved and to get an answer

19   from them.

20     Q.  Do they have duty officers available to answer

21   your calls whenever you call or does it take a long

22   time?

23     A.  When I was the PRO, yes, there was always a duty

24   attorney.

25     Q.  And on the first occasion when Ms. Tomasic asked

1    you for assistance in January of 2016, did you follow

2    that procedure?

3        A.  I believe I know which one we're talking about,

4    but do you have a document I could look at to make sure

5    we're talking about the same contact?

6        Q.  And do you usually express your opinion to the

7    attorney before you call PRAO?

8        A.  Sometimes I did, sometimes I didn't.

9        Q.  So that if in this instance you-- you just

10   called-- you called the PRAO and they gave you a

11   response; is that right?

12       A.  Again, if you have a document.

13       Q.  Let me show you what has been marked Defendant's

14   Exhibit 491--

15       A.  Thank you.

16       Q.  -- and just the middle piece of it and see if you

17   recognize--

18       A.  Okay.  Were you asking me about January of 2016

19   or July of 2016?

20       Q.  It would be January.

21       A.  This is July of 2016.

22       Q.  Uh-huh, July.  July.

23       A.  All right.  So, yes, I do recall this.

24       Q.  And you got a response pretty quickly, didn't

25   you?

1    A.   Yes.   There was some urgency, because when

2  Ms. Tomasic contacted me there was-- I think she

3  contacted me on a Friday and she had trial the following

4  Monday, and so there was a need to get an answer as soon

5  as possible.

6         That Friday I had court or I had something in the

7  afternoon, I don't recall what it was, but I made sure

8  that the duty PRAO attorney, which was Marguerite

9  Driessen understood that I would not be available in the

10  afternoon and that she could contact Ms. Tomasic

11  directly, and I believe that's what she did.

12    Q.   And she was given an answer?

13    A.   Yes.

14    Q.   And she followed it as far as you know?

15    A.   "She" meaning Ms. Tomasic?

16    Q.   Ms. Tomasic.

17    A.   I don't know what Ms. Tomasic did.  I know we

18  received an answer from the duty-- the PRAO duty

19  attorney.  And what happened after that, I don't know.

20    Q.   She also made an inquiry of you in this

21  particular case, *Black*, in the *Black* case as it was

22  being investigated when she-- when her agent, Agent

23  Stokes, had briefly looked at two phone calls and she

24  was wondering whether or not the agent should be

25  disqualified from the case.  Do you remember that one?

1    A.   Okay.   That would-- was in January of 2016; is

2   that correct?

3    Q.   Uh-huh.   Uh-huh.

4    A.   Yes, I was contacted by Ms. Tomasic in

5   January 2016 about the defendant-- the name of the

6   defendant she gave me was-- last name was Rapp I

7   believe, R-A-P-P.   And, yes, I did help her with that

8   inquiry.

9    Q.   All right.   Just as an example of how this works,

10   I will show you what's been marked as Special Master's

11   Exhibit 1152, and I want to direct your attention to

12   just this-- these-- this will be an e-mail string, so

13   I'll just pull out the pieces that are-- I can't get it

14   to do what I want it to do here.   There.   See where the

15   checkmark is?

16    A.   Yes.

17    Q.   And you-- you told her you hoped you were wrong

18   in your advice.   Right?   And then you gave her some

19   advice.   And what was the advice that you-- that you

20   gave her, the paragraph that's check-marked?

21    A.   Yeah, I told her that I had concerns about

22   conversations from inmates involving attorneys, that I

23   didn't know that there was a waiver by the fact that the

24   preamble was-- that the inmate was notified that the

25   calls were being recorded.   And I said I hoped that

1   she's able to-- I hoped there was a-- it would act as a

2   waiver, but I was concerned that maybe it would not.

3       Q.   So then you called PRAO to have your-- the

4   question checked out.  Right?

5       A.   I did.  I either called or e-mailed or both.

6       Q.   And after they responded to you, then you wrote

7   back to Erin.  And what did you tell her at the first

8   paragraph?  This is Special Master Exhibit 1153.

9       A.   Do you want me to read that?

10      Q.   If you-- if you'd prefer to, yeah, whichever you

11  prefer.

12      A.   Doesn't matter to me.  I'll just summarize it.  I

13  told Erin that we were contacted by-- I think this was--

14  her first name was Elizabeth, Elizabeth Francis I think

15  was the PRAO attorney that contacted-- returned my call

16  or my e-mail.  And she, Ms. Francis, directed me to a

17  portion of USA Book, which is a-- a resource for us to

18  use to look up various topics.  And she-- she,

19  Ms. Francis, suggested we look at the privilege section

20  in the USA Book.  And I quoted a portion of that USA

21  Book information concerning privileges, which is

22  Paragraph No. 1, disclosure to a third party, that comes

23  from the USA Book.

24          I printed that or I typed that, I sent it to

25  Erin.  The relevant portion of that seemed to me to be

1   the *Hatcher* decision from the Eighth Circuit, which

2   indicated that it is a waiver if the inmate is notified

3   that the phone call is recorded.

4      Q.   And then you gave a caveat here, which is that

5   PRAO does not offer opinions about issues of substantive

6   law, so they won't tell us whether they think the inmate

7   has waived the privilege or not?

8      A.   Right.  When dealing with PRAO, they always

9   indicate-- they give us that.

10     Q.   And is it-- in your experience-- well, let me

11  finish this string I guess.  So then isn't it your

12  experience that they-- that PRAO generally is not going

13  to give you a legal opinion.  They're going to set you

14  in the right direction and let you go most of the time;

15  isn't that right?

16     A.   In my experience, yes.

17     Q.   And in this case it would depend on the facts,

18  the specific facts of that case.  I think I misspoke, I

19  think that is the *Rapp* case.  I think I said the *Black*

20  case, didn't I?  But that is the *Rapp* case.

21          And you-- you relayed that information-- you

22  relayed the information and the resources.  And did you

23  expect Erin Tomasic to take-- take it from there?

24     A.   I-- I viewed my role as being-- giving her the

25  information that had been provided to us by PRAO,

1  letting her take a look at those cases and decide how to

2  go forward with that information.

3      Q.  Have you ever had any calls or any indication

4  from anyone that this particular issue of whether the

5  incarcerated individual wants to exercise his

6  privileges, his-- his attorney-client privilege, that

7  that would be waived by the fact that there was a

8  recording notice?  Have you ever had an office-wide

9  discussion about that problem or said that the office

10  should take any kind of specific approach to it?

11      A.  No, not that I recall.

12      Q.  Have you ever had any U.S. Attorneys tell you

13  that they thought they ought to take an office-wide

14  approach?

15      A.  No, not that I recall.

16      Q.  I'd like to-- to ask you-- and I'd like to quote

17  from a-- from an opinion of-- of a different judge from

18  the case of *U.S. v. Reulet,* which came out of this

19  office, and it's at Page 11, December the 20th, 2016,

20  and Page 28 of that same opinion.

21          The judge says that, "I'm unimpressed when a

22  member of the United States Attorney's Office listens to

23  a communication between a client and her lawyer."  "For

24  the life of me, I don't know why someone from the United

25  States Attorney's Office would listen to phone calls

1    between a person charged with a crime in this district

2    and her lawyer... it may be what the law permits, but

3    I'm not sure if it's in the interest of justice.  I'm

4    reasonably certain it's not."

5         Was that judge's opinion widely known throughout

6    this district for the last couple of years?

7    A.  I-- I don't know, I can't answer that.

8    Q.  So you didn't hear about it in Wichita?

9    A.  I know there's been concerns obviously about what

10   occurred, but no, I can't say that there was wide

11   discussion about that opinion in Wichita.

12   Q.  Was there any movement toward-- toward-- in light

13   of this judicial opinion establishing a policy in the

14   office for what should be done when an attorney has

15   obtained some other attorney's clients' calls?

16   A.  I-- I'm not a member of the management team, I'm

17   not a supervisor, I'm no longer the PRO, so I can't tell

18   you what's been done in the last year-and-a-half.

19   Q.  Okay.  Through 2017 you were the PRO though?

20   A.  I was.

21   Q.  And would you have been expected to have been in

22   the loop if a policy like that was about to be

23   presented?

24   A.  I-- I would expect.

25   Q.  So since you'd never heard of one, as far as you

1  know there isn't one?

2     A.  No, I can't answer that.  I-- I'm not aware of

3  one, but I don't know what discussion has taken place

4  along those lines.

5     Q.  Do you recall when the Special Master in this

6  case, in the *Black* case, was appointed to proceed with

7  the Phase III of his investigation?

8     A.  I know that it happened, I can't tell you when it

9  happened.

10     Q.  All right.  Do you recall ever having-- ever

11  having discussed it with Emily Metzger or Debra Barnett?

12     A.  I can recall receiving e-mails from management

13  about that fact and I'm sure I have in passing discussed

14  the fact that there's a Special Master with both Deb

15  Barnett and Emily Metzger, yes.

16     Q.  When the December letter, litigation hold letter

17  came out, did you have anything to present back as you

18  were requested to do?

19     A.  Not at that time, no.

20     Q.  Did you later?

21     A.  I-- I did produce what you showed me.  That was

22  one.  The e-mail from Marguerite Driessen, I produced

23  that.  And then what I referred to as the *Rapp* series of

24  e-mails, I produced both of those.

25     Q.  Did the-- did you ever speak with the Special

1    Master?

2        A.   No.

3        Q.   Did the Special Master, to your knowledge, ever

4    ask to speak to you?

5        A.   No.

6        Q.   Did you-- you didn't meet him then during the

7    process of all of these goings-on in his investigation

8    for Phase III?

9        A.   No.

10       Q.   Did you have any occasion to have training from

11   management as to how you're supposed to handle any

12   requests from the Special Master?

13       A.   I can't say we've had training, e-mails that we

14   were to fully comply with the lit hold and make sure we

15   look for materials that might be subject to the

16   subpoena.

17       Q.   Once-- once you got these e-mails, you did comply

18   with them, I take it?

19       A.   Yes.

20       Q.   And did you ever have any opportunity to put in

21   your two cents independently with Emily Metzger or Debra

22   Barnett?

23       A.   I don't understand your question.

24       Q.   Did you have an opinion about the ongoing

25   investigation that you related to your superiors?

1    A.  I was-- I didn't understand what my involvement

2    would be in this so I was confused about that.  But

3    that's-- and I'm certain we've had discussions about the

4    investigation, but I don't know-- I know very little

5    about what's been going on.

6    Q.  Were you ever told that you needed to run it past

7    management before you did anything with regard to this

8    investigation?

9    A.  No.

10          MS. VANBEBBER:  I have no other questions.

11              CROSS EXAMINATION

12   BY MS. BRANNON:

13   Q.  Good afternoon, Mr. Welch.  If we could pull up

14   Exhibit 639.  How long have you been with the U.S.

15   Attorney's Office?

16   A.  29 years.

17   Q.  29 years.  And how long were you the PRAO?

18   A.  From 1998 until 2017.

19   Q.  Looking at this particular e-mail where you were

20   telling Ms. Tomasic, "I don't believe the privilege is

21   waived because the conversation is recorded," that was

22   based on your experience and knowledge at the time when

23   she just presented this scenario to you.  Correct?

24   A.  That was my-- I did not research it, but that was

25   my opinion and my concern, yes.

1    Q.  This was not an issue that you encountered

2    regularly in Wichita?

3    A.  No.

4    Q.  And just to be clear, you-- those years that

5    you've been in the U.S. Attorney's Office have all been

6    in Wichita?

7    A.  Yes.

8    Q.  All right.  And during the time you were the

9    PRAO, you had to deal with Mr. Rapp's case with the

10   attorney-client phone calls.  Right?  Well, deal with.

11   A.  One minor distinction.  I was the PRO,

12   professional responsibility officer.  The PRAO is

13   something different, that's Washington's.

14   Q.  I apologize.

15   A.  You're fine.

16   Q.  So you were the PRO, you had to deal with the

17   *Rapp* case?

18   A.  This e-mail chain is-- yes, I did involve myself

19   in the *Rapp* case, yes.

20   Q.  And the *Juan Herrera-Zamora* case also involved

21   attorney-client calls?

22   A.  And that's the July e-mail chain, correct, so

23   yes, I did.

24   Q.  You're aware of what's going on in the *Black* case

25   with attorney-client calls?

1    A.  Only vaguely.

2    Q.  Doesn't involve you directly?

3    A.  Right.

4    Q.  Did you have anything to do with the

5  attorney-client calls in Ashley Huff's case?

6    A.  I don't believe so.

7    Q.  All right.  And the case with Ms. Treadway in

8  *Reulet*, did you have anything to do with the

9  attorney-client calls in that case?

10   A.  Not familiar with that.

11   Q.  And those were all Topeka or Kansas City, Kansas,

12 cases.  Right?

13   A.  If it's Tanya Treadway, it could've been a

14 district-wide case, but I would expect it to be a Topeka

15 case, but I don't know.

16   Q.  When you were confronted with this case in

17 January of 2016, this was your instinct and, based on

18 your experience the privilege wouldn't be waived, you

19 went ahead and went to PRAO to find out, get some

20 guidance; is that right?

21   A.  Yes.

22   Q.  And the guidance you received I think is a little

23 bit further down, and I forget the attorney's name,

24 Marguerite?

25   A.  No, that was July.  This is Elizabeth.  I can't

1   remember her last name.

2       Q.   Okay.  Right.  And so after talking with her, you

3   changed your approach to the case?

4       A.   Well, Elizabeth, I can't remember her last name,

5   she directed me to that portion of the USA Book that had

6   the discussion about the *Hatcher* case.

7       Q.   Right.

8       A.   I forwarded that to Ms. Tomasic for her

9   consideration.

10      Q.   Look at 641.  At no time did you present to

11  anyone in your office so that if a call-- an

12  attorney-client call is recorded and there is a

13  preamble, the privilege is waived?

14      A.   Could you repeat the question?

15      Q.   Did you ever tell anyone in your office that if

16  an attorney-client call is recorded and there is a

17  preamble, that the privilege is waived?

18      A.   No.

19      Q.   If we look a little more closely at this

20  particular e-mail, and let's just talk about the top.

21  You talked about this with Emily Metzger; is that right?

22      A.   I did.

23      Q.   And this is after you've talked with PRAO about

24  the particular topic?

25      A.   Yes.

1    Q.   You and Ms. Metzger at that time probably had 50

2    years combined experience?

3    A.   A lot.

4    Q.   Okay.  And it's your recommendation that defense

5    counsel should be notified about the calls; is that

6    right?

7    A.   That's right.

8    Q.   That that would be the safer way to go?

9    A.   That was my belief.

10   Q.   Because you were not 100 percent convinced that

11   the preamble would waive the privilege?

12   A.   I had those concerns, yes.

13   Q.   And yet you left it up to Ms. Tomasic and Ms.

14   Flannigan about how to proceed?

15   A.   Yes.  I'm not-- I was not their supervisor.  My

16   role was just to provide help, advice, and to put them

17   in touch with PRAO.  And then what they chose to do with

18   that information was up to them.

19   Q.   They didn't have to come back to you and tell you

20   what you [sic] did?

21   A.   No.

22   Q.   You were offering two cents, so the other 98

23   cents pretty much was on them.  Right?

24   A.   They could do whatever they wanted to with it,

25   yes.

1    Q.  Did they have to answer to anybody in your office

2  about how they proceeded?

3    A.  They didn't have to answer to me.  And at that

4  time-- no, they didn't have to answer to me, so I don't

5  know-- you know, there was no obligation for Ms. Tomasic

6  to run that by anyone else.  Now, Kim-- the timing here,

7  Kim, it was Kim Martin then, was the supervisor in the

8  Kansas City office.  So she would've been aware of this

9  e-mail exchange.

10    Q.  There was no structure in your office set up so

11  that when an ethical issue like this came up, that

12  either Ms. Tomasic or Ms. Flannigan would have to

13  account for how they dealt with the specific situation?

14    A.  That's correct.

15    Q.  And there was not a policy in the office at that

16  time that when you come across attorney-client calls you

17  should notice-- you shall notify defense counsel?

18    A.  Oh, no.

19    Q.  Is that policy in place today?

20    A.  No, not that I know of.

21    Q.  Were you aware that this advice that you gave Ms.

22  Martin and Ms. Tomasic was roundly criticized by the KCK

23  office?

24    A.  No, I have no knowledge of that.

25    Q.  Did you hear anything else about it after this?

1     A.   Could you repeat the question?

2     Q.   Did you hear anything else about it after this?

3     A.   Well, not until all of this happened.  But no,

4  immediately after providing this advice, I didn't hear

5  anything more.

