1            UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5    v.                          Docket No. 16-20032-02-JAR

6    KARL CARTER,                Kansas City, Kansas
                                 Date:  10/09/2018
7

8         Defendant.            Day 6
     ....................       Pages 1359-1731

9

10             TRANSCRIPT OF MOTIONS HEARING
        BEFORE THE HONORABLE JULIE A. ROBINSON
11            UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Government:   Mr. Steven D. Clymer
                           Department of Justice - USAO
14                         Lrm Eckert, William
                           100 S. Clinston Street
15                         Suite 9000
                           Syracuse, New York 13261
16
                           Mr. Duston J. Slinkard
17                         Office of United States Attorney
                           444 Southeast Quincy
18                         Suite 290
                           Topeka, Kansas 66683-3592
19
                           Mr. Stephen R. McAllister
20                         Office of United States Attorney
                           500 State Avenue
21                         Suite 360
                           Kansas City, Kansas 66101
22

23

24

25

```
 1    APPEARANCES:

 2    (Continued)

 3    For the Defendant Karl Carter:
                          Mr. David J. Guastello
 4                        The Guastello Law Firm, LLC
                          811 Grand Boulevard
 5                        Suite 101
                          Kansas City, Missouri 64106
 6
      For the Movant Federal Public Defender:
 7                        Ms. Melody J. Brannon
                          Mr. Kirk C. Redmond
 8                        Mr. Branden A. Bell
                          Office of Federal Public Defender
 9                        117 Southwest Sixth Street
                          Suite 200
10                        Topeka, Kansas 66603

11    For the Special Master David R. Cohen:
                          Mr. David R. Cohen
12                        David R. Cohen Co., LPA
                          24400 Chagrin Boulevard
13                        Suite 300
                          Cleveland, Ohio 44122
14
                          Ms. Alleen VanBebber
15                        VanBebber Law Firm, LLC
                          2029 West 95th Street
16                        Leawood, Kansas 66206

17

18

19

20

21

22
      _____
23
            Kelli Stewart, CSR-KS, CRR-MO, RPR, CRR, RMR
24                     Official Court Reporter
               259 U.S. Courthouse, 500 State Avenue
25                     Kansas City, Kansas 66101
```

1                          I N D E X

2

   Special Master's Witnesses:                          Page
3
   SHERI CATANIA
4    Direct Examination By Ms. VanBebber              1647
     Cross Examination By Mr. Redmond                 1688
5    Cross Examination by Mr. Clymer                  1701
     Redirect Examination by Ms. VanBebber            1723
6    Recross Examination by Mr. Clymer                1725

7
   Federal Public Defender's Witnesses:                 Page
8
   JOSH MARTIN
9    Direct Examination By Ms. Brannon                1365
     Cross Examination By Special Master Cohen        1418
10   Cross Examination by Mr. Clymer                  1430
     Redirect Examination by Ms. Brannon              1451
11   Recross Examination By Special Master Cohen      1460
     Recross Examination By Mr. Clymer                1465
12   Redirect Examination By Ms. Brannon              1468

13   WAYNE LEE BIGELOW
     Direct Examination By Ms. Brannon                1471
14   Cross Examination By Ms. VanBebber               1475
     Cross Examination By Mr. Clymer                  1476
15   Redirect Examination By Ms. Brannon              1479

16   NICHOLAS HARRIS
     Direct Examination By Ms. Brannon                1480
17   Cross Examination By Mr. Clymer                  1487
     Redirect Examination By Ms. Brannon              1495
18
   RICH FEDERICO
19   Direct Examination By Ms. Brannon                1497
     Cross Examination By Mr. Clymer                  1569
20   Redirect Examination By Ms. Brannon              1623
     Recross Examination By Mr. Clymer                1632
21   Examination by The Court                         1638
     Redirect Examination By Ms. Brannon              1640
22   Recross Examination By Special Master Cohen      1641
     Recross Examination By Mr. Clymer                1643

23

24

25

E X H I B I T S

Federal Public Defender's
| Exhibits | Offered | Received |
|---|---|---|
| 554 | 1612 | 1612 |
| 560 | 1364 | 1365 |
| 561 | 1364 | 1365 |
| 562 | 1513 | 1513 |
| 562A* | 1513 | 1513 |
| 563** | 1364 | 1365 |
| 564** | 1364 | 1365 |
| 565** | 1364 | 1365 |
| 566** | 1364 | 1365 |
| 567** | 1364 | 1365 |
| 568** | 1364 | 1365 |
| 569** | 1364 | 1365 |
| 572 | 1364 | 1365 |
| 573** | 1364 | 1365 |
| 585 | 1506 | 1506 |
| 600 | 1559 | 1559 |
| 600A | 1563 | 1563 |
| 601 | 1561 | 1561 |
| 601A | 1568 | 1568 |
| 602 | 1561 | 1561 |
| 602A | 1568 | 1568 |
| 603 | 1561 | 1561 |
| 603A | 1568 | 1568 |
| 604 | 1561 | 1561 |
| 604A | 1568 | 1568 |
| 605 | 1561 | 1561 |
| 605A | 1568 | 1568 |
| 606A | 1568 | 1568 |
| 607A | 1568 | 1568 |
| 608A | 1568 | 1568 |
| 628 | 1688 | 1688 |
| 667 | 1364 | 1365 |
| 670 | 1688 | 1688 |

16-20032-JAR  USA v. Karl Carter (Black)  10.09.18          1363

```
 1                         E X H I B I T S

 2
         Government's
 3       Exhibits              Offered              Received

 4          23                  1728                  1728
            24                  1728                  1728
 5          25                  1728                  1728
            26                  1728                  1728
 6          27                  1728                  1728
            28                  1728                  1728
 7          29                  1728                  1728
            32*                 ----                  1729
 8          33                  1728                  1729
            34A                 1728                  1729
 9          38           1441,  1728           1441,  1729
            40*          1604,  1623           1604,  1623
10          42                  1728                  1729

11

12

13
      * Denotes demonstrative exhibit
14   ** Denotes admitted under seal

15

16

17

18

19

20

21

22

23

24

25
```

1             (8:36 a.m., proceedings commenced).

2             THE COURT:  All right.  You can be seated.

3   All right.  Ms. Brannon, are you calling the next

4   witness?

5             MS. BRANNON:  Yes, Your Honor.

6             THE COURT:  Okay.

7             MS. BRANNON:  We would call Josh Martin.

8                    JOSH MARTIN,

9   called as a witness on behalf of the Federal Public

10   Defender's Office, having first been duly sworn,

11   testified as follows:

12             MS. BRANNON:  Your Honor, before we begin

13   with Mr. Martin, we would move by stipulation to admit

14   the following exhibits.

15             THE COURT:  Okay, just a minute.  All right.

16             MS. BRANNON:  560, 561.

17             MS. VANBEBBER:  Excuse me, I think the

18   microphone is off.

19             THE COURT:  Is that microphone-- I believe

20   mine is on.  I don't know if mine-- yeah.

21             MS. VANBEBBER:  There.

22             MS. BRANNON:  560, 561, 563 through 569 we

23   would offer under seal.  572, 573 and 667.

24             THE COURT:  All right.  Any objection?

25             MS. VANBEBBER:  No objection.

```
 1              MR. CLYMER:  No, Your Honor.
 2              THE COURT:  Exhibits 560, 561, 572, 573, 667
 3     admitted, and Exhibits 563 through 569 are admitted
 4     under seal.
 5              MS. BRANNON:  Thank you, Your Honor.
 6                     DIRECT EXAMINATION
 7     BY MS. BRANNON:
 8     Q.   Would you state your name for the record, please?
 9     A.   Yes.  It is Joshua Paine, P-A-I-N-E, Martin.
10     Q.   And, Mr. Martin, what do you do for a living?
11     A.   I am an attorney employed by Securus
12     Technologies, Incorporated.
13     Q.   And what is Securus?
14     A.   Securus is a provider of inmate telephone
15     services to the corrections industry as well as
16     associated public safety-related products and services.
17     Q.   About how big of a company is Securus?
18     A.   We employ right around a thousand people.  We
19     service over a thousand different customers, and we're
20     deployed at over 2,000 facilities.
21     Q.   What do you-- day-to-day what do you do for
22     Securus?
23     A.   My primary responsibilities-- while my title is
24     assistant general counsel and chief compliance officer,
25     my primary responsibilities are management oversight and
```

1   direction of our outside litigation, the

2   administration-- well, development and administration,

3   excuse me, of our compliance programs.  I'm also

4   involved in informal dispute resolution with customers,

5   vendors, third parties, and I oversee our subpoena

6   compliance program.

7       Q.   Because you oversee litigation, are you familiar

8   with the case pending in Western District of Missouri

9   the *Crane versus-- Johnson versus CCA and Securus*?

10      A.   Yes, quite so.

11      Q.   Have you been active in that in terms of

12  providing information from Securus for the litigation?

13      A.   Yes.

14      Q.   Okay.  Same question with the-- the case here,

15  you're familiar with the litigation in *United States*

16  *versus Black*?

17      A.   I am.

18      Q.   Have you worked with the Special Master, David

19  Cohen, in providing information?

20      A.   I have.

21      Q.   And have you also worked with me in answering

22  subpoenas?

23      A.   Yes, quite a few.

24      Q.   All right.  If we could look at Exhibit 565.  To

25  begin with, I just want to ask you which facilities

1    within Kansas that Securus serves or has served.  If we

2    flip over to the second page-- third page I guess.

3        A.  Yes.  So as reflected in the e-mail that

4    comprises at least a portion of this exhibit, we serve

5    Sedgwick County, Butler County, Shawnee County, and we

6    previously served Jackson County, and we previously

7    served CCA's Leavenworth Detention Center.

8        Q.  Do you know when you stopped providing services

9    for CCA?

10       A.  It would've been late summer, early fall of 2017.

11       Q.  Part of the service that you provide to

12   facilities such as CCA is to record phone calls that are

13   outgoing from the inmates; is that right?

14       A.  Yes.  We provided at CCA-Leavenworth what I would

15   characterize as a barebones or plain vanilla deployment

16   of our inmate telephone system.  And that is in broad

17   terms a voice-over Internet protocol enabled

18   telecommunication system that allows detainees or

19   inmates at our agency or facility customers to place

20   outbound telephone calls.

21           And in connection with that, the system provides

22   all the-- the telephone-- excuse me-- technology

23   necessary to, you know, route, place, complete, process

24   the call as well as generate recordings or not generate

25   recordings, depending on the particular, excuse me,

 1   facility configuration.  And it also generates what are

 2   known as call detail reports, which is kind of a

 3   detailed summary of the who, what, when, and where of a

 4   telephone call.

 5       Q.  Was CCA's default to record all calls?

 6       A.  At CCA-Leavenworth, yes.

 7       Q.  You also service other CCA facilities; is that

 8   right?

 9       A.  Yes.  We previously serviced quite a few of CCA's

10   facilities.

11       Q.  So for today when we're talking, we are referring

12   only to CCA-Leavenworth unless we state otherwise; is

13   that right?

14       A.  Understood.

15       Q.  Okay.  Are there facilities that Securus provides

16   service to that choose to have a default of not

17   recording anything?

18       A.  Yes.  Juvenile facilities, at least in my limited

19   experience, almost exclusively do not record calls by

20   default.  And I am aware of at least one adult detention

21   facility in north Texas that does not record calls by

22   default.  There may be other examples, but probably very

23   few.

24       Q.  Let's look at Exhibit 563, please.  You mentioned

25   the call detail report.  Can you define what a call

1   detail report is?

2       A.   A call detail report is a standard collection of

3   data that we generate and retain in connection with

4   attempted or completed calls.  And it contains a variety

5   of information, including things like the facility from

6   which the call originated, the number that was dialed,

7   the date and time of the call, the duration of the call.

8   Oftentimes, it will include the inmate or detainee name

9   that's placing the call as well as his or her account or

10  PIN number information.  And there are other things that

11  are included in it as well, but that's what comes to

12  mind.

13      Q.   So when someone obtains a-- an audio-recording of

14  a phone call, is it the call detail report that gives

15  that audio-recording some context?

16      A.   I would say, yes.  A call recording standing

17  alone would be simply the audio of the inmate or

18  detainee and the called party.  And it doesn't have-- to

19  my knowledge at least, it doesn't have included or

20  imbedded within the audio file the details such as the--

21  well, the facility name might play, but it won't tell

22  you the date and time of the call or things like that.

23  You would need to reference the call detail report to

24  get that information.

25      Q.   Did you work with me in providing information

1   regarding a case *United States versus Brenda Wood*?

2      A.   Yes.

3      Q.   And if you look at this Exhibit 563, I subpoenaed

4   at some point her call detail reports.

5      A.   I recall that.

6      Q.   All right.  And just by way of example, if we

7   could walk through her call detail report.  I think it's

8   a couple of pages over.  There we go.  Blow that up a

9   little bit.

10          All right.  So the first column, that's cut off

11  just a little bit, but can you describe what's in the

12  first column?

13     A.   The first column will typically display the name

14  of the facility at which the call originated.  For

15  CCA-Leavenworth, there is additional information

16  contained within the parenthetical that follows

17  CCA-Leavenworth, KS.  In this instance, it lists

18  default.  That identifies the-- the agency affiliation

19  or site affiliation within the call platform as relates

20  to CCA-Leavenworth.

21     Q.   Let's define a couple of terms.  When you talk

22  about "facility," what are you talking about in this

23  context?

24     A.   That's a difficult question to answer because it

25  is used in a variety of different ways.  In broad terms,

1    facility in my mind means the-- the actual facility,

2    physical building from where the call is originating.

3    For example, Collin County, Texas, a former customer,

4    they have one county detention center and so the

5    facility would be that.

6         Leavenworth was configured a little bit

7    differently in that it had distinctions between

8    facility, which would cover 100 percent of the inmates,

9    and sites, which is a determine-- it's an imprecise

10   term, but it's the term that's used within our platform.

11   And that could typically be used-- if you think of a

12   state Department of Corrections context where there are

13   multiple correctional facilities, the contract or

14   facility level would be the department as a whole.  And

15   then each site would be the separate stand-alone prisons

16   or penitentiaries.

17        In-- at CCA-Leavenworth, the site designator was

18   used by Leavenworth to segregate within the call

19   platform inmates associated with the three agency

20   customers that they provided services to at Leavenworth

21   Detention Center.

22   Q.   In other contexts when we talk about site, if I

23   understand, that would refer to physical sites and

24   divisions among those physical sites?

25   A.   That's correct.

1     Q.   And within CCA, they chose to designate sites

2  based on the inmate population?

3     A.   That's my understanding, yes.

4     Q.   Okay.  So when we talk about site in this

5  context, we're talking about sites at CCA.  Can you tell

6  us what those sites are, what those divisions are?

7     A.   Yes.  There were three sites.  The default site

8  is that associated with United States Marshal detainees.

9  There is a county site, which is for county detainees.

10  And I apologize, I can't remember the name of the county

11  as I sit here.  And then they're a Maryland DOC site,

12  which is associated with Maryland Department of

13  Corrections that were housed by CCA in Leavenworth.

14     Q.   Would the county be Wyandotte?

15     A.   Yes.  Thank you.

16     Q.   Okay.  So looking at this call detail report, the

17  site listed is the default site, which you described as

18  United States Marshals Service population?

19     A.   Correct.

20     Q.   Skipping over to the dialed number, is that just

21  what it says?

22     A.   It is.  It's the number that the inmate called or

23  attempted to call.

24     Q.   Start time and end time?

25     A.   The start and end time of the call.

1    Q.  Let's talk about that for just a minute.  First

2  name and last name.  In this case it lists first name as

3  Wood, last name as Brenda.  Did that cause us some

4  problems?

5    A.  It did.

6    Q.  Can you describe those?

7    A.  If I recall correctly, you had-- your office had

8  issued a subpoena to us for Brenda Wood's call detail

9  reports.  And a search was conducted using first name

10  Brenda, last name Wood, and either generated no results

11  or very few results.  And we provided those to you.

12      And I believe you contacted me with some

13  information indicating you had evidence of other calls

14  that were completed.  And after an inquiry, I determined

15  that Ms. Wood existed two ways within Leavenworth, one

16  as first name Brenda, last name Wood; one as first name

17  Wood, last name Brenda.

18    Q.  The first name/last name, who enters that

19  originally?

20    A.  CCA.

21    Q.  So you were dependent in this context at least on

22  the accuracy of the information that CCA provides you?

23    A.  Correct.

24    Q.  All right.  Is that true in other contexts as

25  well?

1     A.   It is.

2     Q.   Can you give us a couple of examples?

3     A.   The one that springs immediately to mind is

4  information entered by CCA in connection with the

5  privatization of attorney numbers.  The system-- our

6  system is technologically advanced in many respects.

7  But when it comes to the procedural mechanism of

8  determining whether or not it should record a call, it

9  is dependent upon the information that is entered into

10 the system either directly by CCA or in some instances

11 provided to Securus to be entered into the system on

12 CCA's behalf.

13    Q.   If CCA enters the wrong phone number, for

14 example, to be privatized, do you have any way of

15 knowing that?

16    A.   No.  And, in fact, in the great majority of

17 instances-- let me back up slightly.  The call platform

18 is designed to be-- to have administrative

19 responsibilities distributed out to our facility

20 customers.  They want the ability to do things like

21 create user accounts, privatize numbers, make calls

22 free, block numbers, a variety of other things.  And so

23 we-- we give them the tools to do that and the training

24 necessary to accomplish what it is that they want to

25 accomplish.

1        And the great majority of those actions they can

2   do without informing Securus or it otherwise coming to

3   our attention.  The transactions are recorded within the

4   call platform, but we don't necessarily know.  And so

5   we-- to answer your question directly, we wouldn't

6   necessarily even know that they had privatized a number

7   at all, much less that it had been entered incorrectly.

8        And that's particularly true, excuse me, because

9   the decision as to what numbers should be privatized and

10  at what level, that's within CCA's sole discretion.  We

11  don't have the authority to do that.  We maintain the

12  list for them, but the list is theirs.  And so we

13  wouldn't even know that they got a request to privatize

14  a number, much less that they tried to do it, and much

15  less that it was done incorrectly.

16  Q.   Can you think of reasons that a number that had

17  been requested to be privatized would still be recorded

18  after that request?

19  A.   Yes.

20  Q.   And can you tell us those reasons?

21  A.   One would be, and I'm speaking in broad terms

22  here, general terms, across all our customer bases, it

23  could be a failure to comply with the request for

24  whatever reason.  It could be that the-- a person

25  attempted at the facility to enter the number and

1   entered it incorrectly inadvertently.  And Leavenworth

2   has an additional complicating factor, which I'm happy

3   to explain now if you like.

4       Q.  I think we'll get to that.

5       A.  Okay.

6       Q.  Were there-- what about delay in entering the

7   number?

8       A.  Absolutely delay.  I mean, if there is not an

9   efficient process at the facility level to get the-- to

10  get the request and process it within a short period of

11  time, then yes, that could be another reason.

12      Q.  Let's finish going through this example of a call

13  detail report.  Agency type, USMS?

14      A.  Agency type is a field that was used by CCA as

15  part of that kind of administrative segregation in the

16  computer sense of the various agency detainees they

17  have.  So because they designated Ms. Wood as a United

18  States Marshals Service inmate, it shows up in the

19  agency type field, and it also explains why the site is

20  the default level in the first column.

21      Q.  The call status column, can you tell us the

22  difference between complete and incomplete?

23      A.  It is simply that.  A completed call is one where

24  it reaches the point of positive acceptance by the

25  called party, who is then connected to the detainee.  An

1    incomplete call is a call that fails to reach that

2    stage, which could happen for a variety of reasons.

3        Q.   We've been defining some terms.  Can you define

4    the difference between positive acceptance and passive

5    acceptance?

6        A.   Sure.  Positive acceptance is by far the great

7    majority of configurations that we deploy, and that

8    simply means that it requires the called party to take

9    an affirmative action, to press a digit on his or her

10   keypad, after hearing the order admonishment and hearing

11   that it's a call from a detainee.  It's necessary to

12   complete the call.

13        We have it that way-- it's configured that way

14   largely because that's what our facility customers

15   require, but it also helps us an organization when it

16   comes to things like billing disputes.  If there's an

17   affirmative act to accept the call, that helps us.

18        Passive acceptance is used sparingly, in my

19   experience only usually in connections with repeated

20   failed calls to someone who is, for example, hard of

21   hearing.  And that will allow the call to be connected

22   without that affirmative step taking place by the called

23   party.

24        Q.   If a number is set to be free, in other words

25   there's no charge for that call, do you know whether

1   it's set to positive or passive acceptance?

2       A.   Can you repeat the question, please?

3       Q.   If a number is designated to be free, no charge

4   for that number, do you know whether it's set to be

5   positive or passive acceptance?

6       A.   I do not.

7       Q.   Okay.  If we go over a couple of more columns,

8   there's one that at the top says Priv, P-R-I-V.  What's

9   that column for?

10      A.   That column indicates that the number-- the

11  dialed number was designated as private at the facility

12  either for all inmates or for the inmate subpopulation,

13  the site that is placing the call.  And it further

14  indicates that the call was not recorded.

15      Q.   All right.  If a number is private, that call is

16  just not recorded.  Correct?

17      A.   Correct.

18      Q.   Okay.  If we go down to the third row, the call

19  was to (816) 835-1000.  In the private column, that

20  number was not marked private.  Correct?

21      A.   I see that.

22      Q.   Okay.  If we could flip over a couple of pages.

23  So a complete call detail report in this case was how

24  long?

25      A.   I'm sorry, I don't understand the question.

1    Q.   If we go to that last page.  I just pulled a
2    couple of sheets out of this, but in Ms. Wood's case it
3    was 597 pages?
4    A.   Oh.  Yes, I see that.
5    Q.   All right.  Let's look at the next exhibit which
6    is 572.  I talked about privatization.  Privatization
7    essentially means no record?
8    A.   Correct.
9    Q.   Does it have any other meaning?
10   A.   No.
11   Q.   Okay.  In 572, if we blow that up a little bit,
12   can you just describe what this represents?
13   A.   So this document is a limited excerpt from what I
14   would call a master privatization report that was
15   produced by Securus in the *Crane* and *Huff* matters.  And
16   this reflects the data that was captured by our system
17   that is associated by the transaction by which this
18   particular dialed telephone number represented in the
19   second column was made private on December 22nd of 2014
20   at about 8:22 in the morning.
21   Q.   So after this privatization on that call detail
22   report, that privatization column would have an "X" in
23   it for this number; is that right?
24   A.   It would regardless of the agency affiliation or
25   site level of the detainee placing the call.  And I say

1    that because, the way this report was generated, you see

2    the contract info in the center and then site name to

3    the right of it.

4        If the-- if the number was made private for

5    100 percent of the inmates at Leavenworth, that site

6    name would be blank.  If it was made private for a

7    limited inmate subpopulation, that site name would be

8    populated and it would tell us which subpopulation was

9    impacted.

10   Q.   This action, does it mean that just Ms. Wood's

11   calls to this number are not recorded or all calls to

12   that number are not recorded?

13   A.   All calls.

14   Q.   The user name, what does that signify to you?

15   A.   The most significant thing there is what follows

16   after the "@" sign.  The way our system is configured,

17   user accounts for Securus employees or user accounts

18   created by Securus at the request of somebody else may

19   have a secur.tx after the "@" sign.

20       Here it is a little bit hard for me to see, but

21   it's I think a seven-digit character-- or string of

22   characters that reflects the contract identifier for

23   this facility within our system.  And so that-- just

24   looking at that alone tells me that that is or was an

25   employee of CCA whose credentials were used to process

1    this transaction.

2        Q.   Let's look at Exhibit 573.  And while we're

3    pulling that up, you mentioned the *Crane-Johnson*

4    litigation.  The information that we're looking at here,

5    where did you pull that from?

6        A.   I would have to answer that in response to a

7    specific exhibit.  But the majority of the information

8    we provided in response to your subpoenas that related

9    to privatization history or recording access logs were

10   generated by pulling subsets from the larger versions of

11   those same documents that we had produced in the *Crane*

12   case.  And the smaller versions we pulled were those

13   that corresponded to the criteria either in your

14   subpoena or that we negotiated.

15   BY MS. BRANNON:

16       Q.   573, can you tell from that document where that

17   information was pulled?

18       A.   This information would've been produced from--

19   let me back up slightly.  In the *Crane* case and also in

20   the *Huff* case that's pending here, we produced a master

21   recording access log and a master privatization report

22   that reflected transactions associated with the numbers

23   contained in Special Master David Cohen's known attorney

24   telephone number list.

25            And in response-- as I suggested a moment ago, in

1  response to your subpoenas, we produced limited subsets

2  of that.  This document would've been generated from

3  that master recording access log that was filtered based

4  on criteria provided by you.

5           MS. BRANNON:  Your Honor, I think I

6  overlooked this, but we would ask for 573 to be under

7  seal.

8           MR. CLYMER:  No objection.

9           THE COURT:  573 admitted under seal.

10 BY MS. BRANNON:

11    Q.  If we flip over to the last page of this exhibit.

12 There are different ways you can run reports in your

13 system or run spreadsheets.  Right?

14    A.  Yes.

15    Q.  And in this case, if you look down to the

16 requested numbers, can you describe what criteria you

17 ran to produce this report?

18    A.  So this would've been-- we would've started with

19 all of Brenda Wood's transactions and then we would've

20 pulled out those that were related to calls to the four

21 numbers-- four numbers contained below the asterisk on

22 the bottom left corner at Page 7.

23    Q.  We will talk more about accessing in just a

24 minute.  But when you use the term "access," what does

25 that mean?

1    A.   It refers to any transaction or activity within

2  the call platform that involves access to a call

3  recording.

4    Q.   And when you look at this particular spreadsheet,

5  the second column, what does that tell you?

6    A.   The type of activity that was performed.

7    Q.   It shows that these calls were accessed?

8    A.   Oh, yes.

9    Q.   Okay.  If you look at the next to last column,

10  does that tell you who accessed the calls?

11    A.   It tells us whose user credentials were used in

12  connection with this-- these access events.

13    Q.   And the last column?

14    A.   The last column reflects the number to - boy, I'm

15  going to mess up my syntax here - that's the phone

16  number that was called that generated the recording that

17  was accessed, and that access event is reflected in this

18  document.

19    Q.   The information that Securus receives when calls

20  are being accessed, does Securus record in any way why

21  the calls are accessed?

22    A.   No.

23    Q.   Does it record in any way who originally asked

24  for the calls to be accessed?

25    A.   No.

1    Q.   All you know would be that that user account is
2  the one that was used to access Securus' call platform?
3    A.   That's correct, with one very minor exception
4  would be where in the event that a facility customer
5  contacted our technical support department and asked for
6  assistance in downloading calls, which happens from time
7  to time.
8        And as a general rule, who requested it and, at
9  least broadly speaking, the basis for a request; i.e.,
10  the facility received a subpoena, will be recorded by
11  help desk technicians in the ticket tracking system that
12  is used to record their activities.
13    Q.   How often does that happen?
14    A.   Very-- relatively infrequently.
15    Q.   Let's look at just a couple of quick exhibits.
16  551.  Do you know who Wayne Bigelow is?
17    A.   Not directly.  I know that he was employed in
18  some capacity by CCA and worked at the Leavenworth
19  Detention Center.
20    Q.   This exhibit has already been admitted.  Can you
21  tell us who Michael Kenyon is?
22    A.   Yes.  Michael Kenyon is an account manager at
23  Securus.  And during the time that CCA was a customer of
24  ours, he was CCA's account manager.  That was the sum
25  total of his responsibilities was to take care of the

1  CCA account.

2     Q.   In this case does it appear that Securus is

3  actually setting up a user account for Mr. Bigelow?

4     A.   Can I see the next page of the exhibit, please?

5     Q.   Sure.

6     A.   Yes.

7     Q.   And why would Securus be setting up an account

8  for Wayne Bigelow?

9     A.   As a courtesy in response to the question from

10  Kennith Lajiness, if I'm pronouncing his last name

11  correctly.

12     Q.   For a standard user account, can the facility

13  itself set up those accounts?

14     A.   Yes.   The facility has the ability-- they will

15  have an administrative-- administrator or super user

16  account that can be used to generate other user accounts

17  and define roles, responsibilities, things like that.

18  It's referred to as a security template.

19        As I sit here, it's not clear to me why

20  Mr. Lajiness would've been asking this of Michael

21  Kenyon.   It could be he didn't want to do it himself and

22  it's easier to send an e-mail to Michael Kenyon.

23     Q.   All right.

24     A.   It might be because the user account that

25  Mr. Kenyon is creating for Mr. Bigelow is that

 1   administrator level account, because I don't know if one

 2   administrator has the ability to create another

 3   administrator.

 4       Q.   If we go back to the first page, can you just

 5   tell us what date the user name was set up for

 6   Mr. Bigelow?

 7       A.   Yes.  Mr. Kenyon e-mailed the credentials to

 8   Mr. Lajiness with a copy to Mr. Bigelow on

 9   December 2nd-- excuse me, December 10th, 2015.

10       Q.   Let's look at Exhibit 550, please.  And can you

11   tell us what this exhibit represents?

12       A.   Yes.  This appears to be an e-mail from Michael

13   Kenyon to Wayne Bigelow on July 27th of 2016, and he is

14   conveying instructions to Mr. Bigelow on how to

15   privatize a number at Leavenworth for all inmates.

16       Q.   That's some seven months after Mr. Bigelow had

17   his user account set up?

18       A.   It appears to be the case, yes.

19       Q.   All right.

20       A.   Is this the whole page of the exhibit or is there

21   another one?

22       Q.   I'm not sure.

23       A.   I was just curious if it reflected when

24   Mr. Bigelow asked Mr. Kenyon to provide him with that

25   information, and it looks like it was on July 27th of

1    2016 and Mr. Kenyon responded the same day.

2        Q.    Very good.    In the course of talking with me, did

3    you provide me some screenshots?

4        A.    I did.

5        Q.    All right.    If we could look at 667, please.    And

6    you've already talked about facility level/site level.

7    If we go up to the very top of this, can you describe

8    what those drop-down categories are?

9        A.    I can, but I'd like to provide just a little bit

10   of context.

11       Q.    Sure.

12       A.    As I've discovered in the two-plus years that

13   I've been working on these issues, the terminology that

14   is used in this context suggests a degree of complexity

15   that doesn't exist, and it makes it hard to convey it

16   using the terms.

17            So I just want to talk about the privatization

18   process in broad terms.    And then as we go through this

19   exhibit, I think we'll have a chance to marry those up

20   to the specific terms.

21       Q.    Great.

22       A.    If I'm at CCA-Leavenworth and I want to privatize

23   a number, I would go to this page and-- I'm sorry, to

24   the next page and I am selecting-- I need to put that

25   number on a list.    And I have four lists to pick from.

1    Q.   All right.

2    A.   And the decision I-- well, once I pick a list,

3    all I need to do is type in the number, click the

4    "private" box and hit submit and the transaction is

5    complete and the system immediately recognizes that

6    number as a private one.

7         The important decision is which list I pick,

8    because there are four.  And the first one will make the

9    number private for the entire facility.  100 percent of

10   outbound calls, regardless of a detainee's agency

11   affiliation will not be recorded.  But there are three

12   smaller lists that are associated with the agency

13   subpopulations.

14        So there's a list for the whole facility, that's

15   the big one.  And then there's a list for marshal

16   service inmates, a list for county inmates, and a list

17   for Maryland DOC inmates.

18        And if the number is privatized-- entered only on

19   the marshals service list, for example, calls from

20   marshals service inmates to that number will not be

21   recorded, but calls from county inmates to that number

22   will be recorded, and calls from Maryland DOC inmates to

23   that number will be recorded.

24        And throughout kind of the course of this, folks

25   have looked at the data, including David Cohen,

1   attorneys in the-- plaintiff's attorneys in the *Crane*

2   case, and your office and have identified instances

3   where the number-- a call was recorded after a

4   privatization request was submitted and entered.

5         And I just want-- it's important I think from

6   Securus' perspective for you and the Court to understand

7   that the data we produced in the *Crane* case shows that

8   the system worked as designed and as instructed

9   100 percent of the time.  There is no example where a

10  number was privatized, for example, at the "all inmate"

11  list on January 1st, 2016, and calls were subsequently

12  recorded.  It worked as designed.

13        I think the issues that have come up have arisen

14  because, for whatever reason, CCA decided to make a

15  number private for only one inmate subpopulation, which

16  prevented those calls from being recorded, but then

17  there would be potentially instances where, for example,

18  a county inmate or a DOC inmate called the same number

19  and the call was recorded because the platform by

20  default at Leavenworth records all calls unless

21  Leavenworth tells it not to.  And absent an instruction

22  not to do it, it's going to do what it was originally

23  programmed to do, which is record all calls.

24    Q.  I send my number in to be privatized by CCA.  If

25  they don't choose from the drop-down, then that number

1    is privatized for all inmates.  Correct?

2        A.  Yes.  And if you go to the next page, I think it

3    will illustrate that point a little bit better.  So

4    after-- when you're navigating to the screen where you

5    want to privatize a number, this is the first page--

6    place that you land.  And you'll see at the left there's

7    a management level, and it shows Leavenworth Detention

8    Center, because that's the facility that I'm personally

9    operating in in this screenshot.  And then the site,

10   the-- the first box, the box that is present on the

11   screen when you get there is all sites, which is the all

12   inmate list.

13       Q.  So if you just leave that alone and don't do a

14   drop-down, then that number that I sent in would be

15   privatized for all inmates?

16       A.  Yes.

17       Q.  If I send my number in and the drop-down goes and

18   whoever is entering my number chooses, for example, the

19   Maryland inmates, that means only Maryland inmates'

20   calls would be not recorded, but all USMS inmates would

21   still be recorded?

22       A.  That's correct.

23       Q.  Okay.  And did you find that sort of error in

24   this litigation?

25       A.  I don't know that I know enough to characterize

1    it as an error, but certainly I have seen examples where

2    numbers were privatized for one of those named

3    subpopulations and calls were being made to the same

4    attorney number by other inmate populations for which

5    the number was not made private.

6       Q.   Is there anything else from this page that you--

7    we need to cover?

8       A.   No.

9       Q.   Okay.  And the next page, does that just show the

10   different sites that can be chosen?

11      A.   That's correct.  It's showing the-- the three

12   subpopulation sites that can be selected.  The only

13   other thing I would-- I would like to add here in

14   response to your preceding question, is if this entry

15   screen is used for things other than privatizing

16   numbers.

17           For example, if the facility wanted to make

18   numbers free, they would go in and do it here.  That can

19   also be used to block calls to a particular number at

20   the request of the called party.  And there's a few

21   other minor things, but those are-- it's used for more

22   than just privatizing calls.

23      Q.   So you've defined "facility."  You've defined

24   "site."  I think you mentioned "global list."

25      A.   Yes.

1    Q.   Could you again define what that means?

2    A.   Global list is a terrible misnomer and it gives

3  me headaches, because it suggests to a layperson that

4  the changes here are globally applicable.  And they are,

5  but only on a limited basis based on the population

6  that's selected.

7        What the global list does is it allows a facility

8  customer to make exceptions to otherwise generally

9  applicable rules.  So, for example, if the default is

10 "record," you would check "private" to make a call not

11 recorded.  If the default is "do not record," you would

12 check "record" to-- to make it recorded.

13       So the changes are globally applicable in the

14 sense that they apply to calls to that number, but

15 they're not universally applicable in terms of the

16 eligible inmate population.

17   Q.   I note that there's also a box that says

18 "active."  Can a number be deemed inactive?

19   A.   I do not know.

20   Q.   All right.  Can a number be deprivatized?

21   A.   Yes.

22   Q.   All right.  Let's-- is that the last page of this

23 exhibit?

24       All right.  Let's look at 568 and let's talk

25 about some actual instances of privatization.  You

1    received this subpoena from me?

2       A.   I did.

3       Q.   And I'm requesting privatization reports of

4    certain numbers, limited numbers.  Right?

5       A.   Yes.

6            MS. BRANNON:  And, Your Honor, for the

7    record, yesterday we filed a stipulation that identified

8    these numbers as the three primary numbers for our three

9    offices and our three (800) numbers.

10           THE COURT:  Yes.

11   BY MS. BRANNON:

12      Q.   So if we flip over a couple of pages and look to

13   the actual privatization log.  Let's go back to that

14   first page.  All right.  So if we look at that first

15   column and blow that up a little bit, let's just walk

16   kind of quickly through this.

17           The dialed number, is that the number to be

18   privatized?

19      A.   It is.

20      Q.   Modified field, what does that mean?

21      A.   That was captured in the preparation of this

22   report to demonstrate that that's what this report

23   reflects, our privatization transactions within the

24   various global lists, not other transactions.

25      Q.   The blank column "Before."

 1      A.  Is a null value.  It means that this number did

 2  not previously exist on the global list or had not

 3  previously-- yeah, that's correct.

 4      Q.  Okay.  "After" just means that it was actually

 5  privatized and that was the modification?

 6      A.  Correct.

 7      Q.  The date?

 8      A.  The date and time that the transaction occurred.

 9      Q.  So this would represent that that number was

10  privatized on October 14th, 2009?

11      A.  Correct.

12      Q.  Go over to site name.  What does that tell you

13  about the privatization in this case?

14      A.  That will tell the inmate subpopulation, if

15  applicable, for which this number was made private.

16      Q.  And in that case it was county?

17      A.  Correct.

18      Q.  Which means Wyandotte County inmates would have

19  private calls, but United States Marshals Service would

20  not?

21      A.  Correct.

22      Q.  And looking at this internal description, that

23  refers to Federal Public Defender numbers should be free

24  and not recorded as required by USMS?

25      A.  I see that.

1    Q.   Was this before your time at Securus?

2    A.   Oh, it was.  It was.

3    Q.   All right.  Let's drop down to the third row.

4  The 9828, for the record, is the main number at our

5  Topeka office.  When does it show that that number was

6  privatized?

7    A.   October 26th of 2011.

8    Q.   And the site that was privatized?

9    A.   The default site, which is applicable to United

10  States Marshals Service inmates.

11    Q.   So Wyandotte County inmates' calls to that number

12  would still be recorded?

13    A.   Yes.

14    Q.   Okay.  And we can see this on the callout.  The

15  next row references Jason Shidiskis, I don't know if I'm

16  saying that right.  Do you know who that is?

17    A.   Not directly, but-- I've never personally met

18  him, but Mr. Shidiskis is an employee of an entity

19  called Praeses, spelled P-R-A-E-S-E-S.  And Praeses is--

20  functions as-- the best way I can think to describe

21  them, as a third-party administrator for facilities who

22  have inmate telephone services.

23         They assist in things like preparation of

24  requests for a proposal, describing mandatory

25  requirements, evaluating responses.  And then they

1  generally assist in the administration of the account on

2  behalf of their customer, in this case CCA.

3       Q.   This is still addressing on this row the 9828

4  number was modified to private.  Why would there be a

5  subsequent modification to private?

6       A.   I wouldn't characterize it necessarily as a

7  modification, but rather a new privatization event

8  because we do have those four separate lists.  So the

9  first transaction we looked at is the transaction on the

10  default list.  The subsequent transaction, excuse me,

11  the site name field is blank, which tells us that this

12  was privatized for all inmates.  As to why Mr. Shidiskis

13  went in and did that at that time, I do not know.

14       Q.   So the change that would affect the 9828 number

15  is that all inmates at CCA, their calls would not be

16  recorded to that number?

17       A.   Correct.  The privatization would no longer be

18  limited to marshals service inmates.

19       Q.   All right.  Let's look at Exhibit 564.  This is

20  another subpoena from the FPD to you.  And in this we

21  asked for specifically - if we can go down a couple - a

22  call detail report to all of our numbers; is that right?

23       A.   I don't know that those are all of your numbers.

24       Q.   Fair enough.

25       A.   But certainly for all of the numbers that were

1    listed in your subpoena.

2       Q.  And your system allows you to run specific

3    numbers through to see when all of those numbers

4    would've been privatized?

5       A.  No.  The data exists within the platform.  It can

6    be extracted using a canned or pre-programmed reporting

7    functionality only on a limited basis.  It's very

8    difficult to do, for privatization events.  So it's

9    necessary to go in through the back end of the database

10   and obtain that data.

11      Q.  All right.  Let's look at 567.  And if we flip

12   over, there was an occasion that I asked for--

13          I'm sorry, I-- I missed something on 564.  If we

14   could go back to that.  So I was asking for call detail

15   reports to these numbers.  If we flip down to the call

16   detail report itself, what did this show?

17      A.  This appears to be an excerpt from one of the

18   call detail reports that we produced.  The data was

19   provided in Excel format, which it allows-- the

20   formatting can be manipulated.

21          So, for example, this has certain columns that

22   appear hidden.  It goes A, B, E, for example.  But this

23   reflects certain portions of the call detail report

24   associated with the numbers-- at least some of the

25   numbers in your subpoena.

1    Q.   If we look at row 22-- 22, and I'm sorry this is

2  so small.  But if we look at 22, CCA-Leavenworth is the

3  default.  Does that mean that inmate is a USMS?

4    A.   In row 22 or 23?

5    Q.   Let's look at 22 first.

6    A.   Okay.  Yes, that-- the default listing there

7  tells us that this was an inmate associated with the

8  marshal service by CCA.

9    Q.   The call was to 9828.  Correct?

10   A.   Yes.

11   Q.   It has the date and time?

12   A.   I see that.

13          THE COURT:  Can I ask something for

14  clarification?  I'm sorry.  So when-- so default

15  signifies only USMS inmates or does it signify all

16  inmates?

17          THE WITNESS:  Only United States Marshals

18  Service inmates, Your Honor.

19          THE COURT:  Okay.

20  BY MS. BRANNON:

21   Q.   If you look across this row, Mr. Davis' call to

22  the 9828 number, was that recorded?

23   A.   Yes.  There is no "X" in the private field, which

24  tells me that it was recorded.

25   Q.   If we look at row 23, the number to 6712, which

16-20032-JAR  USA v. Karl Carter (Black)  10.09.18          1399

1  is, for the record, our main number in Kansas City,

2  Raymond Hickman, when he dialed that number, even though

3  it was incomplete, was that call recorded?

4      A.  No.

5      Q.  If we go down to the next row to that same

6  number, 6712, on that same date by a different inmate,

7  the call was complete.  Was that call recorded?

8      A.  It was.

9      Q.  Can you explain why one call to our front desk

10  would be recorded and one would not on the same day?

11     A.  Because of the reasons we've previously

12  discussed.  The call reflected in row 22 was placed by

13  an inmate associated by CCA with county inmates, and

14  that call was marked as private.

15         The subsequent call was placed by an inmate

16  associated by CCA with the default, or United States

17  Marshals Service, and that call was recorded, which

18  tells me that this number could only have been

19  privatized at the county level and perhaps the Maryland

20  Department of Corrections level at the time it was made

21  and was not privatized at the default level.

22     Q.  The 6712 on that date was privatized for

23  Wyandotte County inmates but not for United States

24  Marshal inmates?

25     A.  Yes.

 1      Q.  Okay.  Thank you.

 2          SPECIAL MASTER COHEN:  Excuse me, I don't

 3   have the screen, so I'm not looking at what you're

 4   doing.  Are the two numbers that you just talked about

 5   going to the-- one was-- were they the same number?

 6          MS. BRANNON:  Yes.

 7          SPECIAL MASTER COHEN:  To the front desk?

 8          MS. BRANNON:  Yes.

 9          SPECIAL MASTER COHEN:  Exact same number on

10   the same day?

11          MS. BRANNON:  Yes.

12          THE COURT:  The number was (913) 551-6712.

13          MS. BRANNON:  Correct.

14   BY MS. BRANNON:

15      Q.  And, in fact, those two calls were less than an

16   hour apart.  Right?

17      A.  It appears that way, yes.

18      Q.  So if we look at the next exhibit, 567, after you

19   provided me with the call detail reports of the FPD

20   offices, FPD office numbers, I gave you a subpoena

21   asking for the call detail reports of three specific

22   people; is that right?

23      A.  Yes.

24      Q.  And for the record, these are all my clients, my

25   personal clients.  I have the names listed two different

1    ways.   Why is that?

2        A.   Based on what you told me, to avoid the

3    Brenda-Wood, Wood-Brenda situation we faced earlier in

4    the year.

5        Q.   I asked for call detail reports and the actual

6    call recordings; is that right?

7        A.   You did.

8        Q.   The actual call recordings are just that, it

9    would've been the substantive conversation between me

10   and that client if there was a substantive conversation?

11       A.   Yeah, it would've been audio of the conversation

12   between the called party and the receiving party.

13       Q.   In that instance, the calls to the 6712 that were

14   not privatized, do you know if there would've been a

15   preamble on those calls?

16       A.   Yes, the-- by preamble, do you mean the

17   admonishments?

18       Q.   Yes.

19       A.   Yes, the admonishment plays for all non-private

20   calls.

21       Q.   So the first call to the six-- the-- that one

22   number that was privatized would not have had the

23   admonishment, the one less than an hour later would've

24   had the admonishment?

25       A.   Yes.

1       Q.   All right.

2       A.   The difference between the two would be:  "This

3   call is subject to recording and monitoring," would've

4   been played for the non-private call but not the-- but

5   not for the private call.  I think the remainder of the

6   preamble would've been the same.  "This is a collect

7   call from an inmate at Leavenworth Detention Center."

8       Q.   All right.  Let's look over and see what you

9   discovered when you ran this request.  Did you find any

10  actual recordings?

11      A.   I don't recall.

12      Q.   Do you recall having a conversation with me about

13  when your-- when Securus actually purged recorded calls?

14      A.   Yes.  Yes, I do.  So, no, there were no call

15  recordings responsive to this subpoena.

16      Q.   Does that mean no call recordings ever existed?

17      A.   No.

18      Q.   What happened to those recordings?

19      A.   Securus retains call recordings for a period of

20  time that is specified in the contract with our

21  particular customer, and it can vary.  CCA's recording

22  retention period was five years.  And although purging

23  of calls was suspended in 2016 for certain internal

24  business reasons and had not resumed at the time a

25  litigation hold was put in place in connection with the

1  issues that came to light here, those call recordings

2  would have been purged from the system, at which point

3  they are irrevocably gone.

4      Q.  Available-- actual call recordings are available

5  for five years in this instance and not available after

6  that?

7      A.  That's correct.

8      Q.  Did you have other data that confirmed that the

9  calls were actually recorded?

10     A.  The CDR itself confirms that the call was

11  recorded by virtue of the values in Column T.  If the

12  private field is blank, the call was recorded.  If it is

13  "X"'ed, it is not.

14     Q.  And so looking at this, this is a call detail

15  report for those three clients.  Correct?

16     A.  Yes.

17     Q.  And it indicates that none of those calls were

18  privatized?

19     A.  That's correct.  None of those numbers were

20  private at the time the call was placed, or at least not

21  private at the default/United States Marshals Service

22  level.

23     Q.  If we look over-- the first column, site default,

24  all of these are marked as "default," meaning that they

25  are USMS clients?

1    A.   Meaning that CCA has designated them as such

2    within the platform.

3    Q.   And none of the United States Marshal Service

4    clients' calls to our offices were privatized?

5    A.   That's correct.   None of these numbers appear to

6    have been private at the time the calls were made.

7    Q.   That doesn't mean that those numbers-- well, let

8    me ask it this way:   Those numbers could've been

9    privatized as to the Maryland populus, for example?

10   A.   Maryland DOC or county inmates, yes.

11   Q.   Okay.   Let's look at the next page.   If you look

12   in-- the term "category," it requires positive

13   acceptance?

14   A.   Yes.

15   Q.   So that means we have to push a button to get the

16   call?

17   A.   Correct.

18   Q.   All right.   Let's talk about user access

19   accounts.   You defined "access" earlier.   Can you tell

20   us what you mean by "user access accounts"?

21   A.   I don't know that user access account is a term

22   that I would use.   Are you referring to user accounts?

23   Q.   Okay.

24   A.   So a user account would be an account created by

25   a facility for an authorized user of the platform, or

1    their-- their aspect of the platform.

2       Q.   And my confusion comes from a user account can

3    access calls on the Securus platform?

4       A.   If they have the appropriate privileges, yes.

5       Q.   If a user account is set up through CCA, can that

6    user access all calls on the Securus platform?

7       A.   No, only those associated with the-- with

8    CCA-Leavenworth.

9       Q.   So a user account set up at CCA, they couldn't

10   access federal detainees housed at Sedgwick County, for

11   example?

12      A.   No.

13      Q.   Okay.  You testified earlier that generally it is

14   the facility that sets up these user accounts.  Does

15   Securus limit the number of user accounts that a

16   facility can have?

17      A.   Not to my knowledge, no.

18      Q.   Do you set any sort of parameters or restrictions

19   on user accounts?

20      A.   User accounts created by facilities?

21      Q.   Uh-huh.

22      A.   We do not.

23      Q.   So a facility could create a user account for

24   anyone that facility chose to do so?

25      A.   Yes.

1      Q.   All right.  Let's look at Exhibit 594.  This was

2   previously admitted by Captain Schechter at Sedgwick

3   County.  This particular exhibit, was that generated

4   from the Securus platform?  Do you recognize that as

5   being generated from the Securus platform?

6      A.   I do.

7      Q.   Throughout this, when I've talked about a user

8   account showing up on access logs, I think you've

9   corrected me a couple of times that it's not necessarily

10  the person with that user account that's accessing the

11  logs; you can only tell that it's that user account?

12     A.   That's correct.  The credentials associated with

13  that user account.

14     Q.   So if someone had given their user account

15  credentials to someone else to access, there's no way

16  Securus would know that?

17     A.   No, although we strongly encourage them to be

18  responsible with their user accounts.  But, no, if they

19  had shared it, we would be unaware.

20     Q.   If you look over in the e-mail, those e-mails are

21  the e-mails associated with the user name?

22     A.   Those would be the e-mail addresses that were

23  entered at the time the-- this-- these user accounts

24  were created.

25     Q.   All right.  If we could go over another page.

1    MR. BELL:  I'm sorry?

2    MS. BRANNON:  One more page.  All right.  I

3  was just looking for something.  If I could have just a

4  moment, Your Honor?

5    THE COURT:  Yes.

6    MS. BRANNON:  And one more page, please,

7  Branden.  And one more, please.  Two more.  I'm trying

8  to get down to the Ms in the last name-- in the last

9  name column.  One more page.

10  BY MS. BRANNON:

11    Q.  All right.  I'm not finding it.  Let's go ahead

12  and switch to Exhibit 599.  So, Mr. Martin, when you

13  have a user account, can you run a report that says this

14  user accessed the Securus platform when and what they

15  obtained?

16    A.  I believe so.

17    Q.  You can run a report just for that particular

18  user account; is that right?

19    A.  Actually, I do not know that for sure.  Although

20  it appears from this document, if I'm looking at the

21  search criteria, those-- if the format here is similar

22  to other Securus reports that I'm familiar with, those

23  reflect the search criteria that was used to generate

24  this report.  And the format of this document tells me

25  that it is a pre-- pre-generated report, that is a

1    canned report.

2        Q.  Right.

3        A.  And so it looks like a report was run here for a

4    user with the last name O'Neal, all activity type, over

5    a specified date range.  So I would assume that that is

6    a standard reporting functionality.

7        Q.  All right.  Give me just one moment.

8            Securus doesn't control who has a user account,

9    but your record does show what user accounts were set up

10   for a particular facility.  Correct?

11       A.  Absolutely.

12       Q.  And that's why in that last exhibit Securus-- a

13   Securus report is run showing everyone who has a user

14   account through Sedgwick County?

15       A.  I'm assuming that that was the criteria used to

16   generate that report, yes.

17       Q.  All right.  Did you run a similar report for me

18   for CCA?

19       A.  Yes.

20       Q.  Okay.  Let's just go ahead and go to 569, please.

21   Is that the report?  Branden, if we could go to 569.

22       A.  Yes.

23       Q.  When we look at the-- when we compare the e-mails

24   to the user names for CCA, does it appear that almost

25   all of the users-- user accounts are CCA employees?

1    A.   Can you expand or zoom in on that column?  I

2   can't quite read it on the screen.

3    Q.   On the e-mail column?

4    A.   Yes.

5    Q.   David@specialmaster is listed; is that right?

6    A.   Correct.

7    Q.   There's one for Praeses.  Right?

8    A.   Correct.

9    Q.   And I think there's one for Securus, would that

10   be right?

11   A.   I don't see it on this page unless I'm missing

12   it, but I would not be surprised in the least to see

13   Michael Kenyon as having an account.

14   Q.   When a user account is set up, different users

15   have different authorities as shown by advanced user,

16   full access and so forth; is that right?

17   A.   That's correct.  The system, excuse me, includes

18   a variety of-- they're called security templates, that

19   are pre-generated consistent with what we found to be

20   the kind of user profiles that our customers require.

21   Those can be customized.

22        For example, Mr. Cohen's, he has a template

23   called Special Master.  I wager his is the only one of

24   those in our platform.  But, yes, it's very granular in

25   the types of privileges that can be granted to an

1   individual user either based on standard or custom

2   complex.

3       Q.   Right under Mr. Cohen's name is Matthew Collins,

4   and it says "full access"?

5       A.   I see that.

6       Q.   Would Mr. Collins be able to access the Securus

7   platform to get recorded phone calls?

8       A.   I don't know.  I don't know exactly what is meant

9   by "full access."  It's I think a reasonable conclusion

10   that that's the case, but I don't know for sure.

11       Q.   Let's switch over to some other documents that

12   you produced for our office.  Exhibit 566.  At some

13   point-- that last page, please.

14           At some point I asked for all recording access

15   logs made between 2010 and 2018.  Is that a lot of

16   documents?

17       A.   It is.

18       Q.   Okay.  Based on our conversations, what did you

19   initially provide me instead?

20       A.   I provided you-- I believe you provided me with a

21   list of FPD detainees at CCA-Leavenworth, and then I

22   identified for you those that had their call recordings

23   accessed.  You can tell from my tone of voice I'm not

24   100 percent confident in that answer.

25       Q.   You gave us a list of 1,600 names of people whose

 1  calls had been accessed.  Does that refresh your memory?

 2      A.  Yes, that's correct.  Yes.  Thank you.

 3      Q.  And after you provided that, did I send a smaller

 4  list of names back to you?

 5      A.  You did, in ten consecutive sets or batches.

 6      Q.  And for those names in those ten batches, what

 7  did you return to us?

 8      A.  We returned excerpts from the master recording

 9  access log produced by Securus in the *Crane* and *Huff*

10  litigations, excerpts that were associated with the

11  detainees identified by you in those ten lists.

12      Q.  For every name that we provided, you provided a

13  spreadsheet of calls accessed for that detainee?

14      A.  Correct.

15      Q.  All right.  Let's look at an example on Page 3 of

16  this exhibit.  If we could blow that up.

17          All right.  Name, William Mitchell.  Let's walk

18  across these columns.  Access time means what?

19      A.  The date and time at which this particular

20  recording was accessed.

21      Q.  Recording usage.  Tell us the categories of

22  recording usage available.

23      A.  There are four that I'm aware of.  Playback,

24  which is just that, someone listening to the call.  Save

25  to folder, which refers to the ability to save call

1    recordings to a folder within the call platform itself.

2    For example, if I am investigating-- conducting an

3    investigation associated with a particular court case, I

4    may have a folder with that court case name.  And when I

5    find calls of interest, I copy them into the folder.

6    That's usually, I'm guessing, done as an act either so

7    that you can find them again easier, more easily in the

8    future, or as an act prefatory to burning a CD.

9         Downloading is also an option, which I believe--

10   I believe it's downloading the call-- the call recording

11   on your local computer.

12   Q.   The first category you mentioned, call playback,

13   does that mean that a user can call directly-- or tap

14   directly into Securus' platform and listen to a call

15   without downloading it and burning it or saving it to a

16   folder?

17   A.   Yes.  A user with the appropriate credentials

18   could search for a call recording based on any number of

19   criteria and then listen to that call without taking any

20   other action.

21   Q.   The access to Mr. Mitchell's phone calls, it

22   shows both CD burning and save to folder.  Can it be

23   that a call-- one call was both burned to a CD and saved

24   to a folder?

25   A.   Yes.  In my experience, the two normally go

1    together, similar to what we see here where we have-- I

2    don't want to assume, but a lot of times you will see

3    ten transactions that are saved to a folder.  And then

4    following shortly thereafter in time, ten transactions

5    for the same calls for CD burning.

6        Q.  Every line of data does not represent a different

7    unique phone call?

8        A.  No.  Every line of data with the same recording

9    usage flag would represent the same phone call, but you

10   could have ten calls with CD burning, followed by the

11   same ten calls with saved to folder.

12       Q.  All right.  Let's look at-- well, you mentioned

13   this access time was 6-19 of 2013.  Let's flip over to

14   Page 4.  When we blow that up, we're still looking at

15   William Mitchell.  Right?

16       A.  Yes.

17       Q.  Go over another page, please, Branden.  All of

18   these 6-19-- all these calls were accessed on 6-19; is

19   that right?

20       A.  Yes, 6-19 of 2013.

21       Q.  It includes call start time, call end time.  The

22   user, what does the user tell you?

23       A.  That tells me who-- which user account's

24   credentials were used to access this call recording.

25       Q.  Last column, obvious, the number that was dialed?

1       A.   Correct.

2       Q.   And, therefore, the number that was recorded?

3       A.   Yes.

4       Q.   The call would not be listed on the access log if

5    it was not recorded?

6       A.   That's correct.  Recording access logs

7    transactions require an underlying recording to be

8    accessed.

9       Q.   All right.  Let's go through another couple of

10   pages.  Okay.  If we blow this page up.

11          If you look down towards the bottom of the page,

12   it shows access on April 2nd of 2014?

13      A.   I see that.

14      Q.   What does that represent?

15      A.   That tells me that on April 2nd of 2014, a

16   variety of calls here related to William Mitchell were

17   accessed by the M. Collins CCA user account.

18      Q.   Just walking through the mechanics, if you know,

19   when someone is accessing calls in this manner, how did

20   they gain access to the Securus platform?

21      A.   They would have to have appropriate credentials,

22   and then they would access-- they would log in.  And

23   then, presumably, they would-- the landing page for any

24   facility is the call detail report search page.  They

25   would have to input their criteria for whatever calls

1  they were looking for, and there's a variety of ways to

2  do it.  And then they would hit search, and that would

3  generate an on-screen call detail record.

4       And then from there, there are additional steps

5  that would need to be taken in order to do any of these

6  transactions.  I can't speak to what those are because I

7  do not have access-- my template does not give me access

8  to call recordings.

9  Q.  If we look at Exhibit 607, down to Page 7.  Okay.

10  This particular exhibit, can you explain what this is?

11  A.  This looks generally consistent with an-- an

12  automated e-mail that can be generated, I believe but am

13  not certain, through the download access event that

14  sends an e-mail to a recipient specified by the user,

15  which contains a link that can allow the user to

16  download a CD image, an ISO image of whatever calls were

17  selected by the user who initiated the e-mail.

18  Q.  Whoever receives this link can download those

19  calls from Securus?

20  A.  Yes, for a limited period of time.

21  Q.  When Mr. Hall at the top received this e-mail,

22  can he forward this e-mail to someone else who can then

23  use that link?

24  A.  I am certain that the e-mail could be forwarded.

25  I do not know if the system prevents access from someone

1   other than the e-mail's original recipient.

2       Q.   Let's flip over to Exhibit 486.  Generally, if a

3   request is submitted for all recorded-- you know, all

4   calls from a particular inmate without specifying any

5   numbers, what is then provided?

6       A.   Request is submitted to whom?

7       Q.   So all recorded calls for that inmate would be

8   available and provided.

9       A.   Are you talking about if Securus received a

10  request?

11      Q.   Yes.

12      A.   So, for example, yes, if we received a request

13  from your office that said you would like all calls

14  placed by Brenda Wood or Wood Brenda, then assuming we

15  intended to comply with the subpoena, we would provide

16  you with all call recordings that existed, as well as a

17  complete CDR for all calls within the specified time

18  period.

19      Q.   If we look at this particular e-mail, it says

20  something about purged phone number and asking

21  essentially to exclude calls to a certain number.

22  Securus can do that in producing phone calls; is that

23  right?

24      A.   Yes.

25      Q.   Does excluding a certain phone number mean that

1  that number is privatized going forward?

2    A.  Merely by the act of Securus excluding it from a

3  production?

4    Q.  Yes.

5    A.  No.

6            MS. BRANNON:  If I could have just one

7  moment, Your Honor.

8  BY MS. BRANNON:

9    Q.  Mr. Martin, let me clarify one thing.  If a

10  number is privatized, is a call to that number not

11  recorded at all, or is it recorded but unavailable in

12  any of the databases?

13    A.  It's actually a third option.

14    Q.  Okay.

15    A.  If a call is-- if a call is set to private, no

16  portion of the call that occurs post-connection is

17  recorded.  In some instances, the-- a recording will

18  automatically be generated of the admonitions or

19  messages that are playing to the inmate.  I tend to

20  refer to it as a stub recording.  And those are

21  generated also for incomplete calls.  And those

22  recordings will exist for a very limited period of time,

23  about 30 days is my understanding, before they are

24  automatically purged from the system.

25            But to answer I think the-- the thrust of your

1   question, if a call-- if an inmate calls a number set to

2   private, there is no recording of the conversation that

3   takes place, not a recording is generated that is

4   somehow unavailable.

5            MS. BRANNON:  Thank you, Mr. Martin.

6            THE WITNESS:  You're welcome.

7            SPECIAL MASTER COHEN:  Thank you, Judge.

8                    CROSS EXAMINATION

9   BY SPECIAL MASTER COHEN:

10    Q.  Hi, Josh.  We've had dozens of phone calls

11   together.

12    A.  We have.  It's nice to meet you in person.

13    Q.  Likewise.  Thank you.

14    A.  Sure.

15    Q.  And we usually refer to each other as David and

16   Josh, but today I guess I'll call you Mr. Martin.

17    A.  I understand, Mr. Cohen, and I will return the

18   courtesy.

19    Q.  Thank you.  So I want to go over just a little

20   bit of what Ms. Brannon discussed to make sure that I

21   understand it as well as clarify a few things.

22            First of all, there is a difference between a

23   number that is blocked and a number that is privatized.

24   Correct?

25    A.  Yes.  A number that is blocked is one that cannot

1  be called.

2     Q.  Okay.  So sometimes people have used the term

3  blocked, but privatized means the number can be called

4  but isn't recorded, as opposed to a number that is

5  blocked, which means the number cannot be called by the

6  inmate at all; is that right?

7     A.  Correct.  They're very different contexts.

8     Q.  Okay.  And at CCA, there were references by folks

9  who worked there and in e-mails and documents and so on

10  about numbers that were restricted or privileged, but

11  those are not terms that you use; is that right?  You

12  would use privatized?

13     A.  Yes.  I don't think I-- I certainly would not use

14  the term "privileged," if only because a number can be

15  privatized for any number of reasons, not necessarily

16  attorney numbers; clergy, medical professionals, things

17  like that.

18         Restricted in my mind has a general connotation,

19  not specific to CCA, of a number that, for example,

20  can't be called-- can only be called during certain

21  periods of the day or only on certain days.  But that

22  is, at least in my experience, a relatively limited

23  occurrence.

24     Q.  Okay.  And as far as you know, did CCA have the

25  ability to restrict a number in that way?

1    A.  I do not know.

2    Q.  Okay.  You-- you were looking at Exhibit-- I

3    think it was 524 with Ms. Brannon.  And there were two

4    numbers that were the same number but one was recorded

5    and one was not.  Do you recall that?

6    A.  I do.

7    Q.  It had to be the case for that to occur that that

8    number was privatized only for one of the sites and not

9    for the entire CCA facility; is that right?

10   A.  That's correct.  If a number has been privatized

11   at the "all inmate" level, then no call to it would've

12   been recorded, regardless of the site level.

13   Q.  And if the Federal Public Defender had requested

14   that that number be privatized - I don't know if this is

15   a question you can answer - would it have been fair for

16   them to assume that it would've been privatized for the

17   entire facility and not just certain sites?

18   A.  I would think that would depend on what sort of

19   information was conveyed to them about the scope of the

20   privatization by CCA.

21   Q.  If the Federal Public Defender believed that

22   having made a privatization request for a given number,

23   that it would be privatized for the entire facility and

24   not just certain sites, and then - as they did - they

25   received some calls from the facility where there was

1    the admonition and some calls from the facility where

2    there was no admonition, what-- what do you suppose

3    might've been a fair understanding then by the Federal

4    Public Defender, if you can answer that?

5              MR. CLYMER:  I'm going to object as both

6    speculative and beyond this witness' knowledge.

7              THE COURT:  I'll overrule.  You can answer

8    it if you can.

9              THE WITNESS:  If I, as a practicing

10   attorney, requested that my number be made private at a

11   facility and I received a call where the admonishment

12   played, I would assume that that call was being recorded

13   and I would contact the facility to obtain further

14   clarification and information.  That's just how I would

15   have responded, and that's really the only way I can

16   answer the question.

17   BY SPECIAL MASTER COHEN:

18   Q.  Okay.  There are attorneys who have testified

19   that they believed they privatized their number,

20   believed that having done so, all numbers from that

21   facility would not be recorded, nonetheless, got phone

22   calls with the admonition.  Do you think it would have

23   been an unfair conclusion by those attorneys that the

24   system just was sometimes-- sometimes played it and

25   sometimes didn't, the admonition, that it was

 1   inconsistent?

 2          MR. CLYMER:  Objection, speculate-- calls

 3   for speculation.

 4          THE COURT:  Overruled.  You can answer it if

 5   you can.

 6          THE WITNESS:  I would-- were I receiving

 7   that call, and that's the only way I can answer this

 8   question, I would've assumed that my number was not

 9   private for that call and that there was some other

10   issues that would've required further investigation on

11   my part.

12   BY SPECIAL MASTER COHEN:

13   Q.   Okay.  That's fair.  And, of course, you know

14   that there is the option of privatizing for less than

15   facility-wide sites?

16   A.   Yes.

17   Q.   You mentioned the admonishment.  Are you aware

18   that sometimes the admonishment is different depending

19   on, for example, whether the call is prepaid or collect?

20   A.   When I use the term "admonishment," I focus on

21   the portion of the admonishment that talks about the

22   call being recorded-- subject to recording and

23   monitored.

24          To my knowledge, that is consistent regardless of

25   the type of-- how the call is being paid for.  But the

1    portions that-- of the preamble, to use Ms. Brannon's

2    term, may be different depending on whether or not it's

3    a free call or a prepaid call.

4        Q.   Have you ever been in a facility and actually

5    used the Securus phones to call out to different

6    numbers?

7        A.   No.

8        Q.   I did and heard different admonishments,

9    depending on the number that I was calling.  Can you

10   explain that to me?

11       A.   I cannot.

12       Q.   Just so that I understand different facilities.

13   If I were to privatize my own phone number at Sedgwick

14   County, that has nothing to do with whether my number is

15   privatized at CCA; is that correct?

16       A.   That's correct.  Each facility maintains its own

17   list of private numbers.

18       Q.   And am I correct that Securus is no longer the

19   provider at CCA right now?

20       A.   That's correct.

21       Q.   Ms. Brannon asked you a question, I just want to

22   give you a concrete example.  And this is completely

23   hypothetical, I'm not saying this happened, but I just

24   want to know if it could happen.

25       A.   Understood.

1     Q.   So Ken Lajiness is a fellow who had an account at

2     CCA at one time.  Do you recall that name?

3     A.   The name is familiar to me, yes.

4     Q.   Okay.  And so he had access to phone calls.  If

5     he gave his security credentials to Joe Smith, Joe Smith

6     could use those credentials to do whatever it is Ken

7     Lajiness could do?

8     A.   That's correct.

9     Q.   And that would include, for example, if Ken

10    Lajiness could do it, monitoring phone calls or

11    downloading and-- downloading recordings of phone calls?

12    A.   Under the scenario you've just described, that's

13    correct.

14    Q.   If a phone number isn't marked private, it is

15    recorded; is that right?

16    A.   If the facility is set to record by default, yes.

17    Q.   And CCA was?

18    A.   CCA at Leavenworth was, yes.  I don't know about

19    other CCA facilities.

20    Q.   If a phone number is marked private after some

21    time, all of the previously recorded numbers [sic] are

22    still in the system, could be downloaded and listened

23    to; is that correct?

24    A.   Assuming the facility did not instruct Securus to

25    purge those calls, correct.

1    Q.   Are you aware of CCA having done anything like

2  that, asking Securus to purge calls?

3    A.   Not to my knowledge, no.

4         I'd like to clarify my previous answer.  The

5  better answer is I do not know.

6    Q.   Okay.   Thank you.

7         As I think you know, having read my reports, I

8  found examples of instances where a call that was-- a

9  call to a number that had been marked private was,

10 nonetheless, recorded and accessed, not merely recorded

11 but also accessed.  And I was speculating as to

12 different reasons that might've occurred.  One was, as

13 we just talked about, it was recorded before the number

14 was privatized.  That's one way that could've happened?

15   A.   That is one possibility.

16   Q.   Another is that the number had been marked

17 private for less than the entire facility, as we saw

18 with Ms. Brannon's example earlier; is that right?

19   A.   That is another possibility, yes.

20   Q.   Another possibility is that the private number

21 request that had gone to CCA was input incorrectly so

22 that even though the attorney had asked for calls to be

23 privatized, it simply didn't work because the number,

24 for example, was keyed in wrong.  Is that possible?

25   A.   That's possible.  The system can only react to

1    data with which it is provided.

2       Q.   Is another possibility that the list at CCA was

3    deleted somehow or modified?

4       A.   When you say "the list"?

5       Q.   I guess what I'm asking is whether the numbers

6    that had been privatized by CCA somehow got

7    unprivatized?

8       A.   To my knowledge, that could only occur based on

9    an affirmative act within the platform, i.e., a

10   deprivatization event.

11       The call processing platform exists in two

12   physically independent but redundant data centers.  And

13   I struggle to envision a scenario under which it would

14   be accidentally deleted due to a system error at both.

15   And the-- the number of people who would have the

16   ability to go into the system without leaving a trail

17   and do something like that, to my knowledge, is two.

18       Q.   Okay.  And I didn't mean to suggest something

19   that nefarious or that complicated.  I just meant that a

20   number could be deprivatized?

21       A.   Yes.  And a person could go into the applicable

22   list and find the number and untick the private box and

23   save it.

24       Q.   You mentioned an entity called Praeses?

25       A.   Yes, sir.

1    Q.   Can you explain to me what they are and how they

2    interacted with you and with CCA?

3    A.   I've had no direct interactions with Praeses

4    other than contract negotiations with them prior to my

5    current position with Securus.

6         My understanding, though, is they-- they assist

7    with kind of the things that I've described.  They will

8    help a customer of theirs prepare a bid for inmate

9    telephone service and then put that bid to market,

10   evaluate responses, negotiate the ensuing contract, and

11   then assist in the administration of the account on a

12   going-forward basis.

13        The examples of administration that I am most

14   familiar with would be in the contract space.  The

15   customer would like some new products or functionality,

16   and Praeses will assist them in negotiating an amendment

17   to their contract with us.

18        I assume they can also provide more direct

19   hands-on help.  I think we saw from one of the exhibits

20   we looked at earlier, Mr. Shidiskis at Praeses was

21   privatizing numbers, which tells me that-- I strongly

22   doubt he was doing that on his own.  Right?  So he was

23   apparently responding to a request from CCA for that

24   kind of assistance.

25   Q.   Okay.  So you're aware then that in this case,

1    Praeses was helping CCA do things like privatize numbers
2    on the Securus platform?
3        A.  I've seen at least one example of that, yes.
4        Q.  Do you know whether Praeses may have ever
5    deprivatized numbers on the Securus platform?
6        A.  I do not know.  I will say that the records we
7    have produced in the *Crane* litigation, the privatization
8    history reports showed no deprivatization transactions.
9        Q.  Okay.  You've described a very-- what I would
10   call a very sophisticated system with incredible
11   recording capacity and recording-- the ability for
12   people really around the country, if they have the right
13   credentials, I suppose anywhere in the world with a web
14   connection, to monitor and-- monitor calls live or to
15   obtain recordings of calls made between inmates and
16   whatever numbers they're calling; is that right?
17       A.  Generally, yes.
18       Q.  And some of the other services or capacities that
19   the Securus system have include, as I recall, an ability
20   for the system to notify, for example, a law enforcement
21   agent that an inmate is making a call so that it
22   actually can notify an agent that an inmate is making a
23   call.  On that agent's cell phone, he can connect and
24   listen to that call live.  Do I have that right?
25       A.  Yes.  That is a product functionality that's

1    referred to as covert alert.

2       Q.   Did CCA have that?

3       A.   No.

4       Q.   Did Sedgwick County have that?

5       A.   I do not know.

6       Q.   Do you know if any of the other jails which are

7    using the Securus platform in Kansas or Missouri have

8    that?

9       A.   I do not know.

10      Q.   And am I correct that there's also within the

11   Securus platform a voice recognition capacity?

12      A.   I would characterize it as a voice biometric

13   capacity that is used when-- and it's called

14   Investigator Pro.

15          When an inmate enrolls at a facility with an

16   IPro, as it's referred to, deployed, the system will

17   capture a voice print.  And that is used to validate the

18   identity of the inmate whose account and/or PIN number

19   is being used to place the call.

20          As you might imagine, PIN theft and account theft

21   or coercion occurs from time to time.  And so that is a

22   feature that would allow the-- the system to validate

23   that the person whose credentials are being used to

24   place the call is, in fact, the person who is placing

25   the call.

1      Q.   So if, for example, one inmate is using another

2  inmate's PIN, you can still tell which Inmate A-- the

3  Securus system using that biometric voice pattern can

4  tell usually that the-- who the inmate really is, not

5  maybe the one whose PIN has been borrowed?

6      A.   No, not to my knowledge.  It's a pass/fail test.

7  So when the inmate is using the-- putting in the other--

8  Inmate A is putting in Inmate B's credentials and then

9  he has to say his name, if the voice print doesn't

10  match, the call will not continue.

11      Q.   Understood.

12          During our tenure of talking together, you

13  actually got a promotion, as I recall?

14      A.   I did.

15      Q.   And that was partly because you were working so

16  hard and doing such a good job on this case; is that

17  right?

18      A.   I would like to think so, yes.

19      Q.   I'm happy for that.  Thank you very much.

20      A.   I appreciate it.

21                      CROSS EXAMINATION

22  BY MR. CLYMER:

23      Q.   Good morning, Mr. Martin.  How are you?

24      A.   I'm well, sir.  How are you?

25      Q.   Now, I haven't had the privilege like my

1   colleagues of speaking to you before, have I?

2       A.   No, you have not.

3       Q.   So if I mess up the terminology or get something

4   wrong, I'll just ask you to be a little patient with me.

5       A.   Absolutely.

6       Q.   Would it be-- is it accurate to say that the

7   services that your company provides to detention

8   facilities are essential for the operation of the

9   criminal justice system?

10      A.   Without question.

11      Q.   And on one hand, your company provides the

12  ability for inmates to speak with their attorneys while

13  they're incarcerated, which is necessary for them to be

14  effectively represented at trial; is that right?

15      A.   I don't know that I would agree with the second

16  part of it, the conclusion part it.  But on the first

17  part, yes.

18      Q.   The attorney could go visit them as well.

19  Correct?

20      A.   Yes.

21      Q.   So the use of the phones may not be essential,

22  but it's certainly an important component in effective

23  representation.  Correct?

24      A.   I would agree, generally so, yes.

25      Q.   And at the same time, people who are in detention

1    facilities often are in the facilities for good reason.

2    Correct?

3         A.  Yes.

4         Q.  And sometimes those people are dangerous to the

5    community?

6         A.  Yes.

7              MS. BRANNON:  Objection, speculative and I

8    think outside his knowledge.

9              THE COURT:  Overruled.  You can answer if

10   you can.

11   BY MR. CLYMER:

12        Q.  And there are known instances where people in

13   detention facilities try to have witnesses killed; is

14   that correct?

15        A.  I'm anecdotally familiar with those, yes.

16        Q.  And the covert alert system you described under

17   the right circumstance might save a witness' life.

18   Correct?

19        A.  Yes.

20        Q.  So the trick is to balance the inmates' interests

21   in having effective representation with the need for

22   effective law enforcement.  Right?

23        A.  Yes.  Without being glib, life is all about

24   tradeoffs, and we have to make the right compromises,

25   yes.

1    Q.   And in order to give inmates the ability to speak

2    to their attorneys privately, Securus has a

3    privatization function in its software.   Correct?

4    A.   Yes.

5    Q.   And based on everything you have learned during

6    the course of this litigation and the other litigation

7    you've been involved in, there's nothing to suggest that

8    the Securus privatization function is faulty in any way,

9    is there?

10   A.   Based on all the data that was produced by us in

11   the *Crane* case, I have found no instance where a call

12   that was set to private for the inmate that was placing

13   the call was recorded.

14   Q.   But Securus' platform can only be as good as the

15   data that's given to it.   Correct?

16   A.   Absolutely.

17   Q.   And so if the wrong phone number is submitted as

18   part of a privatization request, only that wrong phone

19   number will be privatized.   Correct?

20   A.   Yes.   The system only knows the ten digits, not

21   whether it's right or wrong.

22   Q.   And if the inmate-- if the subset of the inmate

23   population designated in a privatization request is

24   listed a certain way, that's what the platform does.

25   Correct?

1    A.   Yes.  It responds to the data with which it is

2   provided.

3    Q.   And if someone forgets to forward a privatization

4   request to Securus, that doesn't go into the Securus

5   platform either, does it?

6    A.   Generally speaking, we do not process

7   privatization requests.  So if someone failed to

8   internally forward it to the appropriate person in that

9   facility, that would cause a number not to be

10   privatized.  But by and large, privatization

11   transactions are handled by our facility customers.

12    Q.   If a phone-- if an attorney phone number is not

13   privatized for any particular reason, when the inmate

14   makes the call there is a warning on the call; is that

15   correct?

16    A.   There is a warning that the call is subject to

17   recording and monitoring, yes.

18    Q.   And if it's not-- if the call is not privatized,

19   that warning is on every such call used on the-- made on

20   the Securus platform.  Correct?

21    A.   Yes.

22    Q.   So that warning that the call is subject to

23   recording and monitoring gets heard by the caller every

24   time he makes that call.  Correct?

25    A.   To my knowledge, yes.

1    Q.   And it's heard by the recipient every time the

2    recipient receives that call.  Correct?

3    A.   To my knowledge, yes.

4    Q.   So every time this happens, both the caller and

5    the recipient is given notice that that particular call,

6    that specific call is subject to recording and

7    monitoring.  Correct?

8    A.   Yes.

9    Q.   And that alone puts someone on notice that

10   perhaps a privatization request was ineffective; is that

11   right?

12   A.   I can only speak to what my personal reaction

13   would be to hearing that admonishment after submitting a

14   privatization request, but that is absolutely how I

15   would take it.

16   Q.   You would take it as a suggestion-- or an

17   indication that the privatization request didn't work.

18   Correct?

19   A.   Yes.

20   Q.   Now, let's suppose you had two sets of inmate

21   populations calling you.  And for one set of inmate

22   calls you heard that warning, and for another set you

23   didn't hear that warning.  And that happened after you

24   submitted a privatization request.  In other words, that

25   difference between the two sets.

1   A.   Understood.

2   Q.   Would that give you additional notice that

3   something may have been wrong with that privatization

4   request?

5   A.   It would tell me that, for whatever reason, the

6   request had not been fulfilled for at least one of my

7   inmate clients.  And me personally, it would cause me to

8   follow up with the facility and, of course, not to

9   discuss anything substantive with my client on the call

10  at which I heard the admonishment.  And, frankly, I

11  probably, until I received additional assurances from

12  the facility, wouldn't have substantive discussions with

13  my clients even if I did not hear the admonishment.

14          MR. CLYMER:  I'll need a moment, Your Honor,

15  to find an exhibit.  Could I have Exhibit 564 put up,

16  please?  If you could flip down to the subpoena return,

17  I would appreciate it.  Go up just to the page where

18  Line 23 and 24 are located.  That's good.  Thank you

19  very much.

20  BY MR. CLYMER:

21  Q.   Can you see that screen, Mr. Martin?

22  A.   If we could zoom in on rows 23 and 24, I would

23  appreciate it.

24          MR. CLYMER:  I think he wants you to zoom in

25  if you could.

```
 1              THE WITNESS:  Thank you.  I can see it now.
 2    BY MR. CLYMER:
 3       Q.  Do you see those rows?
 4       A.  I do.
 5       Q.  And those are the rows, 23, 24, were the rows
 6    where the same phone number at the Public Defender's
 7    Office was privatized as to one-- excuse me, that may
 8    not be the right one.
 9              MR. CLYMER:  Could I have a moment, Your
10    Honor?
11              THE COURT:  Yes.
12              MR. CLYMER:  I'm sorry, could you go to
13    Page 6 of that exhibit?  Could you-- is that
14    Exhibit 564?
15              MR. BELL:  Yes.
16              MR. CLYMER:  Could you go to the one at the
17    bottom that says Page 1 of 199, please?  Thank you.
18    Now, could you go to Lines 23 and 24 of that page?
19              THE WITNESS:  That's-- that zoom level was
20    sufficient for me to be able to read it.
21    BY MR. CLYMER:
22       Q.  That's the exhibit that Ms. Brannon-- that's the
23    page of the exhibit Ms. Brannon showed you before; is
24    that correct?
25       A.  It is.
```

1    Q.   Okay.  And does that line indicate that, in fact,

2  in this case or in the call related to this case, the

3  Federal Public Defender's Office received both the

4  preamble with the warning on a non-privatized call and

5  the preamble without the monitoring and recording

6  warning on an unprivatized call?

7    A.   Yes.

8    Q.   To the same telephone number?

9    A.   Yes.

10   Q.   So over time, there may have been other calls to

11 the same number, both privatized and non-privatized

12 calls.  Correct?

13   A.   That's possible.

14   Q.   Okay.  Now, if a user of your service-- well,

15 strike that.

16        In addition to the warning that you talked about

17 about recording and monitoring, there's also a series of

18 choices a recipient has to make about whether to accept

19 the call or reject the call.  Correct?

20   A.   I don't know that I would characterize it as a

21 series of choices, but they would need to decide whether

22 or not they were going to accept or not accept the call.

23   Q.   And they-- so they actually have to press a

24 button and do something affirmative.  Correct?

25   A.   Yes.

1    Q.   So that suggests that every time that warning is

2    given, a human being has to hear it before the call can

3    be accepted; is that right?

4    A.   I would assume so, yes.

5    Q.   Because somebody has to press a button to

6    continue the process?

7    A.   Yes.

8    Q.   Now, if a user requests a call and the call has

9    that warning on it, is there anything on that call that

10   would notify the user who's requested the call that

11   there had been a privatization request with respect to

12   that number?

13   A.   By user, you're referring to user at CCA?

14   Q.   Yes.

15   A.   And they're-- they're listening to the recording

16   of the call?

17   Q.   Let me give you a better example.

18   A.   Please.

19   Q.   If an Assistant United States Attorney asks CCA

20   to get telephone calls made on a certain inmate's PIN

21   number--

22   A.   Okay.

23   Q.   -- and CCA makes the request and obtains those

24   calls and gives them to the Assistant U.S. Attorney, is

25   there anything on those calls that the Assistant U.S.

1    Attorney receives that tells the Assistant U.S. Attorney

2    that there's been a privatization request as to that

3    number?

4        A.   No.

5        Q.   Is there anything in the call detail records that

6    accompanies that request that tells the Assistant U.S.

7    Attorney that there's been an unsuccessful privatization

8    request as to that number?

9        A.   No.

10       Q.   So the only person who would have notice of the

11   failure of a privatization request would be the person

12   who made the request and then hears calls later with the

13   warning on it or the person at CCA who made the mistake;

14   is that correct?

15       A.   Yes.

16       Q.   And if the attorney told the inmate, I've had

17   your calls to me privatized, and the inmate subsequently

18   heard the warning, the inmate would have notice as well.

19   Correct?

20       A.   Potentially, yes.

21       Q.   If the warning played on the calls.  Correct?

22       A.   It's hard for me to answer that question

23   without-- without assessing the relative sophistication

24   of the inmates.

25       Q.   But if the privatization request failed, the

1    inmate would still hear that warning.  Correct?

2        A.  Yes.

3        Q.  Every single call.  Correct?

4        A.  Yes.  And were I detained or incarcerated and

5    calling my attorney and had previously submitted a

6    privatization request and not heard the admonishment for

7    a period of time and then began to hear the

8    admonishment, my personal reaction would be the same as

9    if I were in the attorney's shoes.  I would be

10   concerned, and I would assume that the call was-- that

11   the privatization was unsuccessful or had subsequently

12   failed.

13       Q.  I'm going to show you what's been marked as

14   Government Exhibit 38.  And I'll represent to you that

15   this is the Special Master's report regarding other

16   issues related to recordings at CCA-Leavenworth, Docket

17   No. 214 in this case.

18       A.  Understood.

19           MR. CLYMER:  Your Honor, I move 214 into

20   evidence.

21           THE COURT:  Exhibit 38 admitted.

22           MS. BRANNON:  It's already in the record.

23   BY MR. CLYMER:

24       Q.  If you look at the page I directed you to there,

25   could you tell us what page I pulled up?

1      A.   Page 19.

2      Q.   And on Page 19, is there a description by the

3   Special Master of the admonishment that is on the

4   recording at CCA-Leavenworth from Securus?

5      A.   There is.

6      Q.   And can you read the line that gives the inmate

7   and the attorney notice that the call is being monitored

8   and recorded?

9      A.   "This call is subject to recording and

10  monitoring."

11     Q.   And is that your understanding of the recording

12  that Securus puts on all unprivatized calls made by

13  inmates?

14     A.   The admonishment predates my time.  And so-- and

15  I, frankly, just haven't done the investigation to

16  understand quite how-- how frequently it is used, but

17  let me-- sorry, my answer is getting confused.

18          An admonishment plays for all non-private calls.

19  It is either this one, which I would characterize as the

20  standard or routine admonishment, or in the case of

21  certain facilities, it can be a custom admonishment

22  that, for example, provides guidance about contacting

23  the facility to request that a number be privatized.

24     Q.   Do you have any reason to believe that the

25  Special Master's characterization of the admonishment in

1   that exhibit is incorrect?

2       A.  I believe the Special Master has accurately

3   quoted the admonishment that played for calls from

4   CCA-Leavenworth for non-private calls.

5               MR. CLYMER:  May I have Exhibit 568 put on

6   the screen?  And if you could zoom in on-- if you go

7   back down to the page you were on, thank you, and zoom

8   in on that.  Actually zoom in on the last four columns.

9   Thank you.  Actually-- right there is good, where you

10  had it is fine.  Thank you.

11  BY MR. CLYMER:

12      Q.  I notice in the last column here--

13              MR. CLYMER:  Could you scroll up so we see

14  the heading on that column?  Thank you, counsel.

15  BY MR. CLYMER:

16      Q.  The last column here says "passive status."  And

17  sometimes there's an "N" in this column and sometimes

18  there's a "Y."  Can you explain to us what that means?

19      A.  I believe this is associated with the passive

20  acceptance option that's contained within the four lists

21  that we discussed earlier.  If it is an "N" for no, the

22  call requires positive acceptance.  If it is a yes, I

23  assume - but do not know for certain - that that means

24  the call can be completed without positive acceptance.

25      Q.  That means nobody would have to push a button on

1    the other end.  Correct?

2        A.  That's correct.

3        Q.  If that was the case and if these telephone

4    numbers that are listed here to the Public Defender's

5    Office on this Exhibit 568 were in passive status, does

6    that mean that a call on the Securus system that went to

7    voicemail would be listed as a completed call?

8        A.  Potentially.

9        Q.  Okay.  And can you tell us for these rows - where

10   the last column has a "Y" in it as in passive status -

11   the dates on which there was a change to the system, and

12   as of the date of that change, the system-- or that line

13   was in passive status?

14       A.  The data exists within the system.  There is no

15   easy way to get to it.  So as I sit here today, no, I

16   cannot.

17       Q.  If you look at the privatization data date--

18       A.  Yes.

19       Q.  -- that simply shows the date that the change to

20   privatization was made.  Correct?

21       A.  Yes.

22       Q.  So as a result of that date, would the system

23   have been in passive status or can we just not tell when

24   it was moved to passive status?

25       A.  I don't know what conclusion we can draw.

1    Q.   Thank you.  Now, the call detail records you

2    described before don't actually show who the inmate is

3    who makes the call, does it?

4    A.   It shows the name of the inmate whose account

5    number and PIN number were used to place the call.

6    Q.   But sometimes inmates will let other inmates use

7    their PIN number.  Correct?

8    A.   Anecdotally I'm aware of that occurring, yes.

9    Q.   And that's one of the reasons why you have the

10   biometric function that Mr. Cohen asked about.  Correct?

11   A.   Yes.

12   Q.   So for any particular call detail record, you

13   cannot tell from that-- any particular call who actually

14   initiated the call from the detention facility?

15   A.   No, we can only tell whose credentials were used.

16   Q.   And the call detail records show the telephone

17   number that the inmate called.  Correct?

18   A.   They do.

19   Q.   It doesn't show who answered the phone, does it?

20   A.   They do not.

21   Q.   And it doesn't show who was on the line during

22   the call, does it?

23   A.   It does not.

24   Q.   And it doesn't show for-- for numbers that are in

25   passive status whether the call just went straight to

1  voicemail, does it?

2      A.   No.

3      Q.   Only the content of the call, the recording

4  itself would provide that kind of information.  Correct?

5      A.   Yes.

6              MR. CLYMER:   Could we have Exhibit 563 up,

7  please?  If you could scroll down to the subpoena.  If

8  you could expand then the-- the data you have there.

9  Thank you.

10 BY MR. CLYMER:

11     Q.   I'd like to now direct your attention to

12 Exhibit 563, which you were shown before.  And of the

13 five calls reflected on the call detail record, one is

14 incomplete.  Do you see that?

15     A.   I do.

16     Q.   And the-- you testified before that a call would

17 be incomplete if it never connected.  Correct?

18     A.   Correct.

19     Q.   Would the recording still play on an incomplete

20 call?

21     A.   Would the recording still play?  Which recording?

22     Q.   The recording that has the warning in it and the

23 instructions about buttons to press.

24     A.   It would depend on how long the called party

25 remained on the line after first picking up.

1    Q.  If you could go over a couple columns to the

2    start and end time for that call, you'll see-- you see,

3    do you not, that the start time of that call appears to

4    have been 1:14 and 41 seconds on November 27, 2014.

5    Correct?

6    A.  I see that, yes.

7    Q.  And the end time is 1:16:17 on the same date.

8    Correct?

9    A.  I see that as well.

10   Q.  So that would suggest that that call lasted

11   roughly a minute-and-a-half.  Correct?

12   A.  That's a difficult question for me to answer

13   because the-- I'm not-- I don't know when the clock

14   starts ticking, in other words when the start time

15   begins.  If it begins when the inmate first takes the

16   handset out of the cradle and begins the dialing

17   process, that could account for some portion of that

18   time.

19   Q.  And the earlier the clock starts running, the

20   longer the call is going to be in terms of the-- based

21   on the call detail records, even if no one is talking to

22   each other.  Correct?

23   A.  Yeah, that's correct.

24   Q.  So a call that never connects here seems to have

25   lasted roughly a minute-and-a-half.  Correct?

1    A.   Well, it depends what you mean by "call."  If

2    we're describing that as the beginning-- at the moment

3    the inmate takes the handset off the hook, then that

4    answer would be correct.

5    Q.   This attempted call seemed to be recorded as

6    lasting roughly a minute-and-a-half in the Securus call

7    detail report.  Correct?

8    A.   Yes, subject to the caveat that I don't know the

9    actual event that begins the clock ticking.

10             THE COURT:  Mr. Clymer, if you're going to

11   be a few more minutes, let's take a break.

12             MR. CLYMER:  Thank you, Your Honor.  That

13   would be helpful.

14             THE COURT:  All right.  Let's take a break

15   for 15 minutes.

16             (Recess).

17             THE COURT:  All right.  You can be seated.

18             MR. CLYMER:  May I proceed, Your Honor?

19             THE COURT:  Yes.

20   BY MR. CLYMER:

21   Q.   Mr. Martin, during the time your company had the

22   contract with CCA-Leavenworth and an attorney wanted to

23   submit a privatization request, did the documentation

24   for that request go to CCA-Leavenworth or did it go to

25   Securus?

1    A.  It did not go to Securus.

2            MR. CLYMER:  Could I get that Exhibit 568 up

3    again?

4    BY MR. CLYMER:

5    Q.  I'm going to show you what's been marked as

6    Exhibit 568.

7            MR. CLYMER:  Bonnie, can we get the screen

8    on?

9            COURTROOM DEPUTY:  Before I was asked not to

10   have them on because they're sealed.

11           MR. CLYMER:  Oh, is this one sealed?  I'm

12   sorry, thank you.

13           THE COURT:  We do have a problem.  The

14   Special Master--

15           COURTROOM DEPUTY:  We have a monitor.

16           MS. VANBEBBER:  We have it.

17           THE COURT:  Now, but you didn't have it

18   before.  So you haven't seen any of these documents that

19   have been admitted under seal?

20           MS. VANBEBBER:  No, Your Honor, we have not

21   until the paper was delivered to us about half an hour

22   ago.

23           THE COURT:  All right.  I'm going to give

24   you leeway if you want to, Mr. Cohen, examine about the

25   documents since you weren't able to see them up until

1    now.  But go ahead and proceed.

2            So you've got it on your monitor, I have it.

3    You now have it on your monitor.  FPD have it on your

4    monitor.  All right.  Mr. Slinkard?

5            MR. SLINKARD:  Yes.

6            THE COURT:  Okay.

7            MR. CLYMER:  Thank you.

8            COURTROOM DEPUTY:  So don't publish it?

9            THE COURT:  Don't publish it.  Mr.

10   Guastello, are you able to see it?

11           MR. GUASTELLO:  I am, Your Honor.

12           THE COURT:  Okay.  Good.

13   BY MR. CLYMER:

14   Q.  Exhibit 568 is a document you already testified

15   about that shows in your system when privatization

16   requests were made to the system; is that right?

17   A.  It shows privatization transactions entered into

18   the system subject to the criteria-- the subpoena, which

19   this document was produced in response to.

20   Q.  And that would be Securus' record of the

21   privatization request; is that right?

22   A.  Of the privatization transactions, not

23   necessarily the request, yes.

24   Q.  The transaction, thank you.

25   A.  Yes.

1   Q.   If somebody deprivatized or unprivatized a

2   telephone number in the Securus system, would your

3   system also maintain a record of that transaction?

4   A.   It would.

5   Q.   And if you were served a subpoena for that

6   information, would you comply with the subpoena?

7   A.   Subject to a potential burden objection, which we

8   can discuss now or later, I mean, it's-- the issue is

9   the data exists within the system, but there is not a

10  reporting function-- standard reporting functionality

11  that allows it to be easily generated.  So it will take

12  some time and person hours to generate that report.

13  Q.   You're not aware, as you sit here right now, of

14  any deprivatization transactions, are you?

15  A.   No.  We produced the privatization-- master

16  privatization log in the *Crane* litigation, which was

17  reflected-- was based on transactions associated with

18  the numbers on Special Master Cohen's known attorney

19  telephone number list.  And of those transactions, there

20  were no deprivatization events.

21              MR. CLYMER:  Nothing further, Your Honor.

22                   REDIRECT EXAMINATION

23  BY MS. BRANNON:

24  Q.   Mr. Martin, does Securus have anything to do with

25  publishing privatization protocol?

1       A.   No.

2       Q.   Do you require your customers or facilities to

3    publish privatization protocol?

4       A.   Not to my knowledge.

5       Q.   Do you know whether CCA ever informed any

6    attorney that there was a difference in privatizing at

7    site levels?

8       A.   I do not know.

9       Q.   If we could look at Exhibit 550.  You looked at

10   this earlier, it was an e-mail to Mr. Bigelow.  If you

11   could go down one I think.  That.  Right.

12           These are instructions from Michael Kenyon to Mr.

13   Bigelow.  And the question was how to privatize.  Is

14   there anything in those instructions that talks about

15   different site levels?

16      A.   Not explicitly.

17      Q.   Is there anything implicitly that talks about

18   site levels?

19      A.   There is no specific instruction regarding

20   selecting a site level.  So were I interpreting this as

21   the recipient, I would take the path of least resistance

22   in terms of steps needed to complete the transaction,

23   which would result in it being privatized.  At the

24   facility level, that is the "all inmate."

25      Q.   Okay.  Let's break that down a little bit.

1   There's nothing in this e-mail that would tell Mr.

2   Bigelow what the differences were in the site levels.

3   Correct?

4       A.   That's correct.

5       Q.   And earlier you pointed out that on the drop-down

6   option-- if you just left that alone and didn't click

7   anything, it would privatize for the entire facility?

8       A.   That is correct.

9       Q.   And in order to choose one of the smaller sites,

10  you have to actually go in and choose that rather than

11  just passively-- or just pass it by?

12      A.   That's correct.  Selection of a site level

13  privatization transaction requires additional steps on

14  the part of the end user.

15      Q.   Is there anything in these instructions to Mr.

16  Bigelow that would tell him that if he just didn't

17  choose anything on the site level, that it would

18  privatize calls to all inmates?

19      A.   No.  This e-mail is silent on the distinction

20  between facility and site level privatization events.

21      Q.   You talked on cross examination about why a

22  number that had been requested to be privatized would

23  still be recorded.  And if we could look at Exhibit 548.

24  And I handed you this exhibit over the break to read

25  through.  Did you get a chance to do that?

1    A.  I did.

2    Q.  Okay.  And if we look at the last page of this,

3   just going up through the e-mail chain.  The first

4   e-mail I think on the next page-- I'm sorry, Branden,

5   one more.

6        This e-mail chain is about Mr. Bigelow having

7   entered numbers-- entered the wrong numbers; is that

8   right?

9    A.  Yes.

10    Q.  And is he asking Mr. Kenyon to fix that for him?

11    A.  In Mr. Bigelow's e-mail dated September 12th,

12   2016, at 11:52 a.m., it appears that he is asking Mr.

13   Michael Kenyon how-- quoting-- quote, "Now how do I

14   delete these-- those incorrect numbers?"

15    Q.  And this is in the context of privatization of

16   those numbers?

17    A.  Yes.

18    Q.  All right.  On cross examination you talked

19   somewhat about what your reaction would be to hearing

20   the admonition.  Now, let me start by asking you, Mr.

21   Martin, have you practiced criminal defense work before?

22    A.  No.

23    Q.  Have you ever represented someone who is locked

24   up in a facility?

25    A.  I have not.

1    Q.   And would it be fair to say that from your

2    position and experience over the last couple of years,

3    you would be particularly sensitive to what the preamble

4    or-- what was the word you used, admonition--

5    A.   Admonition.

6    Q.   -- what that says?

7    A.   Yes.   That is correct.   Although my initial

8    reaction as an individual, as the facts of this case

9    became known to me, you know, that hasn't changed.

10    Q.   To follow up on some of the hypotheticals that

11    the prosecutor posed to you.   If you were a defense

12    attorney and you had asked for your number to be

13    privatized and you had received confirmation from the

14    facility that your number had been privatized, would it

15    be reasonable to expect that call is not recorded, even

16    if there was an admonition that was played?

17    A.   From my perspective, if I heard the admonition, I

18    would assume that something was not working as I had

19    been told it was.

20    Q.   What if they followed up and asked again, is my

21    number privatized, and they received confirmation again

22    that it was privatized.   How many times would that

23    attorney need to go back to the facility?

24    A.   I can't answer that question.

25    Q.   Okay.   If he had received-- if the attorney had

1  received confirmation more than once that his number had

2  been privatized, would it be reasonable to believe that

3  the call was not recorded, despite the preamble?

4      A.  From my perspective, it would depend on my

5  relative interpretation of the credibility of the person

6  making those representations.

7      Q.  Would it depend at all on what the admonition

8  actually said?

9      A.  It might.

10     Q.  The admonition that Securus uses does not say

11  that this call will be recorded.  Right?

12     A.  It does not contain those exact words.  That's

13  correct.

14     Q.  It says that the call is subject to recording.

15  Right?

16     A.  Correct.

17     Q.  And you would agree that that's a lesser degree

18  of assurance-- of information about whether a call would

19  be recorded or not, that it's possible?

20     A.  Yes.

21     Q.  But subject to recording, it's possible that it

22  would be recorded.  So hearing that admonition, if an

23  attorney had been assured that his calls were not

24  recorded, would it be reasonable to assume that they

25  were not recorded, despite the preamble?

1    A.   I can only answer again from my perspective

2    putting myself in those shoes, and my first instinct

3    would be to protect my presumably less-sophisticated

4    detainee client and refrain from discussing anything

5    substantive on the call until I could reach a level of

6    assurance that the call was not being recorded.

7    Q.   Do you know what the preamble says in Spanish?

8    A.   I do not.

9    Q.   So if the Spanish version said the call may be

10   recorded, you would agree that that's an even lesser

11   degree of information about whether a call would be

12   recorded?

13   A.   I would agree that it creates at least a higher

14   amount of uncertainty.

15   Q.   If-- and you talked about the

16   lesser-sophisticated inmate.  If the

17   lesser-sophisticated inmate had been told by his

18   attorney that his calls to the attorney would not be

19   recorded, would it be reasonable for that

20   less-sophisticated inmate to rely on what his attorney

21   said, despite the preamble?

22   A.   Theoretically, yes.

23   Q.   And would that be especially true if he was-- the

24   preamble said that the call may be recorded?

25   A.   That would be a factor.

1    Q.  And still true if it said subject to recording?

2    A.  Yes.

3    Q.  If it said your call will be recorded, that might

4  be a direct contradiction?

5    A.  I agree that the statement "this call will be

6  recorded" is more definitive than "this call may be" or

7  "this call is subject to."  But all I can answer that

8  question with is how I believe I would react in those

9  circumstances, which I have never been in.

10    Q.  Do you know what information the inmate is given

11  about recorded calls in orientation when they arrive at

12  the facility?

13    A.  I believe I was present in the *Crane* case at a

14  deposition of CCA's corporate representatives where the

15  issue was discussed, but I do not recall with

16  specificity the information responsive to your question.

17    Q.  Do you remember-- do you know what information

18  the inmate may be given if they received a handbook?

19    A.  I do not.

20    Q.  Do you know if the inmate receives any

21  information at all about what the preamble means in

22  context of calling their attorney?

23    A.  I do not.

24    Q.  If we could look at-- well, yeah, Exhibit 563,

25  please.  The prosecutor asked you some questions about a

 1  call detail report.  If we'd look at this particular

 2  one.

 3       Going back and following up on hypotheticals.  If

 4  an Assistant U.S. Attorney knew a defense attorney's

 5  phone number, would it be possible to look at a call

 6  detail report and determine whether a call was to that

 7  number?

 8       A.  Yes.

 9       Q.  And you could do that without actually listening

10  to the call?

11       A.  Yes.

12       Q.  All right.  And if we look at Exhibit 573, you

13  were asked about the length of certain calls.  These are

14  all calls to the 1000 number.  Correct?

15       A.  That's what's reflected in the document, yes.

16            MS. BRANNON:  And, Your Honor, for the

17  record, the earlier testimony was that this was Mr.

18  Cox's phone number, Ms. Wood's attorney at the time.

19            THE COURT:  The record will so reflect.

20  BY MS. BRANNON:

21       Q.  Some of these calls are quite short, would you

22  agree?

23       A.  It appears that way, yes.

24       Q.  But some of them, like the fourth row down, 9:52

25  to 10:03?

1       A.   I see that, yes.

2       Q.   And that's minutes, not seconds.   Correct?

3       A.   Agreed.

4       Q.   Is there a time limit on these phone calls?   Do

5    they cut off at 15 minutes?

6       A.   Facilities generally have a time limit on calls.

7    And 15 minutes is, in my experience, the most commonly

8    applied time limit, but I do not know specifically what

9    was in place at Leavenworth.

10      Q.   Does passive status-- whether it's set at passive

11   status, does that have anything to do with whether a

12   call is recorded or not?

13      A.   It does not.

14      Q.   Does it have anything to do with whether a

15   preamble plays?

16      A.   To my knowledge it does not.

17              MS. BRANNON:   Nothing further.   Thank you.

18              THE COURT:   Go ahead.

19              SPECIAL MASTER COHEN:   Thank you, Judge.

20                      RECROSS EXAMINATION

21   BY SPECIAL MASTER COHEN:

22      Q.   There's one thing that just keeps confusing me I

23   don't understand.   To make a private number less

24   private, that is to make it private for a site only

25   instead of the entire facility, takes at least two

1  additional clicks by whoever it is that is privatizing

2  the number, as I understand it; is that right?

3     A.  That's consistent with my understanding, yes.

4     Q.  And you say that you haven't practiced criminal

5  law, but it's clear that you understand that an attorney

6  who wants to protect communications with his inmate

7  client probably wants to protect communications with all

8  of his inmate clients in the facility, not just one.

9  Right?

10    A.  I would agree.

11    Q.  So here's the thing that just confounds me.  Why

12 would a number ever be set by anybody for less than

13 fully private for the entire facility?  Why would that

14 ever occur?

15    A.  I can only answer as to Securus.  And were such a

16 request made to us by a facility customer, by

17 Leavenworth, we would comply with it because it's

18 their-- that's their list to control.  Why CCA would do

19 it, I do not know.

20    Q.  Right.  So your-- as the supplier of the system

21 to CCA, if they asked for that capacity, you would make

22 it available because you can.  Right?

23    A.  What do you mean by "that capacity"?

24    Q.  The capacity to make a number private for less

25 than the entire facility.  You would provide that

1  capacity if they wanted it?

2     A.   Yes.   And the capacity exists in this instance

3  not, to my knowledge, because they requested it, but

4  because it was a necessary by-product of the way they

5  requested that the inmates be segregated within the

6  platform by agency affiliation.

7     Q.   Is there any reason that you can think of that

8  defense counsel, criminal defense counsel, would know or

9  learn that their number is being privatized for less

10  than the entire facility?

11     A.   Only if they were informed by the facility.

12     Q.   It's not something they would expect, do you

13  think?

14     A.   If I had requested that my number be made private

15  at CCA-Leavenworth and I was told that it was done, I

16  would assume that it was done universally and not in

17  relation to a specific inmate subpopulation.

18        The only way I would think something otherwise

19  would be if CCA had a policy of allowing numbers to be

20  privatized only on an inmate-client-by-inmate-client

21  basis.

22     Q.   And if defense counsel makes a privatization

23  request and understands or believes that the number is

24  made private for the entire facility, and then still

25  hears a recording that says it may be subject to

1  recording-- excuse me, still hears an admonition that it

2  may be subject to recording, that's not inconsistent

3  entirely.  It might give them a heads-up that something

4  is off, but it's not inconsistent.  Would you agree?

5      A.  I don't know that I would agree.  All I can do in

6  answering these questions is speak to how I personally

7  as an individual attorney would've responded to hearing

8  that admonishment.  And my reaction would be the same as

9  that which I previously testified to, I would assume

10  that there was a problem with the privatization process,

11  and I would not discuss anything substantive with my

12  inmate client on that call.

13      Q.  Fair enough.  Mr. Clymer asked you about defense

14  counsel perhaps sometimes from some inmates getting

15  calls with the admonition and sometimes getting calls

16  from inmates without the admonition, and that that could

17  conceivably give them an understanding that there are

18  different populations in the facility.

19      A.  I recall those questions, although I didn't make

20  that mental jump to the conclusion that you just

21  described.

22      Q.  Okay.  That was probably in my own head.  But if

23  defense counsel could make that inference that there is

24  a reason that some inmates' calls are privatized to the

25  same number and some aren't, if defense counsel could

1  get wind of that, United States Attorneys could get wind

2  of that too, because they're actually getting the calls;

3  is that right?

4      A.  I can't answer that question.

5      Q.  You talked about sophistication.  I assume that

6  you meant that most inmates are probably not really very

7  sophisticated with regard to their own Sixth Amendment

8  rights.  Do you recall that?

9      A.  I-- I recall my characterization or reference to

10 the relative sophistication between an inmate client and

11 his attorney, but I don't know that I would extend it

12 that far to knowledge of Sixth Amendment rights.

13     Q.  Okay.  Is it fair to say that an attorney is

14 generally more sophisticated than an inmate client about

15 legal matters and specifically Sixth Amendment rights

16 and attorney-client communications?

17     A.  I would assume so, yes.

18     Q.  And that would include United States Attorneys?

19     A.  Yes.

20     Q.  You understand that the Securus platform is-- the

21 Securus platform allows inmates to call their attorneys,

22 that's one of the things it does?

23     A.  Correct.

24     Q.  As well as their friends and loved ones?

25     A.  That's right.

1    Q.   The fact that it allows them to communicate with

2    their attorneys has implications, you understand, for

3    the attorney-client privilege and the Sixth Amendment;

4    is that right?

5    A.   Generally, yes.

6    Q.   Those are constitutional rights.  Correct?

7    You're an attorney, you know that?

8    A.   I do know that.

9    Q.   So it's pretty important what we're talking

10   about.  We're talking about an inmate's Sixth Amendment

11   rights under the Constitution and his rights to have

12   attorney-client communications kept private.  Would you

13   agree that that's very important?

14   A.   I agree that the issues at play in this

15   proceeding are very important.  Yes.

16   Q.   And so making sure the system works correctly is

17   also important?

18   A.   In this capacity, yes.

19            SPECIAL MASTER COHEN:  Just a moment,

20   please.  Thank you, Mr. Martin.

21            THE WITNESS:  Thank you.

22                 RECROSS EXAMINATION

23   BY MR. CLYMER:

24   Q.   Mr. Martin, I want to ask you about something you

25   just said to Mr. Cohen about the different sites, that

1   you could designate inmates based on sites.

2        Does the division of inmates into different sites

3   have some function in the Securus platform other than to

4   designate privatization requests to-- privatization

5   transactions, excuse me?

6        A.   Yes, it does.

7        Q.   Can you explain that, please?

8        A.   Well, in one sense, the segregation of inmates in

9   the same physical facility into separate sites has

10  implications on reporting.  For example, it would allow

11  CCA to segregate out the number of calls placed by

12  inmates from marshal to county to DOC.  It would also

13  allow them to-- it has financial reporting functions as

14  well, because commissions are paid on calls.  And it's

15  my anecdotal understanding that in some instances CCA's

16  obligations with respect to its agency clients vary from

17  contract to contract and so-- in financial terms.  So

18  that may be an aspect as well.

19       In terms of the call platform itself, the primary

20  differences that I'm aware of, or implications, are

21  those associated with the settings that are contained

22  within the global lists that are applicable to each of

23  the three sites and as well as the facility.  There may

24  be other implications within the platform of which I am

25  unaware.

1    Q.   So the fact that the inmate pool at

2  CCA-Leavenworth is divided into three separate groups of

3  people, each subject to a different contract with a

4  different entity, has implications for the way the

5  Securus platform works; is that right?

6    A.   I would say that their directive to us to

7  segregate the three populations had implications on how

8  the platform works, yes.

9    Q.   Once you do that within the Securus platform,

10 does that drop-down menu that counsel asked you about

11 automatically populate with all three of the client

12 populations?

13   A.   I do not know.

14   Q.   So it's possible that nobody ever set that up for

15 that drop-down menu on that particular page where you

16 privatize a call, that just may happen automatically

17 because of the software code; is that right?

18   A.   I'm speculating, but yes, that is certainly

19 possible.

20   Q.   Mr. Cohen asked you about who would have notice

21 about there being the admonition on some calls and not

22 others.  Do you remember those questions?

23   A.   I do.

24   Q.   If a call is privatized, it has no admonition.

25 Correct?

1    A.   Correct.

2    Q.   If a call is not privatized, it does have the

3    admonition.  Correct?

4    A.   It does.

5    Q.   Privatized calls that don't have the admonition

6    never get accessed and sent out, though, do they?

7    A.   Those calls are not recorded, so there is nothing

8    to be accessed or sent out.

9    Q.   So a federal prosecutor getting a recording would

10   never hear a call that lacks the admonition; is that

11   correct?

12   A.   That's correct.

13   Q.   Only the person who's actually having the live

14   conversation with the inmate when the number has been

15   privatized will hear the warning with no admonition.

16   Correct?

17   A.   Yes.  Those would be the only people who would

18   hear the preamble without the admonition.

19            MR. CLYMER:  Nothing further.

20            THE COURT:  All right.  Anything more?  Oh,

21   go ahead.

22                    REDIRECT EXAMINATION

23   BY MS. BRANNON:

24   Q.   Mr. Martin, how much is Securus worth as a

25   company?

1     A.   I do not know the answer to that question.

2     Q.   Millions?

3     A.   I do know that we recently changed our equity

4  owners, and the valuation of the company in connection

5  with that transaction was north of a billion dollars,

6  but I don't know by how much.

7     Q.   Your company, Securus, is being sued in the

8  *Crane-Johnson* litigation over in the Western District of

9  Missouri; is that right?

10    A.   That's correct.

11    Q.   And you're being sued by defense lawyers.

12 Correct?

13    A.   Yes.  It is a class consisting of defense

14 lawyers.

15    Q.   Criminal defense lawyers who had clients at CCA?

16    A.   Correct.

17    Q.   And one of the allegations in that suit against

18 your company is that Securus recorded attorney-client

19 calls?

20    A.   Correct.

21    Q.   That Securus recorded attorney-client calls after

22 requests for privatization?

23    A.   I believe so.

24    Q.   And one of Securus' defenses rests on the playing

25 of the preamble that the defense attorney may have

 1   heard; is that right?

 2      A.   That is correct.

 3              MS. BRANNON:  Nothing further.

 4              THE COURT:  Anything more?

 5              SPECIAL MASTER COHEN:  No, Judge.  Thank

 6   you.

 7              MR. CLYMER:  No, Your Honor.

 8              THE COURT:  All right.  May this witness be

 9   excused?  Mr. Martin, you're excused.

10              MS. BRANNON:  Your Honor, we will call Wayne

11   Bigelow next.

12              MS. VANBEBBER:  Your Honor, while we're in

13   the middle of that, could I ask whether Defendant's

14   Exhibit 573 is under seal?

15              MS. BRANNON:  I think that's the one that I

16   asked to be under seal during the examination.

17              THE COURT:  It is under seal.

18              MS. VANBEBBER:  So if we were to examine

19   another witness under that, it would remain under seal.

20   Correct?

21              THE COURT:  Yeah.  The ones that have been

22   admitted under seal remain under seal.  As a practical

23   matter, witnesses have been examined about the ones

24   under seal, it's just they're not being published in

25   this open public courtroom.  But you can certainly

 1  utilize those exhibits in examining witnesses.

 2          MS. VANBEBBER:  So we will still have our--

 3  our equipment for the remainder of the witnesses?

 4          COURTROOM DEPUTY:  You'll have that the

 5  remainder of the trial or hearing.

 6          MS. VANBEBBER:  All right.  Thank you.

 7                  WAYNE LEE BIGELOW,

 8  called as a witness on behalf of the Federal Public

 9  Defender's Office, having first been duly sworn,

10  testified as follows:

11                  DIRECT EXAMINATION

12  BY MS. BRANNON:

13      Q.  Mr. Bigelow, thank you for coming again.  State

14  your name for the record, please.

15      A.  Wayne Lee Bigelow.

16      Q.  And where do you work?

17      A.  CoreCivic.

18      Q.  I want to ask you some very specific questions,

19  Mr. Bigelow, about the privatization process--

20      A.  Okay.

21      Q.  -- at CCA.  When a request is made for an

22  attorney's number to be privatized, sometimes you are

23  the one that actually privatizes that number; is that

24  right?

25      A.  No, not any longer.

 1       Q.   Okay.  Before did you do that?

 2       A.   I believe we did, yes.

 3       Q.   Who does it now?

 4       A.   Praeses.

 5       Q.   All right.  So Praeses is a company that you send

 6   those privatization requests out to?

 7       A.   That's correct.

 8       Q.   Okay.  Back when you were doing it and you were

 9   privatizing a number, do you remember the screen?

10           And I think if we could look at 667.  We could

11   zoom in on the very top of that, please, Branden.

12           Up at the top there was a site, it said "all

13   sites"?

14       A.   Yes.

15       Q.   When you were privatizing a number, how did you

16   determine what site to choose?

17       A.   Well, we had-- at some point we had inmates from

18   Wyandotte County, so they were in a-- in a different--

19   as I recall, in a different area.  And our U.S. Marshal

20   inmates were under the Leavenworth Detention Center.

21       Q.   And so you chose the site privatization based on

22   who was housing the inmates there?

23       A.   That's correct.

24       Q.   Did you ever house Wyandotte County inmates in

25   the same pods as U.S. Marshals Service people?

1    A.   No, ma'am.

2    Q.   Do you now?

3    A.   No, ma'am.

4    Q.   Were you aware of whether, for example, the FPD

5   might represent someone who's housed by Wyandotte County

6   as opposed to the U.S. Marshals Service?

7    A.   No.

8    Q.   Why did you not just leave it privatized at all

9   sites?

10   A.   I don't recall.

11   Q.   Did anybody ever give you any instruction on how

12  to choose the sites?

13   A.   No, ma'am.

14   Q.   If we could look at Exhibit 539.  Excuse me.  And

15  while we're pulling that up, do you know if CCA ever

16  told attorneys that there were different levels of sites

17  that could be privatized?

18   A.   I do not.

19   Q.   Do you know how CCA even communicated the

20  privatization protocol to attorneys?

21   A.   I do not.

22   Q.   All right.  If we look at the last page of this.

23  Is that your handwriting at the bottom?

24   A.   It is.

25   Q.   Okay.  And do you recognize this sheet?

1    A.  I do.

2    Q.  Okay.  If we could go up just one page, please,

3   Branden.

4        This is a letter from me to CCA.  Right?

5    A.  Yes, ma'am.

6    Q.  And did you understand that-- for me to be asking

7   for all of the numbers on the next page to be

8   privatized?

9    A.  Yes, ma'am.

10   Q.  Is there anything in there where I asked for

11  privatization at a certain site level?

12   A.  No, ma'am.

13   Q.  Do you remember what site level you chose when

14  you privatized the numbers on the next page?

15   A.  I do not.

16   Q.  And if we go up a page.  "All phone numbers

17  listed in your request have been restricted so they may

18  not be monitored or recorded as requested."  Do you say

19  anything in that response to me about site levels?

20   A.  I do not.

21   Q.  Do you say anything in there about what site

22  level you chose?

23   A.  No, ma'am.

24   Q.  Did you ever come back to me and ask if I had a

25  preference about site levels?

1    A.  I did not.

2    Q.  Do you know if you've ever done that with any

3  defense attorney when they've asked for a call to be--

4  or a number to be privatized?

5    A.  I have not.

6         MS. BRANNON:  If I could have just a minute,

7  Your Honor.  Thank you, Mr. Bigelow.

8                    CROSS EXAMINATION

9  BY MS. VANBEBBER:

10   Q.  Mr. Bigelow, did I understand you to say that if

11 you had a Wyandotte County inmate and his lawyer asked

12 for privatization, that arbitrarily would be the only

13 inmate who had privatized calls to that particular

14 attorney?

15   A.  No, ma'am.

16   Q.  That's not your testimony?

17   A.  No.

18   Q.  What if I say-- come to you and say, I've got a

19 client in Wyandotte County, I want my calls privatized,

20 that's what you'd do.  Right?

21   A.  Yes, ma'am.

22   Q.  Would you also tell him you're not going to get

23 any other calls privatized, just Wyandotte County?

24   A.  I would not, no.

25   Q.  So you wouldn't tell him anything at all?

1    A.   I'm not sure I understand.

2    Q.   If I have a Wyandotte County client, you've

3  explained what you would do.  What if I also have a

4  federal client at your institution at that same time,

5  would you tell me you're going to have to have a second

6  privatization or it won't get privatized?

7    A.   No, ma'am, I would not.

8    Q.   Why not?  Isn't that pretty important?

9    A.   Well, certainly.

10   Q.   Well, then why wouldn't you tell them?

11   A.   Well, if they're having it privatized for one

12  inmate, it would apply to all of them, if I understand

13  you correctly.

14   Q.   Are you saying if you privatized-- do you

15  understand yourself the-- the site differences?  Is it

16  your testimony that you believe that if you were

17  privatizing for Wyandotte County and you made the

18  checkmark on that site, that it would also privatize for

19  federal inmates?

20   A.   Yes.

21        MS. VANBEBBER:  No other questions.

22                  CROSS EXAMINATION

23  BY MR. CLYMER:

24   Q.   Mr. Bigelow, I'm going to direct your attention

25  to the last page of a document that's been marked as

 1  Exhibit 667.

 2        Could you zoom in on the drop-down menu for us?

 3  Thank you very much.

 4        And I'm going to ask you about this little

 5  drop-down menu.  Do you see that?

 6    A.  Uh-huh.

 7    Q.  Is that familiar to you, that little drop-down

 8  menu on that screen?

 9    A.  I-- I understand what it is, yes.

10    Q.  Do you recall using that particular drop-down

11  menu--

12    A.  I do not.

13    Q.  -- on that particular screen when you worked at

14  CCA?

15    A.  I do not, no.

16    Q.  You don't have any recollection of that?

17    A.  No.

18        MR. CLYMER:  Could we zoom into the whole

19  page again, Branden, appreciate it.

20  BY MR. CLYMER:

21    Q.  Do you recall seeing that larger screen that's

22  now up in front of you on the last page of Exhibit 667?

23    A.  Yes, sir.

24    Q.  So did you work with that screen when you got a

25  privatization request?

1      A.  Yes, sir.

2      Q.  Okay.  But you don't remember that little

3   drop-down menu I just showed you?

4      A.  I don't recall it, no, sir.

5      Q.  Okay.  Did you at the time you worked for

6   CCA-Leavenworth have any idea what the consequences

7   would be for choosing one of those options on that

8   drop-down menu rather than another option?

9      A.  No, sir.

10      Q.  When did you start doing this-- working with this

11   computer program, do you recall?

12      A.  It was probably February of 2016.

13      Q.  And who worked on it before you did?

14      A.  There was a gentleman named Ken Lajiness and

15   the-- the gentleman I replaced was Dane Hundley.

16      Q.  When you replaced Mr. Hundley, did anybody train

17   you about what the consequences of making a selection on

18   that particular drop-down menu would be, to the best of

19   your recollection?

20      A.  I don't recall ever having any specific training,

21   no.

22           MR. CLYMER:  No further questions.

23           MS. BRANNON:  Could I have just one moment,

24   Your Honor?

25           THE COURT:  Yes.

                    REDIRECT EXAMINATION

1

2   BY MS. BRANNON:

3      Q.  Mr. Bigelow, did Mr. Lajiness train you?

4      A.  He did.

5      Q.  And when you stopped doing this, it went to

6   Praeses, not anybody within CCA?

7      A.  That's correct.

8      Q.  If you look at Exhibit 649.  Do you know from

9   looking at this if that number would've been privatized

10  by CCA or would've been sent out to Praeses?

11     A.  I believe at that point we were still doing it.

12     Q.  All right.  So if we look at the second page of

13  this exhibit.  When an inmate was filling out a request

14  for privatization, at that time it would've been a-- you

15  who was still privatizing the numbers; is that right?

16     A.  I believe so, yes, ma'am.

17             MS. BRANNON:  All right.  Thank you.

18  Nothing further.

19             THE COURT:  All right.  May Mr. Bigelow be

20  excused?

21             MS. BRANNON:  Yes.

22             MS. VANBEBBER:  Yes.

23             MR. CLYMER:  No objection.

24             THE COURT:  You're excused.

25             THE WITNESS:  Thank you.

 1              MS. BRANNON:  Your Honor, we would call Nick

 2   Harris.

 3                    NICHOLAS HARRIS,

 4   called as a witness on behalf of the Federal Public

 5   Defender's Office, having first been duly sworn,

 6   testified as follows:

 7                    DIRECT EXAMINATION

 8   BY MS. BRANNON:

 9      Q.   Would you state your name for the record, please?

10      A.   Nicholas Harris.

11      Q.   And what do you do for a living, Mr. Harris?

12      A.   I'm a digital forensic analyst and software

13   developer.

14              THE COURT:  I'm sorry.  I'm having trouble

15   hearing you.  All right.  You can actually pull that

16   down to you, the top of it, the tip of it.  Yeah.

17              THE WITNESS:  Is that any better?

18              THE COURT:  Yes.

19   BY MS. BRANNON:

20      Q.   All right.  So tell me again what it is you do.

21      A.   I'm a digital forensic analyst and software

22   developer.

23      Q.   Who do you work for?

24      A.   Digital-Strata.

25      Q.   Can you just briefly tell me what your background

1   is that prepared you for your current job?

2       A.   Sure.   I studied computer information systems in

3   college.   I have a bachelor of science in that.   I spent

4   the last ten or, I'm sorry, more like nine working for

5   Digital-Strata both as a software developer and forensic

6   analyst.   In addition, I am EnCase certified as well as

7   GIAC certified in digital forensics.

8       Q.   You also work with e-discovery platforms and ESI?

9       A.   That's correct.

10      Q.   All right.   You are not a statistician?

11      A.   That is also correct.

12      Q.   All right.   Was your firm retained to work in

13  *Crane versus Johnson*?

14      A.   Yes.

15           MS. BRANNON:   And just to back up for a

16  minute.   Your Honor, we had previously admitted Mr.

17  Harris' CV as Exhibit 560.

18           THE COURT:   560?

19           MS. BRANNON:   560.

20  BY MS. BRANNON:

21      Q.   Tell me what your role in the *Crane-Johnson* case

22  is.

23      A.   So we were provided a number of data sources in

24  Excel format and I was tasked with essentially taking

25  that data and running some reports on it to put it into

1    a more digestible format for attorney use.

2        Q.   Are you an expert in that case?  Are you-- have

3    you been designated as an expert in that case?

4        A.   I don't believe so, no.

5        Q.   All right.  Your job was to take a lot of numbers

6    and try to make sense of it?

7        A.   Yeah.

8        Q.   All right.  What sources did you have of the

9    numbers you were looking at?  And I'm specifically

10   talking about attorney phone numbers and call detail

11   reports.

12       A.   I was given three data sources to begin with.

13   The first was the Special Master's list of attorney

14   phone numbers, and the other two were call data reports

15   from CoreCivic and one from Securus.

16       Q.   Recording the Securus call data, do you know what

17   the time frame was for that?

18       A.   Roughly 2011 to 2017.

19       Q.   And using these three sources of data, were you

20   asked to determine whether there were any calls to those

21   attorney numbers that were recorded?

22       A.   Yes.

23       Q.   And what did you determine?

24       A.   That a number of calls were, in fact, recorded.

25       Q.   Did you write a declaration for the *Crane*

1  litigation?

2     A.  Yes.

3     Q.  And was it dated May 24th of 2018?

4     A.  It was.

5     Q.  All right.  If we could look at Exhibit 561,

6  please.  What was the purpose of this declaration?

7     A.  I was asked a number of questions as far as

8  numbers of calls and various other reporting requests.

9  And this declaration was meant to put them all down and

10 report on them.

11    Q.  If we look at Paragraph No. 6 on your

12 declaration.  "Based on Securus data, 18,759 calls were

13 recorded to 567 known attorneys."  Can you just unpack

14 that for us a little bit?  How did you come to that

15 conclusion?

16    A.  Sure.  The Securus data has a column titled

17 "Recorded," which states either a call record was

18 recorded or not recorded.  The 18,759 calls were the

19 calls that were, in fact, marked recorded.  The 567

20 known attorneys taken from that data were the distinct

21 phone numbers found in that data set.

22    Q.  If we go down to exhibit-- or to Paragraph 12,

23 can you explain this paragraph in relation and in

24 comparison to Paragraph 6?

25         Let me ask you this:  The list of attorney

1   numbers that you had from the Special Master, did you

2   get additional attorney numbers?

3       A.   Yes.

4       Q.   All right.

5       A.   So this paragraph actually relates to

6   Paragraph 10.  I was provided additional bar directories

7   from Kansas, Nebraska, Iowa, Missouri and the KCMBA.

8   From these numbers, additional phone numbers, 13,315

9   additional phone calls were made to numbers that did not

10  appear on the Special Master list, of which 580 of them

11  were distinct phone numbers.

12      Q.   In your analysis that you just reviewed, you did

13  not limit your inquiry to Kansas attorneys?

14      A.   Correct.

15      Q.   And you didn't limit it to inmates who made calls

16  from CCA who were charged in the District of Kansas?

17      A.   Correct.

18      Q.   And at this point these numbers have nothing to

19  do with whether a number was privatized or not?

20      A.   That is correct.

21      Q.   Tell us your understanding of the word

22  "privatized" in this context.

23      A.   So I was provided with records explained to me to

24  be privatization records, which represented a date in

25  which a phone number was officially requested to not be

1   recorded.

2       Q.   And looking at Paragraph 19 and your analyzation

3   of these data sets, did you determine how many

4   attorney-- calls to attorneys were recorded after that

5   number had been privatized?

6       A.   Yes.

7       Q.   How many?

8       A.   So based on the records I had, 203 separate phone

9   calls to a number appearing on the Special Master list

10  were recorded after it had been requested to be

11  privatized.

12      Q.   Do you know whether you had access to all

13  privatization requests to CCA?

14      A.   I do not.

15      Q.   Okay.  And, I'm sorry, I just want to clarify

16  this.  The privatization records you were relying on, do

17  you know if that was information from Securus that

18  verified a number had been privatized or whether this

19  included just requests for privatization, if you know?

20      A.   I actually don't know.

21      Q.   All right.  I asked you about a-- a particular

22  inmate, Greg Rapp; is that right?

23      A.   Yes.

24      Q.   And did you look up information on Greg Rapp?

25      A.   I did.

 1      Q.   I gave you a particular phone number.

 2           MS. BRANNON:  And, Your Honor, this is in

 3   relation to Exhibit 649, which has already been

 4   admitted.

 5   BY MS. BRANNON:

 6      Q.   I gave you the phone number (816) 521-8249.  Did

 7   you run that number for me in your data set?

 8      A.   Yes, I did.

 9      Q.   And did you find any calls to that number

10   recorded?

11      A.   Yes.

12      Q.   Did you find numbers to that call recorded after

13   December 15th of 2016?

14      A.   Yes.

15      Q.   How many?

16      A.   Seven.

17      Q.   In your review of all of this data, did you also

18   find calls to Federal Public Defenders that were

19   recorded?

20      A.   Yes.

21      Q.   That analysis was not limited to the Kansas

22   Federal Public Defender; is that right?

23      A.   I believe so, yes.

24      Q.   Let me ask the question a different way.  Do you

25   remember finding calls to the Federal Public Defender

1    that were, in fact, recorded?

2      A.   Yes.

3      Q.   Did you calculate the exact number of calls to

4    the Kansas Federal Defender that were recorded, if you

5    remember?

6      A.   I don't remember off the top of my head.

7      Q.   Okay.  Is there anything-- let me ask it this

8    way:  Your analysis did not look at what happened to

9    those recorded calls later.  In other words, whether

10   they were accessed or how they were used after they were

11   recorded?

12     A.   That's correct.

13     Q.   You stopped at the fact that they were recorded

14   and may have been privatized?

15     A.   Yes.

16     Q.   Okay.

17              MS. BRANNON:  Thank you, Mr. Harris.

18              MS. VANBEBBER:  No questions.

19                   CROSS EXAMINATION

20   BY MR. CLYMER:

21     Q.   Mr. Harris, you said you worked with three data

22   sets; is that right?

23     A.   Correct.

24     Q.   And one of the data sets was a list of attorneys

25   that the-- strike that.  Was a list of attorney

1    telephone numbers that the Special Master compiled.

2    Correct?

3         A.   Correct.

4         Q.   Did you ever go back and cross-check to be sure

5    that all those numbers were, in fact, attorney phone

6    numbers?

7         A.   I did not.

8         Q.   You assumed he got it.  Right?

9         A.   Yes.

10        Q.   But you also looked at a broader swath of

11   geographical territory and eventually added other

12   attorney telephone numbers to a data set.  Correct?

13        A.   Correct.

14        Q.   So you had a larger data set of presumably known

15   attorney numbers than the Special Master had?

16        A.   Correct.

17        Q.   You also said you got a data set or you were

18   asked about a data set from CoreCivic.  What was the

19   CoreCivic data set, what did it consist of?

20        A.   Call records.

21        Q.   Was it call detail records?

22        A.   I believe so.

23        Q.   Was that a computer-generated list or was it

24   paper-- individual paper copies regarding calls?

25        A.   The list that I was given was in Excel format, so

1   a computer file.

2       Q.   And do you know who generated it and under what

3   circumstances?

4       A.   I do not.

5       Q.   Do you remember what the data was?

6       A.   Call records.

7       Q.   Do you recall what the call records represented?

8       A.   Telephone calls.

9       Q.   Do you recall whose telephone calls to whom?

10      A.   I believe they're from clients to attorneys-- or

11  rather detainees to attorneys.

12      Q.   Do you know that for a fact or are you guessing?

13      A.   It's what was represented to me.

14      Q.   So you didn't know for certain, somebody just

15  represented to you this is what this data set is?

16      A.   Yep.

17      Q.   To you it was just a bunch of entries on a Excel

18  spreadsheet.  Correct?

19      A.   Correct.

20      Q.   And what was the data set from Securus you

21  obtained?

22      A.   It was also call records.

23      Q.   And your-- you were given tasks to kind of crunch

24  those numbers.  Right?

25      A.   Yes right.

1    Q.  Now, I wanted to direct your attention back to

2  your-- your declaration.

3            MR. CLYMER:  Could I get Page 1 of 561 up?

4            MR. BELL:  I'm sorry?

5            MR. CLYMER:  Page 1 of 561.

6  BY MR. CLYMER:

7    Q.  Is that-- do you have that in front of you on the

8  screen now?

9    A.  Yes.

10   Q.  And I want to ask you to look again to

11  Paragraph 6 where you describe the number of calls

12  placed to 567 known attorneys appearing on the Special

13  Master list.  Do you see that?

14   A.  I do.

15   Q.  Now, when you made that statement in your

16  declaration, you did not mean to say, did you, that

17  those were calls in which an attorney was on one end of

18  the line?

19   A.  I have no opinion either way.

20   Q.  You have no idea, do you?

21   A.  I don't.

22   Q.  All you know is that those calls were placed not

23  to known attorneys but to known attorneys' telephone

24  numbers; is that right?

25   A.  That would be fair.

1      Q.  And in Paragraph 7, again, when you refer to

2  number of calls placed to known attorneys, what you mean

3  is known attorney telephone numbers.  Correct?

4      A.  Correct.

5      Q.  You don't know if somebody answered the phone

6  at-- when the call was made, do you?

7      A.  I don't.

8      Q.  You don't know who answered the phone.  Correct?

9      A.  Correct.

10      Q.  You don't know if an attorney ever got on the

11  phone?

12      A.  Correct.

13      Q.  And you certainly don't know what was discussed

14  when that call was made?

15      A.  Correct.

16      Q.  Now, you were also-- your attention was also

17  directed to Paragraph 12.  And here you refer to 13-- a

18  large number of additional phone calls were made to

19  numbers that did not appear on the Special Master list.

20  And, in fact, that's what you were working with, right,

21  was attorney numbers, not attorneys themselves.

22  Correct?

23      A.  Correct.

24      Q.  You were asked questions about things that were

25  done after privatization requests were made.  Do you

1    recall that testimony?

2        A.   Yes.

3        Q.   Did you ever see the actual paper copies of the

4    privatization requests or were you only working from

5    spreadsheets that people had given you?

6        A.   I was working from spreadsheets.

7        Q.   So you don't know anything about the accuracy of

8    any of those spreadsheets?

9        A.   I don't.

10            MR. CLYMER:   Could I get Exhibit 649 up,

11   please?

12   BY MR. CLYMER:

13       Q.   I'm going to direct your attention to

14   Exhibit 649, which was that privatization request that

15   Ms. Brannon showed you regarding an inmate named Gregory

16   Rapp.

17       A.   Okay.

18       Q.   Did you work with this document as part of the

19   analysis you did?

20       A.   Not during my initial analysis, no.

21       Q.   And that's a-- as you understand, that to be a

22   request made to have a certain attorney's telephone

23   number privatized; is that correct?

24       A.   I believe so, yeah.

25       Q.   And what's the date on that?

1      A.   12-13-2016.

2      Q.   So December 13th, 2016.  Correct?

3      A.   Correct.

4      Q.   I'm going to show you what's been marked as

5  Exhibit 34A.

6           MR. CLYMER:  And, Your Honor, I neglected to

7  move this into evidence, but there was a stipulation to

8  its admissibility.  I move it into evidence at this

9  time.

10          THE COURT:  34A admitted.

11  BY MR. CLYMER:

12     Q.   I'm going to show you Exhibit 34A.  Would it be

13  accurate to say you've never seen Exhibit 34A before?

14     A.   Yes.

15     Q.   Okay.  If you take-- just take your time and read

16  34A and let me know when you're done reading it.

17     A.   Okay.

18     Q.   Would it be correct to say that Exhibit 34A is an

19  e-mail chain involving - at least for everything but the

20  top line - an attorney named Rick Johnson and an

21  Assistant U.S. Attorney named Erin Tomasic?

22     A.   It certainly looks that way.

23     Q.   And would it be correct to say that on

24  January 22nd, 2016, Tomasic notified attorney Rick

25  Johnson that there were some phone calls between Rapp

1    and Johnson that were intercepted and provided to the

2    government?

3        A.   From my first reading, yeah, that is what it

4    appears to be.

5        Q.   And the attorney, Rick Johnson, is the same

6    attorney who appears to have submitted the privatization

7    request in 649, Exhibit 649.  Correct?

8               MS. BRANNON:  Judge, if I may.  I think the

9    record reflects that Mr. Rapp himself submitted this

10   request for privatization, not Mr. Johnson.

11              MR. CLYMER:  Thank you.

12   BY MR. CLYMER:

13       Q.   Does it appear Mr. Rapp submitted this

14   privatization request on 649?

15       A.   I see his name on the privatization request, so I

16   would assume so.

17       Q.   And he's the same person whose jail calls are

18   being referred to in 34A.  Correct?

19       A.   I couldn't tell you one way or another.

20       Q.   If you look at the-- the initial e-mail in the

21   chain that starts, "On January 22nd, 2016, 5:44, Tomasic

22   Erin, wrote," do you see that, kind of in the middle?

23       A.   Yeah.

24       Q.   Okay.  And if you look down a little bit, do you

25   see "in the course of transmitting Rapp's jail calls"?

 1     A.   Yeah, I see that.

 2     Q.   That's the same last name as is on the

 3 privatization request in 649.  Correct?

 4     A.   It appears that way, yes.

 5     Q.   So does it appear from Exhibit 34A that the

 6 government notified Mr. Johnson, the defense attorney,

 7 about Rapp's calls being recorded in January of 2016,

 8 well before Rapp submitted a privatization request?

 9     A.   According to this e-mail, it appears that

10 somebody named Rapp was alerted about it.

11     Q.   Well, actually, Mr. Johnson was alerted about it.

12 Correct?

13     A.   Oh, okay, yeah.

14     Q.   Correct?

15     A.   I believe so.

16          MR. CLYMER:  Nothing further, Your Honor.

17                REDIRECT EXAMINATION

18 BY MS. BRANNON:

19     Q.   Mr. Harris, looking at the first page of this

20 exhibit, the date on that you would agree is

21 December 15th, 2016?

22     A.   Yes.

23     Q.   And my question to you was how many calls were

24 recorded to that number after December 15th of 2016.

25 Right?

1       A.  Correct.

2       Q.  And what was your answer?

3       A.  Seven.

4       Q.  You were asked about CoreCivic data.  The

5   CoreCivic data that was provided to you, did that

6   indicate whether calls were recorded or not?

7       A.  It did not.

8       Q.  And is that why you relied on Securus data?

9       A.  Correct.

10      Q.  Your analysis was limited to calls that were

11  completed.  Right?

12      A.  I believe so.

13      Q.  Okay.

14          MS. BRANNON:  Thank you.

15          MS. VANBEBBER:  No questions.

16          MR. CLYMER:  Nothing further, Your Honor.

17          THE COURT:  May Mr. Harris be excused?

18          MS. BRANNON:  He may, Your Honor.

19          THE COURT:  All right.  You're excused.

20  Thank you.  Do you-- I don't know who's calling the next

21  witness.  Do you want to take a lunch break now or do

22  you want to continue?

23          MS. BRANNON:  Your Honor--

24          THE COURT:  I'm sorry?

25          MS. VANBEBBER:  I'm just saying it's fine

1   with me to take a lunch break now.

2         MS. BRANNON:  Your Honor, our next witness

3   is Rich Federico.  He will be a fairly lengthy witness,

4   so if you wanted to take a break.

5         THE COURT:  All right.  Let's take a break

6   until 1:00.

7         (Recess).

8         THE COURT:  All right.  You can be seated.

9   Call your next witness.

10        MS. BRANNON:  Your Honor, we would call Rich

11  Federico.

12                    RICH FEDERICO,

13  called as a witness on behalf of the Federal Public

14  Defender's Office, having first been duly sworn,

15  testified as follows:

16                 DIRECT EXAMINATION

17  BY MS. BRANNON:

18    Q.  Would you tell us your name, please.

19    A.  Rich Federico.  My last name is spelled F, as in

20  Frank, E-D-E-R-I-C-O.

21    Q.  And what do you do for a living, Mr. Federico?

22    A.  I'm an Assistant Federal Public Defender here in

23  the District of Kansas.  I work primarily out of the

24  Topeka office.

25    Q.  And could you just briefly give us a little bit

1  of your background as an attorney?

2      A.   Sure.   I graduated from the University of Kansas

3  Law School in 2002.   While in law school, I was

4  commissioned as an officer in the United States Navy.   I

5  served on active duty in the Navy JAG Corps at various

6  duty stations around the world for just shy of 13 years.

7          When I left active duty, I went to work for the

8  Federal Public Defender in the District of Oregon in the

9  Portland office.   And then transferred within the FPD

10 here to Kansas in February of last year.

11     Q.   When you arrived in our office in February of

12 last year, were you assigned to the *United States versus*

13 *Black* case?

14     A.   On my first day in the office.

15     Q.   All right.   Your work in Oregon, did you have any

16 similar experience-- well, let me ask it this way:   Did

17 you have any cases in Oregon that had similar issues as

18 we have in *Black*?

19     A.   Yes.   I represented a client named Ryan Payne.

20 He was charged as one of the leaders of the Malheur

21 National Wildlife Refuge Occupation, along with Ammon

22 Bundy.   Mr. Payne also had a federal case in the

23 District of Nevada that was ongoing at the same time.

24         He was transferred about midway through our case

25 from Oregon to Nevada, where he was held in detention at

1   a CCA facility called the Southern Nevada Detention

2   Center in Pahrump, Nevada.

3           Because he had a case ongoing in Oregon, I had

4   regular contact with him.  I became suspicious pretty

5   early on that my calls with him were being recorded, and

6   so I had to look into that, both factually in his case

7   but also our office in Oregon had had a-- a case called

8   the *Pederson* case, Joey Pederson, P-E-D-E-R-S-O-N, in

9   which Securus had a contract with the facility and there

10  was an issue of attorney-client phone calls that were

11  not just recorded but accessed and actively listened to

12  by the U.S. Attorney's Office and which resulted in

13  Judge Haggerty in Oregon issuing a supervisory opinion

14  in August of 2013 that really laid out all those issues.

15          And so as part of the *Ryan Payne* case, I had to--

16  I looked into this as it related from what had happened

17  in that other case, in my own case.

18  Q.   Once you arrived in the Kansas Federal Public

19  Defender's Office, were you also assigned to a case of

20  Juan Herrera-Zamora?

21  A.   I was.  In I believe the summer of last year, the

22  government filed a Notice of Record Correction that

23  disclosed some issues regarding the prosecutors in that

24  case.  I was asked to look into it.  Our office was then

25  later appointed to represent Mr. Herrera-Zamora.

1          I really took lead on that.  I worked with-- he

2    had an appeal pending at the Tenth Circuit.  I had to

3    figure out the legal issue procedurally how to get the

4    case back to the District of Oregon [sic] for-- because

5    we also had negotiated essentially a plea agreement, a

6    result for that case.  And so I worked on the case in

7    that capacity, and I was in constant communication with

8    Mr. Herrera-Zamora about his legal options.

9      Q.   He was given a new sentence of time served?

10     A.   He was.  I think Mr. Redmond actually appeared

11   with him at sentencing because I was in Wichita for

12   another case.  His sentence was reduced as part of the

13   agreement from a 35-year sentence he got as a result of

14   his jury trial to time served, and then unfortunately

15   sort of had a tragic result thereafter.

16     Q.   He was deported?

17     A.   He was.  There was an ICE detainer.  He was

18   deported right after-- within a week of his sentencing

19   hearing.  And then within two weeks of his return to

20   Mexico, he was - as it was described to me - targeted

21   and shot two times.  He's now paralyzed from the waist

22   down and his leg had to be amputated.

23     Q.   Have you stayed in contact with

24   Mr. Herrera-Zamora?

25     A.   I have through his family in Arizona.  That's how

1   I really found out about what had happened to him.  They

2   provided me medical documentation.  They were just

3   asking really any assistance in terms of anything that

4   could be done, and I tried to offer them whatever I

5   could in terms of legal resources on immigration

6   matters.

7      Q.   The legal issues in Mr. Herrera-Zamora's case

8   mirrored or overlapped with those in the *Black*

9   litigation; is that right?

10     A.   I believe so, yes.

11     Q.   Can you tell us what your duties were in the

12  *Black* case in regard to this litigation?

13     A.   Initially my primary duties was legal research

14  and writing.  There were a number of issues that the

15  office had been litigating prior to my arrival, and you

16  asked for my assistance in drafting pleadings.  Just

17  becoming more familiar with the record as it existed at

18  that point in time, but also looking forward as to where

19  we thought the case may be.  That really became of

20  increasing importance after the last hearings here

21  before this Court when it looked like we may negotiate a

22  settlement.

23       My primary duties then became to try to figure

24  out who were our potential pool of clients that could

25  have a claim under 2255 and sort of how to gather the

1    evidence that may relate to those claims.

2        Q.  If we break those clients down into categories,

3    if we could just talk about the video clients for a

4    moment.  Can you explain what you did to identify

5    clients in terms of video-recordings at CCA?

6        A.  We believed that it would be easier to identify

7    clients who may have a claim based upon their meetings

8    with their lawyers being video-recorded.  It would be

9    easier because the-- the pool of information was much

10   smaller.

11            Mr. Cohen, the Special Master, had already

12   identified in his report which rooms had had video

13   cameras in them and which visitation rooms had recorded

14   attorney-client meetings, so we had his report.  He also

15   had provided, as part of his investigation, visitation

16   logs from CCA and the calendar that CCA used.  And it

17   was a much smaller period of time, it was February to

18   May of 2016 that those recordings were made.

19            So because we had just more limited information,

20   we tried to identify what we called the video clients

21   first.

22       Q.  Were there certain clients on the visitation logs

23   that you did not include in the pool of clients who

24   maybe have a Sixth Amendment claim available?

25       A.  Yes.  So for the video clients, similar to what

1  we later did with the phone call clients, we tried to

2  prioritize those who we thought may most benefit from

3  relief under a 2555 claim.  And that would be those who

4  were still in custody.

5      Q.  Were there certain rooms that were not

6  video-recorded?

7      A.  My understanding, based upon the Special Master's

8  investigation, was that Rooms 1 and 2 did not have video

9  cameras in them and Rooms 4 and 5 were not used for

10  attorney visitations.  And so the Special Master report,

11  which I think is Docket Exhibit 193, says that

12  visitation rooms in CCA 3, 6, 7, 8, and 9 were rooms

13  that potentially had privileged conversations recorded.

14      Q.  Were there a couple of days that you also

15  excluded from your analysis?

16      A.  Yes.  The Special Master concluded that, for

17  whatever reason and I'm still not certain why, I believe

18  it was April 27th and 28th, if my memory serves, of 2016

19  that there were no recordings for those dates.

20      Q.  Did you do all this work by yourself?

21      A.  No.

22      Q.  In terms of the video-recording, did you have

23  other help from people in our office?

24      A.  Yeah.  We started this process of the video

25  clients over the summer, again, when we were

1    anticipating a potential settlement would be reached.

2    We have a third chair program of interns, law students

3    who work in our office, and so I tasked them, two of

4    them in particular, with going through the CCA

5    visitation logs, the calendars, and to compare those to

6    the Special Master report to, again, try to identify any

7    person who during that relevant time period met with

8    their lawyer, that we could verify they met with their

9    lawyer, and then sort of catalog all that information.

10   So that was sort of the first primary step we did and

11   had the interns do.

12        And then we did a quality control check of that

13   ourselves by going back through and-- and making sure

14   that they got their information correct.  We were able

15   to identify 102 potential clients who, again, met with

16   their lawyers at a time when video-recordings were made

17   in particular rooms.  And then I also had an opportunity

18   to quality control check as we reached out to clients

19   and I would talk with them.  And each time I would do

20   that - and I talked to a large number of individuals - I

21   would go back through and make sure the spreadsheet was

22   accurate.

23   Q.   The 102 individuals that you mentioned, were

24   those only clients who were still in custody at the time

25   of your review?

1    A.   Yes.

2    Q.   And why did you make that division?

3    A.   Again, we were trying to prioritize those who we

4    thought may benefit the most if any relief were to be

5    granted or as part of a settlement.  So we only looked

6    at those who were in custody.

7         We were also mindful of the fact that CCA houses

8    inmates who don't have federal charges in the District

9    of Kansas, so you had to be both a District of Kansas

10   federal criminal case and currently be in custody for us

11   to do our analysis to-- again, whether or not they met

12   all those criteria.

13   Q.   We have a document that we've marked as

14   Exhibit 585 that has not yet been admitted, but can you

15   describe to us what that document is?

16   A.   Yes.  585 is a summary report that documents the

17   steps our office took to figure out, again, who this

18   pool of clients-- or what we called video clients were.

19   It includes references to the Special Master's report,

20   also to the CCA visitation logs, and the visitation

21   calendar that were, again, gathered as part of the

22   Special Master's investigation, and then how we did this

23   analysis to reach the conclusions we did regarding the

24   102 potential clients.

25   Q.   So it essentially explains the methodology that

1    you used to reach these conclusions?

2      A.  Yes.

3           MS. BRANNON:  Your Honor, we would move to

4    admit Exhibit 585.

5           MR. CLYMER:  Your Honor, I'd like a chance

6    to look at 585 more carefully in light of Mr. Federico's

7    testimony.  585 is essentially a report-- not

8    essentially, it is a report or memorandum that either

9    Mr. Federico or someone in his office has authored that

10   essentially spells out in writing what he just described

11   in his testimony.  So it's in the nature of hearsay.

12           I just want to double-check to make sure

13   that there's no inaccuracies in it.  So I can give the

14   Court an answer on our position tomorrow.  But for

15   present purposes, I'd ask the Court to defer admission

16   of this document.

17           MS. BRANNON:  I think he can cross examine

18   on inaccuracies, so we would move to admit it at this

19   time.

20           THE COURT:  I'll conditionally admit it,

21   subject to further objection.  I do agree that there are

22   inaccuracies that can be fleshed out on cross

23   examination.  But I'll conditionally admit it.  If

24   it's-- if I determine that it's so replete with

25   inaccuracies that it has no relevance or weight, then I

1  might consider excluding it.

2              MS. BRANNON:  May we present it to the

3  Court?

4              THE COURT:  Yes.  I'm just conditionally

5  admitting it, so you can go ahead and use it.

6              MS. BRANNON:  So if we can bring up 585,

7  please.

8  BY MS. BRANNON:

9    Q.  So, Mr. Federico, you've given us sort of an

10  overview.  But looking at this first page, that box in

11  the middle, can you describe what that represents?

12    A.  Yes.  That box comes directly from the Special

13  Master's report on video-recordings.  Again, as it

14  references in Footnote 4, that was that Docket

15  Exhibit 193 in the *Black* case, and we just did what we

16  call a snip.  So we took from the Special Master's

17  report and included it in our own.

18    Q.  And we also, you mentioned, had the visitation

19  records and calendars from CCA?

20    A.  Correct.  And those are also reflected in this

21  report.

22    Q.  In your overall analysis, did you find that some

23  clients were on video-recordings who also had phone

24  calls that had been accessed?

25    A.  Yes, we did.

16-20032-JAR  USA v. Karl Carter (Black)  10.09.18          1508

1    Q.  Do you know how many of those?

2    A.  I believe it was 47-- 47 or 48 that were

3  potentially clients based upon a claim for having their

4  meetings video-recorded and also their phone calls

5  accessed that were made to their lawyer.

6    Q.  Based on the Special Master's report, the time

7  frame that we have, the visitation logs and calendar,

8  did you determine that these 102 clients had videotaped

9  meetings with attorneys or legal staff?

10    A.  So we're relying, of course, on-- largely on the

11  Special Master's investigation.  The videos themselves

12  were taken into chambers, and so we don't-- you know,

13  we've never-- I've never personally viewed the

14  recordings to verify, but I'm comfortable relying on the

15  Special Master's investigation for the-- that these

16  video-recordings do show the meetings between inmates

17  and their lawyers.  I believe the Special Master

18  described in his report how he did samplings to reach

19  the conclusions he did, and we relied upon those.

20    Q.  Is there anything else you'd like to point out

21  for the Court regarding the video report?

22    A.  No, ma'am.

23    Q.  All right.  Let's talk about the phones then.

24  Tell us how you undertook the analysis of the phone

25  data.

1    A.   So--

2    Q.   And if I could back up.  You were in the

3  courtroom while Mr. Martin testified this morning; is

4  that right?

5    A.   I was, yes.

6    Q.   Okay.  Go ahead.

7    A.   So the phone client potential pool was much more

8  difficult to determine.  For one, we're dealing with a

9  lot more data, phone calls between just meetings between

10  lawyers and their clients.  We're also dealing with a

11  much larger time frame.

12       And so we looked back to phone calls that were

13  made starting on January 1st of 2010.  That date was, I

14  would say, almost a little bit arbitrarily drawn.  We

15  knew that the civil litigation started on January 1st,

16  2011, so we wanted to go back a little further than

17  that.

18       But we're looking at, again, a larger time frame,

19  a lot more data, and so there were challenges to try to

20  sort of decipher this data that were much more difficult

21  and challenging than the video clients.

22    Q.   Did you prepare a report that explains your

23  methodology and the data that you considered in reaching

24  these conclusions?

25    A.   I did, and I believe it's been marked as

1  Defendant's Exhibit 562.

2     Q.  And was a version of that provided to the

3  government and Special Master last week?

4     A.  Yes.  We provided a copy of what then was a draft

5  report and a draft slide presentation.  We met with the

6  government last Monday morning, all counsel who are at

7  table here were there, along with a few other Assistant

8  United States Attorneys.  Counsel for the Special Master

9  was also present.

10        And so I presented to them at the time our

11  analysis and conclusions.  And I noted several times

12  that they were going to change because we were still

13  analyzing data we had just received from Securus.  And

14  so the numbers, as I sit here today, have been updated

15  to reflect that we've just done more analysis.

16     Q.  The report that you have today, so the numbers

17  have been updated.  Do you anticipate that there is more

18  work to be done in this regard?

19     A.  I do.  In particular, as I can explain, in our

20  methodology, we have analyzed the Securus call access

21  data which shows when any phone calls were accessed by a

22  Securus user, and I don't expect that data will change.

23        However, the other part of this is we've been

24  trying to determine when there is documentation to show

25  the government requested inmate phone calls, including

1  who made that request, how they made that request.  That

2  has proved to be much more difficult for a variety of

3  reasons.

4      Q.  The report, as it stands now, is it as current as

5  possible with the information that we have right now?

6      A.  It is current as of yesterday when I put the

7  polish on the final draft to be marked.

8      Q.  Did you have any concerns in your analysis about

9  duplication or double counting?

10      A.  Yes.  We wanted to ensure that we weren't

11  overstating the data that.  In particular, as I can

12  explain, that if there were calls that were made or

13  accessed, that we didn't count them more than once, even

14  if they would show up on a access log.  So sort of one

15  of our governing principles, if you will, or business

16  rules in our analysis was to do everything we could to

17  avoid double counting.

18      Q.  So you erred on the side of not double counting;

19  is that fair to say?

20      A.  We did.

21      Q.  You were under considerable time pressure as

22  well; is that fair to say?

23      A.  It is.  Particularly at the beginning of August

24  when we really started to gather from Securus the call

25  access logs, there was a lot of data, over 191,000 sort

1  of rows in spreadsheets that we had to cull through.

2       In addition, just figuring out sort of the

3  methodology that was-- would produce the most accurate

4  results.  And I think we had to sacrifice some

5  efficiency in that, so it took a lot of time.  But we

6  knew it was important to present here to the Court at

7  this hearing, so we've been trying to do the best we

8  can.

9    Q.   Are you confident in the accuracy of your report?

10   A.   I am.

11   Q.   Did you undertake in your report to identify what

12  numbers to-- what attorney numbers had been privatized

13  or requested to be privatized?

14   A.   We did not, no.  I do not have access to sort of

15  all the paperwork of the documentation an attorney may

16  have submitted for privatization.  I've sort of heard

17  anecdotally about the numbers of privatization being

18  different between Securus and the facility at CCA, but

19  that was not part of our analysis.

20   Q.   In regard to privatization, it's fair to say

21  there were a lot of variables that attended that

22  particular question?

23   A.   Yes, for certain.  And I've been here in the

24  courtroom even this morning, and I think that rang true

25  in the testimony I heard.

1          MS. BRANNON:  Your Honor, we would move to

2    admit Mr. Federico's report, which has been marked as

3    562.

4          THE COURT:  Any objection?

5          MR. CLYMER:  Your Honor, I received the

6    updated draft just this morning and have not had a

7    chance to review it.  My suspicion is that

8    Mr. Federico's testimony about the accuracy is accurate,

9    but I would still like a chance to look at it before I

10   respond to the Court.  So I'd ask the Court to also

11   admit this conditionally.

12         THE COURT:  All right.  562 admitted

13   conditionally.

14         MS. BRANNON:  Your Honor, we've also

15   prepared essentially a PowerPoint, PowerPoint slides to

16   support Mr. Federico's testimony.  We would move to

17   admit this as-- 562A as a demonstrative exhibit.

18         MR. CLYMER:  No objection.

19         THE COURT:  562A admitted as a demonstrative

20   exhibit.

21   BY MS. BRANNON:

22      Q.  All right.  Mr. Federico, let's look at the-- the

23   first slide and talk about your methodology.  All right.

24   Talk to us about your client criteria.

25      A.  One of the first things we did was to, again, try

1  to prioritize those persons who we thought may most

2  benefit from any relief that could be granted in a 2255.

3       So we knew from Securus-- the first subpoena

4  return we received told us that there were 1,615 persons

5  or inmates at CCA during the time period of 2010 to 2017

6  who had calls accessed.

7     Q.  This morning Mr. Martin I believe testified about

8  a list of 617 names.  Do you remember that?

9     A.  I do.

10     Q.  What's the difference between the 1,615 and 1,617

11  [sic]?

12     A.  I wasn't entirely sure, and I did not get a

13  chance to talk to Mr. Martin afterwards.  But again, we

14  asked Securus to turn to us-- return to us, excuse me,

15  all calls that had been accessed.

16       And as I heard him say this morning, as Securus

17  had explained to us before, in order for a call to be

18  accessed, that means it was recorded.  And so we had a

19  large list of names.  And it was just that, all I had

20  was names.  And so we sought to narrow that list.  And

21  here were the criteria that we applied to narrow the

22  list, and there were five.

23       In order for us to do an analysis that's in my

24  report, the person had to meet all five of these

25  criteria.  And the first was that they were previously

1   obviously in custody at CCA-Leavenworth.  The second is

2   we wanted to distinguish those persons who had criminal

3   cases in the District of Kansas from those who didn't.

4   The third was we wanted to prioritize those who were

5   still in custody today.

6       Q.  Is that for the same reason that we made that

7   distinction with the video clients?

8       A.  It is.

9       Q.  Okay.

10      A.  The fourth criteria was that their recorded

11  telephone calls, again, were accessed on the Securus

12  telephone platform.  And lastly, that those calls that

13  were accessed contained at least one call to their

14  attorney.

15      Q.  All right.  Did you face some limitations in your

16  analysis?

17      A.  We faced significant limitations.  And this next

18  slide spells out what some of those are.  The first is--

19  and I mentioned this before, the Securus data was more

20  of a finite set of data for us to analyze, but we were

21  also trying to determine when the government may have

22  made requests to CCA for calls to be accessed and

23  produced.

24          That proved to be much more difficult for a

25  variety of reasons, and that's what the first two

 1   bullets here represent.  The first reason is because, I

 2   think the testimony in this case has made clear, that

 3   government or government agents could request calls be

 4   produced.  They could do that orally.  They could pick

 5   up the telephone.  I heard special agent-- or excuse me,

 6   former Special Assistant U.S. Attorney Erin Tomasic say

 7   that.  Warden Linda Thomas from CCA said that at the

 8   last hearing in May.  Sergeant Bigelow referenced the

 9   informal nature of the requests that used to happen at

10   CCA.

11        And then we have an e-mail, I think it's in

12   evidence as Defendant Exhibit 484, where there's an

13   agent from the U.S. Marshals requesting calls and

14   Sergeant Bigelow responds saying, "Well, we're going to

15   need a subpoena for those."  And the agent then says,

16   "Well, we used to just pick up the phone and ask for

17   them.  Why the change?"

18        So it's pretty clear I think from the evidence to

19   us that calls could-- call production requests could be

20   made orally.  So that's No. 1.

21   Q.  So we wouldn't have a paper trail on the front

22   end of that, we would just know that calls were accessed

23   on the other side?

24   A.  That's right.

25   Q.  All right.

1    A.   Second is we know that we are missing

2  documentation that-- for call productions.  For example,

3  the first sub-bullet is Defendant Exhibit 449.  That was

4  a spreadsheet that was admitted here before the Court I

5  believe in August 2016.  It's before I even transferred

6  here to the District of Kansas.  But I've read the

7  transcript where a lawyer by the name of Michael Jackson

8  or Mike Jackson prepared that spreadsheet.  And it was

9  calls that were produced to him in the *Black* case in

10  discovery.  It references the call list by inmate, the

11  number of calls and the lawyer.

12    When I look at that list, I find calls that were

13  distributed in discovery in *Black* that I obviously know

14  were in the possession of the U.S. Attorney's Office

15  because they produced it in discovery, that we can find

16  no documentation of those calls being requested be

17  produced at CCA.

18    Q.   Did the FPD have access to the discovery in the

19  *Black* case?

20    A.   Not to my knowledge, no.

21    Q.   So there were clients and calls listed on that

22  exhibit that you did not find a paper trail for?

23    A.   That's correct.  We knew from the *Black* case and

24  materials that were filed that there was a grand jury

25  subpoena that listed particular inmates.  There were

1    inmate phone calls to their lawyers that were

2    distributed to Mr. Jackson, as he represented to the

3    Court, that were not on that grand jury subpoena and we

4    could not find any documentation for those calls being

5    requested to be produced.

6          Also, the Special Master in his second phone

7    report, which I believe is Docket Exhibit 187,

8    references this collection of calls that were produced

9    in discovery.  And as he notes in his report, I believe

10   at Footnote 2, there were some discrepancies.  There

11   were sort of more calls that he found that had been

12   recorded and produced that-- or differences.  There were

13   more calls that he found than Mr. Jackson had been

14   provided or that showed up in that spreadsheet.  And I

15   found that same analysis when I looked at the call

16   access logs, that there were more calls than were given

17   to Mr. Jackson.

18      Q.   Let's talk about Virok Webb for a moment.  Virok

19   Webb was on that exhibit list as his calls being in the

20   *Black* discovery; is that right?

21      A.   He was, yes.

22      Q.   Was he also listed on the access list that

23   Securus provided?

24      A.   He was, yes.

25      Q.   Did you have any link between?

1    A.  We could find none.  He-- he falls into the

2   category of individuals where I can see from the Securus

3   call access logs that he had calls that were made to his

4   lawyer that were accessed on the Securus platform that

5   Mr. Jackson represented to the Court in his exhibit that

6   were produced to him by the U.S. Attorney's Office in

7   discovery, but we cannot find any evidence of those

8   calls actually being requested from the U.S. Attorney's

9   Office.

10    Q.  Mr. Webb was not listed on the grand jury

11   subpoena that you referenced?

12    A.  He was not, correct.  And there were two others

13   like him.

14    Q.  Okay.  The next limitation that you have listed?

15    A.  My understanding is that within the last month we

16   have reached out to the government and asked for them to

17   look at their own files to see if there's documentation

18   where they may have requested CCA or had their agents

19   request CCA produce calls, and that that discovery has

20   not yet fully been produced.  So my expectation would be

21   perhaps that there will be evidence of call production

22   requests within that discovery.  Also--

23    Q.  Just on that point.  Did you understand that I

24   had an agreement with Mr. Slinkard maybe to put that on

25   the back burner so that the subpoena *duces tecum* could

1   be produced first?

2       A.   Yes.  And I was here last week and I obviously

3   know that the government had large production requests

4   and responses to subpoenas.  And my understanding is we

5   sent 38, I believe was the number of inmates that we had

6   asked them to review case files.  And it just-- as it,

7   again, was described to me, I wasn't part of that

8   conversation, is you did say that could sort of fall

9   behind in line in the queue, if you will, the subpoena

10  production returns.

11      Q.   All right.  Next on the list?

12      A.   The third sub-bullet is the marshals service

13  turned over documents as part of the Special Master's

14  investigation.  I saw an e-mail from the marshals

15  service saying that their documents reflected this time

16  period that's here in this bullet of January 1, 2014, to

17  May 1st, 2017.

18          Again, our look at the call access logs starts in

19  2010, so we have a period of three years where we don't

20  have evidence from the marshals that may be in their

21  files as to the call production requests they made.  And

22  then, likewise, CCA had provided to the Special Master

23  documents from the time frame January 1, 2011, to

24  December 31st, 2016.

25          My understanding is as of about two hours ago,

1    CCA produced to our office in response to a subpoena the

2    years 2010 and 2017, but obviously we didn't have a

3    chance to analyze that yet.

4         But the bottom line is, there's-- we know we are

5    missing documentation that would show requests for CCA

6    to produce phone calls.

7    Q.   Next on the list of limitations?

8    A.   As I mentioned before, we are only looking at

9    CCA.  And so our initial pool of 1,615 persons who had

10   their calls accessed was only at the CCA facility in

11   Leavenworth.  As we have since learned, there are other

12   facilities that Securus in particular had a contract

13   with, I heard Mr. Martin say this morning.  We had two

14   witnesses from two of those facilities last week at

15   Sedgwick County jail and Butler County jail, but we

16   have-- we have not analyzed those facilities at all.

17   Q.   The access list that Mr. Martin provided us was

18   an access list for CCA inmates; is that right?

19   A.   Yes.

20   Q.   Okay.  And finally on the limitations list?

21   A.   Lastly, again, we only looked at District of

22   Kansas clients who remain in custody today.  And the

23   numbers and my conclusions show that there-- there

24   were-- out of the pool of individuals, roughly more than

25   half are still in custody, but that still leaves a large

1  chunk of individuals who are not in custody today who

2  may-- or, you know, who have their calls accessed who we

3  have not analyzed.

4     Q.  All right.  Let's look at the next slide.  Talk

5  to us about your methodology, please.

6     A.  So, as I mentioned before, part of the sort of

7  intellectual challenge to find these answers was how

8  to-- to break down the process or the methodology.

9        I put Step 1 as the cataloging of the-- the call

10 production requests.  In reality, that step, because it

11 proved to be so difficult, was something we did all

12 throughout this process.  But we focused that as Step 1,

13 because we had already several caches, if you will, of

14 these documents that the Special Master had gathered

15 that had been provided to the parties that were sort of

16 forms requesting calls.

17       And so we-- we started with that also because,

18 again, we had those in hand in the summer, but we were

19 at that point focused on a potential settlement and

20 trying to find as quickly as we could see clients who

21 may have a claim.

22    Q.  You mentioned and described that there were

23 requests for phone calls made orally, and that's in the

24 record.  What other forms of requests did you find in

25 the data you analyzed?

1    A.  Yeah, there-- the next couple slides I actually

2  show examples of each types of forms that-- that-- or

3  different types of requests for calls, so when I call

4  production requests, what I'm referring to.

5    Q.  All right.  Step 2?

6    A.  Yes.  Step 2 was that process I mentioned that

7  the first list we got from Securus was 1,615 inmates

8  from CCA who had their calls recorded and accessed.  So

9  we wanted to narrow that list.  And we did that, again,

10  by trying to meet all those criteria.  We wanted to weed

11  out, if you will, inmates who did not have a case in the

12  District of Kansas, those who are not in custody.  And

13  so that-- that narrowed that 1,615 number down

14  significantly.

15      Step No. 3 was, once we had that final list of

16  persons who met all five criteria, and that number ended

17  up being 372, we then went to Securus and requested the

18  actual access-- we call them call access logs.  I heard

19  Mr. Martin reference them this morning as call access

20  reports.  But all this is is an Excel spreadsheet that

21  has just lines of data of call accesses for each

22  individual.

23      Some of them had thousands of phone calls

24  accessed.  So it was a significant amount of data, and

25  so we had to obtain those from Securus.  We did so on a

1    rolling basis, what we called batches.  So we would

2    submit a list or a batch of names to Securus, they would

3    return in one Excel workbook the access logs.  And that

4    happened through nine batches, as I sit here today.

5        Q.   You talked about the amount of data that you had

6    to analyze.  If you remember, can you approximate the

7    number of lines of data that you had to look at?

8        A.   It was over 191,000.

9        Q.   We still have some of these access logs or access

10   reports outstanding with Securus?

11       A.   Just a few.  We have what we call Batch 10, that

12   was more of-- let me back up.  We have received-- for

13   all the persons that meet the five criteria, I said

14   before, 372 inmates, we have received all of those call

15   access logs and we have analyzed them.

16           Batch 10 are individuals who don't meet all those

17   criteria but who we believe are relevant to this case

18   for a variety of reasons.  For example, Juan

19   Herrera-Zamora is in Batch 10.  Ms. Ashley Huff is in

20   Batch 10, Richard Dertinger, Brenda Wood.  So

21   individuals who, again, have been part of this

22   litigation, but who don't meet those five criteria.  We

23   have not received that batch yet from Securus.

24       Q.   Step 4?

25       A.   Once we receive the call access log, as

1  Mr. Martin explained this morning, it just shows the

2  number that was dialed, but it doesn't tell you who--

3  whose number that is.  And so we then had to identify

4  which of those calls were made to attorney phone

5  numbers.

6      Q.  And you're aware that the Special Master compiled

7  a list of phone numbers.  Did we rely on that?

8      A.  We did not, no.  We-- we built our own.

9      Q.  And how did we do that?

10     A.  A variety of ways.  For the Federal Public

11 Defender, we just went back and looked at some of our

12 phone lists historically at certain periods of time.  So

13 we used all those phone numbers.  We asked for lawyers

14 in our office to maybe identify any other number they

15 had in the past that may have been used for clients to

16 call them.

17         And then for the CJA panel lawyers, we sent

18 e-mails out to all of them asking for them to turn over

19 that same list.  In other words, please tell us what

20 phone numbers clients from CCA may have ever called you

21 on.  And they would-- they were very responsive and

22 e-mailed us back those phone numbers.

23         And then, lastly, for persons who we couldn't

24 otherwise find or didn't hear from, and that was only a

25 very few individuals, we would look at CM/ECF to see

1    what numbers were listed for them there and in any

2    pleadings they may have filed that were relevant to the

3    clients in this analysis, and we put those phone numbers

4    in our list.

5         And then all told, we had our own spreadsheet

6    that had all these attorney telephone numbers.

7    Q.   You heard Mr. Cox testify that he had the office

8    number, but he also had a cell phone number that he gave

9    to clients?

10   A.   Yes.

11   Q.   So in Mr. Cox's case, you would've included both

12   the office number and the cell phone number?

13   A.   We would've included whatever phone numbers the

14   lawyers told us that clients may have called, yes.

15   Q.   And for the attorneys that weren't responsive, if

16   they had, for example, a cell phone number, we didn't

17   have any way of discovering that?

18   A.   Unless it was on a pleading or in CM/ECF, we

19   would not have known that.  But again, the catalog or

20   the pool of phone numbers we were able to put together,

21   more people were responsive than weren't for sure.

22   Q.   Step 5?

23   A.   Step 5 was, you know, consolidation.  Once we had

24   sort of figured out what calls had been accessed that

25   were made to attorney phone numbers, gone through all

1   the call access logs, then we sort of took a more

2   holistic view and said, you know, what is the real

3   analysis here between any call production requests, so

4   any document trail we have, compared to what the call

5   access log showed us, and then also in relation to what

6   was going on in the case.  So we sort of took a step

7   back and said, how does this puzzle sort of fit

8   together?  And so Step 5 was probably the most

9   time-intensive.

10      Q.  Step 5 you're trying to marry the requests from

11  the U.S. Attorney or agent that you might know and the

12  access log?

13      A.  To do that and also just see if there's anything

14  else about the case maybe in the docket that may give

15  some insight as to why calls were requested on a

16  particular date.

17      Q.  Can you give us an example of what might've been

18  significant to you from the docket?

19      A.  Yes.  I would look for, again, what was happening

20  in the case.  And there's an example I'll use in a

21  minute of *United States versus William Mitchell,* and the

22  dates.  There are two, two times where we can show a

23  paper trail where the government requested calls be

24  produced.

25          The first is on the same day that a superseding

1    indictment was filed, and the second is I believe 12

2    days before jury trial began.  So, you know, again,

3    while the case was sort of active in litigation, call

4    production requests were made.

5        Q.  Was there anything unique about the date

6    August 24th, 2016 when you were looking at the call

7    access logs?

8        A.  I think there is, but I can't explain what it is.

9    I-- I just happened to notice, looking at all these call

10   access logs, that August 24th, 2016, seemed to keep

11   coming up.  And all the access was done by a user in the

12   Securus platform with the user name APerry@Securus and

13   the .tx, which we know from Mr. Martin means that that's

14   a Securus employee who works in Texas.

15           And so we just-- I saw that enough that that date

16   sticks out to me.  For example, we looked at how that

17   date lined up with the litigation in the docket in the

18   *Black* case itself, that is obviously shortly after the--

19   that these issues came to light.  Two hearings were held

20   and there are pleadings being filed on phone calls when

21   that sort of-- sort of greater frequency of access

22   occurred.

23       Q.  All right.  Let's look at the next slide and the

24   different sorts of call production requests that you

25   came across.

1     A.  Sure.  Sure.  So this-- these next slides are

2  meant to illustrate, when we say call production

3  requests, what we mean by that.

4       The first is-- and I have this in a footnote in

5  the report, and this is from you see Defense Exhibit 367

6  on the second page.  This was the first evidence we had

7  from what we ended up calling the marshal form.  And

8  that's a form that could be used to request calls from

9  CCA.

10       And on this date in May of 2013, Deputy Marshal

11  Hoffer, who I heard, you know, people testify goes by

12  Brett Hoffer, sent out the form to various individuals,

13  both at the U.S. Attorney's Office-- I know Amanda Spee

14  is from the FBI from other documentation, to Douglas

15  County-- or, excuse me, to Lawrence Police Department,

16  to the DEA, and to the IRS.  Just basically distributing

17  this to various agencies, this form, saying hey, you're

18  going to have to have this form from now on to request

19  phone calls from CCA.

20       So I included this e-mail just to show that this

21  was the earliest date that we could find that this form

22  sort of arises in the evidence.  And I believe the next

23  slide is the form itself.

24     Q.  All right.  Let's look at that.

25     A.  Here's an example - again, I think this has

1   already been admitted in Defense Exhibit 606 - of one of

2   many of these what we call the marshal forms.  So this

3   is the form that Deputy Marshal Hoffer distributed back

4   in May of 2013 that allowed for government agents,

5   prosecutors to request by use of this form calls be

6   produced by CCA.

7       Q.  Can you estimate how many of these forms, unique

8   versions of this form you looked at?

9       A.  I know our bottom line number of call production

10  requests is 141.  If I had to estimate how many of

11  those, and I did not actually count, but how many of

12  those were requests done by use of this form versus

13  simple e-mails that would say, hey, can I get calls for

14  this individual, I would guess it is a little more than

15  half of those probably have the marshals form.

16      Q.  Do you remember any of these forms that

17  specifically excluded attorney numbers, identified

18  attorney names or identified attorney numbers?

19      A.  I do not.  I mean, obviously the form at the

20  bottom itself says, "Attorney-Client conversations will

21  not be included in these recordings."  We know from our

22  analysis that they were actually produced as a result of

23  this production or request on this form.  I cannot

24  recall, though, any particular form where an agent of

25  the government sought to exclude by name or number an

 1   attorney.

 2       Q.   All right.  Let's look at the next slide.

 3       A.   So this next slide is a-- just another example of

 4   how we found in the documentation where the government

 5   could request call production.  And that's just by

 6   e-mail.

 7            And so here you have on December 19th, 2014, an

 8   Assistant United States Attorney e-mailing Mr. Hundley,

 9   who worked at CCA, who I believe Sergeant Bigelow just

10   said he relieved in his position, saying, you know, I

11   have a hearing coming up, I believe jail calls are

12   useful, can you forward the calls to me?

13       Q.   This is from Jabari Wamble?

14       A.   That's what it says, yes.

15       Q.   On December 19th of 2014?

16       A.   Correct.

17       Q.   If we flip back to that last slide we were

18   looking at.  I think the one before that.  This one.

19   That e-mail directing the use of the USMS form, that was

20   to others, including Jabari Wamble.  Right?

21       A.   Yes.

22       Q.   And it pre-dated his e-mail request?

23       A.   Correct.

24       Q.   Did you find a number of instances where even

25   after the U.S. Marshal asked for that form to be used

1  that it was not used?

2      A.  We did, yes.

3      Q.  Okay.

4      A.  If you were to assume there was strict compliance

5  with the requirement to use this form, then you would

6  expect after May 2013 that there wouldn't be sort of

7  informal e-mail requests for calls to be produced.  But

8  we found that there was not strict compliance because

9  that-- as that e-mail from AUSA Wamble illustrates, we

10  found those type of e-mails, requests after that date.

11     Q.  All right.  Is there anything else about that

12  particular slide that you'd like to point out?

13     A.  No, I don't think so.

14     Q.  Do you believe that Dane that he's addressing

15  to-- well, it says Dane Hundley, right, that's someone

16  at CCA?

17     A.  Yes.

18     Q.  Okay.  The next slide then, please.

19     A.  So oftentimes in the-- the paperwork, the e-mails

20  that we reviewed, we would see this.  And I know

21  Mr. Martin referenced one of these in his testimony this

22  morning.  And it appears to be sort of a generic e-mail

23  that comes from Securus to a CCA employee.  Again, here

24  it's Dane Hundley, alerting Mr. Hundley to the fact that

25  calls are available for him to be downloaded.  We found

1  a number of these that-- again, a notice of availability

2  of calls being ready to be downloaded.  For ones in

3  which we only had this, we did not count that as a call

4  production request.

5     Q.  Why not?

6     A.  Because it-- using this example, you know, I can

7  show from the paperwork that on November 25th, 2014, a

8  CCA employee, Mr. Hundley, received a notice from

9  Securus saying Robert Robinson's calls are available to

10  be downloaded.  What I can't tell you from this form,

11  though, is why he requested them at all or who-- or, you

12  know, whether that was done as a result of a marshal

13  form being provided to CCA saying we want his call or

14  some other way.

15     Q.  So this might've been triggered by an oral

16  request?

17     A.  Yeah.  It may have been, yes.

18     Q.  All right.  Did you find any instances of this

19  response from Securus with an e-mail link being

20  forwarded to someone else for review?

21     A.  I saw evidence where people would discuss that it

22  happened, but the forwarded e-mail wasn't there.  For

23  example, I recall one e-mail thread where an agent is

24  saying, "Hey, I got the link, but I can't get it work.

25  Can you re-send?"  There were more than one occasion I

1    would see those types of e-mails.

2        Q.   All right.  Let's look at the next slide.

3        A.   This last example isn't necessarily a call

4    production request, it's a receipt.  We found that,

5    particularly in 2016, Sergeant Bigelow would e-mail back

6    to either government agents or prosecutors specifically

7    saying, "Your calls are ready.  Here's a receipt."

8            I would find many instances where I could see an

9    e-mail from Sergeant Bigelow back to whomever requested

10   the calls, but then there's no evidence that it was ever

11   signed and returned.

12           Here's an example of one that appears to be

13   signed and returned by an Assistant U.S. Attorney, Sheri

14   Catania, on May 18th, 2015, where she is essentially

15   acknowledging receipt of the calls in this case from

16   Dane Hundley.

17       Q.   Did you find any cases where you found what we

18   might call a complete paper trail?

19       A.   I would-- I would say yes.  The only reason I

20   hesitate is I-- I don't remember one in which it was all

21   the requests; showing availability that the calls are

22   ready to be downloaded, documentation that they're

23   available, or they're either going to be on the

24   transport or provided some other way, and that included

25   this receipt.  There may have been one or two, but that

1    would've been rare.

2        Q.   Were there instances where you found the only

3    paper trial, so to speak, was an e-mail?

4        A.   Yes.

5        Q.   Do you know how often that occurred?

6        A.   Again, you really are asking me to estimate the

7    call production requests that were done by the marshals

8    form versus e-mail.  I actually didn't go through and

9    count.  But if I had to guess, as I sit here today, and

10   it's an educated guess, I would say a little more than

11   half the time we probably had a marshal form.  And the

12   remaining portion of the time were more e-mail requests.

13       Q.   Is it possible there are cases where you haven't

14   been able to link up the access and U.S. Attorney, where

15   it could've been by e-mail, we just don't have the

16   e-mail?

17       A.   I don't-- wouldn't even just say it's possible, I

18   think it's certain.

19       Q.   Why do you think it's certain?

20       A.   Again, the classic example that proved this to me

21   was Mike Jackson's exhibit.  Again, I know there were

22   calls that were in the possession of the United States

23   Attorney's Office that were made between CCA inmates to

24   their lawyers that were produced in discovery, but I

25   have no evidence as to why those were produced to the

1    U.S. Attorney's Office.

2        Q.   Did you find some requests that were done by

3    subpoena?

4        A.   Yes.

5        Q.   Some by administrative subpoena?

6        A.   Administrative subpoena was the most common,

7    particularly in one case.

8        Q.   And which case was that?

9        A.   I believe it was more Michelle Reulet.

10       Q.   All right.  Speaking of Michelle Reulet.  In any

11   of your evaluation looking at phone call requests, did

12   you ever see Tanya Treadway's fingerprints on anything?

13       A.   I don't believe so.  Michelle Reulet's case comes

14   to mind where my understanding is she was the prosecutor

15   in that case.  We found a lot of call production

16   requests in that case, but they were all done by an

17   agent by the name of Twaddle, and I don't recall seeing

18   Ms. Treadway's name on those requests.

19       Q.   All right.  Let's look at the next slide.

20       A.   If I could also just with that--

21       Q.   Sure.

22       A.   Although I-- I hesitate a little bit because I

23   did not go back.  I-- I just looked at what I had

24   written in my notes, but I didn't go to the original

25   documents.  And none of my notes reflect Ms. Treadway's

1   name on the form, but I didn't go back and verify on the

2   original documents.

3       Q.   All right.  Securus call access logs.

4       A.   Yes.  I put this in the presentation just to

5   illustrate to the Court that what we're talking about in

6   the call access logs, but Mr. Martin testified about

7   this this morning, and it's the same.

8           This just shows when I say call access log what

9   the data is that we would receive in response from

10  Securus.  And so you see here, and I believe the next

11  slide has-- I pulled out some of this information.  So

12  the call access log tells us the date and time in which

13  that call was accessed by a Securus user.

14      Q.   You used the term "access."  Are you using the

15  same terminology that Mr. Martin used this morning?

16      A.   I believe so, yes.

17      Q.   And that means what to you?

18      A.   It could be accessed one of four ways.  And two

19  of them are here in the recording usage.  So that column

20  in all of these logs would show us how that particular

21  call was accessed.  And recorded usage, again, was the

22  term that Securus put, not me.

23          It could be saved to folder, which my

24  understanding from Securus means that someone would save

25  it to a folder in the Securus platform itself.  The

1  second was a CD burning, so you're taking calls that you

2  have saved in those folders and burning them into some

3  type of media.

4       The third was download, which is the same as save

5  to folder, it's just a matter of where you save it.  We

6  did not even encounter a download until Batch 7.  So,

7  for example, when I presented this last week to the U.S.

8  Attorney's Office, I said there were only three

9  recording usage because we had never seen download, but

10  we saw just a few of those in our analysis last week.

11       Q.   How many call playbacks did you find?

12       A.   Yeah, last was call playback.  And my

13  understanding, again, from Securus is that a user could

14  go in and just listen to the call on the Securus

15  platform without saving it.  I don't know the exact

16  number because, again, we're talking over 191,000

17  different calls that were accessed.  That was certainly

18  less frequent than save to folder and CD burning, but

19  not so infrequent that we-- we didn't see it

20  occasionally.

21       Q.   This example that you have here, does that

22  represent two separate calls that were accessed?

23       A.   No.  In this case, this represents the same phone

24  call.  And I think this is a good point to make, which

25  is, as you see on the right, the call start and end

1  time.  I should also say this slide is where I just

2  broke up two lines of data from the call access log.

3  It's the same phone call made on December 18th of 2013

4  at 2209 and going to 2212, but it shows it was accessed

5  twice because it was saved to folder.  And if you look

6  at the left, the call access time happened at 1317 or

7  1:17 p.m.  And then it was burnt onto a CD at 1319 or

8  1:19 p.m.

9          So when we encountered this, which was very, very

10  common, we did not double count this.  This is what we

11  were referring to earlier as double counting.  We would

12  count this as it was, it was only one call.

13      Q.  Two lines of data, one call?

14      A.  Correct.

15      Q.  You count one call?

16      A.  And even times in an individual inmate's call

17  access log where a-- one call may have been accessed 10

18  or 20 times, we would still count that as one.

19      Q.  There were times that there might have been a

20  call request in 2013 and another one in 2014, but the

21  2014 also captured what had been accessed in 2013?

22      A.  Yes.  It was very common to see times where a--

23  one particular call had been accessed several times.

24      Q.  So even though one call was accessed more than

25  once, how many times did you count it?

1    A.    Once.

2    Q.    All right.  Let's look at the next slide.

3    A.    So what I'm attempting to do here is just use by

4    an example of one case of William Mitchell the

5    methodology that we employed here in our analysis.

6         I'll say William Mitchell was a case that I chose

7    somewhat randomly.  I don't know anything about Mr.

8    Mitchell's case, other than what I found in the data

9    that was available to us and then on CM/ECF.  I chose

10   his case, though, because he had more than one call

11   accessed, so there was some data to look at, but also we

12   had call production requests.  So I thought this example

13   could best illustrate what we did.

14   Q.    All right.  Let's walk through it.

15   A.    So on the next slide, the first thing we did was,

16   again, catalog production requests.  For Mr. Mitchell,

17   we found two.  And here's the example of the second one.

18   So we found within what's called the catalyst database

19   that was put together by the Special Master an e-mail

20   from a legal assistant at the U.S. Attorney's Office by

21   the name of Bonnie Kaiser on April 2nd, 2014, sent to

22   the marshals, copying Special Assistant U.S. Attorney

23   Erin Tomasic.  On the subject line it says, "CCA call

24   requests Mitchell pdf."

25         Attached to that e-mail is what is on the right

1   here, which is the marshal form.  And that is a form

2   dated the same day, April 2nd, 2014, from Ms. Tomasic

3   and an agent who I believe was with Douglas County

4   Sheriff's Office for William Mitchell's call.  So we see

5   here sort of the beginning of the paper trail when the

6   U.S. Attorney's Office is requesting Mr. Mitchell's

7   calls from CCA.

8        Q.   All right.  Next slide.

9        A.   The next slide is Step 1 continued.  Again, on

10  that same date, on April 2nd, not long after-- I believe

11  it's only ten minutes, give or take, there was an e-mail

12  that we found from the marshal, Mr. Hoffer, who had

13  received that e-mail from Ms. Kaiser.  He forwards it on

14  to Matthew Collins.

15       I know from my review of the documents in this

16  case that Matthew Collins was an employee at CCA.  And

17  so he's forwarding that call request he received from

18  the U.S. Attorney's Office to CCA.  And, you know, the

19  only body of the text, he says, "And another one," but

20  you see, again, the attachment listed there is that CCA

21  call request for William Mitchell or Mitchell.

22       On the right-hand side of this slide, you see on

23  the same day, April 2nd, 2014, that generic "no reply"

24  Securus e-mail sends to Matthew Collins saying that,

25  "Your calls for William Mitchell are now available to be

 1   downloaded."

 2        And again, as I look at the time-stamps on this,

 3   the marshals sent it to CCA at 11:36 a.m. on April 2nd.

 4   At 12:24, or less than an hour later, Securus platform

 5   is generated and messaged to Mr. Collins telling him

 6   those calls are now available to be downloaded.

 7        Q.   I should've pointed this out earlier, Mr.

 8   Federico.  But on your slide you have defense exhibits

 9   and then the numbers.  Why-- why are those numbers on

10   the slides?

11        A.   Yeah.  So I just wanted to reference for the

12   Court and the parties that these numbers are-- or these

13   are examples, these snips, if you will, come from actual

14   exhibits that have been admitted in this case.

15        Q.   All right.  The next slide.

16        A.   So, again, Step 1 was us just going through this

17   paper trail.  And that's an illustration of William

18   Mitchell's case, the paper trail of one call production

19   request.

20        And Step 2 was when we sought to narrow our

21   larger pool of individuals to figure out if they meet

22   all of our criteria.  And here on the left I show from

23   CM/ECF just a-- again, a snip of William Mitchell's case

24   showing the case number in front of Judge Murguia.  It

25   shows his lawyers.  CM/ECF has information we thought

1   was relevant, so we would always look there.

2        And then on the right is a snip from the BOP

3   inmate locator on their website showing the same William

4   Mitchell who's still in custody at Leavenworth USP.  So

5   at this point Mr. Mitchell meets all of our criteria, we

6   believed, to continue the analysis in this case.

7        Q.  All right.  Step 3.

8        A.  Step 3 is we requested from Securus the call

9   access log for William Mitchell.  What we received back

10  was, again, a-- a tab and a spreadsheet workbook.  For

11  Mr. Mitchell in particular, I believe he had 1,029 calls

12  that were accessed.

13       Q.  I reviewed a certain folder with Mr. Martin this

14  morning.  Do you recall that being Mr. Mitchell?

15       A.  It was, yes.

16       Q.  And so that's the same information that you're

17  talking about here?

18       A.  It is, yes.

19       Q.  All right.  The next slide.

20       A.  So now for Step 4 I mentioned we have 1,029 calls

21  from Mr. Mitchell that had been recorded and accessed on

22  the Securus platform, but I didn't know - when you just

23  look at that - how many of those calls were made to a

24  lawyer.

25       And so we knew from CM/ECF, and I just reviewed

1    the docket, that he had been represented by Mr. Duma and

2    Mr. Jenab.  We had their phone numbers because they

3    responded to us when we asked them for their phone

4    numbers.

5           And so for Mr. Mitchell, like for all others, we

6    ran what's called a power query search on Excel, and it

7    would pull out for us anytime that there were the

8    telephone numbers to the lawyers in relation to William

9    Mitchell's call access log.  And for his case in

10   particular, it's hard to see, but I did a snip of 26

11   lines of data, of calls made from Mr. Mitchell to the

12   phone number for Mr. Duma that were accessed on the

13   Securus platform.  So we've now reduced from 1,029

14   accessed to 26.

15   Q.   So whoever it was that accessed all of those

16   calls accessed attorney-client calls?

17   A.   Yes.

18   Q.   Okay.  Let's go to the next slide.

19   A.   And Step 5 is-- what I mentioned is sort of the

20   most labor-intensive, the consolidation analysis.  So

21   now, because I have 26 calls from Mr. Mitchell in his

22   call access log that were recorded and accessed to a

23   lawyer-- or excuse me, 26 lines of data, I-- I also

24   wanted to avoid double counting.

25          So even though there are 26 lines of data, there

1   were actually only 13 phone calls, because for each

2   call, M. Collins user name on the Securus platform would

3   save it to a folder and then it would be downloaded to

4   CD.  But we would count that once because it were only--

5   again, so it was accessed twice but it was one call.  So

6   I learned that Mr. Mitchell had 13 calls to Mr. Duma

7   that were recorded and accessed on the Securus platform.

8          I also then went into CM/ECF to find out what was

9   happening in his case.  I alluded to this example

10  earlier.  The first call production requests for Mr.

11  Mitchell's calls happened on December 18th, 2013.  That

12  was the same day a superseding indictment was filed in

13  his case.

14         The second request that I just showed a moment

15  ago on April 2nd is where we have that paper trail where

16  the prosecution requested his calls.  And the purpose of

17  that was ongoing investigation.  That occurred 12 days

18  before voir dire and a jury trial began in his case.

19     Q.  So walking through all five of these steps for

20  Mr. Mitchell, what's your conclusion about who accessed

21  his calls?

22     A.  Ultimately, it's a circumstantial case, but one

23  I'm comfortable presenting.  I-- you know, we have a

24  paper trail where a prosecutor and a legal assistant

25  from the prosecution office has requested production of

1   the calls.  I can show that that was delivered to CCA,

2   that CCA was notified from Securus that the calls were

3   available for download.

4          I looked at Mr. Mitchell's call access log, and I

5   see that on April 2nd, that same day, that those calls

6   were saved to folder and then burnt to a CD.  And so,

7   you know, the paper trail of the call production request

8   with the call access log tells me circumstantially that

9   those calls were produced to the United States

10  Attorney's Office.

11      Q.   Let's look at the next slide.

12      A.   So here-- here is our overall conclusions we

13  reached in terms of the numbers.  And so I've tried to

14  just illustrate sort of pictorially again this analysis

15  we've undertaken.

16          And so the first slide shows, again, our starting

17  point, which was 1,615 was the number of CCA inmates

18  from this time frame here of 2010 to 2018 where calls

19  were accessed.

20          Two notes on that.  One is, our subpoena

21  requested Securus to provide to us any calls accessed

22  through August 1, 2018.  The reality is there were--

23  excuse me, was no data from August 1st, 2017 into 2018,

24  and the reason is because Securus no longer provided

25  the-- the telephone platform to CCA.

1        Mr. Martin this morning said he believed it was

2   in the summer of 2017.  I believe from my review of the

3   documentation it was July 27th, 2017, is the last day

4   Securus platform was operating at CCA.  So even though

5   it says 2018, in reality there are no calls in the

6   Securus platform in 2018 from CCA-Leavenworth.

7       Q.  Do you know who took over the phone service at

8   CCA after Securus no longer had a contract?

9       A.  Yes, it's a company called ICSolutions.

10      Q.  All right.

11      A.  The other note I wanted to make about this slide,

12  because it's in my report, the actual number we received

13  back from Securus was 1,617.  But we went through that

14  list and determined two of them had been counted twice.

15  One was Brenda Wood, because she appeared as both Brenda

16  Wood and Wood Brenda.  And the other was similar, a

17  gentleman by the name of Ricardo-- I can't remember

18  Ricardo's last name, but his name had been spelled two

19  different ways with a different letter.  So we took

20  those out of our pool.  So our number was 1,615.

21      Q.  All right.  Next slide.

22      A.  From there we went through the 1,615 names on a

23  list to determine how many of those had cases in the

24  District of Kansas.  And that number turned out to be

25  723.

1    Q.  All right.  Next.

2    A.  We then-- this slide just illustrates that the

3    892 inmates who did not have a District of Kansas case

4    were then put to the side.  We did no analysis on them

5    whatsoever.

6    Q.  All right.  And the next slide.

7    A.  So this slide shows that from the 723 CCA inmates

8    from the District of Kansas who had calls accessed, that

9    372 remained in custody on the date we began our

10   analysis, which was in August of this year.

11   Q.  You have sources listed on all of these slides.

12   Do you want to explain that?

13   A.  Sure.  I'm just illustrating to the parties and

14   the Court that the bottom Securus subpoena return,

15   that's-- Securus is the one that told us about the 1,615

16   names.  CM/ECF is how we determined whether or not there

17   was a District of Kansas case.  And then we used the

18   Bureau of Prisons inmate locator to figure out whether

19   or not they were in BOP custody.

20   Q.  All right.  And next.

21   A.  Out of the 372 CCA inmates with District of

22   Kansas cases who were-- remained in custody, we found

23   that 104 of them had attorney-client calls accessed.

24   Q.  Let's talk just for a minute about the people who

25   are out of custody.  They were not excluded because

1  you-- well, why, again, were they excluded?

2      A.   It was just a matter of us prioritizing those who

3  are in custody.  So we know that that pool of potential

4  clients, again, had District of Kansas cases and that

5  their calls were accessed.  But we have not yet

6  requested their call access logs, so I can't tell you

7  sitting here today whether or not any of them had

8  attorney-client calls that were accessed.  But again,

9  that's something I anticipate we will be doing.

10     Q.   So it has nothing to do with our determination of

11  whether they had a valid claim or not, we just haven't

12  gotten to them yet?

13     A.   Correct.  We're trying to prioritize those who

14  most-- or potentially could gain the most from any

15  relief being granted.

16     Q.   All right.  And then the next slide.

17     A.   So this slide is meant to represent the call

18  production requests.  So I mentioned before that we were

19  able to verify 141 requests from the government to CCA

20  for call production requests.  I am confident to a

21  degree of certainty that that number is fewer than the

22  actual number of call production requests made, again,

23  based upon the evidence we have.

24          We also, though, wanted to ensure that if there

25  were requests made by defense attorneys to CCA or

1   Securus to access the calls, that we were able to

2   account for those.  And so we subpoenaed Securus and

3   asked them to provide to us subpoenas they had received

4   from defense lawyers over this time period.  We found

5   that there were seven requests made from our office at

6   the Federal Public Defender for calls to be accessed and

7   that there were four made by private counsel.

8       Q.   If we found more subpoenas, for example, from our

9   office maybe to CCA, the effect would be that the seven

10  number would go up, but the 141 would stay the same?

11      A.   Correct.

12      Q.   Because those 141 are verified U.S. Attorney

13  requests?

14      A.   Correct.

15      Q.   All right.  And the next slide?

16      A.   The next slide is just the conclusions from our

17  data analysis.  So, again, I've already mentioned some

18  of these numbers.  The number of documented call

19  requests, it was 141 for attorney-client calls that were

20  accessed.  We analyzed 372 call access logs.  The number

21  of-- of those clients who had attorney calls that were

22  accessed was 104.

23      Q.   Now, the difference between 104 and 141, does

24  that mean-- well, what do you know about the difference

25  between those two numbers?

1     A.   So there were call production-- or yes, there

2  were call production requests made by the government

3  that did not necessarily fall within the 104, and that

4  was-- when we sort of started dividing up some of this

5  documentation in particular by attorney or prosecutor

6  name.

7          But I think the next line sort of is where these

8  two numbers intersect, which is if I look at that pool

9  of individuals that-- this 104, and again, these are

10 inmates from CCA who have District of Kansas cases who

11 remain in custody who had attorney calls that were

12 accessed on the Securus platform.  So that's our 104

13 number.  The number of those-- from those pool that we

14 actually could verify call production requests was 46.

15    Q.   Do you think that represents the entire number of

16 clients whose calls were accessed by the U.S. Attorney's

17 Office?

18    A.   No.

19    Q.   Why not?

20    A.   Because we haven't even begun to count those who

21 are out of custody today and we're only looking at

22 CCA-Leavenworth.

23    Q.   Does the fact that we still don't have a complete

24 set of records from the marshal or from the U.S.

25 Attorney's Office also impact that analysis?

1    A.  Yes.  Although, I mentioned CCA has produced more

2  documentation.  We got some last week that we-- I began

3  to review and-- and saw that there were going to be a

4  lot of duplicates, but we haven't done that analysis

5  yet.  My own conclusion likely is that there's just

6  going to be the inability to-- to actually find all

7  these documents because I just don't think they exist

8  anymore.

9    Q.  As your analysis continues, these first four

10  numbers, are they going to go down?

11    A.  They would only go up.

12    Q.  They would only go up.  All right.  Talk to me

13  about the percentage that you have there.

14    A.  So the percentage is just taking the 104,

15  dividing it by 372.  So this is percentage, again, of

16  clients.  And I define that term in my report.  And,

17  again, District of Kansas, in custody, of calls whose

18  attorney-client calls were accessed.  And that number is

19  27.96.

20      So there was more than a one-in-four chance if

21  the government requested calls of a CCA inmate that they

22  were going to get attorney-client calls.

23      I heard you say in opening statement before this

24  hearing it was a one-third chance.  As you stood up and

25  made that opening, our percentage was higher because we

1    had not completed analysis of the batch.  I told the

2    government last Monday it was 31 point I think

3    23 percent.  Obviously that number did go down a little

4    bit.  So as I sit here and we have reviewed all 372 call

5    access logs now, the number is 27.96 percent.

6       Q.   So the percentage as you continue may go up or

7    down, but these first four numbers can only rise?

8       A.   Correct.

9       Q.   Please tell me if I have this right.  When a U.S.

10   Attorney or an Assistant U.S. Attorney requests all

11   calls recorded-- all calls from a certain inmate

12   recorded to any number, they have a 27.96 percent chance

13   of obtaining attorney-client calls?

14      A.   Yes, I agree with that statement.

15      Q.   All right.  The 735 number?

16      A.   So that's just the number of individual calls

17   that we found-- attorney-client calls, excuse me, that

18   were accessed by the government.  And so there were some

19   clients who had multiple-- some had a lot of calls that

20   were recorded and accessed, and then others that had

21   maybe only one.  So this is just that total number.

22   Again, being careful not to count a particular call more

23   than once.

24      Q.   There was some testimony this morning about an

25   incomplete call versus a complete call.  Did you count

1  incomplete calls?

2      A.  So I only-- I heard Mr. Martin say that he can't

3  say whether or not a call was complete, he can only say

4  from the log when the call started and ended.  And

5  that's all the log tells us.

6          But I also thought I heard him say that unless it

7  was complete in that-- you know, I think he said, you

8  know, the time they picked up the phone out of the

9  cradle may have been the start time or it may have not

10  have been until the call was connected to the party

11  dialed.

12          Because Securus doesn't know that, I-- I don't

13  know that.  So all I can do is look at calls from the

14  start time to the end time and the call access log.  And

15  there were none that had 0.  I mean, all of them-- there

16  were some that were less than a minute, but there were

17  none that had zero or less than ten seconds.

18      Q.  As an attorney, can you convey information to a

19  client in a minute-long call?

20      A.  Depending on the client, yes.

21      Q.  All right.  Let's look at the-- is there anything

22  else from this slide, Mr. Federico?

23      A.  Yeah.  The last point of data, I just-- again,

24  this was just doing some simple math and tried to figure

25  out the number of actual attorney-client calls accessed

1    per client.  You know, whether or not that's a

2    meaningful statistic, I'm not sure, because, again,

3    there were some that had a lot of calls that were

4    recorded and accessed, others may have just had one.

5    But the average came out to be a little over seven

6    attorney-client calls per client.

7        Q.   Let's go back to these first four numbers.  So

8    you were just looking at clients that are still in

9    custody, you were not looking at District of Kansas'

10   clients that were out of custody, but they were

11   approximately an even number, 50/50 or close?

12       A.   Close to it, yes.

13       Q.   So when you go back and analyze the

14   out-of-custody clients, how do you think that will

15   affect these first four numbers?

16       A.   So all I did was did what I perceived to be

17   simple extrapolation, that's the next slide.  So if I

18   take the percentage of clients with attorney-client

19   calls accessed and I apply that to the number of

20   individuals who are out of custody as well, I would

21   expect our number of 104 clients in the District of

22   Kansas to go up to 202.  So that would be all District

23   of Kansas cases from CCA only that had attorney-client

24   calls accessed, regardless whether they're in custody

25   today or not.  And then the second is just the

1    extrapolated number of calls.  So that 735 I would

2    expect to go up to 1,429.

3        Q.  Did you have the actual call recordings?

4        A.  I did not.

5        Q.  Did you listen to any actual call recordings as

6    part of your analysis?

7        A.  No.

8        Q.  Did you have any way to determine what was done

9    with these accessed calls by the U.S. Attorney once they

10   had them in their possession?

11       A.  There were only rare cases and only through

12   testimony in this case, in the past in transcripts I've

13   read, or what I've heard last week.  But other than

14   those rare cases or ones in which the government

15   acknowledged through record correction, such as Juan

16   Herrera-Zamora, otherwise the data we reviewed doesn't

17   tell us that at all.

18       Q.  Let's talk about FPD clients for a moment.  Do we

19   have a slide on that?

20       A.  No.

21       Q.  Okay.  Let's talk about FPD clients.  Well, I'm

22   sorry, was there another slide?

23       A.  No.

24       Q.  Okay.  Tell us what you learned about the

25   privatization of FPD phone numbers.

1     A.   So, again, my understanding - and this happened

2   well before I joined the office - that our office had

3   privatized numbers dating back even to 2009, and then

4   there was a paper trail in 2011, and then even this

5   morning I saw you reviewing some of the privatization

6   with-- with Mr. Martin.  So our office had made efforts

7   to privatize phone numbers.

8        And then we learned through our review of the

9   data that there were phone calls made to FPD phone

10  numbers, particularly here in Kansas City, that were

11  recorded and accessed.  Now, why that happened?  Again,

12  I-- I can't tell you that.  And as I heard the testimony

13  just the same as everyone else here this morning, it

14  sounds to me that Securus is saying it's not an error

15  with their telephone platform, it's really operator

16  error in some form or fashion.

17    Q.   So all these numbers that you've talked about and

18  the analysis that you undertook, did you find recorded

19  FPD phone calls that had been accessed and a paper trail

20  back to the U.S. Attorney's Office?

21    A.   Yes.

22    Q.   That was a long question.

23    A.   Yeah.  There were certainly calls to the FPD that

24  were accessed.  Where it gets a little tricky is our

25  office will commonly represent someone, but they'll have

1    other lawyers in the life of the case.  Either we

2    represented them at their, you know, initial Rule 5

3    proceedings and they had to have a panel lawyer, or we

4    represent them on appeal, or some other way in which our

5    office is listed as being-- representing that client.

6         What I can-- and so I-- there are a couple of

7    those clients that come to mind, but I can't recall off

8    the top of my head whether or not any call production

9    requests sort of matched up in the time in which we

10   represented them, if that makes sense.

11       Q.  If you could look at Exhibit 564, please.  And if

12   we go down a couple-- I think the next page.  When you

13   talk about the FPD numbers, is that what you're talking

14   about?

15       A.  Yes.  So we took the list that was submitted in

16   2011 for privatization and then we went through it.  And

17   I had some role in this, and I even added and subtracted

18   some numbers myself.  And some were for former

19   employees, like a cell phone for one former employee,

20   for example, that was on the list before that we

21   removed.  And so this was the list that we sent a

22   subpoena in July, I believe, of this year regarding

23   calls to our numbers.

24       Q.  One number on here, it's (785) 246-6012.  Whose

25   number is that?

1    A.   I believe that's yours.

2    Q.   Do you remember whether we found calls recorded

3  to that particular number?

4    A.   I recall in the past there had been calls, yes,

5  that were recorded.

6         MS. BRANNON:  May I approach the witness,

7  Your Honor?

8         THE COURT:  Yes.

9  BY MS. BRANNON:

10   Q.   I'm going to hand you what's been marked

11  Exhibit 600A.

12         THE COURT:  600 letter A, subpart A?

13         MS. BRANNON:  Yes.

14  BY MS. BRANNON:

15   Q.   And Mr. Federico--

16         MS. BRANNON:  I would move for admission of

17  Exhibit 600, please.

18         MR. CLYMER:  No objection.

19         THE COURT:  600 admitted.

20  BY MS. BRANNON:

21   Q.   Can you tell us briefly what 600 represents?

22   A.   Yes.  So this is the sort of collection or

23  catalog of documents that we found for call production

24  requests made by or what appear to be at the behest of

25  Assistant United States Attorney Sheri Catania.

1        When we were going through our analysis, we were

2   much more focused on the clients, trying to determine

3   how sort of the-- the cache of documents of call

4   production requests related to particular clients, but

5   we would also then, towards the end, just to assist in

6   the presentation here at this hearing, tried to save in

7   individual potential witness folders.

8        And so for each Assistant U.S. Attorney, we would

9   sort of save in their folder any requests we found that

10  had their name on them or that were submitted by them.

11  So this is the stack of documents we saved for Ms.

12  Catania.  This stack is not likely-- it's not meant to

13  be all comprehensive, again, because we were focusing

14  our search on a more client-based search than it was the

15  prosecutor.

16  Q.   So maybe a representation of times that Ms.

17  Catania has requested records, phone records; is that

18  right?

19  A.   Yeah, exactly.  I mean, these are documents that

20  we found in which that occurred.  And we did this,

21  again, for other Assistant United States Attorney as

22  well.  But our analysis was more-- since it was more

23  client-focused, I can't say that for each of the

24  Assistant U.S. Attorneys that we have saved in these

25  exhibits every call production request or document that

1  may relate to a call production request they made.

2            MS. BRANNON:  Your Honor, we would move for

3  admission of 601, 602, 603, 604, and 605, which I

4  believe are-- the government's agreed to admit.  They

5  are each these sort of packets for different AUSAs.

6            MR. CLYMER:  No objection.

7            MS. VANBEBBER:  No objection.

8            THE COURT:  Exhibits 601 through 605

9  admitted.

10 BY MS. BRANNON:

11    Q.  And let's switch over to Exhibit 601, please.

12            THE COURT:  By the way, what is 600A?  I'm

13 not sure you've offered it.

14            MS. BRANNON:  Not yet, Your Honor.

15            THE COURT:  Okay.  Never mind.

16 BY MS. BRANNON:

17    Q.  601, can you tell from the cover sheet which U.S.

18 Attorney this pertains to, this stack pertains to?

19    A.  Not from just this document, no.

20    Q.  All right.  If we flip over to the next page, the

21 *Williamson* case?

22    A.  Yes.

23    Q.  So based on that, would you-- do you know if this

24 stack represents requests made by Kim Flannigan because

25 her name is in that?

1      A.  Yes.  And my understanding is in-- that she

2  previously-- her name was Kim Martin, but yes.  So in

3  looking at the *Williamson* case, that is one I'm familiar

4  with from his call access logs and call production

5  requests.  And, again, we found examples such as this

6  where AUSA Flannigan's name appears on call production

7  requests.

8      Q.  So that is the 600 through I believe 608 series

9  would be these sort of examples of times that an AUSA

10  requested calls.  The Court mentioned 60-- 600A.  Can

11  you explain-- that hasn't been admitted yet, but can you

12  explain what that document is and what it represents?

13      A.  Yes.  We began to just try to put together

14  documents that were just summaries of the sort of cache

15  of documents we were collecting.  And, again, it's not

16  meant to be all-encompassing of every request an

17  individual prosecutor may have made themselves or had

18  agents make on their behalf, but it's just a way to sort

19  of summarize.

20          So, for example, 600A is meant to correspond to

21  600, so that you can just see on a list the different

22  cases, whether calls were accessed from the call access

23  log, whether or not those included attorney-client calls

24  and, if so, the number.

25          MS. BRANNON:  Your Honor, we'd move to admit

 1   600A.

 2              MR. CLYMER:  No objection.

 3              MS. VANBEBBER:  No objection.

 4              THE COURT:  600A admitted.  You said

 5   something about a series of 600 to 608, but I think

 6   you've only admitted 600 through 605.

 7              MR. CLYMER:  We have no objections to 606

 8   and 607 and 608, Your Honor.

 9              MS. BRANNON:  I think 606, '7, and '8 have

10   been admitted previously.

11              THE COURT:  Okay.  Fine.

12   BY MS. BRANNON:

13     Q.  All right.  Mr. Federico, for the Exhibits 600

14   through 608, did you prepare the summary sheet for each

15   of those?

16     A.  I didn't prepare all of them myself; in other

17   words, I didn't type them out.  I'm familiar with them

18   all.  I've gone in and made some corrections.  The

19   government was even courteous enough to alert to us that

20   we had double counted one.  We made that change.  I did

21   make that change.  But I'm familiar with them, yes.

22     Q.  All right.  So we have 600A up on the screen.

23   Can you just walk us through this document?

24     A.  Yeah.  Again, the records requested in the left

25   is meant to show the name of the client or the case.

1   And the next column is calls accessed, that's just a

2   simple yes or no.  Again, what we have here in this-- in

3   600 are call production requests.  We want to know

4   actually-- were calls actually accessed in the Securus

5   logs.  And so that would say yes or no.

6        The third column is attorney-client calls

7   accessed.  A lot of those-- and some of them we went

8   back in and just did a yes/no, others we had the batch

9   number.  Again, if-- I would anticipate we could create

10  a finished polished product in all of these, but with

11  time constraints we weren't able to do so.  We just

12  would mark whether or not we knew the answer was yes or

13  no for the batch that we submitted Securus.

14       Some of these you're going to see later numbers

15  because we just didn't go back in and make the changes.

16  The UNK OOC means unknown, out of custody.  And again,

17  we weren't-- we don't have call access logs for those

18  individuals, so I don't know the answer for them.

19  Q.   So starting on row 11, Batch 8-- 5, 6, 7, 8, 9,

20  you just haven't analyzed so you don't know if there are

21  any attorney-client calls?

22  A.   We have.  We just-- on some of these we made

23  updates, some of them we didn't.  Apparently in 600A we

24  have not updated Batch 8 for Mr. Valdez-Aguirre to know

25  whether or not attorney-client calls were accessed.  So

1   we-- we know that answer, this summary just doesn't

2   reflect it.

3       Q.   If you could look at 608A, please.  And I believe

4   608 pertain to Mr. Zabel.  So in this case, of the call

5   requests that you have in 608, you did not find any

6   attorney-client calls in what Mr. Zabel had requested?

7       A.   We did not find any-- or we don't have a

8   corresponding call access log to tell us whether or not

9   these calls were even accessed, let alone

10  attorney-client calls.

11      Q.   The fact that there are no attorney-client calls

12  accessed on this sheet, does that mean that Mr. Zabel

13  did not have any attorney-client calls in his

14  possession?

15      A.   Not necessarily.  I'm not familiar with Paxton

16  Graves' case in particular, but again, what this is

17  meant to reflect is only that we don't have evidence

18  those calls were accessed.  So, you know, anything

19  beyond that, I can-- from my review of the data would I

20  say it was impossible he had attorney-client calls for a

21  particular client?  No, I wouldn't say that.  But again,

22  I can't tell you that.

23      Q.   All right.  Let's look at 603A just for a minute.

24  And this pertains to Ms. Morehead.  And, again, do you

25  think that you have all call requests that Ms. Morehead

1    made during this time frame?

2        A.   Based upon my review of the evidence, I don't

3    believe we have the call production requests for anyone

4    that-- the totality of those call production requests.

5        Q.   Che Ramsey is listed as one of the defense

6    counsel; is that right?

7        A.   Yes.

8        Q.   And is she with our office?

9        A.   She is an Assistant Federal Public Defender here

10   in the Kansas City office.

11       Q.   All right.   Let's talk about future analysis, Mr.

12   Federico.   What do we plan to do in the future with the

13   phone data that is still rolling in?

14       A.   Yeah.   So really two primary objectives.   One is,

15   once we are confident that we have-- are in possession

16   of really all the documentation that exists, whether it

17   be from the marshals, from CoreCivic, from the U.S.

18   Attorney's Office, we want to go back through and make

19   sure that we can verify all call production requests

20   that were made.

21            And, again, my experience looking through these

22   documents is that's difficult because the record-keeping

23   was not always, you know, great by any of the parties in

24   terms of just making sure they were cataloging these

25   requests.

1       For example, at CCA, there was-- there was no
2  record-keeping, other than it may be still in their
3  e-mail system, or there was a stack of forms found.  But
4  in 2016, Ken Lajiness decided to create a spreadsheet of
5  all requests that came in.  I know that because I
6  interviewed Ken Lajiness and he told me that and I've
7  seen the spreadsheet.
8       But before that, there was no real cataloging of
9  record-keeping.  So it's been proven to be very
10 difficult to go back through all those documents.  But
11 that's-- we're going to do that, so that's one thing
12 that we're going to focus on.
13      Second is, we have a large number of individuals
14 who meet all of the criteria of our analysis except
15 they're no longer in custody.  And so that's all those--
16 and I should also say we didn't count people who may be
17 on supervised release or who may be in a residential
18 re-entry center.  So custody meant BOP custody.  And so
19 I anticipate we will get their call access logs and do
20 that analysis as well.
21   Q.  And we still don't have the sort of-- our motion
22 for discovery of phone call information from the U.S.
23 Attorney is still outstanding; is that right?
24   A.  To my knowledge, it is, yes.
25   Q.  Based on your analysis, do you think we will ever

1  be able to show conclusively each time that someone in

2  the U.S. Attorney's Office accessed phone calls and it

3  included attorney-client calls?

4      A.  No.

5      Q.  And why not?

6      A.  Because, again, the paper trail either doesn't

7  exist because it was an oral request that was made so

8  there is no paper trail, or the records weren't kept.

9      Q.  All right.

10             MS. BRANNON:  Could I have just a moment,

11  Your Honor?

12             THE COURT:  Yes.

13             MS. BRANNON:  Your Honor, we would move to

14  admit 601A, 602A, 603A, 604A, and 605A.

15             MR. CLYMER:  No objection.

16             MS. VANBEBBER:  No objection.

17             THE COURT:  601 through 605, subpart A on

18  each of those is admitted.

19             MS. BRANNON:  And if I could-- I don't think

20  I've done this, but 606A through 608A, we would move as

21  well.

22             THE COURT:  606A, 607A, 608A also admitted.

23             MS. BRANNON:  Thank you.  Thank you, Mr.

24  Federico.

25             MS. VANBEBBER:  I have no questions, Your

1    Honor.

2                        CROSS EXAMINATION

3    BY MR. CLYMER:

4        Q.   Mr. Federico, the Federal Public Defender in the

5    District of Kansas has three offices.  Correct?

6        A.   Yes.

7        Q.   Where are they located?

8        A.   Kansas City, Kansas; Topeka and Wichita.

9        Q.   And the U.S. Attorney's Office also has offices

10   in all three of those locations.  Correct?

11       A.   Yes.  And there's a Special Assistant U.S.

12   Attorney at Fort Riley, Kansas, who works for the Judge

13   Advocate Office as well.

14       Q.   In the Federal Public Defender's Office, do

15   attorneys typically handle cases in the district court

16   that sits in the city where they sit?

17       A.   I would say primarily, yes.  However, you know,

18   we're a flexible organization so I myself have five

19   cases out of Wichita right now and even though I work

20   out of the Topeka office.

21       Q.   So sometimes you're on the road driving to

22   another city to handle a case?

23       A.   Yes.

24       Q.   And is that true for other attorneys in your

25   office as well?

1    A.   Yes.  And certain attorneys don't really handle

2   cases outside of their particular office, but others do.

3   So it's not true across the board, but it is true of our

4   office to say that we do sort of cross-pollinate

5   different offices.

6    Q.   So some attorneys who handle district court cases

7   either always or almost always do so in the city where

8   their office is located, some attorneys who handle cases

9   in the district court may travel more to handle cases in

10   other cities; is that right?

11    A.   Yes, it is.

12    Q.   Okay.  And each office-- each one of these

13   offices has a main telephone number.  Correct?

14    A.   Yes.

15    Q.   And each one also has a toll-free telephone

16   number?

17    A.   That's my understanding, yes.

18    Q.   And it's a different number.  Right?

19    A.   Yes.

20    Q.   And in addition to that, there's an exhibit - and

21   I don't recall the number now - where there's a whole

22   list of other numbers that are used by attorneys or

23   other personnel in the Federal Public Defender's Office

24   in the District of Kansas.  Correct?

25    A.   Correct.

1      Q.   And is there a policy in the office about what

2   number is given out to clients who are in custody or

3   what numbers are given out?

4      A.   Well, I think the preference used to be, for

5   example, on business cards to have a direct line as

6   well.  Obviously we're trying to be as most accessible

7   as we can to our clients.

8           I personally will say I changed that to be our

9   generic office line.  The reason is because I'm on the

10  go a lot, and if you call the general line, you're going

11  to talk to Latasha, who's going to answer the phone.

12  And she can reach me on my cell phone.

13          So you're more likely to get me if I give you the

14  main number than if I give you my direct line.  So it's

15  not a hard policy that says you have to give a client

16  your direct number.  Just looking at business cards that

17  we have, I notice some people do and some people give

18  the generic number.

19     Q.   So any particular attorney in one of the three

20  offices may receive contact from a client through the

21  main number, through the toll-free number, or in some

22  cases through a direct landline office number.  Correct?

23     A.   I would assume that's accurate, yes.

24     Q.   And does the office pay for cell phones for the

25  attorneys as well?

1    A.   I'm not sure about for the attorneys, I know some
2    of the investigators have them.
3    Q.   The attorneys don't have work cell phones that
4    the office pays for?
5    A.   I don't, so I don't know about others.
6    Q.   And you don't know if the others do or not?
7    A.   Yeah, I'm sorry, I'm just not aware actually.
8    Q.   Okay.  Do you know if attorneys who practice in
9    district court in the Federal Public Defender's Office
10   give out their cell phone numbers to in-custody clients?
11   A.   I-- I would feel confident saying that there are
12   some that do, yes.
13   Q.   Do you think there's also some that don't?
14   A.   Yes.
15   Q.   If somebody calls the main number or the
16   toll-free number, who answers the phone at the office?
17   I know Latasha does at one location.
18   A.   In Topeka, yes.  And even calls to Wichita
19   usually can be funneled to her so that she can answer
20   the calls there as if she's in Wichita.  And then here
21   in Kansas City it's a woman named Cachet.
22   Q.   Okay.  And when either Latasha or Cachet receives
23   a call at the main number or the toll-free number that's
24   for an attorney and the attorney is not available or
25   doesn't want to take the call for some reason, what--

1   what do those two employees do?

2       A.  I think it would depend on why the attorney is

3   not connecting on the call.  In terms of whether or not

4   the attorney may say, just take a message, and then I

5   would say assume they say to the client, you know, he or

6   she is not available, can I take a message?  Or there

7   may be other things; they would respond to say, you

8   know, call back at a certain date and time.  So I think

9   it would be specific to the situation of that phone

10  call.

11      Q.  Do these employees that answer the phone call

12  sometimes actually handwrite messages listing the name

13  and information about the call to give to the attorneys?

14      A.  It would be more common for them to do it by

15  e-mail.

16      Q.  And does your-- would that be through an office

17  e-mail system?

18      A.  Yes.

19      Q.  So your office would have a record of those sorts

20  of communications?

21      A.  Yes.

22      Q.  Do the employees who answer the telephones ever

23  simple roll somebody over to voicemail in-- a client who

24  calls over to voicemail in those situations?

25      A.  I would assume they do, yes.

1    Q.   And do you know the record-keeping capabilities
2  of your office voicemail system?
3    A.   I know as a user what the record-keeping function
4  is, yes.
5    Q.   And is it like mine where it fills up and then
6  won't take any more calls?
7    A.   I don't know about that.  I've had a lot of
8  messages on my phone at times if I'm on the road or in
9  the trial, and it's never reached capacity that I'm
10  aware of.  But that may exist on the system, I just
11  don't know.
12    Q.   Do you ever delete messages from your voicemail?
13    A.   I delete them from the phone voicemail system,
14  but they also exist as an audio .wav file in our e-mail.
15    Q.   So when somebody leaves a voicemail message for
16  somebody in your office, the system will generate an
17  e-mail message with a .wav file so you can listen to the
18  message on your computer.  Correct?
19    A.   Correct.
20    Q.   And those would be stored in your-- in your
21  voicemail-- in your computer system?
22    A.   I, personally, my practice is to store-- any
23  communications from a client, I'm going to store and
24  keep as part of that client's file, yes.  And on that,
25  I'll speak only for my own practice.

1   Q.   If a client calls the direct line of an attorney

2   in your office and nobody answers the phone, does that

3   call roll over to voicemail automatically?

4   A.   So there's a-- a voice system that-- that-- so

5   when you call our main number, it's not just that

6   Latasha picks up the phone and says, Federal Public

7   Defender.  The first thing you hear is a voice prompt.

8   And that you can then type in the last-- or excuse me,

9   the first three letters of the last name of the person

10  you're trying to reach.

11       So for me, you could type in F-E-D for Federico

12  and it will then say, if you hear the person you're

13  trying to reach's name, press pound.  You'll hear

14  Richard Federico.  They can press pound, and then it

15  should go directly to me.

16       There's-- the other option essentially asks for

17  the operator, so to speak, and that's when Latasha would

18  take the call.

19       It would be rare that you would call our office

20  during business hours, that no one would pick up, and

21  that that voice prompt system wouldn't eventually get

22  you to someone.  Because if you say nothing, the default

23  in the system is for the operator to pick up.

24  Q.   Okay.  So I want to ask you a hypothetical

25  situation.

1    A.   Okay.

2    Q.   Somebody calls a direct line.  The attorney on

3  the direct line is not in his or her office.  The phone

4  keeps ringing.  Does the phone then eventually roll over

5  to voicemail or does it roll over to the receptionist?

6    A.   I don't know that for 100 percent, but I will go

7  on my assumption is it goes to voicemail.  And the

8  reason I assume that is because, again, I travel

9  frequently and I routinely get voicemails from clients

10 in my e-mail system or on my phone system.  And that

11 happens more frequently I think than Latasha e-mailing

12 me saying, you know, Client X called and had this

13 question for you.

14   Q.   Is it your understanding that one gets the

15 employees who answer the phones only by pressing a

16 button and specifically requesting that outcome?

17   A.   I don't know the answer to that.  And the-- the

18 reason I hesitate also is because if you're calling from

19 a facility, there are limitations, because you-- you can

20 call our office collect.  We're going to take your call

21 if you're in a detention facility.

22        What I can't recall, though, is if the person

23 calling has to do something to trigger the operator

24 coming on in that scenario when it's either the 1 (800)

25 number or a collect call.  I just don't know the answer

1   to that, I'm sorry.

2     Q.  Okay.  So one possible outcome from a call to

3   your office is the person calls the main number, the

4   phone rings.  The phone then prompts the person to put

5   in the three-- first three letters of the name of the

6   attorney to whom that person wants to speak.  The person

7   figures out on a keypad that's mainly numeric, but maybe

8   has small letters on it as well, which buttons to press

9   to identify those three letters.  The phone then rolls

10  over to the attorney and the attorney number may not

11  answer and it may then roll to voicemail.  Correct?

12    A.  Possible.  I-- for example, I had one client who

13  was at a BOP facility in South Dakota.  And I remember

14  him saying to me, I can't get to you because it won't

15  allow me to press the buttons when I call in.  Something

16  has to happen on your end, so I can't dial direct to

17  you.  And I had to explain to him do nothing and

18  eventually the operator will pick up, and that's what

19  happened.

20    Q.  It may take some time then to get to the point

21  where you can leave a message for an attorney.  Correct?

22    A.  I don't think it takes too terribly long but

23  certainly doesn't happen instantaneously, yes.

24    Q.  Is there a practice in the Federal Public

25  Defender's Office in the District of Kansas for

 1   attorneys to keep notes or records of every phone call

 2   that they have with a client?

 3       A.   That's going to be the individual attorney's

 4   practice.  And so, you know, again, I can only speak for

 5   myself in that regard.  And, you know, again, I try to

 6   be pretty meticulous in my own record-keeping with any

 7   particular client's case.  So whether that's handwritten

 8   notes or electronic notes or some other type of

 9   record-keeping for my communications, I try my best to

10   do that.  That's-- obviously can be difficult when

11   you're running ten different ways and sometimes your

12   notes may be better with one client call than others.

13       Q.   Did you make any effort as part of your

14   investigation in this case to determine the

15   record-keeping practices of any of your colleagues when

16   inmates call them from CCA-Leavenworth?

17       A.   There was only one occasion that I recall that I

18   contacted one of our lawyers here, it was Tom Bartee,

19   because there was an unusual situation in a case he had

20   here out of Kansas City, and I wanted to ask him if he

21   had any recollection as to what had happened in those

22   client calls, but also why the call access would've

23   happened a year-- about 16 months later.  Would there be

24   any reason he knew of that the U.S. Attorney's Office

25   here would've requested his calls.  So other than

 1  talking to--

 2     Q.  When you said "requested his calls," when you say

 3  "his" you mean--

 4     A.  The client's.

 5     Q.  -- the inmate's calls.  Right?

 6     A.  Correct.  I-- that was one occasion.  There was

 7  another early on with Mr. Bell, Branden Bell sitting at

 8  counsel table.  He had a client, Quentin Lawton, that we

 9  know calls that were made from Mr. Lawton to him were

10  recorded and accessed.  And I-- I believe I just had a

11  discussion with him as to why that would've happened.

12     Q.  So would it be correct to say that you've made no

13  systematic effort to explore or investigate the

14  record-keeping practices in the Federal Public

15  Defender's Office about recording conversations with

16  inmates who call from CCA-Leavenworth?

17     A.  That would be accurate, yes.

18     Q.  As part of your investigation, did you make any

19  effort to determine the telephone answering practices or

20  voicemail capability or note-taking practices of any

21  attorneys who practiced defense-- criminal defense law

22  in the District of Kansas outside of the Public

23  Defender's Office?

24     A.  Not their note-taking for sure.  We did not-- I

25  personally, nor did the staff or the team I work with

1  drill down like that.  I think there were-- so I'll say

2  no.

3      Q.  Now, you-- you mentioned having provided some of

4  the documentation you've used here today in rough form

5  to the U.S. Attorney's Office.  Correct?

6      A.  Providing it to the U.S. Attorney's Office?

7      Q.  Yeah.  You provided a draft version of your

8  report to the U.S. Attorney's Office?

9      A.  Last week, yes.

10      Q.  And it was actually the week before last week,

11  wasn't it?  Or was it last week?

12      A.  I'm sorry, it was October 1st.

13      Q.  Maybe it was last week.

14      A.  Today is my daughter's fifth birthday, October

15  9th, I have to know these dates.  So yes, eight days

16  ago.

17      Q.  And you were good enough to do a presentation for

18  both me and the U.S. Attorney and other members of the

19  U.S. Attorney's Office as well as counsel for the

20  Special Master.  Right?

21      A.  I gave a presentation.  I appreciate that

22  characterization, yeah.

23      Q.  Well, and to the extent that this case involves

24  allegations of a culture of distrust in this district,

25  do you think that those sorts of presentations and that

1   sort of interaction starts to address that problem?

2       A.   I hope so, yes.

3       Q.   And we asked you some questions and you did your

4   best to answer those questions.  Correct?

5       A.   Yes.  I thought you asked fair questions, I

6   hopeful-- I was hopeful I was able to be responsive to

7   your questions.

8       Q.   I will try to ask fair questions again today.

9   Now, you've made some changes to the report that you

10  handed us that day.  Correct?

11      A.   Yes.

12      Q.   And would it be accurate to say that as far as

13  you can remember, the changes you made were simply to

14  update the numbers based on your analysis of additional

15  data since we met?

16      A.   There were additional changes.  The methodology

17  didn't change, the case example, William Mitchell,

18  didn't change.  The underlying conclusions, the numbers

19  did change, you're right.  There were some other

20  instances where I just polished the language.  And the

21  other substantive change was last week I reported to you

22  that I was only aware of three different ways a call

23  could be accessed.

24      Q.   Today you said four.

25      A.   Yeah, when I looked at Batch 7, all of a sudden I

1  saw a download and we went back to Securus to-- just to

2  get a sense of what that meant.

3      Q.   And part of your analysis that you testified

4  about today and that you told us about on October 1st

5  was to try to determine when Assistant U.S. Attorneys

6  use either subpoenas or some other means to request

7  outgoing inmate telephone calls from CCA-Leavenworth.

8  Correct?

9      A.   Correct.

10     Q.   And you assembled records pertaining to

11 individual AUSAs in Exhibits 600 through 608; is that

12 correct?

13     A.   Yeah, just the ones that we sort of found and

14 saved.  Again, it's not entirely comprehensive because

15 the focus of our search was more client than it was

16 prosecutor.

17     Q.   And I've got to confess, I'm having a hard time

18 keeping up with all the exhibits in this case.  So let

19 me ask you this:  Is there any other exhibit that you're

20 aware of as you sit here right now, other than 600

21 through 608, where AUSA requests for inmate telephone

22 calls from CCA-Leavenworth are located?

23     A.   I don't recall the earlier exhibit numbers from

24 even before I started in the office, so there may have

25 been in the 400 series, for example, from 2016.  There

1  are some e-mail threads in some other exhibits from CCA

2  that I think probably would've counted as a call

3  production request.  Exhibit 484 comes to mind where

4  it's a Deputy U.S. Marshal I think named Andrews, Josh

5  or Jason Andrews, talking to Sergeant Bigelow that I

6  don't recall if it has a specific case name on it.

7       So there may be exhibits that have e-mails,

8  references to call production requests.  I-- I don't-- I

9  couldn't tell you what all those numbers are, though,

10 sitting here.

11    Q.  And is it possible that in some of those other

12 exhibits there may be additional documentation that's

13 not contained in 600 through 608?

14    A.  It is both-- that is both possible and it is

15 possible that those other exhibits do appear in those

16 documents as well.  So it could be duplicated.

17    Q.  So there could be-- a request could appear in

18 multiple places?

19    A.  That is possible, yes.  I have not gone through

20 all the exhibits to do that analysis.

21    Q.  Where did you get those documents from, the ones

22 in 600 through 608?

23    A.  The primary source was a catalyst database that

24 the Special Master and his team built.  We had

25 subpoenaed CoreCivic in 2017 asking for all these call

1    production requests.  Their response was:  We've already

2    given this to the Special Master, just get it from him.

3    And I don't mean that flippantly, but essentially they

4    obviously wanted to avoid going through to duplicate the

5    materials again.

6        Q.  I'm well aware of the pains of document

7    production.

8        A.  Right.  And so they just said, you know, go to--

9    the Special Master has it, our understanding is he's

10   cataloged it.  You can just get them from him.

11        And so that database is the primary source of

12   information we had, because that's what contains all the

13   e-mails and those notice of availability e-mails from

14   Securus, for example.

15        The marshal forms, though, there was also a stack

16   of those that the Special Master provided to the parties

17   in this case and we used those as well.  So between the

18   marshal forms, the stack of those, and the catalyst

19   database, those are the two primary sources.

20       Q.  Are you aware that in the *Herrera-Zamora* case the

21   United States Attorney's Office, after receiving

22   guidance from the Professional Responsibility Advisory

23   Office in the Department of Justice, specifically

24   requested records of inmate calls made to a telephone

25   number assigned to an attorney named Carlos Moran?

1       A.  I am very aware of that, yes.

2       Q.  So that-- that request was what's called a

3   reverse; is that right?

4       A.  Yes.

5       Q.  And a reverse is when you're not asking for the

6   calls made by a particular inmate's PIN number, but

7   rather, you're asking for all calls that go to a certain

8   specified outside number; is that right?

9       A.  Yes.

10      Q.  In all the documentation you have looked through

11  in this case, do you know of any other situation where

12  an Assistant U.S. Attorney did a reverse like that,

13  requesting calls made to an attorney's known telephone

14  number?

15      A.  No.

16      Q.  So *Herrera-Zamora* is all by itself an outlier in

17  that regard, to your knowledge?

18      A.  Yes, I think that's fair to say.  I can't think

19  of any other-- there were definitely other reverses

20  done, but I can't think of another example where that

21  reverse was to a number I know to be an attorney number.

22      Q.  So, for example, a reverse might be done to a

23  suspect whose on the outside who's in cahoots with the

24  inmate in the commission of a crime?

25      A.  I mean, it was just to another phone number.

1   Again, I don't know if it was to an attorney or not.

2   The only one I can-- is Carlos Moran's phone number, the

3   270 number that I'm very familiar with.

4       Q.   And you know that was done after consultation

5   with the Professional Responsibility Advisory Office.

6   Correct?

7       A.   I learned after the fact as part of the

8   *Herrera-Zamora* litigation that consultations were made.

9   I don't think, as I reviewed those e-mails, there were

10  sort of definitive answers saying that you can do this.

11  I mean, I think the guidance they received back was--

12  discussed filter teams.  And, you know, the testimony as

13  I heard it last week from Ms. Tomasic, Mr. Zabel, some

14  of it was conflicting as to who knew what when.

15      Q.   Yeah, and I'm not asking you that.  I'm simply

16  asking were you aware that it was after guidance from

17  PRAO?

18      A.   Yes.

19      Q.   Okay.  Now, would it be safe to say then that

20  with respect to all of the other calls that you've

21  testified about today that have gone to a known attorney

22  number, they went-- they were produced to the United

23  States Attorney's Office because they were mixed in with

24  other calls that that inmate made?

25      A.   Yes, I think that's accurate.

1     Q.  So in other words, the U.S. Attorney's Office

2  sends a request to CCA-Leavenworth which gets passed on

3  to Securus, and it's for all the calls an inmate makes

4  and that happens to include - when production is made -

5  in some-- roughly a quarter to a third of the cases

6  attorney calls as well?

7     A.  Yes.

8     Q.  So your-- your analysis does not reflect any

9  intentional effort, other than the *Herrera-Zamora* case,

10  for an AUSA to obtain attorney-- calls made to an

11  attorney?

12     A.  I hesitate.  There was a case-- and this was

13  referenced last week with Ms. Tomasic.  Ashley Huff is

14  the defendant's name.  And calls made to the lawyer

15  friend it was referenced, and William Sessions was on

16  some of those calls.  I don't remember the paperwork

17  from that particular request, though, and how that

18  impacted Mr. Sessions in particular.

19       Also there was a case of *Michelle Reulet* out of

20  Topeka.  And in that case there was a lawyer from Texas

21  who I believe had been retained to represent Ms. Reulet,

22  and there were specific call requests made-- I can't

23  remember in the paperwork whether the number was

24  included, but that case sticks out to me also as an

25  outlier in which the prosecutor knew full well they were

1    going to get calls made to this particular lawyer in

2    Texas, and I believe took a litigation position that

3    that wasn't a violation of any rules for whatever

4    particular reasons that related to that case.

5        Q.   And I think we'll be hearing testimony about

6    *Reulet*, so I'll put that aside now.  But in the *Huff*

7    case, do you remember that the person who was

8    characterized in some e-mail traffic as a lawyer friend

9    had a telephone number in Sacramento, California?

10       A.   I don't remember that, sorry.

11       Q.   Did you remember that the number is available to

12   look at, telephone number?

13       A.   I don't remember that, no, sorry.

14       Q.   So you didn't do any investigation to check if

15   that person is really a lawyer or not?

16       A.   I did not, no.  I actually in my own mind was

17   remembering the transcript of the-- the hearing in

18   Ashley Huff's case where there's a sidebar and Ms.

19   Tomasic is explaining to the Court issues relating to

20   Ms. Huff, and Mr. Sessions being somewhat baffled about

21   information she may have gained through an attorney

22   call.  That's really what stuck out to me that I recall.

23       Q.   So because there was a reference to the person as

24   "a lawyer friend of mom," you characterized that as an

25   attorney call?

1      A.   No, I would not.  The only way we would've

2   counted it - the call - is, again, if it was to one of

3   the lawyer numbers that we had put together in our

4   spreadsheet.  This lawyer friend, unless they are an

5   attorney of record in CM/ECF on the case, then we would

6   not have counted that call.

7      Q.   And do you know if the person whose number that

8   is is even a lawyer?

9      A.   I don't.

10     Q.   Other than the *Reulet* case, this *Huff* matter that

11  we're talking about, and *Herrera-Zamora*, is it safe to

12  say that your analysis does not reveal any intentional

13  effort by an Assistant U.S. Attorney to get calls a

14  client made to a lawyer?

15     A.   I mentioned before we have Batch 10 outstanding

16  and it has some of these sort of outlier cases.  So I'm

17  hesitant without looking at that list to say with

18  certainty that there are no others like that.

19     Q.   Let's limit it to your analysis to date.

20     A.   The only other case that comes to mind is *Greg*

21  *Rapp*, which we heard about this morning.  Because the

22  number of requests for his call productions-- and,

23  again, I didn't do privatization analysis.  But as that

24  was-- been presented I believe this morning, is you had

25  all these efforts to privatize, and I saw within the

1    documentation significant requests for his calls.  So

2    there was definitely an interest in his case.

3         His co-defendant was Richard Dertinger, who was

4    part of all this testimony with Jackie Rokusek.  So his

5    case may also be an outlier.  But I agree with your

6    point, I'm talking about outlier cases, that's not the

7    norm.

8    Q.   And do you remember in the *Rapp* case that the

9    U.S. Attorney's Office notified Mr. Rapp's attorney long

10   before his privatization request that they had access to

11   Rapp's calls?

12   A.   I heard that referenced earlier today, yes.

13   Q.   Do you recall if that included that they had

14   access to his attorney-client calls?

15   A.   I heard that reference today, yes.

16   Q.   Okay.  And that was before the privatization

17   request.  Correct?

18   A.   I don't recall the exact timeline of how that

19   happened, I'm sorry.

20   Q.   So would it be safe to say that you-- your

21   analysis is consistent with the Special Master's

22   conclusion that it cannot be said that the Office of the

23   United States Attorney and law enforcement officers have

24   used an array of tactics to intentionally obtain

25   attorney-client communications?

1    A.   I-- I hesitate to agree with that for this

2    reason:  I mean, the data somewhat speaks for itself.

3    And eventually there are so many attorney-client calls

4    that were acquired by the government and its agents in

5    cases, for example like *Brenda Wood,* whether it was

6    intentionally obtained or used in the litigation, I

7    can't say.  I'm not in the prosecutor's office.  I

8    don't-- I'm not personally asking any of those

9    questions.

10        But the data sort of speaks for itself.  And it's

11   so substantial in my mind that the pattern and practice

12   seems to be that at best there's sort of a negligent

13   attitude towards the acquisition of attorney-client

14   calls.  So I would say that I don't have direct evidence

15   across the board of intentional obtaining of

16   attorney-client calls, but...

17   Q.   So then you've just agreed, haven't you?  In

18   other words, let me read a statement to you again.

19   A.   Okay.

20   Q.   "It cannot be said--"

21            THE COURT:  That's a tentative statement

22   before the Special Master was privy to any of this.

23            MR. CLYMER:  I understand, Your Honor,

24   that's why I'm asking the witness about how it-- whether

25   it's consistent with his analysis.

1          THE COURT:  Well, he can say it is, but it

2    means nothing to me.  That's why we're here, because the

3    Special Master was not able to complete his

4    investigation and there were a lot of sources of

5    information he didn't get access to, not necessarily

6    always because of the U.S. Attorney, but because of

7    Securus and CCA.  So we're here for me to determine this

8    very question.

9          You can have him answer the question, but

10   it's based on the Special Master knowing almost nothing

11   at that point when he wrote that tentative finding.

12   BY MR. CLYMER:

13   Q.  Since the time the Special Master wrote that

14   statement, have you obtained data from Securus?

15   A.  Yes.

16   Q.  Have you obtained data from the U.S. Attorney's

17   Office?

18   A.  Data generally, yes.  But as mentioned, we're

19   awaiting I believe call production request discovery

20   from U.S. Attorney's Office files.  But certainly there

21   has been, for example, the subpoena returns that have

22   e-mail threads discussing attorney-client calls, yes.

23   Q.  So you have a lot more data now than you had when

24   the Special Master wrote this?

25   A.  Yes, which is why I was somewhat hesitant to

1  agree, because I also heard prosecutors saying that the

2  litigation position of the United States is these calls

3  aren't even privileged.

4        And so when I marry up that testimony with what

5  the data shows to be, in my view, a substantial pattern

6  and practice of obtaining attorney-client calls, I

7  guess, you know, as I sit here today on October 9th,

8  2018, compared to the record as it was when I think Mr.

9  Cohen was writing that sentence has changed

10  significantly.

11     Q.  Do you think it's improper for the United States

12  to take a position in this litigation that phone calls

13  subject to a warning about monitoring and recording is

14  improper in some way?

15     A.  Well, whether it's proper or not, that's your

16  litigation position.

17     Q.  That's my question, is:  Do you think that's

18  improper?

19     A.  I disagree with your legal position.

20     Q.  Is it improper for the Department of Justice to

21  take that position in litigation?

22     A.  I think the Department of Justice can take

23  whatever legal positions it determines is proper.

24  That's not for me to say.  It's for the Court to

25  determine, for the government as a party to determine

1  what it believes the law is.  I reach a different

2  conclusion than the government in terms of your

3  litigation position.

4      Q.  In your data did it sometimes show that a U.S.

5  Attorney made a request for inmate calls and those calls

6  were never accessed in the Securus system?

7      A.  I think the answer is yes.  And, for example, we

8  just saw in 608A, Mr. Zabel had a request that we did

9  not see was accessed.  But there were also other

10  requests that were made that we haven't even analyzed

11  yet because the person is not in custody anymore.

12      Q.  Do you know why it would be that there would be a

13  request made for inmate calls and the calls would never

14  be accessed by Securus?

15      A.  No.

16      Q.  Now, you've testified about numbers of inmate

17  telephone calls accessed by Securus, and some of which

18  were calls made to attorney telephone numbers.  Correct?

19      A.  Not accessed by Securus, accessed on the Securus

20  platform.

21      Q.  Well, ultimately doesn't Securus have to download

22  them or burn the CD?

23      A.  No, someone who has access to the Securus

24  platform.  A number of these requests-- or, excuse me,

25  access were done by employees at CCA.

1    Q.   So either someone from CCA or Securus would've

2  had to have done the accessing of the Securus platform?

3    A.   Yeah.   As I understand, the CCA facility did not

4  give user access to persons outside of those categories.

5  That is not true as we learned, for example, in like

6  Sedgwick County where a number of law enforcement-- I

7  mean, I believe it was-- the actual user list was over a

8  thousand names at one point could access the platform

9  directly.   But my understanding of CCA is that was not

10 how they set up their system.

11   Q.   And it's true, is it not, that there are times

12 where the Securus platform was accessed for inmate calls

13 based on a request from somebody outside law

14 enforcement?

15   A.   I-- I can't say that.   There were times where

16 calls were accessed that I can't determine from the

17 paper trail why it was accessed.

18   Q.   Did you find times--

19   A.   But whether that was done by someone outside of

20 law enforcement, I have no idea.

21   Q.   Didn't you find times where there were requests

22 made by defense attorneys?

23   A.   Yes.

24   Q.   And so the inmate calls in those cases were

25 accessed on the Securus platform based on a non-law

1    enforcement request.  Correct?

2      A.  Yeah, that is right.  I'm sorry.  Yeah, for

3    example, Gary Hart, a lawyer, a defense lawyer here in

4    the district, had issued a subpoena.  He, my

5    understanding is, was a former law enforcement agent

6    himself and was very protective over the attorney-client

7    calls and the privatization process, became very

8    dismayed when he found a lot of his calls were recorded.

9    We found a subpoena that he issued to Securus or to CCA,

10   and he had a list of his clients.  And some of those I

11   know were-- on the call access logs included the calls

12   that would've been accessed as a result of his subpoena.

13     Q.  I'm going to direct your attention to

14   Exhibit 601, which were the requests that you attributed

15   to Kim Martin, then Kim Flannigan.  I'll ask you to look

16   at Pages 10 through 15 of this document.

17     A.  Okay.  Okay.

18     Q.  Can you tell us what Pages 10 through 15 of

19   Exhibit 601 reflect?

20     A.  Yes.  This appears to be e-mail thread where

21   defense lawyer, Robin Fowler, from Bath & Edmonds, is

22   requesting calls for inmate Brent Williamson, who I

23   assume is his client, and talking with the coordinator

24   at CCA, Dane Hundley, for production of those calls.

25     Q.  So would it be correct to say that that set of

1  pages, 10 to 15, was erroneously included in

2  Exhibit 601?

3     A.  I would say it's correct that 12 through 15 were

4  erroneously included.  Page 10, though, is an e-mail

5  from May 22nd, 2015, that Mr. Williamson's calls were

6  available for download on the platform.  This e-mail

7  thread is after that.

8          So I would agree with you, though, that e-mails

9  from a defense lawyer should not be attributed to one

10  that's a call production request of the government.  I

11  can't tell you, though, that-- or I wouldn't say that we

12  counted that, though, in our number of 141 call

13  production requests.  And I mention on that one slide

14  that there were four requests from private attorneys, I

15  can think of what three of those four are off the top of

16  my head.  This may be the fourth, I don't remember.

17     Q.  But you'd agree with me that the records I just

18  referred you to, at least some of those pages, and I-- I

19  don't have it in front of me so I can't count which

20  pages, there are a number of pages in Exhibit 601 that

21  reflect a request was made by a defense attorney for Mr.

22  Williamson's inmate telephone calls from

23  CCA-Leavenworth, not a request from Ms. Flannigan.

24  Correct?

25     A.  Yes, I agree with that.

1    Q.  Do those records reflect how the request was

2    originally made by the attorney, Mr. Fowler?

3    A.  Give me one more minute, please.  I don't see

4    that it does.  The reason I'm flipping back and forth,

5    it's an e-mail thread and sometimes the timing of

6    messages gets jumbled, but it-- I don't see that it

7    actually has sort of the-- the basis of the request, so

8    then it references a request was made.

9    Q.  So would it be correct to say that what we have

10   now in Exhibit 601 is evidence that an attorney

11   requested calls made by his own client and we don't know

12   how he initiated that request?

13   A.  Yeah, I think that's right, yes.

14   Q.  Do you know how many other times that has

15   happened?  In other words, how many other times an

16   attorney has requested calls from the Securus platform

17   for his own client?

18   A.  Ten.

19   Q.  And how do you know it's ten?

20   A.  Well, we-- we have subpoena requests, so I know

21   it's at least ten.

22   Q.  But I'm sorry, you said at least ten.

23   A.  Now I'm saying at least ten.  But on the other

24   hand, we did searches by client name.  And so for our--

25   that pool of clients, the 372 individuals, we were able

1   to pull up every document that had a search term that

2   had the client's name on them.  And so, you know,

3   obviously we retrieved the Williamson here, Mr. Fowler.

4   I will concede that's an error that we put this in Kim

5   Flannigan's packet, but I would not anticipate there are

6   a lot of these similar types of documents by defense

7   attorneys because, again, we did the searches by the

8   client names so they would've come up in those searches.

9      Q.  When you refer to the 372 clients, those are your

10  clients.  Correct?

11     A.  Well, our office was appointed under Standing

12  Order 18-03 I believe it is, to represent any person who

13  may have a claim for a Sixth Amendment violation in the

14  District of Kansas.  So when I say "clients," that's who

15  I'm referring to.

16     Q.  What was the 372 number you just gave us a minute

17  ago?

18     A.  That is-- well, that's the five criteria.

19  Persons who were previously in custody at

20  CCA-Leavenworth; who have a District of Kansas case; who

21  are in custody today; who had calls that were accessed;

22  and whose calls included attorney-client calls.

23     Q.  Is Mr. Brett Williamson among that 372?

24     A.  I believe he was, yes.

25     Q.  And in his case, it appears that calls were

1    accessed based on a defense attorney request.  Correct?

2       A.  It does, yes.

3       Q.  And you have no subpoena for that request.

4    Correct?

5       A.  Not that I recall, no.

6       Q.  So would it be safe to say, as you sit here right

7    now, you can't tell us whether there were other requests

8    made by either the same defense attorney or other

9    defense attorneys for inmate calls where no subpoena

10   exists?

11      A.  I can't tell you that except, again, with the

12   caveat, as I mentioned before, we did requests or

13   searches by inmate name.  So my expectation is that

14   there are very few, if any more, of these types of

15   e-mail threads.  I say that with confidence, a high

16   degree of confidence.

17      Q.  I want to ask you a question about a-- a unit of

18   measurement that's different than the one you used in

19   your analysis.  Can you tell us as you sit here right

20   now the number of-- for the time period January 1st,

21   2010, to August 1st, 2017, according to the analysis

22   you've done to date, and understanding that it's not

23   completed yet, how many inmates, individual people, have

24   had their calls accessed by Securus following a request

25   by an AUSA or a law enforcement official?

1    A.  So we found 141 requests.  And I-- some of those

2  inmates, though, had multiple requests for their

3  particular calls.  I believe the number that was on the

4  slide is 46 different inmates who met our criteria.  So

5  they're in custody still today who are at CCA with D.Kan

6  cases that we are able to verify had call production

7  requests.

8    Q.  Now, when you talk about calls from those

9  inmates, those are calls from the inmate's PIN number.

10  Correct?

11    A.  Yes.

12    Q.  So with any particular call at any particular

13  time, we don't know if the inmate made that call or

14  somebody else using the PIN made the call.  Correct?

15    A.  That's correct.

16            THE COURT:  Mr. Clymer, if you're going to

17  be for a while, why don't we take a 15-minute break.

18            MR. CLYMER:  Okay.  Thank you, Your Honor.

19            (Recess).

20            THE COURT:  All right.  You can be seated.

21  Go ahead.

22  BY MR. CLYMER:

23    Q.  Do you have a copy of 562A up there with you, the

24  PowerPoint presentation?

25    A.  I do not.

1     Q.   I'm going to show you I think the two-- the

2   second to last page of Exhibit 562A.  And I've

3   highlighted some of the words on here, I want to talk to

4   you about one of the sets of highlighted words.  You-- I

5   take it you prepared that PowerPoint.  Correct?

6     A.   I did, yes.

7     Q.   Okay.  And on that PowerPoint on this slide where

8   you had some statistical information, you referred to

9   A-C calls.  Correct?

10     A.   Correct.

11     Q.   And is that short for attorney-client calls?

12     A.   Yes.

13     Q.   Isn't it true that you don't know for any

14   particular call in your analysis whether there was an

15   attorney or a client on either end of the line?

16     A.   Correct.  We did not have content for any calls,

17   so I don't know what was said or the voice of the

18   speakers.  I only know that calls were made from an

19   inmate PIN number to an attorney's phone number.

20     Q.   So those references would more accurately say

21   instead of A-C calls, calls to an attorney telephone

22   number.  Correct?

23     A.   Sure.  I mean, those are pretty similar, but I

24   mean, I'm comfortable just saying A-C calls as a way to

25   reflect what it is I just mentioned, which is calls made

1    to attorney phone numbers that show up on the call

2    access log.

3       Q.   But, in fact, as you just said, you don't know

4    that any of those calls were made by a client, correct,

5    any individual call?

6       A.   Well, I know they were made from an inmate PIN

7    number to persons that we found matched up in CM/ECF as

8    being represented by those lawyers.

9       Q.   And you know that-- on the other end, you don't

10   know who answered the phone?

11      A.   Correct.

12      Q.   So wouldn't it be more accurate to say they're

13   calls to an attorney telephone number?

14      A.   Sure.

15      Q.   I'm going to give you this page from the-- give

16   you the last two pages, and I'll ask you just very

17   neatly if you could in writing everywhere it says--

18   actually just the first time where it says

19   "attorney-client calls," can you just hand-write on-- do

20   you have a pen with you, sir?

21      A.   I do.

22      Q.   Just write on-- use mine.  "Attorney-client

23   calls," change that to "calls to an attorney telephone

24   number."

25      A.   I'm sorry, you want me to hand-write A-C calls to

1  an attorney phone number?

2      Q.  No, I want you to replace "A-C calls," which you

3  told me was more accurate, with the words "calls to an

4  attorney telephone number."

5      A.  I have done as directed.

6      Q.  Thank you.

7          MR. CLYMER:  Your Honor, I'd ask that that

8  be marked as Exhibit 40-- or I'll mark it as Exhibit 40

9  and move that into evidence.

10         THE COURT:  Exhibit 40?

11         MR. CLYMER:  40.

12         THE COURT:  Exhibit 40 admitted.

13  BY MR. CLYMER:

14     Q.  For each one of those calls in your analysis, you

15  don't know who answered the telephone, do you?

16     A.  Correct.

17     Q.  You don't know if the call rolled over to

18  voicemail, do you?

19     A.  I do not.

20     Q.  For any particular call, you don't know if the

21  inmate ultimately hung up before leaving a message?

22     A.  I don't.

23     Q.  On any particular call you don't know if it was

24  another inmate using the PIN number?

25     A.  I don't.

1    Q.   I'll read you a passage from Exhibit 38, which is

2    the Special Master's report, and I'll ask you if you

3    recall this passage.

4         "The Securus data includes very short calls where

5    nothing meaningful occurred, such as calls where, one,

6    the recipient refused the call after hearing the Securus

7    pre-recorded message; the recipient attempted to join a

8    third party to the call, which normally leads to

9    immediate call termination; or three, the inmate

10   terminated the call after learning the intended

11   recipient was not present, such as when a receptionist

12   answers the phone and informs the inmate his attorney is

13   unavailable."

14        Do you remember that passage from the Special

15   Master's report that's been marked as Exhibit 38 in this

16   case?

17   A.   I do as you read it to me, yes.

18   Q.   And is it your view after doing your analysis

19   that that passage from the Special Master's report is

20   accurate?

21   A.   I can't say whether it's accurate or not.  Again,

22   we don't have-- my understanding is Mr. Cohen was able

23   to review some content.  I-- I have no content, we did

24   not seek to retrieve any content of calls because, of

25   course, in our view calls made between clients and their

1   lawyers are privileged.

2       We don't yet necessarily represent those clients

3   or haven't gone through any waivers to acquire the

4   content of the calls, so I don't know what was on those

5   calls.  So I can't say whether that's accurate or not.

6   I also heard this morning--

7    Q.  I'm sorry to interrupt you.  Didn't you just tell

8   me a minute ago that you, by a special order of the

9   Court, now represent all these defendants?

10    A.  We have been appointed by Standing Order-- again,

11   I think it's 18-3 to represent all persons who may have

12   a claim for a Sixth Amendment violation.  I used and I

13   defined the term "clients" in my report to say that

14   potential pool of individuals.  But we're, again, still

15   undergoing the process, particularly as it relates to

16   phone clients, to determine who actually we're going to

17   represent to file a 2255 on their behalf.

18       So I use that term-- again, "clients," I define

19   that in the report the potential persons we could

20   represent under the standing order.

21    Q.  So for purposes of your presentation today, you

22   cannot tell us what percentage of the calls that you

23   counted as attorney-client calls actually ended up with

24   a receptionist only talking to the inmate?

25    A.  Correct, I agree with that.

1    Q.   You cannot tell us what percentage of the calls

2    were rolled over to voicemail?

3    A.   Correct.

4    Q.   You can't tell us what percentage of the calls

5    resulted in a conversation with the inmate and somebody

6    other than an attorney?

7    A.   Correct.

8    Q.   And you can't tell us what happened on any one of

9    those calls in your data?

10   A.   Correct.

11   Q.   I now want to turn to what occurred after the

12   call was accessed.  One of the ways the data regarding a

13   call was transmitted was by hyperlink; is that correct?

14   A.   Yes.  Securus-- those examples we showed would

15   generate a hyperlink that allowed the person with user

16   access to download the calls.  I don't recall seeing any

17   e-mails, though, where that link itself was forwarded.

18   I know this was referenced this morning.  I do recall

19   seeing e-mail threads, though, saying:  I got the link

20   you sent me, it doesn't work, can you re-send?

21   Something of that nature.

22   Q.   Who sent that e-mail you just referred to about

23   the link not working?

24   A.   Boy, I can't remember the particular names

25   involved.  It was someone--

1    Q.  Was it a law enforcement official?

2    A.  Yeah, my recollection is it's a law enforcement

3    official to CCA.

4    Q.  When that link was generated and sent, at what

5    point does the Securus platform record the phone data as

6    being accessed?

7    A.  So my understanding, and this is again a better

8    question for Securus than me, I'm telling you what was--

9    what the logs seemed to indicate is the access.

10        So that link-- that e-mail is generated saying

11   when the calls are available for download, the user

12   would have to go in and actually click on the link to

13   save those to a folder, and the access log would then

14   generate data saying accessed at that time.

15        And then the most common scenario by far was an

16   access to save those calls to a folder and then CD

17   burning, where the calls would then be duplicated into

18   some type of removable media.

19   Q.  So is it your understanding that if no one ever

20   clicks on that link or clicks on the link only if it

21   expires, there will be no entry on the Securus platform

22   of the call being accessed, if you know?

23   A.  Yeah, I-- I'm not 100 percent certain on that

24   actually, because I can't recall that I went back to

25   marry up any of those generic Securus e-mails to the

1    call access logs because, again, we didn't count those

2    as call production requests.

3        Q.  So on one hand, it's entirely possible that some

4    of the documents you have included in 600 through 608

5    that show those links never resulted in the Securus

6    database actually being accessed if the link expired

7    before somebody clicked on it?

8        A.  Yes.  And the e-mail that Securus would generate,

9    a lot of them had a 24-hour deadline, as in these calls

10   are available to be downloaded within the next 24 hours.

11       Q.  Yeah, but my question is a little different.  My

12   question is:  If it's the case that the Securus platform

13   doesn't record the call as being accessed until an

14   active hyperlink is pressed, you may have documents in

15   600 through 608 that reflect a link being sent out that,

16   in fact, doesn't have any data accessed as a result?

17       A.  That is possible, with one other note to that,

18   which is, I don't have access to Securus' platform, I

19   never have.  So I don't know if you click on the link if

20   you then have to do something else to save to folder,

21   for example.  I don't know what happens when you click

22   the link.

23       Q.  Fair enough.  And if it's the case that the

24   Securus database does reflect an access just to generate

25   the hyperlink in the first place, then your data may

1   show an access when nobody ever got to that link before

2   it expired; is that correct, too?

3       A.   That would be correct if that were true, yes.

4       Q.   Does your analysis show how often it was the case

5   that once a CD or a hyperlink was produced with calls

6   available, that no one ever listened to it because the

7   case was resolved by guilty plea?

8       A.   My analysis doesn't show that at all.

9       Q.   Does your analysis show how often calls were

10  requested solely for purposes of voice recognition and

11  never needed because the defendant never challenged

12  identification in a case where voice recognition could

13  have been but wasn't ultimately an issue?

14      A.   It does not.  In fact, I don't recall a single

15  form of production request ever mentioning voice

16  recognition as the basis for the call production

17  requests.  Most of the times it would say something like

18  "ongoing investigation" or "trial prep."

19      Q.   But you-- as you've told us, you don't have all

20  the request forms?

21      A.   Correct, yes.

22      Q.   Does your analysis show how often the inmate

23  spoke to-- spoke a language that the Assistant U.S.

24  Attorney and the agents didn't know and, therefore, the

25  calls went to an interpreter?

1     A.  No.

2     Q.  You're aware, are you not, that your colleagues

3   interviewed an interpreter named Sara Gardner, who said

4   that she had standing instructions from Assistant U.S.

5   Attorneys not to listen to attorney-client calls?

6     A.  I know that we interviewed Ms. Gardner.  I wasn't

7   present at that interview, I don't know if she said that

8   or not.

9          MS. BRANNON:  I'm going to object to that

10   last question because I don't think that's an accurate

11   representation of what Ms. Gardner says.

12          THE COURT:  All right.  So noted.  I think

13   in evidence are the summaries as well as the actual

14   transcript of her interview, which I must say the

15   summaries I don't think are an accurate account of what

16   she actually said during the interview, so I'm going to

17   pay more attention to the interview transcript itself.

18          MR. CLYMER:  The transcript is 554, Your

19   Honor.  If it's not in evidence, I'd move it into

20   evidence.

21          THE COURT:  I think it is in evidence, but

22   if not-- what's the exhibit?

23          MR. CLYMER:  It's 554.

24          THE COURT:  554.

25   BY MR. CLYMER:

16-20032-JAR  USA v. Karl Carter (Black)  10.09.18        1612

1    Q.  Did you ever read this transcript?

2    A.  I did not, no.

3         THE COURT:  All right.  554 if it's not

4    admitted is admitted.  And I-- are the summaries also

5    admitted?  I think they are.

6         MS. BRANNON:  I believe they are, Your

7    Honor.

8         MS. VANBEBBER:  Yes.  Yes, Your Honor, they

9    are, but I-- they may be sealed.  I don't-- I don't

10   recall for sure.

11        THE COURT:  Well, anything under seal I'll

12   be looking at anyway, so-- all right.  Go ahead.

13   BY MR. CLYMER:

14   Q.  So your-- your analysis doesn't show how many

15   times the agents and the Assistant U.S. Attorney didn't

16   even speak the language that the inmate spoke on the

17   telephone?

18   A.  It does not.

19   Q.  Does your analysis show often or when Assistant

20   U.S. Attorneys and agents didn't listen to the calls

21   just because there were too many to listen to?

22   A.  No.

23   Q.  And, in fact, for the one you use as an example,

24   William Mitchell, there was 1,029 calls by that single

25   inmate.  Correct?

1      A.  No, there were 100-- 1,029 accessed.  Some of

2  those were individual calls that were accessed multiple

3  times.  So I focused on his attorney-client calls, and

4  the example I gave is there were 26 times where a call

5  was accessed, but there were actually only 13 calls

6  because, remember, those 13 calls were accessed twice.

7      Q.  Those were just to the attorney phone numbers?

8      A.  Correct.  But the same analysis applies to the

9  1,029.  You said, are there 1,029 calls?  I'm saying no,

10  there weren't 1,029 calls.  I don't know the actual

11  number of phone calls that were made.  I'm saying there

12  were 1,029 times that there was an access to William

13  Mitchell's calls.

14      Q.  Would it be accurate to say that for some inmates

15  when you accessed-- when you looked at the Securus

16  database, many of their calls had been accessed?

17      A.  I think it was-- there were large variations.

18  There were some that had literally thousands of calls

19  that were accessed.  There were some that had very few.

20  The only times that it was very clear what was happening

21  was on a playback.  And that's when someone went in just

22  to listen to that call.  And so for-- there were some

23  instances where there was a call made that the only time

24  it was accessed was for playback.

25      Q.  So your analysis doesn't show, as a general

1    matter, whether any Assistant U.S. Attorney listened to

2    the substance of any call to an attorney between 2010

3    and 2017?

4        A.  It does not, no.

5        Q.  And more particularly, your data does not show

6    what happened on any particular call that was made from

7    CCA to an attorney telephone number?

8        A.  I mean, it shows the amount of time from the call

9    start to the call end, it shows the dialed number.  So

10   when you say any data about the call, I don't agree with

11   that.  But I think what you're asking is in terms of

12   content, I agree, no, we don't have content.

13       Q.  It doesn't show content and it doesn't show

14   whether anybody in law enforcement ever listened to the

15   call?

16       A.  Correct.

17       Q.  Your analysis also shows that on occasion when

18   inmates' calls were requested, they included calls to

19   privatized telephone numbers?  Actually strike that.

20   I'll ask the question.

21           Were there any instances where there was a

22   request from the United States Attorney that marries up

23   with a privatized call being accessed in the Securus

24   database?

25       A.  Privatized call, my understanding, could not be

1    accessed because it wouldn't have been recorded.  The

2    errors were in the privatization process, but I don't

3    have those records.

4        Q.  Let me ask you a better question.  You've

5    identified a group of calls in the Securus database

6    where there was a privatization request submitted.

7    Correct?

8        A.  Again, I didn't do privatization, but the most

9    obvious example is the Federal Public Defender, so yes.

10       Q.  Of the calls that you-- of the attorney telephone

11   numbers that you have seen evidence of a privatization

12   request being submitted on, do you have any records

13   showing that any of those numbers after the request was

14   made were accessed in the Securus database?

15       A.  Again, I don't have records of privatization, so

16   my answer to really any of those questions would be no.

17   The only ones that-- because I work in the office, I'm

18   aware of the fact that our office privatized numbers

19   going back to 2011, but yet I have calls to, for

20   example, Tom Bartee or to Che Ramsey that were recorded

21   and accessed.

22           I can't explain why that is, I don't have the

23   particular privatization records of Securus to tell me

24   their phone numbers and why.  For example, this morning

25   they talked about the different locations where-- in the

1   pull-down menu.  That may be the explanation, I just

2   don't have access to that information.

3       Q.  When you contacted attorneys in the District of

4   Kansas, did you make any effort to determine how many

5   had tried to get their numbers privatized?

6       A.  So I personally did not do this.  We have a panel

7   coordinator, who is the person that talks with the panel

8   lawyers.  And my understanding throughout the--

9   throughout this litigation, since 2016, there has been

10  communications regarding the privatization process, just

11  notification generally to lawyers about what was going

12  on in the litigation so that they can make informed and

13  reasonable decisions as to what they needed to do for

14  their own practice.  But I personally did not talk to

15  panel lawyers about whether they did or did not

16  privatize or how they may have done so.

17      Q.  Do you have any knowledge from your work in this

18  case roughly what percentage of criminal defense

19  attorneys in this district made any effort to have their

20  calls to their telephone numbers privatized?

21      A.  I don't know that percentage, no.

22      Q.  You talked about the video evidence.  Would it be

23  correct to say that you haven't watched any of the video

24  evidence?

25      A.  I have not.

1    Q.   You know that the video evidence is all

2  soundless.   Correct?

3    A.   My understanding from the testimony of Ms.

4  Rokusek, her investigator Mr. Bussell, is that when they

5  viewed it on I believe it was August 5th of 2016 at the

6  U.S. Attorney's Office that that is what they reported

7  to the Court.   So my only knowledge about what's on the

8  video is from reviewing the transcripts of that hearing

9  when they communicated that to the Court.

10    Q.   Do you recall reading the Special Master's report

11  that also reported that the-- all of the audio-- all the

12  video from CCA-Leavenworth was soundless?

13    A.   Yes, you're correct.   I'm sorry.   I did read that

14  report as well.

15    Q.   Okay.   So would it be safe to say that in order

16  to glean any information about the communications on

17  those videos, one would have to rely on hand gestures

18  and face gestures and body language.   Correct?

19    A.   Yes.   I mean, what you're observing in terms of

20  the communication between two people in a room, so those

21  three things you mentioned, absolutely, yes.

22    Q.   Now, have you watched any of those videos to

23  determine whether any hand gestures, body gestures were

24  made during the communications?

25    A.   I have not, no.

1    Q.   So you don't know what's on any of those videos?

2    A.   No.  My understanding is those videos were

3    impounded by the Court, and so I have not taken any

4    efforts, nor has my office, to my knowledge, to seek

5    access to those videos.

6    Q.   You haven't asked the Court to watch them?

7    A.   I haven't, no.

8    Q.   Those are your clients?

9    A.   Those are-- yes, we have filed, I can't remember

10   the number, it's in the 60s, of 2255s for individuals

11   who had meetings with their lawyers that were

12   video-recorded.

13   Q.   Oh, one question I forgot to ask you.  When the

14   calls were produced to the United States Attorney's

15   Office, you also don't know what percentage of those

16   calls were turned over to a taint team, do you?

17   A.   I do not, no.

18   Q.   You do know, don't you, that the U.S. Attorney's

19   Office used taint teams?

20   A.   Yes.

21             MR. CLYMER:  Can I have one moment, Your

22   Honor?

23             THE COURT:  Yes.

24   BY MR. CLYMER:

25   Q.   Oh, one other thing.  I'm going to go back to

1  what's now been marked as Exhibit 40.  And before I

2  focused on the terminology you used, "attorney-client

3  calls," where you've changed it now, at least in one

4  location, to "an attorney phone number."

5       The other terminology I want to focus on is the

6  word "accessed."  Now, you have used the term "accessed"

7  to describe what somebody does with respect to the data

8  in the Securus platform.  Correct?

9     A.  Yes.

10    Q.  So somebody goes into the platform and they can

11 either download or burn a CD or review or whatever the

12 fourth possibility was.  Correct?

13    A.  Yes.

14    Q.  And that is them accessing it?

15    A.  Yes.

16    Q.  On this sheet you use the same word "access" to

17 mean something else, don't you?

18    A.  I wouldn't say so, no.

19    Q.  Well, you say, for example in the third entry

20 down, "number of clients whose calls to an attorney

21 telephone number were, quote, accessed by the USAO."  Do

22 you see that?

23    A.  I do.

24    Q.  Okay.  And there you're not suggesting, are you,

25 that the United States Attorney's Office accessed the

1   Securus database, are you?

2       A.  So in my report I define--

3       Q.  I'm sorry.  Please just answer the question.  Are

4   you saying that or not?

5       A.  Well, yes, and I'll-- I can explain why.

6       Q.  Okay.  Go ahead, I'm sorry.

7       A.  So in my report I define USAO as the United

8   States Attorney's Office for the District of Kansas.  I

9   also then describe the government as both the U.S.

10  Attorney's Office and its agents.

11          So ultimately, if the question is presented to

12  the Court, it can determine whether or not any person

13  at-- for example, CCA is an agent of the government for

14  these purposes.  I've done the legal research myself, I

15  think there's a strong argument to be made that CCA is

16  an agent of the government.  So when I used the term

17  "USAO" as I defined it in my report, I'm talking about

18  not just prosecutors who work at the U.S. Attorney's

19  Office, but any marshal that may work as an agent of the

20  U.S. Attorney's Office, any DEA agent, any CCA employee.

21      Q.  That's an atypical use of the term "U.S.

22  Attorney's Office," is it not?

23      A.  It may be, yes.  But again, I put this in my

24  report to be clear about what I meant when I said that.

25      Q.  You know, for example, that the marshals don't

1   report to Mr. McAllister, don't you?

2       A.  I do, yes.  That's my understanding from their

3   organizational chart.  They have their own marshal here

4   in the district.

5       Q.  And the employees at CCA don't report to

6   Mr. McAllister, either, do they?

7       A.  I would agree with that.  Yes.

8       Q.  And what actually happened with the U.S.

9   Attorney's Office, as that term is commonly used, is

10  those calls were produced to the U.S. Attorney's Office.

11  Correct?

12      A.  I don't know that's true.  My-- the data doesn't

13  show-- for example, if there are e-mails that say the

14  calls are on the transport, that was common.  Well, you

15  know, I don't have personal knowledge of what happened

16  on that transport, that the marshal picked up a physical

17  disk and delivered it to the U.S. Attorney's Office,

18  because there's-- there's no paper trail to document

19  that.

20          So I can't say, as you just did, that the calls

21  were produced in that sense to the U.S. Attorney's

22  Office.  But again, I used that term and defined it as

23  more expansive because, in my view, you know, the

24  government is the government, so to speak.

25      Q.  But you didn't use the word "government" on your

1   exhibit?

2       A.   That's true, that was-- but, again, in the report

3   I used them interchangeably and I explained that.

4       Q.   This wasn't an effort to try to suggest more

5   access by the U.S. Attorney's Office than it actually

6   had, was it?

7       A.   No, I wasn't trying to mislead by using that

8   term.  You could strike USAO and put government if you'd

9   like.

10      Q.   Why don't we do that actually.  Why don't you put

11  government and CCA since it--

12      A.   Well, if you want me to accurately reflect my

13  testimony, my reference would be to say government.  I

14  mean, it's your exam so I'll write whatever it is you

15  want if you want to offer it.  But my testimony would be

16  government is the most accurate way to say that.

17      Q.   Then just put the word "government."

18      A.   (Witness complies).

19      Q.   And so you can't tell us for any particular call

20  in your database whether it was actually ever produced

21  to anybody in the U.S. Attorney's Office?

22      A.   No.  I have circumstantial evidence where it will

23  say the calls are ready, they're going to be on the

24  transport.  Or agents will say, thank you, that's great.

25  But, you know, again, I wasn't there that day when the

1   transport picked up CDs.  I certainly didn't follow it.

2   I don't have any evidence to show it was handed off to a

3   prosecutor or anyone else in law enforcement.

4        Q.  Or whether anybody listened to it?

5        A.  Correct.

6             MR. CLYMER:  No further questions, Your

7   Honor.  Your Honor, now that Exhibit 40 has been

8   altered, I offer it again as it is.  I'll mark it

9   tonight and have a copy for the parties tomorrow.

10            MS. BRANNON:  Can I see it?

11            MR. CLYMER:  Sure.

12            THE COURT:  It's a demonstrative?  It's

13  based on a demonstrative; is that correct?

14            MR. CLYMER:  That's fine, Your Honor.

15            MS. BRANNON:  Yes.

16            THE COURT:  Exhibit 40-- well, you're

17  modifying it is admitted as a demonstrative.

18                   REDIRECT EXAMINATION

19  BY MS. BRANNON:

20       Q.  Mr. Federico, how is it that we would ever know

21  whether an Assistant U.S. Attorney actually listened to

22  attorney-client calls?

23       A.  I would think there would be two ways.  The most

24  obvious and direct way would be to talk to them about it

25  and ask them that question.  The second would be-- we're

1    talking about audio files, which means they are loaded

2    onto a computer, which means there are a forensic

3    computer trail that shows potentially which files were

4    accessed.  But then again, that would only show that on

5    this person's computer at a particular date and time a

6    file was accessed.

7        Q.   That information is within the sole custody and

8    control of the U.S. Attorney's Office?

9        A.   Yes.

10       Q.   All right.  If a client calls our office and

11   leaves a message with Latasha, "I'll take the deal," do

12   you consider that protected privileged communication?

13       A.   Yes.  Under the Rules of Professional

14   Responsibility, it's not just the attorney him or

15   herself, it deals with their representatives, to include

16   investigators, paralegals, anyone who works under the

17   general umbrella of the attorney team fits within the

18   privilege.

19            And, you know, Latasha is a valued member of our

20   team, like all other staff employees.  If you

21   communicate something to Latasha, something that's in

22   furtherance of the representation, you're communicating

23   that to me.  It's covered under the privilege.

24       Q.   It's a rather short message as well, isn't it?

25       A.   It's an important one, though.

1    Q.  A client calls and leaves a message on your

2    voicemail, "Talk to Joe at this number," is that

3    privileged information?

4    A.  Yes.

5    Q.  Is it information that would reach you?

6    A.  Yes.

7    Q.  Again, might be a rather short call?

8    A.  Yes.

9    Q.  The videos that the prosecutor asked you about,

10   in addition to hand gestures, expressions, the sort of

11   documents that are being reviewed could be

12   communicative?

13   A.  Yes.  And, in fact, from what Ms. Rokusek

14   describes-- well, not just what she describes, but the

15   e-mail threads about that video encounter, I mean,

16   that's, in fact, what the government was trying to

17   determine, was they wanted to--

18           MR. CLYMER:  Objection, that's a matter in

19   dispute.

20           THE COURT:  Well, he can testify to a matter

21   in dispute.  You can cross examine.

22           THE WITNESS:  Again, my understanding, you

23   read the e-mail threads, that's what they're discussing

24   is they had-- and Ms. Rokusek testified that they were

25   basically accusing her of passing discovery from another

1    case to her client, Mr. Dertinger, and that the videos

2    would prove that it happened.  So that's beyond hand

3    gestures, that's actual physical documents being

4    exchanged.

5    BY MS. BRANNON:

6        Q.  Sometimes the true communicative value of an

7    exchange between two people is only understood by the

8    people involved in that case, for example?

9        A.  I would absolutely agree with that.

10       Q.  So we might have one of these random videotapes

11   of an attorney meeting with a client and you could look

12   at it and it means nothing to you.  Right?

13       A.  Yes.

14       Q.  But the prosecutor in that particular case might

15   read something completely different out of that video

16   exchange?

17       A.  Yes.

18       Q.  Even without the sound?

19       A.  Yes.

20       Q.  And how would you know what the communicative

21   value of that particular video exchange would be to an

22   individual prosecutor in that case?

23       A.  I wouldn't.

24       Q.  Because that's just in a prosecutor's mind?

25       A.  Yes, or how the evidence-- then they would use

1  that and either present it in court or use it as part

2  of, you know, pretrial preparation or litigation in some

3  manner.

4      Q.  Sometimes that sort of evidence can indicate

5  whether it's an amicable relationship or not between an

6  attorney and client.  Right?

7      A.  Yes, or it could be relevant to sentencing in

8  terms of the demeanor of the person.  I can think of one

9  classic case, a death penalty case out of Massachusetts,

10  where a video of the person in a holding cell was played

11  in sentencing, an argument for the death penalty for

12  lack of remorse.

13      Q.  Let's talk a little bit more about what might be

14  in a prosecutor's mind in a particular case.  When a

15  prosecutor orders a batch of all recorded calls of a

16  certain person and it happens to include attorney-client

17  calls, do you know whether that attorney-- that

18  prosecutor intended to get those attorney-client calls?

19      A.  I do not.

20      Q.  Do you know whether they just happened to hope

21  with luck they would get those attorney-client calls?

22      A.  Yep, I do not.  All I know is what they put on

23  the forms, if there are forms, about the-- the basis of

24  the request.  And again, the most common were things

25  like ongoing investigation or trial prep.

1   Q.   Did any of these experienced or-- U.S. Attorneys,

2   AUSAs ever write down on those forms, "I want to find

3   out what the attorney and client are talking about"?

4   A.   No.

5   Q.   "I want to find out what the attorney and client

6   are talking about to prepare for trial"?

7   A.   No.

8   Q.   Are you familiar with the term "deliberate

9   indifference"?

10   A.   Yes.

11   Q.   And tell me your definition of that.

12   A.   Well, there's a Tenth Circuit instruction on it

13   sometimes called deliberate ignorance.  It's when you

14   purposefully don't avail yourself of information you

15   know to be relevant so that you can later claim I didn't

16   know, so therefore, I cannot be shown to be sort of

17   guilty or have the intent to do something bad.

18   Q.   The first time a prosecutor orders a batch of

19   phone calls and it comes back with attorney-client

20   calls, that might be inadvertent.  Fair to say?

21   A.   It may be.

22   Q.   The second time they ask for a batch of calls in

23   that same case and they don't exclude the

24   attorney-client [sic] number, do you think that would

25   be-- could be categorized as deliberate indifference?

1    A.   It could be.  And this is-- earlier I was asked

2  about the Special Master's statement about whether

3  things are intentional, and my answer probably

4  inarticulately was trying to communicate that fact,

5  which is what I call at best negligence.

6         And when you have-- maybe are on notice that

7  attorney-client calls are being produced, there's a

8  pattern and practice here that the data shows that these

9  calls are being produced in significant-- what I

10 determine and think are significant numbers, that at

11 some point, you know, even without direct evidence of

12 intentional behavior, you are at least seeing negligence

13 or what you could call deliberate ignorance.

14   Q.   Let's look at Exhibit 603A, which is a summary

15 sheet for Terra Morehead, AUSA Terra Morehead's calls.

16 If you look at that pattern of cases in which she

17 requested recorded calls and they happened to include

18 attorney-client calls, what do you take from that

19 pattern?

20   A.   I take that the prosecutor in this particular

21 exhibit, Ms. Morehead, believes that there is value in

22 acquiring the calls of the person she is prosecuting, of

23 the defendants.  I take from this that attorney-client

24 calls are being accessed based upon her requests in what

25 I believe are significant numbers.

1          And I also see here on this particular one that
2    we haven't even done the full analysis for most of these
3    individuals because they're out of custody, so they did
4    not meet our criteria.  And so the numbers of
5    attorney-client calls that she may have obtained or that
6    were accessed as a result of her production request is
7    likely to be higher than what you see here.

8    Q.   The records that you reviewed for Ms. Morehead
9    that are in 603, Ms. Morehead never excluded or excepted
10   an attorney's phone number.  Correct?

11   A.   I don't recall that on any forms that I-- that I
12   saw.  And, you know, again, we're talking about hundreds
13   of pages, but I don't recall a single time when an
14   attorney number was specifically excluded or that it
15   said an attorney's name, to exclude those calls.

16   Q.   So there are nine cases here where Ms. Morehead
17   requested calls that included attorney-client calls.  Of
18   the ones that are not out of custody, I count four
19   times, only four times, where she didn't obtain
20   attorney-client numbers; is that accurate?

21   A.   That looks accurate.  And a lot of those names
22   that-- what we label as detainee names are individuals
23   who, you know, I've even personally spoken with as part
24   of our 2255 reach-out to clients.  And so they, you
25   know, also have-- and this happens a lot where people

1  are suspicious, particularly once this case-- the

2  litigation arose.  Word travels fast within BOP.

3       So, you know, whether or not their suspicions are

4  just grounded in what they've heard is happening in this

5  litigation or otherwise, but I look at two names here in

6  particular of people who were suspicious.

7  Q.  So let's say after the first two cases where Ms.

8  Morehead requested all calls for a certain person and

9  both times it came back with attorney-client numbers,

10  the third time that she asked for all recorded calls of

11  someone and did not exclude attorney-client numbers, do

12  you think that could be read as deliberate indifference?

13  A.  It could be.  But as, you know, Mr. Clymer asked

14  and I agreed with, I can't tell you that Ms. Morehead--

15  there's evidence that she, herself, listened to these

16  calls or directed agents to do so.  All we can show is

17  that requests were made, calls were accessed often as a

18  result of those requests, and they included

19  attorney-client calls.

20  Q.  By the eighth time that Ms. Morehead asked for

21  all recorded calls of someone and did not exclude an

22  attorney's number, do you think that would be evidence

23  of intentionality as opposed to just deliberate

24  indifference?

25  A.  It certainly could be evidence.  I think in a

1    courtroom presentation it would be presented as such, as

2    evidence.  Whether or not it's conclusive would be for

3    the fact-finder to determine.

4        Q.  The Tenth Circuit sometimes equates deliberate

5    indifference with guilty knowledge; is that right?

6        A.  Yes.

7            MS. BRANNON:  Nothing further.  Thank you.

8            MS. VANBEBBER:  I have no questions.

9                    RECROSS EXAMINATION

10   BY MR. CLYMER:

11       Q.  Do you know what was on any of the recordings on

12   the first instance where AUSA Morehead requested calls

13   and those calls were accessed by Securus?

14       A.  No.

15       Q.  Do you know whether anybody ever listened to

16   those calls?

17       A.  No.

18       Q.  Do you know if an attorney's voice was on any of

19   the calls?

20       A.  No.

21       Q.  So the next time Ms. Morehead requested calls and

22   they came-- if they came with attorney-client

23   communications, there wouldn't have been a first time

24   when she had knowledge.  Right?

25       A.  I'm sorry, I couldn't hear that.

1   Q.  She wouldn't have known from a first time that
2   she got attorney calls the first time?
3       A.  She may have, she may not have, I don't know.
4       Q.  She may not have known in any of the times that
5   are listed on Exhibit, whatever it is, 603A.  Correct?
6       A.  That is entirely possible, yes.
7       Q.  You don't know for any particular instance in
8   your database whether an inmate spoke on one end of the
9   phone, do you?
10      A.  I do not.
11      Q.  You don't know if an attorney spoke on the other
12  end of the phone?
13      A.  Correct.
14      Q.  You don't know what was said?
15      A.  No.
16      Q.  You don't know if it was "take the deal."
17  Correct?
18      A.  Correct.
19      Q.  You don't know if it was "talk to Joe"?
20      A.  Right.
21      Q.  You don't know if-- "sorry, can't help you"?
22      A.  Right, correct.
23      Q.  You don't know if anybody listened to those
24  calls?
25      A.  I don't.

1    Q.   You don't know if someone listened to the calls,

2    they told Ms. Morehead, "This has an attorney

3    communication on it, and I shut it down immediately"?

4    A.   I don't.

5    Q.   You don't know if it went to a taint team?

6    A.   Nope.

7    Q.   You don't know if an interpreter listened to it?

8    A.   I don't.

9    Q.   Is body language and facial gestures showing an

10   amicable relationship between an attorney and a client

11   privileged information?

12   A.   I believe it is, yes.

13   Q.   And how does that communicate legal strategy or

14   legal advice?

15   A.   So in my experience in meeting with countless

16   clients in a detention facility, you know, body language

17   communicates a lot.  And I use it in terms of how I read

18   my client, my relationship with them.

19        And so, you know, legal representation is a broad

20   term.  I don't go to jails to talk to people about the

21   weather or about, you know, the Chiefs game, I go to

22   talk about their case.  And so how it is that we may

23   interact with each other, in my view, falls under the

24   attorney-client privilege because it's communicative as

25   to the nature of my relationship to the client.

1    Q.   Can you demonstrate for us without using any

2    sound how you would communicate legal strategy or legal

3    advice?

4    A.   I'm not sure that I can.

5    Q.   So as you sit here--

6    A.   It's hypothetical with no client.  I mean, we're

7    talking about real-world situations.  I can think of an

8    example that sticks out in my mind very recently of a

9    person I sat in a holding cell with who was in very much

10   distress.  And even though there weren't words, so the

11   transcript would read nothing but weeping, but in my

12   view, that was a significant interaction I had with that

13   individual.  It was significant in terms of my legal

14   representation.  Whether or not it was a bullet point,

15   this is what we're going to do in your case, to me is

16   beside the point.

17        I believe-- and again, it's not my ultimate

18   determination to make, but I've also read what the Court

19   has said in terms of the legal significance of

20   non-verbal communication to the attorney-client

21   relationship.

22   Q.   I am not questioning you about whether it's an

23   important form of communication, I don't dispute that.

24   I am not questioning you whether people are capable of

25   communicating non-verbally, there's no dispute about

1  that.   The Federal Rules of Evidence recognize it.

2       What I'm asking you is to show me just one, any

3  one you want, an example of how you would communicate

4  legal strategy or legal advice without using sound.

5     A.   Sure.   Can I ask for your assistance?

6     Q.   Sure.

7     A.   All right.   Please approach the witness stand.

8  Let's-- so I'm on video and I'm showing you a piece of

9  discovery in the paperwork and the video camera has the

10  ability to zoom in so that the person watching can see

11  what's on the paper.   If you are the client - and you'll

12  be the client - and show this to me and point out

13  something, point out any words on the paper, and then I

14  will show you how my non-verbal response will

15  communicate something related to verbal advice.

16     Q.   If I could read that, that alone could be

17  privileged.   Correct?   In other words, if the camera can

18  read the document, the document itself may be

19  privileged.   Right?

20     A.   Sure.

21     Q.   Let's take the document out of the equation.

22  Show me how you communicate legal advice on the stand.

23     A.   Well, the example I was going to give is you

24  point to something and I shake my head yes.

25     Q.   Show me one without the document.

1    A.  How about the client-- and you want to be the

2  client, why don't you demonstrate some action that may

3  be relevant to the case.

4    Q.  Oh, wait.  How do you know it's relevant to the

5  case?

6    A.  Because the prosecutor watching probably knows

7  the facts of the case.  Let's say we're talking about a

8  robbery, a bank robbery.  What if the client goes up and

9  makes a motion with their hand like sliding and I'm

10  sitting here nodding yes or no.  That's communicating

11  back and forth.

12    Q.  Does the person watching that video know that

13  when a client moves his hands the way you've shown me,

14  which is to start with the hand curled and then make the

15  hand straight, does the person watching that soundless

16  video know that that's what the client is talking about?

17    A.  In the context of the case they may.  The

18  prosecutor-- if it's a bank robbery case where it's--

19  you know, they go to the teller and it's a slide

20  (indicating), and we're demonstrating these actions,

21  absolutely they could.

22    Q.  So it's your testimony here that moving one's

23  hand forward under those circumstances, the way we've

24  demonstrated which started curled, moved forward, that

25  communicates attorney-client privileged information?

1    A.   You're asking me about hypotheticals.   I

2  personally have done bank robbery cases where I've

3  watched video that don't have audio on them of actions

4  to a teller that was evidence of the bank robbery.

5       And so what I'm saying-- what I'm trying to

6  communicate to you, sir, is that if you're asking me if

7  I believe a video without audio in which they are

8  demonstrating action that may or may not be similar to

9  the evidence of the case and I'm giving the affirmative

10  or the negative, could that communicate something, legal

11  representation?  My answer to that is, yes, sir, it may.

12    Q.   Have you watched any of those videos to see if

13  such communications occurred?

14    A.   The ones at CCA-Leavenworth?

15    Q.   Yes.

16    A.   No.

17    Q.   Have you asked the Court to do so?

18    A.   No.

19    Q.   So you don't know whether there's sufficient

20  communication, non-verbal communication, on any one of

21  those videos to represent attorney-client privileged

22  material, do you?

23    A.   Correct.

24         MR. CLYMER:  No further questions.

25                    EXAMINATION

```
 1   BY THE COURT:
 2       Q.  Mr. Federico, has there ever been a time when you
 3   visited with a client at CCA or otherwise where you
 4   would've been comfortable to have the prosecutor watch
 5   your interaction through a window?
 6       A.  Every time, Your Honor.
 7       Q.  You would have been comfortable?
 8       A.  Oh, uncomfortable, Your Honor, every time.
 9       Q.  And why is that?
10       A.  Because, as I've said, in-- my interaction with
11   my client is significant, in my view and my experience,
12   as to the nature of my relationship with that client.
13   And that, in turn, I believe is not just relevant to the
14   communication of legal advice but to the overall case
15   posture.  It also communicates their individual state of
16   mind.
17           And, again, when I go to talk to them, I'm
18   talking to them about their case.  And so how they
19   react, even if you can't hear the words, gives
20   information about how they feel about their case at that
21   particular point in time.  So I would never be--
22       Q.  Conversely, have you ever been invited by the
23   prosecutor to look through a window as they are pretrial
24   prepping one of their witnesses?
25       A.  No, Your Honor, I have not.
```

1    Q.  Have you ever had a client who you've met with

2   who has re-enacted a situation, whether it's a bank

3   robbery or something else, either re-enacted the crime,

4   so to speak, or re-enacted their version of what's

5   happened?

6    A.  Yes, Your Honor, I have.

7    Q.  And was that communicative?

8    A.  I believe it was, yes, ma'am.

9           THE COURT:  All right.  Any other questions?

10          MR. CLYMER:  Yes, Your Honor.

11          THE COURT:  Well, I think it goes back to

12   the other parties before you.  Anything else?

13          MS. BRANNON:  Yes.

14               REDIRECT EXAMINATION

15   BY MS. BRANNON:

16    Q.  In the particular scenario if a client knew that

17   a prosecutor was watching your interaction, do you think

18   that would chill the client's relationship with you and

19   willingness to share information with you?

20    A.  I know that it would.

21    Q.  If a client thought that a prosecutor was

22   listening in on your phone conversations, do you think

23   that would affect the communication between you and the

24   client?

25    A.  I'm certain that it would.

1    Q.   Since this has occurred and you've been with our

2    office, have you had clients who expressed concern about

3    continued recording of phone calls or even

4    video-recordings within the rooms?

5    A.   Certainly the phone calls.  I can't recall,

6    though, anytime where someone has said anything about

7    videos, and particularly because there are no more video

8    cameras like at CCA.

9    Q.   In the rooms have you had clients who now express

10   concern about the speakers in the room recording your

11   audio conversations?

12   A.   I have not.  I don't recall that coming up.

13   Q.   All right.  Thank you.

14             SPECIAL MASTER COHEN:  A couple questions,

15   Judge.  Thank you.

16                     RECROSS EXAMINATION

17   BY SPECIAL MASTER COHEN:

18   Q.   If you're in the attorney-client meeting room, do

19   you think that someone could observe and tell whether

20   you are having a friendly, agreeable relationship with

21   your inmate client as opposed to an unfriendly,

22   disagreeable relationship where the inmate is not

23   trusting your advice?

24   A.   Yes.

25   Q.   Do you think that that information could be used

1   by a United States Attorney during, for example, the

2   question of plea bargaining?

3        A.   Yes, sir, I do.

4        Q.   Whether somebody would accept a-- a specific

5   sentence?

6        A.   Yes, sir, I do.

7        Q.   Somebody would accept your advice?

8        A.   Yes.

9        Q.   Going back to privatization of phone numbers.

10  Did you hear Mr. Bigelow testify?

11       A.   I did, yes, sir.

12       Q.   And did you hear him explain that he would pick a

13  site from the drop-down menu that was not necessarily

14  always the entire facility, but some lesser part of the

15  facility?

16       A.   I did, I heard him say that.

17       Q.   And he said that he didn't understand that when

18  he did that it might have an effect on the extent to

19  which the number was privatized.  Do you recall that?

20       A.   I do.

21       Q.   After this-- after my investigation began, the

22  Federal Public Defender asked CCA to once again

23  privatize all of its phone numbers.  Do you recall that?

24       A.   Yes, I do.

25       Q.   If Mr. Bigelow did that, even after my

1   investigation, it might've been the case that he still

2   didn't privatize the Federal Public Defender's numbers

3   for the entire facility; is that correct?

4       A.   I think it is.  Yes.

5            SPECIAL MASTER COHEN:  That's all I have,

6   Judge.

7                    RECROSS EXAMINATION

8   BY MR. CLYMER:

9       Q.   Are the cameras in those interview rooms visible?

10      A.   There are no cameras there anymore.

11      Q.   When the cameras were there, were they visible?

12      A.   I don't know because I transferred here in

13   February of 2017, they were removed before my arrival.

14      Q.   Have you read the Special Master's report about

15   the cameras?

16      A.   I have.

17      Q.   Do you recall what it said?

18      A.   I don't recall the language, no, sir, I'm sorry.

19      Q.   Do you understand that the issue here is not

20   whether prosecutors should be able to watch attorneys

21   meeting with their clients?

22      A.   I'm not sure I agree with that.  I think that is

23   part of the issue here.

24      Q.   Are you aware of any evidence of any federal

25   prosecutor who watched any video of any attorney meeting

1  with his client from CCA?

2     A.  Yes.

3     Q.  Who?

4     A.  Jeff Stokes from KBI potentially watching videos

5  of Richard Dertinger with Jackie Rokusek in December of

6  2015.

7     Q.  Is he an Assistant U.S. Attorney?

8     A.  No, I'm sorry.  Again, I interpreted that term to

9  also mean the prosecutor and their agents.

10    Q.  Okay.  So when I say U.S. Attorney you mean-- you

11 interpret it to mean anybody in law enforcement?

12    A.  Well, particularly those-- when they're working

13 at the specific behest of the Assistant U.S. Attorney,

14 yes, I did interpret it that way.  My apologies.

15    Q.  So let me ask the question again.  And when I say

16 United States Attorney, I mean to use the term in its

17 normal meaning, which is a person who is employed by the

18 United States Attorney's Office as a federal prosecutor.

19        Do you know of any evidence of any Assistant U.S.

20 Attorney watching any video from CCA of an attorney

21 meeting with a client?

22    A.  No.

23    Q.  Your office did not learn that these videos were

24 even made until early August 2016.  Correct?

25    A.  I wasn't at the office at that time, so I'm

1  relying upon the record as I have reviewed it, in terms

2  of e-mails that have been exhibits and the transcripts,

3  and that my understanding is that is correct, that it

4  wasn't until August and when Ms. Rokusek had this

5  interaction with the prosecutors in the *Dertinger* case

6  that this really came to light.

7      Q.   Other than Mr. Dertinger, is there any inmate who

8  you know of who claims that any law enforcement official

9  has watched a video from CCA of him meeting with his

10  client?

11     A.   I don't know if I would go that far, but Ms.

12  Tomasic disclosed that there was a cooperator at CCA who

13  told her, and she said that's how I first realized that

14  attorney-client visitation rooms were being recorded.  I

15  don't think she said-- or that the cooperator claimed

16  that was viewed by a prosecutor, but I don't recall that

17  part.

18     Q.   So as you sit here right now, you don't know of

19  any other claim, any other person that any prosecutor or

20  any law enforcement agency-- agent watched any video

21  from CCA of an inmate meeting with his counsel?

22     A.   I will tell you having talked with clients,

23  people raised suspicions.  And so your question is do I

24  know of anyone who's made that claim?  Yes.  Do I have

25  any verification of that?  No.

1    Q.   Is Richard Dertinger a client of yours?

2    A.   He is not.   However, his case was adjudicated so

3    that I believe he got a time served result in front of

4    Judge Murguia.   Whether or not, though, he potentially

5    could gain other relief through the 2255 process, for

6    example having his conviction vacated, I-- I believe he

7    would be covered, in my review of the standing order.

8    But as of today, he is not my client or my office's

9    client.

10    Q.   As soon as you reported to the judge that there

11    was video-recording, the judge ordered that

12    video-recording to cease.   Correct?

13    A.   As soon as it was brought to the Court's

14    attention, yes, my understanding is that the Court did

15    issue that order to impound and then also issued a

16    clawback order.

17    Q.   Has the government ever challenged the judge's

18    order to have video-recordings cease at CCA-Leavenworth?

19    A.   Not to my knowledge, no.

20         MR. CLYMER:   Nothing further.

21         THE COURT:   All right.   Anything more?

22         MS. BRANNON:   No, Your Honor.   Thank you.

23         SPECIAL MASTER COHEN:   No, Your Honor.

24         THE COURT:   All right.   Thank you, Mr.

25    Federico.   You can call your next witness.

 1              MS. BRANNON:  Your Honor, we thank the

 2   Special Master for letting us call some witnesses out of

 3   order and we defer back to the Special Master for the

 4   next witness.

 5              THE COURT:  It's 4:25, so we'll go for a

 6   while.  If we need to, we'll take a break at 5:00 and

 7   keep going.  Who are you calling?

 8              MS. VANBEBBER:  We call Ms. Sheri Catania,

 9   Assistant United States Attorney.

10                       SHERI CATANIA,

11   called as a witness on behalf of the Special Master,

12   having first been duly sworn, testified as follows:

13                     DIRECT EXAMINATION

14   BY MS. VANBEBBER:

15      Q.  Ms. Catania, you've been with the U.S. Attorney's

16   Office for several years, have you not?

17      A.  Yes.

18      Q.  When did you start?

19      A.  2002.

20      Q.  Two?

21      A.  Yes.

22      Q.  Now, during that time have you done many

23   different kinds of criminal prosecution or just one?

24      A.  I do mainly drug cases, but I do do some bank

25   robberies and kidnappings.

1    Q.   Would you repeat that last part?

2    A.   I do some bank robberies and kidnappings.

3    Q.   Okay.  You may need to get real close to your

4    microphone for me to hear you.

5    A.   How is that?  Better?

6    Q.   In 2016, 2017, what was the nature of your

7    primary workload?

8    A.   Major drug cases.

9    Q.   Are you part of the organized-- what we call

10   OCDETF?

11   A.   Yes, ma'am.

12   Q.   Which is?

13   A.   Organized crime drug enforcement task force.

14   Q.   Who was your direct supervisor in 2016 and 2017?

15   A.   I believe it was Ms. Flannigan.

16   Q.   Kim Flannigan?

17   A.   Yes, ma'am.

18   Q.   Do you recall that Debra Barnett became the

19   criminal chief in February of 2016?

20   A.   She may have, I don't know the date.

21   Q.   And do you recall that Tom Beall became the

22   acting U.S. Attorney in April of 2016 after the

23   departure of Mr. Grissom?

24   A.   That sounds correct, but I'm not certain of the

25   date.

1    Q.   And Mr. Beall also retained his previous position
2    as the First Assistant U.S. Attorney while he was acting
3    U.S. Attorney.   Correct?
4    A.   Yes, ma'am.
5    Q.   You and your case agents routinely obtained
6    recorded non-attorney calls so you can further your
7    investigations and your prosecutions.   Right?
8    A.   That's correct.
9    Q.   Was it your policy when you found something that
10   you thought could be constitutionally protected to call
11   in a taint team?
12   A.   I didn't find anything of that nature, ma'am.
13   Q.   You didn't ever have a need to use a taint team?
14   A.   During that period, I don't recall ever having to
15   use a taint team.   After--
16   Q.   Go ahead, I'm sorry.
17   A.   After, we did use a taint team.
18   Q.   Pardon?
19   A.   After that period we did use a taint team on a
20   case.
21   Q.   And what made you think that you would need a
22   taint team in any case?
23   A.   I'm not sure I understand the question.
24   Q.   Explain to me what a taint team does.
25   A.   In my case, the taint team reviewed all the calls

1   to make sure there were no attorney-client

2   communications.

3        Q.   And then if they found one, what were they to do?

4        A.   I believe they were to notify the Court and

5   opposing counsel.  They didn't find any.

6        Q.   The Court and counsel?

7        A.   Yes.

8        Q.   If they did find any or if they did not?

9        A.   If they did.

10       Q.   If they did find some, they were to tell counsel

11  that they found them and they were also to notify the

12  defense attorney whose call-- calls had been-- had been

13  recorded.  Correct?

14       A.   Yes, ma'am.  And, in fact, I believe they turned

15  them over to the attorneys regardless in that case

16  before I ever got them.

17       Q.   Would you agree that the Kansas City, Kansas

18  office litigation position, in other words the general

19  position of all the assistants, is that client-- is that

20  attorney-client calls at CCA are unprivileged fair game?

21       A.   I can't testify as to what everyone's position

22  is, ma'am.

23       Q.   Did you gather an impression of what everyone's

24  position is?

25       A.   No.

1      Q.  What's your position?

2      A.  My position on an attorney-client call?

3      Q.  From CCA.

4      A.  That we shouldn't listen to them.

5      Q.  Why-- why not?

6      A.  Because it would be improper in my opinion.

7  That's not a position of the office, that's my opinion.

8      Q.  Is that because they're privileged?

9      A.  I'm not-- I don't believe that the law states

10  that, I just believe that just because you can do

11  something doesn't mean you should.

12      Q.  To the extent that there's been testimony that

13  the office litigation position was that they are

14  unprivileged, can you think of any reason except the

15  preamble warning that calls may be recorded at CCA?

16      A.  I guess I'm not sure what you mean by litigation

17  position, I'm not really privileged to know what that

18  is.

19      Q.  I mean, when you were prosecuting a case, your

20  litigation-- you have litigation positions, do you not,

21  when you prosecute a case?

22      A.  I do.  I can't speak to others.

23      Q.  So it's your litigation position then that these

24  calls at CCA are privileged?

25      A.  No, that's not what I stated.  They are not under

1    the law.  However, I see no reason to listen to such.

2    And therefore--

3        Q.   So that would just be your preference?

4        A.   That would be my practice.

5        Q.   And do you believe that there's an ethical

6    obligation involved there, or is that just your

7    practice?

8        A.   You know, I don't know that the ethical canons

9    would be-- I mean, they could come into play, I guess it

10   would be a case-by-case situation as to whether--

11   there's situations I think where attorney calls are

12   listened to because they may be involved in criminal

13   activity.  It would depend on a case-by-case basis I

14   would have to say.

15       Q.   Would you-- if there's testimony that the Kansas

16   City, Kansas' litigation position in general is that

17   there's no obligation to tell an attorney that the

18   prosecutor has his attorney-client calls if you're not

19   going to use them.

20       A.   Again, I don't know what the litigation position

21   you're referring to is.  I would tell an attorney if I

22   had listened to a call or if I accidentally listened to

23   a call.  I just don't recall that ever occurring, ma'am.

24       Q.   Do you have-- did you have an ongoing conflict

25   with Ms. Bartlett based on the activities of a DEA agent

1  and based on the requirements of *Jencks*?

2     A.  Ms. Bartlett?

3     Q.  Barnett, excuse me.

4     A.  Barnett.  I don't believe I'm at liberty to

5  discuss that.

6     Q.  Why not?

7             MR. CLYMER:  I think the witness is looking

8  to me about whether it's authorized, Your Honor.  And I

9  don't think the Special Master ever gave us any notice

10  about this line of inquiry so I haven't had the

11  opportunity to check to see if there's authorization

12  here.

13             THE COURT:  All right.  Well, go ahead and

14  check.

15             MR. CLYMER:  I'll have to call back, Your

16  Honor, I'll have to call--

17             THE COURT:  I mean, you don't have-- you

18  don't have the documentation of the *Touhy* summaries and

19  your responses for this witness?

20             MR. CLYMER:  This was never-- we were never

21  given notice that they wanted to ask this, so it's not

22  in a *Touhy* summary.

23             MS. VANBEBBER:  Your Honor, there was

24  testimony to that effect and, consequently, it would

25  come up again with Ms. Bartlett-- Ms. Barnett as well,

 1  so--

 2              MR. CLYMER:  Could I speak to counsel for a

 3  minute, Your Honor, maybe try to resolve this?

 4              THE COURT:  Go ahead.

 5              (Counsel confer).

 6              MS. VANBEBBER:  I believe Mr. Clymer says

 7  he'll need to talk to Main Justice about that; is that

 8  correct?

 9              THE COURT:  I don't know, are you going to

10  have this witness on the rest-- are you going to finish

11  with her this evening?

12              MS. VANBEBBER:  I would think so.  If not

13  this evening, then, of course, tomorrow morning first

14  thing.

15              THE COURT:  So are you invoking *Touhy* or

16  not?  I'm not clear.

17              MR. CLYMER:  Your Honor, as we've addressed

18  to the Court in pleadings, litigants have an obligation

19  to notify us of the general areas that they want to

20  question a witness about, and then we go through a

21  process to determine whether it's authorized.  And we've

22  done that in this case extensively.

23              THE COURT:  I know, but what she-- this line

24  of questioning has to do with something that another

25  witness testified to and I think would fall under the

 1    general parameters perhaps of impeachment.

 2              Now, if you need to talk to Justice

 3    Department about that, that's fine.  I was just trying

 4    to figure out-- because if you're going to invoke *Touhy*,

 5    I think it needs to be on the record that that's what

 6    you're doing as opposed to some other objection.

 7              MR. CLYMER:  And, Judge, without meaning to

 8    sound repetitive, I-- it's not a question of me invoking

 9    *Touhy*, the witness simply has not been authorized to

10    answer this.  And the reason for that specifically, Your

11    Honor, is we were never given an opportunity to assess

12    this line of inquiry or this area of inquiry because no

13    notice was given to us.

14              THE COURT:  Under *Touhy*.

15              MR. CLYMER:  Correct.

16              THE COURT:  So when I say invoke *Touhy*,

17    that's what I'm talking about.

18              MR. CLYMER:  Correct.

19              THE COURT:  It could be-- it could be that

20    there's definitely no authorization given, it could be

21    that you're saying it wasn't within the scope of the

22    summary, but we're talking about *Touhy* to be clear.

23              MR. CLYMER:  That is correct, Your Honor.

24    That is correct.

25              THE COURT:  Okay.  So for now, I'm going to

1   point-- I'm going to make a record that you're invoking

2   *Touhy*, subject to checking with Department of Justice.

3           MR. CLYMER:  And what I'd like to do, Your

4   Honor, if I could, is get from Ms. VanBebber a-- a

5   written summary of what she wants to elicit.  It can be

6   by e-mail.

7           THE COURT:  No, that's not-- that's not

8   proper, that's not the way it works.  She gave you a

9   summary, she told you that this is not in the summary as

10  I take it.  You speak for yourself.  It's not in the

11  specific summary, but she's referencing some prior

12  testimony in this case that involved I assume this

13  witness or this witness' knowledge, so she wants to ask

14  her about that.  So that's the parameter.  It's not-- I

15  don't think there's any dispute that it wasn't in the

16  written summary that you were given.  Is that fair?

17          MS. VANBEBBER:  I think it-- you could

18  perhaps stretch a couple of the ones in the summaries,

19  but yes, I think that's probably fair.

20          THE COURT:  All right.  So just to be clear

21  what the parameters are since you need to seek advice or

22  counsel about this, there's no question it's-- well,

23  maybe there is, I mean, but what I'm hearing is there

24  wasn't a line in the *Touhy* summary that says I'm going

25  to ask you about whether you had a conflict with Deb

 1  Barnett over a DEA agent handling a particular type of
 2  evidence.  That wasn't in the summary, but she's
 3  referencing prior testimony about that very matter, so
 4  that's why she's asking it.
 5          MR. CLYMER:  That's correct.
 6          MS. VANBEBBER:  Your Honor, maybe it would--
 7          THE COURT:  Consistent with what other
 8  witnesses have been asked in this case.
 9          MS. VANBEBBER:  Your Honor, maybe it would
10  be helpful with Mr. Clymer's phone call for me to go
11  ahead and ask the questions in this limited paragraph
12  and assume that she has no-- she's welcome to say, "I
13  have no authority to answer that question," and then we
14  could go from there tomorrow.
15          MR. CLYMER:  Either way is fine, Your Honor.
16  I believe the regulations require that it be in writing,
17  but if Ms. VanBebber wants to put it on the record and I
18  get the transcript, we'll assume that that's in writing.
19  That's good enough for me.
20          What I don't want to do, Your Honor, the
21  reason I asked for something written is I don't want to
22  mischaracterize it based on an oral representation.  I
23  don't want to have to come back tomorrow and have an
24  argument about exactly what she said and what she didn't
25  say because I'm going to make a specific request.

 1            And, Your Honor, I've been trying to do this
 2    throughout trial to make sure that we didn't have these
 3    issues.  And I think, as the Court is aware, this has
 4    not arisen.  And I have told witnesses repeatedly that
 5    they can answer questions, they have authority to do so.
 6            Today, for example, Mr. Redmond came up to
 7    me with an issue, I talked about it, I've already sought
 8    approval and I'm going to communicate to him about
 9    whether the authorization is there or not.  I am really
10    trying to avoid this problem.
11            THE COURT:  That's well taken.  I understand
12    you need to talk to Justice Department.  But I just
13    wanted a record made that your concern-- the reason
14    you're talking to Justice Department is because it comes
15    within the penumbra of *Touhy*.
16            MR. CLYMER:  Correct.
17            THE COURT:  Okay.  All right.  Go ahead--
18            MR. REDMOND:  Your Honor, could I have just
19    a moment with Ms. VanBebber?
20            THE COURT:  Yes.
21            MR. REDMOND:  I apologize.
22            (Counsel confer).
23            MS. VANBEBBER:  Your Honor, the question
24    that we made, I will put this on the record, "Catania
25    will be asked to describe her involvement in the

 1    litigation of the *Black* case.  She will be asked what

 2    she learned from management or others in the U.S.

 3    Attorney's Office about the circumstances leading to the

 4    Court's order to conduct Phase III.  She'll be asked

 5    what she was instructed or directed by management to do

 6    or not do regarding cooperation with the Special Master

 7    in Phase III and what she did, if anything, to assist

 8    the Special Master."

 9              THE COURT:  All right.

10              MS. VANBEBBER:  With that, I think that's

11    why I say at a stretch I think what I'm going to ask her

12    is included, but if Mr. Clymer thinks he needs to ask

13    permission, that will be fine.

14              Perhaps, Mr. Clymer, would you like to speak

15    with the witness and--

16              MR. CLYMER:  I can try.

17              MS. VANBEBBER:  -- what she needs to say in

18    terms of "I don't have authority," or is that evident to

19    you?

20              MR. CLYMER:  Actually, Your Honor, I think

21    it may be-- maybe I can resolve this if I can just speak

22    to Ms. VanBebber and the witness again for a minute.  I

23    might be able to resolve this.

24              THE COURT:  That's fine.

25              MR. CLYMER:  I'd like to try and maybe

 1  rephrase the question.

 2            (Counsel confer).

 3            MR. CLYMER:  We may have a resolution here,

 4  Your Honor.

 5            MS. VANBEBBER:  May we understand that if--

 6  if Mr. Clymer believes that it falls within lack of

 7  authorization, that the witness may answer "I'm not

 8  authorized to answer that question"?

 9            MR. CLYMER:  That's fine.

10  BY MS. VANBEBBER:

11    Q.  All right.  We'll go at this a little

12  differently, Ms. Catania.

13            Did you and Ms. Barnett at some point during the

14  time period we're talking about, or perhaps a little bit

15  before, have a disagreement as to whether you were

16  required to turn over what you believed to be *Jencks*

17  material and did she tell you that you were not going to

18  be permitted to do that?

19            MR. CLYMER:  You can answer that question.

20            THE WITNESS:  I can answer that?

21            MR. CLYMER:  Yes.

22            THE WITNESS:  Yes, we did.

23  BY MS. VANBEBBER:

24    Q.  Did you declare your intention that you were

25  going to turn over information about a given agent to

1  the given defense counsel because it was required by

2  *Giglio*?

3              THE WITNESS:  May I answer that?

4              MR. CLYMER:  Yes.

5              THE WITNESS:  Yes, I did.

6  BY MS. VANBEBBER:

7     Q.  In the process of that, did you then have a call

8  with then criminal chief Jared Maag and First Assistant

9  U.S. Attorney Tom Beall?

10             THE WITNESS:  May I answer that?

11             MR. CLYMER:  Yes.

12             THE WITNESS:  Yes, I did.

13 BY MS. VANBEBBER:

14    Q.  What did-- what happened on that phone call?

15             MR. CLYMER:  You can answer the question.

16             THE WITNESS:  That case was removed from me

17 because I refused to not tell defense counsel about the

18 issue with that agent.

19 BY MS. VANBEBBER:

20    Q.  Did you share with the Special Master that that

21 call had occurred?

22    A.  I've never spoken to the Special Master.

23    Q.  Did you feel that you couldn't talk to the

24 Special Master about that sort of thing and that it

25 might be helpful?

1    A.   No, I-- I didn't know-- I didn't feel it was my

2    place to reach out to the Special Master.

3    Q.   Did you record that call?

4    A.   Did I record that call?

5    Q.   Yes.  Did you record that call?

6    A.   I did at the-- yes, I did then.

7    Q.   So the result was you were taken off the case?

8    A.   Not because I recorded the call because I refused

9    to--

10    Q.   No, the result of the telephone call was that you

11    got taken off the case by Mr. Maag?

12    A.   Yes, ma'am.

13    Q.   And what happened to it after that?

14    A.   I believe he pled it.

15    Q.   He pled-- he took the case himself?

16    A.   Yes, ma'am.

17    Q.   And he pled it out?

18    A.   I believe so, I'm not certain.

19    Q.   Uh-huh.  Outside the crime fraud exception, are

20    you aware of any other instances where Kansas City,

21    Kansas, prosecutors used information that was arguably

22    privileged for any reason?

23    A.   I'm not sure I understand that question.  Am I

24    aware personally of that?

25    Q.   Yes.  Are you personally aware of instances where

1  a Kansas City, Kansas, prosecutor used arguably

2  privileged material to gain advantage in a criminal

3  case?

4      A.  I have no firsthand knowledge of that.

5      Q.  Do you have any belief other than firsthand

6  knowledge?

7      A.  I don't believe I have authority to answer that.

8      Q.  If-- pardon me?

9      A.  I don't--

10              MR. CLYMER:  You can answer that question.

11              THE WITNESS:  May I answer that?

12              MR. CLYMER:  Yes.

13              THE WITNESS:  It was reported to me that

14  phone calls had been listened to by individuals in my

15  office.  I was not part of that case.  It was a report

16  by somebody else.

17  BY MS. VANBEBBER:

18      Q.  Do you remember what case?

19      A.  They didn't tell me what case.

20      Q.  Who was it that told you that?

21      A.  An interpreter.

22      Q.  Pardon me?  Oh, an interpreter?

23      A.  Yes, ma'am.

24      Q.  Okay.  Well, we'll get into that a little bit

25  more.  When-- if you were aware that someone had-- in

1   your office had misbehaved to that extent, wouldn't you

2   think you had an ethical obligation to report it?

3       A.  Yes, ma'am.

4       Q.  Okay.  When Erin Tomasic first came to the U.S.

5   Attorney's Office, were you assigned to be her mentor?

6       A.  Initially, yes.

7       Q.  And was there a time that you got relieved of

8   that assignment?

9       A.  Mr. Warner relieved me of that assignment.

10      Q.  Did he say why?

11      A.  No.

12      Q.  He just said that you were no longer to be

13  assigned as her mentor?

14              THE WITNESS:  May I answer that question?

15              MR. CLYMER:  Yes.

16              THE WITNESS:  Mr. Warner just refused to

17  allow her to work on cases with me, so she was assigned

18  to other people.

19  BY MS. VANBEBBER:

20      Q.  Do you recall receiving an August the 6th, 2016

21  e-mail from acting USA Beall with some good news in it

22  about getting a new position in the office?

23      A.  Could you be more specific?

24      Q.  Uh-huh, yeah.  Let me--

25      A.  I don't recall.

1    Q.  Let me see if this refreshes your recollection.

2    I'm going to show you what's been admitted as Special

3    Master's Exhibit 1161 and ask you to just look at it.

4    A.  Oh.  Thank you.  Oh, yes, I remember this.

5    Q.  And did you-- did you send an e-mail back-- well,

6    first of all, wasn't the good news that the District of

7    Kansas had ranked 11 out of 93 districts for your

8    prosecutions on OCDETF cases?

9    A.  It was for the whole office's prosecutions, not

10   just mine.

11   Q.  And you were-- were going to get a new full-time

12   OCDETF attorney position--

13   A.  Yes, ma'am.

14   Q.  -- somewhere in the district?

15   A.  I'm sorry.  Yes, ma'am.

16   Q.  On October 8th did you write back to Mr. Beall

17   and to Scott Rask asking for the position to be placed

18   in the Kansas City, Kansas office?

19   A.  Yes, ma'am.

20   Q.  And did you remind them at that time that Special

21   Assistant U.S. Attorney Erin Tomasic was the one largely

22   responsible for those OCDETF cases?

23   A.  Yes, man.

24   Q.  Did you remind him that she was also making

25   headway in efforts to combat opioid deaths?

1    A.  I don't recall the opioid deaths, but it may be

2  in here, I'm sorry.  Yes, I see that, yes.

3    Q.  Did you expect that Tomasic would be hired as an

4  AUSA to fill that new position?

5    A.  I don't know.  I just made a recommendation based

6  on her numbers.  It was completely stat driven.

7    Q.  Did she get the position?

8    A.  No.

9    Q.  Was she, in fact, removed from her criminal cases

10 in October of 2016 and assigned as the Social Security

11 Special AUSA?

12    A.  I don't recall the date, I do recall her being

13 removed from criminal cases.

14    Q.  And she stayed removed until she was fired in

15 May, 2017.  Correct?

16    A.  That's correct, ma'am.

17    Q.  I'm going to draw your attention to December,

18 2017.  Was that when you visited with Sara Gardner?

19    A.  Yes.

20    Q.  And she's a contract interpreter that you

21 regularly use for Spanish translation?

22    A.  Yes, ma'am.

23    Q.  Did she talk to you about her experience in June,

24 the prior June, with the trial of Juan Herrera-Zamora?

25    A.  I don't believe I have authority to answer that

 1   question.

 2              MR. CLYMER:  You can answer the question.

 3              THE WITNESS:  She didn't indicate the case

 4   that she was involved in, she just said it was a case

 5   that was in trial at our Kansas City office.

 6   BY MS. VANBEBBER:

 7      Q.  And did she tell you that Erin Tomasic and David

 8   Zabel were the prosecutors?

 9      A.  Yes, ma'am.

10      Q.  Did she tell you that Tomasic called her into the

11   Kansas City, Kansas, U.S. Attorney's Office during trial

12   and directed her to listen to the defendant's CCA

13   telephone calls?

14      A.  I don't believe she indicated that it was

15   Tomasic.  I think she just said "they," but I-- the

16   exact details are not entirely clear.

17      Q.  Did she-- did they-- did they want you to look--

18   did she tell you that they wanted her to look at-- to

19   see if they could-- if Ms. Gardner could find one or

20   more calls that included the defendant's attorney?

21      A.  No, it wasn't that specific.  She told me that

22   they had asked her to listen to attorney calls.  She

23   wasn't specific as to defendants or anything like that.

24      Q.  To attorney-client calls?

25      A.  Yes.

1      Q.   And did she-- did one of them-- excuse me.  Did

2    Ms. Gardner say that the use for that communication was

3    going to be for impeachment?

4      A.   No, she didn't say that.

5      Q.   Did she tell you that Tomasic came up from the

6    trial more than once to see how she was doing?

7      A.   No, ma'am.  She didn't give me specifics probably

8    because of my reaction.

9      Q.   Why?  What was your reaction?

10     A.   I was shocked.

11     Q.   Shocked about what?

12     A.   What she reported to me and I told her I was

13   going to have to report it.

14     Q.   All right.  Did you-- did she ask you whether

15   both of them would've known about this request for

16   attorney calls?

17     A.   No, she didn't-- I didn't know it happened, so

18   no, she didn't ask me if both of them would've known.

19   Maybe I'm not understanding your question.

20     Q.   Do you recall if she-- if she has stated that she

21   was worried that Dave Zabel was involved in knowing that

22   you were looking at attorney calls?

23     A.   No, I-- Dave Zabel has never been worried that I

24   was involved in looking-- not that I know of,

25   attorney-client calls.

1    Q.   So when she said "they," who-- who would that

2    mean?

3    A.   I think I'm misunderstanding your question.

4    Q.   You said that she didn't mention specifically

5    Tomasic, but she said they were asking you to find-- her

6    to find attorney calls.

7    A.   I don't know that it was-- I don't have a

8    transcript of that conversation in my head.  She told me

9    that she was on a trial and that-- that she had been

10   brought into our office to listen to calls, that the

11   calls involved an attorney, that she was to give oral

12   summaries to them.  It was really that general.

13   Q.   To them?

14   A.   Yes, ma'am.

15   Q.   And "them" would've been Tomasic and Zabel.

16   Correct?

17   A.   I don't know the answer to that.  I didn't ask

18   her specific as to who was involved in what.  I just

19   wanted to get out of there.

20   Q.   Did you believe you also had an ethical

21   obligation yourself to report the matter to your

22   superiors?

23   A.   I knew I did.

24   Q.   You knew you did?

25   A.   Yes.

1    Q.  Did you make a phone call to Emily Metzger, who

2    was one of the two district professional review

3    officers, and discuss that with her?

4    A.  I sent her an e-mail asking to speak with her as

5    soon as we were back to work.  That was a Friday evening

6    I believe.

7    Q.  You didn't make a phone call?

8    A.  To Emily, no, I wouldn't have called Emily.

9    Q.  And you didn't record that call?

10   A.  I made a call to Emily on I believe it was the

11   Monday following that, whenever we were back to work

12   next, and I recorded my side of that conversation.

13   Q.  Did you-- today that's two calls that you've

14   talked about, two calls that you recorded on the job.

15   Correct?

16   A.  My side of the conversation, yes.

17   Q.  Do you regularly record your telephone

18   conversations with management?

19   A.  No.  No, I don't.

20   Q.  Why these two?

21   A.  I don't believe I have authority to answer that.

22           MR. CLYMER:  You can answer the question.

23   Go ahead.

24           THE WITNESS:  There had been some dispute

25   from my understanding regarding a chambers incident.  I

1  didn't want there to be any dispute as to what I had

2  reported or when.

3  BY MS. VANBEBBER:

4      Q.   Regarding the chambers incident?

5      A.   Yes, ma'am.

6      Q.   Is this the chambers incident where Ms. Tomasic

7  entered the judge's chambers without permission after

8  hours?

9      A.   I don't know exactly what happened, I just know

10 there was a dispute as to how that was arranged, and I

11 just wanted to make sure what I stated was clear and

12 that I had proof.

13     Q.   If there's testimony in the record that most of

14 the Kansas City, Kansas, attorneys record their calls,

15 do you believe that?

16     A.   No.

17     Q.   Do you think you're the only one?

18     A.   I don't think anyone regularly records any type

19 of calls.

20     Q.   Do you know-- do you keep private copies of your

21 e-mails and other documents?

22     A.   Private copies of what e-mails?

23     Q.   Your e-mails and other documents that are

24 prepared by you.

25     A.   No, not of all e-mails.

1    Q.   So if you want to get-- not of all your e-mails,
2    you keep some?
3    A.   No.  Yes.
4    Q.   What do you do with them?
5    A.   Put them in the case file.
6    Q.   Pardon?
7    A.   I put them in their case file.
8    Q.   Do you keep-- do you have private copies of
9    e-mails of yours that you've taken home?
10   A.   Not private copies of e-mails.  I have e-mails at
11   home.
12   Q.   It's the DOJ procedure that all the office
13   e-mails are permanently kept in the Cloud, to your
14   knowledge.  Correct?
15   A.   That's my understanding.
16   Q.   So if you can always get into the Cloud and get
17   them back, why would you need to take any of them home?
18   A.   I don't believe I have authority to answer that.
19              MR. CLYMER:  You can answer the question.
20              THE WITNESS:  Because I have a current
21   grievance against--
22              MR. CLYMER:  If you--
23   BY MS. VANBEBBER:
24   Q.   You have a disagreement--
25              MR. CLYMER:  -- just say you--

 1          THE COURT:  Wait a minute.  One at a time.
 2  I'm sorry.  Mr. Clymer.
 3          MR. CLYMER:  I don't think it's-- I think
 4  there's a Privacy Act issue if she identifies the person
 5  or people against whom the grievance is filed.
 6          THE WITNESS:  That was my understanding, I
 7  don't think I have authority to answer that.
 8  BY MS. VANBEBBER:
 9    Q.  Yeah, I don't want a name.  Are you doing that to
10  protect yourself from any arguments that you might have
11  with anybody else in the office?
12    A.  No.
13    Q.  So you're-- you're keeping them for what purpose?
14    A.  I don't believe I have authority to answer that.
15    Q.  Without naming any names?
16          MR. CLYMER:  Can I speak to the witness,
17  Your Honor?
18          THE COURT:  Yes.
19          (Confer).
20          THE WITNESS:  Okay.  I'm sorry, I
21  misunderstood you.  I have a current grievance that's in
22  the process of mediation, and I have an entire set of
23  documents at home related to that.
24  BY MS. VANBEBBER:
25    Q.  So that is the documents that you have kept and

1  taken home?

2      A.  Yes, ma'am.

3      Q.  All right.  Weren't you aware when you got an

4  e-mail from Attorney Steve Schweiker on August the 4th

5  that the attorney-client rooms at CCA might've been

6  videotaped?

7      A.  I had no idea.

8      Q.  Is that the first day you became aware of that

9  possibility?

10     A.  Yes, ma'am.

11     Q.  And then weren't you later aware that same month

12  of August that the Court had impounded CCA phone

13  recordings as well?

14     A.  I don't know when I learned of that, I don't know

15  the date.  I-- I heard the Court say they wanted them

16  held.

17     Q.  And that was within a two-week period that you

18  learned both of those things.  Correct?

19     A.  I don't recall the date, I'm sorry.

20     Q.  Okay.  You were aware in August that the-- of

21  2016 that defense counsel were-- were accusing the

22  Kansas City, Kansas office of listening to their CCA

23  calls with their attorneys?

24     A.  I thought the accusation was looking at videos,

25  maybe it was recordings as well, I-- I'm not certain.

1      Q.   When you learned that there were these

2   accusations and that the Court had impounded videotape

3   from CCA, did management immediately give you some

4   direction as to what you ought to preserve or put on

5   hold in order to address those accusations?

6      A.   I believe the litigation hold e-mail came out in

7   December, but I could be incorrect about that.

8      Q.   When you started learning these things in August,

9   did it surprise you that you weren't being given any

10  directives?

11     A.   No, I-- I don't know the whole breadth of the

12  *Black* litigation, so no.

13     Q.   Would you-- if you knew there were accusations

14  being made of improprieties in your office, wouldn't you

15  immediately want such a directive so that you could

16  avoid inadvertent destruction of evidence?

17     A.   I don't really think anyone destroys evidence--

18  well, I can only speak to me.

19     Q.   Inadvertent.

20     A.   Inadvertent, I don't know.  I took all my CCA

21  calls and locked them in a drawer.

22     Q.   You did what?

23     A.   I took all my CCA calls and locked them in a

24  drawer, and that's what I did.  I don't know--

25     Q.   CCA call records that you were using for your

 1   case-- for your cases?

 2       A.   The ones that I had at that time, yes.

 3       Q.   You were aware in October 2016 that the Special

 4   Master had been appointed to investigate these matters,

 5   weren't you?

 6       A.   I don't know the date, but I know he was

 7   appointed at some point.

 8       Q.   And you also knew there was a court order that

 9   required the U.S. Attorney to cooperate fully?

10       A.   I'm sure there was, but I--

11       Q.   Are you telling me you didn't read that order?

12       A.   I just don't know when it was.

13       Q.   If I represent to you that it was in October of

14   2016 that the Court directed the U.S. Attorney's Office

15   to cooperate with the Special Master, can you accept

16   that?

17       A.   Certainly.  I-- I don't know the date myself.

18       Q.   And that the order required you to make--

19   required the USAO to make available people and

20   information and documents and all sorts of other items

21   so that the Special Master could review them?

22       A.   Okay.

23       Q.   Do you believe that order applied to you

24   personally?

25       A.   I don't know that it-- I don't know that I

1    realized that it applied to all of us, I think I thought

2    it applied only to the people that were in *Black*.

3         Q.   Between October the 11th, 2016, which is when the

4    Phase I of the investigation began, and May 27th of that

5    year when Phase III of the investigation began, did you

6    ever speak with the Special Master?

7         A.   No.

8         Q.   Between May 27th and today, have you spoken to

9    the Special Master?

10        A.   No.

11        Q.   I'm sorry, I should've said May 27th, 2017, not

12   '16.

13        A.   I've never spoken to the Special Master.

14        Q.   Why not?

15        A.   I was never invited to speak with him.  I know

16   other people were, but I was never invited to do so.

17        Q.   You could've invited yourself to speak with him

18   if you had some things you'd like for him to know,

19   couldn't you?

20        A.   I was unaware of that, but okay.

21        Q.   Did anybody in management ever tell you not to

22   speak to the Special Master?

23        A.   No.

24        Q.   Are you aware of any other people who were told

25   not to speak with the Special Master?

1    A.   No.  I don't know anyone that-- that has

2  indicated that.

3    Q.   Do you recall there was a meeting scheduled for

4  December 9th, 2016, in Kansas City, Kansas, for the

5  attorneys to meet with Ms. Metzger and discuss

6  cooperation with the Special Master?

7    A.   I do know of such a meeting, I'm not certain of

8  the date.

9    Q.   Did you attend?

10    A.   No, I didn't.

11    Q.   Did you take eight hours of leave that day?

12    A.   I may have.

13    Q.   Did you have eight hours of medical appointments?

14    A.   I very well could have.

15    Q.   Did you just simply want to avoid that meeting,

16  Ms. Catania?

17    A.   No.  No.  I have lots of medical appointments.

18    Q.   Do you agree that much of what you said today so

19  far would've been of some assistance to the Special

20  Master?

21    A.   I don't know.

22    Q.   Why is it that you don't know?  Is it that you

23  were never told of what his investigation is about or

24  some other reason?

25    A.   I just don't know what the Special Master was

 1  looking for.  I assumed he would've contacted me if he

 2  wanted to speak with me.

 3      Q.  Do you recall that a preservation directive or

 4  what you call a litigation hold letter finally did come

 5  out on December the 19th, 2016?

 6      A.  I recall that one did come out, yes.

 7      Q.  Did you do what it asked you to do and

 8  immediately notify your agents and forward the lit hold

 9  letter to them?

10      A.  I did.

11      Q.  Do you recall a second e-mail from Ms. Metzger

12  dated February the 20th and addressed to 63 USAO

13  employees or contractors who either hadn't even followed

14  the direction to acknowledge receipt of a letter or have

15  failed to confirm whether or not they had responsive

16  materials?

17      A.  I don't recall such an e-mail.

18      Q.  That's two months later.  Correct?

19      A.  February would be two months after December, yes.

20  I just don't recall the e-mail.

21      Q.  I would show you what's been marked as

22  Exhibit 1163 and ask you to just look at the very top of

23  it.

24            THE COURT:  Is it 1163?

25            MS. VANBEBBER:  1163.

 1    BY MS. VANBEBBER:

 2        Q.   And just look at the very top of it.

 3        A.   Okay.

 4        Q.   Is that-- is the bottom half of that the letter,

 5    the litigation-- the lit hold that we just talked about?

 6        A.   The December 16th e-mail?

 7        Q.   Yes.

 8        A.   I'm sorry, 19th e-mail, yes.  It's the

 9    February one I don't recall.

10        Q.   When you received this e-mail on-- in February--

11        A.   I don't think I've seen the February e-mail, I'm

12    sorry.

13        Q.   I may have given you the wrong one.  I did give

14    you the wrong one, I'm sorry.

15        A.   That's all right.

16        Q.   This is Special Master 1164.  And look at the top

17    of it again.  And let's talk about what it says.  I'll

18    represent to you that there's 63 names in that-- in the

19    top of that e-mail.

20        A.   Okay.

21        Q.   And does the e-mail point out that the 63 of you

22    that are listed on here, including yourself, either had

23    done one of two things in response to her December the

24    19th letter?

25        A.   Yes.

1   Q.  Either they had not even bothered to inform her

2   that they had received the letter, which was the first

3   thing she asked of them, or they had not performed, they

4   had not told her what they had, if anything, that might

5   be responsive to the December 19th letter.  Correct?

6   A.  Correct.

7   Q.  Now, did you personally respond to this and tell

8   her that-- what you had or didn't have?

9   A.  I don't recall if I responded to that e-mail.  I

10  had responded to the original litigation hold, giving

11  her the agency names and had-- so she could send-- make

12  sure that all of them got it.  I guess I thought that

13  was responsive.  Maybe she didn't-- didn't record it as

14  such, I don't know.

15  Q.  In any event, you then immediately informed her

16  that you-- and this is 1141.  What did you tell her?

17  A.  I don't know.

18  Q.  I'll let you look at it.

19  A.  Thank you.  I said, "Received, thanks."  Do you

20  want me to go through the rest of it?

21  Q.  No.  Did you tell her-- well, I'll just ask you--

22  you can just look at it.  This is dated February the

23  21st, so that was promptly after you received the

24  February 20th e-mail.  Correct?

25  A.  Yes.  That would be prompt.

1    Q.   And you told her that you do routinely obtain CCA

2   telephone calls?

3    A.   Yes, ma'am.

4    Q.   And that you had not obtained any video footage--

5    A.   Yes, ma'am.

6    Q.   -- is that right?  Do you know why she waited two

7   months to get that much information out of people?

8    A.   I wouldn't know why Ms. Metzger did what she did.

9    Q.   She didn't tell you why it took so long?

10    A.   No.

11    Q.   Okay.  Now, I asked you earlier today whether you

12   had any idea about what was going on in the *Black* case.

13   Did you know what was going on in the *Black* case?

14    A.   In regard to what?

15    Q.   To-- to the Special Master's investigation.

16    A.   Regarding the Special Master's investigation, I

17   knew some of it because I attended some of the court

18   hearings.  But I-- I guess I don't really know how to

19   specifically answer that.  I knew some things, I didn't

20   know others.

21    Q.   When, if ever, did you first believe that the--

22   the office had a conflict that ought to require recusal

23   from prosecution in the *Black* litigation?

24    A.   Early, I don't recall the date.

25    Q.   Early before the Special Master was appointed or

1  after?

2      A.   I don't recall.

3      Q.   When, if ever, did you first suggest that-- that

4  Main Justice should be called and ask the criminal

5  division attorneys to take charge of the *Black*

6  investigation?

7      A.   When did I suggest it verbally?

8      Q.   When did--

9      A.   Verbally.

10     Q.   When did you suggest it verbally?

11     A.   Early, but I don't recall when.  I believe that I

12  attended the first hearing and I believe in a meeting

13  immediately following that hearing, I expressed-- I'm

14  sorry, I expressed that, as did others.  And then later

15  I put it in writing to-- in an e-mail to my supervisor.

16     Q.   And your supervisor was whom?

17     A.   At that time it was Scott Rask.

18     Q.   Did you get a response from Scott Rask about

19  that?

20     A.   I believe he-- I don't know exactly what the

21  response was, but I don't believe he understood my

22  request.

23     Q.   Did you make the request of Mr. Beall?

24     A.   No, I made it again to Mr. Rask verbally, close

25  in time, it may have been the same day, as did others.

1  And so, no, he was my direct supervisor, I would not

2  have gone directly to Mr. Beall.

3     Q.  You told me earlier that you felt that you

4  shouldn't be-- be listening to attorney-client calls; is

5  that correct?

6     A.  That I shouldn't?  Yes.

7     Q.  And did you tell me that you didn't know whether

8  they were-- whether the law required it?

9     A.  The law required?

10    Q.  Whether the law required that you not talk-- that

11  you not receive attorney-client calls.

12    A.  It depends on the circumstances.  The law does

13  allow for us to listen to phone calls if they are in

14  certain circumstances, et cetera.  My response to you is

15  that just because I could doesn't mean I should.

16    Q.  This is Special Master's Exhibit 1165.

17    A.  It's blown up really big, but I do remember this

18  e-mail.

19    Q.  All right.  It's an e-mail you wrote to Kim

20  Flannigan?

21    A.  Yes.  And my-- I can't recall if she was my

22  supervisor, they switched back and forth, and Scott Rask

23  who-- he may or may not have been my supervisor then, I

24  can't remember, as well as the other trial attorneys in

25  our office.

1    Q.  All right.  Look at the third paragraph.  Read

2  that, please.

3    A.  "Further, and most importantly, these calls

4  aren't privileged.  And if the system failed to block

5  numbers that were timely blocked, it wasn't by our

6  design."

7    Q.  Does that mean if accidents like that happen, the

8  defendant is just going to have to bear the brunt of it

9  because you can now look at them?

10   A.  I think I've answered that question.  Just

11  because you can and the law allows it doesn't mean you

12  should.

13   Q.  And had you ever had this discussion with other--

14  with people in your office?

15   A.  Yes, I've had this discussion multiple times.

16   Q.  On this topic?

17   A.  Yes.

18   Q.  And how much agreement did you get from your--

19  with your point of view?

20   A.  Some.

21   Q.  A majority?

22   A.  I don't know about that.  I--

23   Q.  But you certainly got plenty who disagreed with

24  you?

25   A.  I don't recall anyone disagreeing with me.  I

1  just was expressing an opinion.

2            MS. VANBEBBER:  No other questions.

3  BY MS. VANBEBBER:

4     Q.  Who were the people who expressed a different

5  opinion from the one you have given me today?

6     A.  Ms. Tomasic expressed a different opinion to me,

7  and she pointed out circumstances where it would be

8  acceptable, a crime fraud exception, et cetera.  And she

9  was correct.

10    Q.  Who else?

11    A.  I'm trying to think.  I can't think of anyone

12 else.

13    Q.  Nobody else told you it was fine to-- fair game

14 to listen to CCA calls between a client and his

15 attorney?

16    A.  No one said it was fine or fair game, no one used

17 those statements.

18    Q.  What terms did they use?

19    A.  I'm sorry?

20    Q.  What terms did they use?

21    A.  The statements that were made were that they were

22 not privileged, which they're not.  And that's never

23 been my position.  They're not privileged.  However, I'm

24 not going to listen to an attorney-client call absent

25 some exigent reason that I should be doing so.  That's

1    just my opinion.

2       Q.  And do you recall having a conversation we

3    alluded to earlier that you didn't have any obligation

4    to tell a defense counsel that his calls had been

5    listened to?

6       A.  I don't believe I testified that we had no

7    obligation to do that.  If I did, that's--

8       Q.  Is it true-- is it true that you think you do

9    have an obligation?

10      A.  Yes, absolutely.

11      Q.  And did the people disagree with you about that

12   too?

13      A.  I don't know that I expressed that opinion.

14      Q.  You don't think you told anybody that, you

15   weren't in any conversations?

16      A.  I don't recall that being said by me.  I

17   could've, I just don't remember it.

18      Q.  So you-- Mr. Oakley never said anything like that

19   to you, Ms. Tomasic never said anything like that to

20   you, Ms. Flannigan?

21      A.  You know, I don't believe I ever discussed

22   anything of that nature with Mr. Oakley ever.  I may

23   have had that discussion with Ms. Flannigan or-- I know

24   I had it with Ms. Tomasic.  But no, I don't believe that

25   Ms. Flannigan expressed a different opinion.  I could be

1  wrong, I just don't remember that.

2          MS. VANBEBBER:  All right.  That's all the

3  questions I have, Your Honor.

4          MR. REDMOND:  Before I begin, I'd like to

5  admit Exhibits 628 and 670.  The first is a recording of

6  a phone call and the second is a very short e-mail

7  produced by the government.  I think-- I think there's

8  an agreement on that.

9          MR. CLYMER:  There's no objection to either

10  exhibit, Your Honor.

11          THE COURT:  628, 670 admitted.

12          MR. REDMOND:  Thank you, Your Honor.  May I

13  approach the witness?

14          THE COURT:  Yes.

15                  CROSS EXAMINATION

16  BY MR. REDMOND:

17     Q.  You indicated you sent an e-mail to Ms. Metzger

18  after you talked to Ms. Gardner.  Is that the e-mail

19  that we're talking about?

20     A.  Yes, sir.

21     Q.  That's Exhibit 670.  One of the other things that

22  you had indicated is that this conversation with Mr.

23  Gardner was a long time ago, and you're a little unclear

24  on some of the details; is that fair to say?

25     A.  With Ms. Gardner, yes.

1    Q.   Yes.   Okay.   So I would like to play a little bit

2   of that phone call.

3              MR. REDMOND:   Your Honor, it's eight minutes

4   and 54 seconds long, I will not play the entire thing,

5   but it will be available for the Court's review later.

6   With the Court's permission we'll play it.

7              THE COURT:   All right.   Go ahead.

8              (Federal Public Defender's Exhibit No. 628

9   was played).

10  BY MR. REDMOND:

11   Q.   You sound-- I guess is nervous the right way to

12  describe that?

13   A.   Very nervous, yes.

14   Q.   Okay.   Ms. VanBebber asked you about a couple of

15  folks in your office.

16        Let me actually close the loop with that phone

17  call.   The interview-- so when you say "they told her to

18  listen to a phone call," you didn't know anything about

19  the actual facts of *Herrera-Zamora*?

20   A.   I didn't even know it was *Herrera-Zamora*.

21   Q.   Right.

22   A.   No.

23   Q.   So what you're assessing is only what Sara is

24  telling you?

25   A.   Correct.

1    Q.  You had, however, had a lot of experience at

2  being sort of the more senior prosecutor with a second

3  chair?

4    A.  Absolutely.

5    Q.  Okay.  And so during that sort of arrangement,

6  tell me how the dynamic works.  Does the second chair

7  get to just decide to do anything they want?

8              THE WITNESS:  May I answer that?

9              MR. CLYMER:  Yeah.

10             THE WITNESS:  For me, I was the mentor

11 coordinator for almost a decade in the office, so I

12 mentored all the young trial attorneys--

13 BY MR. REDMOND:

14   Q.  Right.

15   A.  -- when they came to the Kansas City office.  And

16 so I would take them on as trial partners.  All-- all

17 decisions have to be discussed with the senior attorney.

18 That's true even today.  I had recently a-- a young

19 attorney assigned to me for several months and all

20 decisions in a trial team are discussed and agreed upon.

21 That's me.  That's how I work.  I don't know how others

22 work.  I didn't have a mentor.  So I-- how I work is,

23 yes, everything is discussed.

24             MR. REDMOND:  Okay.  And can I approach the

25 witness again, Your Honor?

1           THE COURT:  Yes.

2   BY MR. REDMOND:

3       Q.  I am showing you Exhibit 554.  This is a

4   deposition of Sara Gardner.  I'm sure you've never seen

5   this.  If you would take a look at the beginning of that

6   paragraph and then where it goes on to the next page,

7   starting at the bottom of Page 78.  Yes, please.

8           MR. CLYMER:  What page are you on, counsel?

9           MR. REDMOND:  78 and then to the top of 79.

10          THE WITNESS:  Should I read the whole next

11  paragraph?

12  BY MR. REDMOND:

13      Q.  Just the paragraph that ends--

14      A.  Oh, I'm sorry, I'm done.

15      Q.  And I'll let you keep that.  Does that refresh

16  your recollection of your memory-- of your meeting with

17  Sara Gardner that night?

18      A.  Not really.  She's talking about e-mails and such

19  in this paragraph.

20      Q.  Yeah.  And the part where she says-- if I could--

21  let me make sure we're looking at exactly the same

22  thing.

23      A.  Maybe I'm looking at the wrong one.

24      Q.  Okay.  78, she asks about a conversation with

25  Scott Rask.  And we assume Scott is Scott Rask; is that

 1   fair?

 2       A.   Okay.   Sure.

 3       Q.   And where he's asking her about how she would've

 4   known that Dave knew that this was going on; is that

 5   also fair to say?

 6       A.   Yes, okay.

 7       Q.   And is she talking about the same kinds of things

 8   that you are in terms of like the way that a first chair

 9   and a second chair relate to each other during the

10   prosecution of a criminal trial?

11       A.   I can't tell.   I mean, I would only-- I don't

12   know.

13       Q.   Okay.   Let me ask you about the basis of your

14   statement on that phone call that they, presumably

15   meaning Dave and Erin, both knew.   Why did you say that?

16       A.   Because she told me that they called her in and

17   they were in trial.

18       Q.   Okay.   That's fair enough.

19       A.   And I said, who is "they"?   And she told me.

20       Q.   Okay.   How long have you known Scott Rask?

21       A.   Since 2002.

22       Q.   And has that time all been at the U.S. Attorney's

23   Office in Kansas City?

24       A.   Yes, sir.

25       Q.   Okay.   And have you previously expressed an

1   opinion of his character for truthfulness?

2       A.   I don't believe I'm authorized to answer that.

3               MR. CLYMER:  I don't believe so.

4               MR. REDMOND:  Now the reason that we reached

5   a compromise was that relationships between the parties

6   in the case were deemed to be fair game.  That's what

7   Mr. Clymer said when we were dealing with Ms. VanBebber,

8   which is why I'm asking the question.

9               MR. CLYMER:  If I'm not mistaken, Your

10  Honor, I believe the question calls for an opinion.  And

11  the problem is the opinion can be based on information

12  that may not be-- that may not be authorization for

13  disclosure.  So I don't think the witness is authorized

14  to answer this question.  If I could speak to

15  Mr. Redmond, I'll see if we can try to make an

16  arrangement.

17              THE COURT:  All right.  But if his question

18  goes to her relationship with Scott Rask, that's

19  different.  You do authorize that question?

20              MR. CLYMER:  Well, I'd like to see what the

21  question is, Your Honor, rather than--

22              THE COURT:  Okay.  Go ahead.

23              MR. REDMOND:  And I can lay that out for the

24  Court as well.  This is a question under Federal Rule of

25  Evidence 608.  Not only is that essentially the form of

```
1   the question I'm limited to, I cannot, under the rule,

2   go into specific instances of conduct and I won't.

3                 MR. CLYMER:  Can I just speak to Mr. Redmond

4   for a second?

5                 THE COURT:  Sure.

6                 (Counsel confer).

7                 MR. CLYMER:  You can answer the question.

8                 THE WITNESS:  The question again was?

9   BY MR. REDMOND:

10    Q.   Yeah, I'm sorry.  Have you previously expressed

11  an opinion of Scott Rask's character for truthfulness?

12                MR. CLYMER:  Objection.  I believe you said

13  you were going to ask her if she has an opinion now, not

14  that she's previously expressed it.

15                MR. REDMOND:  I will ask her both.  That's--

16  the question that I just asked I repeated verbatim.

17  That's what I thought we were talking about.

18                MR. CLYMER:  Okay.  That's not what you

19  repeated to me, but that's fine.  You're authorized to

20  answer.  Go ahead.

21                THE WITNESS:  I'm sure I have.

22  BY MR. REDMOND:

23    Q.   Do you feel like you well-- know him well enough

24  to have formed an opinion on his character for

25  truthfulness?
```

16-20032-JAR  USA v. Karl Carter (Black)  10.09.18          1695

1       A.  I don't know.

2       Q.  When you said you had previously-- or that you're

3   sure you have, what was the opinion that you expressed?

4       A.  In the history of ever?  I-- I express opinions

5   all the time.  I'm not really sure I can answer that

6   accurately.

7       Q.  How about whether you have enough-- do you

8   believe you have enough information to express an

9   opinion about Mr. Rask's reputation for truthfulness?

10      A.  His reputation?

11      Q.  Yes.

12      A.  In what community?

13      Q.  In the community that you're in in the U.S.

14  Attorney's Office in Kansas City, maybe the U.S.

15  Attorney's Office at large.  I think the community is

16  left to your definition under the rule.

17      A.  Can I talk to Mr. Clymer?

18      Q.  Sure.

19              MR. CLYMER:  May I, Your Honor?

20              THE COURT:  Yes.

21              (Confer).

22              THE WITNESS:  I think I'm ready.

23  BY MR. REDMOND:

24      Q.  I hope you remember the question.

25      A.  I think the question was in what community that I

1   define is Scott's reputation; is that the question?

2      Q.   Yes.   Do you think you have enough information to

3   express an opinion on Mr. Rask's reputation for

4   truthfulness?

5      A.   I don't think I have enough information to

6   express an opinion.

7      Q.   And-- yeah, that's fair enough.   And the-- have

8   you ever felt it necessary to tell others an opinion

9   about Scott Rask's truthfulness, say, in the last five

10  years?

11     A.   Yes.

12     Q.   And what was that opinion you expressed?

13     A.   It was expressed in a grievance, and I don't know

14  that I'm authorized to discuss that any further.

15     Q.   Let me think that through for a minute.   And

16  let's-- well, I ask you the same questions as relates to

17  Ms. Barnett.   The-- have you ever expressed-- previously

18  expressed an opinion of Ms. Barnett's character for

19  truthfulness?

20     A.   Yes.

21     Q.   And do you feel like you know her well enough to

22  maintain an opinion as to her character for

23  truthfulness?

24     A.   I don't know that I know her character for

25  truthfulness outside of the experience I have.

1    Q.  But that's fair.  What is your opinion of her

2  truthfulness?

3    A.  I don't know that I have authority to answer that

4  as it's contained in a grievance.

5    Q.  Okay.

6            MR. REDMOND:  Could I have a moment with

7  Mr. Clymer, Your Honor?

8            THE COURT:  Yes.

9            (Counsel confer).

10           MR. CLYMER:  You're authorized to state your

11  opinion if you have one that you feel comfortable

12  stating in federal court.

13           THE WITNESS:  That I feel comfortable

14  stating?

15           MR. CLYMER:  Right.  That you can honestly

16  state in federal court.

17           THE WITNESS:  Okay.

18  BY MR. REDMOND:

19    Q.  So as to Mr. Rask, the-- your opinion of his

20  truthfulness?

21    A.  Mixed.

22    Q.  As to Ms. Barnett, her opinion-- your opinion of

23  her truthfulness?

24    A.  My opinion is that she is untruthful.

25    Q.  Okay.  You were asked a couple of questions about

 1    a litigation hold.  Were any statements regarding a

 2    litigation hold ever put into a pleading filed by your

 3    office of which you're aware?

 4        A.  I don't know if they were put into a pleading.  I

 5    heard her make some in a hearing.

 6        Q.  Okay.  And did you disagree with the substance of

 7    those statements?

 8        A.  I thought I heard her wrong.

 9        Q.  And I should back up.  The "her" is Ms. Barnett;

10    is that right?

11        A.  Yes, sir.

12        Q.  And you think you heard her wrong, is that what

13    you said?

14        A.  I thought that I heard her wrong, and so I waited

15    for the transcript to come out from that hearing so I

16    could read it.

17        Q.  Okay.  And after you saw the transcript, did you

18    disagree with the position that she had taken?

19        A.  I did.

20        Q.  Okay.  And what was the position that she took

21    that you disagreed with?

22        A.  And it would be highly summarized because I

23    don't-- it's been a very long time, but I believe that

24    she stated to the Court that we had items on lockdown,

25    which scared me because I knew I did not have them on

 1    lockdown.  I was fearful that I had missed an e-mail or
 2    a directive.
 3          And so I went and checked to see if I had missed
 4    something.  I couldn't find any e-mails, I asked others
 5    if there was such a directive to make sure I hadn't
 6    missed it.  I thought I hadn't complied with something.
 7      Q.  Okay.  And eventually you find out there was no
 8    such litigation hold in place at the time that Ms.
 9    Barnett made that statement; is that fair?
10      A.  I-- that's my understanding.  I don't know.
11      Q.  Did you know that Ms. Brannon sent a letter in
12    August to Ms. Barnett asking to put a litigation hold in
13    place?
14      A.  No, sir.
15      Q.  Okay.  You had talked about a particular client,
16    and I'm not going to get into the particulars of the
17    *Brady* issue.  Was the client's name that you're talking
18    about, was that Damian Brooks?
19      A.  Yes, sir.
20      Q.  Okay.  One final small set of questions.  You
21    testified about collecting non-attorney-client phone
22    calls for evidence-- or to use as evidence in cases.
23      A.  Yes, sir.
24      Q.  That's actually pretty useful evidence sometimes.
25    Right?

```
 1        A.  Yes, sir.
 2        Q.  People say crazy stuff on the phone.  Or crazy is
 3   wrong.  Exculpatory stuff on the phone.
 4        A.  They do.
 5        Q.  And some of these people like to talk a whole lot
 6   on the phone; is that fair?
 7        A.  Yes, some have a lot of minutes.
 8        Q.  My guess is it's not you sitting with your
 9   earbuds in for eight hours a day listening to these
10   phone calls?
11        A.  I typically do not.
12        Q.  It's your agents.  Right?
13        A.  Or my interpreters, yes.
14             MR. REDMOND:  Could I have just a moment,
15   Your Honor?
16             THE COURT:  Yes.
17             MR. REDMOND:  Nothing further, Your Honor.
18   Thank you.
19             THE COURT:  Mr. Clymer, do you think you'll
20   be very long with this witness?
21             MR. CLYMER:  I think I'll probably be done
22   before quarter of.
23             THE COURT:  Okay.  Let's try to finish up.
24             MS. VANBEBBER:  Could I ask that I get a
25   copy Exhibit 524?
```

 1                MR. CLYMER:  It's not my exhibit.

 2                THE COURT:  Where is it?

 3                MR. REDMOND:  We have another one.  We have

 4   another one.

 5                        CROSS EXAMINATION

 6   BY MR. CLYMER:

 7     Q.  Ms. Catania, did you have any role at all in the

 8   CCA-Leavenworth investigation?

 9     A.  No, sir.

10     Q.  Did you have any input into the grand jury

11   subpoena that was issued in that case?

12     A.  No, sir.

13     Q.  Did you know a grand jury subpoena was issued in

14   that case that was drafted sufficiently broadly that it

15   resulted in your office obtaining video evidence of

16   attorneys meeting with clients at CCA?

17     A.  I later learned that, sir.

18     Q.  Did you know it at the time it was issued?

19     A.  No.

20     Q.  Did you know it at any time before the litigation

21   in this matter started?

22     A.  No.

23     Q.  Were you aware at one point that there were hard

24   drives in your office containing soundless video of

25   inmates meeting with legal counsel?

 1      A.   Later I learned that.

 2      Q.   At any point did you ever watch any of that

 3  video?

 4      A.   No, sir.

 5      Q.   Do you know of any AUSA in your office who ever

 6  watched any video of any attorney meeting with any

 7  client at CCA?

 8      A.   No, sir.

 9      Q.   I'm going to show you what's been marked as

10  Government Exhibit 25, ask you to take a look at this

11  and let me know when you're done.

12      A.   Yes, sir.

13      Q.   Do you recognize that?

14      A.   Yes, sir.

15      Q.   Is that an e-mail chain that includes a message

16  you received on August 4th, 2016--

17      A.   Yes, sir.

18      Q.   -- to a defense attorney?

19      A.   I'm sorry.  Yes, sir.

20      Q.   And who is the defense attorney?

21      A.   Steven Schweiker.

22      Q.   And what did Mr. Schweiker's message to you say?

23      A.   "I have made an appointment to discuss

24  Guillermo's options with him tomorrow at CCA.  Can you

25  provide assurance that our conference will not be

1    monitored and/or videotaped?  Thank you."

2       Q.   And what was the date of that message to you?

3       A.   August 4th, 2016.

4       Q.   Did you have any idea what Mr. Schweiker was

5    talking about when he sent that to you?

6       A.   No, sir.

7       Q.   What was the name of the-- the defendant in that

8    case?

9       A.   I believe it was Guillermo Morales.  Yeah,

10   Guillermo Morales.

11      Q.   When you got that e-mail message, Exhibit 25,

12   what did you do with it?

13      A.   I forwarded it-- well, I was on vacation, so I

14   forwarded it to multiple groups of people on my phone

15   because I couldn't figure out how to access groups.  So

16   I sent it out saying, "Look at this," and I-- I made a

17   snarky comment too regarding this.

18      Q.   On Exhibit 25, is Erin Tomasic one of the people

19   you sent that to?

20      A.   I don't-- oh, yes.  I'm sorry, yes.

21      Q.   What time was that that you sent it to her?

22      A.   It looks like my message went out at 8:54 a.m.

23   maybe.  No, my message went out at 4:41 p.m., I'm sorry.

24      Q.   On August 4th, 2016?

25      A.   Yes, sir.

1     Q.   And that went out to all the people in that

2    particular distribution list?

3     A.   Yes.  And I-- I know there was an additional set

4    of people as well.

5     Q.   And is your snarky comment on Exhibit 25 or did

6    that make it onto the other group?

7     A.   It's not on this one.

8     Q.   Are you aware that within 24 hours of getting

9    that e-mail, Erin Tomasic had reported what she knew

10   about the attorney-client video to the Court?

11    A.   I don't know anything about that.

12    Q.   Do you know that Erin Tomasic made that report

13   before the Federal Public Defender or any other attorney

14   notified the Court?

15           MR. REDMOND:  Objection, Your Honor.  Those

16   e-mails are going to speak for themselves.

17           THE COURT:  I'll sustain.

18           THE WITNESS:  I do not.  I was on vacation

19   that week, sir.

20   BY MR. CLYMER:

21    Q.   To the best of your recollection, have you as a

22   part of a criminal investigation or prosecution either

23   obtained yourself or had an agent obtain

24   audio-recordings of outgoing inmate telephone calls from

25   CCA?

1     A.  Yes, sir.

2     Q.  Can you approximate for us how many times you've

3  done that?

4     A.  I wouldn't be able to approximate, but it was a

5  lot.

6     Q.  When you have done that, how have you made the

7  requests?

8     A.  Normally I would either call or e-mail Brett

9  Hoffer, Roland Hoffer, with the U.S. Marshals Service,

10  who is the liaison to CCA, or was.  I'm not sure if he

11  is anymore.

12     Q.  In response to your requests, to obtain

13  recordings made at CCA by inmates making outgoing calls?

14     A.  Yes.

15     Q.  What were your reasons for getting those calls,

16  inmate calls?

17     A.  There were several.  In a wiretap case, I would

18  obtain a body of calls from inmates who were believed to

19  be on the wire so that I could hear them speaking

20  naturally on the phone, in addition to getting a voice

21  exemplar.  Those would be used as a body of recorded

22  calls to identify voices later if that issue was raised.

23       If we believed that contact orders were being

24  violated, one inmate at CCA and another person on the

25  outside, we would obtain their phone calls to see if

1    they were having contact.

2         Often I had witnesses that were threatened.  We

3    would obtain phone calls to see if calls were going from

4    CCA outside of CCA to others to threaten the witnesses.

5         I mean, they go on and on and on.  Trafficking, I

6    recently obtained calls to see if a defendant had

7    instructed his girlfriend to move his methamphetamine

8    and gun after he had been arrested.

9    Q.   Did you ever seek phone calls from CCA for the

10   purpose of listening to an inmate speak to his attorney?

11   A.   No.

12   Q.   To your knowledge, other than the *Herrera-Zamora*

13   case, do you know of any instance of an attorney in your

14   office seeking inmate calls for the purpose of listening

15   to the inmate speak to his attorney?

16   A.   No.

17   Q.   If you had ever heard about that, what would you

18   have done?

19   A.   I'm sorry, I need to correct that.

20   Q.   Sure.

21   A.   I have read an order involving an attorney in our

22   Topeka office where--

23   Q.   Treadway?

24   A.   Yes.  Where she had listened to them.  I just

25   read the order to see Judge Crabtree's ruling.

1    Q.  That was a published decision.  Right?

2    A.  Yes.

3    Q.  Was it-- was it an order or was it a statement

4  the judge made during a hearing?

5    A.  It could've just been a statement.  I don't

6  recall, sir.  It was on-- I believe it was a case called

7  *Reulet*.  And at one point I was going to assist with

8  some motions in that case, but I did not.  I was not

9  needed.

10    Q.  But that was widely known information once the

11  judge made that statement.  Correct?

12    A.  Yes, I believe so.

13    Q.  If you had heard of an attorney doing that,

14  intentionally getting attorney phone calls-- I'm sorry,

15  an AUSA doing that, intentionally getting attorney phone

16  calls in your office, would you have reported it?

17    A.  Immediately.

18    Q.  And that's what you did in the *Herrera-Zamora*

19  case.  Correct?

20    A.  Yes, sir.

21    Q.  In the cases where you requested and obtained

22  recordings of inmate telephone calls from

23  CCA-Leavenworth, did you ever have an interpreter

24  listening to the calls before you did?

25    A.  Often.

1    Q.   And was it always the same interpreter or was it

2    a different interpreter?

3    A.   It was Sara Gardner or one of her associates.

4    I've used her for over a decade.

5    Q.   Did you give Ms. Gardner or her associates who

6    did this work for you specific direction regarding what

7    they should do if when listening to the calls they

8    encountered an attorney-client call?

9    A.   Yes, sir.

10    Q.   Can you please describe that for the Court?

11    A.   Yes.  And actually, Ms. Gardner also worked--

12    worked and works on all of my wiretap cases.  So the

13    minimization order and memo is well-known to her.  But I

14    go over the instructions regarding attorney-client

15    privilege, penitent-parishioner, husband and wife

16    because we have common-law in Kansas.  I describe all of

17    that to her.  I often just read it straight from the

18    minimization memorandum.  And it indicates that if you

19    encounter such a call, you are to stop listening

20    immediately and you're to notify me, the attorney, so

21    that I can notify the Court if it's a wiretap.  If it's

22    an ongoing case, so I can notify the Court and opposing

23    counsel.

24    Q.   Is that a standard instruction you give?

25    A.   Yes.

1    Q.  So you-- if Ms. Gardner follows that instruction,
2    she's not to listen to those calls once she realizes an
3    attorney is on the line; is that correct?
4    A.  That's correct.  I also teach that at a class she
5    teaches at Maple Woods.
6    Q.  And she's only to tell you she encountered an
7    attorney-client call, not tell you the content of the
8    call; is that correct?
9    A.  Well, if she had followed my instructions, she
10   wouldn't have heard the content.  But, yes, if she were
11   to know the content, she's not to tell me the content
12   obviously.
13   Q.  To your knowledge, did Ms. Gardner and her
14   associates comply with your instructions?
15   A.  Always.
16   Q.  Did you ever get notice from Ms. Gardner or one
17   of her associates that they encountered an
18   attorney-client call?
19   A.  No, sir.
20   Q.  In cases where you don't need an interpreter, do
21   you listen to the calls or have your agents do so?
22   A.  I have the agents listen to the calls.
23   Q.  Are there ever instances where you get
24   attorney-client calls from CCA-Leavenworth and then no
25   one ends up listening to the calls?

1      A.   Yes, sir.

2      Q.   Is that a common event?

3      A.   It's more common than not.

4      Q.   Can you explain why it is you'd go to the trouble

5  of getting the calls and then never having anybody

6  listening to the calls?

7      A.   Yes, sir.  I treat all my cases as if we're going

8  to go to trial.  I gather as much evidence as possible

9  and I consider all scenarios.  One of the scenarios is

10  that someone may claim that's not me on that phone call;

11  therefore, I would get phone calls in that case as a

12  matter of course.

13      Oftentimes you get calls and then the person

14  pleads and there's just no reason to continue on with

15  evidence review.  I move to the next case.

16      Sometimes I give instructions to agents and I

17  have them prioritize the most important things and they

18  don't get to them because of time constraints.

19      Sometimes defendants come in and-- and may just

20  decide they want to enter a plea and we don't need to

21  move forward with that kind of evidence.

22      Q.   You testified earlier that it was your job to

23  mentor young Assistant U.S. Attorneys in your office; is

24  that correct?

25      A.   Yes, that used to be.

1    Q.   When you did that, did you teach these principles

2    to the young AUSAs who you mentored?

3    A.   Yes, sir.

4    Q.   Was that the way the District of Kansas taught

5    young assistants, to gather as much evidence, even if

6    you were never going to listen to it or use it?

7    A.   Absolutely.

8    Q.   Now, you're aware of the warning or the

9    admonition on the CCA outgoing calls.  Correct?

10   A.   Yes, sir.

11   Q.   And it's your understanding from your review of

12   the law that that constitutes a waiver of the

13   attorney-client privilege; is that right?

14   A.   That's my understanding, yes.

15   Q.   And if you had to defend in court an agent

16   listening to a call, you might make those arguments in

17   litigation.  Correct?

18   A.   Of course.

19   Q.   Because that's an argument that you'd have to

20   make to zealously represent your client.  Correct?

21   A.   Well, and that's what the law is, yes.

22   Q.   And that's what the law says under your

23   understanding.  Correct?

24   A.   Yes, sir.

25   Q.   So you would be remiss as an Assistant United

1  States Attorney not to take a litigation position that

2  the privilege is waived when a client consents to a

3  recorded call?

4      A.  Of course.

5      Q.  Would the same hold for video evidence?  In other

6  words, if you had waiver arguments or claims that the

7  privilege did not apply at all, would you be obligated

8  under the Rules of Professional Responsibility to make

9  those arguments in litigation on behalf of the United

10  States of America?

11      A.  Yes, sir.

12      Q.  Would you be doing a disservice to the citizens

13  of this district if you didn't make those arguments?

14      A.  Yes, sir.

15      Q.  Is that a different thing than deciding whether

16  you're going to listen to a call when you first

17  encounter an inmate-attorney call?

18      A.  Yes, sir.  The law allows us to do lots of

19  things.  We don't do them all.

20      Q.  I'm going to show you what's been marked as

21  Special Master Exhibit 1165.  You've already been

22  questioned about it.

23          MR. CLYMER:  Bonnie, can we have the ELMO

24  on?  Thank you.

25  BY MR. CLYMER:

1    Q.   Would it be correct to say that Exhibit 1165 is a

2   e-mail chain within your office?

3    A.   Yes, sir.

4    Q.   And you were a participant in that?

5    A.   Yes, sir.

6    Q.   Okay.  And from the bottom of it, does it appear

7   that the e-mail chain got triggered by a CM/ECF filing

8   or a notice of a filing by the Federal Public Defender

9   in the *Black* litigation?

10   A.   That's correct.

11   Q.   And is the next e-mail on that chain a message

12  from Scott Rask that says that, "The FPD filed a

13  response to the latest report by the Special Master,

14  continuing with allegations against us"?

15   A.   Yes, I believe that's Mr. Rask's message.  Mine

16  is cut off, but I think that's what it was.

17   Q.   And that's dated January 5th, 2017?

18   A.   Yes, sir.

19   Q.   And who-- who participates in this conversation

20  on the e-mail next?

21   A.   It looks like the trial attorneys in Kansas City,

22  Kansas, as well as our senior litigation counsel.  I

23  don't know if she was that then or appellate counsel,

24  Ms. Capwell.

25   Q.   I'm sorry, go to the e-mail above Mr. Rask's.

1    Ms. Flannigan say something?

2        A.   Yes, she did.

3        Q.   Is that the same day, January 5th?

4        A.   Yes.

5        Q.   And then after Ms. Flannigan sent that out, you

6    responded.  Correct?

7        A.   Yes.

8        Q.   I'd like to go down with-- and discuss with you

9    your responses here.

10       A.   Okay.

11       Q.   Can you describe the response in the first--

12   actually, just read it and describe what you meant to

13   communicate there.  You can read it out loud.

14       A.   Oh, okay.  "I am not going to stand silent if my

15   reputation is attacked.  I have never"--

16            MR. REDMOND:  Objection.  There's-- we can

17   read.  I mean, the e-mails speak for themselves.

18            THE COURT:  I'll sustain.

19   BY MR. CLYMER:

20       Q.   Did you say that you had never sought or listened

21   to an attorney speak with a client during any calls, CCA

22   recordings or otherwise?

23       A.   Yes, sir.

24       Q.   Is that the truth?

25       A.   Yes, sir.

1     Q.   Is that what you testified here today?

2     A.   Yes, sir.

3     Q.   Two paragraphs down you state an opinion about

4  whether the privilege applies under the circumstance of

5  a person making a call when they knew their call was

6  going to be recorded?

7     A.   Yes, sir.

8     Q.   Is that your understanding of the law now?

9     A.   Yes, sir.

10    Q.   Was that your understanding of the law at that

11  time?

12    A.   Yes, sir.

13    Q.   What's the next paragraph down meant to

14  communicate?

15    A.   From my point of view, we had not communicated

16  that to the Court and we should have.

17    Q.   Communicated what to the Court?

18    A.   That we didn't listen to calls or review videos,

19  and we essentially hadn't communicated that well.

20    Q.   And did you feel that there would be false

21  accusations made against you and your colleagues by the

22  Federal Public Defender's Office in this litigation?

23    A.   Yes.  And I believe the document that Mr. Rask

24  had attached was a claim that there were attorney calls

25  in one of my cases and they had pulled it into *Black*, if

1    I remember correctly.

2        Q.   And do you think that's an unfair and untrue

3    accusation against you?

4        A.   Yes, sir.  I-- I never listened to any client

5    calls-- attorney-client calls, and I never had an

6    attorney tell me that they were in discovery.  So it was

7    rather shocking that I was being accused of that.  I was

8    also, again, on vacation and so I'm reviewing this

9    without being able to look at any documents.

10       Q.   I'm going to show you what's been marked as

11   Defendant's Exhibit 6000A-- I'm sorry, 600A.

12       A.   Okay.

13       Q.   Do you recognize that as a list of some of the

14   cases you've handled?

15       A.   Yes, sir.

16       Q.   Did you ever listen to attorney-client calls--

17            MR. REDMOND:  Asked and answered, Your

18   Honor.

19   BY MR. CLYMER:

20       Q.   -- in any of those cases?

21       A.   No.

22       Q.   To your knowledge, has any one of your agents

23   ever listened to an attorney-client call in any of those

24   cases?

25            MR. REDMOND:  Asked and answered, Your

 1  Honor.

 2             THE WITNESS:  Not to my--

 3             THE COURT:  I'm not sure that one has.  Good

 4  ahead and answer.

 5             THE WITNESS:  Not to my knowledge.

 6  BY MR. CLYMER:

 7     Q.  Have you ever intentionally tried to obtain

 8  attorney-client communications for the purpose of

 9  listening to or reading those communications?

10             MR. REDMOND:  Asked and answered, Your

11  Honor.

12             THE COURT:  Overruled.  Answer it if you

13  can.

14             THE WITNESS:  No, sir.

15  BY MR. CLYMER:

16     Q.  To your knowledge, have you ever used an

17  attorney-client communication as part of an

18  investigation or prosecution?

19     A.  No, sir.

20     Q.  I'd like to now discuss briefly with you your

21  issues about the Special Master.  Did you ever refuse to

22  provide cooperation to the Special Master?

23     A.  No, sir.  I was asked to provide some documents

24  for him and I produced them that day.

25     Q.  Did anybody ever tell you not to cooperate with

 1   the Special Master?

 2       A.  No.

 3       Q.  Did you think it was incumbent on you to reach

 4   out to the Special Master to speak to him?

 5       A.  No.  I really didn't think I could.  I thought he

 6   reached out to you.  I really didn't understand the

 7   process, I guess.

 8       Q.  Did anybody ever tell you that you couldn't reach

 9   out to the Special Master if you wanted to?

10       A.  No, sir.

11       Q.  Do you recall a meeting at the-- strike that.

12   You testified about that.

13           Finally, I want to talk to you about this issue

14   about your meeting with Sara Gardner.  Was Sara Gardner

15   a friend of yours or is she a friend of yours?

16       A.  Yes.  She still is, yes.

17       Q.  Did you have a-- a yearly practice of getting

18   together around the holidays?

19       A.  Yes, sir.

20       Q.  Okay.  And did you get together with her in late

21   December?

22       A.  Yes, sir.

23       Q.  Was the purpose for that meeting for her to

24   discuss cases in your office?

25       A.  No.

1    Q.   What was the purpose of the meeting?

2    A.   We're friends.  We just have drinks and talk

3  about things like French bulldogs and--

4    Q.   French bulldogs?

5    A.   Yeah, we-- she wants a French bulldog.  I have

6  some.  We talk about friend things.

7    Q.   Where did you meet in December of 2017 with Sara

8  Gardner?

9    A.   We met at a bar near her husband, Chad Gardner's,

10  law practice.  I don't recall the name of it.  I can

11  picture it.  It was like a beer-brewhouse-type place.

12    Q.   Was this a friendly meeting or was this an

13  interview?

14    A.   It was a friendly meeting.

15    Q.   Did you take notes during the meeting?

16    A.   No, I had-- no.

17    Q.   Did you record the meeting?

18    A.   No.

19    Q.   Do you recall everything she said during that

20  meeting?

21    A.   No.

22    Q.   Do you recall what she said verbatim during the

23  meeting?

24    A.   Not at all.

25    Q.   I take it that the meeting troubled you?

1    A.  The end of the meeting troubled me, and that's

2   when I excused myself and left.

3    Q.  Do you recall Ms. Gardner telling you during that

4   meeting that Dave Zabel was not present when Erin

5   Tomasic tasked her to listen to attorney-client calls?

6    A.  I don't believe she was that specific.

7    Q.  Do you recall that you said to her, "If Dave was

8   the lead attorney, I assume he was involved"?

9    A.  I don't recall saying that.

10    Q.  Would it help refresh your recollection if you

11   looked at an interview where she reported that that's

12   what you said to her?

13    A.  Certainly.

14    Q.  I'm going to show you a report of an interview

15   done with her.  This is marked Exhibit 545.  I'm going

16   to show you the third page which I've got highlighted.

17   If you could just read this paragraph.

18         MS. VANBEBBER:  Objection, Your Honor.  I

19   think she needs to understand that this is not the

20   interview.  This is a summary that was prepared by Emily

21   Metzger and I believe Scott Rask.

22         THE COURT:  All he's asking is if it

23   refreshes her recollection.  But I've already said I've

24   compared the two and I'm going to give weight to what

25   her interview said, not somebody's summary, because

1   there are inconsistencies.

2           MR. CLYMER:  Your Honor, I'm only asking if

3   it refreshes her memory.  That's all I'm asking.

4           THE WITNESS:  Okay.

5   BY MR. CLYMER:

6    Q.  Does that refresh your memory of what Sara

7   Gardner said to you during that conversation?

8    A.  I think we talked at certain points about what I

9   did with-- or if I was concerned about attorneys that

10  did cases with me and if I-- if they did things I didn't

11  know about.  This was before she reported.  And I-- and

12  I'm just paraphrasing because I don't really remember,

13  I-- I said things like they-- you know, I-- I don't

14  worry because we discuss everything and that type of

15  thing.  So she may have assumed that because of that I--

16  I don't know.

17   Q.  Is it possible, Ms. Catania, that you assumed

18  that it was a "they" when Ms. Gardner didn't convey to

19  you that it was a "they"?

20   A.  It's possible but--

21   Q.  You just don't remember?

22   A.  I just don't remember.  I thought it was that she

23  said "they."  I could be wrong.  I wasn't concerned

24  about that, I was more concerned about what happened.

25   Q.  I'm-- I'm going to direct you to Exhibit 554,

1   which is a transcript of the interview you've already

2   been asked about.  If you'll read to yourself beginning

3   on Page 36 and read from 36 to 41.  And let me know when

4   you're done.

5       A.  To 41?

6       Q.  Yes, to 41.

7       A.  Oh, okay.

8       Q.  And take your time, just let me know when you're

9   done.

10      A.  Okay, I think I've finished.

11      Q.  In that-- those pages, 36 to 41, under

12  questioning by a Assistant Federal Public Defender, Ms.

13  Gardner recounts what happened when she was tasked to

14  listen to attorney-client calls.  Correct?

15      A.  Yes.

16      Q.  And she says it was just her and Erin Tomasic

17  when the request was made.  Correct?

18      A.  Yes.

19      Q.  As you read that, is it possible that that brief

20  conversation with Ms. Gardner did not implicate

21  Mr. Zabel in this conduct at all?

22      A.  Certainly.  I-- I could've misheard her or

23  misunderstood her, I don't know.

24      Q.  And if Ms. Gardner did tell you that night in

25  that brief conversation over drinks in a bar that

1  surprised you, that it was only Erin Tomasic and not Mr.

2  Zabel, that would be entirely consistent with what Ms.

3  Gardner said during this interview.  Correct?

4      A.  Yes.  She did tell me that it was their case,

5  though, I mean--

6      Q.  Their case?

7      A.  Yes.

8      Q.  And it was their case.  Correct?

9      A.  Yeah, if it's *Herrera-Zamora*, yes.  I believe so.

10              MR. CLYMER:  Nothing further, Your Honor.

11              MS. VANBEBBER:  If I may just quickly look

12  at Exhibit 554.  Thank you.

13                      REDIRECT EXAMINATION

14  BY MS. VANBEBBER:

15      Q.  On the evening that you spoke with-- on the

16  evening that you spoke with Sara Gardner, do you

17  remember at some point her expressing chagrin, she

18  wanted to know whether Dave knew what Erin was doing?

19      A.  Chagrin?  No.  I mean--

20      Q.  She was worried.  She didn't want to think Dave

21  knew.  Do you recall that?

22      A.  I don't-- I don't know about that.  I don't

23  really think we talked about that.

24      Q.  Do you recall her saying-- asking you what you

25  thought, whether Dave knew, and do you recall her-- you

1    saying to her, "Sara, he knew"?

2        A.  I don't recall saying that, no.

3        Q.  If that is what Ms. Gardner reported, would you

4    have any reason to contest it at this point in time?

5        A.  She may have a better recollection of that

6    conversation than I do because I, honestly, would've

7    assumed that.  Just because of the trial team, I would

8    assume that.

9        Q.  You would assume that in any event, wouldn't you?

10       A.  I would have.  So, yeah, I don't know, I could've

11   said that I suppose.

12       Q.  You said repeatedly that you believe the law says

13   that the CCA-type calls would not be privileged--

14       A.  Yes.

15       Q.  -- right?  And what law would that be?  Has the

16   Supreme Court ever said that?

17       A.  I can't cite a case here on the stand.  There's a

18   body of law that--

19       Q.  And there's a body of law the other way too,

20   isn't there?

21       A.  I'm sure that you've cited such, but I couldn't

22   cite it off the top of my head now.

23       Q.  But it's your belief that the law says an

24   admonition that a call may be recorded trumps the Sixth

25   Amendment?

1    A.   Again, I can't cite a case that I don't have in

2    front of me.

3              MS. VANBEBBER:  No other questions.

4              MR. REDMOND:  Nothing based on that, Your

5    Honor.

6                    RECROSS EXAMINATION

7    BY MR. CLYMER:

8    Q.   You had no involvement at all in the

9    *Herrera-Zamora* case, did you?

10   A.   No.

11   Q.   And you weren't involved in tasking the

12   interpreter to listen to calls between *Herrera-Zamora*

13   and his lawyer, were you?

14   A.   No.

15   Q.   So you had no basis to say, if by some chance you

16   did, to Sara Gardner "Dave knew," did you?

17   A.   No.  And I don't recall saying that.

18             MR. CLYMER:  No further questions.

19             THE COURT:  Anything more from Ms. Catania?

20   All right.  Can she be excused?

21             MR. REDMOND:  Yes.

22             THE COURT:  All right.  You're excused.  All

23   right.  Before we recess for the evening, how are we

24   doing time-wise do you think it?

25             MS. VANBEBBER:  It seems to me like we're

16-20032-JAR  USA v. Karl Carter (Black)  10.09.18          1726

```
1    fairly close to being caught up to where we said we were
2    going to be.
3              THE COURT:  Do you agree?
4              MS. BRANNON:  I think we're on track, Your
5    Honor.
6              THE COURT:  All right.  Mr. Clymer?
7              MR. CLYMER:  At this point, Your Honor, I
8    don't envision rebuttal witnesses that-- but that may
9    change, depending on the evidence that's presented.
10             Your Honor, we filed a motion that pertains
11   to a--
12             THE COURT:  Peter Joi.
13             MR. CLYMER:  Yes.
14             THE COURT:  Taking it under advisement.  So
15   we'll proceed to hear his testimony.  You're trying it
16   to the Court, we don't have to worry about confusion.
17   We do need to be concerned about whether it's helpful to
18   the trier of fact.  And my practice in a bench trial,
19   unless I'm absolutely convinced it won't be of any help,
20   is to let the witness testify and then I'll decide.
21             MR. CLYMER:  And I understand that, Your
22   Honor.  And I think the Federal Public Defender may have
23   misunderstood our claim.  We weren't suggesting
24   confusion.  The concern is invading the province of the
25   Court.
```

```
1              THE COURT:  Yeah, I understand that as well.

2   And I think you can be assured that I'm not going to let

3   it invade my province.

4              MR. CLYMER:  I get that sense from these

5   proceedings, Your Honor.

6              THE COURT:  All right.

7              MR. CLYMER:  Your Honor, before you leave, I

8   do have one other thing.  I'm sorry to-- really quickly.

9   But there was some government exhibits that I-- I think

10  I neglected to move into evidence.

11             THE COURT:  Okay.  And one other thing I'll

12  tell you, and probably not tonight is the night to do

13  it, but you all-- I think you all, but I know for sure

14  the Special Master and the FPD have been adding exhibits

15  and in part that's because of this rolling discovery or

16  maybe-- but, in any event, Ms. Wiest is having

17  difficulty because she doesn't have updated exhibit

18  lists.

19             And at some point I know she needs to make

20  sure that she can go through all of this with you.  And

21  for some of the exhibits that aren't-- weren't on the

22  exhibit list, we don't even really have a description of

23  them.  So it's really hard to keep track of and it won't

24  be a good appellate record.  So that all needs to be

25  fixed at some point sooner rather than later I hope.
```

1           MR. CLYMER:  If I could, Your Honor, may I

2    move some exhibits in now to help clarify things?

3           THE COURT:  Okay.

4           MR. CLYMER:  And I believe the Federal

5    Public Defender has stipulated to these:  Exhibit 23,

6    24, 25, 26, 27, 28, 29.  32 was already admitted as

7    demonstrative evidence.  And then 33.  34A I believe the

8    Court admitted today, 38 I believe the Court admitted

9    today, and 42 has already been admitted.  Did that catch

10   you up, Ms. Wiest?

11          COURTROOM DEPUTY:  I have a couple, like 36

12   here.

13          MR. CLYMER:  It has not been used.

14          COURTROOM DEPUTY:  Okay.

15          MR. CLYMER:  And I'll get you--

16          COURTROOM DEPUTY:  And then today you said

17   something about-- a demonstrative that you was talking

18   about, Exhibit 40.  I mean, it seemed like you said

19   Exhibit 40.  Did I misunderstand that?

20          MR. CLYMER:  I did say 40 and I owe you that

21   tomorrow.  We've got to put an exhibit sticker on it.

22          THE COURT:  You're going to modify it, but

23   it's demonstrative.  Okay.  By my record then exhibits--

24   and some of these may already have been admitted.

25   Exhibits 23 through 29 are admitted.  Exhibit 32

1  admitted as a demonstrative exhibit.  Exhibit 40

2  admitted as a demonstrative.  And then 33, 34A, 38 and

3  42 also admitted; is that fair?

4           MR. CLYMER:  And I'm not sure I caught all

5  that, Judge.  I asked for 24, 25, 26, 27, 28.

6           THE COURT:  Right, 23 through 29.

7           MR. CLYMER:  Okay.  Thank you.  I didn't

8  hear.  Thank you, Judge.

9           THE COURT:  32 is a demonstrative.  40

10  you're modifying, but it's a demonstrative.  And then

11  33, 34A, 38, and 42.

12           MR. CLYMER:  Correct, Your Honor.

13           MS. VANBEBBER:  Your Honor, while we're on

14  the topic of the, excuse me, rolling production, I do

15  need to put into the record that Thumb Drive No. 6 was

16  delivered I believe to the Special Master-- or to the

17  FPD yesterday and to me this morning at my request that

18  I get it today instead of yesterday.  It contains

19  322,500 kilobytes and we're a little--

20           THE COURT:  322,000?

21           MS. VANBEBBER:  32 gigabytes.

22           And, yes, we do have a number of exhibits

23  that have not been admitted and we've not offered.  I've

24  tried to gather them all together in order to make it

25  easier for the bailiff to take care of, and hopefully

1    I'll be able to enter them as a group tomorrow, but I

2    can't guarantee I'll be through until the very end.

3                THE COURT:  Okay.

4                MS. BRANNON:  Your Honor, on that topic, we

5    believe one sub-folder contains about 4,000 e-mails.  So

6    we're not going to get through those, but we will do our

7    best.  I believe this afternoon we e-mailed some more

8    exhibits and an updated exhibit list.  I will try to get

9    with Ms. Wiest before lunch tomorrow.

10                COURTROOM DEPUTY:  I'm getting Jennifer in

11    the morning.  We're going to go over everything

12    together.

13                MS. BRANNON:  Great.  They're ahead of me as

14    usual.  Thank you.

15                THE COURT:  Okay.  All right.  Let's plan to

16    reconvene at 8:30 tomorrow.  We'll be in recess.

17                (5:58 p.m., proceedings recessed).

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3

4

5        I, Kelli Stewart, a Certified Shorthand Reporter and

6    the regularly appointed, qualified and acting official

7    reporter of the United States District Court for the

8    District of Kansas, do hereby certify that as such

9    official reporter, I was present at and reported in

10   machine shorthand the above and foregoing proceedings.

11       I further certify that the foregoing transcript,

12   consisting of 372 pages, is a full, true, and correct

13   reproduction of my shorthand notes as reflected by this

14   transcript.

15       SIGNED October 29, 2018.

16

17

18

19            /s/ Kelli Stewart
             _____

20            Kelli Stewart, CSR, RPR, CCR, RMR

21

22

23

24

25
```