```
 1                   UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,

 4        Plaintiff,

 5   v.                              Docket No. 16-20032-02-JAR

 6   KARL CARTER,                    Kansas City, Kansas
                                     Date:  10/11/2018
 7

 8        Defendant.                 Day 8
     ....................            Pages 2068-2183
 9

10                 TRANSCRIPT OF MOTIONS HEARING
             BEFORE THE HONORABLE JULIE A. ROBINSON
11                 UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Government:   Mr. Steven D. Clymer
                           Department of Justice - USAO
14                         Lrm Eckert, William
                           100 S. Clinston Street
15                         Suite 9000
                           Syracuse, New York 13261
16
                           Mr. Duston J. Slinkard
17                         Office of United States Attorney
                           444 Southeast Quincy
18                         Suite 290
                           Topeka, Kansas 66683-3592
19
                           Mr. Stephen R. McAllister
20                         Office of United States Attorney
                           500 State Avenue
21                         Suite 360
                           Kansas City, Kansas 66101
22

23

24

25
```

```
 1    APPEARANCES:

 2    (Continued)

 3    For the Defendant Karl Carter:
                          Mr. David J. Guastello
 4                        The Guastello Law Firm, LLC
                          811 Grand Boulevard
 5                        Suite 101
                          Kansas City, Missouri 64106
 6
      For the Movant Federal Public Defender:
 7                        Ms. Melody J. Brannon
                          Mr. Kirk C. Redmond
 8                        Mr. Branden A. Bell
                          Office of Federal Public Defender
 9                        117 Southwest Sixth Street
                          Suite 200
10                        Topeka, Kansas 66603

11    For the Special Master David R. Cohen:
                          Mr. David R. Cohen
12                        David R. Cohen Co., LPA
                          24400 Chagrin Boulevard
13                        Suite 300
                          Cleveland, Ohio 44122
14
                          Ms. Alleen VanBebber
15                        VanBebber Law Firm, LLC
                          2029 West 95th Street
16                        Leawood, Kansas 66206

17

18

19

20

21

22
      _____
23
            Kelli Stewart, CSR-KS, CRR-MO, RPR, CRR, RMR
24                     Official Court Reporter
              259 U.S. Courthouse, 500 State Avenue
25                    Kansas City, Kansas 66101
```

1                          I N D E X

2
     Federal Public Defender's Witnesses:                    Page

3
     CHRISTOPHER JOSEPH
4       Direct Examination By Mr. Redmond                   2071
        Cross Examination By Mr. Clymer                     2082
5
     TRENT KRUG
6       Direct Examination By Mr. Redmond                   2094
        Cross Examination By Ms. VanBebber                  2113
7       Cross Examination By Mr. Clymer                     2114
        Redirect Examination By Mr. Redmond                 2133
8       Recross Examination By Mr. Clymer                   2137

9
     Government's Witnesses:                                Page

10
     TRISTRAM W. HUNT
11   Direct Examination By Mr. Clymer                       2141
     Cross Examination By Mr. Redmond                       2162
12   Cross Examination By Ms. VanBebber                     2179
     Redirect Examination By Mr. Clymer                     2180
13   Recross Examination By Mr. Redmond                     2181

14

15                        E X H I B I T S

16     Federal Public Defender's
        Exhibits              Offered            Received
17
             581A                2156               2156
18           586                 2146               2146
             689**               2173               2174
19           690**               2173               2174

20

21   ** Denotes admitted under seal

22

23

24

25

```
 1              (1:36 p.m., following proceedings commenced).
 2                   MR. REDMOND:  Your Honor, we call
 3    Christopher Joseph.
 4                   THE COURT:  I'm sorry?
 5                   MR. REDMOND:  We'd call Christopher Joseph.
 6                   CHRISTOPHER JOSEPH,
 7    called as a witness on behalf of the Federal Public
 8    Defender's Office, having first been duly sworn,
 9    testified as follows:
10                   THE COURT:  You may proceed.
11                   MR. REDMOND:  Thank you, Your Honor.
12                   DIRECT EXAMINATION
13    BY MR. REDMOND:
14       Q.  Could you state your name for the record, sir?
15       A.  Chris Joseph.
16       Q.  And, Mr. Joseph, what do you do for a living?
17       A.  I'm a defense attorney.
18       Q.  How long have you been a defense attorney?
19       A.  I graduated law school in 2000, clerked for two
20    years, began private practice I think August of 2002 and
21    then doing defense work since then.
22       Q.  Have you been doing federal defense work since
23    then?
24       A.  Yes.
25       Q.  Okay.  So are you a member of the Criminal
```

1   Justice Act panel for the Kansas City courthouse?

2       A.   Not for the Kansas City courthouse, no.  I've

3   been on the CJA panel in Topeka only since shortly after

4   I came out of the clerkship.  I don't know if it was

5   2002 or 2003.

6       Q.   Have you had federal criminal cases in the Kansas

7   City, Kansas courthouse?

8       A.   Yes.  They're always retained over here.

9       Q.   Okay.  And have you had clients detained, federal

10  clients detained at CCA?

11      A.   Yes.

12      Q.   And when they were detained, did you speak with

13  them on the phone?

14      A.   Yes.

15      Q.   Did they call you with legal questions?

16      A.   Yes.

17      Q.   Did you answer those questions?

18      A.   Yes.

19      Q.   Okay.  So when you spoke with your clients, did

20  you talk about the case?

21      A.   Yes.

22      Q.   I mean, did you maybe exchange a pleasantry or

23  two at the beginning of the conversation?

24      A.   That's fair.

25      Q.   But the rest of the conversation, what was it

1    about?

2       A.   I mean, I can't obviously over 16 years--

3       Q.   Generally--

4       A.   -- tell you--

5       Q.   -- yes.

6       A.   The point is, they're going to call me, some

7    clients more than others because they're high

8    maintenance, they're going to call to talk about the

9    case.  And I can't go out there-- you know, from Topeka,

10   from my office in Topeka, it's an hour each way.  Some

11   clients are more high maintenance than the others, so

12   they'll call more often or they'll want to talk more

13   often.  But for short-- short issues or quick

14   refreshers, it's not practical to get out there, so I'll

15   talk to them on the phone about issues.

16      Q.   And so when they call, I mean, are you talking

17   about holiday plans or how the Chiefs are doing?

18      A.   No.

19      Q.   Is it a fair statement that your communication

20   with your clients on the phone is-- is focused almost

21   solely on the case itself?

22      A.   Yes.

23      Q.   Okay.  When you visited your clients at CCA, did

24   you talk about the case?

25      A.   Yes.

1    Q.   Could you bill if you didn't?

2    A.   Probably not.

3    Q.   So the-- if there's an audio-recorded phone call

4    between you and your client, is it inevitably going to

5    contain conversation about the case?

6    A.   The only-- the only scenario where it would not

7    contain information about the case is if we don't talk

8    about it and he's just demanding-- or he or she are

9    demanding that I come out there and see him and talking

10   about scheduling, but otherwise absolutely.

11   Q.   Okay.  And if there's a video-recorded visit

12   between you and your client, it's going to contain

13   communication about the case?

14   A.   It would be a video of us talking about the case,

15   yeah.

16   Q.   Okay.  So the next topic is privatization.  Did

17   you ever privatize your phone number with CCA?

18   A.   I believe so, yes.

19   Q.   How long ago?

20   A.   So I don't have any specific memories-- I mean,

21   what I can tell you is I've been going out there for 16

22   years, since either 2002 or 2003.  There was a process,

23   I can't remember when it was explained to me or how it

24   was explained to me, but there was a process of

25   providing phone numbers that I was told would not be

1    recorded when we provided those numbers.  And I did

2    that.

3          I can't tell you how I did that.  I believe there

4    were faxes sent in.  I know we added-- you know, we've

5    grown as a firm.  And when we add lines, I believe we

6    sent additional information or provided additional

7    information.

8          The best I can tell you is that we did that at

9    least in paper more than once, but, you know, it's been

10   16 years.  I can't tell you.  I know my memory is that I

11   was told that they would not be recorded.

12   Q.   Okay.  And so when a phone call is made to you,

13   is there somebody who takes that phone call before you

14   do?  Is there like a front desk assistant?

15   A.   Yeah, we do not have direct dial-- we haven't

16   historically had direct dial, so it goes to the

17   reception.

18   Q.   Okay.  So do you ever yourself take a phone call

19   directly from CCA?

20   A.   I have when a client has gotten ahold of my cell

21   phone, which I use for work, but I generally prefer they

22   don't--

23   Q.   Okay.

24   A.   -- don't-- don't call that number.  But there's a

25   few folks that-- I mean, it's fairly well available, so

1   I've had a few calls directly come to my cell phone.

2   So, yes, I've heard the recording through that method.

3       Q.   Do you remember what the recording said?

4       A.   Not off the top of my head, other than the call

5   is subject to monitoring and recording.

6       Q.   Okay.  And do you ever-- without talking about

7   particular clients or particular cases, do you ever have

8   a discussion with your clients about the legal import of

9   that recording?

10      A.   Well, I mean, yeah.  I mean, especially on

11  wiretap cases.  There are plenty of paranoid clients

12  that want to know-- or don't want to talk on the phone

13  about something.  And especially if it's something quick

14  or something simple, or a high-maintenance client, I'm

15  not going to drive out to CCA.

16          You know, it takes just-- just to go out to CCA

17  will take, you know, easily two hours of travel, a

18  little more.  You sit in the waiting room, you know, you

19  wait for them to be placed.  You come back out.  I mean,

20  it's a three-hour-- it's really a half-day venture to go

21  out to CCA to see someone.

22          If I have a quick issue, the process that I

23  understand it to be is that you send a fax to the front

24  desk at CCA and they will have them call you.  We

25  followed that.  And for short and simple issues, if I

1    needed some information from a client, I'll follow that

2    and we'll do it by phone.

3        Q.   And so you said you send a fax to CCA.  Is that a

4    fax from your office?

5        A.   Yes.  And I don't know the details, usually staff

6    sends it, but I think it has to be on a letterhead

7    requesting a call.  And my understanding is they then

8    call from the same phone lines that have the monitored

9    or recorded message on them.

10       Q.   But you-- each time you send a fax, CCA is on

11   notice that this call is going to be made to a law

12   office?

13       A.   Yeah, that's-- it would be on our letterhead.  I

14   mean, they know what it's for.  I mean, the folks at the

15   front desk, I'm out there enough that they know who I

16   am.  And so if I'm asking-- I mean, I don't think I

17   could have-- I don't think a non-lawyer can send a fax

18   and ask a client to call them.  So, I mean, yes, it's--

19   the purpose, as I understand it, is for legal calls.

20            So what they do is I'll fax it in, say, have Mr.

21   X call me.  It's on my letterhead.  It's obvious for an

22   attorney-client call.  And usually it's Connie up front

23   will then say-- she passes it along to somebody and that

24   note makes it back to the client to call their lawyer.

25   And they'll pick up the phone and call me.  That's how I

1    understand it works.  And it's usually pretty promptly.

2       Q.   So say I'm your client, I'm at CCA.  I call you

3    and I say, Mr. Joseph, I think this call is being

4    recorded.  What would you tell me?

5       A.   Nobody is monitoring this, don't worry about it.

6    I mean, it's-- first of all, they're not supposed to

7    listen.  And if they are-- I mean, I've even-- I can

8    even tell you I've said a couple times, "This is

9    privileged."  Say it out loud, "This is an

10   attorney-client call."  You know, I say that because

11   that was my understanding.

12         And, frankly, any Assistant U.S. Attorney who I--

13   who I know, Mr. Slinkard included, I mean, if somebody

14   gets my call with a client, I would trust-- they'd say,

15   whoa, hot potato, and stop and not listen to that.  I

16   don't think anybody is listening to it or at least

17   that's-- had been my impression.

18      Q.   When did that impression change?

19      A.   When my calls were released in discovery, I got

20   notice of that.

21      Q.   Can you explain what happened there, how the--

22   you became aware of the release of your calls?

23      A.   I believe I got a call from Ms. Brannon saying

24   that there was a significant number of my calls that

25   were turned over in discovery and suggesting that I go

1  watch the hearing to find out more, which I did.

2      Q.  That was in the *Black* case?

3      A.  Yeah.

4      Q.  Okay.  Do you remember how many of your calls

5  were turned over in discovery?

6      A.  It was a lot.  I mean, it was one of those

7  high-maintenance clients.  I can tell you who it is, I

8  remember he called me all the time.  He always had

9  something.

10     Q.  Was that client charged in the *Black* case?

11     A.  No, he was not charged in the *Black* case.  He was

12 in another case, but he was somehow being looked at by

13 agents in connection with the *Black* case and was a

14 potential target I believe.  It's been a while, but he

15 had some involvement.

16     Q.  Okay.  So the-- as a lawyer or just as a person

17 interpreting language, you said the preamble was that

18 the call may be subject to recording or monitoring?

19     A.  Right.

20     Q.  What did you take that phrase to mean?

21     A.  My perception is that it-- is that that said that

22 regardless of whether or not it was actually going to be

23 recorded or not, they didn't have a separate system.

24         So, for example, if I-- if I have somebody that's

25 in KDOC, they have that same recording system.  But if I

1    want to talk to a client, I have to arrange it through a

2    case manager who has you use a private separate phone

3    that doesn't have that warning.  Right?  That's how you

4    do it in KDOC, and BOP, to my understanding.

5         But at CCA, my impression is they don't have

6    that.  So if I send a request in for a call, it's not

7    going to go-- be routed through a social worker or a

8    case manager on a private phone, they just tell them to

9    go use that system, which is why they ask for those

10   numbers so that they don't record.  That's how I

11   understood it to work.

12   Q.   Okay.  You made reference to the amount of time

13   it takes to get to CCA for a visit.  How important is it

14   to your ability to communicate with clients to be able

15   to talk with them over the phone privately?

16   A.   Very.  I mean, especially-- again, from Topeka,

17   which is where I'm getting the CJA appointments, and

18   it's not a lot of them, but I mean, if I had to run out

19   there every time I wanted to talk to somebody, that

20   would be a substantial burden.

21        And, frankly, I don't think the Court would be

22   interested in paying three hours, you know, worth of

23   time every time I had a question.  The vouchers would

24   get out of hand.  Every case would hit that excessive--

25   I mean, every case would be exceptional in terms of the

1  caps under the CJA voucher.  So it would be-- I mean, it
2  would be virtually impossible to do any case within the
3  budget that is set under the CJA.
4      Q.  In your experience, how important is it to have a
5  good relationship with your client?
6      A.  Client control is critical, so it's very
7  important.
8      Q.  And how important is regular communication to a
9  good relationship with your client?
10     A.  Very important.  They get mad and they get upset
11 if they feel neglected and ignored.  You-- you know, and
12 the clients range considerably in terms of their
13 temperament.  But, you know, even the most calm client,
14 if you don't have any contact with them for a couple
15 months, is going to get really antsy.
16     Q.  Have you ever been notified by the U.S.
17 Attorney's Office that your calls-- your attorney-client
18 calls had been recorded?
19     A.  No, I-- not other than what's come out in the
20 *Black* case.
21     Q.  And had you ever received in discovery any
22 attorney-client calls between you and your clients?
23     A.  No, not that I'm aware of.
24     Q.  If you knew that your calls were in the
25 possession of the U.S. Attorney's Office, what would you

1    have done?

2        A.   I don't know.  That would be alarming, to say the

3    least.

