```
 1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,

 4        Plaintiff,

 5   v.                          Docket No. 16-20032-02-JAR

 6   KARL CARTER,               Kansas City, Kansas
                                Date:  10/12/2018
 7
          Defendant.            Day 9
 8   ....................       Pages 2184-2485

 9
                           REDACTED
10              TRANSCRIPT OF MOTIONS HEARING
           BEFORE THE HONORABLE JULIE A. ROBINSON
11              UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13
     For the Government:  Mr. Steven D. Clymer
14                        Department of Justice - USAO
                          Lrm Eckert, William
15                        100 S. Clinston Street
                          Suite 9000
16                        Syracuse, New York 13261

17                        Mr. Duston J. Slinkard
                          Office of United States Attorney
18                        444 Southeast Quincy
                          Suite 290
19                        Topeka, Kansas 66683-3592

20                        Mr. Stephen R. McAllister
                          Office of United States Attorney
21                        500 State Avenue
                          Suite 360
22                        Kansas City, Kansas 66101

23

24

25
```

```
 1    APPEARANCES:

 2    (Continued)

 3    For the Defendant Karl Carter:
                           Mr. David J. Guastello
 4                         The Guastello Law Firm, LLC
                           811 Grand Boulevard
 5                         Suite 101
                           Kansas City, Missouri 64106
 6
      For the Movant Federal Public Defender:
 7                         Ms. Melody J. Brannon
                           Mr. Kirk C. Redmond
 8                         Mr. Branden A. Bell
                           Office of Federal Public Defender
 9                         117 Southwest Sixth Street
                           Suite 200
10                         Topeka, Kansas 66603

11    For the Special Master David R. Cohen:
                           Mr. David R. Cohen
12                         David R. Cohen Co., LPA
                           24400 Chagrin Boulevard
13                         Suite 300
                           Cleveland, Ohio 44122
14
                           Ms. Alleen VanBebber
15                         VanBebber Law Firm, LLC
                           2029 West 95th Street
16                         Leawood, Kansas 66206

17

18

19

20

21

22    _____
23
           Kelli Stewart, CSR-KS, CRR-MO, RPR, CRR, RMR
24                  Official Court Reporter
           259 U.S. Courthouse, 500 State Avenue
25                  Kansas City, Kansas 66101
```

1                            I N D E X

2    Special Master's Witnesses:                        Page

3    KIM FLANNIGAN
       Direct Examination By Ms. VanBebber        2190
4      Cross Examination by Mr. Bell              2224
       Cross Examination by Mr. Clymer            2264
5      Recross Examination By Mr. Bell            2275

6    DEBRA BARNETT
       Direct Examination By Ms. VanBebber        2282
7      Cross Examination By Ms. Brannon           2326
       Cross Examination By Mr. Clymer            2389
8      Redirect Examination By Special Master     2407
       Cohen
9      Recross Examination by Mr. Clymer          2418

10   THOMAS E. BEALL
       Direct Examination By Ms. VanBebber        2449
11     Cross Examination By Ms. Brannon           2469

12

13   Federal Public Defender's Witnesses:               Page

14   THOMAS HANEY
       Direct Examination By Mr. Redmond          2420
15     Cross Examination By Mr. Clymer            2426

16

17   Government's Witnesses:                             Page

18   SCOTT CLIFFORD RASK
       Direct Examination By Mr. Clymer           2441
19

20

21

22

23

24

25

```
 1

 2                      E X H I B I T S

 3    Special Master's
      Exhibits            Offered            Received
 4
            1082           2241               2241
 5          1166           2304               2304
            1167           2449               2449
 6          1168           2449               2449
            1169           2449               2449
 7          1170           2449               2449
            1171           2449               2449
 8          1172           2449               2449
            1173           2449               2449
 9          1174           2449               2449
            1175           2449               2449
10          1176           2308               2309
            1177           2311               2311
11          1178           2448               2448
            1179           2448               2448
12          1180           2448               2448
            1181**      2448, 2466        2448, 2466
13          1182           2448               2448
            1183           2448               2448
14          1184           2448               2448
            1185           2448               2448
15          1186           2448               2448
            1187           2448               2448
16          1188           2448               2448
            1189           2448               2448
17          1190           2448               2448
            1191           2448               2448
18          1192           2448               2448

19

20

21

22

23

24

25
```

1

2                          E X H I B I T S

3      Federal Public Defender's
         Exhibits              Offered           Received
4
              505               2249               2250
5             575               2325               2326
              588               2325               2326
6             589               2325               2326
              618               2276               2276
7             620               2253               2253
              622               2225               2225
8             635               2325               2326
              655               2325               2326
9             656               2483               2484
              656A              2483               2484
10            659               2325               2326
              660**             2325               2326
11            660A**            2325               2326
              664               2325               2326
12            677               2420               2420
              681               2325               2326
13            691               2325               2326
              695               2325               2326
14            695**             2470               2470
              700               2325               2326
15            701               2325               2326
              702               2325               2326
16            703               2325               2326
              704               2325               2326
17

18
         Government's
19       Exhibits              Offered           Received

20            41                2418               2418

21

22    * Denotes demonstrative exhibit
     ** Denotes admitted under seal
23

24

25

1              (8:54 a.m., proceedings commenced).

2              THE COURT:  All right.  You can be seated.

3  All right.  Before we get started, one thing.  The

4  original exhibits, I want you to work on this sometime

5  today so that by this afternoon all of the originals

6  from all the parties are here on this table by

7  Ms. Wiest.  I just want to make sure we have all of

8  them.  She's got some of them, but we're pretty sure she

9  doesn't have all of them.  And I want to make sure we

10 have all that before we--

11             COURTROOM DEPUTY:  Are these Judge's copies?

12             MS. BRANNON:  Yes, those are the new ones

13 we'll be using today.

14             COURTROOM DEPUTY:  I just need to have the

15 originals, make sure that's up-to-date.

16             THE COURT:  All right.  Mr. Bell.

17             MR. BELL:  Your Honor, this morning we filed

18 a motion for exception from the protective order.  It's

19 Doc. 646.  Some of the materials that were marked or/and

20 admitted as exhibits during yesterday's hearing came

21 from the production from the government.  As the Court

22 knows, there's a protective order in place for those

23 materials that limits their use to this hearing and

24 related 2255s.

25             Based on yesterday's testimony, I think some

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18          2190

1   of those exhibits need to be disclosed to the
2   Disciplinary Administrator and the District of Kansas
3   Disciplinary Committee, so we asked for permission to
4   submit those as part of any complaint that might get
5   filed.  The government has no objection to that request.
6              THE COURT:  And I'll-- are you all clear on
7   which documents you're talking about?
8              MR. BELL:  Yes.  It lists the exhibit-- the
9   motion lists the-- the exhibits that we're asking to be
10  excepted from the protective order.
11             THE COURT:  And the government doesn't
12  oppose?
13             MR. McALLISTER:  We do not, Your Honor.
14             THE COURT:  All right.  Docket 646, motion
15  for exception to protective order is granted.
16             MR. BELL:  Thank you, Your Honor.
17             MS. VANBEBBER:  We would call Kim Flannigan.
18                      KIM FLANNIGAN,
19  called as a witness on behalf of the Special Master,
20  having first been duly sworn, testified as follows:
21                   DIRECT EXAMINATION
22  BY MS. VANBEBBER:
23     Q.  Ms. Flannigan, as you may well know, we've been
24  here listening to witnesses for the last
25  week-and-a-half.  And I'm not going to go through many

1   of the usual preamble-type questions with you.  And so

2   I'd like you to limit your-- assume that the questions

3   are limited to the years 2016 and 2017.

4       A.  Okay.

5       Q.  How long have you been an Assistant United States

6   Attorney?

7       A.  Over 30 years.

8       Q.  When did you first become the Kansas City,

9   Kansas, criminal coordinator?

10      A.  In-- well, I was criminal coordinator two

11  different times.  But the most recent time, I believe,

12  was in June of 2014, I believe.  I-- I don't recall.

13  I'm sorry.

14      Q.  Who preceded you in that job, if you know?

15      A.  Mr. Rask.

16      Q.  Do you know why Mr. Rask was removed and you were

17  put in his place?

18      A.  I do not.

19      Q.  You reported to the criminal chief, who at that

20  time in 2016 and 2017, was Debra Barnett; is that right?

21      A.  Initially it was Jared Maag, and then Ms. Barnett

22  later.

23      Q.  And she offices in Wichita?

24      A.  Correct.

25      Q.  And the acting U.S. Attorney and first assistant

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18          2192

1   was Tom Beall?

2       A.   At the end, yes.

3       Q.   And he offices in Topeka?

4       A.   Yes.

5       Q.   All right.  Does the Kansas City, Kansas,

6   criminal coordinator generally assign attorneys for

7   investigative and trial work on each case?

8       A.   Yes.

9       Q.   Did you make the assignments for *Herrera-Zamora*,

10  *Rapp*, and the *Black* case?

11      A.   I did.

12      Q.   Did you assign Erin Tomasic as the lead attorney

13  for the *Black* case?

14      A.   I did.  I did.

15      Q.   You knew at that time that Tomasic had come

16  straight to you out of judicial clerkships.  Right?

17      A.   Yes.

18      Q.   And she had only two jury trials before you made

19  her the lead attorney in the biggest case in the

20  district?

21      A.   Well, I didn't think it was the biggest case in

22  the district at the time.

23      Q.   You didn't think, with the potential of 95-- 95

24  defendants, at some point that it wouldn't be the

25  biggest case?

1    A.  Well, I didn't know that the-- at the beginning

2  of the investigation, it wasn't that-- there weren't

3  that many defendants.  And I also did assign Mr. Oakley

4  to work with her on the case.

5    Q.  All right.  So she was lead counsel and Mr.

6  Oakley was co-counsel; is that right?

7    A.  Correct.

8    Q.  Why wasn't that reversed?

9    A.  The *Black* litigation arose out of the *Dertinger*

10  case, which was Ms. Tomasic's, and so she was most

11  familiar with the facts and circumstances surrounding

12  the allegations that were being made as part of *Black*.

13    Q.  By the time *Black* got going, Ms. Tomasic had been

14  in the office three-and-a-half years.  Right?

15    A.  I don't know exactly.

16    Q.  At least she wouldn't-- she hadn't walked in the

17  door six months earlier?

18    A.  I'm sorry?

19    Q.  She hadn't walked in the door six months earlier,

20  had she?

21    A.  No, she had been around for a little bit.

22    Q.  During that time frame, did you have an

23  opportunity to work with her periodically?

24    A.  Yes.

25    Q.  And did you learn that she's the type of an

1    attorney who wants to follow the rules?

2        A.  I did.

3        Q.  And did she always seek help, as much as she

4    could, as she was learning the job?

5        A.  I thought she did.

6        Q.  Did you notice that she followed the lead of the

7    prosecutors in the office when she could?

8        A.  I think she did.

9        Q.  Did you feel like she followed your lead when she

10   could?

11       A.  Yes.

12       Q.  Did she pretty much accept the instructions of

13   those who had been there longer and tried to take their

14   advice when she could?

15       A.  I believe she did.

16       Q.  In your practice, do you regularly obtain CCA--

17   CCA inmate calls to help complete your investigations of

18   criminal matters?

19       A.  Not regularly.

20       Q.  How often do you think you normally do that in a

21   year?

22       A.  Periodically, I would say.

23       Q.  All right.  Do you recall that Tomasic issued a

24   grand jury subpoena in *Black* for the phone records of at

25   least 17 CCA inmates?

1    A.  I wasn't involved in the *Black* investigation.

2    Q.  Did you-- you were supervising her, weren't you?

3    A.  I was.

4    Q.  And weren't you interested in her effort to get a

5    grand jury subpoena out?

6    A.  We don't-- supervisors do not review all grand

7    jury subpoenas that are issued in all the investigations

8    in our office.

9    Q.  So even though you knew this was only her third

10   trial, you didn't think you should step in and just take

11   a look at the grand jury subpoena?

12   A.  As I said, Mr. Oakley was involved in the case

13   with her, so I did not feel that that-- that was needed.

14   Q.  So you assumed that both she and Mr. Oakley had--

15   were privy to what was in the grand jury subpoenas?

16   A.  I presumed that they had discussed the issuance

17   of the grand jury subpoena.

18   Q.  When did you become aware that she had issued the

19   grand jury subpoena for the phone records of these

20   inmates and had not specifically excluded

21   attorney-client calls?

22   A.  I don't recall.

23   Q.  You don't recall when you learned that?

24   A.  No.

25   Q.  You did learn that, did you not?

1       A.   Yes.

2       Q.   When you did learn it, did you have any

3   suggestions for her about why she should've excluded

4   attorney-client calls?

5       A.   No.

6       Q.   Did you think she should've or not?

7       A.   No.

8       Q.   You didn't think she should?

9       A.   No.

10      Q.   Why not?

11      A.   Because it's my understanding that CCA had in

12  place a process by which attorney calls would not be

13  provided to us.  And in the circumstances in which we

14  would, on occasion, get attorney-client calls as part of

15  a subpoena for an inmate, we had a procedure in place,

16  at least I had a procedure in place, where we did not

17  listen to those calls.

18      Q.   Are you speaking of a procedure being a taint

19  team?

20      A.   No.

21      Q.   What procedure in place?

22      A.   My procedure in-- when I would obtain CCA phone

23  calls in a particular case, my procedure would be to

24  have the agents review those phone calls and only

25  provide to me the calls that they believed were relevant

1   to our investigation.  Only then did I review them to

2   see if I wanted to use them in any manner in a hearing

3   or in a trial.

4       Q.  Were you and Tomasic co-counsel in the *Rapp* case?

5       A.  Yes.

6       Q.  And in March or April of 2016, did you learn from

7   a cooperating CCA inmate that people in the

8   attorney-client rooms were being videotaped?

9       A.  I did not.

10      Q.  Where did you find out that information?

11      A.  When I read the transcript of the hearing that

12  happened in July.  That-- that was part of the *Black*

13  investigation is my recollection.

14      Q.  And Ms. Tomasic didn't come and tell you, look

15  what I've-- look what we found, we think?

16      A.  No.

17      Q.  All right.  You testified in the *Dertinger* case--

18  *Dertinger* case.  Right?

19      A.  I did.

20      Q.  And so I'm not going to ask you to repeat that

21  testimony.  You don't have any reason to believe there

22  would be anything you'd say any different, do you?

23      A.  No.

24      Q.  All right.  You said you didn't discuss the phone

25  call subpoena, but did you discuss the subpoena that

1    Tomasic prepared for the *Black* case seeking all

2    surveillance from CCA?

3        A.   I did not.

4        Q.   When you found-- you did find out that that's

5    what she had done.  Correct?

6        A.   Yes.

7        Q.   Did you suggest that she should have eliminated

8    the attorney-client rooms from the surveillance subpoena

9    because there was a chance that something would be

10   there?

11       A.   I did not discuss with her the elimination of

12   attorney-client video.

13       Q.   Did you talk to her about it after the fact?

14       A.   We had conversations after the fact.  I'm not

15   sure that I ever indicated that she should have excluded

16   the attorney-client rooms because I did not know those

17   were recorded.

18       Q.   In your years as a-- strike that.

19            When there's a need for a taint team, do you

20   routinely have one?

21       A.   Yes.

22       Q.   How often do you think in the past five years

23   you've had to assemble a taint team?

24       A.   None, in my cases.

25       Q.   Why not?

1    A.   Because I do primarily child pornography and

2  human trafficking cases, and I don't have the sorts of

3  issues that come up in drug cases.

4    Q.   In your supervision of her then, did you give

5  Tomasic any guidance on the topic of taint teams in a

6  criminal practice and how to use them?

7    A.   I don't recall.

8    Q.   You never had any discussion with her about the

9  occasions when those might come up in the kind of cases

10  she was doing?

11    A.   Well, we did discuss the use of a taint team with

12  regard to certain evidence that was going to be seized

13  during the search warrants of-- at the-- in the *Black*

14  investigation.

15    Q.   Did you refer her to Tanya Treadway in Topeka as

16  a good leader for a taint team that she might want to

17  contact?

18    A.   I did discuss her communicating with Tanya.

19    Q.   Do you recall when she was sent to formal DOJ

20  training for criminal discovery practice?

21    A.   No.

22    Q.   Do you recall that there was a point when she

23  came back from some education that she had had to tell

24  the AUSAs around the lunchroom that she learned that

25  you're not supposed to possess attorney-client recorded

1    calls?

2        A.   I don't recall that.

3        Q.   Okay.  Would you agree that in 2016 and 2017, it

4    was the long-standing practice and position of most of

5    the AUSAs in Kansas City, Kansas, that the

6    attorney-client privilege is waived for CCA inmate

7    calls?

8        A.   I believe that's what the-- the case law

9    suggests.

10       Q.   And that's the practice most of you followed?

11       A.   I don't believe there's a practice.  I'm sorry.

12   I guess I don't understand what your question is.

13       Q.   You-- you agree that the position of most of the

14   criminal prosecutors in the Kansas City, Kansas office

15   is that the attorney-client privilege has been waived at

16   CCA for inmate calls?

17       A.   I don't-- I don't believe that's just particular

18   to our position.  I believe that's what the case law

19   suggests.  I don't think our office just took that

20   position without the research and understanding what the

21   case law suggested.

22       Q.   But you think that that is the position they're

23   taking?

24       A.   I-- I believe that is what the case law suggests.

25       Q.   Is that because of the preamble that begins the

 1  calls?

 2      A.  And that's what the-- again, that's what the case

 3  law suggests.

 4      Q.  And was it generally the litigation position that

 5  the only exception to that would be with-- is if the

 6  defense attorneys had jumped through the hoops at CCA to

 7  get their calls privatized?

 8      A.  I'm sorry.  I-- I'm not understanding.  There

 9  wouldn't be any exception to-- to the case law.  In

10  other words, they're not privileged if there's a

11  preamble.  And, again, that's what the case law says.

12      Q.  As we stand here today, is this position the same

13  as it always was?

14      A.  I believe so.

15      Q.  Is there a statement, an office position, a

16  district-wide position on that issue?

17      A.  I don't-- I don't know.  All I know is what the

18  case law suggests.

19      Q.  Nothing you've seen in writing?

20      A.  No.

21      Q.  Is it also the litigation position for most

22  people at your office that there's no obligation to tell

23  an attorney that you have his calls of his client?

24      A.  I don't-- I don't know that there's a-- a policy

25  regarding that.

1    Q.  Is there a practice?

2    A.  I don't know that-- there's not a uniform

3  practice that I'm aware of.

4    Q.  And is there a uniform practice that if you

5  somehow got privileged communications, you don't need to

6  disclose them if you're not going to use them?

7    A.  I'm unaware of that.

8    Q.  Okay.  When the District of Kansas takes a formal

9  position on a litigation practice issue, do you

10  personally follow that position?

11    A.  Yes, I do.

12    Q.  You don't ignore it and just go your own way?

13    A.  I do not.

14    Q.  And you take it upon yourself to know when

15  there's written formal positions on any given topic

16  around the office?

17    A.  I-- I try my best.

18    Q.  But management generally notifies you when they

19  take a formal position on something, don't they?

20    A.  Generally.

21    Q.  Okay.  I'm going to take you to August 9th, 2016.

22  You were on vacation when the judge called an emergency

23  hearing in the *Black* case.  Right?

24    A.  Correct.

25    Q.  So you weren't at the hearing?

1      A.  I was not.

2      Q.  Isn't that also the day that you know that the

3   judge impounded the video hard drives from CCA under the

4   *Black*-- that they had gotten under the *Black*

5   surveillance subpoena?

6      A.  I'm not sure if that was the day or if it

7   happened later, but I'm aware she did that.

8      Q.  If the record reflects that, you don't have any

9   reason to disagree?

10     A.  I do not.

11     Q.  Did you learn from Tomasic whether she got to be

12  in the courtroom that day?

13     A.  Yes.

14     Q.  Did you learn from Christopher Oakley that he

15  wasn't in the courtroom either?

16     A.  Yes.

17     Q.  Do you know whether they wanted to be in the

18  courtroom?

19     A.  I do not know.

20     Q.  Do you know why they weren't in the courtroom?

21     A.  I do not.

22     Q.  Is it-- from supervising both of them, weren't

23  they the only two AUSAs who appeared of record in the

24  *Black* case at that time?

25     A.  That's correct.

1      Q.   But who appeared, if you know, on August the 9th

2   on behalf of the government?

3      A.   My understanding was that Ms. Barnett and

4   Mr. Slinkard appeared on behalf of the government.  I

5   don't know if there were others, but I know they did

6   appear.

7      Q.   As far as you know, were Oakley and Tomasic the

8   only two who knew enough about that case at that time to

9   adequately answer the judge's questions?

10      A.   I believe that to be true.

11      Q.   On Monday when you found out-- you found out

12   about this on-- over the weekend.  Right?

13      A.   I think I received some e-mail traffic that day,

14   the 9th, but I can't recall for sure.

15      Q.   From the e-mail traffic, are you aware that the

16   day before the hearing, Monday, August the 8th, a

17   volunteer group of attorneys at the KCK office tried to

18   write a memo to give to Ms. Barnett, who was going to

19   appear and would need the information?

20      A.   I am aware of that, yes.

21      Q.   Did you help with that?

22      A.   No.  I was on vacation.

23      Q.   Okay.  So you learned through e-mail traffic or

24   conversations?

25      A.   E-mail traffic.

1     Q.   Do you know whether Barnett accepted that

2  memorandum or rejected it?

3     A.   It was not filed.

4     Q.   It was presented to her, but it was not filed?

5     A.   Correct.

6     Q.   Was there another hearing that you're familiar

7  with on August 16th, the next week?

8     A.   Yes.

9     Q.   And were you at that hearing?

10    A.   I was.

11    Q.   Do you remember that the Court first learned

12 about the inmate phone recordings at that hearing?

13    A.   I don't recall.

14    Q.   Do you know that Tomasic was not at that hearing

15 as well?

16    A.   I believe that to be true.

17    Q.   Did the Court announce it was going to enter a

18 clawback order for those phone records?

19    A.   It did.

20    Q.   And was that clawback order, to your knowledge,

21 actually entered on August the 18th?

22    A.   I believe it was.  I'm sorry.  I don't know the

23 date, but I know it was entered.

24    Q.   And do you recall that there were a number of

25 AUSAs who then went over to Topeka the very next day to

1    decide how to comply with that order?

2       A.   I remember there was a-- a meeting in Topeka.

3    I'm sorry, I don't remember the time frame.

4       Q.   It was right after the order issued, though, you

5    would say?

6       A.   What makes-- what triggers my memory of that, it

7    was at the same time as our district conference.   I

8    don't remember if that was several days later or the

9    next day.   I'm just-- I'm sorry.

10      Q.   In any event, the objective was to figure out

11   what the office was going to do to be in compliance with

12   the judge's order.   Right?

13      A.   Correct.

14      Q.   Who decided at that meeting to choose an

15   interpretation of it that limited it to calls only that

16   were collected in the *Black* case?

17      A.   I believe Ms. Metzger and maybe Mr. Oakley.   I

18   don't recall specifically.   I know we all discussed it,

19   but I think that Ms. Metzger was the one who said she--

20   she believed that the interpretation would be just the

21   *Black* case.

22      Q.   Do you recall you, yourself, saying that you

23   maybe ought to be thinking about interpreting it a

24   little broader because you actually had calls, for

25   example, in the *Rapp* case, that would collide with those

1    in *Black*?

2        A.   I did.

3        Q.   Did anybody pay any attention to you?

4        A.   They believed the order was just for *Black*.  I--

5    I don't know-- yeah, that's--

6        Q.   Isn't it-- isn't it fairer to say that they

7    decided that it was in their best interest to interpret

8    it that way?

9        A.   I don't recall that.

10       Q.   Do you recall that Erin Tomasic suggested the

11   best thing to do would probably be just to file

12   something and ask the Court to clarify the limits of its

13   order?

14       A.   I think she did mention that.

15       Q.   Did anybody pay attention to that?

16       A.   It wasn't done.

17       Q.   Did you think that was a pretty good idea?

18       A.   I thought it was a good idea.

19       Q.   But Ms. Barnett and Ms. Metzger felt differently?

20       A.   Again, I don't recall who ultimately made the

21   decision, but it wasn't done.

22       Q.   Well, Barnett is the civil chief, so she could've

23   overridden the rest of you if she felt like it, couldn't

24   she?

25       A.   She was the criminal chief.

1    Q.   Chief, yeah.  I'm sorry.

2    A.   And Emily was the civil chief.

3    Q.   I'm sorry.  I said that backwards.  Emily

4    couldn't probably have overridden it because she was the

5    civil chief, but Debra Barnett could've made a final

6    decision that was different, couldn't she?

7              MR. CLYMER:  Objection.  Counsel is

8    testifying about internal U.S. Attorney matters.  I'd

9    ask that she ask the witness if she knows.

10             THE COURT:  I'd say reframe the question.

11   BY MS. VANBEBBER:

12   Q.   Do you know whether your boss, the person you

13   reported to, the criminal chief, could've made the final

14   decision, regardless of what the discussion was?

15   A.   I believe she and the U.S. Attorney obviously

16   could've made a decision different than what we had

17   suggested.

18   Q.   Let me now turn your attention to August 25th,

19   2016.  And you're familiar with what happened that day,

20   aren't you?

21   A.   I'm sorry.  What day?

22   Q.   August 25th, 2016.

23   A.   I'm not sure.

24   Q.   The day that Ms. Tomasic took materials to the--

25   A.   Oh, yes.

1      Q.   -- judge's chambers.

2      A.   Yes.

3      Q.   At that point were you in your office that day?

4      A.   I was.

5      Q.   And had your office, to your knowledge, received

6   the materials that are demanded in the clawback order

7   for the *Black* discovery?

8      A.   We had.

9      Q.   And who was supposed to originally have delivered

10   those materials to the judge?

11      A.   I don't think it was specified who should deliver

12   those materials.

13      Q.   If the record reflects that Mr. Oakley was going

14   to do it, but he was out of town and asked Ms. Tomasic

15   to take on that task, do you have any reason to

16   disagree?

17      A.   I would not.

18      Q.   When Ms. Tomasic returned after making her

19   delivery to the fifth floor about 3:30 on the 25th, were

20   you in-- in your office?

21      A.   I was.

22      Q.   Did she come to you soon after that to say that

23   she needed to go back to the judge's chambers?

24      A.   She came back to me indicating that there were

25   more-- there was more-- there were more items that would

1   be covered by the clawback order than we had-- than we

2   had delivered, because the order included derivative

3   evidence, which would've been items that were on not

4   just our computers but also the agency computers.

5       Q.   And did she tell you she had the ability to copy

6   those off and take them to chambers?

7       A.   She did not.

8       Q.   Did she do that?

9       A.   No, I don't-- I--

10      Q.   Did she ask Sandie to do that?

11      A.   I don't recall.

12      Q.   Okay.  In any event, she needed-- she felt she

13  needed to go back.  Right?

14      A.   Well, she came to me asking how we should deal

15  with this derivative evidence.

16      Q.   It was before 5:00.  It was part of the delivery

17  she was supposed to make anyway.  Why didn't you tell

18  her, well, go take it back, it's still office hours, the

19  clerk is still there.

20      A.   At this point in time I felt Ms. Barnett was in--

21  she was the prosecutor on the *Black* matter at this

22  point.  She was taking the lead on these issues with

23  regard to the *Black* litigation, with regard to the

24  videos and the audios, and she was the one who appeared

25  for the government at the hearing.  So I believed that

1    was her decision to make on how we would deal with this

2    derivative evidence.

3        Q.   You didn't think there was any question that she

4    would just do it the same way she had done it an hour

5    before?

6        A.   Well, I think there was-- I think maybe there's a

7    miscommunication, because the derivative evidence wasn't

8    just on our computers, but the agency's computers as

9    well.  And there were all-- there would've been perhaps

10   thousands and thousands of pages of derivative evidence,

11   items in which-- like Title III applications and other

12   items in which this information was located.

13       So I thought Ms. Barnett should be the one to

14   determine how we would go about turning over that

15   evidence, because she was going to be responsible for

16   the compliance ultimately.

17       Q.   So you told Tomasic you thought you ought to get

18   hold of Debra Barnett.  Right?

19       A.   I did.

20       Q.   Did you try?

21       A.   We did.

22       Q.   Did you succeed at that first try?

23       A.   No.

24       Q.   Did you call Emily Metzger?

25       A.   Ultimately we did.

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18        2212

1    Q.  And did she know how to get hold of Debra
2    Barnett?
3    A.  I don't know.
4    Q.  Well, did she?
5    A.  She did not.
6    Q.  Then at some point later in the afternoon did she
7    tell you that Debra Barnett had come back to the office
8    and you were ready-- ready to speak with her?
9    A.  Yes, but it was after 4:30, I believe.  Between 4
10   and 4:30.
11   Q.  Okay.  So did you get on a four-way call?
12   A.  We did.
13   Q.  Did you have a discussion about options that you
14   might have--
15   A.  We did.
16   Q.  -- for getting this stuff to the judge?
17   A.  We did.
18   Q.  Do you know whether they had a copy of the order
19   in Wichita with them?
20   A.  I don't know.
21   Q.  Did you have a copy?
22   A.  I did.
23   Q.  And did you discuss the parameters of the order
24   and try to figure out which would be the best way to do
25   this?

1        A.   We did.

2        Q.   By the time you came to a conclusion, wasn't it

3    well past 5:00?

4        A.   It was.

5        Q.   And that's closing time for the fifth floor

6    secured area?

7        A.   Correct.

8        Q.   Whose idea was it to find a marshal and have him

9    get Erin into the secured area?

10       A.   I don't recall who suggested it.  I-- I think I

11   need to back up, because the ultimate decision on how to

12   handle that was to write a letter to the agencies,

13   telling them not to access that information, and for

14   us-- for my office to send an e-mail to the district

15   indicating that we-- no one should access the *Black*

16   files.

17            So we would-- after we hung up, we were going to

18   write the letter, send the e-mail and then put that

19   together in an envelope.  I don't recall who suggested

20   trying to deliver that to chambers after hours.  I don't

21   recall whose suggestion that was, because we believed,

22   and of course wrongly, that the deadline was that day.

23       Q.   The deadline was the 29th, not the 25th.  Right?

24       A.   I-- yes.

25       Q.   Which you can see if you read the order?

1    A.   Correct.

2    Q.   Didn't you write an e-mail that said it was your

3    idea to get the marshal involved?

4    A.   I did call the marshal, and I did-- as we were

5    hanging up from our phone call, I specifically said,

6    "Well, I need to call the marshals," and I-- so I did

7    say, "I need to call the marshals" when we were on the

8    phone call.

9    Q.   And Ms. Barnett didn't disapprove of that?

10   A.   No.

11   Q.   And as a matter of fact, she directed you to go

12   find the marshal.  Right?

13   A.   I don't recall that.

14   Q.   And you had several options.  You could've gone

15   upstairs and tried the buzzer for each one of the judges

16   and see if anybody was there that could help you?

17   A.   We could have.

18   Q.   You could've e-mailed Judge Robinson or her

19   docket clerk, explained the situation and asked to

20   provide the materials the next day?

21   A.   We could have.

22   Q.   You could've electronically filed a motion for

23   leave to file the next day?

24   A.   We could have.

25   Q.   You could've read the order carefully?

1    A.   We could have, yes.

2    Q.   And then you wouldn't have had to do anything

3  else, would you, that day?

4    A.   Probably not.

5    Q.   But instead, you decided to get a marshal to help

6  you go in and-- into the secured area after hours and

7  proceed to the judge's chambers, which presumably

8  would've been locked?

9    A.   I will just answer it this way:  Both Emily

10  Metzger and I had worked with Judge Robinson when she

11  was an AUSA.  Judge Robinson was somebody that I liked

12  and admired when she was an AUSA.  I would not have

13  suggested a procedure or signed off on any procedure

14  that I thought would upset or anger her.

15       And so as-- in the heat of the moment as we were

16  trying to comply with this order, and in a very

17  contentious litigation, we took a course of action that,

18  unfortunately, did those things that we would never have

19  done, so-- and I regret that that was the decision that

20  was made, but it was made.  But it wasn't made out of

21  any sort of malice or any sort of desire to anger or

22  upset the Court.

23    Q.   Now, once again, you had a Special Assistant U.S.

24  Attorney which is, you could say, at the bottom of the

25  totem pole.  Right?

1    A.   Yes.

2    Q.   And they had-- had you as a midline manager?

3    A.   Yes.

4    Q.   And Emily Metzger, the civil chief?

5    A.   Yes.

6    Q.   And Debra Barnett, the criminal chief?

7    A.   Correct.

8    Q.   So sitting here today, who's the logical person

9    to have made the choice of the decisions?

10   A.   Well, I think that the information was being

11   passed on, we discussed it as a group, and then I

12   believe there was a group decision made.

13   Q.   Did anybody disagree in the group?

14   A.   Nobody did.

15   Q.   Debra Barnett could've prevented you from making

16   that decision, couldn't she?

17   A.   She could have.

18   Q.   And-- but Erin is the one who gets picked to go

19   up and get into chambers after hours.  Right?

20   A.   She was essentially the-- the person who was

21   physically going to deliver that, yes.  She was chosen

22   to--

23   Q.   Was there ever any question about that?

24   A.   I'm sorry?

25   Q.   Was there ever any question that she would be the

 1   delivery person?

 2       A.   I don't know that we ever discussed who would

 3   actually do the delivery.   I know--

 4       Q.   Could've been you.   Right?

 5       A.   It could've been.

 6       Q.   During the hearing on September the 7th in the

 7   *Black* case, were you present in the courtroom?

 8       A.   I was.

 9       Q.   And Ms. Barnett represented the United States

10   that day?

11       A.   I believe she and Mr. Slinkard both represented

12   the United States.

13       Q.   And she was speaking for the United States

14   concerning the possible appointment of the Special

15   Master.   Right?

16       A.   Yes.

17       Q.   Isn't that what the hearing was called for?

18       A.   Yes.

19       Q.   And at the end of that hearing, did the judge

20   then inform all the participants for the first time

21   about what had happened on August 25th?

22       A.   She did.

23       Q.   In-- after listening to the judge's remarks, is

24   it fair to say that most of them landed on Ms. Tomasic?

25       A.   They did.

1    Q.   And from the heavy press coverage that followed,

2    did you have the opinion that the public was going to

3    think that she was a rogue-- Tomasic was a rogue

4    attorney who just wrongfully made the office look bad to

5    the public?

6    A.   That was my opinion, yes.

7    Q.   Did you stand up and say, Judge, you've got it

8    wrong, this isn't the way it happened, in that hearing?

9    A.   Not in the hearing, no.

10   Q.   Did Ms. Barnett stand up and say, I'm the

11   criminal chief, I take responsibility?

12   A.   She did not.

13   Q.   She just sat there and let Ms. Tomasic take the

14   heat?

15   A.   Yes.

16   Q.   And so did you?

17   A.   Yes.

18   Q.   Did you try to make up for that later by asking

19   Mr. Beall and getting together with several other

20   attorneys and asking them to clear the record after the

21   fact?

22   A.   I did.

23   Q.   What result did you have?

24   A.   There was no result.

25   Q.   Did you ever get a yes or a no-- yes, I'll do

1    that, or no, I'm not going to do that?

2        A.   I don't recall.  I know I did get a response, but

3    I don't remember-- I think the response-- the response I

4    recall is that, I'll run this by Deb and Emily and see

5    if we'll file anything.

6        Q.   And get back-- get back with you?

7        A.   Yes.

8        Q.   And nobody did?

9        A.   I don't recall.

10       Q.   Do you recall that on October the 11th, 2016, the

11   Court appointed the Special Master--

12       A.   Yes.

13       Q.   -- which the--

14       A.   I'm sorry.  I don't remember the date.  I do

15   remember it was-- he was appointed.

16       Q.   Which the U.S. Attorney's Office and the Federal

17   Public Defender had jointly moved for?

18       A.   I don't recall the process, but I do recall he

19   was appointed.

20       Q.   Did Ms. Metzger and Barnett come to Kansas City,

21   Kansas, early in December to discuss the office's

22   responsibility to cooperate fully with the Special

23   Master?

24       A.   I recall a meeting in which we discussed the

25   litigation hold.  And I don't recall the dates, I'm

1    sorry.

2       Q.   Did you comply with everything you were asked to

3    do concerning the investigation?

4       A.   I did.

5       Q.   Were you told you couldn't visit with the Special

6    Master unless you got permission from management?

7       A.   I don't recall that.

8       Q.   Do you-- did you or anyone else you talked to get

9    the impression that you were free to just go talk to the

10   Special Master when he was in town?

11      A.   I don't recall that.

12      Q.   Did you want to speak to the Special Master?

13      A.   I did.

14      Q.   Did you ask for permission?

15      A.   I did.

16      Q.   Why did you think you needed to ask?

17      A.   Actually, I didn't ask permission.  I just sent

18   an e-mail to Ms. Metzger and said that information had

19   come to me that the Special Master wanted to talk to me,

20   and I was-- would be willing to talk to him if he wanted

21   to talk to me.

22      Q.   Well, how did information come to you?

23      A.   Mr.-- Agent Stokes after--

24      Q.   Agent Jeff Stokes with the KBI?

25      A.   Correct.

1    Q.   And he told you, hey, the Special Master wants to

2    talk to you?

3    A.   Yes.

4    Q.   So he had obviously already talked to the Special

5    Master?

6    A.   He had.

7    Q.   So the Special Master reached out to you?

8    A.   No, he did not.

9    Q.   So how did it come about then?

10   A.   I-- Agent Stokes came to me, said he had met with

11   the Special Master and the Special Master wanted to talk

12   to me.  So the Special Master never did reach out to me

13   and never did contact me.

14        So I e-mailed Emily, and I know she was in

15   contact with the Special Master because of the

16   litigation hold.  So I e-mailed Ms. Metzger, and I told

17   her that Agent Stokes had told me the Special Master

18   wanted to talk to me, I would be willing to talk to him.

19   And I think she responded that she would pass on the

20   information.

21   Q.   Did you ever talk to the Special Master?

22   A.   I did not.

23   Q.   So you don't know whether she actually contacted

24   him or not?

25   A.   I do not.

1      Q.   Do you recall if there was anyone else who you

2  know was specifically told not to have contact with the

3  Special Master?

4      A.   Not that I know of.

5      Q.   Are you aware that Erin Tomasic was fired by Tom

6  Beall in May 2017?

7      A.   I know that, yes.

8      Q.   How did you find that out?

9      A.   I believe she told me.

10     Q.   Did she tell you why she was fired?

11     A.   No.

12     Q.   When did you step down as the office

13  coordinator-- criminal coordinator?

