# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | **Case No. 16-CR-20032-JAR** |
| ) | |
| **Plaintiff,** ) | **Government's Motion for** |
| ) | **Reconsideration of the Final** |
| **v.** ) | **Production and Briefing Order Dated** |
| ) | **November 21, 2018; Memorandum of** |
| **KARL CARTER,** ) | **Points and Authorities; Affirmation of** |
| ) | **Stephen R. McAllister; Exhibits** |
| **Defendant.** ) | |
| _____ ) | |

The United States of America, by and through its counsel of record, Assistant United States Attorney Steven Clymer, appointed as Special Attorney pursuant to 28 U.S.C. § 515 to represent the United States in connection with Phase III of the Special Master Investigation, hereby moves the Court to reconsider and vacate the "Final Production and Briefing Order" issued on November 21, 2018 [Docket #690]. The production and briefing order should be vacated because (a) the Special Master must be disqualified under 28 U.S.C. § 455(a) because his impartiality in this proceeding can reasonably be questioned; (b) the Phase III investigation must be terminated because it violates the constitutionally-required separation of powers; and (c) the production order lacks a legal basis, itself violates the separation of powers, and is unnecessary and overly burdensome.

This motion is based on the attached memorandum of points and authorities, the affirmation of Stephen R. McAllister, and the exhibits.

Respectfully submitted this 4th day of December, 2018.

Steven D. Clymer
Assistant United States Attorney
Special Attorney for the United States
NDNY Bar Roll # 509281

United States Attorney's Office
Northern District of New York
900 Federal Building
100 South Clinton Street
Syracuse, NY 13261
(v) 315-448-0672
(f) 315-448-0658

## MEMORANDUM OF POINTS AND AUTHORITIES

## I

## INTRODUCTION

This Court should reconsider and vacate its November 21, 2018 production and briefing order for the following reasons, all of which are described below:

1. New evidence is available and reconsideration is necessary to correct clear error and prevent manifest injustice (pages 3-5, *infra*);

2. The Special Master's own sworn testimony and statements, as well as other evidence, demonstrate that his impartiality can reasonably be questioned, thereby requiring that he be disqualified under 28 U.S.C. § 455(a), that the results of his investigation be suppressed and disregarded, and that the production and briefing order be vacated (pages 5-12, *infra*);

3. The Phase III investigation must be terminated as a violation of the separation of powers, also requiring that the production and briefing order be vacated (pages 13-16, *infra*); and

4. There is no legal authority for the Court's production order, it violates the separation of powers, and it is unnecessary and overly burdensome, thereby requiring that it be vacated (pages 16-42, *infra*).

## II

## GROUNDS FOR RECONSIDERATION

District of Kansas Local Rule 7.3 provides in pertinent part:

A party may file a motion asking a judge or magistrate judge to reconsider an order or decision made by that judge or magistrate judge.

*****

(b) Non-Dispositive Orders. Parties seeking reconsideration of non-dispositive orders must file a motion within 14 days after the order is filed unless the court extends the time. A motion to reconsider must be based on:

(1) an intervening change in controlling law;
(2) the availability of new evidence; or
(3) the need to correct clear error or prevent manifest injustice.

A motion to reconsider is available when the court has misapprehended the facts, a party's position, or the controlling law, but it is not appropriate to revisit issues already addressed or to advance arguments that could have been raised in prior briefing.  *See e.g., Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (addressing motion under Rule 59(b)). The decision whether to grant a motion to reconsider is committed to the district court's discretion.  *In re Motor Fuel Temp. Sales Practices Litigation*, 707 F.Supp.2d 1145, 1166 (D.Kan.2010).

Here, there are ample reasons for reconsideration.  First, because the Court denied the government's request to submit briefing in advance of the Court's issuance of the production and briefing order, R.T. 2806, this reconsideration motion does not revisit previously-briefed issues.[1] This motion is necessary to bring to the Court's attention facts that were not before it at the time it issued its order, including, for example, the relevant exchanges between the government and counsel for the Special Master related to the government's response to the subpoena *duces tecum*.

In addition, for the reasons explained below, reconsideration is needed here to correct "clear error" and "prevent manifest injustice" because the Court must disqualify the Special Master, terminate the Phase III investigation, and vacate the production and briefing order.  A decision of the Court of Appeals for the District of Columbia, *Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003), clearly demonstrates that the Special Master must be disqualified and the Phase II investigation must be terminated.

---

[1] Citation to the court reporter's transcript of the hearings held on May 15-16, October 2-4 and 9-12, and November 16, 2018, are preceded by "R.T."  Citation to exhibits attached to the McAllister affirmation are designated by letter; citations to exhibits admitted during the hearings are designated by number.  Other citations are described in the text.

Further, this motion for reconsideration is properly filed because this Court invited the government to do so.  R.T. 2806 ("No, I'm going to issue an order and then if you want to file a motion or you want to appeal that order, you go right ahead."); *Id*. at 2807 ("And you will be free to file a motion to reconsider . . . .").

## III

## ARGUMENT

**A. The Special Master Must be Disqualified and the Production and Briefing Order Must be Vacated Because His Impartiality in This Proceeding Might Reasonably be Questioned.**

Section 455(a) of Title 28 of the United States Code, requires that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  In the leading case applying this statute to a court-appointed special master, *Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003), the Court of Appeals for the District of Columbia, under facts strikingly similar to those present here, held that disqualification was required.

*Cobell* arose from a lawsuit in which the Secretary of the Interior and other federal officials, in their official capacities, had been found liable for a breach of fiduciary duties in connection with their management of trust accounts for the benefit of Native Americans.  *Id*. at 1132.  In April 2001, after an appellate remand for further proceedings, the district court, with consent of all of the parties, appointed Joseph S. Kieffer III as a "Court Monitor" and assigned him limited duties. *Id*.  In 2002, over the objection of the government defendants, the district court reappointed the monitor, expanded his duties, and later elevated his status to "Special Master-Monitor."  *Id*. at 1132, 1135.  Thereafter, the district court denied a government motion to revoke the special master's appointment.  *Id*. at 1136.   The government challenged these rulings on mandamus,

arguing both that the reappointment order exceeded the district court's authority and that the court-appointed special master should be disqualified due to an appearance of partiality. *Id.* at 1139.

The *Cobell* Court held that 28 U.S.C. § 455(a) applies to court-appointed special masters and can be a basis for disqualification of a special master by a federal court. *Id.* at 1143-44 ("the ethical restrictions of § 455 apply to a special master"); *see also In re Kempthorne*, 449 F.3d 1265, 1269 (D.C. Cir. 2006) (explaining that "a special master is subject to the same ethical restrictions as a judge when the special master serves as the 'functional equivalent' of a judge even though the special master is under a judge's 'control'") (quoting *Jenkins v. Sterlacci*, 849 F.2d 627, 630-32 (D.C.Cir.1988)). The *Cobell* Court further determined that Kieffer's disqualification was required under § 455(a) because he had learned facts and formed opinions while he was still a court monitor and this cast doubt on his ability to be impartial when he was appointed to be a special master. *Id.* at 1144-45.

Specifically, the Court of Appeals noted that Kieffer, while a monitor, was permitted to have *ex parte* contacts with the parties, including government officials. *Id.* at 1144. Among other things, while a monitor, he participated in an internal meeting of government officials, and "discussed with [Department of the] Interior officials his concerns about the way they were doing their jobs – concerns that he was subsequently to report to the district court." *Id.* at 1135. The district court later "characterized Kieffer's actions as 'an effort to set the stage to convince the parties attending the meeting to find some way to work together.'" *Id.*

Applying the standard in 28 U.S.C. § 455(a), the *Cobell* Court concluded that the district court had committed "clear error" by not disqualifying Kieffer and instead making him a special master *Id.* at 1143. It explained:

> The district court's account of these events demonstrates that Kieffer had a settled
> opinion about what the Department should and should not do on remand to comply

with the order of the district court, which opinion he developed in his extrajudicial role as Court Monitor with access to the internal deliberations of the Department regarding the lawsuit. The district court's account also demonstrates that Kieffer's opinion was based in part upon *ex parte* communications received [during the meeting] in his extra-judicial capacity as Monitor. These facts so clearly cast a shadow over Kieffer's impartiality that the district court abused its discretion in appointing Kieffer to be Special Master (in addition to Monitor).

*Id*. at 1144.

