## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                                              Case No. 16-20032-02-JAR

KARL CARTER,

     Defendant.

### MEMORANDUM AND ORDER

On November 21, 2018, this Court entered a Final Production and Briefing Order (the "Final Production Order") directing the government to produce relevant information within sixty days and established a schedule for the parties to submit additional evidence and proposed findings of fact and conclusions of law.[1]  This matter is before the Court on the government's Corrected Motion for Reconsideration of that Order (Docs. 696, 697).  The matter is fully briefed, and the Court is prepared to rule.[2]  For the reasons explained in detail below, the Court grants the motion in part and modifies the production portion of the order; denies the government's request to disqualify the Special Master and terminate the Phase III investigation; modifies the order to permit the Federal Public Defender and Special Master to move for admission of any additional exhibits identified through the government's production pursuant to the subpoena *duces tecum* issued prior to the October 2018 evidentiary hearing (the "SDT"); and

---

[1]Doc. 690.

[2]*See* Docs. 706, 708.

accelerates the briefing schedule for the parties to submit proposed findings of fact and conclusions of law.

## I.      Standard for Reconsideration

Although there is no authority in the Federal Rules of Criminal Procedure for reconsideration of a ruling on a criminal matter, the Tenth Circuit has held that motions to reconsider are proper in criminal cases.[3]  Because there is no grounding for motions to reconsider in the Federal Rules of Criminal Procedure, "standards for evaluating a motion to reconsider in the civil context are relevant for evaluating a motion to reconsider in a criminal case."[4]  Under D. Kan. R. 7.3(b), a party may seek reconsideration of a non-dispositive order based on (1) an intervening change in controlling law, (2) the availability of new evidence, or (3) the need to correct clear error or prevent manifest injustice.[5]  A motion to reconsider is only appropriate where the Court has obviously misapprehended a party's position, the facts or applicable law, or where the party produces new evidence that it could not have obtained earlier through the exercise of due diligence.[6]  The Tenth Circuit defines clear error as "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment."[7]  Manifest injustice is "a direct, obvious, and observable error in a trial court."[8]  To prevail on a motion for reconsideration for manifest

---

[3]*United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014) (citing *United States v. Randall*, 666 F.3d 1238, 1242 (10th Cir. 2011) (recognizing that "motions to reconsider in criminal cases are not grounded in a rule or statute")); *United States v. Miller*, No. 06-40151-JAR, 2008 WL 2783146 (D. Kan. July 15, 2008).

[4]*United States v. Blechman*, No. 08-40008-JAR, 2010 WL 235025, at *1 (D. Kan. Jan. 8, 2010) (quoting *United States v. Carr*, No. 06-40147-SAC, 2007 WL 1989427, at *1 (D. Kan. June 20, 2007)).

[5]D. Kan. Rule 7.3(b).

[6]*Comeau v. Rupp*, 810 F. Supp. 1172, 1174–75 (D. Kan. 1992).

[7]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc*., 259 F.3d 1226, 1236 (10th Cir. 2001).

[8]*Paliwoda v. Showman*, No. 12-2740-KGS, 2014 WL 11517806, at *1 (D. Kan. Sept. 30, 2014) (quoting *Tri-state Truck Ins., LTD v. First Nat'l Bank of Wamego*, No. 09-4158-SAC, 2011 WL 4691933, at *3 (D. Kan. Oct. 6, 2011) (citation omitted)).

injustice, a party must show that it is "apparent to the point of being indisputable."[9]  Although the Tenth Circuit has not specifically defined manifest injustice in the context of a motion for reconsideration, other courts have defined it as "more than just a clear and certain prejudice to the moving party, but also a result that is fundamentally unfair in light of governing law."[10]

A motion to reconsider is not a second opportunity for the losing party to make its strongest case, to rehash arguments, or to dress up arguments that previously failed.[11]  A party's failure to present its strongest case in the first instance does not entitle it to a second chance in the form of a motion to reconsider.[12]  Whether to grant a motion to reconsider is left to the Court's discretion.[13]

## II.    Background

The Court assumes the reader is familiar with the orders, hearings, and discovery requests that precipitates the matter before the Court.  In reciting the following background, the Court will not restate the underlying facts in detail, but will provide excerpts from the proceedings and orders as needed to frame its discussion of the matters presently before it.

In May 2016, an Indictment was returned charging Lorenzo Black and others (the "*Black* case") with conspiracy to distribute controlled substances inside the private detention facility in Leavenworth, Kansas, operated at the time by Corrections Corporation of America ("CCA").[14]  On August 5, 2016, the Federal Public Defender ("FPD") filed a motion for Fed. R. Crim. P.

---

[9]*Id.*

[10]*CalMat Co. v. Oldcastle Precast, Inc.*, ---F. Supp. 3d---, 2018 WL 3025053, at *1 (D.N.M. June 21, 2018).

[11]*Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 (D. Kan. 1994).

[12]*Cline v. S. Star Cent. Gas Pipeline, Inc.*, 370 F. Supp. 2d 1130, 1132 (D. Kan. 2005).

[13]*See Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997).

[14]Now known as CoreCivic.

41(g) Return of Information based on information and belief that the government was in possession of video recordings of the attorney-client meeting rooms at CCA, which the FPD alleged intruded into privileged, confidential communications of attorneys and clients housed at CCA.  The Rule 41(g) motion was amended on August 7, 2016, to include audio telephone recordings.[15]  The *Black* defendants joined the  motion and defendants across this District filed similar motions in their respective cases.

On August 9, 2016, this Court conducted an emergency hearing on the FPD's Rule 41(g) motions, where it was alleged that two prosecutors—Assistant United States Attorney ("AUSA") Kim Flannigan and Special Assistant United States Attorney ("SAUSA") Erin Tomasic—used the video recordings obtained in this case to pressure defense counsel to withdraw from representing the defendant in another case in this District, *United States v. Dertinger*.[16]  Based on the evidence presented at the hearing, the FPD and the government agreed that the Court should appoint a special master, although the parties disagreed about the scope of the special master's investigation.  The Court ordered the government to produce all originals and copies of video recordings of attorney-client communications in its possession or in the possession of law enforcement agencies; ordered CCA to cease recording attorney-client meetings and phone calls; impounded the video recordings; ordered the government to preserve its computer hard drives; and set a hearing "to determine the appointment and scope of work of a special master."[17]

The Court held two more evidentiary hearings on August 16 and September 7, 2016, after which "many of the Court's questions regarding the government's conduct in obtaining and

---

[15]Doc. 85.

[16]D. Kan. No. 14-20067-JAR.

[17]Doc. 102.

disseminating the recordings, including the government's intent in doing so, went unanswered."[18]

### *Appointment of Special Master*

Based on the hearings and the parties' submissions, and pursuant to Fed. R. Civ. P. 53, this Court appointed David Cohen as Special Master on October 11, 2016.[19]  The Order set forth the Master's Initial Duties in two phases: Phase I would involve determining the feasibility of culling potentially privileged and confidential attorney-client recordings from the universe of recordings the government obtained from CCA; Phase II would involve culling the potentially privileged materials, and providing progress updates to the Court and the parties.[20]  The Court limited the Special Master's duties to those which the government consented at that time, and reserved the right to later expand the scope of his appointment to investigate whether, and the extent to which, the government violated the Sixth Amendment and/or Fed. R. Crim. P. 6(e) in this and other criminal cases as requested by the FPD.[21]  The Court authorized the Special Master to employ staff as may be necessary to assist him in performing his duties, including experts, consultants, or advisors.[22]

The Order of Appointment specifically addressed *ex parte* communications with the parties and the Court:

> The Special Master may communicate ex parte with the Court at the Special Master's discretion, without providing notice to the parties, regarding logistics, the nature of his activities, management of the litigation, and other appropriate matters, and also to assist the Court with legal analysis of the parties'

---

[18]Doc. 372 at 5.

[19]Doc. 146.

[20]Doc. 253.

[21]*Id.* at 7.

[22]*Id.* at 6.

submissions. The Special Master may communicate ex parte with any party or his attorney, as the Special Master deems appropriate, for the purposes of ensuring the efficient administration and management and oversight of this case, **and for the purpose of mediating or negotiating a resolution of any dispute related to this case**. The Special Master shall not communicate to the Court any substantive matter the Special Master learned during an ex parte communication between the Special Master and any party.[23]

The Court directed the Special Master to issue formal orders, findings, reports, rulings, or recommendations; pursuant to Rule 53(f)(2), the Order set forth a detailed procedure for objecting to any aspect of the Special Master's inquiry.[24]  The Order stated the Court shall decide de novo all objections to conclusions of law made or recommended by the Special Master; and the Court retained sole authority to issue final rulings on matters formally submitted for adjudication, unless otherwise agreed by the parties.[25]  The Court ordered all parties to "provide full cooperation to the Special Master . . . and observe faithfully the requirements of any orders of the Court and rulings by the Special Master."[26]

After initially consenting to the Special Master's appointment, on November 29, 2016, the government moved to reconsider the Appointment Order, arguing (1) it did not consent to the appointment of a Special Master according to the process outlined by the Court at the September hearing, and thus the Court cannot require the government to pay the costs of the Special Master; (2) the Special Master's review will result in fees that are excessive, unreasonable, and disproportionate; and (3) review of the video recordings is unnecessary because the government no longer intends to use the videos at trial.[27]  The Court denied the motion, finding the Special

---

[23]*Id.* at 8–9 (emphasis added).

[24]*Id.* at 9.

[25]*Id.* at 11.

[26]*Id.* at 13.

[27]Doc. 163.

Master was properly appointed to carry out the assigned duties, the Court is satisfied the costs associated with the Special Master's appointment are justified in light of the necessity of review, and that the Special Master's review of the video recordings is appropriate to ensure no possible Sixth Amendment violations.[28]

The Special Master completed Phases I and II of the investigation, during which time he interviewed dozens of affected or knowledgeable people, ordered the preservation and/or production of evidence, and filed eight status reports to this Court.[29]  In his first status report, the Special Master invited "[a]ny attorney who may have received a telephone call from an inmate at CCA for the purpose of obtaining legal advice . . . to provide me with the telephone numbers those inmates may have called."[30]  In his March 16, 2017 Status Report, the Special Master specifically stated that

> in the course of pursuing the Court's directives so far, the Special Master **has met and spoken with many attorneys in the Kansas City area**.  It appears to the undersigned that one reason the defense bar's response has been so ardent—that is, one reason the spark lit a high flame, instead of flaring and dying out—is that there is a widespread undergrowth of mistrust between the Office of the United States Attorney for the District of Kansas and defense counsel.[31]

In the March 16, 2017 Report, the Special Master made certain findings of fact, including tentatively concluding that neither the Office of the United States Attorney, District of Kansas ("USAO"), nor law enforcement actually viewed the videos in May of 2016 or in the past.[32]  But

---

[28]Doc. 182.

[29]Docs. 176, 177, 183, 184, 186, 187, 193, 214.

[30]Doc. 183 at 4.

[31]Doc. 214 at 26 (emphasis added).

[32]*Id.* at 26–27 (explaining that his initial investigation suggested that "[defense bar] suspicions of regular incursion into attorney-client communications . . . are groundless.").

the extent to which the USAO or law enforcement obtained recordings of audio calls made by inmates and the extent to which the USAO was not entitled to obtain those recordings remained an open question, as the Court had not asked the Special Master to issue a Report on those concerns.[33]  The Special Master listed a number of actions for the Court to consider, directed at reaching final conclusions of fact and "mending the parties' relationship," including authorizing him to proceed with a third phase of the investigation into video and audio recordings and the intrusion by an AUSA in to the Court's chambers.[34]  This report drew objections from both sides: the FPD objected in part to certain tentative findings by the Special Master, submitted its own proposed findings of fact, and urged a broader scope of future investigation than the Special Master recommended;[35] the government also objected to certain components of the Report, but "consistently advocated" the Court to affirm the Special Master's tentative findings and conclusions.[36]

In a sur-reply signed by AUSA Debra Barnett, who served at that time as Criminal Chief for the USAO, the government objected to the FPD's "attempt to shift the focus of this litigation towards summary conclusion and away from the measured and methodical approach taken by the Special Master."[37]  The government submitted that "the rush to judgment advocated by the public defender is not supported by the record and undercuts the extensive work already undertaken by the Special Master."[38]  The government concluded that overall, the FPD received an "appropriate and timely response" to its concerns from the government, and received from the

---

[33]*Id.* at 27.

[34]*Id.* at 29–30.

[35]Docs. 229, 230.

[36]Docs. 237, 250.

[37]Doc. 250 at 1–2.

[38]*Id.* at 2.

