**In the United States District Court
for the District of Kansas**

---

**United States of America**,

Plaintiff,

v.

Case No. **2:16-cr-20032-JAR-02**

**Karl Carter,**

Defendant.

---

### THE FEDERAL PUBLIC DEFENDER'S APPLICATION
### FOR ATTORNEYS' FEES AND LITIGATION EXPENSES

---

As detailed in this Court's Findings of Facts and Conclusions of Law, the Federal Public Defender is entitled to attorneys' fees and costs caused by the Government's failure to preserve and failure to cooperate with witness and document production.[1]

There simply "is no template for this case, where the fairness of the adversary system is called into question by systemic prosecutorial misconduct of the type alleged here."[2] From the outset, the Government disregarded the Court's Orders to preserve evidence and to cooperate, and, consequently, this litigation has dragged on for more than three years. The FPD has invested more than **6,946.4** hours of attorney, paralegal, and investigator time worth at least **$1,653,638.50.**

---

[1] D.E. 758.

[2] *Id.* at 184.

The FPD has also incurred **$39,852.80** in expenses (non-taxable costs), of which the FPD is only seeking a small fraction, **$3,375**. Because the Government's bad faith pervades this entire action, it is well within the Court's inherent authority to award the entirety of the **$1,693,491.30** fees and expenses incurred by FPD.

But we don't ask the Court to do that. Rather, we attempt to distill the specific time and resources required to litigate the Government's contemptuous conduct. Below, we lay out specific areas where the Government's bad faith directly caused the FPD to incur fees and expenses. The FPD estimates that 833.86 hours of attorney, paralegal, and investigator time worth $220,341.30 and $3,375 in expenses were invested as a direct result of the Government's bad faith failure to preserve evidence and failure to cooperate with witness and document production.

## I.    The FPD is entitled to the attorney fees it incurred as a result of the Government's misconduct.

The FPD spent more than 6,946.4 actual hours on the litigation and related correspondence.[3] This is not surprising, given the complexity and novelty of the issues.[4] The number of hours was exacerbated by the Government's repeated refusals to cooperate with the investigation and its repeated attempt to litigate the procedural posture of the case rather than comply with the Court's orders.[5] The

---

[3] *See Ex. A,* Thompson Decl. at 17.

[4]  D.E. 758 at 184.

[5] *See City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) ("The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by plaintiff[s] in response.") (internal quotation marks and citation omitted); *Henson v. Columbus Bank & Trust Co.*, 770 F.2d 1566, 1575 (11th

Government's strategy contravened the Federal Rules of Civil Procedure[6] and the local rules of this Court.[7]

Federal courts possess certain "inherent powers," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[8] That authority includes "the ability to fashion an appropriate sanction for conduct which abuses the judicial process."[9] And one permissible sanction is an "assessment of attorney's fees"—an order instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side.[10]

This Court already "***easily*** [ruled] that the Government violated ***myriad*** Court orders and Special Master directives, and the Court impose[d] monetary

---

Cir. 1985) ("While [defendant] is entitled to contest vigorously '[plaintiffs'] claims, once it does so it cannot then complain that the fees award should be less than claimed because the case could have been tried with less resources and with fewer hours expended.").

[6] This Court previously held the Federal Rules of Civil Procedure apply to Rule 41(g) motions. *See* Doc. 758 at 125 citing *In re Special Grand Jury 89-2,* 450 F.3d 1159, 1167 (10th Cir. 2006) ("It is the 'essential nature of the action, not the underlying proceeding it arose from, that determines whether it is civil or criminal.'").

[7] *See, e.g.,* Fed. R. Civ. P. 1 ("[The Rules] should be construed, administered and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.").

[8] *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) citing *Link v. Wabash R. Co.,* 370 U.S. 626, 630–631 (1962).

[9] *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44–45 (1991).

[10] *Id.,* at 45.

sanctions for these violations."[11] The Court identified two areas of misconduct by the Government: (1) failure to preserve evidence and (2) failure to cooperate with witness and document production.[12] This misconduct so permeates the litigation that it falls into the extraordinary circumstance where the Court has the authority to sanction the Government for the entirety of the FPD's fees and expenses.

