IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 16-CR-20032-JAR |
| Plaintiff, | ) | |
| | ) | Government's Response to the |
| v. | ) | Court's Findings of Fact & |
| | ) | Conclusions of Law re: Contempt |
| KARL CARTER, | ) | and the Federal Public Defender's |
| | ) | Application for Attorneys' Fees and |
| Defendant. | ) | Litigation Expenses |
| _____ | ) | |

The United States of America, by and through its counsel of record, Assistant United States

Attorney Steven D. Clymer, appointed as Special Attorney pursuant to 28 U.S.C. § 515 to represent

the United States in connection with Phase III of the Special Master Investigation, hereby responds

to the Court's "Findings of Fact and Conclusions of Law" regarding contempt, Docket # 758 at

pp. 123-45, and the Federal Public Defender's ["FPD"] "Application for Attorneys' Fees and

Litigation Expenses." Docket #784.

A.    **Introduction**

On August 13, 2019, the Court issued "Findings of Fact and Conclusions of Law," in which

the Court determined that "the Government knowingly violated the Court's and Special Master's

orders," Docket #758 at p. 137, and "that a compensatory award is in order, either as a remedy for

contempt or for abuse of the judicial process under the Court's inherent authority." *Id.* at p. 144.

Specifically, the Court determined that the government acted wrongfully in the following ways:

1. By failing to properly preserve electronically stored information, Docket #758 at pp. 132-

   36, and failing to comply with Special Master's October 25, 2016 Discovery Conference

   Order (Docket #155), as supplemented by his November preservation order, which

included an order to suspend routine destruction of information (Docket #180, n.1).  Docket #758 at pp. 138-41.

2.  By failing to fully comply with the Court's August 9, 2016 oral clawback order (Tr. Aug. 9, 2016 hearing, Docket #104 at 114-15) and August 10, 2016 written clawback order (Docket #102) regarding hard drives containing video evidence from CCA-Leavenworth. Docket #758 at pp. 138-39.

3.  By failing to fully comply with the Court's August 18, 2016 written clawback order regarding audio recordings (Docket #113).  Docket #758 at pp. 138-39.

4.  By delaying compliance with the Court's August 15, 2018 preservation order (Docket #569) and a preservation directive in its November 21, 2018 Final Production Order (Docket #690).  Docket #758 at pp. 141-43.

5.  By not cooperating with the Special Master's efforts to interview District of Kansas United States Attorney's Office ["USAO"] employees. Docket #758 at p. 141.

6.  In its September and October 2018 document production to the Special Master, by permitting "individuals [who] allegedly engaged in wrongdoing" to "cull[ ] their own documents instead of a neutral reviewer"; not using search terms that the Special Master developed in conjunction with the USAO; and "refus[ing] to create and provide a log for materials withheld on the basis of privilege, Touhy, and the Privacy Act."  Docket #758 at pp. 141-43.

Having so determined, the Court acknowledged that "to impose a sanction of fees and costs under the Court's inherent authority, there must be a 'but-for' causal link between the litigant's bad conduct and the legal fees incurred by the opposing party."  Docket #758 at 144.  Thus, the Court recognized that "[a]ny award of fees and costs must be calibrated to the contumacy involved

here—failure to preserve and failure to cooperate with witness and document production." *Id.* It ordered the FPD "to submit an application for attorneys' fees and costs, addressing both its entitlement to fees and costs and the amount . . . ." *Id.* at 145.

On September 24, 2019, the FPD submitted an application alleging that it had expended 833.86 hours of attorney, paralegal, and investigator time worth $220,341.30 and incurred $3,375 in expenses "as a direct result of the Government's bad faith failure to preserve evidence and failure to cooperate with witness and document production." Docket #784 at p. 2. The FPD refuses to accept payment, requesting instead "that the Court consult with the Office of the General Counsel for the Administrative Office of the U.S. Courts on where funds should be deposited and how they are to be appropriated." *Id.* at p. 24.

As explained below, there is no basis to sanction the government through an order requiring payment of attorneys' fees and expenses demanded by the FPD. Although the Court's and Special Master's orders that the government purportedly violated lacked legal foundation and many intruded into the affairs of a coordinate branch of government, the USAO made good faith efforts to comply with them, and in fact did substantially comply. While challenging the FPD's still-unproven and meritless contentions that there have been widespread Sixth Amendment violations, the government has endeavored to timely satisfy far-reaching "clawback," preservation, and production orders of the Court and Special Master, including by voluntarily producing thousands of internal USAO records to the Special Master and FPD and authorizing testimony about the operations of the USAO from more than a dozen present and former employees. Moreover, when ordered to do so, the government produced to the Court video and audio recordings that were the subject of the FPD motion for return of property and, in early 2018, made clear that it did not

oppose the Court delivering such recordings to the movants, which the Court has since done. The record here does not support a finding of willful contempt of court.

**B.    The Court's Orders and the Special Master's Demands Upon Which the Contempt Determinations Are Based Were Void and Cannot Serve as Grounds for a Contempt Sanction.**

The various orders that this Court's "Findings of Fact and Conclusions of Law" identified as having been willfully violated by the government all exceeded this Court's statutory and constitutional authority. Consequently, they were void *ab initio* and cannot serve as a basis for a sanction against the government. This is the case for three reasons.

First, as the government has explained previously, the purportedly-violated orders—requiring the government to produce legally obtained audio and video recordings to the Court; preserve voluminous internal USAO records; and "cooperate" with the Court-appointed Special Master, who made additional production, disclosure, and preservation demands—all exceeded the Court's authority to compel government discovery in a criminal case. There is no suggestion here that the government failed to comply with Fed. R. Crim. P. 16(a), 18 U.S.C. § 3500, or any other criminal discovery obligation, or that the various orders that the Court identified as the government having violated were within the Court's authority to order discovery in a criminal case. Rather, the Court concluded that "civil standards" applied here because the FPD—who did not represent any defendant in the criminal case—filed a motion for return of property under Fed. R. Crim. P. 41(g). Docket #758 at p. 124-28.[1]

---

[1] The Court's Findings of Fact and Conclusions of Law appears to assume that the relevant orders of the Court and the Special Master were permissible under the Federal Rules of Civil Procedure. The government questions this assumption. None of the orders that are the subject of the Court's conclusions regarding sanctions—Docket #120, #113, #146, #155, #180, #569, #690—expressly rely on any discovery rule in Title V of the Federal Rules of Civil Procedure and it is not clear that those rules permit the demands that the Court and the Special Master imposed on the USAO here.

But, there is no authority for the proposition that a criminal defendant, or, as is the case here, a non-party intervenor, can enlarge the government's discovery obligations in a criminal case by filing a Rule 41(g) return of property motion.  The authority upon which this Court relied to justify its various orders and its empowerment of the Special Master— *In re Special Grand Jury 89-2*, 450 F.3d 1159, 1169 (10th Cir. 2006), *see* Docket #758 at p. 125, n.456—does not support this proposition.  Rather, *In re Special Grand Jury 89-2* addressed the very different question whether, for the purpose of determining whether a notice of appeal was timely filed under Fed. R. App. P. 4, a petition to release grand jurors from their secrecy obligations under Fed. R. Crim. P. 6(e) should be considered as having initiated a "civil" or a "criminal" case.  *Id.* at 1162-63.  The Tenth Circuit recognized that in deciding whether a case is "criminal" or "civil," "there are gray areas presenting challenging issues," *id.* at 1167, such as return of property motions filed in criminal cases.  It noted, however, that "in *United States v. Madden*, 95 F.3d 38, 39 n.1 (10th Cir. 1996), we agreed with every other circuit that had ruled on the issue in holding that a motion for return of property under Fed. R. Crim. P. 41(g) is civil rather than criminal."  *Id.* at 1167; *see also id.* at 1169.

*Madden*, which involved Fed. R. Crim. P. 41(e), the predecessor to the present Rule 41(g), said this:

> Although Fed. R. Crim. P. 41(e) is contained in the Federal Rules of Criminal Procedure, we have held proceedings surrounding the motion for return of property seized in a criminal case are civil in nature, and that the higher standard of proof applicable in criminal proceedings does not apply.  We have also held the remedy provided under Fed. R. Crim. P. 41(e) may be available even if there is no criminal action currently pending against the party seeking the return of property.

95 F.3d at 39–40 (10th Cir. 1996) (internal quotation marks, brackets, and citations omitted).

*Madden* makes clear, however, that a determination whether a Rule 41(g) motion is "civil" or "criminal" depends on context.  95 F.3d at 39, n.1 ("We have never considered whether a motion

for return of property is a civil or criminal action *for the purposes of determining the time for filing the notice of appeal*.") (emphasis added); *see also United States v. Droganes*, 728 F.3d 580, 588 (6th Cir. 2013) (refusing to apply Fed. R. Civ. P. 11 in connection to a Rule 41(g) motion because this civil rule is "plainly inapplicable in a criminal proceeding").