6     Q.   You were clear that the PRAO advice was not

7  substantive-- a substantive decision that waiver had

8  been-- or the privilege had been waived.  Correct?

9     A.   Correct.

10     Q.   Let's look at-- well, back up.  You're the PRO,

11  professional responsibility officer, you check with

12  PRAO.  Do you also refer to the Model Rules of

13  Professional Conduct or the Kansas rules?

14     A.   We typically would.  I don't think we did in this

15  instance, but frequently PRAO would cite the Model

16  Rules, yes.

17     Q.   All right.  And if we look at the rule in

18  Kansas-- and you're familiar with these rules.  Right?

19     A.   Yes.

20     Q.   So if we look at 4.4(b), the ethical rule

21  requires that if you come into possession relating to

22  the representation of a lawyer's client-- well, I'll let

23  you read it because I'm making a mess of it.

24          Does Rule 4.4(b) indicate that the defense

25  counsel should have been notified if your office came

1   into possession of attorney-client communications?  Is

2   that how you read that?

3       A.   I-- I guess my-- my-- I pause because it says if

4   the information was inadvertently sent.  I think there

5   was a question whether this was inadvertently sent,

6   given that there was notification that the call was

7   being recorded.

8       Q.   Right.  So when you were looking at these

9   particular situations where attorney-client calls were

10  obtained by your office, whether intentionally or

11  inadvertently, your research and advice and

12  recommendations were not based on the Model Rules or the

13  Kansas ethical rules?

14      A.   I-- usually I would refer the matter to PRAO to

15  get their input because they were the experts on those--

16  on those type of issues.

17           In this instance, the January e-mail string, I

18  don't recall PRAO citing any Model Rule, so we didn't

19  discuss it because PRAO didn't raise any of those with

20  us.  And I did not look at those at that time either.

21           MS. BRANNON:  Could I have just one moment,

22  Your Honor?

23           THE COURT:  Yes.

24           MS. BRANNON:  Thank you.

25                   CROSS EXAMINATION

1    BY MR. CLYMER:

2        Q.   Mr. Welch, I want to begin by just getting a

3    sense of some of the inside Department of Justice terms

4    you used in your testimony.

5            To your knowledge, does every United States

6    Attorney's Office have a professional responsibility

7    officer or PRO on the criminal side and a separate

8    professional responsibility officer on the civil side?

9        A.   I know every office has a professional

10   responsibility officer.  I'm not sure every office has

11   both a criminal and a civil.  We did, but I'm not sure

12   everyone does.

13       Q.   At the time of the events that are the subject of

14   this hearing, the *Herrera-Zamora* case, the *Rapp* case,

15   the investigation that resulted in the prosecution of

16   *Black*, did your office have a civil and a criminal

17   professional responsibility officer?

18       A.   We did.

19       Q.   And the criminal professional responsibility

20   officer was you.  Correct?

21       A.   Correct.

22       Q.   And the civil professional responsibility officer

23   was Emily Metzger?

24       A.   Correct.

25       Q.   And are Assistant United States Attorneys in the

1   office instructed that if they have a professional

2   responsibility issue, they should reach out and contact

3   the professional responsibility officer?

4       A.  Yes.

5       Q.  And the other acronym that's getting thrown

6   around is PRAO.  As the Special Master has established,

7   one of the few entities at Main Justice that gets back

8   to you promptly.

9       A.  Right.

10      Q.  That is a group of attorneys at the Department of

11  Justice who are dedicated to researching professional

12  responsibility issues and providing guidance.  Correct?

13      A.  They work full-time on those issues, yes.

14      Q.  And they-- they learn and study and work with the

15  professional responsibility codes of every state in the

16  country; is that correct?

17      A.  That's correct.

18      Q.  In fact, when you contact them isn't one of the

19  first questions that gets asked, where are you licensed

20  to practice?

21      A.  Correct.

22      Q.  Because if you're licensed in multiple

23  jurisdictions, they will give you the analysis in each

24  one of those jurisdictions.  Correct?

25      A.  That's correct, yes.

1    Q.   And as the professional responsibility officer in

2    the District of Kansas, did you have occasion to contact

3    PRAO to get guidance on professional responsibility

4    issues?

5    A.   Yes.

6    Q.   Did you do that regularly?

7    A.   Yes.

8    Q.   Are you aware of guidance from PRAO that if you

9    have a professional responsibility issue and you

10   accurately and completely give them the facts and you

11   follow their guidance, that you're insulated from

12   professional discipline?

13   A.   Yes.

14   Q.   So there's an incentive for assistants to go to

15   PRAO and to follow that guidance.  Correct?

16   A.   Correct.

17   Q.   And there's also an incentive to fully and fairly

18   and accurately inform them of what the facts are.

19   Correct?

20   A.   That's correct.

21   Q.   When you communicate with PRAO, Mr. Welch, do you

22   do it orally or do you do it in writing typically?

23   A.   Both.  Both by telephone calls and e-mail.

24   Q.   And you get a duty attorney to handle your call?

25   A.   Yes.

1    Q.   Or your e-mail.  Correct?

2    A.   Yes.

3    Q.   You made reference to another internal Department

4    of Justice institution called USA Book.  Do you remember

5    that?

6    A.   I do.

7    Q.   Can you tell us, please, what USA Book is?

8    A.   USA Book is a repository of-- a wealth of

9    information, legal information, that has topics that we

10   frequently encounter that we can go to to do research

11   and look for-- there's guides for indictments, legal

12   research, and a lot of wealth of information we can go

13   to that we have at our disposal.

14   Q.   It's a massive compilation of legal information,

15   isn't it?

16   A.   It is.

17   Q.   And there are literally hundreds and hundreds and

18   hundreds of topics federal prosecutors confront where

19   there's information, cases, statutes, rules, other

20   things, that are pertinent to the practice of federal

21   law.  Correct?

22   A.   That is correct.

23   Q.   Have you used USA Book during your practice as a

24   federal prosecutor?

25   A.   Yes.

1     Q.   Do you find it reliable and authoritative?

2     A.   Yes.

3     Q.   So when someone refers you to USA Book, do you

4  feel that you can rely on the information you receive in

5  USA Book is an accurate characterization of the existing

6  law?

7     A.   Without question.

8     Q.   I want to talk to you a little bit about these

9  two professional responsibility issues that you were

10  confronted with that were the subject of your earlier

11  testimony today.  Would it be accurate to say that in

12  these cases there were a set of issues or decisions that

13  prosecutors had to make under certain circumstances?

14     A.   Yes.

15     Q.   One decision in the *Rapp* case was, does the agent

16  have to be recused.  Correct?

17     A.   That's right.

18     Q.   Another decision is, do we have to not listen or

19  stop listening or can we continue to listen.  Correct?

20     A.   Can they continue to listen or should they have a

21  filter team.

22     Q.   So if you're going to listen, do you have to get

23  a taint team--

24     A.   Yes.

25     Q.   -- so the investigative AUSAs and agents don't

1    listen?

2        A.   Correct.

3        Q.   That's a second-- a different decision point?

4        A.   Right.

5        Q.   Is there also a decision point about whether you

6    have an obligation or whether you should prudentially

7    notify defense counsel of any attorney-client

8    communication you've stumbled onto?

9        A.   That was advice that I-- I gave in one of these.

10       Q.   And we'll get to the specifics.  But is that a

11   decision you have to make as well, do I notify defense

12   counsel or not?

13       A.   Again, it was an issue we discussed, but it

14   wasn't something that-- I'm sorry.  Rephrase your

15   question.

16       Q.   And I'm not talking about the specifics, I'm just

17   asking about the kinds of decisions prosecutors face.

18   So if a prosecutor gets a call from an agent and says, I

19   inadvertently heard ten seconds of an attorney-client

20   communication, what should we do now?  One question is,

21   should you, as the prosecutor, notify defense counsel

22   that you have this recording?

23       A.   Yes.

24       Q.   And a fourth decision is, if you're going to

25   litigate the privilege, should you make sure the Court

1    decides rather than deciding the issue yourself?

2        A.  Yes.

3        Q.  Fair to say all four of those come up?

4        A.  Yes.

5        Q.  Okay.  I'd like to now turn to the specifics of

6    the decisions that you and your office actually made in

7    these cases.  And I'm going to give you a different

8    exhibit, it's similar to the e-mail traffic you've

9    looked at already.  It's in larger print, which makes it

10   much easier for me late in the day.

11           So this is Exhibit 33, and it's in evidence.  And

12   I'll ask you just to look at this yourself and then I've

13   got some questions for you about Exhibit 33.

14       A.  I'm familiar with this.

15       Q.  Okay.  And would it be correct to say Exhibit 33

16   is a chain of e-mail traffic regarding Erin Tomasic

17   seeking guidance from you and then PRAO regarding what

18   to do in the *Rapp* case when Agent Stokes came upon a few

19   attorney-client communications?

20       A.  Yes.

21       Q.  Okay.  And you communicated with PRAO about this.

22   Correct?

23       A.  I did.

24       Q.  And as part of that communication, you were

25   referred to USA Book.  Correct?

1      A.  Yes.

2      Q.  And what did USA Book provide-- what information

3 did you glean from USA Book when you went to USA Book?

4      A.  The portion of-- don't know the page number here,

5 but in my-- well, I shared in one of my e-mail responses

6 to Ms. Tomasic a portion of USA Book which discussed

7 privileges.  And there were two case cites in that

8 section, *U.S. versus Bump and U.S. versus Hatcher.  Bump*

9 really was not applicable, but I thought *Hatcher* could

10 be and something she might want to look at.

11      Q.  And did you later refer to a Second Circuit

12 decision, U.S. v. Mejia-- (reporter interruption), where

13 a Court found recorded conversations between an inmate

14 and his sister where the inmate was asking the sister to

15 convey information to the attorney were not covered by

16 the attorney-client privilege?

17      A.  I did.

18      Q.  Because a third party was involved?

19      A.  Correct.

20      Q.  And did you refer that information to Ms.

21 Tomasic?

22      A.  Yes.

23      Q.  Now, counsel earlier pointed to-- strike that.

24 When Ms. Tomasic sent you this message, originally what

25 was the guidance she was looking for?  The decisions I

1    mentioned before, what question was she specifically

2    asking you when she first reached out to you?

3        A.   Initially she wanted to know if her case agent

4    needed to be recused from the case.

5        Q.   And had a decision already been made to stop

6    listening to the call?

7        A.   Yes.

8        Q.   So there's never any question about anybody doing

9    anything intentional to invade the attorney-client

10   privilege here.  Correct?

11       A.   That was my understanding, yes.

12       Q.   And Ms. Tomasic wasn't saying to you, can we

13   continue to listen to these calls.  Right?

14       A.   No.  In fact, she was saying just the opposite.

15       Q.   We're not going to listen to the calls?

16       A.   Right.

17       Q.   So that was a decision that was made before even

18   reaching out to you.  Correct?

19       A.   Yes.

20       Q.   Okay.  So that's one of the decisions.  No

21   evidence here that he actually listened further once he

22   figured out it was an attorney?

23       A.   Correct.

24       Q.   And on the recusal decision, what guidance did

25   you give her?

 1    A.  Well, I initially needed a little more

 2  information from her as to what the nature of the

 3  inadvertent listening was.  And then after I think I--

 4  look here.

 5        After she responded to me about how much-- how

 6  many calls Agent Stokes had listened to, he had had

 7  three, but listened to 10 or 15 seconds of one call and

 8  stopped listening when he realized it was the attorney

 9  that the inmate was talking to, that's when I then went

10  to PRAO and got the information from Elizabeth.

11    Q.  So you wanted to know how long he listened to the

12  conversation.  Correct?

13    A.  Yes.

14    Q.  And you wanted to know what he heard, if

15  anything?

16    A.  Yes.

17    Q.  Because the more he heard, the more likely it was

18  you need a new case agent.  Correct?

19    A.  Yes.

20    Q.  So you wanted facts before you made that

21  determination?

22    A.  Correct.

23    Q.  Was there a determination made in this

24  conversation, this e-mail conversation you were having

25  with Tomasic and PRAO, about whether to notify defense

1    counsel about the fact that Jeff Stokes had stumbled

2    across these attorney-client calls?

3        A.   Yes.

4        Q.   And what decision was made by you, Ms. Tomasic,

5    and your office with respect to that?

6        A.   I suggested to Ms. Tomasic that she might want to

7    consider notifying defense counsel that we had these

8    three calls and that one of the calls had been

9    inadvertently listened to.

10       Q.   And Ms. Metzger had suggested the same thing to

11   you.  Correct?

12       A.   Yeah.  I initially suggested she might want to

13   consider-- by myself, I suggested she might want to

14   consider doing that.  And then Erin had a follow-up

15   e-mail-- yeah, she had a follow-up e-mail on

16   January 21st at 4:41 p.m., which was a Thursday, and

17   then that was, yeah, late in the afternoon.

18            So then the next morning I got with Emily

19   Metzger, who as a civil PRO-- it wasn't unusual for me

20   to consult with her on PRO issues, so I did that.  And

21   together we suggested that she should consider notifying

22   defense counsel.

23       Q.   Is it your understanding that Tomasic then

24   reached out to the attorney and let him know about the

25   calls?

1    A.   What Erin's response to me was that, "We will

2    notify defense counsel promptly."  And I don't know what

3    happened, if that occurred or not.

4    Q.   I'm going to show you what's been marked as 34A,

5    which is also in evidence.  Is 34A an e-mail that shows

6    that Ms. Tomasic reached out to the defense attorney

7    whose attorney-client communications were inadvertently

8    stumbled on and advised him of the case law, at least

9    some of the case law you described, but nonetheless,

10   notified him about the fact that she had possession of

11   the calls?

12   A.   Yes.

13   Q.   Finally I want to get to the issue about whether

14   a court should decide or whether prosecutors make the

15   decision unilaterally.

16        If you could look back to Exhibit 33, and I want

17   you to go to the third page, the one that has a e-mail--

18   most of the page is an e-mail message from you to

19   Tomasic on January 21, 2016, at 9:45.  Do you see that

20   page?

21   A.   I do.

22   Q.   Can you please read for the Court the third

23   paragraph in your message to Erin Tomasic?

24   A.   The one that starts with "while I think"?

25   Q.   Yes, please.

1    A.  "While I think you have a good argument the

2    inmate has waived any privilege by talking with his

3    attorney on a jail recorded line, it might be a good

4    idea to continue to segregate those calls and not listen

5    to them.  However, it would make me nervous to try to

6    exploit these calls unless I'm convinced there's a

7    waiver.  One way to make sure is to notify defense

8    counsel and the Court that you have these calls, have

9    not listened to them, but you think you could given

10   *Hatcher* and ask the Court for a ruling.  This gets the

11   issue out of the way before trial and will give you a

12   firm answer."

13   Q.  And ultimately, in terms of notifying counsel and

14   not listening, she followed that advice.  Correct?

15   A.  She did.

16   Q.  So there was never a need to litigate anything,

17   was there?

18   A.  It does not appear so.

19   Q.  So on the decision points that we talked about

20   earlier, you sought facts to decide whether to

21   investigate the-- recuse the agent.  Correct?

22   A.  Correct.

23   Q.  The advice Tomasic got here was stop listening,

24   she had done that by herself anyway.  Correct?

25   A.  Right.  But she told me she was going-- they

1    would not listen, so I did not have to give her that

2    advice.

3        Q.   You gave her advice to notify counsel and she

4    did.  Correct?

5        A.   Correct.

6        Q.   And if there was going to be any litigation, the

7    office was going to let the Court decide.  Correct?

8        A.   Correct.

9        Q.   Have you ever given inconsistent advice in any

10   case of attorney-client communications?

11       A.   No, I don't believe so.

12       Q.   Now-- and how long were you the PRO?

13       A.   Oh, from 1998 to 2017, so...

14       Q.   And that was across the entire District of

15   Kansas?

16       A.   Yes.

17       Q.   Now, in the *Herrera-Zamora* case, different set of

18   facts.  Correct?

19       A.   Correct.

20       Q.   Because there was an investigative need to listen

21   to attorney-client calls.  Correct?

22       A.   Right.

23       Q.   To hear if Mr. Moran was speaking to witnesses in

24   the case.  Correct?

25       A.   That's right.

1      Q.   What mechanism was put in place after your

2   discussions with the PRAO regarding how to handle that

3   situation within the Rules of Professional

4   Responsibility?

5      A.   That's the instance where I put Ms. Tomasic in

6   direct contact with Marguerite Driessen, who was the

7   duty PRAO attorney at the time, because I was not

8   available for some reason.  And then Marguerite Driessen

9   I think did have a telephone conversation with Ms.

10  Tomasic, but she followed up with an e-mail, which she

11  actually sent the e-mail to me, copied Ms. Tomasic.  And

12  Ms. Driessen suggested that there be a filter attorney

13  used to filter those-- to review those calls.