4        Q.   What was your reaction when you went to the *Black*

5    hearing and found out that your phone calls had been

6    recorded and disseminated in discovery by the

7    government?

8        A.   I figured there was a pretty big screw-up

9    somewhere and I didn't know what happened.

10               MR. REDMOND:  Could I have just a moment,

11   Your Honor?

12               THE COURT:  Yes.

13               MR. REDMOND:  That's all we have.  Thank

14   you.

15               MS. VANBEBBER:  No questions.

16                    CROSS EXAMINATION

17   BY MR. CLYMER:

18       Q.   Mr. Joseph, you said you practiced for 16 years

19   now?

20       A.   I graduated in 2000, went into practice August of

21   2002, I think is when my clerkship ended.  Still in

22   practice.

23       Q.   And you said I think that you work for a law

24   firm?

25       A.   Yes.

1        Q.   What law firm is that, sir?

2        A.   Joseph, Hollander & Craft.

3        Q.   Have you worked for that law firm that entire

4    period since your clerkship ended?

5        A.   Yeah, we've gone through-- you know, it used to

6    be Joseph & Hollander, PA.  It's now Joseph, Hollander &

7    Craft, LLC, but it's the same group.

8        Q.   On those-- other than those rare occasions where

9    a client finds out your cell phone number, when clients

10   call you, what number do they call?

11       A.   The main line is (785) 234-3272.

12       Q.   I'm not going to get your calls, that's not why

13   I'm asking.

14       A.   I'm not worried.  I mean, it's on the Internet,

15   so I'm not too worried about it.

16       Q.   Okay.

17       A.   We've got-- there are four offices.  Each office

18   has a main line.  When you dial out, though-- so take

19   Topeka, for example, we've got ten lines.  And with the

20   advent of caller ID, if I pick Line 2 and call out and

21   someone has got caller ID, then they've got that line as

22   well now.  So occasionally you'll see Line 2 light up.

23       Q.   So a client might call more than one of the

24   lines-- landlines at your law firm; is that right?

25       A.   If they're-- if they're calling off information

1    I've given them and they're in custody, no.  I mean,

2    they'd only call the main line if they're in custody

3    because they don't have caller ID.  But if somebody is

4    out of custody, occasionally they can.

5       Q.   Let's stick with in custody.

6       A.   Yeah.  In custody, no.  I mean, the only number

7    they would have would be what's on my card or on my

8    letterhead, which would be the main lines.

9       Q.   And if someone calls that main number, the one

10   that you give to in-custody inmates, who answers the

11   phone?

12      A.   Should be the receptionist, although I'll tell

13   you over the years I've grabbed a phone every once in a

14   while.  I mean, we're a small office so you-- it should

15   be the receptionist.

16      Q.   Not always the receptionist?

17      A.   Not always the receptionist.

18      Q.   My understanding of those calls from CCA is that

19   there is a preamble that requires that you push a

20   certain button in order to permit the call to go

21   through; is that correct?

22      A.   I think so.

23      Q.   Does your secretary or your-- I'm sorry, your

24   receptionist have instructions that he or she should

25   push that button when the call comes in?

1    A.   If I'm not there, they tend to decline.  But, you

2  know, I couldn't tell you beyond that.  If I'm there and

3  they'll buzz me and say, do you want the call and--

4    Q.   And that's what I was going to ask.  If you're

5  not there, you think they simply decline the call?

6    A.   I believe so.  I mean, I don't know.  I usually

7  don't get messages.  There's also-- the other caveat is

8  I believe there's some kind of audio that comes across

9  where they give their name or something, so I don't know

10  if they're accepting it, saying he'll call you back, or

11  they're just sending a message.

12    Q.   So you don't know whether the receptionist simply

13  rejects the call when you're not around or perhaps

14  answers the phone, has a brief conversation with the

15  client and then hangs up the phone?

16    A.   My guess is rejects, but I'm not sure.

17    Q.   Not sure.

18    A.   And, frankly, we've gone through a few

19  receptionists over the years, so I couldn't tell you.

20    Q.   I'm guessing that your receptionist talks to

21  someone on the phone, she doesn't give any legal advice

22  though; is that right?

23    A.   I hope not.

24    Q.   Are there ever times where the receptionist

25  buzzes you, you're busy with something else but you're

1  almost done with that thing, and you have the person on

2  the line wait for you?  If you remember.

3      A.  You know, I'm sure, I suppose.  It would be a

4  brief wait.  Yeah, sure.

5      Q.  Are there ever times where the receptionist will

6  take a call from CCA and roll it over to your voicemail

7  so somebody can leave a voicemail message for you?

8      A.  It's possible.  I don't recall that happening

9  though.

10     Q.  So do you recall-- do you know, as you sit here

11  right now, what sort of instructions the receptionists

12  at your law firm have about how to react to these

13  different situations when someone from CCA calls?

14     A.  If a client-- what I've told them-- and I don't

15  know how strictly they follow it, but what I say is if

16  somebody is calling from CCA and I'm in, track me down

17  and I'll tell you if I have time for the call or not.

18  So I couldn't tell you logistically what's happening

19  there.

20     Q.  So you don't know if they got the other person on

21  the line and then they hang up if you're too busy?  You

22  just don't know?

23     A.  No, I couldn't give you enough details.

24     Q.  Fair enough.  You said there came a time where

25  you tried to privatize the line?

1      A.   Yeah.

2      Q.   And when you did that, what phone number or phone

3    numbers did you send to CCA, if you remember?

4      A.   I couldn't tell you.  I mean, the first-- I'm-- I

5    don't know-- I mean, this is 2002, 2003 when I first

6    would've started going out there.  I don't have any

7    specific recollection of what we did or did not do back

8    then.

9          I do have some memory over the years of updating,

10   a fax being sent over to CCA with new numbers or

11   numbers.  I couldn't tell you when.  I knew-- I know we

12   did something.  And-- and Mr. Redmond asked me the same

13   thing, and I just really don't know enough.  It wasn't

14   that important.  I mean, I knew it was happening, I just

15   don't remember.

16     Q.   If the true answer is I don't remember, that's

17   fine.

18     A.   I couldn't tell you when.  I know we sent in some

19   faxes.  I know, yeah, we provided numbers, I couldn't

20   tell you how often, when or how.

21     Q.   And you described two different kinds of fax that

22   I think you had your law firm send in to CCA.  One is a

23   privatization fax and one is a "request client call"

24   fax.  Right?

25     A.   Correct.

1    Q.  Who sends those?  Do you personally from the fax

2  machine or somebody else?

3    A.  It would've been-- some staff member would've

4  probably done it.

5    Q.  So you ask a staff member, you tell the staff

6  member what number or what client and they do it?

7    A.  Usually-- if I want to talk to a client, I mean,

8  it, frankly, depends on who-- you know, if I'm in the

9  Lawrence office and it's somebody that's experienced and

10  knows how to do this and talks to Connie scheduling all

11  the time, they'll put together a fax.  And probably it's

12  a letter-- usually it's in a letter form is my guess, if

13  I recall.  And I'll sign the thing or maybe the staff

14  will sign it, just requesting the client call me.  I

15  couldn't tell you what exact language it was.

16    Q.  Do you recall when it was that you or your law

17  firm, to the best of your recollection, sent the first

18  privatization request to CCA?

19    A.  I really don't.

20    Q.  Could it have been less than ten years ago?

21    A.  I mean, the best I can tell you is I'm-- I'm

22  confident that we would've addressed that fairly early--

23  or I mean, I would've wanted to know the answer.  So at

24  some point when I first started going to CCA, I couldn't

25  tell you how that was addressed, but I'm sure we-- I'm

1   sure I talked to somebody out there.  I wouldn't have

2   just-- that impression didn't come from out of the blue.

3   I don't know when we sent paper faxes in.  I really

4   couldn't tell you.

5      Q.   This incident where you got notice that another

6   attorney had gotten calls between you and your client,

7   how recently was that?

8      A.   That was at the-- the first hearing on-- on the

9   subject.

10     Q.   2016?

11     A.   Could be, yeah.

12     Q.   And you believe by then you had sent a

13   privatization request?

14     A.   Oh, yeah.  Yeah.  For sure.

15     Q.   Do you recall hearing, after having sent the

16   privatization request, the-- the warning about recording

17   and monitoring?

18     A.   Yeah.

19     Q.   Did it ever occur to you that because you were

20   hearing that warning that maybe the privatization

21   request didn't work?

22     A.   You know, no.  I mean, I-- the best I can explain

23   is my understanding, and I can't tell you why

24   specifically I have that, is that this is somehow

25   different than KDOC, Department of Corrections, or BOP

1    where they have a separate system by which you can get

2    the call.  I can't tell you why I believe that's the

3    only way that they can call us.  And, frankly, I have no

4    idea about the technology.  I mean, I didn't spend a lot

5    of time thinking about it, to be completely honest,

6    but--

7        Q.  You didn't think it was part of your ethical

8    obligations to your client to go out to CCA and see how

9    their phone system worked?

10       A.  To investigate beyond sending a privatization

11   request or becoming familiar with that?  No.

12           And, frankly, if I thought my-- I hold my

13   colleagues in the U.S. Attorney's Office in high esteem.

14   And, frankly, if they were getting my calls, I would

15   think they would tell me.

16       Q.  And you thought that essentially with this

17   privatization request, if you were told sending a

18   privatization request out will privatize your line, you

19   could rely on that.  Correct?

20       A.  Yeah.  And, frankly, I would expect that had that

21   not been the case, had it been coming-- being produced

22   in other cases, somebody would've said something to me.

23           I mean, I do have good relationships with

24   prosecutors and nobody has ever said anything to me, and

25   I've never heard any scuttlebutt around the courthouse

 1   that our calls were being intercepted.

 2       Q.   Do you know which prosecutor sent that discovery

 3   out?

 4       A.   No, I don't.

 5       Q.   Do you know if a prosecutor ever listened to

 6   those calls that got sent out in discovery?

 7       A.   I do not.

 8       Q.   Do you know if sometimes prosecutors simply burn

 9   a disk and send it out without ever listening to the

10   calls?

11       A.   I imagine that's possible, sure.

12       Q.   Okay.  So you haven't reached the conclusion that

13   a prosecutor listened to those calls in that case?

14       A.   I have no idea, no.

15       Q.   And you're not making an accusation here that a

16   prosecutor listened to those calls?

17       A.   No, sir.

18       Q.   Would it be safe to say that because CCA is a

19   detention facility that's got a contract with the

20   marshals service, you thought you could rely on their

21   representation about privatization?

22       A.   I would sure hope so, yeah.

23       Q.   Do you think you could also rely on a

24   representation about information about inmate calls from

25   the marshals service itself?

1      A.   I would hope so.

2      Q.   If the marshals service told you something, do

3    you think you could rely on it?

4      A.   I would sure hope so.

5      Q.   So you relied on CCA and then you found out that

6    maybe it wasn't so accurate.  Right?

7      A.   Seems to be the case.

8      Q.   Did you know that the form that U.S. Attorneys

9    used to get calls from the marshals service had a banner

10   on it that said you won't get any attorney calls?

11     A.   I've never seen that, no.

12     Q.   Would you fault a Assistant U.S. Attorney for

13   relying on a banner like that on the form?

14     A.   No.

15     Q.   Kind of what you did.  Right?

16     A.   Sure.  I mean, look, I-- I do think highly of

17   most of the-- I mean, of the federal prosecutors.  I

18   mean, I don't think Mr. Slinkard for a second - I'm just

19   picking on him because he's sitting there - for a second

20   would-- would listen to my attorney-client calls.  If he

21   got them, he'd say, whoa, and he'd pick up the phone and

22   call me.  So I don't-- I would think that I would've

23   heard from somebody if my calls were being disseminated

24   regularly.

25     Q.   Are you aware that they think highly of you as

```
 1   well?
 2       A.  No.  No.
 3       Q.  And I believe you-- I believe you told us that
 4   some of your clients, when they called you, they had
 5   concerns about that warning?
 6       A.  There are a lot of paranoid clients.  Well, not
 7   necessarily the warning, they just think people are
 8   listening.  I mean, they're always paranoid.  I don't
 9   know that it was the warning specifically.  They just--
10   they think the government is listening on their calls.
11   And I would tell them, no, that that's not something
12   that would-- they wouldn't do that.  That doesn't make
13   sense.  It would be a bad move for them.  They don't
14   need the advantage candidly.
15       Q.  But, to your knowledge, they would've heard that
16   warning before making that call?
17       A.  I don't know what they hear.  I mean, I have no
18   idea what it sounds like on that end of the line, if
19   they even hear that or not.  I have no idea.
20               MR. CLYMER:  Thank you.  Nothing further,
21   Your Honor.
22               MR. REDMOND:  No other questions, Your
23   Honor.
24               MS. VANBEBBER:  No other questions.
25               THE COURT:  All right.  May Mr. Joseph be
```

1    excused?

2              MR. REDMOND:  He may for us.

3              THE COURT:  You're excused.

4              THE WITNESS:  Thank you.

5              THE COURT:  All right.  Next witness.

6              MR. REDMOND:  We call Trent Krug, Your

7    Honor.

8                        TRENT KRUG,

9    called as a witness on behalf of the Federal Public

10   Defender's Office, having first been duly sworn,

11   testified as follows:

12             THE COURT:  Proceed.

13             MR. REDMOND:  Thank you, Your Honor.  May I

14   approach the witness?

15             THE COURT:  Yes.

16                   DIRECT EXAMINATION

17   BY MR. REDMOND:

18     Q.  Mr. Krug, I am going to refer to this pleading in

19   a little bit.  It's a case we had together, *United*

20   *States of America versus Domingo Uriarte.*  I have some

21   questions about-- that are going to have something to do

22   with how discovery flows in your office.

23             MR. REDMOND:  I'm not going to enter this as

24   an exhibit, though, Your Honor.

25   BY MR. REDMOND:

1     Q.   At some point your office or you or an agent

2   caused to be issued to CCA a request for Mr. Uriarte's

3   calls; is that right?

4     A.   That's correct.

5     Q.   And I'm referring to I think Pages 3 and 4, which

6   can give you some more details about that if your memory

7   is fuzzy.

8          And it's your understanding that, as a result of

9   that request, calls were provided to your office which

10  included attorney-client calls; is that right?

11    A.   Yes and no.  Calls were provided.  I don't recall

12  any attorney-client calls being on those recordings that

13  we received.

14    Q.   Okay.  It was my understanding from the pleading

15  that those calls were not reviewed by you or an agent,

16  they were simply sent along in discovery; is that right?

17    A.   There's two different sets of calls.  If I can go

18  back.

19    Q.   Please.

20    A.   So the first request was on July 17th of 2015.

21    Q.   Okay.

22    A.   So we requested at that time CCA calls between

23  Mr. Uriarte at the facility from the date of his arrest,

24  which was April 28th, '15 to that July 17th, 2015 date.

25    Q.   Okay.

1    A.  We received that batch of calls, had those sent

2    to Sara Gardner for translations.  So those were

3    submitted to Mr. Uriarte's initial counsel, maybe

4    subsequent counsel, Ms. Bath, at that time.

5         Fast-forward to August of 2016.  I met with

6    Mr. Hart, who was representing Mr. Uriarte at that time.

7    He had requested visitor logs and call logs because the

8    *Black* litigation was going on at that time and-- around

9    August of '16.

10        So I requested from the marshals call and visitor

11   logs from the date of his arrest, which was April 28th

12   of '15, to the present date.