14     A.   In October of 2017.

15     Q.   Were you asked to step down?

16     A.   I was.

17     Q.   Did you consider resigning at that point?

18     A.   Resigning as an AUSA?

19     Q.   Uh-huh.

20     A.   No.

21     Q.   Did anybody threaten your employment at that

22  point to get you to step down?

23     A.   No.

24     Q.   You were just asked to step down, and you did?

25     A.   Correct.

 1      Q.   And who took your place?

 2      A.   Mr. Rask.

 3      Q.   Came back then and took the position he had

 4  formerly had?

 5      A.   Correct.

 6      Q.   Have you ever accused the United States Attorney

 7  or any other attorney in the office of sexual

 8  harassment?

 9      A.   No.

10      Q.   Creating a hostile workplace?

11              MR. CLYMER:  Objection, relevance.

12              THE COURT:  Overruled.

13              THE WITNESS:  I don't think that I'm

14  authorized to answer that question pursuant to my *Touhy*

15  request.

16  BY MS. VANBEBBER:

17      Q.   Okay.  Have you ever accused any male supervisor

18  of any type of discrimination, whether you were involved

19  or not?

20      A.   Again, I don't think I'm authorized to answer

21  that.

22      Q.   Do you know of other people who have filed

23  grievances or suits against male supervisors in this

24  particular office of the District of Kansas?

25      A.   That's not part of my authorization either.

1          MS. VANBEBBER:  All right.  That's all the

2    questions I have, Your Honor.

3                    CROSS EXAMINATION

4    BY MR. BELL:

5      Q.  Ms. Flannigan, the litigation about the recording

6    of attorney-client meetings at CCA began in August of

7    2016?

8      A.  As I recall, yes.

9      Q.  And in September of 2016, you were the criminal

10   coordinator for the Kansas City office?

11     A.  I was.

12     Q.  You knew about a computer refresh that was

13   scheduled to occur during that time?

14     A.  I was generally aware that there were-- that we

15   were going to be getting new computers.

16     Q.  At some later point you learned that there was

17   some controversy about a particular computer in the

18   Kansas City office--

19     A.  Yes.

20     Q.  -- called the AVPC?

21     A.  I don't know what it was called.

22     Q.  It was one of Pauletta Boyd's computers?

23     A.  I learned that later, yes.

24     Q.  And specifically the controversy was about the

25   hard drives of the AVPC being wiped or reformatted?

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18        2225

1        A.  I learned that later, yes.

2        Q.  And you learned that that was one of the

computers that had been used to view video of the

attorney-client meeting rooms at CCA?

5        A.  Yes.

6        Q.  Ma'am, I'm going to show you what's been

previously marked as Exhibit 622.  Do you recognize

Exhibit 622 to be an e-mail from yourself to Scott Rask

on May 25th, 2017?

10       A.  Yes.

11            MR. BELL:  Your Honor, I'd move to admit

Exhibit 622.

13            MR. CLYMER:  No objection.

14            THE COURT:  Exhibit 622 admitted.

15  BY MR. BELL:

16       Q.  In this e-mail to Mr. Rask, you state you're

concerned that the computer that had been used to view

the video had been wiped prior to the litigation in

*Black*?

20       A.  That was my understanding at the time.

21       Q.  And who told you that it had been wiped prior to

the litigation in *Black*?

23       A.  I believe it was Mr. Steeby.

24       Q.  So Mr. Steeby told you or gave you the impression

that the computer that had been used to view the video

1    had been wiped prior to the litigation in *Black* in

2    August 2016?

3         A.   That was my understanding.

4         Q.   You also state that that was not the only

5    computer.  There were many, not just one computer; is

6    that right?

7         A.   Again, that was my understanding.

8         Q.   So your understanding was there were many

9    computers that had been used to view the videos?

10        A.   No, that there were many computers that had been

11   wiped.

12        Q.   I'd like to talk a little bit about this basis

13   for belief that your office had that no privilege

14   applied or the privilege had been waived to calls

15   between inmates and their attorneys at CCA.

16             If I understand your testimony correctly, it's

17   that the belief is the inmate knows that the-- the

18   conversation is being recorded and, therefore, that acts

19   as a waiver of the privilege?

20        A.   That's what the case law says.

21        Q.   Is there a Tenth Circuit case that you can cite

22   for me that holds that position?

23        A.   I'm only familiar with the Eighth Circuit case,

24   the *Hatcher* case.

25        Q.   Are you familiar with any binding authority in

1    the Tenth Circuit that stands for that proposition?

2        A.   I'm unaware of any.

3        Q.   Are you aware of any authority or-- in the

4    District of Kansas where any judge has come to that same

5    conclusion?

6        A.   I haven't looked for any.  Sorry.

7        Q.   Are you aware of the facts of the *Hatcher* case?

8        A.   I believe they were similar to ours.  I'm sorry,

9    it's been a really long time since I read that case.

10   But I-- when I read it at the time, it seemed that the

11   facts were similar to ours.

12       Q.   Well, were you aware then, having read the case

13   at the time, that the government in that case took the

14   opposite position, that the calls were protected by

15   attorney-client privilege?

16       A.   I was not.

17       Q.   The basis for your legal theory that the

18   privilege has been waived is that the presence of a

19   recorder on the calls acts as fundamentally a third

20   party, and that presence of a third party destroys the

21   privilege?

22       A.   I'm sorry.  That's not my position.  I-- my

23   office has taken the position that's based upon the case

24   law.

25       Q.   All right.

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18      2228

1      A.  I didn't take the position.  I didn't make this
2  position, in other words.
3      Q.  Ms. Flannigan, obviously you're a lawyer.
4      A.  Yes.
5      Q.  You have written pleadings or have made
6  statements under your own name that state that you
7  believe the privilege is waived in these circumstances?
8      A.  I believe that's what the case law indicates.  So
9  my position is-- my legal position is based upon the
10  case law that I have read and cited.
11      Q.  And that position is, if I understand it
12  correctly, that the presence of a recording device on
13  the line that the defendant knows about acts as
14  essentially a third party to the call, which destroys
15  the privilege; is that right?
16      A.  That is part of the rationale, I believe, that
17  the cases discuss.
18      Q.  And in these particular instances, the third
19  party under that analogy would be CCA?
20      A.  I don't know.  I assume.
21      Q.  And the third party would also in that case be
22  essentially the United States Marshals Service because
23  they have the contract with CCA?
24      A.  I don't-- I don't know.
25      Q.  I believe you just testified a few moments ago

1    that you don't request calls in every case that you

2    prosecute?

3        A.   I do not.

4        Q.   So there are some cases where the defendant

5    you're prosecuting is detained at CCA or another

6    facility and you don't request recorded phone calls from

7    them?

8        A.   That's correct.

9        Q.   And obviously if you don't request the calls in

10   those cases, there's not-- you don't disclose them to

11   defense counsel because you don't have them, there's

12   nothing to disclose?

13       A.   Correct.

14       Q.   Are there-- in the times that you do request

15   recorded phone calls, I believe your testimony was you

16   don't listen to them, you have the agents listen to

17   them?

18       A.   That is typically my policy-- my procedure.

19       Q.   And then the agents flag ones for you that they

20   think are pertinent, and then you might listen to them?

21       A.   Correct.

22       Q.   When you engage in that procedure where you

23   request the calls, have the agents review them, do you

24   always disclose all of the calls to the defense?

25       A.   I don't know.  I think I do, but it's possible

1   that we only disclose those that we intend to use at

2   trial.

3       Q.  All right.  So-- and the reason being that if you

4   don't intend to use it at trial, then there's no need to

5   really disclose it.  Right?

6       A.  Well, correct.  But, I mean, it-- usually I try

7   to provide whatever I think that the defense would--

8   would want.

9       Q.  But if-- again, if you haven't listened to the

10  calls, then you don't-- I mean, I understand your

11  attempt, but you don't have a good idea of what the

12  defense might want?

13      A.  Correct.

14      Q.  Now, when you get these calls, you can do it by

15  making a request through the marshals service?

16      A.  Yes.

17      Q.  And the marshals service will turn around and get

18  them from CCA?

19      A.  Yes.

20      Q.  And CCA, you know, is obligated to provide those

21  to the marshals under the contract between the marshals

22  service and CCA?

23      A.  I don't know.

24      Q.  And so those calls, when the marshals get them,

25  they're essentially in the marshals' control, the

1  marshals can just say, hey, CCA give those to us, and

2  CCA gives them the calls?

3      A.   I don't know.

4      Q.   Have you ever had CCA refuse a request by the

5  marshals for recorded telephone calls?

6      A.   I don't know.

7      Q.   You don't know if you've ever had CCA refuse a

8  request?

9      A.   I don't know if CCA has ever refused a request.

10     Q.   To your knowledge, has CCA ever refused a request

11  from the marshals for phone calls?

12     A.   Not that I'm aware of.

13     Q.   And obviously you know that CCA records all the

14  phone calls, all the outgoing phone calls made by

15  inmates?

16     A.   I assume they do.

17     Q.   Are you familiar with Rule 16 of the Federal

18  Rules of Criminal Procedure?

19     A.   Yes.

20     Q.   Are you familiar that Federal Rule 16(a)(1)(B)

21  requires the prosecution to turn over any recorded

22  statement of a defendant?

23     A.   Any statement--

24          MR. CLYMER:  Objection.  I'm not sure that's

25  what the rule says, Your Honor.

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18        2232

1            THE COURT:  You can cross examine.  Answer
2     it if you can.
3     BY MR. BELL:
4        Q.  So let's look at Rule 16(a)(1)(B).
5        A.  Actually, it-- it says, "made pursuant to
6     interrogation."
7        Q.  So that's (a)(1)(A).  I direct your attention to
8     (a)(1)(B).
9        A.  And that says, "upon a defendant's request."
10       Q.  Are you familiar with the pretrial orders that
11    have been standard in this district for at least the
12    last 10 or 15 years that are entered in all criminal
13    cases?
14       A.  Yes.
15       Q.  Do those say that a defendant's request is not
16    necessary to trigger the government's obligations under
17    Rule 16?
18       A.  Actually, I think a defendant's request is still
19    required for certain items.
20       Q.  Does that include what's under Rule 16(a)(1)(B)?
21       A.  I would have to look at it.  I'm sorry.
22       Q.  So would you say, Ms. Flannigan, as you sit here
23    right now, you're not familiar of what your obligations
24    are to disclose under the pretrial orders as they relate
25    to Rule 16(a)(1)(B)?

1    A.  I would just have to refresh my recollection with

2  regard to that specific item.

3    Q.  All right.  So let's take out the-- irrelevant of

4  the defendant's request or whether you're obligated to

5  turn it over or not, this rule states that the

6  government must disclose any relevant recorded statement

7  by the defendant under certain circumstances.  Would you

8  agree with me so far?

9    A.  Yes.

10    Q.  Statements within the government's possession,

11  custody or control?

12    A.  Yes.

13    Q.  And if you know or could know that the statement

14  exists?

15    A.  Yes.

16    Q.  So you know that the calls are recorded at CCA?

17    A.  Yes.

18    Q.  And you know the marshals can get them from CCA

19  on request?

20    A.  Yes.

21    Q.  And you-- when you ask for the calls, you ask for

22  them through the marshals?

23    A.  I do.

24    Q.  Now, you said that there are some cases where you

25  have incarcerated defendants that you never make a

1    request for these calls and, therefore, never turn them

2    over to the defense; is that right?

3        A.   That's correct.

4        Q.   And there may be other cases where you have made

5    a request for the calls, but you didn't turn over all of

6    the calls to the defense; is that right?

7        A.   I just don't remember.

8        Q.   You've prosecuted cases with co-defendants?

9        A.   Yes.

10       Q.   Sometimes multiple co-defendants that have all

11   been incarcerated in pretrial detention?

12       A.   Yes.

13       Q.   Now, co-defendants aren't allowed to have the

14   same attorney.  Right?

15       A.   Correct.

16       Q.   They all have to have different attorneys?

17       A.   Yes.

18       Q.   And that's because it would be a conflict for one

19   attorney to represent more than one co-defendant?

20       A.   Yes.

21       Q.   The reason that conflict exists, or at least one

22   of the reasons, is that those co-defendants may have

23   adverse defenses?

24       A.   It's possible.

25       Q.   They might point the finger at each other?

```
 1        A.   It's possible.

 2        Q.   And one co-defendant might ultimately decide to

 3   cooperate with the government?

 4        A.   Yes.

 5        Q.   And, in that, explicitly point the finger at the

 6   other co-defendants?

 7        A.   I'm sorry?

 8        Q.   And as part of that cooperation, they may

 9   explicitly point the finger at other co-defendants?

10        A.   Yes.

11        Q.   When you have prosecuted cases with multiple

12   defendants, do you always request all the calls from all

13   the defendants?

14        A.   No.

15        Q.   You're aware that under Rule 16 you're required

16   to disclose any material in your possession that might

17   be material to a defense?

18        A.   Yes.

19        Q.   So, for instance, if one co-defendant decides to

20   cooperate and goes to a proffer session, that

21   co-defendant might make a telephone call before they go

22   to the proffer session describing that they plan to go

23   cooperate?

24        A.   Anything is possible.

25        Q.   And that co-defendant might say, I plan to go lie
```

1    and tell them this stuff that's not true when I do this.

2    Right?

3         A.   Anything is possible.

4         Q.   That co-defendant might make a call after the

5    proffer session?

6         A.   Anything is possible.

7         Q.   And that co-defendant might say that, I just had

8    this session and I lied to the government and told them

9    all this stuff that wasn't true.  Right?

10        A.   Anything is possible.

11        Q.   For the co-defendants that that cooperator is

12   testifying against or giving information against, that

13   would be material to their defense.  Right?

14        A.   It's possible, yes.

15        Q.   It would also constitute impeachment evidence of

16   that cooperating co-defendant?

17        A.   That is possible.

18        Q.   Which you would be required to disclose under

19   *Giglio*?

20        A.   That is possible.

21        Q.   It's possible that that cooperator might

22   eventually be called to testify against the

23   co-defendants at trial?

24        A.   It's possible.

25        Q.   That co-defendant might talk on the phone prior

1    to their testimony and say, I plan to go testify and I

2    plan to lie about what happened?

3        A.   Anything is possible.

4        Q.   If that were the case, that would be evidence

5    that's material to the defense of the defendants on

6    trial?

7        A.   That would be possible.

8        Q.   It would also be impeachment material you'd be

9    obligated to turn over?

10       A.   That would be possible, if it were in my custody

11   and control.

12       Q.   So when you decide which calls to request for--

13   when you're prosecuting co-defendants, do you make a

14   conscious choice not to request the calls of the person

15   who's cooperating?

16       A.   No.

17       Q.   You request--

18       A.   I just--

19       Q.   -- the calls of the defendants who are

20   cooperating, I assume?

21       A.   No, not always.  I do not routinely request jail

22   calls in my cases.

23       Q.   But I think your testimony was - and correct me

24   if I'm wrong - you've prosecuted multi-defendant cases

25   before?

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18        2238

1      A.  Yes, but I don't-- if you could give me a
2  specific example of a case that I did in which I
3  requested jail calls or did not request jail calls in a
4  multi-defendant case, that would be helpful, because I
5  don't-- you're asking me a lot of hypotheticals, and I
6  can't really respond to that and give you a reason why I
7  did or did not request calls because I don't have a
8  specific frame of reference.
9          There may be reasons why I do request calls.
10  There may be reasons why I don't request calls.  So
11  without a specific frame of reference, without a
12  specific case, it's very difficult to answer your
13  questions.
14      Q.  You were aware that CCA had a procedure that
15  attorneys could undergo to make sure their calls would
16  not be recorded or monitored?
17      A.  Yes.
18      Q.  This was called a privatization procedure?
19      A.  I don't know what it was called.
20      Q.  You knew that the attorney had to request that
21  CCA privatize their number?
22      A.  I do not know what the procedure was.
23      Q.  Did you know that CCA was the one that would have
24  to fulfill that request?
25      A.  Yes.

1    Q.   But you didn't know how it worked after that?

2    A.   I did not know how an attorney requested it or

3    the mechanism by which it was done.

4    Q.   You didn't know how long it took CCA to fulfill

5    those requests?

6    A.   I did not.

7    Q.   Or even if they fulfilled them at all?

8    A.   I have no knowledge of that.

9    Q.   Or if they made mistakes fulfilling those

10   requests?

11   A.   I do not know.

12   Q.   Before you requested phone calls from any

13   defendant from CCA, did you ever ask a defense attorney

14   if they had privatized their phone calls?

15   A.   No, I did not.

16   Q.   Did you ever ask CCA if the preamble would still

17   play on a call that had been privatized?

18   A.   I did not ask.

19   Q.   You had never received a direct call from CCA?

20   A.   I don't know.  I don't know if I ever have.

21   Q.   Have you ever placed a call from the pods at CCA?

22   A.   I've never placed a call from there, no.

23   Q.   So you don't know what the person making the call

24   heard?

25   A.   I do not.

1    Q.   You don't know what the person receiving the call

2    hears?

3    A.   I do not.   I have listened to them, though, and--

4    and the person receiving the call does hear the

5    preamble.

6    Q.   Well, on the recordings you listened to there's a

7    preamble that's played?

8    A.   Correct.

9    Q.   You don't know if that's actually what either

10   side hears to the call?

11   A.   Well, based on the calls that I have heard, I

12   think that the receiver does hear that because there's a

13   delay before the-- before the person who answers the

14   call can speak.   They can't speak right away.   And you

15   can hear the inmate-- sometimes you can hear the inmate

16   talking over the recording.

17   Q.   So you said sometimes you can hear the inmate

18   talking over the recording.   And does that make it, I

19   would assume, more difficult to hear what it is the

20   preamble is actually saying?

21   A.   I don't think that it's difficult to hear, but

22   you can hear the inmate talking in the background and

23   the person waiting for the preamble to finish before

24   they can have a conversation.

25   Q.   So how do you hear a person waiting?   You just

1  mean they're not speaking?

2      A.  They're not speaking, correct.

3      Q.  Right.  You don't know if they're waiting for the

4  preamble, you don't know if they're waiting because they

5  haven't realized the call is connected, you don't know

6  what that waiting period is for?

7      A.  Neither one of them are speaking, for the most

8  part.

9      Q.  Let me show you what's been marked as Special

10 Master Exhibit 1082.  Is Special Master Exhibit 1082 an

11 e-mail that you sent?

12     A.  Yes.

13          MR. BELL:  Your Honor, I'd move to admit

14 Exhibit 1082.

15          MR. CLYMER:  May I have a moment to find it,

16 Your Honor?

17          THE COURT:  Yes.

18          MR. CLYMER:  No objection.

19          THE COURT:  1082 admitted.

20 BY MR. BELL:

21     Q.  Exhibit 1082 is an e-mail you sent on August 17th

22 of 2016?

23     A.  2016, yes.

24     Q.  And in this e-mail, you write it to several

25 people in the office, including Mr. Rask, Ms. Tomasic,

1    Mr. Oakley, and you request that you want to contact CCA

2    and find out how calls-- attorney calls are blocked and

3    what exactly does "blocked" mean?

4        A.  Correct.

5        Q.  Now, is it your understanding that-- well, first

6    off, did anyone respond to this e-mail and say, there's

7    no need to do that, I already know how the process

8    works?

9        A.  I don't recall.

10       Q.  You don't recall anyone doing that?

11       A.  I don't recall that-- if there was a response or

12   not, one way or the other.

13       Q.  And now this is August 17th.  Tell me, is this--

14   had your position already been that the privilege didn't

15   apply because it had been waived?

16       A.  I believe we had done research that indicated

17   that that was the position we should take, yes.

18       Q.  And yet at the time you take that position, as

19   reflected in your e-mail, at least you, and apparently

20   others, didn't understand how an attorney could block

21   their call or what even exactly the blocking process

22   did?

23               MR. CLYMER:  Objection to the reference to

24   "apparently others."  There's no evidence of that in the

25   record.

 1  BY MR. BELL:

 2     Q.  You said you can't recall anyone saying that they

 3  already knew about it.

 4            THE COURT:  All right.  Overruled.

 5  BY MR. BELL:

 6     Q.  Right?

 7     A.  Yes.  I'm sorry.  Would you rephrase your

 8  question or repeat your question?  I didn't say yes as

 9  to the answer.  I said yes--

10     Q.  I understand.

11     A.  Okay.

12            MR. BELL:  Would you repeat the question,

13  please.

14            MS. REPORTER:  Let me see if this is what

15  you're looking for.

16            MR. BELL:  That's all right.  I'll try it

17  again.  Thank you.

18  BY MR. BELL:

19     Q.  So at least on August 17th, when your office had

20  already taken the position that the privilege had been

21  waived, neither you nor apparently others in the office

22  knew exactly how calls were blocked or what it even

23  meant for calls to be blocked?

24     A.  We were unaware of the-- how the system at CCA

25  worked.

1    Q.   But you were confident enough to assert that an

2  attorney that had not complied with this procedure, even

3  though you didn't understand how it worked or what it

4  did, had waived the privilege.  Right?

5    A.   The privilege-- privilege belongs to the client,

6  not the attorney.

7    Q.   All right.

8    A.   So we believed that the client was the one

9  waiving the privilege when he spoke on the phone.

10   Q.   Did you know at that point how an inmate would be

11  able to assert the privilege to make sure that their

12  calls weren't recorded?

13   A.   My understanding-- again, I-- from-- from my

14  experience, my understanding was inmates were advised

15  that-- in their handbook when they were checked in that

16  the calls were monitored, and there was also signage

17  above the phones or in the vicinity of the phones to

18  alert them that their calls were monitored.

19   Q.   And you knew that on August 17th?

20   A.   I believe I did.

21   Q.   And did you know what procedure CCA gave to the

22  inmates telling them how they could contact their

23  attorneys without the call being recorded?

24   A.   That, I don't recall.

25   Q.   Do you recall if there was any procedure by which

1  the inmates could ask the facility to not record their

2  calls to their attorneys?

3      A.   I don't know.

4      Q.   Did you know on August 17th that CCA did not

5  publicize its procedure about how to block calls?

6      A.   I don't know.

7      Q.   Did you know on August 17th that even if an

8  attorney was lucky enough to discover the procedure

9  about how to block their calls, that the attorney

10  themselves could not initiate that process?

11      A.   I'm unaware.

12      Q.   Did you know on August 17th, 2016--

13          MR. CLYMER:   Objection.  I believe that

14  misstates the testimony.  I believe an attorney could

15  initiate the process, Your Honor.  There's been

16  testimony about that.

17          MR. BELL:  Your Honor, if I--

18          THE COURT:  The question was that, "Even if

19  an attorney was lucky enough to discover the procedure

20  about how to block their calls, the attorney themselves

21  could not initiate the process."  Well, it depends on

22  how you define "initiate the process."  Reframe your

23  question.

24  BY MR. BELL:

25      Q.   Did you know who had to initiate the process of

1   blocking the calls?

2       A.   No, I did not.

3       Q.   Did you know what steps were necessary between

4   the inmate and the attorney to have the calls blocked?

5       A.   No.

6       Q.   Did you know how CCA even went about blocking the

7   call?

8       A.   No.

9       Q.   Did you know that CCA had assured some attorneys

10  that had been lucky enough to discover this process and

11  figure it out, that their calls would no longer be

12  recorded, and yet their calls were still recorded?

13      A.   That's a very long question.  I am unaware of any

14  communication between CCA and defense counsel regarding

15  the recordings of their phone calls.

16      Q.   So you didn't know the-- how the process worked,

17  you didn't know what anyone heard on the calls for sure,

18  yet you were comfortable asserting the position that the

19  privilege had been knowingly and voluntarily waived?

20      A.   Yes.

21      Q.   Did you ever put that question-- before we filed

22  our motion in this case, had you ever had an occasion to

23  put that question to a court?

24      A.   What-- oh, whether it was waived?  I don't

25  believe I have ever litigated that issue, no.

1       Q.   Is it okay for prosecutors in your office to make

2   a unilateral decision that the privilege had been

3   waived, without submitting it to a court first?

4       A.   We take positions all the time regarding legal

5   issues, one side or the other, and then ultimately they

6   are litigated by a court.  But we-- we often take

7   positions based on our research, based upon-- we take

8   positions on whether there's a search that may be a bad

9   search.  We advise our law enforcement partners whether

10  or not we're going to take a case because, based upon

11  the case law, we believe that their search was a bad

12  search.  So, yes, we take positions all the time

13  regarding legal issues.

14      Q.   So my question was a little different.  Is it

15  permissible for a prosecutor when reviewing some

16  evidence to unilaterally decide that the privilege, any

17  applicable privilege, has been waived, without

18  submitting the issue to a court to determine?

19      A.   I-- I think-- I think I'm answering your

20  question, because in any case in which I have a-- a

21  legal issue, I'm unilaterally determining whether the

22  case law supports the legal position that I'm taking.

23      Q.   So let's say you've got the attorney-client

24  calls-- let's say you have a case and you're listening

25  to calls and the agents are listening to calls and at

1    some point you run across a call that you know is

2    between a defendant and an attorney.

3        A.   Okay.

4        Q.   Your position has been, as I understand, that

5    privilege does not apply or has been waived to that

6    communication.

7            Is there anything that legally prohibits you from

8    listening to that call?

9        A.   There's nothing that legally prohibits me, no.

10       Q.   Ms. Flannigan, about how many cases have you

11   tried as a prosecutor?

12       A.   Probably 100 maybe.

13       Q.   Would you agree with me that the prosecution has

14   a number of advantages at a trial, just like the defense

15   has a number of advantages at trial?

16       A.   Okay.  Yes.

17       Q.   Would you agree with me that one of the

18   advantages that the defense has at trial is that it

19   doesn't necessarily have to disclose its defense

20   strategy or defense theme?

21       A.   Well, neither does the prosecution.  So I think

22   that's an equal-- that's an equal advantage on both

23   sides.

24       Q.   You agree the government has more disclosure

25   obligations than the defense has?

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18      2249

1      A.   Actually, I think we have equal disclosure

2  obligations, but they're just not always followed.

3      Q.   Would you agree with me then it would be helpful

4  for a prosecutor to know what a defendant was thinking

5  prior to trial?

6      A.   No.

7      Q.   Let me show you what's been marked as

8  Exhibit 505, and I believe it's previously been

9  admitted.  I'd ask you to turn to the second page of

10  that exhibit and see if you see an e-mail that you wrote

11  on that page.

12      A.   I'm sorry.  What?

13      Q.   I'd ask you to turn to the second page of

14  Exhibit 505 and see if you see there an e-mail that you

15  wrote.

16      A.   Yes.

17           MR. BELL:  Your Honor, I'd move to admit

18  Exhibit 505.  Actually it--

19           MR. CLYMER:  No objection.

20           MR. BELL:  It may already be admitted, but

21  just in case it's not.

22           THE COURT:  Is it already admitted?

23           COURTROOM DEPUTY:  Yes, it is.  It was

24  admitted earlier, May 16th.  If you want to admit it for

25  this hearing...

 1              THE COURT:  It was admitted at the May 16th

 2  hearing?

 3              COURTROOM DEPUTY:  Uh-huh.

 4              THE COURT:  Well, we'll go ahead and admit

 5  it today as well.  Exhibit 505 is admitted.

 6  BY MR. BELL:

 7     Q.  This is an e-mail you sent to Roland Hoffer on

 8  July 7th, 2015?

 9     A.  Yes.

10     Q.  The subject of the e-mail is "Theis CCA calls"?

11     A.  Correct.

12     Q.  You were-- at that time you were prosecuting a

13  defendant named Kenneth Theis?

14     A.  Theis I believe is how--

15     Q.  Theis, I apologize.  Kenneth Theis?

16     A.  Yes.

17     Q.  Mr. Theis was scheduled to go to trial in front

18  of Judge Robinson on July 7th?

19     A.  Yes.

20     Q.  So this is the day that the trial was supposed to

21  start?

22     A.  Actually, I'm sorry, I don't recall the date the

23  trial was supposed to start.

24     Q.  Assuming that it was July 7th, on the morning of

25  Mr. Theis' trial you send an e-mail requesting his CCA

 1    calls?

 2        A.   Correct.

 3        Q.   And you say you needed them by noon that day?

 4        A.   Yes.

 5        Q.   It's not vital, but you'd like to see what he's

 6    thinking?

 7        A.   That's what I said to Mr. Hoffer, yes.

 8        Q.   You testified in front of Judge Robinson in

 9    *United States versus Dertinger*?

10        A.   I did.

11        Q.   You were under oath?

12        A.   I was.

13        Q.   You were asked why you were no longer criminal

14    coordinator?

15        A.   I was.

16        Q.   Let me show you what's been admitted as

17    Exhibit 504 on Pages 446 and 447.  You were asked if you

18    were still in the role as coordinator, and you said that

19    you were not?

20        A.   Correct.

21        Q.   That you ceased being in that role in October?

22        A.   Correct.

23        Q.   And you were asked why you were no longer in that

24    role, and you said that you asked to be removed.  You

25    were asked why you asked to be removed, and you told the

1    Court "for personal reasons"?

2        A.  Correct.

3        Q.  And then you were later asked whether those

4    reasons were related to the job or personal reasons

5    outside the job.

6        A.  I can't see that on my screen.

7        Q.  You were asked if your personal reasons-- you

8    were asked-- you said "for personal reasons," and then

9    you were asked, "Related to the job or personal reasons

10   outside of the job?"  Right?

11       A.  Correct.

12       Q.  And you again said "personal reasons"?

13       A.  Correct.

14       Q.  Ms. Flannigan, isn't it true that Tom Beall made

15   it clear to you that if you did not voluntarily resign

16   from that position that you would be demoted?

17       A.  I was given the option to step down.

18       Q.  Or someone would remove you from the position if

19   you didn't do it voluntarily?

20       A.  That was my interpretation of his comments.

21       Q.  I'll show you what's been marked as Exhibit 620.

22   Do you recognize Exhibit 620 as some e-mails that you

23   sent to Mr. Beall?

24       A.  Yes.

25           MR. BELL:  Your Honor, I'd move to admit

1    Exhibit 620.

2              MR. CLYMER:  Could I have a moment, Your

3    Honor?

4              THE COURT:  Yes.

5              MR. CLYMER:  No objection.

6              THE COURT:  620 admitted.

7    BY MR. BELL:

8      Q.  October 3rd, 2016, you write to Mr. Beall that

9    you understood that you had the choice to resign or be

10   demoted?

11     A.  That is my-- that was my understanding from our

12   conversation, yes.

13     Q.  October 3rd, 2016, you also tell Mr. Beall that

14   you specifically recall him stating that he would take

15   action if you didn't and strongly suggested it would be

16   in your interest to resign voluntarily; is that right?

17     A.  That is what I wrote, yes.

18     Q.  So under oath you were asked during the *Dertinger*

19   hearing whether you stepped aside for reasons related to

20   the job or for personal reasons.  You didn't disclose or

21   testify anything about being told that if you didn't do

22   it voluntarily, that you would be demoted by Mr. Beall?

23     A.  I-- I accurately stated that I stepped down for

24   personal reasons.

25     Q.  When Judge Robinson appointed the Special Master,

1   she ordered your office to give him your full

2   cooperation?

3       A.   Yes.

4       Q.   And to make any person in your office available

5   to him?

6       A.   Correct.

7       Q.   She entered that order on October 16th of 2016?

8       A.   I don't recall the date.

9       Q.   Did anyone ever tell you not to cooperate with

10  the Special Master?

11      A.   No.

12      Q.   That wouldn't be full cooperation, would it?

13      A.   I'm sorry?

14      Q.   That wouldn't be full cooperation?  If someone

15  told you you couldn't meet with the Special Master, that

16  wouldn't be full cooperation with the Special Master?

17      A.   No one ever told me not to cooperate with the

18  Special Master.

19      Q.   Did anyone ever tell you not to have any contact

20  with the Special Master?

21      A.   No.

22      Q.   That also wouldn't be full cooperation by the

23  office, would it?

24      A.   I was never told not to have any contact with

25  him.

 1      Q.  Did anyone in your office tell any other member
 2   of your office not to have any contact with the Special
 3   Master, that you know of?
 4      A.  I do not know.
 5      Q.  I'll show you what's been marked as Defense
 6   Exhibit 617.  Do you recognize Exhibit 617 as an e-mail
 7   that was forwarded to you by Ms. Tomasic?
 8      A.  Yes.
 9      Q.  You received this e-mail on February 6th, 2017?
10      A.  Yes.
11           MR. BELL:  Your Honor, I'd move to admit
12   Exhibit 617.
13           COURTROOM DEPUTY:  It was admitted already.
14           MR. CLYMER:  No objection.
15           THE COURT:  It's already in evidence.
16   BY MR. BELL:
17      Q.  Exhibit 617, that's an e-mail Ms. Tomasic sent on
18   February 6th to Ms. Metzger and Mr. Rask?
19      A.  Yes.
20      Q.  And in that e-mail Ms. Tomasic states that on
21   October 31st, 2016, Ms. Barnett instructed Mr. Rask to
22   direct Ms. Tomasic to have no contact with the Court,
23   court personnel or the Special Master about the *Black*
24   case.
25      A.  That's what this e-mail says, yes.

1      Q.   All right.  So would you agree that in this
2   e-mail at least, Ms. Tomasic is describing an
3   instruction that she received not to speak to the
4   Special Master?
5      A.   That's what she's describing.
6      Q.   Did Ms. Tomasic also tell you outside of this
7   e-mail that Mr. Rask had instructed her at Ms. Barnett's
8   behest not to have any contact with the Special Master?
9      A.   I don't recall.
10      Q.   Do you recall a conversation about this topic
11   between you, Ms. Tomasic, and Mr. Rask where Ms. Tomasic
12   references this October 31st instruction?
13      A.   I don't recall.
14      Q.   And do you recall Mr. Rask telling Ms. Tomasic
15   he, in fact, had never said that?
16      A.   I don't recall.
17      Q.   Do you recall Ms. Tomasic being surprised and
18   looking at you thinking that-- and saying that if Mr.
19   Rask was going to be dishonest, there was no hope left?
20      A.   I don't recall.
21      Q.   You said you learned that Ms. Tomasic had been
22   fired because she told you; is that right?
23      A.   I think that's how I learned it, yes.  I wasn't--
24   I wasn't told in advance.  I think that's the point I
25   was trying to make.

1      Q.   Did she tell you why she had been fired?

2      A.   I don't recall.

3      Q.   Did she call you the day that she had been fired?

4      A.   I don't remember.

5      Q.   Did she ask you to do anything for her?

6      A.   I do recall there were some items in her office

7 related to the EEOC complaint that we had filed and she

8 asked if she could have those, because she was still

9 part of the EEOC litigation.

10     Q.   And did those items include notebooks?

11     A.   I believe they did.

12     Q.   With e-mails?

13     A.   I don't recall what was in them.  I don't know

14 that I ever looked in them.

15     Q.   So she asked you to get materials, including

16 notebooks, related to an EEOC complaint?

17     A.   That was my understanding, yes.

18     Q.   And this is the same conversation where she tells

19 you that she has been fired?

20     A.   I don't recall if that was the same conversation

21 or not.

22     Q.   And when she asked for that, did you tell her

23 that she would need to make that request through

24 management?

25     A.   I did not.

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18    2258

1      Q.    Did you tell her that it was-- the notebooks and
2    the e-mails themselves probably constituted governmental
3    property and, therefore, she'd have to request them back
4    from management?
5      A.    I did not.
6      Q.    Did you go into her office and take them?
7      A.    I did.
8      Q.    Did you tell management you were doing that?
9      A.    I believe I-- I can't recall if I bumped into-- I
10   don't recall, I'm sorry.
11     Q.    Do you know why Ms. Tomasic wasn't permitted to
12   retrieve those items from her office herself?
13     A.    I don't know that she thought to ask for them
14   before she left.  She was emotional and it was a very
15   stressful time, so I-- I think she didn't think to ask
16   for them.  But "I don't know" is the answer.
17     Q.    You said you think you bumped into somebody on
18   your way to get the items.  Who do you think--
19     A.    I don't remember, I'm sorry.
20     Q.    All right.  So would it be fair to say there's no
21   official request, by e-mail or writing or otherwise,
22   where you asked management if it was okay for you to go
23   into Ms. Tomasic's office and take these items?
24     A.    I assumed they were her personal items, that they
25   were her personal items and that's why I did that.  So

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18        2259

 1  no, I did not ask.

 2      Q.  You thought that the printed material in the

 3  notebooks relevant to her EEOC complaint against others

 4  in the office were her personal property?

 5      A.  No, I thought they were personal records of hers.

 6      Q.  Right.  You agree that they're governmental

 7  property?

 8      A.  I don't know what was in them, so I don't know

 9  is-- I didn't look inside them.

10      Q.  So she asked you to go get these materials,

11  including notebooks, you go in and get them.  You don't

12  recall if you told management or not, you don't remember

13  telling management that you did it.  Now, you have these

14  notebooks.  What do you do with them?

15      A.  I took them to her house.

16      Q.  Were you the only one that went to her house with

17  property of hers that evening?

18      A.  I don't recall.  I think so, but I don't recall.

19      Q.  Do you recall Dave Zabel being there as well?

20      A.  I don't recall.  I think he may have helped me

21  carry, because they were heavy.  But I don't remember if

22  he had gone to her house or not.

23      Q.  Did he also help you carry the notebooks out of

24  the office?

25      A.  That's what I recall.  But again, I didn't recall

1   that he went to her house, I thought he just helped me

2   take them to my car.

3       Q.   In addition to the notebooks that she asked you

4   to bring, what else did she ask you to get from the

5   office?

6       A.   That's all I remember.

7       Q.   So the items that she wanted from her office,

8   they didn't include pictures, plants, any other personal

9   memorabilia or other property that she might want, it

10  was just these notebooks?

11      A.   That's all I recall.

12      Q.   After you had given these notebooks to Ms.

13  Tomasic without telling anyone in management, did you

14  tell anyone in management that you had given her the

15  notebooks?

16      A.   I believe I did.

17      Q.   Who did you tell?

18      A.   I think I told Mr. Rask.

19      Q.   When did you do that?

20      A.   The next day-- shortly after.

21      Q.   Was it in response to questions from management

22  about what had happened to the notebooks that were in

23  Ms. Tomasic's office?

24      A.   I don't recall.

25      Q.   Or did you voluntarily disclose it?

1      A.   I don't remember.

2      Q.   Ms. Flannigan, just to be clear, before you took

3  those notebooks out of the office and into the parking

4  lot and then drove them to Ms. Tomasic's house, you

5  didn't have any authorization from management to do

6  that?