*Cobell* shows that disqualification is required here. Just like Kieffer, the Special Master had a very limited role at the outset of his appointment. In its "Appointment Order" on October 11, 2016 [Docket #146], this Court empowered the Special Master to only conduct a Phase I "feasability [sic] evaluation." *Id*. at 4. Like Kieffer in *Cobell*, he was permitted to "communicate *ex parte* with any party or his attorney." *Id*. at 8. On November 16, 2016, without government consent, this Court expanded the Special Master's authority somewhat, enabling him to conduct the Phase II investigation, which also involved limited duties, but did not include conducting an investigation of the United States Attorney's Office in the District of Kansas ["USAO"] or its employees. Docket #179, #146 at 5. Indeed, it was not until May 17, 2017, that this Court issued its Phase III order authorizing the Special Master to investigate the USAO and its employees. Docket #253.

But, the Special Master's own testimony demonstrates that through *ex parte* contacts, the Special Master, like Kieffer, formed and expressed opinions, very strong opinions, about the USAO and some of its employees long before he had authority to investigate the USAO. When questioned by his own counsel, the Special Master described a conversation that he had with then-United States Attorney Thomas Beall shortly after he was appointed in October 2016 and authorized only to conduct a limited "Phase I" feasibility evaluation:

> My very first meeting -- the very first thing I did after I was appointed was to call United States Attorney Grissom, who, of course, had just recently left office. And

he advised me that I should call Mr. Beall.  And so I made arrangements the very first time I came into Kansas City to meet with Mr. Beall, and I sat with him for a good hour, maybe -- maybe not quite that long, but it was a lengthy period of time, at least a half an hour.  And I told him that I thought this was an opportunity for things to get fixed that were wrong and that because I was from out of town, I was perfectly happy being the bad guy. He could blame everything on me and he could be the hero as far as I was concerned, but let's get it fixed.  I think there are problems in your office, let's fix them. Let me do that, let me help you. I'm hearing stories that, if half of them are true, something is very wrong. That has proved correct. And unfortunately, that's not what happened in this investigation. I wasn't allowed to help the way I wanted to. I wasn't given the tools to, as I called it, burn the cancer out. And it's a sad state of affairs that it's two years later and I'm not sure that the problem is yet fixed.

R.T. 2757-58.

Shortly thereafter, the Special Master proposed to USAO Criminal Chief Debra Barnett that they work together to have three attorneys in the USAO fired from their jobs.[2]  During an evidentiary hearing on October 12, 2018, the Special Master personally questioned Barnett about a meeting they had in early December 2016,[3] including by making factual assertions during this questioning, assertions that she confirmed in her answers:

> Q:    Do you remember when we were at the barbecue or any other time during any of the many phone calls that we had that you told me that you thought that there were three people in particular in the office that weren't practicing the way that a United States Attorney should practice?
>
> A:    Yes.
>
> Q:    Do you remember who it was that you told me you thought that about?
>
> A:    Yes.
>
> Q:    Can you tell me again who those were?
>
> ******

[2] There is no evidence that Barnett expressed agreement with or agreed to help implement this plan.

[3] Barnett discussed this meeting in an electronic mail message dated December 10, 2016.  The message refers to Barnett having met "last week" with the Special Master "at Jack Stack BBQ." Exhibit 1166.

A:    I'm not sure I remember all three exactly, but one would've been Sheri McCracken or Catania, Terra Morehead, and I believe the third one would've been Erin [Tomasic].

Q:    *That's my recollection as well. And you remember I think I said something along the lines of: I'm from out of town. I'll be the bad guy. I'll take the heat. Let's figure out a way to get rid of them if they're bad actors and clean this all up, something like that. Does that sound right?*

A:    *Yes.*

Q:    *And as I said, we used language that we wouldn't use in the courtroom, but I said something like: It will be a shit storm, but I'll hold your hand through it. Does that sound like something I would've said?*

A:    *Something similar to that.*

R.T. 2412-13 (emphasis added).

On November 16, 2018, when the Special Master testified at the hearing, he confirmed what occurred during this December 2016 conversation with Assistant United States Attorney ["AUSA"] Barnett:

Q:    And, in fact, *when you first got involved in the investigation and you tried to understand the lay of the land, as you testified yourself, you thought there was a cancer and you were willing to do what you could do properly to help fix it; is that fair to say?*

A:    *In my role as a neutral, yes.*

Q:    *And you had a conversation with Deb Barnett at a barbecue place that she later recounted in an e-mail that's been admitted into evidence where she was telling Mr. Beall what had happened at that meeting. Correct?*

A:    *Yes.*

******

Q:    Let me ask you a specific question, but I want us both to be careful and not use any names in this part of my question. Do you remember telling her that based on the investigation you had done to date, you had identified some people in the office, the U.S. Attorney's Office, *who you would characterize as bad apples or*

> *problematic and that you were willing to help do what was necessary and be the, quote, bad guy in order to get those people fired*?

A:    *I'm not sure I said it then, but I certainly said it to her at some point. And probably then.*

Q:    Okay. And at the time you said that, I take it you said it because, from what you had learned, you thought that that would improve things in this district, to take out people who were, at least from what you had learned, repeatedly problematic AUSAs that were contributing to what you later describe as a culture of distrust?

A:    And those who it hadn't even been repeated. Just if there were problem actors that we needed to -- that I would help as much as I could.

Q:    To get them out of the district?

A:    To-- I don't know what the cure was. If the cure was to get them out of the district, if the cure was to retrain them, whatever it was, whatever was necessary, I was willing to help the United States Attorney's Office do that so that it could identify the issues, identify the people, identify the problems, and take whatever the appropriate action was to get that fixed.

Q:    Did you remember-- do you recall telling Ms. Barnett, either in that conversation or in a later conversation, that one of the things you'd help do is get them fired?

A:    I don't recall saying that, *but if -- if that was what it took to cure the problem, then I would do that. I would -- I would do whatever I could to help her get them fired.*

R.T. 2771-73 (emphasis added).[4]

This conversation the Special Master had with Barnett, like the one that he had with United States Attorney Beall, occurred months before the Court's Phase III order in May 2017 authorized him to investigate the USAO and its employees.  Like Kieffer—the wayward special master in *Cobell*, who, while acting only as a monitor, participated in a Department of the Interior meeting and thereby formed opinions relevant to the litigation—the Special Master here, by his own testimony, acquired information about the USAO and its employees during *ex parte*

---

[4] It is hardly comforting that when the Special Master admitted that he had this conversation, he testified, oxymoronically, that he did so "[i]n my role as a neutral."

communications and formed opinions, all before he received judicial authorization to conduct an investigation of the USAO.  In short, like Kieffer, the Special Master formed "a settled opinion about what the Department should and should not do" based on "*ex parte* communications received in his extrajudicial capacity."  334 F.3d at 1144.  By the time this Court issued its Phase III order, the Special Master already had obtained "significant prior knowledge . . . on the basis of which he had formed and expressed opinions of continuing relevance to the litigation."  *Id*.

As *Cobell* explained, it is a violation of federal law for a federal judge to "hear a case in which he previously played *any* role."  *Id*. (emphasis added).  This principle, which also applies to court-appointed special masters, required that Kieffer be disqualified because of the facts he learned and the opinions he formed during his "prior role and personal involvement in this case as Court Monitor."  *Id*. at 1144-45.  The same is true here as a result of facts the Special Master learned and opinions he formed (and expressed to Beall and Barnett) before the Phase III order.[5]

The Special Master's extra-judicial conduct here is considerably more problematic and disturbing than Kieffer's.  Before the Special Master had authority to delve into the affairs of the USAO or its employees, he had decided that there were problems with the USAO that required remedial action, and was plotting to end the careers of three USAO attorneys, or at least purporting to do so, when meeting with their supervisor.  These same USAO employees were called as witnesses and questioned by the Special Master and/or his counsel.  R.T. 267, 1647, 2040.  A person aware of the Special Master's conversations with United States Attorney Beall and AUSA

---

[5] Under the circumstances present here, the Special Master has a legal obligation to disqualify himself.  *See Kempthorne*, 449 F.3d at 1270 ("We agree with the Department that Balaran should have recused himself pursuant to § 455(a).").

Barnett would reasonably question whether he could be impartial as to these USAO employees/witnesses, their testimony, or the USAO generally.

An observer would reasonably question the Special Master's impartiality in this proceeding for other reasons as well. The Special Master has become an adversary to the government, despite his obligation to remain impartial as an arm of the Court. He responded to and opposed government motions [Docket #350, #351], compelled testimony from and aggressively questioned (or had his counsel question) numerous government employees, and, over a specific government objection, recently gave sworn testimony that disputed the accounts of some of those government witnesses. R.T. 2741-42, 2744-46, 2762-63.[6] All of this reasonably calls the Special Master's impartiality into question.

Not only must the Special Master be disqualified, but the Court must disregard his work product from the outset of his investigation. *See Kempthorne*, 449 F.3d at 1271 ("Because Balaran was disqualified from proceeding once he hired Smith, his subsequent work product-including the April 2003 interim report of investigation and the two site-visit reports that followed-must be suppressed."). The Special Master's apparent lack of impartiality casts a shadow over Phase III in its entirety. The Court must terminate this investigation, including by vacating the production and briefing order.