Court the Special Master review that it requested.[39]  The government noted the report of the

Special Master "appropriately focuses on the mechanics and specifics," and that

> the Court has in place a process to conduct a dispassionate,
> thorough, and professional review, stripped of emotion and
> hyperbole.  This process should not be abandoned in favor of the
> rush to judgment, nor should the agenda of the Special Master be
> other than that which, through measured, impartial review, he
> deems necessary.[40]

### *Phase III*

On May 17, 2017, the Court expanded its inquiry into Phase III, and directed the Special

Master "to investigate the actions and conduct of the government, the USAO attorneys and staff,

and the participating investigative agencies . . . in procuring, obtaining and perhaps using video

and audio recordings of attorney-client meetings and phone calls at CCA."[41] The Court noted

that it was charged with conducting a de novo review of the Special Master's findings and that it

had commenced an investigation before appointing the Special Master, resulting in three

evidentiary hearings.[42]  The Court set forth in detail its findings in support of this Sixth

Amendment inquiry, as informed by the evidentiary record before the Special Master was

appointed and informed by his extensive investigation.[43]  This evidence included three notable

events: (1) the government "offered a number of inconsistent, inaccurate, or misleading

statements about their knowledge of the existence of the video recordings and whether they

viewed or otherwise used any of the video recordings";[44] (2) the government "wiped clean" the

---

[39]*Id.* at 9.

[40]*Id.* at 10.

[41]Doc. 253 at 5–6.

[42]*Id.* at 5.

[43]*Id.*

[44]*Id.* at 30–38.

hard drive of the computer it had used to access the video recordings;[45] and (3) the AUSA responsible for delivering the audio recordings to the Court for impoundment, made an after-hours entry into Chambers where impounded materials in this case were kept.[46]  Phase III would not be funded by the government, but instead the Court would bear the cost from specially appropriated funds.[47]

The government did not seek reconsideration of the Phase III Order.  During the Phase III investigation, the government asked the Special Master to serve as a "taint team" to review materials seized in the March 2016 search of CCA to segregate attorney-client letters and communications.[48]  Furthermore, during the Phase III investigation, additional evidence came to light.  First, the government notified the Court that SAUSA Tomasic had listened to attorney-client calls not only in this case, but in a second case before another judge in this District, resulting in her termination from employment.[49] And after the Court held an evidentiary hearing on Defendant Dertinger's motion to dismiss the indictment in *United States v. Dertinger* based on allegations of the government's use of the attorney-client video recordings obtained in the *Black* case, Dertinger entered into a plea agreement in which the parties agreed to a sentence of time served.[50]

The Special Master filed a Phase III Status Report on October 20, 2017, describing how he worked cooperatively with the USAO to craft language regarding a litigation hold and to craft

---

[45]*Id.* at 40.

[46]Doc. 351 at 8.

[47]Doc. 253 at 47–48.

[48]Doc. 372 at 8.

[49]Doc. 276; *United States v. Herrera-Zamora*, D. Kan. No. 14-20049-CM.

[50]D. Kan. No. 14-20067-JAR-6, Doc. 237.  The *Dertinger* case was transferred to this Court in May 2017 based on the interrelatedness of the issues in that case and the *Black* case.  *Id.*, Doc. 520.

search terms to be applied to the USAO's electronic repository of emails and other documents.[51] The Special Master also reported that on September 12, 2017, he received a 24-page letter from AUSA Steven Clymer, wherein Clymer "respectfully decline[d] to provide most of the information and documents sought" by the Special Master as part of the Phase III investigation.[52] AUSA Clymer set forth the government's position that it had authority to preclude production and testimony based on its housekeeping regulations often referred to as the Department of Justice's ("DOJ") *Touhy* Regulations ("*Touhy*").[53]  In response, the FPD moved the Court to issue an order directing the government to show cause why it should not be held in contempt of court for violating the Court's orders to cooperate with the Special Master.[54]

The Court set the matters for hearing for January 18, 2018, "to discuss the Special Master's findings concerning the government's failure to comply with the Phase III investigation and the appropriate response and/or remedies for such," and also "any other issues the parties may want to address related to the Phase III investigation."[55]  In advance of the hearing, the Special Master issued an Order of Production directing AUSA Clymer to bring to the hearing certain documents and materials that were set out in subpoenas issued by the Special Master, as well as subpoenas directed at current and former employees of the USAO.[56]  The FPD and counsel for the remaining *Black* defendants also subpoenaed government attorneys and other

---

[51]Doc. 298 at 2–3.

[52]Doc. 298-9, Ex. I at 1–2.  Clymer, an AUSA in the Northern District of New York, was appointed by the Department of Justice as a Special Attorney to the United State Attorney General to respond to the Special Master's request for information in Phase III.

[53]*Id.* at 2–7 (citing 28 C.F.R. §§ 16.21–16.29); *see United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

[54]Doc. 301.

[55]Doc. 300.

[56]Doc. 317.

witnesses.[57]  Defendant Carter moved to dismiss the Indictment on Sixth Amendment and prosecutorial misconduct grounds.[58]

The government moved to quash the subpoenas and terminate Phase III of the investigation,[59] addressing two threshold issues: (1) whether the Special Master's Phase III investigation exceeds a federal district court's Article III authority; and (2) whether the FPD has Article III standing in this case.  The Court found the FPD has standing to litigate its Rule 41(g) motions and issues central to the Phase III litigation in this case.[60]  The Court also rejected the government's argument that the Phase III investigation constitutes "a judicial investigation into the operations and decision-making of a co-equal branch of government," a violation of the separation of powers doctrine, finding instead that Phase III is a limited investigation grounded in the Rule 41 motions at issue in this and related cases, which argue that the conduct of the USAO in obtaining and disseminating recorded attorney-client communications violated their clients' attorney-client privilege and Sixth Amendment rights.[61]  In so ruling, the Court assured the government that to the extent it was concerned that certain inquiries would intrude into the "operations and decision-making" of the USAO, it would have "a full opportunity" to "assert any statutory and legal protections it has against providing testimony" at the hearing itself.[62]  The Court also clarified that in addition to the "threshold issues" identified by the government, the January 18, 2018 evidentiary hearing was necessary to address several pretrial motions before the Court, including the FPD's motion for order to show cause, the Rule 41 motions, and the

---

[57]Docs. 363, 368, 369.

[58]Doc. 333.

[59]Docs. 336, 340, 341, 360, 370.

[60]Doc. 372 at 13.

[61]*Id.* at 14.

[62]*Id.* at 14–16.

motion to dismiss on allegations of prosecutorial misconduct.[63]  The Court also stated that the hearing would "inform whether the Phase III investigation is both proper and necessary to the resolution of the underlying pretrial motions and issues in this case."[64]

### Mandamus

The Phase III hearing preparations came to a halt when the government challenged the Court's decision with a petition for writ of mandamus with the Tenth Circuit Court of Appeals and secured a stay of the hearing pending its decision on that petition.[65]  The Tenth Circuit granted in limited part the petition for writ of mandamus to the following extent:

> The district court's order directing the Special Master to conduct a Phase III investigation authorized specific tasks as they pertain to three categories of people:  defendants in the case before it; defendants with pending motions for relief in the District of Kansas which motions are based on certain allegations; and targets and subjects of the CCA investigation . . . . We direct the district court to limit the scope of investigation and inquiries to matters related to defendants before the court in *United States v. Black*, No. 16-20032-JAR, and to other parties in *Black* who have filed Rule 41(g) motions in that proceeding.[66]

### May 2018 Hearing and Settlement

The evidentiary hearing was eventually rescheduled for May 15, 2018.[67]  The government moved to quash the subpoenas reissued by the Special Master, which the Court had previously stayed in December 2017.[68]  The Court did not rule on the motions to quash, and

---

[63]*Id.* at 11.

[64]*Id.*

[65]Docs. 386, 387.

[66]Doc. 398.

[67]Doc. 429.

[68]Doc. 461.

ultimately did not enforce the subpoena *duces tecum*, given the government's invocation of *Touhy*. Counsel for the Special Master, Alleen VanBebber, also appeared at the hearing.[69] The Special Master and the parties proceeded to present evidence on the scope and extent of alleged Sixth Amendment violations caused by the USAO, and its possession of recorded, privileged, attorney-client communications. At that hearing, neither the USAO nor AUSA Clymer made procedural objections to the Special Master questioning witnesses. However, AUSA Clymer made nearly blanket *Touhy* objections to the testimony of AUSA Scott Rask and partial objections to the testimony of former SAUSA Tomasic.[70]

On May 16, 2018, after a full day of evidence, the parties asked the Court to recess the hearing to allow them to work toward an agreed resolution of outstanding issues related to the Special Master's investigation. United States Attorney Stephen McAllister[71] later announced to the Court that his office and the FPD hoped to reach an agreement on a proposed standing order with the help of the Special Master, and that the government would seek to dismiss remaining Defendants Carter and Bishop. All parties understood that if an agreement did not come to fruition, the hearing would be reconvened. The FPD and USAO proceeded to work toward resolution of matters impacted by this litigation, including a jointly proposed Standing Order approved by this Court that appoints the FPD to represent any defendant in this District who may have a post-conviction Sixth Amendment claim based on video or audio recordings of attorney-client communications by any holding facility housing federal detainees.[72] The Court granted

---

[69]VanBebber, a former AUSA, was hired by the Special Counsel because of her *Touhy* expertise and pursuant to the appointment Order authorizing him to hire staff, including consultants, experts, and advisors. Doc. 253 at 6.

[70]*See generally* Mot. Hr'g Tr., May 15, 2018, Doc. 482.

[71]McAllister was sworn in as United States Attorney for the District of Kansas on January 25, 2018.

[72]Standing Order 18-3.

the government's oral motion to dismiss all charges against David Bishop.[73]  Defendant Karl

Carter's motion to dismiss the indictment was held in abeyance.[74]

      But on July 30, 2018, the FPD filed a motion to reconvene the evidentiary hearing

recessed on May 16, 2018, citing a letter to the Special Master from Deputy Attorney General

Rod J. Rosenstein dated July 27, 2018, informing the Special Master of the Department of

Justice's ("DOJ") position in the *Black* litigation and the Special Master investigation.[75]  The

letter explained that the DOJ would not approve blanket sentencing reductions absent evidence

of particularized harm, and would either negotiate or litigate any claims individually.[76]  The

letter concluded by addressing the DOJ's position going forward in "this matter":

> The Department has shifted responsibility for this matter to an
> attorney who did not participate in the conduct at issue, and we
> will continue to cooperate with you in pursuing any credible
> evidence of misconduct.  The Department is open to working with
> you as a mediator to further identify, refine, and possibly resolve
> issues in the litigation.  If the Court finds that there is a basis to
> doubt the integrity of particular Department employees, we have
> no objection to the employee responding to questions focused on
> the issue of whether he or she improperly obtained, watched, or
> listened to, and used privileged communications. We could not
> acquiesce in allowing defense attorneys to question prosecutors
> about other aspects of their work in the absence of credible
> evidence of wrongdoing, nor would we approve unwarranted
> sentence reductions as a mechanism to avoid unwarranted
> discovery.[77]

---

[73]Doc. 480.

[74]*Id.*

[75]Doc. 536; Aug. 1, 2018 Hr'g, Ex. 555 at 1.

[76]Aug. 1, 2018 Hr'g Ex. 555 at 2.

[77]*Id.*

In the interim, the government approved generous sentence reductions for Defendants Lorenzo Black and Anthon Aiono,[78] who had pending Rule 41(g) motions in this matter.[79]

The government opposed reconvening the evidentiary hearing, arguing there was no need because it did not oppose the Rule 41 motions, and because the Court has provided FPD representation for any post-conviction relief and a means by which the FPD can investigate such alleged violations.[80]

The Court addressed this letter with AUSA Clymer at a status conference held August 1, 2018. Clymer confirmed that the DOJ had tasked him with the lead role in future negotiations regarding the Phase III investigation, and that he had contacted the Special Master to express his willingness to continue negotiations.[81] Clymer stated that he would be willing to "sit down with" the Special Master and discuss a way to investigate whether any AUSA had watched a video or listened to recorded calls known to be an attorney-client conversation, short of an evidentiary

---

[78]Black was sentenced to time served on July 30, 2018 (Doc. 540); Aiono was sentenced to probation on August 1, 2018 (Doc. 556).

[79]The government also approved reduced sentences for defendants in other cases who had pending Rule 41(g) motions or where the government had listened to, procured, or used video and audio recordings of attorney-client communications. *See, e.g., United States v. Herrera-Zamora*, D. Kan. No. 14-20049-CM, Doc. 233 (after SAUSA Tomasic's misconduct came to light, government agreed to recommend the district court vacate defendant's 420-month sentence and impose instead a sentence of time served); *United States v. Dertinger*, D. Kan. No. 14-20067-JAR, Docs. 396, 558 (after evidence revealed that government procured, viewed, and used video of defendant communicating with his counsel, the government made a time-served offer to defendant contingent on him withdrawing his Rule 41(g) and other motions); *United States v. Uriarte*, D. Kan. No. 15-20043-JAR, Docs. 156, 153 (after filing Rule 41(g) motion and seeking to join that motion with all similarly related motions and proceedings pending in *Black,* defendant pled to one count of misprision of a felony and sentenced to time served); *United States v. Huff*, D. Kan. No. 14-20067, Doc. 481 (after defendant filed Rule 41(g) motion, government agreed to functionally time-served 36-month sentence on condition that defendant withdraw her pending motions); *United States v. Wood*, D. Kan. No. 14-20065-JAR, Docs. 236, 237 (defendant was facing up to 78 months' imprisonment, but after filing motion for relief based on government's procurement and possession of video or audio recordings of attorney-client communications, government agreed to reduce defendant's sentence to time served (approximately 50 months); *United States v. Ruelet*, D. Kan. No. 14-40005-DDC, Doc. 1262 (defendant was originally sentenced to 60 months' imprisonment, but after AUSA Treadway's testimony at the October 2018 hearing in *Black*, government agreed to reduce defendant's sentence to time served).