Thus, the question is how to assess the pecuniary penalty against the Government.

## II.    Computation of the Lodestar

The general principles governing the award of fees, costs, and expenses are well-settled. The starting point is the "lodestar" figure, that is, "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."[13] When a party seeks compensation for services of a non-lawyer, such as a legal assistant, the court must scrutinize the reported hours and suggested rates in the same manner.[14] The party seeking an award of fees has the burden of proving both the number of hours spent and the reasonableness of the hourly rates.[15] Once this

---

[11] D.E. 758 at 5, emphasis added.

[12] D.E. 758 at 144

[13] *Anchondo v. Anderson, Crenshaw & Assoc., LLC,* 616 F.3d 1098, 1102 (10th Cir. 2010)(citing *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983)).

[14] *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1249 (10th Cir. 1998).

[15] *United Phosphorus, Ltd v. Midland Fumigant, Inc.,* 205 F.3d 1219, 1233 (10th Cir. 2000).

burden is met, a claimant is entitled to a strong presumption that this lodestar amount reflects a "reasonable" fee.[16]

### A. Hours Incurred as a result of the Government's misconduct

When the basis for awarding fees is bad faith, the party entitled to fees is limited to the fees incurred solely because of the opposing party's misconduct – "or put another way, to the fees that party would not have incurred but for the bad faith."[17]

Strict mathematical certainty in this context is neither practical nor required. "The essential goal" in shifting fees is "to do rough justice, not to achieve auditing perfection."[18] Accordingly, a district court "may take into account [its] overall sense of a suit, and may use estimates in calculating and allocating an attorney's time."[19] The court may decide, for example, that all (or a set percentage) of a particular category of expenses were incurred solely because of a litigant's bad-faith conduct.[20]

### 1. This exceptional case permits the Court to shift all of the FPD's fees.

In extraordinary cases, the "but-for standard permits a trial court to shift *all* of a party's fees, from either the start or some midpoint of a suit, in one fell

---

[16] *Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 552 (2010).

[17] *Haeger,* 137 S.Ct. at 1184.

[18] *Id* citing *Fox v. Vice,* 563 U.S. 826, 838 (2011).

[19] *Id.*

[20] *Haeger,* 137 S. Ct. at 1187.

swoop."[21] One such example is *Chambers v. NASCO,* in which the Supreme Court approved an award of the plaintiff's entire fees because "literally everything the defendant did – 'his entire course of conduct' throughout, and indeed preceding the litigation – was 'part of a sordid scheme' to defeat a valid claim."[22] The *Chambers* district court reasonably concluded that all legal expenses in the suit "were caused . . . solely by [the defendant's] fraudulent and brazenly unethical efforts."[23]

Here, in line with *Chambers*, the FPD's involvement began as an action for specific performance—that the USAO return client property under Rule 41(g). But it quickly morphed into a three-year exercise in subterfuge by the USAO. This "wholesale strategy to delay, diffuse, and deflect"[24] has cost the FPD substantial time and resources, but, more importantly, it has successfully denied "the individual [§ 2255] litigants their day in court for almost three years."[25]

The Court detailed in its 188-page Findings of Fact and Conclusions of Law the Government's bad-faith and failure to cooperate or preserve. Indeed, from the earliest hearings, "the Government evaded the Court's questions"[26] and "denied

---

[21] *Id.*

[22] *Id.* citing *Chambers*, 501 U.S. at 51, 57.

[23] *Chambers,* 501 U.S. at 58.

[24] D.E. 758 at 7.

[25] *Id.*

[26] D.E. 758 at 4.

that its practices implicated the Sixth Amendment or the attorney-client privilege."[27] These dilatory tactics continue today.[28] Indeed, at the time of this filing, five individual AUSAs have filed purported notices of appeal, one alleging "reputational injury,"[29] that can only be seen as a continued attempt to thwart a timely resolution of this case.

The Government has displayed a willful defiance of this Court's authority and has unnecessarily multiplied the proceedings. By contrast, the FPD repeatedly attempted to resolve this matter. Consequently, it would be within the Court's inherent authority to assess the total attorney fees the FPD incurred litigating the Rule 41(g) motion, which comes to $1,653,638.50.[30] But again, that's not the remedy we seek. As we describe below, we seek fees and costs, constituting a small fraction of our investment in the case, of $223,716.30.