It is one thing to permit a Rule 41(g) claimant to file an appeal under the more generous timing requirements applicable in civil case, resolve a return of property motion under the preponderance of the evidence standard, and enable non-indicted persons to recover their seized property.  It is quite another thing to ignore statutory limits on the government's discovery obligations in a criminal case simply because a Rule 41(g) motion has been filed.  And, it is noteworthy that, in other contexts, both the FPD and this Court treated the FPD's Rule 41(g) claims as a criminal not a civil matter.  When the FPD moved for subpoenas and the Court approved them, both the FPD and Court relied on Fed. R. Crim. P. 17, not Fed. R. Civ. P. 45.  *See, e.g.*, Docket #87, #88, #91, #93, #328, #329, #600, #601, #602, #603, #692, #695.

If a Rule 41(g) motion eliminates restrictions on criminal discovery, any criminal defendant whose property is seized will be able to significantly expand his right to obtain discovery from the government—including by the use of civil discovery tools like depositions and interrogatories—by simply filing a Rule 41(g) motion.  The government is not aware of any authority permitting a Rule 41(g) movant in a criminal case to circumvent federal criminal discovery rules with such ease.

Further, even if the filing of a Rule 41(g) motion in a criminal case were enough to saddle the government with civil discovery obligations, such a rule should not apply here, where the FPD's return of property motion was frivolous because it did not allege that any moving party was

"aggrieved by an unlawful search and seizure of property or by the deprivation of property," as is required by Rule 41(g).

Second, even if civil standards were applicable in this case, the Special Master's orders and requests, and the Court's order that the government "cooperate" with him were void because the Court lacked power to authorize the Special Master to perform duties other than to serve as a filter for potentially privileged audio and video recordings. Rule 53(a)(1)(A) of the Federal Rules of Civil Procedure provides that "[u]nless a statute provides otherwise, a court may appoint a master only to . . . perform duties consented to by the parties." Here, the government refused to consent to any duties for the Special Master other than serving as a filter for privileged materials. Docket #120; Exhibit 490 at pp. 148-39. Accordingly, the Court's Appointment and Phase III orders, Docket #146, 253, empowering the Special Master to demand document production, compel interviews of USAO employees, and investigate the USAO were void. Although the Court also relied on its inherent authority to appoint a Special Master, Docket #146 at p. 3, it did not explain why it was permitted to grant the Special Master duties outside the scope of the parties' consent, when doing this contravened the express limitation in the Federal Rules of Civil Procedure.

Third, as the government also has explained before, this Court's protracted and far-ranging inquiry into the operations of the USAO violated the constitutionally-required separation of powers, rendering void many of the Court's orders in furtherance of that enterprise. Although federal courts have authority to remedy constitutional violations in specific cases, the separation of powers prevents them from probing the internal workings of the executive branch. *See United States v. Dominguez-Villa*, 954 F.2d 562, 565 (9th Cir. 1992) ("A district court does not have general supervisory powers over the co-equal executive branch of government."); *United States v.*

*Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir. 1983) ("[T]he federal judiciary's supervisory powers over prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all.").

On the rare occasions in which a federal district court has undertaken an investigation into the conduct and decisions of a federal prosecutor's office, federal appellate courts have made clear that doing so is improper.   In one case, a federal district judge sought to investigate the government's application for an overly broad grand jury disclosure order.  *In re United States*, 398 F.3d 615, 616-17 (7th Cir. 2005) (per curiam).  The judge "threatened to hold the [AUSA who sought the disclosure order] in criminal contempt of court, and he demanded to know who within the United States Attorney's Office participated in the decision to file such a request and why they had approved it." *Id*. at 617. The Court of Appeals issued a writ of mandamus, concluding "that the inquiry is inappropriate and must cease."  *Id.*  It explained that "[t]he fundamental problem with this inquiry is that the United States Attorney is not answerable to a judge for the deliberations among his staff."  *Id.* at 618.  Moreover, "[t]he intra-office conversations and memoranda that the judge wants to see are covered by multiple privileges."  *Id.*  "How the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate."  *Id.*  Although "[j]udges often are tempted to seek a larger role in the conduct of litigants," that "temptation must be resisted in order to maintain separation between executive and judicial roles."  *Id.*  "In the rare situations when a prima facie case of criminal contempt has been made out, and the contempt is not committed in the judge's presence (and thus amenable to summary disposition), the judge must turn the matter over to a prosecutor rather than assume an inquisitorial role inappropriate to the Judicial Branch."  *Id.*

A similar outcome resulted in *In re United States*, 503 F.3d 638 (7th Cir. 2007), where a federal district court judge "propounded [a] set of interrogatories to the United States Attorney" concerning a cooperating defendant's eligibility for a government motion under U.S.S.G. § 5K1.1; the court refused to accept or reject the defendant's guilty plea until it received answers. *Id.* at 639-40. The Seventh Circuit issued a writ of mandamus requiring that the district court rule on the government's motion "without requiring access to information about ongoing investigations or deliberations within the Executive Branch." *Id.* at 643. The district court's questions were "questions a United States Attorney might well ask of an Assistant United States Attorney; they are not appropriate questions for the Judicial Branch to ask of the Executive Branch." *Id.* at 641. The court also noted that "[m]ultiple privileges cover the internal deliberations of the Executive Branch, just as they do for the Judicial Branch's internal deliberations." *Id.*

In yet a third case by the same name, the First Circuit granted the government's petition for mandamus, terminated a judicial investigation, and ordered the judge's recusal where the district court continued its own investigation into alleged government misconduct in the grand jury where the DOJ's Office of the Inspector General and Office of Professional Responsibility had concluded that there was no misconduct. *In re United States*, 441 F.3d 44, 67-68 (1st Cir. 2006). The appellate court observed that "[a] judge's investigation of a prosecutor's office under the label of government misconduct . . . poses the risk that the line will be crossed 'between executive and judicial roles, and between the formulation and evaluation of positions in litigation.'" *Id.* at 67 (quoting *In re United States*, 398 F.3d at 618). Although "the court's inherent supervisory authority undoubtedly provided some authority to investigate misconduct as to the grand jury proceedings," this authority was "subject, of course, to the broader constitutional principle of the separation of powers." *Id.* at 58. The "constraints" of the separation of powers "mean that there

must be some reasonable basis for a district court to launch an inquiry" into claims of government misconduct. *Id.* And "there are limits on who should investigate and how the investigation should be done." *Id.*

This Court lacked the authority to investigate the USAO, to empower a Special Master to do so, and to compel government compliance with the Special Master's demands. The orders that the Court and Special Master issued in furtherance of this endeavor violated the separation of powers, were void, and cannot serve as a basis to sanction the government. Although the Tenth Circuit did not address these same arguments when the government advanced them in its petition for a writ of mandamus, the government urges the Court to reconsider them here.[2]

## C.    The Court's Contempt Determinations Are Based on Erroneous Findings of Fact and Conclusions of Law.

### 1.    The Court's Conclusion that the USAO Willfully Violated a Duty to Preserve Evidence Erroneously Relies on Non-Existent Preservation Obligations, and Fails to Account for the Special Master's Determination that the USAO Cooperated With His Preservation Order.

In its conclusions of law, the Court attempts to fashion a general government preservation obligation akin to one that would apply to a party named in or threatened with a civil lawsuit. It asserts that in early August 2016, "a duty to preserve evidence surrounding the USAO's practice of requesting and obtaining audio and video recordings of meetings between federal detainees and their attorneys" arose from (a) the FPD's Rule 41(g) motion; (b) an August 30, 2016 email that FPD Brannon sent to the USAO; (c) the Court's August 18, 2016 audio clawback order; and,

_____

[2] As this Court recognized, "the partial grant of the government's petition for mandamus was announced in a short, unpublished order that does not specify the grounds on which the panel partially granted the petition . . . [and thus] does not necessarily establish law of the case that would bind the Tenth Circuit in a later Appeal [with respect to] the government's separation of powers objection . . . ." Docket #713 at p. 45. Thus, this Court retains discretion to reconsider its earlier rejection of the government's constitutional arguments. *See Arizona v. California*, 460 U.S. 605, 618 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power.").

somewhat later, (d) the Special Master's discovery orders in October and November 2016. Docket #758 at pp. 132-33. As explained below, none of these first three events in August 2016 created a general preservation order in this criminal case, where neither the United States nor any of its agencies was being sued or threatened with a lawsuit. And, in any event, there was nothing to put the government on notice that preservation requirements applicable to civil litigation suddenly applied to it in a criminal case. Further, the government complied with the Special Master's later preservation orders to his satisfaction. Thus, any government failure to preserve internal documents cannot serve as the basis for a contempt sanction.