14     Q.   Do you know who the filter attorney was who was

15  put in place in that case?

16     A.   I do not.

17              MR. CLYMER:  No further questions, Your

18  Honor.

19              THE COURT:  Any redirect?

20              MS. VANBEBBER:  Nothing.

21              THE COURT:  Any redirect?  Or recross I

22  guess.

23              MS. BRANNON:  Just a couple of questions.

24                    RECROSS EXAMINATION

25  BY MS. BRANNON:

1    Q.  Mr. Welch, to your knowledge, did your office

2  ever take the issue of recorded attorney-client calls to

3  any judge for determination about whether there was a

4  waiver?

5    A.  I don't recall there being an instance.

6    Q.  You would agree that a filter team is not a

7  replacement for a court?

8    A.  I-- I would agree.  It's a step before going to

9  the Court.  Hopefully you can resolve those issues with

10  the filter attorney or filter team that contacted the

11  attorney involved.  After-- if you find material that

12  should be segregated, you do that, and talk to the

13  defense attorney to see if you can resolve those issues

14  before going to the Court.

15    Q.  Right.  A filter team does not replace a court?

16    A.  Correct.

17          MS. BRANNON:  Nothing further.  Thank you.

18          THE COURT:  Anything more?

19          MR. CLYMER:  No, Your Honor.

20          THE COURT:  May Mr. Welch be excused?

21          MR. CLYMER:  No objection, Your Honor.

22          MS. BRANNON:  Yes.

23          THE COURT:  All right.  Let's take a

24  15-minute recess.

25          (Recess).

 1           THE COURT:  All right.  You can be seated.
 2    Call your next witness.
 3                    EMILY METZGER,
 4    called as a witness on behalf of the Special Master,
 5    having first been duly sworn, testified as follows:
 6                  DIRECT EXAMINATION
 7    BY MS. VANBEBBER:
 8      Q.  Ms. Metzger, how long have you worked for the
 9    U.S. Attorney?
10      A.  I started in August of 1982.
11      Q.  And have you always worked in the Wichita office?
12      A.  Yes.
13      Q.  Were you the attorney who worked with David
14    Steeby and the Special Master to come up with a set of
15    search terms for this investigation?
16      A.  I and Scott Rask and some others did, yes, but I
17    was somewhat involved in that, yes.
18      Q.  All right.  I'm going to show you a set of
19    documents in that-- just to look at briefly just mostly
20    for the-- for the dates first.  Do you recall that the
21    Special Master was told to start Phase III on October
22    the 11th, 2016?
23      A.  Yes.
24      Q.  And did he immediately come up with production
25    requests for your office on-- on the 25th of October?

1     A.   I do not recall that he immediately came up with

2   production requests.

3     Q.   In any event, you started working on them in

4   November, late November, December of 2016.  Correct?

5     A.   Oh, I see what you're saying.  We started working

6   on search terms to search some of our internal

7   information, yes.

8     Q.   Let me show you what's been marked as

9   Exhibit 1158.  And the date on that is January the 9th;

10  is that right?

11    A.   I cannot see the date, I'm sorry.

12    Q.   Oh, I'm sorry, I keep doing that, I'm sorry.

13  January the 9th, 2017.

14    A.   Yes, it is.

15    Q.   And look down at the paragraph that I've checked.

16  And is that the Special Master giving you a set of terms

17  he would like for you to use?

18    A.   I can't see the entire document, but I think it

19  is.

20    Q.   I just want you to look at that particular

21  paragraph.  As you can see, it's--

22    A.   Yes.

23    Q.   -- it's the beginning of a chain.

24    A.   Yes.

25    Q.   And he wants you to use his set-- his terms.

 1  Right?

 2      A.  I-- I can't see the terms, but it looks like he's

 3  saying there are terms.

 4              THE COURT:  Do you have a copy, so you can

 5  let her see the whole e-mail?

 6              MS. VANBEBBER:  Yeah, there's only two parts

 7  to it, though.

 8              THE WITNESS:  Thank you.  It's not all of

 9  it.  The search terms aren't there, but it appears to be

10  an e-mail that's talking about search terms.

11  BY MS. VANBEBBER:

12      Q.  So he gave you a set of search terms and you said

13  thank you?

14      A.  I'm sorry, I didn't catch your remark.

15      Q.  He gave you a set of search terms on that day and

16  then you said thank you.  Correct?

17      A.  Yes.

18      Q.  And you were-- you discussed them with Mr.

19  Steeby?

20      A.  Yes.

21      Q.  And Mr. Steeby is who?

22      A.  David Steeby is our information technologist.

23      Q.  All right.  You're concerned but you're going to

24  test them and then you'll get back with him; is that

25  right?

 1      A.  Yes.

 2      Q.  All right.  I'm going to show you the next

 3   sequence.  On the 11th, Mr. Cohen--

 4              MR. CLYMER:  I'm sorry, exhibit number,

 5   please?

 6              MS. VANBEBBER:  Excuse me.

 7              COURTROOM DEPUTY:  Exhibit number?

 8              MS. VANBEBBER:  I'm sorry, 1160 is the

 9   exhibit number.

10   BY MS. VANBEBBER:

11      Q.  On January the 11th he says he has some more

12   custodians at CCA that he would like to be added to the

13   searches.  Right?

14      A.  Yes.

15      Q.  And those are his search terms he's talking about

16   at this point.  Correct?

17      A.  I believe so.  I-- I don't recall if there were

18   any intervening e-mails, but I believe so.

19      Q.  And on that day, January the 11th, you told him

20   that you would continue to run your tests.  Right?

21      A.  Yes.

22      Q.  And then I only want you to look at the top of

23   this particular document, which is 1146, to note that it

24   is January the 26th when he writes to you, correct,

25   David Cohen?

1       A.   Yes.

2       Q.   And he wants to know how your document search is

3   coming.  Right?

4       A.   Yes.

5       Q.   All right.  And then the next document I'm going

6   to show you is 1159, which-- let's go to the bottom of

7   the chain so you can see it.  Scott Rask has written

8   to-- to all of you, the three of you, Steeby and

9   Metzger-- or the two of you I mean, and told you some

10  results.

11          And then the next piece in this chain is on

12  February 4th and you want to know from David Steeby, is

13  this the result-- is this the result of a revision--

14  read it to the Court, please.

15      A.   You want me to read it?

16      Q.   Yes.

17      A.   "David, is this the result of the revised syntax

18  you developed with better proximity cues or is this as

19  originally proposed by the Special Master?  I'm not sure

20  which terms were tested here.  Thanks, Emily."

21      Q.   And then you responded to him that, "Scott has

22  yet to test my revised terms."  So Scott is who?

23      A.   Scott Rask in our Kansas City office.

24      Q.   And what role did he play in this project.

25              MR. CLYMER:  Your Honor, I'm sorry, I want

1   to make a small objection.  I think counsel has it wrong

2   who sent and who received this e-mail.

3              THE COURT:  I note that it's from David

4   Steeby to Emily Metzger.

5              MR. CLYMER:  Thank you, Your Honor.

6              MS. VANBEBBER:  Yes.

7   BY MS. VANBEBBER:

8      Q.   Scott Rask has what role?

9      A.   He currently is the criminal supervisor and

10  assistant branch manager of the Kansas City office, and

11  he was at this time also I believe, yes.

12     Q.   So Mr. Steeby tells you that the original terms

13  are what he used for his result-- to get his result?

14     A.   He's indicating that that's what Scott Rask used

15  is how I read this.

16     Q.   So, so far, you haven't got a revision to send

17  back to the Special Master, is that right, from his

18  terms?  You're still working with his terms?

19     A.   Yes.

20     Q.   All right.  Then we'll jump to May, and I'm going

21  to show you Exhibit 1156.  And the date on that e-mail

22  is May the 12th-- May the 18th, correct, and the e-mail

23  is from David Cohen?

24     A.   I can't quite see the top, but I-- yes, May 18th.

25     Q.   And at this point he's asking you more pointedly

1  as to the status of your search terms.  Right?  Read it

2  to yourself and--

3     A.  He's indicating he'd like to resolve the

4  discussion regarding search terms, yes.

5     Q.  Is it correct that this-- the-- the problem of

6  finding search terms had been going on, according to

7  this, from at least December, perhaps November, all the

8  way up to May, and you still hadn't run anything except

9  a test or two?  Is that right?

10    A.  We did run some tests, and I believe we did run

11  some on Erin Tomasic's repository.

12    Q.  All right.  I'll show you 1157.  Is that an

13  e-mail from David Cohen again to you and to-- to Steeby

14  and you and some other people?

15    A.  Yes.

16    Q.  And the first-- excuse me.  Is this Mr. Cohen?

17  There's two Davids here, but he's addressing David

18  Steeby, you would assume, since he's on the e-mail?

19    A.  I cannot see who the e-mail is from.  All right.

20  It is from Mr. Cohen and it is to David Steeby, yes.

21    Q.  And he tells-- Mr. Cohen tells David Steeby that

22  is good news.  Right?

23    A.  Yes, yes.

24    Q.  And that it looks like you're about to get a test

25  ready to run, aren't you?  At that point you're going to

1    run a test?

2        A.   At this point he's adding additional names, and

3    so that would change our search terms again and we would

4    run that, potentially run that.

5        Q.   So he asked you to run the search on Tomasic's

6    repository?

7        A.   Yes.

8        Q.   Produce the results to the Special Master by

9    sending them to Ken Smiley?

10       A.   Yes.

11       Q.   Did you ever run that test on the repository of

12   Erin Tomasic?

13       A.   I don't recall.  We did run a test on Erin

14   Tomasic, I don't remember which set of search terms it

15   was.

16       Q.   But you did run a test?

17       A.   Yes.

18       Q.   And did Mr. Steeby package it up and-- package

19   the results up and get ready to send them off to Ken

20   Smiley?

21       A.   No.

22       Q.   No?

23       A.   No.

24       Q.   How do you know that, how do you know he didn't?

25       A.   Because the repository-- he talked to me about it

1    and the repository was eventually given to me to review.

2        Q.    Who gave it to you?

3        A.    Mr. Steeby.

4        Q.    All right.  So Mr. Steeby did not send it to Ken

5    Smiley, but he gave it to you to review first?

6        A.    Yes.

7        Q.    And then what happened to it?

8        A.    We started to do a review and we realized that

9    the amount of non-responsive material was very, very

10   voluminous and that it would need to have-- be reviewed

11   for privilege and other kinds of things.  And so-- and

12   at that point we also were under the understanding that

13   we probably would no longer have authority in this

14   investigation, so we ceased until that determination was

15   made.

16       Q.    And that's what month?

17       A.    That was sometime I believe in June.

18       Q.    So you did not work anymore on the project for

19   the Special Master?

20       A.    I worked on it for a while until Mr. Clymer came

21   into the case.

22       Q.    And then no one-- no one sends the results to Ken

23   Smiley?

24       A.    No.

25       Q.    Was it your belief that once Ken Smiley got the

1  results that he then would be able to work-- as an

2  expert in IT and as an employee of the Special Master,

3  he would be able to work on them and produce what the

4  Special Master wanted?

5      A.  I-- I don't know.

6      Q.  You don't know why you were supposed to send them

7  to Ken Smiley?

8      A.  Well, I knew that Ken Smiley was the technical

9  person for Mr. Cohen.  It wasn't explained to me what he

10  would do with them.

11      Q.  All right.  Between October 11th, 2016 and today,

12  did Debra Barnett or Tom Beall or any other member of

13  management direct you to refuse full cooperation with

14  the Special Master?

15      A.  No.

16      Q.  But you did refuse full cooperation, didn't you?

17      A.  No, I did not.

18      Q.  Did you ever send the materials to-- to Ken

19  Smiley?

20      A.  No.

21      Q.  Was that cooperation?

22      A.  It was not a lack of cooperation, it was an

23  effort to try to come up with search terms - and we were

24  in consultation with the Special Master throughout -

25  trying to come up with search terms and find a way to

16-20032  USA v. Karl Carter (Black) REDACTED 10.04.18          1273

1    produce documents for him.

2         Q.  Do you recall that at about the time the search

3    term search ended, the Special Master delivered to-- to

4    the U.S. Attorney's Office a set of 12 requests for

5    information?

6         A.  If you're talking about the early July--

7         Q.  Late June, early July.

8         A.  July 2017 requests, yes, I do recall.

9         Q.  Did you cooperate in producing that material?

10        A.  I believe, yes, there were some responses given

11   to Mr. Cohen that Mr. Clymer directed we correct and

12   then were provided.

13        Q.  But do you know whether they were provided to the

14   Special Master?

15        A.  I believe I saw the letter from Mr. Clymer to Mr.

16   Cohen providing them-- not every-- every request, I

17   think there were two that he responded to.

18        Q.  Two out of 12?

19        A.  That's my recollection, but I may not be entirely

20   accurate.

21        Q.  Are you aware that some line AUSAs or special

22   AUSAs were directed not to meet with the Special Master?

23        A.  No.

24        Q.  Is it your testimony that no one told Erin

25   Tomasic she should not speak with the Special Master?

1    A.   I don't recall that anyone ever told Erin Tomasic

2  that.   I actually arranged for her to speak with him.

3    Q.   I'm going to show you the second page of what is

4  marked 1151.  And this is the original piece of a

5  two-part chain, e-mail chain.  The date on that is

6  February the 6th, 2017?

7    A.   Yes, it is.

8    Q.   And it's addressed to you and to Scott Rask?

9    A.   Yes.

10   Q.   Sent by Erin Tomasic?

11   A.   Yes.

12   Q.   Does she point out that she spoke with Pauletta

13 Boyd that day?

14   A.   Yes.

15   Q.   And Pauletta Boyd is who?  To your knowledge,

16 who's Pauletta Boyd?

17   A.   She's like a litigation assistant in the Kansas

18 City office.

19   Q.   She's not an attorney?

20   A.   No.

21   Q.   Pauletta-- "She indicated the Special Master

22 would like to speak with me," meaning Erin Tomasic?

23   A.   Yes.

24   Q.   Erin Tomasic said she'd be happy to speak to

25 him-- with him and she thinks it would be helpful

 1   because she has relevant information?

 2       A.   Yes.

 3       Q.   Did you-- did you disagree with that statement,

 4   that she has relevant information?

 5       A.   I don't know that I made an assessment of that

 6   statement.

 7       Q.   Then she goes on to say, "I've not reached out to

 8   the Special Master for two reasons:  No. 1, I believe

 9   management was weighing whether Kim and I should speak

10   with-- to him," it says "the him," "and, No. 2, on

11   October 31st," this would've been 2016, "Deb instructed

12   Scott to direct me to have no contact with the Court,

13   court personnel, or the Special Master about the *Black*

14   case."

15            Now, so she didn't think it was appropriate since

16   she had been told she couldn't.  Are you-- it's not your

17   testimony that you didn't know anything about this

18   directive, is it?

19       A.   I saw that-- I saw that, I had forgotten.  But

20   I-- I don't know about Scott's directive to-- to Ms.

21   Tomasic.

22       Q.   Well, that's Deb--

23       A.   Other than what I read in that e-mail.

24       Q.   She says it's Deb's directive, doesn't she?

25       A.   I'm sorry, it's not in front of me.

1    Q.   Pardon.  She characterizes it as Deb's directive,

2   doesn't she?

3    A.   She does.

4    Q.   Now, the last piece of that particular e-mail

5   says that Kim and Erin-- Kim would be, to your

6   knowledge, Kim Flannigan?

7    A.   To my knowledge, it would be, yes.

8    Q.   Kim and she had stated, "We'd like to speak with

9   the Special Master if management would permit us to do

10  so."

11       On-- in February of 2017, were you the first

12  assistant?

13   A.   Yes.

14   Q.   So management would be-- top line management

15  would be Mr. Beall, the U.S. Attorney or acting U.S.

16  Attorney, and you.  Correct?

17   A.   Yes.

18   Q.   Well, as management, did you permit her to do

19  anything different than she had been told October the

20  11th, which is to not speak with him?

21   A.   When she told me-- when I learned this

22  information, I reached out to the Special Master about

23  talking with Erin.

24   Q.   And that was in February?

25   A.   Yes, it was.

1    Q.   And so between October, she-- the e-mail

2  apparently says that she had had discussions with Scott

3  about wanting to speak to the Special Master.  Was Scott

4  part of the management team at that time?