13   Q.  And that date was approximately August 12th?

14   A.  Yes, sir.

15   Q.  Okay.  Of 2016?

16   A.  That's correct.

17   Q.  Okay.

18   A.  We then received a different CD that I thought

19   had just visitation logs and call logs; so in other

20   words, no calls on them.  But they did, in fact, contain

21   calls.  So that's the second round, if you will, and

22   that was sent out to Mr. Hart.

23   Q.  And then it is your understanding through

24   communications with Mr. Hart that he had issued his own

25   subpoena?

1    A.   That's correct.  I believe the date on his issued

2   subpoena was around August 19th of 2016.

3    Q.   So the only time difference in those subpoenas

4   would be the week from August 12th to August 19th that

5   it took him to issue the subpoena?

6    A.   I think that's correct, yes.

7    Q.   Otherwise, they'd cover the same amount of calls

8   or the same-- the same time period rather?

9    A.   Yes.

10    Q.   Okay.  And when Mr.-- I mean, it's in evidence in

11   this case, but the subpoena return for Mr. Hart's

12   subpoena included a number of attorney-client calls; is

13   that your understanding?

14    A.   Based on his affidavit.

15    Q.   Yes.  And he actually had a conversation with you

16   as well on the phone; is that right?

17    A.   Yes.  And that was in relation to the second

18   round that we received from that August 12th

19   dissemination letter.

20        So he called me, and I recall this specifically

21   because I was in Texas for a conference from roughly

22   August 22nd through the 26th, somewhere in that time

23   frame.  So I was out of town.  Mr. Hart had called me

24   and said, hey, that second round that you provided had

25   CCA calls on it.  There was no mention that his

1   attorney-client calls were on that particular CD.

2      Q.  He did not tell you that Mr. Hart's calls-- Mr.

3   Hart did not tell you that Mr. Hart's calls were on the

4   CD?

5      A.  That's correct.

6      Q.  Okay.  But he did say attorney-client calls were?

7      A.  No, just that--

8      Q.  Okay.  I'm misunderstanding the conversation.

9   Could you try that again?  I apologize.

10     A.  Yeah, no problem.  So after that second round,

11  the CD that we received from the marshals, Mr. Hart had

12  contacted me while I was in the conference, so it was

13  roughly a week later after he received that, and

14  indicated that there were CCA calls on that discovery

15  disk, not attorney-- we never got into that

16  conversation.

17     Q.  Okay.  Because in your pleading, I mean, I'm

18  looking at Page 4, just to refresh your recollection,

19  that-- because this talks about, "Soon after Mr. Hart

20  receiving the government's August 19th of 2016

21  dissemination, he advised the defendant's CCA calls had

22  been unexpectedly included in the requests."  I don't

23  really understand what that sentence means.

24         Two questions about it:  One, the August 19th

25  dissemination was the subject of the August 12th

1    subpoena.  Am I correctly assuming that?

2       A.   You are, and there is a typo in that.  Instead of

3    August-- I noticed this.  It was August 19th that was in

4    the pleading, that should've been, "Soon after Mr. Hart

5    received the government's August 16th, 2016

6    dissemination."

7       Q.   Okay.  So the-- you explained then to Mr. Hart

8    that you had not listened to the recorded calls and did

9    not realize recorded calls had been provided; is that

10   right?

11      A.   That's correct.

12      Q.   And that's-- when you say recorded calls, you

13   mean recorded attorney-client calls?

14      A.   I'm talking about CCA calls in general.

15      Q.   Okay.  What objection would you have had to

16   listening to CCA calls in general if they did not

17   include attorney-client calls?

18      A.   At that time I just-- with any calls, because

19   that's when the litigation had started.  That just sent

20   off all the alarms in my system as far as-- I told

21   Mr. Hart, did not request those particular calls.  I was

22   hoping to get, based on the e-mail, call logs and

23   visitation logs.  And then this was included in the CD.

24   But I just told him I was not going to listen to them.

25      Q.   Okay.  The earlier subpoena that you mentioned

1   that-- that you received CCA calls back from, the-- were

2   there any-- were those calls listened to?  Were all of

3   those calls listened to?

4       A.   So you're referring to the second round, if you

5   will, after that--

6       Q.   Right.

7       A.   -- August 12th, '16?

8       Q.   No, I'm sorry, the prior dissemination.

9       A.   Okay.  So back the initial one from July of '15?

10      Q.   Yes.

11      A.   Those were provided to Ms. Gardner.

12      Q.   Okay.

13      A.   And we did receive translation summaries of those

14  calls.

15      Q.   And those were provided to defense counsel?

16      A.   Yes, sir.

17      Q.   And you found no attorney-client calls in that

18  batch?

19      A.   That's correct.

20      Q.   Okay.  And I want to back up really quick.

21  Mr. Uriarte was actually represented by four different

22  lawyers.  Right?

23      A.   Correct.

24      Q.   Started with Mr. Bartee with the Federal Public

25  Defender's Office?

1       A.   Yes, sir.

2       Q.   And then Tricia Bath?

3       A.   Correct.

4       Q.   And then Gary Hart?

5       A.   And then you.

6       Q.   And then me.

7            And to be fair, once I took the case over, you

8    did not disseminate those calls to me because they

9    potentially were attorney-client calls; is that right?

10      A.   No, that was not the rationale behind that.

11      Q.   Okay.

12      A.   And it was my maybe mistaken assumption,

13   Mr. Redmond, that you had obtained discovery from

14   Mr. Hart's estate.  That may-- and you pointed out in

15   your-- I want to say it was August of this year when we

16   had the deadline for the plea negotiations, and you had

17   responded and indicated you had not received CCA--

18   certain rounds of discovery.

19      Q.   And I'm asking a bad question.  My question

20   actually is:  Where are those calls that you-- from the

21   batch, the August 19th batch, that you thought might

22   include attorney-client calls, where are those calls

23   now?

24      A.   They are in a file in our office.

25      Q.   Okay.  And that actually leads me directly into

1   my next set of questions, which is, when you get calls

2   in, physically what happens to them?

3         CCA calls are returned upon your request.  Are

4   they uploaded to the network?

5   A.   Generally speaking, we will either-- if they're

6   Spanish, we will make a copy of that.  So I'll provide

7   that to a trial assistant to upload, if you will, for

8   the discovery dissemination purposes.  A copy sometimes,

9   again, if it's Spanish speaking - and this is generally

10  speaking - will be provided to Ms. Gardner, who we have

11  a contract with to do translations.

12  Q.   Okay.  And so if they're not Spanish calls, are

13  they uploaded to the network?

14  A.   Most of my cases are Spanish--

15  Q.   Okay.

16  A.   -- involved, so I don't know the answer to that.

17  Q.   Okay.  So when they are Spanish calls, they're

18  sent to Sara Gardner.  She translates the call.  Are the

19  translations that she provides you uploaded to your

20  network?

21  A.   Yes, sir.

22  Q.   And is that network accessible to anyone in the

23  U.S. Attorney's Office in Kansas City?

24  A.   I don't know the answer to that.

25  Q.   Okay.  So when I say "the network," if you are--

1    and I'm not looking to get into proprietary stuff here,

2    just from a broadly technical perspective, you want to

3    look at discovery that is in a case of yours, what

4    buttons do you click on your computer, into what

5    folders, where does the discovery live?

6        A.   You know, we do have a discovery folder.

7        Q.   Okay.

8        A.   And each attorney has their own folder.  And then

9    once you click-- for example, with my name, once I click

10   on my name, it would allow me access to see what has

11   been sent, what is in our discovery folder, if you will.

12       Q.   Okay.  So if-- if you wanted to click on say

13   Mr. Wamble's discovery folder, could you do that?

14       A.   Perhaps, I don't know.

15       Q.   Okay.  You've had cases with co-counsel.  Right?

16       A.   That's correct.

17       Q.   And it gets saved in one of your two-- the

18   discovery gets saved in one of your two discovery

19   folders?

20       A.   That's true, yes.

21       Q.   And so you could go look at that discovery to

22   prepare for a trial if you're second-chairing somebody

23   else in a case?

24       A.   Correct.

25       Q.   Okay.  And so if there is an attorney-client call

1  that's uploaded to the network, it's available to anyone

2  in the office?

3      A.   Potentially.

4      Q.   Okay.  So I've got--

5           MR. REDMOND:  Branden, could you put up

6  whatever is first on the list, I think 608A.

7           MR. BELL:  606A.

8  BY MR. REDMOND:

9      Q.   606A.  Mr. Krug, can you see that in front of

10  you?

11      A.   Yes, sir.

12      Q.   Okay.  So what I'm going to do is show you some

13  exhibits where the U.S. Attorney's Office has made

14  requests for calls and those calls have been accessed

15  and those-- the accessed calls had attorney-client phone

16  calls on them.

17           MR. REDMOND:  And, Branden, which prosecutor

18  is this?

19           MR. BELL:  Tomasic.

20  BY MR. REDMOND:

21      Q.   All right.  This is Ms. Tomasic, some of the

22  stuff she's accessed.  Have you ever had a case with Ms.

23  Tomasic?

24      A.   Yes, sir.

25      Q.   And in that case, to your memory, did you access

1   attorney-client-- I'm sorry, did you access CCA phone

2   calls?

3       A.   Perhaps.  I have no recollection of doing that

4   with her cases, but that may have happened.

5               MR. REDMOND:  Next one, Branden.  I believe

6   this is 600A.

7               MR. BELL:  There's a second page to it.

8   BY MR. REDMOND:

9       Q.   Oh, there's a second page to this.  So my

10  question is:  It looks like your office requests calls a

11  lot.  Is that your sense of things as well?

12      A.   I think it depends on the circumstances.  I

13  wouldn't say a lot, but again, depends on the case and--

14      Q.   What would make you request calls from CCA?

15      A.   A lot of times with my cases - and I can only

16  speak to my cases - I have a lot of long-term sometimes

17  wiretap investigations where we have-- certain arrests

18  are made at the times of opportunity, if you will.  So

19  maybe we haven't entirely conducted a takedown of all

20  the defendants that we're interested in, our targets.

21          I would request those under normal circumstances

22  to ascertain whether or not the individual who is

23  arrested is communicating with other co-defendants or

24  perhaps talking about where there would be hidden drugs,

25  hidden money, hidden assets, incoming shipments, those

1   kind of things that would be relevant to the

2   investigation.

3       Q.  Okay.  But I-- so the fact that the cases are

4   long term, why does that make it more likely you're

5   going to request calls?

6       A.  Just because I don't think we've captured, if you

7   will, the entire organization.  So there's always going

8   to be - not always, but in some cases - communication

9   with individuals that are unindicted co-conspirators,

10  other pertinent individuals that we may believe have

11  some information related to the investigation.

12      Q.  And bottom line is you consider it helpful.

13  There's good evidence to be found when you get calls

14  from CCA; is that a fair statement?

15      A.  There can be.

16      Q.  Okay.  And, I mean, would you think that that's a

17  fairly common sentiment in your office?

18      A.  Again, I couldn't speak for other attorneys.  I

19  think that's the case.

20      Q.  Okay.  So this is Ms. Tomasic's 30 cases where

21  she has accessed calls.  Next exhibit.

22              MR. CLYMER:  Objection, I believe it's 30

23  defendants, Your Honor, not 30 cases.

24              MR. REDMOND:  That's fair.  That's right.

25  BY MR. REDMOND:

1      Q.   This is Exhibit 600A, 15 defendants by another

2    prosecutor.  Could I see 601A?  Another five-- another

3    four.  602A, another 23.  And 603A--

4              MR. REDMOND:  Is there a second page,

5    Branden?

6              MR. BELL:  No.

7    BY MR. REDMOND:

8      Q.   I don't know how many.  That looks like a lot

9    though; is that fair?

10     A.   I think 602A were a lot of my cases.

11     Q.   Yeah, and we're going to go back to that in just

12   a second.  Actually, let's go back to 602A real quick.

13   So could you just take a minute to review this list and

14   make sure that you were actually an attorney on all of

15   these cases?

16     A.   I think all of those except No. 18.  I don't

17   recognize Antonio Wills.

18     Q.   Okay.  So the purpose of you getting these

19   attorney-client calls is to get evidence.  I mean,

20   you're prosecuting these people.  Have you ever heard an

21   attorney-client call?

22     A.   I have not.

23     Q.   Have-- or were you the one that reviewed the

24   discovery or-- I'm sorry.

25              Were you the one that reviewed the recorded calls

 1   from CCA?

 2       A.  In these particular cases?

 3       Q.  Yes.

 4       A.  My general thing is to send them to the agents to

 5   review.

 6       Q.  Okay.

 7       A.  So I don't-- a lot of these are, again,

 8   Spanish-speaking.  I just don't have the time

 9   necessarily to devote to listen in on phone calls.

10       Q.  You don't have time and you don't speak Spanish.

11   Right?

12       A.  Right.

13       Q.  Okay.  So this would never be something that you

14   would do personally?

15       A.  Now, there may be cases-- circumstances which I

16   would have to listen to a call.  I don't recall doing

17   that.

18       Q.  Okay.  So when the agent listens to the calls for

19   you, how is the agent's summary of those calls provided

20   to you?

21       A.  Let me backtrack just a bit.  When we send the

22   information to the agents, generally looking at-- at

23   this list, a lot of them are Spanish-speaking.

24       Q.  Right.

25       A.  So those would've been translated by Sara

1   Gardner, and then we would've disseminated those

2   translations to the case agents to review to see if

3   there's information related to potential unindicted

4   co-conspirators, information related to the

5   investigation in those summaries.

6       Q.   Okay.  So the translations are not even

7   re-disseminated-- or they're not even disseminated to

8   you; they're disseminated to the agents?

9       A.   I will get those as well.

10      Q.   Okay.  You'll get it as well?

11      A.   Yes, sir.

12      Q.   And the-- so at that point you're reviewing those

13  calls with the agents to determine if there's anything

14  pertinent?

15      A.   Generally those-- their review is done separate.

16  So they're--

17      Q.   I'm sorry.  I asked a terrible question, Mr.

18  Krug.  I apologize.

19          Once these summaries of the recorded phone calls

20  are prepared, that's what you review with the agents?

21      A.   That's what I share with the agents, yes.

22      Q.   Okay.  And so how often is it that you need to go

23  back in and actually listen to the phone calls yourself?

24  Do you see what I'm saying?

25          You would see something is pertinent, you think I

1    need to listen to that myself, have somebody translate

2    it for me, whatever, how often does that happen?

3        A.   I can't think of any time that that's occurred.

4        Q.   Okay.  So all of these phone calls you've never--

5    you can't think of a time that you've ever listened to

6    any of them; is that fair?

7        A.   That's fair.  And, again, a lot of these are in

8    Spanish.

9        Q.   Sure.  Sure.  Okay.  So the videos-- oh, actually

10   a couple more questions on phone calls.  Your office has

11   taken the litigation position in this case that even if

12   one of those batches contained attorney-client phone

13   calls, that you can listen to it because the privilege

14   is waived.  Do you personally concur with that

15   assessment?

16       A.   Sir, I don't have a personal stake in that.  I

17   would defer to my boss, the U.S. Attorney, and the

18   court's decision on those.

19       Q.   Well, let me ask it a different way.  If an agent

20   came to you and said one of the phone calls from this

21   guy is an attorney, what do you do?

22       A.   I would advise my supervisor and get advice,

23   whether it's contacting PRAO, finding-- I would do

24   something before I listened to the phone call or acted

25   upon that phone call.