7      A.   I had not discussed it with management.

8           MR. BELL:  I have no further questions.

9           MR. CLYMER:  Your Honor, may we see the

10  Court at sidebar?

11          THE COURT:  Yes.

12          (Proceedings had at the bench, outside the

13  hearing of open court).

14  ███████████████████████████████████████████

15  ███████████████████████████████████████████

16  ██████████████████████████████████████

17  ████████████████████████████████████████

18  █████████████████████████████████████

19  █████████████████████████████████████

20  █████████████████████████████████████

21  ███████████████████████████████████

22  █████████████████████████████████████

23  █████████████████████████████████████

24  ████████████████████████████████████

25  ███████████████████████████████████████████

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18          2262



1  ████████████████████████████████████

2         █████████████████████████████████████

3  ████████████████

4              (Proceedings continued in open court).

5              THE COURT:  All right.  We'll be in recess

6  for 15 minutes.

7              (Recess).

8              THE COURT:  All right.  You can be seated.

9              MR. CLYMER:  May I proceed, Your Honor?

10             THE COURT:  Yes.

11             MR. CLYMER:  Thank you.

12                    CROSS EXAMINATION

13 BY MR. CLYMER:

14    Q.  Ms. Flannigan, were you aware when the CCA video

15 was delivered to your office in response to a grand jury

16 subpoena that there was video of CCA in your office?

17    A.  Yes.

18    Q.  How did you become aware of that?

19    A.  I believe in conversations during trial prep for

20 *Dertinger*, there was conversation that spilled over to

21 the-- regarding the *Black* investigation.  So I was aware

22 that they were either going to subpoena or had

23 subpoenaed the video.

24    Q.  Did you know the details about what the grand

25 jury subpoena asked for from CCA?

1       A.   No.

2       Q.   When the video arrived, did you ever watch any of

3   the video?

4       A.   No.

5       Q.   Did you know how to use the technology necessary

6   to watch the video?

7       A.   I did not.

8       Q.   Did you ever watch any video of any attorney

9   meeting with an inmate at CCA-Leavenworth?

10      A.   I did not.

11      Q.   To your knowledge, did any Assistant United

12  States Attorney in this district ever watch any video of

13  any attorney meeting with an inmate at CCA Leavenworth?

14      A.   To my knowledge, nobody did.

15      Q.   Do you have any information that anyone intended

16  to subpoena from CCA-Leavenworth video of attorneys

17  meeting with inmates at CCA-Leavenworth?

18      A.   We did not intend to get attorney video.

19      Q.   Are you certain of that?

20      A.   I'm pretty certain of that, yes.

21      Q.   Did you or Ms. Tomasic, to your knowledge, ever

22  task Jeff Stokes of the Kansas Bureau of Investigation

23  to watch video of Jackie Rokusek meeting with her

24  client, Mr. Dertinger, at CCA?

25      A.   I know I did not.  And I do not believe Ms.

1    Tomasic did either.

2        Q.    Did you ever tell Ms. Rokusek that you had tasked

3    or were going to task Special Agent Stokes to watch

4    video of Ms. Rokusek meeting with her client, Richard

5    Dertinger?

6        A.    I never told her that.

7        Q.    To your knowledge, did Stokes ever watch any

8    video of Dertinger meeting with Rokusek?

9        A.    Not to my knowledge.

10       Q.    Did he ever tell you that he did?

11       A.    He never did.

12       Q.    Did anybody else ever tell you that he had done

13   so?

14       A.    No.

15       Q.    You testified earlier that during the course of

16   your career as an Assistant United States Attorney you

17   have obtained recordings of outgoing telephone calls

18   from CCA inmates as part of investigations and

19   prosecutions; is that correct?

20       A.    Correct.

21       Q.    Limiting yourself to say the last eight years,

22   2010 to present, can you estimate for us how many cases

23   you've done that in?

24       A.    Maybe three or four.

25       Q.    And you said sometimes you have multi-defendant

1  cases; is that right?

2      A.  Correct.

3      Q.  And when you have multi-defendant cases, is it

4  your-- and you're going to get audio-recordings from CCA

5  regarding one inmate's calls, do you get them for the

6  rest of the defendants in the case as well?

7      A.  I do not.

8      Q.  So you make decisions on a defendant-by-defendant

9  basis?

10     A.  Correct.

11     Q.  When you've done this within the last ten years,

12 to the best you can recall and characterize it, what was

13 your purpose for getting those audio-recordings?

14     A.  It's usually to further the investigation.

15 It's-- and it's usually closer in time to trial.  If

16 it's going to be a trial, we may get CCA calls to see if

17 they've communicated with a girlfriend or a mother and

18 made statements regarding their culpability.

19     Q.  In those cases when you've done that since 2010,

20 what method did you use to request the audio-recordings?

21     A.  I would usually contact-- well, sometimes the

22 agents would-- would communicate with me, asking if we

23 would get the calls.  And in those circumstances, I

24 would have them contact the marshals service to get the

25 calls, or I would call the marshals service and ask for

16-20032   USA v. Karl Carter (Black) REDACTED 10.12.18        2268

1  them, or e-mail them.

2      Q.   When you did that, were you ever doing it with

3  the intent to try to get attorney-inmate telephone

4  calls?

5      A.   No.

6      Q.   When you'd get the calls as part of your regular

7  practice when you do this, do you listen to the calls

8  yourself or do you have the agents do it?

9      A.   Typically I ask the agents to review them and

10 then provide me with the calls they think are most

11 relevant to our case.

12     Q.   When you do that, do you listen to the calls that

13 the agent deems not relevant to your case?

14     A.   I do not.

15     Q.   Do you give the agents instructions before they

16 listen to the recordings about what they should do if

17 they should inadvertently encounter an attorney-inmate

18 conversation?

19     A.   I don't usually have to do that.  Most of the

20 agents that I work with are experienced and they-- they

21 know not to listen to attorney-client calls.

22     Q.   Have you ever gotten a set of calls from

23 CCA-Leavenworth and instead of giving it to an agent to

24 listen to, instead listen to it yourself?

25     A.   I can recall one instance, yes.

1     Q.   And why-- why did you depart from your normal

2   practice in that instance?

3     A.   It was a local police officer who was my case

4   agent.

5     Q.   So you listened to the calls yourself?

6     A.   I did.

7     Q.   Do you remember the case that that occurred in?

8     A.   That was the *Theis* case.

9     Q.   The one you've testified about on direct

10  examination?

11    A.   Yes.

12    Q.   Now, at the time you listened to those calls in

13  *Theis*, had you already become aware of the case law

14  saying that a telephone call, subject to a warning that

15  it's recorded and monitored, waives the privilege?

16    A.   I was.

17    Q.   And you knew-- so you knew that there was case

18  law out there?

19    A.   I did.

20    Q.   Had you come across an attorney-inmate call

21  during the course of listening to the calls in that

22  case, would you have said, well, because of these cases,

23  I'm free to listen to this call?

24    A.   No.

25    Q.   Why not?

1     A.   Just because you can do something doesn't mean

2   that you should.  And I think-- I view-- in fact, in all

3   of my cases I do a cost-benefit analysis.  Is the

4   benefit of listening to this information going to

5   outweigh the cost of the litigation or the delay that it

6   might cause.

7          And for the-- in my case, I have never come--

8   I've never had a case in which I thought the benefit of

9   listening to an attorney call would-- would be

10  substantial enough that I should listen to it.

11    Q.   To your knowledge, other than the *Herrera-Zamora*

12  case and the *Reulet* case, do you know of any case in

13  your office when an Assistant U.S. Attorney has

14  intentionally listened to an attorney-inmate telephone

15  call?

16    A.   No.

17    Q.   Have you ever heard about it happening in your

18  office, other than those two cases?

19    A.   I have not.

20    Q.   In the cases you've done since 2010, has an agent

21  ever come to you and said to you, I've encountered an

22  attorney-client telephone call?

23    A.   Not that I recall.

24    Q.   When you were listening to the calls in the *Theis*

25  case, did you encounter an attorney-client telephone

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18      2271

1  call?

2      A.  There weren't any.

3      Q.  I'm going to show you what's been marked as

4  Exhibit 601A.  It's in evidence already.  I will ask you

5  to just look at it and familiarize yourself with it and

6  then I'll put it on the screen for you.

7      A.  Okay.

8      Q.  Thank you.

9              MR. CLYMER:  Thank you.

10  BY MR. CLYMER:

11      Q.  I'm showing you now what's been marked as

12  Exhibit 601A.  Do you see the names in the first column

13  on that document?

14      A.  I do.

15      Q.  Did you handle a case involving a defendant named

16  Marissa Goodnight?

17      A.  No.

18      Q.  Have you ever worked on that case, to your

19  knowledge?

20      A.  No.

21      Q.  Did you ever handle a case with a defendant named

22  Brett Williamson?

23      A.  I did.

24      Q.  Do you recall if you requested attorney-- I'm

25  sorry, requested inmate telephone calls in that case?

1     A.  We did.

2     Q.  Did you listen to any of those calls?

3     A.  Just the ones that the agents provided to me.

4     Q.  Did that case go to trial?

5     A.  It did.

6     Q.  Did you use some of the recordings as evidence

7  during that trial?

8     A.  We did.

9     Q.  So your-- strike that.

10        Were the attorneys on that case Jeremy Weis and

11  Robin Fowler?

12    A.  Mr. Williamson had several attorneys.  I don't

13  recall specifically Mr. Weis being on the case, but

14  obviously he must've been early on.  The attorney who

15  was going to represent him at trial was Mr. Fowler.

16    Q.  Do you remember if Mr. Fowler made any efforts in

17  that case to get inmate telephone calls from CCA of his

18  own client?

19    A.  I do not know.

20    Q.  The third case is the *Theis* case, which you've

21  talked about already.  Correct?

22    A.  Correct.

23    Q.  The fourth case is John Devosha.  Is that name

24  familiar to you?

25    A.  Yes, and I think it's Devosha.

1      Q.   Did you prosecute him?

2      A.   I did not.

3      Q.   Did you ever request inmate calls for him?

4      A.   I did not.

5      Q.   To your knowledge, have you ever used evidence

6   from an attorney-inmate telephone call in an

7   investigation or prosecution?

8      A.   I have not.

9      Q.   I want to ask you a couple of questions about the

10   trip to Erin Tomasic's house with the binders.  When you

11   got the binders, how long was it after Erin Tomasic's

12   termination?

13      A.   It was shortly after.  I don't remember if it was

14   that same day or a couple of days later.  I don't

15   recall.

16      Q.   And did you get the binders at Erin Tomasic's

17   request?

18      A.   Yes.

19      Q.   Did she make that request face-to-face or over

20   the telephone or in some other manner?

21      A.   I think it was over the phone.

22      Q.   And how did you get into Erin Tomasic's office?

23      A.   It was unlocked.

24      Q.   You took the binders?

25      A.   I did.

1    Q.   And when you took the binders, did you leave the

2    office immediately?

3    A.   It was at the end of the day.  I-- I didn't go

4    get them and keep them in my office.  It was-- at the

5    end of the day, I just went by her office and picked up

6    what she had asked for.

7    Q.   And what did you do then?

8    A.   And then I went to her house with them.

9    Q.   Did you go by yourself?

10   A.   I did as far as-- I did in my vehicle, I was by

11   myself, yes.

12   Q.   And you were on your way home at the time?

13   A.   I was.

14   Q.   And you stopped by her house on the way home?

15   A.   Correct.

16   Q.   And you dropped off the binders?

17   A.   Correct.

18   Q.   And you visited with Erin for a while?

19   A.   Just for a few minutes, yeah.

20   Q.   And then you went on home?

21   A.   Yes.

22   Q.   Was anybody else there?

23   A.   Not that I recall.

24            MR. CLYMER:  Nothing further, Your Honor.

25            THE COURT:  Any redirect?

1          MS. VANBEBBER:  No redirect, Your Honor.

2          THE COURT:  All right.  Mr. Bell.

3          MR. BELL:  Thank you, Your Honor.

4                    RECROSS EXAMINATION

5  BY MR. BELL:

6     Q.  Ms. Flannigan, you testified when Mr. Clymer was

7  asking you some questions about whether Agent Stokes had

8  ever watched any meetings between attorneys and clients

9  on the CCA video.  Do you remember those questions?

10    A.  I'm sorry, I'm not sure I understand your

11 question.

12    Q.  Mr. Clymer asked you whether, to your knowledge,

13 Agent Jeff Stokes watched any recorded meetings between

14 attorneys or clients on the CCA video.

15    A.  Are you talking during the *Dertinger* hearing?

16    Q.  I'm asking you about the questions Mr. Clymer

17 just asked you.

18    A.  Oh, I'm sorry.  I'm sorry, I-- I-- I heard

19 Mr. Cohen, I apologize.  Yes, I recall him-- his

20 questions.

21    Q.  And I think your answer was no, he didn't watch

22 any of the videos?

23    A.  Correct.

24    Q.  So let me show you what's been marked as

25 Exhibit 618.  Is Exhibit 618 an e-mail you sent to Scott

1    Rask on April 17th, 2017?

2        A.   Correct.

3                MR. BELL:  Move to admit Exhibit 618.

4                MR. CLYMER:  No objection.

5                THE COURT:  618 admitted.

6    BY MR. BELL:

7        Q.   The first sentence of this e-mail is that,

8    "Jeff--" and I assume Jeff refers to Jeff Stokes?

9        A.   Correct.

10       Q.   "-- never encountered or viewed any attorney room

11   video."

12       A.   That's what it says, yes.

13       Q.   And so-- and I assume that's what Agent Stokes

14   told you, that he had not seen any video from any of the

15   attorney rooms?

16       A.   Correct.

17       Q.   All right.  And so when Mr. Clymer asked you

18   whether Agent Stokes had seen any of those meetings, you

19   knew that Agent Stokes had told you that he hadn't even

20   seen any video from any of the rooms, so obviously he

21   hadn't seen any of the meetings?

22       A.   I'm sorry, I-- I thought Mr. Clymer asked me

23   whether or not Mr.-- Agent Stokes or anybody that I knew

24   of had actually viewed a meeting with Ms. Rokusek and

25   her client, and I said no.

1     Q.   All right.  Well, then let me--

2     A.   That was the question I thought I was answering.

3     Q.   Let me ask a broader question then.  To your

4  knowledge, did Agent Stokes watch any video of any

5  attorney meeting with their client?

6     A.   Not that I know of.

7     Q.   And, in fact, I think you just testified Agent

8  Stokes told you that he never even saw any video from

9  any of the attorney rooms?

10    A.   That's my understanding, yes.

11    Q.   So let me show you what's already been admitted

12  as Exhibit 611.  This is an e-mail from Jeff Stokes to

13  Chris Oakley on August 20th, 2016.  Mr. Stokes says,

14  "When I viewed the video, there were 16 views and the

15  attorney-client rooms were included in that."  Did I

16  read that correctly?

17    A.   That's what it says, yes.

18    Q.   So when he told you that he had never even seen

19  any video from any of the attorney-client rooms, does

20  that appear to be inconsistent with what he writes to

21  Mr. Oakley in August of 2016?

22    A.   I do not-- I interpreted his statements to me as

23  being, I never encountered any attorneys meeting with

24  any clients.  He had discussed seeing rooms where there

25  was a-- there were chairs and tables, but there was no

1   activity in those rooms.

2         My understanding of what he told me was he

3   couldn't tell whether those were attorney visitation

4   rooms for sure or not because they were essentially

5   empty rooms.

6      Q.   All right.  So when he tells you about this, he

7   says he doesn't know if the rooms he saw were

8   attorney-client meeting rooms or not?

9      A.   There was no activity in those rooms is what he

10  said.

11     Q.   And he tells you that he doesn't know if they

12  were attorney-client meeting rooms or not?

13     A.   I don't recall that specifically.

14     Q.   Would you agree that if that is what he told you,

15  it's inconsistent with what he told Mr. Oakley?

16     A.   I don't think that it's inconsistent, because I

17  think on the disk or on the hard drive that he's looking

18  at, because of the log, he would know that the attorney

19  rooms were on that media.

20     Q.   All right.  But he's not talking about the log in

21  this e-mail, he's talking about what he saw on his

22  screen.  Right?

23     A.   I don't-- I guess I'm not-- I don't know how to

24  interpret his e-mail.  I'm not trying to be difficult, I

25  just-- I'm not sure I'm understanding.

1     Q.   Would you agree that you told Mr. Rask, based on
2  your conversation with Agent Stokes, that Mr.-- that
3  Agent Stokes had never seen any video from the attorney
4  rooms?
5     A.   That's my-- those are my words, those aren't
6  Jeff's words.
7     Q.   And would you agree that, based on what
8  Mr. Stokes told Mr. Oakley, that he did, in fact, see
9  video from the attorney rooms?
10    A.   That's what he-- he said in his e-mail.
11         MR. BELL:  Thank you.  No further questions.
12  Oh, one moment, Your Honor, I'm sorry.
13         (Counsel confer).
14  BY MR. BELL:
15    Q.   Ms. Flannigan, Mr. Clymer asked you some
16  questions about call requests for a *Devosha* case, do you
17  remember those questions?
18    A.   Yes.
19    Q.   Do you remember being on an e-mail to Matt
20  Collins specifically requesting those calls?
21    A.   I do not recall that.
22    Q.   If there is an e-mail that you're on specifically
23  requesting those calls, would that mean, in fact, that
24  you were aware that the calls had been requested?
25    A.   Not necessarily.  I-- I guess I'm not sure.  I

1  mean, if there's an e-mail that I'm cc'd on, then I
2  would've been tangentially aware that calls were being
3  requested.
4      Q.  Were you a prosecutor on that case?
5      A.  I don't-- I don't-- no.  No, I was not, I don't
6  think so.
7      Q.  So if you were not a prosecutor on the case, yet
8  there is an e-mail that you're copied on requesting the
9  calls, why would that be?
10     A.  I don't know.
11     Q.  Do you remember assisting in any function or any
12  part of the prosecution of that case?
13     A.  I don't recall it.
14     Q.  Do you know who the prosecutor was?
15     A.  I do not.
16              MR. BELL:  No further questions.
17              THE COURT:  Anything more, Mr. Clymer?
18              MR. CLYMER:  No, Your Honor.
19              THE COURT:  All right.  May Ms. Flannigan be
20  excused?  All right.  You're excused.  All right.
21  You're ready with your next witness?
22              MS. VANBEBBER:  Your Honor, this might be a
23  good time to pause I guess, but I can't-- yes.
24              THE COURT:  I'm sorry, it's 11:00, you need
25  to get some more exhibits, is that what the issue--

 1                MS. VANBEBBER:  Yes, we've got an exhibit

 2     glitch.

 3                THE COURT:  All right.  How long a break do

 4     you think we should take?

 5                MS. VANBEBBER:  15, 20 minutes.

 6                THE COURT:  All right.  Let's be in recess

 7     until 11:20.  I think what we'll do is go a little later

 8     and take a little later of a lunch break, if that works.

 9                MR. CLYMER:  Your Honor, may I address the

10     Court very briefly?

11                THE COURT:  Yes.

12                MR. CLYMER:  I think the witness cleared up

13     the concern that caused me to go to sidebar, I apologize

14     for taking the Court's time on that.

15                THE COURT:  Not a problem.

16                MR. CLYMER:  And second, Your Honor, I've

17     told both counsel and the Special Master that we will be

18     calling a rebuttal witness for some brief testimony

19     today.

20                THE COURT:  Okay.  Well, hopefully we will

21     get it all done today.

22                MR. CLYMER:  That testimony shouldn't take

23     long from me.

24                THE COURT:  Okay.  All right.  We will be in

25     recess until 11:20.

```
 1                (Recess).

 2                THE COURT:  All right.  You can be seated.

 3   Call your next witness.

 4                MS. VANBEBBER:  I apologize, Your Honor, for

 5   that technical glitch.  We would call Debra Barnett.

 6                     DEBRA BARNETT,

 7   called as a witness on behalf of the Special Master,

 8   having first been duly sworn, testified as follows:

 9                   DIRECT EXAMINATION

10   BY MS. VANBEBBER:

11      Q.   Ms. Barnett, how long have you been with the U.S.

12   Attorney's Office?

13      A.   Since February of 1995.

14      Q.   Have you always been on the criminal side of the

15   house?

16      A.   Yes.

17      Q.   Tell me when you got promoted to be criminal

18   chief of the District of Kansas, U.S. Attorney's Office.

19      A.   It was in February of 2016.

20      Q.   And you office in Wichita?

21      A.   Yes.

22      Q.   Who preceded you in that job?

23      A.   Jared Maag.

24      Q.   Is he still with the office as well?

25      A.   Yes.
```

1    Q.  Are you still the criminal chief?

2    A.  No.

3    Q.  When did you step down?

4    A.  In February of this year.

5    Q.  2018?

6    A.  Yes.

7    Q.  Why did you step down?

8    A.  I--

9         MR. CLYMER:  You can answer the question.

10        THE WITNESS:  Okay.  I didn't want to do the

11   criminal chief position anymore, handle it anymore.

12   BY MS. VANBEBBER:

13   Q.  So who succeeded you?

14   A.  Duston Slinkard.

15   Q.  All right.  Does the criminal chief carry a

16   caseload or is she fully employed with supervisory

17   duties in the three offices?

18   A.  I think it really depends on the criminal chief,

19   and I can really only talk about my time while I was the

20   criminal chief.  I didn't carry a full caseload, I think

21   I maintained a couple of cases on my-- my docket sheet,

22   but I didn't maintain a full caseload.

23   Q.  Did you really-- routinely supervise the criminal

24   coordinators in each of the three offices?

25   A.  What do you mean by "routinely supervise"?

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18      2284

1    Q.   Did you have regular visiting times, did you go

2    periodically, did you never go see them?

3    A.   Yes, we had supervisory meetings and we

4    communicated either by phone or e-mail.

5    Q.   Did you question why Kim Flannigan assigned a

6    Special Assistant U.S. Attorney with almost no trial

7    experience to one of the most complex multi-defendant

8    cases in the district?

9    A.   Are you referring to the *Black* case?

10   Q.   Yes.

11   A.   There was a point in time when I questioned why

12   Erin Tomasic was assigned to that case.  I don't know

13   that I would characterize it as the most complex case in

14   the office, but I did question why Erin was assigned to

15   the case, yes.

16   Q.   And did you receive a satisfactory answer?

17   A.   No.

18   Q.   Do you regularly in your cases obtain inmate

19   calls to help you complete your investigations?

20   A.   No.

21   Q.   Why not?

22   A.   I don't need them to complete my investigations.

23   And candidly, I-- I feel like they're confidential

24   communications and that I shouldn't try to access them

25   or use them.

1     Q.   Do you have a type of a caseload that you would

2   need to do that very often anyway?

3     A.   When I was a line AUSA and as a criminal

4   coordinator, I have cases now.  I have cases where

5   people are maintained in custody and use phones.  We--

6   there are cases where agents will get phone calls, but

7   certainly not calls with attorneys.

8     Q.   Have you once in a while come into possession of

9   something you suspected was attorney-client

10   communication?

11     A.   Do you mean in the phone call sense?

12     Q.   Yes.

13     A.   No.  Let me make sure I-- I'm sorry, let me make

14   sure.  You're asking have I come into contact with

15   things in my cases through phone calls?

16     Q.   Uh-huh.

17     A.   No.

18     Q.   I'm going to ask you to think about August 9th,

19   2016.  Do you recall what event-- what event was here

20   that day?

21     A.   No.

22     Q.   Do you remember that that was the day that you

23   went to court in front of Judge Robinson concerning the

24   CCA audio-- excuse me, visual?

25     A.   I don't remember the date, but I do remember the

1    first hearing that we had that was initiated.

2        Q.  All right.  Now, at the time that you went to the

3    first hearing in the *Black* case that you were-- had

4    entered an appearance on, you knew that Erin Tomasic and

5    Chris Oakley were the two lawyers on that case.  Right?

6        A.  Yes.

7        Q.  And when you decided to insert yourself into that

8    case on the 6th of August, did you tell them you were

9    going to do that before you did it?

10       A.  Well, the decision to step into the case and

11   enter my appearance wasn't my decision alone.  It was

12   made in consultation with other supervision in the

13   office and--

14       Q.  What do you mean "other supervision"?

15       A.  Well, as criminal chief, there are people that

16   are above me that I'm supervised by.  And if there's a

17   first assistant like Mr. Beall, he was my direct

18   supervisor at the time.  And during the short time that

19   Mr. Grissom was in the office after I became the

20   criminal chief, he was above Mr. Beall, so--

21       Q.  So did you consult with one or both of them

22   before you entered your appearance in the *Black* case?

23       A.  With Mr. Beall, yes.

24       Q.  And Mr. Beall later became the acting-- well,

25   first the interim and then the acting U.S. Attorney--

1      A.  Yes.

2      Q.  -- didn't he?  And he kept his position as first

3  assistant while he served in that temporary position,

4  didn't he?

5      A.  For a time.  And then eventually Ms. Metzger

6  became the first assistant.

7      Q.  Did-- did you speak at all with the two assigned

8  attorneys on that day, August 9th?

9      A.  I don't recall if I talked to them specifically

10  that day.  I know that when the Public Defender's Office

11  filed their initial motion, that there was a conference

12  call at some point with myself and a number of the

13  attorneys up here in Kansas City.

14      Q.  Well, let's go back-- let's go back to the 6th.

15  You enter your appearance, needless to say people are

16  surprised because they don't know why you're entering

17  your appearance.  Right?  Did you not get a bunch of

18  e-mail traffic--

19              MR. CLYMER:  I'm going to object to people

20  were surprised because she entered her appearance.

21  There's no evidence of that in the record.

22              THE COURT:  All right.  Reframe your

23  question.

24  BY MS. VANBEBBER:

25      Q.  Did you have an-- have e-mail traffic that

1    indicated that the other assistants in Kansas City,

2    Kansas, didn't know why you were entering your

3    appearance?

4        A.  I don't recall if I did or not.

5        Q.  Did you have a lot of e-mail traffic that weekend

6    with them, with Mr. Rask in particular?

7        A.  That weekend?

8        Q.  Uh-huh.

9        A.  I don't recall, I'm sure we had e-mail traffic

10   about it.

11       Q.  Did you get an e-mail from Rask, or a series of

12   e-mails from Mr. Rask, saying that there was a team of

13   prosecutors in the Kansas City, Kansas office that would

14   pull together on August the 8th a memorandum that you

15   could use to familiarize yourself with the facts of the

16   case?

17       A.  I don't recall when that occurred, but I do

18   recall Mr. Rask indicating that there were a group of

19   AUSAs that would be willing to work on pleadings.

20       Q.  Do you recall that they actually did pull

21   something together that evening of August the 8th?

22       A.  And would that have been the night before the

23   hearing?

24       Q.  Yes.

25       A.  I don't recall.  They may have.

1    Q.  Do you recall that they-- they asked you did you

2    want-- do you want to see this, and that your response

3    was no, stand down for now?

4    A.  I don't recall that.  I do recall that they

5    wanted me to come in and fight that day with the Court

6    and the Public Defender's Office, and I didn't feel like

7    we were at a point where we should come in and do that.

8    Q.  So you came-- you drove on down to Kansas City

9    and-- or up to Kansas City from Wichita and entered the

10   courtroom.  Right?

11   A.  Yes.

12   Q.  Did you feel that you were without any-- enough

13   information to be able to articulate to the Court what

14   the facts of the case were or what the problems with the

15   case were?

16   A.  I felt that I had adequate information at that

17   point in time to address the concerns that needed to be

18   brought before the Court on that date.

19   Q.  And where did you obtain that information?

20   A.  In conversations with Ms. Brannon, the Federal

21   Public Defender, in communicating with Mr. Beall,

22   Mr. Slinkard in our office.  And I'm sure there was

23   e-mail traffic and information from Kansas City

24   attorneys, and I reviewed that.

25   Q.  But you refused to review the all-day-long

1    project that they had done to try to get you educated on

2    the case, didn't you?

3        A.   I don't know what they submitted, as I sit here

4    today.  I am certainly willing to look at anything that

5    you'd like for me to look at to refresh my recollection.

6            I will tell you that their position in Kansas

7    City was they wanted me to come in and oppose the Public

8    Defender coming into the proceedings and trying to

9    protect potentially privileged information of their

10   clients.  And I was not willing to do that because

11   personally I felt like it needed to be resolved whether

12   or not we had their privileged property and whether or

13   not we should have it and how we should handle it.

14       Q.   And the arguably privileged property was

15   audio/visuals, right?  Videotapes and hard drives?

16       A.   Videotapes--

17       Q.   Not tapes, they're not tapes anymore.  VCRs.

18       A.   I don't know.  They were something like a DVR,

19   they were kind of a unique-looking thing.  And then I

20   can't remember if at that point we were talking about

21   telephone calls or if that came up later.  But I think

22   the DVRs were the primary thing at that point.

23       Q.   And isn't that the day that the judge impounded

24   two of those hard drives?

25       A.   I-- that's a long time ago.  But, as I recall, if

1  that's the correct date, we provided or turned over all
2  of the DVRs.  And I think there were six.  There were
3  two that there were primary concerns about what was on
4  them, but I think there was a total of six.

5     Q.  All right.  Now, did you-- you said you did not
6  speak with either Oakley or Tomasic that day, August the
7  9th?

8     A.  No, I don't recall whether I did.

9     Q.  Do you-- do you recall telling-- asking Mr. Beall
10  to tell them that they were not to be in the courtroom?

11     A.  No.

12     Q.  You don't remember that you did not want Erin
13  Tomasic in that courtroom?

14     A.  No.

15     Q.  That just slipped your mind?

16     A.  I don't recall talking to Mr. Beall specifically
17  about that.  I do recall that there was-- and I don't
18  remember what day it was, but there was one day before a
19  hearing where Mr. Beall, Mr. Slinkard and I met with
20  Erin Tomasic and Mr. Rask, and it was-- she was told
21  that she would be encouraged not to come up - she wasn't
22  ordered - but not to come up.

23         And when she inquired as to why she shouldn't be
24  sitting in the courtroom, it was explained to her that
25  that-- it would be cruel for her to have to sit there

1   and listen to the things that were going to be said
2   about the way she had handled the case.  And she made
3   the decision on her own then not to come up, but she was
4   never ordered not to come up to court.
5       Q.  You just indicated correctly that there was
6   another hearing on August the 16th.  Correct?
7       A.  I don't know if August 16th was the date or not.
8       Q.  If the record reflects that, do you have any
9   reason to doubt it?
10      A.  I don't-- I don't recall the dates.
11      Q.  Do you recall that, on whatever date it was,
12  there were a number of concerns that the judge had and
13  that she ordered that all of the audio materials that
14  had been gathered for the *Black* case be turned in as
15  well?
16      A.  I remember at a hearing that, yes, that was a
17  concern and that was ordered.
18      Q.  And then a couple of days later, she entered an
19  order to that effect, didn't she?
20      A.  I don't remember when the order-- written order
21  was entered.
22      Q.  Pardon me?
23      A.  I don't remember when the written order was
24  entered.
25      Q.  But there was one.  Correct?

1    A.   I recall that there was one.

2    Q.   And shortly after that, you and a number of other

3  Assistant U.S. Attorneys met in Topeka to discuss how

4  you were going to comply with the judge's order.  Right?

5    A.   There was a meeting, I don't know when it fell in

6  terms of these hearings, just because I-- I'm not good

7  with dates right now without a calendar.  But there was

8  a meeting in Topeka in the morning where we were

9  discussing the order and how it would be applied to the

10 *Black* case and potentially other cases.

11   Q.   Were you there?

12   A.   Yes.

13   Q.   At the meeting?

14   A.   Yes.

15   Q.   Was Tomasic there at the meeting?

16   A.   Yes.

17   Q.   And a number of others?

18   A.   Yes.

19   Q.   Who was it who decided at that meeting that there

20 would be a very narrow interpretation of the Court's

21 order limiting it to calls collected only in the *Black*

22 case and not in other cases?

23   A.   It was a collective decision by all of us sitting

24 there, including the other supervisors in the meeting,

25 based upon the information that was provided to us by

1   Kim Flannigan, Erin Tomasic, and Chris Oakley.

2       Q.  You would-- you would have the authority in that

3   meeting to make the call if it-- if you couldn't agree.

4   Right?

5       A.  If Mr. Beall hadn't been there, and I don't

6   remember whether he was there or not.

7       Q.  So you were in agreement with what you say was a

8   collective decision?

9       A.  I was in agreement based upon what I was told at

10  that time, but I later changed my mind based upon what I

11  learned after that meeting.  And, frankly, I learned

12  information after that meeting that I should have been

13  told at that specific meeting and I was not told,

14  deliberately in my opinion.

15      Q.  Do you-- do you recall that there were at least

16  some who said it should be interpreted more broadly

17  because of the confluence of the phone calls in more

18  than one case, the same calls in *Rapp* as were going to

19  come in in *Black*?

20      A.  No, that discussion didn't happen at that

21  meeting.  And that's what I'm talking about.  At that

22  specific meeting that we had in Topeka, looking back on

23  it now, I realize that we were being given very limited

24  information by the people from Kansas City about what

25  was involved in how they wanted to interpret the order.

1    They wanted it interpreted extremely narrowly, they

2    wanted it to only apply to the *Black* calls.

3         After that, I became aware of the *Dertinger-Rapp*

4    case and the fact that calls had been obtained in that

5    case by Ms. Tomasic and Ms. Flannigan as part of that

6    investigation.  Eventually I became aware that there was

7    a subset of calls that were collected in the *Rapp* case

8    that were some of the exact same calls that were

9    collected in *Black*.  And when I became aware of that, my

10   position was that it's all then impounded, it all has to

11   be held back.

12        Ms. Flannigan and Ms. Tomasic did not want to do

13   that.  They wanted to argue with me, and did, about

14   whether or not they could use those calls and keep them

15   in *Dertinger* and *Rapp.*  And I told them that they either

16   were to turn those calls in *Dertinger* and *Rapp* over to

17   Judge Robinson and the Court, or they had to go to their

18   judge in *Dertinger* and *Rapp* and tell the judge about

19   this, tell the judge about Judge Robinson's decision in

20   this case, and they had to ask the Court what they

21   should do and let the Court go to Judge Robinson and

22   work it out.

23   Q.  Do you recall that it was Tomasic who suggested

24   at the meeting that the best way to handle the

25   interpretation of the order would be to file something

1    and ask the Court to clarify the limits that she

2    intended?

3        A.   No, I do not recall her saying that.

4        Q.   Do you recall going to another hearing in the

5    *Black* case on September the 7th of 2016?

6        A.   I recall the hearing in September.

7        Q.   And the-- it was ostensibly called to deal with

8    your joint motion with the Federal Public Defender to

9    appoint a Special Master?

10       A.   Yes.

11       Q.   And was it at that hearing that the judge

12   volunteered to the participants the incidents of

13   August 25th when Tomasic entered her chambers after

14   hours?

15       A.   Judge Robinson spoke about what happened at-- I

16   think it was towards the end of the hearing.

17       Q.   By September the 7th, the time that passed

18   between August 25th when the entry occurred and the next

19   hearing, you had been given quite a lot of information

20   about that event, and you already knew about it because

21   you had participated in the call with Tomasic,

22   Ms. Metzger and Kim Flannigan as to what to do about it.

23   Right?

24       A.   Once again, I had been given limited information

25   by Ms. Flannigan and Ms. Tomasic about what had taken

1    place.  And, quite candidly, at that hearing, if you

2    could've read my mind, you would've seen in my mind me

3    falling out of my chair.  Because when Judge Robinson

4    talked about some of the facts and what had occurred, I

5    was not aware of some of those things until Judge

6    Robinson disclosed it in court.

7         After that, we went back up and we met with Ms.

8    Tomasic and we asked her about one of the things

9    specifically that Judge Robinson had referenced.  And

10   she then told us, yes, that, in fact, she had made a

11   certain comment to I believe it was Judge Robinson's

12   clerk, and she laughed it off.  I can assure you that I

13   was appalled and I was upset that we had not been told

14   about that before.

15   Q.  Well, you do recall that before Erin Tomasic went

16   upstairs after hours, that you-- the four of you got

17   together and decided what your course of action was

18   going to be?

19   A.  I-- from my perspective, Ms.-- I thought we had

20   decided it, but I can assure you that it was not-- it

21   occurred in a very different way than what I believe the

22   instructions were for giving those materials over to the

23   Court.

24        In other words, from my opinion, Ms. Flannigan

25   and Ms. Tomasic took it upon themselves to get the

1    marshals to unlock a door.  Ms. Metzger and I were not

2    told about that beforehand.  We were not asked about

3    that, and I would not have authorized that.

4        Q.  You had a lot of other options.  You could've

5    e-mailed the judge, you could've gone up-- told her to

6    go upstairs and buzz and see who she could get into the

7    building-- or she could get into the fifth floor.  You

8    could have filed a motion for an extension of time.  You

9    could've read the orders, you could've read the calendar

10    order and seen that this was not the last day for a

11    delivery, couldn't you?

12        A.  Ms. Metzger and I actually suggested other

13    options to Ms. Flannigan and Ms. Tomasic, including

14    e-mailing the Court and the defense attorneys that

15    night, advising them that they had come across

16    additional materials, can we produce them tomorrow, will

17    this create a problem?

18            Ms. Tomasic and Ms. Flannigan said that they

19    didn't want to do that because they believed that they

20    would get in a lot of trouble for it if they did it that

21    way.  We suggested does the clerk's office or someplace

22    in the courthouse have a mail drop, like the courthouse

23    in Wichita has, that they could put the information in a

24    mail drop?  No, they assured us that that didn't exist.

25            So then the suggestion was made about sliding an

1   envelope with the materials under the door.  They

2   assured both of us repeatedly on the phone call that,

3   yes, they could do that.  Ms. Metzger was concerned at

4   one point about whether or not they could do it so

5   completely that no one could fish it out and the

6   envelope would not be visible to anyone in the-- the

7   corridor.  They assured us that that could happen with

8   the materials that they were going to be producing.

9        That goes back to what I mentioned before.  When

10  Judge Robinson said in court at the hearing that there

11  was no possible way for those materials to fit under the

12  door, I was stunned by that, because we were assured

13  that they could.  They did not tell us they were going

14  to unlock a door.