---

[6] All of this has been done by a Special Master who is empowered to "communicate *ex parte* with the Court at [his] discretion, without providing notice to the parties, regarding logistics, the nature of his activities, management of the litigation, and other appropriate matters, and also to assist the Court with legal analysis of the parties' submissions." Docket #146 at 8-9.

B.    **The Phase III Investigation Must be Terminated and the Production and Briefing Order Must be Vacated Because the Special Master's Expanded Role Violates the Constitutionally-Required Separation of Powers.**

*Cobell v. Norton* also explains in forceful and unequivocal language that serious constitutional infirmities arise when "a federal court authoriz[es] its agent to interfere with the affairs of another branch of the federal government."  334 F.3d at 1142.  Specifically, *Cobell* addressed limits on a district court's power to authorize a special master to investigate the conduct of the Executive Branch.

The D.C. Circuit first rejected the notion that a federal district court has "inherent authority" to appoint over a party's objection a special master with expansive powers.  *Id.* at 1141 ("Therefore, we hold the district court does not have inherent power to appoint a monitor – at least not a monitor with the extensive duties the court assigned to Kieffer – over a party's substantial objection, here the Government's objection that the appointment violated the separation of powers.").  The *Cobell* Court concluded that the lower court acted impermissibly when it invested a special master "with wide-ranging extrajudicial duties over the Government's objection."

> The Monitor's portfolio was truly extraordinary; instead of resolving disputes brought to him by the parties, he became something like a party himself. The Monitor was charged with an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system. When the parties consent to such an arrangement, we have no occasion to inject ourselves into their affairs. When a party has for a nonfrivolous reason denied its consent, however, the district court must confine itself (and its agents) to its accustomed judicial role.

*Id.* at 1142.

The *Cobell* Court next addressed whether Fed. R. Civ. P. 53 permitted the appointment of Kieffer as a special master and concluded that based on extensive role the district court created for him, "we think the present case goes far beyond the practice that has grown up under Rule 53." *Id.*  Specifically:

> [t]he court authorized the Monitor to engage in *ex parte* communications, and required the DOI [Department of the Interior] to 'facilitate and assist' the Monitor, to 'provide [him] with access to any ... offices or employees to gather information,' and to pay his hourly fees and expenses. In short, the Monitor acted as an internal investigator, not unlike a departmental Inspector General except that he reported not to the Secretary but to the district court.

*Id*. at 1141. "In this case, the district court's appointment of the Monitor entailed a license to intrude into the internal affairs of the Department, which simply is not permissible under our adversarial system of justice and our constitutional system of separated powers." *Id*. at 1143. Accordingly, Rule 53 could not serve as a basis for the appointment of the special master.

Concerns that dictated the outcome in *Cobell* exist here, and to a far greater extent. This Court relied on both Rule 53 and its "inherent power" when it initially appointed the Special Master. [Docket #146 at pp. 2]. Although the government consented to a limited role for a special master—as a filter for potentially privileged materials—it expressly withheld consent when the Court initially appointed the Special Master and gave him broader powers, Docket #146, and when later increased those powers in its Phase III order. *See, e.g*., Docket #120; #135: reporter's transcript of hearing on September 7, 2016 at pp. 148-50. And, it later unsuccessfully moved to terminate his Phase III investigation. Docket #336.

Despite this, the Special Master's role has expanded with the express and tacit approval of this Court. The Special Master admittedly has acted as an investigator, an inquisitor, an advocate, and a witness. R.T. 2767-70. Without interference from the Court, the Special Master has responded to government motions, including by opposing one, and questioned DOJ employees and other witnesses during evidentiary hearings. The Court *sua sponte* appointed an attorney to represent the Special Master, as if he was a party to this case. In addition, over a specific government objection, R.T. 2733-35, the Court permitted the Special Master to testify as a witness.

R.T. 2735-82. The Special Master then disputed from the witness stand earlier testimony from USAO employees about his personal interactions with them, testimony that he (or his counsel) had elicited from those same employees. R.T. 2741-42, 2744-46, 2762-63.[7] This Court apparently intends to make credibility determinations between this testimony from the Special Master, who the Court appointed and who has continuing *ex parte* access to the Court, and the testimony he and his counsel elicited from USAO witnesses whom he is investigating. R.T. 2733-35.

In short, the Special Master here "became something like a party himself," and has assumed "an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system." 334 F.3d at 1142. He has "acted as an internal investigator, not unlike a departmental Inspector General except that he report[s] not to the Secretary but to the district court," *id*. at 1141, as did the special master in *Cobell*.[8] If anything, the Special Master's role here is more expansive, and thus more constitutionally problematic, than the special master in *Cobell*.

---

[7] Much of this conduct – enabling the Special Master to question witnesses at the evidentiary hearing, appointing counsel for the Special Master, permitting the Special Master to again issue a subpoena *duces tecum* to the government, this time with the Court's oral imprimatur during two status conferences, and allowing him to testify as a witness – occurred after the Court denied the government's earlier motion to terminate the Special Master. Thus, this motion is properly before the Court despite its denial of the earlier motion.

[8] The *Cobell* Court also expressed concern that Kieffer's expansive role interfered with the Department of the Interior's deliberative process.

> The events of April 19 . . . suggest the Department's concerns about the scope of the Court Monitor's role were well-founded. The district court's findings indicate that the Court Monitor's duties were so wide-ranging as to have a potentially significant effect upon the DOI's deliberative process. *See* Monitor Order, 226 F.Supp.2d at 172 (Court Monitor's presentation was "an effort to set the stage to convince the parties attending the meeting to find some way to work together"); *id*. (Court Monitor "sought to ... enable [DOI officials] to better carry out [their] trust reform fiduciary obligations"); *id*. at 172 n. 6 (Court Monitor, with authorization of district court, "attempt[ed] to facilitate a resolution of the continuing dispute between the Secretary, the Deputy Secretary, and the Special Trustee").

*Id*. at 1145 n.*. Obviously, this concern applies here as well.

The Court has undisputedly given him "a license to intrude into the internal affairs of the Department, which simply is not permissible under our adversarial system of justice and our constitutional system of separated powers." *Id.* at 1143. Indeed, this was the objective of the Phase III order. Accordingly, the Constitution *requires* that this Court terminate the Phase III investigation without further proceedings, and that it vacate the production and briefing order.

**C.    The Court Should Vacate the Production Order Because the Order Lacks Legal Authority, Violates Separation of Powers, and is Unnecessary and Overly Burdensome.**

**1.    Factual and Procedural Background**

**a.    The Special Master's Search Terms and "ETOMASICBLACK7_0.pst"**

A principal feature of the Court's production and briefing order is the demand that the government conduct numerous electronic document searches for both electronic mail messengers and other documents using "the search terms negotiated with the Special Master." Docket #690 at 8. Accordingly, a discussion of those search terms is in order.

On June 6, 2017, at the request of the Special Master, David Steeby, the systems manager of the USAO, ran the Special Master's search terms—a complex and lengthy digital word search request containing numerous search terms in the disjunctive (meaning that the "or" connector was used, yielding results when any term in the string is detected) —through the electronic mail account of then-former Special Assistant United States Attorney ["SAUSA"] Erin Tomasic. (McAllister Affirmation at ¶ 15; Exhibit G).[9] This test was a part of an ongoing process in which the USAO

---

[9] These are the search terms:

("record* call"~5 OR "record* calls"~5 OR "record* video*"~5 OR "record* audio*"~5 OR "record* CCTV"~5 OR "record* tape"~5 OR "monitor* call"~5 OR "monitor* calls"~5 OR "monitor* video*"~5 OR "monitor* audio*"~5 OR "monitor* CCTV"~5 OR "monitor* tape"~5 OR "view* video*"~5 OR "review* video*"~5 OR "jail call"~15 OR "jail calls"~15 OR "jail video*"~15 OR "jail

record*"~15 OR "jail monitor*"~15 OR "prison* call"~15 OR "prison* calls"~15 OR "prison* video*"~15 OR "prison* record*"~15 OR "prison* monitor*"~15 OR "CCA call"~15 OR "CCA calls"~15 OR "CCA video*"~15 OR "CCA record*"~15 OR "CCA monitor*"~15 OR ""CCA surveillance" ~15 CCA footage*" ~15 OR "Corrections call"~15 OR "Corrections calls"~15 OR "Corrections video*"~15 OR "Corrections record*"~15 OR "Corrections monitor*"~15 OR "Corporation call"~15 OR "Corporation calls"~15 OR "Corporation video*"~15 OR "Corporation record*"~15 OR "Corporation monitor*"~15 OR "inmate* call"~15 OR "inmate* calls"~15 OR "inmate* video*"~15 OR "inmate* record*"~15 OR "inmate* monitor*"~15 OR "detainee* call"~15  OR "detainee* calls"~15 OR "detainee* video*"~15 OR "detainee* record*"~15 OR "detainee* monitor*"~15 OR "audio* record*"~5 OR "video* record*"~5 OR "audio* monitor*"~5 OR "video* monitor*"~5 OR "inmate* account*"~2 OR "prisoner* account*"~2 OR "inmate* PIN*"~2 OR "prisoner* PIN*"~2 OR Securus OR "covert alert" OR "request for CCA Recorded" OR ((prison* OR inmate*) AND ("listen* call"~15 OR "listen* calls"~15 OR "watch* video"~15 OR "watch* record*"~15 OR "listen* audio*"~15 OR "listen* record*"~15 OR "view* video*"~15 OR "view* record*"~15 OR "review* video*"~15 OR "review* audio*"~15 OR "review* record*"~15)) OR ((Anderson OR Atkins OR Bigelow OR Barnett OR Baxter OR Beall OR Beam OR Bernhardt OR Black OR Brannon OR Cahill OR Cash OR Catania OR Clem OR Collins OR Cook OR Dertinger OR Evans OR Fitzpatrick OR Flannigan OR Fletcher OR Gallup OR Gillespie OR Grissom OR Guerrero OR Gurin OR Hall OR Hanika OR Hernandez OR Herron OR Hinojosa OR Hodges OR Hoffer OR Hood OR Howell OR Hudson OR Hundley OR Johnson OR Johnston OR Kaiser OR Kenyon OR Kinney OR Krug OR Lajiness OR Marques OR Martin OR Matushek OR McClain OR McCracken OR Metzger OR Miller OR Milliken OR Morehead OR Morgan OR Moore OR Moorehead OR Oakley OR Oberly OR Parrish OR Pauletta OR Perry OR Phom OR Phommaseng OR Phommasang OR Phommeseng OR Phommesang OR Phomaseng OR Phomasang OR Phomeseng OR Phomesang OR Potter OR Preciado OR Rapp OR Rask OR Reulet OR Roberts OR Rokusek OR Ruffalo OR Sallee OR Schloemer OR Schuster OR Seubert OR Stokes OR Strickler OR Thibault OR Thomas OR Tomasic OR Treadway OR Trujillo OR Twaddle OR Vargas OR Virden OR Wamble OR Welch OR West OR York OR Younger OR Zitegma) AND ("jail call"~15 OR "jail calls"~15 OR "jail video*"~15 OR "jail record*"~15 OR "jail monitor*"~15 OR "prison* call"~15 OR "prison* calls"~15 OR "prison* video*"~15 OR "prison* record*"~15 OR "prison* monitor*"~15 OR "CCA call"~15 OR "CCA calls"~15 OR "CCA video*"~15 OR "CCA record*"~15 OR "CCA monitor*"~15 OR "Corrections call"~15 OR "Corrections calls"~15 OR "Corrections video*"~15 OR "Corrections record*"~15 OR "Corrections monitor*"~15 OR "Corporation call"~15 OR "Corporation calls"~15 OR "Corporation video*"~15 OR "Corporation record*"~15 OR "Corporation monitor*"~15 OR "inmate* call"~15 OR "inmate* calls"~15 OR "inmate* video*"~15 OR "inmate* record*"~15 OR "inmate* monitor*"~15 OR "detainee*

was assisting the Special Master to develop and refine a set of search terms. R.T. 1093-1104, 1263-71, 2507-09. The June 6, 2017 search request was written in a computer syntax compatible with the ProofPoint software that the DOJ uses to archive electronic mail communications that have been sent and received through its Outlook mail software. R.T. 2509-10. The use of the Special Master-designated June 6, 2017 search string yielded 4,493 electronic mail messages from Tomasic's account. Exhibit G. These messages were preserved in a digital file titled "ETOMASICBLACK7_0.pst." R.T. 2788-89. This file is 2.11 GB in size. Exhibit 1194.

This digital file was not produced to the Special Master or the Court in June 2017. Ultimately, a copy of this file was produced to counsel for the Special Master on or about September 30, 2018, under circumstances discussed below. McAllister Affirmation at ¶¶ 16-18. There are messages within this file that are not pertinent to the Special Master's investigation or this litigation. McAllister Affirmation at ¶ 16.

The Special Master's search string described above, set out in footnote 9, and reflected in Exhibit G—which this Court has adopted as the foundation for its production order—was not tested on the electronic mail accounts of any other USAO employees. Further, the syntax used for the June 6, 2017 search request was unique to ProofPoint and it is "highly doubtful" that it can be used to conduct searches through different digital directories. R.T. 2510. There is no evidence in the record concerning the ability of this search string to produce results relevant to the Special Master's investigation or this litigation, whether used to search electronic mail accounts of other USAO employees or, in a modified syntax, other DOJ digital directories, or both. *See, e.g.*, R.T.

---

call"~15 OR "detainee* calls"~15 OR "detainee* video*"~15 OR "detainee* record*"~15 OR "detainee* monitor*"~15))).

*See* Exhibit G.

2509 (when asked if search string was "useful," Steeby responded: "I always thought we could make more progress.").

> **b.    The Special Master's Multiple Categorical Document Requests and the Government's Responses**
>
> > **i.    The Special Master's July 10, 2017 Letter to United States Attorney Thomas Beall and the Government's Response**

On July 10, 2017, the Special Master sent a letter to then-United States Attorney Thomas Beall requesting information and documents for the time period January 1, 2014 through May 1, 2017, "[i]n connection with my investigation related to *United States v. Black*." [Exhibit I].  The letter did not describe or request specific documents; instead it described 14 general categories of information and documents sought from the USAO.

This letter did not demand or request that any specified USAO personnel be precluded from involvement in the identification or collection of the requested categories of documents.  Nor did the letter demand or request that the USAO create and produce a log identifying any responsive documents withheld from production or the grounds on which any responsive documents were withheld.  Finally, the letter made no mention of the USAO employing the June 6, 2017 search terms to conduct searches through any additional electronic mail accounts or other digital directories.

On September 12, 2017, the government, through AUSA Steven D. Clymer, a "Special Attorney" appointed pursuant to 28 U.S.C. § 515, responded to the Special Master's letter to Beall. [Docket #346-1].  This responsive letter described the DOJ *Touhy* regulations, 28 C.F.R. §§ 16.21 *et seq.*, and explained that they governed DOJ's response to the Special Master's request for information and documents.  The September 12, 2017 letter explained that when a demand for information or documents is made to DOJ, the *Touhy* regulations require DOJ to take into account

specified considerations before deciding whether to produce documents.  These considerations include whether "disclosure is appropriate under the rules of procedure governing the case or matter in which the demand arose" or "under the relevant substantive law concerning privilege"; and whether disclosure would violate a statute or rule or "reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired." The letter further explained how these considerations related to the various categorical requests in the Special Master's letter to United States Attorney Beall, and that the government, after consideration of these factors, could reveal only some, but not all, of the requested materials.[10]

### ii.     The Special Master's First Two Subpoenas *Duces Tecum*, the Related Production Order, and the Government's Motions to Quash.

On December 4, 2017, the Special Master issued a subpoena *duces tecum* directed to the DOJ Special Attorney.  Docket #461-1 at pp. 2-7.  It demanded production on or before January 2, 2018, of 14 categories of documents and materials "that are or were in the possession of the United States Attorney's Office for the District of Kansas" for use at an evidentiary hearing that then was scheduled for January 18, 2018.[11]  Simultaneously, the Special Master issued an "Order of Production" demanding that the government produce the same documents and materials as

---

[10] In a hearing on October 2, 2018, counsel for the Special Master acknowledged that these *Touhy* regulations govern the conduct of DOJ officials.  "We recognize again, and we're sure the Court does and everybody else does, that no DOJ employee or no former DOJ employee can obey a demand for DOJ records or for DOJ testimony about their work without authority from the Attorney General, not even when the demand comes in a subpoena . . . ."  R.T. 434.

[11] On this subpoena, the Special Master's demands are set out in paragraphs numbers 1 through 13, but two paragraphs are designated as number 9.  Therefore, there are 14 categories of information demanded.

described in the subpoena, returnable on the same day, in anticipation of the same hearing. Docket #317.

On December 18, 2017, the government moved to quash the Special Master's December 4, 2017 subpoena *duces tecum* and to vacate the corresponding production order. Docket #335. On the same day, the government moved to terminate the Special Master's Phase III investigation. Docket #336. On December 19, 2017, the government filed a corrected motion to quash the Special Master's subpoena *duces tecum*. Docket #341.