[80]Doc. 554.

[81]Hr'g Tr. 21–22, Aug. 1, 2018, Doc. 560.

hearing.[82]  Clymer also expressed his willingness to negotiate with the Special Master and the parties under *Touhy*, despite his earlier blanket invocation of the regulation to oppose all testimony and any response to the Special Master's SDT.[83]  The Court granted the FPD's motion, as the May 2016 hearing was never adjourned, but was held in abeyance to give the parties time to negotiate.[84]  The Court stressed that it must conclude the evidentiary hearing that began on May 15, 2018, "in order to resolve pending motions in this case, and in order to conclude Phase III of the investigation within the scope authorized by the Tenth Circuit."[85]

The Court ultimately reconvened the evidentiary hearing for the first two weeks of October 2018 to address (1) the Special Master's Phase III Report; (2) the Federal Public Defender's ("FPD") Motion to Show Cause and Supplemental Motion for Order to Show Cause; (3) pending Rule 41 motions in this case; and (4) Defendant Carter's Motion to Dismiss Indictment.  On August 17, 2018, the Special Master served the government with a narrowed subpoena *duces tecum*, which demanded, *inter alia*, information, documents, and instructions sent by AUSA Emily Metzger, the USAO Litigation Hold Coordinator, concerning retention, preservation, and production of materials related to the issues in *Black* and responses thereto, as well as a list or log of all repositories being searched using negotiated search terms.  The government did not object to that SDT, but was granted a two-week extension to produce in advance of the October hearing.[86]  But the government did not fully produce by that deadline.

---

[82]*Id.* at 30.

[83]*Id.* at 41–44.

[84]Doc. 562.

[85]*Id.* at 5.

[86]Doc. 582.

Instead, the produced the documents on a rolling basis, up to and including production on the next to last day of the hearing.

### October 2018 Evidentiary Hearing

The Court will limit its discussion of the testimony and evidence from the seven-day hearing to matters relevant to the motion before it.  The evidence included notable testimony from three witnesses.  First, AUSA Metzger testified that a litigation hold letter was in place for the Kansas City USAO in December of 2016.[87]  Second, AUSA Tanya Treadway's testimony made clear for the first time that she listened to CCA recordings of attorney-client calls in a case she was prosecuting.[88]  Evidence and testimony also revealed that questions remained as to whether other AUSAs had accessed recordings in their respective cases.

Third, AUSA Debra Barnett, who served as Criminal Chief for the District of Kansas from February 2016 to February 2018, testified that she prepared a memo to the DOJ seeking District of Kansas recusal from the *Black* case on or around October 11, 2016, and that Thomas Beall, then acting United States Attorney, sent the recusal letter to the DOJ on October 12, 2016.[89]  Barnett testified that she did not recall whether she talked to the Special Master about the recusal request.[90]  Barnett was questioned about her meetings with the Special Master after his appointment in October 2016.[91]  Barnett testified that she wrote an email to Beall on

---

[87]Doc. 672 at 1293–95. The transcripts of the October and November 2018 evidentiary hearing consist of ten volumes found at Docs. 651, 652, 669 through 677, and 694 and collectively consist of 2,819 sequentially paginated pages.  For convenience, the Court cites to these documents by ECF docket entry number, followed by a reference to the page number in the transcript that appears in the upper right corner of each page.

[88]Doc. 652 at 80–122.

[89]Doc. 677 at 2324–25.

[90]*Id.* at 2325.

[91]*Id.*

December 10, 2016, explaining a meeting she had with the Special Master the previous week.[92]

The email states:

> Mr. Cohen wanted to meet with me last week so I met with him at Jack Stack BBQ at 9:30 p.m. That is a whole other story.
>
> Suffice it to say that I'm going to tell you things I will [sic] not going to tell anyone else.
>
> 1. Judge Robinson is still upset with Erin and she isn't going to get over it.  She still wants to file the order she initially drafted against Erin.
>
> 2. Attorneys (unidentified) have come forward to talk to him about the following AUSAs—Kim, Terra, Sheri and Erin—who they believe are unethical and engaged in practices designed to obtain privileged communications to use in their prosecutions.  He said that not one single attorney has said anything complimentary about Erin.  In fact, they all say very negative things about her, the way she practices law on behalf of our office, and Judge Robinson does NOT believe that she is credible.  On the other hand, he says that no single attorney has spoken ill about me.  I don't know why that was relevant, except that that causes him to believe he can trust me.  For what that is worth.
>
> 3. He will finish up the review of evidence for us by the first of the year.  Then, an investigation will begin. The end goal—to turn over whatever is found to OPR or OIG.  Judge Robinson is aware of past OPR investigations that have gone nowhere.  So, the belief is that an investigation provided by a Judge, with allegations from the same Judge, will probably go somewhere.
>
> 4. He suggested that if we know something it would be better for us to come forward with it, rather than for the Court/SM to find out about it.
>
> So, you ask what the allegation is—it is that we have attorneys who have engaged in a practice of obtaining privileged information/materials in order to use it for the benefit of one of our prosecutions.  The belief is that, in the past, we have not turned those materials over to the defense so they have not been aware that we were obtaining calls from CCA.

---

[92]*Id.* at 2305–06; Oct. 2018 Hr'g Ex. 1166.

. . . .

> As an aside, I believe that Erin continues to create strife and
> discord in our office, among colleagues. I would like you to
> consider letting her go as a SAUSA.[93]

Barnett testified that at that point, she was developing a working relationship with the Special Master and that she trusted him.[94] Barnett confirmed that during the time that she was dealing with the Special Master directly, she "felt like he was fair in his treatment of [her]."[95] On cross-examination by FPD Brannon, Barnett confirmed that the Special Master gave her information about the defense community's perception of certain members of her office that was consistent with what she knew and had heard back in August of 2016, before the appointment of the Special Master.[96] Barnett testified that she agreed with this perception based upon her own observation of such behavior by certain Kansas City prosecutors in the past.[97] In fact, some of this questionable behavior had been directed towards Barnett.[98] Barnett testified that, ahead of the August 9, 2016 hearing, she did not have absolute confidence that SAUSA Tomasic and AUSA Flannigan were giving her complete and accurate information and she did not want to sponsor such before the Court.[99] Her lack of confidence was based on past experiences and complaints from defense attorneys and members of a federal agency about Tomasic's bad

---

[93]Oct. 2018 Hr'g Ex. 1166.

[94]Doc. 677 at 2307.

[95]*Id.* at 2324.

[96]*Id.* at 2343 ("By the time that I believe he said that to me was maybe in December of 2016. I absolutely had seen similar behavior in other contexts and that they exhibited towards me as well.").

[97]*Id.*

[98]*Id.*

[99]*Id.* at 2341.

behavior toward an officer.[100]  Again, Barnett's past experiences occurred long before the

Special Master was appointed.

The Special Master conducted the redirect examination of Barnett.[101]  Barnett confirmed

that they had a friendly relationship and that they grew comfortable calling and emailing each

other using language they would not necessarily use in the courtroom.[102]  Barnett testified that

she recalled discussions with the Special Master about how he hoped his role and the

investigation would work, and that the Special Master was "hoping that there would be a way to

get the [tension] that existed up here between the defense bar and people in the Kansas City,

Kansas office—find a way to work through that and somehow eliminate that."[103]  The Special

Master questioned Barnett about the December 2016 meeting at Jack Stack's:

> Q:      Do you remember when we were at the barbeque or any
> other time during any of the many phone calls that we had that you
> told me that you thought that there were three people in particular
> in the office that weren't practicing the way that a United States
> Attorney should practice?
>
> A:      Yes.
>
> Q:      Do you remember who it was that you told me you thought
> that about?
>
> A:      Yes.
>
> Q:      Can you tell me again who those were?
>
> . . . .
>
> A:      I'm not sure I remember all three exactly, but one would've
> been Sheri McCracken or Catania, Terra Morehead, and I believe
> the third one would have been Erin.

---

[100]*Id.* at 2341–42.

[101]*Id.* at 2406.

[102]*Id.* at 2407.

[103]*Id.* at 2408.

> Q:      That's my recollection as well.  And you remember I think
> I said something along the lines of:  I'm from out of town.  I'll be
> the bad guy.  I'll take the heat.  Let's figure out a way to get rid of
> them if they're bad actors and clean this all up, something like that.
> Does that sound right?
>
> A:      Yes.
>
> Q:      And as I said, we used language we wouldn't use in the
> courtroom, but I said something like: It will be a shit storm, but I'll
> hold your hand through it.  Does that would like something I
> would've said?
>
> A:      Something similar to that.[104]

On the last day of the hearing, after government counsel could still not say whether the

USAO would produce more information,[105] the Court kept the record open and ordered a further

evidentiary hearing for November 16, 2018, to "figure out whether the production is complete,

all other concerns about production, [and] any requests for remedies about production."[106]  The

FPD subsequently filed a Second Supplemental Motion to Show Cause,[107] which was set for

evidentiary hearing that same date.

### *November 16, 2018 Hearing*

The Court again limits its discussion of the testimony and evidence from this day-long

hearing to matters relevant to the motion for reconsideration.  The Special Master recalled three

witnesses:  David Steeby, Systems Manager for the USAO; Thomas Beall; and Emily Metzger.

It was first learned at the November 16 hearing that the USAO had not put an effective litigation

hold in place until May 2017, nine months after the Government was placed on notice to

---

[104]*Id.* at 2412–13.

[105]*Id.* at 2477–78.

[106]*Id.* at 2482.

[107]Doc. 668.

implement a litigation hold preserving all its information relative to the Sixth Amendment allegations in the *Black* case. During the October 2018 hearing, AUSA Metzger testified that she put a litigation hold in place in December 2016.[108] But at the November 16, 2018 hearing, Exhibit 1196 was admitted, revealing for the first time that a standard DOJ standard litigation hold form was not submitted to DOJ until May 2017.[109] Exhibit 1196 was produced at some time during the government's rolling production during the October hearing, such that neither the FPD nor the Special Master was able to question witnesses about it during the October 2018 hearing.

Both Beall and Metzger further testified that the USAO requested recusal from the *Black* case on October 12, 2016, the day after the Special Master was appointed, and that they had kept the Special Master apprised during all phases of the investigation that they were seeking recusal and that they were going to have to get permission from the DOJ for almost everything the Special Master was requesting to be produced while the parties were negotiating search terms for the USAO repositories.[110]

Over the government's objection, the Special Master was called to testify as a rebuttal witness.[111] The Special Master testified that he was not informed of the May 2017 litigation hold or its results.[112] The Special Master testified that he worked with Steeby to develop a set of search terms over the course of several months, and that they agreed to run the final search terms against the Tomasic repository as a test in early June of 2017.[113] The Special Master further

---

[108]Doc. 672 at 1293–95.

[109]Nov. 2018 Hr'g Ex. 1196.

[110]Doc. 693 at 2557–2644 (Beall); 2645–2732 (Metzger).

[111]*Id.* at 2735.

[112]*Id.* at 2756.

[113]*Id.* at 2737–38.

testified that it was always his understanding while working with Steeby and the USAO that there would come a point where they would agree upon the search terms, then they would need to resolve the government's concerns about production of certain documents that implicated national security and privacy concerns.[114]  The Special Master testified that his discussions with Beall and Metzger always concerned how they would run the search, produce the documents, and then figure out a mechanism for those documents to be reviewed before they were given to the Special Master.[115]  The Special Master testified that neither Beall nor Metzger informed him about the pending recusal request, and that in the many conversations he had with Beall to keep him apprised of the production progress, Beall told him that his office was going to cooperate with his investigation.[116]  The Special Master further testified that it was not his role to determine Beall's motivation for not sharing concerns Beall had about production.[117]

The Special Master testified that he began to speak with Beall by phone almost immediately after his appointment in October 2016:

> My very first meeting—the very first thing I did after I was appointed was to call United States Attorney Grissom, who, of course, had just recently left office.  And he advised me that I should call Mr. Beall.  And so I made arrangements the very first time I came into Kansas City to meet with Mr. Beall, and I sat with him a good hour, maybe—maybe not quite that long, but it was a lengthy period of time, at least a half an hour.  And I told him that I thought this was an opportunity for things to get fixed that were wrong and that because I was from out of town, I was perfectly happy being the bad guy.  He could blame everything on me and he could be the hero as far as I was concerned, but let's get it fixed.  I think there are problems in your office, let's fix them.  Let me do that, let me help you.  I'm hearing stories that, if half of them are true, something is very wrong.  That has proved correct.  And

---

[114]*Id.* at 2740.

[115]*Id.* at 2714.

[116]*Id.* at 2742.