    2.  *The FPD only seeks fees incurred related to discrete areas of the Government's bad faith.*

This is the exceptional case in which the government's bad faith permeates the Rule 41(g) proceeding, but the FPD only distills the fees and expenses as to certain discrete areas caused by the Government's bad faith disregard of the Court's orders, as directed by the Court.

---

[27] *Id.*

[28] *Id.* at 7.

[29] D.E. 771.

[30] *See* Ex. A, Thompson Decl. at 17.

### a. The Government's bad faith failure to preserve the AVPC.

The Government had a duty to preserve the AVPC hard drives based on the August 2016 Rule 41(g) motions and Brannon's August 30, 2016 email.[31] Yet the Government admittedly failed to preserve the hard drive; the balance of the evidence is that the Government affirmatively destroyed that evidence.[32] The Court released the AVPC hard drives to the FPD, who then retained Tami Loehrs to analyze any remaining metadata. That analysis demonstrates that there was conduct on the part of the Government that directly contributed to the AVPC's spoilation.

To get to the point where the FPD finally had access to the computer hard drives, litigation was required. The FPD spent 42.1 hours investigating, researching, and drafting the motion for discovery regarding computers (Doc. 573).[33] This issue was also litigated during multiple hearings; however, that time is accounted for in the sections below.

### b. Government's failure to produce – time spent obtaining and reconstructing CCA phone calls, preparing motions to compel, and fruitlessly meeting with the Government.

The Government finally responded to the Special Master's August 2018 subpoena duces tecum with what "can only be characterized as an incomplete

---

[31] Doc. 758 at 130.

[32] Doc. 758 at 131.

[33] See Attachment 1 to Ex. A, Thompson Decl.

'document dump.'"[34] In an attempt to determine the breadth of the USAO's accessing attorney-client calls, the FPD filed a motion requesting that the Government identify cases in which it requested recorded phone calls of District of Kansas detainees.[35] The Government responded that it was in discussions with the FPD to provide this information, or, in the alternative, that there was no legal basis for the FPD's requests.[36]

As this Court found, "despite Clymer's proclamations that the Government was willing to resolve pending Rule 41(g) motions by turning over audio recordings to the FPD, that did not begin until January 2019."[37] Because the Government repeatedly said it was willing to resolve the motions and turn over the audio recordings, the FPD spent time negotiating with the Government or reviewing the partial productions during the summer of 2018.[38] Because the Government did not produce a complete accounting of calls that it had requested or reviewed before the October hearing, the FPD had to complete an arduous process over several

---

[34] Doc. 758 at 142.

[35] Doc. 572.

[36] *See* Doc. 587.

[37] Doc. 758 at 102.

[38] See Attachment 1 to Ex. A, Thompson Decl.

months.[39] This culminated in the report and testimony of AFPD Rich Federico. This Court detailed the process in its Findings of Fact and Conclusion of Law.[40]

The FPD spent 264.76 hours conducting investigation and motion practice to determine what attorney-client phone calls the Government accessed.[41]

### c. Government's failure to cooperate and produce witnesses – time spent on responding to the Government's bad faith *Touhy* and privilege invocations.

The Court repeatedly ordered the Government to cooperate with the Special Master., and this included producing documents and witnesses.[42] The Government repeatedly circumvented these orders, as detailed in the Court's Findings of Facts and Conclusions of Law. Specifically, the Government "refused to create and provide a log for materials withheld on the basis of privilege, *Touhy*, and the Privacy Act."[43]

In an attempt to identify the information and documents the Government refused to produce, the FPD was required to research, prepare, and file a response to Government's motion to quash,[44] a Memorandum of Law regarding the proper

---

[39] *See* Exhibit 562; Doc. 178 at 102.

[40] Doc 758 at 102-106.

[41] See Attachment 1 to Ex. A, Thompson Decl.

[42] D.E.. 758 at 141.

[43] *Id*. at 141-142.