The FPD's Rule 41(g) motion alleged only "that CCA is recording confidential legal communication, and . . . it provides that confidential legal communication to the government, with no notice to the defendant or counsel." Docket #85 at p.2; *see also* Docket #82. Nothing in this allegation can be fairly read to create a duty by the USAO to preserve its internal records and, as a general matter, there is no authority for the proposition that a Rule 41(g) motion imposes obligations on the government to preserve records that are not alleged to be the property of the Rule 41(g) movant. *See United States v. King*, 528 F.2d 68, 69 (9th Cir. 1975) (rejecting Rule 41 motion for return of recordings of intercepted communications, explaining that the party seeking return "is no more the owner of the tapes and transcripts of the conversations made by the government than he is the owner of the mental impressions and memories of the government agents who intercepted the conversations").

Similarly, FPD Brannon's message stated only that "it would probably be a good idea to maintain all existing computers, including hard drives and other media that could contain data related to the video recordings." Exhibit 589. With the explainable (and explained) exception of the AVPC, the government did this. No expansive duty to preserve internal records could have

sprung from this message; it asked only for preservation of electronic storage devices ("hard drives and other media") containing "data related to the video recordings."  Nor can the Court's August 18, 2016 audio clawback order be interpreted to create a general USAO obligation to preserve documentary evidence.  This order, Docket #113, commanded "the preservation and protection of any and all audio recordings of attorney-client communications at Community [sic] Corporation of America (CCA)," without *any* mention of the government preserving internal records.  Although the order did expressly impose certain production and notice obligations on the government, it said nothing further about preservation.[3]  In short, none of these three events—the Rule 41(g) motion, the Brannon e-mail message, and the August 18, 2016 audio clawback order—created an general obligation for the USAO to preserve internal records, and certainly did not provide notice to the USAO that it must do so.

Nor does the Special Master's October 25, 2016, "Discovery Conference Order," Docket #155, serve as a sound basis for a contempt sanction.  This is because, as described in the government's proposed findings of fact and conclusions of law, Docket #745 at pp. 80-82, 85-87, the USAO worked with the Special Master to comply with his preservation demand and, *with his express approval*, on December 16, 2016, circulated to the USAO a litigation hold/preservation directive.  Docket #298-1 (electronic mail message from the Special Master to the USAO Litigation Hold Coordinator describing as "fine" the final version of their jointly-crafted preservation directive to USAO employees).  This prompted the Special Master to describe in a written report on October 20, 2017, to having "worked cooperatively" with the USAO on this preservation endeavor.  Docket #298 at p. 2.

---

[3] The Court's Findings of Fact and Conclusions of Law indicates that the government also violated a court order located at Docket #114.  *See* Docket #758 at p. 138 & n.502.  In fact, this court order was directed to "Community [sic] Corporation of America (CCA)," not the USAO.

In its conclusions of law, this Court erroneously discounted this passage in the Special Master's own report by asserting that the USAO litigation hold coordinator "misled and lulled the Special Master into believing that she had implemented a full preservation hold on all repositories of information."   Docket #758 at p. 140.  The record contains no evidence of this.  Rather, the record demonstrates that from the earliest stages the USAO litigation hold coordinator communicated frequently with the Special Master to develop and refine a litigation hold to meet his concerns regarding preservation, while adhering to her obligations to the United States and Department of Justice policy by not conceding whether the interests of the United States would allow for broad production.  *See e.g.* Exhibit 1146; Exhibit 1155.  Nonetheless, the Court faulted the USAO for the Special Master's erroneous assumption that "his October 2016 preservation order had been immediately implemented and that the December 19, 2016 email was intended to be a more specific and detailed directive," because the master "did not know about the DOJ litigation hold process" and "no one in the USAO educated him that a central litigation hold would be required."   *Id.*  But, although the Court had issued an order mandating "cooperation" with the Special Master, Docket #146 at pp. 13-14, there was no order requiring that the USAO volunteer to educate him about internal DOJ practices and procedures concerning document retention.  A court-ordered requirement that the government provide the Special Master with "cooperation" was insufficient to notify the USAO that it was obligated to provide such an education.  Further, there was nothing to alert the USAO that the Special Master harbored erroneous beliefs about the efficacy of his preservation demands.  In any event, the USAO was entitled to conclude from the Special Master's written report describing having worked "cooperatively" with the USAO that it

satisfied its obligation to provide him with "cooperation." Accordingly, there is no evidence of a willful effort to ignore a duty to preserve evidence.[4]

> **2.     The Court's Conclusion that the USAO Willfully Violated its Video Clawback Orders Is Erroneous Because, Contrary to the Court's Findings, the USAO Did Not Retain Copies of that Evidence.**

In its conclusions of law, the Court asserts that the government violated its orders directing the government to produce to the Court the original and all copies of video evidence subpoenaed from CCA-Leavenworth. Docket #102; *see also* #104 at p. 114. Specifically, the Court's conclusions state: "in violation of the Court's second written video clawback order, the USAO maintained copies of the video recordings even after turning over the original CCA DVRs to the Court in August 2016." Docket #758 at p. 139. This conclusion is based on a factual finding that "[t]he USAO maintained a copy on Boyd's AVPC, and Stokes maintained a copy on his laptop computer." *Id.*; *see also id*. at p. 30. This finding is clearly erroneous. Neither USAO employee Pauletta Boyd nor Kansas Bureau of Investigation ["KBI"] Agent Jeff Stokes retained a copy of the video evidence; instead, the original (on six hard drives) and the only copy of that video evidence (on six additional hard drives) were produced to the Court.

---

[4] The Special Master also issued a preservation order on November 18, 2016, but this was directed to entities other than the USAO. Docket #180. A footnote in that order provided that "[t]he obligation imposed by this Order and the *Discovery Conference Order* includes: suspension of routine destruction of information; guarding against deletion; preservation of data and metadata in native form; preservation of information on workstations, servers, laptops, online accounts, and all other sources; and preservation of information in the custody of others that is subject to the obligee's direction or control." *Id.* at p. 2, n.1. But, a month later, on December 17, 2016, the Special Master expressed his approval with the USAO's proposed preservation directive, which he had helped to draft. Docket #298-1. The USAO was entitled to conclude that its efforts satisfied the Special Master's previous orders. At worst, there was a miscommunication, with the Special Master believing that the USAO had taken additional steps to preserve records and the USAO believing it had complied fully with his demands.

Testimony at the evidentiary hearing established that when CCA-Leavenworth produced the six hard drives containing 18 TB of video evidence to the United States Secret Service ["USSS"] in response to a grand jury subpoena, the USSS made a single copy of each of the six drives, retained the original drives in its vault, and produced the copied video evidence to the USAO. R.T. 860-63. Boyd initially retained the copy (the six hard drives) in her office. The video evidence contained on these drives could be viewed only with an external docking station to accept the drives and a propriety PELCO software viewer, which could be installed on a computer by use of an executable file. R.T. 980, 1041-42. Boyd testified that she did not store the video evidence itself on the "AVPC" computer that she used to view some of the video. R.T. 986. Although Stokes borrowed the necessary docking station and the single copy of the six hard drives, and installed the PELCO viewer on his laptop computer, he similarly testified that his agency did not make a copy of the video evidence itself. R.T. 65-69, 980-82, 1025, 1032.

Special Agent John Seubert of the USSS later retrieved the hard drives from Stokes's residence, R.T. 121, 135, and both the original and the single copy of the video evidence were produced to the Court as ordered. These six original hard drives and six copies were the only electronic storage devices where the video evidence was located. R.T. 861-63. In short, there was no violation of the Court's video clawback order and any sanction based upon a contrary conclusion would be erroneous.[5]

---

[5] The Court's erroneous finding that Boyd and Stokes retained additional copies of the video evidence cites to two passages in a transcript of a hearing in *United States v. Dertinger*, 14-20067-JAR on June 20, 2017. *See* Docket #758 at p. 30 nn. 96, 97. The cited testimony does not support the assertions that Boyd or Stokes made copies of the video evidence. Indeed, it would have been impossible to load 18 terrabytes of video evidence—an enormous amount of digital data—onto either the AVPC or Agent Stokes's laptop computer; six external 3 TB hard drives were needed to store this digital evidence, and a docking station was needed to connect the hard drives to a computer.