5    A.   I'm sorry, what?

6    Q.   Scott--

7    A.   At what date?

8    Q.   -- Rask.  February of '17.

9    A.   Yes.  Yes.

10    Q.   So he would've been part of management as well?

11    A.   Yes.

12    Q.   Did he ever say to you between October and

13  February, hey, let's let-- let's let Erin talk to the

14  Special Master if she wants to?

15    A.   I don't recall.

16    Q.   All right.  So then you did tell Erin that you

17  had informed the Special Master you wanted to speak with

18  him, isn't that correct, you told-- you told the Special

19  Master that Erin could talk to him?

20    A.   Yes.

21    Q.   All right.  So let's look at that responsive

22  e-mail, which again is 1151.  So you had-- you told him

23  that you had concerns about the potential meeting?

24    A.   Yes.

25    Q.   First you said that, "Is she willing to speak on

1    her own accord?"  You already knew the answer to that,

2    didn't you, that she wanted to speak to him?

3        A.   She said she was willing, I just wanted to verify

4    it was of her own accord.  I didn't want her to think we

5    were compelling her to do anything.

6        Q.   And then you said, "Our office has constantly--

7    consistently objected to the scope of the Court/Special

8    Master's potential investigation of our office and the

9    Court's order that we pay for it."

10           So you're telling her that by letting her speak

11   with him, you're not going to waive any of those

12   objections.  Correct?

13       A.   Yes.  I was telling her I was taking that up with

14   the Special Master.

15       Q.   Okay.  And then you expressed a concern about how

16   her underlying employer, at this point Social Security

17   Administration, would feel about her doing that; is that

18   right?

19       A.   I-- I can't see that, I'm sorry.

20       Q.   I'm sorry.

21       A.   Yes.  We were not her employer, the Social

22   Security Administration was.  I didn't think it would

23   matter to them, but I didn't want to do anything that

24   they would see as a problem from her employment

25   perspective to jeopardize her.

1    Q.  All right.  And then you remind her that her

2    reasons-- as to the reasons for not reaching out to the

3    Special Master, "we understand and would not have

4    expected you to do so."  Can you explain that-- that

5    sentence to me?  You understand her reasons for not

6    speaking out?

7            THE COURT:  What-- can you highlight what

8    you're talking about?  I'm not following.

9            MS. VANBEBBER:  The very-- the last

10   paragraph "as to your reasons for not reaching out to

11   the Special Master--"

12           THE COURT:  Okay.

13   BY MS. VANBEBBER:

14   Q.  "-- we understand and would not have expected you

15   to do so."  You understand her reasons?

16   A.  I understood that we have disclosure obligations

17   and it takes the consent of the U.S. Attorney to

18   disclose information or confidences of the United

19   States.  And so we wouldn't have expected her to

20   individually reach out without going through a process.

21   Q.  Okay.  Would that have been true for all the

22   employees of the office?

23   A.  Yes.

24   Q.  So none of them were to volunteer any information

25   to the Special Master, is that what you're saying,

1  without going through management first?

2      A.  I don't think we issued that directive, but those

3  are the regulations that would govern their disclosure

4  of information held by the United States.

5      Q.  You are familiar with the Court's order that said

6  every employee was to fully cooperate with the Special

7  Master, aren't you?

8      A.  I don't recall specifically, but I-- I would

9  think the Court did say that probably.

10     Q.  Our office-- you would respond to the Special

11  Master, but you would not expect any employee to

12  volunteer information without management saying it's

13  okay?

14     A.  I would expect the United States Attorney to give

15  consent if anyone were going to disclose information

16  held by the United States acquired under the scope of

17  their employment.

18     Q.  Did you try to explain to Ms. Tomasic the reasons

19  why she was precluded from speaking with the Special

20  Master between October and February?

21     A.  I tried to-- I believe that others in our office

22  had indicated some reasons, and I tried to relay those

23  to her in this.

24     Q.  And what were those reasons?

25     A.  You have to excuse me, I have to refresh my

1  recollection.

2    Q.  If you would like to look again at the

3  Exhibit 1151, at the last-- at the penultimate

4  paragraph.

5    A.  I am, thank you.  I-- at the time in October of

6  2016, we felt like there were some very intense issues

7  around Erin with regard to the *Black* matter.  And I

8  think she was told by her supervisor to just step back

9  from the *Black* case at that time, and I was reiterating

10  that to her.

11    Q.  What were you afraid she was going to say if she

12  talked to the Special Master that would be so damaging

13  to the office that she had to be told she couldn't talk

14  to him?

15    A.  I was not afraid of anything she would say.

16    Q.  Then what was the reason to not give her-- give

17  her leave in October to speak with the Master?

18    A.  I didn't know he wanted to speak with her in

19  October.

20    Q.  So if Deb Barnett is the one who gave that

21  directive, should I-- should I address that question to

22  Deb rather than to you?

23    A.  I think that the office wanted to comply with the

24  Special Master and let the Special Master unfold his

25  investigation as he saw fit.  So I think we tried to

1    just comply when he wanted to speak with someone.  But

2    Erin did not contact me until February.

3        Q.  Who else, to your knowledge, besides Erin

4    Tomasic, was directed not to speak with the Special

5    Master?

6             MR. CLYMER:  Object to the characterization,

7    Your Honor.

8             THE COURT:  Overruled.  You can cross

9    examine.

10            THE WITNESS:  I know of no one, as I

11   testified earlier, that was directed not to speak to the

12   Special Master.

13   BY MS. VANBEBBER:

14       Q.  Except for Erin Tomasic?

15       A.  I'm not aware personally that Erin Tomasic was

16   told not to speak to the Special Master.

17       Q.  All right.  That was never discussed with Ms.

18   Barnett and you?

19       A.  I don't recall.  I don't recall anyone ever

20   saying that they were instructing anyone not to

21   cooperate with the Special Master.

22       Q.  Did you receive calls or e-mails from any AUSAs

23   or support staff regarding whether they should speak

24   with the Special Master?

25       A.  I believe I received-- I received some indication

1    from Pauletta Boyd, I don't remember how, that she

2    understood the Special Master wanted to speak with her.

3    I believe that came through-- maybe from even someone

4    outside the office, like an agent.  So I became aware of

5    that.

6        Q.   Did you give her an answer?

7        A.   Yes.

8        Q.   And what was the answer?

9        A.   That we would arrange for her to speak with him.

10       Q.   Excuse me.  Did you attend a meeting in the

11   Kansas City, Kansas office about the *Black* case with

12   other managers in Topeka or in this office, either one?

13       A.   Can you-- do you have a time frame or--

14       Q.   August 2016.

15       A.   A meeting in this office with--

16       Q.   Excuse me.  The Topeka office or this office,

17   either one, about the clawback order.

18       A.   I'm still not--  I mean, there were many meetings

19   among management about the *Black* case so I'm uncertain

20   what date or time frame.  Do you have a date?

21       Q.   I'm asking it pretty loosely, so let me tighten

22   that up.

23       A.   Okay.

24       Q.   Do you recall the Court issuing a clawback order

25   for the phone records and the videos at CCA?

1    A.   Yes.

2    Q.   And that-- do you recall that that was in

3  August 2016?

4    A.   Yes, yes.

5    Q.   So did you attend a meeting together with several

6  USAO managers and Tomasic in Topeka or in Kansas City,

7  either one, to talk about that clawback order?

8    A.   Yes.

9    Q.   And what was the tenor of the discussion in that

10  clawback-- in that clawback discussion?

11   A.   I think the-- the tenor was how to fulfill the

12  clawback order generally.

13   Q.   Were you all in agreement about how it should be

14  filled-- fulfilled?

15   A.   I believe we came to a consensus.

16   Q.   And what was that consensus?

17   A.   To comply with the-- with the information-- I'm

18  not sure what your-- I'm unclear of your question I

19  guess.  I'm sorry.

20   Q.   Were you trying to determine what the Court meant

21  by her clawback order?

22   A.   We did discuss that, yes.

23   Q.   And did you make a decision?

24   A.   Yes.

25   Q.   And what was it?

1    A.  That the Court in the *Black* case wanted the

2  submission of the calls, the videos and derivative

3  information of those.

4    Q.  Only in *Black*?

5    A.  Yes.

6    Q.  Was there disagreement amongst the group about

7  whether it should extend further than *Black*?

8    A.  I don't recall any disagreement.

9    Q.  Did anybody suggest that if you wanted an

10  interpretation of the Court's order, you could probably

11  just call the Court and-- or not call, you could file

12  something with the Court and ask for clarification?

13    A.  I-- I don't recall.

14    Q.  You don't remember that Erin Tomasic suggested

15  that?

16    A.  I don't, no.  I'm not saying it didn't happen, I

17  just don't recall.

18    Q.  Did you or anyone else suggest that a narrow

19  interpretation of that clawback order was the best way

20  to shield the Kansas City, Kansas office from revealing

21  attorney-client communications breaches in other cases?

22    A.  No.

23    Q.  Was anybody worried that failing to consult the

24  judge about the breadth of her order could justify an

25  adverse inference that you really were trying to hide

1    other evidence?

2       A.   I don't remember the details of the discussion,

3    I'm sorry.  I thought it-- it seemed to me it was a

4    consensus.  There was a discussion and I thought there

5    was a consensus.

6       Q.   During 2016 and for years before that, you were

7    the civil chief, weren't you, in Kansas City, Kansas--

8       A.   That's correct.

9       Q.   -- the Kansas U.S. Attorney's Office?

10      A.   That's correct.

11      Q.   And you sometimes served as first assistant as

12   well?

13      A.   I served as first assistant in a dual capacity.

14   I was also civil chief I believe from-- I don't remember

15   these dates, perhaps 1997 or 1998 to 2001 and then again

16   from January 2017 to January 2018.

17      Q.   Did you also serve as the civil PRO for the

18   district?

19      A.   Yes.

20      Q.   Along with Lanny Welch as the criminal version of

21   the PRO?

22      A.   During some of that time, yes.

23      Q.   Do you recall-- I'm going to put in front of you

24   what is called Exhibit 1154.  And I'm going to ask if

25   you just recall having a conversation with Mr. Welch

1    about a question that Ms. Tomasic had given you in your

2    position-- given him in his position as PRO?

3        A.   Generally, yes.  Yes.

4        Q.   Mr. Welch tells Ms. Tomasic that he's-- he's--

5    the question is passed to you because you're way smarter

6    than he is.  Collective opinion-- he gave you [sic] a

7    collective opinion from the two of you.  And is it-- do

8    you recall that the question was that one of the agents

9    had picked up very briefly the phone recorded

10   conversations of an attorney and his client and she

11   wanted to know if-- if the agent ought to be taken off

12   the case and she wanted-- just wanted your advice.

13   Right?

14       A.   I need to confer with Mr. Clymer, I'm sorry, to--

15   this was not within the scope of my authorization, just

16   to--

17            MR. CLYMER:  You can answer.

18            THE WITNESS:  Okay.  Thank you.

19            What I recall is I-- I didn't know the case

20   name, I didn't speak with Erin.  What I recall is that

21   Lanny Welch came to me and I believe said that Erin

22   had-- there had been an attorney call, Erin had maybe--

23   the agent or someone had maybe listened to it for a

24   little bit.  There was a consultation with-- by Lanny

25   with our Professional Responsibility Advisory Office.

1            As a result of that consultation, they had--
2    Lanny had concluded it likely was not privileged and
3    that there was-- it was not necessary to reveal it to
4    the attorney, but he wanted-- but thought maybe we
5    should-- what was my opinion.  And my opinion was yes,
6    we absolutely should, and collectively he relayed that.
7    BY MS. VANBEBBER:
8      Q.  The question being not so much whether it was
9    privileged but whether it should be turned over to
10   counsel?
11     A.  Or counsel should be notified of-- of the
12   instance, that it occurred.  I think there was a
13   conclusion it potentially was not privileged, I didn't
14   personally look into that.
15     Q.  But in any event, you and Lanny agreed that the
16   best course would be to tell the attorney that you had--
17   somebody had looked at his calls?
18     A.  To tell whatever I relayed in the e-mail.  I'm
19   sorry, it's not in front of me and it's been some time,
20   but, yeah, whatever he relayed.
21     Q.  That sounds like the gist of the answer, doesn't
22   it?  Well, let's put it this way--
23     A.  The answer would be what's in the e-mail, yes.
24     Q.  If I asked you again, if I have-- if I've
25   listened in my position as an Assistant U.S. Attorney

1    to-- briefly to calls, should I turn to the attorney who

2    belonged to that half of that conversation and say, hey,

3    we've got-- we took a brief look at these calls, we're

4    not going to look at them anymore, would that be a wise

5    thing to do?

6        A.  I-- I'm not sure I could answer without knowing

7    the situation and the context, but very possibly.

8        Q.  Do you believe in general that an AUSA who gains

9    access to either videos or recorded calls of a lawyer

10   and his incarcerated inmate-- incarcerated client, or

11   not incarcerated client, should be notified if you

12   inadvertently or on purpose find-- find those calls?

13       A.  I need to confer with Mr. Clymer as to whether I

14   can give my opinion.

15               MR. CLYMER:  I don't have a problem with

16   that.

17               THE WITNESS:  All right.  Again, I guess I

18   need to know the circumstances, I-- in your hypothetical

19   whether they were listened to or heard or-- but probably

20   generally I would follow the advice I gave in that other

21   instance.

22   BY MS. VANBEBBER:

23       Q.  Did you attend-- did you go to Kansas City with

24   Debra Barnett on-- for the hearings of either August 9th

25   or August 16th of 2016?

1    A.  I didn't travel with her, but I was at the

2    hearing on I believe August 9th, 2016.

3    Q.  Did you enter-- you didn't enter an appearance?

4    A.  No.

5    Q.  But you were in the audience?

6    A.  Yes.  I was actually seated by Deb Barnett I

7    believe at counsel table, but I did not enter an

8    appearance.

9    Q.  You did come before the bar, but you didn't-- but

10   you didn't enter an appearance?

11   A.  No.

12   Q.  What were you there for?

13   A.  I was asked to attend as a professional

14   responsibility officer.

15   Q.  So on August 9th, you were painfully aware that

16   there were difficulties with the *Black* case.  Correct?

17   A.  I'm sorry?

18   Q.  On August 9th, you were painfully aware by

19   sitting through the hearing that you had some problems,

20   the office had some problems with the *Black* case?

21           MR. CLYMER:  Objection to the

22   characterization.

23           THE COURT:  Overruled.  You can answer it if

24   you can.

25           THE WITNESS:  I actually had knew nothing

1    about the *Black* case when I entered the courtroom, so I

2    only knew what I heard that day.

3    BY MS. VANBEBBER:

4       Q.  Did it appear that there were allegations of-- of

5    misconduct being made against the Kansas City, Kansas

6    office?

7       A.  There appeared that there were definitely

8    concerns about videos and what could potentially be on

9    videos and there was some agreement reached to impound

10   or submit those videos to the Court.

11      Q.  You at that time were the-- one of the PROs?

12      A.  Yes.

13      Q.  And you were-- you worked closely with Mr. Welch?

14      A.  Yes.

15      Q.  When you went back to the office, did you-- when

16   you went back to the office in Wichita, did you discuss

17   with him what you had seen in court August the 9th?

18      A.  I need to ensure from Mr. Clymer that I can talk

19   about internal discussions.

20          MR. CLYMER:  What was the question again,

21   counselor?

22          MS. VANBEBBER:  All I want to know now is

23   did she discuss what she saw August the 9th with Lanny

24   Welch, who was the other PRO officer involved with

25   criminal cases.

 1          MR. CLYMER:  I think you can confirm or deny

 2    it, that's fine.

 3          THE WITNESS:  Okay.  I don't recall.  I may

 4    have, but I don't recall that I did.

 5    BY MS. VANBEBBER:

 6     Q.  As a litigation hold coordinator, even on the

 7    civil side, wouldn't you have thought - given what you

 8    heard August the 9th - that you better get a litigation

 9    hold letter or protected letter-- protective letter, or

10    whichever nomenclature you want to use for that, and get

11    it out right now, get it out as soon as possible?

12     A.  Not at that time.  We understood this to just be

13    the *Black* case and we were impounding the videos and the

14    calls and we were retaining closed files as a result of

15    that hearing.  And normal retention policies for our

16    office would dictate that items in those cases would be

17    retained anyway.

18     Q.  What made you-- what made you think that people

19    who knew something about the *Black* case in the Kansas

20    City office might just clean out their own-- their own

21    notes or any kind of notebooks they had or any other

22    information they might've had about the *Black* case?

23     A.  That would be contrary to normal retention policy

24    as far as with any ongoing case.

25     Q.  So you didn't see a need for any kind of

1  preservation or sequestration of any files or anything--

2  anything other than-- other than what had been

3  impounded-- was going to be impounded?