1      Q.   Okay.  It makes you nervous if there's an
2   attorney-client phone call in a batch of discovery that
3   you have?
4      A.   I just realize I have ethical obligations with
5   respect to that.
6      Q.   Do you have any sort of general sense what those
7   ethical obligations are?
8      A.   Yes and no.  I mean, as far as-- and you had
9   asked your initial question whether I am aware of my
10  office's position; is that correct?
11     Q.   Yes.
12     A.   And I generally am, just based on some of the
13  pleadings.  But, again, I haven't prepared or researched
14  anything for today's presentation with respect to those.
15     Q.   Sure.  Did you participate in the drafting of any
16  of those pleadings in *Black*?
17     A.   No, I did not, sir.
18     Q.   Okay.  And so have you ever personally researched
19  the issue of whether a-- a preamble advising that a call
20  may be recorded waives the privilege in that phone call?
21     A.   I have not personally.
22     Q.   Have you ever-- have you had a colleague or have
23  you personally litigated that issue before any court?
24     A.   Not that I'm recalling.
25     Q.   Okay.  And so you-- are you aware of any Tenth

1    Circuit authority that says that the preamble would
2    waive the privilege?
3         A.   I'm not.
4         Q.   So if you ran across an attorney-client phone
5    call, you wouldn't just listen to it?
6         A.   That is correct.
7         Q.   Because you don't-- or you're not aware of any
8    controlling authority that would authorize you to do so?
9         A.   It's not that I'm unaware of any controlling
10   authority.  I know there's authority for that based on
11   the pleadings.  Again, I'm not recalling specifically
12   what that is, but I would seek advice.
13        Q.   Okay.  Videos, did you ever see any?
14        A.   No, sir.
15        Q.   Are any of your-- have any-- any of the cases
16   that-- where there's a 2255 that's been filed that
17   alleges that the client was videotaped in CCA, are any
18   of those yours?
19        A.   Yes.
20        Q.   How many?
21        A.   I can name them off if I can have just a second.
22        Q.   Sure.
23             MR. REDMOND:  Yeah, and could I have a
24   second, Your Honor?
25             THE COURT:  Yes.

 1  BY MR. REDMOND:

 2      Q.  Mr. Krug, it's my spreadsheet.  I'll look it up.

 3  I appreciate your time.  That's all my questions.

 4      A.  It can be up to six at this point.  I'm not sure.

 5          MR. REDMOND:  Okay.  That's all I have, Your

 6  Honor.  Thank you.

 7                     CROSS EXAMINATION

 8  BY MS. VANBEBBER:

 9      Q.  I just have a couple of questions for you,

10  Mr. Krug.

11      A.  Yes, ma'am.

12      Q.  You are familiar with the Special Master's

13  investigation in the *Black* case, aren't you?

14      A.  Yes, ma'am.

15      Q.  Did you ever have occasion to meet with the

16  Special Master?

17      A.  No, I have not.

18      Q.  Did you receive the December 2016 what we call a

19  litigation hold letter from Emily Metzger?

20      A.  Yes, ma'am.

21      Q.  And what did she want you to do?

22      A.  She requested - and I'm highly summarizing - to

23  preserve any information that may be relevant to the

24  investigation.

25      Q.  And did you do that?  Did you have any?

 1    A.  Yes, ma'am.

 2    Q.  What did you do with it?

 3    A.  What did I did with?

 4    Q.  Uh-huh.  How did you maintain it?

 5    A.  I made sure that nothing was purged from the

 6   files, made sure that we had e-mails saved in a certain

 7   file with respect to subpoena compliance, those types of

 8   measures.

 9    Q.  And did you ever have any management people tell

10   you that you should not contact the Special Master?

11    A.  Not to my recollection.

12    Q.  Do you know of anyone who did get the order not

13   to contact the Special Master?

14    A.  No, I-- I don't.

15         MS. VANBEBBER:  No other questions.

16                   CROSS EXAMINATION

17   BY MR. CLYMER:

18    Q.  Mr. Krug, I want to start by talking a little

19   about the *Uriarte* case and move to some other topics.

20   As I understand it, Mr. Uriarte was arrested as part of

21   a larger investigation; is that right?

22    A.  That's correct.

23    Q.  And when he was arrested, did he kind of appear

24   on the scene a little unexpectedly in your case?

25    A.  He did, yes, sir.

1    Q.   Can you explain that, if you can without

2    revealing any confidential information.  If not, tell me

3    it's confidential.

4    A.   No, generally speaking, he showed up in April

5    of 2015.  We had a wire investigation going on in the

6    background.  Our main target-- and that individual has

7    been charged at this point, Oscar Aguilera.  We-- Oscar,

8    according to our confidential source, was expecting a

9    load to be brought into Kansas City.  Our confidential

10   source revealed to the agents that they had the driver,

11   who was later identified as Mr. Uriarte.  So he was

12   unknown to us at that time in April-- roughly around the

13   22nd, 23rd of April.  He was arrested then trying to

14   transport a load of meth on April 28th of '15.

15   Q.   And was he detained pending trial?

16   A.   Yes, sir.

17   Q.   And when he was at the CCA detention facility,

18   you made a request for his telephone calls; is that

19   right?

20   A.   That's correct.

21   Q.   Was the purpose of doing that to try to get a

22   sense of whether those phone calls could give you some

23   insight into Mr. Uriarte's role in the organization?

24   A.   That is correct.

25   Q.   And you wanted to see who he contacted.  Correct?

1     A.   Yes, sir.

2     Q.   You got those phone calls.  Correct?

3     A.   Yes, sir.

4     Q.   And you knew when you made that request that you

5 were requesting phone calls, not logs.  Correct?

6     A.   That is correct.

7     Q.   When you got those phone calls, were there two

8 attorneys on the case in which he was charged?

9     A.   Can I go back to your previous question?

10     Q.   Sure.

11     A.   You had asked about logs.  What do you mean by

12 that?

13     Q.   Okay.  There's a second request you made

14 somewhere down the road after Mr. Hart asks you to.

15 Right?

16     A.   Yes.

17     Q.   That one was for logs only.  Right?

18     A.   Correct, call and visitor logs.  That--

19     Q.   Okay.  Hold off.  Let's just hold off.

20     A.   Sure.

21     Q.   The first request you requested calls, though.

22 Correct?

23     A.   Calls.  And there is I think a notation on that

24 request form, I just want to be accurate here, that at

25 the very bottom there's some other language "logs may be

1   a part of that."

2       Q.   Okay.  So when you request calls, you expect to

3   get logs as well?

4       A.   Generally, the CD contains I believe just the

5   calls, but it may have the logs associated with that.

6       Q.   In any event, the first time you made the

7   request, what you were looking for was phone calls

8   essentially?

9       A.   That's correct.

10      Q.   When you got-- did you get them on a disk?

11      A.   Yes, sir.

12      Q.   When you got that disk, is that one of the disks

13  that would've gone to Sara Gardner?

14      A.   Yes, sir.

15      Q.   Because Mr. Uriarte is a Spanish speaker?

16      A.   I think he spoke both Spanish and English.

17      Q.   But you-- in case there was Spanish, you send it

18  off to Sara Gardner?

19      A.   Yes.

20      Q.   Did you typically use Ms. Gardner?

21      A.   We did.

22      Q.   In all the time you used Ms. Gardner, did she

23  ever come back to you and say to you, "That disk of

24  calls you gave me had attorney-clients' phone calls on

25  it"?

1    A.  No.

2    Q.  If she had done that, what would you have done?

3    A.  Several things.  I would've asked her to stop

4  what she's doing.  And then I would've taken that

5  information and, again, contacted my supervisor,

6  contacted the agents not to listen if they had any

7  access to those calls, and start a taint team process.

8    Q.  Let's go back to the *Uriarte* case.  Did you send

9  copies of that disk out to the two defense attorneys who

10 were then involved in that case?

11   A.  I did.

12   Q.  And who were those two attorneys that you recall?

13   A.  I do have-- and I'm referring to Document 134

14 that Mr. Redmond and I were communicating about.

15   Q.  Yeah, if you want to take a look to refresh your

16 memory.

17   A.  Yes, sir.  So on February 11th of '16, I

18 submitted a dissemination letter and discovery CD which

19 contained those calls to Trisha Bath, who was

20 representing Mr. Uriarte, and Carl Cornwell, who was

21 representing Oscar Aguilera.

22   Q.  Somewhere down the road after you sent that CD

23 out, did you get the translations back from Sara

24 Gardner?

25   A.  Yes, sir.

1    Q.   Had you already sent that CD out to the two

2  defense attorneys before you even knew what was on that

3  CD?

4    A.   Yes, sir.

5    Q.   That's because you wanted to get that CD out with

6  your Rule 16 discovery; is that right?

7    A.   Yes, sir.

8    Q.   So the defense attorneys would have it promptly?

9    A.   That's correct.

10   Q.   When the translations came back from Ms. Gardner,

11  did you send that to the defense lawyers who were

12  involved in the case at that time?

13   A.   Yes, sir.

14   Q.   That was part of discovery as well?

15   A.   That's correct.

16   Q.   Now, did there come a time where Mr. Hart became

17  involved as the attorney for Mr. Uriarte?

18   A.   Yes, sir.  I believe that was April 6th of 2016.

19   Q.   And did you have a meeting with Mr. Hart about

20  the case?

21   A.   Yes, sir.

22   Q.   Did Mr. Hart make a request of you?

23   A.   He did.

24   Q.   What did Mr. Hart ask you to do for him?

25   A.   And that was in early, I believe, again if memory

1    serves, in August of 2016 he wanted information related

2    to our confidential source who had provided information

3    about Mr. Uriarte.  A lot of the reports we had--

4    because that CS, if you will, was still active in the

5    investigation--

6        Q.   When you say CS, do you mean confidential source?

7        A.   Yes, sir.  And I'm sorry.

8        Q.   That's all right.

9        A.   So, in other words, Mr. Hart had requested some

10   additional information that we had not provided with

11   respect to what that confidential source was being paid,

12   what activity he had conducted on behalf of DEA and

13   wanted some of the reports unredacted.  So that created

14   a meeting between myself and the DEA and group

15   supervisor to obtain that information.

16       Q.   So did you send a request for logs to CCA on

17   behalf of Mr. Hart?

18       A.   I did.  And part of that conversation, in

19   addition to the CS discussion that we had, Mr. Hart had

20   been I think present at one of the initial *U.S. versus*

21   *Black* court hearings and was interested in what was

22   going on.  So Mr. Hart had asked if, you know, perhaps

23   he could get in some fashion call logs, visitation logs

24   with respect to his client.

25       Q.   Did you request call logs and visitation logs

1    from CCA for Mr. Uriarte on behalf of Mr. Hart?

2        A.   I did on August 12th of '16.  I sent an e-mail to

3    the U.S. Marshals.

4        Q.   When you made that request, were you trying to

5    get more calls from Mr. Uriarte's-- from Mr. Uriarte or

6    just the logs?

7        A.   Just the logs.

8        Q.   And you were doing it only because Mr. Hart asked

9    you to?

10       A.   Yes, sir.

11       Q.   There was no investigative purpose on your

12   behalf?

13       A.   That's correct.

14       Q.   When the disk came in in response to that request

15   for logs, did you see what was on that disk?

16       A.   I did not.

17       Q.   What did you do with it?

18       A.   Gave it to my trial assistant so she could

19   disseminate that to Mr. Hart.

20       Q.   When your trial assistant disseminated it to

21   Mr. Hart, was there a cover letter that went with it?

22       A.   Yes, sir.

23       Q.   And did the cover letter have a mistake-- strike

24   that.

25            Did the cover letter accurately describe what was

1   on there?

2       A.   It did.

3       Q.   And did it turn out that there were actually

4   calls on that disk?

5       A.   Yes, sir.

6       Q.   And does the letter say "calls"?

7       A.   It does.

8       Q.   Did you realize that when that letter went out?

9       A.   I did not.

10      Q.   So you thought you were sending Mr. Hart what?

11      A.   Visitation logs, calls logs and unredacted

12  reports related to that confidential source.

13      Q.   Did you review that disk at that time?

14      A.   I did not.

15      Q.   Have you ever reviewed that disk?

16      A.   I did not.

17      Q.   At some point did Mr. Hart get back to you about

18  the disk that you had gotten only because he requested

19  it?

20      A.   Yes.  And that was, as we were talking about,

21  while I was at a conference.  Mr. Hart had called, he

22  had my cell phone number because we had been in

23  communication about this particular case, and then told

24  me that, hey, on the CD there are CCA calls.

25      Q.   Was that the first you knew about that?

1      A.   That is correct.

2      Q.   Had you ever given that disk to either

3  Ms. Gardner or agents or anybody else to listen to?

4      A.   No, sir.

5      Q.   Had you ever listened to it yourself?

6      A.   I did not.

7      Q.   Mr. Krug, did you have any involvement at all in

8  the investigation that resulted in the indictment in

9  *United States vs. Black*?

10     A.   No, sir.

11     Q.   Did you have any input into the drafting of the

12 grand jury subpoena?

13     A.   No, sir.

14     Q.   Did you learn at any time before the litigation

15 started that your office had issued a subpoena on behalf

16 of the grand jury for video from CCA?

17     A.   No, sir.

18     Q.   Did you know that in the summer of 2016 there

19 were six hard drives of video data from-- from CCA in

20 your office?

21     A.   No, sir.

22     Q.   Did you at any time watch any video of any

23 attorney meeting with a client at CCA-Leavenworth?

24     A.   No.

25     Q.   To your knowledge, did any Assistant U.S.

1    Attorney in your office watch any video of any attorney

2    meeting with their client at CCA?

3        A.   Not to my knowledge.

4        Q.   Have you ever heard about any Assistant U.S.

5    Attorney in your office watching video of an attorney

6    meeting with their client at CCA?

7        A.   No, sir.

8        Q.   Now, you were asked some questions about your use

9    of audio-recordings of inmate telephone calls from CCA.

10   Do you remember that questioning?

11       A.   I do.

12       Q.   How long have you been a federal prosecutor in

13   this district?

14       A.   I started as a Special Assistant U.S. Attorney in

15   April of 2008.  So in some respect I've been a federal

16   prosecutor since then.

17       Q.   Can you tell us or estimate for us about how many

18   cases you've had where you've requested calls from-- or

19   telephone calls of inmates from CCA-Leavenworth during

20   that time period?

21       A.   This would be an estimate.  It would be more than

22   20, I would assume.  I-- I don't know.

23       Q.   And some of those are multi-defendant cases?

24       A.   Yes, sir.

25       Q.   So maybe five cases a year?

1      A.   Perhaps.

2      Q.   And you explained to us already when Mr. Redmond

3   questioned you why you get the calls, and you've kind of

4   explained the process.  Would it be safe to say that

5   when the disk comes in, it's your standard practice to

6   very shortly thereafter make a copy to be sent out in

7   discovery?

8      A.   Yes, sir.

9      Q.   Is it common, as was the case in the *Uriarte*

10   case, that you send out the disk to defense counsel

11   before you even get the interpretations back?

12      A.   Yes, that's common.

13      Q.   Just-- that's your routine practice?

14      A.   Yes, sir.

15      Q.   Now, you said most of your-- most of your cases

16   involve Spanish speakers.  Is Sara Gardner the

17   interpreter you typically use?

18      A.   Yes, sir.

19      Q.   And I asked you this before, so I'll just maybe

20   ask it a different way now.  Is it correct to say that

21   Sara Gardner has never notified you that she came across

22   an attorney-client call on any of the disks you've ever

23   given her?