15       With regard to the buzzer, I don't work up here

16  on a regular basis in the court system, so I am not

17  familiar with the-- the system of getting in.  But

18  candidly, in my own personal practice, if I had learned

19  that I had missed a deadline on something, I would

20  e-mail the participants in it and ask for forgiveness,

21  ask-- apologize and ask how they want me to handle it,

22  but I would not get a marshal to unlock a door to

23  somebody else's office.

24       In addition, if I can add one more thing.  We had

25  also asked Ms. Tomasic to prepare a cover letter for the

1  materials, and Ms. Metzger had specified that she wanted

2  it to be very specific, outlining what was in it.  After

3  all of this occurred, I eventually got around to asking

4  for the cover letter, because I wanted to see what the

5  materials were and basically to confirm that I had been

6  misled by Ms. Tomasic and Ms. Flannigan about whether

7  the materials could slide under the door.

8        Eventually we saw something that they believed

9  might be the cover letter for these materials.  It was

10 not specific.  And so I still to this day have no idea

11 what was in that package and what was turned over to the

12 Court.

13    Q.  You do know that it was left with the law clerk

14 who was-- who was there?

15    A.  We were told that Ms. Tomasic entered the first--

16 a first door with the marshal.

17    Q.  Would you just answer the question I asked?  Were

18 you aware that the law clerk was there and took the

19 materials?

20    A.  Yes.

21    Q.  And that the letter was on top of the-- of the

22 envelope?

23    A.  I don't know.

24    Q.  Because the Court had custody of that, that

25 packet and the letter.  Right?

1    A.  I was told that the package was turned over to

2    the Court's clerk.

3    Q.  There were four-- four people on the phone, you

4    could've been very-- you were in charge, you were the

5    criminal chief.  Right?

6    A.  Yes.

7    Q.  You've got a brand-new special-- or not

8    brand-new, but pretty-- with very limited experience

9    Special U.S. Attorney and the criminal coordinator, the

10   civil chief, and you.  Right?

11   A.  I don't agree with the characterization that Erin

12   was-- or Ms. Tomasic was limited in her experience,

13   especially in reading court orders that set deadlines.

14   Q.  Tell me how what-- how many trials she'd had

15   before she got involved in *Black.*

16   A.  I don't know.

17   Q.  Then you don't know the extent of her experience

18   is what you're telling me.  Right?

19   A.  It's my understanding that she clerked for two

20   courts, which would give her the ability to interpret a

21   deadline that is given in a case and to count it

22   correctly on the calendar.

23   Q.  This is the same order you people had been

24   talking about in Topeka when you decided to see how to

25   implement it.  Didn't you read it then?

1        A.   No.

2        Q.   You didn't read the order, you didn't see what

3   the timeline was?

4        A.   I trusted the attorneys to handle it and to tell

5   me the accurate timeline for the order.

6        Q.   Counting to seven is not too hard, is it?

7        A.   I'm sorry, what?

8        Q.   Counting to seven is not too hard, is it?

9        A.   No.

10       Q.   That's all you had to do, to glance at that order

11  to see how-- when your deadline was going to be.  Didn't

12  you want to know when your deadline was, regardless of

13  what everybody else thought?

14            MR. CLYMER:  Objection, argumentative.

15            THE COURT:  Overruled.

16            THE WITNESS:  I had no reason to question

17  Ms. Tomasic's ability to count to seven and to calculate

18  when the due date was for those materials.  So when she

19  contacted Ms. Metzger and I about it that day, I took

20  her at her word, that she knew what the deadline was for

21  those materials.

22  BY MS. VANBEBBER:

23       Q.   You didn't go over-- you didn't have a copy of

24  the order?

25       A.   No.

1      Q.  You began suggesting to Mr. Beall on October the

2  31st that he probably ought to consider firing Erin

3  Tomasic.  Right?

4              THE WITNESS:  Am I authorized to--

5              MR. CLYMER:  I'm not sure she's got

6  authority to answer this question.

7              MS. VANBEBBER:  It's in evidence.

8              MR. CLYMER:  That may be true, but this

9  witness doesn't have authority to testify about issues

10  of a personnel matter.

11             MS. VANBEBBER:  Oh, authority, okay.  You're

12  saying-- you're saying that she doesn't have authority

13  to testify about when she wrote a letter to her boss

14  suggesting the firing of another employee?

15             MR. CLYMER:  (Nods head up and down).

16             THE COURT:  Is that exhibit in evidence?

17             MS. VANBEBBER:  Pardon?

18             THE COURT:  Is that exhibit in evidence?

19             MR. CLYMER:  I believe the witness can

20  authenticate the e-mail, Your Honor, but she has no--

21             MS. VANBEBBER:  I'm going to just ask her to

22  look at it and read the last sentence.  No, this is not

23  in evidence, Your Honor.  It's the one I gave you this

24  morning, 1166.

25             (Counsel confer).

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18      2304

1   BY MS. VANBEBBER:

2      Q.  Now that you've had a chance to look at it, does

3   that refresh your recollection?

4           MR. CLYMER:  The witness can authenticate

5   the document, Your Honor, but she can't testify about a

6   personnel matter.

7           THE COURT:  All right.  Do you want to have

8   her authenticate it and offer it into evidence?

9           MS. VANBEBBER:  Yes.

10          THE COURT:  What's the exhibit number?

11          MS. VANBEBBER:  This is Exhibit No. 1166,

12  which was provided to counsel this morning.  It is

13  amongst the group of those that are supposedly

14  authenticated and-- as admissible, subject to relevance.

15  I would move the exhibit into evidence.

16          MS. BRANNON:  No objection.

17          THE COURT:  Exhibit 1166?  Mr. Clymer?

18          MR. CLYMER:  No objection.

19          THE COURT:  1166 admitted.  All right.

20  She's not authorized to answer questions about it, but

21  it is a matter of evidence at this point.  If you want

22  to publish it for the Court to read it, I can do that.

23          MS. VANBEBBER:  Your Honor, we'll just

24  establish that it's--

25          MR. CLYMER:  And to be clear, Your Honor,

1    there is much on the exhibit that she may be able to

2    testify about, but the specific inquiry is about a

3    matter that she's not authorized to disclose information

4    on.

5              THE COURT:  And that is about discussions

6    between her and Beall about--

7              MR. CLYMER:  A personnel matter about

8    somebody else who has Privacy Act rights.

9              THE COURT:  Okay.  Go ahead and publish it

10   and I'll read it and then we can move on.

11             THE WITNESS:  May I ask, is this water for

12   me or is this someone else's?

13             MS. BRANNON:  I believe it's Ms.

14   Flannigan's.

15             THE COURT:  Is there another cup we can-- or

16   is there a pitcher there?

17             THE WITNESS:  Sorry.

18             THE COURT:  All right.  I'm sorry.

19   BY MS. VANBEBBER:

20     Q.  Okay.  Why don't you look at the very--

21             THE COURT:  Can you make it smaller?  I

22   can't really read it.  What is it, 1166?  I'll try to--

23   do I have that?

24             COURTROOM DEPUTY:  You should.  There you

25   go.

1          THE COURT:  Oh, okay.

2    BY MS. VANBEBBER:

3      Q.   This letter indicates that you-- this happened to

4    be a day that you met with the Special Master.  Right?

5      A.   It's an e-mail that I wrote on December 10th

6    explaining to Mr. Beall a meeting that I had with the

7    Special Master the previous week.  And then I think at

8    the bottom of it I talk about a meeting in Kansas City

9    with Kansas City AUSAs.

10     Q.   Look at No. 2.  You say attorneys, without naming

11   them, have come forward to complain about people in the

12   Kansas City, Kansas office; is that correct?

13     A.   Actually I didn't name them because I didn't know

14   who the attorneys were.  This was the Special Master who

15   explained to me that he had talked to attorneys who--

16     Q.   I see.  Are you familiar with all four of those

17   people?

18     A.   Yes.

19     Q.   Then did the Special Master also tell you that no

20   one said anything complimentary about Erin Tomasic?

21     A.   Yes.

22     Q.   And he also told you that no attorney spoke ill

23   about yourself; is that right?

24     A.   He did.

25     Q.   So at this point you're beginning to establish a

1    trust relationship with the Special Master, would you

2    say?

3       A.  I was developing a working relationship with him,

4    yes.

5       Q.  Did that involve you trusting each other?

6       A.  I can only speak for my feelings.  I trusted him.

7       Q.  Are you aware that Erin Tomasic was fired by Tom

8    Beall in May of 2017?

9               MR. CLYMER:  You can answer.

10              THE WITNESS:  Yes.

11   BY MS. VANBEBBER:

12      Q.  Did you have occasion to ever speak to Erin

13   Tomasic after she was fired?

14      A.  No.

15      Q.  I want to direct your attention now to an

16   April 30th notice from Ms. Brannon.  Now, that has been

17   also established this morning.

18              MS. BRANNON:  I'm sorry, was that August or

19   April?

20              MS. VANBEBBER:  Just one second and I'll

21   tell you here, I'll just get it.  This is another one of

22   the group that's been-- that's admissible but for

23   relevance.

24              MR. CLYMER:  What's the exhibit number?

25              MS. VANBEBBER:  It is 1176, and also there

 1    will be 1177.

 2              MR. CLYMER:  We have an 1176.

 3              MS. VANBEBBER:  That's right.  This is

 4    another one of the documents that is admissible by

 5    stipulation unless you have a relevance objection.

 6              MR. CLYMER:  In other words, counsel, is--

 7              MS. VANBEBBER:  You provided it--

 8              MR. CLYMER:  -- 1176 a copy of somebody

 9    else's exhibit?

10              MS. VANBEBBER:  It might be.  I don't know.

11              MR. CLYMER:  Because I-- I don't know how

12    this is admitted because you just gave it to me this

13    morning.

14              MS. VANBEBBER:  Yes.  And it's-- you

15    provided it to us, and I believe we have a stipulation

16    that they're admissible unless they're irrelevant.

17              MR. CLYMER:  Your Honor, I didn't stipulate

18    to documents I hadn't seen yet.

19              THE COURT:  This is-- well, okay, first of

20    all, what's the exhibit number?

21              MS. VANBEBBER:  1176, it was provided to us

22    by the government.

23              THE COURT:  When?

24              MS. BRANNON:  Judge, if it helps, it's

25    already been admitted as 589 as well.

1          MR. CLYMER:  Then no objection, Your Honor.

2          THE COURT:  All right.  Let's-- it's the

3   same as Exhibit 589.  All right.  1176 admitted.

4   BY MS. VANBEBBER:

5      Q.  Do you recall getting this e-mail from Melody

6   Brannon on August the 30th, 2016?

7      A.  The specific one-- it looks to me like this is

8   part of an e-mail chain.  But the one you're showing me

9   is on Tuesday, August 30th at 5:58 p.m.  And yes, I do

10  recall receiving that from Ms. Brannon.

11     Q.  Right.  That is the first in the e-mail chain.

12  After you received this, apparently you had a question.

13  Question mark.  E-mail-- I'm sorry.  E-mail August 31st

14  from you to Emily Metzger and others, question mark,

15  question mark?

16     A.  Is-- below that, is that the end of the page?  I

17  mean, it's--

18     Q.  Yes.

19     A.  Can I see the whole thing, please?

20     Q.  That's it.  That's all we have at least.

21     A.  May I see the entire exhibit, please?

22     Q.  Certainly.

23          MS. BRANNON:  If it helps, there is a

24  notebook that has 589 in it.

25          THE WITNESS:  589?  Okay.  Okay.  I'm

1   looking at the copy in the notebook as Defendant's

2   Exhibit 589.  And at the bottom of the first page there

3   is an e-mail from me to Ms. Metzger, Mr. Beall and

4   Mr. Slinkard with three question marks, yes.

5   BY MS. VANBEBBER:

6       Q.   And you received an e-mail back from Emily

7   Metzger that same day right away that explains what she

8   understands about Ms. Brannon's e-mail to you?

9       A.   Yes, she wrote me back.

10      Q.   She's assuring you, isn't she, that she doesn't

11  think any data is going to be lost by this refreshment

12  of the computers in the office.  Right?

13      A.   Yes.

14      Q.   And then the next in line is an e-mail from

15  Duston Slinkard who-- going to all of you Wednesday,

16  August the 31st again, and it says to "Check with David

17  to make sure, but I understood that we would be

18  retaining all hard drives from the old computers."  Who

19  is David?

20      A.   David Steeby.

21      Q.   That's your IT guy?

22      A.   Yes.

23      Q.   And then Ms. Metzger comes back and says, "I

24  agree.  This is just Melody being more cautious."

25           You were on notice at that point that there was a

1  concern with the Federal Public Defender that something

2  could go wrong if the computers were refreshed in the

3  Kansas City, Kansas office.  Right?

4      A.  Yes.

5      Q.  Did you check-- did you check with David?

6      A.  Did I personally?  No.  Someone else was handling

7  that.

8      Q.  What do you mean?  Who's-- who is someone else?

9      A.  Well, Ms. Metzger knew about this and was

10  addressing it, as well as Mr. Slinkard, both in a

11  limited context, but I relied upon them to address this.

12      Q.  I would now draw everybody's attention to Special

13  Master's Exhibit 1177, which should be right--

14              MR. CLYMER:  I'm fine.

15              MS. VANBEBBER:  And ask that it be admitted.

16              MR. CLYMER:  No objection.

17              THE COURT:  1177 admitted.

18  BY MS. VANBEBBER:

19      Q.  Do you recognize Mr. Seubert's name?

20      A.  I know who Mr. Seubert is.

21      Q.  And he is e-mailing you concerning the hard

22  drives that he has turned over that have been impounded

23  by the Court.  Correct?

24      A.  May I see the whole e-mail, please?

25              THE COURT:  The whole page?  Is there an

 1    extra copy?

 2              THE WITNESS:  Is it in this notebook, Ms.

 3    Brannon?  Thank you.

 4              Okay.  Thank you.  What was your question?

 5    BY MS. VANBEBBER:

 6       Q.  I haven't-- didn't pose one yet.  I would just

 7    like to have you look at the-- the last sentence on

 8    Paragraph 2.  It says, "Should these drives or the

 9    copies turned over by the USAO become lost or damaged,

10    we will not possess any CCA video to the investigation."

11       A.  I'm trying to find that part of the e-mail, I'm

12    sorry.

13       Q.  The second paragraph, Mr.-- of Mr. Seubert's

14    message.

15       A.  In the 11:06 a.m. e-mail?

16       Q.  Yes.

17       A.  Okay.  I'm looking at it.

18       Q.  Did that not put you on notice even before Ms.

19    Brannon's concern that you'd better be very careful with

20    those hard drives?

21              MR. CLYMER:  Your Honor, I'm going to object

22    because Ms. Brannon's e-mail dealt with a different

23    computer, it didn't deal with these hard drives.

24              THE COURT:  All right.  You can cross

25    examine and clarify if you need to.

1              THE WITNESS:  All right.  These were the

2    DVRs that were collected from CCA.  I took Ms. Brannon's

3    concern in her e-mail, the e-mail we discussed a while

4    ago, it's-- I have it up here as 589, that had to do

5    with the hard drives in the computers that were within

6    our office.

7              We were going through a computer refresh in

8    our district at that point, and I took it that there was

9    a concern about losing any potential evidence that might

10   exist on our internal computers, not-- Mr. Seubert's

11   e-mail is about DVRs collected from CCA, not our office.

12   BY MS. VANBEBBER:

13      Q.  You knew from Mr. Seubert's e-mail that if

14   anything happened to those hard drives, there would be

15   no evidence left, correct--

16      A.  I--

17      Q.  -- for openers?  And then-- correct?

18              MS. REPORTER:  I'm sorry, I didn't hear your

19   answer.

20              THE WITNESS:  I'm sorry, I think I

21   interrupted her.  I don't know if her question was

22   finished or not.

23   BY MS. VANBEBBER:

24      Q.  We'll just ask you that piece of it.  You knew

25   from Mr. Seubert's e-mail if anything happened to the

1  hard drives that there would be no evidence left from

2  CCA's equipment?

3    A.  I knew that there was a concern if the hard

4  drives were turned over to the Court and the Court lost

5  them that, yes, we would not have evidence of them.  But

6  I frankly-- I trusted the Court.  I did not expect or

7  think that the Court would lose any evidence.

8    Q.  And Ms. Brannon's later e-mail goes to the DVR

9  information that was stored on your own computers at

10  that point.  Correct?

11    A.  I don't know whether her reference in her e-mail

12  was to that or whether it had to do with just an overall

13  concern of wanting to-- if we had gotten phone calls.  I

14  can't remember when phone calls came into this as

15  opposed to the videos or the DVRs.

16        But my overall concern with Ms. Brannon's e-mail

17  and what I was trying to, you know, look at in that

18  situation with supervision was different than what I

19  felt I was being asked to consider in Mr. Seubert's

20  e-mail.

21    Q.  Mr. Steeby would've been the effective custodian

22  of whatever information was stored on the computers in

23  all three offices.  Right?

24    A.  I don't know that I would characterize him as the

25  custodian, as I understand a custodian.

1      Q.  He would be the person to repair the computers,

2   he was the person in charge of the refresh.  Correct?

3      A.  I don't-- I don't know that he repairs our

4   computers, but he was certainly the person who was

5   involved in addressing the refresh in the computers.

6      Q.  And the refresh-- by August the 30th, the refresh

7   had already occurred in Wichita, hadn't it?

8      A.  I don't recall when it was completed in Wichita.

9      Q.  Do you recall when it was completed in Topeka?

10     A.  No.

11     Q.  You knew when it was going to be completed in

12   Kansas City, though, didn't you?

13     A.  No.

14     Q.  Nobody told you when these refreshes were going

15   to happen?

16     A.  We were told that they would occur.  But as far

17   as being given specific deadlines or timelines for it, I

18   don't recall being given that.  And, frankly, that's

19   really not something that I would have been involved in.

20     Q.  Well, the e-mail was sent to you from Ms.

21   Brannon.

22     A.  At that point I was involved in looking into it

23   or getting information from people.

24     Q.  And when she's giving you that kind of a

25   heads-up, didn't you feel it necessary to do whatever it

1    took to make sure that that refresh was not going to

2    damage anything in the custody of the Kansas City,

3    Kansas office, in the custody of the court's office, in

4    the custody of everybody's office that had to do with

5    the CCA information?

6        A.  Well, I'm going to have to break up my answer to

7    your question.  With regard to evidence that we turned

8    over to the Court and the Special Master, I don't-- I

9    don't feel like I have to police them on how they're

10   handling it and how they're dealing with it.  I trust

11   the Court to handle evidence appropriately and to

12   determine how it should be handled.

13       With regard to information within our office, I

14   feel like I did take the appropriate steps to address

15   concerns and to deal with information by dialing into

16   the discussion other people in the office who had an

17   expertise in those areas that I do not have and allowing

18   them to do their jobs and perform their functions.

19       Q.  Does that mean you didn't ever call Mr. Steeby

20   and express concern that Ms. Brannon had telegraphed to

21   you and-- since you're both attorneys who had made

22   appearances in the *Black* case?

23       She was in charge of her side of it, you were in

24   charge of your side of it.  Didn't you think you should

25   at least call and ask-- and ask Mr. Steeby or somebody

1   in charge at the Kansas City office and say, we've got

2   this problem, can we make sure that the refresh isn't

3   going to damage anything?

4       A.  I don't know that I can really respond to that

5   because I feel like there are a number of different

6   questions.  After receiving the e-mail from Ms. Brannon,

7   I forwarded it to Ms. Metzger, Mr. Beall and

8   Mr. Slinkard.  And based upon Ms. Metzger's response, I

9   felt like this was being addressed.  Do I recall

10  specifically talking to Mr. Steeby about Ms. Brannon's

11  concerns, no, I do not specifically recall that.

12      Q.  So you passed the buck to Mr. Beall for purposes

13  of Kansas City?

14      A.  Mr. Beall was my supervisor and either the FAUSA

15  or the U.S. Attorney at that time, so I-- I frequently

16  had to go to him and seek authorization or guidance on

17  what to do in situations.  I don't view it as passing

18  the buck.

19      Q.  All right.  Let's move on to the Special Master's

20  investigation.  Do you recall that he was appointed on

21  October the 11th, 2016?

22      A.  I recall he was appointed.  I don't recall the

23  specific date.

24      Q.  And do you recall that almost simultaneously with

25  his appointment, you were writing a memo to the Office

1    of General Counsel of the EOUSA asking for authority to

2    recuse the entire office from the *Black* case?

3                MR. CLYMER:  You can answer.

4                THE WITNESS:  Yes.

5    BY MS. VANBEBBER:

6    Q.  So on the one hand, you were welcoming the

7    Special Master; on the other hand, you were trying to

8    get the office out of any connection with the Special

9    Master?

10   A.  I wouldn't characterize it that way.  I felt that

11   our office needed to be recused and that other attorneys

12   or attorney should come in and litigate this, given the

13   posture of the case.

14   Q.  And at that time did you share that belief with

15   the Special Master?

16   A.  I don't recall if I talked to him about that or

17   not.

18   Q.  From the first few times that he came into Kansas

19   City, he often talked with you on the phone or he met

20   with you or-- at any rate, communicated with you about

21   what he was going to do when he was in town.  Right?

22   A.  I met with him one time after the October

23   hearing, right-- or following the hearing.  And then I

24   met with him on-- in the e-mail that we've talked about

25   before at the barbecue.  I don't remember if we met on

1    any other occasions, but there were certainly a number

2    of phone calls with him.

3        Q.   Didn't he tell you the very first time you met

4    him, and repeatedly after that, that one of the things

5    he wanted to do was to meet with certain people in the

6    office?

7        A.   I don't recall us talking about him meeting with

8    certain people.  I do know that at some point he did

9    speak with Mr. Beall and Ms. Metzger about it.  That was

10   conveyed to me and--

11       Q.   Well, let's talk about that a little more.  Are

12   you saying you don't recall him asking you repeatedly, I

13   want to speak with Erin Tomasic and I want to speak with

14   Pauletta Boyd?

15       A.   No, I don't recall him asking me about that.

16       Q.   Do you recall him e-mailing you about it?

17       A.   I don't recall it, no.

18       Q.   Do you recall that you told Scott Rask that you

19   did not want Erin interacting with the Court or court

20   personnel on this case?

21       A.   There was a meeting that was going to take place

22   that I did not want Erin to go to that was-- I think the

23   Special Master was going to be there, if I'm recalling

24   it correctly.  And I did not want her to be there

25   because I did not trust her to conduct herself

1    appropriately in light of all of the other things that

2    had happened.

3        Q.   This is Special Master's 1171.  It's a little

4    broader than that when you read the e-mail, isn't it?

5        A.   Could I read the whole e-mail, please?

6        Q.   Yes, you can.

7        A.   Thank you.  All right.  I'm finished.  Thank you.

8        Q.   Pardon me?

9        A.   I'm finished.  Thank you.

10       Q.   Your e-mail to Scott Rask comes in the context of

11   a visit from the Special Master, doesn't it?

12       A.   Well, my e-mail to Scott was about who was going

13   to go up and create the inventory of the materials and

14   try to figure out what was there and to assist the

15   Special Master in his review of them.

16       Q.   So you had just met the Special Master, along

17   with-- along with Chris Oakley?

18       A.   Yes.

19       Q.   And doing some work on the investigation.  And

20   then right after that, the next day, you tell Scott, "I

21   do not want Erin interfacing with the Court or court

22   personnel on this case."  Does that include the Special

23   Master?

24       A.   I said I didn't want her interacting with the

25   Court or court personnel.  And yes, I included the

 1   Special Master as the Court.

 2      Q.  So when he is asking you repeatedly or at least

 3   early on that he wants to talk to Erin Tomasic--

 4              MR. CLYMER:  Objection.  That misstates this

 5   e-mail, Your Honor.  There's nothing in this e-mail that

 6   says the Special Master wanted to speak to Erin Tomasic.

 7   That is a misleading statement and counsel continues to

 8   misrepresent these e-mails.

 9              THE COURT:  I'm going to overrule the

10   objection.  I don't think she even completed her

11   question.  So reframe your question, please.

12   BY MS. VANBEBBER:

13      Q.  We just had a discussion about whether you recall

14   the Special Master repeatedly asking you to be able to

15   speak with Erin Tomasic.

16      A.  And I told you that I do not recall him doing

17   that, and I do not believe that e-mail was a request to

18   interview Erin Tomasic.

19      Q.  So why did you tell Scott you didn't want Erin to

20   be talking to the Court, including the Special Master?

21      A.  At that point in time I had received a number of

22   complaints about Erin's demeanor and her conduct toward

23   defense attorneys, towards an agency, a federal agency

24   that we work with.  I had had an opportunity then, of

25   course, through some of this litigation to see how she

1    had conducted herself during this litigation, and then,

2    of course, learning about the incident where she entered

3    Court's chambers and made what I consider to be a

4    grossly inappropriate comment to the Court's legal clerk

5    about breaking in to the Court's chambers.

6         I did not feel that Erin was an appropriate

7    person to interact with the Court or court personnel

8    because I did not feel that she understood how to be

9    respectful, courteous and polite.  She had demonstrated

10   privately within the office an attitude of wanting to

11   push back and fight with the Court and the Special

12   Master on this, and that was not the attitude that I

13   thought was appropriate for us to take.  And so I did

14   not want her to in any way convey that attitude to the

15   Special Master or to make inappropriate comments to him

16   or in his presence.

17       Q.  Do you know whether Scott Rask followed up on

18   your request?

19       A.  I don't-- I don't know if he did or not.  But I

20   don't recall learning that Erin had, you know, came up

21   and did the inventory for the Special Master.  I do

22   know, though, that eventually Erin was interviewed by

23   the Special Master.

24       Q.  Do you recall that it was Halloween when Mr. Rask

25   told Erin that she was not to contact the Special

 1   Master, and it was February when she did talk to him?

 2       A.  I don't recall the dates.

 3            THE COURT:  When you're at a good stopping

 4   point, we'll take a lunch break.

 5            MS. VANBEBBER:  I think I'm nearly through.

 6            THE COURT:  All right.  Let's take a lunch

 7   break until 1:30.

 8            (Recess).

 9            THE COURT:  All right.  You can be seated.

10   All right.

11   BY MS. VANBEBBER:

12       Q.  I just have a couple more questions for you.

13   Would you agree that you and Emily Metzger were the

14   primary contacts with the Special Master, as delegated

15   by U.S. Attorney Beall?

16       A.  It depends on what time period you're talking

17   about.  I believe that initially I was the primary point

18   of contact for the Special Master.  And then when we

19   started getting into more the litigation hold things and

20   when Ms. Metzger became the first assistant, she then

21   became his primary contact.  So after that, I didn't

22   have much contact with the Special Master.

23       Q.  Okay.  And you-- you said you trusted Mr. Cohen?

24       A.  Yes.

25       Q.  And you trusted him to be fair?

1      A.  Yes.

2      Q.  And he was fair, wasn't he, as far as you knew?

3      A.  During the time that I was dealing with him

4   directly, I felt like he was fair in his treatment of

5   me, yes.

6      Q.  He was polite?

7      A.  Yes.

8      Q.  He was accommodating?

9      A.  I don't know what you mean by accommodating.  I

10  mean, he asked me to give him information or provide him

11  with documents, and I did that.

12     Q.  And he wasn't heavy-handed about it?

13     A.  He was never rude to me or impolite.

14     Q.  Were you always fair with him as well?

15     A.  I tried to be.

16     Q.  You testified that you did indeed seek recusal--

17  or start the memo to seek recusal on October the 11th,

18  2016?

19     A.  I don't remember the exact date, but yes, I was

20  tasked with initially beginning the draft of the memo.

21     Q.  And the next day, the recusal letter went out

22  from Mr. Beall?

23     A.  Again, I don't recall what the date was, but the

24  memo had to be passed around and looked at by a couple

25  of people in the office and then it went out at some

1    point.

2        Q.  At that time did you tell Mr. Cohen that a

3    request to recuse your office was already in process?

4        A.  I don't recall whether I talked to him about that

5    or not.

6              MS. VANBEBBER:  That's all.

7              MS. BRANNON:  Your Honor, before I begin

8    with Ms. Barnett, we have an agreement with the

9    government to admit certain exhibits.

10              THE COURT:  All right.

11              MS. BRANNON:  That would be 575, 588, 589,

12    635, 655, 659, 660, 660A, 664, 681, 691, 695 and 700

13    through 704.

14              THE COURT:  All right.  Hopefully I got all

15    those down.

16              MR. CLYMER:  With respect to some of those,

17    Your Honor, Ms. Brannon would probably know better than

18    I because I just have a handwritten list, there was an

19    agreement to admit them under seal, if any of those were

20    the sealed ones.

21              MS. BRANNON:  I apologize, that's correct.

22    660 and 660A would be under seal by agreement.  And

23    there may be another one that we haven't settled yet,

24    but I will point that one out.

25              MR. CLYMER:  Do you remember which one that

1    is?  Do you remember the number?

2            (Counsel confer).

3            THE COURT:  All right.  Exhibits 660 and

4    660A are admitted under seal.  And then the following

5    exhibits are admitted not under seal:  575, 588 through

6    '89, 635, 655, 659, 664, 681, 691, 695 and 700 through

7    704.

8            MS. BRANNON:  That is correct, Your Honor.

9            THE COURT:  Okay.

10            MS. BRANNON:  And if we could go ahead and

11    look at Exhibit 453, please.

12                    CROSS EXAMINATION

13    BY MS. BRANNON:

14    Q.  Good afternoon, Ms. Barnett.

15    A.  Good afternoon.

16    Q.  E-mails don't exist in a vacuum, do they?

17    A.  No.

18    Q.  These-- got these two-dimensional sources of

19    evidence, but there's a lot of sort of three-dimensional

20    back-story to some of these e-mails, and that's what I

21    want to start with and talk to you about.

22            This particular e-mail is dated I believe August

23    3rd of 2016.  Do you remember receiving this e-mail?

24    A.  Yes.

25    Q.  Before you got this e-mail, I had called you

1    about this particular topic.  Right?

2        A.  Yes.

3        Q.  And told you I came into some information about

4    CCA video-recording our meeting rooms, I didn't know

5    much more than that, but I told you how I came into that

6    information and we talked about it.  Right?

7        A.  Yes.

8        Q.  And as a result of that, both of us went off in

9    different directions to try to find out more

10   information?

11       A.  Yes.

12       Q.  We found out different things; is that fair to

13   say?

14       A.  Yes.

15       Q.  At least initially?

16       A.  Yes.

17       Q.  You contacted the marshals and the warden and

18   other things, and I believe all that's in evidence, but

19   your initial information was that CCA did not record

20   these meetings rooms?

21       A.  Yes.  And just-- not to take issue with what you

22   said, but I had never contacted the warden initially

23   about it.  I contacted Troy Oberly, who was the deputy

24   supervisor of the marshals in Wichita, which is where

25   I'm stationed at, and I asked him if he would check into

1  this and see if he would be willing to find out some

2  information on this.  And he did.

3       He passed back information that-- I don't know if

4  he directly-- I don't remember if it was him directly

5  with the warden or if someone else spoke directly with

6  the warden, but the information came back and I learned

7  later that it was incorrect.

8       Q.  In those-- in those early days-- and if you look

9  at the calendar, August 3rd is the Wednesday, Thursday,

10 Friday.  During those three days you and I were in

11 contact quite a bit, would you agree?

12      A.  Yes.

13      Q.  Just trying to figure out what was going on?

14      A.  Yes.

15      Q.  I sent this e-mail to you to put you on notice

16 that we felt like as the defense community we had to act

17 and had to assert privilege where necessary.  We let you

18 know as of the 3rd that we were going to bring this

19 matter to the attention of the Court.  Correct?

20      A.  Yes.

21      Q.  Both in Rule 5s and with the district court; is

22 that right?

23      A.  Yes.

24      Q.  So if there's a suggestion from the-- the

25 prosecution table over here that it was your office that

1    took it upon themselves to notify the Court that there

2    might be an issue with the videotapes, that's not

3    accurate?

4        A.   That's not how I recall it.  I recall it

5    happening in discussions with you about your concerns

6    that you had.  I think-- let me clarify though.

7        Q.   Sure.

8        A.   I think there were several of us in the office,

9    though, once we were aware of this issue, problem, that

10   we felt like it needed to be brought before the Court,

11   that we needed the Court's assistance and guidance to

12   deal with it.

13       Q.   Absolutely.  And we agreed on that point?

14       A.   Yes.

15       Q.   But it was our-- the initial phone call from our

16   office and this e-mail that started the conversation

17   about what these videos were and what they meant?

18       A.   The conversation with me was begun with you.

19       Q.   When we talked about it-- well, let me ask you

20   this:  Within your office, what did you do with this

21   e-mail?

22       A.   You know, I don't recall.  I'm-- I probably

23   forwarded it, but I don't recall for sure what I did.

24   But I know that in handling these matters in this case,

25   the people that I relied on and consulted with were

1  Mr. Slinkard, Mr. Beall, Ms. Metzger at a later point in

2  time.  But those were the people that if I forwarded it,

3  that's who I would've sent it to.

4     Q.  This e-mail and these conversations were not your

5  first knowledge or involvement in the *Black* case; is

6  that fair to say?

7     A.  Yes.

8     Q.  Can you describe for us what you knew about the

9  *Black* case before August 3rd?

10    A.  Shortly after I became the criminal chief in

11  February of 2016 - and I apologize, again, that I don't

12  have the dates fresh - but there was a wiretap

13  application that was sought by Ms. Tomasic in that

14  investigation.  And as the criminal chief, I had the

15  duty of looking at and approving those affidavits.

16        And so that was really my first involvement in

17  the *Black* case was having that 100-plus page affidavit--

18  at least at that time it was 100-plus pages, e-mailed to

19  me.  I was in training somewhere else and spending an

20  evening reading it and going over it and then talking to

21  Ms. Tomasic about it on the phone.

22        After that, then I would occasionally hear some

23  additional things about it, what was going on, that

24  there was a-- a search warrant at CCA that was going to

25  take place, things of that nature.

1          And then in the summer, and I don't remember
2    when, but I seem to recall being contacted by Ms.
3    Shaneyfelt about a hearing and maybe about some comments
4    that were made in the hearing.  And I think either she
5    or you had shared with me a portion of a transcript from
6    that hearing.
7        Q.  When I called you on the 3rd about this
8    particular case, you were aware of the case and sort of
9    the parameters of the investigation.  That's fair to
10   say?
11       A.  Yes.
12       Q.  And you knew that videotape had already been
13   seized from CCA before I contacted you; is that right?
14       A.  Yes.
15       Q.  Did you have any idea that there were
16   attorney-client meetings on that videotape at that time?
17       A.  No, I did not.
18       Q.  And the first time you learned about that was
19   from our phone call?
20       A.  Yes.
21       Q.  As I mentioned, we were getting different kinds
22   of information.  At some point I let you know that the
23   Western District of Missouri Marshal's Office confirmed
24   that there was video-recording of attorney-client
25   meetings.  Right?

1    A.  Yes.

2    Q.  And that was contrary to the information you had?

3    A.  Yes.

4    Q.  The afternoon of August 5th, with this sort of

5    conflicting information, I contacted you about my

6    concern that your office was in possession of these

7    videotapes of attorney-client meetings.  Right?

8    A.  Yes.

9    Q.  And I told you that I was concerned that someone

10   in your office would intentionally destroy evidence of

11   those videotapes.  Right?

12   A.  I don't remember if you used the word "destroy,"

13   but I know that you were concerned that it might be

14   accessed in some way.  And I-- I can't remember if that

15   was when we discussed taking those items and securing

16   them in the vault and who would do that and how that

17   would be handled or not, but I recall talking to you at

18   some point about that.

19   Q.  But that is a conversation we had about you had

20   this information, how are we going to secure it until we

21   had this hearing?

22   A.  Yes.

23   Q.  I proposed two things.  One is that I could come

24   to the Court that day, that Friday, on that August 5th,

25   go to the Court and say, we want the Court to right now

1   take possession of these video-recordings before we have

2   the hearing so that it would be in the Court's

3   possession over the weekend.  We didn't do that.

4       A.  Correct.

5       Q.  And do you remember why I chose not to do that

6   based on our conversation?

7       A.  No, I really don't.  I'm sorry.

8       Q.  Was it because that-- you said you would take

9   care of this and make sure that the information was

10  secure in that office?

11      A.  I did take attempts or make attempts to secure

12  the DVRs.  And I can't remember, though, how I did that,

13  but I believe that someone took them and put them in the

14  vault.  And then the vault-- I believe the vault

15  combination was changed and only certain people were

16  allowed to have it.

17      Q.  Do you remember even talking to me about who

18  would have access to the vault--

19      A.  Yes.

20      Q.  -- until that hearing?

21      A.  Yes.

22      Q.  And ultimately, that is the-- the course that was

23  taken.  Right?

24      A.  I believe so, yes.

25      Q.  And so any suggestion that it was your office or

1   Erin Tomasic or Kim Flannigan who raised their hand and

2   said, we-- we recognize this and we want to make sure

3   that we're securing this evidence and keeping it safe,

4   that's not accurate, is it?

5       A.  That's not my recollection of events.

6       Q.  All right.  And, in fact, on that Friday

7   afternoon, the Federal Public Defender did file a motion

8   asking for an emergency hearing.  Right?

9       A.  Yes.

10      Q.  Not a surprise to you that we did that?

11      A.  No.

12      Q.  And I-- I believe I laid a copy up there.  Filing

13  this motion caused quite a stir in your office, didn't

14  it?

15      A.  Yes, it did.

16      Q.  Upset a lot of people in the Kansas City, Kansas

17  office?

18              THE WITNESS:  Am I authorized to--

19              MR. CLYMER:  You can answer the question.

20              THE WITNESS:  Yes, it did.

21  BY MS. BRANNON:

22      Q.  If we actually look at the motion and what we

23  asserted there, just kind of walking through it, oh, we

24  said that we understood that at least in certain

25  visitation rooms at Leavenworth they were recording our

1    visits with our clients.  That turned out to be true,

2    didn't it?

3        A.  Yes.

4        Q.  And we also asserted that at least in some cases

5    that these video-recordings were provided to the U.S.

6    Attorney's Office.  That turned out to be true as well,

7    didn't it?

8        A.  Yes.

9        Q.  We said we didn't know whether there-- whether--

10   when there were audio-recordings being made or produced.

11   Right?

12       A.  Yes.

13       Q.  And at the time we didn't know that?

14       A.  Right.

15       Q.  We alleged that, based on what we knew, we

16   believed that the prosecution at least had access to

17   these recorded FPD attorney-client meetings.  That

18   turned out to be true.  Right?