On December 21, 2017, the Court stayed compliance with the Special Master's subpoena *duces tecum* and production order. Docket #345.[12] On December 28, 2017, the Special Master filed responses to the government's motions to quash and vacate, and to terminate Phase III. Docket #350, #351. The Special Master opposed the government motion to quash.

The Court did not rule on the government's motion and did not order the government to comply with the subpoena or production order. Ultimately, the Court denied the government's motion to quash as moot. Docket #372. The January 18, 2018 hearing was stayed by an order of the Court of Appeals for the Tenth Circuit and thereafter cancelled by this Court. Docket #382; #386.

On April 23, 2018, the Special Master issued a second subpoena *duces tecum*, this time directed to United States Attorney Thomas Beall. Docket #461-1 at pp. 9-13. This subpoena was

---

[12] The Court's "Final Production and Briefing Order" [Docket #690] states at page 3 that "[p]roduction was stayed, however, by the Department of Justice's ('DOJ') petition for mandamus relief." This is inaccurate. This Court stayed production by order dated December 21, 2017. Docket #345. The government's mandamus petition, which was filed on January 16, 2018, did not seek to stay compliance with the Special Master's subpoena *duces tecum*. A motion that the government filed in conjunction with its mandamus petition asked the Tenth Circuit to stay the evidentiary hearing scheduled for January 18, 2018. The Tenth Circuit issued an order staying that hearing.

substantially similar to the first subpoena *duces tecum* and demanded 13 categories of documents and information in anticipation of an evidentiary hearing then set for May 15, 2018.  On May 7, 2018, the government again moved to quash.  Docket #461.  The Court did not order compliance with the second Special Master's subpoena *duces tecum* and, on September 27, 2018, in advance of a continuation of the May evidentiary hearing set to begin on October 2, 2018, ruled that the motion to quash was moot.  Docket #616.

Neither these first two Special Master subpoenas *duces tecum*, nor the Special Master's production order, demanded or requested that any specified USAO personnel be precluded from involvement in the identification or collection of the demanded categories of documents.  Nor did the subpoenas or production order demand or request a log identifying any withheld documents or the reasons why they were withheld.  Finally, the subpoenas and production order did not demand or request that the USAO employ the June 6, 2017 search string to conduct searches through any additional electronic mail accounts or digital directories.

### iii.    The August 2018 Status Conferences

The Court convened an evidentiary hearing on May 15, 2018.  Docket #476.  As noted above, the government was not required to produce documents or materials in connection with this hearing.  On May 16, 2018, the Court adjourned the hearing at the request of the parties to permit negotiations.

When those negotiations did not resolve all matters in dispute, the Court held two status conferences in August 2018, to discuss, among other things, reconvening the evidentiary hearing. On August 1, 2018, at the first status conference, the Court said the following:

> But you will recall before the evidentiary hearing before -- or at least at some stage of the proceeding, Mr. Cohen [the Special Master] had issued subpoenas *duces tecum* and you filed motions to quash. And that is something else I want to address before we go forward with an evidentiary hearing.  Last time the Court didn't rule

> on those motions to quash, we just went forward without the records. If we're going
> to have an evidentiary hearing, it needs to be a full hearing, and that would include
> appropriate subpoenas. I'm not saying that everything that was subpoenaed is
> appropriate. Some of it may very well need to be quashed.

August 1, 2018 transcript at p. 45.

This was the first notice that the government received of the possibility that it would be

compelled to produce documents in advance of a reconvened evidentiary hearing.  On August 8,

2018, at a second status conference, the Court said this:  "And I will tell you at least the Special

Master is going to issue new subpoenas *duces tecum*. They will not be -- they will not be identical

to those issued before, but we'll be issuing subpoena *duces tecum*."  August 8, hearing transcript

at p. 23.  The Court later ordered the evidentiary hearing to resume on October 2, 2018.  Docket

#571.

### iv.      The Third Special Master's Subpoena *Duces Tecum* and the Government's Response

Consistent with the Court's statements at the status conferences, on August 17, 2018, the

Special Master issued a third subpoena *duces tecum*, once again demanding that the government

produce numerous broad categories of documents.  Exhibit A.  For example, one category in the

subpoena demanded production of:

> Any documents or materials not already filed as exhibits in the *Black* case, relating
> to allegations that personnel, contractors, and agents of USAO-DKan personnel and
> their contractors acted in violation of the U.S. Constitution by obtaining,
> possessing, listening to, or watching confidential communications of inmates and
> attorneys. This demand seeks information created during the defined time period
> [January 1, 2014 through May 1, 2017] and any time since then.

At this point, the litigation in *Black* had been going on for over two years and there were

numerous internal USAO communications and draft documents related to the litigation.

The Special Master would later state "that the subpoena *duces tecum* was broader than the

search terms" he had developed with the USAO.  R.T. 2792.  This third subpoena *duces tecum*,

which was directed to United States Attorney Stephen R. McAllister, required production on or

before August 31, 2018.  Like the earlier July 10, 2017 letter, the first two subpoenas *duces tecum*,

and the Special Master's order of production, this subpoena did not demand or request that any

specified USAO personnel be precluded from involvement in the identification or collection of the

demanded categories of documents.  Nor did the subpoena demand a log indicating whether any

documents had been withheld or identifying the government's reasons for doing so.  Finally, the

subpoena made no demand that the Special Master's June 6, 2017 word search string be used to

search any other electronic mail accounts or other digital directories.

On August 30, 2018, after counsel for the Special Master rejected a government request

for an extension of time within which to comply with the subpoena, the government moved the

Court for an order staying compliance.  Docket #582; McAllister Affirmation at ¶ 8.  This motion

explained that a stay was necessary because under federal law, specifically 28 C.F.R. § 17.27, Mr.

McAllister could not produce the subpoenaed documents unless he received authorization from

DOJ authorizing him to do so and that "the Department of Justice was evaluating the document

and information requests in the subpoena and that it was unlikely that this process would be

completed before the August 31, 2018 deadline for production."  *Id*. at ¶ 3.  The Court extended

the production deadline by two weeks and ordered the government to "produce on a rolling basis

any documents responsive to the Special Master's subpoena that it concludes should be produced

after review by Department of Justice officials."  Docket #586.

Shortly after he was served with the subpoena, Mr. McAllister directed his First Assistant

United States Attorney ["FAUSA"], Duston Slinkard, to task USAO employees whose electronic

mail accounts, digital directories, and offices might contain responsive digital and paper

documents to produce them in digital format to an administrative USAO employee who was tasked

to collect and assemble these documents for review.  Exhibit B; McAllister Affirmation at ¶ 5. Acting on authorization from DOJ, United States Attorney McAllister, FAUSA Slinkard, and AUSA Clymer then reviewed the documents and materials that the USAO employees had identified and collected as responsive.  This review was conducted to determine whether each document (a) bore directly on the conduct of DOJ officials that is the subject of allegations of wrongdoing in this matter, specifically alleged violations of the Sixth Amendment, alleged efforts to improperly impede the Special Master's investigation, alleged willful destruction of evidence, and the unauthorized entry into Chief Judge Robinson's chambers; or, alternatively (b) related to litigation-related decision-making and strategy and the thought processes of DOJ officials. McAllister Affirmation at ¶ 9.  According to his authorization from DOJ, McAllister was authorized to disclose responsive documents and materials in the first of these two categories.  *Id.*

On September 17, 2018, government counsel sent a letter to counsel for the Special Master explaining the government's approach to producing responsive documents.  Exhibit C.  This letter described three considerations that caused concern about disclosure of internal DOJ communications: "(a) the Department is not aware of any legal basis for the disclosure of such documentation and information under the circumstances present here; (b) the Department is not aware of any evidence of any Sixth Amendment or other constitutional violation suffered by any litigant in this case; and (c) as a practical matter, it is burdensome for the United States Attorney's Office ["USAO"] to identify and review every e-mail message and other document in its possession that is potentially responsive to the broad categories of demands in the subpoena *duces tecum*."  The government explained in a lengthy footnote its legal position that "none of the disclosures demanded in the subpoena *duces tecum* . . . are appropriate under the rules governing federal criminal cases."  The government expressed its willingness to discuss these matters with

the Special Master and his counsel and invited them to provide legal authority for any of the demanded disclosures and/or any evidence showing that any litigant had suffered a Sixth Amendment or other violation.