[117]*Id.* at 2777.

unfortunately, that's not what happened in this investigation. I wasn't allowed to help the way I wanted to. I wasn't given the tools to, as I called it, burn the cancer out. And it's a sad state of affairs that it's two years later and I'm not sure that the problem is yet fixed.[118]

On cross-examination by AUSA Clymer, the Special Master testified about the December

2016 meeting with Barnett:

> Q:      And, in fact, when you first got involved in the investigation and you tried to understand the lay of the land, as you testified yourself, you thought there was a cancer and you were willing to do what you could do properly to help fix it; is that fair to say?
>
> A:      In my role as a neutral, yes.
>
> Q:      And you had a conversation with Deb Barnett at a barbecue place that she later recounted in an email that's been admitted into evidence where she was telling Mr. Beall what had happened at that meeting. Correct?
>
> A:      Yes.
>
> Q:      Was that email message that she—where she recounted your meeting, was that substantially accurate in your mind?
>
> A:      Honestly, I'd have to read it. I don't remember it well enough to be able to say right now that it was accurate or not.
>
> Q:      Do you remember looking at it and thinking, I've got to correct the record on this, this is just wrong?
>
> A:      I remember thinking that her impression, her—her impression of our relationship wasn't exactly the same as what mine was at that juncture.
>
> Q:      Let me ask you a specific question, but I want us both to be careful and not use any names in this part of my question. Do you remember telling her that based on the investigation you had done to date, you had identified some people in the office, the U.S. Attorney's Office, who you would characterize as bad apples or problematic and that you were willing to help do what was

---

[118]*Id.* at 2757–58.

necessary and be the, quote, bad guy in order to get those people fired?

A:      I'm not sure I said it then, but I certainly said it to her at some point.  And probably then.

Q:      Okay.  And at the time you said that, I take it you said it because, from what you had learned you thought it would improve things in this district, to take out people who were, at least from what you had learned, repeatedly problematic AUSAs that were contributing to what you later describe as a culture of distrust?

A:      And those who it hadn't even been repeated.  Just if there were problem actors that we needed to—that I would help as much as I could.

Q:      To get them out of the district?

A:      To—I don't know what the cure was.  If the cure was to get them out of the district, if the cure was to retrain them, whatever it was, whatever was necessary, I was willing to help the United States Attorney's Office do that so that it could identify the issues, identify the people, identify the problems, and take whatever the appropriate action was to get that fixed.

Q:      Did you remember—do you recall telling Ms. Barnett, either in that conversation or in a later conversation, that one of the things you'd help do is get them fired?

A:      I don't recall saying that, but if—if that was what it took to cure the problem, then I would do that.  I would—I would do whatever I could to help her get them fired.

Q:      Did you have any idea at that time how administratively challenging it is . . . To get an Assistant U.S. Attorney fired?

A:      Actually, I—I didn't.  I very quickly—in fact, it might've been in my conversation with Deb Barnett, I very quickly learned that you don't just fire somebody in the United States Attorney's Office.
. . . .

Q:      Do you remember the testimony of Mr. Warner, the former First Assistant who sat here in Kansas City?

A:      Vaguely, yes.

> Q:      Do you remember him claiming that even though he knew there were all sorts of problems, there was nothing that he could do to change anything?
>
> A:      I believe that he said there was nothing he can do without the support of his United States Attorney, yes.[119]

### *Final Production Order*

On November 21, 2018, the Court issued the Final Production Order.[120]  After detailing specific problems and issues with production, the Court ordered the government to (1) use the search terms negotiated with the Special Master to run a document search on the ProofPoint email archive system files and on all other electronic repositories, individual or shared, for every current or former USAO employee who has testified at any hearing in this case, and produce all documents resulting from these searches and identify the source of each document; (2) search all non-electronic repositories for every USAO current or former employee who has testified in this case, using a team of neutral, uninterested searchers, and produce all documents from those searches; (3) produce every completed and signed response to the May 19, 2017 litigation hold notice and certification form; and (4) produce a production log for withheld information of any type.[121]  The government was ordered to comply with these directives within sixty days of the Order, and the FPD and Special Master were given 120 days from the date of the Order to move for admission of any additional exhibits identified through this production.[122]  The parties were

---

[119]*Id.* at 2771–74.

[120]Doc. 690.

[121]*Id.* at 9–10.

[122]*Id.* at 10.

given 120 days from the date of the Order to submit proposed findings of fact and conclusions of law.[123]

## III.    Discussion

The government moves the Court to reconsider and vacate its Final Production Order under D. Kan. Rule 7.3(b) on four grounds: (1) new evidence is available and reconsideration is necessary to correct clear error and prevent manifest injustice; (2) the Special Master's own sworn testimony and statements, as well as other evidence, demonstrate that his impartiality can reasonably be questioned, thereby requiring that he be disqualified under 28 U.S.C. § 455(a), that the results of his investigation be suppressed and disregarded, and that the production and briefing order be vacated; (3) the Phase III investigation must be terminated as a violation of the separation of powers; and (4) there is no legal authority for the Court's Final Production Order, it violates the separation of powers, and it is unnecessary and overly burdensome.[124]

The government cites "ample" reasons for reconsideration of the Final Production Order: (1) because the Court denied the government's request to submit briefing in advance of the Court's production order, its motion does not revisit previously-briefed issues, and the motion is necessary to bring to the Court's attention facts that were not before it at the time it issued its Order; (2) reconsideration is needed to correct clear error and to prevent manifest injustice because the Court must disqualify the Special Master, terminate the Phase III investigation, and vacate the production and briefing order; and (3) because this Court invited the government to file a motion for reconsideration.[125]

---

[123]*Id.*

[124] Doc. 697 at 3.

[125]*Id.* at 4–5.  The Court notes that its invitation to file a motion to reconsider its production order was made with the caveat that the motion be filed in good faith. Doc. 693 at 2809.

As a threshold matter, the Court questions whether a motion for reconsideration is the proper mechanism to seek vacation of its order, a nondispositive order for production and further briefing that allows the government to withhold legitimately protected or privileged information. While the government directly challenges the Final Production Order on grounds that the Court lacks authority to order such production and that the production ordered is unnecessary and overly burdensome, it does not limit its argument to the merits and specifics of that order. Instead, the government indirectly seeks vacation of the Final Production Order in a broad request to both terminate the Phase III investigation as a violation of the separation of powers doctrine and disqualify the Special Master. The Court will address both the direct and indirect challenges in turn.

### A.  Direct Challenges

The Court first addresses the government's direct challenge to the Final Production Order, which alleges three legal errors by the Court that require the order be vacated: (1) the Court lacks authority to order production under Fed. R. Crim. P. 16; (2) the production order violates the separation of powers doctrine; and (3) the production order is unnecessary and overly burdensome.

The government first argues that there is no legal authority for the directives in the Court's production order because this is a criminal case and the Court's authority to order government disclosures is principally governed by Rule 16(a). But as this Court has repeatedly observed, Phase III is more than a criminal case—it is an investigation of alleged prosecutorial misconduct within the context of the criminal case. The Tenth Circuit permitted the Phase III investigation to proceed with respect to the FPD's pending Rule 41(g) motion, which is civil in

nature.[126]  The government's assertions are merely a rehash of its previous arguments, and are

insufficient to warrant reconsideration under D. Kan. Rule 7.3(b).

The government's second argument that the Final Production Order's directive to locate

responsive documents by running the agreed-upon search terms through its repositories, using a

team of neutral, uninterested searchers, violates the separation of powers doctrine is similarly

unavailing.  The government renews its argument that "a district court does not have general

supervisory powers over the co-equal executive branch of government."[127]  The government

again cites *United States v. Dominguez-Villa*, where the Ninth Circuit held the district court

exceeded the bounds of its authority when it ordered non-prosecution lawyers and agency

department heads to review the personnel files of all law enforcement witnesses that it intended

to call at trial.[128]  The court held that there was no authority that the government's refusal

violated the Constitution, a federal statute, or a rule.[129]  In this case, however, the directive

requiring neutral searches is in response to verification that the government failed to protect

against any purposeful destruction of documents by allowing the alleged wrongdoers in the

USAO to perform their own document reviews and production in response to the SDT issued

ahead of the October 2018 hearing.[130]  Notably, there were only two prosecutors who did not

have an opportunity to review their own repositories, Erin Tomasic and Tanya Treadway, both of

whom had left the USAO by the time of production.  And the documents produced as well as

---

[126]*See In re Special Grand Jury 89-2*, 450 F.3d 1159, 1167 (10th Cir. 2006) (the court "agreed with every other circuit that had ruled on the issue in holding that a motion for return of property under Fed. R. Crim. P. 41(g) is civil rather than criminal.") (citing *United States v. Madden*, 95 F.3d 38, 39 n.1 (10th Cir. 1996)).

[127]*See* Doc. 336 at 11, 20–22 (citing *United States v. Dominguez-Villa*, 954 F.2d 562, 565 (9th Cir. 1992)).

[128]954 F.2d at 565.

[129]*Id.*

[130]Doc. 690 at 7.

other evidence, proved that Tomasic and Treadway breached attorney-client privilege by listening to audio recordings.[131]  Further, the Court does not dictate which government officials should conduct the review, only that those officials should be neutral.   Thus, the Court's directives in the Final Production Order are authorized and not in violation of the separation of powers doctrine and the Court declines to reconsider its order on these grounds.

Nevertheless, it is now apparent to the Court that the government had no intention of complying with the Court's Final Production Order, despite asking the Court to keep the record open at the conclusion of the November 16 hearing.  At the end of that hearing, after testimony by USAO representatives verified that an effective litigation hold had not been put in place until May 2017, the Court engaged in a colloquy with AUSA Clymer about outstanding production issues, specifically, whether the agreed-upon search terms had been applied to the "ProofPoint" of AUSAs other than Tomasic or other repositories of those AUSAs as the SDT contemplated.[132] Clymer confirmed that individual AUSAs were tasked with looking through their own documents, that not all of the documents responsive to the SDT were produced, but that the USAO "bent over backwards to try to be overly inclusive."[133]  Clymer then suggested a meeting with the Special Master to try to work out a resolution, narrow the request, and get something that was satisfactory to both the Special Master and the Court.[134]

The Court proceeded to list numerous problems with the way production happened over the course of two years, which it intended to address in a written order: (1) individuals that have been alleged to engage in wrongdoing are the ones doing the culling of their own documents

---

[131]*Id.*

[132]Doc. 693 at 2790–91.

[133]*Id.* at 2793–94.

[134]*Id.* at 2794.

instead of a neutral reviewer; (2) the year-long process of developing agreed search terms with the intent that they be applied across all repositories had not happened; (3) the individuals whose repositories are being searched should not control who is searching them; and (4) while acknowledging the government is entitled to do a privilege/*Touhy*, national security, and Privacy Act review, the Court and the parties are entitled to a privilege/production log.[135]  The Court advised Clymer that he was free to talk to the Special Master and the FPD to try to resolve these things but that meanwhile, it intended to address its concerns in a written order as these production matters should have been completed two years ago.[136]  The Court further noted that Clymer's argument that such production, particularly a privilege log, would be too much work and too time consuming fell on deaf ears, as this matter has been going on for two years and had resulted in a "document dump" shortly before and continuing throughout the two-week hearing in October 2018.[137]

FPD Brannon then informed the Court that the government's production was not only a document dump, it was incomplete, as evidenced by the testimony earlier in the hearing regarding the delayed litigation hold.[138]  Brannon expressed that

> [B]ased on [the Government's] conduct so far and the time it's taken, I have no confidence that production is ever going to be complete or it's ever going to be reliable.  They're relying on their own people to produce this and not checking or auditing in any way?  I mean, every day that the government has delayed, they win and my clients lose. I—you know, they come in and complain about it's so much work. You know, DOJ is willing to come in and send Mr. Clymer and to blow up our deal and to put resources towards obstructing this and then delaying on the recusal, but they're not willing to send people in to do this review and help

---

[135]*Id.* at 2794–98.

[136]*Id.* at 2798.

[137]*Id.* at 2798–99.

[138]*Id.* at 2799–30.

fulfill the Court's order?  I mean, where is—where are those resources?  How do they answer for that lack of commitment? . . . [T]his has been going on so long.  And DOJ has interfered, they've been involved in this and known about this since October of 2016. Where are they coming in and fulfilling their obligations to this Court?

We've heard today that they believe federal regulations trump court orders. I think that's all we need to know.  This is never going to be done, it's never going to be completed, and it's certainly way past being timely.

I think it should be stopped and the Court should just draw adverse inferences at this point from what they haven't produced, . . . find that based on their conduct and what they haven't produced that they have reviewed attorney-client communications in every case we've identified, and that they've relied on it . . . to their advantage.  Because that's where we are going right now.

. . . [T]he things that have been described are going to take another six months and we're still going to be struggling with this.  This is enough.  This really is enough.  They've been given chances. Deadlines mean nothing to them.