[44] D.E. 357.

invocation of a various privileges,[45] and a Memorandum of Law regarding the proper invocation of *Touhy*.[46]

The Government repeatedly asserted the *Touhy* doctrine in bad faith at the at the May 15, 2018 hearing.[47] The USAO made near blanket *Touhy* objections to AUSA Rask's testimony and partial *Touhy* objections to Tomasic's testimony.[48] In contrast, at the October 2, 2018 hearing, the witnesses invoked *Touhy* more narrowly[49] and "Clymer often advised the witnesses that they could proceed to answer questions that they were initially reticent to answer based on their authorizations."[50]

The FPD spent 187.5 hours preparing Doc. 357, Doc. 385, and Doc. 622.[51]

### d. Government's general failure to cooperate – preparing motion for show cause, the reply, and litigating the same at an evidentiary hearing.

To combat the Government's repeated efforts to "frustrate the efforts of the Special Master, the Court, and the FPD to discover the extent and scope of any

---

[45] D.E. 385.

[46] D.E. 622.

[47] D.E.. 758 at 15.

[48] *Id*.

[49] D.E. 758 at 17.

[50] *Id*.

[51] See Attachment 1 to Ex. A, Thompson Decl.

Sixth Amendment violations committed by the USAO," the FPD filed repeated motions to show cause and motions for discovery.

More than a year after filing the initial Rule 41(g) motion, it became clear that the USAO did not intend to cooperate with witness and document production as ordered. In response, the FPD filed a motion to show cause why the Government should not be held in contempt of court for its refusal to cooperate with the Special Master in a faithful and timely manner.[52]

Ten months after the FPD filed that motion, the Government was still not cooperating and continued to thwart the Special Master's investigation. In response, the FPD filed a supplemental motion to show cause.[53]

And in a further attempt to obtain the discovery the Government refused to provide, the FPD filed a reply to the Government's response to its motions for discovery.[54]

Ultimately, these issues were litigated before the Court in an evidentiary hearing over three days in October 2018. Between the motion practice and the October 2018 evidentiary hearing, the FPD spent 339.5 hours attempting to gain the information the USAO should have provided under its duty to cooperate under the Court's orders.[55]

---

[52] D.E. 301.

[53] D.E. 585.

[54] D.E. 588.

[55] See Attachment 1 to Ex. A, Thompson Decl.

e. **Total Hours directly caused by the Government's failure to preserve and cooperate with witness and document production.**

The total hours for which the FPD seeks fees are as follows:

| Event | Date | Hours |
|---|---|---|
| Motion to Show Cause (D.E. 301)[56] | 10/25/17 | 27.5 |
| Response to Motion to Quash (D.E. 357) | 12/18/17 | 65.0 |
| Memorandum of Law re: Privilege (D.E. 385) | 01/17/18 | 49.7 |
| Phone Call Review[57] | Summer 2018 | 241.16 |
| Motion for Discovery (D.E. 572) | 08/20/18 | 23.6 |
| Motion for Discovery re: Computer (D.E. 573) | 08/24/18 | 42.1 |
| Supplemental Show Cause Motion (D.E. 585) | 08/31/18 | 32.9 |
| Reply re: Motions for Discovery | 09/04/18 | 12.5 |
| Memorandum of Law re: *Touhy*[58] | 09/28/18 | 72.8 |
| Hearing[59] | 10/2/18-10/4/18 and 10/9/18-10/12/18 | 266.6 |
| **Total** | | 833.86 |

---

[56] Our time records regarding pleadings were determined by: (1) segregating time records proximate to filing the pleading, (2) identifying the author, primary reviewer, and secondary reviewer of the pleading, and (3) including only the time records of individuals directly involved with the pleading at times temporally proximate to the filing.

[57] The process of collecting and analyzing call detail reports and building a database to search for attorney-client calls acquired by the government was explained in detail by Rich Federico at the October hearing.

[58] We excluded all FPD time concerning the May, 2018 hearing. While the government repeatedly invoked *Touhy* at that hearing in a manner contrary to the law and to their later practice, we are unable to disaggregate from our records what time we spent litigating the *Touhy* issue.