3.      **The Court's Conclusion that the USAO Willfully Violated its Audio Clawback Order Is Erroneous Because the Scope of the Order Was Not Clear.**

There was uncertainty in the USAO whether the Court's August 18, 2016 audio clawback order (Docket #113) pertained to only those recordings of outgoing CCA-Leavenworth inmate telephone calls that the USAO acquired in connection with the contraband smuggling investigation that resulted in the charges in *United States v. Black*, the case in which the Court issued the order, or instead to *all* such recordings in the government's possession.  R.T. 521-22; 1283-85; 1311, 2201-22; 2292-94; *see also* Docket #758 at p. 31 (noting that, at a meeting in the USAO to discuss the order, "there was not a consensus" how it should be interpreted).  There was reason to believe that the former, more limited reading was correct.  The order followed a hearing on August 16, 2016, in which the FPD requested the clawback order based on information that the government had produced to numerous defense attorneys representing clients in both the *Black* case and in related cases *recordings the government obtained in connection with the contraband-smuggling investigation,* which recordings allegedly included conversations between some inmates and their lawyers.  Docket #118 at pp. 12-25.  This raised the concern that certain defense attorneys had obtained potentially privileged recordings pertaining to inmates who were not their clients. Accordingly, the audio clawback order begins with "[u]pon hearing from the parties on August 16, 2016" and explains that "[t]he Government has disseminated or made available to counsel for the defendants, and others, discovery that contains audio recordings of attorney-client communications at CCA.  The discovery that contains audio recordings of attorney-client communication may be covered by the attorney-client privilege or otherwise confidential."  Docket #113 at p. 1.  Under these circumstances, there was good reason to believe that the Court's order pertained only to those recordings discussed at the hearing, namely those that the government had produced in discovery in the criminal case that was before the Court.  Indeed, language in the order

suggested exactly this. *See, e.g., id.* at pp. 2-3 ("In order to facilitate continued discovery production and review *in this case*, the Coordinating Discovery Attorney will assist defense counsel with the identification and removal of potentially privileged attorney client communications located on the 1 TB hard drives recently distributed by the government.") (emphasis added). And, although this Court's findings of fact cite to an internal government e-mail message from an uninvolved AUSA as evidence that the audio clawback order was interpreted within the USAO to apply more broadly, *see* Docket #758 at p. 31 ("On that same date, AUSA Carrie Capwell opined in an email to Tomasic that the Court's order could be broadly read to apply to all cases."), in fact, the author of that message expressed exactly the opposite conclusion. *See* Exhibit 1247 ("As to what she orders our office to do, it seems confined to the discovery that was collected and sent out in the *Black* case only.").

Thus, whether or not this Court intended the clawback order to apply more broadly, *see* Docket #758 at pp. 30-32, 132-33, 138-39, the scope of the order was not entirely clear. And, when disagreement surfaced in writing within the USAO about how to interpret the order, the Criminal Chief instructed the SAUSA assigned to the case to seek clarification from the Court. R.T. 2295; Exhibit 1174. Under these circumstances, it cannot be fairly said that there was a willful violation of a court order.[6] *See, e.g.*, *United States v. Saccoccia*, 433 F.3d 19, 26-28 (1st Cir. 2005) (explaining that a contempt sanction is not appropriate unless the order violated is "clear, definite, and unambiguous"); c*f. Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("Since an

---

[6] The Court's findings of fact and conclusions of law suggest that AUSA Debra Barnett, the USAO Criminal Chief at that time, understood that the audio clawback order should be read broadly because she reported to the Court on October 28, 2016 "that her office had 'put a lockdown' on information and records" beyond the *Black* case. Docket #758 at p. 139. But, this representation to the Court merely reflected what AUSA Barnett believed that her office had done, not how the Court's August 18, 2016 audio clawback order should be interpreted.

injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.").  And, on appeal, "any ambiguities or omissions in such a court order [are read to] redound to the benefit of the person charged with contempt." *NBA Properties, Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990) (internal quotation marks, bracketed language, and citations omitted).

   **4.    The Court's Determination of Willful Contempt in Connection with the Special Master's Interviews of USAO Employees Is Erroneous.**

   In its findings of fact and conclusions of law, the Court acknowledges that the Special Master "did not demand interviews" of USAO employees.  Docket #758 at p. 54.  Instead, according to the Special Master, he recalled that, in October 2016, "one of the first things I said to everybody I spoke with at the United States Attorney's Office, and most particularly [then United States Attorney] Tom Beall and -- and [then-Criminal Chief] Deb Barnett, was that I would like to speak with Erin Tomasic. I also mentioned Pauletta Boyd and I also mentioned Kim Flannigan, but primarily it was Erin Tomasic from the very first conversations I had with anybody." R.T. 2744. The Special Master described how he proceeded with respect to possible witness interviews: "I tried very hard to let it be known, everybody I spoke to, whether on the defense, on the government or former United States Attorneys, I told everybody I could in this town if anybody needs to talk to me, they should call me." R.T. 2750.  As Barnett recalled it, the Special Master had told her that "if there was anyone that wanted to talk to [him], that anyone could call [him] and talk to [him]." R.T. 2411.  Neither Beall nor Barnett recalled a specific request from the Special Master to interview then-SAUSA Erin Tomasic until February 2017.  R.T. 2319, 2450-51, 2559-60.

   In October 30, 2016, the Special Master sent an electronic mail message requesting assistance in creating an inventory of materials in the Court's vault, but this request did not include

a request for an interview of Tomasic, Boyd, or Flannigan.  Exhibit 1171.  Barnett made known to Tomasic, through AUSA Scott Rask, that she did not want Tomasic interacting with the Court or court personnel, including the Special Master on this inventory project, at that time.  Barnett did this because of concern whether Tomasic would be respectful, courteous, and polite.  R.T. 2321-22.  Barnett did not intend to prevent Tomasic from being interviewed.  R.T. 2402-03; 2413-15.

Without interference from the USAO, the Special Master interviewed Tomasic while she still was employed by the USAO, R.T. 770, 2746,[7] and also interviewed Boyd.  R.T. 1004.  The Special Master did not interview AUSA Flannigan because he questioned her during the *Dertinger* hearing.  R.T. 2746.[8]

Under these circumstances, where there was no clear demand from the Special Master for the USAO to produce these USAO employees for interviews, but instead merely a generalized expression of a desire to meet with them, and where the Special Master did interview two of the employees and apparently chose not to interview the third, there is insufficient evidence to support a finding of willful contempt.   As the Supreme Court reiterated in its most recent term, "civil contempt 'should not be resorted to where there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct.'"  *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801-02 (2019) (quoting "*California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)) (emphasis in

---

[7] The Court's finding that "Tomasic *finally* submitted to an interview with the Special Master in May 2017, *shortly after the USAO terminated her employment*," Docket #758 at 56 (emphasis added), is clearly erroneous.  Although the Special Master did interview Tomasic after she was terminated, R.T. 770-71, he originally interviewed her while she still worked at the USAO.  R.T. 770, 2746

[8] The Court's assertion that "[t]he Special Master *never was able* to interview Flannigan," Docket #758 at 141 (emphasis added), finds no support in the record.  Instead, the Special Master testified: "I think she ended up taking the stand [in the *Dertinger* hearing] and I asked her questions while she was on the stand at a hearing, and so I never met with her privately."  R.T. 2746.

*Taggart*).  "This standard reflects the fact that civil contempt is a severe remedy, and that principles of basic fairness require that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt." *Id.* at 1802 (citations, internal quotation marks, and brackets omitted).

>  **5.    The Court's Conclusion that the Government Committed Willful Contempt in its Document Production by Relying on AUSAs to Search Their Own Files, Not Using the Special Master's Search Terms, and Not Creating a Privilege Log Is Erroneous Because the Government Had No Obligation To Do These Things.**

The Court concluded that the government's voluminous production of documents to the Special Master on in September and October 2018 was contumacious because AUSAs who had been accused of misconduct were permitted to search for their own records; search terms that the Special Master had created with USAO assistance in 2017 were not used; and the government did not create a "privilege" log identifying documents that were not produced because authorization for such production was not forthcoming under 28 C.F.R. § 16.21 *et. seq.* (the "DOJ *Touhy* regulations").[9]  Docket #758 at pp. 141-42.   Because the government had no obligation to do any of these things, this conclusion is erroneous.