4     A.  We did.  We directed that-- not me, the criminal

5  chief directed that closed files would not be-- nothing

6  would be removed from closed files and closed files

7  would be retained.

8     Q.  So you finally did send a litigation hold letter

9  out, didn't you?

10    A.  Those other preservation steps were not taken

11 personally by me.  I did issue a office-wide lit hold,

12 yes, in December of 2016.

13    Q.  So you knew what the situation was in August, but

14 you waited until December to send the litigation hold

15 letter?

16    A.  The litigation hold was in response to the

17 Court's appointment order and then a preservation

18 scheduling order issued by the Special Master, yes.

19    Q.  So it wasn't until the Special Master got

20 involved that you sent out that letter; is that right?

21    A.  It was a result of the Court's appointment order

22 where the Court listed a lot of areas of inquiry that

23 appeared to be much broader than the cases at issue.

24    Q.  Did the Special Master review your letter before

25 you sent it out?

1    A.  Multiple times.

2    Q.  And then you finally came to an agreement on what

3    would be the appropriate letter?

4    A.  Yes.

5    Q.  And did you start discussing a litigation hold

6    directive with him in November?

7    A.  Yes.

8    Q.  What kind of responses did you get to the hold

9    directive?

10    A.  Responses within the office?

11    Q.  Yeah.

12    A.  Everyone had to acknowledge that they had read it

13    and inform me whether or not they thought they had

14    responsive material.  I also received a variety of sort

15    of questions or inquiries about how to notify agents,

16    time frames, scope.  I don't remember specifically, but

17    I had inquiries.

18    Q.  You didn't get a 100 percent response, did you,

19    even that they had read the letter?

20    A.  Eventually.  I had to sometimes just ask people

21    to acknowledge it, they just forgot, but...

22    Q.  Do you-- did you keep all the responses that were

23    substantive responses such as I do have stuff that is

24    relevant?

25    A.  I believe I did.  I certainly made note of who it

 1  was.

 2     Q.  And your litigation hold letter just simply told

 3  people to stand-- stand in place.  Right?  They didn't

 4  tell you-- you didn't tell them to turn things over to

 5  you, did you?

 6     A.  I told them that's what-- I anticipate they would

 7  be provided to me, I told them when I provided search

 8  terms.

 9     Q.  When your search terms were finished and all

10  that?

11     A.  Yes.

12     Q.  And which never happened?

13     A.  That's correct.

14     Q.  Today the investigation is still open and it

15  still hasn't happened.  Right?

16     A.  Search terms refined?

17     Q.  Yeah.

18     A.  That's correct.

19     Q.  You were well aware that there was going to be a

20  district-wide computer refresh in August?

21     A.  I would've been notified at some point, yes.

22     Q.  Would you have-- would you have created a

23  information sheet to send out to people as to what that

24  would mean?

25     A.  I did not, no.

1    Q.  Do you know if anybody else did?  Did you get

2  one?

3    A.  I-- I don't recall, but I-- I would imagine I

4  did.  I don't recall however.  I'm sure our IT people

5  would send something out about it.

6          MS. VANBEBBER:  I think that's all the

7  questions I have for now.

8          Your Honor, if you could give me a minute,

9  I'm trying to find a document.

10          THE COURT:  All right.

11  BY MS. VANBEBBER:

12    Q.  Were you made aware at any time that the Special

13  Master had explicitly asked Mr. Beall, Ms. Barnett and

14  others in 2016, before Pauletta Boyd mentioned it to

15  you, that he wanted to talk to Erin Tomasic?

16    A.  No, I don't recall that I was.

17    Q.  All right.  I'm going to show you the June 5th

18  e-mail again.

19          MR. CLYMER:  I'm sorry, what number is that?

20          MS. VANBEBBER:  Excuse me, just a minute.

21          MR. CLYMER:  Thank you.

22          MS. VANBEBBER:  I'm going to ask you to look

23  at the very first one, and this is in Document 1157.

24  BY MS. VANBEBBER:

25    Q.  You spoke about how you could never get the

1   search terms down sufficiently to have it be productive?

2       A.   Yes.

3       Q.   Is that right?

4       A.   I-- yes, I can only see the bottom, but...

5       Q.   That's all I want you to look at right now.

6            Mr. Steeby wrote to Mr. Cohen and said, I was

7   able to update the group 3 terms and remove the other

8   issues, and so we're down from 7,784 results to 4,347.

9   And then he includes a new group 3 code for Mr. Cohen's

10  information.

11           Didn't that eliminate the problem of having too

12  much material?

13      A.   It did not eliminate the problem of the number of

14  material that was non-responsive to really what was

15  being asked for here.

16      Q.   Did you--

17      A.   So our problem became how to search and produce

18  this kind of volume of material and who would search.

19      Q.   Did you ever relay that information to Mr. Cohen?

20      A.   Oh, yes.

21      Q.   So then Mr. Cohen responded in the same

22  Exhibit 1157, responded and told David Steeby that that

23  was good news.  Correct?

24      A.   Yes.

25      Q.   Do you take that to mean that-- that Mr. Cohen

1   thought the problem was solved?

2       A.  I took it to be he thought it was improved or it

3   was good news.

4       Q.  And so he asked him to go ahead, run a search.

5   Doesn't that indicate that he believed the problem was

6   solved?

7       A.  I-- I don't know if he really understood fully

8   the problem, but we had discussed it and we discussed it

9   again in early June in person after this I believe.

10      Q.  Okay.  Isn't it true that by the time it got to

11  June, the only concerns you had was national security or

12  privacy issues?

13      A.  And privilege issues as well.

14      Q.  And privilege issues, I'm sorry.  Privacy issues,

15  national security and privileges?

16      A.  I think by early June, yes, we were trying to

17  figure out who would-- how we would go through that, who

18  would search.  And also at that time we came to know we

19  wouldn't have authority in the case.

20      Q.  Well, isn't it your testimony that by June the

21  5th, you still had those three concerns and they hadn't

22  been solved yet?

23      A.  Yes.

24      Q.  And you also knew that Mr. Clymer's appointment

25  was going to stop the whole project, didn't you?

1    A.  No.  Well, it would stop our authority in-- in

2  the case, in the investigation, but not the project

3  necessarily.

4    Q.  So you didn't know whether-- only you in the U.S.

5  Attorney's Office would no longer be able to work with

6  Mr. Cohen on his investigation, but you thought perhaps

7  DOJ was going to be able to do that?

8    A.  I'm sorry, I'm not sure I followed your question.

9  I understood that we would no-- maybe this answers your

10  question.

11    I understood that we would no longer have the

12  authority to make the decision in the investigative case

13  and that authority would rely now with Mr. Clymer, but I

14  didn't know what his position would be.

15    Q.  He hadn't shared that with you?

16    A.  He wasn't appointed at that point, we just knew

17  it was forthcoming.

18    Q.  You knew it was coming?

19    A.  Yes.

20    Q.  Okay.

21        MS. VANBEBBER:  No other questions right

22  now.

23        MS. BRANNON:  Your Honor, if I haven't done

24  so already, we would move to admit Exhibits 639, 641,

25  642 and 651.

```
 1              MR. CLYMER:  Are those the ones you looked
 2    over with somebody else?
 3              (Counsel confer).
 4              MR. CLYMER:  What are those numbers?
 5              THE COURT:  639, 641, 642, and 651?
 6              MS. BRANNON:  Yes.
 7              COURTROOM DEPUTY:  I'm showing 639, 641
 8    already admitted.
 9              THE COURT:  639 and 641 are already
10    admitted?
11              COURTROOM DEPUTY:  It looks like they're
12    already admitted.
13              THE COURT:  Okay.  So that leaves us with
14    642 and 651?
15              COURTROOM DEPUTY:  Yes.
16              MR. CLYMER:  No objection to either one of
17    them, Your Honor.
18              THE COURT:  All right.  642, 651 also
19    admitted.
20              MS. BRANNON:  Thank you.
21                    CROSS EXAMINATION
22    BY MS. BRANNON:
23      Q.  Good afternoon, Ms. Metzger.
24      A.  Good afternoon.
25      Q.  What is a litigation hold?
```

1    A.   What is a litigation hold?

2    Q.   Yes.

3    A.   It's basically a preservation effort.

4    Q.   And what's the purpose of a litigation hold?

5    A.   To ensure that we preserve information and

6  documents, material relevant to ongoing litigation.

7    Q.   We don't see those too often in criminal cases,

8  do we?

9    A.   Almost never, yeah.

10    Q.   You practice in the civil division, though?

11    A.   I do.

12    Q.   Have you always practiced in the civil division?

13    A.   No.

14    Q.   How long have you been there?

15    A.   In the civil division?

16    Q.   Yes.

17    A.   I started out in the-- well, we weren't really

18  divisionalized when we started out.  But I started out

19  doing civil work in 1982.  In 1983, I started doing

20  criminal work and some degree of civil work as well

21  until probably 1991 when I became civil chief.

22    Q.   In civil litigation, a litigation hold is a big

23  deal.  Right?

24    A.   Yes.

25    Q.   And your obligation to have a litigation hold in

1    a particular case, what triggers that?

2        A.   Usually knowledge of litigation.

3        Q.   Right.  Not that a suit has actually been filed.

4    Right?

5        A.   Sometimes the suit is-- because the suit is

6    filed, yes.

7        Q.   But sometimes you know that it might be filed or

8    litigation is pending and you have an obligation to

9    impose a litigation hold, even though a suit hasn't been

10   filed?

11       A.   Not in every instance, it would depend.

12       Q.   But sometimes?

13       A.   Sometimes.

14       Q.   It doesn't require a court order?

15       A.   No.

16       Q.   Doesn't require a Special Master?

17       A.   No.

18       Q.   It requires the parties' knowledge that you might

19   have information that should not be destroyed.  Right?

20       A.   Yes.

21       Q.   And this is particularly important when we have

22   ESI, would you agree?

23       A.   Yes.

24       Q.   And for the record, what's ESI?

25       A.   Electronically-stored information.

1    Q.  You're very familiar with what a litigation hold

2    looks like.  Correct?

3    A.  I would say yes, generally.  Yes.

4    Q.  Let's talk about what you became aware of in this

5    particular case at what time.  And I'm going to ask--

6    can we look at the first exhibit, actually it's 453.

7         And, Ms. Metzger, I have a notebook next to you

8    and it's that white notebook and it is a tabbed notebook

9    for particular documents we're looking at.  We might not

10   have the entire document on the screen, but I believe

11   the entire documents are there for your reference as we

12   go through.

13   A.  All right.  Thank you.

14   Q.  Have you seen this e-mail before?

15   A.  I don't know that I have before.  I don't recall

16   that I have, I could have, but I don't recall.

17   Q.  It was not sent to you.  Correct?

18   A.  Correct.  And I was not in the office on that

19   date.

20   Q.  And that day happened to be a Thursday.  Correct?

21   And I think--

22   A.  I have-- oh, I'm sorry.

23   Q.  Ms. VanBebber has provided a calendar.

24   A.  Yes, it does.  No, actually August 3rd happens to

25   be a Wednesday.

 1     Q.   Okay.  So you weren't in the office 10:30 at

 2   night.  Were you in the office the following day?

 3     A.   No.

 4     Q.   Or the Friday?

 5     A.   No.

 6     Q.   Were you involved in anything in your office

 7   related to *Black* or this e-mail during that week?

 8     A.   No.

 9     Q.   When was the first time you became aware of any

10   of this?

11     A.   I was called on Sunday evening of August 7th to

12   attend the hearing on August 9th.

13     Q.   And who called you?

14     A.   Deb Barnett.

15     Q.   Her role at the time was criminal chief?

16     A.   Yes.

17     Q.   And your role was first assistant?

18     A.   No, I was civil chief.

19     Q.   Civil chief at the time.  When you talked with

20   Ms. Barnett on Sunday night or even what you came to

21   learn before the hearing on Tuesday, were you aware that

22   our office was concerned - and by our office, the FPD -

23   was concerned about preservation of evidence?

24     A.   I guess I'd confer with Mr. Clymer if I can

25   answer internal-- all right.

1            I don't think I was advised you were concerned
2    about preservation of evidence.  I was advised there was
3    a concern about some videos.
4        Q.  Well, were you advised that there was concern
5    about what the-- the videos would be destroyed?
6        A.  No.
7        Q.  Were you advised that our office had communicated
8    to your office an express concern about intentional
9    destruction of evidence by your office on August 4th or
10   August 5th?
11       A.  No.
12       Q.  Before the hearing were you ever told by anyone
13   in your office that we had communicated a concern about
14   the intentional destruction of evidence in the U.S.
15   Attorney's possession?
16       A.  I was informed that you were concerned about the
17   videos and what might be on them and that you wanted to
18   have them secured I believe or impounded, I believe is
19   what I was told.
20       Q.  And did you understand the reason that we wanted
21   them to be secured was because we were concerned that
22   evidence would be destroyed?
23       A.  No.  I understood that you were probably
24   concerned about what might be on them.
25       Q.  Before the hearing took place on that Tuesday,

1  were you aware that we were trying to find out more

2  information about what was going on?  And by "we," I

3  mean the FPD.

4      A.  Before I attended the hearing, I did not know

5  anything other than I was asked to attend the hearing

6  because there was a concern about the videos.

7      Q.  All right.  So you weren't aware of-- of our

8  meeting with Mr. Beall and Ms. Barnett on either Monday

9  or Tuesday, the 8th or 9th?

10     A.  I believe I was told there would be a meeting on

11 Monday.

12     Q.  But you were not told anything about the content

13 of the meeting?

14     A.  I believe I was told you would be meeting about

15 this issue with the videos.  I wasn't told much, it

16 wasn't very extensive.

17     Q.  Probably learned a lot at that hearing, didn't

18 you?  I understand that you were there in your capacity

19 as PRO?

20     A.  Yes.

21     Q.  As a result of your attending that hearing as a

22 PRO, did you do anything?  Did you have to make any

23 reports?

24     A.  I would confer with Mr. Clymer if I may answer.

25         MR. CLYMER:  I'm going to have to speak to

1   you about this.  May I speak to the witness, Your Honor?

2            (Confer).

3            MR. CLYMER:  May I speak to Ms. Brannon for

4   a second, Your Honor?

5            THE COURT:  Yes.

6            (Counsel confer).

7            MS. BRANNON:  Your Honor, my understanding

8   from Mr. Clymer is that I can ask that question about

9   internal-- internal actions as opposed to global

10  actions.

11           THE COURT:  As opposed to what?

12           MS. BRANNON:  Global actions.  Did I state

13  that correctly?

14           MR. CLYMER:  I think-- I told Ms. Brannon

15  that if she asks what Ms. Metzger did within the U.S.

16  Attorney's Office, she's authorized to answer that

17  question.  I think that well satisfies Ms. Brannon.

18           THE COURT:  As opposed to what she might've

19  done with DOJ or--

20           MR. CLYMER:  Exactly, Your Honor.

21           THE COURT:  Okay.  I understand.  Okay.

22           MS. BRANNON:  Right.  And I just wanted to

23  make the record that I'd like to know both, but I

24  understand the limitation.

25  BY MS. BRANNON:

1      Q.   So, Ms. Metzger, with that, can you tell us what

2    you did as a result of what you learned at that hearing

3    internally within your office?

4      A.   We discussed the information and whether we

5    should report it outside of the office.

6      Q.   To who?

7             MR. CLYMER:   Again, Your Honor, that-- she

8    doesn't have authorization to talk about what she did

9    outside the office.

10            THE COURT:   Not what she did, but whether

11   she discussed whether to report it to outside--

12            MR. CLYMER:   The problem is the substance of

13   what they discussed would reveal what they did outside

14   the office, and I cannot give her authorization to do

15   it.

16   BY MS. BRANNON:

17     Q.   And who was involved in those discussions that

18   you just referred to?

19     A.   Certainly the U.S. Attorney-- or interim U.S.

20   Attorney Tom Beall, myself.  I'm sorry, it's been a

21   while, my memory is--

22     Q.   Sure.

23     A.   I'm recollecting as best I can.  Probably Deb

24   Barnett, Duston Slinkard.  I don't recall if Scott Rask

25   would've been-- Scott Rask I think was not involved.

1  There may have been others, but I don't recall.

2      Q.  Fair enough.  At that hearing, you understood

3  that the Court issued an order impounding certain

4  information and also issuing an order that no further

5  attorney-client communications would be recorded,

6  generally to that effect?

7      A.  Yes, I did.

8      Q.  All right.  And there's a memorandum and order on

9  the screen in front of you.  The Court also issued a

10  written order to that effect.  Right?  It should be on

11  the screen in front of you as well.

12      A.  Yeah.  Oh, I'm sorry.  I'm sorry, are you asking

13  me was I aware of this order?