24      A.   That's correct.

25      Q.   You described also your practice of putting it in

 1   your discovery folder and how you accessed that for

 2   that.  Is that the office practice or is that your

 3   practice?

 4       A.  Are we talking about the physical disk or-- I'm

 5   sorry.

 6       Q.  There was questions about downloading it to the

 7   network and how you did that.  Do you remember that

 8   questioning?

 9       A.  Yes.

10       Q.  Were you describing what you do or were you

11   describing what everybody does?

12       A.  I am technically-- or technology deficient, so I

13   rely a lot, if you will, upon the trial assistants in

14   getting the discovery processed.

15       Q.  So it would be a challenge for you to try to find

16   out what's in somebody else's discovery folder?

17       A.  Not necessarily.  I think there's access in that

18   discovery-- I can get there at least with respect to

19   navigating some of the folders, so potentially I could

20   do that.  But generally, my practice is-- is to allow--

21   in this case it's Bonnie Kaiser who's my trial

22   assistant, to create a CD or thumb drive or whatever

23   format that we have at this point to disseminate

24   discovery to defense counsel.

25       Q.  Have you ever had occasion to go hunt through the

1   discovery folders of other Assistant U.S. Attorneys for

2   discovery sent out in cases that you're not involved in?

3       A.   No, sir.

4       Q.   By the way, sometimes do you get English language

5   calls?

6       A.   Yes.

7       Q.   Do those go to agents or do you listen to those

8   yourself?

9       A.   Go to agents.

10      Q.   Has an agent ever come back to you and told you,

11  hey, we've got an attorney-client call?

12      A.   No, sir.

13      Q.   Have you ever personally listened to an

14  attorney-client call from an inmate at CCA-Leavenworth?

15      A.   No, sir.

16      Q.   To your knowledge, has an agent you've worked

17  with ever listened to an attorney-inmate call from

18  CCA-Leavenworth?

19      A.   Not to my knowledge.

20      Q.   And to your knowledge, Ms. Gardner never has

21  either.   Correct?

22      A.   That's correct.

23      Q.   You described what you would do if you came

24  across information that you had in the possession of an

25  attorney-client call.   Is it your understanding that

1    that would be the general practice in your office how to

2    respond, if you know?

3        A.   I believe so, I-- I don't know.

4        Q.   Have you ever known any of your colleagues, other

5    than in the *Herrera-Zamora* case, to listen to

6    attorney-client calls?

7        A.   No, sir.

8        Q.   I want to ask you about another case you had.  Do

9    you remember prosecuting a defendant named Jose

10   Garcia-Velasquez?

11       A.   Yes, sir.

12       Q.   Did you seek his calls from CCA-Leavenworth?

13       A.   Yes.  And as well-- he was detained in Atchison.

14       Q.   He was not at CCA?

15       A.   I think he was at CCA initially, if memory

16   serves, and then was placed at Atchison for some reason,

17   I think they had a contract with Atchison, and at some

18   point was brought back to CCA.  But yes, we did request

19   calls.

20       Q.   And were the calls that you requested made from

21   Atchison, if you recall?

22       A.   I don't know.  I believe they were from Atchison.

23       Q.   They were-- they were calls from one of those two

24   detention facilities?

25       A.   That's correct.

1    Q.   Were those English language or Spanish calls?

2    A.   I don't recall.

3    Q.   Did you burn a discovery disk with respect to

4    those calls?

5    A.   Yes, sir.

6    Q.   Did you burn it for one defense attorney or more

7    than one defense attorney?

8    A.   For two.  Mr. Garcia-Velasquez was represented by

9    Mark Thomason.  And the co-defendant, Vargas Ponciano I

10   believe was his name, was represented by Lance Sandage.

11   Q.   And so did you send Mr. Garcia-Velasquez's calls

12   to both of those attorneys?

13   A.   Yes, sir.

14   Q.   And did you later get a call from Mr. Thomason?

15   A.   I believe it was a call, yes, sir.

16   Q.   Can you tell us about that call?

17   A.   Yes.  Mr. Thomason had called in reference to the

18   discovery that we sent which contained those, whether

19   it's CCA calls or Atchison calls, and indicated that he

20   was listening to himself.  So I said obviously that's

21   not a good thing.  He made kind of a joke that he didn't

22   like the sound of his voice, something like that.  So I

23   said, "Okay, thanks for letting me know."

24        So then I sent an e-mail to Lance Sandage

25   indicating that we had a plea-- I recall this e-mail, I

1    saw it recently.  We had an initial-- the initial

2    paragraph consisted of our plea negotiations.  At the

3    very end of the e-mail itself, I said, listen, this has

4    happened, co-defendant's counsel was captured on these

5    recordings, please get ahold of me as soon as possible

6    so we can get this taken care of.

7        Q.   So you clawed the recording back?

8        A.   That's correct.

9        Q.   Did he give it back to you?

10       A.   I believe so, yes.

11       Q.   Did you take steps to make sure nobody listened

12   to those calls other than Mr. Thomason?

13       A.   Yes.

14       Q.   Was Mr. Thomason satisfied with what you did in

15   response to his phone call, to the best of your

16   knowledge?

17       A.   To the best of my knowledge.

18       Q.   Other than coming across those calls in the

19   *Uriarte* case that a defense attorney told you about but

20   you never listened to, and the calls in the

21   *Garcia-Velasquez* case where the defense attorney told

22   you about it but you never listened to it, have you ever

23   had any other encounters with attorney-client calls?

24       A.   No, sir.  And with respect to Mark Thomason's

25   client, so we sent that discovery disk to Mark and to

1    Lance.  And then we also sent it out in the bigger case,

2    if you will.  So Mark's client was part of a-- just a

3    small portion of a bigger investigation.  So we had

4    charged that larger investigation and at that time had

5    made several arrests.

6          So we sent, as part of Mark's incident, that

7    discovery disk to those other attorneys, if you will.

8    And so once Mark contacted me, I reached out to them

9    again via e-mail indicating we need this returned.  And

10   so those attorneys complied and sent back their

11   discovery.

12   Q.  So you clawed it back from everybody?

13   A.  That's correct.

14   Q.  You were asked some questions about your

15   knowledge of the government's litigating position with

16   respect to the waiver issue.  Do you remember that

17   questioning?

18   A.  Yes, sir.

19   Q.  Has anyone in your office ever suggested that

20   because of that litigation position, it's okay for you

21   or anybody else in your office to listen to

22   attorney-client calls without taking the precautionary

23   steps like a taint team that you've described?

24   A.  No, sir.

25   Q.  Has anyone in your office ever suggested to you

1    that you shouldn't cooperate with the Special Master?

2       A.   That I should not cooperate?

3       Q.   Yes.

4       A.   No, no one suggested that.

5       Q.   Have you suggested to anybody that you should not

6    cooperate with the Special Master?

7       A.   No, sir.

8       Q.   Have you done anything to frustrate the Special

9    Master?

10      A.   I hope not.

11      Q.   Have you-- have you followed all the instructions

12   given to you by your office management based on requests

13   from the Special Master?

14      A.   I believe so.

15              MR. CLYMER:  Nothing further, Your Honor.

16              MR. REDMOND:  Your Honor, I apologize.  I do

17   not have marked exhibits because I just pulled up-- we

18   just had put on our network the production we received

19   today at noon.  There's some things I'm going to ask

20   Mr. Krug out of that production.  I'm only 15 pages into

21   it, but--

22              MR. CLYMER:  We can make him available

23   tomorrow, if that's helpful.

24              MR. REDMOND:  But I apologize to the Court

25   and counsel that nobody is going to know what I'm

```
 1   referring to.
 2            MR. CLYMER:  I've got paper copies if you
 3   want.
 4            MR. REDMOND:  I'm okay with this.  Mr. Krug,
 5   if it's okay if I'll just show it to you.  I'll just
 6   stand next to you.  I don't know how else to do it.  Is
 7   that okay?
 8            THE WITNESS:  Sure.
 9                 REDIRECT EXAMINATION
10   BY MR. REDMOND:
11     Q.  Okay.  So the-- you were just asked a couple of
12   questions about your prosecution of Mr. Vargas-Ponciano.
13   Now, I must've misunderstood your direct because I
14   thought you said that if you had came across an
15   attorney-client call, that you didn't know what to do
16   and you'd go talk to your supervisor.  Right?
17     A.  Yes.
18     Q.  Well, but you've been through this in 2016 is my
19   understanding.  I mean, there was attorney calls in
20   discovery that you produced.  Right?
21     A.  Yes, sir.
22     Q.  Okay.  So is this something that you then went
23   and talked to your supervisor about?
24     A.  Yes, after I conversed with Mark.
25     Q.  I'm sorry, I didn't hear you.
```

1     A.   After I conversed with Mark Thomason.  Once he

2  alerted me to the situation, I immediately notified my

3  supervisor and then sent out those e-mails.

4     Q.   Okay.  I want to attempt to clarify the facts of

5  this.  What happened is Mark Thomason's client is

6  incarcerated in the Atchison County jail?

7     A.   Yes, sir.

8     Q.   Okay.  And that Mark's calls with his client are

9  recorded; is that right?

10    A.   That's my understanding.

11    Q.   And they are sent to you in discovery-- or, I'm

12  sorry, they are-- you acquire those calls as part of

13  your investigation?

14    A.   Yes, sir.

15    Q.   And you testified that what you do in those

16  circumstances is you farm out the calls to your agents?

17    A.   That's correct.

18    Q.   And in this case were these calls Spanish

19  speakers?

20    A.   Yes, I think he was-- Garcia-Velasquez was

21  Spanish-speaking.

22    Q.   Okay.  And so you would've used-- you would've

23  sent these calls to an interpreter?

24    A.   Yes.

25    Q.   But no interpreter told you that these are

1    attorney-client phone calls?

2       A.   That is correct.

3       Q.   And so when you testified that the-- an

4    interpreter-- if I understood this correctly, you

5    testified that an interpreter had never told you that

6    there was an attorney-client phone call?

7       A.   To the best of my recollection, that's correct.

8       Q.   Okay.  And this-- apparently they just missed

9    this?

10      A.   I don't know the circumstances.

11      Q.   Did you have a summary of that attorney-client

12   phone call?

13      A.   I don't know.

14      Q.   Is-- does that file still exist in your office?

15      A.   Those summaries, yes, sir.

16      Q.   Did you respond to Ms. Metzger's e-mail about the

17   litigation hold with the circumstances of-- what is it

18   again, I'm sorry, what's the defendant's name?

19   Garcia-Velasquez?

20      A.   Yes, sir.

21      Q.   So you notified-- when Ms. Metzger sent out an

22   e-mail saying if you have anything responsive, did you

23   say yes, I believe this is responsive?

24      A.   I don't recall specifically doing that to that

25   case.

1    Q.  I also see an e-mail from April 5th of 2016 from

2  Tom Telthorst.  I'm going to just-- I'm going to show it

3  to you.

4              MR. REDMOND:  Can I approach, Your Honor?

5              THE COURT:  Yes.

6  BY MR. REDMOND:

7    Q.  And, Mr. Krug, this is not to-- or no, it is to

8  you from Mr. Telthorst, and there's a number of other

9  counsel copied on the e-mail; Mr. Edmonds, Mr. Toth, Mr.

10  Naseem, Mr. Fehlig, Mr. Smith and Sandie Kistler from

11  your office.  Was this attorney-client phone call

12  distributed to all of those counsel as well?

13    A.  Yes, that was the second batch, if you will, that

14  was the *Pacheco* case.

15    Q.  Okay.  Do you need to see this or do you

16  remember?

17    A.  I do remember that.

18    Q.  Okay.  So explain how many counsel was that

19  attorney-client call disseminated to?

20    A.  So the original one went to Mark Thomason and

21  Lance Sandage.

22    Q.  Okay.

23    A.  And then the *Pacheco* case, with those attorneys.

24    Q.  Okay.  And that's one, two, three, four, five--

25  five other attorneys.  Were they also representing

1  defendants in the *Pacheco* case?

2      A.   Yes, sir.

3      Q.   And these cases you saw as related or were they

4  charged together?

5      A.   They were related.

6      Q.   Okay.  And so when the-- so what you're-- when

7  you became aware there was an attorney-client call, what

8  your decision was was to notify counsel.  Right?

9      A.   Yes.

10     Q.   Okay.  And then you clawed back that call?

11     A.   That is correct.

12     Q.   Okay.  So the-- I mean, I'm six pages into a

13 55-page pdf.  Has this happened in any other case where

14 there was an attorney-client call that showed up in

15 discovery?

16     A.   No, sir.

17          MR. REDMOND:  That's all I have.  Thank you,

18 Mr. Krug.  Thank you, Your Honor.

19          MS. VANBEBBER:  No more questions.

20               RECROSS EXAMINATION

21 BY MR. CLYMER:

22     Q.   Do you recall how soon it was between the time

23 you sent the calls out to Mr. Thomason and the other

24 attorneys and the time Mr. Thomason noticed-- notified

25 you that you had an attorney-client call?

1      A.   I don't, I would have to look at the actual

2   dissemination letter to see what-- the date that we sent

3   those to Mr. Thomason.

4      Q.   Was it before or after you got the summaries from

5   the interpreter, if you will?

6      A.   I don't recall.

7               MR. CLYMER:   Nothing further, Your Honor.

8               MR. REDMOND:   Your Honor, no other

9   questions, but two requests of the Court.   No. 1 is I--

10   I understood from Mr. Krug's testimony that he had--

11   still retains or the U.S. Attorney's Office still

12   retains the disk that we know through Mr. Hart's exhibit

13   contains attorney-client privileged calls from the

14   Federal Public Defender.   We'd request as an extension

15   of the 41(g) motion that that be returned to our office.

16               Secondly, we would ask that Mr. Krug remain

17   under subpoena and remain sequestered.   I don't know

18   whether I'll have additional questions for him, but I'll

19   do my best to get through everything tonight.

20               MR. CLYMER:   No objection to either one of

21   those, Your Honor.

22               THE COURT:   All right.   The motion for

23   Rule 41 turnover of the disk in the U.S. Attorney's

24   Office possession of Uriarte's calls is granted and it

25   should be returned forthwith, that disk.   And I think

```
 1   any derivative reports or summaries associated with that

 2   disk as well.

 3              And then, Mr. Krug, you're not released from

 4   your subpoena.  You may be recalled, so you remain

 5   sequestered under the witness exclusion rule.

 6              THE WITNESS:  Yes, Your Honor.

 7              MR. CLYMER:  May I speak to Mr. Krug for a

 8   minute, Your Honor, before he leaves?

 9              THE COURT:  Yes.  In fact, let's take a

10   15-minute break.

11              (Recess).

12              THE COURT:  All right.  You can be seated.

13   All right.  Next witness.

14              MR. SLINKARD:  Your Honor, before we do that

15   I want to make a brief record.

16              During the break Agent Seubert and Tris-- or

17   excuse me, Trent Krug went down to our office and

18   obtained the notebook I'm holding in my hand when it was

19   delivered to me by Mr. Krug.  It's my understanding that

20   it is the disk of calls of Uriarte that was ordered

21   returned pursuant to the 41(g) motion, as well as

22   whatever documents are included in there constitute the

23   derivative information.  So that's my understanding at

24   this point.

25              Mr. Krug was going to continue to check on
```

1    additional derivative information.  If such is

2    developed, we'll make a record at the time, but we think

3    this is it.  And at this time I'll deliver that to Mr.