19       A.  Yes.

20       Q.  And we were concerned that this was-- either had

21   been or was going to be disseminated in discovery to

22   other defense counsel.  And that turned out to be true

23   as well.  Right?

24       A.  Do you mean the videos or the phone calls?

25       Q.  The--

1    A.  I can't remember--

2    Q.  That the videos--

3    A.  I'm sorry.

4    Q.  That the videos either had been or would be

5  disseminated in discovery.

6    A.  I think the plan was to disseminate them in

7  discovery.

8    Q.  Right.

9    A.  I don't know if the videos were ever actually

10  copied and disseminated.

11    Q.  And so that turned out to be accurate as well?

12    A.  That that was initially planned, yes.

13    Q.  That that was a concern, yes.  If you look over

14  on Page 3 in the first full paragraph, again, we

15  believed that the U.S. Attorney had these

16  video-recordings and that we would be happy to be wrong.

17  But we weren't wrong, were we?

18    A.  Not on everything, no.

19    Q.  And this is what so upset your office and the

20  people in your office, saying that you did not come to

21  them to get their side of the story before this

22  August 9th hearing.  Remember that?  The Special Master

23  asked you about that?

24    A.  Yes.

25    Q.  Ms. Barnett, is it true that-- well, let's back

1  up a little bit.

2       So on August 5th, we filed this.  We agreed to

3  meet with you on August 8th, that following Monday.

4  Right?

5     A.  Yes.

6     Q.  And that meeting was in the Federal Public

7  Defender's Office?

8     A.  Yes, in Topeka.

9     Q.  Right.  Do you remember who all was there?

10    A.  Not everyone, but I remember some of the people

11 there.

12    Q.  You were there?

13    A.  Yes.

14    Q.  I was there?

15    A.  Yes.

16    Q.  Kirk?

17    A.  Yes.

18    Q.  Laura Shaneyfelt?

19    A.  Yes.

20    Q.  William Sessions?

21    A.  Yes.

22    Q.  Jackie Rokusek?

23    A.  Yes.

24    Q.  Tom Beall?

25    A.  Yes.

1        Q.   Duston Slinkard?

2        A.   Yes.

3        Q.   And there might've been some others that I don't

4    remember either, but we all got together.

5             And the purpose of that is for the FPD to lay out

6    for you, the U.S. Attorney's Office, what we thought we

7    knew and what we were concerned about.  Right?

8        A.   Yes.

9        Q.   And we invited you in, we laid our case out for

10   you, and we offered to answer your questions?

11       A.   Yes.

12       Q.   We had Jackie Rokusek there.  She told you what

13   happened to her.  You were free to question her; is that

14   right?

15       A.   Yes.

16       Q.   Do you think we withheld anything at that meeting

17   from you that you asked for?

18       A.   I didn't feel like any questions I had for anyone

19   were-- information was withheld.

20       Q.   And we did this knowing that there was a hearing

21   the next day on this?

22       A.   Yes.

23       Q.   We told you who our witnesses were going to be?

24       A.   I believe so.

25       Q.   All right.  Ms. Rokusek told you what happened in

1   that meeting she had with Ms. Flannigan and Ms. Tomasic

2   just a couple of days before.  Right?

3       A.  Yes.

4       Q.  Told you what she saw on those videotapes?

5       A.  I don't recall if she gave a lot of detail about

6   what she saw, but I know she talked about viewing them.

7       Q.  Part of this was she talked about how she was

8   treated by the members of that office.  Do you remember

9   that?

10      A.  Yes.

11      Q.  Do you remember what she said?

12      A.  Not specifically, but I remember that it was--

13  she was treated disrespectfully and unprofessionally, in

14  her opinion.

15      Q.  And what about Mr. Sessions, Bill Sessions?

16      A.  He had had an encounter also with certain

17  attorneys in the Kansas City office, and he experienced

18  the same type of disrespectful and unprofessional

19  treatment as well.

20      Q.  Accusations from members of that office that he

21  had done things wrong?

22      A.  Yes.

23      Q.  Same accusations against Ms. Rokusek?

24      A.  Yes.

25      Q.  Based on those accusations, they were not being

1  given discovery in certain cases.  Right?

2      A.  That was my understanding, yes.

3      Q.  Do you remember Mr. Session's description of how

4  he was treated by members of the KCK office being so

5  extreme that Mr. Beall had to apologize to him?

6      A.  Yes.

7      Q.  Do you remember if Mr. Beall ever did anything

8  after that to apologize or make amends to Mr. Sessions?

9      A.  Other than the conversation that took place in

10  the meeting, I don't know--

11     Q.  All right.

12     A.  -- if he did.

13     Q.  When you left the meeting that day, there were

14  still a lot of unanswered questions?

15     A.  Yes.

16     Q.  On both sides?

17     A.  Yes.

18     Q.  But there was a hearing the next day, and we

19  agreed to meet again before that hearing to see what

20  else we knew; is that right?

21     A.  Yes.

22     Q.  The testimony you gave on direct about not

23  getting information from Ms. Flannigan or-- or Ms.

24  Tomasic or the others, is one of the reasons that you--

25  and correct me if I'm making assumptions here.  Is one

1    of the reasons that you didn't go to them and put their

2    version of what happened before the Court at that

3    emergency hearing because you-- you didn't have absolute

4    confidence that it would be correct or complete?

5              THE WITNESS:  May I?

6              MR. CLYMER:  You're authorized to answer

7    that question.

8              THE WITNESS:  That is correct, I didn't have

9    confidence that I was being given full and complete

10   information.

11   BY MS. BRANNON:

12     Q.  And you didn't want to be the one who sponsored

13   incomplete or inaccurate information before this Court

14   in something this serious?

15     A.  Correct.

16     Q.  And you understood completely the weight of these

17   issues?

18     A.  Absolutely.

19     Q.  The reason that you perhaps did not have the--

20   well, the reason you did not have confidence in the

21   accounting you would be given from your own colleagues,

22   was that based on past experience with them?

23     A.  Somewhat.  It was also based upon - I think I

24   mentioned it before - complaints from other defense

25   counsel about the way that they had been treated by

1  certain people in the Kansas City office, as well as

2  complaints from a federal agency that we work with about

3  how Ms. Tomasic had treated a TFO specifically.

4       And then based on my own limited experience at

5  that time, I certainly after that point in time had a

6  lot more experience with Ms. Tomasic and Ms. Flannigan,

7  but my limited experience even before that hearing

8  caused me to give credence to the complaints that I was

9  hearing about their behavior and the way that they

10  treated people.

11     Q.  Well, and it turns out that your-- your choices

12  or instincts about that initial hearing were correct,

13  because in this very case you were not given complete

14  and accurate information by Erin Tomasic about what

15  happened?

16     A.  Correct.

17     Q.  You were not given complete and accurate

18  information from Kim Flannigan about what happened?

19     A.  I would agree with that.

20     Q.  What about Mr. Oakley?

21     A.  My contacts with Mr. Oakley were a little bit

22  more limited.  The primary person that I had contact

23  with on the *Black* case, at least initially, was Ms.

24  Tomasic and Ms. Flannigan.  Frankly, I was unclear for a

25  while about Mr. Oakley's role in the case.  And

1  initially, I'm not sure that he was actually even

2  assigned in the case back when I began as criminal

3  chief.  I'm not sure when he was actually assigned, but

4  I wasn't aware of his assignment in the case I want to

5  say until maybe June, July, August, somewhere in there.

6  So I'm not trying to be vague--

7      Q.   That's fine.

8      A.   -- I just didn't have a lot of contact with him.

9      Q.   Later on when you were talking with the Special

10 Master, he gave you information about the defense

11 community's perception of certain members of your

12 office.  The information he gave you, was that

13 consistent with what you knew and had heard back in

14 August of 2016?

15     A.   It-- I would say back in August of 2016, the

16 impression that he was getting from the defense

17 community, I-- I was seeing it.

18          By the time that I believe he said that to me was

19 maybe in December of 2016, I absolutely had seen similar

20 behavior in other contexts and that they exhibited

21 towards me as well.

22     Q.   Specifically with Ms. Tomasic, what-- well, let

23 me back up.  Did you do an independent investigation in

24 your office based on these allegations and the

25 litigation in this case?

1    A.   I'm not really-- I'm not trying to play games

2    with words, but when you say "investigation," to me-- to

3    me that's-- you get an agent, you have subpoenas, you do

4    formal interviews, things of that nature.  I asked

5    questions about what had happened.  I read documents,

6    memorandums, pleadings, whatever they were titled,

7    e-mails that people sent me from Kansas City about what

8    occurred from their perspective.

9         As far as my actually formally interviewing

10   people, you know, I guess maybe you could consider

11   conversations that I and others had with Ms. Tomasic or

12   Ms. Flannigan, maybe those count as interviews.  We

13   certainly talked a lot about this.  And then at some

14   point in there - and I apologize, again, I don't know

15   the dates - I did attempt to speak with KBI Agent Jeff

16   Stokes.

17   Q.   How did that go?

18   A.   The first contact with him didn't go well because

19   he refused to talk to me and answer my questions.

20   Q.   Do you know why he refused to talk to you?

21   A.   When I pressed him on his refusal, he eventually

22   said that it was because he was instructed not to talk

23   to me by his supervisor, Doug Younger.  And that if I

24   wanted to talk to him, I'd have to go through his

25   supervision to do it, set it up.

1     Q.   Do you know whether any of your colleagues in

2   your office, Kim Flannigan or Erin Tomasic, gave Mr.--

3   gave Agent Stokes any direction on whether to talk to

4   you?

5     A.   I suspected that they had, but I don't know that

6   for certain.

7     Q.   All right.

8     A.   And, I'm sorry, eventually I did interview him

9   with Ms. Metzger.

10     Q.   So these dynamics that you're talking about

11   within the office, those pre-existed the-- the filing in

12   this particular case; is that fair to say?

13     A.   Which part of those dynamics?  Do you mean just

14   the animosity and the--

15     Q.   Sure.  Yes.

16     A.   Yes.

17     Q.   There's been some testimony in this case--

18   somebody described it as the inmates were in control of

19   the jail, or something to that effect.  Would that be an

20   accurate characterization of the KCK United States

21   Attorney's Office?

22     A.   I think that's unfair of the entire KCK United

23   States Attorney's Office.  I believe that there is a

24   very small group of people who I wish conducted their

25   practice differently.

1      Q.   In early August of 2016, by that time you had

2    been in your role as first assistant for about six

3    months?

4      A.   Criminal chief.

5      Q.   Criminal chief, I'm sorry.  Six months?

6      A.   Yes.

7      Q.   But you had been in management for quite some

8    time?

9      A.   For a couple of years before that, yes.

10     Q.   So you had some management experience?

11     A.   In Wichita, yes.

12     Q.   Let's talk about-- maybe we don't call it an

13   investigation, but about management's reaction to the

14   filing of this and-- and the hearings that ensued.

15          You actually interviewed people in your office to

16   find out what had happened?

17              MR. CLYMER:  You can answer the question.

18   You can answer the question yes or no, I think.

19              THE WITNESS:  Yes.

20   BY MS. BRANNON:

21     Q.   Did you interview Erin Tomasic?

22     A.   I spoke to Erin Tomasic about what happened.

23     Q.   All right.  Did you speak to Kim Flannigan?

24     A.   Yes.

25     Q.   Did you speak to them together?

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18      2347

1      A.  I believe that there were times when they were

2  both on the phone when we spoke over the phone together,

3  but I also spoke to them separately.

4      Q.  So coming out of the hearing on August 9th, did

5  you understand the base allegation to be that they had

6  called Ms. Rokusek into their office, said we believe

7  you gave protected information to your client, Richard

8  Dertinger, and we have asked an agent to look for a

9  video meeting of you and Mr. Dertinger to see what

10 information was given to him?

11     A.  That was my understanding, yes.

12     Q.  When was the first time you talked to Ms. Tomasic

13 about this?

14     A.  It would've been I believe within a week after

15 that meeting with Ms. Rokusek.

16     Q.  Before you testified today, I asked you to look

17 at some documents; is that right?

18     A.  Yes.

19     Q.  I'm going to refer you to Exhibit 691.  Do you

20 routinely keep handwritten notes?

21     A.  Yes.

22     Q.  And when you, well, take handwritten notes, do

23 you always keep these notes?

24     A.  Yes.

25     Q.  All right.  So-- and I asked you to look at these

1   because I was having some trouble reading them, and I

2   wanted to review and ask you some questions about this.

3   The whole of these notes, do they include notes about

4   your conversations with Ms. Tomasic and Ms. Flannigan

5   about the incidents in this case?

6           MR. CLYMER:  You can answer the question.

7           THE WITNESS:  Yes.  My notes specifically,

8   if I-- if I understand your question, reflect a

9   conversation during case reviews that took place on

10  September 28th.  And Mr. Beall was present for part of

11  the conversation.

12  BY MS. BRANNON:

13      Q.  What are case reviews?

14      A.  Case reviews are when we, as AUSAs, sit down with

15  our supervisors and we go through our workload list.

16  And sometimes they want to know about every case,

17  sometimes they just want to know about the main cases,

18  want to know if there are any problems or how things are

19  going, if we're overwhelmed or not.

20          It's just to get a sense of what we're doing and

21  to kind of check in with the line AUSAs since sometimes

22  supervisors who are one or two levels above the direct

23  supervisor don't have a lot of daily contact with the

24  line AUSAs.

25      Q.  Do you know how I came to be in possession of

1    these notes?

2        A.  I-- I suspect.

3        Q.  Okay.  I mean, this little set of notes that we

4    have here, did you pull them out and give them to

5    somebody?

6        A.  Yes.

7        Q.  Who?

8        A.  I provided them pursuant to a request within our

9    office for information related to a request for

10   information from either you or the Special Master.

11       Q.  And when did you do that?

12       A.  I don't know.  Within the last couple weeks

13   maybe.

14       Q.  Okay.  Were these the only notes that you

15   provided in response to that?

16       A.  Of this meeting?

17       Q.  Well, are these the only handwritten notes that

18   you provided in response?

19       A.  I believe so, but I'm not sure.  I-- I could go

20   back and look and see what I provided.

21       Q.  All right.  So every time you have a meeting like

22   this or that you perhaps would sit down and talk to

23   somebody about something important, did you take notes

24   like this?

25       A.  No.  So, for example, on this particular day we

1  would've had case reviews with more than two attorneys--

2      Q.   Right.

3      A.   -- in Kansas City, Kansas.  And I didn't write

4  notes about everybody's case review that day.  I just

5  wrote the notes about the problematic or the-- frankly,

6  the-- the conversations that I thought needed to be

7  documented in terms of personnel-type issues.

8      Q.   All right.  Let's walk-- and you turned these

9  over because you thought they were responsive to a

10 request perhaps the Special Master made in the *Black*

11 litigation?

12     A.   Someone made, yes.

13     Q.   All right.  So the date, 9-26, would that be

14 9-26-2016?

15     A.   I think it's-- well, at the top, 9-26-2016, yes,

16 the call from Rick Johnson.  And then the case reviews I

17 referenced were 9-28-16.

18     Q.   The first highlighted sentence I have on there,

19 what does that say?

20     A.   9-26.

21     Q.   Okay.  And if you skip down, the next sentence

22 that I have highlighted.

23     A.   "Tom commented about Erin's mistakes and

24 specifically the mistake in almost releasing--" and

25 P-R-I-V is my reference to privileged-- "materials to

1  defense counsel." And I apologize, I have trouble

2  reading my writing too, so...

3      Q.  Can you tell us what that was in reference to?

4  What was the mistake and what was the privileged

5  material?

6              MR. CLYMER:  You can explain your notes.

7              THE WITNESS:  It goes back to what you were

8  mentioning a short time ago that in the *Black* litigation

9  in preparing to provide discovery in the case, the plan

10 was to make copies of the DVRs or to provide them to all

11 defense attorneys in that case.  And then at some point

12 the discussion turned to the telephone calls.  And I

13 apologize, the two go together for me.

14     Q.  Right.

15     A.  But to also then provide the entire batch of

16 phone calls collected to all of the defense attorneys in

17 the case.

18          My understanding of that issue was simply that

19 you may have had a client's phone calls between you and

20 your client in that recording, and those calls were

21 going to be turned over to a completely separate defense

22 attorney and their client in discovery.  And that that--

23 that just shouldn't happen.

24     Q.  Because that's privileged material?

25     A.  Yes.

1      Q.   And you refer to it as privileged material here?

2      A.   I do.

3      Q.   All right.  And based on what you said in direct

4   examination, you considered these phone calls that we're

5   talking about in the *Black* case to be privileged?

6      A.   I consider any communication between an attorney

7   and their client to be privileged.  I also recognize,

8   though, that there are waivers to that in the law.  But

9   the way that I treat it is I treat all communications

10  between clients and their attorneys as privileged until

11  there's a determination that they are not.

12     Q.   And the very fact that you took this approach to

13  these calls and communications being privileged, was

14  that a source of conflict within the Kansas City, Kansas

15  office?

16     A.   For a couple of people.  They were upset that I

17  wouldn't oppose your motion initially filed in the case,

18  that I wouldn't come in and beat the drum loudly that

19  there had been the preamble or the waiver language on

20  the recorded calls before the conversations took place.

21          I mean, I understood intellectually and legally

22  why there is this position that they're not technically

23  privileged and that we could have access to them.  But

24  as an attorney - not a prosecutor - but as an attorney,

25  I still respect the right of clients to have

1    confidential communications with their attorneys.  And I

2    do not want to get access to any of that information in

3    any format unless the Court authorizes me to do so.

4        Q.  As part of that, the determination of a privilege

5    should be taken to the Court rather than decided

6    unilaterally?

7        A.  Yes.  But could I explain that?

8        Q.  Sure.

9        A.  If I know that I'm going to do a search warrant

10   and that there is a potential for there to be privileged

11   information in this location-- and I'm not talking about

12   a lawyer's office, that's totally different, but an

13   individual who may have legal documents in their house,

14   I don't necessarily believe that I have to go to the

15   Court and get permission to go in and seize those

16   documents beyond just the initial search warrant and

17   what I'm requesting to seize.

18          But if I have reason to believe that there may be

19   privileged documents in that office, in that house, I

20   believe that I, as a responsible attorney, should set up

21   a filter process for an investigator and a lawyer who

22   are completely separate from the prosecution team to go

23   in, to go through stuff, and to segregate anything that

24   is potentially privileged away from the eyes of anybody

25   else that then later goes in and searches.  Does that

1  make sense?

2      Q.  And so potentially privileged material before a

3  filter team would necessarily require the involvement of

4  the defense attorney at some point.  Right?

5      A.  At some point, yes.

6      Q.  Right.  And if there's-- continues to be a

7  dispute about that, then that potentially privileged

8  material would come before a court for a determination

9  about whether there was a waiver or not.  Right?

10     A.  Yes.

11     Q.  And that's how it should work?

12     A.  That's how I believe it should work.

13     Q.  In the scenario that you're describing and the

14 use of a filter team, how often have you done that?

15     A.  In my entire career?

16     Q.  Yeah.  Sure.

17     A.  Actually, I haven't had it come up much in my

18 practice over the years, but a few times we've had

19 filter teams that went into a house or an apartment

20 before the investigative team went in to search.

21     Q.  It's critical when you're using a filter team

22 that that filter attorney be an experienced lawyer?

23     A.  Absolutely.

24     Q.  Be a lawyer who understands and knows the

25 constitutional protections that a defendant should

1    enjoy?

2        A.   Yes.

3        Q.   Knows and respects the ethical considerations of

4    privilege?

5        A.   Yes.  And I'll go one step further.  They need to

6    be discreet because they have to understand that

7    although these people are their colleagues in one

8    context, they can never discuss with them what they see

9    or what they review in that filter process.  Never.

10       Q.   And for this filter process to work on both

11   sides, to protect my clients and to protect your job as

12   a prosecutor, that filter attorney has to be someone of

13   considerable integrity; is that right?

14       A.   I believe so.

15       Q.   In your office was that filter attorney Tanya

16   Treadway often?

17       A.   I don't know if often.  I became aware that she

18   was the-- the filter attorney in this case.

19       Q.   All right.  We'll get back to the calls in this

20   particular case in just a minute.  I'd like to finish

21   walking through your notes right here if we could.

22       A.   Uh-huh.

23       Q.   If we would go to the next page.  The next

24   highlighted sentence I read is, "Erin and Chris will be

25   counseled."  Is that right?

 1      A.  Yes.

 2      Q.  And what would they be-- and I assume this is

 3  still related to the *Black* litigation?

 4              MR. CLYMER:  Go ahead.

 5              THE WITNESS:  May I answer that?

 6              MR. CLYMER:  Yes.

 7              THE WITNESS:  Yes.

 8  BY MS. BRANNON:

 9      Q.  And what were they to be counseled for?

10      A.  They were to be counseled-- and this was a part

11  of the conversation that Mr. Beall was having with Ms.

12  Flannigan, and I'm sitting there listening to it.  But

13  my understanding was they were to be counseled about the

14  deficiencies that were being identified in the handling

15  of the case.

16      Q.  In regard to attorney-client communications?

17      A.  Yes.

18      Q.  All right.  Were they counseled?

19      A.  I don't know.

20      Q.  The next line, "Kim was argumentative and

21  combative"?

22      A.  That was my opinion that I wrote.  And about

23  that-- well, let me see.  And about that time is when

24  Mr. Beall left.

25      Q.  Okay.  She was still in management at that time?

1    A.  Yes.  She was still the criminal coordinator in

2    Kansas City.

3    Q.  In the context of your conversation about Chris

4    and Erin in the *Black* case, do you recall the

5    circumstances of her being argumentative or combative?

6    A.  I remember sitting there and watching her and

7    Mr. Beall go back and forth and--

8         THE WITNESS:  Am I allowed to-- I'm sorry.

9    I started.

10        MR. CLYMER:  (Nods head up and down.)

11   BY MS. BRANNON:

12   Q.  Sure.

13   A.  And sensing that Mr. Beall was very frustrated

14   that Kim would not-- I'm sorry, Ms. Flannigan would not

15   acknowledge that mistakes had been made and that Erin,

16   Ms. Tomasic, had not conducted herself appropriately in

17   the case, and him just being frustrated by Ms.

18   Flannigan's unwillingness to acknowledge that mistakes

19   had been made and they needed to be learned from and

20   corrected.

21   Q.  Did Ms. Flannigan remain defensive of Ms. Tomasic

22   throughout the rest of Ms. Tomasic's time in the office?

23   A.  Yes.

24   Q.  Did that cause divisions in the office?

25   A.  I don't know what it did up in the Kansas City

1    office, so I don't-- because I don't work there

2    regularly, but I-- I suspect that it did.

3        Q.   You determined that Ms. Tomasic's conduct in this

4    case in the handling of attorney-client communications

5    was wrong.  Correct?

6        A.   Yes.

7        Q.   Ms. Flannigan would never agree with that?

8        A.   Not to me she wouldn't.

9        Q.   And you continue your conversation with Ms.

10    Flannigan.  And if we look at the next page, you talk

11    about a couple of the things that went wrong in this

12    case.  Right?

13        A.   Yes.

14        Q.   And the first thing you identified that-- Ms.

15    Tomasic knew that attorney-client rooms at CCA were

16    video-recorded.  Right?

17        A.   Yes.

18        Q.   And she didn't tell anybody?

19        A.   Yes.

20        Q.   And so when that grand jury subpoena went out for

21    all of the video footage for 22 months, based on what

22    you knew as a supervisor at that point, Ms. Tomasic knew

23    that she was going to get attorney-client meeting room

24    video?

25        A.   And as I recall, the way I-- I kind of came into

1    knowing about these facts, because I-- if I haven't made

2    it clear, I never felt like we were ever given a full

3    and complete statement of things upfront.  We kind of

4    learned things through a trickle-down system.

5            But initially I was aware of the grand jury

6    subpoena going out.  And as I recall, Ms. Tomasic

7    conveyed that it was a mistake.  She never intended it

8    to be that overbroad, she never intended to capture

9    these recordings.

10           And then at a different point in time, she then

11   began to mention having this proffer that took place and

12   having this person that proffered not wanting to talk in

13   CCA because he felt or she felt that the rooms were

14   being recorded or monitored in some way.

15           And so at this point in time then, in September,

16   when I'm talking to Ms. Flannigan about this, I'm

17   saying, if what she says is true, that she knew back

18   then that this was happening, why didn't she bring it to

19   somebody's attention so that we could figure it out back

20   then instead of you and I starting to talk about it in

21   August later on.  I felt like we should've been on top

22   of this back then.

23           THE COURT:  When you say "back then," what

24   time period are you talking about?

25           THE WITNESS:  Ms. Tomasic said that this

1    proffer took place I believe in March of 2016.

2    BY MS. BRANNON:

3        Q.   So back then, Kim Flannigan was Erin Tomasic's

4    direct supervisor.  Correct?

5        A.   Yes.

6        Q.   Is it fair to say that what you're saying about

7    Ms. Tomasic also-- that responsibility rested to a

8    degree on Ms. Flannigan as well?

9        A.   If she was aware of that and that proffer-- or

10   when she became aware of that proffer, then yes, I

11   believe-- candidly, I believe that if I had become aware

12   of this through a proffer, I believe that I would have

13   immediately gone to a supervisor or more senior attorney

14   and tried to determine whether it was true or not.  And

15   that's what I expected from Ms. Tomasic, Ms. Flannigan

16   or anyone else who became aware of this, that they would

17   respond to it quickly.

18       Q.   When your office is going in and investigating

19   CCA and issuing grand jury subpoenas for 22 months of

20   all video footage, would you agree that's a big case?

21       A.   Yes.

22       Q.   Would you agree it's the sort of case that

23   warrants a lot of supervision?

24       A.   Yes.

25       Q.   This isn't a felon in possession that somebody is

1  doing that's going to take three weeks to investigate

2  and six months to wrap up.  Right?

3     A.  Yes, primarily because of the volume of the

4  evidence you're talking about.  And I believe you need

5  to have people who are actively looking at it and

6  reviewing it and-- and preparing it.

7     Q.  From a management point of view, would you have

8  expected Ms. Flannigan to know about the proffer or know

9  about the subpoena that was going out?

10    A.  I don't know if I would've expected her to know

11 specifically about the subpoena, but I-- I certainly was

12 upset about the fact that Ms. Tomasic apparently didn't

13 bring her into the loop on this proffer.  And at least

14 that was my impression, that she didn't tell Ms.

15 Flannigan about it right away.

16    Q.  Well, you know from the hearings that there was

17 some talk about setting up some sort of controlled-- I

18 don't know if a buy-- or some controlled exchange within

19 an attorney-client meeting room at CCA.  Right?

20    A.  Yes.

21    Q.  If that's going to happen, is that something Ms.

22 Tomasic could've just done on her own, or would it have

23 required supervisory approval?

24    A.  In Wichita, you would get a supervisor's

25 approval.

1      Q.   Were there-- in management, did you come to a

2  decision or conclusion that there were supervisory

3  failures in the *Black* case that led to this litigation?

4                MR. CLYMER:  You can answer the question.

5                THE WITNESS:  I came to that conclusion,

6  yes.

7  BY MS. BRANNON:

8      Q.   And explain-- maybe expound on that conclusion.

9                THE WITNESS:  May I?

10               MR. CLYMER:  Yeah.  May I speak to the

11  witness, Your Honor?

12               THE COURT:  Yes.

13               (Confer).

14               THE WITNESS:  If I remember your question

15  correctly, my perception of the supervisory failure

16  there was that Ms. Tomasic was allowed to do whatever

17  she wanted, that Ms. Flannigan would not tell her no.

18  And my position as a supervisor is we have to be willing

19  to say no to employees and enforce it.

20  BY MS. BRANNON:

21      Q.   If we look to the next page of your notes, I'm

22  just going to ask you maybe some more direct questions.

23          From your conversations with Ms. Tomasic and the

24  others involved in this case, did you learn that Ms.

25  Tomasic had actually instructed Agent Stokes to look at

1    the video of the attorney-client meeting rooms at CCA?

2        A.   What I learned - and I hope I get the word

3    correct - is that Ms. Tomasic was very clear about

4    expressing that she instructed him to locate, and that--

5    I believe that was the word she used, locate certain

6    footage or a recording or a certain picture, but she did

7    not tell him to look at it or review it.

8        Q.   He was to locate the meeting between Ms. Rokusek

9    and Mr. Dertinger on the day in question?

10       A.   That was my understanding.

11       Q.   And was it Ms. Tomasic that said she told him not

12   to actually look at it, just to locate?

13       A.   Yes.

14       Q.   Ms. Tomasic also told you that she told Ms.

15   Rokusek that they were locating this particular

16   attorney-client video?

17       A.   Yes.

18       Q.   And you told Ms. Flannigan that this is what Erin

19   Tomasic had said?

20       A.   Yes.

21       Q.   Did you tell Ms. Flannigan this before she

22   testified at the *Dertinger* hearing?

23       A.   I don't remember if I did or not, but I know on

24   this date I did tell her.

25       Q.   So the *Dertinger* hearing-- I think the one I'm

1  thinking of was in-- June 20th of 2017.

2      A.   Then yes, I did tell her before.

3      Q.   From all of your investigation, did you find

4  anything that-- well, that's a badly-phrased question.

5           Let's look at Exhibit 659.  Do you recognize

6  this?

7      A.   Yes.

8      Q.   And what is it?

9      A.   This is part of the-- the production that-- I was

10 asked to look for e-mails, but this actually was, I

11 believe, questions that were posed, and I was asked to

12 respond to them if I had a response to them.

13     Q.   Those are questions from the Special Master?

14     A.   Yes.  It says SM subpoena, so Special Master.

15     Q.   And those are your answers?

16     A.   Yes.

17     Q.   And you understood and understand the gravity of

18 answering those questions?

19     A.   Yes.

20     Q.   The Special Master is serving as an arm of the

21 court?

22     A.   Yes.

23     Q.   And your answers to the Special Master are

24 answers to the Court?

25     A.   Yes.

1   Q.  And these answers need to be complete and
2   accurate and reliable.  Yes?
3   A.  Yes.
4   Q.  You were asked a list of everyone known to have
5   accessed any video-recording of attorney-- attorneys'
6   meetings at CCA with detainees.  And you say Jeff
7   Stokes.
8   A.  Yes.
9   Q.  And you were saying that Jeff Stokes saw video of
10  a meeting between an attorney and detainee?
11  A.  No.  My understanding was who accessed
12  video-recordings.  And from the second conversation that
13  I had with Ms. Metzger and Mr. Stokes-- and, I'm sorry,
14  do you want me to explain this?
15  Q.  Sure.
16  A.  From that second telephone conversation that we
17  had, it was my understanding that he had-- and I'm not
18  going to try to say which numbers, certain DVRs from CCA
19  or copies of them, and that he had tried to go in and
20  locate the meeting.
21      So in my mind-- he said he didn't actually find
22  it, but in my mind, he still accessed the recordings
23  because he-- however you put it in, you bring it up and
24  you look.  So I don't know whether he actually ever saw
25  a meeting between Ms. Rokusek and her client or not.

1      Q.   Later on in the litigation, Ms. Tomasic explained

2   to the Court that they were actually looking to see

3   Mr. Dertinger's expression on his face when he walked

4   back into the pod.  Do you remember that?

5      A.   I-- I remember hearing that they were looking to

6   see about a reaction that took place in the pod.

7      Q.   When is the first time you heard that

8   explanation?

9      A.   I don't remember, but I don't recall it being

10  immediately.

11     Q.   And it wasn't when you were talking to Ms.

12  Tomasic about what she told Mr. Stokes that day?  I

13  mean, we're talking about notes from September 26th of

14  2016.  There's no reference to that in your notes.

15  Correct?

16     A.   Right.  Right.

17     Q.   Under the phone calls, you list Erin Tomasic and

18  KBI Special Agent Jeff Stokes as people who have

19  accessed phone calls between CCA detainees and

20  attorneys.  You filled this out September 18th of this

21  year?

22     A.   Yes.

23     Q.   You don't list Tanya Treadway.

24     A.   Oh.  No, I didn't.  I didn't even think about

25  her.

1      Q.  But you're aware of that?

2      A.  I am.

3      Q.  You don't list Dave Zabel--

4      A.  No.

5      Q.  -- in *Juan Herrera-Zamora*?

6      A.  I didn't-- I didn't think that he actually

7  listened to the calls--

8      Q.  Okay.

9      A.  -- or accessed them.  I didn't-- that was my

10  interpretation anyway.

11      Q.  Let's talk for just a minute about what happened

12  in this case after the Special Master was appointed.

13  Well, actually, let's talk about earlier.  Let's look at

14  Exhibit 589, which was my e-mail, and the Special Master

15  asked you about the string of e-mails.

16          Ms. Barnett, we sort of have a situation where we

17  have a lot of people on this e-mail acknowledging

18  something should be done, and they're pointing fingers.

19  Whose responsibility was it to tell Dave Steeby to

20  maintain this AVPC hard drive?

21      A.  I would say that it would be somebody above me

22  since Mr. Steeby is in our administrative staff, and I

23  do not supervise the administrative staff.  So I would

24  say that that directive to him to do something of that

25  nature would need to come from someone that either

1   supervises Mr. Steeby's supervisor or Mr. Steeby's

2   supervisor.

3       Q.   So I think you got it before-- when I sent this

4   e-mail out, I'm saying I want all of the hard drive

5   information and metadata, all of that preserved.  And

6   you would agree that that would cover-- my e-mail covers

7   the hard drives in the AVPC?

8       A.   Yes.  Although I-- I don't know that I was

9   thinking about the AVPC at that time.

10      Q.   Do you know what the AVPC was?

11      A.   Where it was?

12      Q.   What it was?

13      A.   What?  No, I don't.

14      Q.   But there was a reason you forwarded my e-mail?

15      A.   Yes.

16      Q.   Was there a reason you forwarded it to Emily

17  Metzger?

18      A.   Yes.

19      Q.   Why?

20      A.   Emily Metzger was our civil chief at the time--

21  well, she still is today.  And I just felt like she was

22  somebody, especially when it comes to litigation holds

23  and things of that nature, that would really help us in

24  understanding these issues and ensuring that we were

25  handling it properly.  I had never dealt with anything

1  like this before.  And so, frankly, I was reaching out

2  to her to seek guidance and counsel from her about what

3  to do.

4      Q.  Who else was on this e-mail that you forwarded?

5  Who else did you forward it to?

6      A.  Mr. Beall and Mr. Slinkard.

7      Q.  Is there anywhere on here that Mr. Beall weighs

8  in?

9      A.  No, I don't think so.

10     Q.  Because you're talking about it's somebody above

11 your level that has the ultimate responsibility to do

12 this.  That would be Tom Beall and Emily Metzger?

13     A.  Yes.

14     Q.  Nobody else above you?

15     A.  Correct.  And Emily I don't believe at that time

16 was the first assistant, but she was the civil chief,

17 and she was our lit hold person for the district.

18     Q.  Okay.  So as a lit hold person, she has a

19 different responsibility?

20     A.  Yes.

21     Q.  It's not necessarily supervisory over you, but

22 you would expect if she gets this information, this lit

23 hold, that she would know what to do with it?

24     A.  Yes.

25     Q.  Do you know what she did with it?

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18    2370

1     A.  No, other than what's in this e-mail.  And then,

2  you know, later conversations and e-mails about the

3  ultimate lit hold that went out in our district.

4     Q.  And you would agree that the later lit hold that

5  went out would have covered the AVPC hard drives?

6     A.  Yes.

7     Q.  But that didn't go out until December?

8     A.  Correct.

9     Q.  Let's talk about when you discovered that the

10  AVPC had been wiped, hard drives had been wiped.  When

11  was that?

12     A.  It was-- I think it was either shortly after the

13  October hearing or, you know, immediately after the

14  October hearing.

15     Q.  Let's look at Exhibit 588, please.  Now, you

16  hadn't told Dave Steeby to do anything with the AVPC,

17  but you do step in here at 588.  Right?

18     A.  588?

19     Q.  Right.  November 7th, it's an e-mail from you to

20  Dave Steeby.

21     A.  I have 589, but...

22     Q.  I'm sorry.  Perhaps-- it's on the screen if I

23  didn't put it in the notebook.  I apologize.

24     A.  Oh, okay.  Sorry.

25     Q.  So down at the bottom, this is an e-mail from you

1   to Dave Steeby on November 7th telling him to lock down

2   the AVPC.  So why is it that you had authority to do

3   that then and there in November, but you didn't do

4   anything in August?

5       A.  Because candidly, there were times when I just--

6   and, frankly, Mr. Steeby could've ignored what I said

7   because I'm not in his supervisory chain.  But there

8   were times when I would step in on things and say, you

9   need to do this.  Sometimes I--

10      Q.  When I send you the August 30th e-mail, is it so

11  much a question of who has authority to say who-- what

12  to who or is it about just preserving the evidence?

13      A.  In my mind, it was about trying to preserve the

14  evidence.  But within our office, there are so many

15  different people you have to deal with, permissions you

16  have to get.  It isn't a matter of me as the criminal

17  chief being able to send out the order to everyone and

18  have it be effective.

19      Q.  When I sent you the August 30th e-mail, are you

20  saying you could not have sent that to Steeby and said,

21  preserve this?

22      A.  I could've sent it to him and asked him to

23  preserve it.

24      Q.  You could've done what you did on November 7th?

25      A.  Yes.

1      Q.   But you didn't?

2      A.   No, I didn't.

3      Q.   At this point you're doing this in-- in response

4   to something from the Special Master?

5      A.   I don't recall what prompted this, to tell you

6   the truth.

7      Q.   Talking November of 2016.  You're still working

8   with the Special Master.  Are you still the point person

9   basically to deal with the Special Master at this point?

10     A.   Yes, I think so.

11     Q.   That-- the same was true through December?

12     A.   Yes.

13     Q.   January?

14     A.   I think sometime in January, February it-- it

15   changed.  It shifted to Emily to become-- I'm sorry,

16   Ms. Metzger to become the point person.

17     Q.   Throughout those months, you and I stayed in

18   contact about this case.  Right?

19     A.   Yes.

20     Q.   I understood that your office was continuing and

21   cooperating with the Special Master on the order.  Was

22   that a reasonable belief on my part?

23     A.   I don't mean to be cute with you, but I don't-- I

24   don't know what you understood or what information you

25   were being provided on that.