On September 18, 2018, counsel for the Special Master responded by letter.  Exhibit D. With respect to the government's assertion that there is no legal authority for the subpoena demands and its invitation to the Special Master for contrary information, counsel for the Special Master said only this: "I believe we simply must agree to disagree as to the remainder of the legal arguments you present."  In response to the government's invitation to provide evidence of any constitutional violations, the letter said only this: "This is a question better addressed to the litigants' attorneys in the underlying cases."  Finally, with respect to the indication in the government's letter that there were some responsive documents that might be withheld, the Special Master's counsel wrote this: "We know that, should your search uncover materials you believe are privileged from disclosure in this case, you will identify them and present them, if necessary, for decision of the Court as to admissibility at the hearing."

On September 21, 2018, the government replied by letter, Exhibit E, responding as follows to the last point in the letter from counsel for the Special Master: "We understand that the Department of Justice can assert privileges . . . . But, as you know, the *Touhy* regulations provide for Department of Justice consideration of specified factors, including privilege, and internal decisions whether to authorize disclosure. Under that process, documents that are not authorized to be disclosed are neither identified nor presented to a court for decision."  In this exchange of correspondence, counsel for the Special Master did not demand that any USAO employees be precluded from involvement in the production process; nor did she demand a log of withheld documents.

Mindful of the impending October 2, 2018 hearing and the Court's order filed in response to the government's motion to stay compliance with the subpoena, United States Attorney McAllister, FAUSA Slinkard, and AUSA Clymer conducted their review of responsive documents collected by the USAO as expeditiously as possible, erring in favor of disclosure when in doubt. They devoted a substantial time to this project and reviewed documents at night and over weekends to both enable Mr. McAllister to comply with DOJ's authorization and promptly produce responsive documents when appropriate.   McAllister Affirmation at ¶ 11.

On September 17, 2018, United States Attorney McAllister produced the first of seven voluminous sets of digital documents and materials responsive to the subpoena.   McAllister Affirmation at ¶¶ 11-13.   A letter from Mr. McAllister to counsel for the Special Master accompanied the initial document production.   Exhibit F.   The letter explained that "the Department of Justice produces these documents voluntarily, not because it has a legal obligation to do so" and that "[by making this and future voluntary production of documents, the Department does not waive any right under applicable federal law to decline to make any disclosures or produce documents."

The letter also explained that DOJ "has endeavored and will continue to endeavor to identify and produce documents responsive to the subpoena *duces tecum* to the extent those documents bear directly on the conduct of DOJ officials that is the subject of allegations of wrongdoing, specifically alleged violations of the Sixth Amendment, alleged efforts to improperly impede the Special Master's investigation, alleged willful destruction of evidence, and the unauthorized entry into Chief Judge Robinson's chambers."   But, it also explained that "[t]he Department has not produced . . . documents reflecting internal communications related to litigation-related decision-making and strategy and the thought processes of DOJ officials [or]

documents sent to or received by the Department's Office of Professional Responsibility or its Professional Responsibility Advisory Office."

Altogether, Mr. McAllister produced responsive documents and materials in digital form as indicated below, generally organized by the categories delineated in the Special Master's subpoena *duces tecum*:[13]

| Date Produced | Production Number | Size of production |
|---|---|---|
| September 17, 2018 | 1 | 7.07 GB |
| September 18, 2018 | 2 | 7.09 GB |
| September 25, 2018 | 3 | 7.07 GB |
| September 28, 2018 | 4 | 6.20 GB |
| September 30, 2018 | 5 | 2.11 GB |
| October 9, 2018 | 6 | 0.32 GB |
| October 11, 2018 | 7 | 0.06 GB |

Exhibit 1194.

These materials, which were marked as Exhibit 1189 in the hearing, resulted from a good faith effort to voluntarily produce all of the documents demanded by the Special Master's third subpoena *duces tecum*, other than those reflecting internal communications related to litigation-related decision-making and strategy and the thought processes of DOJ officials and documents

---

[13] Some documents were responsive to multiple categories set out in the subpoena.

sent to or received by the Department's Office of Professional Responsibility or its Professional Responsibility Advisory Office.  McAllister Affirmation at ¶ 11.

**v.**     **The Tomasic and Treadway Documents**

Two categories of responsive documents merit particularized attention because of a false suggestion in a pleading filed by the Federal Public Defender ["FPD"].  In a "Second Supplemental Motion to Show Cause," Docket #668, filed on October 26, 2018, the FPD suggested that the government may have made "selective production [of documents] (compare, for instance, the government's thorough production regarding former USAO attorneys with its less-thorough production regarding current USAO attorneys)."  At the time of the document production, Erin Tomasic was a former USAO SAUSA and Tanya Treadway was a former USAO AUSA.

As noted above, in June 2016 a test of a Special Master-created search string resulted in a very large collection of Tomasic electronic mail messages that were assembled into a single file titled ETOMASICBLACK7_0.pst.  Category #2 of the Special Master's third subpoena *duces tecum* demanded production of "[a]ny and all documents and materials sent, given to, or received by AUSA Emily Metzger in response to her instructions concerning retention, preservation, and production of materials that relate to or concern Black or the Investigation."  Exhibit A.  Because Metzger had received ETOMASICBLACK7_0.pst as part of her efforts to assist the Special Master refine search terms, this entire digital file arguably was responsive to the Category #2 demand in the subpoena by virtue of the circumstances surrounding its creation and Metzger's possession of it, *without regard to the content of any electronic mail messages contained in it*.  McAllister Affirmation at ¶ 15.

Because this file nonetheless contained numerous internal DOJ messages that had no bearing on matters in this proceeding, United States Attorney McAllister initially withheld this large file from production. He so notified counsel for the Special Master:

> [T]he Department has withheld production of a very large digital file – over two GB – which is technically responsive to Request #2 in the subpoena but which contains numerous internal communications from as early as 2014 that are non-responsive, privileged, or otherwise not disclosable. This document is a .pst file, meaning a file that is made up of multiple (in this case very many) individual Microsoft Outlook messages from former SAUSA Erin Tomasic's e-mail account. This large conglomeration of e-mail messages was assembled and provided to then-First Assistant United States Attorney Emily Metzger as part of the litigation hold. Thus, this digital file  technically qualifies as a document "sent, given to, or received by AUSA Emily Metzger in response to her instructions concerning retention, preservation, and production of materials that relate to or concern *Black* or the investigation" even though messages within this larger file are not pertinent to your investigation or this litigation. Instead of producing this large digital file, we have made and are continuing to make efforts to search Tomasic's e-mail account and other computer folders to identify responsive documents in her email messages.

Exhibit F.

But, when it became apparent that there were delays in reviewing the content of Tomasic messages to identify those relevant to the matters under investigation, United States Attorney McAllister, to ensure that the Special Master and the FPD were not denied potentially relevant messages, disclosed the entire .pst file. As he explained in an electronic mail message to counsel for the Special Master on September 29, 2018:

> I need to follow up on my letter of September 17, in particular the discussion in item 3 of that letter regarding the Tomasic emails. We have struggled to get through the thousands of emails she generated and received during her time in the office. As I said in the letter, we have a pst file that collects Tomasic emails based on search terms the Special Master and the USAO discussed during the course of the Master's investigation. It is a large file, and thus we had planned and intended to winnow down the Tomasic emails we provided. But that has proven a most difficult

task. At this point, in order to get potentially relevant information to you, we are prepared to turn over the entire pst file referred to in item 3 of my letter.

By turning this entire file over, the government is not waiving any privilege claims or other objections to the use of any particular emails contained in the pst file, but we are doing this voluntarily so that you may have this material and begin reviewing it before the hearing commences.

Exhibit H; McAllister Affirmation at ¶ 18; *see also* R.T. 2788-89 (FAUSA Slinkard explaining that this file "has been produced in toto and was not reviewed for purposes of privilege, *Touhy* or anything else out of a desire to get it in your hands").

Similar circumstances unrelated to content arose with respect to documents associated with former AUSA Tanya Treadway.  When Treadway retired from DOJ in September 2017, she produced to FAUSA Slinkard materials that she had retained in compliance with a litigation hold in this case.  Slinkard, in turn, provided these materials to Metzger because she was the USAO Litigation Hold Coordinator.  Accordingly, these documents, which by virtue of the circumstances under which they came into Metzger's possession and, were responsive to Category #2 of the subpoena *duces tecum* and submitted for Mr. McAllister's *Touhy* review without regard to their content.[14]  McAllister Affirmation at ¶ 19.[15]  FAUSA Slinkard explained this process to the Court on October 11, 2018.  *See* Sealed Transcript at pp. 128-32.

In short, even if it were the case that more documents related to former SAUSA Tomasic and/or former AUSA Treadway were produced to the Special Master than documents related to each of the presently-employed Kansas AUSAs—a fact that has not been proven and that the

---

[14] This does not mean that these Treadway documents were not also responsive based on content. At least some related to the *Reulet* case, in which there were allegations of Sixth Amendment right-to-counsel violations.