They're still in possession of attorney-client communications that they haven't turned over, and they know it and they've identified them and we've identified them.  They still have them.  They haven't sequestered them.  They haven't produced them to the Court.  They're still available to people in their office.  Two years later. I—this is enough.[139]

In response, AUSA Clymer informed the Court that it remains the position of the DOJ that there is no legal basis for the disclosures that have been ordered in this case, and that the disclosures made in response to the SDT were made *voluntarily* by the government.[140]  When the Court reminded Clymer that the Tenth Circuit authorized Phase III of the investigation, which means it authorized this Court through the Special Master to obtain these documents, Clymer pushed back, arguing there is nothing in the Tenth Circuit decision that states the government has

---

[139]*Id.* at 2800–2802.

[140]*Id.* at 2802.

an obligation to turn over these materials.[141]  When asked by the Court if he wanted to close the record on that note—that the government was not going to turn over anything—Clymer repeated his request to speak to the Special Master to try to work out an accommodation.[142]  After the Court reminded him that he would also need to work out an agreement to the FPD's satisfaction, Clymer stated he was willing to talk to all parties.[143]

The Court invited the parties to continue to try to resolve the production issues, but explained that it would proceed to issue an order to avoid further delay.[144]  The Court denied AUSA Clymer's request for permission to brief the issue about further disclosures prior to the Court's issuing any such order, which it characterized as straightforward:  it would order production of a privilege/production/national security log, have neutral people do the searches across all ProofPoint repositories, and then produce those parts of the repositories that meet the search terms, along with an appropriate log to litigate, if necessary.[145]  The Court stated the government would be free to file a motion to reconsider or appeal, and asked Clymer to consider the Court's order before deciding whether he "in good faith should even file such a motion for reconsideration."[146]

Of course, no resolution of the pending production issues was reached and the government instead filed the instant motion arguing not only that the Court has no power to order production of anything, including a privilege/production log, but that the Special Master should be disqualified and Phase III is invalid.  In fact, the government's last word on the matter, in the

---

[141]*Id.* at 2802–03.

[142]*Id.* at 2803.

[143]*Id.* at 2804.

[144]*Id.* at 2805–06.

[145]*Id.* at 2806.

[146]*Id.* at 2809–09.

conclusion of its reply brief, requests the Court modify the deadlines set out in its final production to run from the date on which the Court rules on the pending motion for reconsideration; and further, the government advises the Court that the DOJ "likely will respectfully decline to comply with the production order if it remains in place as presently drafted."[147]

The FPD's prediction has come to fruition.  As the 60-day production deadline passes, it is clear that, despite giving it a fair chance to comply, compelling any further production from the government is an exercise in futility.  Accordingly, in light of the protracted history of these proceedings, and in order to avoid further delay and waste of judicial resources, the Court will reconsider and modify its final production and briefing order on this ground.[148]  Rather than compel further production at this time, the Court will prepare to close the record.[149]  Further remedies, if any, associated with the government's failure to cooperate with Phase III are under advisement and will be addressed in the Court's order on the pending motions before it.  The preservation order shall stand.[150]

In so ruling, however, the Court does not suggest the government will never have to produce these documents and information.  Indeed, AUSA Clymer has argued in at least three briefs filed in these proceedings that the "appropriate mechanism" for investigation of any Sixth Amendment violations is 28 U.S.C. § 2255, even though some defendants have sought relief for

---

[147]Doc. 708 at 20–21.

[148]*See Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1224–25 (10th Cir. 2007) (explaining "law of the case" doctrine is discretionary, and district courts remain free to reconsider their earlier interlocutory rulings made before the entry of judgment).

[149]Doc. 690 at 9–10, directives (2) through (7).

[150]*Id.* at 9, directive (1).  The Government indicates that it has complied with directive (1) of the order. Doc. 697 at 37 n.18.

Sixth Amendment violations in pending criminal cases.[151]  The Court will leave the production matter for another day, as there are currently sixty-six pending § 2255 motions that raise potential Sixth Amendment violations, where there can be no dispute that both the Federal Rules of Evidence and Rules of Civil Procedure apply.[152]

The Court will also modify the Final Production Order to permit the FPD and Special Master to move for admission of any additional exhibits identified through the government's rolling production pursuant to the SDT before and during the October 2018 hearing.  As there is no longer need for review and production of additional exhibits identified through the Final Production Order, the Court will accelerate the submission of proposed findings of fact and conclusions of law.[153]

### B.  Indirect Challenges

Next, the Court addresses the indirect challenges to the Final Production Order, ultimately seeking termination of Phase III and thus vacation of the order.  The government argues that (1) the Phase III investigation must be terminated as a violation of the separation of powers doctrine; and (2) the Special Master must be disqualified, Phase III must be terminated, and the Final Production Order vacated because his impartiality in this proceeding may

---

[151]Doc. 554 at 7; Doc. 697 at 41–42; Doc. 336 at 18.

[152]The FPD has advised there is the potential for more than 100 additional 2255 petitions involving audio recordings. *See, e.g., United States v. Phommaseng*, No. 15-20020-JAR-5, Supp. to Def.'s Mot. to Vacate Pursuant to 28 U.S.C. § 2255, Doc. 583 (D. Kan. Jan. 17, 2019) (stating that FPD' investigations have revealed at least seventy-six recorded attorney-client phone calls between Petitioner and his counsel were accessed and obtained by the government during the course of his prosecution; at least thirteen of those attorney-client calls exceeded two minutes in duration; there are at least two documented production requests for Petitioner's phone calls made by the government; and the government had been in possession of Petitioner's recorded CCA phone calls and surrendered those to the Court in the *Black* proceedings).

[153]Because the Court modifies the production portion of its order, the government's argument seeking vacation of the order as unnecessary and overly burdensome is moot for purposes of this order on reconsideration. However, the issues raised in the government's argument are very much alive with respect to the FPD's pending motion for order to show cause and other related motions, which the Court has taken under advisement.

reasonably be questioned.  Reconsideration of the order on these broad grounds is misplaced, however, as such relief has either previously been sought and denied or is unrelated to the merits of the production order itself.  The government maintains that even if this Court finds reconsideration on these grounds is not appropriate, however, the government can raise these issues in one or more "stand-alone" motions.[154]  Although the Court has modified in part its Final Production Order, it proceeds to consider the government's serious constitutional and disqualification concerns insofar as they seek additional relief.

### 1.  *Cobell v. Norton*

In both claims seeking termination of Phase III, the government attempts to analogize this case to *Cobell v. Norton*, which arose from a lawsuit in which the Secretary of the Interior and other federal officials had been found liable for a breach of fiduciary duties in connection with their management of trust accounts for the benefit of Native Americans.[155]  The case actually involved two Special Masters: (1) Balaran, who was appointed to serve as a Special Master pursuant to Fed. R. Civ. P. 53, with the consent of the parties, to oversee the discovery process in the case;[156] and (2) Kieffer, who was originally appointed to serve as "Court Monitor," with the charge to "monitor and review all of the Interior defendants' trust reform activities and file written reports with the Court."[157]  The Department of Interior consented to Kieffer's initial appointment, which was based on the district court's "inherent powers," not pursuant to Fed. R.

---

[154]Doc. 708 at 5.

[155]334 F.3d 1128, 1133 (D.C. Cir. 2003).

[156]*In re Brooks*, 383 F.3d 1036, 1039, 1044 (D.C. Cir. 2004) (subsequent mandamus action seeking recusal of Special Master Balaran from contempt proceedings under 28 U.S.C. § 455(b)(1), which requires recusal for actual bias or prejudice concerning a party).

[157]*Cobell*, 334 F.3d at 1134.

Civ. P. 53.[158]  Kieffer's appointment as Court Monitor was extended a second year over the

objection of the government defendants.[159]  With authorization from the district court, the Court

Monitor attended a meeting with Department of Interior officials, where he discussed his

"concerns about the way they were doing their jobs—concerns that he was subsequently to report

to the district court."[160]  The Court Monitor proceeded to issue multiple reports that were

"unflattering" to the Department of Interior, and which prompted the district court to order

Interior officials to show cause why they should not be held in civil contempt.[161]  After a lengthy

bench trial, the district court held the Department of Interior officials in civil contempt of court,

denied defendants' motion to revoke Kieffer's appointment as Court Monitor, and issued an

Order *sua sponte* elevating Kieffer to serve as "Special Master-Monitor" pursuant to Rule 53.[162]

The district court found that the Court Monitor's participation in the meeting with the

Department of Interior officials was not inappropriate or beyond his authority because it was at

the Secretary of the Interior's request and in conformance with the orders of the court.[163]

On appeal, the *Cobell* court first took issue with the district court's reappointment of

Kieffer as Court Monitor.[164]  The court rejected the notion that a federal district court has

"inherent authority" to appoint a monitor, "at least not a monitor invested with "wide-ranging

extrajudicial duties," over the government's objection that the appointment violated the

---

[158]*Id.* at 1134, 1140.

[159]*Id.* at 1135.

[160]*Id.*

[161]*Id.*

[162]*Id.* at 1135–36.

[163]*Id.* at 1136.

[164]*Id.* at 1142.

separation of powers.[165]  The court stressed that its holding "is a narrow one, tethered to the particular facts" of the case.[166]  The court noted that as Court Monitor, Kieffer was authorized to engage in *ex parte* communications and required the Department of Interior to facilitate and assist the Monitor and provide him with access to offices or employees to gather information.[167]  The court concluded that the Monitor "acted as an internal investigator, not unlike a departmental Inspector General, except that he reported not to the Secretary but to the district court."[168]  The court explained, "[t]he Monitor's portfolio was truly extraordinary; instead of resolving disputes brought to him by the parties, he became something like a party himself.  The Monitor was charged with an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system."[169]  The court compared Kieffer's duties as Court Monitor to a special master appointed in another case, where the special master was specifically directed not to intervene in the administrative management of the defendant state department of corrections or to direct the defendants or any of their management to take or refrain from taking any specific action to achieve compliance with a remedial court order requiring structural reform of a state institution.[170]  By contrast, Kieffer was and was ordered "to monitor and review all of the . . . Defendants' trust reform activities," including Defendants' progress and "any other matter Mr. Kieffer deems pertinent to trust reform."[171]  The court concluded that "[i]n this case, the district court's appointment of the Monitor entailed a license to intrude into the internal

---

[165]*Id.* at 1141–42.

[166]*Id.* at 1141.

[167]*Id.*

[168]*Id.*

[169]*Id.* at 1142.

[170]*Id.* at 1142–43 (citing *Ruiz v. Estelle*, 679 F.2d 1115, 1161–65 (5th Cir.), *amended in part, reh'g denied in part on other grounds*, 688 F.2d 266 (5th Cir. 1982)).

[171]*Id.* at 1143.

affairs of the Department, which simply is not permissible under our adversarial system of justice and our constitutional system of separated powers."[172]

The court next addressed Kieffer's appointment as Special Master-Monitor.[173]  Applying the standard set forth in 28 U.S.C. § 455(a), the court concluded that the district court had committed clear error by not disqualifying Kieffer as Court Monitor and instead appointing him Special Master-Monitor, explaining:

> The district court's account of these events demonstrates that Kieffer had a settled opinion about what the Department should and should not do on remand to comply with the order of the district court, which opinion he developed in his extrajudicial role as Court Monitor with access to the internal deliberations of the Department regarding the lawsuit. The district court's account also demonstrates that Kieffer's opinion was based in part upon ex parte communications received in his extrajudicial capacity as Monitor. These facts so clearly cast a shadow over Kieffer's impartiality that the district court abused its discretion in appointing Kieffer to be Special Master (in addition to Monitor).[174]

The court stressed that "the district court appointed Kieffer to a judicial role in a case in which he had significant prior knowledge obtained in his role as a Court Monitor, on the basis of which he had formed and expressed opinions of continuing relevance to the litigation."[175]  The court explained that, similar to a newly appointed judge who may not hear a case in which he previously played any role, "Kieffer's experience as Court Monitor disqualified him from later assuming a judicial role in this case."[176]

---

[172]*Id.*

[173]*Id.*

[174]*Id.* at 1144.

[175]*Id.*

[176]*Id.* at 1144-45.

Two years later, the new Secretary of the Interior sought disqualification of Special Master Balaran and suppression of reports he filed with the district court involving Interior's management of the Indian trust accounts.[177]  In *In re Kempthorne*, the Department of Interior hired an information technology firm to help with the Indian trust accounts.[178]  That firm eventually accused the Department of fraud in the midst of a contract dispute.[179]  Aware of the dispute, Balaran hired Smith, an executive vice president of the firm, to assist him with monitoring the Department accounting.[180]  Balaran then issued an interim report to the district court accusing the Department of misconduct that attached exhibits identified and produced by Smith.[181]  When the Department learned Balaran had hired Smith, it moved to disqualify Balaran from further participation in the case pursuant to §§ 455(a) and (b)(1).[182]  The court found that Balaran's impartiality was placed into question when he hired Smith because the company Smith worked for stood to gain financially from a finding of misconduct.[183]  The court also found Balaran's employment of Smith raised the specter of "selection bias, which necessitates disqualification under § 455."[184]  Although Balaran resigned as Special Master before the court issued its decision, it held that suppression of Balaran's reports submitted to the court after he hired Smith was an appropriate remedy.[185]  The court explained that "Balaran's reliance on Smith in choosing which documents to consider . . . would lead 'one fully apprised of the

---

[177]*In re Kempthorne*, 449 F.3d 1265, 1266 (D.C. Cir. 2006).