[59] The only FPD time we have included concerning the October 2018 hearing is FACT entries. These entries document only review of the government's tardy document dump, and litigation support required to attempt to organize the discovery production and mark exhibits. We do not include any travel time, court time, or investigation time.

As set forth in the declaration of FPD General Counsel Erin Thompson, the hours set forth above represent various reductions and exclusions in an exercise of billing judgment. These exclusions include work performed by attorneys in connection with the underlying Rule 41(g) motion if they performed relatively little work on the matter (*i.e.* worked fewer than 15 hours on the matter).

To be clear, the FPD's billing records do not contain detailed billing descriptions or "task billing" by attorney and date. That is for several reasons. To begin, the FPD routinely keeps its time and this case followed its general practice of recording only general time descriptions by attorney and date.[60] The FPD's time is not kept in a manner to be sent to a client; rather, the time is reported to the Defender Services Office so that appropriate resources can be allocated based on caseload.[61] Next, this FPD made a policy decision, unrelated to this case, to keep its timekeeping records as generic as possible to maximize attorney-client privilege.[62] Nor did the FPD ever expect that it would be seeking attorneys' fees when it began keeping time in this matter. The FPD squarely acknowledges that the Court may reduce the fees requested based on the FPD's block billing.[63] But the time records do provide a guidepost for the Court to consider.

---

[60] *See Ex. B,* Brannon Decl.

[61] *Id.*

[62] *See id.*

[63] "Block billing" is the practice of lumping multiple tasks into a single entry of time such that the billing entry does not delineate how many hours were allotted to a specific task. *See Cadena v. Pacestter Corp.,* 224 F.3d 1203, 1214-15 (10th Cir.

### B. Hourly rates

In setting reasonable attorneys' fees, the general touchstone is whether the rate is in line with those prevailing in the community for comparable services by lawyers of reasonably comparable skill, experience, and reputation.[64] The focus of the inquiry into a reasonable hourly rate is on the rates of lawyers of comparable skill and experience.[65] The Court "should establish, from the information provided to it and from its own analysis of the level of performance and skill of each lawyer whose work is to be compensated, a billing rate for each lawyer based upon the norm for comparable private firm attorneys in the area in which the court sits, calculated as of the time the court awards fees."[66]

The hourly rates requested for the attorneys, paralegals, and investigators who performed work in the underlying Rule 41(g) motion are as follows:

| Name (Position) | Rate |
|---|---|
| Melody Brannon, Kirk Redmond, Laura Shaneyfelt (attorneys) | $325 |
| Brandon Bell, Rich Federico (attorneys) | $250 |
| Michele Oeberst, Jennifer Wilson (paralegals) | $110 |
| Zay Thompson (investigator) | $100 |

---

2000). The Tenth Circuit discourages this practice and the court can reduce the fees requested when time records including block billing are submitted. *See Okla. Natural Gas Co.,* 355 F.Supp.2d 1246, 1264 (N.D. Okla. 2004).

[64] *See, e.g., Lippoldt v. Cole,* 468 F.3d 1204, 1224-1225 (10th Cir. 2006) (considering the "'prevailing market rate in the relevant community'" in determining what constitutes reasonable rate)

[65] *See Fox v. Pittsburg State Univ.,* 258 F. Supp. 3d 1243, 1264 (D.Kan. 2017).

[66] *Sussman v. Patterson,* 108 F.3d 1206, 1211 (10th Cir. 1997) (quoting *Ramos v. Lamm,* 713 F.2d 546, 555 (10th Cir. 1982)).

As set forth below, these requested rates are reasonable for complex criminal litigation in the Kansas City market.[67]

Should the Court determine that these rates exceed or at the high range for the Kansas City market, an upward departure is appropriate upon an examination of the *Johnson* factors.

In assessing whether adjustments should be made, courts often consider the twelve factors set out in *Johnson v. Georgia Highway Express, Inc.*, which include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required; (4) preclusion of other employment; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorney's; (10) the undesirability of the case; (11) the nature and relationship of the professional relationship with the client; and (12) awards in similar cases.[68]

The FPD was uniquely situated to take on this undesirable case. To warrant an enhancement due to the undesirability of the case, accepting the case and proceeding to trial must require "great courage" from counsel to undertake it.[69] Accusing the USAO of prosecutorial misconduct and intentionally intruding on the attorney-client relationship is more than a lone CJA panel attorney could bear.[70]

---

[67] *See Fox,* 158 F. Supp. 3d at 1264 (finding that the "relevant market is the Kansas City metropolitan area, which includes Missouri and Kansas.")