The government's September and October 2018 production of documents arose from a subpoena *duces tecum* that the Special Master issued to United States Attorney Stephen McAllister

---

[9] The Court's "Findings of Fact and Conclusions of Law" states that the government withheld production of some materials "on the basis of privilege, *Touhy*, and the Privacy Act." Docket #758 at p. 142.   To be clear, the government did not assert claims of privilege or advance statutory claims to the Court for its determination of their validity.  The DOJ *Touhy* regulations require *internal* consideration whether a privilege applies to demanded documents, 28 C.F.R. § 16.26(a)(2), and whether production would violate a statute, *id.* at 16.26(b)(1). Accordingly, the government's document production decisions, which were governed by its own internal application of the DOJ *Touhy* regulations, took into account whether there were potential privileges or statutory restrictions on disclosure.  Government counsel explained this in a letter to counsel for the Special Master, *see* Docket #697-1, Exhibit E ("We understand that the Department of Justice can assert privileges in this manner. But, as you know, the *Touhy* regulations provide

on August 17, 2018.  Docket #697-1, Exhibit A.  This subpoena did not make demands about the method to be used to produce documents and thus did not identify who should collect the documents, did not compel use of search terms,[10] and did not require creation of a "privilege log." In an exchange of correspondence described at Docket #697, pp. 26-27, and contained in Docket #697-1, Exhibits C, D, E, and F, the government explained that it was producing documents responsive to the subpoena voluntarily and that it had no obligation to produce a log reflecting documents it withheld based on the DOJ *Touhy* regulations, and would not do so.  The Special Master did not challenge the government on this and made no effort before the government's document production to seek an order requiring the creation of a log or placing any other restrictions on the method by which the government collected and produced documents.

It was only *after* the government produced the documents, *see* Docket #697-2, that counsel for the Special Master and the FPD first requested that the government be ordered to generate a "privilege log."  On November 21, 2018, this Court issued its "Final Production Order."  Docket #690.  This order demanded that the government, among other things, "[u]se the search terms negotiated with the Special Master to run a document search on the ProofPoint email archive system files and all other electronic repositories, individual or shared, of every current or former USAO employee who has testified at any hearing in this case"; "[s]earch all non-electronic repositories of every USAO current or former employee who has testified at any hearing in this case, using a team of neutral, uninterested searchers to accomplish all steps of the search"; and

---

for Department of Justice consideration of specified factors, including privilege, and internal decisions whether to authorize disclosure. Under that process, documents that are not authorized to be disclosed are neither identified nor presented to a court for decision."), and referred to this letter when explaining its document production to the Court.  R.T. 2793.

[10] Indeed, the Special Master later testified "that the subpoena *duces tecum* was broader than the search terms" he had developed with the USAO.  R.T. 2792.

"[p]roduce a production log for withheld information of any type, including identification sufficient to allow a reviewer to rule on the stated basis for withholding, including statutory or common-law privilege, Touhy authority, and/or any other category of justification that could allow exclusion from production in response to this Order."  Docket #690 at pp. 8-10.  But, the government thereafter made a timely motion for reconsideration of this order, arguing, among other things, that this Court lacks the authority to order the government to do these things.  Docket #697 at pp. 34-44; *see also* Docket #708.  In response, the Court rescinded the above-described aspects of its final production order.  Docket #713 at p. 36 ("Rather than compel further production at this time, the Court will prepare to close the record.").

Thus, both for the reasons described in the government's reconsideration motion— concerning the Court's lack of authority— and the Court's own rescission of its final production order, the government had no duty to create a "privilege log," use uninvolved employees to collect documents, or use specified search terms when making its voluntary document production.  The Court's contrary contempt conclusion is erroneous.

**D.    The Court Cannot Sanction the Government for Contempt Without Advance Notice and an Opportunity To Be Heard.**

Civil contempt sanctions can be imposed only "upon notice and an opportunity to be heard."  *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *see also F.T.C. v. Kuykendall*, 371 F.3d 745, 754 (10th Cir. 2004) ("[W]e apply the longstanding rule that in civil contempt proceedings all that is required to satisfy the Due Process Clause is that defendants be given reasonable notice and an opportunity to be heard.").

Here, the government did not receive advance notice that it had to defend against a contempt citation on the grounds identified by this Court in its Findings of Fact and Conclusions of Law.  Despite an FPD motion requesting that the Court "Order the government to show cause,"

Docket #301 at p. 1, the Court did not do so, leaving the government uncertain what conduct, if any, it was required to defend.  The FPD's "show cause" motion and two supplemental motions did not rectify this deficiency.  In its show cause motion, Docket #301, the FPD focused principally on a report of the Special Master entitled "First Status Report Regarding Phase III Investigation," (Docket #298) that described the government's decision, based on the DOJ *Touhy* regulations, to provide only some of the information that the Special Master had requested from the USAO. Docket #301 at p. 2 ("Now the Special Master's October 20, 2017 Report laid to rest any doubt about the government's obstructive delay tactics, and that these tactics have violated the Court's Orders.").  But, in its findings of fact and conclusions of law, this Court correctly refrained from determining that this government conduct, made in accord with the DOJ *Touhy* regulations and fully explained to the Special Master, Docket #298-9, was contumacious.

The FPD show cause motion also identified the USAO reformatting the AVPC as a ground for contempt, Docket #301 at pp. 4-5, but this was done on September 6, 2016, the day *before* the Court issued an oral order preserving evidence that may have been located there, R.T. 1115-16, undermining any basis for a contempt sanction.  And, for other reasons, the Court expressly rejected the contention that the remote reformatting of the AVPC was contumacious.  Docket #758 at pp. 129-32.  Otherwise, the FPD show cause motion offered only generalized vitriolic complaints without providing either factual support or specific allegations.  *See, e.g.*, Docket #301 at p. 1 ("refusal to cooperate with the Special Master in a faithful and timely manner"); p. 3 ("the USAO's long-term dissembling and desultory conduct intended to deter and mislead the Court-ordered investigation"); p. 5 ("[t]he USAO's dissembling and delay continue unabated").  The FPD's first supplemental show cause motion did not provide any notice; it addressed only relief. Docket #585 ("With this supplemental motion, we amend our remedy request to ask the Court to

assess defense costs to the Government.").  The FPD's second supplemental show cause motion only asked the Court to take certain matters into account when deciding the FPD's two previous show cause motions.  Docket #668.

Accordingly, the government was denied the required notice and/or an opportunity to be heard with respect to all of the grounds on which the Court found it in contempt.  For example, there was neither notice nor an opportunity to be heard with respect to the Court's conclusion that the government committed contempt by not timely complying with the Court's August 15, 2018 preservation order and certain non-rescinded aspects of its November 21, 2018 Final Production Order.  The same is true with respect to the contempt citation based on the government's method of making document production in September and October 2018.  Without the required notice and opportunity to be heard, no contempt sanction should issue.

**E.    The FPD Has Not Shown that Any Party Properly in this Case Incurred Attorneys' Fees or Expenses.**

In granting the government's petition for a writ of mandamus in part, the Tenth Circuit limited this matter "to defendants before the court in *United States v. Black*, No. 16-20032-JAR, and to other parties in *Black* who have filed Rule 41(g) motions in that proceeding."  *In Re United States*, 18-3007 (10th Cir. Feb. 26, 2018).  Consequently, if this Court has authority to compel the government to make compensatory payments of attorney's fees and expenses, it is only with respect to persons within the two class that the Tenth Circuit identified (indicted Black defendants and persons who filed Rule 41(g) motions in *Black*).  *See Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) ("As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.") (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  A party seeking judicial relief "must assert his own

legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 499. Indeed, "[a]bsent a plaintiff with constitutional standing, federal courts lack jurisdiction." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013). Indeed, this Court acknowledged that "to impose a sanction of fees and costs under the Court's inherent authority, there must be a 'but-for' causal link between the litigant's bad conduct and *the legal fees incurred by the opposing party*." Docket #758 at p. 144.

The FPD is an attorney in this litigation, not an opposing party—it has no attorney-client privilege or Sixth Amendment rights—but it has steadfastly refused to identify by name any client whom it represents who is within one of the classes of persons that the Tenth Circuit identified in its mandamus order. The FPD did not represent any of the indicted defendants, and its return of property motions, Docket #82; Docket #85, did not identify a single client who sought a return of property based on an alleged constitutional violation or deprivation. Rather, it merely alleged that "two of our clients were named in the body of the complaint [in *Black*], Robert Buress and Jermaine Rayton," and that "[w]e currently represent about 75 clients who are housed at CCA pending trial or sentencing." Docket #85 at p. 2. The FPD conceded that it no longer represented Burress, *id.* at p. 2 n.4, and, to date, has not alleged, much less established that a soundless video or recorded telephone call with legal counsel involving either of these named inmates was acquired by the government.

Thus, it is predictable that the FPD's application for attorneys' fees and litigation expenses does not identify any "party" within the classes of persons identified in the Tenth Circuit's mandamus order who is entitled to relief. Docket #784. The FPD has no right to recover fees on its own or on behalf of inmates with no standing in *Black*, such as § 2255 movants. *Cf. People of State of N.Y. by Vacco v. Operation Rescue Nat.*, 80 F.3d 64, 71–72 (2d Cir. 1996) (holding that

State of New York lacked standing to recover fees resulting from contempt sanction). Accordingly, unless the FPD identifies a party whom the Tenth Circuit recognized as properly involved in this litigation by virtue of having filed a Rule 41(g) motion, its application should be denied in full.