14      Q.  Right.  You were aware of the order?

15      A.  I was at some point, yes.

16      Q.  All right.  And part of that order was that the

17  government would submit to the custody of the Court all

18  originals, copies of the DVR hard drives.  Right?

19      A.  Yes.

20      Q.  And so that was an instance that you were aware

21  the Court was trying to obtain and preserve information

22  in this particular case?

23      A.  This information, yes.

24      Q.  All right.  And let's look at the next slide.

25             MR. CLYMER:  Can we get an exhibit number,

1    counselor?

2              MS. BRANNON:  It's a document.

3              MR. CLYMER:  Just a document, not an

4    exhibit?

5              MS. BRANNON:  Yeah.

6              MR. CLYMER:  Gotcha, thanks.

7    BY MS. BRANNON:

8        Q.   You're also aware that the Court issued a

9    clawback order in this case?

10       A.   Yes.

11       Q.   And tell us what a clawback order is.

12       A.   Well, it's-- I can't read all this order, but, as

13   I recall, it was asking for certain information to be

14   impounded by the Court.  Basically taken back.

15       Q.   And if you want to see the entire order, it's in

16   that tabbed notebook if there's something else you want

17   to refer to.

18            But again, this is an instance of the Court

19   trying to get information, preserve information so that

20   it's available to the Court for review.  Correct?

21       A.   Yes.  I-- yes, I understood it to be that this

22   may have been confidential or potentially arguably

23   privileged information and the Court was taking it into

24   custody until that could be determined.

25       Q.   You had a role in implementing this clawback

1    order in your office?

2        A.  I-- yes.  I was involved in some discussions I

3    believe about it.  I mean, I didn't actually physically

4    implement it.

5        Q.  You gave directions to people in your office

6    about what would be captured by this order?

7        A.  I don't know that I did personally.  I was

8    involved in some discussions about that.

9        Q.  And what-- do you remember, was it your advice

10   that this should be construed broadly?

11       A.  I recall that we discussed that it would be--

12   that we all-- that we felt it was limited to the *Black*

13   case or the *Black* investigation.

14       Q.  Let's look at the next slide.  And as part of

15   this clawback order, you understood that the Court was

16   trying to get information back not just from your office

17   but from agents of your office.  Correct?

18       A.  I'm sorry, I don't recall.  I'd have to read the

19   order.

20       Q.  Sure.  And if it helps, on the screen I've pulled

21   out that particular page.

22       A.  Okay.  I guess generally yes, in response to your

23   question, or that we would try to get recordings,

24   derivative information that we-- we would have access

25   to.

1    Q.  Let's go back to the litigation hold for a

2    moment.  When a litigation hold is used in a civil case,

3    that would go out perhaps, for example, to a corporation

4    but also to other companies or agents of that

5    corporation in order to preserve evidence.  Right?

6    A.  I'm not sure.  I'm not sure I followed your

7    question.  If--

8    Q.  Go ahead.

9    A.  If a-- is your question that if a party to the

10   litigation was a corporation, would the corporation

11   institute a lit hold?

12   Q.  Right.

13   A.  Presumably, yes.

14   Q.  Right.  A litigation hold in a civil case might

15   not just be limited to the company being sued, for

16   example, but to its agents as well so that that evidence

17   is not destroyed?

18   A.  That would depend on the litigation.

19   Q.  But there are times that it would happen like

20   that?

21   A.  Possibly, yes.

22   Q.  Because the idea of a litigation hold is to reach

23   out as far as possible to make sure nothing is

24   destroyed?

25   A.  To reach out within the scope of the litigation,

 1   yes.

 2       Q.   And you understood the scope of the litigation at

 3   this point was the *Black* case?

 4       A.   Yes.

 5       Q.   And the *Black* case included the video-recordings?

 6       A.   Yes.

 7       Q.   And the *Black* case included who had accessed the

 8   video-recordings?

 9       A.   Potentially, yes.

10       Q.   Because as you pointed out, this is about

11   confidential communications potentially that the Court

12   wanted to get back in control?

13       A.   Yes.

14       Q.   And that that also needed to be preserved?

15       A.   What also needed to be preserved?

16       Q.   Information related to who may have accessed this

17   privileged information.

18       A.   Yes.

19       Q.   All right.  If we look at the next slide.  Do you

20   recognize that order?

21       A.   I assume I may have seen this order, I don't

22   know.

23       Q.   It's dated August 30th, 2016; is that correct?

24       A.   Yeah, I don't recall.  I wasn't getting the

25   orders in this case, but someone could've provided it to

1    me.  I don't recall this specific order, but I was aware

2    there was a hearing on that date, so I became aware in

3    some manner.

4        Q.  You attended that hearing?

5        A.  I did, yes.

6        Q.  Let's look at something else that happened on

7    August 30th.  If you'd look at the next slide.  If I

8    could have just one moment.

9            And we are getting the exhibit number for the

10   other parties, but do you recognize this e-mail?

11       A.  I have seen this e-mail at some point, I don't

12   know that it was at this point in time.  It could've

13   been later.

14       Q.  All right.  And for the record, it is

15   Exhibit 589.  Do you remember-- so you don't remember

16   whether you got it on August 30th?

17       A.  I believe I did not get it on August 30th, but I

18   don't recall.

19       Q.  How do you interpret this particular e-mail?

20       A.  I interpret it as-- that you had a concern about

21   the computer refresh project that was going on in our

22   office and you wanted the hard drives preserved.

23       Q.  "Maintain all existing computers, including hard

24   drives and other media that could contain data related

25   to the video-recordings."

1      And do you understand my concern was that that

2  sort of information might be destroyed during the

3  refresh?

4      A.  I understood that was your concern, yes.

5      Q.  All right.  If we look at the next slide.  This

6  was forwarded to you?

7      A.  It was.

8      Q.  By Ms. Barnett--

9      A.  Yes.

10      Q.  -- is that right?

11      A.  Yes.

12      Q.  Okay.  And if we look at the next slide.

13      A.  I do recall this, yes.

14      Q.  Okay.  And so you responded to-- to Ms. Barnett,

15  but you did not respond to me directly, if you recall?

16      A.  No, you did not e-mail me and I-- I received it

17  from Deb Barnett and responded to her.

18      Q.  In fact, during this time frame you and I never

19  talked about it?

20      A.  No.

21      Q.  Okay.  And so the communication generally between

22  our offices was-- well, it was not handled by you; is

23  that fair to say?

24      A.  Yes.

25      Q.  Okay.  And do you know why Ms. Barnett forwarded

1  it to you?

2      A.  I presume she just was consulting with me or had

3  a question.

4      Q.  Okay.  Were you the litigation hold director in

5  your office?

6      A.  I was litigation hold coordinator, yes.

7      Q.  Coordinator, all right.  And you were the

8  litigation hold coordinator at that time?

9      A.  Yes.

10     Q.  And so would it have made sense for her to

11 forward this to you as the litigation hold coordinator?

12     A.  Possibly, yes.

13     Q.  Because, again, we don't use those in criminal

14 cases so often, but you would be the person who knows

15 about a litigation hold.  Correct?

16     A.  Well, I think others know about it, but yes, I

17 did know about it.

18     Q.  You're the civil chief.  Right?

19     A.  Yes.

20     Q.  Okay.  So that part of it makes sense.  And you

21 respond there that you don't think any data will be lost

22 during the refresh--

23     A.  Uh-huh.

24     Q.  -- correct?  "Pauletta and Dave Steeby can likely

25 verify that nothing will be lost."  Did you verify that

1  with Dave Steeby?

2    A.  No.

3    Q.  Did you verify that with Pauletta?

4    A.  No.

5    Q.  Did you tell anybody to verify that with either

6  one of them?

7    A.  In this I was intending to tell Deb Barnett that

8  they would be the source of the information.

9    Q.  Well, you told her that they would be the source.

10  Did you tell her to verify that with them?

11    A.  I don't recall that we discussed-- I don't recall

12  if we had a discussion after this or not.

13    Q.  And that's not how you read this e-mail, as

14  directing her to do that?

15    A.  No, I wasn't her supervisor.

16    Q.  I understand.  Well, directing-- Mr. Steeby was

17  not copied on this e-mail?

18    A.  No.

19    Q.  Nor was Ms. Boyd?

20    A.  No.

21    Q.  And you recognized that I'm concerned about there

22  may be some type of metadata on the videos?

23    A.  I wasn't sure.  I was raising a question for Deb

24  to inquire what the concern was.

25    Q.  And you didn't ask Deb to come back to me and get

1  more information about my concerns?

2      A.  Not other than responding to this e-mail.

3      Q.  As you're describing this refresh in this e-mail,

4  we understand that this was something scheduled

5  nationally, happens routinely.  Right?

6      A.  Yes.

7      Q.  Have you been through other refreshes?

8      A.  Probably, yes.

9      Q.  But just because a refresh is scheduled does not

10  mean that there could not have been a litigation hold on

11  that information, would you agree?

12      A.  I don't know that it would've stopped the

13  refresh, but-- so I'm not sure what you're asking.

14      Q.  Would a court order not to change-- to do

15  anything with that evidence have perhaps delayed a

16  refresh?

17      A.  Potentially.

18      Q.  Could a litigation hold have delayed that

19  refresh?

20      A.  Potentially.  I mean, we did hold the hard

21  drives.

22      Q.  You did hold the hard drives.  And so-- so you

23  were able to go in and say because of this case we're

24  not going to do things on schedule with this particular

25  set of information?

1    A.  We were able to hold the hard drives, yes.

2    Q.  Despite the nationally-- nationally-scheduled

3  refresh?

4    A.  Yes.  Yes.

5    Q.  But you did not do that with the AVPC?

6    A.  No.  It apparently was refreshed in place, which

7  we didn't know was occurring.

8    Q.  I understand.  But the point is that just because

9  there was a scheduled refresh does not mean that that

10  couldn't be altered to accommodate our-- the concerns of

11  particular litigation?

12    A.  I would assume not.  I mean, that would be

13  probably a higher authority than me, but I assume not.

14    Q.  Well, in this particular case, you did something

15  to preserve information that-- you know, during the

16  middle of a refresh.  Right?

17    A.  We did.

18    Q.  Okay.  Let's look at the next slide.  Mr.

19  Slinkard responds, "Check with David to make sure"?

20    A.  Yes.

21          MR. CLYMER:  Can I get the exhibit number,

22  counselor?  Same one?

23          MS. BRANNON:  Yep, same one.

24          MR. CLYMER:  Sorry.

25  BY MS. BRANNON:

1    Q.   And that-- that e-mail is to you and to Ms.

2    Barnett and Mr. Beall.   Correct?

3    A.   Yes, it is.

4    Q.   So was Mr. Slinkard suggesting that you check

5    with David?

6    A.   I don't know.

7    Q.   And by David, did you understand that to be David

8    Steeby?

9    A.   I understood it to be David Steeby, yes.

10   Q.   But you did not check with David Steeby?

11   A.   I don't recall.   I think we-- someone checked

12   with David that the hard drives would be retained.

13   Q.   Do you remember who did that, who checked with

14   Mr. Steeby?

15   A.   I do not.

16   Q.   Would that have been by e-mail?

17   A.   I don't know.

18   Q.   All right.

19   A.   It could've been.   Probably by phone call.

20   Q.   Okay.   Why do you say that?

21   A.   Why?

22   Q.   Why would it have been by phone call as opposed

23   to the e-mail?

24   A.   I don't know, it could've been either.

25   Q.   You're in Wichita and Mr. Steeby is in Kansas

1    City.  Right?

2        A.  Yes.

3        Q.  All right.  You respond to that that I'm being

4    just extra cautious?

5        A.  Yes.

6        Q.  Do you remember any further e-mail traffic on

7    this particular topic or any e-mail traffic further in

8    this chain of e-mails?

9        A.  I do not.

10       Q.  All right.

11       A.  That doesn't mean there weren't some, I just

12   don't recall.

13       Q.  Okay.  That's all I want to know, if there was

14   something else that you recall.

15           So, to your knowledge, on August 31st, despite

16   this chain of e-mails, you can't tell us whether anybody

17   went to Dave Steeby and said do this or don't do this?

18       A.  I cannot recall that anyone did-- I can't recall

19   who that would've been.

20       Q.  Or to Ms. Boyd?

21       A.  Yes.  Correct.

22       Q.  Let's look at the next slide.  So there's the

23   appointment of the Special Master.  Correct?

24       A.  This is the discovery conference order.

25       Q.  And--

1    A.  I believe he had already been appointed at this

2  point in time.

3    Q.  And so he issued Document No. 155?

4    A.  Yes.

5    Q.  If you want to look in your notebook at that.

6  Document No. 155, a request has-- a number of very

7  specific requests for information and documents.

8  Correct?

9    A.  Yes.

10    Q.  And what was the date of that?

11    A.  October 25th, 2016.

12    Q.  All right.  In looking at the next slide, one of

13  the purposes of this document was that the Special

14  Master wanted to obtain as much relevant information as

15  he could as quickly as possible.  And you understood

16  that?

17    A.  Yes.

18    Q.  And were you given a copy of this order?

19    A.  I'm sure that I was at some point, yes.

20    Q.  And why would you have a copy of this order?

21  What was your role in this case at this point?

22    A.  Management-- there was various management

23  involvement with this case.  So as a management team, we

24  were discussing this case.

25    Q.  Would you have been provided this, in part,

1    because of your role as litigation hold coordinator?

2        A.   Possibly, yes.

3        Q.   All right.  And did you go to the discovery

4    conference?

5        A.   No.

6        Q.   Let's go over to the next slide.  You talked a

7    little bit about this with-- with Ms. VanBebber.  But

8    you understood the appointment of the Special Master at

9    this point and the investigation to require your office

10   to identify and preserve evidence for his review.

11   Correct?

12       A.   Yes.

13       Q.   And you had an active role in implementing that.

14   Correct?

15       A.   Yes.

16       Q.   And what did you do in-- as a result of that?

17       A.   As a result of this, I recall the management team

18   discussed it, that it was-- the breadth and scope

19   required potentially office-wide-- that was probably

20   maybe overly broad, but an office-wide litigation hold.

21       Q.   Let me stop you there.  At what point was there

22   an office-wide litigation hold?

23       A.   There were-- an office-wide, every individual in

24   the office?  It would've been my December 2016

25   litigation hold.  There were some things office-wide

1   otherwise, but they were really more applicable to the

2   criminal division.

3       Q.   Okay.  Let's talk about this.  What was the date

4   of it, December what?

5       A.   Of the lit hold?

6       Q.   Yeah.

7       A.   I believe it was December 19th.

8       Q.   So my e-mail to Ms. Barnett on August 30th about

9   concern about destruction of evidence or preserving

10  evidence did not trigger a litigation hold in your

11  office?

12      A.   No, it triggered a concern about the hard drives

13  in the office.  Well, and that is a form of a lit hold.

14  So yes, I guess it did, but it wasn't office-wide as to

15  these other items.

16      Q.   When you say that that August 30th e-mail

17  triggered a lit hold of sorts, who did that go to?

18  Because it didn't go to Mr. Steeby, did it?

19      A.   On August 30th?

20      Q.   Yeah.

21      A.   I don't know when it-- when Mr. Steeby was

22  advised to hold the hard drives.  Actually, it might've

23  been after the September 7th hearing.

24      Q.   Right.  So what's happening August 30th when that

25  e-mail from me goes out is you are actually in the

1  middle of the refresh.  Correct?

2      A.  We may have been.  I don't recall actually what

3  dates, but we may have been.

4      Q.  And the hearing on September 7th took up the

5  preservation of evidence.  Correct?

6      A.  Yes, somewhat, yes.

7      Q.  And you came to learn later that it was on

8  September 6th that Mr. Steeby-- Steeby said that he

9  wiped the AVPC drive?

10     A.  Yes.

11     Q.  So whatever form of a litigation hold that may

12  have taken place on October-- on August 30th-- or in

13  response to my August 30th did not reach Mr. Steeby?

14     A.  I don't know.

15     Q.  Who did it reach that you know of?

16     A.  Whoever was on the e-mail.  It may have reached

17  the management team, I don't recall.

18     Q.  Well, it was you, Mr. Beall, Duston Slinkard.

19  Who else would've been on the management team?  Deb

20  Barnett.

21     A.  Deb Barnett, Scott Rask.  Actually, Scott Rask

22  probably wasn't on at this time.  There would've been

23  civil folks, but I don't think they would've been

24  involved in the *Black* discussion.

25     Q.  So would there be an e-mail forwarding that to

1  the civil folks saying we need to have this limited lit

2  hold in place?

3      A.  To the civil folks?  No.  I'm sorry, what are you

4  referencing?