4    Redmond.

5              THE COURT:  All right.  So noted.

6              MR. SLINKARD:  With that, our understanding

7    is that the Special Master and the Federal Public

8    Defender have concluded with the witnesses they had

9    prepared for today, so at this time the government is

10   going to call Tris Hunt.

11             THE COURT:  Okay.  That's fine.

12             MR. CLYMER:  And so the Court is aware, Your

13   Honor, this is the only witness that we have to call

14   today, so I believe we'll be out of witnesses after Mr.

15   Hunt is done.

16             THE COURT:  Okay.  Do you-- are you going

17   to-- are you going to call any other witnesses?

18             MR. CLYMER:  I do not know at this time,

19   Your Honor.  I'm still talking to the Special Master and

20   the Federal Public Defender about who they want to put

21   on tomorrow and I've got to make some determinations

22   tonight.  So I believe it's the case that, at most, I

23   would call one other witness tomorrow.

24             THE COURT:  Okay.

25                  TRISTRAM W. HUNT

1  called as a witness on behalf of the Government, having

2  first been duly sworn, testified as follows:

3                    THE COURT:  Proceed.

4                    MR. CLYMER:  Thank you, Your Honor.

5                         DIRECT EXAMINATION

6  BY MR. CLYMER:

7     Q.  Please state your full name and spell your last

8  name for the record.

9     A.  Tristram W. Hunt.  H-U-N-T.

10    Q.  Mr. Hunt, how are you employed?

11    A.  I'm an Assistant United States Attorney for the

12 District of Kansas.

13    Q.  How long have you been employed as an Assistant

14 U.S. Attorney for the District of Kansas?

15    A.  Since September 2005.

16    Q.  Are you assigned to one of the offices in that

17 district?

18    A.  Kansas City, Kansas.

19    Q.  Have you been assigned to that office for your

20 entire tenure as an Assistant U.S. Attorney?

21    A.  Yes.

22    Q.  Are you aware of a case in your office that was

23 at one time entitled *United States versus Black*?

24    A.  Yes.

25    Q.  Did you have any involvement in the investigation

1    that resulted in the indictment in that case?

2        A.  No.

3        Q.  Did you have any input into the drafting of the

4    grand jury subpoena that was issued for video evidence

5    from CCA-Leavenworth?

6        A.  No.

7        Q.  Did you know before the litigation started in

8    *Black* that a grand jury subpoena had been issued for

9    video from CCA-Leavenworth?

10       A.  No.

11       Q.  Did you know that in early June 2006 [sic], six

12   external hard drives were delivered to the U.S.

13   Attorney's Office, Kansas City office that contained

14   video feed from CCA-Leavenworth?

15       A.  No.

16       Q.  Did you at any time watch any of that video feed?

17       A.  No.

18       Q.  Have you at any time during your career as an

19   Assistant U.S. Attorney watched a video of an attorney

20   meeting with a client at CCA-Leavenworth?

21       A.  No.

22       Q.  Do you know of any other Assistant United States

23   Attorney in your office who has ever watched a video of

24   an inmate meeting with an attorney at CCA-Leavenworth?

25       A.  No.

1    Q.   Do you know of any agents who watched video of an

2    inmate meeting with an attorney at CCA-Leavenworth?

3    A.   I believe that I had heard that an agent with

4    KBI, Stokes, during the earlier part of this litigation

5    had potentially watched some video.

6    Q.   Do you realize there's an allegation of that?

7    A.   Yes.  I know there's an allegation, but I don't

8    have any personal knowledge of it.

9    Q.   I take it you have no personal knowledge in

10   either direction on that issue; is that right?

11   A.   Correct.

12   Q.   Other than that one instance, have you heard of

13   anybody else watching any video of any attorney meeting

14   with any-- any attorney meeting with any inmate at

15   CCA-Leavenworth?

16   A.   No.

17   Q.   During your practice as an Assistant U.S.

18   Attorney, have you ever requested audio-recordings of

19   outgoing inmate telephone calls from CCA-Leavenworth--

20   A.   Yes.

21   Q.   -- or any other detention facilities?

22   A.   Yes.

23   Q.   For what purpose have you done this?

24   A.   Well, when individuals are arrested, particularly

25   in certain types of cases, for example felon in

1    possession cases, oftentimes individuals will talk on

2    jail telephones to associates, to individuals that were

3    there.

4          So jail calls are often a valuable source of

5    information to further investigations, which is what we

6    do.  And so agents will, in investigating, obtain jail

7    calls and then review jail calls and sometimes get very

8    important evidence from the admission of jail calls.

9    Q.   Mr. Hunt, in-- in your practice in the time

10   you've been an Assistant U.S. Attorney, would you say

11   it's common or unusual for either you or agents with

12   whom you're working to obtain jail calls?

13   A.   It's relatively unusual.

14   Q.   Can you estimate during the course of your career

15   as an Assistant U.S. Attorney how often you've done it,

16   or agents working with you have done it?

17   A.   Probably less than ten times, in ten cases.

18   Q.   It's not something you do in every case?

19   A.   No.

20   Q.   Was there an occasion in 2016 when you learned

21   that an attorney-inmate telephone call produced by CCA

22   had-- excuse me, let me rephrase that.

23         Was there an occasion in 2016 when you learned

24   that an inmate telephone call from CCA-Leavenworth

25   included a call to an attorney?

1        A.   If you could be more specific.

2        Q.   Did you work on an investigation involving a

3   threat to one of your colleagues?

4        A.   Yes, I did.

5        Q.   Can you tell us a little bit about the background

6   of that investigation?

7        A.   It was a threat against an AUSA by an inmate who

8   was being prosecuted in a collateral case.  The matter

9   was brought to my attention by the U.S. Marshals

10  Service.  The vision of the marshals service is to

11  protect judges and AUSAs, and they indicated they were

12  investigating the threat.  As part of the investigation,

13  it is routine for them to request jail phone calls.

14       Q.   And what happened as a result of that

15  investigation?

16       A.   That investigation ultimately did not result in a

17  case being able to be filed.  I indicated and directed

18  the U.S. Marshals Service that when they reviewed phone

19  calls, they were to make sure that they were to filter

20  out-- or if they encountered any attorney-client phone

21  calls, that they were to immediately stop listening to

22  those calls, segregate them out.  Make sure the

23  investigators did not get any of those calls should they

24  occur and to notify me.

25       Q.   Did they come across an attorney-inmate telephone

1   call?

2       A.   I was notified about three days after I sent that

3   e-mail that a U.S. Marshal personnel in Washington,

4   D.C., had essentially started to listen to a call and

5   realized the call involved an attorney, ceased listening

6   to the call and then the call was segregated.  That

7   information was provided to me.

8       Q.   I'm going to show you what's been marked as

9   Defense Exhibit 586.

10           MR. CLYMER:  And I don't believe this has

11  been moved into evidence, Your Honor.  If not, I'd move

12  it in at this time.

13           MR. REDMOND:  No objection.

14           THE COURT:  586 admitted.

15  BY MR. CLYMER:

16      Q.   Please read that to yourself and let us know when

17  you're done, Mr. Hunt.

18      A.   Yes, I see it.

19      Q.   Do you recognize Exhibit 586?

20      A.   I do.

21      Q.   Can you please tell the Court what it is?

22      A.   It is a document that I drafted in response to a

23  request from my office in response to a subpoena for

24  information by the Special Master in this particular

25  litigation.  It documents communications that I was

1   aware of or a part of on U.S. Attorney electronic

2   systems.

3      Q.   And are those communications related to the

4   threat against AUSA Zabel?

5      A.   Yes, and the response.

6      Q.   So is that essentially a short memo you wrote for

7   the Special Master regarding what occurred during that

8   threat investigation?

9      A.   Yes, you could characterize it that way.

10     Q.   As you sit here today and read that, is that

11  accurate, to the best of your recollection?

12     A.   Yes.

13     Q.   Is it consistent with your testimony here today?

14     A.   Yes.

15     Q.   Did you have some small involvement in a case

16  called *United States versus Herrera-Zamora*?

17     A.   Yes.

18     Q.   Can you tell the Court how you first got involved

19  in that case?

20     A.   I was not involved in the case, it was a case

21  being prosecuted by David Zabel and Tomasic, Erin

22  Tomasic.

23          During the middle of that trial, and I think that

24  was in maybe 2016, Erin Tomasic appeared at my door and

25  she had a DEA task force officer called Maria

 1  Castleberry with her.  She indicated Maria Castleberry

 2  was listening to calls or was a taint agent and that she

 3  had recognized one of the individuals as being a

 4  relative on a call that she was reviewing.

 5      Q.  Did you understand Ms. Tomasic to be saying that

 6  she had obtained CCA audio telephone calls as part of

 7  the *Herrera-Zamora* case?

 8      A.  It wasn't clear to me at that point in time what

 9  she was talking about.  My supervisor had never talked

10  to me about this, I knew nothing about it.  Just

11  appeared and-- and asked me.

12      Q.  So the initial request was from Erin Tomasic?

13      A.  It was from Erin Tomasic.  Like I said, just came

14  to my office and asked me.  I indicated-- she said,

15  well, you need to be the taint attorney, or can you be

16  the taint attorney.  I indicated to her, you know, that

17  I would help out.  I listened to what the particular

18  interpreter had to say, and I said, obviously you can't

19  continue.

20          And, I'm sorry, I say interpreter, what I

21  actually mean is the agent, and said you can't continue

22  to do this.

23      Q.  Was Castleberry a Spanish speaker, to your

24  knowledge?

25      A.  Yes.

1    Q.  And so she was an agent, but she was going to not

2  only act as a filter agent but also interpret as well.

3  Correct?

4    A.  Correct.  So essentially I was not asked to do

5  anything else, I was not given the calls.  The trial

6  resolved itself and--

7    Q.  Let me stop you for a second and just ask you

8  about that initial incident.  During the course of that

9  initial incident, did Tomasic indicate to you either

10  explicitly or implicitly that the filter agent was going

11  to listen to the calls and if you were the filter

12  attorney you would listen to the calls before she ever

13  did?

14    A.  No.  My understanding-- it wasn't clear to me

15  there was a filter team in-- in place.  I had not been

16  part of setting that up.  I was not part or involved in

17  that process.  What occurred was the little I knew about

18  what was going on.

19    Q.  So you determined that the agent had a conflict

20  that would prevent her from effectively serving as a

21  filter agent?

22    A.  Correct.

23    Q.  What happened next?

24    A.  I was not asked to do anything else and my

25  understanding is the case was resolved and there

16-20032-JAR   USA v. Karl Carter (Black)   10.11.18          2150

1   would've been no need to listen to any calls by anybody,

2   by a filter team.

3       Q.   So you never did any filter work on the

4   *Herrera-Zamora* case?

5       A.   No, I didn't.

6       Q.   Did Erin Tomasic ever come back and tell you, I

7   don't need you anymore?

8       A.   No.

9       Q.   You just didn't hear anything else?

10      A.   Didn't hear anything else.  Supervisor didn't

11  assign me to do anything, I was not asked to do

12  anything.

13      Q.   Did there come a time sometime later that fall

14  where a folder from Erin Tomasic came to your attention?

15      A.   Yes.  I think it was October the 7th, around that

16  time, I got an e-mail from Erin indicating that a series

17  of disks had been placed in her inbox, she didn't know

18  how they got there, she thought it was very curious.

19          She had been working in Missouri.  She had asked

20  support staff as to who may have put the disks there.

21  And she indicated it was from *Herrera-Zamora* and then

22  indicated in her e-mail, "As filter attorney, I'm going

23  to give them to you."

24      Q.   Did you understand her to be transmitting to you

25  the CCA telephone calls involving Herrera-Zamora?

1        A.   Yes.

2        Q.   What did you do with that envelope?

3        A.   Once I got it, I signed my name, sealed the

4    envelope and then I placed it in my credenza in my

5    office.   My office obviously is located in the U.S.

6    Attorney's Office.   Because of some of the work I do, I

7    have a cipher lock on my office.

8        Q.   So you lock your office at night?

9        A.   Yes, I lock my office at night.

10       Q.   Did there come a time when a litigation hold was

11   issued in your office?

12       A.   Yes.

13       Q.   At the time that occurred, did you do something

14   with that folder you had sealed up with the-- I'm sorry,

15   the envelope you had sealed up with the folder from Erin

16   Tomasic?

17       A.   Yeah, and I think it was before there was a

18   litigation hold--

19       Q.   Okay.

20       A.   -- issued in this case, and I think that was in

21   February.   Sometime after getting it in October, so it

22   might've been November or December, I don't recall

23   exactly when, I took the envelope and gave it to my

24   supervisor at the time that was Scott Rask.

25       Q.   Did there come a time when the issue of the

1    *Herrera-Zamora* case came up again?

2        A.  Yes.

3        Q.  Can you please tell us about that?

4        A.  I became aware there had been-- I was told there

5    had been motions filed by defense attorneys representing

6    Herrera-Zamora alleging that trial attorneys had

7    improperly accessed attorney-client privileged calls.

8        Q.  What happened then?

9        A.  I attended a meeting that was called by my

10   supervisor.  Erin Tomasic was there, David Zabel was

11   there, myself.  I don't think there was anybody else

12   there.  And we had a meeting about how to respond.  They

13   were filing a paper in response.

14       Q.  Did the paper allege that prosecutors had

15   listened to Mr. Herrera-Zamora's calls to his attorney?

16       A.  I think so.  I never saw or-- or read the actual

17   pleadings that were being filed one way or the other.

18       Q.  Did Ms. Tomasic-- I'm sorry, go ahead.

19       A.  That was the gist of what I took from it.

20       Q.  Did you as a result of that meeting mail the

21   disks to the attorney who represented Herrera-Zamora?

22       A.  Yes.  I got the disks and I had my assistant make

23   copies and then I sent a letter with those copies to Mr.

24   Moran, Mr. Carlos Moran.  I did not review or listen to

25   the calls.  I just mailed the copies to him.

1    Q.  Mr. Hunt, during that meeting with Tomasic, Zabel
2    and Rask that led to you mailing the disks to Mr. Moran,
3    did Erin Tomasic ever acknowledge that she had listened
4    to some of those calls?
5    A.  No.
6    Q.  Did she ever acknowledge that she had hired an
7    interpreter to translate some of those calls for her?
8    A.  No.
9    Q.  Did you receive a call from Erin Tomasic on
10   May 9th, 2017?
11   A.  I did.
12   Q.  Can you please tell us about that?
13   A.  It was in the evening, I can't recall, maybe
14   8:00.  She called me and indicated she had been fired.
15   I asked why she had been fired, she indicated it was
16   because she had accessed calls in the *Herrera-Zamora*
17   case.
18       When she told me that, I told her I was angry
19   with her and I think I might've said I was very
20   disappointed.  And I said to her, "You lied to me."
21   Q.  Do you recall if she responded to that?
22   A.  She said she was sorry.
23   Q.  Did Mr. Rask interview you about these events
24   regarding the *Herrera-Zamora* case at some point?
25   A.  Could you be more specific?

1    Q.   Do you recall sitting down and talking to Scott

2   Rask about these events?

3    A.   At-- at different occasions, yes.

4    Q.   Do you recall or did you know that Mr. Rask

5   prepared a memorandum of his discussion with you?

6    A.   I don't know that he did.

7    Q.   I'm going to approach you and show you what's

8   been marked as 581A and ask you to take a look at this

9   and see if you've ever seen that before.