1    Q.  Was there anything that-- that you told me by

2   e-mail, in any other way, phone conversation, that

3   indicated that you were not cooperating with the Special

4   Master?

5    A.  I don't believe I would've said anything, because

6   from my perspective, I was cooperating with the Special

7   Master.

8    Q.  Had you told the Special Master at that point

9   that you had asked DOJ to be recused from the case?

10    A.  I don't recall discussing that with him.

11    Q.  That was not something you would've discussed

12   with the defense bar either.  Right?

13    A.  No.  We would not have discussed that with the

14   defense bar.

15    Q.  Was it also protected-- so the effect of this

16   recusal request was that actual production to the

17   Special Master could not go forward until that issue was

18   resolved?  Is that an accurate understanding?

19    A.  I don't-- I don't-- may I consult with

20   Mr. Clymer?

21    Q.  I'm just asking your understanding.

22             MR. CLYMER:  You can answer the question if

23   you can.

24             THE WITNESS:  That-- no, that wasn't my

25   understanding.

 1   BY MS. BRANNON:

 2      Q.   Okay.  Was there anything you or your office, to

 3   your knowledge, communicated to the FPD that suggested

 4   this was not moving forward in a smooth fashion?

 5      A.   What part wasn't moving forward?

 6      Q.   The entire investigation.

 7      A.   You mean the Special Master's investigation?

 8      Q.   Yes.

 9      A.   I don't recall telling you anything that would

10   indicate that it wasn't moving forward.

11      Q.   And you understand why that would've been

12   important to the defense to know whether this is going

13   forward or whether it's not going forward.  Right?

14      A.   No, I really don't.

15      Q.   Because I have decisions to make about what to

16   file in what cases and what to pursue at what time.  And

17   if I'm making those decisions based on a reasonable

18   belief that your office is cooperating and giving

19   information to the Special Master, that's an important

20   component, don't you think?

21      A.   Well, my understanding was, is that the Special

22   Master was moving forward, that he was looking at

23   information that he was getting from either Securus or

24   CCA, and that his analysis of that information and the

25   information that we were providing to him was somehow

1    being conveyed, either in his reports-- I don't know

2    whether he had private conversations with you all or

3    not.  It wasn't my place to ask about that.

4         But, frankly, I believed that you all were able

5    to adequately evaluate the positions you needed to take.

6    Certainly there were motions being filed.  So from my

7    perspective--

8    Q.   There were motions being filed, but as far as

9    what habeas to file in other cases, what to do in other

10   cases, what investigations for me to pursue as Federal

11   Public Defender, the fact that this investigation may

12   have been log-jammed by your office, that would be

13   critical information for me, wouldn't it?

14   A.   Well, I don't know if it would or not.  But my

15   perception was that this-- this investigation was not

16   log-jammed, not at the point that I was dealing with the

17   Special Master and not thereafter.

18   Q.   At any point do you think it did become

19   log-jammed?

20   A.   No.  I don't think so.

21   Q.   So it's your testimony that throughout 2016,

22   early 2017, you were still complying with the Court's

23   order to cooperate with the Special Master's

24   investigation?

25   A.   From my perspective.  Anything that he asked me

1    to get for him, I got for him if I could.  And when I

2    say "if I could," I don't mean that I was ever told by

3    anybody not to give him something.

4         If I couldn't find certain items, certain

5    documents for him, I would tell him I looked and I

6    couldn't find them.  But if I found information for him

7    or if I called someone to get an answer to a question

8    for him, I would then convey that to him.

9         So from my perspective, I was complying with his

10   requests and the Court's requests for information and

11   that I wasn't log-jamming him.

12   Q.   And it's your testimony that nobody in your

13   office was log-jamming the investigation?

14   A.   Not in management, not in the supervisors I

15   worked with.  And-- and if I can explain that.  My

16   understanding after I ceased to be the primary point of

17   contact with the Special Master was I didn't receive any

18   more requests for information that I recall.  But if I

19   had, I certainly would've gotten the information for the

20   Special Master.  And I don't believe that Mr. Beall or

21   Ms. Metzger would've told me not to do so.  And I'm not

22   aware of them telling anybody not to get information.

23        However, there were people in the Kansas City,

24   Kansas office who wanted us to oppose and refuse to turn

25   over things to the Special Master and the Court and

1    wanted us to fight on this.  But that came from those

2    individuals, not Mr. Beall, not Ms. Metzger, and not

3    myself.

4        Q.  When-- well, when that was happening in the

5    Kansas City, Kansas office, who was in charge?  Was

6    there no one there to go say, do this, give the Special

7    Master the information he wants?

8        A.  Ms. Brannon, believe me, there were occasions

9    when people were told to do things and they just didn't

10   do it.

11       Q.  In this investigation?

12       A.  I don't recall specifically in this

13   investigation, but when people were told to be polite

14   and respectful and treat defense counsel with

15   professionalism, and they would not do it and--

16       Q.  Well, I know that.  But what I'm concerned about

17   is who is in charge of Kansas City, Kansas's office when

18   that office was supposed to be cooperating with the

19   Special Master so that we could make this progress in

20   this investigation while my clients are sitting in

21   prison.  Who was in charge?

22       A.  In charge in what sense?  Do you mean who's the

23   boss of the office?  Do you mean who would they listen

24   to?

25       Q.  Yeah.  Who has control to go tell them to provide

1  the information that the Special Master wants?

2      A.  Management, senior management has.

3      Q.  Who was that?

4      A.  That would be Mr. Beall, Ms. Metzger, myself, Kim

5  Flannigan initially, and then Mr. Rask when he became

6  the criminal coordinator.

7      Q.  So it was your responsibility to make sure the

8  information that the Special Master asked for was

9  delivered to him completely and on time?

10     A.  Yes.

11     Q.  And you think that was done?

12     A.  Yes.  I'm not aware of any requests that I

13  handled that was not complied with.

14     Q.  Are you aware of any requests to your office that

15  you weren't in charge of that were not complied with?

16     A.  No, I'm not.  But if there's something you want

17  me to look at, I'm happy to look at a document.

18     Q.  Are you aware of any way that the Kansas City,

19  Kansas office was not responsive or compliant with the

20  Special Master's directives?

21     A.  No.

22     Q.  And that includes timeliness.  Right?

23     A.  Timeliness?

24     Q.  Right.

25     A.  In what sense?

1      Q.  In the sense that we're here two years later and
2  we're having this hearing.  He asked for information on
3  a certain date.  Was it provided on the date that he
4  asked for it?
5      A.  Which information are you talking about?
6      Q.  Any of it.  Are you aware of any of it being
7  late?
8      A.  I'm aware of the chambers incident when that
9  information was dropped off.  I-- I believe, though,
10  later it was determined it wasn't late, but it wasn't
11  dropped off appropriately.
12      Q.  Let's change subjects.  Let's look at
13  Exhibit 1054.
14          When all of this happened, Kansas City, Kansas,
15  was particularly upset, including Scott Rask, because
16  they thought that you were going to interfere with their
17  access to recorded phone conversations.  Right?
18      A.  They were upset because they believed that the
19  law allowed them to have access to these phone calls,
20  that they were-- the privilege was waived and,
21  therefore, the privilege did not exist for them.  And
22  they felt like it was a good source of evidence and that
23  they should be able to utilize it.
24      Q.  Not just a good source of evidence, but if they
25  got a negative ruling on this, it was going to interfere

1    with tens of thousands of calls obtained?

2       A.   I have to beg your pardon.  I didn't get through

3    all of the e-mails during lunch, so...

4       Q.   Okay.  Sure.  Looking at an August 10th, 2016

5    e-mail, the day after the first hearing, to you.  Scott

6    Rask expressing concerns that they wouldn't get to

7    review the tens of thousands of calls that they had

8    obtained?

9       A.   Yes, that's his e-mail.

10      Q.   Does that number surprise you?

11      A.   Yes.

12      Q.   Why?

13      A.   I couldn't imagine trying to go through and

14   utilize effectively tens of thousands of calls in a

15   case.

16      Q.   So when the Kansas City, Kansas office is so

17   adamant that they have to win this particular battle,

18   it's because they have so much at stake?

19      A.   I-- I believe they felt like they were justified

20   under the law in having these calls, and they felt

21   frustrated by the fact that I didn't agree with their

22   use of the calls.

23      Q.   And, in fact, their understanding of the

24   privilege was perhaps uninformed, would you agree?

25   Factually uninformed?

1          If we could look at 703, please.  703 is an

2    e-mail from Kim Flannigan to you and others dated

3    August 17th saying, hey, maybe we need to go figure out

4    how this privatization process works.  Right?

5       A.  Yeah.  I believe it was-- they wanted to

6    understand the blocking process and how that works at

7    CCA, because-- I don't remember when, but I think I

8    thought you and I had discussed at some point that there

9    were defense attorneys who believed that they had

10   blocked their calls and then later learned that they

11   were not blocked.

12      Q.  And how that privatization or blocking process

13   worked would bear on the-- whether there was a waiver or

14   not, you would agree?

15      A.  I don't-- I haven't researched that specific

16   issue.  But as a lawyer, yes, I would-- and my ethics,

17   yes, I would agree that that would need to be resolved.

18      Q.  You, consistent with what you've just said, were

19   counseling some caution in using jail calls during this

20   time.  Right?

21      A.  Yes.

22      Q.  And that was some of the resistance from Kansas

23   City, Kansas?

24      A.  Yes, specifically to the calls between attorneys

25   and inmates.

1      Q.  And I'm looking at Special Master 1174.

2           MS. BRANNON:  May I approach the witness,

3  Your Honor?

4           THE COURT:  Yes.

5  BY MS. BRANNON:

6      Q.  I don't think that's in the book.  That is an

7  e-mail where you are asking them to use some caution in

8  listening to jail calls.  Right?

9      A.  Yes.

10     Q.  And what was the date of that?

11     A.  That's-- the one that's highlighted is

12 September 14th of 2016.

13     Q.  Did that go out to Tanya Treadway?

14     A.  Do you mean did they talk to Tanya Treadway about

15 this?

16     Q.  Did that e-mail--

17     A.  Oh, I'm sorry.

18     Q.  Do you know if it went to Tanya Treadway?

19     A.  I don't know if it did.  I don't know if they

20 would've sent it or if I would've sent it.

21     Q.  Let's talk just briefly about some other friction

22 areas.  As management and during this time period, were

23 you aware of problems with discovery practices in Kansas

24 City, Kansas?

25          MR. CLYMER:  You can answer the question.

 1              THE WITNESS:  Yes.
 2   BY MS. BRANNON:
 3       Q.   And was that some of the source of the complaints
 4   from the defense bar?
 5       A.   Yes.
 6       Q.   The practices in Kansas City, Kansas, were
 7   restrictive, would you say?
 8       A.   I believe from the defense bar's perspective,
 9   they were restrictive, yes.
10       Q.   The most narrow reading of Rule 16 possible?
11       A.   I would agree with that.
12       Q.   The most narrow reading of *Giglio* and *Brady*?
13       A.   I-- I don't know if I would agree with that since
14   I never specifically got into looking at the practices
15   in terms of providing impeachment material.
16       Q.   What about slow-walking discovery?
17       A.   What do you mean by that?
18       Q.   Delaying discovery as long as possible.
19       A.   I don't know if I-- I certainly heard complaints
20   from defense attorneys that they felt like it was being
21   slow-walked to them.  And I believe at one of the
22   hearings we had, Judge Robinson expressed concerns about
23   the lengthy amount of time that it would take to produce
24   discovery in certain multi-defendant wiretap-type cases.
25              But as far as my being aware of that directly,

1    I-- I wasn't aware of that directly other--

2    BY MS. BRANNON:

3        Q.    You're on a criminal law committee in this

4    district?

5        A.    Yes.

6        Q.    With me?

7        A.    Yes.

8        Q.    And with Judge Robinson?

9        A.    Yes.  I attended one meeting.  You're talking

10   about the pretrial practice--

11       Q.    Just one?  Just one?

12       A.    It was at the end, yes.  Is that the meeting

13   you're talking about, the committee to develop the

14   pretrial order?

15       Q.    Right.  Exactly.

16       A.    Right.

17       Q.    The goal of the committee was to-- at least in

18   part, as I understood it, to set up complete and smooth

19   and early discovery practices in the district.  Right?

20       A.    It was to encourage early discovery and the

21   efficient handling of cases for the court system.

22       Q.    Did you experience some resistance from the

23   Kansas City, Kansas office regarding those discovery

24   practices?

25              MR. CLYMER:  You can answer the question.

 1                    THE WITNESS:  Yes.
 2     BY MS. BRANNON:
 3        Q.   Because they did not want to give early and
 4     complete discovery?
 5        A.   There were some attorneys who did not want to
 6     produce it.
 7        Q.   And who were they?
 8                    MR. CLYMER:  You're not authorized to answer
 9     that question.
10     BY MS. BRANNON:
11        Q.   Do you remember where that committee meeting was
12     that you went to?
13        A.   Yes.  I believe it was in Judge Robinson's
14     chambers.
15                    MS. BRANNON:  Could I have just one moment,
16     Your Honor?
17                    THE COURT:  Yes.
18                    (Counsel confer).
19     BY MS. BRANNON:
20        Q.   You reviewed a few exhibits before you testified
21     at my request.  Did you review anything else?
22        A.   I've looked back over my disclosure
23     authorization.
24        Q.   All right.  Anything else?
25        A.   No.

 1      Q.   Did you have a prep session with Mr. Clymer?

 2      A.   A prep session?

 3      Q.   Uh-huh.

 4      A.   No.

 5      Q.   Did he interview you before you took the stand,

 6   talk with you about your testimony?

 7      A.   Oh, do you mean before today?

 8      Q.   Yes.

 9              THE WITNESS:  Am I--

10              MR. CLYMER:  Yeah, before today, yeah.  You

11   can answer, sure.

12              THE WITNESS:  Yes.

13   BY MS. BRANNON:

14      Q.   And how long did you all meet?

15      A.   Oh, it was last night for, I don't know, an hour,

16   two hours.

17      Q.   Okay.  Review any documents at that time?

18      A.   No.

19      Q.   Was there any discussion about taking a

20   consistent position with other colleagues in your office

21   in your testimony?

22      A.   No.  I was admonished--

23              MR. CLYMER:  Your Honor, I don't mind the

24   witness answering this question, but I don't want to

25   waive any privilege, because this is all attorney-client

 1   privileged information, because this is-- Ms. Barnett's

 2   conversations with me are privileged.  But I don't mind

 3   her answering this as long as there's an agreement that

 4   there's no waiver to this.  I've got nothing to hide,

 5   but our conversations are privileged.

 6              THE COURT:  Your conversations are

 7   privileged unless you violated the sequestration order.

 8              MR. CLYMER:  And that's why I said I have no

 9   objection to this answer.  I just don't want to say it's

10   a waiver.

11              THE COURT:  All right.

12              THE WITNESS:  I'm sorry.  Would you repeat

13   the question, please?

14              MS. BRANNON:  Could you read the question

15   back?

16              (The question was read back).

17              THE WITNESS:  No.

18   BY MS. BRANNON:

19      Q.  Was there any discussion about laying the blame

20   for all of this on Ms. Tomasic?

21              MR. CLYMER:  You can answer that question,

22   too.

23              THE WITNESS:  No.

24   BY MS. BRANNON:

25      Q.  Was there any discussion about taking the

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18      2388

1   position that what the-- with regard to calls, maybe you

2   could listen to them, but you would choose not to?

3           MR. CLYMER:  Your Honor, at this point I'm

4   going to object.  My conversations with a-- with Ms.

5   Barnett are privileged.  I'm going to-- I allowed

6   questions about a violation of the sequestration order.

7   I don't believe anything else is appropriate.

8           MS. BRANNON:  Judge, we've heard the same

9   line from several witnesses.

10          MR. CLYMER:  She's not authorized to answer

11  these questions.

12          MS. BRANNON:  We've heard the same line from

13  several witnesses, but that we-- that we can listen, but

14  we choose not to.  I was just asking if she was given

15  any direction on that particular line of testimony.

16          THE COURT:  All right.  Well, when you say

17  direction, you're asking what Mr. Clymer told her to say

18  or do about that?

19          MS. BRANNON:  Yes.

20          MR. CLYMER:  I don't mind a question whether

21  I directed her to say anything.  There's no objection to

22  that.

23          THE COURT:  All right.  Reframe your

24  question along those lines.

25  BY MS. BRANNON:

1     Q.   Were you given any direction or suggestion about

2    testifying that you could listen to calls, but you may

3    choose not to?

4     A.   No.

5          MR. CLYMER:   Again, Your Honor, she's not

6    authorized to answer questions about specifics of my

7    conversation with her.

8          THE COURT:   Well, that's inconsistent with

9    what you just said about--

10          MR. CLYMER:   If she wants to ask a general

11    question, we will waive the privilege as to that

12    question.

13          THE COURT:   All right.   I understand.

14          MS. BRANNON:   I think she's answered the

15    question.   If I could have just one moment, Your Honor.

16    Thank you, Ms. Barnett.

17          THE COURT:   Mr. Clymer.

18                  CROSS EXAMINATION

19    BY MR. CLYMER:

20     Q.   You gave some testimony about your views about

21    the Kansas City, Kansas office and some of the attorneys

22    in it.   Do you remember that testimony?

23     A.   Yes.

24     Q.   Would it be safe to say that in the practice of

25    being a prosecutor, there's a fair amount of discretion?

1      A.  Yes.

2      Q.  Would it be also fair to say that there are times

3  where there are governing rules or statutes or

4  constitutional provisions that are subject to

5  interpretation and disagreement?

6      A.  Yes.

7      Q.  Is it wrong for prosecutors to take different

8  opinions about how they should properly exercise the

9  discretion given to them?

10      A.  No.

11      Q.  Is it wrong for prosecutors to disagree with

12  their supervisors and voice disagreements with their

13  supervisors about the amount of discretion a prosecutor

14  should use in a particular situation?

15      A.  No.

16      Q.  Is that something that happens all the time in

17  prosecutors' offices?

18      A.  It is-- it is routine, yes.

19      Q.  Isn't a large part of the job of a prosecutor

20  trying to decide how to properly exercise the discretion

21  vested in you as a prosecutor?

22      A.  Yes.

23      Q.  Are people in Kansas City as entitled to their

24  opinions as people in Wichita?

25      A.  Yes.

1    Q.   Are they as entitled to-- people have their

2    opinions in Topeka?

3    A.   Yes.

4    Q.   Do you ever have discussions in your office about

5    the way to interpret court decisions or statutes or

6    rules?

7    A.   Yes.

8    Q.   Do people disagree about those interpretations at

9    times?

10   A.   On a regular basis.

11   Q.   Do you have discussions about those

12   disagreements?

13   A.   Yes, we do.

14   Q.   Is that an improper thing for prosecutors to do?

15   A.   No.

16   Q.   Is it improper for prosecutors to disagree about

17   the way judges rule in cases?

18   A.   No.

19   Q.   Is it improper for prosecutors to disagree about

20   the way the Federal Public Defender interprets cases?

21   A.   No.

22   Q.   Can prosecutors sometimes push back on things

23   that judges want to do?

24   A.   Yes.

25   Q.   In fact, didn't that happen with the discovery

1   dispute in this case?

2       A.   Yes.

3       Q.   Wasn't there some desire to have a court order

4   that required early disclosure of Jencks Act material?

5       A.   Yes.

6       Q.   And doesn't the law explicitly prohibit that?

7       A.   Yes.

8       Q.   Are you aware of court cases that say a district

9   court lacks authority to make early disclosure-- or

10  order early disclosure of Jencks Act material?

11      A.   Yes.

12      Q.   Is it improper for a prosecutor in Kansas City to

13  believe perhaps on a case-by-case basis that there are

14  times where very late disclosure of Jencks Act material

15  may be appropriate?

16      A.   I would agree with that.

17      Q.   Are there times where disclosure of Jencks Act

18  material causes witnesses to be harmed, threatened, or

19  in some cases killed?

20      A.   Yes.

21      Q.   Are prosecutors entitled to take those

22  considerations into account when deciding how to

23  exercise their discretion about when to produce Jencks

24  Act material?

25      A.   Absolutely.  I think we're mandated to do that.

1      Q.   Are prosecutors allowed to take those sort of

2   considerations into-- into-- take those sorts of facts

3   into consideration when deciding whether to request jail

4   calls of inmates?

5      A.   Yes.

6      Q.   Sometimes there are jail calls requested because

7   there's a threat against a witness?

8      A.   Yes.

9      Q.   Are you aware that there was testimony in this

10   case-- strike that.  You wouldn't be aware.

11      Did you know there was a threat against David

12   Zabel in your office?

13      A.   No.

14      Q.   Did you know that jail calls were obtained as

15   part of that investigation?

16      A.   No.

17      Q.   You've described concerns about the behavior of

18   prosecutors in your Kansas City office.  I take it

19   there's some prosecutors in that office who sometimes

20   push the limit on what their discretion permits; is that

21   right?

22      A.   Yes.

23      Q.   Do you know of any instance, other than Erin

24   Tomasic in the *Herrera-Zamora* case and Tanya Treadway in

25   the *Reulet* case, who listened to an inmate-attorney

1  telephone conversation?

2      A.  No, I do not.

3      Q.  If you knew that, would you disclose that in this

4  hearing?

5      A.  Yes.

6      Q.  You realize you're under oath right now?

7      A.  Yes.

8      Q.  Have you ever heard of a prosecutor in any of

9  your offices express the view that it's acceptable

10  because of the case law regarding waiver to listen to

11  attorney-inmate telephone conversations without a ruling

12  from a court?

13      A.  If I understand your question correctly, I-- I

14  have heard prosecutors express that they do believe that

15  if the waiver, the preamble, is on the recorded call,

16  that it is not privileged and they should be able to

17  obtain it and access it.

18      Q.  Have you ever heard of a prosecutor acting on

19  that belief?

20      A.  No.

21      Q.  Other than those two instances I described?

22      A.  Other than those two instances, no.

23      Q.  When you prepared the-- you talked about how you

24  wanted to prepare the pleadings in your case-- in this

25  case, rather than have people in Kansas City do it?

1    A.   Well, as it turned out, people in Kansas City did

2    prepare pleadings, and they would submit them then to

3    Mr. Slinkard, myself, Ms. Metzger, Mr. Beall for us to

4    review.  And then if we felt changes needed to be made,

5    to make changes on them.

6         And then there came a point where the pleadings

7    related to these issues were then submitted and filed

8    under my signature or Mr. Slinkard's signature.

9    Q.   And were those pleadings reviewed by you and

10   Mr. Slinkard and Mr. Beall before they were filed?

11   A.   I don't know about Mr. Beall, but I know that

12   with regard to Mr. Slinkard and myself and Ms. Metzger,

13   we reviewed them before they were filed.

14   Q.   So are you comfortable with every single factual

15   assertion in those pleadings that have been filed with

16   this-- in this case since the time this litigation

17   began?

18   A.   I was until Ms. Tomasic made the disclosures that

19   she made later about the Herrera-Zamora calls that she

20   listened to.

21   Q.   Other than those, are you comfortable with the

22   factual assertions you have made in this court in those

23   pleadings?

24   A.   Yes.

25   Q.   Are you comfortable with the legal assertions

1  you've made?

2      A.  Yes.

3      Q.  And those legal assertions include, do they not,

4  the assertion that the case law overwhelming supports

5  the view that the attorney-client privilege is waived

6  when an inmate is warned his call is going to be

7  recorded?

8              MS. BRANNON:  Judge, I'm going to object on

9  several grounds, but particularly that's not what the

10 pleadings say.  It's not the state of the law.  It's

11 simply not accurate.

12             THE COURT:  So noted.  Reframe your

13 question.  "Overwhelming."

14 BY MR. CLYMER:

15     Q.  Do you think it's improper for an attorney-- a

16 prosecutor or any attorney anywhere to express the

17 position that, in their view of the law, a privilege is

18 waived under certain circumstances?

19     A.  To assert that?

20     Q.  Yeah.

21     A.  No, I don't.

22     Q.  And as you say, attorneys in your office have

23 made that assertion.  Correct?

24     A.  Yes.

25     Q.  Acting on it might be a different situation.

1    Correct?

2        A.   Yes.

3        Q.   And that, you're not aware of, other than

4    *Herrera-Zamora* and *Reulet*?

5        A.   Correct.

6        Q.   You were asked questions about your level of

7    cooperation with the Special Master and how an

8    investigation would be done.  In your experience, who

9    investigates misconduct in U.S. Attorney's Offices?

10       A.   It depends on the nature of the misconduct, but

11   it could be OPR or OIG, DOJ OIG if it rises to the level

12   of being criminal conduct.  And then, of course, each of

13   us is licensed through states.  And so there would also

14   be the Disciplinary Administrator's Office that could

15   review our behavior.

16       Q.   Ms. Brannon asked you a series of questions about

17   some handwritten notes that you made during a case

18   review of Erin Tomasic.  Do you remember that?

19       A.   Yes.

20       Q.   In those handwritten notes you refer to, quote,

21   privileged materials.  Do you remember that?

22       A.   Yes.

23       Q.   Did you mean when you said privileged materials

24   potentially privileged materials?

25       A.   Yes.

1    Q.   You were not asserting a legal position, I take

2    it, in those notes that the videos in this case of

3    attorney-client meetings are privileged, were you?

4    A.   No.

5    Q.   Were you asserting that any of the telephone

6    calls obtained were, in fact, privileged?

7    A.   No.

8    Q.   So your concern was that Ms. Tomasic had planned

9    to send out in discovery many potentially privileged

10   attorney-client telephone calls and potentially

11   privileged videos of attorney-client meetings; is that

12   correct?

13   A.   Yes.

14   Q.   But you hadn't made any legal conclusions about

15   it?

16   A.   No.

17   Q.   And your concern was that those should not go out

18   because the privilege applies to other attorneys and not

19   just prosecutors.  Correct?

20   A.   Correct.

21   Q.   You were asked questions about an e-mail that Mr.

22   Rask sent regarding concerns that the Kansas City,

23   Kansas office was not getting access to telephone calls.

24   Do you remember that line of questioning?

25   A.   Yes.

1      Q.   Was the concern that they wanted access to calls
2  involving attorneys or calls that inmates made to other
3  people, not their attorneys?
4      A.   No.   I think their overwhelming concern was that
5  they wanted to collect or utilize calls to other
6  co-conspirators in the case, not attorneys, but other
7  people who might be facilitating or assisting in
8  criminal conduct.
9      Q.   Do you think it's improper or some sort of
10 misconduct for attorneys to want to get access to that
11 sort of evidence in prosecutions or investigations?
12     A.   No.
13     Q.   You were asked questions about the reference Mr.
14 Rask made in that e-mail to "tens of thousands."  Have
15 you ever used hyperbole in an e-mail message?
16     A.   Yes.
17     Q.   Do you think that's improper?
18     A.   No.
19     Q.   You were asked questions about whether you were
20 aware that any delay in your cooperation with the
21 Special Master would affect the scheduling and planning
22 of the Federal Public Defender's filings in matters.  Do
23 you remember that question?
24     A.   Yes.
25     Q.   Is it your responsibility to conduct your

1  business to make sure the Federal Public Defender can

2  make filings when it wants to?

3      A.  No.

4      Q.  Is that your obligation?

5      A.  No.

6      Q.  In terms of the Special Master investigation, is

7  it your understanding that the Court has ordered you to

8  open the doors of your office and open your computer

9  system to whatever the Special Master wants to look at?

10     A.  Yes.

11     Q.  Do you have any obligations as a federal

12 prosecutor to safeguard information protected by the

13 Department of Justice?

14     A.  Yes.

15     Q.  Do those considerations come into play when you

16 get requests by the Special Master for information?

17     A.  Yes.

18     Q.  Are you legally obligated to take those

19 considerations into play?

20     A.  Yes.

21     Q.  Did you have to take those considerations into

22 play in this matter when the Special Master made

23 requests for information?

24     A.  Yes.

25     Q.  When you learned from the Special Master that he

1  wanted assistance with an inventory, did you understand

2  him to mean that he wanted to interview Erin Tomasic?

3      A.  No, I didn't.

4      Q.  In October when you got that communication, was

5  there a request to specifically interview Erin Tomasic,

6  Pauletta Boyd, or anybody else in your office?

7      A.  I don't recall that there was.  And it may have

8  been made to someone else in the office, but I don't

9  recall receiving that request.

10          MR. CLYMER:  Could I have a moment, Your

11  Honor?

12          THE COURT:  Yes.

13  BY MR. CLYMER:

14      Q.  I'm going to show you a copy of that e-mail

15  message that you were shown before.  It may be in this

16  book.  I don't remember the exhibit number of this

17  document.  I'm going to show it to you.

18          This is an e-mail message from the Special Master

19  to you regarding the request for assistance in the

20  inventory.  Do you see-- do you remember that e-mail

21  message?

22      A.  Yes.

23      Q.  I'm going to put it up on the ELMO.

24          MR. CLYMER:  I apologize, Your Honor, I

25  don't remember the exhibit.  Perhaps the Special Master

1    or the Public Defender could remind me of the exhibit

2    number.  My copy doesn't have it on it.

3    BY MR. CLYMER:

4       Q.  I'd like you to read the first sentence of the

5    last paragraph on this page where the names Erin Tomasic

6    and Pauletta Boyd appear.  And let's see what the

7    Special Master is requesting of you.

8       A.  Do you mean the last paragraph--

9       Q.  First sentence of the last paragraph.

10      A.  "To do this, I need help from the persons who

11   collected and submitted all of these materials."

12      Q.  What does the next sentence say?

13      A.  "I assume that is Erin Tomasic and Pauletta Boyd,

14   but you would know or can find out better than I."

15      Q.  Did you provide the assistance that the Special

16   Master requested in his e-mail message to you?

17      A.  I believe that we did.

18      Q.  Was it your intent to prevent Erin Tomasic to

19   ever-- from ever talking to the Special Master?

20      A.  No.

21      Q.  Was it your intent to prevent anyone from ever

22   talking to the Special Master?

23      A.  No.

24      Q.  Was it your intent to slow-walk the Special

25   Master's investigation?

1       A.   No.

2       Q.   Was it your intent to impair the Special Master's

3   investigation?

4       A.   No.

5       Q.   Did you conspire with Scott Rask to somehow

6   impair the Special Master's investigation?

7       A.   No.

8       Q.   You were asked some questions about discovery

9   practices.  I asked you earlier about exercise of

10   prosecutorial discretion.  Is there also a fair amount

11   of prosecutorial discretion when deciding what is

12   discoverable or not discoverable?

13       A.   Yes.

14       Q.   Are there disputes sometimes between prosecutors

15   about that?

16       A.   Yes.

17       Q.   In your practice, do you take the position that

18   it's better to over-disclose than not over-disclose?

19       A.   In my practice I do.

20       Q.   Do you think that that's a wise thing to do?

21       A.   Yes.

22       Q.   Is it improper for a prosecutor to be less

23   generous with discovery than you are?

24       A.   No.

25       Q.   Do you know of prosecutors in your office who

1    violate the discovery rules?

2        A.   No.

3        Q.   Oh, a couple other questions, Ms. Barnett, I

4    forgot to ask you.  You testified that there were

5    prosecutors in the Kansas City office who wanted to take

6    a different litigation posture in this case than you

7    did.  And you described it as wanted to fight.  Do you

8    remember that testimony?

9        A.   Yes, yes.

10       Q.   Sometimes do prosecutors want to take more

11   aggressive rather than less aggressive litigation

12   positions?

13       A.   Yes.

14       Q.   Is that improper?

15       A.   No.

16       Q.   Is it simply a matter of exercise of

17   prosecutorial discretion?

18       A.   Yes.

19       Q.   You were asked questions about the recusal memo

20   that was one of the exhibits.  Do you remember that?

21       A.   Yes.

22       Q.   Did the recusal memo have any connection at all

23   to the Special Master's investigation?

24       A.   No.

25       Q.   When you're asking to be recused in a prosecution

1    or an investigation, what does that mean?  Can you

2    explain it?

3        A.    When we're asking to be recused, we-- from my

4    perspective, I feel like we're saying that we do not

5    believe that we should be tasked with having to not only

6    protect our clients' interests and rights in this

7    litigation, but at the same time trying to then separate

8    out any of the personal concerns that we may have as

9    individual attorneys within the office.

10            There may be conflicts that exist, either because

11   we know somebody who's a target in the case or have some

12   sort of relationship, a good friendship with an attorney

13   or something of that nature.  And we simply feel that in

14   order to ensure that our clients' interests are fully

15   protected, we ask that we're recused from the case and

16   that another attorney or another district assumes

17   responsibility for handling the case.

18       Q.    Is there a formal process within the Department

19   of Justice to assess those sorts of recusal questions?

20       A.    Yes.

21       Q.    And is the first step in the process to draft and

22   submit the sort of memorandum that's in the Public

23   Defender's exhibits in this case?

24       A.    Yes.

25       Q.    And was that done by your office here?

1       A.  Yes.

2       Q.  And once one of those memos is submitted, does it

3    go to a component of the Department of Justice for

4    review, analysis and a decision?

5       A.  Yes.

6       Q.  Was that done by your office in any way, shape,

7    or form to slow down, frustrate or impair the Special

8    Master's investigation?

9       A.  No, absolutely not.

10      Q.  Did you have-- did you have any sense that it was

11   your obligation to inform the Court, the Special Master,

12   the Federal Public Defender's Office, or the defense bar

13   about your discussions with the Department of Justice on

14   the issue of recusal?

15      A.  No.

16           MR. CLYMER:  No further questions, Your

17   Honor.

18           THE COURT:  All right.

19           SPECIAL MASTER COHEN:  Judge--

20           THE COURT:  Do you want to take a break or--

21           SPECIAL MASTER COHEN:  -- Mr. Clymer has

22   been very gracious and permitted me, although it's not

23   usual, of course, to do redirect, which I think would

24   probably take five minutes or less.

25           MR. CLYMER:  Your Honor, it's not up to me

1    to permit it, of course.  I simply don't oppose

2    Mr. Cohen doing that.

3              SPECIAL MASTER COHEN:  He's said that it's

4    okay.

5              THE COURT:  All right.  Proceed.

6              SPECIAL MASTER COHEN:  Thank you.

7                    REDIRECT EXAMINATION

8    BY SPECIAL MASTER COHEN:

9        Q.  Hello, Deb.  Good to see you.  Do you remember

10   the first time we met?

11       A.  I remember that it was the October hearing I

12   believe when you were here.  And I think it was actually

13   in this courtroom.  And then we went in the back with

14   Mr. Slinkard and Mr. Oakley.

15       Q.  And after that first time, you and I had a number

16   of e-mails with each other and conversations on the

17   phone; is that right?

18       A.  Yes.

19       Q.  And would you say that that was a friendly

20   relationship?

21       A.  Yes.

22       Q.  That we grew to feel comfortable calling each

23   other and e-mailing each other using language you

24   wouldn't necessarily use in the courtroom?

25       A.  Yes.

1    Q.   Would you agree that we had frank conversations?

2    A.   Yes.

3    Q.   And that you told me things that you wouldn't

4    necessarily want to make-- that you wouldn't want to say

5    if, for example, Tom Beall was standing next to you?

6    A.   Well, I don't know about Tom Beall, but-- I'm not

7    sure I know what you're talking about.

8    Q.   Things, for example, like your impressions of

9    other Assistant United States Attorneys and whether they

10   were doing things the right way?

11   A.   I-- we talked about my disagreements with the

12   practices of a couple of people, but I wouldn't be

13   ashamed for Mr. Beall to know that I said that to you.

14   Q.   During the course of our conversations, say after

15   October when we first met and January, so that's four or

16   five months, do you recall my suggestion of how I was

17   hoping this would all work, this-- my role and my

18   investigation would take place?

19   A.   I think-- my recollection was that you were

20   hoping that there would be a way to get the attention

21   [sic] that existed up here between the defense bar and

22   people in the Kansas City, Kansas office-- find a way to

23   work through that and somehow eliminate that, if I'm

24   tracking your question correctly.

25   Q.   Yeah, I think so.  And do you recall our having

 1   conversations about how problems within the United

 2   States Attorney's Office might get fixed that would lead

 3   to a decrease in tension?

 4       A.   Yes.  And I think, in fact, you and I talked

 5   about it at the-- that Jack Stack Barbecue.

 6       Q.   Right.  I was going to ask you about that.  I

 7   didn't remember the name of the barbecue.  Do you

 8   remember meeting at the barbecue?

 9       A.   I do.

10       Q.   And I think I called you and said, why don't we

11   get together and talk about this investigation, this

12   case, who knows what, how this all might resolve?

13       A.   Right.

14       Q.   Do you recall that?

15       A.   (Nods head up and down).

16       Q.   And do you recall why it is we met so late at the

17   barbecue?

18       A.   No, I don't.  It-- it may be that my day got

19   messed up or something, but...

20       Q.   Do you remember I think that I told you let's

21   meet at the barbecue, but there were two of them--

22       A.   Yes.

23       Q.   -- with the same name and you drove to the wrong

24   one and--

25       A.   That's right.

1    Q.   Right.  So it was a while before we actually got

2    together.

3    A.   Uh-huh.

4    Q.   Do you remember what you ordered?

5    A.   Yes.  I ordered a beer.

6    Q.   Do you remember what I ordered?

7    A.   You had a drink of some type.  I don't know.

8              MR. CLYMER:  Your Honor, if we're going to

9    hear Mr. Cohen's entire meal, then I may withdraw my

10   non-opposition.

11             SPECIAL MASTER COHEN:  I didn't remember, so

12   I wanted to see if she did.

13   BY SPECIAL MASTER COHEN:

14   Q.   Do you remember my talking about my desire not to

15   subpoena anybody?

16   A.   No, I actually don't.  You may have said that,

17   but I don't remember.

18   Q.   Do you remember that I suggested that-- that I

19   wanted to talk to Erin Tomasic and Pauletta Boyd and it

20   would be good if they called me?

21   A.   I remember-- now that you've reminded me, I

22   remember that about Pauletta Boyd.  I don't specifically

23   remember it about about Erin, but I remember it about

24   Pauletta.

25   Q.   Do you remember my saying that anybody, Pauletta,

1   Erin, or anybody else, that you should let the office

2   know that if anybody had something to tell me, they

3   should call me?

4        A.   I remember that you told me that if there was

5   anyone that wanted to talk to you, that anyone could

6   call you and talk to you, yes.

7        Q.   And do you remember my asking you to convey that?

8        A.   To Pauletta, I do remember that now.

9        Q.   Anybody else?

10       A.   No.

11       Q.   Changing subjects just for a second.  The AVPC,

12   do you remember that Duston Slinkard sent me a letter, I

13   think it was November 5th, saying-- copying you, saying,

14   looks like we might've messed up and the AVPC wasn't

15   taken out of circulation?