[15] McAllister produced these Treadway documents to the Special Master in their entirety. McAllister Affirmation at ¶ 19.

government does not concede—any differential resulted from circumstances unrelated to the content of those documents.   Any suggestion of improperly selective disclosure or other wrongdoing has no factual basis and is unwarranted.

> **vi.    There is No Evidence of a Violation of the Sixth Amendment Rights of Any Defendant in this Case or Any Inmate by Any Present USAO Employee.**

Judgment has been entered against four of the six defendants charged in this case.  Docket #212 (Rowlette); #264 (Tackett); #540 (Black); #556 (Aiono).  A fifth defendant, David Bishop, had his charges dismissed.  Docket #478.  Only defendant Karl Carter remains technically involved in any way in this litigation and this is only because this Court has held in abeyance an unopposed government motion to dismiss all charges against him with prejudice.  Docket #478.  This Court did this for the express purpose of keeping this investigation open, even though, in reality there is no justiciable case or controversy remaining.  R.T. 332-35.  Carter has no pending claim of a Sixth Amendment violation and no real interest in these proceedings.  He waives his appearance at every scheduled Phase III hearing, Docket #467, #488, #514, #543, #567, #625, #687, and his attorney sits silently in court during these hearings.  For these reasons alone, this Court lacks jurisdiction and thus should vacate its production and briefing order and terminate these proceedings as moot.[16]

Further, despite the extensive document demands and USAO document production, and despite the fact that the Special Master (and FPD) questioned 17 present and former USAO employees, and could have questioned more USAO employees had they so requested, this record remains devoid of any evidence showing a violation of the Sixth Amendment right to counsel of any litigant in this case, whether a charged defendant or one of the yet-unidentified Rule 41(g)

---

[16] The government has previously asserted that it has no opposition to the Court returning the video and audio recordings that it possesses by virtue of its "claw-back" order to the Rule 41(g) claimants, rending their motions moot as well.

claimants whom the FPD purports to represent.  At most, there is evidence that two former USAO attorneys—AUSA Treadway, and SAUSA Tomasic—each intentionally listened to recorded conversations between a single inmate and legal counsel, in violation of USAO practice. Specifically, Treadway listened to recorded telephone calls between inmate Michelle Reulet and three attorneys who represented or had represented her in civil and criminal matters, *see* redacted transcript of 10-12-2018 at pp. 80-120, and Tomasic listened to, and tasked an interpreter to listen to one or more recorded telephone between inmate Juan Herrera-Zamora and legal counsel.  *See, e.g.,* R.T. 777-84.  Neither of these inmates is a litigant here and, in any event, there was no finding of a Sixth Amendment violation by the presiding district court judge in either the *Reulet* or the *Herrera-Zamora* case.

When specifically asked, numerous AUSAs denied under oath ever intentionally listening to an inmate-attorney conversation, or watching a soundless video an inmate-attorney meeting, or knowing of a USAO colleague having done either these things, other than Treadway in *Reulet* and Tomasic in *Herrera-Zamora*.  *See, e.g.*, R.T. 220-21 (Rask); 915-19 (Wamble); 1200-06 (Zabel); 1702, 1706 (Catania); 1880-81 (Patton); 1976-77, 1982 (Oakley); 2123-24, 2127-28 (Krug); 2142, 2157-58 (Hunt); 2265-66, 2269-71 (Flannigan).   There is no testimony or evidence in the record contradicting this testimony.

## 2.    There is No Legal Basis for the Production Order.

When invited to do so, neither the Special Master nor his counsel offered legal authority for the demands in the subpoena *duces tecum*.  There is none.  Similarly, there is no legal authority for the demands in this Court's recently-issued production order.  Because this is a criminal case, the Court's authority to order government disclosures is principally governed by Fed. R. Crim. P. 16(a).  This Rule obligates the government to produce discovery to a criminal defendant, not to a

district court, a court-appointed special master, or a FPD who does not represent any defendant in a criminal prosecution.

Even if Rule 16 could serve as a basis for a district court to order the government to make disclosures to the court, the Special Master, or the FPD, it would not permit the disclosures described in the Court's production order.  This is because the production order's demands do not fall within any of the categories in Rule 16(a).  The Federal Public Defender has suggested entitlement to government disclosures in this litigation because they are "material to preparing the defense" under Fed. R. Crim. P. 16(a)(1)(E)(i) (previously in subsection (a)(1)(C)).  *See, e.g.*, Docket #409-1 at p. 16.  This is wrong.  The Supreme Court has made clear that "material to preparing the defense" relates to whether an item is responsive to the government's case-in-chief during a criminal trial, not whether it supports a defendant's claim of government misconduct raised in a pretrial motion.  *United States v. Armstrong*, 517 U.S. 456, 462 (1996) ("we conclude that in the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief.  While it might be argued that as a general matter, the concept of a 'defense' includes any claim that is a 'sword,' challenging the prosecution's conduct of the case, the term may encompass only the narrower class of 'shield' claims, which refute the Government's arguments that the defendant committed the crime charged.  Rule 16(a)(1)(C) tends to support the 'shield-only' reading."); *see also United States v. Rashed*, 234 F.3d 1280, 1285 (D.C. Cir. 2000) ("Because Rashed's defense here relates not to refutation of the government's case in chief but to establishment of an independent constitutional bar to the prosecution, Rule 16(a)(1)(C) of the Fed. R. Crim. P. is inapplicable.").

Further, Rule 16(a)(2) expressly exempts from criminal discovery "reports, memoranda, or other internal government documents made by an attorney for the government or other

government agent in connection with investigating or prosecuting the case," unless such materials fall within one of the categories of information governed by the rule. Fed. R. Crim. P. 16(a)(2).

Similarly, Rule 17 of the Federal Rules of Criminal Procedure does not support the Court's production order. This Rule cannot be used to circumvent the restrictions in Rule 16. *See Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951) ("It was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms."); *see also United States v. Gonzalez-Acosta*, 989 F.2d 384, 389 (10th Cir. 1993). Even if Rule 17 could be used to obtain discovery beyond that addressed in Rule 16, it expressly provides that "[n]o party may subpoena a statement of a witness or of a prospective witness under this rule." Fed. R. Crim. P. 17(h). This prohibition applies to e-mail communications of DOJ employees who testified as witnesses at the hearing. Finally, Rule 26.2 and 18 U.S.C. § 3500 do not authorize production of witness statements here because these provisions apply only to specified proceedings other than this one.

In short, the Court lacks legal authority to make the demands in the production order. For this reason alone, the Court should reconsider and vacate its production order.[17]

---

[17] At the hearing in November, the Court suggested that it could order the government to produce documents in furtherance of an investigation by a court-appointed special master. "And this may be a criminal case, but as you will recall, you've told me repeatedly, you're not here in the criminal case, you're here with respect to the Special Master's Phase III investigation. And there have been subpoenas *duces tecum*, there have been requests for production, there have been all kinds of, you know, attempts to gain discovery specific to his investigation and, you know, we're not going to talk about Rule 16 because that's not the—we're not talking about the criminal case. All right? We're talking about something different, we're talking about an investigation of – of alleged prosecutorial misconduct within the context of this case . . . . ." R.T. 2804-05. The government is not aware of authority permitting a district court to compel discovery in a criminal case in furtherance of the court's own investigation of the Executive Branch.

### 3.    The Court's Production Order Violates Separation of Powers.

Even if the Court had legal authority to command the government to produce specified documents or categories of documents, it cannot dictate to a coordinate branch of government which employees must comply with such a court order or how they must do so.  "The Constitution provides that '[t]he executive Power shall be vested in a President of the United States of America.' Art. II, § 1, cl. 1. As Madison stated on the floor of the First Congress, 'if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, *and controlling* those who execute the laws.' 1 Annals of Cong. 463 (1789)."  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (emphasis added).  Accordingly, appellate courts have rejected the notion that a court can supervise federal prosecutors.  *United States v. Dominguez-Villa*, 954 F.2d 562, 565 (9th Cir. 1992) ("A district court does not have general supervisory powers over the co-equal executive branch of government."); *United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir. 1983) ("[T]he federal judiciary's supervisory powers over prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all.").