[178]*Id.* at 1267.

[179]*Id.*

[180]*Id.*

[181]*Id.* at 1267, 1270.

[182]*Id.* at 1268.

[183]*Id.* at 1270.

[184]*Id.* (citing *In re Brooks*, 383 F.3d 1036, 1046 (D.C. Cir. 2004)).

[185]*Id.* at 1271–72.

surrounding circumstances,' to conclude Balaran's interim report was likely affected by selection bias."[186]  "Smith obviously was not a disinterested source, and his input was received *ex parte* and therefore untested by the adversary process."[187]

### 2.  Separation of Powers

The government argues that reconsideration of the Final Production Order is necessary because it would be "manifestly unjust to persist in violations of the separation of powers doctrine."[188]  In its December 2017 motion to terminate Phase III, the government argued that the Phase III investigation constitutes "a judicial investigation into the operations and decision-making of a co-equal branch of government," in violation of the separation of powers doctrine.[189] This Court rejected the government's characterization of Phase III, instead holding that it is a limited investigation grounded in the Fed. R. Crim. P. 41 motions alleging that the conduct of the USAO in obtaining and disseminating recorded attorney-client communications violated those defendants' Sixth Amendment attorney-client privilege.[190]

The government challenged the Court's decision with a petition for writ of mandamus seeking an order from the Tenth Circuit Court of Appeals terminating Phase III of the Special Master investigation as well as quashing and restricting use of subpoenas.[191]  The separation of powers argument was central to the government's petition for writ, the same argument made now seeking reconsideration of the Final Production Order.[192]  As previously discussed, the Tenth

---

[186]*Id.* at 1271 (quoting *Cobell*, 334 F.3d at 1143).

[187]*Id.*

[188]Doc. 708 at 2.

[189]Doc. 361 at 3.

[190]Doc. 372 at 14.

[191]Doc. 382.

[192]No. 18-3007 Pet. for Mandamus at 21–22; Pet'r's Reply at 11–17 (10th Cir.) (citing *United States v. Dominguez-Villa*, 954 F.2d 562, 565 (9th Cir. 1992); *In re United States*, 503 F.3d 638 (7th Cir. 2007)).

Circuit granted in limited part the petition for writ of mandamus and permitted the Phase III investigation to proceed.[193]

The parties disagree on the effect of the Tenth Circuit's Order: the FPD contends that the government argued, and lost, the separation of powers issue; the government vehemently disagrees, arguing the FPD's claim is "false" because the Tenth Circuit did not explicitly rule on the separation of powers issue and that, in any event, the Special Master's expanded role is no longer within constitutional limits.

As to the government's first argument, "[u]nder the law of the case doctrine, when a court decides an issue of law, that decision should govern all subsequent stages of the litigation."[194] "The mandate rule is a corollary to the law of the case [doctrine] requiring trial court conformity with the appellate court's terms of remand."[195] "[T]he scope of the mandate on remand in the Tenth Circuit is carved out by exclusion: unless the district court's discretion is specifically cabined, it may exercise discretion on what may be heard."[196] "Therefore we do not make inquiry into whether the issue presented is antecedent to or arises out of the correction on appeal."[197] "Instead the district court is to look to the mandate for any limitations on the scope of the remand and, in the absence of such limitations, exercise its discretion in determining the appropriate scope."[198] The law of the case doctrine is also commonly applied to prevent an appellate court from revisiting or reconsidering "matters resolved on a prior appeal."[199]

---

[193]Doc. 398.

[194]*Dish Network Corp. v. Arrowood Indem. Co.*, 772 F.3d 856, 864 (10th Cir. 2014) (quotation omitted).

[195]*United States v. West*, 646 F.3d 745, 748 (10th Cir. 2011).

[196]*Id.* at 749.

[197]*Id.*

[198]*Id.*

[199]*Id.*

However, law of the case principles apply only to decisions on the merits.[200]  "Because orders denying a petition for mandamus are most frequently denied as a result of the special limitations inherent in the writ itself, and not on the merits, such denials are not ordinarily given 'law of the case' effect, and the parties are not precluded from raising an issue in a subsequent appeal."[201] "'Law of the case' principles are typically applied only to those mandamus decisions actually deciding the case on the merits, or to those discrete issues that were actually adjudicated by the mandamus panel."[202]

Here, the mandamus order granted the government partial relief by limiting the scope of the Phase III investigation "to matters related to defendants before the court in [*Black*], and to other parties in *Black* who have filed Rule 41(g) motions in that proceeding."[203]  This order "leaves undisturbed" the Phase III order that the investigation be conducted as it pertains to those parties, including the FPD.[204]  However, the partial grant of the government's petition for mandamus was announced in a short, unpublished order that does not specify the grounds on which the panel partially granted the petition.  Thus, while the partial grant of the mandamus petition does not necessarily establish law of the case that would bind the Tenth Circuit in a later appeal, it certainly remains the law of the case in the litigation before this Court that the investigation was permitted to proceed, over the government's separation of powers objection as this Court determined in its order denying termination of Phase III.  The Court declines to exercise its discretion to revisit its prior rulings on this issue.

---

[200]*Kennedy v. Lubar*, 273 F.3d 1293, 1298–99 (10th Cir 2001) (citing *Wilmer v. Bd. of Cty. Comm'rs*, 69 F.3d 406, 409 (10th Cir.1995)).

[201]*Id.* (citing *United States v. Dean*, 752 F.2d 535, 541 (11th Cir 1985)).

[202]*Id.* (citations omitted).

[203]Doc. 398 at 2.

[204]*Id.*

The government's second argument merely rehashes another previous claim that the Court has usurped its power, recasting it to the role of the Special Master. This argument is unavailing. First, the government mischaracterizes the role of the Special Master. The government attempts to extrapolate the narrow ruling regarding the Court Monitor in *Cobell* to the Special Master in this case, arguing that the Special Master's role in this case "[i]f anything, . . . is more expansive, and thus more constitutionally problematic than the special master in *Cobell*."[205] But the government's analysis repeatedly interchanges the title of special master with that of court monitor, while the relevant *Cobell* language is specifically addressed to the concerns with the Court Monitor.[206] As *Cobell* recognized, a court monitor is not the functional equivalent of a special master.[207] "Whereas a monitor's 'primary function is to monitor compliance,' a master's role is broader: to 'report [ ] to the court and, if required, to make [ ] findings of facts and conclusions of law.'"[208] "It is well-settled that when a special master accepts an appointment by the Court, the special master assumes the duties and

---

[205]Doc. 697 at 15.

[206]*See* Doc. 697 at 13 ("Specifically, *Cobell* addressed limits on a district court's power to authorize a special master to investigate the conduct of the Executive Branch"); *id.* ("The D.C. Circuit first rejected the notion that a federal district court has 'inherent authority' to appoint over a party's objection a special master with expansive powers"); *id.* ("The *Cobell* court next addresses whether Fed. R. Civ. P. 53 permitted the appointment of Kieffer as a special master and concluded based on the extensive role the district court created for him, 'we think the present case goes far beyond the practice that has grown up under Rule 53'"); *id.* at 14 ("Accordingly, Rule 53 could not serve as a basis for appointment of the special master"); *id.* at 15 (likening Special Master in this case to an internal investigator who reports to the district court, "as did the special master in *Cobell*); *id.* ("If anything, the Special Master's role here is more expansive, and thus more constitutionally problematic, than the special master in *Cobell*). All of these cited passages in *Cobell* discuss appointment of Kieffer as court monitor, not special master. *See Cobell*, 334 F.3d at 1141–42.

[207]*Cobell*, 334 F.3d at 1144 (comparing "extrajudicial" role of a court monitor with "judicial" role of a special master).

[208]*United States v. Tennessee*, No. 92-2062 D/P, 2010 WL 1212076, at *12–13 (W.D. Tenn. Feb. 16, 2010) (quoting *Cobell v. Norton*, 392 F.3d 461, 476 (D.C. Cir. 2004) (quotation omitted) (discussing a "Judicial Monitor" appointed after Kieffer)).

obligations of a judicial officer."[209]  Special masters have "the ability to convene and regulate hearings, to rule on the admissibility of evidence, to subpoena and swear witnesses, and to hold non-cooperating witnesses in contempt."[210]  And, as discussed further *infra*, special masters are subject to the Code of Conduct for United States Judges.[211]

The Special Master's role in this case is not "constitutionally problematic."  Unlike the Court Monitor in *Cobell*, the Special Master was neither tasked with "wide-ranging extrajudicial duties," nor given a "license to intrude into the internal affairs" of the USAO.  Instead, pursuant to the original appointment order under Rule 53, the Phase III order directed the Special Master "to investigate the actions and conduct of the government, the USAO attorneys and staff, and the participating investigative agencies . . . in procuring, obtaining and perhaps using video and audio recordings of attorney-client meetings and phone calls at CCA."[212]  In this quasi-judicial role, the Special Master was authorized to compel record testimony, issue subpoenas *duces tecum*, employ staff, and, although he never did, to issue contempt citations.  The Special Master was specifically directed to make determinations; identify information; inspect and copy files; and report to the Court parties affected by any breaches of privilege, confidence, constitutional rights, statutory rights, or ethical obligations; and recommend available remedies.[213]  Therefore, Mr. Cohen's role was not problematic when the Court issued the appointment order for Phase III, or for the four months thereafter when the Special Master sought production from USAO.  Nor

---

[209]*United States v. City of Albuquerque*, No. 14-cv-1025 RB-SMV, 2017 WL 5508519, at *3 (D.N.M. Nov. 16, 2017) (quoting *Hoffman v. EMI Resorts, Inc.*, 689 F. Supp. 2d 1361, 1374 (S.D. Fla. 2010) (citation omitted)).

[210]*Id.* (quoting *Benjamin v. Fraser*, 343 F.3d 35, 45 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009) (citing Fed. R. Civ. P. 53(c)–(d)).

[211]Fed. R. Civ. P. 53, advisory committee's note to 2003 amendment.

[212]Doc. 253 at 5–6.

[213]*Id.* at 46–47.

was it problematic when the Special Master issued SDTs or questioned witnesses at the May and October 2018 evidentiary hearings.  And it was not problematic for the Special Master to testify at the November 16 production hearing, as his testimony was not to address any substantive issues referred to him in the Phase III appointment order, but to report facts and address claims regarding outstanding production issues before this Court, facts about which only he had personal knowledge.[214]  These facts were central to the issues before the Court at the hearing— whether the USAO cooperated with the Phase III investigation.  If anything, as discussed *infra*, the Special Master's role was diminished after AUSA Clymer was appointed and took the position that the USAO was not required to produce the documents the Special Master sought in the Phase III investigation.

Second, the government continues to mischaracterize the scope of Phase III's Sixth Amendment inquiry as investigating the internal affairs and decision-making of the Executive Branch.  This Court previously declined to terminate Phase III on nearly identical grounds, stressing that Phase III is "a limited investigation grounded in the Rule 41 motions at issue in this case" where the FPD argued that "the conduct of the USAO in obtaining and disseminating recorded attorney-client communications violated its clients' Sixth Amendment attorney-client privilege."[215]  The Court further found that evidence existed that the government purposely obtained and used attorney-client communications related to criminal defendants in this and

---

[214]The government does not cite, nor did the Court find, case law holding a Special Master is not permitted to testify under similar circumstances.  *See., e.g., Hatten-Gonzales v. Earnest*, No. 88-0385 KG/CG, 2018 WL 1665643, at *10 (D.N.M. Apr. 5, 2018) (special master testified at hearing on objections to his Report and Recommendation regarding compliance with Consent Decree, court orders, and federal law, including propriety of a receivership); *Maggette v. BL Dev. Corp.*, Nos. 2:07CV181-M-A, 2:07CV182-M-A, 2010 WL 3522798, at *3, 13–14 (N.D. Miss. Sept. 2, 2010) (special master testified at sanctions hearing after reports made findings of defendant misconduct and that defendant "stonewalled" discovery).

[215]Doc. 372 at 14.

other cases.[216]  Indeed, the October 2018 evidentiary hearing revealed that yet another AUSA, Ms. Treadway, had purposely engaged in such conduct.[217]  Thus, the Phase III investigation, which continues to be limited to the questions of whether the government intentionally viewed or listened to attorney-client communications, is not a means to supervise the internal operations of the USAO, but remains "both proper and necessary to the resolution of the underlying Rule 41 motions in this case."[218]  And, as acknowledged by the Court in its previous orders as well as the Final Production Order, the government is entitled to assert any statutory and legal protections it has that certain inquiries will intrude into the "operations and decision-making" of the USAO.[219]  In fact, the government did just that by asserting the *Touhy* privilege throughout the May 2018 hearing.[220]

The *Cobell* Court Monitor's uncabined, extrajudicial monitoring and review of the Department of Interior's internal accounting practices is easily distinguishable from the Special Master's quasi-judicial investigation in this case, which is limited to specific questions of whether the USAO intruded into a defendant's Constitutional rights by intentionally viewing or listening to attorney-client communications.  As the FPD argued in opposition to the petition for mandamus, this Sixth Amendment inquiry is not only authorized, it is required, and will promote separation-of-powers interests by acting as a check against government abuse.[221]  Because the

---

[216]*Id.*

[217]Doc. 652 at 80–122.