[68] 488 F.2d 714, 717-17 (5th Cir. 1974).

[69] *See Ramos v. Lamm,* 713 F.2d 546, 557–58 (10th Cir. 1983).

[70] *See Brannon* Decl.

The only way to address the USAO's systematic skirting of the Sixth Amendment was to have the institutional power of the FPD behind it.[71]

Accordingly, the FPD relied on counsel with substantial experience litigating against this USAO and significant experience litigating Sixth Amendment right to counsel, prosecutorial misconduct, and knowledge of the contours of hundreds of criminal cases pending before the District of Kansas.[72] While numerous courts have considered issues related to the Government's intrusion into the attorney-client relationship,[73] no court has previously considered a prosecuting office's systemic abuse, which calls into question the fairness of the entire system.[74]

Specifically, the four tiers of rates requested by the FPD for its counsel are reasonable for the following reasons:

First, the rate of $325 an hour is a reasonable rate for Ms. Brannon, Ms. Nichols, Mr. Redmond, and Ms. Shaneyfelt. Ms. Brannon is the Defender for the District of Kansas, a position akin to managing partner at a private law firm; and Mr. Redmond is First Assistant, a position akin to a supervising partner in private law firm.[75] Each of the four attorneys has more than 20 years of experience

---

[71] *Id.*

[72] *See* Ex. A, Thompson Decl. (describing qualifications of FPD counsel).

[73] *See e.g. Shillinger v. Haworth,* 70 F.3d 1132 (10th Cir. 1995)*; Weatherford v. Bursey,* 429 U.S. 545 (1977).

[74] *See* D.E.. 758 at 184.

[75] See Attachment 1 to Ex. A, Thompson Decl.

practicing law.[76] They each have substantial experience litigating complex criminal matters in the United States District Court for the District of Kansas.[77]

A rate of $325 per hour is reasonable for attorneys of their experience and skill working on complex criminal litigation in the Kansas City area.[78] It is lower than what this Court has approved for similarly situated attorneys in Title VII litigation[79] and in a National Voting Rights Act case.[80]

This rate is substantially less than the Laffey Matrix[81] – which this Court cited favorably in its appointment of the Special Master.[82] It is also lower than the Department of Justice's fee matrix that sets a rate of $572 per hour for attorneys with more than 20 years of experience.[83]

---

[76] *See id.* (29 years for Ms. Brannon, 26 years for Ms. Nichols, 21 years for Mr. Redmond, 34 years for Ms. Shaneyfelt).

[77] *See id.*

[78] *See* Ex. A, Thompson Decl.; *See* Declaration of Charles E. Atwell, attached hereto as Ex C.

[79] *See Fox*, 258 F. Supp. 3d at 1271 (finding $400 per hour was reasonable in the Kansas City area for experienced attorneys).

[80] *See Fish v. Kobach,* No. 16-2105-JAR, 2018 WL 3647132 (D. Kan. Aug. 1, 2018) (holding $450 per hour was reasonable in the Kansas City area for a specialized area of law).

[81] Available at http://www.laffeymatrix.com/see.html

[82] D.E. 146 at 11-12.

[83] Available at https://www.justice.gov/usao-dc/file/796471/download

Second, the rate of $250 per hour is a reasonable rate for Mr. Bell and Mr. Federico. Both are assistant federal public defenders with between 10 and 20 years of experience as attorneys.[84] Both have substantial experience in federal criminal matters.[85]

A rate of $250 is reasonable for attorneys of their experience and skill working on complex criminal litigation in the Kansas City area.[86] This rate is also substantially less than the Laffey Matrix.[87] It is also lower than the Department of Justice's fee matrix, which sets a rate of $544 per hour for attorneys with 16-20 years of experience[88] and a rate of $491 for attorneys with 11-15 years of experience.[89]

Fourth, the rate of $110 per hour is reasonable for paralegal time. The term "attorney's fees" encompasses paralegal time as well as attorney time;[90] $110 per hour is a reasonable fee for a paralegal.[91]

---

[84] *See* Ex. A, Thompson Decl.