**F.      The FPD's Application for Fees and Expenses Is Predicated on Conduct that the Court Did Not Find To Be Contumacious.**

In its "Findings of Fact and Conclusions of Law," this Court rejected the FPD's previous request for sanctions "because the FPD did not address the causation showing required for misconduct tied to the Government's preservation and production obligations."  Docket #758 at 145.  The Court made clear that any recovery here "must be based upon the [FPD's] actual losses sustained as a result of the contumacy."  Docket #758 at p. 144 (quoting *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992)).

In its application, the FPD makes no effort to comply with the Court's directive.  It does not establish "but-for" causation between any contumacious conduct that the Court identified—as described in the Court's Findings of Fact and Conclusions of Law and summarized in Section A, pages 1 and 2, above—and any of the attorney's fees and expenses it seeks to recover.  Instead, the FPD seeks recovery for attorneys' fees and expenses that are not casually linked to Court-identified contempt of court, and further argues that it is entitled to recover *all* of its fees and expenses, a position directly at odds with this Court's directive to the FPD in its "Findings of Fact and Conclusions of Law."

The FPD's application essentially ignores the Court's very specific and detailed findings and conclusions regarding contempt.  It does not explain, for example, how Court-perceived deficiencies in the USAO's December 19, 2016 preservation directive caused the FPD to expend additional attorney time or incur litigation costs.  Nor does the FPD's application describe how the

USAO's purported failure to fully comply with the Court's audio and video clawback orders required it to expend additional attorney time or incur costs. Similarly, the FPD does not endeavor to show entitlement to compensation because of delay in the Special Master's interviews of Tomasic and Boyd, or what resources it expended because the government did not use the Special Master's search terms when it collected documents for production to the Special Master, or because the USAO had AUSAs accused of misconduct cull their own records.

Any reasonable effort to comply with the Court's instructions would have begun with each instance of Court-identified contumacious conduct and described the litigation fees and expenses that flowed from it. The FPD does nothing like this. Instead, it reiterates generalized complaints about the government and identifies attorney's fees and expenses that are unrelated to the government conduct found to be contumacious, including some costs that it incurred *after* the conduct about which it complains. Essentially the FPD protests having to expend effort because the government chose to litigate, rather than concede, the FPD's still-unproven claims that any person involved in this litigation suffered a Sixth Amendment violation.

Specifically, the FPD seeks sanctions in connection with its alleged expenditure of time and money in connection with the following:

**1. The reformatting of the AVPC:** In seeking attorney's fees and expenses based on the reformatting of the AVPC, including its costs in preparing a discovery motion (Docket #573), Docket #784 at p. 8, the FPD ignores that this Court determined that this event was not proven to be contumacious. Docket #758 at p. 132 ("Thus, spoliation sanctions are not available under Rule 37(e) for the destruction of information on the AVPC on this record."). Indeed, proof of willful contempt in connection with the AVPC reformatting would not be possible because, in addition to the reasons upon which the Court relied, the reformatting occurred the day *before* the Court issued

an oral preservation directive concerning data on the AVPC hard drives, and, in any event, the reformatting was done remotely as part of a pre-scheduled process initiated by a USAO employee unfamiliar with this litigation, R.T. 1091-92, 1114-19, not in willful contempt of a court order.[11]

**2.  The Recorded Inmate Telephone Calls:** The FPD seeks recovery for its factual research and motion practice to identify and obtain recordings of inmate telephone calls that had been produced to the government.  This includes the FPD's work culminating in its presentation of testimony and exhibits on this topic at an evidentiary hearing in October 2018.  *See, e.g.*, Exhibits 562 and 562A. It argues entitlement to this recovery because the government had not by then produced recordings of inmate telephone calls in its possession to the FPD.  Docket #784 at pp. 8-9.  But, the government was under no obligation to do this until two months later, when, with government agreement, the Court issued an order in December 2018.  Docket #705.  (The government has complied with that order.  Docket #764; #787.)  The FPD's application does not explain why it is entitled to compensation for the government not having produced the inmate telephone call recordings before October 2018 when it had no duty to do so, when the FPD had not then asked it to do so, and when the Court did not identify in its findings and conclusions any contumacious conduct related to the government's production of the recordings.

The FPD also seeks to recover for its discovery motion to obtain inmate recordings from the USAO (Docket #572), and for a reply to government response to that motion (Docket #588), Docket #784 at pp. 9, 12, but does not identify allegedly any contumacious conduct that made this litigation necessary.  Despite a contrary suggestion in the FPD application, there was no broken government promise "to resolve pending Rule 41(g) motions by turning over audio recordings to

---

[11] All of the expenses that the FPD seeks are based on payments to its computer forensics witness at the evidentiary hearing, Tami Loehrs, whose work and testimony pertained only to the FPD AVPC claim.  Consequently, there is no basis to award the FPD any of its request for expenses.

the FPD."  Docket #784 at p. 9.  Instead, the government notified the Court that it "does not oppose *the Court* granting the movants the relief provided in Rule 41(g) by delivering any such recordings to the movants, as sought by their motions, through their respective counsel."  Docket #399 (emphasis added).  This was an expression of non-opposition concerning recordings in the Court's possession, not the government's.  And, when the FPD later filed its discovery motion seeking recordings in the government's possession, the government agreed to work with the FPD to provide recordings that the government possessed.  The government's principal response said this: "The government advises the Court that the parties are in negotiations with respect to both of the Federal Public Defender's motions and that the government may voluntarily produce some or all of the requested information and documents even though there is no legal basis for the FPD's motions. Accordingly, the government respectfully requests that the Court hold the motions in abeyance pending completion of negotiations."  Docket #587 at pp. 1-2.[12]  When the matter came before the Court, it noted that "[t]he parties informed the Court of their progress in resolving the matter by agreement."  Docket #705.  In short, the FPD has not and cannot show that the research it conducted to identify recorded inmate telephone calls in the government's possession and its litigation efforts to obtain these recordings were caused by any contumacious government conduct.

**3.  The *Touhy* Regulations:**  The FPD seeks to recover for its filing of a December 2017 motion to quash (Docket #357); a January 2018 memorandum regarding privilege (Docket #385); and a September 2018 memorandum regarding the *Touhy* regulations (Document #622), all

---

[12] The government's response explained that if the Court was disinclined to hold the motion in abeyance during negotiations, it should "deny [it] because there is no legal basis for [it] and [it was] are contrary to Rule 16 of the Federal Rules of Criminal Procedure, or, at the minimum, require the FPD to provide a legal basis for the information and documentation that it seeks." Docket #587.  This was consistent with the government's earlier expression of its non-opposition to the Court's production to the Rule 41(g) movants of the clawed-back recordings.

because the government did not produce a "*Touhy* log" in connection with its September and

October 2018 document production.[13]  (Docket #784 at pp. 10-11).  But the FPD created and filed

all of those documents *before* the FPD first requested that the log be created, which request

occurred on October 12, 2018.  R.T. 2480.[14]  The FPD cannot show necessary but-for causation

when the government conduct about which it complains (the non-compliance with FPD request

for a *Touhy* log) occurred only *after* the expenditures for which it seeks compensation (its three

identified pleadings).  Apparently aware of its flawed reasoning, the FPD also recounts that some

DOJ employees were not authorized to disclose information in response to some questions posed

to them during hearings in May and October 2018.[15]  But, this has no relevance.  The Court

correctly refrained from holding these USAO employees in contempt for complying with the DOJ

*Touhy* regulations.  *See In re Boeh*, 25 F.3d 761, 766 (9th Cir. 1994) ("We conclude that, in the

absence of a direct challenge to the Attorney General's decision to withhold permission and a

ruling that permission was improperly withheld, Boeh cannot be held in contempt for refusing to

testify without permission, pursuant to 28 C.F.R. § 16.22(a).") (footnote omitted).

---

[13] There was no finding that the government's filing of the motion to quash was contumacious. Docket #372, #758.

[14] And, as explained above, pp. 21-22, although the Court issued a written order for the government to create such a log, Docket #690, it rescinded that order soon thereafter.  Docket #713.

[15] The FPD application refers to "[t]he Government repeatedly assert[ing] the *Touhy* doctrine"; and "ma[king near blanket *Touhy* objections"; and to government witnesses "invok[ing]" *Touhy*." Docket #784 at p. 11.  This misstates what occurred.  As government counsel explained at the evidentiary hearing and in a filed pleading, Docket #466, under federal regulations "unless authorized to do so, a subpoenaed DOJ employee (present or former) lacks authority to disclose information within the ambit of the *Touhy* regulations, even when demanded by subpoena or court order."  *Id.* at p. 4.  Thus, at times in this litigation, DOJ employees have explained that they lacked authorization to make testimonial disclosures about matters governed by the DOJ *Touhy* regulations or to produce documents governed by those regulations.  The Tenth Circuit has long held that the DOJ *Touhy* regulations are "valid."  *United States v. Allen*, 554 F.2d 398, 406 (10th Cir. 1977).