5      Q.  Well, you talked about sort of a limited

6  litigation hold in response to my August 30th e-mail.

7  I'm trying to figure out who it went to, because we know

8  it didn't go to Dave Steeby.

9      A.  I don't know.  I don't know if there was.  I

10  think I corrected and said I know that there were hard

11  drives directives post-September 7th, I don't recall

12  prior to that.

13     Q.  When you issue a litigation hold, whether it's

14  a-- one like the one that went out in December or one

15  that may be more limited, you do that in writing.

16  Correct?

17     A.  Yes.

18     Q.  And--

19     A.  Well, I did it verbally as well, but yes.

20     Q.  Okay.  But did you do something in writing that

21  you know of before the December litigation hold?

22     A.  Me personally?

23     Q.  Yes.

24     A.  No.

25     Q.  Okay.  But you're the litigation hold

1  coordinator, you did not do anything in writing to the

2  office before the December--

3      A.   Office-wide, no.

4      Q.   Did anybody else that you know of?

5      A.   There were-- office-wide, I do not believe so.

6      Q.   Well, more limited?

7      A.   There were directives-- I'm aware there were

8  directives obviously to impound the videos, the calls.

9  There were directives I've mentioned earlier with regard

10 to closed files.  I think there was an acquisition of

11 information concerning who might've accessed

12 information, but those were not issued by me.

13     Q.   Who were they issued by?

14     A.   I believe Deb Barnett.

15     Q.   And it would be in writing?

16     A.   I don't know.

17     Q.   Well, how do you know about them?

18     A.   We talked about them as a management team.

19     Q.   So when you talk about things as a management

20 team, is there some agenda or some memorialization about

21 what you talk about?

22     A.   No, it's not memorialized.

23     Q.   One of the things that happened after my

24 August 30th e-mail and before your December litigation

25 hold was that Mr. Slinkard had to send this letter to

 1   Mr. Cohen.  Right?

 2       A.  Yes.

 3       Q.  And are you familiar with that letter?

 4       A.  I've seen it, yes, I'm familiar with it.

 5       Q.  Did you help draft it?

 6       A.  I think we all reviewed it, but I didn't draft

 7   it.

 8       Q.  This letter informs the Court about the wiping of

 9   the AVPC, would you agree with that?

10       A.  Yes.

11       Q.  Based on your knowledge about whatever

12   preservation directives went out in your office, did the

13   wiping of that AVPC violate any directives from

14   management to anyone in the office?

15       A.  I don't know because I don't know when there was

16   a specific directive regarding the hard drive.  I know

17   there was after the hearing on September 7th, I don't

18   know if there was prior to that.

19       Q.  Let me ask it this way:  Did the wiping of the

20   AVPC as described in this letter violate any litigation

21   hold or other directives from you to anyone?

22       A.  No.

23       Q.  Did the wiping of the AVPC as described in this

24   letter violate the directive holds of Deb Barnett that

25   you know of?

1     A.  I don't know.

2     Q.  If Ms. Barnett had issued any sort of litigation

3  hold or directives to preserve evidence, would you have

4  been included on that communication?

5     A.  Possibly.

6     Q.  But you don't remember?

7     A.  I don't remember such a communication.

8     Q.  In your management meetings that you've

9  described, was there ever any discussion that the wiping

10 of the AVPC as described in this letter violated any

11 preservation directive or litigation hold in your

12 office?

13    A.  I just would confer with Mr. Clymer if I can

14 speak about internal deliberations.

15             MR. CLYMER:  Can you repeat the question?

16             MS. BRANNON:  Could we have the question

17 read back, please.

18             (The question was read back).

19             MR. CLYMER:  May I speak to the witness a

20 second, Your Honor?

21             (Confer).

22             MR. CLYMER:  You can answer.

23             THE WITNESS:  My answer is I believe not, I

24 just don't recall if there was anything.  I know we

25 talked about this wiping and Mr. Steeby just didn't seem

1    to understand-- associate this with sort of the hard

2    drive retention, but I think it had already occurred at

3    that point.

4    BY MS. BRANNON:

5        Q.   You don't have any written litigation hold or

6    preservation directive that you can point me to that

7    would've guided Mr. Steeby on what could and could not

8    be destroyed?

9        A.   There were, but it depends at what point in time.

10   I believe they were after the September 7th hearing.

11       Q.   Right.  I'm concerned about what Mr. Steeby was

12   told to do or not do before September 7th.

13       A.   No, I can't point you to anything.

14       Q.   Is that because it doesn't exist?

15       A.   As far as I know.  I'm not aware of it.

16       Q.   Okay.  To your knowledge, it doesn't exist?

17       A.   To my knowledge, I'm not aware of any existence,

18   that's correct.

19       Q.   And at this point you had not issued any

20   preservation directive or litigation hold office-wide?

21       A.   That's true.

22       Q.   Or to people in the *Black* case?

23       A.   That's true.

24       Q.   Or to the IT people, including Mr. Steeby and Ms.

25   Boyd?

16-20032  USA v. Karl Carter (Black) REDACTED 10.04.18      1331

1      A.   That's correct.

2      Q.   The litigation hold that you issued was in

3 December?

4      A.   Yes.

5      Q.   And that was the first formal litigation hold in

6 this case?

7      A.   I wouldn't call it-- a litigation hold, again, is

8 a preservation effort.  There were some other

9 preservation efforts I've already described.  But, yes,

10 that was the first formal office-wide written litigation

11 hold.

12     Q.   Were there other preservation directives that you

13 have not yet described?

14     A.   I don't believe so, that I recall.

15     Q.   All right.  So the formal litigation hold that

16 we're talking about that went out in December, that was

17 after you were aware that this evidence had not been

18 preserved?

19     A.   Yes.

20     Q.   And so between that recognition in October--

21 October 25th-- well, let's go from November 5th.  From

22 November 5th when you sent the letter to Mr. Cohen,

23 there was still not a litigation hold in place until

24 December, mid-December?

25     A.   The office-wide, yes.  There was already a

1    computer litigation hold in place.

2        Q.   Okay.  Tell me about that.

3        A.   For the hard drive.

4        Q.   Okay.  We're talking about the hard drives that

5    were actually pulled?

6        A.   Yes, yes.

7        Q.   But that's all we're talking about.  Right?

8        A.   The computers, the hard drives, the equipment

9    necessary to access those hard drives, anything

10   associated with that.

11       Q.   All right.  Let's go over a couple of slides.  So

12   tell us what the delay was between the beginning of this

13   case and the litigation hold in December.  Why did it

14   take so long?

15       A.   I already explained that, why we didn't issue a

16   lit hold initially.  We thought it was limited to *Black*

17   and there would be retention of those cases.

18       Q.   But let me stop you there.  You can issue a

19   litigation hold on a more limited basis in *Black* like

20   this.  Correct?

21       A.   You could I suppose, yes.

22       Q.   But you didn't?

23       A.   No.

24       Q.   Okay.  So what was it that caused the delay

25   between when you knew all of this was going on and the

1   litigation hold that went out in December?

2       A.   The delay from October to December was-- when I

3   became aware of the order, we talked about it as a

4   management team.  I then drafted, attempted to draft or

5   did draft a draft of a preservation that I thought met

6   or hoped met the terms of the Court's order.

7           I shared that with the management team.  It was

8   vetted among the management team.  I then asked Deb

9   Barnett, she was our contact with the Special Master at

10  that time, to share it with him.  She did so, he

11  responded.  I think they had a couple back and forths.

12  At some point Deb said maybe you just talk to him

13  directly.  I then sent him an e-mail and we started some

14  exchange to refine it, to get it to a point where he

15  thought it was acceptable.

16      Q.   So when it finally got to that point on

17  December 19th, it went out to everyone in your office?

18      A.   Yes.

19      Q.   Did you have a deadline on their response?

20      A.   No.

21      Q.   And in February, you still hadn't heard from some

22  people?

23      A.   That's true.

24      Q.   When was it that you finally heard back from

25  everyone?

1    A.  I don't recall, probably in February or March,

2  early March.

3    Q.  Over 30 people responded to you saying that they

4  had information that they believed would fall within the

5  ambit of this litigation hold?

6    A.  Approximately 30 people.  Some of those were

7  maybes.  But yes, approximately 30 people.

8    Q.  And this litigation hold was also sent out to

9  agents that you worked with; is that right?

10    A.  It was.

11    Q.  Okay.  If we could flip over.  Okay.  And what

12  you see on the screen, is that an example of that?

13    A.  That's one example, yes.

14         MS. BRANNON:  And for the record, we're

15  looking at Defendant's Exhibit 651.  All right.

16         THE COURT:  51 or 61?

17         MS. BRANNON:  651.

18         THE COURT:  651.

19         MS. BRANNON:  Thank you.

20  BY MS. BRANNON:

21    Q.  Let's talk just for a minute about a couple of

22  other timing matters.  You became aware of some problems

23  in Juan Herrera-Zamora's case; is that right?

24    A.  Yes.

25    Q.  And were you aware that a Notice of Correction

1    had to be filed in that particular case?

2        A.   Yes.

3        Q.   Were you involved in drafting that Notice of

4    Correction?

5        A.   Yes.

6        Q.   The Notice of Correction was based on information

7    that you learned on May 10th of 2017?

8        A.   Yes.

9        Q.   It was not filed until some 40 days later.

10   Right?

11       A.   That's probably about right, yes.

12       Q.   And the purpose of this Notice of Correction was

13   to inform the Court that your office had provided

14   inaccurate information to the Court in a pending case.

15   Right?

16       A.   Potentially inaccurate, yes.

17       Q.   Inaccurate enough that you informed the Court of

18   that potentiality?

19       A.   Yes.  Or potentially we thought it was inaccurate

20   enough, yes.

21       Q.   Tell us why it took 40 days to inform the Court

22   of that.

23       A.   We-- we internally consulted-- I'm going to have

24   to again, I apologize, confer with Mr. Clymer to see if

25   I can speak to this.

1          MR. CLYMER:  May I approach the witness,

2   Your Honor?

3          THE COURT:  Yes.

4          (Confer).

5          MR. CLYMER:  Thank you, Your Honor.

6          THE WITNESS:  May I ask one more question?

7   Just-- it might-- it might save some time later, Your

8   Honor.

9          (Confer).

10          THE WITNESS:  I'm sorry, can you repeat the

11   question?

12          (The question was read back).

13          THE WITNESS:  As a result of the information

14   we received on May 10th of 2017, I - and at times others

15   but predominant-- I think predominantly I was the one

16   who was involved - consulted with other components

17   within the Department about the matter.  And there was

18   various discussions and it took a long time or a while

19   to get information back from those components.

20   BY MS. BRANNON:

21    Q.  It was filed on June 19th?

22    A.  I believe that's correct.

23    Q.  Did that have anything to do with the fact that

24   the next day on June 20th there was an evidentiary

25   hearing scheduled in Richard Dertinger's case that was

1  related to these very same issues?

2      A.  We were trying to get it on file and, as I

3  recall, we-- we did want to try very much to get it on

4  file before then, but it-- the delay wasn't as a result

5  of that.

6      Q.  In *Juan Herrera-Zamora*, you were advised-- you

7  were advised of the-- the need to at least consider a

8  correction in May of 2017?

9      A.  Yes.  I mean, we recognized the potential.

10  That's another thing we were doing during that time was

11  reviewing some of the records.

12      Q.  And at that time it was your understanding that

13  Ms. Tomasic had listened to attorney-client phone calls?

14      A.  Some portion, yes.

15      Q.  At that point did you understand that Dave Zabel

16  had listened to any attorney-client phone calls?

17      A.  No.

18      Q.  Later on in 2018 or late 2017, did you learn that

19  information?

20      A.  Later on when?  I'm sorry.

21      Q.  2017, 2018 related to an interpreter.

22      A.  Not necessarily that David had listened to

23  attorney-client calls.

24      Q.  You received a call from Ms. Catania--

25      A.  Yes.

1    Q.   -- about this?  And in that phone call--

2    A.   Or no, I received an e-mail.

3    Q.   You did not have a phone conversation with Ms.

4  Catania about that?

5    A.   Subsequent to the e-mail.

6    Q.   And in that phone conversation, did she inform

7  you that Mr. Zabel was party to this accessing

8  attorney-client phone calls?

9    A.   She was relaying what an interpreter had

10  indicated, that there were attorney-client-- that the

11  interpreter knew that there were attorney-client calls

12  in a case.  The case was not identified to Ms. Catania.

13    Q.   But Ms. Catania identified both Ms. Tomasic and

14  Mr. Zabel as the prosecutors on that case?

15    A.   I believe she did, yes.

16    Q.   And her information to you was that the

17  interpreter said that both Ms. Tomasic and Mr. Zabel

18  asked her to interpret attorney-client phone calls?

19    A.   I don't recall, something of that nature, yes.

20    Q.   Were you aware that that phone call with you was

21  recorded?

22    A.   No.

23    Q.   Was that a practice in your office of recording

24  phone calls with colleagues?

25    A.   No.

1    Q.  So the fact that that was recorded, was that

2  unusual?

3    A.  I would say it is, yes.

4    Q.  Were you aware that it was recorded at the time?

5    A.  No.

6    Q.  Okay.  I'm going to ask you about another timing

7  issue.  When was it decided in your office to notify DOJ

8  about these proceedings?

9    A.  About what proceedings?

10    Q.  The litigation in the *Black* case regarding the

11  recording of attorney-client communications, both by

12  video and audio?

13    A.  To notify DOJ?  What do you mean-- what do you

14  mean-- there are various components within DOJ.

15    Q.  Well, at one point later on, Mr. Beall sent a

16  letter to DOJ that resulted in Mr. Clymer being

17  appointed in this case.  Correct?

18    A.  Yes.

19    Q.  Was there any conversation or consideration of--

20  well, let me ask you this.  Was DOJ contacted before

21  that about this litigation?

22    A.  Yes.

23    Q.  In what capacity?

24    A.  In what capacity?

25    Q.  Why were they contacted?

1           MR. CLYMER:  Your Honor, I believe this gets

2    into privileged information.  I'm not sure she can

3    answer it.  I'd be happy to speak with Ms. Brannon to

4    try to narrow it down.

5    BY MS. BRANNON:

6       Q.  Let me see if I can narrow my question.  Setting

7    aside OPR, did your office contact DOJ about this

8    litigation in order to get help, assistance, guidance?

9       A.  Yes.

10          MR. CLYMER:  You can answer that question.

11          THE WITNESS:  Yes.

12   BY MS. BRANNON:

13      Q.  And when?

14      A.  I believe early in the fall-- I don't remember

15   exactly, I believe it was early in the fall of-- or late

16   summer, early fall of 2016.

17      Q.  And what was DOJ's response?

18      A.  I did have to--

19          MR. CLYMER:  Objection.  She's not going to

20   answer that question.

21          THE COURT:  All right.  So noted.

22          MS. BRANNON:  If I could have just one

23   moment, Your Honor.

24      A.  I-- could I clarify that?

25   BY MS. BRANNON:

16-20032  USA v. Karl Carter (Black) REDACTED 10.04.18      1341

1    Q.   Sure.

2    A.   If you're asking about DOJ providing prosecutive

3  assistance in the case, I believe Deb Barnett may have

4  done that early-- earlier on in the case, but I-- I

5  couldn't really speak to that, she could.

6              MS. BRANNON:   If I could have just one

7  moment, Your Honor.

8              THE COURT:   Okay.

9              MS. BRANNON:   Nothing further.   Thank you.

10             MR. CLYMER:   Your Honor, may we have a few

11 minutes to speak to Mr. McAllister and Mr. Slinkard?

12 Thank you.

13             (Counsel confer).

14             THE COURT:   Did you have enough time?

15             MR. CLYMER:   No questions, Your Honor.

16             THE COURT:   Okay.   Ms. VanBebber, did you

17 have anything more in light of--

18             MS. VANBEBBER:   Yes, I do.

19                   REDIRECT EXAMINATION

20 BY MS. VANBEBBER:

21    Q.   Ms. Brannon asked you about two different

22 hearings, August the 9th and August the 16th.   And it's

23 your recollection that Debra Barnett brought DVR 5 and

24 DVR 6 with her to court that day anticipating that they

25 would be impounded; is that right?

 1    A.  I believe she may have, I don't recall.  And I

 2  don't know at which hearing.  I was only at one of those

 3  hearings.

 4    Q.  In any event, by the time she got back you knew

 5  that they had been impounded and that the rest of them

 6  were brought in to be impounded the very next day?

 7    A.  I did know at some point, yes, that they were

 8  impounded.

 9    Q.  And then you were asked questions about the

10  clawback order.