10    A.   Yeah.  No, I've not seen this.

11    Q.   You have not seen it before?

12    A.   No.

13    Q.   Does that document appear to you to be a

14   substantially accurate account of your interaction with

15   Erin Tomasic in connection with the *Herrera-Zamora* case?

16    A.   No.

17    Q.   What's inaccurate about it?

18    A.   To the best of my recollection, I never agreed to

19   look at calls or work with Maria Castleberry.  As I

20   indicated to you earlier, Erin and Maria came to my

21   office, explained she had recognized a relative, and I

22   indicated that she could not review calls.

23    Q.   So it misdescribes the interaction you had with

24   Ms. Castleberry and what you understood, your role at

25   the outset.  Correct?

1    A.   Yes.

2    Q.   Could that be just a miscommunication you had

3  with Mr. Rask?

4    A.   I presume so, yes.

5    Q.   Any other inaccuracies that you've noticed now

6  that you've seen that memorandum for the first time?

7    A.   What I've indicated to you is the-- the-- the

8  most striking inaccuracy.

9    Q.   Which is the one I've just-- you just indicated?

10   A.   Yeah.

11   Q.   Let me ask you something about that, sir.  Thank

12 you.

13        Would it be correct to say that the third

14 paragraph of this memo refers you-- to you delivering

15 the folder to Mr. Rask in connection with the litigation

16 hold?

17   A.   Yeah, that's correct.

18   Q.   And your recollection is you did it earlier than

19 that.  Correct?

20   A.   Yes.

21   Q.   Other than those two inaccuracies, is the memo

22 appearing to be accurate?

23   A.   And I'd have to review the letter I wrote to Mr.

24 Moran, I don't think I said-- I did not go into as much

25 detail as is described in the last paragraph of this

 1    letter.

 2        Q.   Other than those things, does it appear to be an

 3    accurate account of what happened?

 4        A.   Yeah.

 5             MR. CLYMER:   I move 581 into evidence, Your

 6    Honor.  581A, excuse me.

 7             MR. REDMOND:   No objection.

 8             MS. VANBEBBER:   No objection.

 9             THE COURT:   581A admitted.

10    BY MR. CLYMER:

11        Q.   Mr. Hunt, what is your understanding of the law,

12    the federal law governing whether there's a waiver of

13    the attorney-client privilege by an inmate who makes a

14    call after receiving a warning that the call is subject

15    to recording and monitoring?

16        A.   My understanding is, and always has been, that if

17    a person is in custody, they are notified correctly,

18    i.e., by warnings on a call or by documentation, for

19    example, when they are brought through intake into a

20    prison facility and by signage that if that individual

21    does communicate with anybody, that communication is not

22    subject to being privileged.

23             I guess theoretically there could be a call

24    between an attorney and an inmate that was being

25    recorded, but the inmate would know it was being

1    recorded.  So even if it was a privileged call, the

2    privilege would be waived.

3         My understanding in working in this office the

4    entire time I've been there is that CCA jail calls were

5    not subject-- any attorney-client conversation would be

6    a waiver of the privilege.  And that is the state, as I

7    understand it, and still is the state of the precedent

8    that we are operating under within different circuits.

9    Q.   Based on that understanding, do you believe it's

10   acceptable for an Assistant U.S. Attorney who comes

11   across an attorney-inmate call subject to that waiver to

12   listen to the call?

13   A.   No.

14   Q.   Why not?

15   A.   Just because you can do something doesn't mean

16   you should do it.  And what we did historically in this

17   office was we treated communications wherein legally a

18   privilege, if it existed, had been waived, but we

19   treated it as if it existed.

20   Q.   And is it your understanding that that was the

21   practice in the U.S. Attorney's Office in the District

22   of Kansas where you worked?

23   A.   Yes.

24   Q.   You can continue.  I'm sorry I interrupted you.

25   A.   No, I was finished.

1    Q.   And if you came across such a call or an agent

2    notified you that he had come across such a call, what

3    action would you take?

4    A.   I would indicate to them they immediately were to

5    segregate the call, they were to make sure that the call

6    was not accessed by the investigative team or any of the

7    prosecutors involved, and I should be notified of that

8    fact.

9    Q.   Are you familiar with the *Reulet* case?

10   A.   Pardon me?

11   Q.   Are you familiar at all with the facts in the

12   *Reulet* case?

13   A.   No.

14   Q.   Other than Erin Tomasic's conduct in the

15   *Herrera-Zamora* case, do you know of any instance in

16   which an attorney in your office has listened to an

17   attorney-inmate call without stopping immediately upon

18   realizing it's an attorney-inmate call?

19   A.   No, I'm not aware of anyone that's done that.

20   Q.   Have you ever heard of such a thing happening,

21   other than with Erin Tomasic in the *Herrera-Zamora* case?

22   A.   I had heard that former AUSA Tanya Treadway had

23   listened to an inmate-attorney call from an attorney who

24   did not represent the defendant.  That's the only person

25   I can recall hearing about.  I didn't have personal

1   knowledge, I was not involved in that case.

2       Q.   Other than the Zabel threat case that you

3   testified about before, have you in your practice ever

4   come across an attorney-inmate call when you've obtained

5   telephone records from CCA?

6       A.   I think one of my agents has come across a call

7   like that and I've indicated they needed to segregate it

8   off.  But when that was or which case, I can't tell you.

9           The practice was, and the agents are told, that

10  they're not to listen.  If it-- if they become aware

11  that there is an attorney or it's a call to an

12  attorney's office or there's any reason to believe it

13  could be a call to an attorney or with an attorney, they

14  are to immediately stop, segregate, and let us know.

15      Q.   Are you aware of the process of what a filter

16  attorney does when a filter taint team is set up?

17      A.   Yes.

18      Q.   Can you please describe that for the Court?

19      A.   Generally speaking, it would be an attorney who

20  has no connection with the criminal investigation or the

21  investigative team.  And when I say "investigative

22  team," I mean agents, support staff, and-- and

23  prosecutors.  That individual would then be in charge of

24  work with agents and supervise agents to conduct

25  searches, for example.

1          We will routinely do this in search warrants

2    where we had reason to believe there may be privileged

3    communications.  A filter team is set up ahead of

4    execution of a warrant.  The agents do not collect, for

5    example, materials that we suspect may be privileged and

6    then that attorney works with the defense attorneys to

7    make a determination as to whether documents that have

8    been obtained, for example, are privileged, whether a

9    privilege is going to be asserted.

10          Generally speaking, you'll have three types of

11   documents or communications.  You will have essentially

12   documents or communications that the defense counsel and

13   the filter attorney agree are absolutely not privileged.

14   You will have then a group of documents or

15   communications where there may be some communication,

16   negotiation, legal positions set forth about certain

17   documentations, privileges being asserted.

18          And if there is no agreement with respect to

19   those particular documents or communications, then the

20   procedure I would employ as a filter attorney would be

21   then to litigate that issue before a court, for a court

22   to make a determination.

23   Q.   So if there's an assertion of the privilege that

24   cannot be resolved through agreement, the Court decides.

25   Correct?

1      A.   That is the way it should occur, yes.

2      Q.   And that should occur even if it's a

3  inmate-to-attorney call from CCA when you believed there

4  may have been a waiver of the privilege?

5      A.   That is what probably we would do then.

6      Q.   You're aware that the Court appointed a Special

7  Master in connection with the *Black* litigation.

8  Correct?

9      A.   Yes.

10     Q.   Have you done everything that's been asked of you

11  to cooperate with the Special Master?

12     A.   Yes.  I am not the person who is the tip of the

13  spear in terms of dealing with the Special Master, you

14  are and members of the management team, present and

15  former.  But obviously we have cooperated and continue

16  to cooperate and do what we're asked to do.

17     Q.   Was that memorandum that's been marked as

18  Exhibit 586 one example of the cooperation you've given

19  the Special Master?

20     A.   Yes.

21     Q.   And by the way, that Exhibit 586, did you attach

22  a whole stack of e-mail messages as supporting

23  documentation to that memo?

24     A.   Yes.

25     Q.   And did you collect and assemble that material

16-20032-JAR  USA v. Karl Carter (Black)  10.11.18        2162

```
 1   for purposes of assisting the Special Master?
 2       A.  Yes.
 3       Q.  Has anyone told you not to cooperate with the
 4   Special Master?
 5       A.  No.
 6       Q.  Have you told anybody not to cooperate with the
 7   Special Master?
 8       A.  No.
 9       Q.  Have you done anything to frustrate or impair the
10   Special Master's investigation?
11       A.  No.
12              MR. CLYMER:  I have nothing further, Your
13   Honor.
14              THE COURT:  Yes.
15              MR. REDMOND:  Thank you, Your Honor.
16                     CROSS EXAMINATION
17   BY MR. REDMOND:
18       Q.  Mr. Hunt, I want to go sort of in backwards
19   order.  You answered a number of questions about filter
20   teams.  My understanding from some of the evidence we've
21   reviewed in this case is that Tanya Treadway, a senior
22   litigation counsel, was often involved in the filter--
23   in filter teams in the District of Kansas; is that
24   accurate?
25       A.  Yes.
```

1     Q.   And wouldn't-- would you agree that it's
2    essential that the person who is in charge of the filter
3    team, the filter attorney, is being-- strictly adhering
4    to all of the ethical requirements?
5     A.   You would hope so.
6     Q.   Because, if not, then they're disseminating
7    potentially protected or privileged information to
8    members of the prosecution team.  Is that the--
9     A.   The whole point is to have a wall between the
10   two, right.
11    Q.   Fair enough.  And so that's why that it's
12   essential that you pick somebody with a great deal of
13   integrity to be the filter team attorney?
14    A.   I would hope so.
15    Q.   Okay.  The-- you and Mr. Clymer talked about your
16   opinion that--
17              MR. REDMOND:  Oh, and I apologize, Your
18   Honor.
19   BY MR. REDMOND:
20    Q.   -- that the-- a phone call made from CCA is not
21   privileged, and you said that's been your opinion since
22   the time you've been in the U.S. Attorney's Office.
23   Right?
24    A.   Yes.
25    Q.   Okay.  So I have a couple of questions for you

1  about that.  Your opinion is that it's not privileged

2  because the privilege is waived when the attorney-- when

3  the attorney and the client speak on a recorded line?

4      A.  My opinion is if there have been the appropriate

5  caveats, the inmate is aware the conversation is being

6  recorded and that anything they talk about could be

7  recorded.  If an attorney were to have a communication

8  with that inmate about something that is covered by the

9  privilege, not just the communication, then that

10  privilege is waived.

11      Q.  Okay.  So the-- were you aware that CCA has a

12  system of privatization where you can make a request

13  that your phone calls with your client not be recorded?

14      A.  I've become aware of that.

15      Q.  Okay.  And so what happens there is you fill in

16  some forms and CCA sends something back saying your

17  phone calls are now private.  Were you aware of that?

18      A.  No.

19      Q.  Okay.  Were you aware that our office did that on

20  a whole number of different occasions?

21      A.  No.

22      Q.  Were you aware that, although we filled out the

23  privatization paperwork and were told that our calls

24  with our clients were private, due to errors within CCA

25  that was not true?

1    A.  Not aware of it.

2    Q.  If that were the case, would your opinion remain

3  the same about whether those phone calls-- that--

4  whether the privilege was waived?

5    A.  Obviously the way you have posed your question,

6  privilege exists for-- for many reasons, and I'm not

7  going to give you a dissertation on that.

8        If a person is engaging in communications where

9  there is a reasonable expectation of a privilege and the

10  privilege is recognized, if that person is being led to

11  believe that their communications are, in fact, private

12  and they've been told they're private because of a

13  procedure, then I think it would be more difficult to

14  make an argument that a call under those circumstances

15  would constitute a waiver of what was communicated.

16    Q.  Okay.

17    A.  If there's a mechanism in place where people are

18  told:  The way you talk to your attorney is you engage

19  in these procedures, you do these things, and then

20  you're not going to be monitored, clearly that is a

21  different circumstance than somebody talking on a line

22  when they've been notified in three different ways or an

23  attorney making the decision they're going to talk to

24  their client on a jail phone call.  Clearly you don't.

25    Q.  Okay.  So the-- were you aware that CCA was

1  publicly advertising that they would afford detainees

2  confidential contact with their attorneys?

3      A.   No, I was not aware of that.  I understood that

4  attorneys can communicate with their clients.

5      Q.   Okay.

6      A.   That many attorneys will meet with their clients.

7  But how they communicated, I've subsequently learned

8  that inmates are able to ask for calls that are not

9  monitored with their attorneys.  And attorneys are made

10 aware that-- of procedures that they have to undertake

11 to affirmatively make sure that calls that they may

12 choose are not monitored.

13     Q.   And I'm not trying to have you definitively opine

14 on anything, my point is just-- is that waiver is a

15 determination that is based on the facts; is that fair

16 to say?

17     A.   Yes.  Facts mean everything.

18     Q.   Okay.  And when-- so what I-- I've heard from a

19 lot of witnesses this same opinion that these calls are

20 not privileged because the privilege is waived.  I'm

21 trying to trace the source of that opinion.

22          Do you have-- you said you've had that opinion

23 since you've been here.  Is that an opinion that's

24 widely shared within the office?

25     A.   Yes.

1    Q.   Okay.  And the-- is there a case that you have

2    litigated that involved that precise question, whether

3    that recorded preamble waived the privilege?

4    A.   No, there's not a case I've been involved in.  I

5    know there's a case out of the Eighth Circuit, there's a

6    case out of the Western District of Missouri involving

7    CCA.  I think there's a First Circuit case.

8    Q.   And let me break that down.  You're talking about

9    *United States versus Hatcher* is the Eighth Circuit case?

10   A.   Yes.

11   Q.   And *United States versus Eye* is the case from

12   CCA?

13   A.   Yes.  And then there's a Tenth Circuit case as

14   well, but that involves Title III.

15   Q.   Do you know what the name of that Tenth Circuit

16   case is?

17   A.   No.

18   Q.   When the pleadings in *Black* were being drafted on

19   this issue, it's my understanding it was sort of a group

20   effort.  Did you participate in that effort?

21   A.   I was aware of that effort.  I was not assigned

22   any particular aspect of the proposed response.

23   Q.   So you did not do any of the research on this

24   waiver issue; is that right?

25   A.   No.

1      Q.   Okay.  You explained that over the course of your

2  time in the U.S. Attorney's Office you've maybe

3  requested phone calls in about ten cases; is that right?

4      A.   Yeah.  That's an estimate, it could be more,

5  could be less.

6      Q.   Why?  Why so few?

7      A.   Why so few?  There's certain types of cases,

8  generally speaking, the ones that come to mind are FIP

9  cases where you're going to probably get good evidence.

10  All right?

11          So resources when you investigate are precious.

12  The agent's time is precious.  If you're going to go and

13  yank three months' worth of calls, depending on how

14  prolific a caller a particular defendant is, and

15  defendants also will use other people's PIN numbers, and

16  you've got to sort through that, it is a tremendously

17  time-consuming, labor-intensive task for the agents to

18  go through all of the calls to perhaps get certain

19  evidence.

20          So it's not something that I would seek agents to

21  do.  Some agents would-- would-- they're self-starters

22  and sometimes calls would've been listened to before you

23  ever got involved in a case.

24          In a threat case, if you've got an incarcerated

25  individual, they are having to communicate either

1    through attorneys or through visits or on the phone or

2    through mail or through third parties.  And so that's

3    the type of case you want to start, you know, looking at

4    phone calls.

5         But I do lots of different kinds of cases, and so

6    phone calls are just not something that I would ask my

7    agents to spend their resources on.  And I think that

8    probably explains why you do or you don't.