16       A.   I remember that that happened.  I don't remember

17   the letter specifically, but I remember that did happen.

18       Q.   Do you remember that it was on a Saturday that he

19   sent it?

20       A.   I don't remember what day.

21       Q.   Do you remember that within an hour, I responded

22   and said, you need to take this out of circulation

23   immediately to preserve whatever is left?

24       A.   I don't recall that.

25       Q.   And you don't remember, even though it was a

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18        2412

1  Saturday, that at 11:30 that evening I sent another

2  e-mail asking again to do anything that he could to make

3  sure that that was preserved?

4      A.  No.  There were a lot of e-mails and things in

5  this case and other cases, so I apologize, I just don't

6  have a memory of it today.

7      Q.  Do you remember when we were at the barbecue or

8  any other time during any of the many phone calls that

9  we had that you told me that you thought that there were

10 three people in particular in the office that weren't

11 practicing the way that a United States Attorney should

12 practice?

13     A.  Yes.

14     Q.  Do you remember who it was that you told me you

15 thought that about?

16     A.  Yes.

17     Q.  Can you tell me again who those were?

18             MR. CLYMER:  You're not authorized to answer

19 that question.

20             SPECIAL MASTER COHEN:  She's not authorized

21 to tell me what she told me at the time?

22             MR. CLYMER:  You're right.  She is

23 authorized to answer that question, I stand corrected.

24             THE WITNESS:  I'm not sure I remember all

25 three exactly, but one would've been Sheri McCracken or

1   Catania, Terra Morehead, and I believe the third one

2   would've been Erin.

3   BY SPECIAL MASTER COHEN:

4      Q.   That's my recollection as well.  And you remember

5   I think I said something along the lines of:  I'm from

6   out of town.  I'll be the bad guy.  I'll take the heat.

7   Let's figure out a way to get rid of them if they're bad

8   actors and clean this all up, something like that.  Does

9   that sound right?

10     A.   Yes.

11     Q.   And as I said, we used language that we wouldn't

12  use in the courtroom, but I said something like:  It

13  will be a shit storm, but I'll hold your hand through

14  it.  Does that sound like something I would've said?

15     A.   Something similar to that.

16     Q.   Let the record reflect that I am here.

17          So I guess what I'm confused about then is when

18  we had a good relationship and you were producing

19  documents at my request why you told Erin not to talk to

20  me.

21     A.   I didn't tell Erin not to talk to you.

22     Q.   She says that you said not to talk to me.  It's

23  in an e-mail and it's copied to Rask, and so how do you

24  explain that?

25     A.   If you're referring to the e-mail where I didn't

1    want her to participate in the inventory, that wasn't an

2    instruction for her not to talk to you.  It was an

3    instruction for her to not come up and interact with you

4    at that time, because I did-- as I said before, because

5    of all of the complaints that have been made about her,

6    because of the conduct that I had witnessed her

7    exhibiting towards Mr. Beall, Mr. Slinkard and myself, I

8    did not trust her to act appropriately in your presence.

9    And I thought it was appropriate and important that when

10   we interacted with you that we were respectful,

11   courteous and professional at all times.

12        But that was not designed to prevent you from

13   ever being able to interview her or any other person in

14   our office.  It was meant to try to keep her where she

15   would learn to act professionally and learn to conduct

16   herself with respect towards the Court and come to see

17   that we needed to-- we needed to be thoughtful in this

18   litigation, and we needed to consider the Public

19   Defender's perspective and we needed to interact

20   appropriately with the Court.  And candidly, she hadn't

21   done that up until that point.

22        Q.  If she testified there were other reasons and

23   other times, besides what you just said, that you

24   directed her not to communicate with me, is she wrong?

25        A.  I don't recall ever directing her not to

1    communicate with you.

2       Q.   Do you think that there's any reason that you

3    would have to tell Erin Tomasic not to contact me, for

4    example, in connection with her entry into chambers and

5    who told what to whom?

6       A.   No.

7       Q.   When did you first write the recusal letter?

8       A.   I don't know when I wrote it.  It would be dated

9    on it, but--

10      Q.   Very early-- I mean, was it shortly after my

11   appointment?

12      A.   When were you appointed?

13      Q.   Two years and one day ago.

14           THE COURT:  October 11th, 2016.

15           THE WITNESS:  I don't know when I started

16   it.  And it wasn't triggered by your appointment.  It

17   was simply an internal discussion that triggered the

18   writing of it.  I'm sorry, I may not be authorized to

19   respond to that.

20           MS. BRANNON:  Judge, and I'm sorry to

21   interrupt for the record, but there is some confusion

22   about this point.  And it's Exhibits 660 and 660A.  And

23   it's because it was one of those Word documents that

24   came up with the wrong date.  660A indicates that that

25   recusal letter went out October 12th of 2016.  660 has a

1    later date on it, but it's the erroneous date.  So we

2    just wanted to clarify that.

3                THE COURT:  All right.  So noted.

4    BY SPECIAL MASTER COHEN:

5        Q.  So there was a-- a recusal written-- excuse me, a

6    recusal letter written, the record will reflect, in

7    October of 2016 for at least a year-- well, I shouldn't

8    say that, for at least many months, there was no recusal

9    and the United States Attorney's Office continued to

10   work with me directly; is that right?

11       A.  Yes.

12       Q.  And then Mr. Clymer made an appearance, and

13   that's when things changed.  Right?

14       A.  Yes.

15       Q.  Do you remember when it was that - and you were

16   part of the e-mail thread - that the search terms were

17   finalized for going through Ms. Tomasic's and other

18   United States Attorneys' records?

19       A.  No.  I don't remember when that happened, but I

20   remember the thread you're talking about.

21       Q.  Was it about a week before Mr. Clymer appeared?

22       A.  I don't know.  It may be in this book if you want

23   me to look and see.

24       Q.  That's all right.  So for all that time that we

25   were negotiating search terms, the only-- would you

1   agree that the only issue that was raised was that the

2   search terms were too broad.  And there was never raised

3   a concern about privacy, about national levels--

4   national concern, or privilege?

5       A.   I-- I wasn't involved in those discussions with

6   you totally, even though I was on some of the e-mail

7   chains.  But it was my understanding that at some point

8   it had been expressed to you that we did have to take

9   those things into consideration.

10              SPECIAL MASTER COHEN:  Thank you very much.

11              THE WITNESS:  Uh-huh.

12              THE COURT:  All right.  We can take a break

13   unless you think you'll be very brief.

14              MS. BRANNON:  If we could go ahead and take

15   the break, Your Honor, I'd appreciate it.

16              THE COURT:  All right.  We'll be in recess

17   for 15 minutes.

18              (Recess).

19              THE COURT:  All right.  You can be seated.

20   Call your next witness.

21              MS. BRANNON:  Judge, we have no further

22   questions.

23              THE COURT:  Oh, I'm sorry, redirect.  Go

24   ahead.

25              MS. BRANNON:  We have no further questions

 1   for Ms. Barnett.

 2            THE COURT:  I'm sorry?

 3            MS. BRANNON:  We have no further questions

 4   for Ms. Barnett.

 5            THE COURT:  Okay.  All right.

 6            MR. CLYMER:  I have just a couple, Your

 7   Honor.  But before I do, because I keep forgetting,

 8   there was an exhibit I neglected to move in.  Government

 9   Exhibit 41.  And I don't believe there's any opposition

10   to it.

11            THE COURT:  All right.  41 admitted.

12                    RECROSS EXAMINATION

13   BY MR. CLYMER:

14     Q.  Ms. Barnett, as a employee of the Department of

15   Justice, do you have to comply with a large body of

16   rules and regulations and department policy?

17     A.  Yes.

18     Q.  Are you free to simply approve-- as criminal

19   chief, are you free to approve any employee in the

20   office revealing confidential information to somebody

21   outside the office?

22     A.  No.

23     Q.  Are you free to simply get rid of or terminate

24   people who you consider troubled prosecutors?

25     A.  No.

1    Q.  Has your office ever been recused in this case?

2    A.  In the *Black* case?

3    Q.  Yeah.

4    A.  No.

5    Q.  So the recusal request was denied.  Correct?

6    A.  Yes.

7    Q.  So my appointment in this case did not result in

8    the recusal of your office, did it?

9    A.  Correct.

10   Q.  Did you ever tell Mr. Cohen that your office

11   would produce the internal documents that he requested

12   of you?

13   A.  Did I ever tell him?

14   Q.  Yes.  Did you ever tell him that all those word

15   searches would result in the production of those

16   documents?

17   A.  No.  No.

18            MR. CLYMER:  Nothing further, Your Honor.

19            THE COURT:  All right.  Anything more?

20            MS. BRANNON:  No, Your Honor.

21            THE COURT:  All right.  May Ms. Barnett be

22   excused?

23            MR. CLYMER:  No objection, Your Honor.

24            THE COURT:  You're excused.

25            THE WITNESS:  Thank you, Your Honor.  Should

1    I leave the exhibits up here or give them to people?

2              THE COURT:  Call your next witness.

3              MR. REDMOND:  Yes, Your Honor.  Tom Haney is

4    on his way down the hall.  If I could just put something

5    on the record for 15 seconds.

6              THE COURT:  Go ahead.

7              MR. REDMOND:  Bonnie and Kelli pointed out

8    that I misspoke during Mr. Gelfand's direct.  I moved

9    into admission 667, but it was actually numbered 677.

10   So we would move to admit 677.

11             THE COURT:  All right.  Any objection?

12             MR. CLYMER:  May I just have one second?  No

13   objection, Your Honor.

14             THE COURT:  Exhibit 677 admitted.

15                   THOMAS HANEY,

16   called as a witness on behalf of the Federal Public

17   Defender's Office, having first been duly sworn,

18   testified as follows:

19                 DIRECT EXAMINATION

20   BY MR. REDMOND:

21     Q.  Would you pull that microphone up a little bit?

22   We've had a hard time hearing folks.

23     A.  Well, you'll have a hard time hearing me I think.

24   All right.

25     Q.  All right.  Could you state your name for the

1    record, sir?

2        A.   Tom Haney.

3        Q.   Mr. Haney, what do you do for a living?

4        A.   I'm a lawyer.

5        Q.   And how long have you been a lawyer?

6        A.   45 years.

7        Q.   What kind of law do you currently practice?

8        A.   Oh, it's about probably 90 percent criminal and

9    10 percent some plaintiff's work.

10       Q.   And are you a member of the CJA panel?

11       A.   Yes.

12       Q.   Do you have cases in Topeka and sometimes Kansas

13   City?

14       A.   Yes.

15       Q.   How long have you practiced in federal criminal

16   law?

17       A.   On the CJA panel or just general?

18       Q.   Just generally.

19       A.   30 years.

20       Q.   And during that time have you had clients

21   detained at CCA?

22       A.   Yes.

23       Q.   Did you speak with them on the phone?

24       A.   Yes.

25       Q.   And when they called you, did they call you with

1    legal questions?

2        A.  Yes.

3        Q.  And did you answer those questions?

4        A.  Tried to.

5        Q.  When you spoke with your clients, did you talk

6    about the case?

7        A.  Yes.

8        Q.  Did you-- did the communication almost solely

9    focus on the case?

10       A.  Pretty much.

11       Q.  And when you visited your clients, did you talk

12   almost solely about the case?

13       A.  Yes.

14       Q.  And so any-- so if there's an audio-recorded

15   phone call between you and your client, it's going to

16   contain conversation about the matter in which you

17   represent them?

18       A.  Yes.

19       Q.  And the same is true of visits that you make at

20   CCA; if there's a video, it's going to contain

21   communication with your clients about your case?

22       A.  Yes.

23       Q.  Okay.  Did you privatize your phone number

24   through the CCA process?

25       A.  Well, I'm not sure what that process means, but I

1   advised them what my phone numbers were that they-- that

2   my clients would call to, so I provided those numbers.

3        I used a procedure when I would talk to my client

4   to advise him that this was an attorney-client

5   privileged conversation, it should not be recorded, et

6   cetera.  But as far as a procedure to privatize it, I'm

7   not even sure I know what that is.

8   Q.   Okay.  So you never sent a fax or sent a letter

9   to CCA saying please privatize my phone calls?

10  A.   Not with that word.

11  Q.   Had you ever-- well, did you send a letter that

12  had a similar effect?

13  A.   I thought so.  I sent them a letter saying what

14  my numbers were from the office that my clients would

15  call.

16  Q.   Okay.  If I'm your client, I'm at CCA and I call

17  you, what do you tell me about whether the call is

18  privileged or not?

19  A.   What I tell my client?

20  Q.   Yeah.

21  A.   I tell my client that anytime that we're talking

22  about the case or we're communicating, that it's

23  absolutely privileged between the client and me.  And if

24  there's an interpreter there, the interpreter is bound

25  to the same sort of privilege, or if I have a paralegal

1    with me, the same thing.

2        Q.  Okay.  So you said that you were unaware of any

3    formal privatization process; is that right?

4        A.  Right.

5        Q.  So in the 30 years you've been practicing federal

6    criminal law, had you ever heard that there was such a

7    process at CCA?

8        A.  At CCA?

9        Q.  Yes.

10       A.  Not using that term "privatization," no.

11       Q.  Okay.  Had you ever gotten a letter from CCA,

12   here's how you privatize your phone calls?

13       A.  Not that I recall.

14       Q.  Did you see a sign in the lobby that said, here's

15   how you privatize your phone calls?

16       A.  Not that I recall.

17       Q.  Do you hear-- when you get a call from CCA, from

18   a client at CCA, do you hear a preamble that says, "This

19   call may be subject to recording or monitoring"?

20       A.  On occasion if the call comes in directly to me,

21   I would hear it.  If it goes through my switchboard and

22   it's transferred to me, of course, I wouldn't hear it

23   then.

24       Q.  Okay.  Did you think that that preamble meant

25   that your conversation was not privileged?

1        A.   Absolutely not.

2        Q.   Why?

3        A.   Well, the attorney-client privilege, if it's

4   waived, it has to be waived in a knowing, intelligent

5   manner.  And no, I wouldn't consider that a waiver of

6   the attorney-client privilege whatsoever.

7        Q.   And did you express your belief to your client

8   that the call remained privileged, despite the fact that

9   you heard the preamble?

10       A.   Yes.

11       Q.   And the-- did you at some point become aware that

12   attorney-client phone calls had been recorded?

13       A.   Only what I had really read in the paper and what

14   was commonly discussed among the defense bar.

15       Q.   And is that as a result of this case?

16       A.   I think so.

17       Q.   Okay.  And what was your reaction to that?

18       A.   Initially I was-- I was hesitant to believe that

19   it happened.  I was, to say the least, surprised,

20   somewhat shocked that those conversations would be

21   recorded.  No. 1, recorded, or possibly kept or shared

22   with someone else was just fairly unbelievable.

23       Q.   Why was it unbelievable?

24       A.   Well, I've been practicing 45 years, both on the

25   defense and the prosecution side.  And attorney-client

1   privileged communications are extremely sensitive to

2   both sides.  And the fact that they would be, if they

3   were recorded, shared with anyone would be to me a clear

4   breach of the Sixth Amendment and a clear violation.

5     Q.  In all the time you've been practicing law, have

6   you ever received discovery from the United States

7   Attorney's Office that contained phone calls between

8   clients and their attorneys?

9     A.  From the U.S. Attorney's Office?  No.

10    Q.  Okay.  And if you had known that your calls were

11  in the possession of the U.S. Attorney's Office, what

12  would you have done?

13    A.  To start with, I would've demanded that they be

14  produced to me and then follow up from there as to what

15  they were used for, if anything, who had reviewed them,

16  who had copies of them, how they were intercepted.

17  Yeah, it would be a fairly serious violation.

18          MR. REDMOND:  That's all I have, Mr. Haney.

19  Thank you.

20          MS. VANBEBBER:  No questions.

21               CROSS EXAMINATION

22  BY MR. CLYMER:

23    Q.  Mr. Haney, is your practice a solo practice or

24  are you in a law firm?

25    A.  I'm with Stevens & Brand law firm.

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18        2427

1      Q.   How many attorneys in that firm, sir?

2      A.   Last time I counted, I think there were just a

3  little under 20.

4      Q.   And if I heard you correctly, when you said you

5  give your number to clients, you actually said numbers

6  plural, do you give more than one phone number to

7  clients?

8      A.   Yeah, we've got a-- kind of a rolling series of

9  numbers for the office, and then I have a private number

10 that rings on my desk only.  And I think on occasion

11 I've given clients a cell phone number, but not very

12 often.

13     Q.   Do you use a cell phone, too, sir?

14     A.   I don't use a cell phone at CCA.

15     Q.   So if a person is an inmate at CCA and a client

16 of yours, would he-- would he-- is there one or two

17 numbers that they'd definitively have?

18     A.   More than likely he would call the main

19 switchboard number and it would either roll over into

20 another number or be answered and then referred to me.

21     Q.   Okay.  And what is that number, sir?

22     A.   (785) 408-2000 is the main number.

23     Q.   And when somebody calls that number, does a

24 receptionist answer it or do you get a recording?

25     A.   No, the receptionist will answer.  If that phone

1    is tied up, it will roll over to another auxiliary

2    number, but somebody should answer it.  We don't--

3    during work hours, they should not get an answering

4    machine.

5        Q.   So they should get a live person?

6        A.   Yes, sir.

7        Q.   Are your receptionists taught that when they get

8    the call from CCA they should press the button that has

9    the call accepted?

10       A.   Yeah.  They have-- they have a list of my clients

11   at CCA.  Occasionally I'll get calls from inmates at

12   CCA, I don't have any idea who they are, they just want

13   to call.

14       Q.   You don't want to accept that call?

15       A.   No.

16       Q.   So they've got a list of your clients.  The

17   preamble has got the name of the client in it.  Correct?

18       A.   It should.

19       Q.   And it tells them if you want to accept you've

20   got to push a certain button?

21       A.   Yes, sir.

22       Q.   And it sounds like your receptionists are advised

23   that they should push the button for your clients?

24       A.   Yeah.

25       Q.   When that happens, does the receptionist then

1    determine if you're in or not in the office?

2        A.   Well, the receptionist should know whether I'm in

3    the office.  But yes, it will show.  They'll call me and

4    say you have Mr. X on Line 2.

5        Q.   If you're not in the office, do they still accept

6    the call or do they reject the call?

7        A.   If I'm not in the office, they'll normally accept

8    the call but won't refer them to my answering machine,

9    they'll just say, Mr. Haney will be back at a certain

10   time.

11       Q.   So the inmate may leave a phone message for you

12   on your answering machine?

13       A.   Yeah, a phone message with the receptionist

14   rather than on a voicemail.

15       Q.   Gotcha.  And do they-- do they leave a message

16   with the receptionist where the receptionist writes it

17   down, or is it recorded by the receptionist?

18       A.   It's normally just written down with a-- received

19   phone call from so and so and what time they called.

20       Q.   So if we looked at phone records, we might see

21   calls from CCA to your office where it's one of your

22   clients and the person may have only talked to a

23   receptionist and left a message, rather than talked to

24   you; is that safe to say?

25       A.   That's possible.  The message would just be the

1    inmate had called and when they called.  The

2    receptionist would not take a--

3        Q.   Substantive message?

4        A.   -- substantive message, no.

5        Q.   They're not talking-- the receptionist is not

6    talking about legal advice to your clients?

7        A.   No.

8        Q.   And I want to make sure I understand.  There's a

9    little confusion about privatization.  You don't use

10   that term.  Correct?

11       A.   No, I don't.

12       Q.   Let's put that term aside.  Did you ever take

13   steps at any point in your career as a lawyer in your

14   practice in criminal defense to ask CCA to make sure

15   your calls-- calls to your number were not going to be

16   recorded?

17       A.   Other than letters I sent with the-- the numbers

18   on them, I never even fathomed that they would be

19   recorded.

20       Q.   And when you said the letters you sent with the

21   numbers on them, can you tell us a little bit what

22   you're talking about?

23       A.   Well, it would go to CCA, listing the numbers,

24   the official numbers that inmates would call my office

25   with so that they would have a list of those numbers

1  that were legal calls.

2      Q.   When did you do that, sir, if you recall?

3      A.   A couple of times.  I don't know, I did it

4  several years ago and maybe--

5      Q.   Do you recall--

6      A.   Within the last three or four years.

7      Q.   Do you recall doing it for the first time in your

8  career in August of 2016, sir?

9      A.   That's what I said, three or four years ago would

10 be about it, but I don't have a specific recollection of

11 the date.

12     Q.   And do you recall that being the first time you

13 ever did it?

14     A.   I don't know.

15     Q.   Okay.  I'm going to show you what's been marked

16 as part of a document that was Exhibit 459.

17     A.   Sure.

18     Q.   Just take your time and take a look through this,

19 sir, and let me know when you're done reading it.

20     A.   Okay.  That refreshes my recollection.

21     Q.   Great.  Can I have that back?  I'm going to ask

22 you a couple of questions.

23     A.   Sure.

24     Q.   Would it be correct to say the document I handed

25 to you and you handed back to me is a two-page affidavit

1   that you signed on the 26th day of August, 2016?

2       A.  Yes.

3       Q.  Okay.  In that document you said that the-- you

4   didn't even know that they had an attorney registry at

5   CCA until August of 2016; is that safe to say?

6       A.  Yes.

7       Q.  So you never sent the letter before August 2016?

8       A.  Don't think I sent a letter, no.

9       Q.  And before August 2016, there were times where

10  you would get in your federal criminal cases telephone

11  recordings from the prosecution in discovery.  Right?

12  Your inmate-- your client talking to somebody else on

13  the phone?

14      A.  By "inmate," do you mean like phone interceptions

15  or wiretaps or--

16      Q.  A telephone call-- did you ever get-- before that

17  date in August of 2016, did you ever get discovery where

18  there are recordings of one of your clients talking to

19  somebody else on the telephone from CCA; calling a

20  friend, a family member, that sort of thing?

21      A.  From CCA, I don't specifically recall, but I

22  wouldn't be surprised.

23      Q.  Okay.  And did you ever have a chance during that

24  time period to get calls yourself from clients at CCA

25  before August of 2016?

1    A.   I think so.

2    Q.   When you got those telephone calls from clients,

3  did you hear the preamble when you picked up the phone?

4    A.   Like I said, if the call was to me directly and

5  the preamble was on the phone, I would hear it.  But if

6  it went through my receptionist, I wouldn't.

7    Q.   Do you remember that before August of 2016, sir,

8  when that preamble would play on those phone calls that

9  the preamble said, "This call is subject to recording

10  and monitoring"?

11    A.   "Subject to," and that's-- that's the time I

12  advised my client on the phone this is an

13  attorney-client privileged conversation, it's not to be

14  recorded, not to be shared.

15    Q.   And what made you say that to your clients, sir?

16    A.   Well, if it's a standard preamble on phone calls

17  to a federal institution, and they're all different, I

18  always say that.  Just like any legal mail going into an

19  institution, I always clearly put "legal mail" on the

20  envelope, even though the institution should know it's

21  legal mail from a law firm.

22         Same thing with a telephone call.  You know, if

23  it says it's subject to recording, I'll say, "This is

24  attorney-client communication, it's not to be recorded."

25  Same thing with phone calls to clients not in

1   institutions.

2      Q.   Do you-- did you think some third party was on

3   the line listening to you and they were going to shut

4   the machine off if you said that?

5      A.   I didn't think so.   I would've been shocked if--

6      Q.   Weren't you concerned that those calls would be

7   recorded?   The recording just told you it was subject to

8   recording.   Right?

9      A.   Subject to, certainly.

10     Q.   What effect did you think it would have for you

11  to say, "This call should not be recorded"?   What was

12  that going to do?

13     A.   Well, when you record-- I don't know whether you

14  record every call that goes in or out of the

15  institution.   It's almost like a wiretap, you record

16  everything that's there.   But if it is an

17  attorney-client communication, it should not be listened

18  to.

19     Q.   Well, we'll talk about the "should" in a minute,

20  we'll get to that.

21     A.   Sure.

22     Q.   My question is:   What did you think you were

23  accomplishing by saying those words when you heard the

24  warning about the recording?   Why did you do it?

25     A.   Because it was an attorney-client privileged

1    communication which shouldn't be listened to, shared

2    with others or recorded or used in any fashion.

3        Q.   What effect did you think your words were going

4    to have?

5        A.   The effect that it would communicate to whoever

6    reviewed that phone call at a later time, or then or

7    whatever, that it was an attorney-client communication.

8        Q.   You wanted to warn somebody who might listen to

9    the call they should stop listening?

10       A.   Yeah, in part, certainly.

11       Q.   I understand.  So it was your expectation that

12   the call was actually going to be recorded?

13       A.   No.

14       Q.   Well, then if the call wasn't going to be

15   recorded, who's ever going to hear you?

16       A.   I didn't know whether they were or were not

17   recorded.  I don't know what the procedure is at CCA for

18   recording conversations, whether-- if they have a

19   machine set up that records everything as opposed to

20   minimizing attorney-client communications.

21           If they record everything, yeah, then that

22   statement on the phone, "This is an attorney-client

23   communication," if they go through this-- these phone

24   calls later, it would clearly delineate this as

25   attorney-client.

1      Q.   Would give them a warning?

2      A.   Certainly.

3      Q.   Okay.  But did you ever make any effort after

4   hearing that in every call you got to check with CCA to

5   see if they're recording those calls?

6      A.   I don't know that I heard it on every call I got.

7      Q.   Did you hear it on some of the calls?

8      A.   Some of the calls.

9      Q.   Did you ever call up CCA and say, you know, why

10  are you guys doing this?

11     A.   Doing what?

12     Q.   Recording your phone calls with your clients.

13     A.   No, I didn't talk to them directly about that.

14     Q.   So you told us how important the attorney-client

15  privilege is, but it was not important enough for you to

16  pick up the phone and call CCA and say to CCA, why are

17  you recording my calls?

18     A.   I didn't know they were recording the calls.

19     Q.   The warning that was on the recordings you heard

20  wasn't enough to give you notice?

21     A.   Subject to recording, yes.  It didn't say, "We

22  are recording this phone call," or, "We are recording

23  and preserving this phone call."

24     Q.   I see.  And now, you decided that hearing that

25  recording did not constitute a waiver, that hearing that

1  warning did not constitute a waiver; is that right?

2      A.  No, it didn't.

3      Q.  Okay.  Did you bring that issue to a court before

4  making that determination, or did you determine that

5  unilaterally?

6      A.  Did I bring it to a court?

7      Q.  Yeah.  I mean, did you just make that legal

8  determination about what's a waiver and what's not by

9  yourself?

10     A.  Well, initially you have to.  Who else is going

11 to make it?

12     Q.  Well, you could've called CCA and found out,

13 couldn't you?

14     A.  About whether I was waiving my privilege at CCA?

15     Q.  Yeah.

16     A.  They wouldn't be able to tell me whether I was

17 waiving a privilege.

18     Q.  Did you do any legal research on it?

19     A.  I've done a lot of legal research on the waiver

20 of attorney-client communications, but I don't recall

21 specifically anything on CCA.

22     Q.  So without doing any research-- did you know

23 there's two Tenth Circuit decisions, decisions from the

24 very circuit that controls here--

25           MR. REDMOND:  Object, that is not true.

 1          MR. CLYMER:  I haven't finished my question.
 2  BY MR. CLYMER:
 3     Q.  -- in which the Court has held that under Title
 4  III, hearing the recording on CCA constitutes consent to
 5  recording, just hearing the recording?
 6          THE COURT:  Are those attorney-client
 7  situations, Mr. Clymer?
 8          MR. CLYMER:  Yes.  Yes, they are, Your
 9  Honor.  I have copies if the Court would like to see
10  them.  One of the cases is called *Faulkner,* and there's
11  a more recent case, and I don't recall the name.  I've
12  got copies if the Court would like to see them.
13          MR. REDMOND:  I'd like to see them.
14          THE COURT:  They're Title III where
15  everything is recorded and where agents are instructed
16  to minimize if they come across an attorney-client
17  conversation?  Title III.  Right?
18          MR. CLYMER:  I believe so, Your Honor.
19          THE COURT:  Okay.  I've heard all I need to
20  hear.  Do you want to answer the question?
21          THE WITNESS:  Whether--
22  BY MR. CLYMER:
23     Q.  Did you know about those Tenth Circuit cases?
24     A.  I haven't read those Tenth Circuit cases.  I'm
25  not sure what you're telling me they stand for.

1        Q.  I'm just asking, sir, did you make any efforts on

2   your own to try to determine whether the law supported

3   your opinion that there was no waiver?

4        A.  No waiver of the attorney-client privilege?

5        Q.  Yes.  Did you do any research to reach that

6   conclusion?

7        A.  Not specifically.

8        Q.  You just made a unilateral decision on your own?

9        A.  Yes.

10       Q.  After you sent that letter in with your phone

11  numbers on it, had you still heard that warning about

12  the recording, or do you not hear that anymore?

13       A.  I don't recall hearing it anymore, but they

14  still-- most of them go through the receptionist rather

15  than come to me, so I wouldn't hear it because I just

16  hear my client's voice on the line.

17              MR. CLYMER:  Nothing further, Your Honor.

18              THE COURT:  Any other questions?

19              MR. REDMOND:  No.  Thank you.

20              THE COURT:  May Mr. Haney be excused?

21              MR. REDMOND:  He may.

22              THE COURT:  All right.  You're excused.

23  Thank you.  Let's call the next witness.  We're going to

24  finish today.  So I've warned you before, Mr. Clymer.  I

25  know the points that you need to make, but please make

 1   them more efficiently.

 2          I mean, you've been doing this with the

 3   other witnesses.  You know, the fact that there has to

 4   be an affirmative acceptance of the call that-- you

 5   know, your theory that the attorneys needed to do a

 6   whole bunch of things to ensure that CCA knew that they

 7   didn't want their calls recorded.  But please do it more

 8   efficiently.

 9          We are going to close the testimonial record

10   today.  So if you want to call your witnesses, and I

11   don't know if you have any more, we need to be

12   efficient.  Next witness.

13          MR. CLYMER:  Your Honor, our next witness is

14   Scott Rask.

15          THE COURT:  And then Mr. Beall, right, and

16   that's it?

17          MR. CLYMER:  Mr. Beall is not my witness,

18   Your Honor.

19          THE COURT:  All right.  How long are you

20   going to be with Mr. Rask?

21          MR. CLYMER:  Myself, maybe 5 to 10 minutes.

22          THE COURT:  All right.  I'm going to hold

23   you to that, ten minutes.  And I'm going to hold you all

24   to ten minutes of cross examination.

25                 SCOTT CLIFFORD RASK,

1    called as a witness on behalf of the Government, having

2    first been duly sworn, testified as follows:

3                        DIRECT EXAMINATION

4    BY MR. CLYMER:

5        Q.   Mr. Rask, can you please state your full name and

6    spell your last name?

7        A.   Scott Clifford Rask.  R-A-S-K.

8        Q.   Mr. Rask, are you an Assistant United States

9    Attorney in the District of Kansas?

10       A.   Yes, sir.

11       Q.   Were you a supervisor in that office in October

12   of 2016?

13       A.   The latter half of October, yes, sir.

14       Q.   And what was your position?

15       A.   As supervisory AUSA or criminal coordinator.

16       Q.   In which office?

17       A.   Kansas City.

18       Q.   Did you receive a e-mail message from the

19   criminal chief, Deb Barnett, at the end of October 2016

20   regarding a request by the Special Master to do an

21   inventory of some documentation or other material

22   related to the *Black* case in which Ms. Barnett

23   instructed you that you should make sure that Ms.

24   Tomasic did not at that time have communication or

25   interaction, I should say, with the Court and court

1    personnel?

2        A.  Yes, I did.

3        Q.  Did you interpret that to include the Special

4    Master?

5        A.  Yes, it would.

6        Q.  What did you do after receiving that e-mail

7    message?

8        A.  I had a telephone conversation with Ms. Barnett

9    at some point after that e-mail.

10       Q.  And can you tell us about that telephone

11   conversation?

12       A.  It was inquiring just to-- so I would have a

13   better understanding of what Ms. Barnett wanted me to

14   specifically communicate and to then be able to carry

15   that out with Ms. Tomasic.

16       Q.  Did that conversation include discussions of Ms.

17   Barnett's thinking in wanting to not have Ms. Tomasic

18   interact with the Court, court personnel or the Special

19   Master at that time?

20       A.  Yes, it did.

21       Q.  Can you describe what she told you?

22       A.  To the best of my recollection, it was an effort

23   to ensure that we were able to give the-- the best

24   information and in the best way to the Special Master,

25   related to ensuring that there wasn't any further

1  difficulties in communicating information or material

2  from Ms. Tomasic herself.

3      Q.   Were there concerns about Ms. Tomasic's behavior

4  and emotional state at that time?

5      A.   That's a fair way of stating it, yes, sir.

6      Q.   And did Ms. Barnett discuss that with you on the

7  telephone conversation?

8      A.   We did have a conversation-- that was part of the

9  conversation, yes, sir.

10     Q.   Was there anything discussed in that conversation

11 about trying frustrate or impair the Special Master's

12 investigation?

13     A.   Not at all.

14     Q.   Was there any discussion that you should try to

15 prevent people from speaking to the Special Master?

16     A.   No, sir.

17     Q.   Was there any criticism of the Special Master's

18 investigation or either explicit or implicit suggestion

19 from Ms. Barnett that your office should be anything

20 less than fully cooperative with the Special Master?

21     A.   No, sir.

22     Q.   After you spoke to Ms. Barnett, did you speak to

23 Erin Tomasic?

24     A.   Yes, I did.

25     Q.   At that time, Mr. Rask, what was the nature of--

1    or the state of your relationship with Ms. Tomasic?  Was

2    it a good relationship or a bad relationship?

3        A.   Good.

4        Q.   And you were her supervisor at that time?

5        A.   I was.

6        Q.   Did you pass along what Ms. Barnett had said to

7    you to Ms. Tomasic?

8        A.   I did, yes.

9        Q.   Can you tell us about that, please?

10       A.   I don't remember exactly how long after I had the

11   conversation with Ms. Barnett, but I met with Ms.

12   Tomasic in the office and let her know that she would

13   not be-- she-- she should not have direct communication

14   with the Court involving-- this Court specifically or

15   court personnel in connection with the *Black* litigation,

16   which would also include the Special Master.

17            Part of that was because the e-mail from the

18   Special Master for this inventory request, if you will,

19   had been forwarded to Ms. Tomasic, so she was aware of

20   the specific request and the Special Master's inquiry if

21   Ms. Tomasic would be an appropriate one to interact

22   with.

23       Q.   Did you communicate to Ms. Tomasic that this--

24   this request was coming-- or this directive was coming

25   from Criminal Chief Deb Barnett?

1    A.  I did.

2    Q.  How did Ms. Tomasic take that?

3    A.  Not well.

4    Q.  Was her relationship with Ms. Barnett at that

5  time somewhat worse than her relationship with you?

6    A.  Yes.

7    Q.  Did Ms. Tomasic get emotional and upset about

8  what you told her when you told her it was from Deb

9  Barnett?

10    A.  There was some emotional response, and it was

11  not-- some of it was negative, yes.

12    Q.  Did there come a time later when Ms. Tomasic

13  revealed to you that she had listened to

14  attorney-client-- at least one attorney-client call in

15  the *Herrera-Zamora* case?

16    A.  Yes.

17    Q.  After that disclosure, did you have a discussion

18  with Ms. Tomasic about what she had done?

19    A.  Yes.

20    Q.  Did you then have discussions with other people

21  who might have information, namely Assistant U.S.

22  Attorneys Oakley, Flannigan, and Zabel?

23    A.  Yes.

24    Q.  Did you prepare memoranda from those discussions?

25    A.  I did.

1     Q.   Did you do your best to be accurate when you

2    prepared those memoranda?

3     A.   Yes, I did.

4     Q.   Did you then take the memoranda and show them to

5    the people with whom you had discussed those matters to

6    ask them if the memoranda were accurate?

7     A.   I did not.

8     Q.   Did you prepare one memoranda for the discussions

9    with each one of those people?

10    A.   I did.  And then with some of the individuals,

11   there was some follow-up conversation, so I did

12   addendums to those memorandums.

13    Q.   And was that follow-up conversation after Erin

14   Tomasic sent a letter to Chief Judge Robinson?

15    A.   It was.

16    Q.   Did there come a time when a interpreter named

17   Sara Gardner came forward with information about her

18   interaction with Erin Tomasic?

19    A.   Yes.

20    Q.   Did you have occasion to interview Ms. Gardner?

21    A.   Yes, I did.

22    Q.   Did you prepare a memorandum based on that

23   interview?

24    A.   There was-- of the second interview, there was a

25   joint memorandum prepared with Criminal Chief Emily

1   Metzger-- I mean Civil Chief Emily Metzger.

2       Q.   The two of you worked on the memorandum together?

3       A.   Yes.

4       Q.   Did you do your best to be accurate in that

5   memorandum?

6       A.   Yes.

7       Q.   After you reviewed whatever input Ms. Metzger had

8   in that, were you confident that her input was also

9   accurate?

10      A.   Yes.

11      Q.   Did you show that to Ms. Gardner to have her

12  review it?

13      A.   No.

14              MR. CLYMER:  May I have a moment, Your

15  Honor?

16              THE COURT:  Yes.

17              MR. CLYMER:  Nothing further, Your Honor.

18              MS. VANBEBBER:  I have no questions.

19              MR. BELL:  We don't have anything to ask Mr.

20  Rask.

21              THE COURT:  All right.  May Mr. Rask be

22  excused?

23              MR. CLYMER:  No objection.

24              THE COURT:  You're excused.

25              THE WITNESS:  Thank you.

 1              THE COURT:  Next witness.

 2              MS. VANBEBBER:  We would call Tom Beall.

 3    Your Honor, while we're waiting I'd like to move for the

 4    admission of the remainder of our exhibits, which would

 5    be numbers 1177 and 1-- through 1192.

 6              THE COURT:  1177 through 1192.

 7              MS. VANBEBBER:  And we would withdraw 1193.

 8              THE COURT:  Any objection?

 9              MR. CLYMER:  I'm not sure I have all those,

10    Your Honor.  May I have a moment?

11              THE COURT:  All right.  Any objection?

12              MR. CLYMER:  I haven't seen some of those

13    exhibits, Your Honor.  So if they're all e-mail messages

14    that we turned over in the production, no objection.