*Dominguez-Villa* is particularly instructive.  There, a district court ordered "agency counsel to review the personnel files [of federal law enforcement agents whom the government planned to call as witnesses at trial] and . . . require[ed] agency heads to 'sign-off' on counsel's determination whether a particular file contains impeachment material."  954 F.2d at 565.  Although the Ninth Circuit recognized that the government has an obligation in a criminal case to ensure that the personnel files of agent witnesses are reviewed for impeachment material, it held that the lower court had exceeded the bounds of its authority when it tried to dictate which government officials should conduct this review.  This is because "there is no authority to cause us to conclude that the government's refusal to involve non-prosecution lawyers and agency department heads in the

review of personnel files violates the Constitution, a statute, or a rule." *Id.* Similarly, even if there was a legal basis upon which this Court could order document production, it would be the prerogative of the Executive Branch, not the Court, to determine which DOJ employees should be involved in that process or how the search for relevant documents should be accomplished.

The Court's demands that the government locate responsive documents by running the Special Master's search terms through its computers and that only "a team of neutral, uninterested searchers" can locate, collect, and produce certain documents violate separation of powers. For these reasons as well, the Court should reconsider and vacate the production order.

### 4.     The Court's Production Order is Unnecessary and Overly Burdensome.

The Court should reconsider and vacate its production order because it is unnecessary and overly burdensome.[18] Now that the government has expended considerable resource and voluntarily produced a large volume of documents consistent with a broad subpoena *duces tecum*, the Court, for the first time, demands that it conduct numerous word searches through the electronic mail accounts and other electronic directories of the 16 additional USAO employees (other than Tomasic, but including Tomasic's non-e-mail directories) who testified in the evidentiary hearing, *see* Docket #690 at 8-9, have "neutral, uninterested searchers" comb through these employees' non-electronic repositories, *id.* at 9, and produce the resulting materials, *id.*, unless there are specified grounds to withhold them, in which case they must be logged and described. *Id.* at 10. *None* of these demands were made by the Special Master in his July 10, 2017 letter to then-United States Attorney Beall, or three subpoenas *duces tecum* he had served on three different government officials.

---

[18] The government has complied with paragraph 1 of the production order.

The Tenth Circuit has recognized that a disclosure demand can be quashed when it is "overly burdensome[,] . . . particularly where the information is believed to be obtainable from another source." *Ahrens v. Ford Motor Co.*, 340 F.3d 1142, 1147 (10th Cir. 2003). In the context of subpoenas, Fed. R. Crim. P. 17 requires balancing "the burden of compliance, on the one hand, against the governmental interest in obtaining the documents on the other" and dictates that "[a] more burdensome subpoena should be justified by a somewhat higher degree of probable relevance than a subpoena that imposes a minimal or nonexistent burden." *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 303–04 (1991) (Steven, *J.*, concurring). Thus, again in the context of subpoenas:

> Although a definitive set of rules to assist in determining reasonableness has not been established, Supreme Court cases suggest three requirements. They are: (1) that the subpoena command only the production of materials relevant to the investigation; (2) that the subpoena specify the materials to be produced with reasonable particularity; and (3) that the subpoena command production of materials covering only a reasonable period of time.

*United States v. Reno*, 522 F.2d 572, 575 (10th Cir. 1975).

The second of these requirements described in *Reno* dictates that a demand for documents "specify the material to be produced with reasonable particularity" such that the recipient would know "what he was being asked to produce and there also [would be] such particularity of breadth that good-faith compliance . . . . would not be unduly burdensome." *Id.*

This authority counsels that the Court reconsider and vacate its production order for several reasons. First, the production order is unnecessary. The government already has substantially complied in good faith with the Special Master's subpoena *duces tecum* and there is no evidence to the contrary. At most, there is evidence of incidental inadvertent omissions in production that can easily be remedied without the need for a sweeping and problematic production order. The government voluntarily produced voluminous records as expeditiously as possible consistent with

a subpoena *duces tecum* that the Special Master himself acknowledged "was broader than the search terms" that the Court now has ordered the government to implement.

Indeed, there is no reason to believe that use of the Special Master's search terms on the same digital storage locations that government officials already have searched for responsive documents will yield additional responsive materials. What is certain, however, is that the demanded word searches will yield innumerable *non-responsive* documents. The test case—ETOMASICBLACK7_0.pst—demonstrates that the Special Master's search string, which the Court's production order incorporates without analysis of its efficacy, is over-inclusive. To require that the government use this flawed search string to identify documents in the electronic mail accounts of the 16 present and former USAO employees who testified in this matter (other than Tomasic) *and* also in numerous additional directories assigned to all of these employees, as well as to Tomasic, where electronic versions of documents are stored (assuming that the search string syntax can be modified to do so), is certain to produce a significant volume of irrelevant documents. If the Tomasic electronic mail search results are an indicator, the Court's production order will yield 50,000 to 100,000 electronic mail messages (4,493 x 16 = 71,888), and this does not include documents stored in other, non-electronic-mail digital directories. The vast majority of any documents identified by these searches will be unresponsive; otherwise, the Special Master's counsel and the FPD would already have admitted numerous exhibits as a result of receiving the results of the Tomasic electronic mail search. Further, under the Court's production order, all of these nonresponsive documents will have to be reviewed and logged by DOJ employees. This is both unreasonable and overly burdensome.

Further, two of the principal features of the production order—the exclusion from the collection and production process of USAO employees whose documents are the subject of the

search and the requirement of a log of withheld documents—are unwarranted.  Initially, it bears mention that neither the Court nor the Special Master required that the government do either of these things when responding to the subpoena *duces tecum*.  It would be improperly punitive and overly burdensome to *now* require the government to essentially redo a massive document production project using a court-dictated method that has been imposed *only after* the government had *already* substantially complied with the subpoena *duces tecum*.

In any event, the now-required exclusion of the USAO employees from the collection process is unwarranted.  There is no showing that any USAO employee intentionally withheld any responsive documents and to suggest that any one of them – or, as the order implies, all of them – did so or would do so is baseless and unfair.  Indeed, the evidence in this case demonstrates just the opposite.  The majority of the documents that the Special Master and Federal Public Defender admitted into evidence in support of their allegations came from the USAO document production.

Similarly, there is no good reason to require creation of a log of any documents that DOJ may choose to withhold based on its statutory and regulatory authority to control its own internal records.  A party's privilege assertions are subject to judicial review, which is aided by a "privilege log" providing non-content information about withheld documents.  But, in contrast, a district court cannot overrule a DOJ employee's refusal to disclose internal documents and records when the employee has not been authorized to make disclosure.  *See* 28 C.F.R. § 16.28.  As noted above, counsel for the Special Master has acknowledged "that no DOJ employee or no former DOJ employee can obey a demand for DOJ records or for DOJ testimony about their work without authority from the Attorney General."  R.T. 434.  Thus, a "*Touhy* log" would serve no purpose other than to impose additional burdens on the government.

The Court's production demand is fatally infirm for additional reasons.  It is a quintessential "fishing expedition," requiring use of the Special Master's demonstrably overbroad and largely untested search string as a net.  It is telling that from the time of the last documented communication with the USAO about the search terms in June 2017, until recently, the Special Master made no attempt to resuscitate the notion of using this search string despite his authority under the Phase III order to issue production orders on his own, a power that he has used for other purposes.  Rather, on three separate occasions, the Special Master instead issued a subpoena *duces tecum* identifying categories of documents.

Consistent with Justice Stevens's observations in *R. Enterprises*, a production demand as burdensome as this one should be narrowly focused.  It is not.  Nowhere is this flaw more apparent than the demands in paragraphs 4 and 5 of the production order, which command "a team of neutral, uninterested searchers" to "search all non-electronic repositories of every USAO current or former employee who has testified at any hearing in this case" and to "[p]roduce all documents from the searches of the non-electronic repositories . . . and identify the source of each document, including the name of the user/employee/attorney, and the specific repository in which it was stored," *but provide no indication whatsoever* about the kinds of documents these DOJ employees are supposed to search for and produce.

Additionally, there is no evidence, either testimonial or documentary, supporting the allegations of widespread Sixth Amendment violations that have been made in this case.  Further, there is no longer a justiciable case or controversy involving any charged defendant.  For these reasons as well, the production and briefing order should be vacated.  To the extent that this Court believes that further litigation is required, the appropriate mechanism is 28 U.S.C. § 2255.  Any

§ 2255 claimant who has not procedurally defaulted his claim remains free to try to demonstrate that he was prejudiced by a violation of his Sixth Amendment rights.

Because the production order is both unnecessary and overly burdensome, it should be vacated.

## IV

## CONCLUSION

For the reasons set out above, the government respectfully requests that this Court immediately disqualify the Special Master, terminate the Phase III investigation, and vacate its production and briefing order.

**Certificate of Service**

I hereby certify that on the 4th day of December, 2018, the foregoing was electronically filed with the clerk of the court for the District of Kansas using the CM/ECF system, which will send a notice of electronic filing to all counsel.

*S/Deanna Lieberman*
Deanna Lieberman
Paralegal Specialist
United States Attorney's Office
Northern District of New York