[218]Doc. 372 at 14–15.

[219]*Id.* at 15; Doc. 690 at 10.

[220]Mot. Hr'g Tr. at 178–258, May 15, 2018, Doc. 482 (AUSA Scott Rask); 261–304 (SAUSA Tomasic).

[221]*See Shillinger v. Haworth*, 70 F.3d 1132, 1137, 1144 (10th Cir. 1995), *reh. den.* (10th Cir. 1996) (addressing appropriateness of factfinding procedures in the face of intrusions into attorney-client communications); *United States v. Singleton*, 52 F. App'x 456, 459–60 (10th Cir. 2002).

government's reliance on that decision is inapt, reconsideration of the Court's refusal to terminate Phase III is unwarranted.

### 3. Disqualification of Special Master

The government next argues that reconsideration is needed to correct clear error and manifest injustice because the Court must disqualify the Special Master, terminate the Phase III investigation, and vacate the production and briefing order. The government again primarily relies on *Cobell* in support of its claim that it would be "clear error" for this Court to continue to use an ethically-disqualified special master. The government contends that when the "similarly situated" district court in *Cobell* rejected analogous government claims concerning the disqualification of a special master under 28 U.S.C. § 455 and separation of powers concerns, the Court of Appeals for the District of Columbia agreed that the district court had committed "clear error," the standard that warrants reconsideration in this case.[222] As discussed above, the focus of the *Cobell* decision upon which the government relies in this case involved the appointment of Kieffer as Court Monitor, not as Special Master.[223] The "clear error" language that the government cites in favor of reconsideration in this case was made in the context of the district court's reappointment of Kieffer as Court Monitor over the government's objection to the scope of his powers,[224] and is distinguishable from the issues the government raises on reconsideration here. Moreover, to the extent the government is relying upon the Special Master's conversations with USAO top management at the outset and early stages of his investigation in 2016, this does not constitute "newly discovered evidence." Both Beall and Barnett were aware of these

---

[222]Doc. 708 at 4.

[223]334 F.3d at 1140.

[224]*Id.*

conversations at that time—they were not newly discovered during the October hearing. Reconsideration of the Final Production Order on these grounds is unwarranted.

Although not a proper ground for reconsideration of the Final Production Order, the Court will consider the government's serious claim that the Special Master must be disqualified as a stand-alone motion. The government argues that the Special Master's impartiality may be questioned in this case because he learned unfavorable facts about the USAO and expressed disqualifying opinions about those facts in his conversations with Beall and Barnett at the outset of his investigation, requiring termination of Phase III and suppression of the results of his investigation. The FPD argues that the Court should exercise its discretion to declare the government's claim waived; alternatively, it argues there is no substantive basis to disqualify the Special Master or to suppress his work product.

### a. Standard for Recusal

28 U.S.C. § 455(a) states that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." "The goal of section 455(a) is to avoid even the appearance of partiality. If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no actual partiality exists. . . ."[225] "This requirement is intended 'to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible.'"[226] "The test in this circuit is 'whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.'"[227] "The standard is purely

---

[225]*Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988); *see United States v. Cooley*, 1 F.3d 985, 992 (10th Cir. 1993).

[226]*Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1310 (10th Cir. 2015) (quoting *Liljeberg*, 486 U.S. at 865).

[227]*Cooley*, 1 F.3d at 992 (quoting *United States v. Burger*, 964 F.2d 1065, 1070 (10th Cir. 1992).

objective.  The inquiry is limited to outward manifestations and reasonable inferences drawn therefrom."[228]  "In conducting this review, we must ask how these facts would appear to a well-informed, thoughtful and objective observer," who is "an average member of the public," not a "hypersensitive, cynical, and suspicious person."[229]  Section 455(a) has been extended to apply to Special Masters.[230]

Courts begin by asking "whether a reasonable factual basis exists for questioning the judge's impartiality,"[231] mindful that "cases within § 455(a) are extremely fact driven 'and must be judged on [their] unique facts and circumstances more than by comparison to situations considered in prior jurisprudence.'"[232]  However, "factual allegations do not have to be taken as true," and "[t]here is as much obligation for a judge not to recuse when there is no occasion . . . to do so as there is . . . to [recuse] when there is.  A judge should not recuse . . . on unsupported, irrational, or highly tenuous speculation."[233]  The Tenth Circuit has also cautioned that "section 455(a) must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice."[234] Although recusal cases must be judged on their "unique facts," the Tenth Circuit has identified a

---

[228]*Id.*

[229]*Mathis*, 787 F.3d at 1310 (quoting *Sensley v. Albritton*, 385 F.3d 591, 599 (5th Cir. 2004)).

[230]*See E.E.O.C. v. U.S. Steel Corp.*, No. 10-1284, 2012 WL 1150799, at *9 (W.D. Pa. Apr. 5, 2012) (collecting cases).

[231]*Nichols*, 71 F.3d at 351 (quoting *Cooley*, 1 F.3d at 993).

[232]*Id.* (quoting *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995)); *accord Bryce v. Episcopal Church in the Diocese of Col.*, 289 F.3d 648, 659 (10th Cir. 2002).

[233]*In re Am. Ready Mix, Inc.*, 14 F.3d 1497, 1501 (10th Cir. 1994) (quoting *Himman v. Rogers*, 831 F.2d 937, 938 (10th Cir. 1987)).

[234]*Cooley*, 1 F.3d at 993 (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1234 (10th Cir. 1986)).

nonexhaustive list of various matters not ordinarily sufficient to require § 455(a) recusal, including rumor, speculation, and suspicion.[235]

In *Liteky v. United States*, the Supreme Court stated that § 455(a) is "subject to an 'extrajudicial source factor,' which at its base asserts that alleged bias or prejudice 'must stem from an extrajudicial source [or a source outside the judicial proceeding at hand] and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.'"[236]  A disqualifying appearance of bias or prejudice under § 455(a) can be based on information the judge acquires in the litigation, but only if "it is so extreme as to display clear inability to render fair judgment."[237] The Supreme Court has explained that when no extrajudicial source is relied upon as a ground for recusal, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a bias or impartiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."[238]  Thus, a party does not establish bias or partiality by merely invoking "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel the parties, or their cases."[239]

### b.  Waiver

The FPD argues that the USAO has treated its recusal claim as a sword, not a shield by willfully engaging in what it now claims are inappropriate conversations with the Special Master

---

[235]*Id.* (citing *Franks*, 796 F.2d at 1234).

[236]*In re Bennett*, 283 B.R. 308, 322 (B.A.P. 10th Cir. 2002) (quoting *Liteky v. United States*, 510 U.S. 540, 545 & n.1, 555 (1994); *accord Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1994); *see United States v. Page*, 828 F.2d 1476, 1481 (10th Cir. 1987) (quoting *United States v. Grinnel Corp.*, 384 U.S. 563, 583 (1966)); *United States v. Wittig*, No. 03-40142-JAR, 2005 WL 758606, at *13 (D. Kan. Apr. 4, 2005).

[237]*Liteky*, 510 U.S. at 551.

[238]*Id.*.

[239]*Id.*

and then keeping a two-year old recusal claim in its "back pocket for use in desperate times."[240] The FPD urges the Court to exercise its discretion to declare the government's recusal claim unforgivably untimely and thus waived.

The government contends the FPD's argument is undermined by the Tenth Circuit decision in *United States v. Wells*.[241]  In that case, defendant argued for a new trial on the grounds that the judge should have recused from participation in the trial *sua sponte* because a reasonable observer would have questioned his impartiality.[242]  The government argued that defendant's recusal-based argument for a new trial was waived because it was not raised in post-trial motions for new trial or acquittal.[243]  The court did not reach the waiver issue because it concluded that defendant's recusal-based argument for a new trial failed on the merits.[244]  The court suggested that some recusal-based claims should be heard on their merits on appeal even if procedurally waived, given that such arguments "uniquely implicate the integrity of the justice system,"[245] but that it is within the court's discretion to bypass the waiver issue and reach the merits of the party's recusal-based argument on appeal.[246]  This case can be distinguished from *Wells* because the issue is not whether the government's recusal-based argument may be procedurally waived on appeal, but rather, whether the recusal-based argument may be affirmatively waived or is untimely as a matter of law.[247]  Thus, while informative, *Wells* does

---

[240]Doc. 700 at 9.

[241]873 F.3d 1241 (10th Cir. 2017).

[242]*Id.* at 1249.

[243]*Id.* at 1250.

[244]*Id.*

[245]*Id.*

[246]*Id.*

[247]*See, e.g., Havens v. Colo. Dep't of Corr.*, 897 F.2d 1250, 1259–60 (10th Cir. 2018) ("We ordinarily deem arguments that litigants fail to present before the district court but then subsequently urge on appeal to be forfeited.") (collecting cases).

not foreclose this Court from considering on the merits the FPD's argument that the government waived its recusal claim as a matter of law.

The government further argues that it is not asserting a claim or right that it can forfeit or waive, but instead is merely calling the Court's attention to facts that raise concerns under § 455(a), which obligates a judge to recuse himself when his impartiality might reasonably be questioned. The government argues that this Court is thus duty-bound to enforce § 455(a) without regard to whether or when a party requests disqualification. "Although a literal reading of § 455 places the duty to recognize the conflict on the judge," courts have concluded that parties seeking disqualification under § 455(a) must do so in a timely manner.[248] And, while the government is correct that § 455(a) is self-enforcing, courts have recognized the potential for parties to use disqualification motions as an abusive litigation tactic.[249] To minimize the potential for abuse, the Eleventh Circuit has held that a movant waives its chance to challenge a special master if it fails to raise the issue at the first available opportunity.[250] As that court explained, "[t]he recusal provision was intended to be a shield, not a sword. An issue involving recusal cannot be used as an insurance policy to be cashed in if a party's assessment of his litigation risks turns out to be off and a loss occurs."[251]

---

[248]*In re Kensington Intern. Ltd.*, 368 F.3d 289, 312 (3d Cir.2004); *Summers v. Singletary*, 119 F.3d 917, 921 (11th Cir. 1997); *In re IBM Corp.*, 45 F.3d 641, 643 (2d Cir. 1995); *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 914 (11th Cir. 1998) (citing *United States v. Slay*, 714 F.2d 1093, 1094 (11th Cir. 1983)); *In re Apex Oil Co.*, 981 F.2d 302, 304 (8th Cir. 1992).

[249]*See United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993); *Sensley v. Albritton*, 385 F.3d 591, 598 (5th Cir. 2004).

[250]*Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 914 (11th Cir. 1998).

[251]*Id.* at 913; *accord In re: Deepwater Horizon*, 824 F.3d 571 (5th Cir. 2016) (citing *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1472 (11th Cir. 1986) ("Counsel, knowing the facts claimed to support a § 455(a) recusal for appearance of impartiality, may not lie in wait, raising the recusal only after learning the court's rulings on the merits.")).

Here, the government knew about the conversations between the Special Master and Beall and Barnett, the Acting United States Attorney and his Criminal Chief, nearly two years before moving for recusal. The government's argument that its motion to disqualify was prompted by the Special Master's testimony at the November 16, 2018 hearing is disingenuous—Beall and Barnett were each a party to the conversations in question. The government was well aware of the details of the conversation, specifically that the Special Master relayed information to Barnett about the perception of the defense community; in fact, those details were memorialized in the December 10, 2016 email from Barnett to Beall, as produced by the USAO.[252]

Moreover, the Special Master was transparent about *ex parte* contact with attorneys during Phases I and II: in his March 16, 2017 Status Report, the Special Master reported that in the course of pursuing the Court's directives in the Phase I and II investigation, he met and spoke with many attorneys, and attributed the defense bar's "ardent" response to the widespread undergrowth of mistrust between the USAO and defense counsel.[253] If the government believed the conversations with the USAO management or the defense bar evidenced that the Special Master had formed and expressed opinions adverse to the USAO and some of its employees, or otherwise engaged in extrajudicial conduct, the government could have raised the issue at that time.

Clearly, the facts giving rise to any alleged appearance of impropriety were known by at least Beall and Barnett long before the Special Master was appointed to the Phase III investigation. But the Special Master continued his investigation for nearly two years without

---

[252]Oct. 2018 Hr'g Ex. 1166.

[253]Doc. 214 at 26.

question.  When the government eventually moved to terminate Phase III in December 2017, it did not seek recusal.[254]  Instead, the government waited to raise a recusal allegation until after the Special Master's rebuttal testimony contradicted Beall, Barnett, and Metzger, and the Court issued the Final Production Order—an order that addressed outstanding issues with respect to the government's production of documents, and which the government apparently considers adverse. The Court views the government's eleventh-hour challenge as the sort of abusive litigation tactic the Eleventh Circuit has described as constituting waiver.  Accordingly, the Court concludes the government's motion is untimely and it has waived the issue of disqualification.