[85] *Id.*

[86] *See* Ex. A, Thompson Decl.; *See* Ex C, Atwell Decl.

[87] Available at http://www.laffeymatrix.com/see.html

[88] Available at https://www.justice.gov/usao-dc/file/796471/download

[89] *Id.*

[90] *Cf. Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 580 (2008) (attorney's fees under 42 U.S.C. § 1988 "embrace[s] the fees of paralegals as well as attorneys").

[91] *See* Ex. A, Thompson Decl.; *See* Ex C, Atwell Decl.

Finally the rate of $100 per hour is reasonable for investigator time. Attorney fees also includes investigator time.[92] For the Kansas City market, $100 per hour is a reasonable fee for an investigator.[93]

The lodestar and presumptive attorneys' fee is $220,341.30 as set forth in the table below:

| Name (position) | Time Spent | Hourly Rate | Billable Amount |
|---|---|---|---|
| Brandon Bell (attorney) | 24.6 | $250 | $6,150.00 |
| Melody Brannon (attorney) | 177.78 | $325 | $57,778.50 |
| Rich Federico (attorney) | 121.6 | $250 | $30,400.00 |
| Michele Oeberst (paralegal) | 172.98 | $110 | $19,027.80 |
| Kirk Redmond (attorney) | 201.1 | $325 | $65,357.50 |
| Laura Shaneyfelt (CJA Resource Counsel) | 117.5 | $325 | $38,187.50 |
| Zay Thompson (investigator) | 19 | $100 | $1,900.00 |
| Jennifer Wilson (paralegal) | 14 | $110 | $1,540.00 |

Sum:    $ 220,341.30

---

[92] *See e.g. Jackson v. Austin*, 267 F.Supp.2d 1059 (D.Kan. 2003)

[93] *See* Ex. A, Thompson Decl.; *See* Ex C, Atwell Decl.

### III.    Non-Taxable Costs (Expenses)

The Court's Findings of Fact also entitle the FPD to recover expenses (non-taxable costs) incurred as a result of the Government's bad faith.[94] The FPD incurred expenses totaling $39,852.80.[95] However, the only costs the FPD seeks are the costs it incurred hiring Tami Loehrs with Loehrs Forensics. The FPD paid Ms. Loehrs **$3,375** in fees[96] As detailed above, these costs are appropriately assessed against the Government.

### IV.    That the FPD is a government agency instead of private counsel does not change the calculus.

First, it makes no difference that the FPD is a government agency rather than private counsel.[97] As the Tenth Circuit has held in the context of Fed. R. Civ. P. 37 sanctions, an

> "attorney fee" arises when a party uses an attorney, regardless of whether the attorney charges the party a fee; and the amount of the fee is the reasonable value of the attorney's services. The payment arrangement for an attorney can vary widely—hourly rate, flat rate, salary, contingency fee, pro bono. What the client pays or owes the attorney may not accurately reflect the reasonable value of the services.[98]

---

[94] D.E. 758 at 144; *Fox*, 258 F. Supp. 3d at 1273 ("As the Tenth Circuit has reiterated, expenses incurred in representing a client in civil rights and analogous cases should be included in the attorneys' fee award if such expenses are reasonable 'usually billed in addition to the attorney's hourly rate.'")

[95] *See Ex. A*, Thompson Decl. at 20.

[96] *Id.*

[97] *Blum v. Stenson,* 465 U.S. 886, 893 (1984).

[98] *Centennial Archaeology, Inc. v. AECOM, Inc.,* 688 F.3d 673, 679 (10th Cir. 2012).

The purpose of "attorney-fee sanctions would be thwarted if a party could escape the sanction whenever opposing counsel's compensation is unaffected by the abuse, as when the fee arrangement is a contingency fee"[99] or, as here, a government agency. In *Centennial,* the court explained that when interpreting a fee shifting provision, "courts should look to their statutory purposes rather than focusing on the inclusion of a word (*incurred)* that, in ordinary usage, would be read into the statute in any event."[100]

Second, sovereign immunity does not immunize the USAO from payment of costs and fees. In *United States v. Horn,* one of the only cases counsel found in which attorney fees were assessed against a U.S. Attorney's Office, the First Circuit held that sovereign immunity barred a federal district court, exercising its supervisory power, from assessing attorneys' fees and costs against the federal government in a ***criminal*** case.[101] But as noted above, Rule 41(g) motions are civil in nature. They "represent a means by which a criminal defendant can determine her rights in property, and not a part of the trial and punishment process that is criminal law."[102]

---

[99] *Id.* at 680.

[100] *Id.* at 682.

[101] 29 F.3d 754 (1st Cir. 1994).

[102] *In re Special Grand Jury 89-2*, 450 F.3d at 1167.

The Tenth Circuit has recognized that the Equal Access to Justice Act, 28 U.S.C. § 2412, waived sovereign immunity and authorized sanctions against the Government for misconduct under the civil rules:[103]

> The legislative history of § 2412(b) supports this view of the EAJA waiver. Section 5 of the original EAJA, Pub. L. No. 96–481, § 205, 94 Stat. 2321, 2330 (1980), expressly addresses fees awarded pursuant to the Federal Rules of Civil Procedure and demonstrates Congress' intent that the EAJA waives government immunity. That section repealed former subdivision (f) of Fed.R.Civ.P. 37, which had disallowed awards of expenses and attorney's fees against the United States for discovery abuses. In repealing subdivision (f), Congress specified that the United States is to be treated like any other litigant in awarding discovery sanctions: "**This change reflects the belief that the United States should be liable for fees the same as other parties when it abuses discovery**." H.R.Rep. No. 1418, 96th Cong., 2d Sess. 19, *reprinted in* 1980 U.S. Code Cong. & Admin. News 4953, 4984, 4998 [hereinafter "*House Report*"]. We believe that Congress through § 5 manifested its broader intent that the United States be subject to fee sanctions under all of the federal rules to the same extent as private parties: Because old Rule 37(f) contained the only specific bar to such sanctions to be found in the Federal Rules of Civil Procedure, it was the only rule the EAJA needed to address specifically.[104]

Furthermore, should sovereign immunity bar a court using its inherent powers to sanction a party, it would violate the separation of powers, particularly the vesting of the Judicial Power in the federal courts under Article III. The judicial power includes the power to enforce orders, which, necessitates contempt sanctions

---

[103] *See Adamson v. Bowen,* 855 F.2d 668, 670-71 (10th Cir. 1988).

[104] *Adamson*, 855 F.2d at 671.

including this fee award against the Government.[105] Without such an enforcement mechanism, judicial rulings against the Government would amount to unsubstantiated platitudes.[106]

Third, any fees awarded will not go directed to the District of Kansas FPD's budget. Rather, the FPD respectfully requests that the Court consult with the Office of the General Counsel for the Administrative Office of the U.S. Courts on where funds should be deposited and how they are to be appropriated.

## V.     Conclusion

For the reasons set forth above, the Court should assess the Government $220,341.30 in fees and $3,375 in expenses to be deposited as determined by the Administrative Office of the U.S. Courts and this Court.

---

[105] *See* Nicholas R. Parrillo, *The Endgame of Administrative Law: Governmental Disobedience and the Judicial Contempt Power*, 131 Harv. L. Rev. 685, 710-711 (2018).

[106] *See id.*

Respectfully submitted:

s/ Melody Brannon
Melody Brannon #17612
Federal Public Defender
for the District of Kansas
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: (785) 232-9828
E-mail: Melody_Brannon@fd.org

s/ Kirk C. Redmond
Kirk C. Redmond, #18914
First Assistant Federal Public Defender
for the District of Kansas
117 SW 6th Avenue, Suite 200
Topeka, KS 66603-3840
Phone: 785-232-9828
Fax: 785-232-9886
Email: kirk_redmond@fd.org

## CERTIFICATE OF SERVICE

I certify that on September 24, 2019, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all parties.

s/ Melody Brannon
Melody Brannon