**4.   The FPD's Show Cause Motions:** As explained above, these FPD motions (Docket #301 and #585) focused on government conduct that was not found to be contumacious: the reformatting of the AVPC, which occurred the day before the Court orally ordered preservation of the data on it, and which the Court found had not been proven to be contumacious, Docket #758 at p. 132 ("Thus, spoliation sanctions are not available under Rule 37(e) for the destruction of information on the AVPC on this record."); and the government's *Touhy*-based compliance with only some of the document production requests that the Special Master submitted to United States Attorney Beall in July 2017, Docket #298-7; #298-9, which the Court also correctly refrained from finding to be contumacious.  *See Edwards v. United States Dep't of Justice*, 43 F.3d 312, 317 (7th Cir. 1994) ("*Touhy* is part of an unbroken chain of authority that supports the Department's contention that a federal employee cannot be compelled to obey a subpoena, even a federal subpoena, that acts against valid agency regulations.").   In short, there is no causal connection between *any* contumacious conduct identified by the Court and the FPD's creation and filing of show cause motions.

**5.   The October 2018 Hearing:**  The FPD also seeks to recover unspecified fees and expenses in connection with an evidentiary hearing in October 2018.  Docket #784 at 12.  The FPD refers cryptically to "these issues [that were] litigated before the Court in an evidentiary hearing over three days in October 2018," *id.*, without specifying which issues or citing to a hearing transcript. The FPD asserts that this hearing was "an attempt to gain the information the USAO should have provided under its duty to cooperate under the Court's orders," *id.*, without identifying the information that it claims was withheld, the Court orders that it claims were violated, or any conduct that the Court found to be contumacious.  Instead, it refers only to the "Government's

general failure to cooperate." *Id.* at p. 11.  This falls well short of satisfying this Court's directive

for the FPD to identify fees and expenses caused by identified contumacious conduct.[16]

---

[16] Apparently aware that it is unable to establish a causal connection between the conduct that the Court identified as contumacious and its claimed entitlement to attorneys' fees and expenses, the FPD, relying on *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), argues that it is entitled to recover for all of its legal work in this litigation.  Docket #784 at pp. 5-7.  It does so despite the Court's determination that the FPD is entitled to recover only those attorneys' fees demonstrated to have resulted from the violations that the Court determined the government to have committed.

In any event, *Chambers* has no application here.  After agreeing to sell a local television station, its facilities, and broadcast license to NASCO, Chambers later changed his mind. 501 U.S. at 35-36.  Aware that NASCO planned to file a lawsuit on the following Monday, Chambers spent the weekend creating a shell trust and arranging a sham sale of the property.  Chambers's attorney intentionally concealed this conduct from the district court judge. 501 U.S. at 36-37.  Chambers later violated a preliminary injunction, resulting in a contempt sanction that he unsuccessfully appealed twice. *Id.* at 38.  "Undeterred, Chambers proceeded with a series of meritless motions and pleadings and delaying actions." *Id.* at 38 (internal quotation marks and citation to the lower court's decision omitted).  This included seeking to improperly depose a witness. *Id.*

Just before trial, Chambers and his corporate entity stipulated that the purchase agreement was enforceable and that Chambers had breached it.  He then raised a meritless defense at trial. *Id.* at 38-39.  Before entry of judgment, "Chambers sought to render the purchase agreement meaningless by seeking permission from the FCC to build a new transmission tower for the station and to relocate the transmission facilities to that site, which was not covered by the agreement."  When NASCO filed a contempt motion, he abandoned this strategy. *Id.* at 39.  After judgment was entered in NASCO's favor, Chambers tried to frustrate transfer of a license for the station until again threatened with contempt. *Id.*  He later made other efforts to frustrate the plaintiff. *Id.*

The Court of Appeals rejected Chambers's appeal as frivolous. *Id.* at 40.  It awarded the plaintiff appellate costs and remanded to the district court to fix the amount of those costs and to determine whether to impose further sanctions. *Id.*  The district court, exercising its inherent power, ordered Chambers to pay the full amount of NASCO's attorney fees.  This order was affirmed on appeal. *Id.* at 41-43.  Upon its further review, the Supreme Court concluded that "[b]ased on the circumstances of this case, we find that the District Court acted within its discretion in assessing as a sanction for Chambers' bad-faith conduct the entire amount of NASCO's attorney's fees." *Id.* at 55.

*Chambers* has no application here.  Chambers actively mislead the district court about efforts to frustrate the plaintiff's lawsuit and vigorously abused legal process in order to prevent recovery on a claim against which Chambers had no viable defense.  In contrast, here the government has defended against still-unsubstantiated allegations of Sixth Amendment violations, has made considerable efforts to comply with the numerous expansive orders of the Court and

G.    **Sovereign Immunity Bars This Court From Ordering the Government To Pay Attorneys' Fees and Expenses.**

"Except to the extent it has waived its immunity, the Government is immune from claims for attorney's fees." *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685 (1983). "Waivers of immunity must be construed strictly in favor of the sovereign," *McMahon v. United States*, 342 U.S. 25, 27 (1951), and not "enlarge[d] . . . beyond what the language requires." *Eastern Transp. Co. v. United States*, 272 U.S. 675, 686 (1927)." *Id.* at 685-86. "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citations omitted).

The FPD relies exclusively on the Tenth Circuit's decision in *Adamson v. Bowen*, 855 F.2d 668 (10th Cir. 1988), to argue that there has been a waiver of sovereign immunity here. Docket #784 at p. 23 & nn.103, 104.   This is wrong.

In *Adamson*, a district court, relying on the sanctions provision in Rule 11 of the Federal Rules of Civil Procedure, ordered the Secretary of the United States Department of Health and Human Services to pay attorney's fees to a disabled beneficiary who had successfully challenged in federal district court the government's rejection in earlier administrative proceedings of his request for disability benefits. *Id.* at 670.  On appeal, the Tenth Circuit concluded that "the district court did not abuse its discretion by concluding that the agency's [administrative ruling denying

---

Special Master despite legitimate concerns about their legality, and has voluntarily made voluminous document production to the Special Master and FPD.  Even if all of the Court's findings of government misconduct were correct (which they are not), they would demonstrate that this case is far different than *Chambers*.  Here the Court found, rightly or wrongly, that the government's preservation efforts were tardy and less thorough than expected by the Court and Special Master; that its compliance with the Court's clawback orders was incomplete; that aspects of its collection and production of documents were unsatisfactory; and that it postponed the Special Master's interviews of some of its employees.  This hardly qualifies for a response like the one in *Chambers*.

benefits] was so lacking in evidentiary support that the Secretary should have conceded the merits of Adamson's complaint [in the district court]." *Id.* at 674. The government argued, however, "that imposing monetary sanctions against [the Secretary] under Fed. R. Civ. P. 11 violates the federal government's sovereign immunity." The *Adamson* Court, however, held that the government had waived sovereign immunity with respect to a grant of attorney's fees under Rule 11 by the enactment of the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412 (1981), which makes the government liable for "reasonable fees and expenses of attorneys . . . to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." *Id.* at § 2412(b). The *Adamson* Court reasoned that the legislative history of the EAJA supports this outcome because "Section 5 of the original EAJA" repealed former Rule 37(f) of the Federal Rules of Civil Procedure, a rule that previously barred discovery sanctions against the government. *Id.* at 670-71. The *Adamson* Court explained that:

> We believe that Congress through § 5 manifested its broader intent that the United States be subject to fee sanctions under all of the federal rules to the same extent as private parties: Because old Rule 37(f) contained the only specific bar to such sanctions to be found in the Federal Rules of Civil Procedure, it was the only rule the EAJA needed to address specifically.

*Id.* at 671.

Even if the EAJA is read to waive the government's sovereign immunity with respect to sanctions imposed against the government under a district court's inherent authority (as opposed to under Rule 11 or another federal rule of civil procedure), *Adamson*—which makes clear that any waiver of sovereign immunity in this context is based on 28 U.S.C. § 2412(b)—does not assist the FPD. This is so for two independent reasons.

First, § 2412(b) has no application here because it permits a district court, in certain circumstances, to award "reasonable fees and expenses of attorneys, in addition to [certain] costs"

only to "*the prevailing party* in any civil action brought by or against the United States . . . ." (emphasis added). This provision indisputably distinguishes between "attorneys"—those who may earn "reasonable fees"—and a "prevailing party"—the only person who is entitled to recover "reasonable fees and expenses of attorneys" under the EAJA in a civil action involving the United States.

But here no "prevailing party" has sought attorneys' fees. As noted above, the FPD has steadfastly avoided identifying the "party" whom it represented in its Rule 41(g) motion and for whom it now claims entitlement to attorneys' fees and expenses. Rather, it is the FPD itself— clearly an "attorney," not a "party" under the express terms of the EAJA—who seeks to have the Court order the government to make payment for the FPD's fees and expenses, and further seeks that they be paid, not to a "prevailing party," but instead to some unspecified entity or agency to be designated by the Administrative Office of United States Courts. Docket #784 at p. 25. The EAJA does not provide for such payments to a non-party.[17] Because the EAJA—which, under *Adamson*, is the sole basis for a waiver of sovereign immunity with respect to an attorney's fees award against the government—has no application here, there has been no waiver of sovereign immunity. Consequently, this Court is foreclosed from directing the government to pay any attorneys' fees or expenses.

---

[17] Because the Criminal Justice Act, 18 U.S.C. § 3006A, provides government funding for indigent representation by the FPD, the FPD does not charge its clients for attorneys' fees or expenses. As a result, even if there had been an identified "prevailing party" here, one who had been represented by the FPD, it is doubtful that the EAJA would permit an award of attorneys' fees or expenses to that party. Here, however, the problem is not just that a prevailing party did not have to pay attorney's fees and expenses; instead, there is no "party" at all and the FPD seeks to have the government be compelled to make payment to an unidentified organization or entity that was not involved in the litigation.

Second, § 2412(b) of the EAJA applies only in a "civil action."  This matter—*United States v. Black/Carter*—is undoubtedly a criminal action, initiated by criminal complaint and grand jury indictment, and docketed as a criminal case.  Even if some aspects of the FPD's Rule 41(g) motion merit treatment under civil, not criminal rules, such as the notice of appeal timing requirements and the burden of proof, this did not alter the essential nature of the underlying "action," which remains a criminal case.  Because Section 2412(b) also is inapplicable for want of a "civil action" and there is no statutory or other basis for finding a waiver of sovereign immunity under the circumstances present here, s*ee United States v. Horn*, 29 F.3d 754, 766 (1st Cir. 1994) (holding that "sovereign immunity forecloses the imposition of monetary sanctions against the federal government in criminal cases"), the FPD's application must be denied.

**H.    The Appropriations Clause Bars This Court From Ordering the Executive Branch To Pay Attorneys' Fees and Expenses at the Direction of the Administrative Office for Federal Courts.**

The Appropriations Clause of the Constitution, Art. I, § 9, cl. 7, provides that: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  In *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414 (1990), the Supreme Court explained that the purpose of this clause "is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good."  *Id.* at 428.   Accordingly, "it would be most anomalous for a judicial order to require a Government official . . . to make an extrastatutory payment of federal funds."  *Id.* at 430.  But, this is exactly what the FPD proposes here, to have this Court issue an order requiring funds that Congress appropriated to the Department of Justice to be transferred to some now unidentified entity at the direction of the Administrative Office of United States Courts, a component of the federal judiciary.  A federal court cannot order that funds appropriated to DOJ be transferred to itself or to an arm of the federal judiciary.  *See, e.g.*, Eric

Blumenson & Eva Nilsen, *A Separation of Powers Objection*, Crim. Just., WINTER 1999, at 9 ("[T]he Appropriations Clause ensures that government income cannot be spent until a specific congressional appropriation releases it.").

**I.**     **If This Court is Inclined to Order Payment of Attorneys' Fees and Expenses, the Government Requests an Evidentiary Hearing to Determine the Amount of Damages Causally Related to Conduct the Court Found To Be Contumacious and Persons Within the Scope of the Tenth Circuit's Mandamus Order.**

The FPD's application and supporting exhibits, as well as its earlier motion for costs, Docket #585, raises questions about the FPD's calculation of attorneys' fees. Three concerns are described below. Because of this uncertainty, the government requests that if the Court is inclined to order the government to pay any attorneys' fees, the government be permitted to examine the relevant members of the FPD's staff at an evidentiary hearing.

First, the government has concerns about the accuracy of Exhibit 2 to the FPD's supporting materials. Docket #784-2. This document purports to allocate documented FPD attorney time to specific pleadings or tasks that the FPD claims were caused by the government's contumacious conduct. The government has reason to inquire into the methodology that the FPD used to allocate time as indicated on Exhibit 2, in part because of what appears to be a grossly inflated allocation of attorney hours to the preparation of Docket #585, the FPD's "Supplemental Motion to Show Cause." Both the FPD's application and the supporting documentation assert that the FPD expended 32.9 hours on this document. But, the body of this "show cause motion" is less than two pages in length (the full motion, including the caption and signature block, is less than three pages long). The motion does nothing other than generally request that the government pay the FPD certain costs because of alleged government contempt (that is not described in the motion). The motion cites only to three easily-accessed legal authorities: a civil procedure rule, a Supreme Court decision, and a Tenth Circuit decision. Docket #585. It does not reflect any additional legal

research or analysis or any factual investigation. But, Exhibit 2 in support of the FPD's application for attorneys' fees asserts that the following attorneys worked the following hours on this short pleading: FPD Brannon: 10.9 hours; AFPD Redmond: 10.4 hours; AFPD Federico: 6.3 hours; and AFPD Bell: 1.3 hours, which hours purportedly included factual research by each of these four lawyers. The government does not allege intentional misconduct by the FPD in this request for 32.9 hours of compensation for this document, but notes the obvious: that it is inconceivable that any competent law office would need to devote that many hours and four attorneys to draft this simple and short document. This suggests that there may be a flaw in the methodology the FPD used to compute attorney time, which merits examination at a hearing.

Second, there are questions about whether the tasks that the FPD has identified—especially, but not only, research done to identify those recordings of inmate telephone calls to attorney telephone numbers that the government obtained—were done to represent a person whom the Tenth Circuit's mandamus order determined was properly before the Court, or instead were done on behalf of potential or actual § 2255 movants. The FPD essentially acknowledges that the work it attributes to government misconduct was, in fact, done for the benefit of § 2255 movants. Specifically, in Docket #585, the FPD demands costs from the government, arguing that "[r]ecent events threaten much higher costs . . . . Because of the failed negotiations, the FPD has filed approximately 50 separate 28 USC § 2255 petitions, and plan to file more as the evidence develops and time permits." Similarly, in Docket #784, the FPD quotes the following passage from this Court's Findings of Fact and Conclusions of Law, but on its own adds the bracketed reference to "§ 2255": "[t]his 'wholesale strategy to delay, diffuse, and deflect' has cost the FPD substantial time and resources, but, more importantly, it has successfully denied "the individual [§ 2255] litigants their day in court for almost

three years." Docket #784 at p. 6 (quoting Docket #758 at p. 7) (bracketed language in Docket #784).

Even if this Court were to determine that the government should be required to pay attorneys' fees, it cannot force it to pay for attorneys' fees related to the FPD's representation of § 2255 claimants who are not shown to be within the classes that the Tenth Circuit identified as properly before the Court in this case and thus who cannot be a "prevailing party" under the EAJA. Accordingly, in the event of any award of attorneys' fees at all, an evidentiary hearing will be needed to investigate this allocation issue as well.

Third, if the Court is inclined to award attorneys' fees, it should not do so for any fees alleged to have been incurred after February 26, 2018. On that date, the USAO notified the Court that "[t]he government does not oppose the Court granting the movants the relief provided in Rule 41(g) by delivering any such recordings to the movants, as sought by their motions, through their respective counsel." Docket #399. Because, on that date, the government expressed its non-opposition to all that any Rule 41(g) movant properly in this case could obtain under Rule 41(g), government conduct cannot be the but-for cause of any attorney's fees or litigation expenses incurred thereafter. *See Goodyear Tire and Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1184 (2017) ("We hold that such an order is limited to the fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith.").

## J.     Conclusion

For the reasons stated above, this Court should correct the errors in its Findings of Fact and Conclusions of Law and deny in full the FPD's application for attorneys' fees and expenses. If the Court is inclined to award attorneys' fees and expenses, the government

requests an evidentiary hearing as to the amount of those fees and expenses and asks that

there be no award for attorneys' fees incurred after February 26, 2018.


Respectfully submitted this 15th day of October, 2019.


Steven D. Clymer
Assistant United States Attorney
Special Attorney for the United States
NDNY Bar Roll # 509281

United States Attorney's Office
Northern District of New York
900 Federal Building
100 South Clinton Street
Syracuse, NY 13261
(v) 315-448-0672
(f) 315-448-0658

**Certificate of Service**

I hereby certify that on the 15th day of October, 2019, the foregoing was electronically filed with the clerk of the court for the District of Kansas using the CM/ECF system, which will send a notice of electronic filing to all counsel.

*S/Deanna Lieberman*
Deanna Lieberman
Paralegal Specialist
United States Attorney's Office
Northern District of New York