11    A.  Yes.

12    Q.  And that's August 16th.  Right?

13    A.  Yes, I believe so.

14    Q.  And the clawback order was for all the recorded

15  telephone calls from CCA?

16    A.  I believe so.  I'd have-- whatever it says.

17        MS. VANBEBBER:  Could you please put the

18  order-- order back up.

19  BY MS. VANBEBBER:

20    Q.  Do you recognize this as the order of the 16th?

21    A.  Yes.

22    Q.  Have you seen it before, it's document--

23    A.  Yes, I do.

24        MS. VANBEBBER:  What number is the document,

25  it's not--

1        MR. BELL:  This is just a portion of it.  I

2  don't have the full document.  The witness has it, I do

3  not have the--

4        MS. VANBEBBER:  What's the exhibit number?

5        MR. BELL:  It's not an exhibit.

6        MS. VANBEBBER:  Oh, all right.  For the

7  record, this is Document 123.

8        THE COURT:  113 it looks like.

9        MS. VANBEBBER:  113.  Okay.

10        THE COURT:  The August-- the August 18th,

11  2016 order?

12        MS. VANBEBBER:  Yes, Document 113, thank

13  you.

14  BY MS. VANBEBBER:

15    Q.  You've read this document before, have you not?

16    A.  I have.

17    Q.  And does it indicate to you that you've got--

18  everyone who has received a copy of any of the

19  audio-recordings of attorney-client communications at

20  CCA must be returned to the Court, must be provided to

21  the Court, is that right, clawed back in other words?

22    A.  I'm sorry, I'm not sure I caught all your

23  question.  I'm sorry.

24    Q.  The Court ordered that any and all

25  audio-recordings of attorney-client communications at

1    CCA had to be turned in to the Court.  Correct?

2        A.  I'm trying to see where you're looking at, I'm

3    sorry, just a moment.

4        Q.  It's the first paragraph of the order.  It's on

5    the screen.

6        A.  I'm sorry, which part are you referencing?

7        Q.  Right underneath the word "order."  The first

8    three-and-a-half lines.

9        A.  Oh, "Upon hearing from the parties"?

10       Q.  Yes.

11       A.  "The Court orders the preservation and protection

12   of any and all audio-recordings of attorney-client

13   communications at CCA"?

14       Q.  Yes.  Is that what we're referring to as the

15   clawback order exhibit-- or Document 113?

16       A.  I-- yes.

17       Q.  We've been talking about that today--

18       A.  Yes.

19       Q.  -- both-- you talked about it with me and you

20   talked about Ms. Brannon--

21       A.  Yes.

22       Q.  You talked about it to Ms. Brannon?

23       A.  Yes.

24       Q.  Would you look to the next paragraph and answer

25   the question:  What kind of a deadline was everyone

1    under to return these recordings to the Court?

2        A.  It appears within seven business days.

3        Q.  Let's take a look at the calendar, shall we?

4    August 16th.  Right?

5        A.  Yes, or 18th.  August 18th.

6        Q.  16th.  Or, excuse me, 18th.  This is from the

7    hearing of August 16th.  Correct?  And the order didn't

8    come out until August the 18th; is that right?

9        A.  Correct, yes.

10       Q.  Does the order not say that the-- the recipients

11   of these recordings-- that, first of all, the government

12   has to give all the recipients it knows about

13   information, a copy of this order, so that they can

14   read-- so the recipients can return the recordings to

15   the Court and that the government has 24 hours to do

16   that; is that right?

17       A.  24 hours to issue the notice, yes.

18       Q.  And then once the people were notified, they had

19   - as you said - seven business days?

20       A.  Yes.

21       Q.  All right.  So we can count one, two, three,

22   four, five, six, seven.  Correct?

23       A.  Yes.

24       Q.  So the due date was the 29th?

25       A.  Yes.

1    Q.   Do you recall having-- do you recall having a

2    conversation with Kim Flannigan and Erin Tomasic on the

3    25th?

4    A.   Yes.

5    Q.   They called you or you called them?

6    A.   Initially Kim Flannigan called me.

7    Q.   And what did she tell you?

8    A.   She told me that they had submitted information

9    in compliance with this order to the Court when that--

10   after that had been submitted, that Erin Tomasic had

11   reviewed the order, found-- and she found that there

12   were some additional items that potentially might be

13   covered by the scope of the order and that they had been

14   trying to reach Deb Barnett to talk about what to do

15   about that.

16   Q.   Did you see a problem at that point as to why

17   they couldn't carry on and do whatever it is they had to

18   do?

19   A.   No, I told the-- I told Kim that if they were

20   arguably within the scope of the order, they ought to be

21   submitted to the Court.  But I told her that Deb

22   Barnett-- I'm sorry.

23   Q.   Go ahead.

24   A.   Deb Barnett was in the office and I would touch

25   base with her.

1    Q.   By the time you touched base with Deb and-- did
2    you get all the others on-- did you get her on the phone
3    all together, all four of you?
4    A.   Yes, we did.
5    Q.   And made a collective decision?
6    A.   Yes.
7    Q.   And was that collective decision to return-- to
8    go up to the judge's chambers after hours?
9    A.   The decision was to-- there was a discussion and
10   it was very late in the afternoon, it was late in the
11   afternoon they contacted me.  Erin Tomasic indicated no
12   one is at the court after 5:00, I can assure you.  They
13   were very concerned because they represented the
14   deadline was that day, that it was seven days in the
15   order.
16   Q.   Did you have the order to look at while you were
17   talking to them?
18   A.   I was not looking at the order, no.
19   Q.   Do you know if Deb was?
20   A.   She was not.
21   Q.   Neither of you were looking at the order?
22   A.   No.
23   Q.   So they told you the deadline was-- was the 25th.
24   And it was not the 25th, was it?
25   A.   No.

1    Q.  The 29th would've been the deadline.  Correct?

2    A.  Correct.

3    Q.  How is it that you didn't want to look at the

4    order?

5    A.  I took their representation.  They just called to

6    say it was due, they said it was due.  When an AUSA is

7    telling me they have something due, I take their

8    representation.

9    Q.  All right.  Once you were told that the chambers

10   was closed, you had some options, didn't you, about what

11   to do about this problem?

12   A.  We-- we discussed how to get the materials timely

13   to the Court.  And ultimately, Kim Flannigan said, I

14   guess we could just slide them under the door.  I

15   believe I said, I guess that would be all right if you

16   had-- could get it completely under the door.  Deb

17   Barnett acknowledged yes.

18   Q.  So you could've filed it under seal--

19   A.  Filed what under seal?

20   Q.  -- and met the deadline.  If the deadline was the

21   25th, you could've filed it under seal anytime before

22   midnight and--

23   A.  It wasn't something to be filed.  It was material

24   being impounded.

25   Q.  You could've asked the Court-- you could've filed

1    it electronically and asked the Court to give you

2    another day?  You could've done that?

3        A.   They were not documents to be filed.

4        Q.   Could you-- you could've asked the Court to give

5    you another day to get them up to her chambers?

6        A.   Filed an extension of time?

7        Q.  Yes.

8        A.   Yes.

9        Q.   You could've e-mailed the Court, told them the

10   problem and asked for the-- the ability to go up the

11   next day and take them to her?

12       A.   Possibly.  If there was a court order, we

13   probably wouldn't have e-mailed the Court, we probably

14   would've filed a pleading.

15       Q.   But you could've?

16       A.   We could've, yes.

17       Q.   You could've just picked up the phone and called

18   upstairs and see whether anybody else is there,

19   couldn't-- who would permit Ms. Tomasic or Ms. Flannigan

20   to go upstairs and deliver it to the law clerk or

21   whoever else might be working late that day?

22       A.   I presumed they would probably try to call or

23   make some contact.

24       Q.   You assumed that?

25       A.   Yes.

1       Q.   But if they had done that, since there was

2    somebody there, then they wouldn't have needed to go

3    into closed chambers, would they?

4       A.   There was never an intent to go into closed

5    chambers.

6       Q.   How do you know that?

7       A.   Well, I know my intent.  My intent was never that

8    there would be an entry into closed chambers.

9       Q.   How was you planning-- did you-- you've been in

10   the courthouse before?

11      A.   This courthouse?

12      Q.   Yes.

13      A.   Yes.

14      Q.   You'd been in a courtroom just a few days before.

15      A.   Yes.

16      Q.   And you could see that that-- that those doors

17   don't have great big gaps underneath them.  Correct?

18      A.   I didn't notice that.

19      Q.   Did she tell you how large the thing that she

20   wanted to take to court was going to be?

21      A.   No.  This was all presuming that it would fit

22   under the door and that there would be a gap to even

23   submit it.  Obviously it would not have been-- it

24   wouldn't have been able to have occurred if that was not

25   the situation.

1    Q.  So Kim and Erin both-- who both worked in the

2    building, did they tell you they thought that that would

3    slide under the door?

4    A.  I very specifically said, if it will fit all the

5    way under the door.  I thought it was a public hallway,

6    so I wanted to be sure that it would not--

7    Q.  Were you aware that-- why would you think it was

8    a public hallway in a secured area?

9    A.  I didn't know it was a secured area.

10   Q.  So did Kim Flannigan volunteer that she could go

11   and have the marshals get her into the secured area?

12   A.  She did not say that.

13   Q.  What did she say?

14   A.  I don't recall.  I believe Deb said later that

15   she said something like that, I could call the marshals.

16   Q.  Why would you call the marshals if it's a public

17   area?

18   A.  I think Deb assumed she just meant that she would

19   notify them they were doing this.

20   Q.  And who decided that it would be Erin Tomasic who

21   would take it upstairs and not Kim Flannigan?

22   A.  I don't know.

23   Q.  You didn't-- you didn't hear Deb direct Erin to

24   go upstairs?

25   A.  I don't recall that Deb said it should be Erin.

1  I mean, she could've, but I don't recall that.  I don't

2  think who was delivering it was really the rest of our

3  discussion, it just needed to be delivered.  I don't

4  recall that, no.

5     Q.  Okay.  Did you find out later that-- well, you

6  were at the-- at the hearing on the 7th, weren't you?

7     A.  Yes.

8     Q.  So you found out what happened?

9     A.  Yes.

10    Q.  At that point on the 7th of September, you're all

11 in the room, the judge is indicating her displeasure and

12 the fact that she thinks that Erin Tomasic did this on

13 her own, did anybody think to stand up and say, Your

14 Honor, this was a joint decision?

15    A.  The Court I thought relayed that there was a

16 discussion with Deb Barnett and myself.  I-- I don't

17 think the Court presented it as a single decision.

18    Q.  So you didn't think there was any need to get up

19 and clear the record?

20    A.  No.  And I understood that Tom Beall had had a

21 conversation with the judge already about the incident.

22    Q.  And you didn't think it was necessary for Deb,

23 who was the case attorney, to make any kind of a record

24 for the judge?

25    A.  The judge had already put it on the record.

1    Q.   Put what on the record?

2    A.   The event.

3    Q.   Again, you didn't think-- you didn't see any

4  reason that Deb as the lead attorney should have given

5  as much explanation to the judge about what happened

6  as-- as possible?

7    A.   I understood that Tom Beall had already given an

8  explanation to the Court.

9    Q.   All right.

10              MS. VANBEBBER:   No other questions.

11                    RECROSS EXAMINATION

12  BY MS. BRANNON:

13    Q.   Ms. Metzger, on August 9th of 2016, you knew the

14  issue was who watched those videos.   Right?

15    A.   I don't know if I knew that was-- that the issue

16  was who watched the videos.   I knew there was a concern

17  that there were-- there were concerns about what was on

18  the videos.

19    Q.   You don't remember evidence about whether Agent

20  Stokes went and actually looked at the videos?

21    A.   I do remember that, yes.

22    Q.   Right.   That was the issue at that point.   At

23  least one of the issues--

24    A.   Yes.

25    Q.   -- at that time was who actually looked at these

1    videos.  Right?

2      A.  Yes, yes.

3      Q.  And you know as a litigation hold coordinator

4    that you had an independent duty at that moment to

5    preserve all relevant evidence related to who viewed

6    those videos.  Right?

7      A.  I-- I don't know that I-- I wasn't there in my

8    role as a litigation coordinator, but--

9      Q.  You were in the courtroom.  Right?

10     A.  I was in the courtroom.  I did hear that.  I

11   understand that.  And I think they did try to find out

12   and preserve that information.  I think they did a

13   survey of who--

14     Q.  My question is:  You knew, whether it's your role

15   or not, you knew at that point you had an obligation to

16   preserve all relevant evidence related to who may have

17   viewed those videos.  Correct?

18     A.  I-- not personally.  The office was-- did try to

19   preserve all that information.

20     Q.  Okay.  Let's back it up.  You knew at that point

21   your office had an independent obligation at that point

22   to preserve all evidence related to who viewed those

23   videos?

24     A.  Yes.

25     Q.  Thank you.

1          THE COURT:  Anything more?

2                  RECROSS EXAMINATION

3    BY MR. CLYMER:

4      Q.  Ms. Metzger, your office is in Wichita.  Correct?

5      A.  Yes.

6      Q.  And are there judicial chambers in the building

7    where your office is located in Wichita?

8      A.  Yes.

9      Q.  Have you ever been in the hallway outside where

10   the judge's chambers are there?

11     A.  Yes.

12     Q.  Is that a public hallway?

13     A.  There is one private hallway.  But our current

14   judges, it's all public hallway, yes.

15     Q.  So the-- there's a public hallway and the judge's

16   chambers are right off that hallway?

17     A.  Yes.

18     Q.  Did you believe that the steps that had been

19   taken as of the judge's clawback order would be

20   sufficient to preserve any computer data necessary to

21   identify what was on those videos and who watched the

22   videos?

23     A.  Yes.

24     Q.  Did it ever occur to you that there might be some

25   logging data-- possibly be logging data on the AVPC

1   where the hard drive was not going to be replaced?

2       A.   I don't know that-- did it ever occur to me there

3   might be logging data?  No.  I think at some point later

4   we did provide some degree of logging data, but I don't

5   remember from what.

6       Q.   Did it ever occur to you that the computer

7   refresh project was going to destroy data related to who

8   had watched those videos?

9       A.   No, I had never had that understanding.

10              MR. CLYMER:  No further questions.

11              THE COURT:  All right.  May Ms. Metzger be

12   excused?

13              MS. VANBEBBER:  Yes.

14              MS. BRANNON:  Yes, Your Honor.

15              MR. CLYMER:  No further questions from me,

16   Your Honor.

17              THE COURT:  All right.  You're excused.

18              THE WITNESS:  Thank you, Your Honor.

19              THE COURT:  All right.  Where are we in

20   terms of-- how far behind are we?

21              MS. VANBEBBER:  We're not sure.  We got

22   caught up pretty well today, but I don't know.  What do

23   you think?

24              MS. BRANNON:  Judge, I will say we are

25   working on maybe eliminating some of our witnesses for

1  next week so that we can get to the important ones I

2  think.  Some of these witnesses have covered what we

3  needed other witnesses for, so we should be able to cull

4  that down some.

5              MR. CLYMER:  Can I help you?

6              MS. BRANNON:  Hm?

7              MR. CLYMER:  Can I help you?

8              MR. REDMOND:  A stipulation.

9              MS. BRANNON:  That's fine with me.

10              THE COURT:  All right.  All right.  So we'll

11  try to adhere to the schedule of 8:30 to 5:00-plus.  By

12  the way, I do work past 5:00 sometimes, as late as we

13  need to go, because we really do need to try to get this

14  thing in next week.  I mean, if we can't, we can't, but

15  we'll do our very, very best.

16              All right.  Anything else we need to talk

17  about?  Monday is a federal holiday, we're not going to

18  be in session tomorrow.  So we won't see you back until

19  8:30 on Tuesday.  Anything else we need to talk about

20  before we recess for the weekend?

21              MR. CLYMER:  Not to my knowledge, Your

22  Honor.

23              MS. BRANNON:  No, Your Honor.  Thank you.

24              THE COURT:  All right.  We'll be in recess.

25              (5:10 p.m., proceedings recessed).

1              C E R T I F I C A T E

2

3

4

5        I, Kelli Stewart, a Certified Shorthand Reporter and

6   the regularly appointed, qualified and acting official

7   reporter of the United States District Court for the

8   District of Kansas, do hereby certify that as such

9   official reporter, I was present at and reported in

10   machine shorthand the above and foregoing proceedings.

11        I further certify that the foregoing transcript,

12   consisting of 301 pages, is a full, true, and correct

13   reproduction of my shorthand notes as reflected by this

14   transcript.

15        SIGNED October 29, 2018.

16

17

18

19             /s/ Kelli Stewart

20             Kelli Stewart, CSR, RPR, CCR, RMR

21

22

23

24

25