9         And I'd also note I don't listen to calls.  I'm

10   not an investigator, we have trained investigators.  And

11   they will then bring anything of evidentiary value to me

12   and sometimes if it's-- yeah, I think that's a fair

13   statement.

14   Q.   That's fair.  You and I were sort of present at

15   the beginning of this whole thing.  I'd like to refer

16   your attention to the calendar.  We're talking about

17   August of 2016.  If I represented to you that the first

18   hearing date was on the 9th in the *Black* case, I believe

19   that there was a hearing on the 5th of August, a

20   detention hearing in *United States versus Imon Wright*.

21   Do you remember what I'm talking about?

22   A.   I do.

23   Q.   Tell me what your memory of that hearing is.

24   A.   Imon Wright is an individual I prosecuted, gone

25   to trial and then convicted in 2008, '9 or '10.  He was

1  picked up, same kind of case, and he was having his

2  either first appearance or it might've been a detention

3  hearing.  I think it was a detention hearing.  Mr. Bell

4  over there was representing him.  We were arguing for

5  detention, the United States was.

6         My recollection was that Mr. Bell brought to the

7  Court's attention and to our attention that Mr. Wright

8  should be released, even though probably fundamentally

9  under the Bail Reform Act factors the magistrate, Judge

10 James, had to consider, because the government could

11 not-- well, the defense could not be assured that the

12 government wouldn't be listening to the calls based upon

13 the-- the CCA phone calls.

14 Q.   And can I stop you?  The-- during that hearing I

15 came in with an e-mail from the marshal in Missouri.  Do

16 you remember that?

17 A.   Yes.

18 Q.   And do you remember what that e-mail said?

19 A.   I don't remember the specifics of the e-mail, but

20 I remember an e-mail being brought in, yeah.

21 Q.   Was generally the gist of it that they had said

22 that yes, the rooms in CCA are recorded?

23 A.   I think so, but I do recall around that period of

24 time our criminal chief had been in communication with

25 CCA, the warden at CCA, and our belief at the time is

1    they were not being recorded.

2        Q.   You had received an e-mail from Debra Barnett

3    that said, I've talked to Linda Thomas, the warden at

4    CCA, and she tells me those visitation rooms for

5    attorneys and clients are not recorded; is that right?

6        A.   Yes, I recall that.

7        Q.   So that morning of-- or I think it was early

8    afternoon of August 5th of 2016, no one was really sure

9    what was going on; is that fair to say?

10       A.   Yes, I think that's fair to say, yeah.

11       Q.   And so we made that argument during the hearing,

12   Mr. Wright was detained; is that right?

13       A.   Yes.

14       Q.   And then you and I had a conversation in the hall

15   thereafter.  Do you remember it?

16       A.   I do.

17       Q.   And what was the contents of that conversation?

18       A.   I indicated to you you were my friend, I

19   indicated to you that I was disappointed with you.  I

20   indicated to you I felt like you had-- when I say "you,"

21   I mean your office, had bushwhacked myself and the Court

22   because you brought an issue into the courtroom without

23   notice to me or without notice to the judge.  And I was

24   perturbed by that, and I wanted to express that to you

25   as a colleague.

1    Q.   I would agree that you were perturbed.

2         So after that conversation, you went back to the

3    U.S. Attorney's Office.  Who did you find and what did

4    you tell them about the contents of that-- or what

5    happened at that detention hearing?

6    A.   I can't tell you who I would've talked to,

7    clearly it was an issue, and I would've informed them of

8    what-- what happened at the hearing.

9    Q.   Part of the reason I'm asking is because there's

10   an e-mail from-- that several people in your office are

11   on much later that day that expresses a sort of great

12   deal of ambiguity about the U.S. Attorney's sense of

13   whether people are being recorded or not.

14        Did you talk to people in management about what

15   had happened in Mr. Wright's detention hearing?

16   A.   I can't tell you specifically or if I did.  I

17   would imagine I would've.

18   Q.   Okay.

19   A.   That's an unusual occurrence.  And, generally

20   speaking, when you have an unusual occurrence, you let

21   your management know.

22   Q.   I mean, is it fair to say that you were surprised

23   by the allegation that people were being videotaped at

24   CCA?

25   A.   Yes.

1    Q.   Okay.

2         MR. REDMOND:  Branden, could you put up-- or

3    not quite yet.

4    BY MR. REDMOND:

5    Q.   Mr. Hunt, I'm going to show you two e-mails that

6    we've marked as Defendant's Exhibits 689 and 690.

7    They're actually just different versions of an e-mail

8    chain.  You had indicated to--

9         MR. REDMOND:  Can I approach the witness,

10   Your Honor?

11        THE COURT:  Yes.

12   BY MR. REDMOND:

13   Q.   You had indicated to Mr. Clymer that when you

14   prepared what's been marked as Defendant's Exhibit 586

15   that you had attached a number of e-mails.  Do you

16   recognize those as e-mails that you may have attached?

17   A.   Let me-- let me just look at them, please.

18   Q.   Okay.

19   A.   689, I recognize that, yes.  And 690 I recognize,

20   yes.

21   Q.   Okay.  Thank you.

22        MR. REDMOND:  Your Honor, I'd move to admit

23   Defendant's Exhibits 689 and 690.

24        MR. CLYMER:  Only if they remain under seal,

25   Your Honor.

1          MR. REDMOND:  Oh, yes, that's right, I

2    apologize.  In the text-- down the text of the e-mail is

3    the name of the person who had been identified as

4    potentially posing a threat to Mr. Zabel.  Given that

5    that person was never convicted, Mr. Clymer asked that

6    we admit it under seal, and we've agreed.

7          THE COURT:  All right.  Exhibits 689 and 690

8    are admitted under seal.

9          MR. REDMOND:  That name is not, however, on

10   the first page of 589, so I would ask to publish-- 689,

11   sorry, I would ask to publish 689.

12         MR. CLYMER:  No objection.

13         THE COURT:  Go ahead.

14         MR. REDMOND:  No, I apologize, it is.  Never

15   mind, never mind.

16   BY MR. REDMOND:

17      Q.  So Exhibit 689, you were tasked with doing this

18   particular investigation, right, of the person that has

19   allegedly threatened Mr. Zabel?

20      A.  Yes, to assist the U.S. Marshals.

21      Q.  Right.  And so one of the marshals that you were

22   working with is Chris Johnson?

23      A.  Sean Franklin is the person who's in charge.

24      Q.  Okay.  The 689 is an e-mail from you to Chris

25   Johnson, Dave Zabel, Kim Flannigan, Deb Barnett?

1      A.   Correct.

2      Q.   And in that e-mail, you don't have to read it,

3  but just tell me sort of what you were trying to convey

4  in the first two lines.

5      A.   And where do you want me to start?

6      Q.   The-- well, after "Thanks, Chris."

7      A.   Yeah, what I was indicating is essentially that

8  once I had been notified-- so early in this e-mail

9  string, which was on I believe August 23rd, 2016, I had

10  sent an e-mail telling the agents, once I realized they

11  had been listening to calls, essentially they needed to

12  make sure that they did not intercept any potential

13  privileged communications.

14      Q.   And you're telling-- I'm sorry.  So what you're

15  telling the agents is you don't believe these calls are

16  privileged because the privilege is waived by CCA's

17  recording process, but that you want the calls treated

18  as if they were; is that a fair statement?

19      A.   I think that is a fair statement, yes.

20      Q.   Okay.  Now, eventually during the investigation,

21  the marshals did come across an attorney-client phone

22  call.  Right?

23      A.   That is correct.  I was notified, and that

24  would've been on the 24th, which would've been the next

25  day after I sent this e-mail, that there was a call to

1   an attorney.  And then the agent gave the name, gave the

2   call number and indicated we discovered it was an

3   attorney call shortly after it began and did not listen

4   to the rest.  And then I indicated what I wanted them to

5   do, and that was essentially to make sure the call is

6   segregated out.

7      Q.  And that's my question.  What you-- so I'm

8   referring to Exhibit 690 now.  You make a decision to

9   notify counsel.  Right?

10     A.  Yeah.

11     Q.  Why did you do that?

12     A.  Why did I do that?

13     Q.  Yes, sir.

14     A.  I didn't do it immediately because I was still

15  investigating whether there was a threat.  I'm not a

16  defense attorney, but I would imagine you have

17  obligations to your client to inform them if the United

18  States government is investigating them, so I thought

19  that was prudent.

20        But based upon the facts of this particular

21  investigation, the posture in the litigation in this

22  case, and out of an abundance of caution, I made the

23  determination, and got that sanctioned, to let the

24  defense attorney know about this call.  And that was

25  done.

1     Q.   And your intent was that-- the e-mail refers to--
2  I'm sorry, strike that question.
3          The e-mail refers to a Picerno, is that the
4  attorney?
5     A.   Yes.
6     Q.   And so your intent was to notify him so he can
7  block and so CCA does not record any future phone calls
8  between Mr. Picerno and his client; is that a fair
9  statement?
10    A.   I think it's a fair statement.  I don't recall
11 talking to him about that.  He was just informed that a
12 call was intercepted, that the agents did not
13 intentionally intercept it, and the call was then
14 segregated out.
15    Q.   So although you believed at the time that the
16 attorney-client privilege was waived, the only time you
17 ever came across an attorney-client phone call you
18 treated it as-- your actions treated it as privileged;
19 is that fair to say?
20    A.   Yes.  And you-- if I can explain.
21    Q.   Please.
22    A.   Like I indicated, understanding a legal position
23 and taking a legal position in litigation or in advocacy
24 as being-- it's a position the United States government
25 is taking in this case--

1      Q.   Right.

2      A.   -- right, versus the actual practice, because of

3 the obligation we have to uphold the law, the

4 Constitution, the President, you don't want to go close

5 to a line.  And so the safest course of conduct is just

6 to segregate those calls off and not listen to them.

7 But there's-- there's not a admission or concession that

8 those calls are privileged.  It is an extra step to

9 ensure that you don't tread on the privilege.

10          So what you're getting at is:  You're claiming

11 they're not privileged, but you're treating them as if

12 they are.  And I agree with you, yes.

13     Q.   You said that most of your office treated--

14 shares your opinion that the calls are not privileged

15 because of the waiver.  Do they also share your opinion

16 that they should be treated effectively as privileged

17 for the reasons you just explained?

18     A.   I don't believe I've ever had a conversation

19 with-- with people about that.  I think I can speak to

20 my own practice and my own beliefs in terms of how I

21 deal with circumstances that arise in my cases.

22               MR. REDMOND:  Could I have just a second,

23 Your Honor?

24               THE COURT:  Yes.

25               (Counsel confer).

 1          MR. REDMOND:  Mr. Hunt, that's all I have.

 2   Thank you.  Thank you, Your Honor.

 3                    CROSS EXAMINATION

 4   BY MS. VANBEBBER:

 5      Q.  Mr. Hunt, I really have one question that is for

 6   clarification purposes.  You said that you had obtained

 7   the disks that you talked about that were in

 8   *Herrera-Zamora*?

 9      A.  Yes, ma'am, Ms. Tomasic gave them to me.

10      Q.  And then you said that you made copies of those

11   disks and sent the copies off to Carlos Moran?

12      A.  Yes.

13      Q.  Where are the disks?

14      A.  Mr.-- the disks were sent to Mr. Moran.  They

15   were copied and sent to Mr. Moran.

16      Q.  The ones that Erin Tomasic gave you and the

17   copies that you made?

18      A.  No.  I believe the copies were retained by our

19   office.

20      Q.  You don't know where they are?

21      A.  I do not.

22      Q.  Do you recall that most recently there was a

23   subpoena *duces tecum* addressed to Mr. McAllister and

24   that everyone has been asked to turn things in pursuant

25   to the subpoena?

1     A.  I know what I was asked to do with respect to the

2  subpoena.  The calls-- the disks that were given to me

3  were returned to Mr. Moran.  My recollection is they

4  were-- copies were made for him, so there would be a

5  record of what actually was on the disks.  But where

6  those copies are, whether they're in electronic format,

7  I don't know.

8     Q.  So that-- that's the reason you didn't give them

9  over pursuant to the subpoena, that you don't have them?

10    A.  I don't know where they are, and I don't know if

11 they-- if they were requested or were covered by the

12 subpoena.

13            MR. REDMOND:  Excuse me, Your Honor.

14            THE COURT:  Yes.

15            MR. REDMOND:  Actually I know the answer to

16 that question.  When we undertook the representation of

17 Mr. Herrera-Zamora, it was represented to us that the

18 U.S. Attorney's Office turned over the entirety of those

19 disks and all of the derivative materials, so our office

20 has custody.

21            MS. VANBEBBER:  Oh, very well.  That answers

22 my question, I don't have any others.

23            THE WITNESS:  Thank you.

24                  REDIRECT EXAMINATION

25 BY MR. CLYMER:

1    Q.  Mr. Hunt, to the best of your knowledge, have you

2    ever seen a case from any circuit court or district

3    court in the federal system that holds that an inmate

4    who's warned about recording and monitoring doesn't

5    waive the privilege?

6    A.  None.

7              MR. CLYMER:  Nothing further.  Excuse me,

8    may I have a moment, Your Honor?

9              (Counsel confers).

10             MR. CLYMER:  Nothing further, Your Honor.

11             THE COURT:  Anything more?

12             MR. REDMOND:  Yes, Your Honor.

13                   RECROSS EXAMINATION

14   BY MR. REDMOND:

15   Q.  Mr. Hunt, have you ever seen a case where the

16   defendant and the attorney did not know that their call

17   was being recorded or believed that it was private--

18   actually, that's a terrible question.

19         Have you ever seen a case where the defense

20   attorney and the client believed their phone call was

21   private where the Court held that the privilege was

22   waived?

23   A.  I have not.

24             THE COURT:  All right.  Anything more?

25             MS. VANBEBBER:  Nothing for us.

1             THE COURT:  All right.  May Mr. Hunt be

2    excused?

3             MR. CLYMER:  No objection, Your Honor.

4             MR. REDMOND:  He may.

5             THE COURT:  All right.  You're excused.  All

6    right.  We're out of witnesses for today.  Correct?  Are

7    you all still thinking we'll finish tomorrow?

8             MS. VANBEBBER:  We have our fingers crossed.

9             THE COURT:  All right.  I'll ask you all to

10   work tonight to try to come up with efficient questions

11   for direct and even more efficient questions for cross

12   examination so that we can get the remaining witnesses

13   on and off tomorrow.

14            All right.  Anything else we need to talk

15   about before we recess for the day?  All right.  We'll

16   be in recess.

17            COURTROOM DEPUTY:  Are we starting at 8:30?

18            THE COURT:  I'm sorry, yes, let's reconvene

19   at 8:30 tomorrow.

20            (4:13 p.m., proceedings recessed).

21

22

23

24

25

1                  C E R T I F I C A T E

2

3

4

5       I, Kelli Stewart, a Certified Shorthand Reporter and

6    the regularly appointed, qualified and acting official

7    reporter of the United States District Court for the

8    District of Kansas, do hereby certify that as such

9    official reporter, I was present at and reported in

10   machine shorthand the above and foregoing proceedings.

11      I further certify that the foregoing transcript,

12   consisting of 115 pages, is a full, true, and correct

13   reproduction of my shorthand notes as reflected by this

14   transcript.

15      SIGNED October 29, 2018.

16

17

18

19              /s/ Kelli Stewart

20              Kelli Stewart, CSR, RPR, CCR, RMR

21

22

23

24

25