15              MS. VANBEBBER:  That's what they are.

16              THE COURT:  All right.  1177 through 1192

17    admitted.

18              MS. BRANNON:  Judge, we have one other

19    exhibit, actually two of them, 656 and 656A.  These are

20    agreed to by the parties.  656 and 656A are a transcript

21    and a translation of the Spanish version of the preamble

22    on the CCA calls.

23              MR. CLYMER:  I was going to take a look at

24    that before I--

25              MS. BRANNON:  We gave it to you.

1              MR. CLYMER:  I told you I'd like to take a

2    look at that.

3              (Counsel confer).

4              MS. BRANNON:  We'll wait on that, Your

5    Honor.

6              THE COURT:  All right.

7              MS. VANBEBBER:  Then the remainder of mine

8    are 11-- 1167 and 11-- through 1175.  And those are the

9    ones from this morning.

10             THE COURT:  All right.  Any objection?

11             MR. CLYMER:  Not if they're e-mails that we

12   produced, Your Honor, no objection.

13             MS. VANBEBBER:  That's what they are.

14             THE COURT:  1167 through 1175 admitted.

15                  THOMAS E. BEALL,

16   called as a witness on behalf of the Special Master,

17   having first been duly sworn, testified as follows:

18                  DIRECT EXAMINATION

19   BY MS. VANBEBBER:

20      Q.   Good afternoon, Mr. Beall.

21      A.   Hello.

22      Q.   Would you please state your full name and spell

23   your last name for the court reporter?

24      A.   Thomas E. Beall.  B-E-A-L-L.

25      Q.   Mr. Beall, I'm going to ask you some questions

1  this afternoon that deal with calendar years 19-- or,

2  excuse me, 2016 and 2017, during the time when you were

3  the acting United States Attorney for the District of

4  Kansas.

5      A.  Understood.

6      Q.  Let me ask you first, did you first meet the

7  Special Master in this case on October 30th on his first

8  visit to Kansas City?

9      A.  I believe so.

10     Q.  And you met him several times after that, did you

11 not?

12     A.  Correct.

13     Q.  Do you remember at that very first meeting that

14 he told you that you would-- he would like for you to

15 tell your employees that they were free to speak with

16 him?

17     A.  I honestly don't recall the specific

18 conversation.

19     Q.  You don't recall that he asked you specifically

20 to inform Erin Tomasic that he would be-- like to speak

21 with her?

22     A.  He may have.  I just don't recall it.

23     Q.  Do you recall him asking you the favor of being

24 able to point employees other than Erin Tomasic to him

25 if they'd like to speak with him?

1    A.  He may have done so, I just don't specifically

2   recall it.

3    Q.  When the Special Master's investigation began,

4   it's true that you delegated your criminal chief to

5   liaison with the Special Master for most events.

6   Correct?

7    A.  That's true.  I spoke with him directly also, and

8   others.

9    Q.  And primarily, he really wanted only two things

10  at the beginning of the investigation:  No. 1, the

11  creation of a set of search terms that would allow you

12  to search the e-mails of all your office employees?

13   A.  In the first meeting?

14   Q.  Yeah.  The first thing that he wanted from you.

15   A.  I-- I don't recall if that was the first thing he

16  wanted.

17   Q.  Well, that is what he ended up wanting from you,

18  wasn't it, No. 1?

19   A.  That certainly was a request, yes.

20   Q.  And the other thing that he wanted from you was

21  the opportunity to hear from USAO employees as it became

22  relevant?

23   A.  Yes.

24   Q.  So was it your intention to fully cooperate with

25  the Special Master in doing those two things?

1      A.   Yes.

2      Q.   You also delegated some primary authority for the

3  search term project to Emily Metzger, your civil chief,

4  didn't you?

5      A.   True.

6      Q.   It was important to have some kind of liaison

7  with these people in your office in order to make this

8  project go smoothly, wasn't it, other than just having

9  contact with you?

10      A.   Yes.

11      Q.   Ms. Metzger worked closely with your IT director,

12  David Steeby, didn't she, on hunting for search terms?

13      A.   I believe that's true, yes.

14      Q.   And that began around November of 2016, didn't

15  it?

16      A.   I couldn't tell you the timeline exactly, but

17  that sounds fair.

18      Q.   It was soon after-- after the Special Master was

19  appointed on October the 11th, wasn't it?

20      A.   In that proximity.

21      Q.   And isn't it true that they finally - working

22  with Mrs. Metzger and the Special Master, David Steeby

23  all working together - finally came up with a workable

24  set of search terms on June the 5th, 2017?

25      A.   I actually don't recall that.  In my memory,

1  the-- the search terms were never fully resolved.

2      Q.   So if there was an agreement that the Special

3  Master and Emily said was sufficient to go ahead and do

4  a test run on one repository--

5      A.   I think there were multiple test runs done to

6  evaluate different search terms to see what kind of

7  results they generated.

8      Q.   And isn't it true that that last-- the last one

9  of those was to be a test run on the repository of Erin

10 Tomasic, who was a former employee, and so, therefore,

11 you have the authority to do a-- to do a run on her

12 specifically?

13     A.   I do recall there may have been a test run done

14 on her e-mails, yes.

15     Q.   And if the record shows that that was June the

16 5th, 2017, when that was okayed, does that sound right

17 to you?

18     A.   I-- I couldn't say.

19     Q.   To your knowledge, although Mr. Steeby had

20 already run the tests with Ms. Tomasic's repository,

21 the-- there was never any provision to give it to the

22 Special Master until a week ago?

23     A.   Can you ask that question again?  I'm not sure I

24 understood it.

25     Q.   To your knowledge, although Mr. Steeby already

1   ran the test for Ms. Tomasic's repository, it was never

2   provided to the Special Master until it was produced

3   last week?

4        A.   I have no knowledge of when it was produced.

5        Q.   You know it was not produced-- you don't know any

6   time that it was produced, do you?

7        A.   No.

8        Q.   Okay.  Aside from the search term issues, Ms.

9   Barnett remained the primary liaison with the Special

10  Master for the other parts of the investigation, didn't

11  she?

12       A.   I think that's fair.

13       Q.   And you knew that the Special Master would

14  probably benefit from talking to certain employees?

15       A.   Yes.

16       Q.   And do you-- you did not know that he repeatedly

17  asked Ms. Barnett to inform Erin Tomasic that he wanted

18  to talk to her or would be willing to talk to her?

19       A.   I don't recall that.

20       Q.   What about Pauletta Boyd?  Do you remember--

21  remember that he repeatedly asked Ms. Barnett to be able

22  to speak with-- to tell Pauletta Boyd he'd like to talk

23  to her?

24       A.   I don't recall how many times or whether there

25  were multiple times that that request was made.  I know

1    that those interviews occurred.

2      Q.   And if the record reflects that it was February

3    when he was able to speak to Pauletta Boyd, does that

4    ring a bell?

5      A.   I don't recall.

6      Q.   If the record reflects that, you don't have any

7    reason to disagree?

8      A.   I don't.

9      Q.   And if the record reflects that-- that Erin

10   Tomasic was finally permitted to speak with him about

11   the same time, in February...

12     A.   Again, I don't-- I don't recall.

13     Q.   To your knowledge, by June of 2017, did the

14   Special Master become frustrated enough by the failure

15   to access the search terms for eight months that he

16   asked to speak with you and the judge together in the

17   middle of June?

18     A.   I don't know about the premise of your question

19   about how frustrated he had become, I'm not aware of

20   what his mental state was, but there was a meeting that

21   was scheduled.

22     Q.   Did that meeting happen?

23     A.   There was a meeting that several people from my

24   office, including myself, attended regarding search

25   terms with the Special Master that occurred in this

1    building.

2        Q.  Are you aware that the entire District of

3    Kansas-- well, let me ask it this way.  If-- were you

4    aware ahead of time that the entire District of Kansas

5    was scheduled for a computer refreshment during August

6    of 2017 [sic]?

7        A.  I recall being aware that there was a computer

8    refresh scheduled.

9        Q.  Well, you were the U.S. Attorney, you would've

10   known the schedule at the time, wouldn't you?

11       A.  I don't know how much I knew of the schedule.

12   Those kind of programs are run directly from the

13   Executive Office of U.S. Attorneys through IT staff, so

14   I didn't manage the program.

15       Q.  So your IT staff would've been actually making--

16   making the refreshment happen?  Would that be

17   Mr. Steeby?

18       A.  He is the systems manager.

19       Q.  So he would be supervising that project, would he

20   not?

21       A.  Yes.

22       Q.  When did you become aware that in August 2016

23   there was going to be a refreshment for all of your

24   offices and everybody would have to save all their work

25   and make sure that they didn't lose anything during the

1    two days when this project occurred?

2        A.    I don't know that I can agree to your

3    characterization of what people had to do or not do in

4    that refresh.

5        Q.    Did you get a memo out to everybody to tell them

6    what they needed to do?

7        A.    I don't recall that there was anything that

8    anybody needed to do.

9        Q.    How did they know how to prepare?

10       A.    I don't-- I don't know that they were required to

11   prepare in some way.  I don't know that it wasn't all

12   managed by IT.  I just don't have any information on

13   that, I don't have any memory of that.

14       Q.    Were you warned by a copy of an e-mail from-- to

15   Ms. Barnett from Melody Brannon on August the 30th of

16   2016?

17       A.    Warned?

18       Q.    Yes.

19       A.    Of what?

20       Q.    That you should be careful not to destroy or lose

21   equipment in that refresh that had information on it

22   related to the *Black* case?

23       A.    I know there was communication about preservation

24   of computer hard drives, I know a lot of effort was made

25   to do so.  And I know there was communication with the

1   Federal Public Defender on that subject.

2        Q.  Are you-- you were also aware that Mr. Slinkard

3   sent a letter to the Special Master on August-- or,

4   excuse me, went to a hearing on October 28th that had to

5   do with the AVPC controlled by Pauletta Boyd?

6        A.  I'm sorry, can you restate the question?  I don't

7   know about the date you're citing, but...

8        Q.  There was a hearing on October 28th--

9        A.  Yes.

10       Q.  -- I'll present that to you.  And were you aware

11  that the subject matter of the AVPC of Pauletta Boyd

12  came up?

13       A.  I wouldn't dispute that.

14       Q.  And did you get a copy or read the letter that

15  Mr. Slinkard then sent on November the 5th to the

16  Special Master saying that he had gotten bad information

17  and that the AVPC was not preserved but, in fact, had

18  been completely reformatted?

19       A.  Yes.

20       Q.  And that whatever information was on it very--

21  very likely was either all or mostly gone?

22       A.  Well, the letter, I assume you have it, speaks

23  for itself.  Yes, I was aware of it.

24       Q.  Did the Special Master then send you e-mails that

25  said, would you please take the AVPC out of commission

1    immediately, unplug it, and then preserve any systems or

2    network information from the servers or routers or

3    appliances, anything that was-- that-- what was invoked

4    with network traffic-- involved with the network

5    traffic?

6        A.   I don't recall a specific e-mail on that.

7        Q.   Would you have been surprised to receive anything

8    like that?

9        A.   I-- would I have been surprised?  I-- I don't

10   know, I doubt it.

11       Q.   The Special Master was concerned?

12       A.   I can't speak for the Special Master.

13       Q.   Were you aware that the AVPC was not unplugged

14   until November the 7th?

15       A.   No.

16       Q.   Were you aware that it was not put in the vault

17   until December?

18       A.   No.

19       Q.   None of-- none of your staff told you about that?

20       A.   I don't have any recollection of being told that.

21       Q.   Go back to the day the Special Master was

22   appointed, October the 11th of 2016.  Do you recall that

23   Ms. Barnett began a memo on that day, the 11th of

24   October, to ask Main Justice to give you the authority

25   for an office-wide recusal of the District of Kansas in

1   the *Black* case?

2        A.  Say that again, that's--

3        Q.  Were you aware that Ms. Barnett began a memo on

4   October the 11th, 2016, the day the Special Master was

5   appointed, to request authority for the office-wide

6   recusal of the District of Kansas in the *Black* case?

7        A.  I don't know what date-- I don't recall knowing a

8   date that a memo like that was started.

9        Q.  If the record reflects that it was that date, do

10  you have any reason to disagree with it?

11              MR. CLYMER:  Your Honor, objection, because

12  the record does not reflect that's the date the memo was

13  started.

14              THE COURT:  All right.  You can cross

15  examine.

16              MS. VANBEBBER:  Just a minute.

17  BY MS. VANBEBBER:

18       Q.  Let me direct your attention to exhibits--

19  Exhibit 1178, and I'm only interested in you looking at

20  the very bottom.  Look at the top first.  Isn't this a

21  memo from-- or a-- an e-mail from Scott Rask?

22       A.  Yes.

23       Q.  Responding to-- originally an e-mail from Debra

24  Barnett.  And at the bottom, Debra Barnett's e-mail,

25  which is Tuesday, October the 11th, 2016 at 1:20 p.m.?

1     A.   I see that.

2     Q.   And she says, "I'm working on a memo requesting

3  recusal."

4     A.   Okay.

5     Q.   So does that refresh your memory about when all

6  this happened?

7     A.   It doesn't refresh my memory, but I don't dispute

8  that that's what occurred.

9     Q.   All right.  Is it your understanding that the

10  next day the-- you sent a letter actually making the

11  recusal request?  And for the record, that would be the

12  Federal Public Defender's Exhibit 600A.

13     A.   I may have.

14     Q.   Well, you remember sending out the request, don't

15  you?

16     A.   I'm sure I-- I know that I did request.  There

17  were numerous requests and conversations on the subject.

18     Q.   And that percolated for a long time, didn't it?

19     A.   I don't think I'm authorized to talk about advice

20  or anything at DOJ.

21     Q.   I'm just asking you if you--

22     A.   Well, you said it percolated.

23     Q.   -- got an answer.

24     A.   What do you mean?  Percolated where?

25     Q.   You said you were writing things back and forth,

1    did you get an answer from DOJ immediately?

2        A.  I don't recall when I got an answer.

3        Q.  When-- did you get an answer finally?

4        A.  As I said, what I recall is a series of

5    communications, both written and verbal, on the subject

6    of requesting recusal or outside counsel to represent

7    the district in the matter over time.  I couldn't tell

8    you a specific communication or date, but certainly that

9    occurred.

10       Q.  Can you tell me when you finally got an-- an

11   answer from DOJ?

12       A.  I couldn't tell you the date, but it would've

13   been-- when I got an answer to my first request or ever?

14       Q.  To your first request.

15       A.  No idea.

16       Q.  They didn't let you recuse from the entire case,

17   did they?

18       A.  Are we still talking about the first request or

19   ever?

20       Q.  Ever.

21       A.  No, we were never fully recused.

22       Q.  Instead, there was-- Mr. Clymer was eventually

23   appointed to handle the investigation side of the case.

24   Right?

25       A.  That's correct.

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18          2463

1     Q.  Now, would you agree that a change in prosecutors
2  could impede the Special Master's investigation if it
3  comes long after the Special Master has established a
4  working relationship, spent time and money on a search
5  term project, worked in-- worked in conjunction with you
6  and your staff?  And then to have to change horses in
7  midstream, wouldn't that be an impediment to the Special
8  Master?
9     A.  I suppose it possibly could be, but I would tell
10  you that I informed the Special Master-- it's my
11  recollection that I informed the Special Master that I
12  was engaged in the effort to be recused or to get
13  outside counsel appointed during my efforts to do so.
14     Q.  And are you aware from the Special Master's
15  report in this case-- or initial report on Phase III in
16  this case that there really was no more cooperation with
17  regard to the search terms and nor-- nor were people
18  talking to him really until this hearing was scheduled?
19     A.  Now you're talking about a time frame that I
20  wasn't in charge of the litigation, and so whatever the
21  Special Master reported on the subject I assume speaks
22  for itself, I couldn't add to that.
23     Q.  Would you agree that there's a big difference
24  between the litigation positions in the three offices of
25  the District of Kansas?

1      A.   I don't understand your question.

2      Q.   Do the attorneys-- not all the attorneys.  Do the

3  criminal assistants in the Kansas City, Kansas office,

4  in your experience as acting U.S. Attorney, have

5  different litigation positions than those that are

6  common in the other two offices?

7      A.   I think that's too much of a generalization, I

8  don't know if I could say that.  There are probably

9  people individually who operate differently than others.

10     Q.   And were you troubled by the Kansas City, Kansas

11  office's treatment of arguably privileged

12  attorney-client communications?

13     A.   At what time?

14     Q.   While you-- while you were either the First

15  Assistant United States Attorney or the acting United

16  States Attorney.

17     A.   The only time I can recall being concerned about

18  that subject in the Kansas City office was when Ms.

19  Tomasic revealed her conduct in the *Herrera-Zamora*

20  matter and, of course, the-- the handling of the-- the

21  discovery in *Black* that was not well-managed or

22  understood.

23     Q.   And the *Rapp* case?

24     A.   The *Dertinger-Rapp-Huff*, that-- that's correct.

25  That all came out about the same time.

1    Q.  And while you were in a management position in

2    the District of Kansas, were you troubled by the

3    difficult relationship that this particular office has

4    with the defense bar, the criminal defense bar?

5    A.  I would say that I was concerned about the

6    relationship with a portion of this office and the

7    defense bar, yes, I think that's fair.

8    Q.  And did you observe that that is a troubled

9    relationship that's not particularly observed in the

10   other two offices?

11   A.  That-- that's probably fair.  I don't know if

12   it's uniformly fair, that's a pretty large

13   generalization, but...

14   Q.  Did these concerns bring you to consider adopting

15   a district-wide policy, procedure, for recording and

16   using inmate phone calls, videos, e-mails?

17   A.  As a result of all of these matters that we were

18   just discussing, yes, I did develop and put into place a

19   new policy, with the help of the litigation team,

20   including Deb Barnett.

21   Q.  I show you what has been marked as Special

22   Master's Exhibit 1181 and ask if you recognize it, or if

23   you'd rather have me just bring it to you.

24   A.  No, I recognize it.  It was produced by me in

25   camera to the Special Master and the Court.

 1      Q.  Yes.

 2              MS. VANBEBBER:  I believe it's under seal,

 3      isn't it, Your Honor?  I think it's--

 4              THE COURT:  Exhibit 1181, is it admitted and

 5      is it under seal?

 6              COURTROOM DEPUTY:  Let me look.  I don't

 7      show it under seal.

 8              MS. VANBEBBER:  Well, then I would move to

 9      have it put under seal.

10              MR. CLYMER:  No objection.

11              MS. BRANNON:  Judge, actually I would

12      object.  I don't see a reason that this should be under

13      seal.  This is a matter of great interest and concerns

14      of the defense bar about how they treat jail calls.

15      I've read it, I have a copy of it.  And I don't-- unless

16      they can make a case for it being under seal, we would

17      object.

18              THE COURT:  Any objection to it not being

19      under seal?

20              MR. CLYMER:  Your Honor, the government

21      produced that document to the Special Master with the

22      understanding it wasn't going to go any further.  We

23      understand the need for the Court to have access to it

24      for purposes of this litigation and have not objected to

25      that.  But when we turned it over to the Special Master,

1    it was under that condition.

2              THE COURT:  All right.  So the parties in

3    this case have access to it.

4              MR. CLYMER:  And I-- yeah, that's correct.

5    And I'm not suggesting that they shouldn't have access

6    to it.  I think that's fair.

7              THE COURT:  All right.  I will keep it under

8    seal for now.  But I will tell you with respect to 2255

9    litigation, I think it should properly not be under seal

10   with respect to that litigation as well, but we can

11   reach that later.

12             MR. CLYMER:  I'd just ask the Court to defer

13   that issue until we get to that litigation.

14             THE COURT:  All right.  It's under seal for

15   now.

16   BY MS. VANBEBBER:

17       Q.  Mr. Beall, it says at the top of this document

18   that it's a revision.  Was there a prior procedural

19   manual?

20       A.  It's not on my screen anymore, but...

21       Q.  Excuse me?

22       A.  It's not on my screen anymore.  If you say it

23   says, that I--

24       Q.  Oh, I'm sorry.

25             THE COURT:  Let's not put it on the-- on the

1   screen because it will be in public view, but have him

2   look at the paper.

3            THE WITNESS:  There-- I'm sorry.  So, I'm

4   sorry, your question was?

5   BY MS. VANBEBBER:

6       Q.  It says that it's a revision.  What is it a

7   revision of?

8       A.  There may have been a small revision to the

9   original-- to essentially the policy we put in place

10  that had to do-- I can't remember with what, maybe

11  including civil or something that expanded the policy.

12  But honestly, I don't-- it wasn't material.

13      Q.  So prior to the mostly significant piece of this,

14  there was no such manual in say 2016?

15      A.  I do not believe there was a specific policy in

16  the district on the handling of those materials.

17  There-- there was, however, training and other resources

18  on the subject.

19      Q.  And this is-- this is something that you wrote?

20      A.  It was written-- it was written somewhat by Deb

21  Barnett and then reviewed by the same team that-- that

22  worked the *Black* litigation, *Black* CCA litigation.

23            THE COURT:  What's the date on that?

24            MS. VANBEBBER:  It's just May, May 2017.

25  BY MS. VANBEBBER:

1    Q.   And this is a procedure that is district-wide?

2    A.   That's correct.

3         MS. VANBEBBER:  No other questions.

4              CROSS EXAMINATION

5  BY MS. BRANNON:

6    Q.   Good afternoon, Mr. Beall.

7    A.   Good afternoon.

8    Q.   Back in August of 2016, you were the acting U.S.

9  Attorney?

10   A.   At some point I transitioned from acting to

11  interim and I couldn't tell you exactly when that was,

12  but it's not probably of any import.

13   Q.   All right.  So basically we go from July of 2016

14  through I think April of this year, were you the top

15  prosecutor in Kansas?

16   A.   I was the U.S. Attorney for practical purposes,

17  yes.

18   Q.   Right.  You were the one responsible for that

19  office?

20   A.   That's correct.

21   Q.   All right.  We are trying to pull up 655 I think.

22  Ask you to look at this exhibit.  Do you recognize that?

23   A.   You'll have to give me a moment.

24   Q.   This has already been admitted.  It-- and just

25  while you're reading it, to make a reference to a jail

1  call policy, is that the one that we just talked about

2  in evidence?

3      A.  It's the only one that we've ever had, so it

4  would have to be.

5      Q.  All right.  To your knowledge, the one that we

6  just referred to is the only written jail call policy

7  that's existed in this district?

8      A.  With maybe a minor revision, but yes, that's

9  correct.

10      Q.  Okay.

11      A.  As far as I know.

12      Q.  And if we look at Exhibit 695.

13      A.  Mine says 655.

14      Q.  Okay.  So if we pull up 695.

15          MS. BRANNON:  And, Your Honor, I think for

16  the record, our Exhibit 695, I think attached to it is

17  the jail policy that we just referred to.  695 is not

18  under seal, but I understand the Court's ruling, so I

19  guess it should be considered under seal for the time

20  being.

21          THE COURT:  All right.  So 695 is-- is

22  already admitted, but it should be admitted under seal

23  because of the attachment.

24  BY MS. BRANNON:

25      Q.  The new policy that you put into place was for

1   the purpose of maybe avoiding the problem that we have
2   in the *Black* case in part?
3       A.  It was definitely to put more structure and more
4   checks in the-- in how those kind of materials are
5   obtained and handled.  So, yeah, I would-- I would think
6   that's a fair statement.
7       Q.  And you put a lot of restrictions on when a line
8   attorney can go get recorded calls from someplace like
9   CCA.  Right?
10      A.  Right.
11      Q.  It includes requiring a subpoena or some kind of
12  written request?
13      A.  Well, the policy speaks for itself and I don't
14  want to misstate what it requires, but it requires
15  permissions and it requires documentation and forms and
16  it requires filtering.
17              MS. BRANNON:  Bonnie, is it possible to just
18  turn the monitors on for the attorneys-- on for the
19  attorneys so that we can see the exhibits without it
20  being published?
21              THE COURT:  Without the large one?
22              COURTROOM DEPUTY:  Let me see.
23              MS. BRANNON:  If it's a big deal, don't
24  worry about it.
25  BY MS. BRANNON:

1    Q.   While we're working on this, one of the points of

2    the new policy is to make sure that there's actually a

3    written record of requests for phone calls.  Right?

4    A.   Right.

5    Q.   So they-- no longer can you just pick up the

6    phone and get calls?

7    A.   That's the idea.

8    Q.   All right.  And it relies heavily on the use of

9    filter teams?

10    A.   It does.

11    Q.   Okay.  There is a recognition in this policy

12    that, "There's a reasonable possibility that

13    communications between an inmate and his or her attorney

14    may be provided in these requests."  Right?

15    A.   I'm sorry?  Is that what it says?

16    Q.   Yes.

17    A.   Okay.  I don't-- I don't have it in front of me.

18    Q.   If we could flip over to Page 3.  Down at the

19    bottom under "Filter Team."

20    A.   Yes.

21    Q.   So the policy here in Kansas now recognizes that

22    there's a reasonable possibility that these phone call

23    requests could include attorney-client communication?

24    A.   Particularly given what we've learned about

25    practices in the jail, yes.

1    Q.   Fair to say that statement you have in your new

2    policy is a direct reflection of what we've learned

3    through the *Black* litigation?

4    A.   I think that's probably fair.

5    Q.   Attached to this policy are actually written

6    forms for phone calls.  Right?

7    A.   Right.

8    Q.   And in those written forms, it specifically - and

9    if we could flip to the last page I think - specifically

10   allows-- well, you can specifically exclude attorney

11   numbers.  Right?

12   A.   Right.

13   Q.   If you're requesting phone calls for Richard

14   Dertinger, on the form you have to put Richard

15   Dertinger's attorney's phone numbers there to exclude

16   those calls from the request.  Right?

17   A.   Hang on a second, let me take a look at this.

18   Q.   Sure.

19   A.   You're right.  There's a provision there for the

20   phone number, there's a block.

21   Q.   Right.  And it's a-- a way of trying to avoid

22   getting attorney-client phone calls.  Right?

23   A.   Right.

24   Q.   And to your knowledge, that's the first time

25   you've used a form like that in the District of Kansas?

1    A.  I don't know about that.  I think there was a

2   prior form being used that had some specific language in

3   it saying attorney-client phone calls are not sought.

4   So there's been language that-- akin to that, but not

5   quite like this.

6    Q.  Not like this that requires the actual attorney

7   phone numbers?

8    A.  That has a space for the number.

9    Q.  Right.

10    A.  As far-- as far as I know, that's right.

11    Q.  It wasn't so hard to do, was it?

12    A.  I don't-- developing the policy wasn't that easy,

13   but there it is, yes.

14    Q.  You didn't have to go to Securus and have them

15   change their technology, or CCA, have them change their

16   protocol, anything like that.  You just had to ask?

17    A.  Yeah.  I mean, the form speaks for itself.

18    Q.  That form-- that policy has been in effect since

19   May of 2017?

20    A.  I believe that to be correct.  Because it says

21   "revised," I'm thinking maybe there's an earlier-dated

22   policy, or maybe that's an error, I don't know.

23    Q.  This is a policy that was written in this

24   district?

25    A.  Yes.  Well, in-- in consultation.

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18      2475

1     Q.   In consultation with?

2     A.   With Main Justice.

3     Q.   All right.  And it's also predicated on a

4  December 2014 DOJ memo on getting BOP phone calls?  Do

5  you remember that?

6     A.   I-- that may be referenced in there.  I'm sorry,

7  I don't recall.

8     Q.   All right.  How is it that you enforce use of

9  this particular policy in these forms?

10    A.   How do you mean-- how do I-- how do we enforce?

11    Q.   Yeah.  How do you require your lawyers to use it?

12    A.   It's mandatory, it's the rule of the district.

13    Q.   Are you aware of any occasion when there's been a

14 violation of this policy or where they have not used the

15 particular forms to get calls?

16    A.   Since it was instituted, I can't--

17    Q.   Yes.

18    A.   -- I can't recall any violation that I'm aware

19 of.

20         MS. BRANNON:  Could I have just a moment,

21 Your Honor?

22         THE COURT:  Yes.

23         (Counsel confer).

24         MS. BRANNON:  I think that's all we have.

25 Thank you.

1              MR. CLYMER:  No questions.

2              MS. VANBEBBER:  No.

3              THE COURT:  All right.  May Mr. Beall be

4    excused?

5              MS. VANBEBBER:  Yes.

6              THE COURT:  All right.  You're excused.

7              THE WITNESS:  Thank you, Judge.

8              THE COURT:  Special Master, any more

9    witnesses?

10             MS. VANBEBBER:  No, ma'am, that's it.

11             THE COURT:  FPD?

12             MS. BRANNON:  No, Your Honor.  Thank you.

13             THE COURT:  Mr. Clymer?

14             MR. CLYMER:  I have no witnesses, no other

15   witnesses, Your Honor.

16             THE COURT:  All right.  We will consider the

17   testimony-- all parties to have rested on the testimony.

18             Ms. Wiest, how are you situated with the

19   exhibits at this point?

20             COURTROOM DEPUTY:  They're all going to

21   provide the originals before the end of the day.

22             THE COURT:  All right.  So you're collecting

23   those from--

24             COURTROOM DEPUTY:  I have all of Special

25   Master's, I just need the rest of--

 1                THE COURT:  Okay.

 2                COURTROOM DEPUTY:  And I think the

 3     government gave me theirs.

 4                MR. CLYMER:  And 41 was moved in, Bonnie.

 5                COURTROOM DEPUTY:  Yeah, I got that.  Thank

 6     you.

 7                THE COURT:  Okay.  And then exhibit lists

 8     have been amended or going to be amended?

 9                COURTROOM DEPUTY:  I've got those.

10                THE COURT:  I'm sorry?

11                COURTROOM DEPUTY:  I've got those taken care

12     of.

13                THE COURT:  Okay.  So we need to talk about

14     production of documents.  And my understanding is the

15     government is not done with production.

16                MR. SLINKARD:  Your Honor, I informed the

17     Special Master and counsel this morning; yesterday I

18     sent out an inquiry to everyone who was working to

19     identify, collect documents for review, to ask if any--

20     for any positive responses of anything that remained

21     outstanding from them.  The only positive response that

22     I received is from the attorneys who have access to Erin

23     Tomasic's e-mail archives, because their process is

24     somewhat slower, having to try and do searching.

25                This morning I posed to the Special Master

1    and counsel that, with the stipulation that the

2    documents that were produced in Batch 5 or Subpoena

3    *Duces Tecum* 5, being the test search of Erin Tomasic's

4    e-mail using the-- the search terms, as Mr. Steeby

5    testified about in the hearing today-- or excuse me, the

6    hearing this week, that they had those, that, of course,

7    we sent those to them without going through and doing

8    the kind of detailed document-by-document review in an

9    attempt to get something to them on Ms. Tomasic prior to

10   the hearing starting.

11          I asked the question of whether or not they

12   considered that execution of those search terms against

13   her e-mail archive to be all that was necessary or if

14   they wanted continued work by the people reviewing her

15   e-mail archive.  They wanted some time to consider that

16   and-- before answering.

17          So as things stand, to the best of my

18   knowledge at this point, I do not anticipate further

19   production in response to the subpoena *duces tecum*

20   unless we either find something that we have missed

21   providing in the review stage, in which case we would,

22   of course, hand that over, or if the answer from the

23   Special Master and counsel is that they wish efforts to

24   go on with respect to Ms. Tomasic's e-mail archive.

25          THE COURT:  All right.  First, Special

1    Master, what's your position on this?

2         SPECIAL MASTER COHEN:  Judge, the essence of

3    Mr. Slinkard's statement is that he doesn't want to

4    tread the same path twice, and I have no interest in--

5    in that happening either.

6         What I think I need to do to be comfortable

7    is to sit with the subpoena *duces tecum* and go through

8    exactly what the categories have requested.  Look again

9    at the search terms that were applied to Ms. Tomasic's

10   custodial file and come to a level of comfort that what

11   they've done is sufficient.  I think it probably is.

12        I'm less confident about the extent to which

13   other custodial files have been sufficiently searched,

14   and that's something I think I just need time to go back

15   and look at what I've asked for and what's been

16   produced.

17        I should just add I think that it's probably

18   going to be helpful for myself and Mr. Slinkard and

19   others to sit down and just talk about what's actually

20   happened, because the productions have been so recent

21   that I think none of us really have a full understanding

22   of what's happened.

23        MR. SLINKARD:  To be clear, my information

24   was intending to update the Court on the status of

25   production, as I understand it.  If the Special Master

1    wants to confer with respect to what's been produced or

2    ask questions, we obviously remain willing to have those

3    conversations and try to answer inquiries.

4              THE COURT:  Okay.  Ms. Brannon, do you want

5    to weigh in on this?

6              MS. BRANNON:  Your Honor, we really don't

7    have anything to do with the exchange between the

8    Special Master and U.S. Attorneys because it is not our

9    production request.

10             At the end of the day we'd just like a full

11   accounting of what they have produced, what they've

12   withheld.  And obviously we still need more time to

13   finish going through what has been produced before we

14   would ask the Court to close the record.

15             THE COURT:  All right.  So I think where I'd

16   like to go from here is to have what would probably be

17   no more than an hour-long hearing sometime in November,

18   or half day, I don't know, but after you all have had a

19   chance to meet and confer on these issues, and have a

20   hearing at which time I can get a final word from all of

21   you as to whether it's time to-- whether the production

22   has been completed to everyone's satisfaction, whether

23   the FPD's concerns about an accounting of what's been

24   withheld by virtue of production of privilege and

25   similar types of logs has been satisfied or not, and

1    then hear from you on any other further relief you want

2    with respect to the production of documents.

3              So I think we need to have that hearing.

4    And I think probably at that hearing, too, we can talk

5    about-- I can let you know what my thoughts are and

6    whether I want to have proposed findings of fact and

7    conclusions of law or not.  And so hopefully at that

8    hearing we will close the record, unless there's

9    something else that goes on.

10             So I'm looking at dates in November.  I'm

11   wanting to stay away from the third week, which is

12   Thanksgiving week.

13             Bonnie, are we in trial the week of the

14   13th?

15             COURTROOM DEPUTY:  No, I think they're

16   working on that, so let me look.

17             THE COURT:  So I think we're probably going

18   to want to have this hearing-- apparently Monday the

19   12th is a federal holiday, so-- but I'm thinking we're

20   going to want to have the hearing sometime the week of

21   November 13th, if that works.

22             SPECIAL MASTER COHEN:  Your Honor, I'll be

23   out of the country, just returning on the 11th.  So if I

24   could have a couple days at least just to kind of settle

25   back in, that would help me.

1              THE COURT:  Okay.  So like if we schedule

2   this for Friday, the 16th of November?

3              SPECIAL MASTER COHEN:  Thank you very much.

4   That would be fine, Judge, for me.

5              THE COURT:  Does that work for everyone?

6              MR. CLYMER:  Your Honor, I'd appreciate it

7   if we could do it sometime that it would enable me to

8   get a flight out of town sometime that mid-afternoon.

9              THE COURT:  So-- well, why not-- if you

10  could fly in on the 15th.

11             MR. CLYMER:  I would do that, Your Honor.

12             THE COURT:  We could have the hearing first

13  thing, like 9:00 on the 16th.

14             MR. CLYMER:  That would be great, Your

15  Honor.  Thank you.

16             THE COURT:  There's definitely direct

17  flights to D.C., I take them all the time in the

18  afternoon, so-- you're going to New York actually.

19             MR. CLYMER:  Your Honor, just for the

20  record-- not D.C.

21             THE COURT:  Yeah.  Okay.  So we'll-- all

22  right.  So why don't we say November 16th at 9:00 a.m.

23  And again, we'll figure out whether the production is

24  complete, all other concerns about production, any

25  requests for remedies about production, discuss whether

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18        2483

1    I-- I want proposed findings of fact and conclusions of

2    law.  And hopefully that's it, then it's under

3    advisement as of that day.  Okay?

4              All right.  So you're going to make sure

5    that Ms. Wiest has everything.  Anything else we need to

6    talk about?

7              MR. CLYMER:  Your Honor, is the court at

8    this point going to lift the sequestration order?

9              THE COURT:  Yes.  Testimony is finished, I

10   see no reason to keep that in order.

11             Okay.  Anything else from the government?

12             MR. CLYMER:  No, Your Honor.

13             THE COURT:  From the Federal Public

14   Defender?

15             MS. BRANNON:  Judge, I'm sorry, we have this

16   last exhibit, 656 and 656A we would move into admission.

17   It's the translation.

18             MR. CLYMER:  If I can see it, Your Honor, I

19   think I can stipulate.

20             THE COURT:  Exhibit 656 and 656A, which is

21   the Spanish preamble and translation.

22             MS. BRANNON:  For the record, we provided it

23   last week.  I think everybody had copies last week.

24             THE COURT:  Okay.  Do you have a copy I can

25   look at real quick?

16-20032  USA v. Karl Carter (Black) REDACTED 10.12.18      2484

```
1                   (Counsel confer).

2              THE COURT:  Spanish and-- you have the

3   Spanish and the English translation?

4              MR. CLYMER:  Your Honor, the two exhibits

5   you were just handed, I'll stipulate to the first one,

6   not to the second one.

7              THE COURT:  I'm sorry?

8              MR. CLYMER:  I think there were two

9   exhibits.  We stipulate to the admissibility of the-- I

10  believe it's an affidavit from an interpreter, we

11  stipulate to that.

12             THE COURT:  Okay.  So that's 656 and 656A

13  admitted.

14             MS. BRANNON:  Thank you, Your Honor.  That's

15  all we have.

16             THE COURT:  Okay.  Here you go, Bonnie.  And

17  this is the original.

18             COURTROOM DEPUTY:  Thank you.

19             THE COURT:  All right.  Thank you all.

20  We'll see you back on November 16th.

21                  (4:57 p.m., proceedings recessed).

22

23

24

25
```

1                    C E R T I F I C A T E

2

3

4

5      I, Kelli Stewart, a Certified Shorthand Reporter and

6   the regularly appointed, qualified and acting official

7   reporter of the United States District Court for the

8   District of Kansas, do hereby certify that as such

9   official reporter, I was present at and reported in

10  machine shorthand the above and foregoing proceedings.

11      I further certify that the foregoing transcript,

12  consisting of 301 pages, is a full, true, and correct

13  reproduction of my shorthand notes as reflected by this

14  transcript.

15      SIGNED October 29, 2018.

16

17

18

19              /s/ Kelli Stewart

20              Kelli Stewart, CSR, RPR, CCR, RMR

21

22

23

24

25