### c.  *Merits*

Even if timely, however, a reasonable person, fully informed of all the facts, could not doubt the Special Master's impartiality under either the extrajudicial source factor or the pervasive-bias exception.  The government argues that before the Special Master had authority to delve into the affairs of the USAO or its employees, he had decided that there were problems with the USAO that required remedial action, and "was plotting to end the careers of three USAO attorneys" when meeting with Barnett.[255]  Thus, the government argues, a person aware of the Special Master's conversations with Beall and Barnett would reasonably question whether he could be impartial as to these USAO employees, their testimony as witnesses, or the USAO generally.

The government again attempts to analogize this case to *Cobell*, where the Court of Appeals for the District of Columbia ultimately held that disqualification of the Special Master was required.[256]  The government urges that, like Special Master-Monitor Kieffer, Special

---

[254]Doc. 361.

[255]Doc. 697 at 11.

[256]334 F.3d 1128, 1143–44 (D.C. Cir. 2003).

Master Cohen's "extrajudicial conduct" requires his disqualification in this case. The Court disagrees.

Extrajudicial conduct encompasses only "personal bias as distinguished from a judicial one, arising out of the judge's background and association and not from the judge's view of the law."[257] "'Personal' bias is prejudice that emanates from some source other than participation in the proceedings or prior contact with related cases."[258] An "extrajudicial source" means "something above and beyond judicial rulings or opinions formed in presiding over the case."[259] Unlike the Court Monitor in *Cobell*, the Special Master was appointed at the outset of this investigation as a special master—a quasi-judicial role—and was at all times acting under Rule 53. Under *Liteky*, a judge is not subject to disqualification simply because he properly acquired knowledge and an opinion during the course of the proceedings at issue.[260] Any information the Special Master has obtained, including information from the hearings that precipitated his appointment and *ex parte* communications with both USAO management and defense attorneys, is not extrajudicial. Likewise, any unfavorable information he received from and about the USAO, and his opinions about it, are not extrajudicial.

Nor is there evidence the Special Master was conducting an independent investigation of the USAO that was outside the scope of the Phase I and II appointment order. This allegation, characterized as a "a plot to end the careers of AUSAs," minimizes the information the Special Master received from AUSA Barnett about personnel and practices of the Kansas City, Kansas USAO—information that turned out to be accurate. Without more, the government's assertion is

---

[257]*Youn v. Track, Inc.*, 324 F.3d 409, 423 (6th Cir. 2003) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)).

[258]*Id.* (citations omitted).

[259]*United States v. Bergrin*, 682 F.3d 261, 282 (3d Cir. 2012).

[260]*Liteky v. United States*, 510 U.S. 540, 551 (1994).

mere speculation or suspicion.  The government cites no authority supporting its claim that because the Special Master's information-gathering during the early stages of his investigation may arguably have exceeded the scope of his directive under Phases I and II, it somehow renders that information extrajudicial.

Because the Special Master's comments and opinions were not based on extrajudicial conduct or sources, a "high threshold" must be met to justify recusal.[261]  The government does not suggest that the Special Master's apparent bias or prejudice, is pervasive or "so extreme as to display clear inability to render fair judgment."[262]  The Special Master's conversations with and comments to Beall and Barnett were not made in a vacuum and must be taken in context.  Key to this analysis is not just what the Special Master said, but to whom he said it and when.  At the time of the Special Master's appointment on October 11, 2016, the FPD had filed two Rule 41(g) motions detailing allegations of negligence and/or misconduct of the USAO, resulting in three evidentiary hearings to address these serious issues.  The Special Master would have learned this information, which included allegations about individual AUSAs, as the backdrop and foundation of his appointment as Master.  Barnett testified that she provided the Special Master with information about the personnel and practices of the Kansas City, Kansas USAO, including the names of individual AUSAs perceived as problematic.  Barnett did not testify this was the Special Master's perception regarding certain AUSAs; she testified he gave her information that was the perception of the defense community.  In response, the Special Master said that he could help get those AUSAs out of the district "if that was what it took to cure the problem,"[263] and that he was willing to help the USAO "take whatever the appropriate action that was to get that

---

[261]*Id.* at 558 (Kennedy, J., concurring).

[262]*Id.* at 551.

[263]Doc. 693 at 2271–74.

fixed," including retraining.[264]  The Special Master testified that Barnett quickly disabused him of the notion that he could help get an AUSA fired.[265]  The Court finds that no reasonable person, knowing all the relevant facts, would believe that the Special Master's comments to AUSA Barnett and Beall implicates the level of "deep-seated favoritism or antagonism" that would make recusal proper and would cause no reasonable person to harbor doubts about the Special Master's impartiality in this case.[266]

### d.  Relief

Assuming arguendo a reasonable factual basis exists for questioning the Special Master's impartiality, the circumstances of this case do not support the wholesale termination of Phase III or suppression of work product sought by the government.  Disqualification is mandatory for conduct that calls a judge's impartiality into question under § 455(a).[267]  Section 455 does not prescribe the scope of disqualification.  Rather, Congress "delegated to the judiciary the task of fashioning remedies that will best serve the purpose of" the disqualification statute.[268]  "At a minimum, § 455(a) requires prospective disqualification of the offending judge, that is, disqualification from the judge's hearing any further proceedings in the case."[269]  "There need not be a draconian remedy for every violation of § 455(a)."[270]

The Supreme Court has held that a district judge could be disqualified under § 455(a) after entering final judgment in a case, even though the judge was not, but should have been,

---

[264]*Id.*

[265]*Id.*

[266]*See Liteky v. United States*, 510 U.S. 540, 554–55 (1994).

[267]*United States v. Microsoft Corp.*, 253 F.3d 34, 116 (D.C. Cir. 2001).

[268]*Id.* (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 862(1988)).

[269]*Id.* (citing *United States v. Microsoft Corp.*, 56 F.3d 1448, 1463–65 (D.C. Cir.1995) (per curiam)).

[270]*Liljeberg*, 486 U.S. at 862.

aware of the grounds for recusal before final judgment.[271]  The Court identified three factors relevant to the question whether vacatur of a judgment is appropriate: (1) the risk of injustice to the parties in the particular case; (2) the risk that denial of relief will produce injustice in other cases; and (3) the risk of undermining the public's confidence in the judicial process.[272] Although the Court was discussing § 455(a) in a different context, where the movant sought to have final judgment vacated, the Court believes the test it propounded applies as well to cases such as this one, where the allegations of disqualifying conduct came to light when the Special Master was near the end of his appointment directives and service.

The government contends the Special Master's disqualifying opinions create the appearance of impartiality.  It neither alleged nor demonstrated that the Special Master's comments rose to the level of actual bias or prejudice.  Indeed, the government stresses that it does not accuse the Special Master of tilting his investigation or omitting or minimizing information in his reports.[273]  There is no reason to presume that everything the Special Master did leading up to his appointment to conduct the Phase III investigation is suspect or that his apparent lack of impartiality "casts a shadow over Phase III in its entirety."[274]

Citing without explanation *In re Kempthorne*,[275] the government asserts that the Special Master's apparent lack of impartiality requires this Court to disregard his work product from the outset of this investigation and terminate Phase III.  As noted, in that case the court ordered suppression of Special Master Balaran's reports submitted after he hired and used a disinterested

---

[271]*Id.* at 864.

[272]*Id.*

[273]*See* Doc. 708 at 12.

[274]*See* Doc. 697 at 12.

[275]449 F.3d 1265, 1271 (D.C. Cir. 2006).

source, as Balaran's reliance on Smith in preparing the report would lead a person fully apprised in the circumstances to conclude Balaran's report was likely affected by selection bias.[276]

There are no comparable disqualifying facts here.  Unlike Balaran, the government does not allege, nor do the facts support, that the Special Master's work product was affected by selection bias.  The challenged comments and opinions of the Special Master were made in conversations with Beall and Barnett, top management at the USAO and parties in this matter; indeed, Barnett testified that she provided information to the Special Master about problematic AUSAs.  Those comments and opinions were expressed in October and December 2016, over six months prior to the Court's Order directing Phase III, an order that was informed by not only the Special Master's initial reports, but by evidentiary hearings before the Court prior to his appointment.

Moreover, the Order directing the Phase III investigation instructed the Special Master to turn his investigation to the government's conduct regarding violations of detainees' Sixth Amendment rights, and anticipated a report and recommendation from the Special Master with respect to his findings and available remedies.[277]  But the Phase III investigation never truly unfolded.  Within a few short months of the Phase III order, the government took the position that it was not legally required to produce the evidence requested by the Special Master and the FPD filed its motion for order to show cause for failure to cooperate—a motion not heard until the October 2018 evidentiary hearing.

Indeed, most of 2018 was devoted to achieving this evidentiary hearing.  It was first set for January, then rescheduled for May, then reconvened in October and November after the DOJ

---

[276]*Id.* at 1271.

[277]Doc. 253.

refused to approve the parties' settlement.  After the Special Master issued his October 20, 2017 Phase III Status Report outlining the USAO's alleged non-cooperation upon appointment of AUSA Clymer,[278] the Court did not adopt his determination of non-cooperation, but set a hearing to discuss the Special Master's findings concerning the government's failure to comply with the Phase III investigation.[279]  The FPD then filed a Motion for Order to Show Cause why the government should not be held in contempt for failure to cooperate with the Special Master.[280] At that point, the Special Master issued his last report in advance of the Court's evidentiary hearing on the government's purported non-cooperation, ordering AUSA Clymer to produce documents and materials set out in the Special Master's subpoena *duces tecum*,[281] setting in action a flurry of motions by the government to quash and to terminate the Phase III investigation, culminating in the Tenth Circuit granting the mandamus petition in limited part and permitting Phase III to proceed.  The hearing itself finally concluded on October 12, 2018, with production issues heard on November 16.

Accordingly, the duties and responsibilities of the Special Master were completed for all intents and purposes at the close of the November hearing.  No report and recommendation from the Special Master was ordered and the record will be closed once the FPD and Special Master move to admit any additional evidence culled from the government's rolling production.  This Court, not the Special Master, will be the finder of fact for purposes of Phase III, based only on the record evidence before it during the hearing, and any exhibits submitted by the parties on the record.  There could be no shadow over Phase III because, by late 2017, the investigation had

---

[278]Doc. 298.

[279]Doc. 300.

[280]Doc. 301.

[281]Doc. 317.

necessarily transitioned to a new stage, that is, a hearing where evidence could be presented, controverted, and tested by the tools of the adversary process. Therefore, the Court concludes that termination of Phase III and suppression of all the Special Master's work product is unnecessary and would unduly penalize the FPD's clients. More to the point, full retroactive disqualification of the Special Master and suppression of his work product is unnecessary to protect the government's right to impartial adjudication, even if this Court were to find a basis for disqualification.

Nevertheless, the government questions whether this Court can make credibility determinations about the Special Master's testimony on production issues at the final evidentiary hearing on November 16, 2018. While the Court will not disqualify the Special Master pursuant to 28 U.S.C. § 455(a), in order to avoid further delay and a waste of judicial resources, the Court excuses the Special Master from any further duties and responsibilities in this case, effective upon submission of any additional evidence as outlined above. The Court, having presided over the extensive evidentiary hearing, arguments, and briefing, will issue a Memorandum Order and Opinion on the remaining Phase III issues, pending Rule 41 motions, the FPD's Motion for Order to Show Cause and supplements thereto, and Defendant Carter's motion to dismiss indictment.

The Special Master's excusal is a natural end to this proceeding and is in no way a reflection on his professional and exemplary services throughout this long, difficult and contentious litigation. The Court believes that Mr. Cohen has served diligently and admirably as Special Master, and thanks him for his outstanding service.

**IT IS THEREFORE ORDERED BY THE COURT** that the government's Corrected Motion for Reconsideration of the Final Production and Briefing Order (Docs. 696, 697) is

granted in part and denied in part.  The Court **modifies** the production portion of the order and will prepare to close the record; **denies** the government's request to disqualify the Special Master and terminate the Phase III investigation; **modifies** the order to permit the FPD and Special Master to move for admission of any additional exhibits identified through the government's production pursuant to the SDT; and **accelerates** the briefing schedule for submitting proposed findings of fact and conclusions of law.  The preservation directive in the order remains in effect.

**IT IS FURTHER ORDERED** that the FPD and Special Master may move for admission of any such additional exhibits on or before **February 15, 2019**, at which time the record from the evidentiary hearing that commenced October 2, 2018, and concluded November 16, 2018, will be closed; the Special Master is excused from any further duties, responsibilities, or actions in this case, effective upon submission of any such additional evidence;

**IT IS FURTHER ORDERED** that the government and the FPD may submit proposed findings of fact and conclusions of law on or before **March 1, 2019**; thereafter, the Court, having presided over the extensive evidentiary hearing, arguments, and relevant briefing, will issue a Memorandum Order and Opinion addressing **all** remaining Phase III issues, pending Rule 41 motions, the FPD's Motion for Order to Show Cause and supplements thereto, and Defendant Carter's motion to dismiss indictment in due course.

**IT IS SO ORDERED.**

Dated: <u>January 25, 2019</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE